**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------- x

In re:

JOANN INC., *et al.*,[1]

     Debtors.

-------------------------------------------------------- x

:   Chapter 11

:   Case No. 24-10418 (_____)

:   (Joint Administration Requested)

:

:

:

**DECLARATION OF DAVID SALEMI IN**
**SUPPORT OF THE DEBTORS' DIP MOTION**

I, David Salemi, hereby declare as follows:

1. I submit this declaration (this "***Declaration***") in support of the *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "***Motion***").[2]

2. I am a Managing Director in the Financial Restructuring Group at Houlihan Lokey Capital, Inc. ("***Houlihan***"), an investment banking and financial advisory firm. I am based out of Houlihan's New York office, located at 245 Park Avenue, 20th Floor, New York, New York 10167.

---

[1] The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, OH 44236.

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion.

3.     Except as otherwise indicated, the statements in this Declaration are based on: (a) my personal knowledge of the Debtors' operations and finances; (b) my review of relevant documents; (c) information provided to me by employees of Houlihan working under my supervision; (d) information provided to me by, or discussions with, members of the above-captioned debtors' (collectively, the "***Debtors***") management team, other employees, or the Debtors' other advisors; (e) records kept in the ordinary course of business by the Debtors and provided by the Debtors or their representatives to Houlihan; and/or (f) my views and belief based upon my experience as a restructuring professional.  I am authorized to submit this Declaration. If called upon to testify, I can and will testify competently as to the facts set forth herein.

## BACKGROUND & QUALIFICATIONS

4.     Houlihan is an internationally recognized investment banking and financial advisory firm, with offices worldwide and more than 2,500 professionals.  Houlihan is a leader in providing investment banking and financial advisory services to debtors, unsecured and secured creditors, acquirers, and other parties in interest involved with financially troubled companies. Houlihan has been retained to provide investment banking and financial advisory services in some of the largest restructurings in the United States, including: *In re MVK Farmco LLC*, Case No. 23-11721 (Bankr. D. Del. Oct. 13, 2023); *In re David's Bridal, LLC*, Case No. 23-13131 (Bankr. D.N.J. Apr. 16, 2023); *In re Sungard AS New Holdings, LLC*, Case No. 22-90018 (Bankr. S.D. Tex. Apr. 11, 2022); *In re Bristow Group Inc.*, Case No. 19-32713 (Bankr. S.D. Tex. May 11, 2019); *In re PHI, Inc.*, Case No. 19-30923 (Bankr. N.D. Tex. Mar 14, 2019); *In re Walter Investment Management Corporation*, Case No. 17-13446 (Bankr. S.D.N.Y. Nov. 30, 2017); *In re Seadrill Limited*, Case No. 17-60079 (Bankr. S.D. Tex. Sep. 12, 2017); *In re Westinghouse Electric Company LLC*, Case No. 17-10751 (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Roust Corporation*, Case No. 16-23786 (Bankr. S.D.N.Y. Dec. 30, 2016); *In re Sports Authority Holdings, Inc.*, Case

No. 16-10527 (Bankr. D. Del. Mar. 2, 2016); *In re Relativity Fashion, LLC* (a.k.a. Relativity Media), Case No. 15-11989 (Bankr. S.D.N.Y. Jul. 30, 2015); *In re RadioShack Corporation*, Case No. 15-10197 (Bankr. D. Del. Feb. 5, 2015); *In re Caesars Entertainment Operating Company, Inc.*, Case No. 15-01145 (Bankr. N.D. Ill. Jan. 15, 2015); *In re Entegra Power Group LLC*, Case No. 14-11859 (Bankr. D. Del. Aug. 4, 2014); *In re Premier International Holdings Inc.* (a.k.a. Six Flags Theme Parks), Case No. 09-12019 (Bankr. D. Del. June 13, 2009); *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (Bankr. D. Del. Jan. 22, 2008); *In re Conseco Inc*, Case No. 02-49672 (Bankr. N.D. Ill. Dec. 17, 2002); *In re WorldCom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002); and *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001).

5.     I have approximately twenty-four (24) years of investment banking experience, entirely at Houlihan.  Since joining Houlihan in 1999, I have provided investment banking expertise and financing advice, including with respect to postpetition debtor-in-possession financing, to companies, lenders, and other parties-in-interest, related to companies both in and outside of chapter 11.  My restructuring experiences include the representation of distressed companies, debtors, creditors and other significant stakeholders in a number of complex financial restructurings, including, without limitation, the following: Six Flags, Ahern Rentals, Inc., Magnum Hunter Resources Corp., Payless Holdings, LLC, Constellation Healthcare Technologies, Inc., and Hollander Sleep Products, LLC.

## HOULIHAN RETENTION

6.     Houlihan has been serving as the Debtors' financial advisor since October 12, 2022, providing financial advisory and investment banking services in connection with assessing strategic alternatives to manage liquidity, raise additional capital, and delever the balance sheet.

31441483.1

7.     Through its prepetition services to the Debtors, Houlihan has developed valuable institutional knowledge regarding the Debtors' operations and capital structure.  In providing these prepetition services Houlihan professionals have worked closely with the Debtors' management and other professionals and have become well-acquainted with the Debtors' businesses and operations, debt structure, creditors and related matters, including by (1) working cooperatively with the Debtors' other professionals to explore various strategic alternatives; (2) reviewing the Debtors' business plan and operating assumptions; (3) reviewing the Debtors' debt and capital structure; (4) evaluating financing options; and (5) preparing for the commencement of the Chapter 11 Cases.  Accordingly, Houlihan has developed significant relevant experience and expertise regarding the Debtors' businesses that will assist Houlihan in providing effective and efficient services in connection with the Chapter 11 Cases.

## THE DEBTORS' NEED FOR DIP FINANCING
## AND ACCESS TO CASH COLLATERAL

8.     As described in the Motion, the Prepetition Secured Creditors have consented to the Debtors' use of Cash Collateral (as defined below).  Based on my discussions with management and the Debtors' other advisors, my experience in restructuring matters, and my familiarity with the Debtors, I believe the Debtors need immediate access to the proceeds from the DIP-to-Exit Facility (as defined below) and the ability to use Cash Collateral on an interim basis to continue operations for the benefits of their estates and their creditors, including to meet obligations to employees and manage their supply chain.  Such relief will avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and other parties-in-interest and will enable the Debtors to administer and preserve the value of their estates.  Based on my knowledge of the Debtors and discussions with the Debtors' management, I understand that the Debtors' ability to maintain business relationships with their vendors, pay their employees, and otherwise finance their

31441483.1

operations during the Chapter 11 Cases is dependent on the availability of capital from the DIP-to-Exit Facility and the use of Cash Collateral. Without access to the proceeds from the DIP-to-Exit Facility and the ability to use Cash Collateral, the Debtors' going concern value will be jeopardized, to the material detriment of their creditors and all parties-in-interest, and the value-maximizing restructuring contemplated by the Plan will not be possible.

9.      The Debtors' continued viability and ability to successfully reorganize as a going concern depend heavily on the timely approval of the use of Cash Collateral and the DIP-to-Exit Facility. The Debtors do not have sufficient Cash Collateral to support their businesses without immediate access to the DIP-to-Exit Facility, and, as set forth in the Interim Order, the consent of the Prepetition ABL Lenders and Prepetition FILO Lenders to use their Cash Collateral is conditioned upon the effectiveness of the commitments under the DIP-to-Exit Facility.

10.     In addition, it is imperative that the Debtors have sufficient postpetition DIP and exit financing in order to send a strong message to the market that the Chapter 11 Cases are well-funded and the Debtors will be well-positioned (and, in fact, to well-position them) for long-term growth and success upon emergence. Securing such financing will help ensure the Debtors have the ability to continue operations uninterrupted, which is imperative to preserve market share, reputation, and the loyalty and goodwill of their customers, suppliers, and employees. Indeed, it is vital to ongoing operations that the Debtors are able to demonstrate that they have the means available to operate in the ordinary course and continue to procure goods and services.

## THE MATERIAL TERMS OF THE PROPOSED FINANCING

11.     After exploring a substantial number of strategic alternatives (as discussed further below), and engaging in extensive arms'-length, good faith negotiations, the Debtors and their key stakeholders have agreed to the terms of a comprehensive restructuring that: (i) includes up to $142,000,000 of postpetition DIP financing, consisting of (a) $107,000,000 in "new money" DIP

Term Loans that may be increased subject to entry of the Final Order by an additional $10,000,000 through an accordion facility, subject to the consent of the Required DIP Lenders[3] (the "*Accordion Facility*"), which converts to committed exit financing upon emergence (the "*DIP-to-Exit Facility*"), subject to confirmation of the Plan, and (b) $25,000,000 of outstanding trade payables converted into DIP Term Loans, (ii) provides for the use of the ABL Lenders' and FILO Lenders' (each as defined below) cash collateral (the "*Cash Collateral*") on a consensual basis, (iii) eliminates $658.1 million in Prepetition Term Loan Obligations[4], and (iv) contemplates certain other incremental liquidity improvements, thereby substantially reducing the Debtors' go-forward leverage and improving overall liquidity. These terms are reflected, among other places, in that certain Transaction Support Agreement, dated as of March 15, 2024 and attached to the First Day Declaration as Exhibit A (as may be amended, modified, or supplemented, the "*Transaction Support Agreement*"). Under the DIP-to-Exit Facility, $95,000,000 will be available upon entry of the Interim Order and an additional $12,000,000 will be available upon entry of the Final Order.

12.     **Importantly, all unsecured claims are unimpaired under the proposed restructuring unless otherwise agreed to by the claim holder.** The proposed restructuring will enable the Debtors to emerge as a financially stronger company with greater liquidity, and the ability to maintain and improve vendor relationships and preserve over 18,000 jobs.

13.     As stated above, the proposed restructuring, and the DIP-to-Exit Facility that supports it, has the support of the Debtors' key stakeholders and contemplates extinguishing

---

[3]     For the avoidance of doubt, any funding of the Accordion Facility is subject to consent of the Required DIP Lenders, and this qualification shall apply to all applicable references to the Accordion Facility herein.

[4]     Other than Prepetition Term Loans assumed in connection with the Backstop Fee. For the avoidance of doubt, this qualification shall apply to all applicable references to the Backstop Fee or the equitization of the Prepetition Term Loan Obligations.

$658.1 million in Prepetition Term Loan Obligations, among other benefits.  The Transaction Support Agreement has been signed by lenders that collectively hold over 80% of the outstanding principal amount of term loans under the Debtors' prepetition Term Loan Facility, including those certain members of an ad hoc term lender group represented by Gibson, Dunn & Crutcher LLP (the "*Ad Hoc Group*"); (b) holders of over 66% of the existing equity interests in Debtor JOANN Inc.; and (c) certain third-party financing parties that have executed joinders to the Transaction Support Agreement (the "*Additional Financing Parties*").  The holders of the outstanding principal amount of asset-backed loans under the Debtors' ABL Facility (the "*ABL Lenders*") and the holders of the outstanding principal amount of "first in last out" loans under the Debtors' FILO Facility (the "*FILO Lenders*") are not parties to the Transaction Support Agreement; however, all of the ABL Lenders and the FILO Lenders are parties to the ABL/FILO Exit Commitment Letters, pursuant to which, *inter alia*, the ABL Lenders and the FILO Lenders have agreed to provide the Exit ABL Loans and the Exit FILO Loans (respectively) as contemplated in the Plan, and have agreed to vote in favor of an Acceptable ABL/FILO Plan (as defined in the ABL/FILO Exit Commitment Letters), which includes the proposed Plan.  In addition, the ABL Lenders and the FILO Lenders have consented to the Debtors' use of Cash Collateral during the Chapter 11 Cases in accordance with the proposed DIP/Cash Collateral Orders (as defined in the Plan).

14.     In connection with the DIP-to-Exit Facility, as described in the Motion and set forth in the Transaction Support Agreement and the DIP Credit Agreement, the Debtors have agreed, subject to Court approval, to pay interest and certain fees.  Specifically, the Debtors have agreed to pay an interest rate equal to the Secured Overnight Financing Rate plus 950 bps, to be paid in cash on account of the DIP Term Loans.

15.     The Debtors have also agreed to pay a backstop fee of 20% of the DIP Term Loans of the DIP Backstop Parties and Project Swift LLC ("***Project Swift***") in the form of an assumption of an equivalent amount of such party's prepetition Term Loan Claims, up to the amount thereof, and thereafter paid in kind (the "***Backstop Fee***").  The Backstop Fee will be earned on the date of execution of the Transaction Support Agreement, but subject to entry of the Interim Order.  Any party that, with the consent of the Required DIP Lenders, funds the Accordion Facility, shall be entitled to a fee no worse for the Company than being paid to the DIP Backstop Parties.

16.     The Debtors have also agreed to pay a participation fee, whereby each applicable "new money" DIP Lender[5] shall receive its pro rata share of a participation fee comprising (i) if the Plan is confirmed, 85% of the New Equity Interests, subject to dilution by the Management Incentive Plan (each as defined in the Plan), or (ii) if the Plan is not confirmed, $28,000,000 DIP Term Loans, payable in kind (the "***Participation Fee***").  Any interest on additional DIP Term Loans payable as part of the Participation Fee shall be payable in kind.  The Participation Fee will be earned on the date of entry of the Final Order.  Additionally, the Supporting Trade Creditors, in connection with providing the Converted DIP Loan, will collectively receive 12.5% of the New Equity Interests (subject to entry of the Final Order and confirmation of the Plan), among other rights.  Finally, Project Swift, in exchange for funding $10,000,000 of DIP Term Loans, in addition to its share of the Backstop Fee and Participation Fee, shall receive a $100,000 capital raise fee and certain other benefits.

17.     The proposed DIP-to-Exit Facility is the result of an extensive, good faith, and highly iterative negotiation process that is described more fully below, which ultimately involved

---

[5]     For avoidance of doubt, Project Swift shall be the only Additional Financing Party providing "new money" DIP Term Loans and thus entitled to receive a share of the Participation Fee as set forth on its Joinder (as defined in the Transaction Support Agreement).

each of the Debtors and their key stakeholders agreeing to certain concessions in order to facilitate a resolution and pave the way to a value-maximizing and job-saving restructuring.  In particular, the Debtors negotiated that the DIP-to-Exit Facility would (a) be, or was, open to all Prepetition Term Loan Lenders (and all Prepetition Term Lenders will have had, or will be offered, the right to participate pro rata in portion of the DIP-to-Exit Facility provided by the Prepetition Term Lenders and receive the applicable Participation Fee), (b) be sized to meet the significant liquidity needs of the Debtors in the Chapter 11 Cases and beyond, (c) provide that 100% of the Participation Fee be paid in equity, and not cash or "in kind" (subject to Plan confirmation), (d) provide the Debtors with adequate time to implement a value-maximizing restructuring as contemplated under the Transaction Support Agreement, and (e) subject to confirmation of the Plan, mandatorily convert into committed exit financing, which ensures the Debtors will not have to obtain alternative financing in order to emerge from the Chapter 11 Cases.  It is important to note that there are no additional commitment or exit fees associated with the DIP-to-Exit Facility.

18.    Additional concessions obtained through negotiations in connection with the DIP-to-Exit Facility from the Ad Hoc Group include (a) increases in the amount of Prepetition Term Loans equitized, from $408,125,000 extinguished in the Ad Hoc Group's initial proposal to the full amount of the Term Loan Facility extinguished under the Transaction Support Agreement, (b) deferring approval of the Participation Fee to the hearing on the Final Order, (c) eliminating an additional roll-up component of the financing, and (d) setting the first interest payment on the converted exit financing to September 2024.

19.    Despite the fact that the transaction significantly impairs their prepetition secured claims and they are otherwise senior in priority to general unsecured creditors ("*GUCs*"), as applicable, the DIP Backstop Parties and the DIP Lenders have agreed to allow the funds they are

advancing through the DIP-to-Exit Facility to be used to pay or otherwise satisfy GUCs in full and in the ordinary course of business pursuant to the Transaction Support Agreement.

**THE DEBTORS' EFFORTS TO NEGOTIATE A**
**RESTRUCTURING AND SECURE POSTPETITION FINANCING**

20.     Houlihan has been working with the Debtors since October 2022 to assess potential alternatives to generate additional liquidity given macroeconomic uncertainties, overall headwinds in the retail industry, and the Debtors' general liquidity position.  That process resulted in the FILO Term Loan Facility in March 2023, which provided additional liquidity runway.  Although this transaction provided sufficient liquidity through the end of 2023, the Debtors' performance continued to struggle due to industry trends, despite significant cost reduction initiatives implemented by management.  Coupled with both the amount of debt and debt service from increasing interest rates, the Debtors found themselves with further depleted liquidity.

21.     Because the Debtors had limited additional financeable assets after raising the FILO Term Loan Facility, and with substantially all of the Debtors' assets already encumbered by the ABL Facility and the Term Loan Facility, in September 2023, Houlihan initiated an outreach process to explore the possibility of an out-of-court restructuring solution supported by new capital from a third-party investor.  Though Houlihan initially engaged with seven (7) potentially interested third parties starting in September 2023, none of these parties was prepared to provide a debt or equity financing solution for the Debtors at that time due to, among other factors, a view that the Debtors needed a more comprehensive restructuring of their capital structure and any transaction would need concessions and consents from multiple existing constituents, including the Prepetition Term Loan Lenders.

22.     Contemporaneously with the initial third-party outreach process, the Debtors received a financing proposal from the Ad Hoc Group.  The Debtors' advisors, Houlihan, Alvarez

& Marsal North America, LLC, and Latham & Watkins LLP, engaged in discussions with the Ad Hoc Group regarding the terms of a restructuring and postpetition financing. As it became evident that the third-party outreach process would not yield an actionable restructuring proposal inclusive of the capital required to fund the Debtors' liquidity needs, the Debtors and their advisors focused their efforts on negotiations with the Ad Hoc Group.

23.    Over a period of weeks through February and into March 2024, the Debtors engaged first with the Ad Hoc Group, and then also with the ABL Lenders and the FILO Lenders, on the terms of an overall consensual restructuring transaction, including the terms of DIP and exit financing. These discussions were highly iterative, hard fought, and proceeded in good faith, with each party agreeing to certain concessions in order to facilitate a resolution and provide for a value-maximizing and job-saving restructuring of the Debtors. By the end of February 2024, the Debtors and the other parties were on the verge of an agreement which required certain members of the Ad Hoc Group to backstop the proposed new money DIP financing in exchange for a portion of each of the then-proposed new money DIP loans and the new equity of reorganized JOANN Inc. to be issued under the Plan, a partial roll-up of Prepetition Term Loan Obligations of the funding parties, as well as backstop and participation fees.

24.    In parallel with the foregoing conversations with the Ad Hoc Group, Houlihan approached five third-party lenders to gauge their interest in providing DIP financing. None of these parties was willing or able to provide DIP financing to the Debtors within the near term time-frame required. With few, if any, unencumbered assets, the third parties approached confirmed that they would not be willing to provide financing on a junior basis or provide senior financing that would require a priming fight with the Debtors' Prepetition Secured Creditors. Additionally, during discussions with the advisors to the Debtors' Prepetition Secured Creditors in the weeks

leading up to the Chapter 11 Cases, the Prepetition Secured Creditors did not intend to permit the incurrence of any senior financing by third parties that would result in priming liens on the Prepetition Collateral.

25.    However, on the eve of signing a transaction support agreement (and related transaction documents), the Debtors were informed by the Ad Hoc Group that the backstop was not fully committed, and thus the proposed transaction could not proceed.

26.    Immediately following this, the Debtors and the Ad Hoc Group reengaged on the terms of a revised transaction and DIP-to-exit financing structure with the goal of bridging the funding gap as quickly as possible, leaving no stone unturned in an effort to reach an actionable deal.

27.    At the same time, in light of the Debtors' increasingly urgent liquidity position and the effect of market speculation on the Debtors' day-to-day operations, the Debtors, the Ad Hoc Group, and their respective advisors began outreach to additional sources of financing outside of the Ad Hoc Group in an effort to ensure all possible avenues were explored.  This process included reconnecting with third parties that had previously expressed an interest in a transaction with the Debtors, reaching out to new parties that the Debtors and their advisors believed would have the ability to consummate a transaction on the required timeline (including multiple private capital and distressed debt investors), and connecting with certain of the Debtors' largest trade partners. Numerous third parties were contacted by the Debtors, the Ad Hoc Group, and their respective advisors, including 16 third parties contacted by Houlihan (including multiple private capital and distressed debt investors as noted above).  Despite the offer of the Backstop Fee and the Participation Fee as incentives, most parties were unwilling or unable to participate in the contemplated DIP financing within the near term time-frame required; however, the Debtors were

ultimately able to obtain $35,000,000 in incremental financing and financial accommodations from three third parties.[6]

28.     As these discussions continued and ultimately collaborative negotiations on a mutually agreeable transaction structure transpired over the course of approximately two weeks, the Debtors also undertook a comprehensive review of cost-saving measures that could be enacted to close the gap on their side.  In this process, the Debtors and their advisors proposed a list of asks to the other stakeholders generally comprising incremental financing (to the Ad Hoc Group), in conjunction with their proposed self-help measures and third-party financing, which was eventually agreed to and which formed the basis for the final DIP-to-Exit Facility.  Ultimately, the Debtors, the Ad Hoc Group, the Prepetition ABL Lenders, the Prepetition FILO Lenders, and the Additional Financing Parties agreed on the terms of the currently proposed DIP-to-Exit Facility, which, inter alia, (a) decreased the new money funding amount (while maintaining appropriate liquidity), (b) eliminated the previously contemplated roll-up, and (c) revised the backstop and participation fees to incentivize the requisite lender participation.

### THE TERMS OF THE DIP-TO-EXIT FACILITY ARE NECESSARY UNDER THE CIRCUMSTANCES

29.     Based on my experience with postpetition financing transactions, as well as my involvement in the negotiation of the DIP-to-Exit Facility and exploration of alternative financing options, the DIP-to-Exit Facility is the best—and only—viable financing option available to the Debtors under the circumstances.  The proposed DIP-to-Exit Facility (a) provides the Debtors with access to crucial liquidity at the outset of the Chapter 11 Cases, (b) contemplates conversion into an exit facility, and (c) is a critical part of the Transaction Support Agreement.

---

[6]    These parties comprised two of the Debtors' largest trade partners and an unrelated third party that was familiar with the Debtors' business.  None of these parties is an insider of the Debtors.

30.     The Ad Hoc Group expressly conditioned their DIP proposal, and the ABL Lenders and FILO Lenders conditioned their consent to use of Cash Collateral, on, among other things, customary forms of adequate protection and standard stipulations regarding their liens and claims (which will be subject to a challenge period as set forth in the Interim Order).  The Ad Hoc Group (on behalf of the DIP Lenders) also insisted on postpetition priming liens (priming the Prepetition Term Loan Lenders' prepetition liens) on the Term Loan Priority Collateral as part of the collateral package securing the DIP-to-Exit Facility (subject to Prepetition Permitted Liens and as further outlined in the Interim Order).  Notably, the DIP-to-Exit Facility does not prime the ABL Facility or the FILO Term Loan Facility.

31.     The Backstop Fee and Participation Fee to be paid under the proposed DIP-to-Exit Facility (a) were the subject of arms'-length and good faith negotiations between the Debtors, the Ad Hoc Group, and their respective advisors, (b) are an integral component of the overall terms of the proposed DIP-to-Exit Facility, and (c) were critical to induce the DIP Lenders and applicable Additional Financing Party to provide financing of this magnitude, including the incremental liquidity necessary to finalize the DIP-to-Exit Facility, under the expedited timeline necessitated by the challenges facing the Debtors' businesses.  In particular, the Backstop Fee was required to induce the DIP Backstop Parties to backstop the DIP-to-Exit Facility at a pivotal and urgent point in the process and, as discussed further below, was offered broadly to all Prepetition Term Loan Lenders that are or were part of the Ad Hoc Group and subject to non-disclosure agreements. Based on my experience as a restructuring professional and my knowledge of the market for DIP and exit financing facilities, and given the cash position of the Debtors, the timing and cost of administering the Chapter 11 Cases, the challenge in filling the commitments under the DIP-to-

Exit Facility, and the lack of viable alternatives, in totality, the fees and interest contemplated by the DIP-to-Exit Facility represent the best financing option available to the Debtors.

32.     Additionally, as noted above and based upon discussions with the advisors to the Ad Hoc Group, I understand that participation in the backstop and receipt of the associated Backstop Fee was offered to all of the Prepetition Term Loan Lenders that were under nondisclosure agreements, including the entire Ad Hoc Group, which comprised approximately 87% of the Term Loan Facility.  However, only holders of approximately 48% of the Term Loan Facility were prepared to backstop the DIP-to-Exit Facility, with over 80% still agreeing to sign the Transaction Support Agreement irrespective of their participation in the backstop or agree to fund their pro rata share. The fact that some Ad Hoc Group members decided to provide the backstop while others did not, even as the Backstop Fee was revised to incentivize participation, further supports the fact that the compensation provided by the Backstop Fee is necessary given the circumstances.

33.     The Participation Fee is priced to incentivize Prepetition Term Loan Lenders to participate in the DIP-to-Exit Facility and, in doing so, ultimately commit to participate in the Exit Term Loans.  Lenders who participate in the DIP-to-Exit Facility are agreeing not only to lend money during the course of the Chapter 11 Cases, but also convert that exposure into four (4)-year Exit Term Loans.  The Participation Fee is designed to compensate lenders for that risk and incentivize broad participation.

34.     As noted above, following entry of the Interim Order, the DIP Term Loans shall be syndicated and made available to all holders of Term Loan Claims that are not or were not previously members of the Ad Hoc Group and held such Term Loan Claims as of the Petition Date, subject to a cap of 13% of $97 million DIP Term Loans, on a pro rata basis, so long as such holders

are a party, or execute a joinder to the Transaction Support Agreement and pursuant to such joinder agree to participate in the DIP Funding pursuant to the terms of the Transaction Term Sheet, the Transaction Support Agreement, and the DIP Facility Documents, and elect to participate in the DIP-to-Exit Facility.

35.    The Participation Fee is an integral component of the DIP-to-Exit Facility.  Based on my involvement in and knowledge of the negotiations, I understand that the DIP Backstop Parties would have been unwilling to fund and backstop the DIP-to-Exit Facility without the Participation Fee.  Further, the ability, subject to confirmation of the Plan, to have this fee paid in equity as opposed to cash or additional debt benefits the Debtors by preserving liquidity and reducing pro-forma debt and the associated additional debt service.  The Participation Fee also has been, or will be, made available to all Prepetition Term Loan Lenders (and Project Swift) to ensure that none of the Prepetition Term Loan Lenders are prejudiced by the lack of opportunity to receive the benefits of funding their pro rata share of this facility, and is further designed to garner additional participation in the DIP-to-Exit Facility and support for the Transaction Support Agreement (and in turn, the Plan).  Moreover, as noted above, the fact that the Participation Fee has been offered to the vast majority of the Prepetition Term Loan Lenders, with only 48% agreeing to backstop or fund their pro rata share, but the holders of over 80% of Prepetition Term Loan Obligations support the restructuring and terms of the DIP-to-Exit Facility pursuant to the Transaction Support Agreement, strongly evidences (a) the necessity of the Participation Fee to incentivize lenders to provide the Debtors with the required capital, and (b) that the economics associated with the Participation Fee are warranted under the circumstances.

36.    The Backstop Fee and Participation Fee are critical pieces of the overall comprehensive restructuring transaction reflected in the Transaction Support Agreement and,

based on highly iterative negotiations with the Ad Hoc Group and other parties, each component serves as an important part of the package of incentives needed for the Prepetition Term Loan Lenders and other financing parties to provide the Debtors with sufficient liquidity to successfully navigate and emerge from chapter 11.  Although Participation Fee is higher than in other cases, I believe it is necessary here in the context of the overall negotiations giving rise to the DIP-to-Exit Facility, as well as the fact that GUCs will be unimpaired under the Plan.  Indeed, the only creditors who are impaired by the Plan are the Prepetition Term Loan Lenders, a super-majority of which have signed the Transaction Support Agreement and all of which will have had, or will be offered, an opportunity to earn the Participation Fee through participation in the DIP-to-Exit Facility.

37.     In summary, the DIP-to-Exit Facility was the product of good faith, arms'-length negotiations, and will help maximize the value of the Debtors and save over 18,000 jobs.  For all of the reasons set forth in this Declaration and based on my experience, I believe that the Debtors' agreement to the terms of the DIP-to-Exit Facility is necessary under the unique facts and circumstances of the contemplated restructuring and the Chapter 11 Cases and represents a reasonable exercise of the Debtors' business judgment.

## **INTERIM RELIEF IS WARRANTED**

38.     I believe that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the estates. Specifically, I believe that, absent the interim relief requested by the Motion, the Debtors will suffer significant, and potentially irreparable and permanent, impairment to their business operations, including insufficient liquidity to meet payroll and other operational obligations and to fund the administrative expenses associated with the Chapter 11 Cases, to the material detriment of their stakeholders.  Conversely, approval of the relief requested in the Motion on an interim basis will facilitate the uninterrupted operation of the

31441483.1

Debtors' business, the maintenance of ordinary course relationships with essential vendors and customers, and the Debtors' ability to meet their working capital needs in the ordinary course.

## **<u>CONCLUSION</u>**

39.     Based on the circumstances and facts presented here, I believe that (a) the DIP-to-Exit Facility should address the Debtors' liquidity needs, (b) the process to obtain debtor-in-possession financing produced the best financing option available to the Debtors at this time, (c) the terms of the DIP-to-Exit Facility, taken as a whole, are necessary under the unique circumstances of this restructuring, and (d) the relief requested in the Motion is in the best interests of the Debtors and their estates and represents a reasonable exercise of the Debtors' business judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 18, 2024

/s/ *Davis Salemi*
David Salemi
Managing Director
Houlihan Lokey Capital, Inc.