## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:

JOANN INC., *et al.*,

        Debtors.[1]

------------------------------------------------------------ x

:  Chapter 11
:
:  Case No. 24-10418 (CTG)
:
:  (Jointly Administered)
:
:  **Ref. Dkt. Nos. 212, 286 & 289**
:
:

### NOTICE OF FILING OF REDACTED AMENDED PLAN SUPPLEMENT

**PLEASE TAKE NOTICE** that April 11, 2024, the debtors in possession in the above-captioned cases (collectively the "***Debtors***") filed the *Motion of Debtors for Entry of an Order (A) Authorizing the Filing of Certain Information Contained in the Plan Supplement Under Seal and (B) Granting Related Relief* [Docket No. 212] (the "***Seal Motion***").[2]

**PLEASE TAKE FURTHER NOTICE** that, on the date hereof, the Court entered the *Order (A) Authorizing the Filing of Certain Information Contained in the Plan Supplement Under Seal and (B) Granting Related Relief* [Docket No. 286] (the "***Seal Order***").

**PLEASE TAKE FURTHER NOTICE** that, on the date hereof, the Debtors filed a sealed version of the *Notice of Filing of Amended Plan Supplement to the First Amended Prepackaged Joint Plan of Reorganization of JOANN Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 289] (the "***Amended Plan Supplement***").

---

[1]    The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); and Jo-Ann Stores Support Center, Inc. (5027).  The Debtors' mailing address is 5555 Darrow Road, Hudson, OH 44236.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Seal Motion.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the proposed redacted version of the Amended Plan Supplement, which redacts the Confidential Information pursuant to the Seal Order, as **<u>Exhibit A</u>**.

*[Signature page follows]*

31572657.2

Dated: April 23, 2024

*/s/ Shane M. Reil*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Shane M. Reil (No. 6195)
Rebecca L. Lamb (No. 7223)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6600
 Email: mnestor@ycst .com
        kcoyle@ycst.com
        sreil@ycst.com
        rlamb@ycst.com

**LATHAM & WATKINS LLP**

George A. Davis (admitted *pro hac vice*)
Alexandra M. Zablocki (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
        alexandra.zablocki@lw.com

Ted A. Dillman (admitted *pro hac vice*)
Nicholas J. Messana (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone:  (213) 485-1234
Email:  ted.dillman@lw.com
        nicholas.messana@lw.com

Ebba Gebisa (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 27017
Telephone:  (312) 876-7700
Email:  ebba.gebisa@lw.com

*Counsel for Debtors and Debtors-in-Possession*

# **EXHIBIT A**

## **Amended Plan Supplement**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------- x
                                                         :    Chapter 11
In re:                                                   :
                                                         :    Case No. 24-10418 (CTG)
JOANN INC., *et al.*,                                    :
                                                         :    (Jointly Administered)
         Debtors.[1]                                     :
                                                         :    **Ref. Docket Nos. 15, 16, 17, 103, 213, 214, 288**
                                                         :
                                                         :
-------------------------------------------------------- x

**NOTICE OF FILING OF AMENDED PLAN SUPPLEMENT TO THE
FIRST AMENDED PREPACKAGED JOINT PLAN OF REORGANIZATION OF
JOANN INC. AND ITS DEBTOR AFFILIATES UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, on March 18, 2024, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing to Consider (A) Approval of Disclosure Statement, (B) Approval of Solicitation Procedures and Forms of Ballots, and (C) Confirmation of Plan; (II) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (III) Approving the Form and Manner of Notice of Combined Hearing, Objection Deadline, and Notice of Commencement; (IV) Approving Notice and Objection Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; (V) Conditionally Waiving Requirement of Filing Schedules of Assets and Liabilities, Statements of Financial Affairs, and 2015.3 Reports; (VI) Conditionally Waiving Requirement to Convene the Section 341 Meeting of Creditors; and (VII) Granting Related Relief* [Docket No. 17] (the "**Solicitation Motion**") with the United States Bankruptcy Court for the District of Delaware (the "**Court**").  Also on March 18, 2024, the Debtors filed the *Prepackaged Joint Plan of Reorganization of Joann Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 15] and the *Disclosure Statement for Prepackaged Joint Plan of Reorganization of Joann Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 16] (as may be amended, supplemented, or modified from time to time, the "**Disclosure Statement**").

**PLEASE TAKE FURTHER NOTICE** that, on the date hereof, the Debtors filed the *First Amended Prepackaged Joint Plan of Reorganization of JOANN Inc. and its Debtor Affiliates*

---

[1]  The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); and Jo-Ann Stores Support Center, Inc. (5027).  The Debtors' mailing address is 5555 Darrow Road, Hudson, OH 44236.

*Under Chapter 11 of the Bankruptcy Code* [Docket No. 288] (as may be amended, supplemented, or modified from time to time, the "***Plan***").

**PLEASE TAKE FURTHER NOTICE** that, on March 19, 2024, the Court held a hearing (the "***Hearing***") to consider, among other things, the Solicitation Motion. Subsequent to the Hearing, the Court entered that certain *Order (I) Scheduling Combined Hearing to Consider (A) Approval of Disclosure Statement, (B) Approval of Solicitation Procedures and Forms of Ballots, and (C) Confirmation of Plan; (II) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (III) Approving the Form and Manner of Notice of Combined Hearing, Objection Deadline, and Notice of Commencement; (IV) Approving Notice and Objection Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; (V) Conditionally Waiving Requirement of Filing Schedules of Assets and Liabilities, Statements of Financial Affairs, and 2015.3 Reports; (VI) Conditionally Waiving Requirement to Convene the Section 341 Meeting of Creditors; and (VII) Granting Related Relief* [Docket No. 103] (the "***Solicitation Order***").[2]

**PLEASE TAKE FURTHER NOTICE** that, on April 11, 2024, the Debtors filed the *Notice of Filing of Plan Supplement to the Prepackaged Joint Plan of Reorganization of JOANN Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 212] under seal and the *Notice of Filing of Redacted Plan Supplement* [Docket No. 214] (each, the "***Plan Supplement***") .

**PLEASE TAKE FURTHER NOTICE** that, subsequent to filing the Plan Supplement, the Debtors made certain revisions to (a) the New Organizational Documents of JOANN Inc. (the "***Revised New Organizational Documents of JOANN Inc.***") attached hereto as **Exhibit A-1**, (b) the Exit Facilities Documents (the "***Revised Exit Facilities Documents***") attached hereto as **Exhibit B-1**, (c) the Governance Term Sheet (the "***Revised Governance Term Sheet***") attached hereto as **Exhibit C**, and (d) the Members of the Reorganized Board (the "***Revised Members of the Reorganized Board***" and, together with each of the Revised New Organizational Documents of JOANN Inc., the Revised Exit Facilities Documents, and the Revised Governance Term Sheet, the "***Amended Exhibits***") attached hereto as **Exhibit D**. For the convenience of the Court and all parties in interest, a blackline comparing the Revised Exit Facilities Documents to the Exit Facilities Documents is attached hereto as **Exhibit B-2**.

**PLEASE TAKE FURTHER NOTICE** that, as indicated in the Plan Supplement, the Debtors reserved their rights to alter, modify, or supplement the Plan Supplement and any of the documents and designations contained therein. Accordingly, the Debtors hereby file the following exhibit (the "***Additional Exhibit***"), which, along with the exhibits attached to the original Plan Supplement and the Amended Exhibits, comprise the amended Plan Supplement (as may be amended, supplemented, or modified from time to time, the "***Amended Plan Supplement***"):

| Exhibit | Plan Supplement Document |
|---------|--------------------------|
| A-2 | Bylaws of JOANN Inc. |

---

[2] Capitalized terms used but not otherwise defined herein shall have their meanings given to them in the Plan or the Plan Supplement, as applicable.

**PLEASE TAKE FURTHER NOTICE** that the Amended Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth therein in full. The documents and designations contained in this Amended Plan Supplement are integral to, and considered part of, the Plan. The Amended Plan Supplement has not yet been approved by the Court. If the Plan is confirmed, the Amended Plan Supplement will also be approved by the Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that, **subject to the terms and conditions of the Plan and the Transaction Support Agreement, the Debtors reserve the right to alter, modify, or supplement any document that is part of, or add any document to, the Plan Supplement**. To the extent that the Debtors make any material amendment or modification to any documents that are part of the Amended Plan Supplement (each, a "***Revised Plan Supplement Document***") prior to the Confirmation Hearing (as defined below), the Debtors shall file with the Court a blackline comparing the Revised Plan Supplement Document against the relevant Plan Supplement document attached hereto for the convenience of the Court and all parties in interest. None of the information contained herein or in any Revised Plan Supplement Document shall be deemed final or binding on the Debtors prior to the Effective Date of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Amended Plan Supplement, the Plan, the Disclosure Statement, and related materials can be obtained free of charge at the Debtors' public restructuring website maintained by Kroll Restructuring Administration LLC (the "***Solicitation Agent***") at https://cases.ra.kroll.com/JOANN or by contacting the Solicitation Agent at (844) 488-7837 (U.S. / Canada, toll-free), (646) 777-2384 (International, toll), or joanninfo@ra.kroll.com. In addition, such documents are available for inspection for a fee on the Court's website at www.deb.uscourts.gov and are on file with the Clerk of the Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, where they are available for review between the hours of 8:00 a.m. to 4:00 p.m. (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan (the "***Confirmation Hearing***") will be held on **April 25, 2024 at 2:00 p.m. (prevailing Eastern Time)** before the Honorable Craig T. Goldblatt, United States Bankruptcy Judge, in Courtroom No. 7 (3rd Floor) of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801. In the event of a timely filed objection that is not settled by the parties, the Court shall hear such objection at the Confirmation Hearing. The Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on other parties entitled to notice.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN, OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, PLEASE CONTACT THE SOLICITATION AGENT AT THE NUMBER OR EMAIL ADDRESS SPECIFIED ABOVE. PLEASE NOTE THAT THE SOLICITATION AGENT CANNOT PROVIDE LEGAL ADVICE.**

*[Signature page follows]*

Dated: April 23, 2024

*/s/ Shane M. Reil*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Shane M. Reil (No. 6195)
Rebecca L. Lamb (No. 7223)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6600
Email:  mnestor@ycst.com
        kcoyle@ycst.com
        sreil@ycst.com
        rlamb@ycst.com

**LATHAM & WATKINS LLP**

George A. Davis (admitted *pro hac vice*)
Alexandra M. Zablocki (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
        alexandra.zablocki@lw.com

Ted A. Dillman (admitted *pro hac vice*)
Nicholas J. Messana (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone:  (213) 485-1234
Email:  ted.dillman@lw.com
        nicholas.messana@lw.com

Ebba Gebisa (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 27017
Telephone:  (312) 876-7700
Email:  ebba.gebisa@lw.com

*Proposed Counsel for Debtors and Debtors-in-Possession*

31570769.4

4

## EXHIBIT A-1

**Revised New Organizational Documents of JOANN Inc.**

**AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**JOANN INC.**

The name of the corporation is JOANN Inc., formerly known as Jo-Ann Stores Holdings Inc., (the "Corporation"). The Corporation was incorporated by the filing of its original Certificate of Incorporation with the Secretary of State of State of Delaware on September 19, 2012 (the "Certificate of Incorporation"). This Amended and Restated Certificate of Incorporation of the Corporation, which amends, restates and integrates and also further amends the provisions of the Certificate of Incorporation, was duly adopted in accordance with the provisions of Sections 242 and 245 of the General Corporation Law of the State of Delaware (the "DGCL"). The Certificate of Incorporation is hereby amended, integrated and restated to read in its entirety as follows:

**ARTICLE I**
**NAME**

The name of the corporation is JOANN Inc.

**ARTICLE II**
**REGISTERED OFFICE AND AGENT**

The address of the Corporation's registered office in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware, 19801. The name of its registered agent at such address is The Corporation Trust Company.

**ARTICLE III**
**PURPOSE AND DURATION**

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the DGCL. The Corporation is to have a perpetual existence.

**ARTICLE IV**
**CAPITAL STOCK**

The total number of shares of all classes of stock that the Corporation shall have authority to issue is 201,000,000, which shall be divided into two classes as follows:

200,000,000 shares of common stock, par value $0.01 per share ("Common Stock"); and

1,000,000 shares of preferred stock, par value $0.01 per share ("Preferred Stock").

Section 1. Subject to the rights of the holders of any series of Preferred Stock, the number of authorized shares of any of the Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority in voting power of the stock of the Corporation entitled to vote thereon irrespective of the provisions of Section 242(b)(2) of the DGCL or any successor provision thereof, and no vote of the holders of any shares of Common Stock or Preferred Stock voting separately as a class shall be required therefor.

Section 2. Shares of Preferred Stock may be issued from time to time in one or more series. The Board of Directors of the Corporation (the "Board") is hereby authorized to provide from time to time by resolution or resolutions for the creation and issuance, out of the authorized and unissued shares of Preferred Stock, of one or more series of Preferred Stock by filing a certificate (a "Certificate of Designation") pursuant to the DGCL, setting forth such resolution or resolutions and, with respect to each such series, establishing the designation of such series and the number of shares to be included in such series and fixing the terms of such series, the voting powers (full or limited, or no voting power), preferences and relative, participating, optional or other special rights, and the qualifications, limitations and restrictions thereof, of the shares of each such series, including without limitation thereof, dividend rights, conversion rights, redemption privileges and liquidation preferences, as shall be stated and expressed in such resolutions, all to the fullest extent now or hereafter permitted by the DGCL. Without limiting the generality of the foregoing, and subject to the rights of the holders of any series of Preferred Stock then outstanding, the resolution or resolutions providing for the establishment of any series of Preferred Stock may, to the extent permitted by law, provide that such series shall be superior to, rank equally with or be junior to the Preferred Stock of any other series. The terms, voting powers, preferences and relative, participating, optional and other special rights, and the qualifications, limitations or restrictions thereof, of each series of Preferred Stock may be different from those of any and all other series at any time outstanding. Except as otherwise expressly provided in this Amended and Restated Certificate of Incorporation (including any Certificate of Designation relating to any series of Preferred Stock), no vote of the holders of shares of Preferred Stock or Common Stock shall be a prerequisite to the issuance of any shares of any series of the Preferred Stock so authorized in accordance with this Amended and Restated Certificate of Incorporation (including any Certificate of Designation relating to any series of Preferred Stock). Except as otherwise required by law, holders of Common Stock shall not be entitled to vote on any amendment to this Amended and

Restated Certificate of Incorporation (including any Certificate of Designation relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Amended and Restated Certificate of Incorporation (including any Certificate of Designation relating to any series of Preferred Stock) or pursuant to the DGCL. Unless otherwise provided in the Certificate of Designation establishing a series of Preferred Stock, the Board may, by resolution or resolutions, increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of such series and, if the number of shares of such series shall be so decreased, the shares constituting such decrease shall resume the status that they had prior to the adoption of the resolution or resolutions originally fixing the number of shares of such series.

## ARTICLE V
## BOARD OF DIRECTORS

For the management of the business and for the conduct of the affairs of the Corporation it is further provided that:

Section 1. Except as otherwise provided in this Amended and Restated Certificate of Incorporation and the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board. The number of directors which shall constitute the whole Board shall be fixed exclusively by one or more resolutions adopted from time to time by the Board. Except as otherwise expressly provided by the bylaws of the Corporation (as the same may be amended and/or restated from time to time, the "Bylaws") or delegated by resolution of the Board, the Board shall have the exclusive power and authority to appoint and remove officers of the Corporation.

Section 2. During the period beginning on the date hereof and ending on the date of the Board Nomination Meeting (as defined below) (such period, the "Interim Term"), the number of seats on the Board shall be five and each of the following individuals will be elected to serve as directors of the Board in accordance with the terms and conditions of this Amended and Restated Certificate of Incorporation and the Bylaws:

(A)    the individual then serving as the Chief Executive Officer of the Corporation (the "CEO Director"), who shall initially be [●];

(B)    one (1) individual nominated by Green Square, who shall initially be Darrell Horn (the "Green Square Director"); and

(C)    three (3) individuals nominated by the Required DIP Backstop Parties, who shall initially be Bill Wall, James Kim and [●] (the "Interim DIP Director" and together with the CEO Director and the Green Square Director during the Interim Term, the "Interim Directors").

Section 3. Prior to the date hereof, the Required DIP Backstop Parties began a search for DIP Initial Director candidates. Upon selection of Initial Directors in accordance with the immediately preceding sentence, a representative designated by the Required DIP Backstop Parties shall submit in writing to the Board the slate of DIP Initial Directors it proposes for nomination in accordance with this Section 3 of Article V (the "Board Nomination Event"). Promptly thereafter, but subject to the Directors' fiduciary duties, the Board shall cause the Corporation to call a general meeting of the holders of Common Stock, or otherwise seek the written consent of the holders of Common Stock (the "Board Nomination Meeting"), for the purpose of electing the DIP Initial Directors in accordance with this Section 3 of Article V. At the Board Nomination Meeting, each holder of Common Stock shall vote, or cause to be voted, all shares of Common Stock over which such holder has the power to vote or direct the voting, and shall take all other necessary actions within such holder's control, in order to cause each of such nominees as are proposed by the Required DIP Backstop Parties in accordance with this Section 3 of Article V to be elected as DIP Initial Directors. Immediately upon the Board Nomination Event, the Required DIP Backstop Parties shall cause the Interim DIP Director to tender his or her resignation from the Board, without prejudice to the application of Section 7 of Article V below, with such resignation effective upon the election of the DIP Initial Directors.

Section 4. During the period beginning on the date of the Board Nomination Meeting and ending on the date of the first annual meeting of the holders of shares of Common Stock that is held following the Board Nomination Meeting (the "Initial Term"), the number of seats on the Board shall be five (5) and each of the following individuals will be elected to serve as directors in accordance with the terms and conditions of the Bylaws:

(A)    the CEO Director;

(B)    the Green Square Director; and

(C)    three (3) individuals nominated by the Required DIP Backstop Parties as may be identified in accordance with Section 3 of Article V to serve as Directors (the "DIP Initial Directors" and, together with the CEO Director and Green Square Director during the Initial Term, the "Initial Directors").

Section 5. Following the Initial Term, the number of seats on the Board shall be five (5) and each of the following individuals will be elected to serve as Directors in accordance with the terms and conditions of the Bylaws:

(A)    the CEO Director;

(B)    either (i) for so long as Green Square (together with 3551300 Canada Inc. and Universe Group, Inc. for so long as Green Square has been granted a full proxy to vote the shares of Common Stock held by such Persons) collectively have not transferred shares of Common Stock (other than to a Permitted Transferee (as defined in the Stockholders Agreement)) resulting in them owning less than 5.00% of the fully-diluted shares of Common Stock (the "Green Square Threshold"), the Green Square Director or (ii) from and after the time Green Square no longer meets the Green Square Threshold, one (1) individual elected by the holders of Common Stock in accordance with the Bylaws (an "At-Large Director"); and

(C)    three (3) individuals elected by the holders of Common Stock in accordance with the Bylaws (together with any other At-Large Director, the "At-Large Directors").

The Board may elect one of the directors to serve as the Executive Chair of the Board, with such duties as the Board shall determine.

Section 6. Notwithstanding anything to the contrary in the Bylaws:

(A)     during the Interim Term, (A) the Interim DIP Director may not be removed unless the Required DIP Backstop Parties shall have first provided written notice to the Board of the Required DIP Backstop Parties' determination to remove such Interim DIP Director at least one (1) Business Day prior to the effectiveness of such removal, and (B) the Interim DIP Director as to which the Required DIP Backstop Parties shall have provided such written notice shall be removed;

(B)     during the Initial Term, (A) no DIP Initial Director may be removed unless the Required DIP Backstop Parties shall have first provided written notice to the Board of the Required DIP Backstop Parties' determination to remove such DIP Initial Director at least one (1) Business Day prior to the effectiveness of such removal, and (B) any DIP Initial Director as to which the Required DIP Backstop Parties shall have provided such written notice shall be removed;

(C)     following the Initial Term, any individual director, other than the Green Square Director (if any) may be removed with or without cause by the affirmative vote of the holders of a majority of the voting power of the outstanding shares of stock of the Corporation entitled to vote in the election of such director, voting together as a single class; and

(D)     for so long as Green Square meets the Green Square Threshold, (A) the Green Square Director may not be removed unless Green Square shall have first provided written notice to the Board of Green Square's determination to remove the Green Square Director at least one (1) Business Day prior to the effectiveness of such removal, and (B) the Green Square Director as to which Green Square shall have provided such written notice shall be removed.

Section 7.  Notwithstanding anything to the contrary in the Bylaws, but subject in all cases to the directors' fiduciary duties: (i) any vacancy of a seat held by the Interim DIP Director or an DIP Initial Director resulting from the death, resignation, removal or otherwise of any such director during the Interim Term or the Initial Term shall be filled by an individual designated by the Required DIP Backstop Parties and (ii) so long as Green Square meets the Green Square Threshold, any vacancy of a seat held by the Green Square Director resulting from the death, resignation, removal or otherwise of such Green Square Director shall be filled by an individual designated by Green Square.  Following the Initial Term, except as otherwise expressly required by law, and subject to any special rights of the holders of one or more series of Preferred Stock to elect directors, any vacancy of a seat held by an At-Large Director resulting from death, resignation, disqualification, removal or other causes and any newly created directorships resulting from any increase in the number of directors shall be filled only by the affirmative vote of a majority of the directors then in office, even if less than a quorum, and shall not be filled by the stockholders; provided, that in the event an At-Large Director was removed by an affirmative vote of stockholders owning a majority of the outstanding shares of Common Stock, then the Board shall provide written notice to the stockholders (a "Director Replacement Notice"), and stockholders owning a majority of the outstanding shares of Common Stock shall be entitled to elect a replacement director to serve in the seat held by such removed At-Large Director until the next election; provided, further, that if stockholders owning a majority of the outstanding shares of Common Stock have not elected a successor director within 30 days following the date of the Director Replacement Notice, then the vacancy shall be filled by an affirmative vote of the majority of the remaining directors until the next election.

Section 8.  Each director shall be entitled to reimbursement from the Corporation for his or her reasonable and documented out-of-pocket expenses (including travel) incurred in attending any meeting of the Board or any committee thereof, pursuant to the Corporation's applicable policies.

Section 9.  Notwithstanding anything to the contrary in the Bylaws, the compensation of directors other than the CEO Director may be composed of reasonable annual cash payments; provided that the annual cash compensation of the Initial Directors shall be determined in the first instance by the Required DIP Backstop Parties.

Section 10. Other than commercial transactions in the ordinary course of business consistent with past practice on arms'-length terms and the issuance of securities pursuant to Section 7 of the Stockholders Agreement, neither the Corporation nor any of its subsidiaries shall enter into any agreement or transaction (or amendment or modification thereto) with (i) any director or officer of the Corporation or its subsidiaries, (ii) any Person, together with its affiliates, which owns, directly or indirectly, 5% or more of the outstanding shares of Common Stock, (iii) any Person in which one or more directors or officers of the Corporation owns, directly or indirectly, individually or in the aggregate, 5% or more of the outstanding equity securities of such Person or (iv) any "affiliate", "associate" or member of the "immediate family" (as such terms are respectively defined in rules and regulations under the Exchange Act) of any Person described in the foregoing clauses (i), (ii) or (iii) (each of the persons described in the foregoing clauses (i), (ii), (iii) and (iv), a "Related Party") without, in each case, the affirmative vote of a majority of the directors (excluding any director who is, or is a Related Party of, the Person with whom the Corporation or any of its subsidiaries is proposing to enter into the relevant agreement or transaction (or amendment or modification thereto)).

Section 11. During any period when the holders of any series of Preferred Stock have the special right to elect additional directors, upon commencement and for the duration of such period during which such right continues: (i) the then otherwise total authorized number of directors of the Corporation shall automatically be increased by such specified number of additional directors, and the holders of such series of Preferred Stock shall be entitled to elect the  additional directors so provided for or fixed pursuant to the Certificate of Designation establishing such series of Preferred Stock, and (ii) each such additional director shall serve until such director's successor shall have been duly elected and qualified, or until such director's right to hold such office terminates pursuant to the Certificate of Designation establishing such series of Preferred Stock, whichever occurs earlier, subject to his or her earlier death, resignation, disqualification or removal. Except as otherwise provided by this Amended and Restated Certificate of Incorporation (including any Certificate of Designation establishing any series of Preferred Stock), whenever the holders of any series of Preferred Stock having the special right to elect additional directors are divested of such right pursuant to this Amended and Restated Certificate of Incorporation (including pursuant to any such Certificate of Designation), the terms of office of all such additional directors elected by the holders of such series, or elected to fill any vacancies resulting from the death, resignation, disqualification or removal of such additional directors, shall forthwith terminate and the total authorized number of directors of the Corporation shall be reduced accordingly.

Section 12. The directors of the Corporation need not be elected by written ballot unless the Bylaws so provide.

Section 13. Except as may otherwise be set forth in the resolution or resolutions of the Board providing for the issuance of one or more series of Preferred Stock, and then only with respect to such series of Preferred Stock, cumulative voting in the election of directors is specifically denied.

**ARTICLE VI**
**STOCKHOLDERS**

Section 1. In addition to any affirmative vote of the holders of any particular class or series of stock required by law or by this Amended and Restated Certificate of Incorporation (including any Certificate of Designation in respect of one or more series of Preferred Stock), the affirmative vote of the holders of at least 50% of the voting power of the outstanding shares of stock entitled to vote thereon, voting together as a single class, shall be required in order for the Corporation to take any of the following actions:

> (A) other than pursuant to a Drag-Along Sale (as defined in the Stockholders Agreement) pursuant to the terms of the Stockholders Agreement, in one transaction or a series of related transactions, the entering into of any agreement with respect to or consummation of (i) any merger or similar combination between the Corporation or any of its subsidiaries, on the one hand, and a third party, on the other hand, or (ii) any acquisition, investment, transfer or disposition of assets (including the equity securities of another person), in each case that results in a change of control of the Corporation; and

> (B) the completion of an initial public offering by the Corporation or the listing of any securities of the Corporation with a national exchange requiring registration under Section 12(b) of the Exchange Act.

Section 2. Any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of the stockholders of the Corporation or may not be taken by consent of the stockholders in lieu of a meeting; provided, however, that any action required or permitted to be taken by any holders of Preferred Stock, voting separately as a series or separately as a class with one or more other such series, may be taken without a meeting, without prior notice and without a vote, to the extent expressly so provided by the applicable Certificate of Designation relating to such series of Preferred Stock.

Section 3. Subject to the special rights of the holders of one or more series of Preferred Stock, special meetings of the stockholders of the Corporation may be called, for any purpose or purposes, at any time by the Chairman of the Board or a resolution adopted by the affirmative vote of the majority of the then-serving members of the Board, but such special meetings may not be called by stockholders or any other Person or Persons (as defined below).

Section 4. Advance notice of stockholder nominations for the election of directors and of other business proposed to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the Bylaws of the Corporation.

**ARTICLE VII**
**LIABILITY AND INDEMNIFICATION**

Section 1. To the fullest extent permitted by the DGCL, as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the DGCL is amended after approval by the stockholders of this Article VII to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL as so amended, automatically and without further action, upon the date of such amendment.

Section 2. The Corporation, to the fullest extent permitted by law, shall indemnify and advance expenses to any Person made or threatened to be made a party to any action, suit or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he or she is or was a director or officer of the Corporation or any predecessor of the Corporation, or, while serving as a director or officer of the Corporation, serves or served at any other enterprise as a director or officer at the request of the Corporation or any predecessor to the Corporation.

Section 3. The Corporation, to the fullest extent permitted by law, may indemnify and advance expenses to any Person made or threatened to be made a party to an action, suit or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he or she is or was an employee or agent of the Corporation or any predecessor of the Corporation, or serves or served at any other enterprise as an employee or agent at the request of the Corporation or any predecessor to the Corporation.

Section 4. Neither any amendment nor repeal of this Article VII, nor the adoption by amendment of this Amended and Restated Certificate of Incorporation of any provision inconsistent with this Article VII, shall eliminate or reduce the effect of this Article VII in respect of any matter occurring, or any action or proceeding accruing or arising (or that, but for this Article VII, would accrue or arise) prior to such amendment or repeal or adoption of an inconsistent provision.

**ARTICLE VIII**
**FORUM**

Section 1. Unless the Corporation consents in writing to the selection of an alternative forum, (a) the Court of Chancery (the "Chancery Court") of the State of Delaware (or, in the event that the Chancery Court does not have jurisdiction, the federal district court for the District of Delaware or other state courts of the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action, suit or proceeding brought on behalf of the Corporation, (ii) any action, suit or proceeding asserting a claim of breach of a fiduciary duty owed by any director,

officer, employee or stockholder of the Corporation to the Corporation or to the Corporation's stockholders, (iii) any action, suit or proceeding arising pursuant to any provision of the DGCL or the Bylaws or this Amended and Restated Certificate of Incorporation (as it may be amended and/or restated from time to time) or (iv) any action, suit or proceeding asserting a claim against the Corporation governed by the internal affairs doctrine; and (b) subject to the preceding provisions of this Article VIII, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. If any action the subject matter of which is within the scope of clause (a) of the immediately preceding sentence is filed in a court other than the courts in the State of Delaware (a "Foreign Action") in the name of any stockholder, such stockholder shall be deemed to have consented to (x) the personal jurisdiction of the state and federal courts in the State of Delaware in connection with any action brought in any such court to enforce the provisions of clause (a) of the immediately preceding sentence and (y) having service of process made upon such stockholder in any such action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder.

Section 2. Any person or entity purchasing or otherwise acquiring any interest in any security of the Corporation shall be deemed to have notice of and consented to this Article VIII. Notwithstanding the foregoing, the provisions of this Article VIII shall not apply to suits brought to enforce any liability or duty created by the Exchange Act or any other claim for which the federal courts of the United States have exclusive jurisdiction.

**ARTICLE IX**
**CORPORATE OPPORTUNITIES**

Section 1. In recognition and anticipation that members of the Board who are not employees of the Corporation ("Non-Employee Directors") and their respective Affiliates may now engage and may continue to engage in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, the provisions of this Article IX are set forth to regulate and define the conduct of certain affairs of the Corporation with respect to certain classes or categories of business opportunities as they may involve any of the Non-Employee Directors or their respective Affiliates and the powers, rights, duties and liabilities of the Corporation and its directors, officers and stockholders in connection therewith.

Section 2. No Non-Employee Director or his or her Affiliates (collectively, as "Identified Persons" and, individually, as an "Identified Person") shall, to the fullest extent permitted by law, have any duty to refrain from directly or indirectly (1) engaging in the same or similar business activities or lines of business in which the Corporation or any of its Affiliates now engages or proposes to engage or (2) otherwise competing with the Corporation or any of its Affiliates, and, to the fullest extent permitted by law, no Identified Person shall be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities. To the fullest extent permitted by law, the Corporation hereby renounces any interest or expectancy in, or right to be offered an opportunity to participate in, any business opportunity which may be a corporate opportunity for an Identified Person and the Corporation or any of its Affiliates, except as provided in Section 3 of this Article IX. Subject to Section 3 of this Article IX, in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for itself, herself or himself and the Corporation or any of its Affiliates, such Identified Person shall, to the fullest extent permitted by law, have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates and, to the fullest extent permitted by law, shall not be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty as a stockholder, director or officer of the Corporation solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself, herself or himself, or offers or directs such corporate opportunity to another Person.

Section 3. The Corporation does not renounce its interest in any corporate opportunity offered to any Non-Employee Director if such opportunity is expressly offered to, or acquired, created or developed by, or otherwise came into the possession of, such Non-Employee Director expressly, solely and directly in such person's official capacity such Person solely in his or her capacity as a director or officer of the Corporation, and the provisions of Section 2 of this Article IX shall not apply to any such corporate opportunity.

**ARTICLE X**
**AMENDMENT OF THE CERTIFICATE OF INCORPORATION AND BYLAWS**

Section 1. The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation, in the manner now or hereafter prescribed by this Amended and Restated Certificate of Incorporation and the DGCL, and all rights, preferences and privileges herein conferred upon stockholders, directors or any other persons herein are granted by and pursuant to this Amended and Restated Certificate of Incorporation in its current form or as hereafter amended are granted subject to the rights reserved in this Article X. Notwithstanding the foregoing, notwithstanding any other provisions of this Amended and Restated Certificate of Incorporation or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any particular class or series of stock required by law or by this Amended and Restated Certificate of Incorporation (including any Certificate of Designation in respect of one or more series of Preferred Stock), the affirmative vote of the holders of at least 50% of the voting power of the outstanding shares of stock entitled to vote thereon, voting together as a single class, shall be required to alter, amend or repeal any of provision contained in this Amended and Restated Certificate of Incorporation; provided that, in addition to and without limiting the foregoing, (i) no amendment to this Amended and Restated Certificate of Incorporation may disproportionately and adversely affect a holder of a class of capital stock of the Corporation relative to other holders of such class of capital stock of the Corporation without such holder's prior written consent, (ii) any amendment to Article V regarding the Required DIP Backstop Parties' right to nominate Directors shall require the prior written consent of the Required DIP Backstop Parties, and (iii) any amendment to Article V regarding Green Square's right to nominate the Green Square Director shall require the prior written consent of Green Square.

Section 2. The Board is expressly authorized to make, repeal, alter, amend and rescind, in whole or in part, the Bylaws. Notwithstanding the foregoing, notwithstanding any other provisions of this Amended and Restated Certificate of Incorporation or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any particular class or series of stock required by law or by this Amended and Restated Certificate of Incorporation (including any Certificate of Designation in respect of one or more series of Preferred Stock), the affirmative vote of the holders of at least 50% of the voting power of the outstanding shares of stock entitled to vote thereon, voting together as a single class, shall be required in order for the stockholders of the Corporation to alter, amend or repeal, in whole or in part, any provision of the Bylaws or to adopt any provision inconsistent therewith.

## ARTICLE XI
### DGCL SECTION 203

Section 1. The Corporation hereby expressly elects not to be governed by Section 203 of the DGCL.

## ARTICLE XII
### MISCELLANEOUS

If any provision or provisions of this Amended and Restated Certificate of Incorporation (including any Certificate of Designation relating to any series of Preferred Stock) shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (i) the validity, legality and enforceability of such provision or provisions in any other circumstance and of the remaining provisions of this Amended and Restated Certificate of Incorporation (including, without limitation, any Certificate of Designation relating to any series of Preferred Stock and each portion of any paragraph of this Amended and Restated Certificate of Incorporation or Certificate of Designation containing any such provision or provisions held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (ii) to the fullest extent possible, the provisions of this Amended and Restated Certificate of Incorporation (including, without limitation, any Certificate of Designation relating to any series of Preferred Stock and each such portion of any paragraph of this Amended and Restated Certificate of Incorporation or Certificate of Designation containing any such provision or provisions held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service or for the benefit of the Corporation to the fullest extent permitted by law.

## ARTICLE XIII
### INTERPRETATION

For as long as the Stockholders Agreement remains in effect, in the event of any conflict between the terms and provisions of this Amended and Restated Certificate of Incorporation and those contained in the Stockholders Agreement, the terms and provisions of the Stockholders Agreement shall govern and control, except as provided otherwise by mandatory provisions of the DGCL.

## ARTICLE XIV
### DEFINITIONS

As used in this Amended and Restated Certificate of Incorporation, except as otherwise expressly provided herein and unless the context requires otherwise, the following terms shall have the following meanings:

"Affiliate" means, with respect to any Person, any other Person that controls, is controlled by, or is under common control with such Person. For the purposes of this definition, "control," when used with respect to any Person, means the power to direct or cause the direction of the affairs or management of that Person, whether through the ownership of voting securities, as trustee (or the power to appoint a trustee), as a personal representative or executor, by contract, credit arrangement or otherwise and "controlled" and "controlling" have meanings correlative to the foregoing.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York.

"DIP Backstop Parties" has the meaning set forth in the Transaction Support Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations).

"Green Square" means Project Swift LLC together with its Affiliates.

"Person" means any individual, general partnership, limited partnership, limited liability company, corporation, trust, business trust, joint stock company, joint venture, unincorporated association, cooperative or association or any other legal entity or organization of whatever nature, and shall include any successor (by merger or otherwise) of such entity.

"Required DIP Backstop Parties" means, as of the date hereof, the four (4) largest holders of shares of Common Stock among the DIP Backstop Parties.

"▉▉▉▉" means ▉▉▉▉, together with its Affiliates.

"Stockholders Agreement" means the Stockholders Agreement, dated as of the date hereof, by and among the Corporation, the DIP Backstop Parties, Green Square, ▉▉▉▉, and other parties thereto.

"Transaction Support Agreement" means that certain Transaction Support Agreement, dated as of March 15, 2024, by and among the Corporation, certain of its direct and indirect subsidiaries and the various other parties signatory thereto.

\* \* \* \*

IN WITNESS WHEREOF, JOANN Inc. has caused this Amended and Restated Certificate of Incorporation to be executed by its duly authorized officer on this [●] day of [●], 2024.

**JOANN Inc.**

By: _____

Name:

Title:

# JOANN INC.
## STOCKHOLDERS' AGREEMENT

This Stockholders' Agreement (this "Agreement") is made and entered into as of [●], 2024 (the "Reorganization Date"), by and among JOANN Inc., a Delaware corporation (the "Corporation"), all of the stockholders of the Corporation party hereto as of the Reorganization Date, and any other Person who hereafter becomes a party to this Agreement pursuant to the provisions hereof as a holder of shares of capital stock of the Corporation (each, a "Holder" and, collectively, the "Holders"). The Corporation and the Holders are referred to collectively herein as the "Parties" and each individually as a "Party".

WHEREAS, the Corporation and each of the Holders desire to establish herein the terms and conditions upon which certain affairs of the Corporation shall be administered and otherwise set forth the Holders' respective rights and obligations as holders of shares of capital stock of the Corporation; and

WHEREAS, the capitalization of the Corporation shall be as set forth in the books and records of the Corporation maintained by its transfer agent.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Party, the Parties agree as follows:

1. **Definitions.** As used in this Agreement, the following terms shall have the respective meanings set forth in this Section 1:

"Accredited Investor" means "an accredited investor" as defined under Rule 501(a) of Regulation D promulgated under the Securities Act.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (for clarity, an investment fund, vehicle or account shall be deemed to be an Affiliate of all other investment funds, vehicles and accounts under common management, directly or indirectly, with such Person); provided, that for purposes of this Agreement, no Holder shall be deemed an Affiliate of the Corporation or any of its Subsidiaries.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means the sale of Registrable Securities constituting less than one percent (1%) of the outstanding shares of Common Stock to one (1) or more purchasers in a registered transaction without a prior marketing process by means of (a) a bought deal, (b) a block trade or (c) a direct sale.

"Approved Transferee" has the meaning set forth in Section 4(a).

"Board" means the board of directors of the Corporation.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York.

"Bylaws" means the Amended and Restated Bylaws of the Corporation, dated as of the Reorganization Date, as amended from time to time.

"Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of the Corporation, dated as of the Reorganization Date, and as amended from time to time.

"Chosen Courts" has the meaning set forth in Section 8(e).

"Close of Business" means, with respect to any Business Day, 5:00 p.m. Eastern Time on such Business Day.

"Commission" means the Securities and Exchange Commission or any other federal agency then administering the Securities Act or the Exchange Act.

"Common Stock" means the common stock, par value $0.01 per share, of the Corporation and shall include any securities into which such Common Stock shall have been changed, or any securities resulting from any reclassification, recapitalization or similar transactions with respect to such Common Stock.

"Common Stock Equivalent" has the meaning set forth in Section 7(a).

"Competitor" means any Person, engaged in the retail business of selling sewing, arts and crafts and home décor products to retail consumers.

"Confidential Information" has the meaning set forth in Section 3(b)(i).

"Confidentiality Agreement" has the meaning set forth in Section 2(a).

"control," including the terms "controlled by" and "under common control with," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Corporation" has the meaning set forth in the preamble and shall include any of its successors by merger, acquisition, reorganization, conversion or otherwise.

"Demand Eligible Holder" has the meaning set forth in Section 6(a)(i).

"Demand Eligible Holder Request" has the meaning set forth in Section 6(a)(i).

"Demand Notice" has the meaning set forth in Section 6(a)(i).

"Demand Registration" has the meaning set forth in Section 6(a)(i).

"Demand Registration Statement" has the meaning set forth in Section 6(a)(i).

"DIP Backstop Parties" has the meaning set forth in the Transaction Support Agreement.

"DIP Initial Director" has the meaning set forth in the Certificate of Incorporation.

"Drag-Along Holder" has the meaning set forth in Section 5(a)(i).

"Drag-Along Notice" has the meaning set forth in Section 5(a)(ii).

"Drag-Along Sale" has the meaning set forth in Section 5(a)(i).

"Dragging Holder" has the meaning set forth in Section 5(a)(i).

"Effectiveness Period" has the meaning set forth in Section 6(a)(iii).

"Equity Incentive Plan" means the Management Incentive Plan or other equity incentive plan established by the Board.

"Excess New Securities" has the meaning set forth in Section 7(b)(iii).

"Excess New Securities Notice" has the meaning set forth in Section 7(b)(iii).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Family Member" means, with respect to any natural Person, such Person's parents, spouse (but not including a former spouse or a spouse from whom such Person is legally separated) and descendants (whether or not adopted) and any trust, family limited partnership or limited liability company that is and remains solely for the benefit of such Person and such Person's spouse (but not including a former spouse or a spouse from whom such Person is legally separated) or descendants.

"Financial Statements" has the meaning set forth in Section 3(a).

"FINRA" means the Financial Industry Regulatory Authority.

"Green Square" means Project Swift LLC together with its Affiliates.

"Green Square Director" has the meaning set forth in the Certificate of Incorporation.

"Group" means a "group" within the meaning of the regulations promulgated by the Commission under Section 13(d) of the Exchange Act.

"Holder" has the meaning set forth in the preamble. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any outstanding shares of capital stock of the Corporation.

"Holders of a Majority of Included Registrable Securities" means Holders who hold a majority of the Registrable Securities included in the applicable Registration Statement.

"Indemnified Person" has the meaning set forth in Section 6(k)(i).

"Initial Public Offering" shall mean (i) the initial firm commitment underwritten Public Offering of Registrable Securities consummated for cash pursuant to an effective registration statement under the Securities Act (other than a registration statement on Form S-4 or Form S-8 (or any similar or successor form)) pursuant to which the Registrable Securities are sold and concurrently listed on a national securities exchange in the United States, (ii) the date of

effectiveness of a registration of the Registrable Securities, or equity securities of any entity in which the Registrable Securities may be converted or exchanged in connection with such registration under the Exchange Act to be listed on a national securities exchange in the United States, or (iii) any merger, consolidation, reorganization, recapitalization, capital stock exchange, stock sale, asset sale or other similar transaction or business combination (or series of related transactions or related business combinations), in each such case, between the Corporation (or any of its Affiliates) and any entity that is a "special purpose acquisition company" (or any of its Affiliates) or "blank check" company (or any of its Affiliates) after which the surviving company is listed on a national securities exchange in the United States.

"Issuer Free Writing Prospectus" means an issuer free writing prospectus, as defined in Rule 433, relating to an offer of the Registrable Securities.

"Joinder" has the meaning set forth in Section 4(a).

"Losses" has the meaning set forth in Section 6(k)(i).

"Management Incentive Plan" means an incentive equity plan for the officers and certain other members of management of the Corporation and its Subsidiaries to be implemented by the Corporation and the Board within one hundred twenty (120) days following the Reorganization Date and pursuant to which shares of Common Stock initially representing no more than ten percent (10%) of the aggregate number of shares of Common Stock outstanding as of the Reorganization Date (calculated on a fully-diluted basis and as adjusted for splits, reverse splits, combinations and recapitalizations) shall be issuable.

"Maximum Offering Size" has the meaning set forth in Section 6(a)(iv).

"New Issuance Notice" has the meaning set forth in Section 7(a).

"New Securities" has the meaning set forth in Section 7(a).

"Non-Recourse Parties" has the meaning set forth in Section 8(m).

"Observer" has the meaning set forth in Section 2(a).

"Other Registrable Securities" means (a) the Common Stock, (b) any securities issued or issuable with respect to, on account of or in exchange for Common Stock, whether by stock split, stock dividend, recapitalization, merger, consolidation or other reorganization, charter amendment or otherwise and (c) any options, warrants or other rights to acquire, and any securities received as a dividend or distribution in respect of, any of the securities described in clauses (a) and (b) above, in each case, held by any other Person who has rights to participate in any offering of securities by the Corporation pursuant to a registration rights agreement or other similar arrangement with the Corporation or any direct or indirect parent of the Corporation relating to the Common Stock (which shall not include this Agreement).

"Parties" has the meaning set forth in the preamble.

"Permitted Transferee" means, with respect to any Holder, any general or limited partner, member, stockholder or Affiliate of such Holder (other than any "portfolio company," as such term is customarily used among institutional investors).

"Person" means any individual, partnership, corporation, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

"Piggyback Eligible Holders" has the meaning set forth in Section 6(b)(i).

"Piggyback Notice" has the meaning set forth in Section 6(b)(i).

"Piggyback Registration" has the meaning set forth in Section 6(b)(i).

"Piggyback Registration Statement" has the meaning set forth in Section 6(b)(i).

"Piggyback Request" has the meaning set forth in Section 6(b)(i).

"Preemptive Rightholder" has the meaning set forth in Section 7(a).

"Proportionate Percentage" has the meaning set forth in Section 7(b)(i).

"Proposed Price" has the meaning set forth in Section 7(a).

"Proposed Transferee" has the meaning set forth in Section 5(b)(i).

"Prospectus" means the prospectus included in a Registration Statement (including a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A or 430B), as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the Registrable Securities covered by such Registration Statement, and all amendments and supplements to the Prospectus, including post-effective amendments, all material incorporated by reference or deemed to be incorporated by reference in such Prospectus and any Issuer Free Writing Prospectus.

"Public Offering" means any sale to the public pursuant to a public offering registered (other than a registration effected solely to implement an employee benefit plan, a dividend reinvestment plan, or similar plans, or a transaction to which Rule 145 is applicable) under the Securities Act.

"Qualified Holder" means, as of a particular date of determination, one or more Holders who beneficially own in the aggregate (together with their Affiliates) twenty percent (20%) or more of the outstanding Registrable Securities.

"Registrable Securities" means (a) any Common Stock, (b) any securities issued or issuable with respect to, on account of or in exchange for Common Stock, whether by stock split, stock dividend, recapitalization, merger, consolidation or other reorganization, charter amendment or otherwise and (c) any options, warrants or other rights to acquire, and any securities received as a dividend or distribution in respect of, any of the securities described in clauses (a) or (b) above, in each case, that are held by the Holders and their respective Affiliates or any transferee or assignee of any Holder or its Affiliates after giving effect to a Transfer made in compliance with this Agreement (including Section 4(a)), in each case, whether now held or hereafter acquired, all of which securities are subject to the rights provided herein for Registrable Securities until such rights terminate pursuant to the provisions of this Agreement.  As to any particular Registrable

Securities, such securities shall cease to be Registrable Securities when (a) a Registration Statement registering such Registrable Securities under the Securities Act has been declared effective and such Registrable Securities have been Transferred by the Holder thereof pursuant to such effective Registration Statement, (b) such securities are Transferred pursuant to Rule 144 and such securities are thereafter freely transferable by such recipient (without limitations on volume) without registration under the Securities Act, (c) such securities cease to be outstanding or (d) such securities may be sold pursuant to Rule 144 without time restrictions, volume or manner of sale limitations or a current public information requirement under Rule 144.

"Registration Expenses" means: (a) all registration, qualification and filing fees and expenses (including fees and expenses (i) of the Commission or FINRA, (ii) incurred in connection with the listing of the Registrable Securities on the Trading Market and (iii) incurred to comply with applicable state securities or "blue sky" laws (including reasonable fees and disbursements of counsel for the underwriters in connection with "blue sky" qualifications of the Registrable Securities)); (b) printing expenses (including expenses of printing certificates for the Corporation's shares and of printing prospectuses); (c) analyst or investor presentation or road show expenses of the Corporation and the underwriters, if any; (d) messenger, telephone and delivery expenses; (e) reasonable fees and disbursements of counsel (including any local counsel), auditors and accountants for the Corporation (including the expenses incurred in connection with "comfort letters" required by or incident to such performance and compliance); (f) the reasonable fees and disbursements of underwriters to the extent customarily paid by issuers or sellers of securities (including, if applicable, the fees and expenses of any "qualified independent underwriter" and its counsel) that are required to be retained in accordance with the rules and regulations of FINRA and the other reasonable fees and disbursements of underwriters (including reasonable fees and disbursements of counsel for the underwriters) in connection with any FINRA qualification, but excluding, for the avoidance of doubt, underwriting fees, discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities; (g) fees and expenses of any special experts retained by the Corporation; (h) Securities Act liability insurance, if the Corporation so desires such insurance; (i) reasonable fees and disbursements of one counsel (along with any reasonably necessary local counsel) representing all Holders participating in such registration mutually agreed by Holders of a Majority of Included Registrable Securities participating in such registration; and (j) fees and expenses payable in connection with any ratings of the Registrable Securities, including expenses relating to any presentations to rating agencies. For the avoidance of doubt, and notwithstanding anything herein to the contrary, "Registration Expenses" shall not include any Selling Expenses, which shall be the sole responsibility of the Holder of the related Registrable Securities.

"Registration Statement" means a registration statement of the Corporation filed with or to be filed with the Commission under the Securities Act and other applicable law, including any Prospectus, amendments and supplements to each such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"Reorganization Date" has the meaning set forth in the preamble.

"Representatives" of a Person means, as applicable, such Person's partners, shareholders, members, directors, officers, employees, agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its Affiliates or wholly owned Subsidiaries.

"<u>Required DIP Backstop Parties</u>" means, as of the relevant date of determination, the four (4) largest holders of shares of Common Stock among the DIP Backstop Parties.

"<u>Rule 144</u>" means Rule 144 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Rule 145</u>" means Rule 145 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Rule 158</u>" means Rule 158 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Rule 405</u>" means Rule 405 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Rule 415</u>" means Rule 415 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Rule 424</u>" means Rule 424 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Rule 430A</u>" means Rule 430A promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Rule 430B</u>" means Rule 430B promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Rule 433</u>" means Rule 433 promulgated by the Commission pursuant to the Securities Act, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such Rule.

"<u>Sale Notice</u>" has the meaning set forth in <u>Section 5(b)(ii)</u>.

"<u>Sale of the Corporation</u>" means (a) a single transaction or series of related transactions, whether by merger, consolidation, tender or exchange offer, or other business combination, pursuant to which, immediately following such transaction or transactions (as the case may be), (i) the shares of capital stock of the Corporation outstanding immediately prior to such transaction represent, or are converted into or exchanged for shares which represent, less than fifty percent (50%) by voting power of the shares of capital stock of (A) the surviving or resulting entity or (B) if the surviving or resulting entity is a wholly owned Subsidiary of another entity immediately following such transaction or transactions (as the case may be), the parent entity of such surviving or resulting entity; or (ii) the shareholders of the Corporation immediately prior to such transaction

or transactions (as the case may be) cease to have the right or ability, by voting power, contract or otherwise, to elect or designate for election at least a majority of the Board, or the board of directors of any direct or indirect parent thereof; (b) the sale, lease, transfer or other disposition, in a single transaction or series of related transactions, by the shareholders of the Corporation of greater than fifty percent (50%) by voting power of the shares of capital stock of the Corporation; or (c) the direct or indirect (including via a sale of the shares of capital stock of one or more Subsidiaries of the Corporation) sale, lease, transfer or other disposition, in a single transaction or a series of related transactions, by the Corporation or its Subsidiaries of all or substantially all the assets of the Corporation and its Subsidiaries taken as a whole (except where such disposition is to a wholly owned Subsidiary of the Corporation).

"Seasoned Issuer" means an issuer eligible to use Form S-3 under the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended.

"Selling Expenses" means all underwriting fees, discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and related legal and other fees of a Holder not included within the definition of Registration Expenses.

"Selling Holder" has the meaning set forth in Section 5(b)(i).

"Specified Issuance" has the meaning set forth in Section 7(c).

"Specified Issuance Offer" has the meaning set forth in Section 7(c)(ii).

"█████" means █████, together with its Affiliates.

"█████ has the meaning set forth in Section 2(a).

"Subject Purchaser" has the meaning set forth in Section 7(a).

"Subsidiary" means, with respect to any Person, (a) a corporation a majority of whose outstanding shares of capital stock or other equity securities with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by one or more subsidiaries of such Person or by such Person and one or more subsidiaries of such Person, and (b) any other Person (other than a corporation) in which such Person, one or more subsidiaries of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest or (ii) the power to elect or direct the election of the directors or other governing body of such Person.

"Suspension Period" has the meaning set forth in Section 6(d).

"Tag-Along Holder" has the meaning set forth in Section 5(b)(i).

"Tag-Along Notice" has the meaning set forth in Section 5(b)(iii).

"Tag-Along Period" has the meaning set forth in Section 5(b)(iii).

"Tag-Along Sale" has the meaning set forth in Section 5(b)(i).

"Tag-Along Seller" has the meaning set forth in Section 5(b)(iii).

"Trading Market" means the principal national securities exchange in the United States on which Registrable Securities are (or are to be) listed.

"Transaction Support Agreement" means that certain Transaction Support Agreement, dated as of March 15, 2024, by and among the Corporation, certain of its direct and indirect subsidiaries and the various other parties signatory thereto.

"Transfer" has the meaning set forth in Section 4(a).

"WKSI" means a "well-known seasoned issuer" as defined under Rule 405 and which (a) is a "well-known seasoned issuer" under paragraph (1)(i)(A) of such definition or (b) is a "well-known seasoned issuer" under paragraph (1)(i)(B) of such definition and is also a Seasoned Issuer.

Unless the context requires otherwise: (a) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neutral forms; (b) references to Sections, Schedules, Exhibits, paragraphs and clauses refer to Sections, Schedules, Exhibits paragraphs and clauses of this Agreement; (c) the terms "include," "includes," "including" or words of like import shall be deemed to be followed by the words "without limitation"; (d) the terms "hereof," "herein" or "hereunder" refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) the term "or" is not exclusive and shall have the inclusive meaning of "and/or"; (f) defined terms herein will apply equally to both the singular and plural forms and derivative forms of defined terms will have correlative meanings; (g) references to any law or statute shall be deemed to refer to such law or statute as amended or supplemented from time to time and shall include all rules and regulations and forms promulgated thereunder, and references to any law, rule, form or statute shall be construed as including any legal and statutory provisions, rules or forms consolidating, amending, succeeding or replacing the applicable law, rule, form or statute; (h) references to any Person include such Person and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns; (i) references to "days" are to calendar days unless otherwise indicated; (j) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded; (k) references to "writing" or "written" shall include electronic mail (provided that no error or failure to deliver message is received); (l) all references to $, currency, monetary values and dollars set forth herein shall mean United States dollars; and (m) all references to "outstanding shares" shall include only those shares issued and outstanding as of the particular date of reference and, for the avoidance of doubt, shall not be calculated on a fully-diluted basis unless expressly required to be so calculated.  Each Party acknowledges that it was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction shall be raised or used in which the provisions of this Agreement shall be construed in favor or against any Party because one is deemed to be the author thereof.

## 2. **Board of Directors.**

(a)    Required DIP Backstop Parties. When selecting the DIP Initial Directors, the Required DIP Backstop Parties shall act with the consent of Required DIP Backstop Parties holding a majority of the shares of Common Stock held by the Required DIP Backstop Parties in the aggregate.

(b)    <u>Observer</u>. For so long as ▮▮▮▮ (together with its Permitted Transferees) holds at least 8.15% of the fully-diluted shares of Common Stock (excluding any equity securities issued pursuant to any Equity Incentive Plan) (the "▮▮▮▮<u>Threshold</u>"), ▮▮▮▮ shall have the right to designate one non-voting observer to the Board who shall be invited by the Board to attend all meetings of the Board, who shall initially be Roger Marrero (the "<u>Observer</u>"); <u>provided</u> that such Observer must execute a confidentiality agreement with the Corporation in a form reasonably satisfactory to the Corporation (it being understood that such confidentiality agreements will be in a form reasonably customary for such circumstances) (the "<u>Confidentiality Agreement</u>").  Subject to the Confidentiality Agreement, such Observer shall be provided correct and complete copies of all notices, minutes, consents and other materials that are provided to directors in the same manner as the same are provided to such directors; provided that the Corporation reserves the right to withhold any information and to exclude such Observer from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Corporation and its counsel or result in the disclosure of trade secrets or with respect to a conflict of interest. If the Corporation excludes the Observer from any information, meeting or portion thereof pursuant to the immediately preceding sentence, the Corporation shall provide a written explanation of the good faith basis for such exclusion. For so long as ▮▮▮▮ (together with its Permitted Transferees) meets the ▮▮▮▮ Threshold, ▮▮▮▮ shall have the right to remove the Observer by delivering written notice thereof to the Board. For so long as ▮▮▮▮ (together with its Permitted Transferees) meets the ▮▮▮▮ Threshold, any vacancy of the Observer resulting from the death, resignation, removal or otherwise of the Observer shall be filled by an individual designated by ▮▮▮▮; <u>provided</u>, that the identity of the replacement Observer shall be subject to the consent of stockholders owning a majority of the outstanding shares of Common Stock (which consent shall not be unreasonably withheld).  In the event that ▮▮▮▮ (together with its Permitted Transferees) fails to meet the ▮▮▮▮ Threshold, ▮▮▮▮ shall no longer have the right to appoint an Observer and any Observer previously appointed by such Holder shall immediately lose the rights granted to the Observer hereunder.

(c)    <u>Removal of Directors</u>. Notwithstanding anything to the contrary in the Bylaws:

(i)    during the Interim Term (as defined in the Certificate of Incorporation), each Holder agrees and covenants that it shall vote (or cause to be voted or provide consent with respect to) all of such Holder's Common Stock and any other voting securities of the Corporation over which such Holder has voting control and shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings or executing consents in lieu of any meeting) so that (A) the Interim DIP Director may not be removed unless the Required DIP Backstop Parties shall have first provided written notice to the Board of the Required DIP Backstop Parties' determination to remove such Interim DIP Director at least one (1) Business Day prior to the effectiveness of such removal, and (B) the Interim DIP Director as to which the Required DIP Backstop Parties shall have provided such written notice shall be removed;

(ii)    during the Initial Term (as defined in the Certificate of Incorporation), each Holder agrees and covenants that it shall vote (or cause to be voted or provide consent with respect to) all of such Holder's Common Stock and any other voting securities of the Corporation over which such Holder has voting control and shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by

proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings or executing consents in lieu of any meeting) so that (A) no DIP Initial Director may be removed unless the Required DIP Backstop Parties shall have first provided written notice to the Board of the Required DIP Backstop Parties' determination to remove such DIP Initial Director at least one (1) Business Day prior to the effectiveness of such removal, and (B) any DIP Initial Director as to which the Required DIP Backstop Parties shall have provided such written notice shall be removed;

(iii)    following the Initial Term, any Director, other than the Green Square Director, may be removed, with or without cause, upon the affirmative vote of Holders owning a majority of the then outstanding shares of Common Stock; and

(iv)    for so long as Green Square (together with 3551300 Canada Inc. and Universe Group, Inc. for so long as Green Square has been granted a full proxy to vote the shares of Common Stock held by such Persons) collectively have not transferred shares of Common Stock (other than to a Permitted Transferee) resulting in them owning less than 5.00% of the fully-diluted outstanding shares of Common Stock (the "Green Square Threshold"), each Holder agrees and covenants that it shall vote (or cause to be voted or provide consent with respect to) all of such Holder's Common Stock and any other voting securities of the Corporation over which such Holder has voting control and shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings or executing consents in lieu of any meeting) so that (A) the Green Square Director may not be removed unless Green Square shall have first provided written notice to the Board of Green Square's determination to remove the Green Square Director at least one (1) Business Day prior to the effectiveness of such removal, and (B) the Green Square Director as to which Green Square shall have provided such written notice shall be removed.

3.    **Information Rights.**

(a)    <u>Financial Statements</u>.  The Corporation will furnish (via an electronic data room) to each Holder the following: (i) within fifteen (15) days following the conclusion of each calendar month, management's discussion and analysis of the important operational and financial developments during such month, (ii) within forty-five (45) days (or sixty (60) days in the case of the first three fiscal quarters ending after the Reorganization Date) following the conclusion of each of the Corporation's first three (3) fiscal quarters of each fiscal year, quarterly unaudited consolidated financial statements of the Corporation and its Subsidiaries and management's discussion and analysis of the important operational and financial developments during such quarterly accounting period; (iii) within ninety (90) days after the end of each fiscal year, annual audited consolidated financial statements of the Corporation and its Subsidiaries and management's discussion and analysis of the important operational and financial developments during such fiscal year (collectively, the "Financial Statements").  Additionally, each Holder shall be entitled to (A) access any information that is made generally available to "public side" lenders of the Corporation or its subsidiaries and (B) join any quarterly earnings calls that the Corporation may from time to time be required to conduct in accordance with any third-party financing agreements to which the Corporation is a party.  Any Holder entitled to receive any of the foregoing financial information may elect to not receive such information, for any reason or no reason, by notifying the Corporation in writing.  Notwithstanding anything to the contrary herein, no Holder will be furnished with or otherwise entitled to receive any of the foregoing financial information

and shall not be permitted to share with any bona fide potential transferees described in <u>Section 3(b)(i)(C)</u> if such Holder or potential transferee, at the time such information is to be distributed, is a Competitor, and each Holder and potential transferee, upon request, must certify to the Corporation (including, for materials provided through an electronic data room, through the use of click-through confidentiality prompts) that it is in compliance with this <u>Section 3(a)</u>.  Each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of <u>Section 3(b)</u> if such Representative or recipient were party to this Agreement.

(b)    <u>Confidentiality</u>.

(i)    Each Holder acknowledges that any notices or non-public information furnished, including verbally, pursuant to this Agreement (the "<u>Confidential Information</u>") is confidential and may be competitively sensitive.  Each Holder shall use, and shall cause any Person to whom it discloses Confidential Information pursuant to <u>clause (A)</u> or <u>(C)</u> below to use, the Confidential Information only in connection with its investment in the shares of Common Stock or other securities of the Corporation and not for any other purpose (including to competitively disadvantage the Corporation or any other Holder).  Each Holder shall not disclose any Confidential Information to any Person; <u>provided</u> that Confidential Information may be disclosed:

(A)    to such Holder's Representatives in the normal course of the performance of their duties for such Holder (it being understood that such Representatives shall be informed by such Holder of the confidential nature of such information and shall be directed to treat such information in accordance with this <u>Section 3(b)</u>);

(B)    to the extent requested or required by applicable law, rule or regulation; <u>provided</u>, that such Holder shall, to the extent practicable and permitted by law, give the Corporation prompt written notice of such request(s) (including if received by a Representative), so that the Corporation may, at its sole expense, seek an appropriate protective order or similar relief (and such Holder shall, and shall use commercially reasonable efforts to cause its Representative (if applicable) to, use commercially reasonable efforts to cooperate with such efforts by the Corporation, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall use commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information);

(C)    to any Person to whom such Holder is contemplating a bona fide Transfer of its shares of Common Stock or other shares of capital stock of the Corporation permitted in accordance with the terms hereof; <u>provided</u> that such Person is not prohibited from receiving such information pursuant to this <u>Section 3</u> and, prior to such disclosure, such potential transferee either (i) accesses such information through an electronic data room that requires the use of customary click-through confidentiality prompts pursuant to which such Person agrees to be subject to confidentiality obligations specified therein or (ii) is advised of the confidential nature of such information and executes a non-disclosure agreement in customary form and subject to customary exceptions pursuant to which such Person is subject to confidentiality obligations substantially similar to the confidentiality obligations of such Holders contained in this <u>Section 3</u>;

(D)    to any governmental, regulatory or self-regulatory authority or rating agency to which such Holder or any of its Affiliates is subject or with which it has

regular dealings in connection with any routine request of or any routine examination by such authority or agency, as long as such authority or agency is advised of the confidential nature of such information;

(E)    in connection with such Holder's or such Holder's Affiliates' normal fundraising, marketing, informational or reporting activities; provided, that prior to such disclosure the Persons to whom such information is disclosed are advised of the confidential nature of such information and execute a non-disclosure agreement in a form approved by the Board and which agreement is independently enforceable by the Corporation; or

(F)    if the prior written consent of the Board shall have been obtained.

(ii)    Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Corporation or any Holder.  The restrictions contained in this Section 3(b) shall terminate, with respect to any Holder, twelve (12) months following the date on which such Holder ceases to own any shares of Common Stock or any other shares of capital stock of the Corporation.

(iii)    Confidential Information, with respect to any Holder, does not include information that: (A) is or becomes generally available to the public (including as a result of any information filed or submitted by the Corporation with the Commission) other than as a result of a disclosure by such Holder or its Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement; (B) is or was available to such Holder or its Representatives on a non-confidential basis prior to its disclosure to such Holder or its Representatives by the Corporation; or (C) was or becomes available to such Holder or its Representatives on a non-confidential basis, in each case of the foregoing clauses (B) and (C), from a source other than the Corporation, which source is or was (at the time of receipt of the relevant information) not, to the best of such Holder's or its Representatives' knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Corporation or another Person.

4.    **Transfer Restrictions.**

(a)    Requirements for Transfer.

(i)    Each Holder agrees that it shall not, directly or indirectly, whether by merger, consolidation, division or otherwise, and whether by or through one or more Affiliates, transfer, sell, assign, pledge, hypothecate or otherwise dispose of (any such transaction, a "Transfer"), any of its shares of capital stock of the Corporation except (A) in compliance with the Securities Act, (B) in compliance with any other applicable securities or "blue sky" laws, (C) in accordance with the terms and conditions of the Bylaws, the Certificate of Incorporation and this Agreement and (D) to a Permitted Transferee of such Holder or to an unaffiliated, third-party transferee which, unless otherwise approved in writing by the Board, as of the expected date of such Transfer, is not a Competitor (the transferee of any such Transfer being an "Approved Transferee"); provided, however, that Transfers pursuant to a Drag-Along Sale in accordance with Section 5(a) hereof shall not be subject to the restrictions in the foregoing clause (D); provided, further, that with respect to a Transfer to an unaffiliated, third-party transferee, the transferring

Holder shall have complied with <u>Section 5(b)</u>.  The transfer agent of the Corporation shall update the books and records of the Corporation from time to time to reflect (x) any additional Holders that are Approved Transferees or new Holders that become party hereto in accordance with this Agreement's terms, (y) the removal of any Persons who are no longer Holders and (z) any changes in any Holder's address.

(ii)    No shares of capital stock (including any shares of Common Stock) shall be Transferred to any Person who is not a party to this Agreement unless and until such Person shall have executed and delivered to the Corporation a Joinder Agreement in substantially the form attached hereto as <u>Exhibit A</u> (a "<u>Joinder</u>").

(iii)    In no event prior to an Initial Public Offering may any Transfer of shares of Common Stock by any Holder be made if, in the Corporation's reasonable, good-faith judgment, such Transfer could, or could reasonably be expected to, cause the Corporation to, after giving effect to the exercise, conversion or exchange of all securities convertible into, or exercisable or exchangeable for, shares of Common Stock, register the Common Stock under Section 12(g) of the Exchange Act, or otherwise be subject to the reporting obligations under Section 15(d) of the Exchange Act.

(iv)    Any attempt to Transfer any shares of capital stock of the Corporation not in compliance with this Agreement, the Bylaws or the Certificate of Incorporation shall be null and void *ab initio*, and the Corporation shall not give any effect in the Corporation's stock records to such attempted Transfer.  Nothing in this <u>Section 4</u> shall limit any restrictions on Transfer contained in any other contract by and among the Corporation and any of the Holders, or by and among any of the Holders.

(b)    <u>New Issuances</u>.  No shares of capital stock (including any shares of Common Stock) shall be issued to any Person who is not a party to this Agreement (including upon the exercise of any options or other shares of capital stock issued to any director, officer or employee of the Corporation pursuant to an Equity Incentive Plan) unless and until such Person shall have duly executed and delivered to the Corporation a Joinder.

(c)    <u>DTC</u>. A person "owns" shares held in the name of a nominee or other intermediary (including the Depository Trust Company) if and so long as such person retains both: (A) the full voting and investment rights pertaining to the shares and (B) the full economic interest in the shares. The person's ownership of shares is deemed to continue during any period in which the person has delegated any voting power by means of a proxy, power of attorney, or other instrument or arrangement that is revocable at any time by the person.

## 5.    **Drag-Along Rights; Tag-Along Rights; Additional Rights.**

(a)    <u>Drag-Along Rights</u>.

(i)    If at any time one or more Holders who together own more than fifty percent (50%) of the then outstanding shares of capital stock of the Corporation (excluding any shares issuable pursuant to an Equity Incentive Plan) (collectively, a "<u>Dragging Holder</u>"), receives a bona fide offer from an unaffiliated third-party purchaser to consummate a Sale of the Corporation (a "<u>Drag-Along Sale</u>"), the Dragging Holder shall have the right to require that each other Holder (each, a "<u>Drag-Along Holder</u>") participate in such transfer in the manner set forth in this <u>Section 5(a)</u>.  Notwithstanding anything to the contrary in this Agreement, each Drag-Along Holder shall

vote (or cause to be voted or provide consent with respect to) in favor of the transaction and take all actions to waive any dissenters, appraisal or other similar rights; provided, however, that no Drag-Along Holder shall be deemed to have provided a proxy in any respects, whether directly or indirectly, with respect to its voting or consent rights pursuant to this Section 5(a) or otherwise as set forth in this Agreement.

(ii)    The Dragging Holder shall exercise its rights pursuant to this Section 5(a) by delivering a written notice (the "Drag-Along Notice") to the Corporation no later than twenty (20) days prior to the closing date of such Drag-Along Sale. The Corporation will promptly deliver a copy of the Drag-Along Notice to each Drag-Along Holder. The Drag-Along Notice shall make reference to the Dragging Holder's rights and obligations hereunder and shall describe in reasonable detail: (A) the number of outstanding shares of capital stock of the Corporation to be sold by the Dragging Holder, if the Drag-Along Sale is structured as a Transfer of capital stock of the Corporation; (B) the identity of the third-party purchaser; (C) the proposed date, time and location of the closing of the Drag-Along Sale; (D) the per share purchase price and the other material terms and conditions of the Transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith to the extent available.

(iii)    All Holders shall receive the same form and amount of consideration per share, which shall be in the form of cash, securities or otherwise (or any combination thereof), in connection with a Drag-Along Sale (or, if any Holder is given an option as to the form and amount of consideration to be received, the same option shall be given to all other Holders), and the terms and conditions of such Transfer shall, except as otherwise provided in the immediately succeeding sentence, be the same as those upon which the Dragging Holder Transfers its shares. Any representations and warranties to be made or provided by a Drag-Along Holder in connection with such Drag-Along Sale shall be limited to representations and warranties related to such Drag-Along Holder's authority, ownership and the ability to convey title to its shares and, with respect thereto, shall be the same representations and warranties that the Dragging Holder makes or provides with respect to its shares; a Drag-Along Holder will not be required to agree to any non-competition, non-solicitation or similar restrictions in connection with such Drag-Along Sale; and any covenants, indemnities and agreements made by the Drag-Along Holders shall be the same covenants, indemnities and agreements as the Dragging Holder makes or provides in connection with the Drag-Along Sale, except that with respect to covenants, indemnities and agreements pertaining specifically to the Dragging Holder, the Drag-Along Holder shall make the comparable covenants, indemnities and agreements pertaining specifically to itself; provided, that any indemnification obligation relating to the Corporation shall be (A) *pro rata* based on the consideration received by the Dragging Holder and each Drag-Along Holder, in each case in an amount not to exceed the aggregate proceeds actually received by the Dragging Holder and each such Drag-Along Holder in connection with the Drag-Along Sale and (B) paid out of an escrow, expense or similar fund established for the purpose of covering such obligations.

(iv)    Each Holder shall take all actions as may be reasonably necessary to consummate the Drag-Along Sale, including entering into customary agreements and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Dragging Holder and subject to the terms of this Section 5(a).

(v)    The reasonable and documented out-of-pocket fees and expenses of the Dragging Holder incurred in connection with a Drag-Along Sale and for the benefit of all Holders

as determined in good faith by the Board (it being understood that costs incurred by or on behalf of a Dragging Holder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Corporation or the third-party purchaser, shall be shared by all the Holders on a *pro rata* basis, based on the aggregate consideration received by each Holder in such Drag-Along Sale; provided, that no Holder shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Drag-Along Sale.

(vi)    The Dragging Holder shall have one hundred and twenty (120) days following the date of the Drag-Along Notice in which to consummate the Drag-Along Sale, on the terms set forth in the Drag-Along Notice (which such period may be extended for a reasonable time not to exceed an additional one hundred and eighty (180) days to the extent reasonably necessary to obtain any required government approvals).  If, at the end of such period, the Dragging Holder has not completed the Drag-Along Sale, the Dragging Holder may not then effect a transaction subject to this Section 5(a) without again fully complying with the provisions of this Section 5(a).

(b)    Tag-Along Rights.

(i)    If at any time a Holder or Group of Holders (the "Selling Holder(s)"), in one transaction, or a series of related transactions, proposes to Transfer more than fifty percent (50%) of the outstanding shares of capital stock of the Corporation (calculated on a fully-diluted basis, excluding any shares issuable pursuant to an Equity Incentive Plan) to any Person other than a Permitted Transferee (the "Proposed Transferee") and the Selling Holder(s) cannot or has not elected to exercise its drag-along rights set forth in Section 5(a), each other Holder (each, a "Tag-Along Holder") shall be permitted to participate in such Transfer (a "Tag-Along Sale") on the terms and conditions set forth in this Section 5(b).

(ii)    Prior to the consummation of any Tag-Along Sale, the Selling Holder(s) shall deliver to the Corporation and each other Holder a written notice (a "Sale Notice") of the proposed Tag-Along Sale subject to this Section 5(b) no later than twenty (20) days prior to the closing date of the Tag-Along Sale.  The Sale Notice shall make reference to the Tag-Along Holders' rights hereunder and shall describe in reasonable detail: (A) the aggregate number of shares of capital stock of the Corporation the Proposed Transferee has offered to purchase; (B) the identity of the Proposed Transferee; (C) the proposed date, time and location of the closing of the Tag-Along Sale; (D) the per share purchase price and the other material terms and conditions of the Transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

(iii)    Each Tag-Along Holder may exercise its right to participate in a Transfer of outstanding shares of capital stock of the Corporation by the Selling Holder(s) subject to this Section 5(b) by delivering to the Selling Holder(s) a written notice (a "Tag-Along Notice") stating its election to do so and specifying the number of shares of capital stock of the Corporation to be Transferred by it no later than fifteen (15) days after receipt of the Sale Notice (the "Tag-Along Period").  The offer of each Tag-Along Holder set forth in a Tag-Along Notice shall be irrevocable, and, to the extent such offer is accepted, such Tag-Along Holder shall be bound and obligated to Transfer in the proposed Transfer on the terms and conditions set forth in this Section 5(b).  Each Tag-Along Holder that timely delivers a Tag-Along Notice (a "Tag-Along Seller") shall have the right to Transfer in a Transfer subject to this Section 5(b) up to the number of outstanding shares

of capital stock of the Corporation equal to the product of (A) the aggregate number of outstanding shares of capital stock of the Corporation owned by the Tag-Along Seller and (B) a fraction (x) the numerator of which is equal to the number of outstanding shares of capital stock of the Corporation proposed to be sold by the Selling Holder(s) in the Tag-Along Sale, and (y) the denominator of which is equal to the number of outstanding shares of capital stock of the Corporation owned by the Selling Holder(s).

(iv)     Each Tag-Along Holder who does not deliver a Tag-Along Notice in compliance with Section 5(b)(iii) above shall be deemed to have waived all of such Tag-Along Holder's rights to participate in such Transfer, and the Selling Holder(s) shall (subject to the rights of any other Tag-Along Seller) thereafter be free to Transfer to the Proposed Transferee its shares at a per share price that is no greater than the per share price set forth in the Sale Notice and on other terms and conditions which are not materially more favorable to the Selling Holder(s) than those set forth in the Sale Notice without any further obligation to the Tag-Along Holders who did not deliver a Tag-Along Notice in compliance with Section 5(b)(iii). The Proposed Transferee shall not be obligated to purchase a number of shares of capital stock of the Corporation exceeding that set forth in the Sale Notice and, in the event such Proposed Transferee elects to purchase less than all of the additional shares of capital stock of the Corporation sought to be Transferred by all Tag-Along Sellers, the aggregate number of shares of capital stock to be Transferred by the Selling Holder(s) and the Tag-Along Sellers shall be reduced on a *pro rata* basis (based on the number of shares of capital stock of the Corporation sought to be Transferred by each such Selling Holder and Tag-Along Seller).

(v)     Each Tag-Along Seller shall receive the same consideration per share as the Selling Holder(s) after deduction of such Tag-Along Seller's proportionate share of the related expenses in accordance with Section 5(b)(vii).

(vi)     Each Tag-Along Seller shall make or provide the same representations, warranties, covenants, indemnities and agreements as the Selling Holder(s) makes or provides in connection with the Tag-Along Sale (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Selling Holder(s), the Tag-Along Seller shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to itself); provided, that no Tag-Along Seller will be required to agree to any non-competition, non-solicitation or similar restrictions in connection with such Tag-Along Sale; provided, further, that all representations, warranties, covenants and indemnities shall be made by each Selling Holder and each Tag-Along Seller severally and not jointly and any indemnification obligation in respect of breaches of representations and warranties shall be borne (A) in the case of representations and warranties made with respect to the Selling Holders and the Tag-Along Holders, exclusively by the Selling Holder(s) and the Tag-Along Holder(s) responsible for such breach(es), and (B) in the case of representations and warranties relating to the Corporation, by all of the Selling Holders and the Tag-Along Sellers *pro rata* based on the consideration received by each Selling Holder and each Tag-Along Seller, in each case, in an amount not to exceed the aggregate proceeds actually received by each such Selling Holder and Tag-Along Seller in connection with the Tag-Along Sale.

(vii)     The reasonable and documented out-of-pocket fees and expenses of the Selling Holder(s) incurred in connection with a Tag-Along Sale and for the benefit of all Tag-Along Sellers as determined in good faith by the Board (it being understood that costs incurred by or on behalf of the Selling Holder(s) for its sole benefit will not be considered to be for the benefit

-17-

of all Tag-Along Sellers), to the extent not paid or reimbursed by the Corporation or the Proposed Transferee, shall be shared by all of the Tag-Along Sellers on a *pro rata* basis, based on the aggregate consideration received by each such Tag-Along Seller in such Tag-Along Sale; provided, that no Tag-Along Seller shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Tag-Along Sale.

(viii)    Each Tag-Along Seller shall take all actions as may be reasonably necessary to consummate the Tag-Along Sale, including entering into customary agreements and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Selling Holder(s).

(ix)    The Selling Holder(s) shall have one hundred and twenty (120) days following the expiration of the Tag-Along Period in which to Transfer the shares of capital stock of the Corporation described in the Sale Notice and the shares to be sold by the Tag-Along Sellers, on the terms set forth in the Sale Notice (which such one hundred and twenty (120) day period may be extended for a reasonable time not to exceed an additional one hundred and eighty (180) days to the extent reasonably necessary to obtain any required government approvals).  If, at the end of such period, the Selling Holder(s) has not completed such Tag-Along Sale, the Selling Holder(s) may not then effect a Transfer of the shares that were the subject of such proposed Tag-Along Sale without again fully complying with the provisions of this Section 5(b).

(x)    If the Selling Holder Transfers to the Proposed Transferee any of its shares in breach of this Section 5(b), then each Tag-Along Holder shall have the right to Transfer to the Selling Holder(s), and the Selling Holder(s) undertakes to purchase from each Tag-Along Holder, the number of shares of capital stock of the Corporation that such Tag-Along Holder would have had the right to Transfer to the Proposed Transferee pursuant to this Section 5(b), for a per share amount and form of consideration and upon the terms and conditions on which the Proposed Transferee bought such shares from the Selling Holder(s), but without indemnity being granted by any Tag-Along Holder to the Selling Holder(s); provided, that nothing contained in this Section 5(b)(x) shall preclude any Tag-Along Holder from seeking alternative remedies against such Selling Holder(s) as a result of its breach of this Section 5(b).  The Selling Holder(s) shall also reimburse each Tag-Along Holder for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the Tag-Along Holder's rights hereunder.

(c)    Additional Rights.

(i)    Each Holder shall have the right, at any time and in each Holder's sole discretion, upon written notice to the Corporation, to require the Corporation to redeem all of such Holder's Common Stock of the Corporation for an aggregate purchase price of $1.00; provided, however, that notwithstanding anything to the contrary contained in this Agreement, if at the time of receiving such written notice the Corporation is then subject to any restrictions in its third-party financing agreements that would prohibit such redemption, then the Corporation shall not be obligated to effectuate such redemption unless and until it is permitted to do so under such financing agreements.

(ii)    In connection with (A) a voluntary or involuntary liquidation, dissolution or winding up of the Corporation, (B) any dividend or distribution made to the Holders by the Corporation or (C) any other similar transaction, if the consideration to be paid to the Holders

consists, in whole or in part, of consideration other than cash, the Holders may (in their sole and absolute discretion) elect to forego the receipt of any such consideration, with no further payment obligations to such electing Holder on behalf of the Corporation or any other person.

**6.**    **Registration Rights.**

(a)    Demand Registration.

(i)    At any time and from time to time commencing one hundred and eighty (180) days after the consummation of an Initial Public Offering upon written notice to the Corporation (a "Demand Notice") delivered by a Qualified Holder or Qualified Holders requesting that the Corporation effect the registration (a "Demand Registration") under the Securities Act (other than pursuant to a Registration Statement on Form S-4 or Form S-8 or any similar or successor form under the Securities Act) of any or all of the Registrable Securities held by such Qualified Holder(s), the Corporation shall promptly (but in any event, not later than five (5) Business Days following the Corporation's receipt of such Demand Notice) give written notice of the receipt of such Demand Notice to all other Holders that, to its knowledge, hold Registrable Securities (each, a "Demand Eligible Holder").  The Corporation shall use its commercially reasonable efforts to, within forty-five (45) days following the receipt of such Demand Notice (subject to compliance with any applicable covenants in any underwriting agreement for a previous registration effected under this Section 6(a) or under Section 6(b)), file the appropriate Registration Statement (the "Demand Registration Statement") subject to Section 6(a)(ii) and use its commercially reasonable efforts to effect, at the earliest practicable date, the registration under the Securities Act and under the applicable state securities laws of (A) the Registrable Securities which the Corporation has been so requested to register by the Qualified Holder(s) in the Demand Notice, (B) all other Registrable Securities of the same class or series as those requested to be registered by the Qualified Holder(s) that the Corporation has been requested to register by the Demand Eligible Holders by written request (the "Demand Eligible Holder Request") given to the Corporation within twenty (20) days following the receipt of the Corporation's written notice of the receipt of the Demand Notice and (C) any Registrable Securities to be offered and sold by the Corporation, in each case subject to Section 6(a)(iv), all to the extent required to permit the disposition (in accordance with the intended methods of disposition) of the Registrable Securities to be so registered.  Notwithstanding anything in this Section 6 to the contrary, the Corporation shall not be obligated to (I) effect more than one (1) Demand Registrations in any six (6)-month period, (II) effect any Demand Registration within ninety (90) days from the date of effectiveness of a Demand Registration Statement or (III) comply with a Demand Notice to the extent the Corporation has already complied with five (5) Demand Notices pursuant to the terms hereof.

(ii)    Demand Registration Using Form S-3.  The Corporation shall effect any requested Demand Registration using Form S-3 whenever the Corporation is a Seasoned Issuer or a WKSI and is eligible to use such form under applicable rules.

(iii)    Effectiveness of Demand Registration Statement.  The Corporation shall use its commercially reasonable efforts to have the Demand Registration Statement declared effective by the Commission and keep the Demand Registration Statement continuously effective under the Securities Act for the lesser of three years from the effective date of such Registration Statement and the period of time necessary for the underwriters to sell all of the Registrable Securities covered by such Demand Registration Statement (including by filing with the Commission a post-effective amendment or a supplement to the Demand Registration Statement

or the related Prospectus or any document incorporated therein by reference or by filing any other required document or otherwise supplementing or amending the Demand Registration Statement, in each case, if required by the rules, regulations or instructions applicable to the registration form used by the Corporation for such Demand Registration Statement or by the Securities Act, any state securities or "blue sky" laws or any other rules and regulations thereunder or if otherwise necessary) (the "Effectiveness Period"). A Demand Registration requested pursuant to this Section 6(a) shall not be deemed to have been effected (A) if the Demand Registration Statement is withdrawn without becoming effective, (B) if the Demand Registration Statement has not been declared effective or does not remain effective in compliance with the provisions of the Securities Act and the laws of any state or other jurisdiction applicable to the disposition of the Registrable Securities covered by such Registration Statement for the Effectiveness Period, (C) if, after it has become effective, such Registration Statement is subject to any stop order, injunction or other order or requirement of the Commission or other governmental or regulatory agency or court for any reason other than a violation of applicable law solely by any Selling Holder and has not thereafter again become effective, or (D) in the event of an underwritten offering, if the conditions to closing specified in the underwriting agreement entered into in connection with such registration are not satisfied or waived other than by reason of some wrongful act or omission by a Selling Holder.

(iv)    Priority of Registration.    Notwithstanding any other provision of this Section 6(a), if (A) the Qualified Holder(s) intend to distribute the Registrable Securities covered by a Demand Registration by means of an underwritten offering and (B) the managing underwriters advise the Corporation that, in their reasonable view, the number of Registrable Securities proposed to be included in such offering (including Registrable Securities requested by Holders to be included in such offering and any securities that the Corporation or any other Person proposes to be included that are not Registrable Securities) exceeds the number of such Registrable Securities that can be sold in such underwritten offering or the number of such Registrable Securities proposed to be included in such Demand Registration would adversely affect the price per share of the Common Stock proposed to be sold in such underwritten offering (in either situation, the "Maximum Offering Size"), then the Corporation shall so advise the Qualified Holder(s) and the Demand Eligible Holders with Registrable Securities requested to be included in such underwritten offering, and shall include in such offering the number of Registrable Securities which can be so sold in the following order of priority, up to the Maximum Offering Size: (x) first, the Registrable Securities requested to be included in such underwritten offering by the Qualified Holders and the Demand Eligible Holders, allocated, if necessary for the offering not to exceed the Maximum Offering Size, *pro rata* among the Qualified Holders and Demand Eligible Holders on the basis of the number of Registrable Securities owned by each such Holder, up to the Maximum Offering Size; (y) second, any securities proposed to be registered by the Corporation; and (z) third, Other Registrable Securities requested to be included in such underwritten offering to the extent permitted hereunder, allocated, if necessary for the offering not to exceed the Maximum Offering Size, *pro rata* among the respective holders of such Other Registrable Securities on the basis of the number of securities owned by each such holder or as otherwise agreed between the holders of such securities. For any holder of Registrable Securities that is a partnership, limited liability company, corporation or other entity, the partners, members, stockholders, Subsidiaries, parents and Affiliates of such holder, or the estates and Family Members of any such partners or members and retired partners or members and any trusts for the benefit of any of the foregoing Persons, shall be deemed to be a single "holder," and any *pro rata* reduction with respect to such Other Registrable Securities shall be based upon the aggregate

amount of securities requested to be included in such registration by all entities and individuals included in such Other Registrable Securities.

(v)    <u>Underwritten Demand Registration</u>.  The determination of whether any offering of Registrable Securities pursuant to a Demand Registration will be an underwritten offering shall be made in the sole discretion of the Holders of a Majority of Included Registrable Securities included in such underwritten offering, and such Holders of a Majority of Included Registrable Securities shall have the right to (A) determine the plan of distribution, including the price at which the Registrable Securities are to be sold and the underwriting commissions, discounts and fees, and (B) select the investment banker(s) and manager(s) to administer the offering (which shall consist of one or more reputable nationally recognized investment banks reasonably satisfactory to the Corporation) and one firm of counsel to represent all of the Holders (along with any reasonably necessary local counsel), in connection with such Demand Registration; provided, (i) that the Corporation shall select such investment banker(s) and manager(s) if the such Holders of a Majority of Included Registrable Securities cannot so agree on the same within a reasonable time period and (ii) that the Corporation shall not be obligated to effect any such underwritten offering if the aggregate proceeds expected to be received from the sale of the Registrable Securities requested to be sold in such Demand Registration, in the good faith judgment of the managing underwriter(s) therefor, is less than $25 million.

(vi)    <u>Withdrawal of Registrable Securities</u>.  Any Holder whose Registrable Securities were to be included in any such registration pursuant to this <u>Section 6(a)</u> may elect to withdraw any or all of its Registrable Securities therefrom, without liability to any of the other Holders and without prejudice to the rights of any such Holder to include Registrable Securities in any future registration (or registrations), by written notice to the Corporation delivered prior to the effective date of the relevant Demand Registration Statement.

(b)    <u>Piggyback Registration</u>.

(i)    <u>Registration Statement on behalf of the Corporation</u>.  If at any time the Corporation proposes to file a Registration Statement for an offering of Registrable Securities (for purposes of this <u>Section 6(b)(i)</u>, irrespective of the Holders thereof) for cash (excluding an Initial Public Offering that does not register Registrable Securities or an offering relating to a transaction on Form S-4 or Form S-8 or any successor form) (a "<u>Piggyback Registration Statement</u>"), the Corporation shall give prompt written notice (the "<u>Piggyback Notice</u>") to all Holders that, to its knowledge, hold Registrable Securities (collectively, the "<u>Piggyback Eligible Holders</u>") of the Corporation's intention to file a Piggyback Registration Statement reasonably in advance of (and in any event at least ten (10) Business Days before) the anticipated filing date of such Piggyback Registration Statement.  The Piggyback Notice shall offer the Piggyback Eligible Holders the opportunity to include for registration in such Piggyback Registration Statement the number of Registrable Securities of the same class and series as those proposed to be registered as they may request, subject to <u>Section 6(b)(ii)</u> (a "<u>Piggyback Registration</u>").  Subject to <u>Section 6(b)(ii)</u>, the Corporation shall use its commercially reasonable efforts to include in each such Piggyback Registration such Registrable Securities for which the Corporation has received written requests (each, a "<u>Piggyback Request</u>") from Piggyback Eligible Holders within ten (10) Business Days after giving the Piggyback Notice.  If a Piggyback Eligible Holder decides not to include all of its Registrable Securities in any Piggyback Registration Statement thereafter filed by the Corporation, such Piggyback Eligible Holder shall nevertheless continue to have the right to include any Registrable Securities in any subsequent Piggyback Registration Statements or Demand

Registration Statements, all upon the terms and conditions set forth herein.  Subject to Section 6(b)(ii), the Corporation shall use its commercially reasonable efforts to effect the registration under the Securities Act of all Registrable Securities which the Corporation has been so requested to register pursuant to the Piggyback Requests, to the extent required to permit the disposition of the Registrable Securities so requested to be registered.

       (ii)    Priority of Registration.  If the Piggyback Registration under which the Corporation gives notice pursuant to Section 6(b)(i) is an underwritten offering, and the managing underwriter or managing underwriters of such offering advise the Corporation and the Piggyback Eligible Holders that, in their reasonable view, the amount of securities requested to be included in such registration (including Registrable Securities requested by the Piggyback Eligible Holders to be included in such offering and any securities that the Corporation or any other Person proposes to be included that are not Registrable Securities) exceeds the Maximum Offering Size (which, for the purposes of a Piggyback Registration shall be within a price range acceptable to the Corporation), then the Corporation shall so advise all Piggyback Eligible Holders with Registrable Securities requested to be included in such Piggyback Registration, and shall include in such offering the number which can be so sold in the following order of priority, up to the Maximum Offering Size: (A) first, the securities that the Corporation proposes to sell up to the Maximum Offering Size; (B) second, the Registrable Securities requested to be included in such Piggyback Registration, allocated, if necessary for the offering not to exceed the Maximum Offering Size, *pro rata* among the Piggyback Eligible Holders on the basis of the number of Registrable Securities owned by each such Piggyback Eligible Holder, up to the Maximum Offering Size; and (C) third, Other Registrable Securities requested to be included in such Piggyback Registration, allocated, if necessary for the offering not to exceed the Maximum Offering Size, *pro rata* among the holders thereof on the basis of the number of securities requested owned by each such holder or as otherwise agreed between the holders of such securities.  All Piggyback Eligible Holders requesting to be included in the Piggyback Registration must sell their Registrable Securities to the underwriters selected as provided in Section 6(b)(iv) on the same terms and conditions as apply to the Corporation if such underwritten offering is consummated.

       (iii)    Withdrawal from Registration.  The Corporation shall have the right to terminate or withdraw any registration initiated by it under this Section 6(b) prior to the effective date of such Registration Statement, whether or not any Piggyback Eligible Holder has elected to include Registrable Securities in such Registration Statement, without prejudice, however, to the right of the Holders immediately to request that such registration be effected as a registration under Section 6(a) to the extent permitted thereunder and subject to the terms set forth therein.  The Corporation shall promptly give notice of the withdrawal or termination of any registration to each Piggyback Eligible Holder who has elected to participate in such registration.  The Registration Expenses of such withdrawn or terminated registration shall be borne by the Corporation in accordance with Section 6(j) hereof.

       (iv)    Selection of Bankers and Counsel.  If a Piggyback Registration pursuant to this Section 6(b) involves an underwritten offering, the Corporation shall have the right, in consultation with the Holders of a Majority of Included Registrable Securities included in such underwritten offering, to (A) determine the plan of distribution, including the price at which the Registrable Securities are to be sold and the underwriting commissions, discounts and fees and (B) select the investment banker or bankers and managers to administer the offering, including the lead managing underwriter or underwriters.

(v)    Effect of Piggyback Registration.    No registration effected under this Section 6(b) shall relieve the Corporation of its obligations to effect any registration of the offer and sale of Registrable Securities upon request under Section 6(a) (subject to compliance with any applicable covenants in the underwriting agreement for a registration effected under this Section 6(b)), and no registration effected pursuant to this Section 6(b) shall be deemed to have been effected pursuant to Section 6(a).

(c)    Notice Requirements.    Any Demand Notice, Demand Eligible Holder Request or Piggyback Request shall (i) specify the maximum number and class or series of Registrable Securities intended to be offered and sold by the Holder making the request, (ii) express such Holder's bona fide intent to offer up to such maximum number of Registrable Securities for distribution, (iii) describe the nature or method of the proposed offer and sale of Registrable Securities (to the extent applicable) and (iv) contain the undertaking of such Holder to provide all such information and materials and take all action, in each case, as may reasonably be required in order to permit the Corporation to comply with all applicable requirements in connection with the registration of such Registrable Securities.

(d)    Suspension Period.    Notwithstanding any other provision of this Section 6, the Corporation shall have the right, but not the obligation, to defer the filing of (but not the preparation of), or suspend the use by the Holders of, any Registration Statement for a period of up to ninety (90) days (unless a longer period is consented to by Holders of a Majority of Included Registrable Securities) (i) upon issuance by the Commission of a stop order suspending the effectiveness of such Registration Statement with respect to Registrable Securities or the initiation of proceedings with respect to such Registration Statement under Section 8(d) or 8(e) of the Securities Act, (ii) (x) if the Board determines, in its good faith judgment, that any such registration or offering should not be undertaken because it would reasonably be expected to materially interfere with any material corporate development or plan of the Corporation or (y) if the Corporation believes in good faith that it would require the Corporation (after consultation with external legal counsel), under applicable securities laws and other laws, to make disclosure of material non-public information that would not otherwise be required to be disclosed at that time and the Corporation believes in good faith that such disclosures at that time would not be in the Corporation's best interests; provided, that the exception set forth in the preceding clause (ii)(y) shall continue to apply only during the time that such material non-public information has not been disclosed and remains material or (iii) if the Corporation is pursuing a primary underwritten offering of Common Stock pursuant to a Registration Statement; provided, that the Holders shall have Piggyback Registration rights with respect to such primary underwritten offering in accordance with and subject to the restrictions set forth in Section 6(b) (any such period, a "Suspension Period"); provided, however, that in such event, the Qualified Holders will be entitled to withdraw any request for a Demand Registration and, if such request is withdrawn, such Demand Registration will not count as a Demand Registration under Section 6(a) and the Corporation will pay all Registration Expenses in connection with such registration; provided, further, that in no event shall (A) the Corporation declare a Suspension Period more than two (2) times in any twelve (12)-month period or (B) the aggregate length of Suspension Periods declared in any twelve (12)-month period exceed ninety (90) days in total.    The Corporation shall (i) give prompt written notice to the Holders of its declaration of a Suspension Period and of the expiration or termination of the relevant Suspension Period and (ii) promptly resume the process of filing or requesting for effectiveness, or update the suspended Registration Statement, as the case may be, as may be necessary to permit the Holders to offer and sell their respective Registrable Securities in accordance with applicable law.    If the filing of any Demand Registration is suspended pursuant

to this Section 6(d), once the Suspension Period ends, the Qualified Holders may request a new Demand Registration.

(e)    Required Information.  The Corporation may require each Holder of Registrable Securities as to which any Registration Statement is being filed or sale is being effected to furnish to the Corporation such information regarding the intended method of distribution of such securities and such other information relating to such Holder and its ownership of Registrable Securities as the Corporation may from time to time reasonably request in writing (provided that such information shall be used only in connection with such registration) and the Corporation may exclude from such registration or sale the Registrable Securities of any such Holder who fails to furnish such information within a reasonable time after receiving such request.  Each Holder agrees to furnish such information to the Corporation and to cooperate with the Corporation as reasonably necessary to enable the Corporation to comply with the provisions of this Agreement.

(f)    Other Registration Rights Agreements.  The Corporation has not entered into and, unless agreed in writing by Holders of a majority of Registrable Securities on or after the date of this Agreement, will not enter into any agreement or arrangement that (i) is inconsistent with the rights granted to the Holders with respect to Registrable Securities in this Agreement or otherwise conflicts with the provisions hereof in any material respect or (ii) other than as set forth in this Agreement, would allow any holder of Common Stock or other securities of the Corporation convertible, exercisable or exchangeable into Common Stock to include such securities in any Registration Statement filed by the Corporation on a basis that is more favorable in any material respect to the rights granted to the Holders hereunder.  For the avoidance of doubt, granting a Person registration rights that would have priority over the Registrable Securities with respect to the inclusion of such securities in any registration would constitute granting registration rights to such Person on a basis that is more favorable in a material respect with respect to the rights granted to the Holders of Registrable Securities and would require the prior written consent of Holders of a majority of Registrable Securities under this Agreement.

(g)    Cessation of Registration Rights.  All registration rights granted under this Section 6 shall continue to be applicable with respect to any Holder until such Holder no longer holds any Registrable Securities.  In the event the Corporation engages in a merger or consolidation in which the Registrable Securities of the Corporation are converted into securities of another Person, the Corporation will use its commercially reasonable efforts to make appropriate arrangements so that the registration rights provided under this Agreement continue to be provided by the issuer of such securities.  To the extent such new issuer, or any other Person acquired by the Corporation in a merger or consolidation, was bound by registration rights that would conflict with the provisions of this Agreement, the Corporation will use its commercially reasonable efforts to modify any such "inherited" registration rights so as not to interfere in any material respect with the rights provided under this Agreement.

(h)    Lock-Up Agreement.  Each Holder of Registrable Securities agrees that in connection with any Initial Public Offering or any underwritten registered offering of the Common Stock in connection with this Section 6, and solely upon the request of the managing underwriter in such offering, such Holder shall agree not to, without the prior written consent of such managing underwriter, during the period commencing on the effective date of such registration and ending on the date specified by such managing underwriter (such period not to exceed one hundred and eighty (180) days following the closing of the offering in the case of an Initial Public Offering or ninety (90) days following the closing of the offering in the case of any other underwritten

registered offering), (i) offer, pledge, sell, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, hedge the beneficial ownership of or otherwise dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into, exercisable for or exchangeable for shares of Common Stock held immediately before the effectiveness of the Registration Statement for such offering, or (ii) enter into any swap or other arrangement that Transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise; provided, that (A) the foregoing provisions shall only be applicable to Holders if all officers and directors of the Corporation are subject to the same restrictions, (B) no Holder shall be subject to any such restriction period of longer duration than that applicable to any other Person subject to such restrictions and (C) such restrictions shall be subject to customary exceptions typically included in underwriter lock-up agreements, to the extent acceptable to the managing underwriter or underwriters. The foregoing provisions of this Section 6(h) shall not apply, except in the case of an Initial Public Offering, to Holders of Registrable Securities that are not participating in the applicable registered offering. Each Holder of Registrable Securities agrees to execute and deliver such other agreements as may be reasonably requested by the Corporation or the managing underwriter that are consistent with the foregoing or that are necessary to give further effect thereto.

(i)     Registration Procedures.  The procedures to be followed by the Corporation and each participating Holder to register the sale of Registrable Securities pursuant to a Registration Statement in accordance with this Agreement, and the respective rights and obligations of the Corporation and such Holders with respect to the preparation, filing and effectiveness of such Registration Statement, are as follows:

(i)     The Corporation will (A) prepare and file a Registration Statement or a Prospectus, as applicable, with the Commission (within the time period specified in Section 6(a)) which Registration Statement (x) shall be on a form required by this Agreement (or if not so required, selected by the Corporation) for which the Corporation qualifies, (y) shall be available for the sale of the Registrable Securities in accordance with the intended method or methods of distribution and (z) shall comply as to form in all material respects with the requirements of the applicable form and include or incorporate by reference all financial statements required by the Commission to be filed therewith, (B) use its commercially reasonable efforts to cause such Registration Statement to become effective and remain effective for the periods provided under Section 6(a), (C) use its commercially reasonable efforts to prevent the occurrence of any event that would cause a Registration Statement to contain a material misstatement or omission or to be not effective and usable for resale of the Registrable Securities registered pursuant thereto (during the period that such Registration Statement is required to be effective as provided under Section 6(a)) and (D) cause each Registration Statement and the related Prospectus and any amendment or supplement thereto, as of the effective date of such Registration Statement, amendment or supplement, (1) to comply in all material respects with any requirements of the Securities Act and the rules and regulations of the Commission and (2) not to contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  The Corporation will, (A) a reasonable time prior to the anticipated filing of a Registration Statement or any related Prospectus or any amendment or supplement thereto (including any documents incorporated by reference therein) or before using any Issuer Free Writing Prospectus, furnish to such Holders, the Holders' counsel and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, copies of all such documents proposed to be filed, and make such of the representatives

of the Corporation as shall be reasonably requested by the Holders available for discussion of such documents, (B) use its commercially reasonable efforts to address in each such document prior to being so filed with the Commission such comments as each such Holder, its counsel or underwriter reasonably shall propose and (C) not file any Registration Statement or any related Prospectus or any amendment or supplement thereto containing information regarding a participating Holder to which such participating Holder reasonably objects.

(ii)     The Corporation will as promptly as reasonably practicable (A) prepare and file with the Commission such amendments, including post-effective amendments, and supplements to each Registration Statement and the Prospectus used in connection therewith as (x) may be reasonably requested by any Holder of Registrable Securities covered by such Registration Statement necessary to permit such Holder to sell in accordance with its intended method of distribution or (y) may be necessary under applicable law to keep such Registration Statement continuously effective with respect to the disposition of all Registrable Securities covered thereby for the periods provided under Section 6(a) in accordance with the intended method of distribution and, subject to the limitations contained in this Agreement, prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities held by the Holders, (B) cause the related Prospectus to be amended or supplemented by any required prospectus supplement, and as so supplemented or amended, to be filed pursuant to Rule 424, (C) respond to any comments received from the Commission with respect to each Registration Statement or Prospectus or any amendment thereto and (D) as promptly as reasonably practicable, provide such Holders true and complete copies of all correspondence from and to the Commission relating to such Registration Statement or Prospectus other than any comments that the Corporation determines in good faith would result in the disclosure to such Holders of material non-public information concerning the Corporation that is not already in the possession of such Holder.

(iii)     The Corporation will comply in all material respects with the provisions of the Securities Act and the Exchange Act (including Regulation M under the Exchange Act) with respect to each Registration Statement and the disposition of all Registrable Securities covered by each Registration Statement.

(iv)     The Corporation will notify such Holders that hold Registrable Securities and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, as promptly as reasonably practicable: (A)(x) when a Registration Statement, any pre-effective amendment, any Prospectus or any prospectus supplement or post-effective amendment to a Registration Statement or any free writing prospectus is proposed to be filed, (y) when the Commission notifies the Corporation whether there will be a "review" of such Registration Statement and whenever the Commission comments on such Registration Statement (in which case the Corporation shall provide true and complete copies thereof and all written responses thereto to each Holder, its counsel and each underwriter, if applicable, other than information which the Corporation determines in good faith would constitute material non-public information that is not already in the possession of such Holder) and (z) with respect to each Registration Statement or any post-effective amendment thereto, when the same has been declared effective; (B) of any request by the Commission or any other federal or state governmental or regulatory authority for amendments or supplements to a Registration Statement or Prospectus or for additional information (whether before or after the effective date of the Registration Statement) or any other correspondence with the Commission or any such authority relating to, or which may affect, the Registration Statement; (C) of the issuance by the Commission or any other

governmental or regulatory authority of any stop order, injunction or other order or requirement suspending the effectiveness of a Registration Statement covering any or all of the Registrable Securities or preventing or suspending the use of any Prospectus or the initiation or threatening of any proceedings for such purpose; (D) of the receipt by the Corporation of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any proceeding for such purpose; (E) if, at any time, the representations and warranties of the Corporation in any applicable underwriting agreement or similar agreement cease to be true and correct in all material respects; or (F) of the occurrence of any event that makes any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or if, as a result of such event or the passage of time, such Registration Statement, Prospectus or other document requires revisions so that, in the case of such Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein (in the case of the Prospectus, in light of the circumstances under which they were made) not misleading, or when any Issuer Free Writing Prospectus includes information that may conflict with the information contained in the Registration Statement or Prospectus, or if, for any other reason, it shall be necessary during such time period to amend or supplement such Registration Statement or Prospectus in order to comply with the Securities Act.

(v)    The Corporation will use its commercially reasonable efforts to avoid the issuance of, or, if issued, obtain the withdrawal of, (A) any stop order or other order suspending the effectiveness of a Registration Statement or preventing or suspending the use of any Prospectus, or (B) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, at the earliest practicable moment, or if any such order or suspension is made effective during any Suspension Period, at the earliest practicable moment after the Suspension Period is over.

(vi)    During the Effectiveness Period, the Corporation will furnish to each Selling Holder, its counsel and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, upon their request, without charge, at least one conformed copy of each Registration Statement and each amendment thereto and all exhibits to the extent requested by such Selling Holder, counsel or underwriter (including those incorporated by reference) promptly after the filing of such documents with the Commission.

(vii)    The Corporation will promptly deliver to each Selling Holder, its counsel and the managing underwriter or underwriters of an underwritten offering of Registrable Securities, if applicable, without charge, as many copies of each Prospectus or Prospectuses (including each form of prospectus) and each amendment or supplement thereto as such Selling Holder, counsel or underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities by such Selling Holder or underwriter.  The Corporation hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the Selling Holders and any applicable underwriter in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(viii)    The Corporation will use its commercially reasonable efforts to (A) register and qualify, or cooperate with the Selling Holders, their counsel, the underwriters, if any, and counsel for the underwriters in connection with the registration or qualification (or exemption from

such registration or qualification) of, the Registrable Securities covered by a Registration Statement, no later than the time such Registration Statement is declared effective by the Commission, under all applicable securities laws (including the "blue sky" laws) of such jurisdictions each underwriter, if any, or any Selling Holder shall reasonably request, (B) keep each such registration or qualification (or exemption therefrom) effective during the period such Registration Statement is required to be kept effective under the terms of this Agreement and (C) do any and all other acts and things which may be reasonably necessary or advisable to enable such underwriter, if any, and each Selling Holder to consummate the disposition of the Registrable Securities covered by such Registration Statement in each such jurisdiction; provided, however, that the Corporation will not be required to (x) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subparagraph, (y) subject itself to taxation in any such jurisdiction or (z) consent to general service of process (other than service of process in connection with such registration or qualification or any sale of Registrable Securities in connection therewith) in any such jurisdiction.

(ix)    To the extent that the Corporation has certificated shares of Common Stock, the Corporation will cooperate with each Selling Holder and the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if applicable, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be delivered to a transferee pursuant to a Registration Statement, which certificates shall be free of all restrictive legends indicating that the Registrable Securities are unregistered or unqualified for resale under the Securities Act, Exchange Act or other applicable securities laws, and to enable such Registrable Securities to be in such denominations and registered in such names as each Selling Holder or the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if any, may request in writing.  In connection therewith, if required by the Corporation's transfer agent, the Corporation will promptly, after the effective date of the Registration Statement, cause an opinion of counsel as to the effectiveness of the Registration Statement to be delivered to and maintained with such transfer agent, together with any other authorizations, certificates and directions required by the transfer agent which authorize and direct the transfer agent to issue such Registrable Securities without any such legend upon sale by the Holder or the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if any, of such Registrable Securities pursuant to the Registration Statement.

(x)    Upon the occurrence of any event contemplated by Section 6(i)(iv)(F), as promptly as reasonably practicable, the Corporation will prepare a supplement or amendment, including a post-effective amendment, if required by applicable law, to the affected Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference or to the applicable Issuer Free Writing Prospectus, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, in light of the circumstances under which they were made) not misleading and no Issuer Free Writing Prospectus will include information that conflicts with information contained in the Registration Statement or Prospectus, such that each Selling Holder can resume disposition of such Registrable Securities covered by such Registration Statement or Prospectus.

(xi)    Selling Holders may distribute the Registrable Securities by means of an underwritten offering; provided that (A) such Holders provide to the Corporation a Demand Notice of their intention to distribute Registrable Securities by means of an underwritten offering, (B) the

right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwritten offering and the inclusion of such Holder's Registrable Securities in the underwritten offering to the extent provided herein, (C) each Holder participating in such underwritten offering agrees to enter into customary agreements, including an underwriting agreement in customary form, and sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Holders entitled to select the managing underwriter or managing underwriters hereunder (provided that any such Holder shall not be required to make any representations or warranties to or agreements with the Corporation or the underwriters other than representations, warranties, agreements and indemnities regarding such Holder, such Holder's title to the Registrable Securities, such Holder's intended method of distribution and the accuracy of information contained in the applicable Registration Statement or the related Prospectus concerning such Holder as provided by or on behalf of such Holder and the aggregate amount of the liability of such Holder in connection with such offering shall not exceed such Holder's net proceeds from the disposition of such Holder's Registrable Securities in such offering) and (D) each Holder participating in such underwritten offering completes and executes all questionnaires, powers of attorney, custody agreements and other documents reasonably required under the terms of such underwriting arrangements. The Corporation hereby agrees with each Holder of Registrable Securities that, in connection with any underwritten offering in accordance with the terms hereof, it will negotiate in good faith, will execute and perform its obligations under all customary indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements and will use commercially reasonable efforts to procure auditor "comfort" letters addressed to the underwriters in the offering from the Corporation's independent certified public accountants or independent auditors (and, if necessary, any other independent certified public accountants or independent auditors of any Subsidiary of the Corporation or any business acquired by the Corporation for which financial statements and financial data are, or are required to be, included in the Registration Statement) in customary form and covering such matters of the type customarily covered by comfort letters for an underwritten Public Offering as the underwriters reasonably request, dated the date of execution of the underwriting agreement and brought down to the closing under the underwriting agreement.

(xii)    The Corporation will use commercially reasonable efforts to obtain for delivery to the underwriter or underwriters of an underwritten offering of Registrable Securities an opinion or opinions and a negative assurance letter from counsel for the Corporation (including any local counsel reasonably requested by the underwriters) dated the most recent effective date of the Registration Statement or, in the event of an underwritten offering, the date of the closing under the underwriting agreement, in customary form, scope and substance, covering the matters customarily covered in opinions and negative assurance letters requested in sales of securities or public underwritten offerings, which opinions shall be reasonably satisfactory to such underwriters and their counsel.

(xiii)    For a reasonable period prior to the filing of any Registration Statement and throughout the Effectiveness Period, and in respect of any offering of Registrable Securities, the Corporation will make available upon reasonable notice at the Corporation's principal place of business or such other reasonable place for inspection by any Selling Holder of Registrable Securities covered by the applicable Registration Statement, by any managing underwriter or managing underwriters selected in accordance with this Agreement and by any attorney, accountant or other agent retained by such Holders or underwriter, such financial and other information and books and records of the Corporation, and cause the officers, employees, counsel

and independent certified public accountants of the Corporation to respond to such inquiries, as shall be reasonably requested by such Holders, underwriters, attorneys, accountants or agents (and in the case of counsel, not violate an attorney-client privilege in such counsel's reasonable belief) to conduct a reasonable investigation within the meaning of the Securities Act.

(xiv)    The Corporation will (A) provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by the applicable Registration Statement from and after a date not later than the effective date of such Registration Statement and provide and enter into any customary agreements with a custodian for the Registrable Securities and (B) not later than the effective date of the applicable Registration Statement, provide a CUSIP number for all Registrable Securities included in such Registration Statement.

(xv)    The Corporation will cooperate with each Holder of Registrable Securities and each underwriter or agent participating in the disposition of Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA and the performance of any due diligence investigations by any underwriter.

(xvi)    The Corporation will use its commercially reasonable efforts to comply with all applicable rules and regulations of the Commission, the Trading Market, FINRA and any state securities authority, and make available to each Holder, as soon as reasonably practicable after the effective date of the Registration Statement, an earnings statement covering at least twelve (12) months, which shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158.

(xvii)    The Corporation will use its commercially reasonable efforts to ensure that any Issuer Free Writing Prospectus utilized in connection with any Prospectus complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related Prospectus, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(xviii)    In connection with any registration of Registrable Securities pursuant to this Agreement, the Corporation will take all commercially reasonable actions as are necessary or advisable in order to expedite or facilitate the disposition of Registrable Securities by such Holders, including furnishing to the Selling Holders or any underwriters such further customary certificates, opinions and documents as they may reasonably request and using commercially reasonable efforts to cause appropriate officers and employees to be available, on a customary basis and upon reasonable advance notice, to meet with prospective investors in presentations, meetings and road shows.

(xix)    In connection with any registration of Registrable Securities pursuant to this Agreement, the Corporation shall use its commercially reasonable efforts to list the Common Stock on the New York Stock Exchange or The Nasdaq Global Market or any other national securities exchange.  Following the listing of the Common Stock or any other Registrable Securities on the New York Stock Exchange or The Nasdaq Global Market or any other national securities exchange, the Corporation will use its commercially reasonable efforts to maintain such listing.

(xx)    The Corporation shall, if an underwritten offering is made pursuant to a Registration Statement on Form S-3 or any similar short-form Registration Statement, include in

such Registration Statement such additional information for marketing purposes as the managing underwriter(s) reasonably request(s).

(xxi)    The Corporation shall use its commercially reasonable efforts to cooperate in a timely manner with any reasonable and customary request of the Holders in respect of any Alternative Transaction, including entering into customary agreements with respect to such Alternative Transactions (and providing customary representations, warranties, covenants and indemnities in such agreements) as well as providing other reasonable assistance in respect of such Alternative Transactions of the type applicable to a Public Offering subject to this <u>Section 6</u>, to the extent customary for such transactions.  Notwithstanding anything herein to the contrary, no Holder shall be entitled to any piggyback rights in respect of an Alternative Transaction.

(xxii)    Each Holder agrees by its acquisition of Registrable Securities that, upon receipt of a notice from the Corporation of the occurrence of any event of the kind described in clauses <u>(C)</u>, <u>(D)</u> and <u>(F)</u> of <u>Section 6(i)(iv)</u> or the occurrence of a Suspension Period, such Holder will forthwith discontinue disposition of such Registrable Securities under the applicable Registration Statement until such Holder's receipt of the copies of the supplemental Prospectus or amended Registration Statement or until it is advised in writing by the Corporation that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement.  In the event the Corporation shall give any such notice, the period during which the applicable Registration Statement is required to be maintained effective shall be extended by the number of days during the period from and including the date of the giving of such notice to and including the date when each seller of Registrable Securities covered by such Registration Statement either receives the copies of the supplemented Prospectus or amended Registration Statement or is advised in writing by the Corporation that the use of the Prospectus may be resumed.

(j)    <u>Registration Expenses</u>.  The Corporation shall bear all Registration Expenses incident to the Parties' performance of or compliance with their respective obligations under this Agreement or otherwise in connection with any Demand Registration or Piggyback Registration (excluding any Selling Expenses), whether or not any Registrable Securities are sold pursuant to a Registration Statement.  In addition, the Corporation shall be responsible for all of its expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including expenses payable to third parties and including all salaries and expenses of the Corporation's officers and employees performing legal or accounting duties), the expense of any annual audit and any underwriting fees, discounts, selling commissions and stock transfer taxes and related legal and other fees applicable to securities sold by the Corporation and in respect of which proceeds are received by the Corporation.  Each Holder shall pay any Selling Expenses applicable to the sale or disposition of such Holder's Registrable Securities pursuant to any Demand Registration Statement or Piggyback Registration Statement, in proportion to the amount of such Selling Holder's shares of Registrable Securities sold in any offering under such Demand Registration Statement or Piggyback Registration Statement.

(k)    <u>Indemnification</u>.

(i)    The Corporation shall indemnify and hold harmless each underwriter, if any, engaged in connection with any registration referred to in this <u>Section 6</u> and provide representations, covenants, opinions and other assurances to such underwriter in form and

substance reasonably satisfactory to such underwriter and the Corporation.  Further, the Corporation shall indemnify and hold harmless each Holder, their respective partners, stockholders, equity holders, general partners, managers, members and Affiliates and each of their respective officers and directors and any Person who controls any such Holder (within the meaning of the Securities Act or the Exchange Act) and any employee or Representative thereof, and each other Person who participates in the offering of such securities (each, an "Indemnified Person", and collectively, "Indemnified Persons"), to the fullest extent permitted by law, from and against any and all losses, claims, damages, liabilities, joint or several, costs (including reasonable costs of preparation and reasonable attorneys', accountants' and experts' fees) and expenses, judgments, fines, penalties, interest, settlements or other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which any Indemnified Person may be involved, or is threatened to be involved, as a party or otherwise, under the Securities Act, the Exchange Act or otherwise (collectively, "Losses"), as incurred, arising out of, based upon, resulting from or relating to (A) any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which any Registrable Securities were registered, Prospectus (including in any preliminary prospectus (if used prior to the effective date of such Registration Statement)), or in any summary or final prospectus or free writing prospectus or in any amendment or supplement thereto or in any documents incorporated or deemed incorporated by reference in any of the foregoing, (B) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements made therein (in the case of the Prospectus, in light of the circumstances under which they were made) not misleading, (C) any violation or alleged violation by the Corporation or any of its Subsidiaries of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any federal, state, foreign or common law rule or regulation in connection with such Registration Statement, disclosure document or related document or report or any offering covered by such Registration Statement, or (D) any information provided by the Corporation or at the instruction of the Corporation to any Person participating in the offer at the point of sale containing any untrue statement or alleged untrue statement of material fact or omitting or allegedly omitting any material fact required to be included in such information or necessary to make the statements therein not misleading, and the Corporation shall reimburse such Indemnified Person for any legal or other expenses reasonably incurred by it in connection with investigating or defending any such loss, claim, damage, liability, demand, action, suit or proceeding; provided, however, that the Corporation shall not be liable to any Indemnified Person to the extent that any such Losses arise out of, are based upon or result from an untrue or allegedly untrue statement or omission or alleged omission made in such Registration Statement, such preliminary, summary or final prospectus or free writing prospectus or such amendment or supplement, in reliance upon and in conformity with written information furnished to the Corporation by or on behalf of such Indemnified Person specifically for use therein.

(ii)    In connection with any Registration Statement filed by the Corporation pursuant to this Section 6 hereof in which a Holder has registered for sale its Registrable Securities, each such Selling Holder agrees (severally and not jointly) to indemnify and hold harmless, to the fullest extent permitted by law, the Corporation, its directors and officers, employees, agents and each Person who controls the Corporation (within the meaning of the Securities Act or the Exchange Act) and any other Holder selling securities under such Registration Statement, its partners, stockholders, equity holders, general partners, managers, members and Affiliates and each of their respective officers and directors and any Person who controls such other Holder (within the meaning of the Securities Act or the Exchange Act) and any employee or Representative thereof from and against any Losses resulting from (A) any untrue or allegedly

untrue statement of a material fact contained in any Registration Statement under which such Registrable Securities were registered or sold under the Securities Act, Prospectus (including in any preliminary prospectus (if used prior to the effective date of such Registration Statement)), or in any summary or final prospectus or free writing prospectus or in any amendment or supplement thereto or in any documents incorporated by reference in any of the foregoing, (B) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of the Prospectus, in light of the circumstances under which they were made) not misleading, (C) any violation or alleged violation by such Holder of any federal, state or common law rule or regulation relating to action or inaction in connection with any information provided by such Holder in such registration, disclosure document or related document or report in the case of clauses (A) and (B) to the extent, but in each case only to the extent that such untrue statement or omission occurs in reliance upon and in conformity with any information furnished in writing by or on behalf of such Selling Holder to the Corporation specifically for inclusion in such registration, disclosure document or related document or report and has not been corrected in a subsequent writing prior to the sale of the Registrable Securities thereunder, or (D) any information provided by such Holder or at the instruction of such Holder to any Person participating in the offer at the point of sale containing any untrue statement or alleged untrue statement of material fact or omitting or allegedly omitting any material fact required to be included in such information or necessary to make the statements therein not misleading, and such Holder will reimburse the Corporation for any legal or other expenses reasonably incurred by it in connection with investigating or defending such Losses.  In no event shall the liability of any Selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder under the sale of Registrable Securities giving rise to such indemnification obligation less any amounts paid by such Holder in connection with such sale.

(iii)    Any Indemnified Person under paragraph (i) or (ii) of this Section 6(k) shall (A) give prompt written notice to the indemnifying person under paragraph (i) or (ii) of this Section 6(k) of any claim with respect to which it seeks indemnification (provided that any delay or failure to so notify the indemnifying person shall not relieve the indemnifying party of its obligations hereunder except to the extent, if at all, that the indemnifying person's ability to defend such claim (through the forfeiture of substantive rights or defenses) is actually and materially prejudiced by reason of such delay or failure) and (B) permit such indemnifying person to assume the defense of such claim with counsel reasonably satisfactory to the Indemnified Person; provided, however, that any Indemnified Person shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless (1) the indemnifying person has agreed in writing to pay such fees or expenses, (2) the indemnifying person shall have failed to assume the defense of such claim and employ counsel reasonably satisfactory to such Indemnified Person within a reasonable time after receipt of notice of such claim from the Indemnified Person, (3) the Indemnified Person has reasonably concluded (based upon advice of its counsel) that there may be legal defenses available to it or other Indemnified Persons that are different from or in addition to those available to the indemnifying person, or (4) in the reasonable judgment of any such Indemnified Person (based upon advice of its counsel) a conflict of interest may exist between such Indemnified Person and the indemnifying person with respect to such claims (in which case, if the Indemnified Person notifies the indemnifying person in writing that such Indemnified Person elects to employ separate counsel at the expense of the indemnifying person, the indemnifying person shall not have the right to assume the defense of such claim on behalf of such Indemnified Person).  If such defense is not assumed by the indemnifying person, the indemnifying person will not be subject to any liability for any settlement made without its prior written consent, but such

consent may not be unreasonably withheld. If the indemnifying person assumes the defense, the indemnifying person shall not have the right to settle such action, consent to entry of any judgment or enter into any settlement, in each case without the prior written consent of the Indemnified Person (which consent shall not be unreasonably withheld, delayed or conditioned); provided that the prior written consent of the Indemnified Person shall not be required if (x) such settlement includes an unconditional release of such Indemnified Person from all liability on the claims that are the subject matter of such settlement, (y) such settlement provides that any sums payable in connection therewith are payable in full by the indemnifying person and (z) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person. It is understood that the indemnifying person or persons shall not, except as specifically set forth in this Section 6(k)(iii), in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees, disbursements or other charges of more than one separate firm (in addition to any local counsel that is required to effectively defend against any such proceeding) for all Indemnified Persons and that all such fees and expenses shall be paid or reimbursed promptly.

(iv)    If the indemnification provided for in this Section 6(k) is held by a court of a competent jurisdiction to be unavailable to an Indemnified Person with respect to any loss, damage, claim or liability, the indemnifying party, in lieu of indemnifying such Indemnified Person thereunder, shall to the extent permitted by law, contribute to the amount paid or payable by such Indemnified Person as a result of such loss, damage, claim or liability in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the Indemnified Person on the other in connection with the actions that resulted in such loss, claim, damage or liability, as well as any other relevant equitable considerations. The relative fault of the indemnifying person and of the Indemnified Person shall be determined by a court of law by reference to, among other things, whether the untrue or allegedly untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying person or Indemnified Person and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Parties agree that it would not be just and equitable if contribution pursuant to this Section 6(k)(iv) were determined by *pro rata* allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding sentences. Notwithstanding the provisions of this Section 6(k)(iv), no Selling Holder shall be required to contribute any amount in excess of the net proceeds (after deducting the underwriters' discounts and commissions) received by such Selling Holder in the offering giving rise to such contribution obligation less any amounts paid by such Holder pursuant to this Section 6(k) and any amounts paid by such Holder as a result of liabilities incurred under the underwriting agreement, if any, related to such sale. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. Each Selling Holder's obligation to contribute pursuant to this Section 6(k)(iv) is several in the proportion that the net proceeds of the offering received by such Selling Holder bears to the total net proceeds of the offering received by all such Selling Holders and not joint.

(v)    The remedies provided for in this Section 6(k) are not exclusive and shall not limit any rights or remedies which may otherwise be available to any Indemnified Person at law or in equity. The obligations of the Corporation and Holders of Registrable Securities under this Section 6(k) shall survive completion of any offering of Registrable Securities pursuant to a Registration Statement and the termination of this Agreement.

(l)    <u>Facilitation of Sales Pursuant to Rule 144</u>.    The Corporation shall use its commercially reasonable efforts to (i) timely file the reports required to be filed by it, if any, under the Exchange Act or the Securities Act and the rules adopted by the Commission thereunder (including the reports under Sections 13 and 15(d) of the Exchange Act referred to in subparagraph (c)(1) of Rule 144 under the Securities Act), and (ii) take such further action as any Holder may reasonably request, all to the extent required from time to time to enable the Holders to sell Registrable Securities without registration under the Securities Act within the limitations of the exemption provided by Rule 144 under the Securities Act.    Upon the written request of any Holder in connection with that Holder's sale pursuant to Rule 144 under the Securities Act, the Corporation shall deliver to such Holder a written statement as to whether it has complied with such requirements.    This <u>Section 6(l)</u> shall apply only after an Initial Public Offering.

## 7.    <u>Future Issuance of Shares; Preemptive Rights</u>.

(a)    <u>Offering Notice</u>.    Except for (i) options to purchase Common Stock or restricted stock which may be issued pursuant to an Equity Incentive Plan, (ii) a stock split, stock dividend, reorganization or recapitalization applicable to all shares of Common Stock, (iii) equity securities of the Corporation issued upon exercise, conversion or exchange of any security or obligation of the Corporation (such security or obligation, a "<u>Common Stock Equivalent</u>") issued in accordance with the terms of this Agreement, (iv) equity securities of the Corporation issued in consideration of an acquisition, business combination or debt financing (whether pursuant to a stock purchase, asset purchase, merger or otherwise) approved by the Board, and, if applicable, the Holders, in accordance with the terms of this Agreement, by the Corporation of another Person, (v) issuances to banks, equipment lessors or other financial institutions (including, for the avoidance of doubt, hedge funds), or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board, (vi) issuances as consideration approved by the Board payable to a third party that is not an Affiliate of the Corporation for any other business relationship the primary purpose of which is not to raise capital, including for the acquisition or license of technology by the Corporation or its Subsidiaries, joint venture or development activities or the distribution, supply or manufacture of the Corporation's or its Subsidiaries' products and services, (vii) issuances to the public pursuant to an effective Registration Statement and (viii) solely with respect to issuances by a Subsidiary of the Corporation, issuances to the Corporation or any other wholly owned Subsidiary of the Corporation,[1] if the Corporation or any of its Subsidiaries wishes to issue any equity securities (including any Common Stock Equivalents) of the Corporation or such Subsidiary (collectively, "<u>New Securities</u>") to any Person (the "<u>Subject Purchaser</u>"), then, except as otherwise provided in <u>(c)</u>, the Corporation shall (or shall cause its applicable Subsidiary to) first offer such New Securities to (i) Green Square, so long as it meets the Green Square Threshold, (ii) ████, so long as it (together with its Permitted Transferees) meets the Sprinrite Threshold, and (iii) each of the Holders who are Accredited Investors and that, at such time, hold at least 10% of the outstanding shares of Common Stock (each, a "<u>Preemptive Rightholder</u>", and collectively, the "<u>Preemptive Rightholders</u>") by sending written notice (the "<u>New Issuance Notice</u>") to the Preemptive Rightholders at least fifteen (15) Business Days prior to such issuance of New Securities, which New Issuance Notice shall state, in reasonable detail, the material terms and conditions of such issuance, including (x) the number of New Securities proposed to be issued and (y) the proposed purchase price per security of the New Securities (the

---

[1] <u>Note to Draft</u>: Exception for issuances under accordion under consideration.

"Proposed Price"). Upon delivery of the New Issuance Notice, such offer shall be irrevocable unless and until the rights provided for in Section 7(b) shall have been waived or shall have expired.

(b)      Exercise.

(i)      For a period of ten (10) Business Days after the giving of the New Issuance Notice pursuant to Section 7(a), each of the Preemptive Rightholders shall have the right, but not the obligation, to purchase its Proportionate Percentage of the New Securities, at a purchase price equal to the Proposed Price and upon the same terms and conditions set forth in the New Issuance Notice. Each such Preemptive Rightholder shall have the right to purchase up to that percentage of the New Securities determined by dividing (A) the total number of outstanding shares of Common Stock of the Corporation then owned by such Preemptive Rightholder exercising its rights under this Section 7(b) by (B) the total number of outstanding shares of Common Stock of the Corporation owned by all of the Preemptive Rightholders (the "Proportionate Percentage"); provided that, for purposes of calculating each Proportionate Percentage, any shares of Common Stock of the Corporation issued or issuable to a Preemptive Rightholder pursuant to an Equity Incentive Plan shall be excluded from such calculation.

(ii)      The right of each Preemptive Rightholder to purchase the New Securities under Section 7(a) shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the ten (10) Business Day period referred to in Section 7(b)(i) to the Corporation or its applicable Subsidiary, which notice shall state the amount of New Securities that such Preemptive Rightholder elects to purchase pursuant to Section 7(b)(i). The failure of a Preemptive Rightholder to respond within such ten (10) Business Day period shall be deemed to be a waiver of such Preemptive Rightholder's rights under Section 7(b)(i); provided, that each Preemptive Rightholder may waive its rights under Section 7(b)(i) prior to the expiration of such ten (10) Business Day period by giving written notice to the Corporation or the applicable Subsidiary.

(iii)      If any Preemptive Rightholder does not fully subscribe for the number or amount of New Securities that it or he is entitled to purchase pursuant to Section 7(b)(i), then the Corporation shall (or shall cause its applicable Subsidiary to) offer to each Preemptive Rightholder which elected to purchase the maximum number of New Securities that it is entitled to purchase in accordance with Section 7(b)(ii) (each, an "Eligible Excess Preemptive Rightholder"), by written notice to each such Preemptive Rightholder (an "Excess New Securities Notice"), the right to purchase up to that percentage of the remaining New Securities not so subscribed for (for the purposes of this Section 7(b)(iii), the "Excess New Securities") determined by dividing (x) the total number of outstanding shares of Common Stock of the Corporation then owned by such Eligible Excess Preemptive Rightholder by (y) the total number of outstanding shares of Common Stock of the Corporation then owned by all Eligible Excess Preemptive Rightholders who elected to purchase Excess New Securities (excluding, in the case of both clauses (x) and (y), shares of Common Stock of the Corporation issued or issuable to a Preemptive Rightholder pursuant to an Equity Incentive Plan). The right of each such Preemptive Rightholder to purchase the Excess New Securities under the immediately preceding sentence shall be exercisable by delivering written notice of the exercise thereof, within five (5) Business Days following the date of the Excess New Securities Notice, to the Corporation or its applicable Subsidiary, which notice shall state the amount of Excess New Securities that such Preemptive Rightholder elects to purchase pursuant to this Section 7(b)(iii). The failure of a Preemptive Rightholder to respond within such five (5) Business Day period shall be deemed to be a waiver of such Preemptive Rightholder's

rights under this Section 7(b)(iii); provided, that each Preemptive Rightholder may waive its rights under this Section 7(b)(iii) prior to the expiration of such five (5) Business Day period by giving written notice to the Corporation or the applicable Subsidiary.

(c)    Specified Issuance.    Notwithstanding the requirements of Section 7(a), the Corporation or its applicable Subsidiary may proceed with an issuance of New Securities that would otherwise be subject to Section 7(a) prior to having complied with the provisions of Section 7(a) (such issuance, a "Specified Issuance") if the Board reasonably determines in good faith that the delay in the issuance of such New Securities caused by compliance with the provisions of Section 7(a) would reasonably be expected to adversely affect the Corporation; provided, that the Corporation shall (or shall cause its applicable Subsidiary to):

(i)    provide to each Preemptive Rightholder as of the date of the Specified Issuance prompt written notice of such Specified Issuance;

(ii)    within a reasonable period of time (but in any event not more than thirty (30) days following such Specified Issuance), offer to all Preemptive Rightholders, in writing (such offer, the "Specified Issuance Offer"), to either (A) issue to each Preemptive Rightholder its Proportionate Percentage of the New Securities or (B) cause the Subject Purchaser who received New Securities in such Specified Issuance to sell to each Preemptive Rightholder its Proportionate Percentage of the New Securities (it being understood that each Holder hereby agrees to effect any sale so requested by the Corporation in accordance with this Section 7(c)(ii)(B)), in each case, at the same price and on the same terms and conditions with respect to such New Securities as the Subject Purchaser received in such Specified Issuance (provided that, for the avoidance of doubt, the Board shall determine, on a Specified Issuance by Specified Issuance basis, whether the applicable Specified Issuance Offer shall comply with subclause (A) or (B) of this Section 7(c)(ii)); and

(iii)    keep such offer open for a period of no less than ten (10) Business Days, during which period, each Preemptive Rightholder may accept such offer by sending a written notice of exercise to the Corporation or its applicable Subsidiary committing to purchase in accordance with the procedures set forth in Section 7(b), an amount of such New Securities (not to exceed the amount specified in the offer made pursuant to Section 7(c)(ii));

provided, further, that (A) for all purposes under this Agreement, any issuance of New Securities to a Preemptive Rightholder pursuant to this Section 7(c) shall be deemed to have occurred on the date of the consummation of such Specified Issuance and (B) during the period commencing on the consummation of such Specified Issuance and ending on the earlier of (x) the consummation of the issuance of New Securities to a Preemptive Rightholder pursuant to this Section 7(c) and (y) the expiration of the ten (10)-Business Day period specified in clause (iii) above, the New Securities issued pursuant to this Section 7(c) shall not be taken into account in calculating the Proportionate Percentage of any Holder for any purposes under this Agreement.

(d)    Closing.    The closing of the purchase of New Securities subscribed for by the Preemptive Rightholders under (i) Section 7(b) shall be held at the executive office of the Corporation at 11:00 a.m., local time, on (a) the fifteenth (15th) Business Day after the giving of the New Issuance Notice pursuant to Section 7(a), if the Preemptive Rightholders (in aggregate) elect to purchase all of the New Securities under Section 7(b), or (b) the date of the closing of the sale to the Subject Purchaser made pursuant to Section 7(a) if the Preemptive Rightholders elect

to purchase some, but not all, of the New Securities under <u>Section 7(b)</u>, (ii) <u>Section 7(c)</u> shall be held at the executive office of the Corporation at 11:00 a.m., local time, on the fifteenth (15th) Business Day after the date of the offer specified under <u>Section 7(c)(ii)</u>, or (iii) in relation to both (i) and (ii), at such other time and place as the parties to the transaction may reasonably agree.  At such closing, the Corporation shall (or shall cause its applicable Subsidiary to) deliver certificates (to the extent that the Corporation or its applicable Subsidiary has determined that such New Securities will be represented by certificated shares) representing the New Securities to the participating Preemptive Rightholders, and such New Securities shall be issued free and clear of all liens (other than those arising hereunder or pursuant to applicable law and those attributable to actions by the purchasers thereof) and the Corporation shall (or shall cause its applicable Subsidiary to) so represent and warrant, and further represent and warrant that such New Securities shall be, upon issuance thereof to the Preemptive Rightholders and after payment therefor, duly authorized, validly issued, fully paid and non-assessable.  Each Preemptive Rightholder purchasing the New Securities shall deliver at the closing payment in full in immediately available funds for the New Securities purchased by him, her or it.  At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary to effectuate the closing.  Notwithstanding the foregoing, if the closing of a sale or issuance of New Securities is not consummated within a six (6)-month period (plus such number of additional days (if any) necessary to allow the expiration or termination of all waiting periods under antitrust laws applicable to such sale) after the date upon which the New Issuance Notice is delivered or if the principal terms of such sale change such that the terms are, in the aggregate, less favorable in any material respect to the Preemptive Rightholders than those in the New Issuance Notice, then the restrictions provided for herein shall again become effective, and no issuance or sale of New Securities may be made thereafter by the Corporation or its applicable Subsidiary without again offering the same to the Preemptive Rightholders in accordance with this <u>Section 7</u>. Notwithstanding any other provision of this <u>Section 7</u>, there shall be no liability on the part of the Corporation, any of its Subsidiaries or any Holder to any Preemptive Rightholder arising from the failure of the Corporation or its applicable Subsidiary to consummate the sale of New Securities for any reason.

(e)    <u>Stock Dividends, Splits, Reclassifications, Mergers, etc</u>. Each Holder acknowledges and agrees that any securities issued by the Corporation pursuant to a stock dividend, stock split, reclassification or like action, or pursuant to the exercise of a right granted by the Corporation to all Holders to purchase New Securities on a proportionate basis, will be Transferred only, and for all purposes be treated in the same manner as, and be subject to the same options with respect to, the securities which were split or reclassified or with respect to which a stock dividend was paid or rights to purchase stock on a proportionate basis were granted. In the event of a merger of or exchange involving the Corporation where this Agreement does not terminate, partnership units, membership units, shares of common stock or similar equity interests (and/or securities convertible into such units, shares or similar equity interests) that are issued in exchange for securities of the Corporation will thereafter be deemed to be securities subject to the terms of this Agreement.

## 8.    <u>Miscellaneous</u>.

(a)    <u>Termination</u>.  This Agreement (other than <u>Sections 3(b)</u> and 6 and this <u>Section 8</u> and their respective defined terms) shall terminate automatically and be of no further force and effect upon the earlier to occur of (i) such time as there is only one Holder or (ii) immediately prior to the effectiveness of an Initial Public Offering.  Notwithstanding anything contained in <u>Section</u>

3(a) to the contrary, during any period when (A) the Corporation is subject to, and in compliance with, periodic reporting obligations under the Exchange Act and (B) the Corporation's securities are listed for public trading on a stock exchange, the Corporation's obligations under Section 3(a) shall be deemed suspended and of no force and effect.

(b)    Remedies.  In the event of a breach by the Corporation or a Holder of any of its obligations under this Agreement, the Corporation or the Holder, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement.  Each of the Parties agrees that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement, to the maximum extent permitted by any applicable law, and further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate and shall waive any requirement for the posting of a bond, in each case to the maximum extent permitted by any applicable law.  No failure or delay by any Person in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

(c)    Amendment; Modification; Waivers.  This Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed by the Corporation and Holders owning at least a majority of the outstanding shares of Common Stock; provided that, (i) in addition to and without limiting the foregoing, no amendment to this Agreement may disproportionately and adversely affect a Holder of a class of capital stock of the Corporation relative to other Holders of such class of capital stock of the Corporation without such Holder's prior written consent and (ii) any amendment to Section 2(a) or Section 7(a) regarding ▮▮▮▮▮▮ right to nominate the Observer and Sprinrite's preemptive rights, respectively, shall require the prior written consent of ▮▮▮▮; provided, however, that the Board may amend this Agreement without the consent of any Holder so long as such amendment is ministerial in nature to correct errors or cure ambiguities; provided, further, that, as provided in Section 8(o), the provisions hereof shall be appropriately adjusted for any stock dividends, splits, reverse splits, combinations, recapitalizations and the like occurring after the date hereof, in each case, without the consent of any Holders.  Any amendment or waiver must specifically reference this Agreement, specify the provision(s) hereof that it is intended to amend or waive and further specify that it is intended to amend or waive such provision(s).

(d)    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (i) upon delivery, if served by personal delivery upon the Person for whom it is intended, (ii) on the third (3rd) Business Day after the date mailed if delivered by registered or certified mail, return receipt requested, postage prepaid, (iii) on the following Business Day if delivered by a nationally recognized, overnight, air courier or (iv) when delivered or, if sent after the Close of Business, on the following Business Day if sent by email, in each case, to the address set forth on such Person's signature page hereto or to such other address as may be designated in writing, in the same manner, by such Person.

(e)    Governing Law; Forum.  This Agreement and all disputes or controversies arising out of or relating to this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principles of conflicts of laws.  Each of

the Corporation and each Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the state and federal courts in the State of Delaware) (together with the appellate courts thereof, the "Chosen Courts"). In connection with any claim arising out of or related to this Agreement, each of the Corporation and each Holder hereby irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection that such Person may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the Corporation or the Holder, (iv) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with Section 8(d), although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (v) agrees not to seek a transfer of venue on the basis that another forum is more convenient. Notwithstanding anything herein to the contrary, (A) nothing in this Section 8(e) shall prohibit any party from seeking or obtaining orders for conservatory or interim relief from any court of competent jurisdiction and (B) each of the Corporation and each Holder agrees that any judgment issued by a Chosen Court may be recognized, recorded, registered or enforced in any jurisdiction in the world and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction.

(f)    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives, permitted assigns and Approved Transferees. The Corporation shall cause any successor or assign (whether by merger, consolidation, sale of assets or otherwise) to assume the obligations of the Corporation under this Agreement or enter into a new agreement with the parties hereto on terms substantially the same as this Agreement as a condition of any such transaction.

(g)    Waiver of Trial by Jury. EACH OF THE CORPORATION AND EACH HOLDER ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PERSON HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH OF THE CORPORATION AND EACH HOLDER CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) SUCH PERSON UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) SUCH PERSON MAKES THIS WAIVER VOLUNTARILY, AND (IV) SUCH PERSON HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(h)    Severability. The provisions of this Agreement shall be deemed severable. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor to

carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction; provided, however, that if any one or more of the provisions contained in this Agreement shall be determined to be excessively broad as to activity, subject, duration or geographic scope, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable under applicable law.

(i)    Business Days.  If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a day other than a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

(j)    Entire Agreement.  This Agreement, together with the Certificate of Incorporation and Bylaws, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and supersedes any and all prior or contemporaneous discussions, agreements and understandings, whether oral or written, that may have been made or entered into by or among any of the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

(k)    Execution of Agreement; Counterparts.  This Agreement may be executed and delivered (by facsimile, by electronic mail in portable document format (.pdf) or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

(l)    Determination of Ownership.  In determining ownership of capital stock of the Corporation hereunder for any purpose, the Corporation may rely solely on the records of the transfer agent for the capital stock of the Corporation from time to time, or, if no such transfer agent exists, the Corporation's stock ledger.

(m)    No Recourse.  Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Holders may be partnerships or limited liability companies, each Holder covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any of the Corporation's or any Holder's former, current or future direct or indirect equity holders, controlling Persons, stockholders, directors, officers, employees, agents, Affiliates, members, financing sources, managers, general or limited partners or assignees (and collectively, the "Non-Recourse Parties"), in each case other than the Corporation, the Holders or any of their permitted assigns under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Non-Recourse Parties, as such, for any obligation or liability of the Corporation or the Holders under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this Section 8(m) shall relieve or otherwise limit the liability of the Corporation or any Holder, as such, for any breach or violation of its obligations under this Agreement or such agreements, documents or instruments.

(n)     Third-Party Beneficiaries.   Nothing in this Agreement, express or implied, is intended to confer upon any Person (other than Section 8(m), of which each Non-Recourse Party is an express third-party beneficiary) other than the Corporation and the Holders, and their respective successors and permitted assigns, any rights, benefits or remedies of any nature whatsoever.

(o)     Recapitalizations, Exchanges, etc.   The provisions of this Agreement shall apply to the full extent set forth herein with respect to (i) the shares of capital stock of the Corporation, (ii) any and all securities into which shares of capital stock of the Corporation are converted, exchanged or substituted in any recapitalization or other capital reorganization by the Corporation and (iii) any and all equity securities of the Corporation or any successor or assign of the Corporation (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in conversion of, in exchange for or in substitution of, the shares of capital stock of the Corporation and shall be appropriately adjusted for any stock dividends, splits, reverse splits, combinations, recapitalizations and the like occurring after the date hereof.

(p)     Headings; Section References.   All headings and section references contained in this Agreement are for convenience purposes only and shall not be deemed to limit or affect any of the provisions of this Agreement.

(q)     No Other Relationships.   Nothing contained herein or in any other agreement delivered pursuant hereto or thereto shall be construed to create any agency relationship among the Holders.  No Holder shall owe any fiduciary duties to the Corporation or to any other Holder by virtue of this Agreement.  To the extent that at law or in equity, a Holder has duties (including fiduciary duties) and liabilities relating thereto to the Corporation or any other Holder, a Holder acting under this Agreement shall not be liable to the Corporation or to any Holder for its good faith reliance on the provisions of this Agreement (including this Section 8(q)).  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Holder otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Holder.

(r)     Waiver of Certain Damages.   To the extent permitted by applicable law, each party hereto agrees not to assert, and hereby waives, any claim against any other party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any of the transactions contemplated hereby.

(s)     Use of Holder's Name.   Other than as may be requested or required by applicable law, rule or regulation (including any applicable listing exchange rules or requirements), neither the Corporation, its Affiliates nor any of their respective Representatives shall issue any press releases or other public disclosure using the name of any Holder or any of its Affiliates without such Holder's prior written consent.

(t)     Governing Documents.   It is the intention of the Parties that in the event of any conflict between the terms and provisions of this Agreement and those contained in the Certificate of Incorporation, the Bylaws or other similar governing documents of the Corporation, the terms and provisions of this Agreement shall govern and control to the maximum extent permitted by applicable law.  In the event of any such conflict, each Holder shall vote (or cause to be voted or provide written consent with respect to) all of such Holder's Common Stock and any other voting

securities of the Corporation over which such Holder has voting control and shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings) to cause the Certificate of Incorporation, the Bylaws or other similar governing documents of the Corporation, as applicable, to be amended to conform the terms and provisions thereof with the terms and provisions of this Agreement.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;*
*SIGNATURE PAGES TO FOLLOW]*

IN WITNESS WHEREOF, the parties hereto have executed this Stockholders' Agreement as of the date first written above.

**CORPORATION:**

**JOANN INC., a Delaware corporation**

By:
    Name:
    Title:

Address for Notices:

JOANN Inc.
5555 Darrow Road
Hudson, Ohio 44236
Attn: Scott Sekella; Ann Aber
Email: Scott.Sekella@joann.com;
Ann.Aber@joann.com

with copies (which shall not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Attn: George Davis; Ted Dillman; Greg Rodgers; Mark Morris
Email: George.Davis@lw.com;
Ted.Dillman@lw.com;
Greg.Rodgers@lw.com; Mark.Morris@lw.com

**<u>HOLDER</u>:**

**[●]**


By:
    Name:
    Title:

Address for Notices:

[●]
[●]
[●]
Attention: [●]
Email: [●]

<u>EXHIBIT A</u>

***Form of Joinder***

The undersigned hereby agrees, effective as of the date set forth below, to become a party to that certain Stockholders' Agreement (as amended, restated and modified from time to time, the "<u>Agreement</u>"), dated as of [_____], 2024, by and among JOANN, Inc., a Delaware corporation (the "<u>Corporation</u>"), and the stockholders of the Corporation.  The undersigned hereby pursuant to this joinder (this "<u>Joinder</u>") agrees to be bound by all of the terms of the Agreement and shall hereafter be deemed to be, for all purposes of the Agreement, a party to the Agreement and a "Holder" (as defined in the Agreement).  This Joinder and all disputes or controversies arising out of or relating to this Joinder shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principles of conflicts of laws.

[_]

By:_____
     Name:
     Title:

Date:

Address:

_____
_____
_____
Attention:
Email:

with a copy (which shall not constitute notice) to:

_____
_____
_____
Attention:
Email:

## EXHIBIT A-2

**Bylaws of JOANN Inc.**

**Amended and Restated Bylaws of**

**JOANN Inc.**

**(a Delaware corporation)**

**Table of Contents**

| | | |
|---|---|---:|
| Article I - Corporate Offices | | 1 |
| 1.1 | Registered Office | 1 |
| 1.2 | Other Offices | 1 |
| Article II - Meetings of Stockholders | | 1 |
| 2.1 | Place of Meetings | 1 |
| 2.2 | Annual Meeting | 1 |
| 2.3 | Special Meeting | 1 |
| 2.4 | Notice of Business to be Brought Before a Meeting | 1 |
| 2.5 | Notice of Nominations for Election to the Board of Directors | 4 |
| 2.6 | Additional Requirements for Valid Nomination of Candidates to Serve as Director and, if Elected, to be Seated as Directors. | 6 |
| 2.7 | Notice of Stockholders' Meetings | 6 |
| 2.8 | Manner of Giving Notice; Affidavit of Notice | 7 |
| 2.9 | Quorum | 7 |
| 2.10 | Adjourned Meeting; Notice | 7 |
| 2.11 | Conduct of Business | 7 |
| 2.12 | Voting | 8 |
| 2.13 | Record Date for Stockholder Meetings and Other Purposes | 8 |
| 2.14 | Proxies | 8 |
| 2.15 | List of Stockholders Entitled to Vote | 9 |
| 2.16 | Inspectors of Election | 9 |
| Article III - Directors | | 10 |
| 3.1 | Powers | 10 |
| 3.2 | Number of Directors | 10 |
| 3.3 | Election, Qualification and Term of Office of Directors | 10 |
| 3.4 | Resignation and Vacancies | 10 |
| 3.5 | Place of Meetings; Meetings by Telephone | 10 |
| 3.6 | Regular Meetings | 10 |
| 3.7 | Special Meetings; Notice | 11 |
| 3.8 | Quorum | 11 |
| 3.9 | Board Action by Written Consent without a Meeting | 11 |
| 3.10 | Fees and Compensation of Directors | 11 |
| Article IV - Committees | | 11 |
| 4.1 | Committees of Directors | 11 |
| 4.2 | Committee Minutes | 12 |
| 4.3 | Meetings and Actions of Committees | 12 |
| Article V - Officers | | 12 |
| 5.1 | Officers | 12 |
| 5.2 | Appointment of Officers | 12 |
| 5.3 | Subordinate Officers | 12 |
| 5.4 | Removal and Resignation of Officers | 13 |
| 5.5 | Vacancies in Offices | 13 |

| | | |
|---|---|---|
| 5.6 | Representation of Shares of Other Corporations | 13 |
| 5.7 | Authority and Duties of Officers | 13 |

Article VI - Records ............................................................................................................ 13

Article VII - General Matters ............................................................................................... 13

| | | |
|---|---|---|
| 7.1 | Execution of Corporate Contracts and Instruments | 13 |
| 7.2 | Stock Certificates | 14 |
| 7.3 | Lost Certificates | 14 |
| 7.4 | Shares Without Certificates | 14 |
| 7.5 | Construction; Definitions | 14 |
| 7.6 | Dividends | 14 |
| 7.7 | Fiscal Year | 14 |
| 7.8 | Seal | 14 |
| 7.9 | Transfer of Stock | 15 |
| 7.10 | Stock Transfer Agreements | 15 |
| 7.11 | Registered Stockholders | 15 |
| 7.12 | Waiver of Notice | 15 |

Article VIII - Notice ........................................................................................................... 15

| | | |
|---|---|---|
| 8.1 | Delivery of Notice; Notice by Electronic Transmission | 15 |

Article IX - Indemnification ................................................................................................ 16

| | | |
|---|---|---|
| 9.1 | Indemnification of Directors and Officers | 16 |
| 9.2 | Indemnification of Others | 16 |
| 9.3 | Prepayment of Expenses | 17 |
| 9.4 | Determination; Claim | 17 |
| 9.5 | Non-Exclusivity of Rights | 17 |
| 9.6 | Insurance | 17 |
| 9.7 | Other Indemnification | 17 |
| 9.8 | Continuation of Indemnification | 17 |
| 9.9 | Amendment or Repeal; Interpretation | 17 |

Article X - Amendments ...................................................................................................... 17

Article XI - Forum ............................................................................................................... 17

Article XII - Miscellaneous ................................................................................................. 17

Article XIII - Interpretation ................................................................................................. 17

Article XIV - Definitions ..................................................................................................... 17

---

**Amended and Restated Bylaws of
JOANN Inc.**

**Article I - Corporate Offices**

1.1 <u>Registered Office</u>.

The address of the registered office of JOANN Inc. (the "<u>Corporation</u>") in the State of Delaware, and the name of its registered agent at such address, shall be as set forth in the Corporation's certificate of incorporation, as the same may be amended and/or restated from time to time (the "<u>Certificate of Incorporation</u>").

1.2 <u>Other Offices</u>.

The Corporation may have additional offices at any place or places, within or outside the State of Delaware, as the Corporation's board of directors (the "<u>Board</u>") may from time to time establish or as the business of the Corporation may require.

**Article II - Meetings of Stockholders**

2.1 <u>Place of Meetings</u>.

Meetings of stockholders shall be held at such place, if any, within or outside the State of Delaware, designated by the Board. The Board may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211(a)(2) of the General Corporation Law of the State of Delaware (the "<u>DGCL</u>"). In the absence of any such designation or determination, stockholders' meetings shall be held at the Corporation's principal executive office.

2.2 <u>Annual Meeting</u>.

The Board shall designate the date and time of the annual meeting. At the annual meeting, directors shall be elected and other proper business properly brought before the meeting in accordance with Section 2.4 may be transacted. The Board may postpone, reschedule or cancel any annual meeting of stockholders previously scheduled by the Board.

2.3 Special Meetings.

Special meetings of the stockholders may be called only by such Persons and only in such manner as set forth in the Certificate of Incorporation. The Board may postpone, reschedule or cancel any special meeting of stockholders previously scheduled by the Board.

No business may be transacted at any special meeting of stockholders other than the business specified in the notice of such meeting.

2.4 Notice of Business to be Brought Before a Meeting.

(i) At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, business must be (a) specified in a notice of meeting given by or at the direction of the Board, (b) if not specified in a notice of meeting, otherwise brought before the meeting by the Board or the chairperson of the Board, or (c) otherwise properly brought before the meeting by a stockholder present in person who (A)(1) was a record owner of shares of the Corporation both at the time of giving the notice provided for in this Section 2.4 and at the time of the meeting, (2) is entitled to vote at the meeting and (3) has complied with this Section 2.4 in all applicable respects or (B) properly made such proposal in accordance with Rule 14a-8 under the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations, the "Exchange Act"). The foregoing clause (c) shall be the exclusive means for a stockholder to propose business to be brought before an annual meeting of the stockholders. The only matters that may be brought before a special meeting are the matters specified in the Corporation's notice of meeting given by or at the direction of the Person calling the meeting pursuant to Section 2.3 of these bylaws. For purposes of this Section 2.4 of these bylaws, "present in person" shall mean that the stockholder proposing that the business be brought before the annual meeting of the Corporation, or a qualified representative of such proposing stockholder, appear at such annual meeting. A "qualified representative" of such proposing stockholder shall be a duly authorized officer, manager or partner of such stockholder or any other Person authorized by a writing executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such Person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of stockholders. Stockholders seeking to nominate persons for election to the Board must comply with Section 2.5 and 2.6 of these bylaws, and this Section 2.4 shall not be applicable to nominations except as expressly provided in Section 2.5 and 2.6 of these bylaws.

(ii) Without qualification, for business to be properly brought before an annual meeting by a stockholder, the stockholder must (a) provide Timely Notice (as defined below) thereof in writing and in proper form to the Secretary of the Corporation and (b) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.4. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not less than sixty (60) days nor more than ninety (90) days prior to the one-year anniversary of the preceding year's annual meeting; provided, however, that if the date of the annual meeting is more than thirty (30) days before or more than sixty (60) days after such anniversary date, notice by the stockholder to be timely must be so delivered, or mailed and received, not later than the ninetieth (90th) day prior to such annual meeting or, if later, the tenth (10th) day following the day on which public disclosure of the date of such annual meeting was first made by the Corporation (such notice within such time periods, "Timely Notice"). In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period for the giving of Timely Notice as described above.

(iii) To be in proper form for purposes of this Section 2.4, a stockholder's notice to the Secretary shall set forth:

(a) As to each Proposing Person (as defined below), (A) the name and address of such Proposing Person (including, if applicable, the name and address that appear on the Corporation's books and records); and (B) the class or series and number of shares of the Corporation that are, directly or indirectly, owned of record or beneficially owned (within the meaning of Rule 13d-3 under the Exchange Act) by such Proposing Person, except that such Proposing Person shall in all events be deemed to beneficially own any shares of any class or series of the Corporation as to which such Proposing Person has a right to acquire beneficial ownership at any time in the future (the disclosures to be made pursuant to the foregoing clauses (A) and (B) are referred to as "Stockholder Information");

(b) As to each Proposing Person, (A) the full notional amount of any securities that, directly or indirectly, underlie any "derivative security" (as such term is defined in Rule 16a-1(c) under the Exchange Act) that constitutes a "call equivalent position" (as such term is defined in Rule 16a-1(b) under the Exchange Act) ("Synthetic Equity Position") and that is, directly or indirectly, held or maintained by such Proposing Person with respect to shares of any class or series of shares of the Corporation; provided that, for the purposes of the definition of "Synthetic Equity Position," the term "derivative security" shall also include any security or instrument that would not otherwise constitute a "derivative security" as a result of any feature that would make any conversion, exercise or similar right or privilege of such security or instrument becoming determinable only at some future date or upon the happening of a future occurrence, in which case the determination of the amount of securities into which such security or instrument would be convertible or exercisable shall be made assuming that such security or instrument is immediately convertible or exercisable at the time of such determination; and, provided, further, that any Proposing Person satisfying the requirements of Rule 13d-1(b)(1) under the Exchange Act (other than a Proposing Person that so satisfies Rule 13d-1(b)(1) under the Exchange Act solely by reason of Rule 13d-1(b)(1)(ii)(E)) shall not be deemed to hold or maintain the notional amount of any securities that underlie a Synthetic Equity Position held by such Proposing Person as a hedge with respect to a bona fide derivatives trade or position of such Proposing Person arising in the ordinary course of such Proposing Person's business as a derivatives dealer, (B) any rights to dividends on the shares of any class or series of shares of the Corporation owned beneficially by such Proposing Person that are separated or separable from the underlying shares of the Corporation, (C) any material pending orthreatened legal proceeding in which such Proposing Person is a party or material participant involving the Corporation or any of its officers or  directors, or any affiliate of the Corporation, (D) any other material relationship between such Proposing Person, on the one hand, and the Corporation  or any affiliate of the Corporation, on the other hand, (E) any direct or indirect material interest in any material contract or agreement of such Proposing Person with the Corporation or any affiliate of the Corporation (including, in any such case, any employment agreement, collective bargaining agreement or consulting agreement), (F) a representation that such Proposing Person intends or is part of a group which intends to deliver a proxy statement or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal or otherwise solicit proxies from stockholders in support of such proposal and (G) any other information relating to such Proposing Person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies or consents by such Proposing Person in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act (the disclosures to be made pursuant to the foregoing clauses (A) through (G) are referred to as "Disclosable Interests"); provided, however, that Disclosable Interests shall not include any such disclosures with respect to the ordinary course business activities of any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the stockholder directed to prepare and submit the notice required by these bylaws on behalf of a beneficial owner; and

(c) As to each item of business that the stockholder proposes to bring before the annual meeting, (A) a brief description of the business desired to be brought before the annual meeting, the reasons for conducting such business at the annual meeting and any material interest in such business of each Proposing Person, (B) the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend the bylaws, the language of the proposed amendment), (C) a reasonably detailed description of all agreements, arrangements and understandings (x) between or among any of the Proposing Persons or (y) between or among any Proposing Person and any other Person or entity (including their names) in connection with the proposal of such business by such stockholder and (D) any other information relating to such item of business that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act; *provided*, *however*, that the disclosures required by this Section 2.4(iii) shall not include any disclosures with respect to any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the stockholder directed to prepare and submit the notice required by these bylaws on behalf of a beneficial owner.

(iv) For purposes of this Section 2.4, the term "<u>Proposing Person</u>" shall mean (a) the stockholder providing the notice of business proposed to be brought before an annual meeting, (b) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the business proposed to be brought before the annual meeting is made, and (c) any participant (as defined in paragraphs (a)(ii)-(vi) of Instruction 3 to Item 4 of Schedule 14A) with such stockholder in such solicitation.

(v) A Proposing Person shall update and supplement its notice to the Corporation of its intent to propose business at an annual meeting, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 2.4 shall be true and correct as of the record date for stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof). For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other section of these bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any proposal or to submit any new proposal, including by changing or adding matters, business or resolutions proposed to be brought before a meeting of the stockholders.

(vi) Notwithstanding anything in these bylaws to the contrary, no business shall be conducted at an annual meeting that is not properly brought before the meeting in accordance with this Section 2.4. The presiding officer of the meeting shall, if the facts warrant, determine that the business was not properly brought before the meeting in accordance with this Section 2.4, and if he or she should so determine, he or she shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

(vii) This Section 2.4 is expressly intended to apply to any business proposed to be brought before an annual meeting of stockholders other than any proposal made in accordance with Rule 14a-8 under the Exchange Act and included in the Corporation's proxy statement. In addition to the requirements of this Section 2.4 with respect to any business proposed to be brought before an annual meeting, each Proposing Person shall comply with all applicable requirements of the Exchange Act with respect to any such business. Nothing in this Section 2.4 shall be deemed to affect the rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(viii) For purposes of these bylaws, "<u>public disclosure</u>" shall mean disclosure in a press release reported by a national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act.

2.5 <u>Notice of Nominations for Election to the Board of Directors</u>.

(i) Nominations of any person for election to the Board at an annual meeting or at a special meeting (but only if the election of directors is a matter specified in the notice of meeting given by or at the direction of the Person calling such special meeting) may be made at such meeting only by or at the direction of the Nominating and Governance Committee, or (b) for so long as Green Square meets the Green Square Threshold (each as defined in the Certificate of Incorporation), Green Square (in such capacity, the "Nominating Person").

(ii) Without qualification, for a stockholder to make any nomination of a person or persons for election to the Board at an annual meeting, the stockholder must (a) provide Timely Notice (as defined in Section 2.4(ii) of these bylaws) thereof in writing and in proper form to the Secretary of the Corporation, (b) provide the information, agreements and questionnaires with respect to such stockholder and its candidate for nomination as required to be set forth by this Section 2.5 and Section 2.6, and (c) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.5 and Section 2.6.

(iii) Without qualification, if the election of directors is a matter specified in the notice of meeting given by or at the direction of the Person calling a special meeting, then for a stockholder to make any nomination of a person or persons for election to the Board at a special meeting, the stockholder must (a) provide timely notice thereof in writing and in proper form to the Secretary of the Corporation at the principal executive offices of the Corporation, (b) provide the information with respect to such stockholder and its candidate for nomination as required by this Section 2.5 and Section 2.6 and (c) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.5. To be timely, a stockholder's notice for nominations to be made at a special meeting must be delivered to, or mailed and received at, the principal executive offices of the Corporation not earlier than the one hundred twentieth (120th) day prior to such special meeting and not later than the ninetieth (90th) day prior to such special meeting or, if later, the tenth (10th) day following the day on which public disclosure (as defined in Section 2.4) of the date of such special meeting was first made. In no event shall any adjournment or postponement of an annual meeting or special meeting or the announcement thereof commence a new time period for the giving of a stockholder's notice as described above.

(iv) To be in proper form for purposes of this Section 2.5, a stockholder's notice to the Secretary shall set forth:

(a) As to each Nominating Person, the Stockholder Information (as defined in Section 2.4(iii)(a) of these bylaws) except that for purposes of this Section 2.5, the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 2.4(iii)(a);

(b) As to each Nominating Person, any Disclosable Interests (as defined in Section 2.4(iii)(b), except that for purposes of this Section 2.5 the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 2.4(iii)(b) and the disclosure with respect to the business to be brought before the meeting in Section 2.4(iii)(c) shall be made with respect to the election of directors at the meeting); and

(c) As to each candidate whom a Nominating Person proposes to nominate for election as a director, (A) all information with respect to such candidate for nomination that would be required to be set forth in a stockholder's notice pursuant to this Section 2.5 and Section 2.6 if such candidate for nomination were a Nominating Person, (B) all information relating to such candidate for nomination that is required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in a contested election pursuant to Section 14(a) under the Exchange Act (including such candidate's written consent to being named in the proxy statement as a nominee and to serving as a director if elected), (C) a description of any direct or indirect material interest in any material contract or agreement between or among any Nominating Person, on the one hand, and each candidate for nomination or his or her respective associates or any other participants in such solicitation, on the other hand, including, without limitation, all information that would be required to be disclosed pursuant to Item 404 under Regulation S-K if such Nominating Person were the "registrant" for purposes of such rule and the candidate for nomination were a director or executive officer of such registrant (the disclosures to be made pursuant to the foregoing clauses (A) through (C) are referred to as "Nominee Information"), and (D) a completed and signed questionnaire, representation and agreement as provided in Section 2.6(i).

(v)  A stockholder providing notice of any nomination proposed to be made at a meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 2.5 shall be true and correct as of the record date for stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof). For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other section of these bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any nomination or to submit any new nomination. In addition to the requirements of this Section 2.5 with respect to any nomination proposed to be made at a meeting, each Nominating Person shall comply with all applicable requirements of the Exchange Act with respect to any such nominations.

2.6 <u>Additional Requirements for Valid Nomination of Candidates to Serve as Director and, if Elected, to be Seated as Directors</u>.

(i) To be eligible to be a candidate for election as a director of the Corporation at an annual or special meeting, a candidate must be nominated in the manner prescribed in Section 2.5 and the candidate for nomination, whether nominated by the Board or by a stockholder of record, must have previously delivered (in accordance with the time period prescribed for delivery in a notice to such candidate given by or on behalf of the Board), to the Secretary at the principal executive offices of the Corporation, a completed written questionnaire (in a form provided by the Corporation) with respect to the background, qualifications, stock ownership and independence of such proposed nominee.

(ii) The Board may also require any proposed candidate for nomination as a Director to furnish such other information as may reasonably be requested by the Board in writing prior to the meeting of stockholders at which such candidate's nomination is to be acted upon in order for the Board to determine the eligibility of such candidate for nomination to be an independent director of the Corporation in accordance with the Corporation's Corporate Governance Guidelines.

(iii) A candidate for nomination as a director shall further update and supplement the materials delivered pursuant to this Section 2.6, if necessary, so that the information provided or required to be provided pursuant to this Section 2.6 shall be true and correct as of the record date for stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation (or any other office specified by the Corporation in any public announcement) not later than five (5) business days after the record date for stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof). For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other section of these bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any proposal or to submit any new proposal, including by changing or adding nominees, matters, business or resolutions proposed to be brought before a meeting of the stockholders.

(iv) No candidate shall be eligible for nomination as a director of the Corporation unless such candidate for nomination and the Nominating Person seeking to place such candidate's name in nomination has complied with Section 2.5 and this Section 2.6, as applicable. The presiding officer at the meeting shall, if the facts warrant, determine that a nomination was not properly made in accordance with Section 2.5 and this Section 2.6, and if he or she should so determine, he or she shall so declare such determination to the meeting, the defective nomination shall be disregarded and any ballots cast for the candidate in question (but in the case of any form of ballot listing other qualified nominees, only the ballots cast for the nominee in question) shall be void and of no force or effect.

(v) Notwithstanding anything in these bylaws to the contrary, no candidate for nomination shall be eligible to be seated as a director of the Corporation unless nominated and elected in accordance with Section 2.5 and this Section 2.6.

2.7 <u>Notice of Stockholders' Meetings</u>.

Unless otherwise provided by law, the Certificate of Incorporation or these bylaws, the notice of any meeting of stockholders shall be sent or otherwise given in accordance with either Section 2.8 or Section 8.1 of these bylaws not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting. The notice shall specify the place, if any, date and hour of the meeting, the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a

special meeting, the purpose or purposes for which the meeting is called.

2.8 <u>Manner of Giving Notice; Affidavit of Notice</u>.

Notice of any meeting of stockholders shall be deemed given:

(i) if mailed, when deposited in the U.S. mail, postage prepaid, directed to the stockholder at his or her address as it appears on the Corporation's records; or

(ii) if electronically transmitted as provided in Section 8.1 of these bylaws.

An affidavit of the secretary or an assistant secretary of the Corporation or of the transfer agent or any other agent of the Corporation that the notice has been given by mail or by a form of electronic transmission, as applicable, shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

2.9 <u>Quorum</u>.

Unless otherwise provided by law, the Certificate of Incorporation or these bylaws, the holders of a majority in voting power of the stock issued and outstanding and entitled to vote, present in person, or by remote communication, if applicable, or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders. If, however, a quorum is not present or represented at any meeting of the stockholders, then either (i) the chairperson of the meeting or (ii) a majority in voting power of the stockholders entitled to vote at the meeting, present in person, or by remote communication, if applicable, or represented by proxy, shall have power to adjourn the meeting from time to time in the manner provided in Section 2.10 of these bylaws until a quorum is present or represented.

2.10 <u>Adjourned Meeting; Notice</u>.

When a meeting is adjourned to another time or place, if any, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present at such adjourned meeting are announced at the meeting at which the adjournment is taken. At any adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for determination of stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix as the record date for determining stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote at the adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record as of the record date so fixed for notice of such adjourned meeting.

2.11 <u>Conduct of Business</u>.

The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting by the Person presiding over the meeting. The Board may adopt by resolution such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board, the chairperson of any meeting of stockholders shall have the right and authority to convene and (for any or no reason) to recess and/or adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairperson, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chairperson of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to stockholders entitled to vote at the meeting, their duly authorized and constituted proxies or such other Persons as the chairperson of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. Unless and to the extent determined by the Board or the chairperson of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

2.12 <u>Voting</u>.

Except as may be otherwise provided in the Certificate of Incorporation, these bylaws or the DGCL, each stockholder shall be entitled to one (1) vote for each share of capital stock held by such stockholder.

Except as otherwise provided by the Certificate of Incorporation, at all duly called or convened meetings of stockholders at which a quorum is present, for the election of directors, a plurality of the votes cast shall be sufficient to elect a director. Except as otherwise provided by the Certificate of Incorporation, these bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or applicable law, or pursuant to any regulation applicable to the Corporation or its securities, each other matter presented to the stockholders at a duly called or convened meeting at which a quorum is present shall be decided by the affirmative vote of the holders of a majority of the votes cast (excluding abstentions and broker non-votes) on such matter.

2.13 <u>Record Date for Stockholder Meetings and Other Purposes</u>.

In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than sixty (60) days nor less than ten (10) days before the date of such meeting. If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be the close of business on the next day preceding the day on which notice is first given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for the adjourned meeting; and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance herewith at the adjourned meeting.

To the extent stockholder action by written consent is permitted by the Certificate of Incorporation, in order that the Corporation may determine the stockholders entitled to express consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board. If no record date for determining stockholders entitled to express consent to corporate action in writing without a meeting is fixed by the Board, (i) when no prior action of the Board is required by law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law, and (ii) if prior action by the Board is required by law, the record date for such purpose shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of capital stock, or for the purposes of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

2.14 Proxies.

Each stockholder entitled to vote at a meeting of stockholders may authorize another Person or Persons to act for such stockholder by proxy authorized by an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting, but, no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212 of the DGCL. A proxy may be in the form of a telegram, cablegram or other means of electronic transmission which sets forth or is submitted with information from which it can be determined that the telegram, cablegram or other means of electronic transmission was authorized by the stockholder.

2.15 List of Stockholders Entitled to Vote.

The Corporation shall prepare, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting (provided, however, that if the record date for determining the stockholders entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least ten (10) days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the Corporation's principal executive office. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Such list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them. Except as otherwise provided by law, the stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by this Section 2.15 or to vote in Person or by proxy at any meeting of stockholders.

2.16 Inspectors of Election.

Before any meeting of stockholders, the Corporation shall appoint an inspector or inspectors of election to act at the meeting or its adjournment and make a written report thereof. The Corporation may designate one or more Persons as alternate inspectors to replace any inspector who fails to act. If any Person appointed as inspector or any alternate fails to appear or fails or refuses to act, then the chairperson of the meeting shall appoint a Person to fill that vacancy.

Such inspectors shall:

(i) determine the number of shares outstanding and the voting power of each, the number of shares represented at the meeting and the validity of any proxies and ballots;

(ii) count all votes or ballots;

(iii) count and tabulate all votes;

(iv) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspector(s); and

(v) certify its or their determination of the number of shares represented at the meeting and its or their count of all votes and ballots.

Each inspector, before entering upon the discharge of the duties of inspector, shall take and sign an oath faithfully to execute the duties of inspection with strict impartiality and according to the best of such inspector's ability. Any report or certificate made by the inspectors of election is prima facie evidence of the facts stated therein. The inspectors of election may appoint such Persons to assist them in performing their duties as they determine.

### Article III - Directors

3.1 Powers.

Except as otherwise provided by the Certificate of Incorporation or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board.

3.2 Number of Directors.

Subject to the Certificate of Incorporation, the total number of directors constituting the Board shall be determined from time to time by resolution of the Board. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

3.3 <u>Election, Qualification and Term of Office of Directors</u>.

Except as provided in Section 3.4 of these bylaws, each director, including a director elected to fill a vacancy or newly created directorship, shall hold office until the expiration of the term of the class, if any, for which elected and until such director's successor is elected and qualified or until such director's earlier death, resignation, disqualification or removal. Directors need not be stockholders. The Certificate of Incorporation or these bylaws may prescribe qualifications for directors.

3.4 <u>Resignation and Vacancies</u>.

Any director may resign at any time upon notice given in writing or by electronic transmission to the Corporation. The resignation shall take effect at the time specified therein or upon the happening of an event specified therein, and if no time or event is specified, at the time of its receipt. When one or more directors so resigns and the resignation is effective at a future date or upon the happening of an event to occur on a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in this Section 3.4 in the filling of other vacancies.

Unless otherwise provided in the Certificate of Incorporation or these bylaws, vacancies and newly created directorships resulting from any increase in the authorized number of directors shall be filled only by a majority of the directors then in office, although less than a quorum, or by a sole remaining director. Any director appointed in accordance with the preceding sentence shall hold office for the remainder of the term of the class, if any, to which the director is appointed and until such director's successor shall have been elected and qualified. A vacancy in the Board shall be deemed to exist under these bylaws in the case of the death, removal or resignation of any director.

3.5 <u>Place of Meetings; Meetings by Telephone</u>.

The Board may hold meetings, both regular and special, either within or outside the State of Delaware.

Unless otherwise restricted by the Certificate of Incorporation or these bylaws, members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and such participation in a meeting pursuant to this bylaw shall constitute presence in Person at the meeting.

3.6 <u>Regular Meetings</u>.

Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.

3.7 <u>Special Meetings; Notice</u>.

Special meetings of the Board for any purpose or purposes may be called at any time by the chairperson of the Board, the chief executive officer, the president, the secretary or a majority of the total number of directors constituting the Board.

Notice of the time and place of special meetings shall be:

   (i)   delivered personally by hand, by courier or by telephone;

  (ii)  sent by United States first-class mail, postage prepaid;

  (iii)  sent by facsimile or electronic mail; or

  (iv)  sent by other means of electronic transmission,

directed to each director at that director's address, telephone number, facsimile number or electronic mail address, or other address for electronic transmission, as the case may be, as shown on the Corporation's records.

If the notice is (i) delivered personally by hand, by courier or by telephone, (ii) sent by facsimile or electronic mail, or (iii) sent by other means of electronic transmission, it shall be delivered or sent at least twenty-four (24) hours before the time of the holding of the meeting. If the notice is sent by U.S. mail, it shall be deposited in the U.S. mail at least four (4) days before the time of the holding of the meeting. The notice need not specify the place of the meeting (if the meeting is to be held at the Corporation's principal executive office) nor the purpose of the meeting.

3.8 <u>Quorum</u>.

At all meetings of the Board, 80% of the total number of directors shall constitute a quorum for the transaction of business. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the Certificate of Incorporation or these bylaws. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting.

3.9 <u>Board Action by Written Consent without a Meeting</u>.

Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

3.10 <u>Fees and Compensation of Directors</u>.

Unless otherwise restricted by the Certificate of Incorporation or these bylaws, the Board shall have the authority to fix the compensation, including fees

and reimbursement of expenses, of directors for services to the Corporation in any capacity.

## Article IV - Committees

4.1 Committees of Directors.

The Board may designate one (1) or more committees, each committee to consist, of one (1) or more of the directors of the Corporation. The Board may designate one (1) or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board or in these bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the Corporation.

The Board shall appoint a nominating and corporate governance committee (the "Nominating and Corporate Governance Committee"). The Nominating and Corporate Governance Committee shall review and evaluate the size, composition, function and duties of the Board consistent with its needs. The Nominating and Corporate Governance Committee shall establish criteria for the selection of candidates to the Board and its committees, and identify and recommend individuals qualified to become Board and Board committee members consistent with such criteria. The Nominating and Corporate Governance Committee shall oversee the evaluation of the Board and develop and recommend to the Board the Corporate Governance Guidelines for the Corporation and oversee compliance with such Guidelines. The Board shall approve a charter for the Nominating and Corporate Governance Committee and the Nominating and Corporate Governance Committee shall comply with such charter in the performance of its duties.

4.2 Committee Minutes.

Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

4.3 Meetings and Actions of Committees.

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of:

    (i)    Section 3.5 (place of meetings and meetings by telephone);

    (ii)    Section 3.6 (regular meetings);

    (iii)    Section 3.7 (special meetings and notice);

    (iv)    Section 3.9 (action without a meeting); and

    (v)    Section 7.12 (waiver of notice),

with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board and its members. *However*:

(i) the time of regular meetings of committees may be determined either by resolution of the Board or by resolution of the committee;

(ii) special meetings of committees may also be called by resolution of the Board or by the chairperson of the applicable committee; and

(iii) the Board may adopt rules for the governance of any committee to override the provisions that would otherwise apply to the committee pursuant to this Section 4.3, provided that such rules do not violate the provisions of the Certificate of Incorporation or applicable law.

## Article V - Officers

5.1 Officers.

The officers of the Corporation shall include a president and a secretary. The Corporation may also have, at the discretion of the Board, a chairperson of the Board and a vice chairperson of the Board from among its members, a chief executive officer, a chief financial officer, a treasurer, one (1) or more vice presidents, one (1) or more assistant vice presidents, one (1) or more assistant treasurers, one (1) or more assistant secretaries, and any such other officers as may be appointed in accordance with the provisions of these bylaws. Any number of offices may be held by the same Person.

5.2 Appointment of Officers.

The Board shall appoint the officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 of these bylaws.

5.3 Subordinate Officers.

The Board may appoint, or empower the chief executive officer or, in the absence of a chief executive officer, the president, to appoint, such other officers and agents as the business of the Corporation may require. Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the Board or an authorized officer (as applicable), may from time to time determine.

5.4 Removal and Resignation of Officers.

Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by the Board or, except in the case of an officer chosen by the Board, by any officer upon whom such power of removal may be conferred by the Board.

Any officer may resign at any time by giving written notice to the Corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice. Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

5.5 Vacancies in Offices.

Any vacancy occurring in any office of the Corporation shall be filled by the Board or as provided in Sections 5.2 and 5.3, as applicable.

5.6 Representation of Shares of Other Corporations.

The chairperson of the Board, the chief executive officer, the president, any vice president, the treasurer, the secretary or assistant secretary of this Corporation, or any other Person authorized by the Board, the chief executive officer, the president or a vice president, is authorized to vote, represent and exercise on behalf of this Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this Corporation. The authority granted herein may be exercised either by such Person directly or by any other Person authorized to do so by proxy or power of attorney duly executed by such Person having the authority.

5.7 Authority and Duties of Officers.

All officers of the Corporation shall respectively have such authority and perform such duties in the management of the business of the Corporation as may be provided herein or designated from time to time by the Board and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board.

## Article VI - Records

A stock ledger consisting of one or more records in which the names of all of the Corporation's stockholders of record, the address and number of shares registered in the name of each such stockholder, and all issuances and transfers of stock of the corporation are recorded in accordance with Section 224 of the DGCL shall be administered by or on behalf of the Corporation. Any records administered by or on behalf of the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or by means of, or be in the form of, any information storage device, or method, or one or more electronic networks or databases (including one or more distributed electronic networks or databases), provided that the records so kept can be converted into clearly legible paper form within a reasonable time and, with respect to the stock ledger, that the records so kept (i) can be used to prepare the list of stockholders specified in Sections 219 and 220 of the DGCL, (ii) record the information specified in Sections 156, 159, 217(a) and 218 of the DGCL, and (iii) record transfers of stock as governed by Article 8 of the Uniform Commercial Code.

## Article VII - General Matters

7.1 Execution of Corporate Contracts and Instruments.

The Board may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances. Unless so authorized or ratified by the Board or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

7.2 Stock Certificates.

The shares of the Corporation shall be uncertificated, provided that the Board by resolution may provide that some or all of the shares of any class or series of stock of the Corporation shall be represented by certificates. Certificates for the shares of stock, if any, shall be in such form as is consistent with the Certificate of Incorporation and applicable law. Every holder of stock represented by a certificate shall be entitled to have a certificate signed by, or in the name of the Corporation by, any two officers authorized to sign stock certificates representing the number of shares registered in certificate form. The chairperson or vice chairperson of the Board, the president, vice president, the treasurer, any assistant treasurer, the secretary or any assistant secretary of the Corporation shall be specifically authorized to sign stock certificates. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

7.3 Lost Certificates.

The Corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

7.4 Shares Without Certificates.

The Corporation may adopt a system of issuance, recordation and transfer of its shares of stock by electronic or other means not involving the issuance of certificates, provided the use of such system by the Corporation is permitted in accordance with applicable law.

7.5 Construction; Definitions.

Unless the context requires otherwise, the general provisions, rules of construction and definitions in the DGCL shall govern the construction of these bylaws. Without limiting the generality of this provision, the singular number includes the plural and the plural number includes the singular.

7.6 Dividends.

The Board, subject to any restrictions contained in either (i) the DGCL or (ii) the Certificate of Incorporation, may declare and pay dividends upon the shares of its capital stock. Dividends may be paid in cash, in property or in shares of the Corporation's capital stock.

The Board may set apart out of any of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the Corporation, and meeting contingencies.

7.7 Fiscal Year.

The fiscal year of the Corporation shall be fixed by resolution of the Board and may be changed by the Board.

7.8 Seal.

The Corporation may adopt a corporate seal, which shall be adopted and which may be altered by the Board. The Corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

7.9 Transfer of Stock.

Shares of the Corporation shall be transferable in the manner prescribed by law and in these bylaws. Shares of stock of the Corporation shall be transferred on the books of the Corporation only by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the Corporation of the certificate or certificates representing such shares endorsed by the appropriate Person or Persons (or by delivery of duly executed instructions with respect to uncertificated shares), with such evidence of the authenticity of such endorsement or execution, transfer, authorization and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps. No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing the names of the Persons from and to whom it was transferred.

7.10 Stock Transfer Agreements.

The Corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes or series of stock of the Corporation to restrict the transfer of shares of stock of the Corporation of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

7.11 Registered Stockholders.

The Corporation:

(i) shall be entitled to recognize the exclusive right of a Person registered on its books as the owner of shares to receive dividends and to vote as such owner; and

(ii) shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another Person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

7.12 Waiver of Notice.

Whenever notice is required to be given under any provision of the DGCL, the Certificate of Incorporation or these bylaws, a written waiver, signed by the Person entitled to notice, or a waiver by electronic transmission by the Person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice. Attendance of a Person at a meeting shall constitute a waiver of notice of such meeting, except when the Person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the Certificate of Incorporation or these bylaws.

**Article VIII - Notice**

8.1 Delivery of Notice; Notice by Electronic Transmission.

Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under any provisions of the DGCL, the Certificate of Incorporation, or these bylaws may be given in writing directed to the stockholder's mailing address (or by electronic transmission directed to the stockholder's electronic mail address, as applicable) as it appears on the records of the Corporation and shall be given (1) if mailed, when the notice is deposited in the U.S. mail, postage prepaid, (2) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's address or (3) if given by electronic mail, when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation.

Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice or electronic transmission to the Corporation. Notwithstanding the provisions of this paragraph, the Corporation may give a notice by electronic mail in accordance with the first paragraph of this section without obtaining the consent required by this paragraph.

Any notice given pursuant to the preceding paragraph shall be deemed given:

    (i)     if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

    (ii)    if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such

posting and (B) the giving of such separate notice; and

(iii)  if by any other form of electronic transmission, when directed to the stockholder.

Notwithstanding the foregoing, a notice may not be given by an electronic transmission from and after the time that (1) the Corporation is unable to deliver by such electronic transmission two (2) consecutive notices given by the Corporation and (2) such inability becomes known to the secretary or an assistant secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice, provided, however, the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

## Article IX - Indemnification

9.1 Indemnification of Directors and Officers.

The Corporation shall indemnify and hold harmless, to the fullest extent permitted by the DGCL as it presently exists or may hereafter be amended, any director or officer of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding") by reason of the fact that he or she, or a Person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while serving as a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred by such Person in connection with any such Proceeding. Notwithstanding the preceding sentence, except as otherwise provided in Section 9.4, the Corporation shall be required to indemnify a Person in connection with a Proceeding (or part thereof) initiated by such Person only if the Proceeding (or part thereof) was authorized in the specific case by the Board.

9.2 Indemnification of Others.

The Corporation shall have the power to indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any employee or agent of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any Proceeding by reason of the fact that he or she, or a Person for whom he or she is the legal representative, is or was an employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or non-profit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such Person in connection with any such Proceeding.

9.3 Prepayment of Expenses.

The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by any officer or director of the Corporation, and may pay the expenses incurred by any employee or agent of the Corporation, in defending any Proceeding in advance of its final disposition; *provided, however,* that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Person to repay all amounts advanced if it should be ultimately determined that the Person is not entitled to be indemnified under this Article IX or otherwise.

9.4 Determination; Claim.

If a claim for indemnification (following the final disposition of such Proceeding) under this Article IX is not paid in full within sixty (60) days, or a claim for advancement of expenses under this Article IX is not paid in full within thirty (30) days after a written claim therefor has been received by the Corporation, the claimant may thereafter (but not before) file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by law. In any such action the Corporation shall have the burden of proving that the claimant was not entitled to the requested indemnification or payment of expenses under applicable law.

9.5 Non-Exclusivity of Rights.

The rights conferred on any Person by this Article IX shall not be exclusive of any other rights which such Person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

9.6 Insurance.

The Corporation may purchase and maintain insurance on behalf of any Person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust enterprise or non-profit entity against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions of the DGCL.

9.7 Other Indemnification.

The Corporation's obligation, if any, to indemnify or advance expenses to any Person who was or is serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or non-profit entity shall be reduced by any amount such Person may collect as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or non-profit enterprise.

9.8 Continuation of Indemnification.

The rights to indemnification and to prepayment of expenses provided by, or granted pursuant to, this Article IX shall continue notwithstanding that the Person has ceased to be a director or officer of the Corporation and shall inure to the benefit of the estate, heirs, executors, administrators, legatees and distributees of such Person.

9.9 <u>Amendment or Repeal; Interpretation</u>.

The provisions of this Article IX shall constitute a contract between the Corporation, on the one hand, and, on the other hand, each individual who serves or has served as a director or officer of the Corporation (whether before or after the adoption of these bylaws), in consideration of such Person's performance of such services, and pursuant to this Article IX the Corporation intends to be legally bound to each such current or former director or officer of the Corporation. With respect to current and former directors and officers of the Corporation, the rights conferred under this Article IX are present contractual rights and such rights are fully vested, and shall be deemed to have vested fully, immediately upon adoption of theses bylaws. With respect to any directors or officers of the Corporation who commence service following adoption of these bylaws, the rights conferred under this provision shall be present contractual rights and such rights shall fully vest, and be deemed to have vested fully, immediately upon such director or officer commencing service as a director or officer of the Corporation. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection (i) hereunder of any Person in respect of any act or omission occurring prior to the time of such repeal or modification or (ii) under any agreement providing for indemnification or advancement of expenses to an officer or director of the Corporation in effect prior to the time of such repeal or modification.

Any reference to an officer of the Corporation in this Article IX shall be deemed to refer exclusively to the chairperson of the Board, a vice chairperson of the Board, a president, a chief executive officer, a chief financial officer, a secretary or a treasurer appointed pursuant to Article V of these bylaws, and to any vice president, assistant secretary, assistant treasurer, or other officer of the Corporation appointed by (x) the Board pursuant to Article V of these bylaws or (y) an officer to whom the Board has delegated the power to appoint officers pursuant to Article V of these bylaws, and any reference to an officer of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be deemed to refer exclusively to an officer appointed by the board of directors (or equivalent governing body) of such other entity pursuant to the certificate of incorporation and bylaws (or equivalent organizational documents) of such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise. The fact that any Person who is or was an employee of the Corporation or an employee of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise has been given or has used the title of "vice president" or any other title that could be construed to suggest or imply that such Person is or may be an officer of the Corporation or of such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall not result in such Person being constituted as, or being deemed to be, an officer of the Corporation or of such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise for purposes of this Article IX.

### Article X - Amendments

The Board is expressly empowered to adopt, amend or repeal the bylaws of the Corporation. The stockholders also shall have power to adopt, amend or repeal the bylaws of the Corporation; *provided, however*, that, in addition to any vote of the holders of any class or series of stock of the Corporation required by law or by the Certificate of Incorporation, such action by stockholders shall require the affirmative vote of the holders of at least 50% of the voting power of all the then-outstanding shares of voting stock of the Corporation with the power to vote at an election of directors, voting together as a single class.

### Article XI - Forum

Unless the Corporation consents in writing to the selection of an alternative forum, (a) the Court of Chancery (the "<u>Chancery Court</u>") of the State of Delaware (or, in the event that the Chancery Court does not have jurisdiction, the federal district court for the District of Delaware or other state courts of the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action, suit or proceeding brought on behalf of the Corporation, (ii) any action, suit or proceeding asserting a claim of breach of a fiduciary duty owed by any director, officer, employee or stockholder of the Corporation to the Corporation or to the Corporation's stockholders, (iii) any action, suit or proceeding arising pursuant to any provision of the DGCL or the Certificate of Incorporation or these bylaws (as either may be amended and/or restated from time to time) or (iv) any action, suit or proceeding asserting a claim against the Corporation governed by the internal affairs doctrine; and (b) subject to the preceding provisions of this Article XI, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. If any action the subject matter of which is within the scope of clause (a) of the immediately preceding sentence is filed in a court other than the courts in the State of Delaware (a "<u>Foreign Action</u>") in the name of any stockholder, such stockholder shall be deemed to have consented to (x) the personal jurisdiction of the state and federal courts in the State of Delaware in connection with any action brought in any such court to enforce the provisions of clause (a) of the immediately preceding sentence and (y) having service of process made upon such stockholder in any such action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder.

Any Person or entity purchasing or otherwise acquiring any interest in any security of the Corporation shall be deemed to have notice of and consented to this Article XI. Notwithstanding the foregoing, the provisions of this Article XI shall not apply to suits brought to enforce any liability or duty created by the Exchange Act or any other claim for which the federal courts of the United States have exclusive jurisdiction.

### Article XII - Miscellaneous

If any provision or provisions of these bylaws shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (i) the validity, legality and enforceability of such provision or provisions in any other circumstance and of the remaining provisions of these bylaws shall not in any way be affected or impaired thereby and (ii) to the fullest extent possible, the provisions of these bylaws shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service or for the benefit of the Corporation to the fullest extent permitted by law.

### Article XIII - Interpretation

For as long as the Stockholders Agreement remains in effect, in the event of any conflict between the terms and provisions of these bylaws and those contained in the Stockholders Agreement, the terms and provisions of the Stockholders Agreement shall govern and control, except as provided otherwise by mandatory provisions of the DGCL.

## Article XIV - Definitions

As used in these bylaws, unless the context otherwise requires, the term:

"Affiliate" means, with respect to any Person, any other Person that controls, is controlled by, or is under common control with such Person. For the purposes of this definition, "control," when used with respect to any Person, means the power to direct or cause the direction of the affairs or management of that Person, whether through the ownership of voting securities, as trustee (or the power to appoint a trustee), as a personal representative or executor, by contract, credit arrangement or otherwise and "controlled" and "controlling" have meanings correlative to the foregoing.

An "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

"Person" means any individual, general partnership, limited partnership, limited liability company, corporation, trust, business trust, joint stock company, joint venture, unincorporated association, cooperative or association or any other legal entity or organization of whatever nature, and shall include any successor (by merger or otherwise) of such entity.

"Stockholders Agreement" means the Stockholders Agreement, dated as of the date hereof, by and among the Corporation and other parties thereto, as may be amended from time to time.

## JOANN Inc.

### Certificate of Amendment and Restatement of Bylaws

The undersigned hereby certifies that she is the duly elected, qualified, and acting Secretary of JOANN Inc., a Delaware corporation (the "Corporation"), and that the foregoing bylaws were approved on [●], 2024 by the Corporation's board of directors.

/s/ _____

## **EXHIBIT B-1**

### **Revised Exit Facilities Documents**

**THIS DRAFT OF THE CREDIT AGREEMENT REMAINS SUBJECT TO CONTINUING NEGOTIATIONS WITH ALL PARTIES IN INTEREST AND THE FINAL VERSION MAY CONTAIN MATERIAL DIFFERENCES. FOR THE AVOIDANCE OF DOUBT, NO PARTY HAS CONSENTED TO THIS VERSION AS THE FINAL FORM, AND ALL PARTIES RESERVE THEIR RESPECTIVE RIGHTS WITH RESPECT TO THIS DOCUMENT AND ANY RELATED DOCUMENTS**

$600,000,000
SECOND AMENDED AND RESTATED CREDIT AGREEMENT

Dated as of April 30, 2024

among

JO-ANN STORES, LLC,
as the Borrower,

JOANN HOLDINGS 2, LLC,
as Parent,

NEEDLE HOLDINGS LLC,
as Holdings,

BANK OF AMERICA, N.A.,
as Administrative Agent, Collateral Agent and Issuer,

1903P LOAN AGENT, LLC,
as FILO Documentation Agent,

and

THE OTHER LENDERS AND ISSUERS PARTY HERETO

_____

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Syndication Agent,

BMO HARRIS BANK, N.A.,
PNC BANK, NATIONAL ASSOCIATION,
TD BANK, N.A. and
U.S. BANK NATIONAL ASSOCIATION,
as Co-Documentation Agents,

BANK OF AMERICA, N.A., and
WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Joint Lead Arrangers and Joint Bookrunners

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS .................................. 1

SECTION 1.1      Defined Terms ........................................................................ 1
SECTION 1.2      Other Interpretive Provisions.................................................. 67
SECTION 1.3      Accounting Terms.................................................................. 68
SECTION 1.4      Rounding................................................................................ 69
SECTION 1.5      Letter of Credit Amounts........................................................ 69
SECTION 1.6      References to Agreements, Laws, Etc ..................................... 69
SECTION 1.7      Times of Day .......................................................................... 69
SECTION 1.8      Pro Forma Calculations; Reclassification; IP Matters ........... 69
SECTION 1.9      Limited Condition Acquisitions.............................................. 71
SECTION 1.10     Interest Rates ......................................................................... 72
SECTION 1.11     FILO Documentation Agent ................................................... 72

ARTICLE II THE FACILITIES ................................................................................. 72

SECTION 2.1      The Commitments.................................................................... 72
SECTION 2.2      Borrowing Procedures for Revolving Loans; Conforming Changes .................. 73
SECTION 2.3      Swing Loans ........................................................................... 75
SECTION 2.4      Letters of Credit ..................................................................... 77
SECTION 2.5      Reduction and Termination of the Commitments...................... 82
SECTION 2.6      Repayment of Loans ............................................................... 82
SECTION 2.7      Evidence of Indebtedness. ...................................................... 82
SECTION 2.8      Optional Prepayments ............................................................ 83
SECTION 2.9      Mandatory Prepayments ......................................................... 83
SECTION 2.10     Interest .................................................................................... 84
SECTION 2.11     Conversion/Continuation Option ............................................ 85
SECTION 2.12     Fees ........................................................................................ 86
SECTION 2.13     Payments and Computations................................................... 87
SECTION 2.14     [Reserved].............................................................................. 89
SECTION 2.15     Revolving Commitment Increase ............................................ 89
SECTION 2.16     Defaulting Lenders ................................................................ 90
SECTION 2.17     Extensions of Loans ............................................................... 92
SECTION 2.18     Sustainability Adjustments .................................................... 95
SECTION 2.19     FILO Deficiency Reserve; Certain Availability Reserves.................. 95

ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY .............................. 97

SECTION 3.1      Taxes....................................................................................... 97
SECTION 3.2      Illegality ................................................................................. 100
SECTION 3.3      Inability to Determine Rates ................................................... 101
SECTION 3.4      Increased Cost and Reduced Return; Capital Adequacy; Reserves on Term
                 SOFR Loans............................................................................ 103
SECTION 3.5      Funding Losses ...................................................................... 105
SECTION 3.6      Matters Applicable to all Requests for Compensation.............. 105
SECTION 3.7      Replacement of Lenders under Certain Circumstances. ........... 105
SECTION 3.8      Survival................................................................................... 107

i

**TABLE OF CONTENTS**
(CONTINUED)

ARTICLE IV CONDITIONS PRECEDENT ....................................................................... 107

    SECTION 4.1     Conditions Precedent to Effectiveness of this Agreement ................................ 107
    SECTION 4.2     Conditions Precedent to Each Loan and Letter of Credit .................................. 110

ARTICLE V REPRESENTATIONS AND WARRANTIES ............................................... 111

    SECTION 5.1     Existence, Qualification and Power; Compliance with Laws ........................... 111
    SECTION 5.2     Authorization; No Contravention ..................................................................... 111
    SECTION 5.3     Governmental Authorization ............................................................................ 112
    SECTION 5.4     Binding Effect ................................................................................................. 112
    SECTION 5.5     Financial Statements; No Material Adverse Effect .......................................... 112
    SECTION 5.6     Litigation ........................................................................................................ 112
    SECTION 5.7     Labor Matters .................................................................................................. 113
    SECTION 5.8     Ownership of Property; Liens ........................................................................... 113
    SECTION 5.9     Environmental Matters .................................................................................... 113
    SECTION 5.10    Taxes ............................................................................................................... 113
    SECTION 5.11    ERISA Compliance .......................................................................................... 113
    SECTION 5.12    Subsidiaries .................................................................................................... 115
    SECTION 5.13    Margin Regulations; Investment Company Act ............................................... 115
    SECTION 5.14    Disclosure ....................................................................................................... 115
    SECTION 5.15    Intellectual Property; Licenses, Etc. ................................................................ 115
    SECTION 5.16    Solvency ......................................................................................................... 116
    SECTION 5.17    OFAC; Sanctions ............................................................................................ 116
    SECTION 5.18    USA PATRIOT Act ........................................................................................ 116
    SECTION 5.19    Collateral Documents ..................................................................................... 116
    SECTION 5.20    Anti-Corruption Laws ..................................................................................... 116
    SECTION 5.21    Affected Financial Institution. ........................................................................ 117

ARTICLE VI FINANCIAL COVENANT ......................................................................... 117

    SECTION 6.1     Minimum Excess Availability. ......................................................................... 117
    SECTION 6.2     Minimum Consolidated Fixed Charge Coverage Ratio .................................... 117

ARTICLE VII REPORTING COVENANTS ...................................................................... 117

    SECTION 7.1     Financial Statements, Etc. ................................................................................ 118
    SECTION 7.2     Certificates; Other Information ........................................................................ 120
    SECTION 7.3     Notices ............................................................................................................ 122
    SECTION 7.4     Borrowing Base Certificates; Appraisals; Field Examinations ........................ 123

ARTICLE VIII AFFIRMATIVE COVENANTS ................................................................. 124

    SECTION 8.1     Preservation of Existence, Etc. ........................................................................ 125
    SECTION 8.2     Compliance with Laws, Etc. ............................................................................ 125
    SECTION 8.3     Designation of Subsidiaries ............................................................................. 125
    SECTION 8.4     Payment of Taxes, Etc. .................................................................................... 126
    SECTION 8.5     Maintenance of Insurance ................................................................................ 126
    SECTION 8.6     Inspection Rights ............................................................................................. 126
    SECTION 8.7     Books and Records .......................................................................................... 127
    SECTION 8.8     Maintenance of Properties. ............................................................................... 127
    SECTION 8.9     Use of Proceeds .............................................................................................. 127
    SECTION 8.10    Compliance with Environmental Laws ............................................................ 127

## TABLE OF CONTENTS
### (CONTINUED)

SECTION 8.11    Covenant to Guarantee Obligations and Give Security ..................................... 127
SECTION 8.12    Cash Receipts ................................................................................................ 128
SECTION 8.13    Further Assurances ...................................................................................... 130

ARTICLE IX NEGATIVE COVENANTS ........................................................................... 130

SECTION 9.1    Liens ............................................................................................................ 130
SECTION 9.2    Investments ................................................................................................. 134
SECTION 9.3    Indebtedness ................................................................................................ 136
SECTION 9.4    Fundamental Changes .................................................................................. 140
SECTION 9.5    Dispositions ................................................................................................. 141
SECTION 9.6    Restricted Payments .................................................................................... 144
SECTION 9.7    Change in Nature of Business ...................................................................... 146
SECTION 9.8    Transactions with Affiliates ........................................................................ 146
SECTION 9.9    Burdensome Agreements ............................................................................. 148
SECTION 9.10    Accounting Changes; Fiscal Year ................................................................ 149
SECTION 9.11    Prepayment, Etc. of Indebtedness ............................................................... 149
SECTION 9.12    Modification of Debt Agreements ................................................................ 150
SECTION 9.13    Holdings and Parent .................................................................................... 150

ARTICLE X EVENTS OF DEFAULT AND REMEDIES........................................................ 151

SECTION 10.1    Events of Default ......................................................................................... 151
SECTION 10.2    Remedies upon Event of Default ................................................................. 154
SECTION 10.3    Application of Funds ................................................................................... 155
SECTION 10.4    [Reserved]. .................................................................................................. 157
SECTION 10.5    Actions in Respect of Letters of Credit; Cash Collateral............................. 157
SECTION 10.6    Post-Petition Financings; Insolvency Proceedings ...................................... 158
SECTION 10.7    Separate Classification ................................................................................ 160
SECTION 10.8    Avoidance and Reinstatement ..................................................................... 160
SECTION 10.9    Payments Over ............................................................................................ 160
SECTION 10.10    Subrogation ................................................................................................. 161
SECTION 10.11    Credit Bidding ............................................................................................. 161
SECTION 10.12    FILO Purchase Option ................................................................................. 162

ARTICLE XI THE ADMINISTRATIVE AGENT .................................................................. 164

SECTION 11.1    Appointment and Authorization ................................................................... 164
SECTION 11.2    Rights as a Lender........................................................................................ 164
SECTION 11.3    Exculpatory Provisions ................................................................................ 165
SECTION 11.4    Reliance by the Administrative Agent .......................................................... 166
SECTION 11.5    Delegation of Duties .................................................................................... 166
SECTION 11.6    Resignation of Administrative Agent ........................................................... 167
SECTION 11.7    Non-Reliance on Administrative Agent and Other Lenders; Disclosure of
    Information by Agents .................................................................................. 168
SECTION 11.8    No Other Duties; Other Agents, Arrangers, Managers, Etc........................... 168
SECTION 11.9    Intercreditor Agreement............................................................................... 168
SECTION 11.10    Administrative Agent May File Proofs of Claim........................................... 169
SECTION 11.11    Collateral and Guaranty Matters .................................................................. 169
SECTION 11.12    Secured Cash Management Agreements, Secured Bank Product Agreements
    and Secured Hedge Agreements .................................................................. 170
SECTION 11.13    Indemnification of Agents ........................................................................... 171

## Table of Contents
### (Continued)

SECTION 11.14 Certain ERISA Matters ................................................................ 172

SECTION 11.15 Recovery of Erroneous Payments. ............................................. 173

ARTICLE XII MISCELLANEOUS ................................................................................ 173

SECTION 12.1 Amendments, Etc. ....................................................................... 173

SECTION 12.2 Successors and Assigns .............................................................. 178

SECTION 12.3 Costs and Expenses .................................................................... 183

SECTION 12.4 Indemnities ................................................................................ 184

SECTION 12.5 Limitation of Liability ............................................................... 185

SECTION 12.6 Right of Set-off .......................................................................... 186

SECTION 12.7 Sharing of Payments. ................................................................. 186

SECTION 12.8 Notices and Other Communications; Facsimile Copies ............ 187

SECTION 12.9 No Waiver; Cumulative Remedies ............................................ 189

SECTION 12.10 [Reserved]. ................................................................................ 189

SECTION 12.11 Binding Effect. ........................................................................... 189

SECTION 12.12 Governing Law; Submission to Jurisdiction; Service of Process ..................... 189

SECTION 12.13 Waiver of Jury Trial. ................................................................. 190

SECTION 12.14 Marshaling; Payments Set Aside ............................................... 190

SECTION 12.15 Execution in Counterparts ......................................................... 190

SECTION 12.16 Electronic Execution of Assignments and Certain Other Documents .............. 191

SECTION 12.17 Confidentiality .......................................................................... 192

SECTION 12.18 Use of Name, Logo, etc. ............................................................ 193

SECTION 12.19 USA PATRIOT Act Notice ....................................................... 193

SECTION 12.20 No Advisory or Fiduciary Responsibility ................................. 193

SECTION 12.21 Severability ............................................................................... 194

SECTION 12.22 Survival of Representations and Warranties .............................. 194

SECTION 12.23 Lender Action ............................................................................ 194

SECTION 12.24 Interest Rate Limitation ............................................................ 195

SECTION 12.25 Time of the Essence. .................................................................. 195

SECTION 12.26 No Strict Construction. .............................................................. 195

SECTION 12.27 Intercreditor Agreement. ........................................................... 195

SECTION 12.28 Keepwell. ................................................................................... 195

SECTION 12.29 Acknowledgment and Consent to Bail-In of Affected Financial Institutions. .... 196

SECTION 12.30 Acknowledgement Regarding Any Supported QFCs. ............... 196

SECTION 12.31 Limited Waiver; Amendment and Restatement. ....................... 197

**SCHEDULES**

| | | |
|---|---|---|
| Schedule I | - | Commitments |
| Schedule II | - | Guarantors |
| Schedule 1.1D | - | Designated Assets |
| Schedule 1.1E | - | Credit Card Agreements |
| Schedule 5.12 | - | Subsidiaries and Other Equity Investments |
| Schedule 8.12 | - | Material Bank Accounts; Credit Card Processors |
| Schedule 9.1(b) | - | Existing Liens |
| Schedule 9.2(f) | - | Existing Investments |
| Schedule 9.3(b) | - | Existing Indebtedness |
| Schedule 9.8 | - | Transactions with Affiliates |
| Schedule 9.9 | - | Burdensome Agreements |
| Schedule 12.8 | - | Administrative Agent's Office, Certain Addresses for Notices |

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Form of Assignment and Assumption |
| Exhibit B | - | Form of Revolving Credit Note |
| Exhibit C | - | Form of Notice of Borrowing |
| Exhibit D | - | Form of Swing Loan Request |
| Exhibit E | - | Form of Letter of Credit Request |
| Exhibit F | - | Form of Notice of Conversion or Continuation |
| Exhibit G | - | Form of Cash Flow Forecast |
| Exhibit H | - | Form of Guaranty |
| Exhibit I | - | Form of Security Agreement |
| Exhibit J | - | Form of Borrowing Base Certificate |
| Exhibit K | - | Form of Intercreditor Agreement |
| Exhibit L | - | Form of Intercompany Subordination Agreement |
| Exhibit M | - | Form of United States Tax Compliance Certificate |
| Exhibit N | - | Form of Compliance Certificate |
| Exhibit O | - | Form of Solvency Certificate |
| Exhibit P | - | Form of FILO Note |

This SECOND AMENDED AND RESTATED CREDIT AGREEMENT (as further defined herein, this "*Agreement*") is entered into as of April 30, 2024, among JO-ANN STORES, LLC, an Ohio limited liability company (the "*Borrower*"), JOANN HOLDINGS 2, LLC, a Delaware limited liability company ("*Parent*"), NEEDLE HOLDINGS LLC, a Delaware limited liability company ("*Holdings*"), BANK OF AMERICA, N.A., as administrative agent (in such capacity, including any successor thereto, the "*Administrative Agent*") and as collateral agent (in such capacity, including any successor thereto, the "*Collateral Agent*") under the Loan Documents, 1903P LOAN AGENT, LLC, as documentation agent for the FILO Facility (in such capacity, including any successor thereto, the "*FILO Documentation Agent*"), and each lender from time to time party hereto (collectively, as further defined herein, the "*Lenders*" and individually, a "*Lender*").

PRELIMINARY STATEMENTS

Holdings and the Borrower have entered into that certain Amended and Restated Credit Agreement, dated as of October 21, 2016 (as amended and in effect, the "*Existing Credit Agreement*"), among Holdings, the Borrower, the "Lenders" as defined therein, Bank of America, N.A., as Administrative Agent and Collateral Agent thereunder, and 1903P Loan Agent, LLC, as FILO Documentation Agent thereunder.

On March 18, 2024 (the "*Petition Date*"), (i) JoAnn., Inc., Holdings and certain of Holdings' Subsidiaries (collectively, the "*Debtors*" and each individually, a "*Debtor*") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code and their cases are being jointly administered under Case No. 24-10418 (CTG) (the "*Chapter 11 Cases*") with the United States Bankruptcy Court for the District of Delaware (the "*Court*").

On [_____], 2024, the Court entered the Confirmation Order (as hereinafter defined) approving the Debtors' [Joint Chapter 11 Plan of Reorganization of [Joann Inc.] and its Affiliated Debtors] (the "*Approved Plan*").

The Borrower has requested that the Lenders enter into this Agreement to provide exit financing to the Debtors in connection with their emergence from the Chapter 11 Cases on the Second Restatement Date, pursuant to the Approved Plan and on the terms and conditions set forth herein.

The applicable Lenders have indicated their willingness to lend, and the Issuers have indicated their willingness to issue Letters of Credit, in each case, on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree that the Existing Credit Agreement shall be amended and restated in its entirety to read as follows:

**ARTICLE I**

**DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS**

SECTION 1.1      Defined Terms.

As used in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Account*" has the meaning given to such term in Article 9 of the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of or (b) for services rendered or to be rendered.

"*Account Debtor*" has the meaning given to such term in Article 9 of the UCC.

"*ACH*" means automated clearing house transfers.

"*Additional Lender*" has the meaning specified in *Section 2.15(a)*.

"*Adjustment Date*" means the first day of each Fiscal Quarter beginning with [August 5], 2024.

"*Administrative Agent*" has the meaning specified in the preamble to this Agreement.

"*Administrative Agent's Office*" means the Administrative Agent's address and, as appropriate, account as set forth on *Schedule 12.8*, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Affected Financial Institution*" any EEA Financial Institution or UK Financial Institution.

"*Affiliate*" means, with respect to any Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  For the avoidance of doubt, none of the Arrangers, the Agents or their respective lending affiliates or any entity acting as an Issuer hereunder shall be deemed to be an Affiliate of Parent, Holdings, the Borrower or any of their respective Subsidiaries.

"*Agent Parties*" has the meaning specified in *Section 12.8(d)*.

"*Agent-Related Persons*" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Persons and of such Persons' Affiliates.

"*Agents*" means, collectively, the Administrative Agent, the Collateral Agent, each of the Co-Syndication Agents, each of the Co-Documentation Agent, the FILO Documentation Agent, each co-agent or sub-agent (if any) appointed by the Administrative Agent from time to time pursuant to *Section 11.5* and the Arrangers.

"*Aggregate Commitments*" means the Revolving Credit Commitments of all the Lenders. As of the Second Restatement Date, the Aggregate Commitments are $500,000,000.

"*Agreement*" means this Credit Agreement, as amended, restated, modified, replaced, extended, renewed or supplemented from time to time in accordance with the terms hereof.

"*Annual Financial Statements*" means the audited consolidated balance sheets of the Borrower and its Subsidiaries as of January 28, 2023 and the related consolidated statements of

operations, changes in stockholders' equity and cash flows for the Borrower for the Fiscal Years then ended.

"*Applicable Indebtedness*" has the meaning specified in the definition of "Weighted Average Life to Maturity".

"*Applicable Margin*" means a percentage per annum equal to (a) from and after the Second Restatement Date until the first Adjustment Date, the percentages set forth in Level III of the pricing grid below; and (b) thereafter, the following percentages per annum, based upon Average Historical Excess Availability as of the most recent Adjustment Date:

| Level | Average Historical Excess Availability | Term SOFR Loans and Term SOFR Margin for Letter of Credit Fees (Standby Letters of Credit) | Base Rate | Letter of Credit Fees (Documentary Letters of Credit) |
|---|---|---|---|---|
| I | Greater than or equal to 66 2/3% of the Maximum Credit | 2.50% | 1.50% | 1.75% |
| II | Less than 66 2/3% of the Maximum Credit, but greater than or equal to 33 1/3% of the Maximum Credit | 2.75% | 1.75% | 1.875% |
| III | Less than 33 1/3% of the Maximum Credit | 3.00% | 2.00% | 2.00% |

The Applicable Margin shall be adjusted quarterly in accordance with the table above on each Adjustment Date for the period beginning on such Adjustment Date based upon the Average Historical Excess Availability as the Administrative Agent shall determine in good faith within ten (10) Business Days after such Adjustment Date. Any increase or decrease in the Applicable Margin resulting from a change in the Average Historical Excess Availability shall become effective as of the first Business Day immediately following the Adjustment Date. If any Borrowing Base Certificates are at any time restated or otherwise revised or if the information set forth in any Borrowing Base Certificates otherwise proves to be false or incorrect such that the Applicable Margin would have been higher than was otherwise in effect during any period, without constituting a waiver of any Default or Event of Default arising as a result thereof, interest due under this Agreement shall be immediately recalculated at such higher rate for any applicable periods and shall be due and payable on demand.

"*Applicable Percentage*" means with respect to any Revolving Credit Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Revolving Credit Commitment at such time, subject to adjustment as provided in *Section 2.16(a)(iv)*. If the commitment of each Revolving Credit Lender to make Revolving Loans and the obligation of the Issuers to make L/C Credit Extensions have been terminated pursuant to *Section 10.2(a)(i)*, or if the Aggregate Commitments have expired, then the Applicable Percentage of each Revolving Credit Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of

DB1/ 145587008.11

US-DOCS\149610879.14

each Revolving Credit Lender is set forth opposite the name of such Lender on *Schedule I* or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"*Applicable Unused Commitment Fee Rate*" means, for any day, a percentage per annum equal to 0.25% per annum.

"*Approved Account Bank*" means a financial institution at which the Borrower or a Guarantor maintains an Approved Deposit Account.

"*Approved Deposit Account*" means each Deposit Account in respect of which a Loan Party shall have entered into a Deposit Account Control Agreement.

"*Approved Fund*" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"*Approved Plan*" has the meaning specified in the preliminary statements of this Agreement.

"*Approved Securities Account*" means each Securities Account in respect of which the Borrower or any Subsidiary Guarantor shall have entered into a Securities Account Control Agreement.

"*Approved Securities Intermediary*" means a securities intermediary at which the Borrower or a Subsidiary Guarantor maintains an Approved Securities Account.

"*Arrangers*" means BofA Securities, Inc. (or any of its designated affiliates), Wells Fargo Bank, National Association, U.S. Bank National Association, and BMO Harris Bank, N.A., each in its capacity as a joint lead arranger and joint bookrunner under this Agreement.

"*Assignee Group*" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"*Assignment and Assumption*" means an assignment and assumption entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in substantially the form of *Exhibit A* or any other form approved by the Administrative Agent.

"*Attorney Costs*" means all reasonable and documented fees, expenses and disbursements of counsel to the Administrative Agent, the FILO Documentation Agent, the Issuers and the Lenders to the extent payable by a Loan Party pursuant to *Sections 12.3* and *12.4*.

"*Attributable Indebtedness*" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"*Availability Reserves*" means, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as the Administrative Agent (solely with respect to the Borrowing Base) or the FILO Documentation Agent (solely with respect to the FILO Borrowing Base) from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Collateral Agent's ability to realize upon the Current Asset Collateral, (b) to reflect claims and liabilities that the Administrative Agent or the FILO Documentation Agent determines will need to be satisfied in connection with the realization upon the Current Asset Collateral,

or (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base or the FILO Borrowing Base, the Current Asset Collateral or the validity or enforceability of this Agreement or the other Loan Documents or any material remedies of the Secured Parties hereunder or thereunder.  Without limiting the generality of the foregoing, Availability Reserves may include (but are not limited to) reserves based on: (i) rent; *provided* that, as long as no Event of Default is continuing, such Availability Reserves shall be limited to an amount not to exceed the sum of (x) past due rent for all of the Borrower and the Subsidiary Guarantors' leased locations plus (y) one (1) month's rent for all of the Borrower and the Subsidiary Guarantors' leased locations (A) located in the states of Washington, Virginia, Pennsylvania and all other Landlord Lien States or (B) that are distribution centers or warehouses, other than, in each case, such locations, distribution centers or warehouses with respect to which the Administrative Agent has received a Collateral Access Agreement; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, *ad valorem*, real estate, personal property, sales, and other Taxes which would have priority over the interests of the Collateral Agent in the Current Asset Collateral; (iv) during the continuance of a Cash Dominion Period, salaries, wages and benefits due to employees of the Borrower; (v) Customer Credit Liabilities and customer deposits; (vi) warehousemen's or bailee's charges and other Liens permitted under *Section 9.1* which would have priority over the interests of the Collateral Agent in the Current Asset Collateral; and (vii) (A) the Cash Management Reserve, (B) the Bank Product Reserve and (C) the Swap Obligations Reserve; *provided*, in each case, that any such Availability Reserve under this clause (vii) shall not be established unless Excess Availability is less than $75,000,000 or an Event of Default has occurred and is continuing.  The amount of any Availability Reserve established or increased by the Administrative Agent or the FILO Documentation Agent shall (i) have a reasonable relationship to the event, condition or other matter that is the basis for the Availability Reserve and (ii) be limited to such Availability Reserves and changes as (1) the Administrative Agent determines, in its Permitted Discretion, are appropriate based on the analysis of facts or events first occurring or first discovered by the Administrative Agent after the Second Restatement Date or that differ from facts or events occurring and known to the Administrative Agent on the Second Restatement Date or (2) the FILO Documentation Agent determines, in its Permitted Discretion, are appropriate based on the analysis of facts or events first occurring or first discovered by the FILO Documentation Agent after the Second Restatement Date or that differ from facts or events occurring and known to the FILO Documentation Agent on the Second Restatement Date; *provided*, this clause (2) shall not prohibit the Administrative Agent or the FILO Documentation Agent from implementing Cash Management Reserves, Bank Product Reserves and/or Swap Obligations Reserves in accordance with clause (vii) above.  Notwithstanding anything herein to the contrary, Availability Reserves shall not duplicate eligibility criteria contained in the definition of Eligible Credit Card Receivables, Eligible Trade Receivables, Eligible In-Transit Inventory, Eligible Inventory or Eligible Letter of Credit Inventory.  For the avoidance of doubt, the FILO Deficiency Reserve shall not be deemed to be an Availability Reserve.

"*Average Historical Excess Availability*" means, at any Adjustment Date, the average daily Excess Availability for the Fiscal Quarter immediately preceding such Adjustment Date.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"*Bail-In Legislation*" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms

or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"*Bank of America*" means Bank of America, N.A., a national banking association, acting in its individual capacity, and its successors and assigns.

"*Bank Product Agreement*" means any agreement or arrangement to provide Bank Products.

"*Bank Product Bank*" means, as of any date of determination, any Person that is an Agent, a Revolving Credit Lender or an Affiliate of a Revolving Credit Lender on such date.

"*Bank Product Obligations*" means obligations owed by any Loan Party to any Bank Product Bank in respect of or in connection with any Bank Products and either (i) in existence on the Second Restatement Date or (ii) after the Second Restatement Date, designated by the Bank Product Bank and the Borrower in writing to the Administrative Agent as "Bank Product Obligations".

"*Bank Product Reserve*" shall mean the aggregate amount of reserves established (based upon the obligations and liabilities of any Loan Party in respect of the Bank Product Obligations) by the Administrative Agent or the FILO Documentation Agent from time to time in its Permitted Discretion in respect of Bank Product Obligations then outstanding.

"*Bank Product / Swap Obligations Cap*" shall mean, in respect of amounts applied to payment of Bank Product Obligations and obligations of any Loan Party arising under any Secured Hedge Agreement pursuant to *Section 10.3*, an aggregate amount equal to $5,000,000.

"*Bank Products*" shall mean any of the following products, services or facilities extended to the Borrower or any Restricted Subsidiary from time to time by any Revolving Credit Lender or any of its Affiliates: (i) supply chain financing services and (ii) credit or debit cards, including purchase cards. Notwithstanding the foregoing, and for the avoidance of doubt, Bank Products shall not include any Cash Management Services or Swap Contracts.

"*Banker's Acceptance*" means a time draft or bill of exchange or other deferred payment obligation relating to a Documentary Letter of Credit which has been accepted by the Issuer.

"*Bankruptcy Code*" means Title 11 of the United States Code or any similar federal or state law for the relief of debtors, as now and hereafter in effect, or any successor statute.

"*Base Rate*" means for any day a fluctuating rate of interest per annum equal to the highest of (a) the Federal Funds Rate *plus* 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate," (c) Term SOFR *plus* 1.00%, and (d) the applicable Floor *plus* 1.00%. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such prime rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change. If the Base Rate is being used as an alternate rate of interest pursuant to *Section 3.3*, then the Base Rate shall be the highest of *clauses (a)*, *(b)* and *(d)* above and shall be determined without reference to *clause (c)* above. The Floor shall be determined separately for the Revolving Obligations and the FILO Obligations, as set forth in the definition of "Floor".

"*Base Rate Loan*" means a Loan that bears interest based on the Base Rate.

"*Beneficial Ownership Certification*" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" means 31 C.F.R. § 1010.230.

"*Benefit Plan*" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"*BHC Act Affiliate*" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"*Borrower*" has the meaning specified in the preamble to this Agreement.

"*Borrower Materials*" has the meaning specified in *Section 7.2*.

"*Borrowing*" means a borrowing consisting of Loans of the same Class and Type made, converted or continued on the same date and, in the case of Term SOFR Loans, having the same Interest Period.

"*Borrowing Base*" means, at any time of calculation, an amount equal to:

(a)     the face amount of Eligible Credit Card Receivables multiplied by the Credit Card Advance Rate; <u>plus</u>

(b)     the face amount of Eligible Trade Receivables multiplied by the Trade Receivables Advance Rate, net of Receivables Reserves applicable thereto; *provided* that unless and until the Administrative Agent receives (A) a Field Examination of all Accounts arising from the sale of the Borrower's or any Subsidiary Guarantor's Inventory from a field examiner reasonably satisfactory to the Administrative Agent in its Permitted Discretion and establishes Receivables Reserves (if applicable) therefor in accordance with this Agreement, and (B) such other due diligence as the Administrative Agent may reasonably require, no Accounts shall be included in the Borrowing Base pursuant to this *clause (b)*; <u>plus</u>

(c)     the Net Recovery Percentage of Eligible Inventory (other than, for the avoidance of doubt, Eligible Letter of Credit Inventory and Eligible In-Transit Inventory), multiplied by the Inventory Advance Rate multiplied by the Cost of Eligible Inventory (other than, for the avoidance of doubt, Eligible Letter of Credit Inventory and Eligible In-Transit Inventory), net of Inventory Reserves attributable to Eligible Inventory; <u>plus</u>

(d)     the Net Recovery Percentage of Eligible Letter of Credit Inventory multiplied by the Letter of Credit Advance Rate, multiplied by the Cost of Eligible Letter of Credit Inventory, net of Inventory Reserves attributable to Eligible Letter of Credit Inventory; <u>plus</u>

(e)     the Net Recovery Percentage of Eligible In-Transit Inventory multiplied by the In-Transit Advance Rate, multiplied by the Cost of Eligible In-Transit Inventory, net of Inventory Reserves attributable to Eligible In-Transit Inventory; <u>minus</u>

DB1/ 145587008.11

US-DOCS\149610879.14

(f)        the then amount of any FILO Deficiency Reserve; <u>minus</u>

(g)        the then amount of all Availability Reserves.

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent and the FILO Documentation Agent pursuant to *Section 4.1(a)* or *Section 7.4*, as applicable, as adjusted to give effect to Availability Reserves and any FILO Deficiency Reserve following such delivery; *provided*, that such Availability Reserves shall not be established or changed except upon not less than three (3) Business Days' notice to the Borrower (during which period the Administrative Agent shall be available to discuss any such proposed Availability Reserve with the Borrower and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such Availability Reserve no longer exists, in a manner and to the extent reasonably satisfactory to the Administrative Agent); *provided further* that, during such three (3) Business Day period, Credit Extensions hereunder shall be subject to the Borrowing Base as if such new or modified Availability Reserves were given effect; *provided further* that no such prior notice shall be required for changes to any Availability Reserves resulting solely by virtue of mathematical calculations of the amount of the Availability Reserve in accordance with the methodology of calculation previously utilized (such as, but not limited to, rent and Customer Credit Liabilities) or if an Event of Default is continuing.

"*Borrowing Base Certificate*" means a certificate of the Borrower substantially in the form of *Exhibit J*.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located.

"*Capital Expenditures*" means, for any period, the aggregate of (a) all amounts that would be reflected as additions to property, plant or equipment on a Consolidated statement of cash flows of the Borrower and its Restricted Subsidiaries in accordance with GAAP and (b) the value of all assets under Capitalized Leases incurred by the Borrower and its Restricted Subsidiaries during such period; provided that the term "Capital Expenditures" shall not include (i) expenditures made in connection with the replacement, substitution, restoration or repair of assets to the extent financed with (x) insurance proceeds paid on account of the loss of or damage to the assets being replaced, substituted, restored or repaired or (y) awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (ii) the purchase of plant, property or equipment or software to the extent financed with the Net Cash Proceeds of Dispositions that are not required to be applied to prepay the Loans or the Term Facility, (iii) expenditures that are accounted for as capital expenditures by the Borrower or any Restricted Subsidiary and that actually are paid for, or reimbursed to the Borrower or any Restricted Subsidiary in cash or Cash Equivalents, by a Person other than the Borrower or any Restricted Subsidiary and for which neither the Borrower nor any Restricted Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation (other than rent) in respect of such expenditures to such Person or any other Person (whether before, during or after such period), including, without limitation, expenditures which are contractually required to be, and are, reimbursed to the Borrower or a Subsidiary Guarantor in cash by its landlords as tenant allowances during such period, (iv) expenditures to the extent constituting any portion of a Permitted Acquisition, (v) the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (A) used or surplus equipment traded in at the time of such purchase, and (B) the Net Cash Proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business, *provided* that such portion of the purchase price in excess of the credit granted by the seller of such equipment for the equipment being traded in at such time or such Net Cash Proceeds, as applicable,

shall not be excluded as "Capital Expenditures" hereunder, (vi) expenditures relating to the construction, acquisition, replacement, reconstruction, development, refurbishment, renovation or improvement of any property which has been transferred to a Person other than a Loan Party or any of its Restricted Subsidiaries during the same Fiscal Year in which such expenditures were made pursuant to a sale-leaseback transaction, to the extent of the Net Cash Proceeds received by a Loan Party or such Restricted Subsidiary pursuant to such sale-leaseback transaction, *provided* that such portion of the expenditures which exceed the Net Cash Proceeds received by a Loan Party or such Restricted Subsidiary pursuant to such sale-leaseback transaction shall not be excluded as "Capital Expenditures" hereunder, or (vii) expenditures financed with the proceeds of an issuance of Equity Interests of the Borrower or a capital contribution to the Borrower or Indebtedness permitted to be incurred hereunder, to the extent such expenditures are made within 365 days after the receipt of such proceeds.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP.

"*Capitalized Leases*" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the Capitalized Lease Obligation with respect thereto.

"*Carve Out*" means, in connection with any Insolvency Proceeding relating to any Loan Party, any carve out amount granted with respect to professional fees and expenses, court costs, filing fees, and fees and costs of the Office of the United States Trustee as granted by the court or as agreed to by the Administrative Agent in its reasonable discretion.

"*Cash Collateral*" shall have a meaning correlative to "Cash Collateralize" and shall include the proceeds of such cash collateral and other credit support.

"*Cash Collateralize*" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Administrative Agent, an Issuer or the Swing Loan Lender (as applicable) and the Revolving Credit Lenders, as collateral for Letter of Credit Obligations, Obligations in respect of Swing Loans, or obligations of Revolving Credit Lenders to fund participations in respect of either thereof (as the context may require), cash or deposit account balances or, if the applicable Issuer or Swing Loan Lender benefitting from such collateral shall agree in its sole discretion, other credit support, in each case pursuant to documentation in form and substance reasonably satisfactory to (a) the Administrative Agent and (b) the applicable Issuer or the Swing Loan Lender (as applicable).

"*Cash Dominion Period*" means (a) each period beginning on the date that Excess Availability shall have been less than the greater of (x) 10% of the Modified Maximum Credit and (y) (i) from the Second Restatement Date through September 30, 2024, $35,000,000, and (ii) thereafter, $45,000,000, and ending on the date Excess Availability shall have been equal to or greater than the greater of (x) 10% of the Modified Maximum Credit and (y) (i) from the Second Restatement Date through September 30, 2024, $35,000,000, and (ii) thereafter, $45,000,000, in each case, for twenty (20) consecutive calendar days or (b) upon the occurrence of a Specified Event of Default, the period that such Specified Event of Default shall be continuing; *provided that* a Cash Dominion Period shall be deemed continuing (even if Excess Availability exceeds the required amounts for twenty (20) consecutive calendar day) if a Cash Dominion Period has occurred and been discontinued on five (5) occasions in any twelve month period. The termination of a Cash Dominion Period as provided herein shall in no way limit, waive or delay the occurrence of a subsequent Cash Dominion Period in the event that the conditions set forth in this definition again arise.

US-DOCS\149610879.14

"*Cash Equivalents*" means any of the following types of Investments, to the extent owned by the Borrower or any Restricted Subsidiary:

(a)    Dollars;

(b)    in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business and not for speculation;

(c)    readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(d)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500,000,000;

(e)    repurchase obligations for underlying securities of the types described in *clauses (c)* and *(d)* above or *clause (g)* below entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)    commercial paper rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and in each case maturing within 12 months after the date of creation thereof;

(g)    marketable short-term money market and similar highly liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(h)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) with maturities of 12 months or less from the date of acquisition;

(i)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); and

(j)    investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (i) above.

In the case of Investments by any Foreign Subsidiary that is a Restricted Subsidiary or Investments made in a country outside the United States, Cash Equivalents shall also include (i) investments of the type and maturity described in clauses (a) through (j) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or

equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries that are Restricted Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (a) through (j) and in this paragraph.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, provided that such amounts are converted into Dollars as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"*Cash Flow Forecast*" means a cash flow forecast substantially in the form of *Exhibit G*, reflecting the Borrower's and its Restricted Subsidiaries' (i) good faith projections of all weekly cash receipts and disbursements on a line item basis in connection with the operation of their businesses for the following 13-week period, and (ii) calculations of the Borrowing Base, the FILO Borrowing Base and Excess Availability for each week of such 13-week period.

"*Cash Management Agreement*" means any agreement or arrangement to provide Cash Management Services.

"*Cash Management Bank*" means, as of any date of determination, any Person that is an Agent, a Revolving Credit Lender or an Affiliate of a Revolving Credit Lender on such date.

"*Cash Management Obligations*" means obligations owed by any Loan Party to any Cash Management Bank in respect of or in connection with any Cash Management Services and either (i) in existence on the Second Restatement Date or (ii) after the Second Restatement Date, designated by the Cash Management Bank and the Borrower in writing to the Administrative Agent as "Cash Management Obligations".

"*Cash Management Reserve*" shall mean the aggregate amount of reserves established (based upon the obligations and liabilities of any Loan Party in respect of the Cash Management Obligations) by the Administrative Agent or the FILO Documentation Agent from time to time in its Permitted Discretion in respect of Cash Management Obligations then outstanding.

"*Cash Management Services*" means any agreement or arrangement to provide cash management services, including automated clearinghouse transfers, controlled disbursement accounts, treasury, depository, overdraft, credit card processing, electronic funds transfer and other cash management arrangements.  Notwithstanding the foregoing, and for the avoidance of doubt, Cash Management Services shall not include any Bank Products or Swap Contracts.

"*Cash Receipts*" shall have the meaning specified in *Section 8.12(c)*.

"*Cash Taxes*" means, with respect to any Test Period, all taxes paid or payable in cash by the Borrower and its Restricted Subsidiaries during such period.

"*Change in Law*" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty (excluding the taking effect after the date of this Agreement of a law, rule, regulation or treaty adopted prior to the date of this Agreement), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and

US-DOCS\149610879.14

Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"*Change of Control*" means the earliest to occur of:

(a)        (1) any Person (other than a Permitted Holder) or (2) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person and its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Exchange Act), directly or indirectly, of Equity Interests representing more than fifty percent (50%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Parent and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of Parent beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders unless, in any case, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of Parent or Holdings; or

(b)        any "Change of Control" (or any comparable term) in any document pertaining to the Term Facility; or

(c)        Holdings (or any successor under *Section 9.4(a)*) ceasing to be a direct wholly owned Subsidiary of Parent; or

(d)        the Borrower ceasing to be a direct wholly owned Subsidiary of Holdings (or any successor under *Section 9.4(a)*).

"*Chapter 11 Cases*" has the meaning specified in the preliminary statements of this Agreement.

"*Class*" (a) when used with respect to commitments, refers to whether such commitment is a Revolving Credit Commitment, an Extended Revolving Credit Commitment of a given Extension Series or a New Revolving Credit Commitment, (b) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Revolving Loans, Loans under Extended Revolving Credit Commitments of a given Extension Series, Loans under New Revolving Credit Commitments or FILO Loans, and (c) when used with respect to Lenders, refers to whether such Lenders have a Loan or commitment with respect to a particular Class of Loans or commitments.

"*CME*" means CME Group Benchmark Administration Limited.

"*Co-Documentation Agents*" means BMO Harris Bank, N.A., PNC Bank, National Association, TD Bank, N.A. and U.S. Bank National Association, each as a Co-Documentation Agent under this Agreement.

"*Co-Syndication Agents*" means Wells Fargo Bank, National Association, U.S. Bank National Association, and BMO Harris Bank, N.A., each as a Co-Syndication Agent under this Agreement.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations thereunder.

"*Collateral*" means all the "*Collateral*" (or equivalent term) as defined in any Collateral Document.

"*Collateral Agent*" has the meaning specified in the preamble to this Agreement.

"*Collateral Access Agreement*" means an agreement reasonably satisfactory in form and substance to the Administrative Agent executed by, as the case may be, (a) a bailee or other Person in possession of Collateral, and (b) any landlord of any premises leased by any Loan Party, pursuant to which, except as the Administrative Agent otherwise may agree, such Person (i) acknowledges the Collateral Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such premises, (iii) agrees to provide the Collateral Agent with access to the Collateral held by such bailee or other Person or located in or on such premises for the purpose of conducting field exams, appraisals or a Liquidation, and (iv) makes such other agreements with the Collateral Agent as the Administrative Agent may reasonably require.

"*Collateral and Guarantee Requirement*" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received (i) each Collateral Document required to be delivered on the Second Restatement Date pursuant to *Section 4.1(a)(iv)*, pursuant to *Section 8.11*, *Section 8.12* or *Section 8.13* at such time, duly executed by each Loan Party thereto, or (ii) a ratification of each Collateral Document delivered on or prior to the Second Restatement Date (to the extent such Collateral Document shall remain in effect as of the Second Restatement Date);

(b)    all Obligations shall have been unconditionally guaranteed by Holdings, Parent, each Restricted Subsidiary of the Borrower that is a Wholly-Owned Subsidiary that is a Material Domestic Subsidiary and not an Excluded Subsidiary, including those Subsidiaries that are listed on *Schedule II* hereto (each such guarantor, a "*Guarantor*") and any Restricted Subsidiary of the Borrower that Guarantees any Indebtedness pursuant to the Term Facility, any Junior Financing (or, in each case, any Permitted Refinancing thereof) shall be a Guarantor hereunder;

(c)    the Obligations and the Guaranty shall have been secured by a first-priority perfected security interest in substantially all Current Asset Collateral of the Loan Parties, in each case, with the priority required by the Collateral Documents and *Section 8.12* shall have been complied with;

(d)    the Obligations and the Guaranty shall have been secured by a perfected security interest (subject in priority only to the Lien of the Term Facility Administrative Agent to secure the obligations under the Term Facility, any Permitted Pari Passu Secured Debt (as defined in the Term Facility Credit Agreement as in effect on the Second Restatement Date or, subject to prior consent of the Administrative Agent, as in effect after the Second Restatement Date) or, in each case, any Permitted Refinancing thereof, and to any non-consensual Liens permitted by *Section 9.1*) in (i) all Equity Interests of the Borrower, (ii) all Equity Interests of each direct Wholly-Owned Subsidiary that is a Domestic Subsidiary (other than a Domestic Subsidiary described in the following *clause (iii)(A)*) of the Borrower or any Subsidiary Guarantor, and (iii) 65% of the issued and outstanding Equity Interests of (A) each Wholly-Owned Subsidiary that is a Domestic Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor and substantially all of the assets of which consist of Equity Interests in, or Equity Interests in and indebtedness of, one or more Foreign Subsidiaries or Domestic Subsidiaries described in this clause (iii)(A), and (B) each Wholly-Owned Subsidiary that is a Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor;

(e)        the Obligations and the Guaranty shall have been secured by a perfected security interest (subject in priority only to the Lien of the Term Facility Administrative Agent to secure the obligations under the Term Facility, any Permitted Pari Passu Secured Debt (as defined in the Term Facility Credit Agreement as in effect on the Second Restatement Date or, subject to prior consent of the Administrative Agent, as in effect after the Second Restatement Date) or, in each case, any Permitted Refinancing thereof, and to any non-consensual Liens permitted by *Section 9.1*) (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the UCC or making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office) in substantially all other tangible and intangible personal property of the Borrower and each Guarantor other than the Current Asset Collateral, in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, surveys, abstracts or appraisals with respect to, (i) any real property or (ii) any other particular assets if and for so long as, in the case of this clause (ii) in the reasonable judgment of the Administrative Agent and the Borrower, the cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance, surveys, abstracts or appraisals in respect of such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

The Administrative Agent may grant extensions of time for the perfection of security interests in particular assets where it reasonably determines, in consultation with the Borrower, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

"*Collateral Documents*" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Security Agreement Supplements, security agreements or other similar agreements delivered to the Administrative Agent or the Collateral Agent and the Lenders pursuant to *Section 4.1(a)(iv)*, *Section 8.11*, *Section 8.12* or *Section 8.13*, the Guaranty, each Lien Acknowledgment Agreement, the Intercreditor Agreement, the Securities Account Control Agreements (if any), the Deposit Account Control Agreements, and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Administrative Agent or the Collateral Agent for the benefit of the Secured Parties.

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"*Communication*" has the meaning specified in *Section 12.6.*

"*Compliance Certificate*" means a certificate substantially in the form of *Exhibit N* and which certificate shall in any event be a certificate of the chief financial officer (a) certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (b) setting forth a reasonably detailed calculation of Consolidated EBITDA and the Consolidated Fixed Charge Coverage Ratio for the most recently completed Test Period.

"*Concentration Account*" has the meaning specified in *Section 8.12(c)*.

"*Confirmation Order*" means the order of the Court confirming the Approved Plan.

"*Conforming Changes*" means, with respect to the use, administration of or any conventions associated with SOFR or any proposed Successor Rate or Term SOFR, as applicable, any conforming changes to the definitions of "Base Rate", "SOFR", "Term SOFR" and "Interest Period", the

addition of the concept of an "interest period", timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definitions of "Business Day" and "U.S. Government Securities Business Day", timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the discretion of the Administrative Agent determined in consultation with the Borrower (and, to the extent pertaining to the FILO Obligations, the FILO Documentation Agent), to reflect the adoption and implementation of such applicable rate(s) and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such rate exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"*Conforming Post-Petition Financing*" has the meaning specified in *Section 10.6(a)*.

"*Consolidated*" means, with respect to any Person, the consolidation of accounts of such Person and any other Person in accordance with GAAP.

"*Consolidated Depreciation and Amortization Expense*" means, with respect to the Borrower and its Restricted Subsidiaries for any period, the total amount of depreciation and amortization expense of the Borrower and its Restricted Subsidiaries, including the amortization of deferred financing fees or costs for such period on a Consolidated basis and otherwise determined in accordance with GAAP.

"*Consolidated EBITDA*" means, with respect to the Borrower and its Restricted Subsidiaries for any Test Period, the Consolidated Net Income of the Borrower and its Restricted Subsidiaries for such Test Period:

(a)　　　increased by (without duplication):

(i)　　　(A) provision for taxes based on income or profits or capital, plus state, provincial, franchise, property or similar taxes and foreign withholding taxes and foreign unreimbursed value added taxes, of such Person for such period (including, in each case, penalties and interest related to such taxes or arising from tax examinations) deducted in computing Consolidated Net Income and (B) amounts paid to Holdings or any direct or indirect parent of Holdings in respect of taxes in accordance with *Section 9.6(g)*, in each case under clauses (A) and (B), solely to the extent such amounts were deducted in computing Consolidated Net Income, <u>plus</u>

(ii)　　　(A) total interest expense (including (A) imputed interest on Capitalized Lease Obligations and Attributable Indebtedness (which, in each case, will be deemed to accrue at the interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligations or Attributable Indebtedness), (B) commissions, discounts and other fees, charges and expenses owed with respect to letters of credit, bankers' acceptance financing, surety and performance bonds and receivables financings, (C) amortization and write-offs of deferred financing fees, debt issuance costs, debt discounts, commissions, fees, premium and other expenses, as well as expensing of bridge, commitment or financing fees, (D) payments made in respect of hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, (E) cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than such Person or a wholly-

DB1/ 145587008.11

US-DOCS\149610879.14

owned Restricted Subsidiary) in connection with Indebtedness incurred by such plan or trust, (F) all interest paid or payable with respect to discontinued operations, (G) the interest portion of any deferred payment obligations and (H) all interest on any Indebtedness that is (x) Indebtedness of others secured by any Lien on property owned or acquired by such Person or its Restricted Subsidiaries, whether or not the obligations secured thereby have been assumed, but limited to the fair market value of such property, (y) contingent obligations in respect of Indebtedness; *provided* that such interest expense shall be calculated after giving effect to Hedge Agreements related to interest rates (including associated costs), but excluding unrealized gains and losses with respect to such Hedge Agreements or (z) fee and expenses paid to the Administrative Agent or the FILO Documentation Agent (in each case, in its capacity as such and for its own account) pursuant to the Loan Documents and fees and expenses paid to the administrative agent, the collateral agent, trustee or other similar Persons for any other Indebtedness permitted by *Section 9.3*) of such Person for such period and (B) bank fees and costs of surety bonds, in each case under this clause (B), in connection with financing activities and, in each case under clauses (A) and (B), to the extent such amounts were deducted in computing Consolidated Net Income, <u>plus</u>

(iii)    Consolidated Depreciation and Amortization Expense of such Person for such period to the extent such depreciation and amortization were deducted in computing Consolidated Net Income, <u>plus</u>

(iv)    any fees, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or the incurrence or repayment of Indebtedness permitted to be incurred hereunder including a refinancing thereof (whether or not successful) and any amendment, restatement or modification to the terms of any such transactions, including such fees, expenses or charges incurred in connection with any amendment to this Agreement and any amendment or refinancing of the Term Facility, in each case, deducted in computing Consolidated Net Income, <u>plus</u>

(v)    (1) the amount of any charge, cost, loss, expense or reserve deducted in such period in computing Consolidated Net Income related to: (A) restructuring (including restructuring charges or reserves, whether or not classified as such under GAAP), severance, relocation, consolidation, integration or other similar items, (B) strategic and/or business initiatives, business optimization (including costs and expenses relating to business optimization programs, which, for the avoidance of doubt, shall include, without limitation, implementation of operational and reporting systems and technology initiatives; strategic initiatives; retention; severance; systems establishment costs; systems conversion and integration costs; contract termination costs; recruiting and relocation costs and expenses; costs, expenses and charges incurred in connection with curtailments or modifications to pension and post-retirement employee benefits plans; costs to start-up, pre-opening, opening, closure, transition and/or consolidation of distribution centers, operations, officers and facilities) including in connection with any Investment permitted hereunder, and new systems design and implementation, as well as consulting fees and any one-time expense relating to enhanced accounting function, (C) business or facilities (including greenfield facilities) start-up, opening, transition, consolidation, shut-down and closing, (D) signing, retention and completion bonuses, (E) severance, relocation or recruiting, (F) charges and expenses incurred in connection with litigation (including threatened litigation), any investigation or proceeding (or any threatened investigation or proceeding) by a regulatory, governmental or law enforcement body (including any attorney general), and (G) expenses incurred in

US-DOCS\149610879.14

connection with casualty events or asset sales outside the ordinary course of business and (2) any one-time costs, expenses or charges incurred in connection with (A) Permitted Acquisitions or other Investments permitted hereunder after the Second Restatement Date or (B) the closing of any Stores or distribution centers after the Second Restatement Date; provided that (1) amounts added back under this clause (v) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent and (2) the aggregate amount added back pursuant to this clause (v), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clauses (vi) and (ix) below, shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (v) and clauses (vi) and (ix) below), plus

(vi)    the amount of costs relating to pre-opening and opening costs for Stores, signing, retention and completion bonuses, costs incurred in connection with any strategic initiatives, transition costs, consolidation and closing costs for Stores and costs incurred in connection with non-recurring (without, in any such case, limitation on the calculation hereof by Item 10(e) of Regulation S-K promulgated by the SEC) product and intellectual property development after the Second Restatement Date, other business optimization expenses (including costs and expenses relating to business optimization programs), and new systems design and implementation costs and project start-up costs; provided that (1) amounts added back under this clause (vi) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent and (2) the aggregate amount added back pursuant to this clause (vi), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clause (v) above and clause (ix) below, shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (vi), clause (v) above and clause (ix) below), plus

(vii)    any other non-cash charges including any write offs or write downs, to the extent reducing such Consolidated Net Income for such period (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (1) the Borrower may determine not to add back such non-cash charge in the current period and (2) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period), including the following: (A) non-cash expenses in connection with, or resulting from, stock option plans, employee benefit plans or agreements or post-employment benefit plans or agreements, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other similar rights, (B) non-cash currency translation losses related to changes in currency exchange rates (including re-measurements of Indebtedness (including intercompany Indebtedness) and any net non-cash loss resulting from hedge agreements for currency exchange risk), (C) non-cash losses, expenses, charges or negative adjustments attributable to the movement in the mark-to-market valuation of hedge agreements or other derivative instruments, including the effect of FASB Accounting Standards Codification 815 and International Accounting Standard No. 9 and their respective related pronouncements and interpretations, (D) non-cash charges for deferred tax asset valuation allowances, (E) any non-cash impairment charge or asset write-off or write-down related to intangible assets (including goodwill), long-lived assets, and Investments in debt and equity securities, (F) any non-cash charges or losses resulting

from any purchase accounting adjustment or any step-ups with respect to re-valuing assets and liabilities in connection with any Investments permitted hereunder, (G) all non-cash losses from Investments permitted hereunder recorded using the equity method and (H) the excess of GAAP rent expense over actual cash rent paid during such period due to the use of straight line rent for GAAP purposes, <u>plus</u>

(viii)    the amount of any minority interest expense deducted in calculating Consolidated Net Income, <u>plus</u>

(ix)    any net after-tax extraordinary, non-recurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses, and fees and expenses in connection with relocation costs, integration costs, facility consolidation and closing costs, severance costs and expenses and non-recurring compensation charges (without, in any such case, limitation on the calculation hereof by Item 10(e) of Regulation S-K promulgated by the SEC); provided that (1) amounts added back under this clause (ix) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent and (2) the aggregate amount added back pursuant to this clause (ix), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clauses (v) and (vi) above, shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (ix) and clauses (v) and (vi) above), <u>plus</u>

(x)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back, <u>plus</u>

(xi)    any costs or expenses incurred by the Borrower or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or stockholders agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of issuance of Equity Interests of the Borrower (other than Disqualified Equity Interests), <u>plus</u>

(xii)    proceeds of business interruption insurance actually received (to the extent not counted in any prior period in anticipation of such receipt) or, to the extent not counted in any prior period, reasonably expected to be received, and

(b)    decreased by (without duplication):

(i)    any non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any gains that represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period (other than such cash charges that have been added back to Consolidated Net Income in calculating Consolidated EBITDA in accordance with this definition), <u>plus</u>

(ii)    any non-cash gains with respect to cash actually received in a prior period unless such cash did not increase Consolidated EBITDA in such prior period.

"*Consolidated Fixed Charge Coverage Ratio*" means, for any Test Period, the ratio of (a) (i) Consolidated EBITDA for such period, minus (ii) Capital Expenditures made during such period and not financed with the proceeds of Indebtedness, minus (iii) Cash Taxes during such period to (b) Debt Service Charges of or by the Borrower and its Restricted Subsidiaries on a Consolidated basis for the most recently completed Test Period in accordance with GAAP.

"*Consolidated Interest Charges*" means, for any Test Period, the sum of (a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, and (b) the portion of rent expense with respect to such period under Capitalized Lease Obligations that is treated as interest in accordance with GAAP, minus (c) cash interest income during such period, in each case of or by the Borrower and its Restricted Subsidiaries on a consolidated basis for the most recently completed Test Period in accordance with GAAP. For purposes of the foregoing, interest expense shall exclude one-time financing fees (including arrangement, amendment and contract fees), debt issuance costs, commissions, expenses and, in each case, the amortization thereof.

"*Consolidated Net Debt*" means, as of any date of determination, (a) Consolidated Total Debt, minus (b) the amount of cash and Cash Equivalents on a consolidated balance sheet of the Borrower that are not "Restricted" for purposes of GAAP on such balance sheet.

"*Consolidated Net Income*" means, with respect to the Borrower and its Restricted Subsidiaries for any Test Period, the aggregate of the Net Income of the Borrower and its Restricted Subsidiaries for such Test Period on a Consolidated basis and otherwise determined in accordance with GAAP; *provided*, *however*, that, without duplication,

(a) [reserved],

(b) the Net Income for such Test Period shall not include the cumulative effect of a change in accounting principles during such Test Period, whether effected through a cumulative effect adjustment or a retroactive application in each case in accordance with GAAP,

(c) effects of adjustments (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries) in such Person's Consolidated financial statements pursuant to GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to any consummated Permitted Acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded,

(d) any net after-tax income (loss) from disposed or discontinued operations and any net after-tax gains or losses on disposal of disposed or discontinued operations shall be excluded,

(e) any net after-tax gains or losses (less all fees and expenses relating thereto) attributable to asset Dispositions or the other Disposition of any Equity Interests of any Person other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(f) the Net Income for such Test Period of any Person that is not a Subsidiary, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of the Borrower and its Restricted Subsidiaries shall include the amount of dividends or distributions or other payments that are actually paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof in respect of such Test Period,

DB1/ 145587008.11

US-DOCS\149610879.14

(g)    (i) any net unrealized gain or loss (after any offset) resulting in such Test Period from obligations in respect of Swap Contracts and the application of Financial Accounting Standards Board Accounting Standards Codification 815 (Derivatives and Hedging), (ii) any net gain or loss resulting in such period from currency translation gains or losses related to currency remeasurements of Indebtedness (including the net loss or gain (A) resulting from Swap Contracts for currency exchange risk and (B) resulting from intercompany Indebtedness) and all other foreign currency translation gains or losses to the extent such gain or losses are non-cash items, and (iii) any net after-tax income (loss) for such Test Period attributable to the early extinguishment or conversion of (A) Indebtedness, (B) obligations under any Swap Contracts or (C) other derivative instruments, shall be excluded,

(h)    any impairment charge or asset write-off, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(i)    any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other Disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days), shall be excluded,

(j)    to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded, and

(k)    any non-cash (for such period and all other periods) compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by, or to, management of the Borrower or any of its Restricted Subsidiaries, shall be excluded.

"*Consolidated Total Debt*" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and the Restricted Subsidiaries outstanding on such date, determined on a Consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with any Permitted Acquisition or any other Investment permitted hereunder), consisting of Indebtedness for borrowed money, unreimbursed obligations in respect of drawn letters of credit, obligations in respect of Capitalized Leases and debt obligations evidenced by promissory notes or similar instruments; *provided* that Consolidated Total Debt shall not include Indebtedness in respect of (i) any letter of credit, except to the extent of unreimbursed obligations in respect of drawn letters of credit (*provided* that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Debt until three (3) Business Days after such amount is drawn (it being understood that any borrowing, whether automatic or otherwise, to fund such reimbursement shall be counted)) and (ii) obligations under Swap Contracts.

DB1/ 145587008.11

US-DOCS\149610879.14

"*Constituent Documents*" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"*Contractual Obligation*" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Cost*" means the cost of purchases of Inventory determined according to the accounting policies used in the preparation of the Borrower's financial statements.

"*Court*" has the meaning specified in the preliminary statements of this Agreement.

"*Covenant Trigger Event*" means that Excess Availability on any day is less than the greater of (i) $45,000,000 and (ii) 10% of the Modified Maximum Credit. For purposes hereof, the occurrence of a Covenant Trigger Event shall be deemed to be continuing until Excess Availability is equal to or greater than the greater of (i) $45,000,000 and (ii) 10% of the Modified Maximum Credit, in each case, for thirty (30) consecutive calendar days, in which case a Covenant Trigger Event shall no longer be deemed to be continuing for purposes of this Agreement. The termination of a Covenant Trigger Event as provided herein shall in no way limit, waive or delay the occurrence of a subsequent Covenant Trigger Event in the event that the conditions set forth in this definition again arise.

"*Covered Entity*" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"*Covered Party*" has the meaning specified in *Section 12.30.*

"*Credit Card Advance Rate*" means 90%.

"*Credit Card Agreements*" means all agreements or arrangements now or hereafter entered into by the Borrower or any Guarantor for the benefit of the Borrower or a Subsidiary Guarantor, in each case with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, including, but not limited to, the agreements or arrangements set forth on *Schedule 1.1E* hereto.

"*Credit Card Issuer*" means any Person (other than the Borrower or a Guarantor) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and

other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc.

"*Credit Card Notification*" means, collectively, the notices to Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements in substantially the form delivered under the Existing Credit Agreement, which Credit Card Notifications shall require the ACH or wire transfer no less frequently than each Business Day (and whether or not there are then any outstanding Obligations) to an Approved Deposit Account of all payments due from Credit Card Processors.

"*Credit Card Processor*" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to the Borrower's or any Guarantor's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"*Credit Card Receivables*" means, collectively, (a) all present and future rights of the Borrower or any Guarantor to payment from any Credit Card Issuer, Credit Card Processor or other third party arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of the Borrower or any Guarantor to payment from any Credit Card Issuer, Credit Card Processor or other third party in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the Credit Card Agreements or otherwise, in each case above calculated net of prevailing interchange charges.

"*Credit Extension*" means each of the following: (a) a Borrowing and (b) a L/C Credit Extension.

"*Current Asset Collateral*" means all the "*ABL Priority Collateral*" as defined in the Intercreditor Agreement.

"*Customer Credit Liabilities*" means, at any time, the aggregate remaining balance at such time of (a) outstanding gift certificates and gift cards of the Borrower and each Subsidiary Guarantor entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory and (b) outstanding merchandise credits of the Borrower or such Subsidiary Guarantor, in each case, net of any dormancy reserves maintained by the Borrower on its books and records in the ordinary course of business consistent with past practices.

"*Customs Broker/Carrier Agreement*" means an agreement in form and substance reasonably satisfactory to the Administrative Agent among a Loan Party, a customs broker, freight forwarder, consolidator, or other carrier, and the Collateral Agent, in which the customs broker, freight forwarder, consolidator, or carrier acknowledges that it has control over and holds the documents evidencing ownership of, or other shipping documents relating to, the subject Inventory or other property for the benefit of the Collateral Agent and agrees, upon notice from the Collateral Agent (which notice shall be delivered only upon the occurrence and during the continuance of an Event of Default), to hold and dispose of the subject Inventory and other property solely as directed by the Collateral Agent.

"*Daily Simple SOFR*" with respect to any applicable determination date means the SOFR published on such date on the Federal Reserve Bank of New York's website (or any successor source).

"*Debt Service Charges*" means for any Test Period, the sum of (a) Consolidated Interest Charges paid, or required to be paid, in cash for such Test Period, plus (b) scheduled principal payments made or required to be made on account of Indebtedness of the types set forth in clauses (a), (b), (c) and (f) of the definition of "Indebtedness" (excluding the Obligations but including, without limitation, Capitalized Lease Obligations) for such Test Period, plus (c) mandatory and voluntary prepayments of the Term Facility made during such Test Period, in each case determined on a consolidated basis in accordance with GAAP.

"*Debtor Relief Laws*" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, arrangement, adjustment, composition, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Debtors*" has the meaning specified in the preliminary statements of this Agreement.

"*Default*" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would constitute an Event of Default.

"*Default Rate*" means (a) when used with respect to Revolving Obligations, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin applicable to Base Rate Loans plus (iii) 2.0% per annum; *provided* that with respect to the outstanding principal amount of any Loan constituting a Revolving Obligation, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such Loan (giving effect to *Section 2.10*) plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws, and (b) when used with respect to FILO Obligations, an interest rate equal to (i) the Base Rate plus (ii) the FILO Applicable Margin applicable to Base Rate Loans plus (iii) 2.0% per annum; *provided* that with respect to the outstanding principal amount of any Loan constituting a FILO Obligation, the Default Rate shall be an interest rate equal to the interest rate (including any FILO Applicable Margin) otherwise applicable to such Loan (giving effect to *Section 2.10*) plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"*Default Right*" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"*Defaulting Lender*" means, subject to *Section 2.16(b)*, any Revolving Credit Lender that, as reasonably determined by the Administrative Agent, (a) has failed to perform any of its funding obligations hereunder, including in respect of its Revolving Loans or participations in respect of Letters of Credit or Swing Loans, within three (3) Business Days of the date required to be funded by it hereunder, (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit generally, (c) has failed, within three Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations (*provided* that any Lender that has failed to give such timely confirmation shall cease to be a Defaulting Lender under this *clause (c)* upon receipt of such confirmation by the Administrative Agent), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) become subject to a Bail-In Action or had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; provided that a Lender shall not be a Defaulting

Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority.

"*Deposit Account*" means any checking or other demand deposit account maintained by the Loan Parties, including any "deposit accounts" within the meaning given to such term in Article 9 of the UCC.  All funds in such Deposit Accounts shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Deposit Accounts, subject to the Security Agreement and the Intercreditor Agreement.

"*Deposit Account Control Agreement*" has the meaning specified in *Section 8.12(a)*.

"*Designated Assets*" means the assets set forth on *Schedule 1.1D*.

"*Designated Jurisdiction*" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"*Designated Non-Cash Consideration*" means the fair market value of non-cash consideration received by the Borrower or a Restricted Subsidiary in connection with a Disposition pursuant to *Section 9.5(j)* that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Borrower, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within one-hundred eighty (180) days following the consummation of the applicable Disposition).

"*Dilution Reserve*" means, for any period, that percentage reasonably determined by the Administrative Agent (or, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) based upon the immediately prior 12 months (or such shorter period as determined by the Administrative Agent (or, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) in its Permitted Discretion) by dividing (A) the amount of charge-offs of Eligible Trade Receivables and returns of goods purchased from the Borrower and the Subsidiary Guarantors during such period which had, at the time of sale, resulted in the creation of an Eligible Trade Receivable, by (B) the amount of sales (exclusive of sales and other similar taxes) of the Borrower and the Subsidiary Guarantors during such period and thereafter ("Dilution") but only to the extent to which Dilution is in excess of 5%.

"*DIP Order*" means, collectively, the order of the Court entered in the Chapter 11 Cases after an interim or final hearing, as applicable (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent and the FILO Documentation Agent, which, among other matters but not by way of limitation, authorizes, on an interim or final basis, as applicable, the use of cash collateral constituting ABL Priority Collateral during the pendency of the Chapter 11 Cases.

"*Disposition*" or "*Dispose*" means the sale, transfer, license, lease or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of any property by any Person (including any sale and leaseback transaction and any sale or issuance of Equity Interests in a Restricted Subsidiary), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Disqualified Equity Interests*" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Revolving Credit Commitments and all outstanding Letters of Credit (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the applicable Issuer)), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after Latest Maturity Date at the time of issuance; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Parent, Holdings, the Borrower or the Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by Parent, Holdings, the Borrower or the Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"*Disqualified Institution*" means:

(1)    any Person that is a competitor of the Borrower and identified by the Borrower in good faith in writing to the Administrative Agent from time to time after the Second Restatement Date;

(2)    those banks, financial institutions, other institutional lenders and investors and other entities that were identified by the Borrower as such in writing to the Administrative Agent on or prior to the Second Restatement Date; and

(3)    any Affiliates of Persons described in the foregoing clauses (1) and (2) that are readily identifiable as such solely on the basis of their names (other than any such Affiliate that is a bank, financial institution or fund (other than a Person described in clause (2) above) that regularly invest in commercial loans or similar extensions of credit in the ordinary course of business and for which no personnel involved with the relevant competitor or Person referred to in clause (2) above make investment decisions);

*provided* that in no event shall any update to the list of Disqualified Institutions (A) be effective prior to two (2) Business Days after receipt thereof by the Administrative Agent or (B) apply retroactively to disqualify any Persons that have previously acquired an assignment or participation interest under this Agreement or that is party to a pending trade.

Notwithstanding anything in the Loan Documents to the contrary, the Administrative Agent shall not be responsible (or have any liability) for, or have any duty to ascertain, inquire into, monitor, or enforce, compliance with the provisions thereof relating to Disqualified Institutions. Without limiting the generality of the foregoing, the Administrative Agent shall not (1) be obligated to ascertain, monitor, or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (2) have any liability with respect to or arising out of any assignment or participation of Revolving Credit Exposure, Revolving Credit Commitments or FILO Loans, or disclosure of confidential information, to any Disqualified Institution. The list of Disqualified Institutions may be made available by the Administrative Agent on the Platform and to prospective assignees and Participants (including Public Lenders).

"*Dividing Person*" has the meaning assigned to it in the definition of "Division."

"*Division*" means the division of the assets, liabilities and/or obligations of a Person (the "*Dividing Person*") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"*Division Successor*" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division.  A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"*Document*" has the meaning set forth in Article 9 of the UCC.

"*Documentary Letter of Credit*" means any Letter of Credit that is drawable upon presentation of documents evidencing the sale or shipment of goods purchased by the Borrower or a Guarantor in the ordinary course of its business.

"*Dollar Equivalent*" of any amount means, at the time of determination thereof, (a) if such amount is expressed in Dollars, such amount or (b) if such amount is denominated in any other currency, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it reasonably deems appropriate.

"*Dollars*" and "*$*" mean lawful money of the United States.

"*Domestic Subsidiary*" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the Laws of Puerto Rico or any other territory).

"*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Effective Date*" means the effective date of the Existing Credit Agreement, which date was October 21, 2016.

"*Electronic Copy*" has the meaning specified in *Section 12.6.*

"*Electronic Record*" has the meaning specified in *Section 12.6.*

"*Electronic Signature*" has the meaning specified in *Section 12.6*.

"*Eligible Assignee*" means (a) a Lender or any of its Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Lender assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Lender's rights in and to a material portion of such Lender's portfolio of asset based credit facilities, and (e) any other Person that meets the requirements to be an assignee under *Section 12.2(b)(iv)* and *(v)* (subject to such consents, if any, as may be required under *Section 12.2(b)(iii)*); *provided* that, with respect to the Revolving Facility (other than in connection with any exercise of the purchase option under *Section 10.12*), no FILO Lender, Affiliate of any FILO Lender or Approved Fund with respect to any FILO Lender may be an Eligible Assignee without the written approval of Administrative Agent (which may be granted or withheld at the Administrative Agent's sole discretion).

"*Eligible Credit Card Receivables*" means Credit Card Receivables due to the Borrower or any Subsidiary Guarantor on a non-recourse basis from Visa, Mastercard, American Express Co., Discover and other major credit card processors reasonably acceptable to the Administrative Agent and the FILO Documentation Agent as arise in the ordinary course of business, which have been earned by performance and are deemed by the Administrative Agent and the FILO Documentation Agent, each in its Permitted Discretion, to be eligible for inclusion in the calculation of the Borrowing Base and the FILO Borrowing Base. Without limiting the foregoing, unless otherwise approved in writing by the Administrative Agent and the FILO Documentation Agent, none of the following shall be deemed to be Eligible Credit Card Receivables:

(a)    Any Credit Card Receivable that has been outstanding for more than five (5) Business Days from the date of sale of the Inventory giving rise to such Credit Card Receivable;

(b)    Credit Card Receivables with respect to which the Borrower or a Subsidiary Guarantor does not have good, valid and marketable title thereto, free and clear of any Lien (other than (i) Liens granted to the Collateral Agent, for its benefit and the ratable benefit of the Secured Parties, pursuant to the Collateral Documents and (ii) (A) Liens permitted under *Section 9.1* having priority by operation of applicable Laws over the Liens of the Collateral Agent, and (B) Liens under *Section 9.1(w)* securing obligations under the Term Facility and any Permitted Refinancings thereof);

(c)    Credit Card Receivables that are not subject to a first priority security interest in favor of the Collateral Agent, for the benefit of itself and the Secured Parties (it being the intent that chargebacks in the ordinary course by the credit card processors shall not be deemed violative of this clause); or

(d)    Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback).

Any Credit Card Receivables which are not Eligible Credit Card Receivables shall nevertheless be part of the Collateral.

"*Eligible In-Transit Inventory*" means, as of the date of determination thereof, without duplication of other Eligible Inventory, Inventory (a) located outside of the United States or in transit within or outside of the United States to the Borrower or any Subsidiary Guarantor from vendors and suppliers for receipt by the Borrower or a Subsidiary Guarantor within sixty (60) days of the date of determination that has not yet been received into a distribution center or store of such Person, (b) for

which the purchase order for such Inventory is in the name of the Borrower or a Subsidiary Guarantor and title has passed to the Borrower or a Subsidiary Guarantor, (c) which has been consigned to the Borrower or a Subsidiary Guarantor (along with delivery to the Borrower or a Subsidiary Guarantor of the documents of title with respect thereto), (d) as to which a Customs Broker/Carrier Agreement, reasonably satisfactory to the Administrative Agent, is in effect or with respect to which Inventory Reserves have been established by the Administrative Agent or the FILO Documentation Agent, and (e) which otherwise would constitute Eligible Inventory; *provided* that the Administrative Agent or the FILO Documentation Agent may, in its Permitted Discretion, and upon notice to the Borrower, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event that the Administrative Agent or the FILO Documentation Agent determines in its Permitted Discretion and upon notice to the Borrower that such Inventory is subject to any Person's right or claim which is (or is capable of being) senior to, or pari passu with, the Lien of the Collateral Agent (such as, without limitation, a right of reclamation or stoppage in transit), as applicable, and would be reasonably likely to adversely impact the ability of the Collateral Agent to realize upon such Inventory.

"*Eligible Inventory*" means, as of the date of determination thereof, (a) Eligible In-Transit Inventory, (b) Eligible Letter of Credit Inventory but only if and to the extent that the Administrative Agent and the FILO Documentation Agent, each in its Permitted Discretion, determines to include such as Eligible Inventory, and (c) items of Inventory of the Borrower or a Subsidiary Guarantor that are finished goods, merchantable and readily saleable to the public in the ordinary course deemed by the Administrative Agent and the FILO Documentation Agent, each in its Permitted Discretion, to be eligible for inclusion in the calculation of the Borrowing Base and the FILO Borrowing Base. Without limiting the foregoing, unless otherwise approved in writing by the Administrative Agent and the FILO Documentation Agent, none of the following shall be deemed to be Eligible Inventory:

(a)    Inventory that is not owned solely by the Borrower or a Subsidiary Guarantor, or is leased or on consignment or the Borrower or a Subsidiary Guarantor does not have good and valid title thereto;

(b)    Inventory (including any portion thereof in transit from vendors, other than Eligible In-Transit Inventory) that is not located at a warehouse facility used by the Borrower or a Subsidiary Guarantor in the ordinary course or at a property that is owned or leased by the Borrower or a Subsidiary Guarantor;

(c)    Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, work-in-process, raw materials, or that constitute spare parts, promotional, marketing, packaging and shipping materials or supplies used or consumed in the Borrower's or a Subsidiary Guarantor's business, (iv) are not in compliance in all material respects with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (v) are bill and hold goods;

(d)    Inventory that is not located in the United States of America (excluding territories and possessions thereof) other than Eligible In-Transit Inventory;

(e)    Inventory that is not subject to a perfected first-priority security interest in favor of the Collateral Agent for the benefit of the Secured Parties (subject only to Liens permitted under *Section 9.1* having priority by operation of applicable Law over the Liens of the Collateral Agent);

(f)      Inventory which consists of samples, labels, bags, packaging, and other similar non-merchandise categories;

(g)      Inventory as to which insurance in compliance with the provisions of *Section 8.5* hereof is not in effect;

(h)      Inventory which has been sold but not yet delivered or as to which the Borrower or any Subsidiary Guarantor has accepted a deposit;

(i)      Inventory which is being Disposed of in a Store closing, "going-out-of-business" or similar sale; and

(j)      Inventory acquired in a Permitted Acquisition, unless and until the Collateral Agent has completed or received (A) an appraisal of such Inventory from appraisers satisfactory to the Administrative Agent and the FILO Documentation Agent, and the Administrative Agent or the FILO Documentation Agent has established Inventory Reserves (if applicable) therefor, and (B) such other due diligence as the Administrative Agent or the FILO Documentation Agent may require, all of the results of the foregoing to be reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent, each in its Permitted Discretion.

Any Inventory which is not Eligible Inventory shall nevertheless be part of the Collateral.

"*Eligible Letter of Credit Inventory*" means, as of the date of determination thereof, without duplication of other Eligible Inventory, Inventory (a) which does not constitute Eligible In-Transit Inventory and for which no documents of title have then been issued, (b) the purchase of which is supported by a Documentary Letter of Credit or Banker's Acceptance having an expiry within sixty (60) days of such date of determination, which Documentary Letter of Credit or Banker's Acceptance provides that it may be drawn only after the Inventory is completed and after documents of title have been issued for such Inventory reflecting the Borrower, a Subsidiary Guarantor or the Collateral Agent as consignee of such Inventory, and (c) which otherwise would constitute Eligible Inventory. For the avoidance of doubt, Eligible Letter of Credit Inventory is without duplication of Eligible In-Transit Inventory.

"*Eligible Trade Receivables*" means Accounts arising from the sale of the Borrower's or any Subsidiary Guarantor's Inventory (but excluding, for the avoidance of doubt, Credit Card Receivables) that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Account (i) has been earned by performance and represents the bona fide amounts due to the Borrower or any Subsidiary Guarantor from an account debtor, and in each case is originated in the ordinary course of business of the Borrower or such Subsidiary Guarantor, and (ii) in each case is acceptable to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent), in its Permitted Discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (r) below. Without limiting the foregoing, to qualify as an Eligible Trade Receivable, an Account shall indicate no Person other than the Borrower or a Subsidiary Guarantor as payee or remittance party. In determining the amount to be so included, and without duplication of eligibility criteria or Availability Reserves, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower or a Subsidiary Guarantor may be obligated to rebate to a customer pursuant to the terms of any written agreement) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrower or Subsidiary Guarantors to reduce the amount of such Eligible Trade Receivable. Except as otherwise agreed by the Administrative Agent (and, if Eligible

Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent), any Account included within any of the following categories shall not constitute an Eligible Trade Receivable:

(a)    Accounts that are not evidenced by an invoice;

(b)    Accounts that have been outstanding for more than ninety (90) days from the date of sale or more than sixty (60) days past the due date;

(c)    Accounts due from any account debtor for which more than fifty percent (50%) of the accounts of such account debtor are accounts described in clause (b), above;

(d)    All Accounts owed by an account debtor and/or its Affiliates together exceed fifteen percent (15%) (or such higher percentage as the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) may establish from time to time in its Permitted Discretion) of the amount of all Accounts at any one time (but the portion of the Accounts not in excess of the applicable percentage may be deemed Eligible Trade Receivables, in the Administrative Agent's (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent's) discretion);

(e)    Accounts (i) that are not subject to a perfected first-priority security interest in favor of the Collateral Agent, for its benefit and the ratable benefit of the Secured Parties, or (ii) with respect to which the Borrower or a Subsidiary Guarantor does not have good and valid title thereto, free and clear of any Lien (other than (i) Liens granted to the Collateral Agent, for its benefit and the ratable benefit of the Secured Parties, pursuant to the Collateral Documents and (ii) (A) Liens permitted under *Section 9.1* having priority by operation of applicable Laws over the Liens of the Collateral Agent, and (B) Liens under *Section 9.1(w)* securing obligations under the Term Facility and any Permitted Refinancings thereof);

(f)    Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback; <u>provided</u> that no Account that otherwise constitutes an Eligible Trade Receivable shall be rendered ineligible by virtue of this clause (f) to the extent, but only to the extent, that the account debtor's right of setoff is limited by an enforceable agreement that is reasonably satisfactory to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent);

(g)    Accounts which arise out of any sale (i) not made in the ordinary course of business, or (ii) are not payable in Dollars;

(h)    [reserved];

(i)    Accounts which are owed by any Affiliate or any employee of a Loan Party;

(j)    Accounts for which all consents, approvals or authorizations of, or registrations or declarations with any Governmental Authority required to be obtained, effected or given in connection with the performance of such Account by the account debtor or in connection with the enforcement of such Account by the Administrative Agent have not been duly obtained, effected or given and are not in full force and effect;

(k)       Accounts due from an account debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(l)       Accounts due from any Governmental Authority except to the extent that the subject account debtor is the federal government of the United States of America and the Borrower or Subsidiary Guarantors have complied with the Federal Assignment of Claims Act of 1940;

(m)      Accounts (i) owing from any Person that is also a supplier to or creditor of the Borrower or any Subsidiary Guarantor or (ii) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling the Borrower or any Subsidiary Guarantor to discounts on future purchase therefrom;

(n)       Accounts arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval or consignment basis or subject to any right of return;

(o)       Accounts arising out of sales to account debtors outside the United States unless either (i) such Accounts are fully backed by an irrevocable letter of credit on terms, and issued by a financial institution, acceptable to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) and such irrevocable letter of credit is in the possession of the Collateral Agent or (ii) covered by credit insurance reasonably acceptable to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent);

(p)       Accounts evidenced by a promissory note or other instrument;

(q)       Accounts consisting of amounts due from vendors as rebates or allowances; and

(r)       Accounts acquired in a Permitted Acquisition, unless and until the Collateral Agent has completed or received (A) a Field Exam in respect of such Accounts, which Field Exam shows results reasonably satisfactory to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent), and the Administrative Agent (or, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) has established Receivables Reserves (if applicable) therefor, and (B) such other due diligence as the Administrative Agent (or, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) may require, all of the results of the foregoing to be reasonably satisfactory to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) in its Permitted Discretion.

"*Entitlement Holder*" has the meaning given to such term in Article 8 of the UCC.

"*Entitlement Order*" has the meaning given to such term in Article 8 of the UCC.

"*Environmental Claim*" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations (other than internal reports prepared by any Loan Party or any of its Subsidiaries (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings with respect to any Environmental Liability (hereinafter "*Claims*"), including (i) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and

(ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"*Environmental Laws*" means any and all Laws relating to the protection of the environment or, to the extent relating to exposure to Hazardous Materials, human health.

"*Environmental Liability*" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Loan Party or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"*Equity Interests*" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"*ERISA Event*" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of their respective ERISA Affiliates concerning the imposition of Withdrawal Liability or written notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA; (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (f) the failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code) with respect to a Pension Plan, whether or not waived, (g) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to a Pension Plan; (h) the imposition of a lien under Section 303(k) of ERISA with respect to any Pension Plan; or (i) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA).

"*ESG*" has the meaning specified in *Section 2.18*.

US-DOCS\149610879.14

"*ESG Amendment*" has the meaning specified in *Section 2.18*.

"*ESG Pricing Provisions*" has the meaning specified in *Section 2.18*.

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Event of Default*" has the meaning specified in *Section 10.1*.

"*Excess Availability*" means, at any time, (a) the Maximum Credit at such time *minus* (b) the aggregate Revolving Credit Outstandings at such time.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Accounts*" means deposit or securities accounts (a) established (or otherwise maintained) (including deposit accounts that are that are zero balance accounts) by the Loan Parties that do not have cash balances at any time exceeding $5,000,000 in the aggregate for all such accounts, (b) solely containing cash allocated as proceeds of the sale of Term Priority Collateral (as such term is defined in the Intercreditor Agreement), (c) payroll, trust and tax withholding accounts, (d) used by the Loan Parties exclusively for disbursements and payments in the ordinary course of business, or (e) that are located outside of the United States.

"*Excluded Subsidiary*" means (a) any Subsidiary that is not a wholly owned Subsidiary of the Borrower or a Guarantor, (b) any Foreign Subsidiary, (c) any Domestic Subsidiary substantially all of the assets of which consist of Equity Interests in, or Equity Interests in and indebtedness of, one or more Foreign Subsidiaries or Domestic Subsidiaries described in this clause (c), (d) any Domestic Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary, (e) any Subsidiary that is prohibited or restricted by applicable Law from providing a Guaranty or if such Guaranty would require governmental (including regulatory) consent, approval, license or authorization, (f) any special purpose securitization vehicle (or similar entity), (g) any Subsidiary that is a not-for-profit organization, (h) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), the cost or other consequences (including any adverse tax consequences) of providing the Guaranty shall be excessive in view of the benefits to be obtained by the Lenders therefrom and (i) each Unrestricted Subsidiary.

"*Excluded Swap Obligation*" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party under the Guaranty of, or the grant under a Loan Document by such Loan Party of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to *Section 12.28* hereof and any and all guarantees of such Loan Party's Swap Obligations by other Loan Parties) at the time the guaranty of such Loan Party, or grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Contracts for which such guaranty or security interest becomes illegal.

"*Excluded Taxes*" means, with respect to any Agent, any Lender, any Issuer or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) any tax on such recipient's net income or profits (or franchise tax or minimum tax imposed in lieu of such tax on net income or profits) imposed by a jurisdiction as a result of

such recipient being organized or having its principal office or applicable Lending Office located in such jurisdiction (including, for the avoidance of doubt, any backup withholding in respect of such a tax under Section 3406 of the Code) or as a result of any other present or former connection between such recipient and the jurisdiction (including as a result of such recipient carrying on a trade or business, having a permanent establishment or being a resident for tax purposes in such jurisdiction), other than a connection arising solely from such recipient having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction specifically contemplated by, or sold or assigned an interest in, any Loan or Loan Documents, (b) any branch profits tax under Section 884(a) of the Code, or any similar tax, imposed by any jurisdiction described in (a), (c) with respect to any Lender (other than any Lender becoming a party hereto pursuant to the Borrower's request under *Section 3.7*), any U.S. federal withholding tax that is imposed on amounts payable to such Lender pursuant to a Law in effect at the time such Lender becomes a party hereto (or where the Lender is a partnership for U.S. federal income tax purposes, pursuant to a Law in effect on the later of the date on which such Lender becomes a party hereto or the date on which the affected partner becomes a partner of such Lender) or designates a new Lending Office or experiences a change in circumstances (other than a Change in Law), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment or change in circumstances), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding tax pursuant to *Section 3.1*, (d) any withholding tax attributable to such recipient's failure to comply with *Section 3.1(c)* or *(h)*, (e) any tax imposed under FATCA and (f) any interest, additions to taxes and penalties with respect to any taxes described in clauses (a) through (e) of this definition.

"*Existing Credit Agreement*" has the meaning specified in the preliminary statements of this Agreement.

"*Existing Obligations*" has the meaning specified in *Section 12.31(b)*.

"*Existing Revolver Tranche*" has the meaning specified in *Section 2.17(a)*.

"*Extended Revolving Credit Commitments*" has the meaning specified in *Section 2.17(a)*.

"*Extending Revolving Credit Lender*" has the meaning specified in *Section 2.17(b)*.

"*Extension*" means any establishment of Extended Revolving Credit Commitments pursuant to *Section 2.17* and the applicable Extension Amendment.

"*Extension Amendment*" has the meaning specified in Section 2.17(d).

"*Extension Election*" has the meaning specified in Section 2.17(b).

"*Extension Request*" has the meaning specified in Section 2.17(a).

"*Extension Series*" has the meaning specified in Section 2.17(a).

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"*Federal Funds Rate*" means, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided that if the Federal Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"*Federal Reserve Board*" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Fee Letter*" means, collectively, (i) the Fee Letter dated September 20, 2016, among the Borrower, Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Bank of America; (ii) the Fee Letter dated as November 25, 2020, among the Borrower and Bank of America; (iii) the Fee Letter dated December 22, 2021, among the Borrower and Bank of America, as may be amended and in effect from time to time; (iv) the Fee Letter dated March 10, 2023, among the Borrower and Bank of America, as may be amended and in effect from time to time; (v) the Fee Letters dated March 15, 2024, among the Borrower and Bank of America, as may be amended and in effect from time to time.

"*Field Examination*" has the meaning specified in *Section 7.4(d)*.

"*FILO Adjustment Date*" has the meaning specified in the definition of "FILO Applicable Margin".

"*FILO Applicable Margin*" means a percentage per annum equal to (a) from and after the Second Restatement Date until the first FILO Adjustment Date thereafter, the applicable percentage set forth in Level II of the pricing grid below, and (b) thereafter, the applicable percentage in the applicable Level of pricing grid below, based upon Consolidated EBITDA for the then most-recently ended Test Period as of the most recent FILO Adjustment Date:

| Level | Consolidated EBITDA | Term SOFR Loans | Base Rate Loans |
|-------|---------------------|-----------------|-----------------|
| I | Greater than the FILO Applicable Margin EBITDA Threshold for the applicable Test Period | 8.75% | 7.75% |
| II | Less than or equal to the FILO Applicable Margin EBITDA Threshold for the applicable Test Period | 9.75% | 8.75% |

The calculation of Consolidated EBITDA shall be based upon the Compliance Certificate and accompanying financial statements delivered by the Borrower to the Administrative Agent and the FILO Documentation Agent by the date required under this Agreement.  The movement between Levels in the pricing grid shall occur on the first calendar day of the month following the month in which the respective Compliance Certificate and accompanying financial statements (commencing with the Compliance Certificate and accompanying financial statements for the Fiscal Quarter ending [June 30,

DB1/ 145587008.11

US-DOCS\149610879.14

2025][1]) have been delivered to the Administrative Agent and the FILO Documentation Agent (a "*FILO Adjustment Date*").  For example, if the Borrower delivers the Compliance Certificate and accompanying financial statements for the Fiscal Quarter ending [June 30, 2025] during the month of [August 2025], then any applicable Level change would be implemented on the first calendar day in [September 2025].

Notwithstanding the foregoing, (x) if the Borrower fails to deliver the financial statements and the related Compliance Certificate necessary to determine the relevant Level under the pricing grid by the date required under this Agreement with respect to any Test Period, then at the FILO Documentation Agent's election, the FILO Applicable Margin shall be a percentage per annum equal to the applicable percentage set forth in Level II of the pricing grid above until such financial statements and Compliance Certificate are delivered (in which event any applicable Level change would be implemented on the first calendar day of the month following such delivery), and (y) no reduction to the FILO Applicable Margin shall become effective at any time when an Event of Default has occurred and is continuing.

If, as a result of any restatement of or other adjustment to the financial statements of the Borrower, the FILO Documentation Agent determines that (i) Consolidated EBITDA as calculated by the Borrower as of any applicable date was inaccurate and (ii) a proper calculation of Consolidated EBITDA would have resulted in different pricing for any period, then (1) if the proper calculation of Consolidated EBITDA would have resulted in higher pricing for such period, the Borrower shall automatically and retroactively be obligated to pay an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period unless waived by the FILO Documentation Agent, and (2) if the proper calculation of Consolidated EBITDA would have resulted in lower pricing for such period, neither the FILO Documentation Agent nor the FILO Lenders shall have any obligation to repay any interest or fees to the Borrower; *provided* that if, as a result of any restatement or other event a proper calculation of Consolidated EBITDA would have resulted in higher pricing for one or more periods and lower pricing for one or more other periods (due to the shifting of income or expenses from one period to another period or any similar reason), then the amount payable by the Borrower pursuant to the foregoing clause (1) shall be based upon the excess, if any, of the amount of interest and fees that should have been paid for all applicable periods over the amount of interest and fees paid for all such periods.

"*FILO Applicable Margin EBITDA Threshold*" means, for the applicable Test Period in the table below, the amount of Consolidated EBITDA corresponding to such Test Period in such table:

| Test Period Ending On or About | Consolidated EBITDA |
|---|---|
| May 3, 2025 | $155,600,000 |
| August 2, 2025 | $164,700,000 |
| November 1, 2025 | $163,700,000 |
| January 31, 2026 | $199,100,000 |
| May 2, 2026 | $205,100,000 |
| August 1, 2026 | $210,900,000 |
| October 31, 2026 | $218,100,000 |

---

[1] NB: To be the date that is the end of the fourth full FQ following the Second Restatement Date

| January 30, 2027 and thereafter | $226,900,000 |
|---|---|

"*FILO Borrowing Base*" means, at any time of calculation, an amount equal to:

(a)    the face amount of Eligible Credit Card Receivables multiplied by the FILO Credit Card Advance Rate; <u>plus</u>

(b)    the face amount of Eligible Trade Receivables multiplied by the FILO Trade Receivables Advance Rate, net of Receivables Reserves applicable thereto; *provided* that unless and until the FILO Documentation Agent (A) receives a Field Examination of all Accounts arising from the sale of the Borrower's or any Subsidiary Guarantor's Inventory from a field examiner reasonably satisfactory to the FILO Documentation Agent in its sole discretion and establishes Receivables Reserves (if applicable) therefor in accordance with this Agreement, (B) receives such other due diligence as the FILO Agent may require in its sole discretion, and (C) determines in its sole discretion to include Eligible Trade Receivables in the FILO Borrowing Base, no Accounts shall be included in the FILO Borrowing Base pursuant to this *clause (b)*; <u>plus</u>

(c)    the Net Recovery Percentage of Eligible Inventory (other than, for the avoidance of doubt, Eligible Letter of Credit Inventory and Eligible In-Transit Inventory), multiplied by the FILO Inventory Advance Rate multiplied by the Cost of Eligible Inventory (other than, for the avoidance of doubt, Eligible Letter of Credit Inventory and Eligible In-Transit Inventory), net of Inventory Reserves attributable to Eligible Inventory (without duplication of Inventory Reserves in effect under the Borrowing Base); <u>plus</u>

(d)    the Net Recovery Percentage of Eligible Letter of Credit Inventory multiplied by the FILO Letter of Credit Advance Rate, multiplied by the Cost of Eligible Letter of Credit Inventory, net of Inventory Reserves attributable to Eligible Letter of Credit Inventory (without duplication of Inventory Reserves in effect under the Borrowing Base); <u>plus</u>

(e)    the Net Recovery Percentage of Eligible In-Transit Inventory multiplied by the FILO In-Transit Advance Rate, multiplied by the Cost of Eligible In-Transit Inventory, net of Inventory Reserves attributable to Eligible In-Transit Inventory (without duplication of Inventory Reserves in effect under the Borrowing Base); <u>minus</u>

(f)    the then amount of all Availability Reserves (without duplication of Availability Reserves in effect under the Borrowing Base).

The FILO Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent and the FILO Documentation Agent pursuant to *Section 4.1(a)* or *7.4*, as applicable, as adjusted to give effect to Availability Reserves following such delivery (without duplication of Availability Reserves in effect under the Borrowing Base)*; provided*, that such Availability Reserves shall not be established or changed except upon not less than three (3) Business Days' notice to the Borrower (during which period the FILO Documentation Agent shall be available to discuss any such proposed Availability Reserve with the Borrower and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such Availability Reserve no longer exists, in a manner and to the extent reasonably satisfactory to the FILO Documentation Agent); *provided further* that, during such three (3) Business Day period, Credit Extensions hereunder shall be subject to the Borrowing Base (including after giving effect to any new or increased FILO Deficiency Reserve) as if such new or modified Availability Reserves were given effect; *provided further* that no such prior notice shall be required for changes to any Availability Reserves

resulting solely by virtue of mathematical calculations of the amount of the Availability Reserve in accordance with the methodology of calculation previously utilized (such as, but not limited to, rent and Customer Credit Liabilities) or if an Event of Default is continuing.

"*FILO Credit Card Advance Rate*" means 10%; *provided*, that such advance rate shall be reduced by 2.5% (i.e., from 10% to 7.5%) at all times when Excess Availability (calculated without giving effect to such reduction or any corresponding reduction under any other component of the FILO Borrowing Base) is less than 20% of the Global Borrowing Base.

"*FILO Deficiency Reserve*" means, at any time, a reserve maintained against the Borrowing Base established by the Administrative Agent (subject to *Section 2.19(a)*) in the amount, if any, by which the then outstanding principal amount of the FILO Loans (excluding, for this purpose, any portion of the FILO Prepayment Premium capitalized to such principal) exceeds the FILO Borrowing Base at such time.

"*FILO Deficiency Reserve Correction Notice*" has the meaning specified in *Section 2.19(a)*.

"*FILO Documentation Agent*" has the meaning specified in the preamble to this Agreement.

"*FILO Facility*" means the term loan facility under this Agreement comprised of FILO Loans.

"*FILO Fee Letter*" means the Amended and Restated FILO Fee Letter dated as of the Second Restatement Date, between the Borrower and the FILO Documentation Agent, as amended and in effect from time to time.

"*FILO In-Transit Advance Rate*" means (a) during the period from September 1, 2024 through and including November 30, 2024, 12.5% and (b) at all other times, 15%; *provided*, in each case, that such applicable advance rate shall be reduced by 2.5% (i.e., from 12.5% to 10%, or from 15% to 12.5%, as applicable) at all times when Excess Availability (calculated without giving effect to such reduction or any corresponding reduction under any other component of the FILO Borrowing Base) is less than 20% of the Global Borrowing Base.

"*FILO Inventory Advance Rate*" means (a) during the period from September 1, 2024 through and including November 30, 2024, 17.5% and (b) at all other times, 20%; *provided*, in each case, that such applicable advance rate shall be reduced by 2.5% (i.e., from 17.5% to 15%, or from 20% to 17.5%, as applicable) at all times when Excess Availability (calculated without giving effect to such reduction or any corresponding reduction under any other component of the FILO Borrowing Base) is less than 20% of the Global Borrowing Base.

"*FILO Lender*" means each Lender that holds a FILO Loan.

"*FILO Letter of Credit Advance Rate*" means 15%; *provided*, that such advance rate shall be reduced by 2.5% (i.e., from 15% to 12.5%) at all times when Excess Availability (calculated without giving effect to such reduction or any corresponding reduction under any other component of the FILO Borrowing Base) is less than 20% of the Global Borrowing Base.

"*FILO Loan*" has the meaning specified in *Section 2.1(d)*.

"*FILO Maturity Date*" means the earliest of (a) the Scheduled Termination Date, (b) the Revolving Credit Termination Date and (c) the date on which the Obligations become due and payable pursuant to *Section 10.2*.

"*FILO Note*" means a promissory note of the Borrower payable to the order of any FILO Lender evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the FILO Loan owing to such Lender.

"*FILO Obligations*" means all Obligations with respect to any FILO Loan (including the FILO Prepayment Premium, if applicable) or otherwise payable to any FILO Secured Party or otherwise in respect of the FILO Facility.

"*FILO Prepayment Premium*" has the meaning specified in the FILO Fee Letter.

"*FILO Secured Parties*" means, collectively, the FILO Documentation Agent and the FILO Lenders.

"*FILO Specified Event of Default*" means (a) an Event of Default under *Section 10.1(a)* with respect to the FILO Loans or any other FILO Obligations, (b) an Event of Default under *Section 10.1(a)* with respect to the Revolving Obligations as a result of failure of the Borrower to pay all such Obligations then due and owing on the Revolving Credit Termination Date, (c) an Event of Default under *Section 10.1(b)(i)*, but only to the extent such Event of Default arises from the Loan Parties' failure to comply with the provisions of *Section 6.1* or *Section 6.2*, as applicable, (d) an Event of Default under *Section 10.1(b)(iii)* or *10.1(b)(iv)*, but only to the extent such Event of Default arises from the Loan Parties' failure to comply with the provisions of *Section 7.4(a)* or *7.4(b)*, and (e) an Event of Default under *Section 10.1(b)(ii)*.  Each determination of whether a FILO Specified Event of Default has occurred and is continuing shall be made without giving effect to any waiver or modification of any such provision effected pursuant to the terms hereof without the consent of the FILO Documentation Agent.

"*FILO Standstill Period*" means the period commencing on the date of the Administrative Agent's and the Borrower's receipt of written notice from the FILO Documentation Agent that a FILO Specified Event of Default has occurred and is continuing and that the FILO Documentation Agent is requesting the Administrative Agent to accelerate the FILO Obligations or otherwise commence the enforcement of remedies, and ending on the date that is (a) thirty (30) days after receipt of such notice with respect to a FILO Specified Event of Default arising under *Section 10.1(a)* and (b) forty-five (45) days after such receipt of such notice with respect to any other FILO Specified Event of Default.

"*FILO Trade Receivables Advance Rate*" means the lesser of (a) 10% and (b) such other advance rate to be determined by the FILO Documentation Agent in its sole discretion; provided, that such advance rate shall be reduced by 2.5% (i.e., from 10% (or such lower advance rate) to 7.5% (or such lower advance rate minus 2.5 percentage points)) at all times when Excess Availability (calculated without giving effect to such reduction or any corresponding reduction under any other component of the FILO Borrowing Base) is less than 20% of the Global Borrowing Base.

"*Financial Asset*" has the meaning given to such term in Article 8 of the UCC.

"*Financial Statements*" means the financial statements of the Borrower and its Subsidiaries delivered in accordance with *Sections 7.1(a)* and *7.1(b)*.

"*Fiscal Quarter*" means a fiscal quarter of any Fiscal Year.

"*Fiscal Year*" means the fiscal year of the Borrower and its Subsidiaries ending on the Saturday closest to January 31 in the following calendar year.

"*Floor*" means a rate per annum equal to (a) with respect to the Revolving Obligations, 0.00%, and (b) with respect to the FILO Obligations, 1.50%.

"*Foreign Lender*" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"*Foreign Plan*" means any material employee benefit plan, program or agreement maintained or contributed to by, or entered into with, Parent, Holdings or any Subsidiary of Holdings with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"*Foreign Subsidiary*" means any direct or indirect Subsidiary that is not a Domestic Subsidiary.

"*Fronting Exposure*" means, at any time there is a Defaulting Lender, (a) with respect to an Issuer, such Defaulting Lender's Applicable Percentage of the outstanding Letter of Credit Obligations to the extent that such Defaulting Lender's Applicable Percentage of such outstanding Letter of Credit Obligations has not been reallocated pursuant to *Section 2.16(a)(iv)* or Cash Collateralized pursuant to *Section 2.16(c)*, and (b) with respect to the Swing Loan Lender, such Defaulting Lender's Applicable Percentage of Swing Loans to the extent that such Defaulting Lender's Applicable Percentage of Swing Loans has not been reallocated pursuant to *Section 2.16(a)(iv)* or Cash Collateralized pursuant to *Section 2.16(c)*.

"*Fund*" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"*GAAP*" means generally accepted accounting principles in the United States, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Second Restatement Date in GAAP or in the application thereof (including through the adoption of IFRS) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Requisite Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through the adoption of IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"*GB Consulting Agreements*" has the meaning specified in *Section 4.1(i)*.

"*Global Borrowing Base*" means, at any time of calculation, an amount equal to the sum of the Modified Borrowing Base plus the FILO Borrowing Base.

"*Governmental Authority*" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

DB1/ 145587008.11

US-DOCS\149610879.14

"*Granting Lender*" has the meaning specified in *Section 12.2(g)*.

"*Guarantee*" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or monetary other obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Second Restatement Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness for borrowed money). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"*Guarantors*" has the meaning specified in the definition of "Collateral and Guarantee Requirement". For avoidance of doubt, the Borrower may cause any Restricted Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Restricted Subsidiary to execute a joinder to the Guaranty in form and substance reasonably satisfactory to the Administrative Agent, and any such Restricted Subsidiary shall be a Guarantor hereunder for all purposes.

"*Guaranty*" means (a) the guaranty made by Holdings, Parent and the other Guarantors in favor of the Administrative Agent on behalf of the Secured Parties pursuant to *clause (b)* of the definition of "*Collateral and Guarantee Requirement*," substantially in the form of *Exhibit H*, and (b) each other guaranty and guaranty supplement delivered pursuant to *Section 8.11*.

"*Hazardous Materials*" means all explosive or radioactive substances or wastes, all substances, wastes, contaminants or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, and radon gas, regulated pursuant to any Environmental Law.

"*Hedge Bank*" means, as of any date of determination, (a) any Person that is a Revolving Credit Lender or an Affiliate of a Revolving Credit Lender on such date or (b) any Person who (i) was a Revolving Credit Lender or an Affiliate of a Revolving Credit Lender at the time the applicable Swap Contract was entered into and who is no longer a Revolving Credit Lender or an Affiliate of a Revolving Credit Lender, (ii) is, and at all times remains, in compliance with the provisions of Section 11.12(b)(i), and (iii) agrees in writing that the Agents and the other Secured Parties shall have no duty to such Person (other than the payment of any amounts to which such Person may be entitled under *Section 10.3* hereof and acknowledges that the Agents and the other Secured Parties may deal with the Loan Parties and the

Collateral as they deem appropriate (including the release of any Loan Party or all or any portion of the Collateral) without notice or consent from such Person, whether or not such action impairs the ability of such Person to be repaid the Secured Obligations under the Secured Hedge Agreements) and agrees to be bound by *Sections 11.12,* in each case such Person being a party to a Secured Hedge Agreement.

"*Holdings*" has the meaning specified in the preamble to this Agreement.

"*In-Transit Advance Rate*" means (a) during the period from September 1, 2024 through and including November 30, 2024, 92.5%, and (b) at all other times, 90%.

"*Incremental Amendment*" has the meaning specified in *Section 2.15(a)*.

"*Incremental Availability*" has the meaning specified in *Section 2.15(a)*.

"*Incremental Facility Effective Date*" has the meaning specified in *Section 2.15(a)*.

"*Indebtedness*" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business), to the extent that the same would be required to be shown as a long-term liability on the balance sheet for such Person prepared in accordance with GAAP;

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse, *provided* that if such Indebtedness has not been assumed by such Person, the amount of Indebtedness under this *clause (e)* shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby;

(f)    all Attributable Indebtedness;

(g)    all obligations of such Person in respect of Disqualified Equity Interests; and

(h)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, (x) the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt, (y) the amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date, and (z) loans and advances made by Loan Parties to Restricted Subsidiaries that are not Loan Parties which have a term not exceeding 364 days (inclusive of any roll over or extensions of terms) and which are made in the ordinary course of business shall not be deemed "Indebtedness" hereunder (except for purposes of Sections 9.2(c)(iv) and 9.3(d)). Notwithstanding the foregoing, Indebtedness will not include (1) contingent obligations incurred in the ordinary course of business unless and until such obligations are non-contingent, (2) earn-outs, purchase price holdbacks or similar obligations in connection with any Permitted Acquisition, (3) intercompany liabilities in the ordinary course of business, (4) Indebtedness of any direct or indirect parent company appearing on the balance sheet of such Person solely by reason of push down accounting under GAAP and (5) lease obligations other than in respect of a Capitalized Lease.

"*Indemnified Liabilities*" has the meaning specified in *Section 12.4*.

"*Indemnitees*" has the meaning specified in *Section 12.4*.

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"*Information*" has the meaning specified in *Section 12.17*.

"*Insolvency Increase Amount*" means, during any Insolvency Proceeding by or against a Loan Party, an amount equal to the result of (a) 5% of the Modified Borrowing Base, minus (b) any then outstanding Protective Advances made pursuant to *clause (b)* of the definition of Maximum Revolving Insolvency Amount (subject to the limitations set forth therein), whether such Protective Advance is made prior to or during such Insolvency Proceeding; *provided* that such result shall not be less than zero.

"*Insolvency Proceeding*" means any case or proceeding commenced by or against a Person under any state, federal, provincial, territorial or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code or any other Debtor Relief Law, (b) the appointment of a receiver, interim receiver, monitor, trustee, liquidator, administrator, conservator, custodian or other similar Person for such Person or any part of its property, including, in the case of any Lender, the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity, or (c) an assignment for the benefit of creditors, but excluding, for the avoidance of doubt, the Chapter 11 Cases.

"*Intellectual Property*" has the meaning specified in the Security Agreement.

"*Intellectual Property Security Agreements*" has the meaning specified in the Security Agreement.

"*Intercompany Subordination Agreement*" means an agreement executed by each Restricted Subsidiary of the Borrower, in substantially the form of *Exhibit L*.

"*Intercreditor Agreement*" means the intercreditor agreement dated as of the Second Restatement Date, among Holdings, Parent, the Borrower, the Subsidiary Guarantors, the Administrative Agent, the Collateral Agent and the Term Facility Administrative Agent, substantially in the form attached as *Exhibit K*, as amended, restated, supplemented or otherwise modified from time to time in accordance therewith and herewith.

"*Interest Period*" means, as to each Term SOFR Loan that is a Revolving Loan, the period commencing on the date such Term SOFR Loan is disbursed or converted to or continued as a Term SOFR Loan and ending on the date one, three or six months thereafter, as selected by the Borrower in its Notice of Borrowing; provided that:

(i)      any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(iii)    no Interest Period shall extend beyond the Revolving Credit Termination Date.

Notwithstanding anything to the contrary herein, in no event shall a FILO Loan be assigned an Interest Period.

"*Inventory*" has the meaning given to such term in Article 9 of the UCC.

"*Inventory Advance Rate*" means (a) during the period from September 1, 2024 through and including November 30, 2024, 92.5%, and (b) at all other times, 90%.

"*Inventory Appraisal*" has the meaning specified in *Section 7.4(c)*.

"*Inventory Reserves*" means (a) such reserves as may be established from time to time by the Administrative Agent or the FILO Documentation Agent, in its Permitted Discretion, with respect to changes in the determination of the saleability, at retail, of the Eligible Inventory or which reflect such other factors as negatively affect the market value of the Eligible Inventory, (b) Shrink Reserves, and (c) contra Inventory load.

"*Investment*" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Restricted Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on the Borrower's good faith estimate of the fair market value of such asset or

property at the time such Investment is made)), without adjustment for subsequent changes in the value of such Investment, net of any return representing a return of capital with respect to such Investment.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other nationally recognized statistical rating agency selected by the Borrower.

"*IP Rights*" has the meaning specified in *Section 5.15*.

"*IRS*" means the Internal Revenue Service of the United States.

"*ISDA Definitions*" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"*ISP*" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"*Issue*" means, with respect to any Letter of Credit, to issue, extend the expiry of, amend, renew or increase the maximum face amount (including by deleting or reducing any scheduled decrease in such maximum face amount) of, such Letter of Credit.  The terms "*Issued*", "*Issuing*" and "*Issuance*" shall have a corresponding meaning.

"*Issuer*" means Bank of America and each other Revolving Credit Lender or Affiliate of a Revolving Credit Lender that (a) is listed on the signature pages hereof as an "Issuer" or (b) hereafter becomes an Issuer with the approval of the Administrative Agent and the Borrower by agreeing pursuant to an agreement with and in form and substance satisfactory to the Administrative Agent and the Borrower to be bound by the terms hereof applicable to Issuers (and in the case of any resignation, subject to and in accordance with *Section 12.2(h)*).

"*Issuer Documents*" means, with respect to any Letter of Credit, the Letter of Credit Request, and any other document, agreement and instrument entered into by an Issuer and the Borrower (or any of its Subsidiaries) or in favor of such Issuer and relating to such Letter of Credit.

"*Junior Financing*" means any Indebtedness that is unsecured or subordinated to the Obligations expressly by its terms (other than Indebtedness among Holdings, Parent, the Borrower and its Restricted Subsidiaries).

"*Junior Financing Documentation*" means any documentation governing any Junior Financing.

"*KPI's*" has the meaning specified in *Section 2.18*.

"*L/C Credit Extension*" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"*Landlord Lien State*" means any state in which, at any time, a landlord's claim for rent has priority (notwithstanding any contractual provision to the contrary) by operation of applicable Law over the lien of the Collateral Agent in any of the Collateral.

DB1/ 145587008.11

US-DOCS\149610879.14

"*Latest Maturity Date*" means, at any date of determination, the latest Scheduled Termination Date applicable to any Loan or Revolving Credit Commitment hereunder at such time, including the latest termination date of any Extended Revolving Credit Commitment or New Revolving Credit Commitment, as applicable, as extended in accordance with this Agreement from time to time.

"*Laws*" means, collectively, all applicable international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"*Leases*" means, with respect to any Person, all of those leasehold estates in real property of such Person, as lessee, as such may be amended, supplemented or otherwise modified from time to time.

"*Lender*" means the Swing Loan Lender, each Revolving Credit Lender, each FILO Lender and each other financial institution or other entity that (a) is listed on the signature pages hereof as a "*Lender*" or (b) from time to time becomes a party hereto by execution of an Assignment and Assumption or, in connection with a Revolving Commitment Increase, an Incremental Amendment or, in connection with an Extended Revolving Credit Commitment or a New Revolving Credit Commitment, an Extension Amendment.

"*Lending Office*" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"*Letter of Credit*" means any Banker's Acceptance or any letter of credit Issued (or deemed Issued) pursuant to *Section 2.4*.  A Letter of Credit may be a Documentary Letter of Credit or a Standby Letter of Credit.

"*Letter of Credit Advance Rate*" means 90%.

"*Letter of Credit Borrowing*" means an extension of credit resulting from a drawing under any Letter of Credit that has not been reimbursed on the applicable Reimbursement Date or refinanced as a Revolving Loan.

"*Letter of Credit Fee*" has the meaning specified in *Section 2.12(b)*.

"*Letter of Credit Obligations*" means, at any time, the aggregate of all liabilities at such time of any Loan Party to all Issuers with respect to Letters of Credit, whether or not any such liability is contingent, including, without duplication, the sum of (a) the Reimbursement Obligations at such time and (b) the Letter of Credit Undrawn Amounts at such time.

"*Letter of Credit Reimbursement Agreement*" has the meaning specified in *clause (vi)* of the proviso to *clause (a)* of *Section 2.4*.

"*Letter of Credit Request*" has the meaning specified in *Section 2.4(c)*.

"*Letter of Credit Sublimit*" means $125,000,000, as such amount may be increased or reduced in accordance with the provisions of this Agreement.  The Letter of Credit Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"*Letter of Credit Undrawn Amounts*" means, at any time, the aggregate undrawn face amount of all Letters of Credit outstanding at such time.

"*Lien*" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); *provided*, that in no event shall an operating lease in and of itself be deemed a Lien.

"*Lien Acknowledgment Agreement*" means each Collateral Access Agreement and Customs Broker/Carrier Agreement.

"*Limited Condition Acquisition*" means any Investment or acquisition (whether by way of merger, amalgamation, consolidation or other business combination or the acquisition of Equity Interests or otherwise) by the Borrower or one or more of its Restricted Subsidiaries permitted by this Agreement whose consummation is not conditioned on the availability of, or on obtaining, third party acquisition financing and which is designated as a Limited Condition Acquisition by the Borrower or such Restricted Subsidiary in writing to the Administrative Agent on or before the Transaction Agreement Date.

"*Liquidation*" means the exercise by the Collateral Agent or the Administrative Agent of those rights and remedies accorded to the Collateral Agent or the Administrative Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Collateral Agent or the Administrative Agent, of any public, private or "going out of business" sale or other disposition of the Collateral for the purpose of liquidating the Collateral.  Derivations of the word "*Liquidation*" (such as "*Liquidate*") are used with like meaning in this Agreement.

"*Liquidity*" means, at any time of calculation, the amount of Excess Availability plus unrestricted cash of the Loan Parties; *provided that* Excess Availability (together with cash held in the Segregated Cash Collateral Account (as such term is defined in the DIP Order) shall comprise not less than $40,000,000 of such calculation; and provided further that the amount of any cash held in the Segregated Cash Collateral Account (as such term is defined in the DIP Order) shall not be duplicative of unrestricted cash used in such calculation.

"*Loan*" means any loan made by any Lender pursuant to this Agreement, including, without limitation, Revolving Loans, FILO Loans, Swing Loans and any Loans made in respect of any Revolving Commitment Increase.

"*Loan Documents*" means, collectively, this Agreement, the Revolving Credit Notes, the FILO Notes, any Incremental Amendment and any Extension Amendment, the Guaranty, the Fee Letter, the FILO Fee Letter, each Letter of Credit Reimbursement Agreement, the Collateral Documents, the Issuer Documents, the Ratification Agreement and each certificate, agreement or document executed by a Loan Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

"*Loan Parties*" means, collectively, (a) Holdings, (b) Parent, (c) the Borrower and (d) each other Guarantor.

"*Margin Stock*" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Master Agreement*" has the meaning specified in the definition of "*Swap Contract*."

"*Material Adverse Effect*" means any event, circumstance or condition that has had a materially adverse effect on (a) the business, operations, assets, liabilities (actual or contingent) or financial condition of Parent and its Subsidiaries, taken as a whole, other than, in each case, customary events or circumstances which resulted from the commencement of the Chapter 11 Cases, (b) the ability of the Loan Parties (taken as a whole) to perform their respective material payment obligations under any Loan Document to which any of the Loan Parties is a party or (c) the rights and remedies of the Lenders, the Collateral Agent, the Administrative Agent and the FILO Documentation Agent (taken as a whole, collectively, for the Lenders and all such Agents) under the Loan Documents (taken as a whole).

"*Material Bank Accounts*" has the meaning specified in *Section 8.12*.

"*Material Domestic Subsidiary*" means, at any date of determination, each of the Borrower's Domestic Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the Consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Second Restatement Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in *clauses (a)* or *(b)* comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended Fiscal Quarter of the Borrower or more than 5.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for the period of four consecutive Fiscal Quarters ending as of the last day of such Fiscal Quarter, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement (or such longer period as may be agreed by the Administrative Agent in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of *Sections 8.11*, *8.12* and *8.13* applicable to such Subsidiary. Notwithstanding anything to the contrary herein contained, the Borrower may, at any time, designate (by written notice to the Administrative Agent) a Subsidiary which would not otherwise constitute a "Material Domestic Subsidiary" as such a Material Domestic Subsidiary and shall thereupon comply with the provisions of *Sections 8.11*, *8.12* and *8.13* applicable to such Subsidiary.

"*Material Foreign Subsidiary*" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the Consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP.

"*Material Indebtedness*" means Indebtedness having an aggregate outstanding principal amount of $45,000,000 or more.

"*Material Subsidiary*" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"*Maximum Credit*" means, at any time, the lesser of (i) the Revolving Credit Commitments in effect at such time and (ii) the Borrowing Base at such time.

"*Maximum Rate*" has the meaning specified in *Section 12.24*.

"*Maximum Revolving Insolvency Amount*" means an amount equal to the sum of (a) the Borrowing Base, plus (b) Protective Advances (subject to the aggregate cap thereon in the definition of "Protective Advances"), plus (c) in addition to the Protective Advances described in the foregoing *clause (b)*, Protective Advances (without regard to the aggregate cap thereon in the definition of "Protective Advances") in an aggregate amount equal to the sum of (i) the aggregate amount required to fund payroll of the Loan Parties and their Subsidiaries for a two-week period and (ii) rent and charges at the Loan Parties' distribution centers and warehouses for a one-month period, plus (d) all then outstanding Unintentional Overadvances, plus (e) the Insolvency Increase Amount, plus (f) the amount of Revolving Loans (including loans made pursuant to a Post-Petition Financing that is a Conforming Post-Petition Financing) to fund the Carve Out.

"*Modified Borrowing Base*" means the Borrowing Base (calculated without giving effect to any FILO Deficiency Reserves).

"*Modified Maximum Credit*" means, at any time, the lesser of (i) the Revolving Credit Commitments in effect at such time and (ii) the Modified Borrowing Base at such time.

"*Monthly Borrowing Base Certificate*" shall have the meaning specified in *Section 7.4(a)*.

"*Moody's*" means Moody's Investors Service, Inc. and any successor thereto.

"*Multiemployer Plan*" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years has made or been obligated to make contributions.

"*Net Cash Proceeds*" means:

(a)    with respect to the Disposition of any asset by the Borrower or any of the Restricted Subsidiaries, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition (including any cash and Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition and that is required to be repaid in connection with such Disposition (other than Indebtedness under the Loan Documents or the Term Facility Documentation or any Permitted Refinancing of the Indebtedness under the Term Facility Documentation), (B) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred by the Borrower or such Restricted Subsidiary in connection with such Disposition, (C) in the case of any Disposition by a non-wholly owned Restricted Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (C)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Restricted Subsidiary as a result thereof, (D) taxes or distributions made pursuant to *Section 9.6(g)(i)* or *(g)(iii)* paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Net Cash Proceeds), *provided* that to the extent

DB1/ 145587008.11

US-DOCS\149610879.14

that the actual taxes are less than such estimate, the excess shall constitute Net Cash Proceeds, and (E) any funded reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (E); *provided* that, so long as no Cash Dominion Period has occurred and is continuing hereunder, no net cash proceeds calculated in accordance with the foregoing realized in any fiscal year shall constitute Net Cash Proceeds under this *clause (a)* in such fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $10,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Cash Proceeds under this *clause (a)*); and

(b)    (i) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary or any Permitted Equity Issuance by the Borrower, the excess, if any, of (A) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (B) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance and (ii) with respect to any Permitted Equity Issuance by any direct or indirect parent of the Borrower, the amount of cash from such Permitted Equity Issuance contributed to the capital of the Borrower.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"*Net Leverage Ratio*" means, with respect to any Test Period, the ratio of (a) Consolidated Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA of the Borrower for such Test Period.

"*Net Recovery Percentage*" means the fraction, expressed as a percentage, (a) the numerator of which is the amount equal to the recovery on the aggregate amount of the Inventory at such time on a "going out of business sale" basis as set forth in the most recent appraisal of Inventory received by the Administrative Agent and the FILO Documentation Agent in accordance with *Section 7.4*, net of operating expenses, liquidation expenses and commissions, and (b) the denominator of which is the applicable original cost of the aggregate amount of the Inventory subject to appraisal.  The Net Recovery Percentage for any category of Inventory used in determining the Borrowing Base and the FILO Borrowing Base shall be based on the applicable percentage in the most recent appraisal conducted as set forth in *Section 7.4*.

"*New Revolving Commitment Lenders*" has the meaning specified in *Section 2.17(c)*.

"*New Revolving Credit Commitments*" has the meaning specified in *Section 2.17(c)*.

"*Non-Consenting Lender*" has the meaning specified in *Section 3.7*.

"*Non-Excluded Taxes*" means all Taxes other than Excluded Taxes and Other Taxes.

"*Non-Loan Party*" means any Subsidiary of the Borrower that is not a Loan Party.

"*Notice of Borrowing*" has the meaning specified in *Section 2.2*.

"*Notice of Conversion or Continuation*" has the meaning specified in *Section 2.11(a)*.

"*Obligations*" means all (a) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, (b) obligations of any Loan Party arising under any Secured Hedge Agreement, (c) Cash Management Obligations, and (d) Bank Product Obligations.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and any of their Subsidiaries to the extent they have obligations under the Loan Documents) include the obligation (including guarantee obligations) to pay principal, interest, Letter of Credit, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document; *provided* that Obligations of a Loan Party shall exclude any Excluded Swap Obligations with respect to such Loan Party.

"*OFAC*" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"*OID*" means original issue discount.

"*Other Taxes*" means any and all present or future stamp or documentary Taxes or any other excise or property Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document excluding, in each case, any such tax that result from an Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (an "Assignment Tax"), but only if (1) such Assignment Tax is imposed as a result of a present or former connection of the assignor or assignee and the jurisdiction imposing such Assignment Tax (other than a connection arising solely from such recipient having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction specifically contemplated by, or enforced, any Loan Documents) and (2) the assignment, participation, etc., giving rise to such Assignment Tax did not take place at the request of the Borrower.

"*Outstanding Amount*" means (a) with respect to the Revolving Loans and Swing Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Loans (including any refinancing of Letter of Credit Obligations as a Revolving Loan) and Swing Loans, as the case may be, occurring on such date; and (b) with respect to any Letter of Credit Obligations on any date, the amount of such Letter of Credit Obligations on such date after giving effect to any related extension of any Letter of Credit occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding Letter of Credit Obligations (including any refinancing of outstanding Letter of Credit Obligations under related Letters of Credit or related extensions of any Letters of Credit as a Revolving Loan) or any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"*Overadvance*" means a Credit Extension to the extent that, immediately after its having been made, Excess Availability is less than zero.

"*Overnight Rate*" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent, an Issuer, or the Swing Loan Lender, as applicable, in accordance with banking industry rules on interbank compensation.

"*Parent*" has the meaning specified in the preamble to this Agreement.

"*Parent Entity*" has the meaning specified in Section 7.1.

"*Participant*" has the meaning specified in *Section 12.2(d)*.

"*Participant Register*" has the meaning specified in *Section 12.2(e)*.

"*Payment Conditions*" means, at any time of determination, (a) with respect to any Permitted Acquisition or Specified Payment under clause (i) of the definition thereof, that (x) no Event of Default exists or would arise as a result of the making of the subject Specified Payment or Permitted Acquisition, as the case may be, and (y) after giving Pro Forma Effect to such Specified Payment or Permitted Acquisition, as the case may be, and for the six-month period immediately preceding such Specified Payment or Permitted Acquisition, as the case may be and on a projected basis for the six-month period immediately following such Specified Payment or Permitted Acquisition, as the case may be, Excess Availability shall be greater than the greater of (A) 15% of the Modified Maximum Credit and (B) $75,000,000 and (b) with respect to any Specified Payment under clause (ii) of the definition thereof, that (x) no Event of Default exists or would arise as a result of the making of the subject Specified Payment and (y) after giving Pro Forma Effect to such Specified Payment, and for the six-month period immediately preceding such Specified Payment and on a projected basis for the six-month period immediately following such Specified Payment, Excess Availability shall be greater than the greater of (A) 25% of the Modified Maximum Credit and (B) $112,000,000.  In each case with respect to the above conditions, the Borrower shall have delivered in accordance with *Section 7.2(f)* hereof, to the Administrative Agent evidence reasonably satisfactory to the Administrative Agent that the conditions in the foregoing clauses *(a)* and *(b)*, as applicable, have been satisfied.

"*PBGC*" means the Pension Benefit Guaranty Corporation or any successor thereto.

"*Pension Plan*" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions in the preceding five plan years.

"*Permitted Acquisition*" means the purchase or other acquisition by Holdings or any of its Restricted Subsidiaries of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, a Store or Equity Interests in a Person that, upon the consummation thereof, will be a wholly owned Restricted Subsidiary of the Borrower (including as a result of a merger or consolidation); *provided* that, with respect to each such purchase or other acquisition:

(i)        the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and each applicable Loan Party and any newly created or acquired Subsidiary (and, to the extent required under the Collateral and Guarantee Requirement, the Subsidiaries of such created or acquired Subsidiary) shall be Guarantors, except for any (A) Foreign Subsidiary or (B) Domestic Subsidiaries up to an acquisition amount not to exceed the greater of (i) $55,000,000 and (ii) 2.50% of

Total Assets in the aggregate for all such Domestic Subsidiaries, and shall have complied with the requirements of *Section 8.11, 8.12* and *8.13*, within the times specified therein (for the avoidance of doubt, this *clause (i)* shall not override any provisions of the Collateral and Guarantee Requirement); *provided* that the formation of any Subsidiary that is a Division Successor shall be deemed to constitute the acquisition of a Restricted Subsidiary for all purposes of this definition;

(ii)       the Borrower shall have delivered to the Administrative Agent, on behalf of the Lenders, no later than five (5) Business Days before the date on which any such purchase or other acquisition is consummated, a certificate of a Responsible Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying that all of the requirements set forth in this definition have been satisfied or will be satisfied on or prior to the consummation of such purchase or other acquisition; and

(iii)      the Borrower is in compliance, on a pro forma basis after giving effect to such transaction, with the Payment Conditions.

"*Permitted Discretion*" means a determination made by the Administrative Agent, the FILO Documentation Agent or the Collateral Agent (as applicable) in good faith in the exercise of its reasonable (from the perspective of an asset-based lender) business judgment.

"*Permitted Equity Issuance*" means any sale or issuance of any Qualified Equity Interests of the Borrower or any direct or indirect parent of the Borrower, in each case to the extent permitted hereunder.

"*Permitted Holder*" means any of (a) each beneficial owner in the common equity of Parent as of the Second Restatement Date as set forth on a schedule delivered to the Administrative Agent and the FILO Documentation Agent on or prior to the Second Restatement Date, (b) any of the Controlled Affiliates (excluding any portfolio companies or of any of their Controlled Affiliates) of any of the Persons specified in *clause (a)* above and (c) any "group" within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act (or any successor provision) of which any of the foregoing are members; *provided* that in the case of such "group" and without giving effect to the existence of such "group" or any other "group", such Persons specified in *clauses (a)* and *(b)* above, individually or collectively, have beneficial ownership, directly or indirectly, of more than 50% of the total voting power of the voting stock of Parent or any of its direct or indirect parent entities held by such "group".

"*Permitted Refinancing*" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium (including tender premiums) thereon plus fees and expenses (including upfront fees and OID) reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to *Sections 9.3(b)* and *(e)*, such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) [reserved], (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment to the Obligations, (i) such modification, refinancing, refunding, renewal, replacement or extension shall be subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (ii) the terms and conditions (excluding as to subordination, pricing,

premiums and optional prepayment or redemption provisions) of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, are not materially less favorable to the Loan Parties or the Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended; *provided* that a certificate of a Responsible Officer of the Borrower delivered to the Administrative Agent at least five (5) Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees) and (iii) such modification, refinancing, refunding, renewal or extension is incurred by the Person who is the obligor of the Indebtedness being modified, refinanced, refunded, renewed or extended and no additional obligors become liable for such Indebtedness, and (e) in the case of any Permitted Refinancing in respect of the Term Facility, such Permitted Refinancing is secured only by assets pursuant to one or more security agreements permitted by and subject to the Intercreditor Agreement (or another intercreditor agreement containing terms that are at least as favorable to the Secured Parties as those contained in the Intercreditor Agreement).

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"*Petition Date*" has the meaning specified in the preliminary statements of this Agreement.

"*Plan*" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"*Platform*" has the meaning specified in *Section 7.2*.

"*Pledged Debt*" has the meaning specified in the Security Agreement.

"*Pledged Equity*" has the meaning specified in the Security Agreement.

"*Post-Petition Financing*" means, in connection with any Insolvency Proceeding with respect to a Loan Party, the consensual use of cash collateral by, or the provision of financing or financial accommodations to, such Loan Party (including, in either event, all of the terms and conditions established and/or approved in connection with the consensual use of cash collateral, financing or financial accommodations).

"*Pro Forma Basis*" and "*Pro Forma Effect*" mean, with respect to compliance with any test or covenant or calculation hereunder, or the calculation of Consolidated EBITDA hereunder, the determination or calculation of such test, covenant, ratio or Consolidated EBITDA (including in connection with Specified Transactions) in accordance with *Section 1.8*.

"*Proceeds*" has the meaning given to such term in Article 9 of the UCC.

"*Projections*" shall have the meaning specified in *Section 7.1(d)*.

"*Protective Advances*" means an Overadvance made or deemed to exist by the Administrative Agent, in its discretion, which:

(a)      is made to maintain, protect or preserve the Collateral and/or the Loan Parties' rights under the Loan Documents or which is otherwise for the benefit of the Loan Parties; or

(b)      is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; or

(c)      is made to pay any other amount chargeable to any Loan Party hereunder; and

(d)      together with all other Protective Advances then outstanding, shall not (i) exceed the greater of five percent (5%) of the Modified Borrowing Base and $20,000,000 at any time or (ii) unless a Liquidation is taking place, remain outstanding for more than forty-five (45) consecutive Business Days, unless in each case, the Requisite Revolving Credit Lenders and the FILO Documentation Agent otherwise agree;

*provided however*, that the foregoing shall not (i) modify or abrogate any of the provisions regarding the Revolving Credit Lenders' obligations with respect to Letters of Credit or with respect to Swing Loans, or (ii) result in any claim or liability against the Administrative Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances, and such Unintentional Overadvances shall not reduce the amount of Protective Advances allowed hereunder.

"*PTE*" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"*Public Lender*" has the meaning specified in *Section 7.2*.

"*Purchase Date*" has the meaning specified in *Section 10.12(a)*.

"*Purchase Notice*" has the meaning specified in *Section 10.12(a)*.

"*Purchase Option Event*" means the occurrence of any of the following: (a) the Administrative Agent shall notify the FILO Documentation Agent of its intention to (by itself or at the direction of the Requisite Lenders) sell, lease or otherwise dispose of all or substantially all of the Collateral whether by private or public sale or to release any Loan Party from its Obligations under this Agreement, in each case in accordance with the last paragraph of *Section 12.1*, (b) the Administrative Agent shall consent to any Liquidation of all or substantially all of the Current Asset Collateral (or if any such Liquidation is otherwise commenced or is the subject of a binding agreement among any Loan Party and a liquidator), (c) any FILO Specified Event of Default shall occur, (d) any Event of Default under *Section 10.1(f)* shall occur, (e) any Event of Default under *Section 10.1(b)(i)* shall occur, but only to the extent (x) such Event of Default arises from the Loan Parties' failure to comply with the provisions of *Section 9.1*, *Section 9.3*, *Section 9.4* or *Section 9.5* (in each case, as in effect on the Second Restatement Date) and (y) such Event of Default has not been waived or cured within thirty (30) days, (f) any Event of Default under *Section 10.1(b)(v)* shall occur, but only to the extent (x) such Event of Default arises from the Loan Parties' failure to comply with the provisions of *Section 7.4(c)* or *(d)* and (y) such Event of Default has not been waived or cured within thirty (30) days, or (g) any assignment by the Revolving Credit Lenders, after giving effect to which more than twenty-five percent (25%) of the aggregate Revolving Credit Exposure will be held by one or more Persons (together with each such Person's Affiliates and Approved Funds with respect to such Person) that is not a financial institution regulated by the Federal Reserve Board.  The Administrative Agent shall endeavor to notify the FILO Documentation Agent of any Purchase Option Event arising under the foregoing *clause (b)* or *clause (g)*.

"*Purchasing Creditors*" has the meaning specified in *Section 10.12(a)*.

"*QFC*" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"*QFC Credit Support*" has the meaning specified in *Section 12.30*.

"*Qualified ECP Guarantor*" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"*Qualified Equity Interests*" means any Equity Interests that are not Disqualified Equity Interests.

"*Qualified Holding Company Debt*" means unsecured Indebtedness of Parent or Holdings (A) that is not subject to any Guarantee by any Subsidiary of Holdings, (B) that will not mature prior to the date that is six (6) months after the Latest Maturity Date in effect on the date of issuance or incurrence thereof, (C) that has no scheduled amortization of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (E) below), (D) that does not require any payments in cash of interest or other amounts in respect of the principal thereof prior to the earlier to occur of (1) the date that is four (4) years from the date of the issuance or incurrence thereof and (2) the date that is ninety-one (91) days after the Latest Maturity Date in effect on the date of such issuance or incurrence, and (E) that has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior discount notes of an issuer that is the parent of a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy provisions, no more restrictive (taken as a whole) than those set forth in this Agreement (other than provisions customary for senior discount notes of a holding company); *provided* that the Borrower shall have delivered a certificate of a Responsible Officer to the Administrative Agent at least five (5) Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement (and such certificate shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five (5) Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees)); *provided further* that any such Indebtedness shall constitute Qualified Holding Company Debt only if immediately after giving effect to the issuance or incurrence thereof and the use of proceeds thereof, no Event of Default shall have occurred and be continuing.

"*Quarterly Financial Statements*" means the unaudited Consolidated balance sheets and related statements of income, and cash flows of the Borrower and its Subsidiaries for the most recent Fiscal Quarter ended October 28, 2023.

"*Ratable Portion*", "*Pro Rata Share*", "*ratable share*" or (other than in the expression "equally and ratably") "*ratably*" means (a) with respect to any Revolving Credit Lender, the percentage obtained by dividing (i) the Revolving Credit Commitment of such Class of such Lender by (ii) the aggregate Revolving Credit Commitments of all Lenders of such Class (or, at any time after the Revolving Credit Termination Date, the percentage obtained by dividing the aggregate outstanding principal balance of the Revolving Credit Outstandings of such Class owing to such Lender by the

aggregate outstanding principal balance of the Revolving Credit Outstandings owing to all Lenders of such Class) and (b) with respect to any FILO Lender, the percentage obtained by dividing (i) the aggregate outstanding principal balance of the FILO Loans owing to such Lender by (ii) the aggregate outstanding principal balance of the FILO Loans owing to all FILO Lenders.

"*Ratification Agreement*" means the Confirmation and Ratification Agreement dated as of the Second Restatement Date by and among the Loan Parties and the Administrative Agent.

"*Receivables Reserves*" means such Reserves as may be established from time to time by the Administrative Agent (or, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) in its Permitted Discretion with respect to the determination of the collectability in the ordinary course of Eligible Trade Receivables, including, without limitation, Dilution Reserves.

"*Recovery*" has the meaning specified in *Section 10.8*.

"*Register*" has the meaning specified in *Section 12.2(c)*.

"*Reimbursement Date*" has the meaning specified in *Section 2.4(h)*.

"*Reimbursement Obligations*" means, as and when matured, the obligation of any Loan Party to pay, on the date payment is made or scheduled to be made to the beneficiary under each such Letter of Credit (or at such other date as may be specified in the applicable Letter of Credit Reimbursement Agreement) and in the currency drawn (or in such other currency as may be specified in the applicable Letter of Credit Reimbursement Agreement), all amounts of each drafts and other requests for payments drawn under Letters of Credit, and all other matured reimbursement or repayment obligations of any Loan Party to any Issuer with respect to amounts drawn under Letters of Credit.

"*Related Indemnified Person*" of an Indemnitee means (a) any controlling person or controlled affiliate of such Indemnitee, (b) the respective directors, officers, or employees of such Indemnitee or any of its controlling persons or controlled affiliates and (c) the respective agents of such Indemnitee or any of its controlling persons or controlled affiliates, in the case of this *clause (c)*, acting at the instructions of such Indemnitee, controlling person or such controlled affiliate; *provided* that each reference to a controlled affiliate or controlling person in this definition shall pertain to a controlled affiliate or controlling person involved in the negotiation or syndication of any Revolving Facility, the FILO Facility, the Term Facility or any Junior Financing.

"*Related Parties*" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"*Reportable Event*" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"*Requisite Lenders*" means, collectively, Lenders having more than fifty percent (50%) of the sum of (a) the aggregate outstanding amount of the Revolving Credit Commitments (or, after the Revolving Credit Termination Date, the aggregate Revolving Credit Outstandings) plus (b) the aggregate outstanding principal amount of the FILO Loans; *provided* that the unused Revolving Credit Commitment of, and the portion of the Revolving Loans and outstanding Letters of Credit held or deemed held by, any Defaulting Lender or Disqualified Institution shall be excluded for purposes of making a determination of

Requisite Lenders; *provided further* that for purposes of determining any consent, request, direction or other action of Requisite Lenders, such consent, request, direction or other action of the FILO Documentation Agent shall be binding upon and deemed to be a consent, request, direction or other action of each FILO Lender.

"*Requisite Revolving Credit Lenders*" means, collectively, Revolving Credit Lenders having more than fifty percent (50%) of the aggregate outstanding amount of the Revolving Credit Commitments (or, after the Revolving Credit Termination Date, the aggregate Revolving Credit Outstandings); *provided* that the unused Revolving Credit Commitment of, and the portion of the Revolving Loans and outstanding Letters of Credit held or deemed held by, any Defaulting Lender or Disqualified Institution shall be excluded for purposes of making a determination of Requisite Revolving Credit Lenders.

"*Rescindable Amount*" has the meaning specified in *Section 2.13(e)*.

"*Resolution Authority*" an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" means the chief executive officer, president, chief financial officer, treasurer or controller of a Loan Party, solely for purposes of the delivery of incumbency certificates, the secretary or any assistant secretary of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"*Restricted Payment*" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any of its Restricted Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or Holdings' stockholders, partners or members (or the equivalent Persons thereof) other than (i) the payment of compensation in the ordinary course of business to holders of any such Equity Interests who are employees or service providers of Holdings (or any direct or indirect parent thereof) or any Subsidiary solely in their capacity as employees or service providers and (ii) other than payments of intercompany indebtedness permitted under this Agreement, unless such payments are made in the form of dividends or other distributions that would otherwise be classified as Restricted Payments hereunder.

"*Restricted Subsidiary*" means any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"*Revolving Commitment Increase*" has the meaning specified in *Section 2.15(a)*.

"*Revolving Commitment Increase Lender*" has the meaning specified in *Section 2.15(a)*.

"*Revolving Credit Commitment*" means, with respect to each Revolving Credit Lender, the commitment of such Lender to make Revolving Loans and acquire interests in other Revolving Credit Outstandings expressed as an amount representing the maximum principal amount of the Revolving

Loans to be made by such Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to this Agreement and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Lender pursuant to an Assignment and Assumption, (ii) a Revolving Commitment Increase, (iii) a New Revolving Credit Commitment or (iv) an Extension.  The initial amount of each Revolving Credit Lender's Revolving Credit Commitment is set forth on *Schedule I* under the caption "*Revolving Credit Commitment*," as amended to reflect each Assignment and Assumption, Incremental Amendment or Extension Amendment, in each case executed by such Lender.  The aggregate amount of the Revolving Credit Commitments as of the Second Restatement Date is $500,000,000.

"*Revolving Credit Exposure*" means, as to each Revolving Credit Lender, the sum of the Outstanding Amount of such Lender's Revolving Loans (including any Protective Advances), its Pro Rata Share of the Letter of Credit Obligations and its Pro Rata Share of the Swing Loan Obligations at such time.

"*Revolving Credit Lender*" means each Lender that (a) has a Revolving Credit Commitment, (b) holds a Revolving Loan or (c) participates in any Letter of Credit.

"*Revolving Credit Note*" means a promissory note of the Borrower payable to the order of any Revolving Credit Lender in a principal amount equal to the amount of such Lender's Revolving Credit Commitment evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Revolving Loans of a given Class owing to such Lender.

"*Revolving Credit Outstandings*" means, at any particular time, the sum of (a) the principal amount of the Loans (other than FILO Loans) outstanding at such time, (b) the Letter of Credit Obligations outstanding at such time and (c) the principal amount of the Swing Loans outstanding at such time.

"*Revolving Credit Termination Date*" means the earliest of (a) the Scheduled Termination Date, (b) the date of termination of all of the Revolving Credit Commitments pursuant to *Section 2.5* and (c) the date on which the Obligations become due and payable pursuant to *Section 10.2*.

"*Revolving Facility*" means the Revolving Credit Commitments and the provisions herein related to the Revolving Loans, Swing Loans and Letters of Credit, Loans under Extended Revolving Credit Commitments and Loans under New Revolving Credit Commitments.

"*Revolving Loan*" has the meaning specified in *Section 2.1(a)*.

"*Revolving Obligations*" means all Obligations other than FILO Obligations.

"*Revolving Secured Parties*" means all Secured Parties other than the FILO Secured Parties.

"*S&P*" means Standard & Poor's Rating Services and any successor thereto.

"*Sale Event*" has the meaning specified in *Section 10.2(c)*.

"*Same Day Funds*" means disbursements and payments in immediately available funds.

"*Sanctioned Person*" has the meaning specified in *Section 5.17*.

"*Sanctions*" means any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, His Majesty's Treasury ("*HMT*") or other relevant sanctions authority.

"*Scheduled Termination Date*" means June 22, 2027, as such date may be extended (solely with respect to the extending Class) pursuant to *Section 12.1(b)* or *Section 2.17*, *provided* that, in each case, if such day is not a Business Day, the Scheduled Termination Date shall be the Business Day immediately preceding such day.

"*Scheduled Unavailability Date*" has the meaning specified in *Section 3.3(b)*.

"*SEC*" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"*Second Restatement Date*" means April 30, 2024, being the first date all the conditions precedent in *Section 4.1* were satisfied or waived in accordance with *Section 12.1*.

"*Second Restatement Transactions*" means, collectively, the entry of the Confirmation Order, the transactions contemplated by the Approved Plan, the funding (or deemed funding) of the Loans and issuance (or deemed issuance) of the Letters of Credit under this Agreement on the Second Restatement Date, the funding (or deemed funding) of the loans under the Term Facility on the Second Restatement Date, the consummation of the other transactions contemplated by this Agreement, the Term Facility Documentation, the Approved Plan or the Confirmation Order, the consummation of any other transactions in connection with the foregoing and the payment of the fees and expenses incurred in connection with any of the foregoing.

"*Secured Bank Product Agreement*" means any Bank Product Agreement that is entered into by and between any Loan Party and any Bank Product Bank.

"*Secured Cash Management Agreement*" means any Cash Management Agreement that is entered into by and between any Loan Party and any Cash Management Bank.

"*Secured Hedge Agreement*" means any Swap Contract permitted under *Section 9.3(f)* that is entered into by and between any Loan Party and any Hedge Bank and designated in writing by the Hedge Bank and the Borrower to the Administrative Agent as a "*Secured Hedge Agreement*."

"*Secured Obligations*" means, in the case of the Borrower, the Obligations and, in the case of any other Loan Party, the obligations of such Loan Party under the Guaranty and the other Loan Documents to which it is a party.

"*Secured Parties*" means, collectively, the Lenders, the Issuers, the Administrative Agent, the Collateral Agent, the FILO Documentation Agent, each Hedge Bank, each Cash Management Bank, each Bank Product Bank and each co-agent or sub-agent (if any) appointed by the Administrative Agent from time to time pursuant to *Section 11.5*.

"*Securities Account*" means all securities accounts of any Loan Party, including "securities accounts" within the meaning given to such term in Article 8 of the UCC.

"*Securities Account Control Agreement*" means an effective securities account control agreement with an Approved Securities Intermediary, in each case in form and substance reasonably satisfactory to the Administrative Agent.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Security*" means any Equity Interest, voting trust certificate, bond, debenture, note or other evidence of Indebtedness, whether secured, unsecured, convertible or subordinated, or any certificate of interest, share or participation in, any temporary or interim certificate for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, but shall not include any evidence of the Obligations.

"*Security Agreement*" means, collectively, the Amended and Restated Security Agreement executed by the Loan Parties, substantially in the form of *Exhibit I*, together with each Security Agreement Supplement executed and delivered pursuant to *Section 8.11*.

"*Security Agreement Supplement*" has the meaning specified in the Security Agreement.

"*Shrink Reserve*" means an amount reasonably estimated by the Administrative Agent or the FILO Documentation Agent to be equal to that amount which is required in order that the shrink reflected in current books and records of the Borrower and its Restricted Subsidiaries would be reasonably equivalent to the shrink calculated as part of the Borrower's and its Restricted Subsidiaries most recent physical Inventory (it being understood and agreed that no Shrink Reserve established by the Administrative Agent or the FILO Documentation Agent shall be duplicative of any shrink as so reflected in the current books and records of the Borrower and its Restricted Subsidiaries or estimated by the Borrower for purposes of computing the Borrowing Base and the FILO Borrowing Base).

"*SOFR*" means the Secured Overnight Financing Rate as administered by the Federal Reserve Bank of New York (or a successor administrator).

"*SOFR Adjustment*" with respect to Daily Simple SOFR and Term SOFR means (a) with respect to the Revolving Obligations, 0.10% (10.00 basis points) per annum, and (b) with respect to the FILO Obligations, zero.

"*Solvent*" and "*Solvency*" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the assets of such Person exceeds its debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person is greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person is able to pay its debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured and (d) such Person is not engaged in, and is not about to engage in, business for which it has unreasonably small capital.  The amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

"*SPC*" has the meaning specified in *Section 12.2(g)*.

"*Specified Event of Default*" means any Event of Default (a) of the type described in *Section 10.1(a), 10.1(b)(i)(A), 10.1(b)(ii), 10.1(b)(iii), 10.1(d)* (with respect to any Borrowing Base Certificate) or *10.1(f)*.

"*Specified Loan Party*" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to *Section 12.28*).

"*Specified Payment*" means (i) any Investment, incurrence of Indebtedness, incurrence of Liens, or Disposition, or (ii) any Restricted Payment or payments made pursuant to *Section 9.11* that, in each case, is subject to the satisfaction of the Payment Conditions.

"*Specified Representations*" shall mean those representations and warranties made by the Borrower in *Sections 5.1(a)* (with respect to organizational existence only), *5.1(b)(ii)*, *5.2(a)*, *5.2(b)(i)*, *5.2(b)(iii)*, *5.4*, *5.13*, *5.16*, *5.18* and *5.19*.

"*Specified Transaction*" means any Investment that results in a Person becoming a Restricted Subsidiary, any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary, any Permitted Acquisition, any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or a Store or any Disposition of a business unit, line of business or division or a Store of the Borrower or a Restricted Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise, incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes), and any Restricted Payment or Revolving Commitment Increase that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"*Standby Letter of Credit*" means any Letter of Credit that is not a Documentary Letter of Credit.

"*Stated Amount*" means at any time the maximum amount for which a Letter of Credit may be honored.

"*Store*" means any retail store (which includes any real property, fixtures, equipment, Inventory and other property related thereto) operated, or to be operated, by the Borrower or any Restricted Subsidiary.

"*Store Accounts*" means Deposit Accounts established for the purpose of receiving receipts from a Store location of a Loan Party.

"*Subsidiary*" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, charitable foundations) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"*Subsidiary Guarantor*" means any Guarantor (other than Holdings and Parent).

"*Successor Borrower*" has the meaning specified in *Section 9.4(d)*.

"*Successor Rate*" has the meaning specified in *Section 3.3(b)*.

"*Supermajority Revolving Credit Lenders*" means, collectively, Revolving Credit Lenders having more than 66.67% of the aggregate outstanding amount of the Revolving Credit Commitments or, after the Revolving Credit Termination Date, more than 66.67% of the aggregate Revolving Credit

Outstandings; *provided* that the unused Revolving Credit Commitment of, and the portion of the Loans and outstanding Letters of Credit held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Supermajority Revolving Credit Lenders.

"*Supported QFC*" has the meaning specified in *Section 12.30*.

"*Sustainability Coordinator*" has the meaning specified in *Section 2.18*.

"*Sustainability Linked Loan Principles*" means the Sustainability Linked Loan Principles as most recently published by the Loan Market Association and Loan Syndications & Trading Association.

"*Swap Contract*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "*Master Agreement*"), including any such obligations or liabilities under any Master Agreement.

"*Swap Obligations*" means with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"*Swap Obligations Reserve*" shall mean the aggregate amount of reserves established by the Administrative Agent or the FILO Documentation Agent from time to time in its Permitted Discretion in respect of Secured Hedge Agreements.

"*Swap Termination Value*" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in *clause (a)*, the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"*Swing Loan*" has the meaning specified in *Section 2.3(a)*.

"*Swing Loan Lender*" means Bank of America in its capacity as the Swing Loan Lender hereunder.

"*Swing Loan Obligations*" means, as at any date of determination, the aggregate Outstanding Amount of all Swing Loans.

"*Swing Loan Request*" has the meaning specified in *Section 2.3(b)*.

"*Swing Loan Sublimit*" means the lesser of (a) $30,000,000 and (b) the aggregate principal amount of the Revolving Credit Commitments.  The Swing Loan Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"*Taxes*" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

"*Tax Indemnitee*" has the meaning specified in *Section 3.1(e)*.

"*Term Facility*" means the credit facility under the Term Facility Credit Agreement.

"*Term Facility Administrative Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and collateral agent under the Term Facility Credit Agreement, or any successor administrative agent and collateral agent under the Term Facility Credit Agreement.

"*Term Facility Credit Agreement*" means that certain credit agreement dated as of the Second Restatement Date among Needle Holdings LLC, as borrower, JOANN Holdings 2, LLC, as holdings, the lenders party thereto and the Term Facility Administrative Agent, as administrative agent and collateral agent, as the same may be amended, restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time in one or more agreements (in each case with the same or new lenders, institutional investors or agents), including any agreement extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case as and to the extent permitted by this Agreement and the Intercreditor Agreement.

"*Term Facility Documentation*" means the Term Facility Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"*Term Facility Lenders*" means the lenders from time to time party to the Term Facility Credit Agreement.

"*Term SOFR*" means:

(a)    for any Interest Period with respect to a Term SOFR Loan that is a Revolving Loan, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the commencement of such Interest Period with a term equivalent to such Interest Period; *provided* that if the rate is not published prior to 11:00 a.m. (New York City time) on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto, in each case, *plus* the SOFR Adjustment for such Interest Period;

(b)    for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the Term SOFR Screen Rate with a term of one month commencing that day; and

(c)    for any interest calculation with respect to a Term SOFR Loan that is a FILO Loan, for any day in any calendar month, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the first day of such calendar month with a term of one month; *provided* that if the rate is not published prior to 11:00 a.m. (New York City time) on such determination date then

Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto with a term of one month.

*provided* that if Term SOFR determined in accordance with any of the foregoing *clauses (a), (b)* or *(c)* of this definition would otherwise be less than the applicable Floor, Term SOFR shall be deemed to be the applicable Floor for purposes of this Agreement.   The Floor shall be determined separately for the Revolving Obligations and the FILO Obligations, as set forth in the definition of "Floor".

"*Term SOFR Loan*" means a Loan that bears interest at a rate based on *clause (a)* or *(c)* of the definition of Term SOFR.

"*Term SOFR Replacement Date*" has the meaning specified in *Section 3.3(b)*.

"*Term SOFR Screen Rate*" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Administrative Agent) and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"*Test Period*" in effect at any time means the most recent period of four consecutive Fiscal Quarters of the Borrower ended on or prior to such time (taken as one accounting period) for which financial statements are available after the use of commercially reasonable efforts by the Borrower to provide same.  A Test Period may be designated by reference to the last day thereof (i.e., the "January 29, 2021 Test Period" refers to the period of four consecutive Fiscal Quarters of the Borrower ended January 29, 2021), and a Test Period shall be deemed to end on the last day thereof.

"*Threshold Amount*" means $45,000,000.

"*Total Assets*" means the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered pursuant *to Sections 7.1(a)* or *7.1(b)*.

"*Trade Receivables Advance Rate*" means 85%.

"*Transaction Agreement Date*" has the meaning specified in *Section 1.9*.

 "*Type*" means, with respect to a Loan, its character as a Base Rate Loan or a Term SOFR Loan.

"*UCC*" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"*UK Financial Institutions*" any BRRD Undertaking (as defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Unintentional Overadvance*" means an Overadvance which, to the Administrative Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Administrative Agent, the Issuers and the Lenders, including, without limitation, the imposition of (or increase in) the FILO Deficiency Reserve, a reduction in the Net Recovery Percentage of property or assets included in the Borrowing Base or the FILO Borrowing Base or misrepresentation by the Loan Parties.

"*United States*" and "*U.S.*" mean the United States of America.

"*United States Tax Compliance Certificate*" has the meaning given to such term in *Section 3.1(c)*.

"*Unrestricted Subsidiary*" means any Subsidiary of the Borrower designated by the board of directors of the Borrower as an Unrestricted Subsidiary pursuant to *Section 8.3* subsequent to the Second Restatement Date, in each case, until such Person ceases to be an Unrestricted Subsidiary of the Borrower in accordance with Section 8.3 or ceases to be a Subsidiary of the Borrower; *provided that* no Subsidiary may be designated as an Unrestricted Subsidiary unless none of its assets are included in the calculation of Borrowing Base and the FILO Borrowing Base immediately prior to such Subsidiary's being designated as an Unrestricted Subsidiary.

"*Unused Commitment Fee*" has the meaning specified in *Section 2.12(a)*.

"*U.S. Government Securities Business Day*" means any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"*U.S. Lender*" means any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"*U.S. Special Resolution Regimes*" has the meaning specified in *Section 12.30*.

"*USA PATRIOT Act*" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"*Weekly Monitoring Event*" means (a) a Specified Event of Default has occurred and is continuing or (b) the Borrower fails to maintain Excess Availability of the greater of (i) $45,000,000 and (ii) 12.5% of the Modified Maximum Credit; *provided* that a Weekly Monitoring Event shall be deemed continuing until the date on which, as applicable, in the case of the foregoing *clause (a)*, such Specified Event of Default is waived in accordance with *Section 12.1*, or, in the case of the foregoing *clause (b)*, Excess Availability has been greater than or equal to the greater of (i) $45,000,000 and (ii) 12.5% of the Modified Maximum Credit, in each case under *clauses (i)* and *(ii)*, for at least twenty (20) consecutive calendar days.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the

making of such payment by (b) the then outstanding principal amount of such Indebtedness; *provided*, that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being modified, refinanced, refunded, renewed, replaced or extended (the "*Applicable Indebtedness*"), the effects of any prepayments or amortization made on such Applicable Indebtedness prior to the date of the applicable modification, refinancing, refunding, renewal, replacement or extension shall be disregarded.

"*Wholly-Owned Subsidiary*" of a Person means a Subsidiary of such Person, all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) nominal shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more Wholly-Owned Subsidiaries of such Person.

"*Withdrawal Liability*" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"*Write-Down and Conversion Powers*" (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule; or (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.2    Other Interpretive Provisions.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    (i)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation, except when used in the computation of time periods.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(v)     Unless otherwise expressly indicated herein, the words "above" and "below", when following a reference to a clause or a sub-clause of any Loan Document, refer to a clause or sub-clause within, respectively, the same Section or clause.

(c)     The terms "Lender," "Swing Loan Lender", "Issuer", "Administrative Agent", "Collateral Agent" and "FILO Documentation Agent" include, without limitation, their respective successors.

(d)     In the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including", the words "*to*" and "*until*" each mean "to but excluding" and the word "*through*" means "to and including."

(e)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(f)     Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Cash Collateralization) of all of the Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Swap Contracts) other than (i) unasserted contingent indemnification Obligations, and any Obligations relating to Swap Contracts that, at such time, are allowed by the applicable Hedge Bank to remain outstanding without being required to be repaid.

(g)     Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

SECTION 1.3     Accounting Terms.

(a)     Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  For purposes of calculating any consolidated amounts necessary to determine compliance by any Person and, if applicable, its Restricted Subsidiaries with any ratio or other financial covenant in this Agreement, Unrestricted Subsidiaries shall be excluded.

(b)     Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Requisite Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Requisite Lenders); *provided* that, until so amended, (A) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (B) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably

requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding the foregoing or the definition of "Capitalized Leases", only those leases (assuming for purposes hereof that such leases were in existence on the Second Restatement Date) that would constitute Capitalized Leases (including leases that are classified as "Financing Leases" for purposes of GAAP) in conformity with GAAP as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)" shall be considered Capitalized Leases hereunder or under any other Loan Document, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or prepared, as applicable, in accordance therewith; provided that all financial statements required to be provided hereunder may, at the option of the Borrower, be prepared in accordance with GAAP without giving effect to the foregoing treatment of Capitalized Leases.

SECTION 1.4        Rounding.

Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.5        Letter of Credit Amounts.

Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

SECTION 1.6        References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to Constituent Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all appendices, exhibits and schedules thereto and all subsequent amendments, restatements, extensions, supplements and other modifications thereto (but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document); and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 1.7        Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

SECTION 1.8        Pro Forma Calculations; Reclassification; IP Matters.

(a)        Notwithstanding anything to the contrary herein, Consolidated EBITDA and any financial ratio or test, including the Net Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio shall be calculated in the manner prescribed by this *Section 1.8*; *provided* that, notwithstanding anything to the contrary in this *Section 1.8*, when calculating the Consolidated Fixed Charge Coverage Ratio for purposes of determining actual compliance (and not compliance on a Pro Forma Basis) with *Section 6.2*, the events described in this *Section 1.8* that occurred subsequent to the end of the applicable Test Period shall not be given Pro Forma Effect.

(b)     For purposes of calculating Consolidated EBITDA and any financial ratio or tests, including the Net Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio, Specified Transactions (and the incurrence or repayment of any Indebtedness in connection therewith) that have been made (i) during the applicable Test Period or (ii) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a pro forma basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period.  If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this *Section 1.8*, then the Net Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio and Consolidated EBITDA shall be calculated to give pro forma effect thereto in accordance with this *Section 1.8*.

(c)     In the event that the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of the Net Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio, as the case may be (in each case, other than Indebtedness incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes), (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then the Net Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio shall be calculated giving pro forma effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(d)     [Reserved].

(e)     If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation of the Consolidated Fixed Charge Coverage Ratio is made had been the applicable rate for the entire period (taking into account any hedging obligations applicable to such Indebtedness).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.  Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower may designate.

(f)     The Borrower (i) shall in its sole discretion, exercised in good faith, determine under which category such Lien (other than Liens securing the Obligations or the Term Facility) or Specified Payment (other than Indebtedness incurred under the Loan Documents or the Term Facility Documentation) is permitted and (ii) shall be permitted, in its sole discretion, to make any redetermination and/or to divide, classify or reclassify under which category or categories such Lien or Specified Payment is permitted from time to time as it may determine and without notice to the Administrative Agent or any Lender, so long as at the time of such redesignation the Loan Parties would be permitted to incur such Lien or Specified Payment under such category or categories, as applicable; *provided*, that, if Payment Conditions were not satisfied at the time of such Lien or Specified Payment, the Borrower may not make any redetermination and/or divide, classify or reclassify such Lien or

Specified Payment as being made under a category that is or categories that are subject to the satisfaction of Payment Conditions.

(g)    In the event of any Investment pursuant to *Section 9.2*, Disposition pursuant to *Section 9.5* or Restricted Payment pursuant to *Section 9.6* that results in the transfer by a Loan Party to an Unrestricted Subsidiary, non-Loan Party or third party of IP Rights necessary in connection with the Current Asset Collateral, the purchaser, assignee or other transferee thereof agrees in writing to be bound by a non-exclusive royalty-free worldwide license of such IP Rights in favor of such Loan Party, which license shall be in a form that enables the Administrative Agent to exercise rights and remedies on behalf of the Secured Parties; *provided* that, in the case of any such Investment, Disposition or Restricted Payment that includes, immediately prior to such Investment, Disposition or Restricted Payment, intellectual property licensed to the Borrower or any of its Restricted Subsidiaries by a third party, such purchaser, assignee or other transferee shall be required to provide such a license only to the extent to which the applicable license gives it a right to do so.

SECTION 1.9    Limited Condition Acquisitions.

In connection with any action being taken in connection with a Limited Condition Acquisition (other than a Permitted Acquisition or a Limited Condition Acquisition made in reliance on *Section 9.2(u)*) for purposes of determining:

(a)    whether any Indebtedness that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in compliance with *Section 9.3* (other than Indebtedness that is being incurred in reliance on *Section 9.3(s)*) or *Section 2.15*;

(b)    whether any Lien being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in accordance with *Section 9.1*;

(c)    whether any other transaction undertaken or proposed to be undertaken in connection with such Limited Condition Acquisition (other than any such transaction that is being undertaken or proposed to be undertaken in reliance on a basket or exception that requires compliance with Payment Conditions with respect thereto) complies with the covenants or agreements contained in this Agreement; and

(d)    any calculation of the ratios or baskets, including the Net Leverage Ratio, Consolidated Fixed Charge Coverage Ratio, Consolidated Net Income, Consolidated EBITDA and/or pro forma cost savings and baskets determined by reference to Consolidated EBITDA or Total Assets and whether a Default or Event of Default exists in connection with the foregoing;

at the option of the Borrower, the date that the definitive agreement for such Limited Condition Acquisition is entered into (the "*Transaction Agreement Date*") may be used as the applicable date of determination, as the case may be, in each case with such pro forma adjustments as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Pro Forma Basis" or "Consolidated EBITDA." For the avoidance of doubt, if the Borrower elects to use the Transaction Agreement Date as the applicable date of determination in accordance with the foregoing, (a) any fluctuation or change in the Net Leverage Ratio, Consolidated Fixed Charge Coverage Ratio, Consolidated Net Income, Consolidated EBITDA and/or Total Assets of the Borrower from the Transaction Agreement Date to the date of consummation of such Limited Condition Acquisition will not be taken into account for purposes of determining whether any Indebtedness or Lien that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred, or whether any other transaction undertaken in connection with such Limited Condition Acquisition by the Borrower or any of

the Restricted Subsidiaries complies with the Loan Documents and (b) after the Transaction Agreement Date and until such Limited Condition Acquisition is consummated or the definitive agreements in respect thereof are terminated or expire, such Limited Condition Acquisition and all transactions proposed to be undertaken in connection therewith (including without limitation the incurrence of Indebtedness and Liens) will be given Pro Forma Effect when determining compliance of other transactions (including without limitation the incurrence of Indebtedness and Liens unrelated to such Limited Condition Acquisition) that are consummated after the Transaction Agreement Date and on or prior to the date of consummation of such Limited Condition Acquisition and any such transactions (including without limitation any incurrence of Indebtedness and the use of proceeds thereof) will be deemed to have occurred on the Transaction Agreement Date and be outstanding thereafter for purposes of calculating any baskets or ratios under the Loan Documents after the Transaction Agreement Date and before the date of consummation of such Limited Condition Acquisition (or the date the definitive agreements in respect thereof are terminated or expire); *provided* that solely with respect to Restricted Payments only (and only until such time as the applicable Limited Condition Acquisition has been consummated or the definitive documentation for such Limited Condition Acquisition is terminated), such calculation shall also be made on a standalone basis without giving effect to such Limited Condition Acquisition and the other transactions in connection therewith.

SECTION 1.10    Interest Rates.  The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "Term SOFR" or with respect to any rate that is an alternative or replacement for or successor to any of such rate (including, without limitation, any Successor Rate) or the effect of any of the foregoing, or of any Successor Rate Conforming Changes.

SECTION 1.11    FILO Documentation Agent.  For the purposes of the definition of "Availability Reserves", "Bank Product Reserve", "Cash Management Reserve", "Dilution Reserve", "Eligible Credit Card Receivables", "Eligible In-Transit Inventory", "Eligible Inventory", "Eligible Trade Receivables", "Inventory Reserves", "Receivables Reserves", "Shrink Reserve" or "Swap Obligations Reserve", or any other provision of this Agreement (other than the provisions of *Section 12.1*) or any other Loan Document where the FILO Documentation Agent has a consent right on a matter for which the Administrative Agent also has a consent right, the FILO Documentation Agent shall consult with the Administrative Agent prior to imposing Reserves, withholding consent rights or otherwise taking action that would be less favorable to the Loan Parties than corresponding action taken by the Administrative Agent.

## ARTICLE II

## THE FACILITIES

SECTION 2.1    The Commitments.

(a)    Revolving Loans.  On the terms and subject to the conditions contained in this Agreement, each Revolving Credit Lender severally agrees to make loans in Dollars (each, a "*Revolving Loan*") to the Borrower from time to time on any Business Day during the period from the Effective Date until the Revolving Credit Termination Date in an aggregate principal amount at any time outstanding for all such loans by such Lender not to exceed such Lender's Revolving Credit Commitment; *provided*, *however*, that at no time shall any Revolving Credit Lender be obligated to make a Revolving Loan in excess of such Lender's Ratable Portion of the Maximum Credit.  For the avoidance of doubt, all "Revolving Loans" made pursuant to the Existing Credit Agreement and outstanding on the Second Restatement Date shall be deemed Revolving Loans pursuant to, and shall be subject to the terms and

conditions of, this Agreement. Within the limits of the Revolving Credit Commitment of each Revolving Credit Lender, amounts of Loans repaid may be reborrowed under this *Section 2.1*.

(b)     Protective Advances. Subject to the limitations set forth below (and notwithstanding anything to the contrary in *Section 4.2*), the Administrative Agent is authorized by the Borrower and the Lenders, from time to time in the Administrative Agent's sole discretion (but shall have absolutely no obligation), to make Revolving Loans (which may be a Swing Loan) to the Borrower, on behalf of all Revolving Credit Lenders at any time that any condition precedent set forth in *Section 4.2* has not been satisfied or waived, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable for the purposes specified in the definition of "Protective Advances". Any Protective Advance may be made in a principal amount that would cause the aggregate Revolving Credit Exposure to exceed the Borrowing Base; *provided* that the aggregate amount of outstanding Protective Advances plus the aggregate of all other Revolving Credit Exposure shall not exceed the Aggregate Commitments; *provided* further that the foregoing shall not result in any claim or liability against the Administrative Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances, and such Unintentional Overadvances shall not reduce the amount of Protective Advances allowed hereunder. Protective Advances may be made even if the conditions precedent set forth in *Section 4.2* have not been satisfied or waived. Each Protective Advance shall be secured by the Liens in favor of the Collateral Agent in and to the Collateral and shall constitute Obligations hereunder. The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Requisite Revolving Credit Lenders. Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof. The making of a Protective Advance on any one occasion shall not obligate the Administrative Agent to make any Protective Advance on any other occasion. At any time that the conditions precedent set forth in *Section 4.2* have been satisfied or waived, the Administrative Agent may request the Revolving Credit Lenders to make a Revolving Loan to repay a Protective Advance. At any other time, the Administrative Agent may require the Revolving Credit Lenders to fund their risk participations described in *Section 2.1(c)*.

(c)     Risk Participations in Protective Advances. Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of a Default), each Revolving Credit Lender shall be deemed, without further action by any party hereto, unconditionally and irrevocably to have purchased from the Administrative Agent without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Applicable Percentage. From and after the date, if any, on which any Revolving Credit Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender, such Lender's Applicable Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

(d)     FILO Loans. The FILO Lenders made term loans in Dollars (each, a "FILO Loan") to the Borrower under the Existing Credit Agreement in an aggregate original principal amount equal to $100,000,000, the full balance of which remains outstanding on the Second Restatement Date. For the avoidance of doubt, such "FILO Loans" made pursuant to the Existing Credit Agreement shall remain outstanding and be deemed FILO Loans under, and shall be subject to the terms and conditions of, this Agreement. FILO Loans that are repaid or prepaid may not be reborrowed.

SECTION 2.2     Borrowing Procedures for Revolving Loans; Conforming Changes.

(a)     Each Borrowing consisting of Revolving Loans shall be made on notice given by the Borrower to the Administrative Agent not later than (i) 11:00 a.m. on the same Business Day, in the case of a Borrowing of Base Rate Loans, and (ii) 12:00 noon three (3) Business Days, in the case of a Borrowing of Term SOFR Loans, prior to the date of the proposed Borrowing. Each such notice shall be

in substantially the form of *Exhibit C* (a "*Notice of Borrowing*"), specifying (A) the date of such proposed Borrowing, which shall be a Business Day, (B) the aggregate amount of such proposed Borrowing, (C) whether any portion of the proposed Borrowing will be of Base Rate Loans or Term SOFR Loans, (D) the initial Interest Period or Interest Periods for any such Term SOFR Loans, (E) the Class of the proposed Borrowing, and (F) with respect to any Borrowing the proceeds of which will be used to fund a Restricted Payment subject to the satisfaction of the Payment Conditions, an additional solvency representation and warranty of the Borrower and its Subsidiaries (taken as a whole) after giving effect to such Borrowing and the use of proceeds thereof. The Revolving Loans shall be made as Base Rate Loans unless, subject to *Section 2.14*, the Notice of Borrowing specifies that all or a portion thereof shall be Term SOFR Loans. Each Borrowing consisting of Revolving Loans that are Base Rate Loans shall be in an aggregate amount of not less than $500,000 or an integral multiple of $100,000 in excess thereof and the aggregate amount of each Borrowing consisting of Revolving Loans that are Term SOFR Loans for each Interest Period must be in the amount of at least $1,000,000 or an integral multiple of $500,000 in excess thereof.

(b)    The Administrative Agent shall give to each Revolving Credit Lender prompt notice of the Administrative Agent's receipt of a Notice of Borrowing and, if Term SOFR Loans are properly requested in such Notice of Borrowing, the applicable interest rate determined pursuant to *Section 2.14(a)*. Each Revolving Credit Lender shall, before 1:00 p.m. on the date of the proposed Borrowing, make available to the Administrative Agent at its address referred to in *Section 12.8*, in Same Day Funds, such Lender's Ratable Portion of such proposed Borrowing. Upon fulfillment (or due waiver in accordance with *Section 12.1*) (i) on the Second Restatement Date, of the applicable conditions set forth in *Section 4.1* and (ii) at any time (including the Second Restatement Date), of the applicable conditions set forth in *Section 4.2*, and, subject to *clause (c)* below, after the Administrative Agent's receipt of such funds, the Administrative Agent shall make such funds available to the Borrower as promptly as reasonably practicable.

(c)    Unless the Administrative Agent shall have received notice from a Revolving Credit Lender prior to the date of any proposed Borrowing that such Lender will not make available to the Administrative Agent such Lender's Ratable Portion of such Borrowing (or any portion thereof), the Administrative Agent may assume that such Lender has made such Ratable Portion available to the Administrative Agent on the date of such Borrowing in accordance with this *Section 2.2* and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such Ratable Portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Rate for the first Business Day and thereafter at the interest rate applicable at the time to the Loans comprising such Borrowing. If such Lender shall repay to the Administrative Agent such corresponding amount, such corresponding amount so repaid shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement. If the Borrower shall repay to the Administrative Agent such corresponding amount, such payment shall not relieve such Lender of any obligation it may have hereunder to the Borrower.

(d)    The failure of any Defaulting Lender to make on the date specified any Loan or any payment required by it, including any payment in respect of its participation in Swing Loans and Letter of Credit Obligations, shall not relieve any other Lender of its obligations to make such Loan or payment on such date but, except to the extent otherwise provided herein, no such other Lender shall be

responsible for the failure of any Defaulting Lender to make a Loan or payment required under this Agreement.

(e)     After giving effect to all Borrowings, all conversions of Revolving Loans from one Type to the other, and all continuations of Revolving Loans as the same Type, there shall not be more than ten (10) Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent; *provided* that after the establishment of any new Class of Revolving Loans pursuant to an Extension Amendment, the number of Interest Periods otherwise permitted by this *Section 2.2(e)* shall increase by three (3) Interest Periods for each applicable Class so established.

(f)     With respect to SOFR or Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document; <u>provided</u> that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

SECTION 2.3     Swing Loans.

(a)     On the terms and subject to the conditions contained in this Agreement, the Swing Loan Lender shall make, in Dollars, loans (each, a "*Swing Loan*") otherwise available to the Borrower under the Revolving Facility from time to time on any Business Day during the period from the Effective Date until the Revolving Credit Termination Date in an aggregate principal amount at any time outstanding (together with the aggregate outstanding principal amount of any other Loan made by the Swing Loan Lender hereunder in its capacity as the Swing Loan Lender) not to exceed the Swing Loan Sublimit; *provided*, *however*, that at no time shall the Swing Loan Lender make any Swing Loan to the extent that, after giving effect to such Swing Loan, the aggregate Revolving Credit Outstandings would exceed the Maximum Credit; *provided further* that in the event that the Swing Loan Lender and the Administrative Agent are not the same Person, then the Swing Loan Lender shall only make a Swing Loan after having given prior notice thereof to the Administrative Agent; *provided further* that the Swing Loan Lender shall not be required to make any Swing Loan to the extent that such Swing Loan Lender reasonably believes that any Lender is a Defaulting Lender unless, after giving effect to the requested Swing Loan, there would exist no Fronting Exposure (in the good faith determination of the Swing Loan Lender and the Administrative Agent). For the avoidance of doubt, all "Swing Loans" made pursuant to the Existing Credit Agreement and outstanding on the Second Restatement Date shall be deemed Swing Loans pursuant to, and shall be subject to the terms and conditions of, this Agreement. Each Swing Loan shall be a Base Rate Loan and must be repaid in full in Dollars within seven (7) days after its making or, if sooner, upon any Borrowing hereunder and shall in any event mature no later than the Revolving Credit Termination Date (without giving effect to any extensions of the type referred to in *Section 12.1(b)* hereof). Within the limits set forth in the first sentence of this *clause (a)*, amounts of Swing Loans repaid may be reborrowed under this *clause (a)*.

(b)     In order to request a Swing Loan, the Borrower shall telecopy (or forward by electronic mail or similar means) to the Administrative Agent a duly completed request in substantially the form of *Exhibit D*, setting forth the requested amount and date of such Swing Loan (a "*Swing Loan Request*"), to be received by the Administrative Agent not later than 1:00 p.m. on the day of the proposed borrowing. The Administrative Agent shall promptly notify the Swing Loan Lender of the details of the requested Swing Loan. Subject to the terms of this Agreement, the Swing Loan Lender shall make a Swing Loan available to the Administrative Agent and, in turn, the Administrative Agent shall make such amounts available to the Borrower as promptly as reasonably practicable on the date set forth in the

relevant Swing Loan Request. The Swing Loan Lender shall not make any Swing Loan (other than a Protective Advance) in the period commencing on the first Business Day after it receives written notice from the Administrative Agent or any Lender that one or more of the conditions precedent contained in *Section 4.2* shall not on such date be satisfied, and ending when such conditions are satisfied. The Swing Loan Lender shall not otherwise be required to determine that, or take notice whether, the conditions precedent set forth in *Section 4.2* have been satisfied in connection with the making of any Swing Loan.

(c)       The Swing Loan Lender may demand at any time (and shall demand, not less frequently than weekly unless such Swing Loan is repaid in accordance with *Section 2.3(a)* hereof), that each Revolving Credit Lender pay to the Administrative Agent, for the account of the Swing Loan Lender, in the manner provided in *clause (d)* below, such Lender's Ratable Portion of all or a portion of the outstanding Swing Loans, which demand shall be made through the Administrative Agent, shall be in writing and shall specify the outstanding principal amount of Swing Loans demanded to be paid.

(d)       The Administrative Agent shall forward each demand referred to in *clause (c)* above to each Revolving Credit Lender on the day such notice or such demand is received by the Administrative Agent (except that any such notice or demand received by the Administrative Agent after 2:00 p.m. on any Business Day or any such notice or demand received on a day that is not a Business Day shall not be required to be forwarded to the Revolving Credit Lenders by the Administrative Agent until the next succeeding Business Day), together with a statement prepared by the Administrative Agent specifying the amount of each Revolving Credit Lender's Ratable Portion of the aggregate principal amount of the Swing Loans stated to be outstanding in such notice or demanded to be paid pursuant to such demand, and, notwithstanding whether or not the conditions precedent set forth in *Sections 4.2* and *2.1* shall have been satisfied (which conditions precedent the Lenders hereby irrevocably waive), each Lender shall, before 11:00 a.m. on the Business Day next succeeding the date of such Lender's receipt of such notice or demand, make available to the Administrative Agent, in Same Day Funds in Dollars, for the account of the Swing Loan Lender, the amount specified in such statement. Upon such payment by a Revolving Credit Lender, such Lender shall, except as provided in *clause (e)* below, be deemed to have made a Revolving Loan to the Borrower in the amount of such payment. The Administrative Agent shall use such funds to repay the Swing Loans to the Swing Loan Lender.

(e)       Upon the occurrence of a Default under *Section 10.1(f)*, each Revolving Credit Lender shall acquire, without recourse or warranty, an undivided participation in each Swing Loan otherwise required to be repaid by such Lender pursuant to *clause (d)* above, which participation shall be in a principal amount equal to such Lender's Ratable Portion of such Swing Loan, by paying to the Swing Loan Lender on the date on which such Lender would otherwise have been required to make a payment in respect of such Swing Loan pursuant to *clause (d)* above, in Same Day Funds, an amount equal to such Lender's Ratable Portion of such Swing Loan. If all or part of such amount is not in fact made available by such Lender to the Swing Loan Lender on such date, the Swing Loan Lender shall be entitled to recover any such unpaid amount on demand from such Lender together with interest accrued from such date at the Federal Funds Rate for the first Business Day after such payment was due and thereafter at the rate of interest then applicable to Base Rate Loans.

(f)       From and after the date on which any Revolving Credit Lender (i) is deemed to have made a Revolving Loan pursuant to *clause (d)* above with respect to any Swing Loan or (ii) purchases an undivided participation interest in a Swing Loan pursuant to *clause (e)* above, the Swing Loan Lender shall promptly distribute to such Lender such Lender's Ratable Portion of all payments of principal and interest received by the Swing Loan Lender on account of such Swing Loan other than those received from a Lender pursuant to *clause (d)* or *(e)* above.

SECTION 2.4    Letters of Credit.

(a)    Subject to the terms and subject to the conditions contained in this Agreement, each Issuer agrees to Issue at the request of the Borrower, for the account of the Borrower or a Restricted Subsidiary (*provided* that any Letter of Credit issued for the benefit of any Restricted Subsidiary that is not the Borrower shall be issued naming the Borrower as the account party on any such Letter of Credit but such Letter of Credit may contain a statement that it is being issued for the benefit of such Restricted Subsidiary), one or more Letters of Credit from time to time on any Business Day during the period commencing on the Effective Date and ending on the earlier of the Revolving Credit Termination Date and five (5) Business Days prior to the Scheduled Termination Date (without giving effect to any extension of the type referred to in *Section 12.1(b)* hereof) (or, if such day is not a Business Day, the next preceding Business Day), or such later date as agreed to by the Administrative Agent in its sole discretion; *provided*, *however*, that no Issuer shall be under any obligation to Issue (and, upon the occurrence of any of the events described in *clauses (ii)*, *(iii)*, *(iv)* and *(v)(A)* below, shall not Issue) any Letter of Credit upon the occurrence of any of the following:

(i)    any order, judgment or decree of any Governmental Authority or arbitrator having binding powers shall purport by its terms to enjoin or restrain such Issuer from Issuing such Letter of Credit or any Law applicable to such Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuer shall prohibit, or request that such Issuer refrain from, the Issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuer with respect to such Letter of Credit any restriction or reserve or capital requirement (for which such Issuer is not otherwise compensated) not in effect on the Effective Date or result in any unreimbursed loss, cost or expense that was not applicable, in effect or known to such Issuer as of the Effective Date and that such Issuer in good faith deems material to it (for which such Issuer is not otherwise compensated);

(ii)    the issuance of such Letter of Credit would violate one or more policies of the Issuer applicable to letters of credit generally;

(iii)    such Issuer shall have received any written notice of the type described in *clause (d)* below;

(iv)    after giving effect to the Issuance of such Letter of Credit, (A) the aggregate Revolving Credit Outstandings would exceed the Maximum Credit at such time, (B) the Letter of Credit Obligations would exceed the Letter of Credit Sublimit or (C)  the Revolving Credit Outstandings of any Revolving Credit Lender would exceed such Lender's Revolving Credit Commitment;

(v)    such Letter of Credit is requested to be denominated in any currency other than Dollars, except as may be approved by the Administrative Agent and such Issuer, each in their reasonable discretion;

(vi)    (A) any fees due in connection with a requested Issuance have not been paid, (B) such Letter of Credit is requested to be Issued in a form that is not acceptable to such Issuer or (C) the Issuer for such Letter of Credit shall not have received, in form and substance reasonably acceptable to it and, if applicable, duly executed by the Borrower, applications, agreements and other documentation (collectively, a "*Letter of Credit Reimbursement Agreement*") such Issuer generally employs in the ordinary course of its business for the Issuance of letters of credit of the type of such Letter of Credit;

(vii)     any Revolving Credit Lender is at that time a Defaulting Lender, unless (i) after giving effect to the requested Issuance, there would exist no Fronting Exposure (in the good faith determination of the applicable Issuer) or (ii) the applicable Issuer has entered into arrangements, including the delivery of Cash Collateral, satisfactory to the applicable Issuer (in its reasonable discretion) with the Borrower or such Lender to eliminate such Issuer's actual or potential Fronting Exposure (after giving effect to Section 2.*16(a)(iv)*) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or any other Letter of Credit Obligations as to which such Issuer has actual or potential Fronting Exposure, as it may elect in its sole discretion.

None of the Lenders (other than the Issuers in their capacity as such) shall have any obligation to Issue any Letter of Credit.  Any Letter of Credit which has been or deemed Issued hereunder may be amended at any time to reduce the amount outstanding thereunder.  For the avoidance of doubt, all "Letters of Credit" issued pursuant to the Existing Credit Agreement and outstanding on the Second Restatement Date shall be deemed Letters of Credit pursuant to, and shall be subject to the terms and conditions of, this Agreement.

(b)     In no event shall (i) the expiration date of (A) any Documentary Letter of Credit be more than 210 days after the date of issuance thereof, or (B) any Standby Letter of Credit be more than one (1) year after the date of issuance thereof; *provided*, *however*, that any Standby Letter of Credit with a term less than or equal to one (1) year may provide for the renewal thereof for additional periods less than or equal to one (1) year, as long as, on or before the expiration of each such term and each such period, the Borrower and the Issuer of such Standby Letter of Credit shall have the option to prevent such renewal or (ii) the expiration date of any Letter of Credit be later than the date that is five (5) Business Days before the Scheduled Termination Date; *provided further*, that, for any Letter of Credit having an expiration date after the Scheduled Termination Date, the Borrower agrees to deliver to the Administrative Agent on or prior to the Scheduled Termination Date a letter of credit or letters of credit in form and substance reasonably acceptable to the Administrative Agent issued by a bank acceptable to the Administrative Agent, in each case in its sole discretion, and/or cash collateral in an amount equal to 103% of the maximum drawable amount of any such Letter of Credit.

(c)     In connection with the Issuance of each Letter of Credit, the Borrower shall give the relevant Issuer and the Administrative Agent at least two (2) Business Days' prior written notice, in substantially the form of *Exhibit E* (or in such other written or electronic form as is acceptable to such Issuer), of the requested Issuance of such Letter of Credit (a "*Letter of Credit Request*").  Such notice shall specify the Issuer of such Letter of Credit, the face amount of the Letter of Credit requested, the date on which such Letter of Credit is to expire (which date shall be a Business Day) and, in the case of an issuance, the Person for whose benefit the requested Letter of Credit is to be issued.  Such notice, to be effective, must be received by the relevant Issuer and the Administrative Agent not later than 11:00 a.m. on the last Business Day on which such notice can be given under the first sentence of this *clause (c)*; *provided* that the relevant Issuer and the Administrative Agent may agree in a particular instance in their sole discretion to a later time and date.

(d)     Subject to the satisfaction of the conditions set forth in this *Section 2.4*, the relevant Issuer shall, on the requested date, Issue a Letter of Credit on behalf of the Borrower in accordance with such Issuer's usual and customary business practices.  No Issuer shall Issue any Letter of Credit in the period commencing on the first Business Day after it receives written notice from any Lender that one or more of the conditions precedent contained in *Section 4.2* or *clause (a)* above are not on such date satisfied or duly waived and ending when such conditions are satisfied or duly waived.  No Issuer shall otherwise be required to determine that, or take notice whether, the conditions precedent set

DB1/ 145587008.11

US-DOCS\149610879.14

forth in *Section 4.2* have been satisfied in connection with the Issuance of any Letter of Credit.  Each Letter of Credit shall be Issued in Dollars.

(e)        The Borrower agrees that, if requested by the Issuer of any Letter of Credit prior to the issuance of a Letter of Credit, it shall execute a Letter of Credit Reimbursement Agreement in respect to any Letter of Credit Issued hereunder.  In the event of any conflict between the terms of any Letter of Credit Reimbursement Agreement and this Agreement, the terms of this Agreement shall govern.

(f)        Each Issuer shall comply with the following:

(i)        give the Administrative Agent written notice (or telephonic notice confirmed promptly thereafter in writing), which writing may be a telecopy or electronic mail, of the Issuance of any Letter of Credit Issued by it, all drawings under any Letter of Credit Issued by it and of the payment (or the failure to pay when due) by the Borrower of any Reimbursement Obligation when due (which notice the Administrative Agent shall promptly transmit by telecopy, electronic mail or similar transmission to each Revolving Credit Lender);

(ii)        upon the request of any Revolving Credit Lender, furnish to such Lender copies of any Letter of Credit Reimbursement Agreement to which such Issuer is a party and such other documentation as may reasonably be requested by such Lender; and

(iii)        on the first Business Day of each calendar week, provide to the Administrative Agent (and the Administrative Agent shall provide a copy to each Revolving Credit Lender requesting the same) and the Borrower separate schedules for Documentary Letters of Credit and Standby Letters of Credit issued by it, in form and substance reasonably satisfactory to the Administrative Agent, setting forth the aggregate Letter of Credit Obligations, in each case outstanding at the end of each month, and any information requested by the Borrower or the Administrative Agent relating thereto.

(g)        Immediately upon the issuance by an Issuer of a Letter of Credit in accordance with the terms and conditions of this Agreement, such Issuer shall be deemed to have sold and transferred to each Revolving Credit Lender, and each Revolving Credit Lender shall be deemed irrevocably and unconditionally to have purchased and received from such Issuer, without recourse or warranty, an undivided interest and participation, to the extent of such Lender's Ratable Portion, in such Letter of Credit and the obligations of the Borrower with respect thereto (including all Letter of Credit Obligations with respect thereto) and any security therefor and guaranty pertaining thereto.

(h)        The Borrower agrees to pay to the Issuer of any Letter of Credit the amount of all Reimbursement Obligations owing to such Issuer under any Letter of Credit issued for its account no later than (x) the Business Day following the date that the Borrower receives written notice from such Issuer that payment has been made under such Letter of Credit in accordance with its terms if such notice is received by the Borrower by 11:00 a.m. and (y) on the second Business Day after which the Borrower receives written notice from such Issuer that payment has been made under such Letter of Credit in accordance with its terms if such notice is received by the Borrower after 11:00 a.m. (such date described in *clause (x)* or *(y)* above, the "*Reimbursement Date*"), irrespective of any claim, set-off, defense or other right that the Borrower may have at any time against such Issuer or any other Person.  In the event that any Issuer makes any payment under any Letter of Credit in accordance with its terms and the Borrower shall not have repaid such amount to such Issuer pursuant to this *clause (h)* (directly or by application of the deemed Loans described below in this *clause (h)* or by virtue of the penultimate sentence of this *clause (h)*) or any such payment by the Borrower is rescinded or set aside for any reason, such

Reimbursement Obligation shall be payable on demand with interest thereon computed (i) from the date on which such Reimbursement Obligation arose to the Reimbursement Date, at the rate of interest applicable during such period to Loans that are Base Rate Loans and (ii) from the Reimbursement Date until the date of repayment in full, at the rate of interest applicable during such period to past due Loans that are Base Rate Loans, and such Issuer shall promptly notify the Administrative Agent, which shall promptly notify each Revolving Credit Lender of such failure, and each Revolving Credit Lender shall promptly and unconditionally pay to the Administrative Agent for the account of such Issuer the amount of such Lender's Ratable Portion of such payment in Same Day Funds in Dollars.  If the Administrative Agent so notifies such Lender prior to 11:00 a.m. on any Business Day, such Lender shall make available to the Administrative Agent for the account of such Issuer its Ratable Portion of the amount of such payment on such Business Day in Same Day Funds.  Upon such payment by a Revolving Credit Lender, such Lender shall, except during the continuance of a Default or Event of Default under *Section 10.1(f)* and notwithstanding whether or not the conditions precedent set forth in *Section 4.2* shall have been satisfied (which conditions precedent the Revolving Credit Lenders hereby irrevocably waive), be deemed to have made a Revolving Loan to the Borrower in the principal amount of such payment. Whenever any Issuer receives from the Borrower a payment of a Reimbursement Obligation as to which the Administrative Agent has received for the account of such Issuer any payment from a Revolving Credit Lender pursuant to this *clause (h)*, such Issuer shall pay over to the Administrative Agent any amount received in excess of such Reimbursement Obligation and, upon receipt of such amount, the Administrative Agent shall promptly pay over to each Revolving Credit Lender, in Same Day Funds, an amount equal to such Lender's Ratable Portion of the amount of such payment adjusted, if necessary, to reflect the respective amounts the Revolving Credit Lenders have paid in respect of such Reimbursement Obligation.  (A) In the absence of written notice to the contrary from the Borrower, and subject to the other provisions of this Agreement (but without regard to the conditions to borrowing set forth in *Section 4.2*), Reimbursement Obligations shall be financed when due with a Base Rate Loan or Swing Loan to the Borrower in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting Base Rate Loan or Swing Loan, and (B) in the event that the Borrower has notified the Administrative Agent that it will not so finance any such payments, the Borrower will make payment directly to the applicable Issuer when due. The Administrative Agent shall promptly remit the proceeds from any Loans made pursuant to *clause (A)* above in reimbursement of a draw under a Letter of Credit to the applicable Issuer.

(i)    Each Defaulting Lender agrees to pay to the Administrative Agent for the account of such Issuer forthwith on demand any such unpaid amount together with interest thereon, for the first Business Day after payment was first due at the Federal Funds Rate and, thereafter, until such amount is repaid to the Administrative Agent for the account of such Issuer, at a rate per annum equal to the rate applicable to Base Rate Loans under the Revolving Facility.

(j)    The Borrower's obligations to pay each Reimbursement Obligation and the obligations of the Revolving Credit Lenders to make payments to the Administrative Agent for the account of the Issuers with respect to Letters of Credit shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement, under any and all circumstances whatsoever, including the occurrence of any Default or Event of Default, and irrespective of any of the following:

(i)    any lack of validity or enforceability of any Letter of Credit or any Loan Document, or any term or provision therein;

(ii)    any amendment or waiver of or any consent to departure from all or any of the provisions of any Letter of Credit or any Loan Document;

(iii)    the existence of any claim, set-off, defense or other right that the Borrower, any other party guaranteeing, or otherwise obligated with, the Borrower, any Subsidiary or other Affiliate thereof or any other Person may at any time have against the beneficiary under any Letter of Credit, any Issuer, the Administrative Agent or any Lender or any other Person, whether in connection with this Agreement, any other Loan Document or any other related or unrelated agreement or transaction;

(iv)    any draft or other document presented under a Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect, or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(v)    payment by the Issuer under a Letter of Credit against presentation of a draft or other document that does not strictly comply, but that does substantially comply, with the terms of such Letter of Credit; or any payment made by an Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(vi)    any other act or omission to act or delay of any kind of any Issuer, the Lenders, the Administrative Agent or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this *Section 2.4*, constitute a legal or equitable discharge of the Borrower's obligations hereunder; or

(vii)    the fact that any Default or Event of Default shall have occurred and be continuing.

Any action taken or omitted to be taken by the relevant Issuer under or in connection with any Letter of Credit, if taken or omitted in the absence of gross negligence or willful misconduct, shall not result in any liability of such Issuer to the Borrower or any Revolving Credit Lender.  In determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof, the Issuers may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary and, in making any payment under any Letter of Credit, the Issuers may rely exclusively on the documents presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary thereunder equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other document presented pursuant to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever, and any noncompliance in any immaterial respect of the documents presented under such Letter of Credit with the terms thereof shall, in each case, be deemed not to constitute willful misconduct or gross negligence of the applicable Issuer.

Each Issuer shall act on behalf of the Revolving Credit Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in *Article XI* with respect to any acts taken or omissions suffered by such Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term

"Administrative Agent" as used in *Article XI* included such Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to such Issuer.

(k)        *Applicability of ISP and UCP.*  Unless otherwise expressly agreed by the relevant Issuer and the Borrower when a Letter of Credit is issued, (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each Documentary Letter of Credit.

SECTION 2.5        Reduction and Termination of the Commitments.

The Borrower may, upon at least three (3) Business Days' prior notice to the Administrative Agent, terminate in whole or reduce in part ratably the unused portions of any Class of Revolving Credit Commitments of the Revolving Credit Lenders without premium or penalty other than any amount required to be paid by the Borrower pursuant to *Section 3.5*; *provided*, *however*, that each partial reduction shall be in an aggregate amount of not less than $1,000,000 or an integral multiple of $500,000 in excess thereof *provided*, *further*, that no reduction or termination of the Revolving Credit Commitments having a later maturity shall be permitted on a greater than pro rata basis with commitments having an earlier maturity.  Except as set forth in the following sentence, each such notice of reduction or termination shall be irrevocable when given.  Notwithstanding the foregoing, the Borrower may rescind or postpone any notice of termination of the Revolving Credit Commitments if such termination would have resulted from a refinancing of all of the applicable Revolving Facility, which refinancing shall not be consummated or otherwise shall be delayed.

SECTION 2.6        Repayment of Loans.

The Borrower promises to repay to the Administrative Agent for the ratable account of (a) the Revolving Credit Lenders the aggregate unpaid principal amount of the Loans (including any Letter of Credit Borrowings, but excluding the FILO Loans) and the Swing Loans on the Revolving Credit Termination Date or earlier, if otherwise required by the terms hereof, and (b) the FILO Lenders the aggregate unpaid principal amount of the FILO Loans on the FILO Maturity Date or earlier, if otherwise required by the terms hereof.

SECTION 2.7        Evidence of Indebtedness.

(a)        The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and maintained by the Administrative Agent, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. After the end of each month, the Administrative Agent shall send to the Borrower a statement accounting for the charges, loans, advances and other transactions occurring among and between the Administrative Agent, the Lenders and the Borrower during that month. The monthly statements shall, absent manifest error, be an account stated, which is final, conclusive and binding on the Borrower.

(b)        [Reserved].

(c)     The entries made in the Register and in the accounts therein maintained pursuant to *clauses (a)* and *(b)* above and *Section 12.2* hereof shall, to the extent permitted by applicable law, be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided*, *however*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans or perform any of its obligations hereunder or under any other Loan Documents in accordance with their terms.  In addition, the Loan Parties, the Administrative Agent, the FILO Documentation Agent, the Lenders and the Issuers shall treat each Person whose name is recorded in the Register as a Lender or as an Issuer, as applicable, for all purposes of this Agreement.  Information contained in the Register with respect to any Lender or Issuer shall be available for inspection by the Borrower, the Administrative Agent, the FILO Documentation Agent, such Lender or such Issuer at any reasonable time and from time to time upon reasonable prior notice.

(d)     Notwithstanding any other provision of the Agreement, in the event that any Lender requests that the Borrower execute and deliver a promissory note or notes payable to such Lender in order to evidence the Indebtedness owing to such Lender by the Borrower hereunder, the Borrower shall promptly execute and deliver a Revolving Credit Note or Revolving Credit Notes, or a FILO Note or FILO Notes, as applicable, to such Lender evidencing the Loans of such Lender, substantially in the form of *Exhibit B* or *Exhibit P*, as applicable.  Each Lender may attach schedules to its Revolving Credit Note or FILO Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto; *provided* that the failure to do so shall in no way affect the obligations of the Borrower or any other Loan Party under any Loan Document.

SECTION 2.8     Optional Prepayments.

The Borrower may prepay the outstanding principal amount of the Revolving Loans and Swing Loans in whole or in part at any time; *provided*, *however*, that if any prepayment of any Term SOFR Loan is made by the Borrower other than on the last day of an Interest Period for such Loan, the Borrower shall also pay any amount owing pursuant to *Section 3.5*.  No prepayment of the FILO Loans (other than, for the avoidance of doubt, a Permitted Refinancing of the full remaining amount of the FILO Loans or a repayment in full of the FILO Loans on the FILO Maturity Date) shall be made prior to the Revolving Credit Termination Date without the written consent of each Revolving Credit Lender.  Without limiting the foregoing, concurrently with any prepayment of the FILO Loans made with the consent of each Revolving Credit Lender, the Borrower shall pay any FILO Prepayment Premium due and payable with respect thereto, if applicable.

SECTION 2.9     Mandatory Prepayments.

(a)     If at any time, the aggregate principal amount of Revolving Credit Outstandings exceeds the aggregate Maximum Credit at such time, the Borrower shall forthwith, upon notification by the Administrative Agent, prepay the Swing Loans *first* and then the other Loans (other than FILO Loans) then outstanding in an amount equal to such excess.  If any such excess remains after repayment in full of the aggregate outstanding Swing Loans and the other Loans (other than FILO Loans), the Borrower shall Cash Collateralize the Letter of Credit Obligations in the manner set forth in *Section 10.5* in an amount equal to 103% of such excess.

(b)     [Reserved].

(c)     [Reserved].

(d)    Subject to *Section 3.5* hereof, all such payments in respect of the Revolving Loans pursuant to this *Section 2.9* shall be without premium or penalty. All interest accrued on the principal amount of the Revolving Loans paid pursuant to this *Section 2.9* shall be paid, or may be charged by the Administrative Agent to any loan account(s) of the Borrower, at the Administrative Agent's option, on the date of such payment. Interest shall accrue and be due, until the next Business Day, if the amount so paid by the Borrower to the bank account designated by the Administrative Agent for such purpose is received in such bank account after 3:00 p.m.

(e)    At all times after the occurrence and during the continuance of a Cash Dominion Period and notification thereof by the Administrative Agent to the Borrower (subject to the provisions of *Section 10.3* and to the terms of the Security Agreement), on each Business Day, at or before 1:00 p.m., the Administrative Agent shall apply all Same Day Funds credited to the Concentration Account, *first* to pay any fees or expense reimbursements then due to the Administrative Agent, the FILO Documentation Agent, the Issuers and the Lenders (other than in connection with Cash Management Obligations, Obligations in respect of Secured Hedge Agreements or any Revolving Commitment Increases), *pro rata*, *second* to pay interest due and payable in respect of any Loans (including Swing Loans, but excluding FILO Loans) and any Protective Advances that may be outstanding, *pro rata*, *third* to prepay the principal of any Protective Advances that may be outstanding, *pro rata*, and *fourth* to prepay the principal of the Loans (including Swing Loans, but excluding FILO Loans) and to Cash Collateralize outstanding Letter of Credit Obligations, *pro rata*.

SECTION 2.10    Interest.

(a)    Rate of Interest. Subject to the provisions of *Section 3.3*, all Loans and the outstanding amount of all other Obligations owing under the Loan Documents shall bear interest, in the case of any Class of Loans, on the unpaid principal amount thereof from the date such Loans are made and, in the case of such other Obligations, from the date such other Obligations are due and payable until, in all cases, paid in full, except as otherwise provided in *clause (c)* below, as follows:

(i)    when used with respect to Revolving Obligations, if a Base Rate Loan or such other Revolving Obligation (other than a Term SOFR Loan), at a rate per annum equal to the sum of (A) the Base Rate as in effect from time to time and (B) the Applicable Margin for Base Rate Loans;

(ii)    when used with respect to Revolving Obligations, if a Term SOFR Loan, at a rate per annum equal to the sum of (A) Term SOFR determined for the applicable Interest Period and (B) the Applicable Margin for Term SOFR Loans in effect from time to time during such Interest Period;

(iii)    when used with respect to FILO Obligations, if a Base Rate Loan or such other FILO Obligation (other than a Term SOFR Loan), at a rate per annum equal to the sum of (A) the Base Rate as in effect from time to time and (B) the FILO Applicable Margin for Base Rate Loans; and

(iv)    when used with respect to FILO Obligations, if a Term SOFR Loan, at a rate per annum equal to the sum of (A) Term SOFR and (B) the FILO Applicable Margin for Term SOFR Loans.

Notwithstanding the foregoing, all FILO Loans shall be made and maintained as Term SOFR Loans (and may not be made as or converted to Base Rate Loans), except as otherwise provided in *Sections 3.2, 3.3* and *3.6*.

(b)    _Interest Payments_. (i) Interest accrued on each Base Rate Loan (other than Swing Loans) shall be payable in arrears (A) in the case of FILO Loans, on the first Business Day of each calendar month, commencing on the first such day following the making of such Base Rate Loan, (B) in the case of Revolving Loans, on the first Business Day of each January, April, July and October, commencing on the first such day following the making of such Base Rate Loan and (C) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Base Rate Loan, (ii) interest accrued on Swing Loans shall be payable in arrears on the first Business Day of each January, April, July and October, (iii) interest accrued on each Term SOFR Loan shall be payable in arrears (A) in the case of FILO Loans, on the first Business Day of each calendar month, commencing on the first such day following the making of such Term SOFR Loan, (B) in the case of Revolving Loans, on the last day of each Interest Period applicable to such Loan and, if such Interest Period has a duration of more than three (3) months, on each date during such Interest Period occurring every three (3) months from the first day of such Interest Period, (C) upon the payment or prepayment thereof in full or in part and (D) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Term SOFR Loan and (iv) interest accrued on the amount of all other Obligations shall be payable on demand from and after the time such Obligation becomes due and payable (whether by acceleration or otherwise).

(c)    _Default Interest_. The Borrower shall pay interest on past due amounts hereunder constituting Revolving Obligations at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. During the continuance of any Event of Default, the Borrower shall, (i) effective upon notice from the FILO Documentation Agent (which notice may elect to apply such Default Rate retroactively as of the first day of such Event of Default, or such later date as the FILO Documentation Agent may agree) or (ii) automatically when any Event of Default under _Section 10.1(f)_ exists, pay interest on all outstanding FILO Obligations at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

SECTION 2.11    Conversion/Continuation Option.

(a)    The Borrower may elect (i) at any time on any Business Day, to convert Base Rate Loans (other than Swing Loans) consisting of Revolving Loans or any portion thereof to Term SOFR Loans and (ii) at the end of any applicable Interest Period, to convert Term SOFR Loans consisting of Revolving Loans or any portion thereof into Base Rate Loans or to continue such Term SOFR Loans or any portion thereof for an additional Interest Period; _provided_, _however_, that the aggregate amount of Term SOFR Loans for each Interest Period must be in the amount of at least $1,000,000 or an integral multiple of $500,000 in excess thereof. Each conversion or continuation shall be allocated among the Revolving Loans of each Revolving Credit Lender in accordance with such Lender's Ratable Portion. Each such election shall be in substantially the form of _Exhibit F_ (a "_Notice of Conversion or Continuation_") and shall be made by giving the Administrative Agent at least two (2) Business Days' prior written notice specifying (A) the amount and Type of Revolving Loan being converted or continued, (B) in the case of a conversion to or a continuation of Term SOFR Loans, the applicable Interest Period and (C) in the case of a conversion, the date of such conversion.

(b)    The Administrative Agent shall promptly notify each Revolving Credit Lender of its receipt of a Notice of Conversion or Continuation and of the options selected therein. Notwithstanding the foregoing, the Administrative Agent or the Requisite Revolving Credit Lenders may require, by notice to the Borrower, that no conversion in whole or in part of Base Rate Loans consisting of Revolving Loans to Term SOFR Loans and no continuation in whole or in part of Term SOFR Loans consisting of Revolving Loans upon the expiration of any applicable Interest Period shall be permitted at any time at which (A) an Event of Default shall have occurred and be continuing, or (B) the continuation of, or

conversion into, a Term SOFR Loan would violate any provision of *Section 2.14*. If, within the time period required under the terms of this *Section 2.11*, the Administrative Agent does not receive a Notice of Conversion or Continuation from the Borrower containing a permitted election to continue any Term SOFR Loans consisting of Revolving Loans for an additional Interest Period or to convert any such Loans, then, upon the expiration of the applicable Interest Period, such Loans shall be automatically converted to Base Rate Loans. Each Notice of Conversion or Continuation shall be irrevocable.

SECTION 2.12    Fees.

(a)    Unused Commitment Fee. The Borrower agrees to pay in Same Day Funds in Dollars to the Administrative Agent for the account of each Revolving Credit Lender a commitment fee (the "*Unused Commitment Fee*") on the average daily amount by which the Revolving Credit Commitment of such Lender exceeds such Lender's Ratable Portion of the sum of (i) the aggregate outstanding principal amount of Revolving Loans for the applicable Class, and (ii) the outstanding amount of the aggregate Letter of Credit Undrawn Amounts from the Effective Date through the Revolving Credit Termination Date at the Applicable Unused Commitment Fee Rate, payable in arrears (x) on the first Business Day of each January, April, July and October, commencing on the first such Business Day following the Effective Date and (y) on the Revolving Credit Termination Date. For the avoidance of doubt, any Swing Loans outstanding shall reduce the Revolving Credit Commitment of the Swing Loan Lender in its capacity as a Lender.

(b)    Letter of Credit Fees. The Borrower agrees to pay the following amounts with respect to Letters of Credit issued by any Issuer:

(i)    to the Administrative Agent for the account of each Issuer of a Letter of Credit, with respect to each Letter of Credit issued by such Issuer, an issuance fee equal to 0.125% per annum of the average daily maximum undrawn face amount of such Letter of Credit for the immediately preceding calendar quarter (or portion thereof), payable in arrears (A) on the first Business Day of each January, April, July and October, commencing on the first such Business Day following the issuance of such Letter of Credit and (B) on the Revolving Credit Termination Date;

(ii)    to the Administrative Agent for the ratable benefit of the Revolving Credit Lenders, with respect to each Letter of Credit, a fee accruing in Dollars at a rate per annum equal to (x) in the case of each Standby Letter of Credit, the Applicable Margin for Term SOFR Loans and (y) in the case of each Documentary Letter of Credit, 50% of the Applicable Margin for Term SOFR Loans (each such fee, a "*Letter of Credit Fee*"), in each case multiplied by the daily Stated Amount of such Letter of Credit for the immediately preceding calendar quarter (or portion thereof), payable in arrears (A) on the first Business Day of each January, April, July and October, commencing on the first such Business Day following the issuance of such Letter of Credit and (B) on the Revolving Credit Termination Date; *provided, however,* that any Letter of Credit Fees otherwise payable for the account of a Defaulting Lender with respect to any Letter of Credit as to which such Defaulting Lender has not provided Cash Collateral satisfactory to the applicable Issuer pursuant to *Section 2.4* shall be payable, to the maximum extent permitted by applicable Law, to the other Revolving Credit Lenders in accordance with the upward adjustments in their respective Applicable Percentages allocable to such Letter of Credit pursuant to *Section 2.16(a)(iv)*, with the balance of such fee, if any, payable to the applicable Issuer for its own account; and

(iii)    to the Issuer of any Letter of Credit, with respect to the issuance, amendment or transfer of each Letter of Credit and each drawing made thereunder, customary

documentary and processing charges in accordance with such Issuer's standard schedule for such charges in effect at the time of issuance, amendment, transfer or drawing, as the case may be.

(c)     Additional Fees.  The Borrower has agreed to pay to (i) the Administrative Agent and the Arrangers additional fees, the amount and dates of payment of which are embodied in the Fee Letter, and (ii) the FILO Documentation Agent additional fees, the amount and dates of payment of which are embodied in the FILO Fee Letter.

SECTION 2.13     Payments and Computations.

(a)     All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  The Borrower shall make each payment and prepayment hereunder (including fees and expenses) not later than 2:00 p.m. on the day when due, in Dollars to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds without condition or deduction for any defense, recoupment, set-off or counterclaim.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office; *provided, however*, that all payments of principal and interest in respect of the FILO Loans shall be distributed to the FILO Documentation Agent for further distribution by the FILO Documentation Agent to the FILO Lenders as separately agreed by the FILO Lenders.  All payments received by the Administrative Agent after 2:00 p.m. shall, in each case, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)     All computations of interest for Base Rate Loans when the Base Rate is determined by Bank of America's "prime rate" shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)     Each payment by the Borrower of any Loan and Reimbursement Obligation (including interest and fees in respect thereof) and each reimbursement of costs, expenses and other Obligations owing under any Loan Document shall be made in Dollars.

(d)     Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, the due date for such payment shall be extended to the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be; *provided, however*, that if such extension would cause payment of interest on or principal of any Term SOFR Loan to be made in the next calendar month, such payment shall be made on the immediately preceding Business Day.  All repayments of any Revolving Loans shall be applied as follows:  *first*, to repay any such Loans outstanding as Base Rate Loans and *then*, to repay any such Loans outstanding as Term SOFR Loans, with those Term SOFR Loans having earlier expiring Interest Periods being repaid prior to those having later expiring Interest Periods.

(e)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the applicable Issuer hereunder that the Borrower will not make such payment, the Administrative

Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable Issuer, as the case may be, the amount due. With respect to any payment that the Administrative Agent makes for the account of the Lenders or any Issuer hereunder as to which the Administrative Agent determines (which determination shall be conclusive absent manifest error) that any of the following applies (such payment referred to as the "*Rescindable Amount*"): (1) the Borrower has not in fact made such payment; (2) the Administrative Agent has made a payment in excess of the amount so paid by the Borrower (whether or not then owed); or (3) the Administrative Agent has for any reason otherwise erroneously made such payment; then each of the Lenders or the applicable Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount so distributed to such Lender or such Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this clause (e) shall be conclusive, absent manifest error.

(f)     Except for payments and other amounts received by the Administrative Agent and applied in accordance with the provisions of *Section 10.2(c)* (or required to be applied in accordance with *Section 2.9*), all payments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied as follows: *first*, to pay principal of, and interest on, any portion of the Loans the Administrative Agent may have advanced pursuant to the express provisions of this Agreement on behalf of any Lender, for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, *second*, to pay all other Obligations then due and payable and *third*, as the Borrower so designates.  Payments in respect of Swing Loans received by the Administrative Agent shall be distributed to the Swing Loan Lender; payments in respect of Loans received by the Administrative Agent shall be distributed to each Lender in accordance with such Lender's Ratable Portion; and all payments of fees and all other payments in respect of any other Obligation shall be allocated among such of the Lenders and Issuers as are entitled thereto and, for such payments allocated to the Lenders, in proportion to their respective Ratable Portions.

(g)     At the option of the Administrative Agent, principal on the Swing Loans, Reimbursement Obligations, interest, fees, expenses and other sums due and payable in respect of the Loans and Protective Advances may be paid from the proceeds of Swing Loans or the Revolving Loans unless the Borrower makes such payments on the next succeeding Business Day after the Borrower receives written notice from the Administrative Agent requesting such payments.  The Borrower hereby authorizes the Swing Loan Lender to make such Swing Loans pursuant to *Section 2.3(a)* and the Lenders to make such Loans pursuant to *Section 2.2(a)* from time to time in the amounts of any and all principal payable with respect to the Swing Loans, Reimbursement Obligations, interest, fees, expenses and other sums payable in respect of the Loans and Protective Advances, and further authorizes the Administrative Agent to give the Lenders notice of any Borrowing with respect to such Swing Loans and the Revolving Loans and to distribute the proceeds of such Swing Loans and the Revolving Loans to pay such amounts. The Borrower agrees that all such Swing Loans and the Revolving Loans so made shall be deemed to have been requested by it (irrespective of the satisfaction of the conditions in *Section 4.2*, which conditions the Lenders irrevocably waive) and directs that all proceeds thereof shall be used to pay such amounts.

SECTION 2.14    [Reserved].

SECTION 2.15    Revolving Commitment Increase.

(a)    The Borrower may at any time or from time to time after the Second Restatement Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request one or more increases in the amount of any Class of Revolving Credit Commitments (each such increase, a "*Revolving Commitment Increase*"); *provided* that subject to the Limited Condition Acquisition provisions, at the time of any such Revolving Commitment Increase (and after giving effect thereto), no Default or Event of Default (or, in the case of any Revolving Commitment Increase to be used to fund a Limited Condition Acquisition, no Event of Default under *Section 10.1(a)* or *Section 10.1(f)* as of the Transaction Agreement Date) shall exist. Each Revolving Commitment Increase shall be in an aggregate principal amount that is not less than $20,000,000 (*provided* that such amount may be less than $20,000,000 if such amount represents all remaining availability under the limit set forth in the next sentence). Notwithstanding anything to the contrary herein, the aggregate amount of the Revolving Commitment Increases shall not exceed $150,000,000 (the "*Incremental Availability*"), and the Borrower may make a maximum of five (5) such requests. Each notice from the Borrower pursuant to this *Section 2.15* shall set forth the requested amount and proposed terms of the relevant Revolving Commitment Increases. Revolving Commitment Increases may be provided by any existing Revolving Credit Lender (it being understood that no existing Revolving Credit Lender will have an obligation to provide a portion of any Revolving Commitment Increase), in each case on terms permitted in this *Section 2.15* and otherwise on terms reasonably acceptable to the Administrative Agent or by any other Person constituting an Eligible Assignee (any such other Person being called an "*Additional Lender*"), *provided* that the Administrative Agent shall have consented (such consent not to be unreasonably withheld or delayed) to such Lender's or Additional Lender's providing such Revolving Commitment Increases if such consent would be required under *Section 12.2(b)* for an assignment of Loans or Revolving Credit Commitments to such Lender or Additional Lender. Revolving Credit Commitments in respect of Revolving Commitment Increases shall become Revolving Credit Commitments (or in the case of a Revolving Commitment Increase to be provided by an existing Revolving Credit Lender, an increase in such Lender's applicable Revolving Credit Commitment) under this Agreement pursuant to an amendment (an "*Incremental Amendment*") to this Agreement and, as appropriate, the other Loan Documents, executed by Parent, Holdings, the Borrower, each Revolving Credit Lender agreeing to provide such Revolving Credit Commitment, if any, each Additional Lender, if any, and the Administrative Agent. The Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section. The effectiveness of any Incremental Amendment shall be subject to the satisfaction on the date thereof (each, an "*Incremental Facility Effective Date*") of each of the conditions set forth in *Section 4.2* (it being understood that all references to "the date of such Loan or Issuance" or similar language in such *Section 4.2* shall be deemed to refer to the effective date of such Incremental Amendment) and such other conditions as the parties thereto shall agree. The representations and warranties contained in the Loan Documents (or, in the case of any Revolving Commitment Increase used to fund a Permitted Acquisition or similar permitted Investment (including any Limited Condition Acquisition), the Specified Representations) shall be accurate in all material respects (or, if qualified by "materiality", "Material Adverse Effect" or similar language, in all respects (after giving effect to such qualification)) before and after the effectiveness of any Incremental Amendment referred to below and any Revolving Commitment Increase shall be documented as an increase to the Revolving Facility and shall be on terms identical to those applicable to the Revolving Facility, except with respect to any commitment, arrangement, upfront or similar fees that may be agreed among the Borrower and the lenders agreeing to participate in such Revolving Commitment Increase. The Borrower shall use Revolving Commitment Increases only as permitted pursuant to *Section 8.9* hereof. Upon each increase

in the Revolving Credit Commitments pursuant to this *Section 2.15*, (x) each Revolving Credit Lender of the applicable Class immediately prior to such increase will automatically and without further act be deemed to have assigned to each Revolving Credit Lender providing a portion of the Revolving Commitment Increase of the applicable Class (each a "*Revolving Commitment Increase Lender*") in respect of such increase, and each such Revolving Commitment Increase Lender will automatically and without further act be deemed to have assumed, a portion of such Lender's participations hereunder in outstanding Letters of Credit and Swing Loans such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding (i) participations hereunder in Letters of Credit, (ii) participations hereunder in Swing Loans held by each Revolving Credit Lender of the applicable Class and (iii) participations in Protective Advances held by each Revolving Credit Lender of the applicable Class (including each such Revolving Commitment Increase Lender) will equal the percentage of the aggregate Revolving Credit Commitments of all Revolving Credit Lenders of such Class represented by such Lender's Revolving Credit Commitment and (y) if, on the date of such increase, there are any Revolving Loans of such Class outstanding, such Revolving Loans shall on or prior to the effectiveness of such Revolving Commitment Increase be prepaid from the proceeds of additional Revolving Loans of such Class made hereunder (reflecting such increase in Revolving Credit Commitments of such Class), which prepayment shall be accompanied by accrued interest on the Revolving Loans of such Class being prepaid and any costs incurred by any Revolving Credit Lender in accordance with *Section 3.5*. The Administrative Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(b)      This *Section 2.15* shall supersede any provisions in *Section 12.1* or *Section 12.7* to the contrary.

SECTION 2.16      Defaulting Lenders.

(a)      *Adjustments*.  Notwithstanding anything to the contrary contained in this Agreement, if any Revolving Credit Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)      *Waivers and Amendments*.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in *Section 12.1*.

(ii)      *Reallocation of Payments*.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to *Article X* or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to *Section 12.6*), shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to any Issuer or the Swing Loan Lender hereunder; *third*, if so determined by the Administrative Agent or requested by any Issuer or the Swing Loan Lender, to be held as cash collateral for future funding obligations of that Defaulting Lender of any participation in any Swing Loan or Letter of Credit; *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy

obligations of that Defaulting Lender to fund Loans under this Agreement; *sixth*, to the payment of any amounts owing to the Lenders, any Issuer or the Swing Loan Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, any Issuer or the Swing Loan Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or Letter of Credit Borrowings in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans or Letter of Credit Borrowings were made at a time when the conditions set forth in *Section 4.2* were satisfied or waived, such payment shall be applied solely to pay the Loans of, and Letter of Credit Borrowings owed to, all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or Letter of Credit Borrowings owed to, that Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this *Section 2.16(a)(ii)* shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    *Certain Fees*. That Defaulting Lender (x) shall not be entitled to receive any commitment fee pursuant to *Section 2.12(a)* for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender for such period) and (y) shall be limited in its right to receive Letter of Credit Fees as provided in *Section 2.12(b)*.

(iv)    *Reallocation of Applicable Percentages to Reduce Fronting Exposure*. During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Swing Loans or Letters of Credit pursuant to *Sections 2.3* and *2.4*, the "Applicable Percentage" of each non-Defaulting Lender shall be computed without giving effect to the Revolving Credit Commitment of that Defaulting Lender; *provided* that (i) each such reallocation shall be given effect only if, at the date the applicable Lender becomes a Defaulting Lender, no Default or Event of Default exists; and (ii) the aggregate obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit and Swing Loans shall not exceed the positive difference, if any, of (1) the Revolving Credit Commitment of that non-Defaulting Lender minus (2) the aggregate Outstanding Amount of the Revolving Loans (including Protective Advances) of that Lender.

(b)    *Defaulting Lender Cure*. If the Borrower, the Administrative Agent, Swing Loan Lender and the Issuers agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Revolving Loans and funded and unfunded participations in Letters of Credit and Swing Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to *Section 2.16(a)(iv)*), whereupon that Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower for the period that such Lender was a

Defaulting Lender; and *provided further* that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)        *Cash Collateral*.  At any time that there shall exist a Defaulting Lender, immediately upon the request of the Administrative Agent, the applicable Issuer or the Swing Loan Lender, the Borrower shall deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover all Fronting Exposure (after giving effect to *Section 2.16(a)(iv)* and any Cash Collateral provided by the Defaulting Lender).

SECTION 2.17    Extensions of Loans.

(a)        *Extension of Revolving Credit Commitments*.  The Borrower may at any time and from time to time request that all or a portion of the Revolving Credit Commitments of a given Class (each, an "*Existing Revolver Tranche*") be amended to extend the Scheduled Termination Date with respect to all or a portion of any principal amount of such Revolving Credit Commitments (any such Revolving Credit Commitments which have been so amended, "*Extended Revolving Credit Commitments*") and to provide for other terms consistent with this *Section 2.17*; *provided* that there shall be no more than two (2) Classes of Revolving Loans and Revolving Credit Commitments outstanding at any time.  In order to establish any Extended Revolving Credit Commitments, the Borrower shall provide a notice to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders under the applicable Existing Revolver Tranche) (each, a "*Extension Request*") setting forth the proposed terms (which shall be determined in consultation with the Administrative Agent) of the Extended Revolving Credit Commitments to be established, which shall (x) be identical as offered to each Lender under such Existing Revolver Tranche (including as to the proposed interest rates and fees payable) and offered pro rata to each Lender under such Existing Revolver Tranche and (y) be identical to the Revolving Credit Commitments under the Existing Revolver Tranche from which such Extended Revolving Credit Commitments are to be amended, except that: (i) the Scheduled Termination Date of the Extended Revolving Credit Commitments shall be later than the Scheduled Termination Date of the Revolving Credit Commitments of such Existing Revolver Tranche, (ii) the Extension Amendment may provide for other covenants and terms that (I) apply solely to any period after the Latest Maturity Date that is in effect on the effective date of the Extension Amendment (immediately prior to the establishment of such Extended Revolving Credit Commitments) or (II) are reasonably satisfactory to the Administrative Agent and the Borrower to incorporate such more restrictive provisions for the benefit of the Lenders (which amendment shall, notwithstanding any provision herein to the contrary, not require the consent of any Lender); and (iii) all borrowings under the Revolving Credit Commitments and repayments thereunder shall be made on a pro rata basis (except for (I) payments of interest and fees at different rates on Extended Revolving Credit Commitments (and related outstandings) and (II) repayments required upon the Revolving Credit Termination Date of the non-extending Revolving Credit Commitments); *provided, further*, that (A) the conditions precedent to a Borrowing set forth in *Section 4.2* shall be satisfied as of the date of such Extension Amendment and at the time when any Loans are made in respect of any Extended Revolving Credit Commitment, (B) in no event shall the final maturity date of any Extended Revolving Credit Commitments of a given Extension Series at the time of establishment thereof be earlier than the then Latest Maturity Date of any other Revolving Credit Commitments hereunder, (C) any such Extended Revolving Credit Commitments (and the Liens securing the same) shall be permitted by the terms of the Intercreditor Agreements (to the extent any Intercreditor Agreement is then in effect) and (D) all documentation in respect of such Extension Amendment shall be consistent with the foregoing.  Any Extended Revolving Credit Commitments amended pursuant to any Extension Request shall be designated a series (each, a "*Extension Series*") of Extended Revolving Credit Commitments for all purposes of this Agreement; *provided* that any Extended Revolving Credit

Commitments amended from an Existing Revolver Tranche may, to the extent provided in the applicable Extension Amendment, be designated as an increase in any previously established Extension Series with respect to such Existing Revolver Tranche. Each Extension Series of Extended Revolving Credit Commitments incurred under this *Section 2.17* shall be in an aggregate principal amount equal to not less than 50% of the aggregate Revolving Credit Commitments outstanding at the time such Extended Revolving Credit Commitments become effective.

(b)    *Extension Request*. The Borrower shall provide the applicable Extension Request at least ten (10) Business Days (or such shorter period as may be agreed by the Administrative Agent) prior to the date on which Lenders under the Existing Revolver Tranche are requested to respond, and shall agree to such procedures, if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably, to accomplish the purposes of this *Section 2.17*. No Lender shall have any obligation to agree to provide any Extended Revolving Credit Commitment pursuant to any Extension Request. Any Revolving Credit Lender (each, an "*Extending Revolving Credit Lender*") wishing to have all or a portion of its Revolving Credit Commitments under the Existing Revolver Tranche subject to such Extension Request amended into Extended Revolving Credit Commitments shall notify the Administrative Agent (each, an "*Extension Election*") on or prior to the date specified in such Extension Request of the amount of its Revolving Credit Commitments under the Existing Revolver Tranche which it has elected to request be amended into Extended Revolving Credit Commitments (subject to any minimum denomination requirements imposed by the Administrative Agent). In the event that the aggregate principal amount of Revolving Credit Commitments under the Existing Revolver Tranche in respect of which applicable Revolving Credit Lenders shall have accepted the relevant Extension Request exceeds the amount of Extended Revolving Credit Commitments requested to be extended pursuant to the Extension Request, Revolving Credit Commitments subject to Extension Elections shall be amended to reflect allocations of the Extended Revolving Credit Commitments, which Extended Revolving Credit Commitments shall be allocated as agreed by Administrative Agent and the Borrower.

(c)    *New Revolving Commitment Lenders*. Following any Extension Request made by the Borrower in accordance with this *Section 2.17*, if the Revolving Credit Lenders shall have declined to agree during the period specified in *Section 2.17(b)* above to provide Extended Revolving Credit Commitments in an aggregate principal amount equal to the amount requested by the Borrower in such Extension Request, the Borrower may request that banks, financial institutions or other institutional lenders or investors other than the Revolving Credit Lenders or Extending Revolving Credit Lenders (the "*New Revolving Commitment Lenders*"), which New Revolving Commitment Lenders may elect to provide an Extended Revolving Credit Commitment hereunder (the "*New Revolving Credit Commitment*"); *provided* that such Extended Revolving Credit Commitments of such New Revolving Commitment Lenders (i) shall be in an aggregate principal amount for all such New Revolving Commitment Lenders not to exceed the aggregate principal amount of Extended Revolving Credit Commitments so declined to be provided by the existing Revolving Credit Lenders and (ii) shall be on identical terms to the terms applicable to the terms specified in the applicable Extension Request (and any Extended Revolving Credit Commitments provided by existing Revolving Credit Lenders in respect thereof); *provided further* that, as a condition to the effectiveness of any Extended Revolving Credit Commitment of any New Revolving Commitment Lender, the Administrative Agent, each Issuer and the Swing Loan Lender shall have consented (such consent not to be unreasonably withheld or delayed) to each New Revolving Commitment Lender if such consent would be required under *Section 12.2(b)(iii)* for an assignment of Revolving Credit Commitments to such Person. Notwithstanding anything herein to the contrary, any Extended Revolving Credit Commitment provided by New Revolving Commitment Lenders shall be pro rata to each New Revolving Commitment Lender. Upon effectiveness of the Extension Amendment to which each such New Revolving Commitment Lender is a party, (a) the Revolving Credit Commitments of all existing Revolving Credit Lenders of each Class specified in the

Extension Amendment in accordance with this *Section 2.17* will be permanently reduced pro rata by an aggregate amount equal to the aggregate principal amount of the Extended Revolving Credit Commitments of such New Revolving Commitment Lenders and (b) the Revolving Credit Commitment of each such New Revolving Commitment Lender will become effective.  The Extended Revolving Credit Commitments of New Revolving Commitment Lenders will be incorporated as Revolving Credit Commitments hereunder in the same manner in which Extended Revolving Credit Commitments of existing Revolving Credit Lenders are incorporated hereunder pursuant to this *Section 2.17*, and for the avoidance of doubt, all Borrowings and repayments of Revolving Loans from and after the effectiveness of such Extension Amendment shall be made pro rata across all Classes of Revolving Credit Commitments including such New Revolving Commitment Lenders (based on the outstanding principal amounts of the respective Classes of Revolving Credit Commitments) except for (x) payments of interest and fees at different rates for each Class of Revolving Credit Commitments (and related Outstanding Amounts) and (y) repayments required on the Revolving Credit Termination Date for any particular Class of Revolving Credit Commitments.  Upon the effectiveness of each New Revolving Credit Commitment pursuant to this *Section 2.17(c)*, (a) each Revolving Credit Lender of all applicable existing Classes of Revolving Credit Commitments immediately prior to such effectiveness will automatically and without further act be deemed to have assigned to each New Revolving Commitment Lender, and each such New Revolving Commitment Lender will automatically and without further act be deemed to have assumed, a portion of such Revolving Credit Lender's participations hereunder in outstanding Letters of Credit and Swing Loans such that, after giving effect to each such deemed assignment and assumption of participations, subject to *Section 2.16*, the percentage of the outstanding (i) participations hereunder in Letters of Credit and (ii) participations hereunder in Swing Loans held by each Revolving Credit Lender of each Class of Revolving Credit Commitments (including each such New Revolving Commitment Lender) will equal the percentage of the aggregate Revolving Credit Commitments of all Classes of Revolving Credit Lenders represented by such Revolving Credit Lender's Revolving Credit Commitment and (b) if, on the date of such effectiveness, there are any Revolving Loans outstanding, such Revolving Loans shall on or prior to the effectiveness of such New Revolving Credit Commitment be prepaid from the proceeds of Revolving Loans made hereunder under the New Revolving Credit Commitments, which prepayment shall be accompanied by accrued interest on the Revolving Loans being prepaid and any costs incurred by any Revolving Credit Lender in accordance with *Section 3.5*.  The Administrative Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

　　　　　(d)　　*Extension Amendment*.  Extended Revolving Credit Commitments and New Revolving Credit Commitments shall be established pursuant to an amendment (each, an "*Extension Amendment*") to this Agreement among the Borrower, the Administrative Agent and each Extending Revolving Credit Lender and each New Revolving Commitment Lender, if any, providing an Extended Revolving Credit Commitment or a New Revolving Credit Commitment, as applicable, thereunder, which shall be consistent with the provisions set forth in *Sections 2.17(a, (b))* and *(c)* above (but which shall not require the consent of any other Lender).  The effectiveness of any Extension Amendment shall be subject to the satisfaction on the date thereof of each of the conditions set forth in *Sections 4.2(a)* and *(b)* and, to the extent reasonably requested by the Administrative Agent, receipt by the Administrative Agent of (i) legal opinions, board resolutions and officers' certificates consistent with those delivered on the Second Restatement Date other than changes to such legal opinion resulting from a Change in Law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent and (ii) reaffirmation agreements and/or such amendments to the Collateral Documents as may be reasonably requested by the Collateral Agent in order to ensure that the Extended Revolving Credit Commitments or the New Revolving Credit Commitments, as the case may be, are provided with the benefit of the applicable Loan Documents.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension Amendment.  Each of the parties hereto hereby agrees that this

Agreement and the other Loan Documents may be amended pursuant to an Extension Amendment, without the consent of any other Lenders, to the extent (but only to the extent) necessary to (i) reflect the existence and terms of the Extended Revolving Credit Commitments or the New Revolving Credit Commitments, as the case may be, incurred pursuant thereto, (ii) make such other changes to this Agreement and the other Loan Documents (without the consent of the Requisite Lenders) and (iii) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section, and the Requisite Lenders hereby expressly authorize the Administrative Agent to enter into any such Extension Amendment.

(e)    No conversion of Revolving Loans pursuant to any Extension in accordance with this *Section 2.17* shall constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement.

SECTION 2.18    Sustainability Adjustments.    After the Second Restatement Date, the Borrower, in consultation with the Administrative Agent (in such capacity, the "*Sustainability Coordinator*"), shall be entitled to establish specified Key Performance Indicators ("*KPI's*") with respect to certain Environmental, Social and Governance ("*ESG*") targets of Holdings and its Subsidiaries. The Sustainability Coordinator, the Requisite Revolving Credit Lenders and the Borrower may amend this Agreement (such amendment, the "*ESG Amendment*") solely for the purpose of incorporating the KPI's and other related provisions (the "*ESG Pricing Provisions*") into this Agreement. Upon effectiveness of any such ESG Amendment, based on Holdings' and its Subsidiaries' performance against the KPI's, certain adjustments (increase, decrease or no adjustment) to the otherwise applicable Applicable Unused Commitment Fee Rate, Applicable Margin for Base Rate Loans consisting of Revolving Loans, and Applicable Margin for Term SOFR Loans consisting of Revolving Loans will be made; *provided that* the amount of such adjustments shall not exceed (i) a 0.05% increase and/or a 0.05% decrease in the otherwise applicable Applicable Margin for Term SOFR Loans consisting of Revolving Loans, in each case, determined based upon the applicable rating on the effective date of the ESG Amendment, and the adjustments to the Applicable Margin for Base Rate Loans consisting of Revolving Loans shall be the same amount, in basis points, as the adjustments to the Applicable Margin for Term SOFR Loans consisting of Revolving Loans or (ii) a 0.01% increase and/or a 0.01% decrease in the otherwise Applicable Unused Commitment Fee Rate. The pricing adjustments pursuant to the KPI's will require, among other things, reporting and validation of the measurement of the KPI's in a manner that is aligned with the Sustainability Linked Loan Principles and is to be agreed between the Borrower and the Sustainability Coordinator (each acting reasonably). Following the effectiveness of the ESG Amendment, any modification to the ESG Pricing Provisions which does not have the effect of reducing the Applicable Unused Commitment Fee Rate, Applicable Margin for Base Rate Loans consisting of Revolving Loans or Applicable Margin for Term SOFR Loans consisting of Revolving Loans to a level not otherwise permitted by this paragraph shall be subject only to the consent of the Requisite Revolving Credit Lenders.  The Sustainability Coordinator will (i) assist the Borrower in determining the ESG Pricing Provisions in connection with the ESG Amendment and (ii) assist the Borrowers in preparing informational materials focused on ESG to be used in connection with the ESG Amendment.  The provisions of this Section shall supersede any provisions in Section 12.1 to the contrary.

SECTION 2.19    FILO Deficiency Reserve; Certain Availability Reserves.

(a)    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, as long as any portion of the FILO Loans are outstanding, the Administrative Agent shall implement and maintain the FILO Deficiency Reserve, if applicable.  For the purposes of determining any FILO Deficiency Reserve, the Administrative Agent shall be entitled to rely solely on the calculation thereof made by the Borrower as reflected in the most recent Borrowing Base Certificate delivered by the

Borrower to the Administrative Agent, unless the Administrative Agent is notified in writing by the FILO Documentation Agent that such calculation is inaccurate and providing the Administrative Agent and the Borrower with the correct calculation, prepared in good faith, of the FILO Deficiency Reserve (any such notice, a "*FILO Deficiency Reserve Correction Notice*"), and, in such event, the Administrative Agent shall be entitled to rely solely on the calculation of the FILO Deficiency Reserve made by the FILO Documentation Agent as reflected in the FILO Deficiency Reserve Correction Notice.  Upon receipt by the Administrative Agent of a Borrowing Base Certificate or a FILO Deficiency Reserve Correction Notice, as applicable, the Administrative Agent shall have a two (2) Business Day period of time to implement any FILO Deficiency Reserve or any adjustments to the FILO Deficiency Reserve then in effect as set forth in such Borrowing Base Certificate or such FILO Deficiency Reserve Correction Notice, as the case may be, and shall thereafter maintain such FILO Deficiency Reserve until further adjustment, if any, pursuant to receipt of a subsequent Borrowing Base Certificate or FILO Deficiency Reserve Correction Notice.  The Administrative Agent shall not have any liability for relying on the calculation of any FILO Deficiency Reserve as set forth in a Borrowing Base Certificate delivered by the Borrower or in any FILO Deficiency Reserve Correction Notice delivered by the FILO Documentation Agent, as the case may be.  In the event of any discrepancy or dispute between the FILO Documentation Agent and the Borrower as to the amount of any FILO Deficiency Reserve, the Administrative Agent shall rely (and shall be entitled to rely) solely on the calculation of the FILO Deficiency Reserve as determined by the FILO Documentation Agent and shall have no liability to any Person for doing so.

(b)     At any time that Excess Availability is less than $75,000,000 or an Event of Default is continuing, upon the written request of the FILO Documentation Agent (with any such written request to be delivered to the Borrower concurrent with delivery to the Administrative Agent), the Administrative Agent shall establish a Cash Management Reserve, a Bank Product Reserve and a Swap Obligations Reserve.  The amount of such Cash Management Reserve, Bank Product Reserve and Swap Obligations Reserve shall be determined by the Administrative Agent in its Permitted Discretion, in consultation with the FILO Documentation Agent, and shall be reviewed and adjusted by the Administrative Agent periodically (but no less frequently than with the delivery of each Borrowing Base Certificate) to reflect any material changes in the credit exposure with respect to such Obligations.  The Administrative Agent shall release any such Cash Management Reserve, Bank Product Reserve and Swap Obligations Reserve established pursuant to this *Section 2.19(b)* on the date on which (x) if the occurrence of an Event of Default was the basis for establishing such reserve, no Event of Default is continuing or (y) if Excess Availability being less than $75,000,000 was the basis for establishing such reserve, Excess Availability is at least equal to $75,000,000.  The foregoing provisions are intended solely to establish circumstances in which the Administrative Agent must establish, at the direction of the FILO Documentation Agent, any such Cash Management Reserve, Bank Product Reserve and Swap Obligations Reserve.  This *Section 2.19(b)* shall not limit the right of the Administrative Agent to establish Availability Reserves at such time and in such amounts as the Administrative Agent determines in its Permitted Discretion and in accordance with the terms of this Agreement.

(c)     Notwithstanding anything to the contrary contained in this Agreement, as long as any FILO Loans remain outstanding, (i) the Administrative Agent shall maintain Availability Reserves against the Borrowing Base of the type established on the Second Restatement Date, which Availability Reserves shall be calculated by the same methodology as established on the Second Restatement Date; *provided* that (A) subject to the following *clause (ii)*, the Administrative Agent may eliminate (or reduce below the level of such Availability Reserve as of the Second Restatement Date) any such Availability Reserve concurrently with or after elimination or reduction of the risk, event or circumstance that gave rise to the establishment of such Availability Reserve (other than any Cash Management Reserve, Bank Product Reserve or Swap Obligations Reserve described in *Section 2.19(b)*, which shall be implemented and may be released in accordance with the terms of *Section 2.19(b)*), (B) the Administrative Agent may, in accordance with the terms of this Agreement, change the methodology used to calculate any such

Availability Reserve if the effect of such change is to increase the amount of such Availability Reserve and (C) subject to the following *clause (ii)*, the Administrative Agent may reduce, eliminate or modify any Availability Reserve against the Borrowing Base to the extent imposed or established after the Second Restatement Date; *provided*, *further*, that, in connection with a Conforming Post-Petition Financing and that is consented to by the Administrative Agent, the Person providing such Post-Petition Financing may release or eliminate any Availability Reserves against the Borrowing Base implemented and maintained by the Administrative Agent that relate to claims or rights that are not senior in priority to such Post-Petition Financing, and (ii) at any time that Excess Availability is less than $75,000,000 or an Event of Default is continuing, the Administrative Agent shall establish Availability Reserves against the Borrowing Base as recommended by the field examiner in connection with any Field Examination (other than any such recommended Availability Reserves that the Administrative Agent and the FILO Documentation Agent mutually agreed to remove or not to implement in connection with or following a prior Field Examination) and shall maintain such Availability Reserves until the field examiner recommends their removal in connection with a subsequent Field Examination, unless otherwise mutually agreed by the Administrative Agent and the FILO Documentation Agent, each in its Permitted Discretion. For clarity, the foregoing shall not limit the right of the Administrative Agent, (x) to modify the amount of any of any Availability Reserves against the Borrowing Base based upon mathematical calculations (*e.g.*, based on an increase or reduction in deposits at the time of calculation) or (y) without regard to the foregoing *clause (x)*, but subject to the foregoing *clause (ii)*, to increase any Availability Reserve against the Borrowing Base from the level established as of the Second Restatement Date and thereafter to reduce the amount of such Availability Reserve to an amount not less than (unless otherwise permitted pursuant to this *Section 2.19(c)*) the amount thereof established on the Second Restatement Date, in the case of each of *clauses (x)* and *(y)*, in a manner otherwise permitted by this Agreement.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

SECTION 3.1        <u>Taxes</u>.  For purposes of this Section 3.1, the term "*applicable Law*" or "*Law*" includes FATCA.

(a)        All sums payable by any Loan Party hereunder or under any other Loan Document to any Agent, Issuer or any Lender shall (except to the extent required by Law) be paid free and clear of, and without any deduction or withholding on account of, any Taxes.

(b)        If any Loan Party or any Agent, Issuer or Lender is required by Law to make any deduction or withholding on account of any Non-Excluded Tax or Other Taxes from any sum paid or payable by any Loan Party to any Lender, Issuer or Agent under any of the Loan Documents: (i) the applicable Loan Party (if it is required to make the deduction or withholding) shall notify the applicable Agent of any such requirement or any change in any such requirement as soon as reasonably practicable after such Loan Party becomes aware of it; (ii) the applicable Loan Party or Agent, Issuer or Lender, as applicable, shall make such deduction or withholding and pay to the relevant Governmental Authority, in accordance with applicable Law, any such Non-Excluded Tax or Other Tax before the date on which penalties attach thereto; (iii) the sum payable to such Lender, Issuer or Agent (as applicable) shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding (including any deductions or withholdings attributable to any payments required to be made under this *Section 3.1*), such Lender, Issuer or Agent (as applicable), receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and (iv) within thirty days after paying any sum from which it is required by Law to make any deduction or withholding (or, if later, within thirty days after the due date of payment of any Tax which it is required by clause (ii) above to pay), the Loan Party making such payments (if it is required to make

the deduction or withholding) shall deliver to the Administrative Agent evidence reasonably satisfactory to the Administrative Agent of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority.

(c)    Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under any Loan Document.  Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this *Section 3.1(c)*) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent of its inability to do so.

Without limiting the foregoing:

(1)    Each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(2)    Each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, two properly completed and duly signed original copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(B)    two properly completed and duly signed original copies of IRS Form W-8ECI or W-8EXP (or any successor forms),

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates substantially in the form of Exhibit M (any such certificate, a "United States Tax Compliance Certificate") to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to any Loan Party described in Section 881(c)(3)(C) of the Code, and that no payment under any Loan Document is effectively connected with such Foreign Lender's U.S. trade or business, and (y) two properly completed and duly signed original copies of IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

DB1/ 145587008.11

US-DOCS\149610879.14

(D)     to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), two properly completed duly signed original copies of IRS Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, as applicable United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information (or any successor forms) from each beneficial owner that would be required under this *Section 3.1(c)* if such beneficial owner were a Lender, as applicable (provided that, if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Foreign Lender on behalf of such beneficial owner), or

(E)     two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax Laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding tax on any payments to such Lender under the Loan Documents.

(3)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (3), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(d)     In addition to the payments by a Loan Party required by *Section 3.1(b)*, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(e)     The Borrower shall indemnify each Lender, each Issuer and each Agent (each a *"Tax Indemnitee"*), within 20 days after written demand therefor, for the full amount of any Non-Excluded Taxes paid or payable by such Tax Indemnitee that is imposed on or in respect of any payment under or with respect to any Loan Document, and any Other Taxes payable by such Tax Indemnitee (including Non-Excluded Taxes or Other Taxes imposed on or attributable to amounts payable under this *Section 3.1*), whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority.  A certificate setting forth in reasonable detail the basis for such claim and the calculation of the amount of such payment or liability prepared in good faith and delivered by the Tax Indemnitee or by the Administrative Agent on its own behalf or on behalf of another Tax Indemnitee, shall be conclusive absent manifest error.

(f)     If and to the extent that a Tax Indemnitee, in its sole discretion (exercised in good faith), determines that it has received a refund of any Non-Excluded Taxes or Other Taxes in respect of which it has received additional payments under this *Section 3.1*, then such Tax Indemnitee shall pay to the relevant Loan Party the amount of such refund, net of all reasonable out-of-pocket expenses of the

Tax Indemnitee (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Party, upon the request of the Tax Indemnitee, agrees to repay the amount paid over by the Tax Indemnitee (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee if the Tax Indemnitee is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(g)    In the event that a Loan Party makes an indemnification payment to a Tax Indemnitee with respect to Non-Excluded Taxes or Other Taxes pursuant to subsection (e) of this *Section 3.1* or a Loan Party is required to repay to a Tax Indemnitee an amount in respect of a refund of any Non-Excluded Taxes or Other Taxes previously paid over to such Loan Party pursuant to subsection (f) of this *Section 3.1*, such Tax Indemnitee shall reasonably cooperate with all reasonable requests of such Loan Party, at the sole expense of such Loan Party, if (i) in the reasonable judgment of the Tax Indemnitee such cooperation shall not subject such Tax Indemnitee, as the case may be, to any unreimbursed third party cost or expense or otherwise be materially disadvantageous to such Tax Indemnitee and (ii) there is a reasonable basis for such Loan Party to contest with the applicable Governmental Authority the imposition of such Non-Excluded Taxes or Other Taxes or the repayment of such refund.  Any resulting refund shall be governed by *Section 3.1(f)*.  This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)    Each of the Administrative Agent and the FILO Documentation Agent (and any successor thereto or sub-agent or supplemental agent thereof) shall deliver to the Borrower on or prior to the date on which it becomes an Agent hereunder or under any other Loan Document (and from time to time thereafter upon the reasonable request of the Borrower) two properly completed and duly signed original copies of IRS Form W-9 (or any successor form). The FILO Documentation Agent hereby represents and warrants to the Loan Parties that it is a "U.S. person" and a "financial institution" and that it will comply with its "obligation to withhold," each within the meaning of Treasury Regulations Section 1.1441-1(b)(2)(ii).

SECTION 3.2    Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to SOFR or Term SOFR, or to determine or charge interest rates based upon SOFR or Term SOFR, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of such Lender to make or continue Term SOFR Loans or to convert Base Rate Loans to Term SOFR Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor (or, in the case of any impacted FILO Loan, the last day of the current calendar month), if such Lender may lawfully continue to maintain such Term SOFR Loan to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loan

and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon SOFR, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to *Section 3.5*.

SECTION 3.3        Inability to Determine Rates.

(a)        If in connection with any request for a Term SOFR Loan or a conversion of Base Rate Loans to Term SOFR Loans or a continuation or maintenance of any of such Loans, as applicable, (i) the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (A) no Successor Rate has been determined in accordance with *Section 3.3(b)*, and the circumstances under *clause (i) of Section 3.3(b)* or the Scheduled Unavailability Date has occurred, or (B) adequate and reasonable means do not otherwise exist for determining Term SOFR for any requested Interest Period (or, in the case of the FILO Loans, for any calendar month) with respect to an existing or proposed Term SOFR Loan or in connection with an existing or proposed Base Rate Loan, or (ii) the Administrative Agent or the Requisite Revolving Credit Lenders (with respect to the Revolving Obligations) or the FILO Documentation Agent (with respect to the FILO Obligations) determine that for any reason that Term SOFR for any requested Interest Period (or, in the case of the FILO Loans, for any calendar month) with respect to an existing or proposed Loan does not adequately and fairly reflect the cost to the applicable Lenders of funding or maintaining such Loan, the Administrative Agent will promptly so notify the Borrower and each applicable Lender.

Thereafter, (x) the obligation of the applicable Lenders to make or maintain Term SOFR Loans, or to convert Base Rate Loans to Term SOFR Loans, shall be suspended (to the extent of the affected Term SOFR Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Term SOFR component of the Base Rate, the utilization of the Term SOFR component in determining the Base Rate for such Loans shall be suspended, in each case until the Administrative Agent (or, in the case of a determination by the Requisite Revolving Credit Lenders or the FILO Documentation Agent described in *clause (ii)* of this *Section 3.3(a)*, until the Administrative Agent upon instruction of the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable) revokes such notice.

Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, or conversion to, or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Committed Borrowing of Base Rate Loans in the amount specified therein and (ii) any outstanding Term SOFR Loans shall be deemed to have been converted to Base Rate Loans immediately at the end of their respective applicable Interest Period (or, in the case of any impacted FILO Loan, at the end of the current calendar month).

(b)        Replacement of Term SOFR or Successor Rate. Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or Requisite Revolving Credit Lenders

(with respect to the Revolving Obligations) or FILO Documentation Agent (with respect to the FILO Obligations) notify the Administrative Agent (with, in the case of the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable, a copy to the Borrower) that the Borrower or Requisite Revolving Credit Lenders or FILO Documentation Agent (as applicable) have determined, that:

(i)        adequate and reasonable means do not exist for ascertaining one month, three month and six month interest periods of Term SOFR (or, in the case of the FILO Loans, the one month period of Term SOFR), including, without limitation, because the Term SOFR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)        CME or any successor administrator of the Term SOFR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent or such administrator with respect to its publication of Term SOFR, in each case acting in such capacity, has made a public statement identifying a specific date after which one month, three month and six month interest periods of Term SOFR (or, in the case of the FILO Loans, the one month period of Term SOFR) or the Term SOFR Screen Rate shall or will no longer be made available, or permitted to be used for determining the interest rate of U.S. dollar denominated syndicated loans, or shall or will otherwise cease, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent, that will continue to provide such interest periods of Term SOFR after such specific date (the latest date on which one month, three month and six month interest periods of Term SOFR (or, in the case of the FILO Loans, the one month period of Term SOFR) or the Term SOFR Screen Rate are no longer available permanently or indefinitely, the "*Scheduled Unavailability Date*");

then, on a date and time determined by the Administrative Agent (any such date, the "*Term SOFR Replacement Date*"), which date shall be at the end of an Interest Period (or, in the case of the FILO Loans, at the end of the current calendar month) or on the relevant interest payment date, as applicable, for interest calculated and, solely with respect to *clause (ii)* above, no later than the Scheduled Unavailability Date, Term SOFR will be replaced hereunder and under any Loan Document with (x) with respect to the Revolving Obligations, Daily Simple SOFR *plus* the SOFR Adjustment for any payment period for interest calculated that can be determined by the Administrative Agent, or (y) with respect to the FILO Obligations, an alternate benchmark rate that has been selected by the Administrative Agent, the FILO Documentation Agent and the Borrower giving due consideration to any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current rate applicable to FILO Obligations hereunder for similar credit facilities at such time, in each case of the foregoing *clauses (x)* and *(y)*, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document (the "*Successor Rate*").

(c)        Solely with respect to the Revolving Obligations, if the Successor Rate is Daily Simple SOFR plus the SOFR Adjustment, all interest payments will be payable on a quarterly basis (it being understood that all interest payments with respect to the FILO Loans will always be payable on a monthly basis).

(d)        Notwithstanding anything to the contrary herein, (i) solely with respect to the Revolving Obligations, if the Administrative Agent determines that Daily Simple SOFR is not available on or prior to the Term SOFR Replacement Date, or (ii) if the events or circumstances of the type described in *Section 3.3(b)(i)* or *(ii)* have occurred with respect to Term SOFR or the Successor Rate then in effect, then in each case, the Administrative Agent and the Borrower may amend this Agreement solely for the purpose of replacing Term SOFR or any then current Successor Rate in accordance with this

*Section 3.3* at the end of any Interest Period (or, in the case of the FILO Loans, at the end of the current calendar month), relevant interest payment date or payment period for interest calculated, as applicable, with (x) with respect to the Revolving Obligations, an alternative benchmark rate giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated credit facilities syndicated and agented in the United States for such alternative benchmark, and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated credit facilities syndicated and agented in the United States for such benchmark, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated, or (y) with respect to the FILO Obligations, an alternate benchmark rate described in *clause (y)* of the definition of "Successor Rate" above.  For the avoidance of doubt, any such proposed rate and adjustments shall constitute a "*Successor Rate*".  Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all applicable Lenders and the Borrower unless, prior to such time, Lenders comprising the Requisite Revolving Credit Lenders (with respect to the Revolving Obligations) or the FILO Documentation Agent (with respect to the FILO Obligations) have delivered to the Administrative Agent written notice that such Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable, object to such amendment.

(e)     The Administrative Agent will promptly (in one or more notices) notify the Borrower and each applicable Lender of the implementation of any Successor Rate.

(f)     Any Successor Rate shall be applied in a manner consistent with market practice; *provided* that to the extent such market practice is not administratively feasible for the Administrative Agent, such Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

(g)     Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than the applicable Floor, the Successor Rate will be deemed to be the applicable Floor for the purposes of this Agreement and the other Loan Documents.  The Floor shall be determined separately for the Revolving Obligations and the FILO Obligations, as set forth in the definition of "Floor".

(h)     In connection with the implementation of a Successor Rate, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement; *provided* that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

SECTION 3.4     Increased Cost and Reduced Return; Capital Adequacy; Reserves on Term SOFR Loans.

(a)     *Increased Costs Generally*.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or any Issuer;

(ii)    subject any Lender or any Issuer to any Tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any Term SOFR Loan made by it, or change the basis of taxation of payments to such Lender or the Issuer in respect thereof (except for any Excluded Taxes or any Non-Excluded Taxes or Other Taxes indemnifiable or otherwise paid under *Section 3.1*); or

(iii)    impose on any Lender or any Issuer any other condition, cost or expense (other than Taxes) affecting this Agreement or Term SOFR Loans made by such Lender or any Letter of Credit or participation therein, in each case that is not otherwise accounted for in this *clause (a)*;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan the interest on which is determined by reference to Term SOFR (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or such Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or Issuer hereunder (whether of principal, interest or any other amount) then, from time to time within ten (10) days after demand by such Lender or Issuer setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender or Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)    *Capital Requirements*.  If any Lender or any Issuer reasonably determines that any Change in Law affecting such Lender or such Issuer or any Lending Office of such Lender or such Lender's or such Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or such Issuer's capital or on the capital of such Lender's or such Issuer's holding company, if any, as a consequence of this Agreement, the Revolving Credit Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuer, to a level below that which such Lender or such Issuer or such Lender's or such Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuer's policies and the policies of such Lender's or such Issuer's holding company with respect to capital adequacy), then from time to time upon demand of such Lender or such Issuer setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender or such Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuer or such Lender's or such Issuer's holding company for any such reduction suffered.

(c)    *Certificates for Reimbursement*.  A certificate of a Lender or an Issuer setting forth the amount or amounts necessary to compensate such Lender or such Issuer or its holding company, as the case may be, as specified in *subsection (a)* or *(b)* of this *Section 3.4* and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender or such Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    *Delay in Requests*.  Failure or delay on the part of any Lender or any Issuer to demand compensation pursuant to the foregoing provisions of this *Section 3.4* shall not constitute a waiver of such Lender's or such Issuer's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender or an Issuer pursuant to the foregoing provisions of this *Section 3.4* for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender or such Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Issuer's intention to claim

compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180 day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 3.5    Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)    any assignment of a Term SOFR Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to *Section 3.7*;

including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

SECTION 3.6    Matters Applicable to all Requests for Compensation.

(a)    *Designation of a Different Lending Office*.  If any Lender requests compensation under *Section 3.4*, or the Borrower is required to pay any additional amount to any Lender, any Issuer, or any Governmental Authority for the account of any Lender or any Issuer pursuant to *Section 3.1*, or if any Lender gives a notice pursuant to *Section 3.2*, then such Lender or such Issuer shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or such Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to *Section 3.1* or *3.4*, as the case may be, in the future, or eliminate the need for the notice pursuant to *Section 3.2*, as applicable, and (ii) in each case, would not subject such Lender or such Issuer, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or such Issuer, as the case may be in any material economic, legal or regulatory respect.

(b)    *Suspension of Lender Obligations*.  If any Lender requests compensation by the Borrower under *Section 3.4*, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make, continue Term SOFR Loans from one Interest Period to another Interest Period or maintain Term SOFR Loans, or to convert Base Rate Loans into Term SOFR Loans, until the event or condition giving rise to such request ceases to be in effect; *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

SECTION 3.7    Replacement of Lenders under Certain Circumstances.

If (i) any Lender requests compensation under *Section 3.4* or ceases to make Term SOFR Loans as a result of any condition described in *Section 3.2* or *Section 3.4*, (ii) the Borrower is required to

pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to *Section 3.1*, (iii) any Lender is a Non-Consenting Lender or (iv) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, *Section 12.2*), all of its interests, rights and obligations under this Agreement and the related Loan Documents to one or more Eligible Assignees that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee specified in *Section 12.2(b)(iv)*;

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.5 and, in the case of any FILO Loan, any applicable FILO Prepayment Premium due and payable with respect thereto, determined as if such Loan were voluntarily prepaid as of such date) from the assignee (to the extent of such outstanding principal and accrued interest and fees, other than the applicable FILO Prepayment Premium) or the Borrower (in the case of all other amounts, including the applicable FILO Prepayment Premium);

(c)    such Lender being replaced pursuant to this *Section 3.7* shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans, and (ii) deliver any Revolving Credit Notes or FILO Notes evidencing such Loans to the Borrower or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Revolving Credit Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Revolving Credit Notes or FILO Notes, as applicable, shall be deemed to be canceled upon such failure;

(d)    pursuant to such Assignment and Assumption, (i) the Eligible Assignee shall acquire all or a portion, as the case may be, of the assigning Lender's Revolving Credit Commitment and outstanding Loans, (ii) the Eligible Assignee shall purchase, at par, all Loans, accrued interest, accrued fees and other amounts owing to the assigning Lender as of the date of replacement and (iii) upon such payment (regardless of whether such replaced Lender has executed an Assignment and Assumption or delivered its Revolving Credit Notes or FILO Notes, as applicable, to the Borrower or the Administrative Agent), the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Revolving Credit Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender;

(e)    in the case of any such assignment resulting from a claim for compensation under *Section 3.4* or payments required to be made pursuant to *Section 3.1*, such assignment will result in a reduction in such compensation or payments thereafter; and

(f)    such assignment does not conflict with applicable Laws.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans and (iii) the

DB1/ 145587008.11

US-DOCS\149610879.14

Requisite Lenders or the requisite Lenders of the applicable Class or Classes of the Loans (or, with respect to the FILO Loans, the FILO Documentation Agent), have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "*Non-Consenting Lender*."

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 3.8        Survival.  All of the Borrower's obligations under this *Article III* shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent, the Collateral Agent, the Swing Loan Lender or any Issuer.

## ARTICLE IV

## CONDITIONS PRECEDENT

SECTION 4.1        Conditions Precedent to Effectiveness of this Agreement.

The effectiveness of this Agreement on the Second Restatement Date is subject to the satisfaction or due waiver in accordance with *Section 12.1* of each of the following conditions precedent (the date on which such conditions are satisfied or waived being herein in accordance with *Section 12.1* shall be the "*Second Restatement Date*"):

(a)        The Administrative Agent's receipt (or, in the case of the FILO Fee Letter, the FILO Documentation Agent's receipt) of the following, each of which shall be originals or facsimiles or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (in each case followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the Administrative Agent (or, in the case of the FILO Fee Letter, the FILO Documentation Agent) and its legal counsel:

(i)        executed counterparts of this Agreement, the Collateral Documents, the Ratification Agreement and the FILO Fee Letter;

(ii)        a Revolving Credit Note executed by the Borrower in favor of each Lender that has requested a Revolving Credit Note at least one (1) Business Day in advance of the Second Restatement Date;

(iii)        evidence that all UCC financing statements required by Law to be filed, registered or recorded to create or perfect the Lien of the Collateral Agent on the Collateral have been so filed, registered or recorded;

(iv)        such certificates of good standing from the applicable secretary of state of the state of organization of each Loan Party, copies of each Loan Party's Constituent Documents, certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party and the identity, authority and capacity of each Responsible Officer thereof authorized to act as a

Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Second Restatement Date;

(v)　　an opinion from Latham & Watkins LLP, New York counsel to the Loan Parties, and an opinion from Jones Day, Ohio counsel to the Loan Parties;

(vi)　　a certificate from a Responsible Officer of the Borrower reasonably satisfactory in form and substance to the Administrative Agent and the FILO Documentation Agent, certifying that as of the Second Restatement Date and after giving effect to the Second Restatement Transactions (i) the Borrower and its Subsidiaries, on a consolidated basis, are Solvent, and (ii) since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect (other than customary events or circumstances which resulted from the commencement of the Chapter 11 Cases);

(vii)　　evidence that all insurance required to be maintained pursuant to the Loan Documents as of the Second Restatement Date, has been obtained and is in effect and that the Collateral Agent has been named as lender loss payee and/or additional insured, as applicable, under each insurance policy with respect to such insurance as to which the Collateral Agent shall have requested to be so named;

(viii)　　copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Administrative Agent with respect to the Loan Parties;

(ix)　　a Borrowing Base Certificate, certified as complete and correct in all material respects, which calculates the Borrowing Base as of the last Business Day of the most recent week ended prior to the Second Restatement Date; and

(x)　　to the extent not previously delivered in connection with the Existing Credit Agreement, copies of Credit Card Notifications which have been executed on behalf of such Loan Party to be delivered to such Loan Party's Credit Card Processors listed on *Schedule 8.12*.

(b)　　All fees due to the Administrative Agent, the FILO Documentation Agent and the Lenders shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, the FILO Documentation Agent and the Lenders that have been invoiced at least one (1) Business Day prior to the Second Restatement Date shall have been paid (or shall have been caused to be paid).

(c)　　The DIP Order shall be in full force and effect (without any adverse modification as to the treatment of the Existing Obligations and Liens under the Existing Credit Agreement and without any other material modification except as approved in writing by all of the Lenders), and no Cash Collateral Termination Event shall have occurred thereunder.

(d)　　The Confirmation Order, authorizing the Loan Parties to execute, deliver, and perform their obligations under this Agreement and the other Loan Documents (including the payment of all fees with respect hereto and thereto), shall have been entered on or before the date that is fifty (50) days following the Petition Date, shall be in full force and effect and shall not have been (i) stayed, reversed, vacated, amended, supplemented or otherwise modified in any manner that could be reasonably expected to adversely affect the interests of the Administrative Agent, the FILO Documentation Agent or the Lenders or (ii) the subject of an appeal.

(e)     The Intercreditor Agreement and the Term Facility Documentation required to be delivered under the Term Facility Credit Agreement on the Second Restatement Date shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(f)     The Second Restatement Transactions, including the Approved Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Approved Plan, shall have been (or concurrently with the occurrence of the Second Restatement Date, shall be) substantially consummated in accordance with applicable Law, the Court, and the Bankruptcy Code.

(g)     The Administrative Agent, the FILO Documentation Agent and the Lenders shall have received an updated business plan reasonably satisfactory to the Lenders and in a form reasonably consistent with the business plan received prior to the filing of the Chapter 11 Cases.

(h)     The FILO Lenders shall have entered into an agreement among lenders substantially in the form of the agreement among lenders with respect to the Existing Credit Agreement.

(i)     The existing executory contracts between the Borrower and Gordon Brothers Retail Partners, LLC (as amended and supplemented in a manner reasonably acceptable to the Borrower, the FILO Lenders, the Administrative Agent, and the Required DIP Lenders (as defined in the DIP Order), and which amendments and supplements shall include a commercially reasonable agency agreement (reasonably acceptable in form and substance to the Borrower, the FILO Lenders, the Administrative Agent and the Required DIP Lenders) to be effective solely upon a Sale Event) and Gordon Brothers Realty Services, LLC (collectively, the "*GB Consulting Agreements*") shall be assumed on the effective date of the Approved Plan.

(j)     Liquidity as of the Second Restatement Date shall be no less than $65,000,000, after giving effect to all amounts advanced (or deemed advanced) under this Agreement on the Second Restatement Date and all payments authorized to be made pursuant to the Approved Plan on or about the Second Restatement Date.

(k)     The Lenders shall have received at least three (3) Business Days prior to the Second Restatement Date all documentation and other information reasonably requested in writing by them at least ten (10) Business Days prior to the Second Restatement Date in order to allow the Lenders to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(l)     The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the Second Restatement Date; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(m)     No Default or Event of Default shall exist or would result from the Second Restatement Transactions.

Without limiting the generality of the provisions of the last paragraph of *Section 9.3*, for purposes of determining compliance with the conditions specified in this *Section 4.1*, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Second Restatement Date specifying its objection thereto.

SECTION 4.2       Conditions Precedent to Each Loan and Letter of Credit.

The obligation of each Lender on any date to make any Loan and of each Issuer on any date to Issue any Letter of Credit (including, without limitation, all Loans deemed made and Letters of Credit deemed issued on the Second Restatement Date) is subject to the satisfaction of each of the following conditions precedent:

(a)       Request for Borrowing or Issuance of Letter of Credit.  With respect to any Revolving Loan, the Administrative Agent shall have received a duly executed Notice of Borrowing (or, in the case of Swing Loans, a duly executed Swing Loan Request), and, with respect to any Letter of Credit, the Administrative Agent and the applicable Issuer shall have received a duly executed Letter of Credit Request.

(b)       Representations and Warranties; No Defaults.  The following statements shall be true on the date of such Loan or Issuance, both immediately before and immediately after giving effect thereto and, in the case of any Loan, giving effect to the application of the proceeds thereof:

(i)       The representations and warranties of the Borrower and each other Loan Party contained in <u>Article V</u> or any other Loan Document (or, if the applicable Loan is being incurred in connection with a Revolving Commitment Increase the proceeds of which are to fund a Permitted Acquisition or similar permitted Investment, the Specified Representations) shall be true and correct in all material respects on and as of the date of such Borrowing; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates; and

(ii)       (x) no Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom, and (y) no Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(c)       Borrowing Base.  After giving effect to the Loans or Letters of Credit requested to be made or Issued on any such date and the use of proceeds thereof, the Revolving Credit Outstandings shall not exceed the Maximum Credit at such time.

Each submission by the Borrower to the Administrative Agent of a Notice of Borrowing or a Swing Loan Request and the acceptance by the Borrower of the proceeds of each Loan requested therein, and each submission by the Borrower to an Issuer of a Letter of Credit Request, and the Issuance of each Letter of Credit requested therein, shall be deemed to constitute a representation and warranty by the Borrower that

the conditions specified in *clause (b)* above have been satisfied on and as of the date of the making of such Loan or the Issuance of such Letter of Credit.

The conditions set forth in this *Section 4.2* are for the sole benefit of the Secured Parties but until the Requisite Revolving Credit Lenders otherwise direct the Administrative Agent to cease making Loans, the Lenders will fund their Applicable Percentage of all Loans and Letter of Credit Borrowings and participate in all Swing Loans and Letters of Credit whenever made or issued, which are requested by the Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this *Section 4.2*, are agreed to by the Administrative Agent, *provided*, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Secured Party of the provisions of this *Section 4.2* on any future occasion or a waiver of any rights or the Secured Parties against the Loan Parties as a result of any such failure to comply.

Notwithstanding the foregoing, other than in connection with Protective Advances made in accordance with *Section 2.1(b)* or referred to in *clause (c)* of the definition of "Maximum Revolving Insolvency Amount", neither the Administrative Agent nor any Lender will waive any condition in this *Section 4.2* if the Loan Parties are not, on a Pro Forma Basis, in compliance with *Section 6.1* or *Section 6.2*, as applicable, immediately before and after giving effect to the applicable Credit Extension.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

To induce the Lenders, the Issuers, the Administrative Agent and the FILO Documentation Agent to enter into this Agreement, each of Parent, Holdings and the Borrower represents and warrants each of the following to the Lenders, the Issuers, the Administrative Agent and the FILO Documentation Agent, on and as of the Second Restatement Date and after giving effect to the making (or deemed making) of the Loans and the other financial accommodations on the Second Restatement Date and on and as of each date as required by *Section 4.2(b)(i)*:

SECTION 5.1    <u>Existence, Qualification and Power; Compliance with Laws</u>.  Each Loan Party and each of its Restricted Subsidiaries that is a Material Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), (b) has all corporate or other organizational power and authority to (i) own its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all applicable Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.2    <u>Authorization; No Contravention</u>.  (a) The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.  (b) Neither the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party nor the consummation of the Second Restatement Transactions will (i) contravene the terms of any of such Person's Constituent Documents, (ii) result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted under *Section 9.1*) under (A) any Contractual Obligation to which such Person is a party or

affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any applicable Law; except with respect to any breach, contravention or violation (but not creation of Liens) referred to in *clauses (ii)* and *(iii)*, to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.3    <u>Governmental Authorization</u>.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.4    <u>Binding Effect</u>.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

SECTION 5.5    <u>Financial Statements; No Material Adverse Effect</u>.

(a)    The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from, normal year-end adjustments and the absence of footnotes.

(b)    Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(c)    The forecasts of consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries, copies of which have been furnished to the Administrative Agent and the FILO Documentation Agent prior to the Second Restatement Date, and all Projections delivered pursuant to *Section 7.1(d)* have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts and actual results may vary materially from such forecasts.

SECTION 5.6    <u>Litigation</u>.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Parent, Holdings, the Borrower, or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.7      Labor Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any of the Borrower or its Subsidiaries pending or, to the knowledge of the Borrower, threatened and (b) since the Petition Date, hours worked by and payment made based on hours worked to employees of each of the Borrower or its Subsidiaries have not been in material violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

SECTION 5.8      Ownership of Property; Liens.  Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by *Section 9.1* and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.9      Environmental Matters.

(a)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Loan Party and each of its Subsidiaries and their respective operations is in compliance with all applicable Environmental Laws (including having obtained all Environmental Permits) and (ii) none of the Loan Parties or any of their respective Subsidiaries has become subject to any pending, or to the knowledge of the Borrower, threatened Environmental Claim or any other Environmental Liability.

(b)      None of the Loan Parties or any of their respective Subsidiaries has released, treated, stored, transported, arranged for transport or disposed of Hazardous Materials at or from any currently or formerly owned or operated real estate or facility in a manner that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.10      Taxes.  Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, Parent, Holdings, the Borrower and its Restricted Subsidiaries (i) have timely filed all federal and state and other Tax returns and reports required to be filed, and (ii) have timely paid all federal and state and other Taxes, assessments, fees and other governmental charges (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets or otherwise due and payable**,** except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.

SECTION 5.11      ERISA Compliance.

(a)      Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(b)      (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan; (iii) none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan; (iv) none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and (v) neither any Loan Party nor any ERISA Affiliate has been

notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is insolvent (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA) and no such Multiemployer Plan is expected to be insolvent or endangered or critical status, except, with respect to each of the foregoing clauses of this *Section 5.11(b)*, as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)    Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, each Foreign Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders, and neither Parent, Holdings nor any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

(d)    Borrower represents and warrants, as of the Second Restatement Date and throughout the term of this Agreement, at least one of the following is and will be true with respect to the Borrower:

(i)    the Borrower is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to the Borrower's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Credit Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the Borrower's entering into and performance of this Agreement, the other Loan Documents, the Loans, the Letters of Credit or the Revolving Credit Commitments and each action or obligation hereunder and thereunder,

(iii)    (A) the Borrower is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Borrower to enter into and perform this Agreement, the other Loan Documents, the Loans, the Letters of Credit or the Revolving Credit Commitments and each action or obligation hereunder and thereunder, (C) the entering into and performance of this Agreement, the other Loan Documents, the Loans, the Letters of Credit or the Revolving Credit Commitments and each action or obligation hereunder and thereunder, each satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of the Borrower, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to the Borrower's entering into and performance of this Agreement, the other Loan Documents, the Loans, the Letters of Credit or the Revolving Credit Commitments and each action or obligation hereunder and thereunder, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and the Borrower.

(e)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (d) is true with respect to the Borrower or (2) the Borrower has provided another representation, warranty

DB1/ 145587008.11

US-DOCS\149610879.14

and covenant in accordance with sub-clause (iv) in the immediately preceding clause (d), the Borrower further represents and warrants, as of the date hereof and throughout the term of this Agreement, that the Administrative Agent is not a fiduciary with respect to the assets of the Borrower involved in the Borrower's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Credit Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

SECTION 5.12    Subsidiaries.  As of the Second Restatement Date, neither Parent, Holdings nor any other Loan Party has any Subsidiaries other than those specifically disclosed in *Schedule 5.12,* and all of the outstanding Equity Interests in Holdings, the Borrower and the Subsidiaries have been validly issued and are fully paid and (if applicable) nonassessable, and all Equity Interests owned by Parent, Holdings or any other Loan Party are owned free and clear of all security interests of any person except (i) those created under the Collateral Documents or under the Term Facility Documentation and secured Permitted Refinancing Indebtedness in respect of the Indebtedness under the Term Facility Documentation (which Liens shall be subject to the Intercreditor Agreement) and (ii) any nonconsensual Lien that is permitted under *Section 9.1.*  As of the Second Restatement Date, *Schedule 5.12* (a) sets forth the name and jurisdiction of each Subsidiary, (b) sets forth the ownership interest of Parent, Holdings, the Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary the Equity Interests of which are required to be pledged on the Second Restatement Date pursuant to the Collateral and Guarantee Requirement.

SECTION 5.13    Margin Regulations; Investment Company Act.

(a)    As of the Second Restatement Date, none of the Collateral is comprised of any Margin Stock.  No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Federal Reserve Board), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)    Neither the Borrower nor any Guarantor is an "investment company" under the Investment Company Act of 1940.

SECTION 5.14    Disclosure.  None of the information and data heretofore or contemporaneously furnished in writing by or on behalf of any Loan Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make such information and data (taken as a whole), in the light of the circumstances under which it was delivered, not materially misleading; it being understood that for purposes of this *Section 5.14*, such information and data shall not include projections and pro forma financial information or information of a general economic or general industry nature.  As of the Second Restatement Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

SECTION 5.15    Intellectual Property; Licenses, Etc.  The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, trademarks, service marks, trade names, copyrights, technology, software, know-how, licenses and other intellectual property rights (collectively, "*IP Rights*") that are necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  To

the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any of its Subsidiaries as currently conducted does not infringe upon, misuse, misappropriate or violate any IP Rights held by any Person except for such infringements, misuses, misappropriations or violations individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect. No written claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened against any Loan Party or Subsidiary, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 5.16    Solvency.  After giving effect to the Second Restatement Transactions, the Borrower and its Restricted Subsidiaries, on a Consolidated basis, are Solvent.

SECTION 5.17    OFAC; Sanctions.  Neither the Borrower, nor any of its Subsidiaries, nor, to the knowledge of the Borrower and its Subsidiaries, any director, officer, employee, agent, Affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction (a "*Sanctioned Person*").  No proceeds of any Loan made or Letter of Credit issued hereunder will be used directly, or to the Borrower's knowledge, indirectly, to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person, or otherwise used in any manner that would result in a violation of any applicable Sanctions by any Person (including any Secured Party or other individual or entity participating in any transaction).

SECTION 5.18    USA PATRIOT Act.  To the extent applicable, each of Parent, Holdings and its Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA PATRIOT Act.  No part of the proceeds of the Loans or any Letters of Credit will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 or other similar anti-corruption legislation in any jurisdiction.

SECTION 5.19    Collateral Documents.  The provisions of the Collateral Documents, together with such filings and other actions required to be, and when, taken hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Debt and any Pledged Equity required to be delivered pursuant to the applicable Collateral Documents), are, and will be, effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable first priority Lien (subject to Liens permitted by *Section 9.1* and subject to the Intercreditor Agreement) on all right, title and interest of the respective Loan Parties in the Collateral described therein.

SECTION 5.20    Anti-Corruption Laws.

The Borrower and its Subsidiaries have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws in all material respects.

SECTION 5.21    <u>Affected Financial Institution</u>.

No Loan Party is an Affected Financial Institution.

## ARTICLE VI

## FINANCIAL COVENANT

So long as any Lender shall have any Revolving Credit Commitment hereunder, any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements, Cash Management Obligations and Bank Product Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent and each applicable Issuer), the Borrower agrees with the Lenders, the Issuers, the Administrative Agent and the FILO Documentation Agent to the following:

SECTION 6.1    <u>Minimum Excess Availability</u>.

From the Second Restatement Date until [May 4, 2025][2], the Loan Parties will not permit Excess Availability at any time to be less than (x) from the Second Restatement Date through September 30, 2024, $25,000,000, and (y) from October 1, 2024 through [May 4, 2025][3], $45,000,000.

SECTION 6.2    <u>Minimum Consolidated Fixed Charge Coverage Ratio</u>.

From and after [May 4, 2025][4], at any time that a Covenant Trigger Event shall be in effect, the Consolidated Fixed Charge Coverage Ratio of the Borrower and its Restricted Subsidiaries for the Test Period ending on the last day of the most recent Fiscal Quarter for which financial statements of the Borrower and its Restricted Subsidiaries were required to have been delivered pursuant to *Section 7.1(a)* or *(b)*, as applicable, and each subsequent Test Period during the continuance of such Covenant Trigger Event, shall be not less than 1.0 to 1.0 and the Borrower shall immediately deliver to the Administrative Agent a certificate of the chief financial officer setting forth reasonably detailed calculations of the Consolidated Fixed Charge Coverage Ratio.

## ARTICLE VII

## REPORTING COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements, Cash Management Obligations and Bank Product Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the

---

[2] NB: To be the date that is immediately following the completion of four full FQs of the Company post-exit.

[3] See f.n. above

[4] See f.n.s above

Administrative Agent), the Borrower shall, and shall (except in the case of the covenants set forth in *Sections 7.1, 7.2 and 7.3*) cause each of the Restricted Subsidiaries to:

SECTION 7.1    Financial Statements, Etc.

Deliver to the Administrative Agent for prompt further distribution to each Lender each of the following and shall take the following actions:

(a)    as soon as available, but in any event within ninety-five (95) days (or such longer period as the Administrative Agent and the FILO Documentation Agent may agree) after the end of each Fiscal Year of the Borrower (commencing with the Fiscal Year of the Borrower ending on February 3, 2024), a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year, and the related Consolidated statements of income or operations, stockholders' equity and cash flows for such Fiscal Year together with related notes thereto and, so long as provided to the holders of the Borrower's or any of its direct or indirect parent companies' debt securities, management's discussion and analysis describing results of operations, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of Ernst & Young LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any explanatory statement (other than an "emphasis of matter" paragraph) or any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (other than a "going concern" qualification or exception resulting from or relating to (i) an actual or anticipated breach of the financial covenant set forth in *Section 6.1* or *Section 6.2*, as applicable, (ii) an upcoming maturity date or (iii) any Unrestricted Subsidiary);

(b)    as soon as available, but in any event (1) within one hundred forty (140) days after the end of the first Fiscal Quarter of the Borrower ending after the Second Restatement Date (i.e. the Fiscal Quarter ending May 4, 2024), (2) within ninety (90) days after the end of the second Fiscal Quarter of the Borrower ending after the Second Restatement Date, (3) within seventy-five (75) days after the end of the third Fiscal Quarter of the Borrower ending after the Second Restatement Date, and (4) within fifty (50) days after the end of each Fiscal Quarter of the Borrower thereafter (or, in each case, such longer period as the Administrative Agent and the FILO Documentation Agent may agree), a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Quarter, and the related (i) Consolidated statements of income or operations for such Fiscal Quarter and for the portion of the Fiscal Year then ended and (ii) Consolidated statements of cash flows for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes (together with and, so long as provided to the holders of the Borrower's or any of its direct or indirect parent companies' debt securities' management's discussion and analysis describing results of operations);

(c)    as soon as available, but in any event (1) within thirty (30) days (or such longer period as the Administrative Agent and the FILO Documentation Agent may agree) after the end of each fiscal month (commencing with the fiscal month ending May 4, 2024) of the Borrower ending on or prior to February 1, 2025 (it being agreed and acknowledged that the last fiscal

month for which any such monthly financials will be delivered pursuant to this clause (c)(1) shall be the fiscal month ending on or about February 1, 2025), (x) a Consolidated statement of income of the Borrower and its Subsidiaries for such fiscal month, in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the results of operations of the Borrower and its Subsidiaries for such fiscal month, but which, for the avoidance of doubt, is not required to be prepared in accordance with GAAP and (y) (i) a statement of the fiscal month-end balance of the Borrower and its Subsidiaries' Cash Equivalents, Credit Card Receivables, Accounts payable, Inventory by category and accrued expenses, (ii) an Accounts payable aging report for such fiscal month, and (iii) a statement of the aggregate amount of Capital Expenditures expended for such fiscal month, (2) within thirty (30) days (or such longer period as the Administrative Agent and the FILO Documentation Agent may agree) after the end of each fiscal month of the Borrower ending after February 1, 2025 (it being agreed and acknowledged that the first fiscal month for which any such monthly financials will be delivered shall be the fiscal month ending on or about February 28, 2025), a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month, and the related (i) Consolidated statements of income or operations for such fiscal month and for the portion of the Fiscal Year then ended and (ii) Consolidated statements of cash flows for such fiscal month and for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal month of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, in each case, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries, subject to normal quarterly and year-end adjustments and the absence of footnotes;

(d)     within ninety (90) days (or such longer period as the Administrative Agent and the FILO Documentation Agent may agree) after the end of each Fiscal Year, a reasonably detailed Consolidated budget for the following Fiscal Year as customarily prepared by management of the Borrower for its internal use (including a projected Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following Fiscal Year, the related Consolidated statements of projected operations, projected cash flow, projected income, projected Excess Availability and any projected FILO Deficiency Reserves and setting forth the material underlying assumptions applicable thereto) in each case on a monthly basis (collectively, the "*Projections*"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer of the Borrower stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such Projections, it being understood that actual results may vary from such Projections and that such variations may be material;

(e)     simultaneously with the delivery of each set of Consolidated financial statements referred to in *Sections 7.1(a)*, *7.1(b)* and *7.1(c)* above, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such Consolidated financial statements; and

(f)     quarterly, at a time mutually agreed with the Administrative Agent and the FILO Documentation Agent that is promptly after the delivery of the information required pursuant to clause (a) above and the information delivered pursuant to clause (b) above for each Fiscal Quarter, participate in a conference call for Lenders to discuss the financial condition and results of operations of the Borrower and its Subsidiaries for the most recently-ended period for which financial statements have been delivered, which requirement may be satisfied by including the Lenders, the Administrative Agent and the FILO Documentation Agent on quarterly conference

calls with the Term Facility Lenders or the noteholders in respect of any other debt securities of Parent, Holdings or the Borrower.

Notwithstanding the foregoing, the obligations in paragraphs (a), (b), and (c) of this *Section 7.1* may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable financial statements of any direct or indirect parent of the Borrower that holds all of the Equity Interests of the Borrower  (a "*Parent Entity*") or (B) the Borrower's or such entity's Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to each of clauses (A) and (B), (i) to the extent such information relates to a parent of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to the Borrower (or such parent), on the one hand, and the information relating to the Borrower and the Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under *Section 7.1(a)*, such materials are accompanied by a report and opinion of Ernst & Young LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit other than as permitted by *Section 7.1(a)*.

SECTION 7.2    Certificates; Other Information.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    concurrently with the delivery of the financial statements referred to in *Section 7.1(a)* and *Section 7.1(b)*, a duly completed Compliance Certificate signed by the chief financial officer of the Borrower;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which Parent, Holdings or the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this *Section 7.2*;

(c)    promptly after the furnishing thereof, copies of any material statements or material reports furnished to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the terms of the Term Facility Credit Agreement, in each case, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this *Section 7.2*;

(d)    together with the delivery of the financial statements pursuant to *Sections 7.1(a)* and *7.1(b)* and each Compliance Certificate delivered pursuant to *Section 7.2(a)*, (i) solely with respect to the delivery of annual financial statements pursuant to Section 7.1(a), a report setting forth the information required by *Section 3.03(c)* of the Security Agreement (or confirming that there has been no change in such information since the Second Restatement Date or the date of the last such report), (ii) a description of each event, condition or circumstance during the last Fiscal Quarter covered by such Compliance Certificate requiring a mandatory prepayment under

*Section 2.9* and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such Compliance Certificate or a confirmation that there is no change in such information since the later of the Second Restatement Date and the date of the last such list;

(e)    on the date on which the delivery of financial statements is required to be made pursuant to *Section 7.1(a)*, the Borrower shall furnish to the Administrative Agent a description, in detail reasonably satisfactory to the Administrative Agent, of all material insurance coverage maintained by the Loan Parties, together with evidence thereof;

(f)    prior to the making of any Specified Payment, a reasonably detailed calculation of the Consolidated Fixed Charge Coverage Ratio and applicable Excess Availability as required pursuant to *clause (b)* of the definition of "Payment Conditions" together with a certification that no Event of Default exists or would arise as a result of the making of the subject Specified Payment, and in the case of a Permitted Acquisition, that the requirements of the definition of "Permitted Acquisition" have been satisfied;

(g)    (i) prompt written notice of any change (A) in any Loan Party's corporate name, (B) in any Loan Party's identity or corporate structure or jurisdiction of formation or (C) in any Loan Party's Federal Taxpayer Identification Number; and (ii) with the delivery of each Compliance Certificate, written notice of any change from the most recently delivered Compliance Certificate, (A) in the location of any Loan Party's chief executive office, its principal place of business, or (B) in the location of any office in which any Loan Party maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility);

(h)    concurrently with the delivery of the financial statements referred to in *Section 7.1(a), Section 7.1(b) and Section 7.1(c)* (if applicable)*,* notice of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof since the date of the most recent financial statements delivered to the Administrative Agent (other than changes made in accordance with GAAP);

(i)    concurrently with the delivery of each Borrowing Base Certificate pursuant to *Section 7.4,* notice of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof since the date of the most recent Borrowing Base Certificate delivered to the Administrative Agent but only to the extent that such changes materially affect the calculation of the Borrowing Base and the FILO Borrowing Base (other than changes made in accordance with GAAP);

(j)    promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or the FILO Documentation Agent may from time to time on its own behalf or on behalf of any Lender reasonably request; and

(k)    promptly following any request therefor, provide information and documentation reasonably requested by the Administrative Agent, the FILO Documentation Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the USA PATRIOT Act and the Beneficial Ownership Regulation.

Documents required to be delivered pursuant to *Section 7.1(a)*, *(b)* or *(c)* or *Section 7.2(c)* may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on *Schedule 12.8*; or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender, the Administrative Agent and the FILO Documentation Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that:  (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arrangers will make available to the Lenders and the Issuers materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "*Borrower Materials*") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "*Platform*") and (b) certain of the Lenders (each, a "*Public Lender*") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Subsidiaries, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arrangers, the Issuers and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in *Section 12.17*); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Arrangers shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

SECTION 7.3    Notices.

Promptly after a Responsible Officer of the Borrower obtains actual knowledge thereof, notify the Administrative Agent who shall promptly thereafter notify each Lender:

(a)    of the occurrence of any Default or Event of Default;

(b)    of (i) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (ii) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights, the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (iii) the occurrence of any ERISA Event that, in any such case referred to in clauses (i), (ii) or (iii), has resulted or would reasonably be expected to result in a Material Adverse Effect; and

(c)      any termination, withdrawal or resignation of Parent's, Holdings' or Borrower's Registered Public Accounting Firm.

Each notice pursuant to this *Section 7.3* shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to *Section 7.3(a)*, *(b)* or *(c)* (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

SECTION 7.4      Borrowing Base Certificates; Appraisals; Field Examinations.

(a)      Subject to *Section 7.4(b)* hereof, Borrower shall provide the Administrative Agent and the FILO Documentation Agent with the following documents in a form and detail to be generally consistent with the form and detail of such documents provided in past practices as soon as possible after the end of each calendar month (but in any event within fifteen (15) Business Days after the end thereof) for prompt further distribution to each Lender: a Borrowing Base Certificate setting forth the calculation of the Borrowing Base, the FILO Borrowing Base and Excess Availability as of the last Business Day of the immediately preceding calendar month, duly completed and executed by a Responsible Officer of the Borrower, together with all schedules required pursuant to the terms of the Borrowing Base Certificate duly completed (such certification, a "*Monthly Borrowing Base Certificate*"); *provided* that the Borrower may elect, at its option, to deliver more frequent Borrowing Base Certificates, in which case such Borrowing Base Certificates shall be computed in accordance with the requirements in respect of Borrowing Base Certificates required to be delivered during the continuance of a Weekly Monitoring Event and the Borrower shall continue to deliver Borrowing Base Certificates on a weekly basis until January 15th of the next succeeding calendar year.

(b)      (i) Subject to Section 4.1(a)(ix), from the Second Restatement Date through September 30, 2024, and (ii) thereafter, at any time during the occurrence and continuation of a Weekly Monitoring Event, the Borrower shall furnish a Borrowing Base Certificate calculated as of the close of business on the last day of the immediately preceding calendar week, on Wednesday of each week (or, if Wednesday is not a Business Day, on the next succeeding Business Day).

(c)      The Borrower shall also cooperate with (and cause its Subsidiaries to cooperate with) the Administrative Agent in connection with appraisals of Inventory that shall be in form and detail and from third-party appraisers reasonably acceptable to (1) the Administrative Agent and (2) if such appraiser is not Hilco, the FILO Documentation Agent (each, an "*Inventory Appraisal*") for the purpose of determining the amount of the Borrowing Base and the FILO Borrowing Base attributable to Inventory; *provided*, *however*, that (x) the Administrative Agent may (and upon the written request of the FILO Documentation Agent shall) carry out, at the Borrower's expense, (i) two (2) Inventory Appraisals during any twelve month period and (ii) at any time during the continuation of a Specified Event of Default, Inventory Appraisals as frequently as determined by the Administrative Agent or the FILO Documentation Agent, each in its reasonable discretion, and (y) in addition to the foregoing *clause (x)*, the Administrative Agent may carry out, at the Lenders' expense, one (1) additional Inventory Appraisal in any twelve month period.  The Borrower shall furnish to the Administrative Agent and the FILO Documentation Agent any information that the Administrative Agent or the FILO Documentation Agent may reasonably request regarding the determination and calculation of the Borrowing Base and the FILO Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of Accounts referred to therein.  It is understood and agreed that (i) the Inventory Appraisals referred to in this *Section 7.4(c)* shall be for the benefit of all Lenders (including the FILO Lenders), and the FILO Lenders and the FILO Documentation Agent shall not have a right to separate or independent Inventory Appraisals and (ii) the methodology of each Inventory Appraisal shall be consistent with the appraisal methodology utilized in

the most recent Inventory Appraisal completed [prior to the Second Restatement Date] (or the methodology most recently approved by the FILO Documentation Agent), unless any changes in such methodology are approved by the FILO Documentation Agent in its Permitted Discretion.  In the event the FILO Documentation Agent disagrees with the results of any Inventory Appraisal solely due to a change in methodology not otherwise approved by the FILO Documentation Agent and such Inventory Appraisal results in a higher Net Recovery Percentage (other than any higher Net Recovery Percentage due to seasonal fluctuations) than the prior Inventory Appraisal, the prior Inventory Appraisal shall continue to be the Inventory Appraisal utilized for all purposes under this Agreement.

(d)     The Administrative Agent may (and upon the written request of the FILO Documentation Agent shall) carry out investigations and reviews of each Loan Party's property at the reasonable expense of the Borrower (including field audits conducted by the Administrative Agent) ("*Field Examination*"); *provided*, *however*, that (x) the Administrative Agent may (and upon the written request of the FILO Documentation Agent shall) carry out, at the Borrower's expense, (i) one (1) Field Examination in any twelve month period, (ii) a second Field Examination during any such twelve month period (I) if requested by the FILO Documentation Agent in writing or (II) at any time on or after the date on which Excess Availability has been less than the greater of (A) $48,125,000 and (B) 17.5% of the Modified Maximum Credit, in each case, for five (5) consecutive Business Days, and (iii) at any time during the continuation of a Specified Event of Default, Field Examinations as frequently as determined by the Administrative Agent or the FILO Documentation Agent, each in its reasonable discretion, and (y) in addition to the foregoing *clause (x)*, the Administrative Agent may carry out, at the Lenders' expense, one (1) additional Field Examination in any twelve month period.  The Borrower shall furnish to the Administrative Agent and the FILO Documentation Agent any information that the Administrative Agent or the FILO Documentation Agent may reasonably request regarding the determination and calculation of the Borrowing Base and the FILO Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of Accounts referred to therein.  It is understood and agreed that the Field Examinations referred to in this *Section 7.4(d)* shall be for the benefit of all Lenders (including the FILO Lenders), and the FILO Lenders and the FILO Documentation Agent shall not have a right to separate or independent Field Examinations.

(e)     From and after the Second Restatement Date through September 30, 2024, Borrower shall deliver an updated Cash Flow Forecast on a rolling 13-week basis on Wednesday of each week, together with a variance report, in form and substance reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent, comparing the Borrower's and the Guarantors' actual cash receipts and disbursements on a line item basis for the immediately preceding applicable period in the Cash Flow Forecast as compared to projected cash receipts and disbursements for such applicable period, as set forth in the Cash Flow Forecast.

## ARTICLE VIII

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Revolving Credit Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements, Cash Management Obligations and Bank Product Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance

reasonably satisfactory to the Administrative Agent), the Borrower shall, and shall cause each of the Restricted Subsidiaries to:

SECTION 8.1    Preservation of Existence, Etc.

(a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to obtain, preserve, renew and keep in full force and effect the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of *clause (a)* or *(b)* to the extent (other than with respect to the preservation of the existence of Holdings and the Borrower) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or is pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by *Article IX*.

SECTION 8.2    Compliance with Laws, Etc.

Comply in all material respects with its Constituent Documents and the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

SECTION 8.3    Designation of Subsidiaries.

The board of directors of the Borrower may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that (i) immediately before and after such designation, no Default shall have occurred and be continuing, (ii) immediately after giving effect to such designation, the Net Leverage Ratio for the Test Period immediately preceding such designation for which financial statements have been delivered pursuant to *Section 7.1* is less than or equal to 5.25 to 1.0 (calculated on a Pro Forma Basis) (and, as a condition precedent to the effectiveness of any such designation, the Borrower shall deliver to the Administrative Agent a certificate setting forth in reasonable detail the calculations demonstrating satisfaction of such test) and (iii) no Subsidiary may be designated as an Unrestricted Subsidiary if, after such designation, it would be a "Restricted Subsidiary" for the purpose of the Term Facility or any Junior Financing or any other Indebtedness for borrowed money of any Loan Party in a principal amount in excess of $45,000,000. The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the fair market value as determined by the Borrower in good faith of the Borrower's or its Subsidiary's (as applicable) Investment therein. The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time and a return on any Investment by the Borrower in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the fair market value as determined by the Borrower in good faith at the date of such designation of the Borrower's or its Subsidiary's (as applicable) Investment in such Subsidiary.

Notwithstanding the foregoing, any Unrestricted Subsidiary that has been re-designated a Restricted Subsidiary after the Second Restatement Date may not be subsequently re-designated as an Unrestricted Subsidiary.

SECTION 8.4      Payment of Taxes, Etc.

Timely pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities in respect of taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (i) any such tax, assessment, charge or levy is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP or (ii) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

SECTION 8.5      Maintenance of Insurance.

Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried.  Each such policy of insurance shall, as appropriate, (i) name the Collateral Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a lenders loss payable clause or endorsement reasonably acceptable to the Collateral Agent that names the Collateral Agent, on behalf of the Lenders as the lenders loss payee thereunder (it being agreed and acknowledged that the lenders loss payable clause or endorsement in effect as of the Second Restatement Date is reasonably acceptable to the Collateral Agent).

SECTION 8.6      Inspection Rights.

In addition to the requirements pursuant to *Section 7.4,* permit representatives and independent contractors of the Administrative Agent and the Requisite Lenders to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Requisite Lenders may exercise rights of the Administrative Agent and the Requisite Lenders under this *Section 8.6* and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; *provided further* that when an Event of Default exists, the Administrative Agent or the Requisite Lenders (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this *Section 8.6*, none of the Borrower or any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives

or contractors) is prohibited by Law or any bona fide arm's length third party contract, or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

SECTION 8.7    Books and Records.

Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or such Restricted Subsidiary, as the case may be.

SECTION 8.8    Maintenance of Properties.

Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

SECTION 8.9    Use of Proceeds.

Use the proceeds of the Loans and Letters of Credit only in compliance with (and not in contravention of) applicable Laws, with each Loan Document and with the representations set forth in Sections 5.17 and 5.18 regarding use of proceeds of the Loans and Letters of Credit.

SECTION 8.10    Compliance with Environmental Laws.

Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent required by applicable Environmental Laws, conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all applicable Environmental Laws.

SECTION 8.11    Covenant to Guarantee Obligations and Give Security.

At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent or the Collateral Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including, upon (x) the formation or acquisition of any new direct or indirect Wholly-Owned Subsidiary that is a Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party, the designation in accordance with *Section 8.3* of any existing direct or indirect Wholly-Owned Subsidiary that is a Material Domestic Subsidiary as a Restricted Subsidiary or any Subsidiary becoming a Wholly-Owned Subsidiary that is a Material Domestic Subsidiary or (y) the acquisition of any material assets by the Borrower or any other Loan Party or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any material assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

(a)    within forty-five (45) days after such formation, acquisition or designation or, in each case, such longer period as the Administrative Agent may agree in its reasonable discretion:

(i)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent Security Agreement Supplements, Intellectual Property Security Agreements and other security agreements and documents, as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent (consistent with the Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Second Restatement Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(ii)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank (or any other documents customary under local law) and instruments evidencing the intercompany Indebtedness held by such Material Domestic Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Collateral Agent;

(iii)    (1) take and cause any applicable Material Domestic Subsidiary and each direct or indirect parent of such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action (including the filing of UCC financing statements and delivery of stock and membership interest certificates to the extent certificated) may be necessary in the reasonable opinion of the Administrative Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law) and (2) comply with the requirements of *Section 8.12* with respect to all Deposit Accounts; and

(b)    within forty-five (45) days after the request therefor by the Administrative Agent (or such longer period as the Administrative Agent may agree in its reasonable discretion), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this *Section 8.11* as the Administrative Agent may reasonably request.

SECTION 8.12    Cash Receipts.

(a)    Use commercially reasonable efforts to enter on or prior to the Second Restatement Date (or such longer period following such date as the Administrative Agent may agree in its reasonable discretion), into an effective account control agreement (a "*Deposit Account Control Agreement*") with each Approved Account Bank, in each case in form reasonably satisfactory to the Administrative Agent, with respect to each Deposit Account existing as of the Second Restatement Date and listed on *Schedule 8.12* attached hereto, but excluding any Excluded Account (collectively, all Deposit Accounts required to become subject to a Deposit Account Control Agreement being referred to as the "*Material Bank Accounts*").

(b)        Each Loan Party shall (i) instruct each Account Debtor or other Person obligated to make a payment to any of them under any Account to make payment, or to continue to make payment, to an Approved Deposit Account, (ii) deposit in (A) a Store Account all Cash Receipts received in the Stores, and (B) an Approved Deposit Account promptly upon receipt all other Cash Receipts (as defined below) received by any Loan Party from any other Person, (iii) deliver to the Administrative Agent, prior to the Second Restatement Date, Credit Card Notifications (it being agreed and acknowledged that as of the Second Restatement Date the Administrative Agent has received such Credit Card Notifications) and (iv) instruct each depository institution for a Deposit Account (including, without limitation, Store Accounts) to cause all amounts on deposit and available at the close of each Business Day in such Deposit Account to be swept to one of the Loan Parties' Approved Deposit Accounts no less frequently than on a daily basis, such instructions to be irrevocable unless otherwise agreed to by the Administrative Agent; *provided* that the Loan Parties shall not be required to sweep, and may maintain, an amount not to exceed $2,000,000 in the aggregate in all of the Store Accounts. So long as no Cash Dominion Period is continuing, the Loan Parties may direct, and shall have sole control over, the manner of disposition of funds in the Approved Deposit Accounts, in each case subject to the other provisions of this Agreement and the other Loan Documents.

(c)        Each Credit Card Notification and Deposit Account Control Agreement shall require (without further consent of the Loan Parties), and the Loan Parties shall cause, after the occurrence and during the continuance of a Cash Dominion Period and subject to the Intercreditor Agreement, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account maintained at Bank of America (or at another financial institution acceptable to the Administrative Agent in its sole discretion) by and in the name of the Borrower (the "*Concentration Account*"), of all cash receipts and collections, including, without limitation, the following (collectively, the "*Cash Receipts*"):

(i)        all available cash receipts from the sale of Inventory and other Collateral or casualty insurance proceeds arising from any of the foregoing;

(ii)        all proceeds of collections of Accounts (including, without limitation, Credit Card Receivables);

(iii)        the then contents of each Deposit Account (including, without limitation, any Approved Deposit Account subject to a Deposit Account Control Agreement and any Store Account) (net of any minimum balance as may be required to be kept in the subject Deposit Account by the institution at which such Deposit Account is maintained);

(iv)        the cash proceeds of all credit card charges; and

(v)        all cash proceeds of any other Collateral.

(d)        The Concentration Account shall at all times be under the sole dominion and control of the Collateral Agent.  The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations, and (iii) the funds on deposit in the Concentration Account shall be applied as provided in this Agreement and in the Intercreditor Agreement.  In the event that, notwithstanding the provisions of this *Section 8.12*, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections during a Cash Dominion Period, such proceeds and collections shall be held in trust by such Loan Party for the Collateral Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited

into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Administrative Agent. Any amounts received in the Concentration Account at any time when all of the Obligations have been indefeasibly paid in full shall be remitted to the operating account of the Loan Parties maintained with the Administrative Agent.

(e)    From and after the Second Restatement Date, except as otherwise expressly provided in the Loan Documents, each Loan Party shall maintain all Material Bank Accounts with the Administrative Agent or another financial institution reasonably acceptable to the Administrative Agent that has executed and delivered such Deposit Account Control Agreements in respect of each such Material Bank Account.

(f)    The Administrative Agent shall promptly (but in any event shall use its commercially reasonable efforts within one (1) Business Day to) furnish written notice to each Approved Account Bank at which any Approved Deposit Account which is subject to a Deposit Account Control Agreement is maintained of any termination of a Cash Dominion Period.

SECTION 8.13    Further Assurances.

Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Loan Parties:

(a)    Promptly upon reasonable request by the Administrative Agent or the Collateral Agent or as may be required by applicable law (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents.

# ARTICLE IX

## NEGATIVE COVENANTS

So long as any Lender shall have any Revolving Credit Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements, Cash Management Obligations and Bank Product Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent), the Borrower shall not (and, with respect to *Section 9.13*, only Parent and Holdings shall not), nor shall the Borrower permit any Restricted Subsidiary to:

SECTION 9.1    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens created pursuant to any Loan Document;

(b)    Liens existing on the Second Restatement Date and set forth on *Schedule 9.1(b)*;

(c)       Liens for taxes, assessments or governmental charges that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP;

(d)       statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens or other customary Liens (other than in respect of Indebtedness) in favor of landlords, so long as, in each case, such Liens arise in the ordinary course of business that secure amounts not overdue for a period of more than thirty (30) days or, if more than thirty (30) days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)       (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, the Borrower or any Restricted Subsidiaries;

(f)       deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)       easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole, or the use of the property for its intended purpose;

(h)       Liens arising from judgments or orders for the payment of money not constituting an Event of Default under *Section 10.1(g)*;

(i)       (i) Liens securing obligations in respect of Indebtedness permitted under *Section 9.3(e)*; *provided* that (A) such Liens attach concurrently with or within two hundred and seventy (270) days after completion of the acquisition, construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits, (C) such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to, or acquired, constructed, repaired, replaced or improved with the proceeds of such Indebtedness; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender, and (D) if requested by the Administrative Agent, the Loan Parties shall use commercially reasonable efforts to cause the holder of such Lien to enter into a Collateral Access Agreement, and (ii) Liens on assets of Restricted Subsidiaries that are Non-Loan Parties securing Indebtedness of such Restricted Subsidiaries permitted pursuant to *Section 9.3(l)*;

(j)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (ii) secure any Indebtedness;

(k)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)    Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to *Section 9.2(i)* or *Section 9.2(m)* to be applied against the purchase price for such Investment or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under *Section 9.5*, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(m)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(n)    Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary incurred pursuant to *Sections 9.3(b), (l), (r) or (v)*;

(o)    Liens in favor of the Borrower or a Restricted Subsidiary securing Indebtedness permitted under *Section 9.3(d)*;

(p)    Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary (other than by designation as a Restricted Subsidiary pursuant to *Section 8.3*), in each case after the Second Restatement Date; *provided* that (i) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Restricted Subsidiary), and (ii) the Indebtedness secured thereby is permitted under *Section 9.3(e) or (v)*;

(q)    any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases (other than Capitalized Leases) or licenses entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(r)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(s)    Liens deemed to exist in connection with Investments in repurchase agreements under *Section 9.2* and reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts maintained in the ordinary course of business and not for speculative purposes;

(t)    Liens solely on any cash earnest money deposits made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement not prohibited hereunder;

(u)      ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(v)      purported Liens evidenced by the filing of precautionary UCC financing statements or similar public filings;

(w)      Liens securing obligations in respect of Indebtedness permitted under *Section 9.3(p)* and other obligations in respect of any Secured Hedge Agreement and any Cash Management Obligation (in each case, as defined in each of the Term Facility Credit Agreement) permitted under *Section 9.3(p),* which Liens shall be subject to the terms of the Intercreditor Agreement (or, in the case of any Permitted Refinancing in respect thereof, another intercreditor agreement containing terms that are at least as favorable to the Secured Parties as those contained in the Intercreditor Agreement);

(x)      Liens (i) of a collection bank arising under Section 4-208 of the UCC on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set off) and that are within the general parameters customary in the banking industry;

(y)      any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(z)      the modification, replacement, renewal or extension of any Lien permitted by clauses (b), (i) and (o) of this *Section 9.1*; *provided* that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under *Section 9.3(e)*, and (B) proceeds and products thereof, and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by *Section 9.3*;

(aa)      rights of set-off against credit balances of the Borrower or any of its Subsidiaries with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to the Borrower or any of its Subsidiaries in the ordinary course of business, but not rights of set-off against any other property or assets of the Borrower or any of its Subsidiaries pursuant to the agreements with such Credit Card Issuers or Credit Card Processors (as in effect on the Second Restatement Date) to secure the obligations of the Borrower or any of its Subsidiaries to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks;

(bb)      without duplication of, or aggregation with, any other Lien permitted under any other clause of this *Section 9.1*, other Liens (not covering Current Asset Collateral unless the Liens thereon are subordinated to the Lien of the Collateral Agent in a manner consistent with the terms of the Intercreditor Agreement) securing Indebtedness permitted under (i) *Section 9.3(s)* (subject to the requirements set forth therein) or (ii) any other clause contained in *Section 9.3* outstanding in an aggregate principal amount not to exceed the greater of $150,000,000 and 6.50% of Total Assets at any time outstanding;

(cc)      deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business of the Borrower and such

Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises; and

(dd)    Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the issuance of Indebtedness or (ii) relating to pooled deposit or sweep accounts of Holdings, the Borrower or any of the Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings, the Borrower and the Restricted Subsidiaries.

For the avoidance of doubt, all Liens on Current Asset Collateral that secure Indebtedness for borrowed money shall be subordinated to the Liens of the Collateral Agent in a manner consistent with the terms of the Intercreditor Agreement.

SECTION 9.2    <u>Investments</u>.

Make or hold any Investments, except:

(a)    Investments by the Borrower or any of the Restricted Subsidiaries in assets that are cash and Cash Equivalents;

(b)    loans or advances to officers, directors and employees of Holdings (or any direct or indirect parent thereof), the Borrower or any of the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings (or any direct or indirect parent thereof; *provided* that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to Holdings in cash) and (iii) for any other purpose, in an aggregate principal amount outstanding under this clause (b) not to exceed $22,000,000;

(c)    Investments (i) by the Borrower or any Restricted Subsidiary that is a Loan Party in the Borrower or any Restricted Subsidiary that is a Loan Party, (ii) by any Non-Loan Party in any other Non-Loan Party that is a Restricted Subsidiary, (iii) by any Non-Loan Party in the Borrower or any Restricted Subsidiary that is a Loan Party and (iv) without duplication of any other clauses of this *Section 9.2*, by any Loan Party in any Non-Loan Party that is a Restricted Subsidiary; *provided* that (A) any such Investments made pursuant to this *clause (iv)* in the form of intercompany loans shall be evidenced by notes that have been pledged (individually or pursuant to a global note) to the Collateral Agent for the benefit of the Lenders and (B) the aggregate amount of Investments made pursuant to this *clause (iv)* shall not exceed $20,000,000 at any time outstanding unless the Payment Conditions have been met at the time of, and after giving effect to, each such Investment (in which event the limit of $20,000,000 shall not apply to such Investment);

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)    Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under *Sections 9.1*, *9.3* (other than *9.3(c)(ii)* or

*(d)*), *9.4* (other than *9.4(c)(ii),* or *(e)*), *9.5* (other than *9.5(d)* or *(e)*) and *9.6* (other than *9.6(d)* or *(g)(iv)*), respectively;

(f)      Investments existing on the Second Restatement Date or made pursuant to legally binding written contracts in existence on the Second Restatement Date, in each case, set forth on *Schedule 9.2(f)* and any modification, replacement, renewal, reinvestment or extension of any of the foregoing; *provided* that the amount of any Investment permitted pursuant to this *Section 9.2(f)* is not increased from the amount of such Investment on the Second Restatement Date except pursuant to the terms of such Investment as of the Second Restatement Date or as otherwise permitted by another clause of this *Section 9.2*;

(g)      Investments in Swap Contracts permitted under *Section 9.3*;

(h)      promissory notes and other non-cash consideration that is permitted to be received in connection with Dispositions permitted by *Section 9.5*;

(i)      Permitted Acquisitions;

(j)      [Reserved];

(k)      Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment;

(l)      loans and advances to Holdings (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings (or such direct or indirect parent) in accordance with *Section 9.6(g)*;

(m)      without duplication of any other clauses of this *Section 9.2*, other Investments that do not exceed $40,000,000 in the aggregate at any time outstanding, determined as of the date of such Investment;

(n)      advances of payroll payments to employees in the ordinary course of business;

(o)      Investments to the extent that payment for such Investments is made solely with Qualified Equity Interests of Holdings (or any direct or indirect parent thereof);

(p)      Investments held by a Restricted Subsidiary acquired after the Second Restatement Date or of a Person merged into the Borrower or merged or consolidated with a Restricted Subsidiary in accordance with *Section 9.4* after the Second Restatement Date (other than existing Investments in subsidiaries of such Subsidiary or Person, which must comply with the requirements of *Section 9.2(i) or (m)*) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(q)      Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(r)        Investments made by any Restricted Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Restricted Subsidiary from an Investment made pursuant to *clauses (c)(iv), (i) or (m)* of this *Section 9.2;*

(s)        Guarantees by the Borrower or any of the Restricted Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(t)        Investments received in connection with a Disposition permitted by *Section 9.5(m)*; and

(u)        without duplication of, or aggregation with, any Investment made under any other clause of this *Section 9.2*, the Borrower and its Restricted Subsidiaries may make other Investments as long as the Payment Conditions are satisfied after giving effect thereto.

SECTION 9.3        Indebtedness.

Create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest, other than:

(a)        Indebtedness under the Loan Documents;

(b)        (i) Indebtedness existing on the Second Restatement Date set forth on *Schedule 9.3(b)* and any Permitted Refinancing thereof and (ii) intercompany Indebtedness outstanding on the Second Restatement Date; *provided* that all such Indebtedness of any Loan Party owed to any Non-Loan Party shall be subject to the Intercompany Subordination Agreement;

(c)        (i) Guarantees by the Borrower and the Restricted Subsidiaries in respect of Indebtedness of the Borrower or any of the Restricted Subsidiaries otherwise permitted hereunder (except that a Restricted Subsidiary that is not a Loan Party may not, by virtue of this *Section 9.3(c)*, Guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this *Section 9.3*); *provided* that (A) no Guarantee by any Restricted Subsidiary of any Junior Financing shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Obligations substantially on the terms set forth in the Guaranty, and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guaranty on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness, and (ii) any Guaranty by a Loan Party of Indebtedness of a Restricted Subsidiary that would have been permitted as an Investment by such Loan Party in such Restricted Subsidiary under *Section 9.2(c)*;

(d)        Indebtedness of the Borrower or any of the Restricted Subsidiaries owing to the Borrower or any other Restricted Subsidiary to the extent constituting an Investment permitted by *Section 9.2*; *provided* that (i) all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subject to the Intercompany Subordination Agreement and (ii) in the event of any such Indebtedness in respect of the sale, transfer or assignment of Current Asset Collateral, such Indebtedness shall be duly noted on the books and records of the Loan Parties as being owing in respect of Current Asset Collateral;

(e)        (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) of the Borrower and the Restricted Subsidiaries financing the acquisition, construction,

repair, replacement or improvement of fixed or capital assets; *provided* that such Indebtedness is incurred concurrently with or within two hundred and seventy (270) days after the applicable acquisition, construction, repair, replacement or improvement and any Permitted Refinancing thereof in an aggregate principal amount pursuant to this sub-clause (i) not to exceed the greater of $110,000,000 and 4.75% of Total Assets, in each case determined at the date of incurrence, (ii) Attributable Indebtedness arising out of sale-leaseback transactions (other than sale-leaseback transactions with respect to any Designated Assets) with respect to properties acquired after the Second Restatement Date and any Permitted Refinancing thereof in an aggregate amount outstanding pursuant to this sub-clause (ii) at any time not to exceed the greater of (x) $110,000,000 and (y) 4.75% of Total Assets, in each case determined at the date of incurrence, and (iii) Attributable Indebtedness arising out of sale-leaseback transactions with respect to any Designated Assets, and any Permitted Refinancing thereof;

(f)      Indebtedness in respect of Swap Contracts designed to hedge against Holdings, the Borrower's or any Restricted Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)      Indebtedness representing deferred compensation to employees of the Borrower and its Subsidiaries incurred in the ordinary course of business;

(h)      Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of Holdings (or any direct or indirect parent thereof) permitted by *Section 9.6*;

(i)      Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in a Permitted Acquisition, any other Investment expressly permitted hereunder or any Disposition, in each case to the extent constituting indemnification obligations or obligations in respect of purchase price (including earn-outs) or other similar adjustments;

(j)      Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements with employees incurred by such Person in connection with the Permitted Acquisitions or any other Investment expressly permitted hereunder;

(k)      Indebtedness in respect of Cash Management Services, Bank Products and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof;

(l)      Indebtedness of the Borrower and the Restricted Subsidiaries in an aggregate principal amount at any time outstanding not to exceed the greater of $150,000,000 and 6.50% of Total Assets (determined at the time of incurrence); *provided* that a maximum of the greater of $58,000,000 and 2.50% of Total Assets (determined at the time of incurrence) in aggregate principal amount of such Indebtedness may be incurred by Non-Loan Parties;

(m)      Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(n)    Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business consistent with past practice in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(o)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(p)    Indebtedness in an aggregate principal amount not to exceed (i) $[  ][5] plus (ii) the amount of (A) the Maximum Incremental Amount (as defined in the Term Facility Credit Agreement as in effect on the Second Restatement Date or, subject to prior consent of the Administrative Agent and the FILO Documentation Agent, as in effect after the Second Restatement Date), (B) Permitted Pari Passu Secured Debt, [(C) Secured Obligations under Secured Hedge Agreements and not incurred in violation of *Section 9.3(f)*, (D) Obligations under Secured Cash Management Agreements][6], (E) Credit Agreement Refinancing Indebtedness, and (F) Incremental Exit Loans in an aggregate principal amount not to exceed $10,500,000 (in the case of each of the foregoing *clauses (A), (B), (C), (D), (E), and (F)*, as capitalized terms not defined herein are defined in the Term Facility Credit Agreement), in each case, at any time outstanding and in respect of clauses (i) and (ii), any Permitted Refinancing thereof;

(q)    Indebtedness (i) of any Person that becomes a Restricted Subsidiary after the Second Restatement Date, which Indebtedness is existing at the time such Person becomes a Restricted Subsidiary and is not incurred in contemplation of such Person becoming a Restricted Subsidiary that is non-recourse to the Borrower, Holdings or any other Restricted Subsidiary, other than any Subsidiary of such Person that is a Subsidiary on the date such Person becomes a Restricted Subsidiary after the Second Restatement Date and is either (A) unsecured or (B) secured only by the assets of such Restricted Subsidiary by Liens permitted under *Section 9.1(p)* and, in each case, any Permitted Refinancing thereof, and (ii) of the Borrower or any Restricted Subsidiary incurred or assumed in connection with any Permitted Acquisition that is secured only by Liens permitted under *Section 9.1(p)* (and any Permitted Refinancing of the foregoing) and so long as the aggregate principal amount of such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof at any time outstanding pursuant to this clause (g)(ii) does not exceed (x) $110,000,000 and (y) 4.75% of Total Assets at any time outstanding;

(r)    Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness of all such Foreign Subsidiaries incurred pursuant to this *clause (r)* and then outstanding, does not exceed the greater of $58,000,000 and 2.50% of Total Assets (determined at the time of incurrence);

(s)    other secured, unsecured or subordinated Indebtedness of the Borrower or any Restricted Subsidiary (and any Permitted Refinancing thereof), so long as (A) the Payment Conditions shall have been satisfied after giving effect thereto, (B) the maturity date and

---

[5] NTD: To be the outstanding principal amount of exit term loan at emergence.

[6] NTD: To be confirmed.

Weighted Average Life to Maturity of such Indebtedness is at least six (6) months after the Latest Maturity Date at the time of incurrence of such Indebtedness, and (C) if such Indebtedness is secured, (i) any such Liens with respect to any Current Asset Collateral shall be junior to the Liens securing the Obligations and (ii) such Indebtedness is subject to an intercreditor agreement containing terms that are at least as favorable to the Secured Parties as those contained in the Intercreditor Agreement;

(t)  [Reserved];

(u)  Indebtedness in respect of letters of credit issued for the account of any of the Subsidiaries of Holdings to finance the purchase of Inventory so long as (x) such Indebtedness is unsecured, and (y) the aggregate principal amount of such Indebtedness does not exceed the greater of $81,000,000 and 3.50% of Total Assets at any time;

(v)  Indebtedness (i) of any Person that becomes a Restricted Subsidiary after the Second Restatement Date, which Indebtedness is existing at the time such Person becomes a Restricted Subsidiary and is not incurred in contemplation of such Person becoming a Restricted Subsidiary that is non-recourse to the Borrower, Holdings or any other Restricted Subsidiary (other than any Subsidiary of such Person that is a Subsidiary on the date such Person becomes a Restricted Subsidiary after the Second Restatement Date) and is either (A) unsecured or (B) secured only by the assets of such Restricted Subsidiary by Liens permitted under *Section 9.1(p)* and, in each case, any Permitted Refinancing thereof, and (ii) of the Borrower or any Restricted Subsidiary incurred or assumed in connection with any Permitted Acquisition that is secured only by Liens permitted under *Section 9.1(p)* (and any Permitted Refinancing of the foregoing) and so long as the aggregate principal amount of such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof at any time outstanding pursuant to *clause (v)(ii)* does not exceed $70,000,000; and

(w)  all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in *clauses (a)* through *(v)* above.

Notwithstanding the foregoing, no Restricted Subsidiary that is a Non-Loan Party will guarantee any Indebtedness for borrowed money of a Loan Party unless such Restricted Subsidiary becomes a Guarantor.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

Notwithstanding anything to the contrary contained in this Agreement, Indebtedness incurred pursuant to the Term Facility (and any Permitted Refinancing thereof) may only be incurred pursuant to *Section 9.3(p)*.

SECTION 9.4    Fundamental Changes.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (including, in each case, pursuant to a Division; *provided* that the formation of any Subsidiary that is a Division Successor shall be deemed to constitute the acquisition of a Restricted Subsidiary for all purposes of this *Section 9.4*), except that:

(a)    Holdings or any Restricted Subsidiary may merge or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that (x) the Borrower shall be the continuing or surviving Person, (y) such merger or consolidation does not result in the Borrower ceasing to be organized under the Laws of the United States, any state thereof or the District of Columbia and (z) in the case of a merger or consolidation of Holdings with and into the Borrower, Holdings shall not be an obligor in respect of any Qualified Holding Company Debt or other Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement, shall not be an obligor in respect of any Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement, shall have no direct Subsidiaries at the time of such merger or consolidation other than the Borrower and, after giving effect to such merger or consolidation, the direct parent of the Borrower shall expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent;

(b)    (i) any Restricted Subsidiary that is not a Loan Party may merge or consolidate with or into any other Restricted Subsidiary of the Borrower that is not a Loan Party, (ii) any Restricted Subsidiary may merge or consolidate with or into any other Restricted Subsidiary of the Borrower that is a Loan Party, (iii) any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States shall be permitted and (iv) any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Restricted Subsidiaries and is not materially disadvantageous to the Lenders; *provided*, in the case of *clauses (ii)* through *(iv)* of this *paragraph (b)*, that (A) no Event of Default shall result therefrom, (B) no Change of Control shall result therefrom and (C) the surviving Person (or, with respect to *clause (iv)*, the Person who receives the assets of such dissolving or liquidated Restricted Subsidiary that is a Guarantor) shall be a Loan Party;

(c)    any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (i) the transferee must be a Loan Party or (ii) such Investment must be a permitted Investment in a Restricted Subsidiary which is not a Loan Party in accordance with *Section 9.2* (other than *clause (e)* thereof) and must be a permitted Disposition in accordance with *Section 9.5*;

(d)      so long as no Default or Event of Default is continuing or would result therefrom, the Borrower may merge or consolidate with any other Person; *provided* that (i) the Borrower shall be the continuing or surviving corporation or (ii) if the Person formed by or surviving any such merger or consolidation is not the Borrower (any such Person, the "*Successor Borrower*"), (A) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (B) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (C) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guaranty confirmed that its Guarantee of the Obligations shall apply to the Successor Borrower's obligations under this Agreement, (D) each Loan Party, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement confirmed that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement, and (E) the Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Collateral Document comply with this Agreement; *provided*, *further*, that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(e)      so long as no Default or Event of Default is continuing or would result therefrom, any Restricted Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to *Section 9.2* (other than *Section 9.2(e)*); *provided* that the continuing or surviving Person shall be the Borrower or a Restricted Subsidiary, which together with each of its Restricted Subsidiaries, shall have complied with the applicable requirements of *Sections 8.11*, *8.12* and *8.13*; and

(f)      so long as no Default or Event of Default is continuing or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to *Section 9.5* (other than *Section 9.5(e)*).

SECTION 9.5      Dispositions.  Make any Disposition except:

(a)      Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and the Restricted Subsidiaries;

(b)      Dispositions of inventory and goods held for sale in the ordinary course of business;

(c)      Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property; *provided* that to the extent the property being transferred constitutes Current Asset Collateral, such replacement property shall constitute Current Asset Collateral.

(d)      Dispositions of property to the Borrower or a Restricted Subsidiary; *provided* that if the transferor of such property is a Loan Party (i) the transferee thereof must be a Loan Party or (ii) such Investment must be a permitted Investment in a Restricted Subsidiary that is not a Loan Party in accordance with *Section 9.2* (other than *Section 9.2(e)*) or (iii) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Loan Party, such Disposition is for fair value and any promissory note or other non-cash consideration received in respect thereof is a permitted

investment in a Restricted Subsidiary that is not a Loan Party in accordance with *Section 9.2* (other than *Section 9.2(e)*); *provided* that if the property being disposed of constitutes Current Asset Collateral and is being transferred to a Subsidiary which is not a Subsidiary Guarantor, such disposition shall be made only if the Payment Conditions are satisfied after giving effect thereto;

(e)    Dispositions permitted by *Sections 9.2* (other than *Section 9.2(e)*), *9.4* (other than *Section 9.4(g)*) and *9.6* (other than *Section 9.6(d)*) and Liens permitted by *Section 9.1*(other than *Section 9.1(l)(ii)*);

(f)    Dispositions of property pursuant to sale-leaseback transactions;

(g)    any issuance or sale of Equity Interests in, or sale of Indebtedness or other securities of, an Unrestricted Subsidiary;

(h)    leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(i)    Dispositions of property subject to Casualty Events (as such term is defined in the Term Facility Credit Agreements);

(j)    Dispositions of property not otherwise permitted under this *Section 9.5*; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default exists), no Default shall exist or would result from such Disposition; (ii) with respect to any Disposition pursuant to this *clause (j)* for a purchase price in excess of $20,000,000, the Borrower or any of the Restricted Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than nonconsensual Liens permitted by *Section 9.1* and Liens permitted by *Sections 9.1(a)*, *(m)*, *(s)*, *(t)*, *(x)*, *(w)*, *(dd)(i)* and *(dd)(ii)*); and (iii) if the property continues to be used by the Loan Parties in the conduct of their business and holds any Current Asset Collateral on the premises thereof, and if requested by the Administrative Agent, the Loan Parties shall use commercially reasonable efforts to cause the transferee of such property to enter into a Collateral Access Agreement; provided, however, that for the purposes of *clause (ii)*, (A) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by such Restricted Subsidiary from such transferee that are converted by such Restricted Subsidiary into cash (to the extent of the cash received) within 180 days following the closing of the applicable Disposition and (C) any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value (as determined by the Borrower in good faith), taken together with all other Designated Non-Cash Consideration received pursuant to this *clause (C)* that is at that time outstanding, not in excess of the greater of $58,000,000 and 2.50% of Total Assets at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash; and (iv) proceeds of such Dispositions are applied in accordance with the Term Facility Credit Agreements;

(k)     Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(l)     bulk sales or other dispositions of the Inventory of a Borrower not in the ordinary course of business in connection with Store closings, at arm's length, *provided, that* such Store closures and related Inventory dispositions shall not exceed (i) in any Fiscal Year, twenty-five percent (25%) of the number of the Borrower's Stores as of the beginning of such Fiscal Year (net of new Store openings) and (ii) in the aggregate from and after the Second Restatement Date, fifty percent (50%) of the number of the Borrower's Stores in existence as of the Second Restatement Date (net of new Store openings), *provided further* that all sales of Inventory in connection with store closings shall be in accordance with liquidation agreements and with professional liquidators reasonably acceptable to the Administrative Agent and the FILO Documentation Agent, *provided further* that all Net Cash Proceeds received in connection therewith are applied to the Obligations if then required in accordance with *Section 2.9* hereof;

(m)     the unwinding of any Swap Contract;

(n)     the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any IP Rights;

(o)     to the extent allowable under Section 1031 of the Code (or comparable or successor provision), any exchange of like property (excluding any boot thereon permitted by such provision) for use in any business conducted by the Borrower or any of its Restricted Subsidiaries that is not in contravention of *Section 9.7*;

(p)     Dispositions of accounts receivable in connection with the collection or compromise thereof, *provided* that no disposition of Eligible Credit Card Receivables or Eligible Trade Receivables shall be permitted pursuant to this *clause (p)* unless the Borrower shall have (i) delivered to the Administrative Agent and the FILO Documentation Agent written notice of such disposition in reasonable detail and (ii) if requested by the Administrative Agent or the FILO Documentation Agent, delivered to the Administrative Agent and the FILO Documentation Agent an updated Borrowing Base Certificate;

(q)     sales or other dispositions by the Borrower or any Restricted Subsidiary of assets in connection with the closing or sale of a Store (including a factory Store) in the ordinary course of the business of the Borrower or such Restricted Subsidiary which consist of leasehold interests in the premises of such Store, the equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such Store (but excluding any Current Asset Collateral); *provided* that as to each and all such sales and closings, (A) no Event of Default shall result therefrom and (B) such sale shall be on commercially reasonable prices and terms in a *bona fide* arm's length transaction;

(r)     Dispositions of Cash Equivalents; *provided* that, if any such Disposition occurs during a Cash Dominion Period, the Loan Parties shall be in compliance with *Section 11.12*; and

(s)     Dispositions of Excluded Property by non-Loan Parties and Dispositions of Excluded Property by Loan Parties for fair market value.

*provided* that (i) any Disposition of any property pursuant to this *Section 9.5* (except pursuant to *Sections 9.5(a), (e), (i), (k), (m)* and (*o*) and except for Dispositions from the Borrower or a Restricted

Subsidiary that is a Loan Party to the Borrower or a Restricted Subsidiary that is a Loan Party), shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith, (ii) in the case of any such Disposition of any Current Asset Collateral the value of which exceeds five (5%) percent of the Borrowing Base, the Borrower shall deliver to Administrative Agent and the FILO Documentation Agent an updated Borrowing Base Certificate prior to the consummation of such Disposition, calculated as of the date thereof and giving effect thereto, and (iii) to the extent any Collateral is Disposed of as expressly permitted by this *Section 9.5* to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent, upon the certification by the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 9.6        Restricted Payments.

Declare or make, directly or indirectly, any Restricted Payment, except:

(a)        each Restricted Subsidiary may make Restricted Payments to the Borrower and to its other Restricted Subsidiaries (and, in the case of a Restricted Payment by a non-wholly owned Restricted Subsidiary, to the Borrower and any of its other Restricted Subsidiaries and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)        the Borrower and each of its Restricted Subsidiaries may declare and make dividend payments or other distributions payable solely in the Equity Interests (other than Disqualified Equity Interests not otherwise permitted by *Section 9.3*) of such Person;

(c)        [reserved];

(d)        to the extent constituting Restricted Payments, Holdings, the Borrower and the Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of *Section 9.2* (other than *Section 9.2(e)*), *9.4* (other than a merger or consolidation of Holdings and the Borrower) or *9.8* (other than *Section 9.8(a)* or *(j)*);

(e)        repurchases of Equity Interests in Holdings, the Borrower or any of the Restricted Subsidiaries deemed to occur upon exercise of stock options or warrants or similar rights if such Equity Interests represent a portion of the exercise price of such options or warrants or similar rights;

(f)        [reserved];

(g)        the Borrower may make Restricted Payments to Holdings (or to Parent and any other direct or indirect parent of Holdings):

(i)        the proceeds of which will be used to pay (or to make Restricted Payments to allow Parent and any other direct or indirect parent of Holdings to pay) the tax liability to each foreign, federal, state or local jurisdiction in respect of which a consolidated, combined, unitary or affiliated return is filed by Holdings (or Parent or any other direct or indirect parent of Holdings) that includes the activities of the Borrower and/or any of its Subsidiaries, to the extent such tax liability does not exceed the lesser of (A) the taxes that would have been payable by the Borrower and/or its Subsidiaries as a stand-alone group with the Borrower the regarded corporate parent of the group and

(B) the actual tax liability of Holdings', Parent's or such other direct or indirect parent's consolidated, combined, unitary or affiliated group, reduced by any such taxes paid or to be paid directly by the Borrower or its Subsidiaries;

(ii)     the proceeds of which shall be used to pay (or to make Restricted Payments to allow Parent or any direct parent of Parent to pay) the operating costs and expenses of Holdings (or Parent or any other direct or indirect parent of Holdings) incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, attributable to the ownership or operations of the Borrower and its Subsidiaries;

(iii)    the proceeds of which shall be used to pay franchise taxes and other fees, taxes and expenses required to maintain Holdings' (or Parent's or any direct or indirect parent of Holdings) corporate existence;

(iv)     to finance any Investment permitted to be made pursuant to *Section 9.2*; *provided* that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment and (B) Parent, Holdings and the Borrower shall, immediately following the closing thereof, cause (1) all property acquired (whether assets or Equity Interests) to be contributed to the Borrower or a Restricted Subsidiary or (2) the merger (to the extent permitted in *Section 9.4*) of the Person formed or acquired into the Borrower or a Restricted Subsidiary in order to consummate such Permitted Acquisition, in each case, in accordance with the requirements of *Sections 8.11, 8.12* and *9.2*;

(v)      the proceeds of which shall be used to pay (or to make Restricted Payments to allow Parent to pay) costs, fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering permitted by this Agreement;

(vi)     the proceeds of which (A) shall be used to pay customary salary, bonus and other benefits payable to officers and employees of Holdings (or Parent) to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries or (B) shall be used to make payments permitted under *Sections 9.8(p)* (but, in the case of this clause (B), only to the extent such payments have not been and are not expected to be made by the Borrower or a Restricted Subsidiary), or (C) shall be used to make payments permitted under *Section 9.8(h)*; and

(vii)    the proceeds of which shall be used to pay withholding or other similar taxes payable upon repurchase, retirement or other acquisition or retirement of Equity Interests of Holdings, a Parent Entity or its Subsidiaries or otherwise pursuant to any employee or director equity plan, employee or director stock option or profits interest plan or any other employee or director benefit plan or any agreement;

(h)      Holdings, the Borrower or any of the Restricted Subsidiaries may pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any Permitted Acquisition;

(i)      [reserved];

(j)      repurchases of Equity Interests (i) deemed to occur on the exercise of options by the delivery of Equity Interests in satisfaction of the exercise price of such options and (ii) in

consideration of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing), including deemed repurchases in connection with the exercise of stock options;

(k)        [reserved];

(l)        [reserved];

(m)        the Borrower may (or may make Restricted Payments to permit any Parent Entity to) (i) redeem, repurchase, retire or otherwise acquire in whole or in part any Equity Interests of the Borrower or any Restricted Subsidiary or any Equity Interests of any Parent Entity ("*Treasury Equity Interests*"), in exchange for, or with the proceeds (to the extent contributed to Holdings or the Borrower substantially concurrently) of the sale or issuance (other than to the Borrower or any Restricted Subsidiary) of, other Equity Interests or rights to acquire its Equity Interests ("Refunding Equity Interests") and (ii) declare and pay dividends on any Treasury Equity Interests out of any such proceeds; and

(n)        redemptions in whole or in part of any of its Equity Interests for another class of its Equity Interests (other than Disqualified Equity Interests, except to the extent issued by the Borrower to a Restricted Subsidiary) or with proceeds from substantially concurrent equity contributions or issuances of new Equity Interests (other than Disqualified Equity Interests, except to the extent issued by the Borrower to a Restricted Subsidiary).

SECTION 9.7        Change in Nature of Business.

Engage in any material line of business substantially different from those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Second Restatement Date or any business reasonably related or ancillary thereto.

SECTION 9.8        Transactions with Affiliates.

Enter into any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, in excess of $12,500,000, other than:

(a)        transactions between or among (i) the Borrower or any of the Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction, and (ii) the Loan Parties,

(b)        transactions on terms substantially as favorable to such Loan Party or such Restricted Subsidiary as would be obtainable by such Loan Party or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate,

(c)        transactions under the Term Facility Documentation,

(d)        [reserved],

(e)        [reserved],

(f)        employment and severance arrangements between Holdings, the Borrower and the Restricted Subsidiaries and their respective officers and employees in the ordinary course of

146

business and transactions pursuant to stock option plans and employee benefit plans and arrangements,

(g)        the non-exclusive licensing of trademarks, copyrights or other IP Rights in the ordinary course of business to permit the commercial exploitation of IP Rights between or among Affiliates and Subsidiaries of Holdings or the Borrower,

(h)        the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers and employees of Holdings and the Restricted Subsidiaries or any direct or indirect parent of Holdings in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries,

(i)        any agreement, instrument or arrangement as in effect as of the Second Restatement Date and set forth on *Schedule 9.8*, or any amendment thereto (so long as any such amendment is not adverse to the Lenders in any material respect as compared to the applicable agreement as in effect on the Second Restatement Date),

(j)        Restricted Payments permitted under *Section 9.6*,

(k)        [reserved],

(l)        transactions in which the Borrower or any of the Restricted Subsidiaries, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of *clause (b)* of this *Section 9.8*,

(m)        the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof to the extent otherwise permitted by this Agreement and to the extent such issuance or transfer would not give rise to a Change of Control,

(n)        [reserved],

(o)        payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by the Borrower and the Restricted Subsidiary in such joint venture) in the ordinary course of business to the extent otherwise permitted under *Section 9.2,*

(p)        the Second Restatement Transactions and the payment of all fees and expenses related to the Second Restatement Transactions and permitted pursuant to the Confirmation Order,

(q)        the entering into of any tax sharing agreement or arrangement and any payments pursuant thereto, to the extent permitted by *Section 9.6(g)(i)*, and

(r)        to the extent not otherwise prohibited under this Agreement, payments by Holdings, the Borrower or any of its Restricted Subsidiaries in respect of any of their respective Indebtedness or Equity Interests that are payable to holders of such Indebtedness or Equity

Interests generally (including Affiliates that may from time to time own such Indebtedness or Equity Interests).

SECTION 9.9     Burdensome Agreements.

Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that prohibits, restricts, imposes any condition on or limits the ability of (a) any Restricted Subsidiary that is not a Loan Party to make Restricted Payments to (directly or indirectly) or to make or repay loans or advances to any Loan Party or to Guarantee the Obligations of any Loan Party under the Loan Documents or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Revolving Facility, the FILO Facility and the Obligations under the Loan Documents; *provided* that the foregoing *clauses (a)* and *(b)* shall not apply to Contractual Obligations that:

(i)     (x) exist on the Second Restatement Date and (to the extent not otherwise permitted by this *Section 9.9*) are listed on *Schedule 9.9* hereto and (y) to the extent Contractual Obligations permitted by *clause (x)* are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing does not expand the scope of such Contractual Obligation,

(ii)     are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary,

(iii)     represent Indebtedness of a Restricted Subsidiary that is not a Loan Party that is permitted by *Section 9.3*,

(iv)     (A) are customary restrictions that arise in connection with any (x) any Lien permitted by *Sections 9.1(a), (l), (s), (t), (w), (x)* and *(dd)* and relate to the property subject to such Lien or (y) Disposition permitted by *Section 9.5* applicable pending such Disposition solely to the assets subject to such Disposition,

(v)     are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under *Section 9.2* and applicable solely to such joint venture entered into in the ordinary course of business,

(vi)     are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under *Section 9.3* but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness and the proceeds and products thereof and, in the case of the Term Facility and any Permitted Refinancing thereof, permit the Liens securing the Obligations without restriction (subject to the Intercreditor Agreement),

(vii)     are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto,

(viii)     comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to *Sections 9.3(e), (m)(i), (p), (r)* or *(u)* to the extent that such restrictions apply only to the property or assets securing such Indebtedness or to the Restricted Subsidiary party to such Indebtedness,

(ix)    are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary,

(x)    are customary provisions restricting assignment of any agreement entered into in the ordinary course of business,

(xi)    are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business,

(xii)    are restrictions contained in the Term Facility Credit Agreement and the Term Facility Documentation, and any documentation governing a Permitted Refinancing of any of the foregoing, or

(xiii)    arise in connection with cash or other deposits permitted under *Section 9.1*, or

(xiv)    comprise restrictions imposed by any agreement governing Indebtedness entered into after the Second Restatement Date and permitted under *Section 9.3* that are, taken as a whole, in the good faith judgment of the Borrower, no more restrictive with respect to the Borrower or any Restricted Subsidiary than customary market terms for Indebtedness of such type, so long as the Borrower shall have determined in good faith that such restrictions will not affect its obligation or ability to make any payments required hereunder.

SECTION 9.10    Accounting Changes; Fiscal Year.

Make any change in Fiscal Year; *provided*, *however*, that Holdings and the Borrower may, upon written notice to the Administrative Agent, change its Fiscal Year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, Holdings, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

SECTION 9.11    Prepayment, Etc. of Indebtedness.

Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal and interest and mandatory prepayments of principal and interest shall be permitted) any Indebtedness constituting Junior Financing (including the FILO Loans, but excluding, for the avoidance of doubt, the Term Facilities and any Permitted Refinancing thereof), except (i) [reserved]; (ii) so long as the Payment Conditions are satisfied after giving effect thereto, any prepayment, redemption, defeasance or other satisfaction of any Indebtedness (other than the FILO Loans) that do not exceed $25,000,000 (determined at the time of such prepayment, redemption, defeasance or other satisfaction of such Indebtedness) in the aggregate at any time outstanding; (iii) the refinancing of any Indebtedness with the Net Cash Proceeds of, or in exchange for, any Permitted Refinancing, to the extent not required to be applied to prepayments pursuant to the Term Facility to the extent permitted by *Section 9.14* below; (iv) the conversion (or exchange) of any Indebtedness to Equity Interests (other than Disqualified Equity Interests) or Indebtedness of Holdings or any of its direct or indirect parents; (v) the prepayment, redemption, purchase, defeasance or other satisfaction of Indebtedness of the Borrower or any Restricted Subsidiary owed to Holdings, the Borrower or a Restricted Subsidiary or the prepayment, redemption, purchase, defeasance or other satisfaction of any Indebtedness with the proceeds of any other Indebtedness otherwise permitted by Section 9.3; (vi) any Permitted Refinancing of any Indebtedness; (vii) any prepayment, redemption, purchase, defeasance or

other satisfaction with the Net Cash Proceeds of any Permitted Equity Issuance; and (viii) the prepayment of Indebtedness incurred pursuant to clauses (e), (f), (g), (h), (k)  and (v) of Section 9.3.

SECTION 9.12        Modification of Debt Agreements.

Amend, modify or change in any manner (i) materially adverse to the interest of the Lenders any term or condition of any Material Indebtedness (other than as a result of a Permitted Refinancing thereof and in any event excluding the Term Facility and any Permitted Refinancing thereof and any Indebtedness hereunder) without the consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed) or (ii) with respect to the Term Facility Documentation or any amendment to any Permitted Refinancing thereof to the extent that such amendment, modification or change would (A) shorten the maturity date of the Term Facility or such refinancing Indebtedness to a date which is prior to ninety-one (91) days after the Latest Maturity Date, (B) [reserved], or (C) violate the Intercreditor Agreement.

SECTION 9.13        Holdings and Parent.

In the case of Holdings and Parent, conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto):  (i) with respect to Parent, its ownership of the Equity Interests of Holdings, and with respect to Holdings, its ownership of the Equity Interests of the Borrower, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the Term Facility or, with respect to Parent or Holdings, any Qualified Holding Company Debt, (iv) with respect to Parent or Holdings, the incurrence of Qualified Holding Company Debt, the issuance of securities, and the incurrence of Qualified Equity Interests, (v) making contributions to the capital of its Subsidiaries, (vi) guaranteeing the obligations of its Subsidiaries in each case solely to the extent such obligations of the Borrower and its Subsidiaries are permitted hereunder, (vii) participating in tax, accounting and other administrative matters as a member of the consolidated group of Parent, Holdings and the Borrower, (viii) holding any cash or property received in connection with Restricted Payments made by the Borrower in accordance with *Section 9.6* pending application thereof by Holdings or Parent, (ix) providing indemnification to officers and directors, (x) making investments in Cash Equivalents in the ordinary course of business, (xi) any issuance of its Equity Interests or making payments or restricted payments with any amounts received in any transaction permitted under *Section 9.6*, and (xii) activities incidental to the businesses or activities described in *clauses (i)* to *(xi)* of this *Section 9.13*.

SECTION 9.14        Repayment of Term Loan.

Make any repayment or prepayment of the outstanding principal amount under the Term Facility Credit Agreement, other than (i) amortization payments thereunder as in effect on the Second Restatement Date, (ii) mandatory prepayments thereunder made from the proceeds of Term Loan Priority Collateral and (iii) any Permitted Refinancing thereof to the extent permitted pursuant to Section 9.3.

SECTION 9.15        GB Consulting Agreements.

So long as any FILO Obligations shall remain outstanding, take any action (or fail to take any required action) that directly results in the termination of a GB Consulting Agreement, except if at the time of such action (or at the deadline for such required action), a party to such GB Consulting Agreement that is not a Loan Party or a Subsidiary of a Loan Party has breached or terminated any such GB Consulting Agreement.

## ARTICLE X

## EVENTS OF DEFAULT AND REMEDIES

SECTION 10.1    Events of Default.

Each of the events referred to in *clauses (a)* through *(m)* of this *Section 10.1* shall constitute an "*Event of Default*":

(a)    Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within three (3) Business Days after the same becomes due, any interest on any Loan, or (iii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or with respect to any other Loan Document; or

(b)    Specific Covenants.

(i)    The Borrower, any Restricted Subsidiary or, in the case of *Section 9.13*, Holdings or Parent, fails to perform or observe any term, covenant or agreement contained in (A) *Article VI*, (B) *Section 7.1(a), Section 7.1(b), Section 7.1(c), Section 7.1(d), Section 7.2(a), Section 7.3(a), Section 8.1(a), Section 8.5*, or *Section 8.9*, or (C) *Article IX*;

(ii)    during the continuance of any Cash Dominion Period, the Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in *Section 8.12*; or

(iii)    the Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in *Section 7.4(a)* and such failure continues for five (5) Business Days; or

(iv)    the Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in *Section 7.4(b) or (e)*, and such failure continues for two (2) Business Days; or

(v)    the Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in *Section 7.4(c)* or *Section 7.4(d)*, as applicable, and, in either case, such failure continues for five (5) Business Days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in *Section 10.1(a)* or *(b)* above), and, for the purposes of clarity, including any failure to perform or observe any covenant or agreement contained in *Section 8.12* other than during the continuance of a Cash Dominion Period, contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent or the FILO Documentation Agent; or

(d)    Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein, in any other Loan Document,

or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(e)    Cross-Default.  Any Loan Party or any Restricted Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party) the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this *clause (e)(B)* shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness or (ii) the conversion of, or the satisfaction of any condition to the conversion of, any Indebtedness that is convertible or exchangeable for Equity Interests; *provided further* that such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Aggregate Commitments or acceleration of the Loans pursuant to *Section 10.2*; *provided further* that no such event under the Term Facility (other than a payment default or any other event of default thereunder which constitutes an independent Event of Default under this Agreement without regard to the provisions of the Term Facility Documentation) shall constitute an Event of Default under this Section 10.1(e) until the earliest to occur of (x) the date that is thirty (30) days after such event or circumstance (but only if such event or circumstance has not been waived or cured), (y) the acceleration of the Indebtedness under the Term Facility and (z) the exercise of any remedies by any Term Facility Administrative Agent or collateral agent or any lenders under such Term Facility in respect of any Collateral; or

(f)    Insolvency Proceedings, Etc. Any Loan Party or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)    Judgments.  There is entered against any Loan Party or any Material Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage thereof) and such judgment or order shall not have been satisfied, vacated,

DB1/ 145587008.11

US-DOCS\149610879.14

discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive calendar days; or

(h)      ERISA.  (i)  An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party or their respective ERISA Affiliates under Title IV of ERISA in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, (ii) any Loan Party or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, or (iii) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable law or plan terms that would reasonably be expected to result in a Material Adverse Effect; or

(i)      Invalidity of Loan Documents.  Any material provision of any Loan Document at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under *Section 9.4* or *9.5*) or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document; or

(j)      Collateral Documents.  Any Collateral Document after delivery thereof pursuant to *Section 4.1* or *8.11* shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under *Section 9.4* or *9.5*) cease to create, or any Lien purported to be created by any Collateral Document shall be asserted in writing by any Loan Party not to be, a valid and perfected lien, with the priority required by the Collateral Documents (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under *Section 9.1,* except to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file UCC continuation statements and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(k)      Junior Financing Documentation.  (i) Any of the Obligations of the Loan Parties under the Loan Documents for any reason shall cease to be "Senior Indebtedness" (or any comparable term) or "Senior Secured Financing" (or any comparable term) under, and as defined in any Junior Financing Documentation governing Junior Financing subordinated in right of payment to the Obligations under the Loan Documents with an aggregate principal amount of not less than the Threshold Amount or (ii) the subordination provisions set forth in any Junior Financing Documentation governing Junior Financing subordinated in right of payment to the Obligations under the Loan Documents with an aggregate principal amount of not less than the Threshold Amount shall, in whole or in part, cease to be effective or cease to be legally valid, binding and enforceable against the holders of any such Junior Financing, if applicable; or

(l)      Change of Control.  There occurs any Change of Control.

SECTION 10.2      Remedies upon Event of Default.

(a)      If any Event of Default occurs and is continuing, the Administrative Agent may, and, at the request of the Requisite Lenders shall, take any or all of the following actions:

(i)      declare Revolving Credit Commitments of each Lender and any obligation of the Issuers to make L/C Credit Extensions to be terminated, whereupon such Revolving Credit Commitments and obligation shall be terminated;

(ii)      declare the unpaid principal amount of all outstanding Loans (including any FILO Prepayment Premium that shall have been capitalized and added to the principal amount of the FILO Loans pursuant to the FILO Fee Letter), all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(iii)      require that the Borrower Cash Collateralize the Letter of Credit Obligations (in an amount equal to the then Outstanding Amount thereof); and

(iv)      exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code, the Revolving Credit Commitments of each Lender and any obligation of the Issuers to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans (including any FILO Prepayment Premium that shall have been capitalized and added to the principal amount of the FILO Loans pursuant to the FILO Fee Letter) and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Borrower to Cash Collateralize the Letter of Credit Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

(b)      If any FILO Specified Event of Default occurs and is continuing and the FILO Standstill Period has expired, the Administrative Agent, at the written request of the FILO Documentation Agent, shall, within a reasonable time after receipt of such request (but in any event within two (2) Business Days with respect to *clause (i)* below, it being agreed that if the Administrative Agent fails to take such requested action described in *clause (i)* below within such two (2) Business Day period, the FILO Documentation Agent may take such action directly) take any or all of the following actions:

(i)      declare the unpaid principal amount of all outstanding FILO Loans (including any FILO Prepayment Premium that shall have been capitalized and added to the principal amount of the FILO Loans pursuant to the FILO Fee Letter), all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document in respect of the FILO Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(ii)      exercise on behalf of itself and the FILO Lenders all rights and remedies available to it and the FILO Lenders under the Loan Documents or applicable

Law, including commencing and prosecuting any suits, actions or proceedings at law or in equity in any court of competent jurisdiction and collecting the Collateral or any portion thereof and enforcing any other right in respect of any Collateral, all in such manner as the Administrative Agent may determine in its reasonable discretion; *provided*, *however*, that none of the FILO Lenders or the FILO Documentation Agent will request or direct the Administrative Agent to commence or continue the exercise of any secured creditor remedies or direct or request the Administrative Agent to seek or continue any rights and remedies under this Agreement, any of the other Loan Documents or applicable Law on behalf of the FILO Lenders so long as the Administrative Agent is diligently pursuing in good faith the exercise of its rights and remedies against all or a material portion of the Collateral, including through actions taken by the Loan Parties with the consent of the Administrative Agent.

(c)      Without limiting *clauses (a) and (b)* of this *Section 10.2*, if any Event of Default pursuant to *Section 10.1(a)* or *(f)* has occurred and is continuing, either of the Administrative Agent or the FILO Documentation Agent shall have the right to direct the Loan Parties to commence a commercially reasonable process for the sale of the Loan Parties' assets on terms reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent (a "*Sale Event*").

(d)      The Borrower hereby irrevocably waives the right to direct the application of any and all payments in respect of the Obligations and any proceeds of Collateral after the occurrence and during the continuance of an Event of Default and agrees that during the continuance of a Specified Event of Default, the Administrative Agent may in its sole discretion, or upon the written direction of the Requisite Lenders, deliver a notice to each Approved Account Bank instructing them to cease complying with any instructions from any Loan Party and to transfer all funds therein to the Administrative Agent and the Administrative Agent shall apply all payments in respect of any Obligations and all funds on deposit in the Concentration Account and all other proceeds of Collateral in the order specified in *Section 10.3* hereof.

SECTION 10.3      Application of Funds.  After the exercise of remedies provided for in *Section 10.2* (or after the Loans have automatically become immediately due and payable and the Letter of Credit Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to *Section 10.2*), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, ratably, pay any fees, indemnities, or expense reimbursements then due to the Administrative Agent, the FILO Documentation Agent or any Issuer from the Borrower (other than in connection with Cash Management Obligations, Bank Product Obligations or Obligations in respect of Secured Hedge Agreements);

*Second*, ratably, to pay any fees or expense reimbursements then due to the Revolving Credit Lenders from the Borrower (other than in connection with Cash Management Obligations, Bank Product Obligations or Obligations in respect of Secured Hedge Agreements);

*Third*, ratably, to pay interest due and payable in respect of any Revolving Loans (including any Swing Loans) and any Protective Advances;

*Fourth*, ratably, to pay the principal of the Protective Advances and the Swing Loans;

*Fifth*, ratably, to pay principal on the Revolving Loans (other than the Protective Advances and Swing Loans) and unreimbursed Letter of Credit Borrowings;

*Sixth*, to pay an amount to the Administrative Agent equal to 103% of the Letter of Credit Obligations on such date, to be held in the Concentration Account as cash collateral for such Obligations;

*Seventh*, to pay Cash Management Obligations, ratably among the Cash Management Banks in proportion to the respective amounts described in this clause *Seventh* held by them;

*Eighth*, ratably, to pay (i) Bank Product Obligations in an amount equal to the sum of (A) without duplication of clause (ii)(A) below, the Bank Product / Swap Obligations Cap, plus (B) such other amounts in respect of Bank Product Obligations for which the Administrative Agent has implemented a Bank Product Reserve (so long as such Bank Product Reserve was established prior to the occurrence of, and not in contemplation of, an Event of Default) and (ii) obligations of any Loan Party arising under any Secured Hedge Agreement then due to the Hedge Banks in an amount equal to the sum of (A) without duplication of clause (i)(A) above, the Bank Product / Swap Obligations Cap, plus (B) such other amounts in respect of obligations of any Loan Party arising under any Secured Hedge Agreement for which the Administrative Agent has implemented a Swap Obligations Reserve (so long as such Swap Obligations Reserve was established prior to the occurrence of, and not in contemplation of, an Event of Default), in each case of *clause (i)* and *clause (ii)*, ratably among the Bank Product Providers and Hedge Banks in proportion to the respective amounts described in this clause *Eighth* held by them;

*Ninth*, ratably, to pay any fees or expense reimbursements then due to the FILO Lenders from the Borrower;

*Tenth*, to pay interest due and payable in respect of any FILO Loans;

*Eleventh,* to pay principal on the FILO Loans (including any FILO Prepayment Premium that shall have been capitalized and added to the principal amount of the FILO Loans pursuant to the FILO Fee Letter);

*Twelfth*, to payment of all other Revolving Obligations (including Bank Product Obligations and obligations of any Loan Party arising under any Secured Hedge Agreement not otherwise paid pursuant to clause *Eighth* above), ratably among the Persons to whom such other Revolving Obligations are owed in proportion to the respective amounts described in this clause *Twelfth* held by them;

*Thirteenth,* to the payment of any other Obligation due to the Administrative Agent, the FILO Documentation Agent or any Lender by the Borrower, ratably among the Persons to whom such other Obligations are owed in proportion to the respective amounts described in this clause *Thirteenth* held by them;

*Fourteenth*, as provided for under the Intercreditor Agreement; and

*Fifteenth*, after all of the Obligations have been paid in full, to the Borrower or as the Borrower shall direct or as otherwise required by Law.

Subject to *Sections 2.4, 2.16, 8.12 and 10.5,* amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause *Sixth* above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other

Obligations, if any, in the order set forth above and, if no Obligations remain outstanding, to the Borrower.

Notwithstanding the foregoing, if sufficient funds are not available to fund all payments to be made in respect of any Secured Obligation described in any of *clauses First* through *Thirteenth* above, the available funds being applied with respect to any such Secured Obligation (unless otherwise specified in such clause) shall be allocated to the payment of such Secured Obligation ratably, based on the proportion of the Administrative Agent's, the FILO Documentation Agent's and each Lender's or Issuer's interest in the aggregate outstanding Secured Obligations described in such clauses; *provided*, *however*, that payments that would otherwise be allocated to the Lenders shall be allocated *first* to repay Protective Advances and Swing Loans *pro rata* until such Protective Advances and Swing Loans are paid in full and *then* to repay the Loans.  The order of priority set forth in *clauses First* through *Thirteenth* above may at any time and from time to time be changed by the agreement of all directly affected Lenders without necessity of notice to or consent of or approval by the Borrower, any Secured Party that is not a Lender or Issuer or by any other Person that is not a Lender or Issuer.  The order of priority set forth in *clauses First* through *Thirteenth* above may be changed only with the prior written consent of the Administrative Agent in addition to that of all directly affected Lenders.  Excluded Swap Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to the Obligations otherwise set forth above in this Section.

SECTION 10.4      [Reserved].

SECTION 10.5      Actions in Respect of Letters of Credit; Cash Collateral.

(a)      At any time (i) upon the Revolving Credit Termination Date, (ii) after the Revolving Credit Termination Date when the aggregate funds on deposit in the Concentration Account to Cash Collateralize Letter of Credit Obligations shall be less than 103% of the Letter of Credit Obligations and (iii) as may be required by *Section 2.9* or *Section 2.16*, the Borrower shall pay to the Administrative Agent in Same Day Funds at the Administrative Agent's office referred to in *Section 12.8*, for deposit in the Concentration Account, (x) in the case of *clauses (i)* and *(ii)* above, the amount required to that, after such payment, the aggregate funds on deposit in the Concentration Account counts equals or exceeds 103% of the sum of all outstanding Letter of Credit Obligations and (y) in the case of *clause (iii)* above, the amount required by *Section 2.9*.  The Administrative Agent may, from time to time after funds are deposited in the Concentration Account, apply funds then held in the Concentration Account to the payment of any amounts, in accordance with *Section 2.9* and *Section 10.2(c)*, as shall have become or shall become due and payable by the Borrower to the Issuers or Lenders in respect of the Letter of Credit Obligations.  The Administrative Agent shall promptly give written notice of any such application; *provided*, *however*, that the failure to give such written notice shall not invalidate any such application.  If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent as herein provided, or that the total amount of such Cash Collateral is less than the applicable Fronting Exposure and other obligations secured thereby, the Borrower or the relevant Defaulting Lender will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency.

(b)      *Application*.  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this *Section 10.5* or *Sections 2.4, 2.9, 2.13* or *10.2* in respect of Letters of Credit or Swing Loans shall be held and applied to the satisfaction of the specific Letter of Credit Obligations, Swing Loans, obligations to fund participations therein (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other

obligations for which the Cash Collateral was so provided, prior to any other application of such property as may be provided for herein.

(c)     *Release*.  Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or other obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Lender or, as appropriate, its assignee following compliance with *Section 12.2(b)(vi)*) or (ii) the Administrative Agent's good faith determination that there exists excess Cash Collateral; provided, however, (x) that Cash Collateral furnished by or on behalf of a Loan Party shall not be released during the continuance of a Default or Event of Default (and following application as provided in this *Section 10.5* may be otherwise applied in accordance with *Section 10.3*), and (y) the Person providing Cash Collateral and the applicable Issuer or Swing Loan Lender, as applicable, may agree that Cash Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.

SECTION 10.6     <u>Post-Petition Financings; Insolvency Proceedings</u>.  Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, if any Loan Party shall be subject to any Insolvency Proceeding:

(a)     *Conforming Post-Petition Financings*. If the Administrative Agent or any Revolving Credit Lender shall seek to provide any Loan Party with, or consent to a third party providing, any Post-Petition Financing, with such Post-Petition Financing to be secured by all or any portion of the Collateral (including assets that, but for the application of Section 552 of the Bankruptcy Code or other applicable Law, would be Collateral), each of the FILO Secured Parties agrees and confirms that it shall be deemed to have consented to such Post-Petition Financing and to the Liens securing the same (or securing any claim for diminution in value in connection therewith) and that it shall not object to any such Post-Petition Financing or to the Liens securing the same (or securing any claim for diminution in value in connection therewith) (nor support any other Person objecting to such Post-Petition Financing or to the Liens securing the same (or securing any claim for diminution in value in connection therewith) or request the Administrative Agent make any such objection), on any grounds whatsoever so long as (i) the Administrative Agent retains its Lien on the Collateral to secure the FILO Obligations, subordinate to the Liens securing such Post-Petition Financing which satisfies the terms and conditions of this *Section 10.6* (and any Lien securing any claim for diminution in value in connection therewith), but otherwise with the same relative priority vis-a-vis other liens in the Collateral as existed immediately prior to the commencement of such Insolvency Proceeding; *provided* that, if in connection with any Post-Petition Financing provided, or consented to, by the Administrative Agent or any Revolving Credit Lender, any Liens on the Collateral held by the Administrative Agent, or any Liens securing such Post-Petition Financing, are subject to a surcharge or are subject to a Carve Out, court ordered charge, fee or other similar interest or right, and so long as the amount of such surcharge, Carve Out, court ordered charge, fee or other similar interest or right is reasonable under the circumstances, then the Liens of the Administrative Agent on the Collateral securing the FILO Obligations shall also be subordinated to such surcharge, claim, Carve Out, court ordered charge, fee or other similar interest or right to the same extent as the Revolving Obligations and/or Post-Petition Financing, as applicable, (ii) the aggregate principal amount of the unfunded commitments and loans and letter of credit accommodations outstanding under any such Post-Petition Financing, together with the aggregate Revolving Credit Outstandings (giving effect to any repayments), does not exceed the Maximum Revolving Insolvency Amount, (iii) the agent under such Post-Petition Financing shall implement, and maintain, at all times, a reserve against all borrowing bases under such Post-Petition Financing in the amount of the Carve Out, (iv) the agent under such Post-Petition Financing shall implement, and maintain, at all times, a reserve against all borrowing bases under such Post-Petition Financing in the amount of the FILO Deficiency Reserve, consistent with the terms of this Agreement, (v) such Post-Petition Financing shall not compel any Loan Party to seek

confirmation of a specific plan of reorganization, unless the FILO Obligations shall be indefeasibly paid in full in cash on the effective date thereof, and (vi) such Post-Petition Financing shall be subject to the same rights of the FILO Documentation Agent and the FILO Lenders with respect to amendments, waivers and modifications as set forth in *Section 12.1* with respect to this Agreement and the other Loan Documents (a Post-Petition Financing complying with the provisions of this paragraph referred to herein as a "*Conforming Post-Petition Financing*").

      (b)    *Other Post-Petition Financing Offers*. The FILO Secured Parties hereby agree that they shall not, and shall not permit any Affiliate controlled by any of them to, (i) provide or offer to provide any Post-Petition Financing to the Loan Parties or (ii) except in the case of a Conforming Post-Petition Financing provided in accordance with *Section 10.6(a)*, endorse, or support any other Person in, the provision of any Post-Petition Financing to the Loan Parties in any Insolvency Proceeding with respect to a Loan Party.

      (c)    *Roll-up Post-Petition Financings*. The Administrative Agent and the Revolving Credit Lenders hereby agree that, to the extent any Post-Petition Financing offered by the Administrative Agent or any Revolving Credit Lender includes a "roll up" or refinancing of any portion of the Revolving Loans, (i) the FILO Lenders may offer and/or request a "roll up" or refinancing of the FILO Loans on a ratable basis with the Revolving Loans that will be subject to the "roll up" or refinancing in connection with such Post-Petition Financing and (ii) neither the Administrative Agent nor any Revolving Credit Lender shall object (or support any other Person in objecting) to such request by any FILO Lender; *provided* that, to the extent such FILO Loans are "rolled up" or refinanced in connection with such Post-Petition Financing, the Maximum Revolving Insolvency Amount shall be deemed increased by the amount of such FILO Loans that are "rolled up" or refinanced by such Post-Petition Financing.

      (d)    *Adequate Protection*. All adequate protection granted to the Administrative Agent in any Insolvency Proceeding with respect to a Loan Party, including all Liens granted to the Administrative Agent in any such Insolvency Proceeding as adequate protection, are intended to be for the benefit of all Secured Parties and shall be subject to *Section 10.3*, subject to any court order affecting the rights and interests of the parties hereto not in conflict with the terms hereof. Without limiting the foregoing, the FILO Documentation Agent, on behalf of the FILO Secured Parties, shall have the right to seek adequate protection for the FILO Loans solely in the form of payment of interest at the then applicable interest rate (including the FILO Applicable Margin) for the FILO Loans and reimbursement of reasonable expenses of the FILO Documentation Agent; *provided*, *however*, that the Administrative Agent, on behalf of the Revolving Secured Parties, may contest (or support any other Person contesting) any request by any FILO Secured Parties for such adequate protection from proceeds of Collateral unless each of the following conditions is satisfied: (i) such payments are approved by a final order of the applicable U.S. Bankruptcy Court (or other court of competent jurisdiction) approving a Post-Petition Financing consented to by the Administrative Agent, (ii) the Administrative Agent and the other Secured Parties (other than the FILO Secured Parties) are also receiving adequate protection payments covering their interest, fees and expenses, (iii) the amount of all such payments is added to the Maximum Revolving Insolvency Amount, and (iv) the FILO Secured Parties agree to pay over an amount not to exceed the payments so received if the Revolving Obligations and all obligations under such Post-Petition Financing are not paid in full in such Insolvency Proceeding.

      (e)    *Relief from Stay*. Each of the FILO Secured Parties agrees not to (i) seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency Proceeding with respect to a Loan Party, without the prior written consent of the Administrative Agent, or (ii) oppose any request by the Administrative Agent, any other Secured Party (other than any FILO Secured Party), or, in the case of any Conforming Post-Petition Financing, any Person providing such

DB1/ 145587008.11

US-DOCS\149610879.14

Post-Petition Financing, for relief from the automatic stay or any other stay in any such Insolvency Proceeding.

(f)     *Judgment Liens*. Each of the FILO Secured Parties agrees that, in the event FILO Secured Party becomes a judgment lien creditor in respect of any Collateral securing the Obligations, such judgment lien shall be subordinated to any Lien on such Collateral securing the Revolving Obligations on the same basis and to the same extent as the Liens on the Collateral of the Administrative Agent securing the FILO Obligations are subordinated (including with respect to the proceeds thereof being subject to *Section 10.3*) to those Liens securing the Revolving Obligations.

(g)     *Intercreditor Agreement Controls*. For the avoidance of doubt in the event of any inconsistency between this Section 10.6 and the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall govern and control.

SECTION 10.7     Separate Classification.  Whether or not it is held that the Revolving Obligations and the FILO Obligations together constitute only one secured claim (rather than separate classes of secured claims), the FILO Secured Parties hereby agree that in any Insolvency Proceeding with respect to a Loan Party, all payments and distributions shall be applied as if the Revolving Obligations and the FILO Obligations were separate classes of secured claims against the Loan Parties in respect of the Collateral with the effect that the Revolving Secured Parties and the FILO Secured Parties shall be entitled to receive payment of all amounts owing to them as set forth pursuant to the priorities in *Section 10.3* (whether or not allowed in such Insolvency Proceeding, and including in respect of post-petition interest and expenses) that would be owing to them as if the Revolving Obligations and the FILO Obligations were so classified as a separate claim and secured by a separate Lien, and any payments or proceeds of Collateral otherwise received or receivable shall be turned over to the appropriate Secured Party to the extent necessary to effectuate the intent of this *Section 10.7*.

SECTION 10.8     Avoidance and Reinstatement.  If a Revolving Secured Party or a FILO Secured Party receives payment or property on account of any Revolving Obligations or FILO Obligations, respectively, and the payment is subsequently invalidated, avoided, declared to be fraudulent or preferential, set aside or otherwise required to be transferred to a trustee, receiver or the estate of any Loan Party (in each instance, to the extent required by applicable law, a "*Recovery*"), then, to the extent of the Recovery, the applicable Obligations intended to have been satisfied by the payment will be reinstated as Revolving Obligations or FILO Obligations, as applicable, as of the date of such payment, and no payment with respect to, or discharge of the Revolving Obligations or FILO Obligations, as applicable, will be deemed to have occurred for all purposes hereunder.  If this Agreement is terminated prior to a Recovery, this Agreement will be reinstated in full force and effect, and such prior termination will not diminish, release, discharge, impair, or otherwise affect the obligations of the Loan Parties from the date of reinstatement.  Upon such reinstatement of any Obligations, each applicable Secured Party will disgorge and deliver to the Administrative Agent any Collateral or proceeds thereof received in payment of, or to discharge, such Obligations to effect the reinstatement required pursuant to the terms hereof.  No Secured Party may benefit from a Recovery, and any distribution made to a Secured Party as a result of a Recovery will be paid over to the Administrative Agent for application to the Obligations in accordance with *Section 10.3* (after application to any Post-Petition Financing that is a Conforming Post-Petition Financing or is otherwise consented to by the FILO Documentation Agent).

SECTION 10.9     Payments Over.  In the event that, notwithstanding the provisions of this *Article X*, payments or proceeds of Collateral shall be received by any Secured Party in violation of the priorities set forth herein, such payments or proceeds of Collateral shall be held in trust for the benefit

of and shall be paid over to or delivered to the Administrative Agent upon the Administrative Agent's or the Requisite Lenders' written demand.

SECTION 10.10    Subrogation.  Until the Revolving Obligations are paid in full, the FILO Secured Parties shall have no right of subrogation to the rights of the Revolving Secured Parties to receive payments or distributions of cash or property applicable to the Revolving Obligations.  For purposes of such subrogation, no payments or distributions to the Revolving Secured Parties of any cash or property to which the FILO Secured Parties would be entitled except for the provisions of this Agreement, and no payment over to the Revolving Secured Parties pursuant to this Agreement by the FILO Secured Parties, as between any Loan Party, its creditors (other than the Revolving Secured Parties), and the FILO Secured Parties, shall be deemed to be a payment by the Loan Parties to or on account of the FILO Obligations.

SECTION 10.11    Credit Bidding.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Requisite Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 and/or 1129 of the Bankruptcy Code, or any other applicable Laws, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Laws; *provided* that the consent of the FILO Documentation Agent shall be required to credit bid all or any portion of the FILO Obligations.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the equity interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid, (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof shall be governed, directly or indirectly, by the vote of the Requisite Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Requisite Lenders contained in *Section 12.1*), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any equity interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the equity interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Notwithstanding anything to the contrary set forth in the foregoing paragraph, each of the Secured Parties hereby agrees that the Administrative Agent may, on behalf of itself and the other

Revolving Secured Parties, credit bid the Revolving Obligations in accordance with Section 363(k) of the Bankruptcy Code (or any similar provision of other applicable Law, including the Uniform Commercial Code), and each FILO Secured Party agrees not to object to (and shall be deemed to consent to) such credit bid, so long as such credit bid does not exceed the amount of the Revolving Obligations.  Each of the Secured Parties hereby agrees that the FILO Documentation Agent may direct the Administrative Agent to, on behalf of the FILO Secured Parties, credit bid the FILO Obligations in accordance with Section 363(k) of the Bankruptcy Code (or any similar provision of other applicable Law, including the Uniform Commercial Code), and the Administrative Agent agrees to take such direction from the FILO Documentation Agent and to not object thereto (and shall be deemed to consent thereto), in each case, so long as such credit bid does not exceed the amount of the FILO Obligations and all Revolving Obligations shall be paid in full in cash upon the effectiveness of any such sale under Section 363 of the Bankruptcy Code (or any similar provision of other applicable Law) (and any such credit bid of the FILO Obligations shall provide for the same). The Secured Parties hereby agree that, in the event the Administrative Agent takes any action to credit bid the FILO Obligations upon the direction of the FILO Documentation Agent on behalf of the FILO Secured Parties, the Administrative Agent shall be entitled to all of the benefits of *Article XI* in connection with such action.

SECTION 10.12    FILO Purchase Option.

(a)    If any Purchase Option Event shall occur, the FILO Lenders shall have the right, but not the obligation, to purchase all, but not less than all, of the Revolving Obligations; *provided* that such option shall expire if the FILO Documentation Agent on behalf of the electing FILO Lenders fails to deliver a written notice (a "*Purchase Notice*") to the Administrative Agent within ten (10) Business Days following the date the FILO Documentation Agent obtains knowledge of the occurrence of a Purchase Option Event (or, in the case of a Purchase Option Event arising under *clause (g)* of such defined term, five (5) Business Days), which Purchase Notice shall (i) identify the applicable FILO Lenders committing to such purchase (the "*Purchasing Creditors*") and indicate the percentage of the Revolving Obligations to be purchased by each Purchasing Creditor (which aggregate commitments must add up to one hundred percent (100%) of the Revolving Obligations) and (ii) confirm that the offer contained therein is irrevocable.  Upon receipt of such Purchase Notice by the Administrative Agent, the Purchasing Creditors shall have from the date of delivery thereof to and including the date that is ten (10) Business Days after the Purchase Notice was received by the Administrative Agent (or such later date as may be agreed by the Administrative Agent in its sole discretion) to purchase all (but not less than all) of the Revolving Obligations (the date of such purchase, the "*Purchase Date*").

(b)    On the Purchase Date, the Administrative Agent and the Revolving Secured Parties shall, subject to any required approval of any Governmental Authority, if any, sell to the Purchasing Creditors all (but not less than all) of the Revolving Obligations.  On such Purchase Date, the Purchasing Creditors shall (i) pay to the Administrative Agent, for the benefit of the Revolving Secured Parties, as directed by the Administrative Agent, in immediately available funds the full amount of all Revolving Obligations, together with all accrued and unpaid interest and fees, all in the amounts specified by the Administrative Agent and determined in good faith in accordance with the Loan Documents or other applicable documents, (ii) furnish such amount of cash collateral in immediately available funds as the Administrative Agent determines is reasonably necessary to secure the Revolving Credit Parties on terms reasonably satisfactory to the Administrative Agent in connection with any (x) asserted indemnification claims, and (y) all Revolving Obligations in respect of or relating to Letters of Credit but not in any event in an amount greater than 103% thereof, and (iii) agree to reimburse the Revolving Secured Parties for any loss, cost, damage or expense resulting from the granting of provisional credit for any checks, wire or ACH transfers that are reversed or not final or other payments provisionally credited to the Revolving Obligations and as to which the Administrative Agent and the other Revolving Secured Parties have not yet received final payment as of the Purchase Date.  Such purchase price shall be

remitted by wire transfer in immediately available funds to such bank account of the Administrative Agent (for the benefit of the applicable Secured Parties) as the Administrative Agent shall have specified in writing to the FILO Documentation Agent.  Interest and fees shall be calculated to but excluding the Purchase Date if the amounts so paid by the applicable Purchasing Creditors to the bank account designated by the Administrative Agent are received in such bank account prior to 2:00 p.m., and interest shall be calculated to and including such Purchase Date if the amounts so paid by the Purchasing Creditors to the bank account designated by the Administrative Agent are received in such bank account after 2:00 p.m.  Notwithstanding anything to the contrary contained in the Loan Documents, the Loan Parties hereby consent to and approve the assignment of the Revolving Obligations contemplated by this Section.

(c)     Any purchase pursuant to the purchase option described in this Section shall, except as provided below, be expressly made without representation or warranty of any kind by the Administrative Agent or the other Revolving Secured Parties as to the Obligations, the Collateral or otherwise, and without recourse to the Administrative Agent and the other Revolving Secured Parties as to the Obligations, the Collateral or otherwise, except that the Administrative Agent and each of the other Revolving Secured Parties, as to itself only, shall represent and warrant only as to (i) the principal amount of the Obligations being sold by it, (ii) that such Person has not created any Lien on, or sold any participation in, any Obligations being sold by it, and (iii) that such Person has the right to assign the Obligations being assigned by it.

(d)     In connection with any purchase of Revolving Obligations pursuant to this Section, each Revolving Secured Party agrees to enter into and deliver to the Purchasing Creditors on the Purchase Date, as a condition to closing, an assignment agreement substantially in the form of *Exhibit A* to this Agreement or any other form approved by the Administrative Agent and, at the expense of the Loan Parties, each of the Revolving Secured Parties shall deliver all possessory Collateral (if any), together with any necessary endorsements and other documents (including any applicable stock powers or note powers), then in such Secured Party's possession or in the possession of its agent or bailee, or turn over control as to any pledged Collateral, deposit accounts or securities accounts of which such Secured Party or its agent or bailee then has control, as the case may be, to the FILO Documentation Agent to act as the successor Administrative Agent and Collateral Agent and otherwise take such actions as may be reasonably appropriate to effect an orderly transition to the FILO Documentation Agent to act as the successor Administrative Agent and Collateral Agent.  Upon the consummation of the purchase of the Revolving Obligations pursuant to this Section, the Administrative Agent shall be deemed to have resigned as an "agent" or "administrative agent" or "collateral agent" (or any similar role) for the Secured Parties, under the Loan Documents; *provided* the Administrative Agent (and all other agents under this Agreement) shall be entitled to all of the rights and benefits of a former "agent" or "administrative agent" or "collateral agent" under this Agreement.

(e)     Notwithstanding the foregoing purchase of the Revolving Obligations by the Purchasing Creditors, the Revolving Secured Parties shall continue to have recourse to the Loan Parties for those contingent indemnification obligations and other obligations under the Loan Documents which by their terms would survive any repayment of the Obligations.

## ARTICLE XI

## THE ADMINISTRATIVE AGENT

SECTION 11.1    Appointment and Authorization.

(a)    Each of the Lenders and the Issuers hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each of the FILO Lenders hereby irrevocably appoints 1903P Loan Agent, LLC (and its successors and permitted assigns in such capacity) to act on its behalf as the FILO Documentation Agent hereunder and under the other Loan Documents and authorizes the FILO Documentation Agent to take such actions on its behalf and to exercise such powers as are delegated to the FILO Documentation Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this *Article XI* (other than *Sections 11.6* and *11.11*) are solely for the benefit of the Administrative Agent, the FILO Documentation Agent, the Lenders and the Issuers, and the Borrower shall not have rights as a third party beneficiary of any such provision.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities as a potential Hedge Bank, Cash Management Bank and/or Bank Product Bank) and the Issuers hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender and such Issuer for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to *Section 11.5* for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this *Article XI* and *Article XII* (including, without limitation, *Sections 11.3, 11.13, 12.3, 12.4* and *12.5*, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto (including the Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

SECTION 11.2    Rights as a Lender.

Any Person serving as an Agent (including as Administrative Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as an Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.  The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan

Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

SECTION 11.3    Exculpatory Provisions.  Neither the Administrative Agent nor any other Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, an Agent (including the Administrative Agent and the FILO Documentation Agent):

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Requisite Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any Person serving as an Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Requisite Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in *Sections 12.1* and *12.2*) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein.

The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a Lender or an Issuer.  Upon the occurrence of a Default or an Event of Default, the Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Requisite Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable in accordance with the terms of this Agreement.  Unless and until the Administrative Agent shall have received such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Secured Parties.  In no event shall the Administrative Agent be required to comply with any such directions to the extent that the Administrative Agent believes that its compliance with such directions would be unlawful.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in *Article IV* or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or (vii) to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

SECTION 11.4    Reliance by the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the applicable Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or such Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or such Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Requisite Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable, as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders or the FILO Lenders, as applicable, against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Requisite Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable (or such greater number of Lenders as may be expressly required hereby in any instance), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law.

SECTION 11.5    Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Agent-

Related Persons of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

SECTION 11.6    Resignation of Administrative Agent and Collateral Agent.

(a)    The Administrative Agent or the Collateral Agent may at any time give notice of its resignation to the Lenders, the Issuers and the Borrower.  Upon receipt of any such notice of resignation, the Requisite Lenders shall have the right, with the consent of the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed), to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such Lender or bank with an office in the United States.  If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent or Collateral Agent, as applicable, gives notice of its resignation, then the retiring Administrative Agent or Collateral Agent, as applicable, may on behalf of the Lenders and the Issuers, appoint a successor Administrative Agent or Collateral Agent, as applicable, meeting the qualifications set forth above; *provided* that if the Administrative Agent or the Collateral Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent or the Collateral Agent on behalf of the Lenders or the Issuers under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor of such Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and each Issuer directly, until such time as the Requisite Lenders appoint a successor Administrative Agent as provided for above in this *Section 11.6*.  Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent, as applicable, hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Requisite Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent or Collateral Agent, as applicable, and the retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this *Section 11.6*).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and *Sections 12.3, 12.4* and *12.5* shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Administrative Agent or Collateral Agent, as applicable.

(b)    Any resignation by Bank of America as Administrative Agent pursuant to this Section shall also constitute its resignation as an Issuer and Swing Loan Lender.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuer and Swing Loan Lender, (ii) the retiring Issuer and Swing Loan Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (iii) the successor Issuer shall issue letters of credit in substitution for the Letters of Credit issued by Bank of America, if any,

outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuer to effectively assume the obligations of the retiring Issuer with respect to such Letters of Credit.

SECTION 11.7    Non-Reliance on Administrative Agent and Other Lenders; Disclosure of Information by Agents.

Each Lender and each Issuer acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender and each Issuer also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Agent-Related Persons and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

SECTION 11.8    No Other Duties; Other Agents, Arrangers, Managers, Etc.

Anything herein to the contrary notwithstanding, none of the Arrangers, Co-Syndication Agents or the Co-Documentation Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, the Collateral Agent or a Lender hereunder and such Persons shall have the benefit of this *Article XI*.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any agency or fiduciary or trust relationship with any Lender, Parent, Holdings, the Borrower or any of their respective Subsidiaries.  Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

SECTION 11.9    Intercreditor Agreement.  The Administrative Agent and the Collateral Agent are authorized to enter into the Intercreditor Agreement, and the parties hereto acknowledge that the Intercreditor Agreement is binding upon them.  Each Lender (a) hereby consents to the subordination of the Liens on the Collateral other than the Current Asset Collateral securing the Obligations on the terms set forth in the Intercreditor Agreement, (b) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (c) hereby authorizes and instructs the Administrative Agent and the Collateral Agent to enter into the Intercreditor Agreement or other intercreditor agreement contemplated hereunder or under any Loan Document with the collateral agent or other representative of the holders of Indebtedness that is secured by a Lien on Collateral that is not prohibited (including with respect to priority) under this Agreement and to subject

the Liens on the Collateral securing the Obligations to the provisions thereof.  The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrower and such Secured Parties are intended third-party beneficiaries of such provisions and the provisions of the Intercreditor Agreement.

SECTION 11.10    Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or Letter of Credit Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, Letter of Credit Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuers and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuers and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Issuers and the Administrative Agent under Sections 2.*12*, *12.3* and *12.4*) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuers, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under *Sections 2.12*, *12.3* and *12.4*.

Nothing contained herein shall be deemed to authorize the Administrative Agent to credit bid any of the Obligations without the consent of the Requisite Lenders (which credit bid shall be made in accordance with *Section 10.11*) or authorize or consent to or accept or adopt on behalf of any Lender or any Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or any Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender or any Issuer in any such proceeding.

SECTION 11.11    Collateral and Guaranty Matters.

Each of the Lenders (including in its capacities as a potential Cash Management Bank, Bank Product Bank and/or Hedge Bank) and the Issuers irrevocably authorizes the Administrative Agent (including in its capacity as Collateral Agent) to, and the Administrative Agent agrees that it will:

(a)    release any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (x) obligations and liabilities under Secured Hedge Agreements, Cash Management Obligations and Bank Product Obligations as to which arrangements satisfactory to the applicable Hedge Bank, Cash Management Bank or Bank Product Bank, respectively,

shall have been made and (y) contingent indemnification obligations not yet accrued and payable) and the expiration or termination of all Letters of Credit (other than Letters of Credit as to which other arrangements reasonably satisfactory to the Administrative Agent and each applicable Issuer shall have been made), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than Parent, Holdings, the Borrower or any of its Domestic Subsidiaries that are Guarantors, (iii) subject to *Section 12.1*, if the release of such Lien is approved, authorized or ratified in writing by the Requisite Lenders, or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below;

(b)    release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by *Section 9.1(i)*;

(c)    release any Guarantor from its obligations under the Guaranty if (i) in the case of any Subsidiary, such Person ceases to be a Restricted Subsidiary as a result of a transaction or designation permitted hereunder or (ii) in the case of Holdings, as a result of a transaction permitted hereunder; *provided* that no such release shall occur if such Guarantor continues to be a guarantor in respect of the Term Facility or any Junior Financing; and

(d)    if any Guarantor shall cease to be a Material Domestic Subsidiary (as certified in writing by a Responsible Officer of the Borrower), and the Borrower notifies the Administrative Agent in writing that it wishes such Guarantor to be released from its obligations under the Guaranty and provides the Administrative Agent and the Collateral Agent such certifications or documents as either such Agent shall reasonably request, (i) release such Subsidiary from its obligations under the Guaranty and (ii) release any Liens granted by such Subsidiary or Liens on the Equity Interests of such Subsidiary; *provided* that no such release shall occur if such Subsidiary continues to be a guarantor in respect of the Term Facility or any Junior Financing.

Upon request by the Administrative Agent at any time, the Requisite Lenders will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this *Section 11.11*. In each case as specified in this *Section 11.11*, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this *Section 11.11*.

SECTION 11.12    Secured Cash Management Agreements, Secured Bank Product Agreements and Secured Hedge Agreements.

(a)    Except as otherwise expressly set forth herein or in any Guaranty or any Collateral Document, no Cash Management Bank, Bank Product Bank or Hedge Bank that obtains the benefits of *Section 10.3*, any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this *Article XI* to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations

arising under Secured Cash Management Agreements, Secured Bank Product Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank, Bank Product Bank or Hedge Bank, as the case may be.

(b)    Each Secured Party hereby agrees (i) that, after the occurrence and during the continuance of a Cash Dominion Period (and thereafter at such frequency as the Administrative Agent may reasonably request in writing), it will provide to the Administrative Agent, promptly upon the written request of the Administrative Agent, a summary of all Obligations owing to it under this Agreement and (ii) that the benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not an Agent, a Lender or an Issuer party hereto as long as, by accepting such benefits, such Secured Party agrees, as among Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by Agent, shall confirm such agreement in a writing in form and substance reasonably acceptable to Agent) this *Article XI* and *Sections 3.1, Sections 12.4, 12.6, 12.19, 12.23* and *12.26* and the Intercreditor Agreement, and the decisions and actions of any Agent and the Requisite Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; *provided, however*, that, notwithstanding the foregoing *clause (ii)*, (x) such Secured Party shall be bound by the provisions set forth above only to the extent of liabilities, reimbursement obligations, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements with respect to or otherwise relating to the Liens and Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (y) each of the Agents, the Lenders and the Issuers party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (z) such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

SECTION 11.13    Indemnification of Agents.

Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Administrative Agent and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless the Administrative Agent and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) from and against any and all Indemnified Liabilities incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Requisite Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this *Section 11.13*. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this *Section 11.13* applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether

through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided further* that the failure of any Lender to indemnify or reimburse the Administrative Agent shall not relieve any other Lender of its obligation in respect thereof.  The undertaking in this Section *11.13* shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent, the Swing Loan Lender or any Issuer.

SECTION 11.14    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Aggregate Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Aggregate Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Aggregate Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such

Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Aggregate Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

SECTION 11.15    Recovery of Erroneous Payments. Without limitation of any other provision in this Agreement, if at any time the Administrative Agent makes a payment hereunder in error to any Lender or any other Secured Party, whether or not in respect of an Obligation due and owing by the Borrower at such time, where such payment is a Rescindable Amount, then in any such event, each Secured Party receiving a Rescindable Amount severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount received by such Secured Party in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. Each Secured Party irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another) or similar defense to its obligation to return any Rescindable Amount. The Administrative Agent shall inform each Secured Party promptly upon determining that any payment made to such Secured Party comprised, in whole or in part, a Rescindable Amount.

## ARTICLE XII

## MISCELLANEOUS

SECTION 12.1    Amendments, Etc. Subject to *Section 3.3* and except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Requisite Lenders and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)    extend or increase the Revolving Credit Commitment of any Lender, or other commitment of any Lender to extend credit, without the written consent of each Lender directly affected thereby (it being understood that (i) a waiver of any condition precedent set forth in *Section 4.2* and (ii) the waiver of any Default, mandatory prepayment or mandatory reduction of the Revolving Credit Commitments shall not constitute an extension or increase of any Revolving Credit Commitment of any Lender);

(b)    postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under *Section 2.6* or *2.10* (or change the format of any such interest payment, including any change that would result in interest that is payable in cash being payable in-kind or for other non-cash consideration) without the written consent of each Lender directly affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory

prepayment of the Loans or any condition precedent set forth in *Section 4.2* shall not constitute a postponement of any date scheduled for the payment of principal or interest;

     (c)     reduce the principal of, or the rate of interest specified herein on, any Loan or Letter of Credit Borrowing, or (subject to *clause (iii)* of the third proviso to this *Section 12.1*) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby (it being understood that any change to any component of "Excess Availability" shall not constitute a reduction in the rate of interest); *provided* that only the consent of (i) the Requisite Revolving Credit Lenders (and not the Requisite Lenders) shall be necessary to amend the definition of "Default Rate", or to waive any obligation of the Borrower to pay interest at the Default Rate, as it relates to the Revolving Obligations (except that any increase in such Default Rate in excess of 2.00% shall also require the consent of the FILO Documentation Agent), and (ii) the FILO Documentation Agent (and not the Requisite Lenders) shall be necessary to amend the definition of "Default Rate", or to waive any obligation of the Borrower to pay interest at the Default Rate, as it relates to the FILO Obligations (except that any increase in such Default Rate in excess of 2.00% shall also require the consent of the Requisite Revolving Credit Lenders);

     (d)     change (i) any provision of this *Section 12.1*, without the written consent of each Lender affected thereby, (ii) the definition of "Requisite Lenders", without the written consent of each Lender, (iii) the definition of "Requisite Revolving Credit Lenders" or "Supermajority Revolving Credit Lenders", without the written consent of each Revolving Credit Lender (and not the Requisite Lenders), or (iv) any other provision specifying the number of Lenders or portion of the Loans or Revolving Credit Commitments required to take any action under the Loan Documents, without the written consent of each Lender affected thereby (and not the Requisite Lenders);

     (e)     other than in a transaction permitted under *Section 9.4* or *9.5*, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

     (f)     other than in a transaction permitted under *Section 9.4* or *9.5*, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

     (g)     change the definition of the term "Borrowing Base" or any component definition thereof, but excluding the definition of "Credit Card Advance Rate", "Trade Receivables Advance Rate", "Letter of Credit Advance Rate", "Inventory Advance Rate" or "In-Transit Advance Rate", in each case the amendment or modifications of which shall be subject to *clause (h)* below, if as a result thereof the amounts available to be borrowed by the Borrower would be increased, without the written consent of the Supermajority Revolving Credit Lenders (and not the Requisite Lenders), *provided* that the foregoing shall not limit the discretion of the Administrative Agent or the FILO Documentation Agent to change, establish or eliminate any Availability Reserves, Inventory Reserves, Receivables Reserves or Shrink Reserves without the consent of any Lenders;

     (h)     increase the numerical percentage contained in Credit Card Advance Rate, Trade Receivables Advance Rate, Letter of Credit Advance Rate, Inventory Advance Rate or In-Transit Advance Rate without the written consent of each Lender; *provided* that the foregoing shall not limit the discretion of the Administrative Agent or the FILO Documentation Agent to change,

establish or eliminate any Availability Reserves, Inventory Reserves, Receivables Reserves or Shrink Reserves without the consent of any Lenders;

(i)     except as provided by operation of applicable Law or in the Intercreditor Agreement, without the prior written consent of all Lenders directly affected thereby, (i) subordinate the Obligations hereunder to any other Indebtedness, or (ii) subordinate the Liens granted hereunder or under the other Loan Documents to any other Lien;

(j)     change the order of the application of funds specified in *Section 10.3* without the written consent of each directly affected Lender;

(k)     amend or waive any provision of *Section 2.8* or *Section 9.11* to permit any voluntary prepayment of the FILO Loans, or any provision of *Section 2.18*, in each case without the written consent of each Revolving Credit Lender (and not the Requisite Lenders);

(l)     amend or waive any provision of *Section 9.6* to permit the making of any Restricted Payment in cash or *Section 9.11* to permit any additional prepayment of the Term Facility, in each case as such Sections are in effect as of the Second Restatement Date, without the written consent of each Lender; or

(m)     amend or waive any provision of *Section 4.1* without the written consent of each Lender;

*provided further* that, in addition to the written consent of the Requisite Lenders, the written consent of the FILO Documentation Agent shall be required for any waiver, amendment or consent that:

(1)     except in connection with, and solely with respect to, a Conforming Post-Petition Financing, (i) except as contemplated by *Section 2.15* as of the Second Restatement Date, increases the Aggregate Commitments or (ii) adds new tranches of Indebtedness under any Loan Document that, in the case of this *clause (ii)*, are senior in right of repayment to, or *pari passu* in right of repayment with, the FILO Loans;

(2)     other than in connection with the provision of a Conforming Post-Petition Financing to implement the Insolvency Increase Amount, (i) changes the definition of "Borrowing Base" (or any component definition thereof), or increases the advance rates applied to eligible assets in the Borrowing Base, if as a result thereof the amounts available to be borrowed by the Borrower would be increased, (ii) changes the definitions of "Excess Availability", "Global Borrowing Base", "Maximum Credit", "Modified Borrowing Base" or "Modified Maximum Credit", or (iii) changes the definition of "FILO Borrowing Base" (or any component definition thereof); *provided* that the foregoing shall not limit the discretion of the Administrative Agent or the FILO Documentation Agent to change, establish or eliminate any Availability Reserves, Inventory Reserves, Receivables Reserves or Shrink Reserves without the consent of any Lenders;

(3)     (i) changes the definition of "FILO Deficiency Reserve" or ceases to deduct from the Borrowing Base (or fails to establish or maintain) the FILO Deficiency Reserve or (ii) amends, modifies or waives any of the provisions of *Section 2.19*;

(4)     amends, modifies or waives (i) any of the provisions of *Section 6.1*, *Section 6.2* or the definition of "Covenant Trigger Event" or (ii) the last paragraph of *Section 4.2*;

(5)     changes the definitions of "Protective Advances" or "Unintentional Overadvance";

(6)     (i) changes the definitions of "Carve Out", "Conforming Post-Petition Financing", "Post-Petition Financing", "Insolvency Increase Amount" or "Maximum Revolving Insolvency Amount" or (ii) changes, modifies or waives any of the provisions of *Sections 10.6* through *10.12*;

(7)     changes, modifies or waives (i) any of the provisions of *Section 7.4* or the definition of "Weekly Monitoring Event", in each case, in a manner which is more favorable to the Loan Parties, or (ii) any of the provisions of *Section 8.12* or the definition of "Cash Dominion Period", in each case, in a manner which is more favorable to the Loan Parties;

(8)     (i) changes the definitions of "FILO Specified Event of Default" or "FILO Standstill Period" or (ii) changes, modifies or waives any of the provisions of (x) *Section 10.1* in any manner which would also constitute a waiver of any FILO Specified Event of Default or (y) *Section 10.2(b)* or *(c)*;

(9)     changes the definitions of (i) "Cash Management Agreement", "Cash Management Bank", "Cash Management Obligations", "Cash Management Reserve", "Cash Management Services" or "Secured Cash Management Agreement", (ii) "Hedge Bank", "Secured Hedge Agreement", "Swap Contract" or "Swap Obligations Reserve", (iii) "Bank Product Agreement", "Bank Product Bank", "Bank Product Reserve", "Bank Product Obligations", "Bank Products" or "Secured Bank Product Agreement", (iv) "Obligations", "Revolving Obligations", "FILO Obligations" or "Secured Obligations" or (v) "Availability Reserves", "Dilution Reserve", "Inventory Reserves", "Receivables Reserves" or "Shrink Reserves";

(10)     changes the definition of "Eligible Assignee" (or any component definition thereof), or changes, modifies or waives any of the provisions of *Section 12.2*, in a manner which would directly make assignments of the FILO Loans more restrictive or would permit the Loan Parties or their Affiliates to be Eligible Assignees;

(11)     changes, modifies or waives any of the provisions of (i) *Section 2.1(d)* or *Section 2.10* in any manner that relates to the FILO Obligations or (ii) *Section 9.11* in any manner that would further restrict prepayment of the FILO Loans; or

(12)     changes, modifies or waives any of the provisions of the Intercreditor Agreement in a manner that is adverse to the FILO Lenders as a Class (but not, for the avoidance of doubt, any amendment that treats the FILO Lenders in the same manner as the Revolving Credit Lenders); *provided*, the Borrower shall provide at least two (2) Business Days' (or such shorter time as agreed by the FILO Documentation Agent) advance notice to the FILO Documentation Agent of proposed changes, modifications and waivers of any of the provisions of the Intercreditor Agreement;

and *provided further* that (i) no amendment, waiver or consent shall, unless in writing and signed by each Issuer in addition to the Lenders required above, affect the rights or duties of an Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Swing Loan Lender in addition to the Lenders required above, affect the rights or duties of the Swing Loan Lender under this Agreement; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable

to, the Administrative Agent under this Agreement or any other Loan Document; (iv) *Section 12.2(g)* may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (v) the consent of Requisite Revolving Credit Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of the Lenders under such Revolving Facility in respect of payments hereunder in a manner different than such amendment affects other Revolving Loan; (vi) no amendment, waiver or consent shall, unless in writing and signed by the FILO Documentation Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the FILO Documentation Agent under this Agreement or any other Loan Document; and (vii) the Fee Letter and the FILO Fee Letter, respectively, may be amended, or rights or privileges thereunder waived, in a writing executed by only the respective parties thereto.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Revolving Credit Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding anything to the contrary contained in *Section 12.1*, guarantees, collateral security documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement or any other Loan Document, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Requisite Lenders, the Borrower may replace such non-consenting Lender in accordance with *Section 3.7*; *provided* that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

No Lender or Issuer consent is required to effect any amendment or supplement to any Intercreditor Agreement or any other intercreditor agreement that is for the purpose of adding the holders of Permitted Pari Passu Secured Debt (as defined in any of the Term Facility Documentation) (or a debt representative with respect to any Indebtedness with respect to which it is a representative or agent) as parties thereto, as expressly contemplated by the terms of such intercreditor agreement (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing).

Notwithstanding this *Section 12.1* or anything else to the contrary in this Agreement or any other Loan Document, each FILO Secured Party agrees that it will not raise any objection to, or oppose, and shall be deemed to have consented to, the release of any Loan Party from its obligations under any Loan Document or to any private or public sale or other disposition of all or any portion of the Collateral (and any post-petition or post-filing assets subject to adequate protection Liens or comparable Liens under any applicable Law in favor of the Administrative Agent) free and clear of any Liens and

other claims (a) at any time after the occurrence and during the continuance of an Event of Default under this Agreement if the Administrative Agent has consented to such release or such sale or other disposition; *provided*, *however*, that after the occurrence and during the continuance of an Event of Default under this Agreement and prior to the commencement of any Insolvency Proceeding with respect to any Loan Party, any such release and/or any such sale or other disposition by the Administrative Agent shall be made in accordance with applicable Law and the Administrative Agent shall provide not less than five (5) Business Days' prior written notice to the FILO Documentation Agent of any proposed release and/or sale or other disposition, or (b) under Section 363 of the Bankruptcy Code (or other similar provision of any applicable Law), in each case under the foregoing *clauses (a)* and *(b)*, if the Administrative Agent has consented to such release any/or such sale or other disposition, and in connection with each of the foregoing *clauses (a)* and *(b)*, each FILO Secured Party shall be deemed to have consented to such release any/or such sale or other disposition and hereby irrevocably authorizes the Administrative Agent to release any Lien on any of the Collateral in connection therewith; *provided* that any Lien of the Administrative Agent on such Collateral attaches to the net proceeds of such release and/or such sale or other disposition of the Collateral received by the Administrative Agent and that all proceeds of the Collateral received by the Administrative Agent from such release and/or such sale or other disposition are, after application to any Conforming Post-Petition Financing, applied in accordance with *Section 10.3*.

SECTION 12.2     Successors and Assigns.

(a)     *Successors and Assigns Generally.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Parent, Holdings nor the Borrower may, except as permitted by *Section 9.4*, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of *subsection (b)* of this Section, (ii) by way of participation in accordance with the provisions of *subsection (d)* of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of *subsection (f)* of this Section, or (iv) to an SPC in accordance with the provisions of *subsection (g)* of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in *subsection (d)* of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuers and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     *Assignments by Lenders.*  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Credit Commitment and the Loans (including for purposes of this subsection (b), participations in Letter of Credit Obligations and in Swing Loans) at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     *Minimum Amounts.*

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Credit Commitment and the Loans of any Class at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)      in any case not described in *subsection (b)(i)(A)* of this Section, the aggregate amount of the Revolving Credit Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Revolving Credit Commitment is not then in effect (or with respect to FILO Loans), the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless each of the Administrative Agent and, so long as no Event of Default under *Section 10.1(a)* or *(f),* solely with respect to the Borrower, has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)      *Proportionate Amounts*.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Revolving Credit Commitment assigned, except that this *clause (ii)* shall not apply to rights in respect of the Swing Loan Lender's rights and obligations in respect of Swing Loans;

(iii)      *Required Consents*.  No consent shall be required for any assignment except to the extent required by *subsection (b)(i)(B)* of this Section and, in addition:

(A)      the consent of the Borrower (such consent not to be unreasonably withheld) shall be required unless (1) an Event of Default under *Section 10.1(a)* or, solely with respect to the Borrower, *Section 10.1(f)*, has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund;

(B)      the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender;

(C)      the consent of the Issuers (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding); and

(D)      the consent of the Swing Loan Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment;

(iv)      *Assignment and Assumption*.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided*, *however*, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The Eligible Assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.  All assignments shall be by novation.

(v)    *No Assignment to Certain Persons.*  No such assignment shall be made (A) to Parent, Holdings, the Borrower or any of the Borrower's Affiliates or Subsidiaries (including any Permitted Holder), or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this *clause (B)*, (C) to a natural person or an investment vehicle of a natural person, or (D) any Disqualified Institution to the extent that the list of Disqualified Institutions has been provided to all Public Lenders on the Platform.

(vi)    *Certain Additional Payments.*  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swing Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to *clause (c)* of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of *Sections 3.1, 3.4, 3.5, 12.3, 12.4* and *12.5* with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Revolving Credit Note or FILO Note, as applicable, the Borrower (at its expense) shall execute and deliver a Revolving Credit Note or FILO Note, as applicable, to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with *subsection (d)* of this Section.

(c)    *Register.*  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Credit Commitments of, and principal amounts (and related interest amounts) of the Loans and Letter of Credit Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall

treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  This *Section 12.2(c)* and *Section 2.7* shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations, and including Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations and, in each case, any amended or successor versions).

(d)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or an investment vehicle of a natural person, any Disqualified Institution to the extent that the list of Disqualified Institutions has been provided to all Public Lenders on the Platform, a Defaulting Lender or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "*Participant*") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Credit Commitment and/or the Loans (including such Lender's participations in Letter of Credit Obligations and/or Swing Loans) owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents, the other Lenders and the Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to *Section 12.1* (other than *clause (d)* thereof) that directly affects such Participant.  Subject to *subsection (e)* of this Section, the Borrower agrees that each Participant shall be entitled (through the applicable Lender) to the benefits of *Sections 3.1, 3.4 and 3.5* (subject to the requirements and limitations of such Sections (including the limitation in the definition of "Excluded Taxes"), and *Sections 3.6(a) and 3.7*, as if the Participant were a Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to *subsection (b)* of this Section.  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of *Section 12.6* as though it were a Lender, *provided* such Participant agrees to be subject to *Section 12.7* as though it were a Lender.

(e)    *Limitations upon Participant Rights*.  A Participant shall not be entitled to receive any greater payment under *Section 3.1, 3.4* or *3.5* than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of *Section 3.1* unless the Borrower is notified of the participation sold to such Participant, the applicable Lender (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintains a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder relating to the exemption from withholding for portfolio interest on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "*Participant Register*") and such Participant agrees, for the benefit of the Borrower, to comply and does in fact comply with *Section 3.1* as though it were a Lender.  No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of

any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury regulations (or, in each case, any amended or successor versions). Unless otherwise required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS. The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)    Any Lender may, at any time, pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Revolving Credit Note or FILO Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    Notwithstanding anything to the contrary contained herein, any Lender (a "*Granting Lender*") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "*SPC*") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Administrative Agent as is required under *Section 2.13(e)*. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under *Sections 3.1, 3.4* and *3.5*, but such obligations under *Section 3.1* as to an SPC will only exist if the SPC satisfies the requirements of *Section 3.1* as if it were a Lender), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Revolving Credit Loan by an SPC hereunder shall utilize the Revolving Credit Commitment of the Granting Lender to the same extent, and as if, such Revolving Credit Loan were made by such Granting Lender. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(h)    *Resignation as Issuer or Swing Loan Lender after Assignment*. Notwithstanding anything to the contrary contained herein, if at any time Bank of America or any other Issuer assigns all of its Revolving Credit Commitment and Revolving Loans pursuant to *subsection (b)* above, Bank of

America or the applicable Issuer may, (i) upon thirty (30) days' notice to the Borrower and the Lenders, resign as Issuer and/or (ii) if applicable, upon thirty (30) days' notice to the Borrower, resign as Swing Loan Lender.  In the event of any such resignation as Issuer or Swing Loan Lender, the Borrower shall be entitled to appoint from among the Lenders a successor Issuer or Swing Loan Lender hereunder; *provided*, *however*, that no failure by the Borrower to appoint any such successor shall affect the resignation of Bank of America or the applicable Issuer as Issuer or (as applicable) Swing Loan Lender, as the case may be.  If Bank of America or the applicable Issuer resigns as Issuer, it shall retain all the rights, powers, privileges and duties of an Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as Issuer and all Letter of Credit Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in unreimbursed amounts under Letters of Credit pursuant to *Section 2.4*).  If Bank of America resigns as Swing Loan Lender, it shall retain all the rights of the Swing Loan Lender provided for hereunder with respect to Swing Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Loans pursuant to *Section 2.3*.  Upon the appointment of a successor Issuer and/or Swing Loan Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuer or Swing Loan Lender, as the case may be, and (b) the successor Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America or the applicable Issuer to effectively assume the obligations of Bank of America or the applicable Issuer with respect to such Letters of Credit.

(i)      Notwithstanding the foregoing, no Disqualified Institution that purports to become a Lender hereunder (notwithstanding the provisions of this Agreement that prohibit Disqualified Institutions from becoming Lenders) shall be entitled to any of the rights or privileges enjoyed by the other Lenders with respect to voting, information, and lender meetings.  In addition, if any assignment or participation is made to any Disqualified Institution without the Borrower's express prior written consent (which consent shall state expressly that the Borrower acknowledges that the assignee Lender is a Disqualified Institution) in violation of clause (v) of *Section 12.2(b)*, the Borrower may, in addition to any other rights and remedies that it may have against such Disqualified Institution, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) in the case of outstanding Loans held by Disqualified Institutions, purchase or prepay such Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (B) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in *Section 12.2*), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

Notwithstanding anything herein to the contrary, the provisions of this *Section 12.2* shall not apply retroactively to disqualify any person that has previously acquired an assignment or interest in any of the Loans with respect to amounts previously acquired to the extent such party was not a Disqualified Institution at the time of the applicable assignment but for only so long as such person continues to hold such Loans.

SECTION 12.3      Costs and Expenses.

The Borrower agrees (a) to pay or reimburse the Administrative Agent, the FILO Documentation Agent and the Arrangers for all reasonable and documented out-of-pocket costs and

expenses incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, and in the case of legal fees and expenses, limited to (i) all Attorney Costs of Morgan, Lewis & Bockius LLP (as counsel to the Administrative Agent), (ii) all Attorney Costs of Choate, Hall & Stewart LLP (as counsel to the FILO Documentation Agent), (iii) the Attorney Costs of Proskauer Rose LLP (as counsel to Centerbridge Credit CS, L.P.) in connection with the preparation, negotiation and execution of this Agreement, and, (iv) if reasonably necessary, all Attorney Costs of one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole, and (b) to pay or reimburse the Administrative Agent, the Issuers and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and in the case of legal fees and expenses, limited to all Attorney Costs of one counsel to the Administrative Agent, the Issuers and the Lenders taken as a whole and all Attorney Costs of one counsel to the FILO Secured Parties taken as a whole selected by the FILO Documentation Agent (and if reasonably necessary (x) one local counsel in any relevant material jurisdiction and (y) in the event of any conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole of the affected parties (including, during the continuance of an Event of Default and after working in good faith to use one counsel, if reasonably necessary in the event of any conflict of interest between the FILO Documentation Agent and any FILO Secured Parties, one additional counsel in each relevant jurisdiction to each group of affected FILO Secured Parties similarly situated taken as a whole of such affected parties; *provided* that no amounts received on account of the Obligations shall be applied, pursuant to *Section 10.3* or otherwise, to pay such additional legal fees and expenses of counsel to such affected FILO Secured Parties under this *clause (y)* until all other FILO Obligations have been paid in full))).  The agreements in this *Section 12.3* shall survive the termination of the Aggregate Commitments and repayment of all other Obligations.  All amounts due under this *Section 12.3* shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail and such supporting material as the Borrower may reasonably request.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

SECTION 12.4    Indemnities.

The Borrower shall indemnify and hold harmless the Agents, each Lender, each Issuer, the Arrangers and their respective Affiliates, directors, officers, employees, agents, partners, trustees or advisors and other representatives (collectively the "*Indemnitees*") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interest of the Lenders, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Revolving Credit Commitment, Loan or Letter of Credit or the use or

proposed use of the proceeds therefrom (including any refusal by an Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), or (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liabilities arising out of the activities or operations of the Borrower, any Subsidiary or any other Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "*Indemnified Liabilities*"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee or agent of such Indemnitee, (y) a material breach of any obligations under any Loan Document by such Indemnitee or of any Related Indemnified Person, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under the Revolving Facility or the FILO Facility and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates.  To the extent that the undertakings to indemnify and hold harmless set forth in this *Section 12.4* may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Effective Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party).  In the case of an investigation, litigation or other proceeding to which the indemnity in this *Section 12.4* applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated.  All amounts due under this *Section 12.4* shall be paid within twenty (20) Business Days after written demand therefor.  The agreements in this *Section 12.4* shall survive the resignation of the Administrative Agent, the Collateral Agent, the Swing Loan Lender or any Issuer, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.  This *Section 12.4* and *Section 12.3* shall not apply to Taxes, which shall be governed by *Section 3.1* and *Section 3.4*.

SECTION 12.5    Limitation of Liability.

The Loan Parties agree that no Indemnitee shall have any liability (whether in contract, tort or otherwise) to any Loan Party or any of their respective Subsidiaries or any of their respective equity holders or creditors for or in connection with the transactions contemplated hereby and in the other Loan Documents, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnitee's gross negligence or willful misconduct or bad faith or breach by such Indemnitee of its material obligations under this Agreement.  In no event, shall any party hereto or any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or

DB1/ 145587008.11

US-DOCS\149610879.14

anticipated savings). Each party hereto hereby waives, releases and agrees (each for itself and on behalf of its Subsidiaries) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

SECTION 12.6      Right of Set-off.

If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such other Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of *Section 2.16* and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 12.7      Sharing of Payments.

If, other than as expressly provided elsewhere herein, any Lender shall obtain payment in respect of any principal of or interest on account of the Loans made by it, or the participations in Letter of Credit Obligations and Swing Loans held by it (in each case, whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them and/or such subparticipations in the participations in Letter of Credit Obligations or Swing Loans held by them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment of principal of or interest on such Loans or such participations, as the case may be, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in *Section 12.14* (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  The provisions of this Section shall not be construed to apply to the application of Cash Collateral provided for in *Sections 10.3* and *10.5*.  For avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect

from time to time or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of set-off, but subject to *Section 12.6*) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this *Section 12.7* and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this *Section 12.7* shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

SECTION 12.8    Notices and Other Communications; Facsimile Copies.

(a)    *General*.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in *subsection (b)* below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to Parent, Holdings, the Borrower, the Administrative Agent, the FILO Documentation Agent, an Issuer or the Swing Loan Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on *Schedule 12.8*; and

(ii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in *subsection (b)* below shall be effective as provided in such *subsection (b)*.

(b)    *Electronic Communications*.  Notices and other communications to the Lenders and the Issuers hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender or Issuer pursuant to *Article II* if such Lender or Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(c)    *Receipt*.  Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other

communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing *clause (i)* of notification that such notice or communication is available and identifying the website address therefor.

(d)     *The Platform*.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Agent-Related Persons or any Arranger (collectively, the "*Agent Parties*") have any liability to Parent, Holdings, the Borrower, any Lender, any Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to Parent, Holdings, the Borrower, any Lender, any Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)     *Change of Address*.  Each of Parent, Holdings, the Borrower, the Administrative Agent, the FILO Documentation Agent, each Issuer and the Swing Loan Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent, each Issuer and the Swing Loan Lender.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content description screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(f)     *Reliance by Administrative Agent, FILO Documentation Agent, Issuers and Lenders*.  The Administrative Agent, the FILO Documentation Agent, the Issuers and the Lenders shall be entitled to rely and act upon any notices (including telephonic Notices of Borrowing or Swing Loan Requests) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, the FILO Documentation Agent, each

Issuer, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

SECTION 12.9    No Waiver; Cumulative Remedies.

No failure by any Lender, the Administrative Agent or the FILO Documentation Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

SECTION 12.10    [Reserved].

SECTION 12.11    Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower, Parent, Holdings and the Administrative Agent and the Administrative Agent shall have been notified by each Lender, Swing Loan Lender and each Issuer that each such Lender, Swing Loan Lender and Issuer has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, Parent, Holdings, each Agent and each Lender and their respective successors and assigns.

SECTION 12.12    Governing Law; Submission to Jurisdiction; Service of Process.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    THE BORROWER, PARENT, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO AGREES THAT THE ADMINISTRATIVE AGENT AND THE LENDERS (BUT NOT THE BORROWER, PARENT OR HOLDINGS) RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST THE BORROWER, PARENT OR HOLDINGS IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY LOAN DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)     THE BORROWER, PARENT, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN *SECTION 12.8*.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

SECTION 12.13     Waiver of Jury Trial.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 12.14     Marshaling; Payments Set Aside.

None of the Administrative Agent, the FILO Documentation Agent, any Lender or any Issuer shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

SECTION 12.15     Execution in Counterparts.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together

shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in *Sections 4.1* and *4.3*, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 12.16    <u>Electronic Execution of Assignments and Certain Other Documents</u>.

The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other modifications, Notice of Borrowing, Swing Loan Request, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided* that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

This Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement (each a "*Communication*"), including Communications required to be in writing, may, if agreed by the Administrative Agent, be in the form of an Electronic Record and may be executed using Electronic Signatures, including, without limitation, facsimile and/or .pdf.  The Loan Parties agree that any Electronic Signature (including, without limitation, facsimile or .pdf) on or associated with any Communication shall be valid and binding on the Loan Parties to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of the Loan Parties enforceable against the Loan Parties in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered to the Administrative Agent.  Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Administrative Agent of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Administrative Agent and each Lender may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("*Electronic Copy*"), which shall be deemed created in the ordinary course of the Administrative Agent's business, and destroy the original paper document.  All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record.  Notwithstanding anything contained herein to the contrary, the Administrative Agent is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it; *provided*, further, without limiting the foregoing, (a) to the extent the Administrative Agent has agreed to accept such Electronic

Signature, each Secured Party shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification and (b) upon the request of the Administrative Agent any Electronic Signature shall be promptly followed by a manually executed, original counterpart.  For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

SECTION 12.17    Confidentiality.

Each of the Administrative Agent, the FILO Documentation Agent, the Lenders and the Issuers agrees to maintain the confidentiality of the Information in accordance with its customary procedures (set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); *provided* that the Administrative Agent, the FILO Documentation Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable prior to any such disclosure by such Person unless such notification is prohibited by applicable Laws, or except in connection with any request as part of a regulatory examination, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, *provided* that the Administrative Agent, the FILO Documentation Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of such disclosure unless such notification is prohibited by law, rule or regulation or except in connection with any request as part of a regulatory examination, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this *Section 12.17*, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee invited to be an Additional Lender (other than to a Disqualified Institution; *provided* that the list of Disqualified Institutions may be provided) or (ii) any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower; (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from the Administrative Agent, the FILO Documentation Agent or such Lender); or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, the FILO Documentation Agent, any Issuer, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than Parent, Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent or Lender to be subject to a confidentiality restriction in respect thereof in favor of the Borrower or any Affiliate of the Borrower.

For purposes of this Section, "*Information*" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent, the FILO Documentation Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof, it being understood that all information received from Parent, Holdings, the Borrower or any Subsidiary after the Second Restatement Date, shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has

exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the FILO Documentation Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

SECTION 12.18    Use of Name, Logo, etc.

Each Loan Party consents to the publication in the ordinary course by Administrative Agent, the FILO Documentation Agent or the Arrangers of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark.  Such consent shall remain effective until revoked by such Loan Party in writing to the Administrative Agent, the FILO Documentation Agent and the Arrangers. The Administrative Agent, the FILO Documentation Agent and the Arrangers reserve the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

SECTION 12.19    USA PATRIOT Act Notice; Foreign Asset Control Regulations.

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

Neither the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "*Foreign Assets Control Regulations*") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "*Executive Order*")) or the USA PATRIOT Act.  Furthermore, none of the Loan Parties or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

SECTION 12.20    No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower, Parent and Holdings acknowledges and agrees, and acknowledges its Affiliates'

understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents and the Arrangers are arm's-length commercial transactions between the Borrower, Parent, Holdings and their respective Affiliates, on the one hand, and the Agents and the Arrangers, on the other hand, (B) each of the Borrower, Parent and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower, Parent and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Agents, the Arrangers and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Parent, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents, the Arrangers nor any Lender has any obligation to the Borrower, Parent, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arrangers, the Lender and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Parent, Holdings their respective Affiliates, and none of the Agents, the Arrangers nor any Lender has any obligation to disclose any of such interests to the Borrower, Parent, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrower, Parent and Holdings hereby waives and releases any claims that it may have against the Agents, the Arrangers nor any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 12.21    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this *Section 12.21*, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, the applicable Issuer or the Swing Loan Lender, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

SECTION 12.22    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent, the FILO Documentation Agent, each Issuer and each Lender, regardless of any investigation made by the Administrative Agent, the FILO Documentation Agent, any Issuer or any Lender or on their behalf and notwithstanding that the Administrative Agent, the FILO Documentation Agent, any Issuer or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

SECTION 12.23    Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of set-off, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent

194

(which shall not be withheld in contravention of *Section 11.4*).  The provision of this *Section 12.23* are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 12.24    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "*Maximum Rate*").  If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 12.25    Time of the Essence.

Time is of the essence in the Loan Documents.

SECTION 12.26    No Strict Construction.

The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

SECTION 12.27    Intercreditor Agreement.

Each of Parent, Holdings, the Borrower, the Agents, the Issuers and the Lenders acknowledge that the exercise of certain of the Administrative Agents' rights and remedies hereunder may be subject to, and restricted by, the provisions of the Intercreditor Agreement.  Except as specified herein, nothing contained in the Intercreditor Agreement shall be deemed to modify any of the provisions of this Agreement and the other Loan Documents, which, as among the Loan Parties, the Agents, the Issuers and the Lenders shall remain in full force and effect. In the event of any inconsistency between the provisions of this Agreement or any other Loan Document and the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall govern and control.

SECTION 12.28    Keepwell.

Each Loan Party that is a Qualified ECP Guarantor at the time the Guaranty or the grant of a security interest under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under the Guaranty voidable under applicable Laws

relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this *Section 12.28* shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full.  Each Loan Party intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

SECTION 12.29    Acknowledgment and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties, each party hereto (including each Secured Party) acknowledges that, with respect to any Secured Party that is an Affected Financial Institution, any liability of such Secured Party arising under a Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority, and each party hereto agrees and consents to, and acknowledges and agrees to be bound by,

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liability which may be payable to it by such Secured Party; and

(b)    the effects of any Bail-in Action on any such liability, including (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under any Loan Document; or (iii) the variation of the terms of such liability in connection with the exercise of any Write-Down and Conversion Powers.

SECTION 12.30    Acknowledgement Regarding Any Supported QFCs.

 To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "*QFC Credit Support*", and each such QFC, a "*Supported QFC*"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "*U.S. Special Resolution Regimes*") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "*Covered Party*") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such

Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

SECTION 12.31    Limited Waiver; Amendment and Restatement.

(a)    The filing of the Chapter 11 Cases on the Petition Date constitutes an Event of Default pursuant to *Section 10.1(f)* of the Existing Credit Agreement (the "*Specified Insolvency Event of Default*"). Subject to the terms and conditions herein contained and in reliance upon the representations and warranties of the Loan Parties herein contained, effective upon the Second Restatement Date, the Administrative Agent, the FILO Documentation Agent and the Lenders hereby waive for any and all purposes of the Existing Credit Agreement and the other Loan Documents, the Specified Insolvency Event of Default. Other than the limited waiver set forth in the preceding sentence, nothing contained in this Agreement shall be construed as a waiver by the Administrative Agent, the FILO Documentation Agent or any Lender of any covenant or provision of the Existing Credit Agreement, the other Loan Documents, this Agreement, or of any other contract or instrument between Loan Parties and Administrative Agent, the FILO Documentation Agent or any Lender, and the failure of the Administrative Agent, the FILO Documentation Agent or any Lender at any time or times hereafter to require strict performance by the Loan Parties of any provision thereof shall not waive, affect or diminish any right of the Administrative Agent, the FILO Documentation Agent or the Lenders to thereafter demand strict compliance therewith. Other than with respect to the limited waiver set forth above, the Administrative Agent, the FILO Documentation Agent and each Lender hereby reserves all rights granted under the Existing Credit Agreement, the other Loan Documents, this Agreement and any other contract or instrument between any of them. The foregoing limited waiver shall be effective only in this specific instance and for the specific purpose for which it is given, and shall not entitle the Loan Parties to any other or further waiver in any similar or other circumstances.

(b)    This Agreement is an amendment and restatement of the Existing Credit Agreement, it being acknowledged and agreed that as of the Second Restatement Date all obligations outstanding under or in connection with the Existing Credit Agreement and any of the other Loan Documents (such obligations, collectively, the "*Existing Obligations*") constitute obligations under this Agreement. This Agreement is in no way intended to constitute a novation of the Existing Credit Agreement or the Existing Obligations. With respect to (i) any date or time period occurring and ending prior to the Second Restatement Date, the Existing Credit Agreement and the other Loan Documents shall govern the respective rights and obligations of any party or parties hereto also party thereto and shall for such purposes remain in full force and effect; and (ii) any date or time period occurring or ending on or after the Second Restatement Date, the rights and obligations of the parties hereto shall be governed by this Agreement (including, without limitation, the exhibits and schedules hereto) and the other Loan Documents. From and after the Second Restatement Date, any reference to the Existing Credit Agreement in any of the other Loan Documents executed or issued by and/or delivered to any one or more parties hereto pursuant to or in connection therewith shall be deemed to be a reference to this Agreement, and the provisions of this Agreement shall prevail in the event of any conflict or inconsistency between such provisions and those of the Existing Credit Agreement.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

**THIS DRAFT OF THE CREDIT AGREEMENT REMAINS SUBJECT TO CONTINUING NEGOTIATIONS WITH ALL PARTIES IN INTEREST AND THE FINAL VERSION MAY CONTAIN MATERIAL DIFFERENCES. FOR THE AVOIDANCE OF DOUBT, NO PARTY HAS CONSENTED TO THIS VERSION AS THE FINAL FORM, AND ALL PARTIES RESERVE THEIR RESPECTIVE RIGHTS WITH RESPECT TO THIS DOCUMENT AND ANY RELATED DOCUMENTS**

GD Draft 4/19/24

CREDIT AGREEMENT

Dated as of April [ ], 2024
among

NEEDLE HOLDINGS LLC,
as the Borrower,

JOANN HOLDINGS 2, LLC,
as Holdings,

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent,

and

THE OTHER LENDERS PARTY HERETO
_____

Table of Contents

Page

ARTICLE I

Definitions and Accounting Terms

SECTION 1.01    Defined Terms ................................................................................. 1
SECTION 1.02    Other Interpretive Provisions ........................................................ 44
SECTION 1.03    Accounting Terms .......................................................................... 45
SECTION 1.04    Rounding ........................................................................................ 45
SECTION 1.05    References to Agreements, Laws, Etc ........................................... 45
SECTION 1.06    Times of Day .................................................................................. 45
SECTION 1.07    Available Amount Transactions .................................................... 45
SECTION 1.08    Pro Forma Calculations ................................................................. 46
SECTION 1.09    Currency Equivalents Generally .................................................... 46
SECTION 1.10    Limited Condition Acquisitions ..................................................... 47
SECTION 1.11    Divisions ......................................................................................... 48

ARTICLE II

The Commitments and Borrowings

SECTION 2.01    The Loans ....................................................................................... 48
SECTION 2.02    Borrowings, Conversions and Continuations of Loans ................ 48
SECTION 2.03    Prepayments ................................................................................... 50
SECTION 2.04    Termination or Reduction of Commitments .................................. 53
SECTION 2.05    Repayment of Loans ...................................................................... 53
SECTION 2.06    Interest ............................................................................................ 54
SECTION 2.07    Fees ................................................................................................ 54
SECTION 2.08    Computation of Interest and Fees .................................................. 54
SECTION 2.09    Evidence of Indebtedness .............................................................. 54
SECTION 2.10    Payments Generally; Administrative Agent's Clawback ............. 55
SECTION 2.11    Sharing of Payments ...................................................................... 56
SECTION 2.12    Incremental Borrowings ................................................................ 57
SECTION 2.13    Refinancing Amendments .............................................................. 58
SECTION 2.14    Extensions of Loans ...................................................................... 59

ARTICLE III

Taxes, Increased Costs Protection and Illegality

SECTION 3.01    Taxes ............................................................................................... 60
SECTION 3.02    Illegality ......................................................................................... 63
SECTION 3.03    Inability to Determine Rates .......................................................... 63
SECTION 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Term
               SOFR Loans .................................................................................... 66
SECTION 3.05    Funding Losses ............................................................................... 67
SECTION 3.06    Matters Applicable to All Requests for Compensation .................. 67
SECTION 3.07    Replacement of Lenders under Certain Circumstances ................. 67
SECTION 3.08    Survival .......................................................................................... 68

ARTICLE IV

Conditions Precedent to Borrowing

SECTION 4.01    Conditions to the Closing Date ..................................................... 69

US-DOCS\149885390.12

Page

SECTION 4.02          Conditions to All Borrowings After the Closing Date ............................................................70

ARTICLE V

Representations and Warranties

SECTION 5.01          Existence, Qualification and Power; Compliance with Laws ................................................71
SECTION 5.02          Authorization; No Contravention.........................................................................................71
SECTION 5.03          Governmental Authorization ................................................................................................71
SECTION 5.04          Binding Effect.......................................................................................................................71
SECTION 5.05          Financial Statements; No Material Adverse Effect...............................................................71
SECTION 5.06          Litigation...............................................................................................................................72
SECTION 5.07          Labor Matters........................................................................................................................72
SECTION 5.08          Ownership of Property; Liens...............................................................................................72
SECTION 5.09          Environmental Matters..........................................................................................................72
SECTION 5.10          Taxes......................................................................................................................................72
SECTION 5.11          ERISA Compliance...............................................................................................................73
SECTION 5.12          Subsidiaries...........................................................................................................................73
SECTION 5.13          Margin Regulations; Investment Company Act....................................................................73
SECTION 5.14          Disclosure .............................................................................................................................73
SECTION 5.15          Intellectual Property; Licenses, Etc. ....................................................................................74
SECTION 5.16          Solvency ................................................................................................................................74
SECTION 5.17          OFAC.....................................................................................................................................74
SECTION 5.18          USA PATRIOT Act...............................................................................................................74
SECTION 5.19          Collateral Documents............................................................................................................74
SECTION 5.20          Anti-Corruption Laws ...........................................................................................................74
SECTION 5.21          Affected Financial Institution ..............................................................................................74

ARTICLE VI

Affirmative Covenants

SECTION 6.01          Financial Statements .............................................................................................................75
SECTION 6.02          Certificates; Other Information.............................................................................................76
SECTION 6.03          Notices ..................................................................................................................................77
SECTION 6.04          Payment of Taxes..................................................................................................................77
SECTION 6.05          Preservation of Existence, Etc. ............................................................................................77
SECTION 6.06          Maintenance of Properties.....................................................................................................78
SECTION 6.07          Maintenance of Insurance .....................................................................................................78
SECTION 6.08          Compliance with Laws ..........................................................................................................78
SECTION 6.09          Books and Records................................................................................................................78
SECTION 6.10          Inspection Rights...................................................................................................................78
SECTION 6.11          Covenant to Guarantee Obligations and Give Security ........................................................79
SECTION 6.12          Compliance with Environmental Laws..................................................................................80
SECTION 6.13          Further Assurances and Post-Closing Conditions.................................................................80
SECTION 6.14          Designation of Subsidiaries ..................................................................................................81
SECTION 6.15          Maintenance of Ratings ........................................................................................................82
SECTION 6.16          Cash Flow Forecast...............................................................................................................82

ARTICLE VII

Negative Covenants

SECTION 7.01          Liens ......................................................................................................................................82
SECTION 7.02          Investments ...........................................................................................................................86

Page

| | | |
|---|---|---|
| SECTION 7.03 | Indebtedness | 88 |
| SECTION 7.04 | Fundamental Changes | 91 |
| SECTION 7.05 | Dispositions | 92 |
| SECTION 7.06 | Restricted Payments | 94 |
| SECTION 7.07 | Change in Nature of Business | 96 |
| SECTION 7.08 | Transactions with Affiliates | 96 |
| SECTION 7.09 | Burdensome Agreements | 98 |
| SECTION 7.10 | Use of Proceeds | 99 |
| SECTION 7.11 | Accounting Changes | 99 |
| SECTION 7.12 | Prepayments, Etc. of Indebtedness | 99 |
| SECTION 7.13 | Holdings | 99 |

## ARTICLE VIII

Events of Default and Remedies

| | | |
|---|---|---|
| SECTION 8.01 | Events of Default | 100 |
| SECTION 8.02 | Remedies upon Event of Default | 102 |
| SECTION 8.03 | Application of Funds | 102 |

## ARTICLE IX

Administrative Agent and Other Agents

| | | |
|---|---|---|
| SECTION 9.01 | Appointment and Authorization of the Administrative Agent | 103 |
| SECTION 9.02 | Rights as a Lender | 104 |
| SECTION 9.03 | Exculpatory Provisions | 104 |
| SECTION 9.04 | Reliance by the Administrative Agent | 105 |
| SECTION 9.05 | Delegation of Duties | 106 |
| SECTION 9.06 | Non-Reliance on Administrative Agent and Other Lenders; Disclosure of Information by Agents | 106 |
| SECTION 9.07 | Indemnification of Agents | 106 |
| SECTION 9.08 | No Other Duties; Other Agents, Etc. | 107 |
| SECTION 9.09 | Resignation of Administrative Agent | 107 |
| SECTION 9.10 | Administrative Agent May File Proofs of Claim | 108 |
| SECTION 9.11 | Collateral and Guaranty Matters | 109 |
| SECTION 9.12 | Appointment of Supplemental Administrative Agents | 110 |
| SECTION 9.13 | Intercreditor Agreements | 111 |
| SECTION 9.14 | Secured Cash Management Agreements and Secured Hedge Agreements | 111 |
| SECTION 9.15 | Withholding Taxes | 111 |
| SECTION 9.16 | Erroneous Payments. | 111 |

## ARTICLE X

Miscellaneous

| | | |
|---|---|---|
| SECTION 10.01 | Amendments, Etc. | 113 |
| SECTION 10.02 | Notices and Other Communications; Facsimile Copies | 116 |
| SECTION 10.03 | No Waiver; Cumulative Remedies | 117 |
| SECTION 10.04 | Attorney Costs and Expenses | 117 |
| SECTION 10.05 | Indemnification by the Borrower | 118 |
| SECTION 10.06 | Marshaling; Payments Set Aside | 119 |
| SECTION 10.07 | Successors and Assigns | 119 |
| SECTION 10.08 | Confidentiality | 122 |
| SECTION 10.09 | Setoff | 123 |

Page

SECTION 10.10    Interest Rate Limitation ...................................................................... 123
SECTION 10.11    Counterparts; Integration; Effectiveness.............................................. 123
SECTION 10.12    Electronic Execution of Assignments and Certain Other Documents.................... 124
SECTION 10.13    Survival of Representations and Warranties .......................................... 124
SECTION 10.14    Severability ............................................................................. 124
SECTION 10.15    GOVERNING LAW........................................................................... 124
SECTION 10.16    WAIVER OF RIGHT TO TRIAL BY JURY ...................................................... 125
SECTION 10.17    Binding Effect........................................................................... 125
SECTION 10.18    Lender Action ........................................................................... 125
SECTION 10.19    Use of Name, Logo, etc. ................................................................. 125
SECTION 10.20    USA PATRIOT Act.......................................................................... 125
SECTION 10.21    Service of Process ...................................................................... 125
SECTION 10.22    No Advisory or Fiduciary Responsibility ................................................ 125
SECTION 10.23    Acknowledgement and Consent to Bail-In of Affected Financial Institutions .......... 126
SECTION 10.24    Acknowledgement Regarding Any Supported QFCs .......................................... 126

SCHEDULES

| | |
|---|---|
| I | Commitments |
| II | Guarantors |
| 1.01A | Certain Security Interests and Guarantees |
| 1.01B | Designated Assets |
| 1.01F | Mortgaged Properties |
| 5.12 | Subsidiaries and Other Equity Investments |
| 7.01(b) | Existing Liens |
| 7.02(f) | Existing Investments |
| 7.03(b) | Existing Indebtedness |
| 7.08 | Transactions with Affiliates |
| 7.09 | Existing Restrictions |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | [Reserved] |
| F | [Reserved] |
| G | [Reserved] |
| H-1 | First Lien Intercreditor Agreement |
| H-2 | Second Lien Intercreditor Agreement |
| I | United States Tax Compliance Certificate |
| J | Intercompany Subordination Agreement |
| K | Solvency Certificate |

US-DOCS\149885390.12

## CREDIT AGREEMENT

This CREDIT AGREEMENT ("**Agreement**") is entered into as of April [  ], 2024, by and among NEEDLE HOLDINGS LLC, a Delaware limited liability company (the "**Borrower**"), JOANN HOLDINGS 2, LLC, a Delaware limited liability company ("**Holdings**") and WILMINGTON SAVINGS FUND SOCIETY, FSB ("**WSFS**"), as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**").

## PRELIMINARY STATEMENTS

WHEREAS, on October 16, 2016, Jo-Ann Stores, LLC, an Ohio limited liability company ("**Jo-Ann Stores**"), entered into that certain Credit Agreement, by and among Needle Holdings LLC, as holdings, Jo-Ann Stores, as borrower, the lenders party thereto ("**Prepetition Lenders**") and WSFS, as the successor administrative agent and collateral agent thereunder (as amended, amended and restated, supplemented or otherwise modified, the "**Prepetition Credit Agreement**") under which it incurred "Loans" (the "**Prepetition Loans**");

WHEREAS, on March 19, 2024, JoAnn Inc., a Delaware corporation (the "**Parent**"), the Borrower and certain Subsidiaries of the Borrower (collectively, the "**Debtors**") commenced Chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") under Case No. 24-10418 (CTG) (the "**Chapter 11 Cases**");

WHEREAS, on March 19, 2024, the Debtors entered into that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to the DIP Order (as defined therein), the "**DIP Credit Agreement**"), by and among the Parent, as holdings, the Borrower, as borrower, WSFS, as DIP Agent (as defined in the DIP Order), and the lenders party thereto (the "**DIP Lenders**"), pursuant to which the DIP Lenders made available to the Borrower "Initial DIP Loans" (as defined in the DIP Credit Agreement);

WHEREAS, on April [  ], 2024, the Bankruptcy Court ended the Confirmation Order (as defined in the DIP Order) approving the Plan (as defined in the DIP Credit Agreement).

WHEREAS, upon the terms and conditions set forth in this Agreement and the Plan, the Lenders shall (i) convert (x) the aggregate principal amount of all "Initial DIP Loans" (as defined in the DIP Credit Agreement) outstanding under the DIP Credit Agreement on the Plan Effective Date and (y) all accrued and unpaid interest, fees, premiums, and all other obligations on account of such "Initial DIP Loans" (as defined in the DIP Credit Agreement) into Term Loans hereunder (the "**Exchange Term Loans**") and (ii) make available to the Borrower an uncommitted additional tranche of Term Loans hereunder in an aggregate principal amount not to exceed $10,500,000 (the "**Incremental Exit Loans**", and together with the Exchange Term Loans, the "**Term Loans**");

WHEREAS, upon the terms and conditions set forth in this Agreement and the Plan, the Lenders have agreed to make the Term Loans hereunder;

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

## ARTICLE I

### Definitions and Accounting Terms

SECTION 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Administrative Agent**" means Bank of America, N.A., in its capacity as administrative agent and collateral agent under the ABL Facilities Documentation, or any successor administrative agent and collateral agent under the ABL Facilities Documentation.

"**ABL Credit Agreement**" means that Second Amended and Restated Credit Agreement, dated as of the Closing Date among the Borrower, Holdings, the guarantors party thereto, the lenders party thereto, the ABL Administrative Agent and the FILO Documentation Agent, as the same may be amended, restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time in one or more agreements (in each case with the same or new lenders, institutional investors or agents), including any agreement extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case as and to the extent permitted by this Agreement and the ABL Intercreditor Agreement.

"**ABL Facilities**" means the asset-based revolving credit facilities under the ABL Credit Agreement.

"**ABL Facilities Documentation**" means the ABL Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"**ABL Intercreditor Agreement**" means the amended and restated intercreditor agreement dated as of April [ ], 2024 among the Administrative Agent, the Collateral Agent, the ABL Administrative Agent and the Loan Parties or any other intercreditor agreement among the ABL Administrative Agent, one or more Senior Representatives of Permitted Pari Passu Secured Debt or Permitted Junior Secured Refinancing Debt, the Administrative Agent and the Collateral Agent on terms, taken as a whole, reasonably determined by the Administrative Agent (acting at the Direction of the Required Lenders) to be not materially adverse to the Lenders compared to those contained in the intercreditor agreement described above, as the same may be supplemented or amended from time to time.

"**Additional Lender**" means, at any time, any bank, other financial institution, institutional investor that, in any case, is not an existing Lender and that agrees to provide any portion of any (a) Incremental Loan in accordance with Section 2.12 or (b) Other Loans pursuant to a Refinancing Amendment in accordance with Section 2.13; *provided* that each Additional Lender (other than any Person that is an Affiliate of a Lender, an Approved Fund of a Lender at such time) shall be subject to the approval of the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed), in each case to the extent any such consent would be required from the Administrative Agent under Section 10.07(b)(iii)(B) for an assignment of Loans to such Additional Lender.

"**Administrative Agent**" has the meaning specified in the introductory paragraph to this Agreement.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. For the avoidance of doubt, none of the Agents or their respective lending affiliates shall be deemed to be an Affiliate of Holdings, the Borrower or any of their respective Subsidiaries.

"**Agent Parties**" has the meaning specified in Section 10.02(d).

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Persons and of such Persons' Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent and the Supplemental Administrative Agents (if any).

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Credit Agreement, as amended, restated, modified, replaced, extended, renewed or supplemented from time to time in accordance with the terms hereof.

"**All-In Yield**" means, as to any Indebtedness, the yield thereof, whether in the form of interest rate, margin, OID, upfront fees, a Term SOFR or Base Rate floor greater than 0.75% or 1.75%, respectively (with such increased amount being equated to interest margins for purposes of determining any increase to the Applicable Rate), or otherwise; *provided* that (i) OID and upfront fees on floating rate Indebtedness shall be equated to an interest rate assuming a 4-year life to maturity (or, if less, the stated life to maturity at the time of the incurrence of the applicable Indebtedness) and (ii) "All-In Yield" with respect to any fixed rate indebtedness shall be determined in accordance with bond market convention  (as reasonably determined by the Administrative Agent) and adjusted to a floating rate yield (based on mid-rate swaps having a term equivalent to such fixed rate Indebtedness at the time of issuance thereof as reasonably determined by the Administrative Agent); *provided*, *further*, that "All-In Yield" shall not include arrangement fees, structuring fees or underwriting or similar fees paid to arrangers for such Indebtedness.

"**Annual Financial Statements**" means the audited consolidated balance sheets of Jo-Ann Stores and its Subsidiaries as of January 28, 2023, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for Jo-Ann Stores for the fiscal year then ended.

"**Applicable ECF Builder Percentage**" means (100% minus the ECF Percentage for the fiscal year in which such fiscal quarter occurs (*provided*, that prior to the date of determination of the ECF Percentage for any fiscal year, such ECF Percentage shall be deemed to be 50%).

"**Applicable Indebtedness**" has the meaning specified in the definition of "Weighted Average Life to Maturity."

"**Applicable Prepayment Amount**" means, in the case of any repayment or prepayment of Loans hereunder (other than pursuant to Section 2.05), (a) on or prior to the first anniversary of the Closing Date, the Make-Whole Premium, (b) after the first anniversary of the Closing Date, but on or prior to the second anniversary of the Closing Date, 2.00%, and (c) thereafter, 0%.

"**Applicable Rate**" means, with respect to Term Loans, a percentage per annum equal to (i) for Term SOFR Loans, 9.50% and (ii) for Base Rate Loans, 8.50%.

"**Appropriate Lender**" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit D or any other form approved by the Administrative Agent.

"**Attorney Costs**" means all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Available Amount**" means, at any time (the "**Reference Date**"), the sum of:

(a)        (i) $0 plus (ii) an amount equal to the Available Excess Cash Flow Amount; plus

(b)        the amount of any capital contributions or Net Cash Proceeds from Permitted Equity Issuances (or issuances of debt securities that have been converted into or exchanged for Qualified Equity Interests) received or made by the Borrower (or any direct or indirect parent thereof and contributed by such parent to the Borrower) during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date; plus

(c)        to the extent not (A) included in clause (a) above or (B) already reflected as a return of capital with respect to such Investment for purposes of determining the amount of such Investment, the aggregate amount of all dividends, distributions, returns of principal, interest, profits on sale and similar amounts received in cash or Cash Equivalents by the Borrower or any Restricted Subsidiary from any Minority Investments, Unrestricted Subsidiaries or Investments made pursuant to Section 7.02(n) during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date; plus

(d)        to the extent not (A) included in clause (a) above or (B) already reflected as a return of capital with respect to such Investment for purposes of determining the amount of such Investment, the aggregate amount of all repayments of principal, interest or similar amounts received in cash or Cash Equivalents by the Borrower or any Restricted Subsidiary from any Minority Investments or Unrestricted Subsidiaries and the fair market value of any Unrestricted Subsidiary that is redesignated as a Restricted Subsidiary (to the extent the Investment in such Unrestricted Subsidiary was made in reliance on the Available Amount) during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date in respect of loans or advances made by the Borrower or any Restricted Subsidiary to such Minority Investments or Unrestricted Subsidiaries; plus

(e)        to the extent not (A) included in clause (a) above, (B) already reflected as a return of capital with respect to such Investment for purposes of determining the amount of such Investment or (C) required to be applied to prepay Loans in accordance with Section 2.03(b)(ii), the aggregate amount of all Net Cash Proceeds received by the Borrower or any Restricted Subsidiary in connection with the sale, transfer or other disposition of its ownership interest in any Minority Investment or Unrestricted Subsidiary during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date; plus

(f)        the aggregate amount of mandatory prepayments declined pursuant to Section 2.03(b)(vi); minus

(g)        the aggregate amount of any Investments made pursuant to Section 7.02(c)(iv)(B), 7.02(i)(B) and Section 7.02(n)(ii) or any payment made pursuant to Section 7.12(a)(D)(2) during the period commencing on the Closing Date and ending on the Reference Date (and, for purposes of this clause (g), without taking account of the intended usage of the Available Amount on such Reference Date in the contemplated transaction).

"**Available Excess Cash Flow Amount**" means, on any Reference Date (i) the Applicable ECF Builder Percentage multiplied by the Excess Cash Flow for each fiscal year of the Borrower after the Closing Date

for which financial statements have been delivered pursuant to Section 6.01(a) on or prior to the applicable Reference Date; *provided* that in no event shall the amount determined pursuant to clause definition at any time be less than zero.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Court**" has the meaning assigned to such term in the recitals to this Agreement.

"**Base Rate**" means for any day a fluctuating rate of interest per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1% (b) the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its "prime rate", (c) Term SOFR *plus* 1.00% and (d) 1.75%. The "prime rate" is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by the Administrative Agent shall take effect at the opening of business on the day specified in the public announcement of such change. If the Base Rate is being used as an alternate rate of interest pursuant to Section 3.03 hereof, then Base Rate shall be the highest of clauses (a), (b) and (d) above and shall be determined without reference to clause (c) above.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Borrower**" has the meaning specified in the introductory paragraph to this Agreement.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrowing**" means a borrowing consisting of Loans of the same Class and Type made, converted or continued on the same date and, in the case of Term SOFR Loans, having the same Interest Period.

"**Borrowing Base**" means, on any date, the sum of (x) 90% of 10% of the net sales of the Borrower and its Restricted Subsidiaries, on a consolidated basis in accordance with GAAP, for the most recent fiscal month for which internal financial statements are available at such time plus (y) 80% of the book value of inventory of the Borrower and its Restricted Subsidiaries, on a consolidated basis in accordance with GAAP, as of the last day of the most recent fiscal month of the Borrower for which internal financial statements are available at such time.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Leases) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and the Restricted Subsidiaries.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the Capitalized Lease Obligation with respect thereto.

"**Cash Collateral Account**" means an account held at, and subject to the sole dominion and control of, the Collateral Agent.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Restricted Subsidiary:

(a)    Dollars;

(b)    in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business and not for speculation;

(c)    readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(d)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500,000,000;

(e)    repurchase obligations for underlying securities of the types described in clauses (c) and (d) above or clause (g) below entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)    commercial paper rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and in each case maturing within 12 months after the date of creation thereof;

(g)    marketable short-term money market and similar highly liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(h)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) with maturities of 12 months or less from the date of acquisition;

(i)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); and

(j)    investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (i) above.

In the case of Investments by any Foreign Subsidiary that is a Restricted Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents shall also include (i) investments of the type and maturity described in clauses (a) through (j) above of foreign obligors, which Investments or obligors (or the

US-DOCS\149885390.12

parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries that are Restricted Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (a) through (j) and in this paragraph.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, provided that such amounts are converted into Dollars as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"**Cash Flow Forecast**" means a cash flow forecast in a customary form to be agreed among the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower, reflecting the Borrower's and its Restricted Subsidiaries' good faith projections of all weekly cash receipts and disbursements on a line item basis in connection with the operation of their businesses for the following 13-week period.

"**Cash Management Bank**" means any Person that is a Lender or an Affiliate of a Lender on the Closing Date or at the time it provides any Cash Management Services, whether or not such Person subsequently ceases to be a Lender or an Affiliate of a Lender.

"**Cash Management Obligations**" means obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank in respect of or in connection with any Cash Management Services and designated by the Cash Management Bank and the Borrower in writing to the Administrative Agent as "Cash Management Obligations."

"**Cash Management Services**" means any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit card processing, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair, or as compensation for the taking of, such equipment, fixed assets or real property.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty (excluding the taking effect after the date of this Agreement of a law, rule, regulation or treaty adopted prior to the date of this Agreement), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" means the earliest to occur of:

(a)      (1) any Person (other than a Permitted Holder) or (2) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person and its Subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), becomes the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of Equity Interests representing more than fifty percent (50%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of Holdings beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders

-7-

unless, in any case, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of Holdings or the Borrower; or

(b)    any "Change of Control" (or any comparable term) in any document pertaining to the ABL Facilities;

(c)    the Borrower ceases to be a direct wholly owned Subsidiary of Holdings (or any Successor Holdings or other successor under 7.04(a)); or

(d)    Jo-Ann Stores ceases to be a direct wholly owned Subsidiary of the Borrower (or any Successor Borrower or other successor under 7.04(d)).

"**Chapter 11 Cases**" has the meaning assigned to such term in the recitals to this Agreement.

"**Class**" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Exchange Term Loans, Incremental Exit Loans, Term Loans, Incremental Loans, Other Loans or Extended Loans, (b) any Commitment, refers to whether such Commitment is a Commitment in respect of Exchange Term Loans, Term Loans, Other Term Commitment (and, in the case of an Other Term Commitment, the Class of Loans to which such commitment relates), or a Commitment in respect of a Class of Loans to be made pursuant to an Incremental Amendment or an Extension Offer and (c) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments.  Other Term Commitments, Other Loans, Incremental Loans and Extended Loans that have different terms and conditions shall be construed to be in different Classes.

"**Closing Date**" means April [  ], 2024.

"**Closing Date Transactions**" means, collectively, the entry of the Confirmation Order, the transactions contemplated by the Approved Plan, the funding (or deemed funding) of the Loans under this Agreement on the Closing date, the funding (or deemed funding) of the loans under the ABL Facilities on the Second Restatement Date (as defined in the ABL Credit Agreement), the consummation of the other transactions contemplated by this Agreement, the ABL Facilities Documentation, the Approved Plan or the Confirmation Order, the consummation of any other transactions in connection with the foregoing and the payment of the fees and expenses incurred in connection with any of the foregoing.

"**CME**" means CME Group Benchmark Administration Limited.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the "Collateral" (or equivalent term) as defined in any Collateral Document and shall include the Mortgaged Properties.

"**Collateral Agent**" has the meaning specified in the introductory paragraph to this Agreement.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)    the Collateral Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Section 4.01(a)(iv) or pursuant to Section 6.11 or Section 6.13 at such time, duly executed by each Loan Party thereto;

(b)    all Obligations shall have been unconditionally guaranteed by Holdings, each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary and not an Excluded Subsidiary including those that are listed on <u>Schedule II</u> hereto (each, a "**Guarantor**"), and any Restricted Subsidiary of the Borrower that Guarantees any Indebtedness incurred by the Borrower pursuant to the ABL Facilities (or is a co-borrower with the Borrower thereunder), any Junior Financing or any Credit

-8-

Agreement Refinancing Indebtedness or Permitted Pari Passu Secured Debt (or, in each case, any Permitted Refinancing thereof) shall be a Guarantor hereunder;

(c)    the Obligations and the Guaranty shall have been secured by a first-priority security interest (subject to non-consensual Liens permitted by Section 7.01) in (i) all the Equity Interests of the Borrower, (ii) all Equity Interests of each direct, wholly owned Domestic Subsidiary (other than a Domestic Subsidiary described in the following clause (iii)(A)) that is directly owned by the Borrower or any Subsidiary Guarantor and (iii) 65% of the issued and outstanding Equity Interests of (A) each wholly owned Domestic Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor and substantially all of the assets of which consist of Equity Interests in, or Equity Interests in and Indebtedness of, one or more Foreign Subsidiaries or Domestic Subsidiaries described in this clause (iii)(A), and (B) each wholly owned Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor;

(d)    except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code or making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office) in substantially all tangible and intangible personal property of the Borrower and each Guarantor (including accounts (other than deposit accounts, other bank or securities accounts or any Securitization Assets), inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, and proceeds of the foregoing), in each case, with the priority required by the Collateral Documents, in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents; *provided* that any such security interests in Current Asset Collateral shall be subject to the terms of the ABL Intercreditor Agreement; and

(e)    the Collateral Agent shall have received, each in form and substance reasonably acceptable to the Collateral Agent, (i) counterparts of a Mortgage with respect to each Material Real Property listed on Schedule 1.01F or required to be delivered pursuant to Section 6.11 and 6.13(b) (the "**Mortgaged Properties**") duly executed and delivered by the record owner of such property, (ii) fully paid Mortgage Policies in form and substance, with endorsements available in the applicable jurisdiction and in amount, reasonably acceptable to the Collateral Agent (not to exceed the fair market value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Collateral Agent, insuring the Mortgages to be valid subsisting Liens on the property described therein, subject only to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Collateral Agent may reasonably request and is available in the applicable jurisdiction, (iii) such surveys, abstracts and appraisals and such customary opinions of local counsel and other documents as the Collateral Agent may reasonably request with respect to any such Mortgaged Property, including evidence of payment by any applicable Loan Party of all title policy premiums, and related charges, mortgage recording taxes, fees and expenses required in connection with recording the Mortgages and issuing the Mortgage Policies, copies of all leases in which any Loan Party holds the lessor's interest, if any, and (iv) (A) a completed "life of the loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property duly executed and acknowledged by the appropriate Loan Parties and (B) with respect to any Mortgaged Property which is designated as a "flood hazard area" in any Flood Insurance Rate Map established by the Federal Emergency Management Agency (or any successor agency), evidence of flood insurance as required by Section 6.07 hereof.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, surveys, abstracts or appraisals with respect to, particular assets if and for so long as, in the reasonable judgment of the Collateral Agent and the Borrower, the cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance, surveys abstracts or appraisals in respect of such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

The Collateral Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the Closing

Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Mortgages, Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Agents and the Lenders pursuant to Sections 4.01(a)(iv), 6.11 or 6.13, the Guaranty, the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement (if any), the Second Lien Intercreditor Agreement (if any) and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Commitment**" means, as to each Lender, its obligation to make a Loan to the Borrower hereunder (including the Term Commitment), expressed as an amount representing the maximum principal amount of the Loan to be made by such Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Lender pursuant to an Assignment and Assumption, (ii) an Incremental Amendment, (iii) a Refinancing Amendment or (iv) an Extension.  The initial amount of each Lender's Commitment as of the Closing Date is set forth on Schedule I hereto under the caption "Term Commitment" or, otherwise, in the Assignment and Assumption, Incremental Amendment or Refinancing Amendment pursuant to which such Lender shall have assumed its Commitment, as the case may be.

"**Committed Loan Notice**" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Term SOFR Loans, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A or such other form as may be approved by the Administrative Agent (acting at the Direction of the Required Lenders) (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended from time to time, and any successor statute.

"**Company Parties**" means the collective reference to Holdings and its Subsidiaries, including the Borrower, and "**Company Party**" means any one of them.

"**Comparable Financing**" means any Indebtedness that is (a) in the form of a syndicated "term loan B" facility, (b) denominated in Dollars and (c) secured by Liens on Collateral that rank pari passu in priority with the Liens that secure the Term Loans.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C and which certificate shall in any event be a certificate of the chief financial officer (a) certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (b) setting forth reasonably detailed calculations, in the case of financial statements delivered under Section 6.01(a), beginning with the financial statements for the fiscal year of the Borrower ending February 3, 2024, of Excess Cash Flow for such fiscal year, (c) commencing with the certificate delivered pursuant to Section 6.02(a) for the first fiscal quarter ending after the Closing Date, setting forth a calculation of the Senior Secured Net Leverage Ratio as of the end of the most recent Test Period and (d) in the case of financial statements delivered under Section 6.01(a), setting forth a reasonably detailed calculation of the Net Cash Proceeds received during the applicable period by or on behalf of, Holdings or any of its Restricted Subsidiaries in respect of any Disposition subject to prepayment pursuant to Section 2.03(b)(ii)(A) and the portion of such Net Cash Proceeds that has been invested or are intended to be reinvested in accordance with Section 2.03(b)(ii)(B).

"**Conforming Changes**" means, with respect to the use, administration of or any conventions associated with SOFR or any proposed Successor Rate or Term SOFR, as applicable, any conforming changes to the definitions of "Base Rate", "SOFR", "Term SOFR" and "Interest Period", timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definitions of "Business Day" and "U.S. Government Securities Business Day", timing of

borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the discretion of the Administrative Agent determined in consultation with the Borrower, to reflect the adoption and implementation of such applicable rate(s) and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such rate exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Cash Interest Expense**" means, with respect to any Person for any period, without duplication, the cash interest expense (including that attributable to any Capitalized Lease Obligation), net of cash interest income, with respect to Indebtedness (including Disqualified Equity Interest) of such Person and its Restricted Subsidiaries (calculated on a consolidated basis in accordance with GAAP) for such period, other than non-recourse Indebtedness, including commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net cash costs under hedging agreements (other than in connection with the early termination thereof), excluding, in each case:

(i)      amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses and any other amounts of non-cash interest (including as a result of the effects of acquisition method accounting or pushdown accounting),

(ii)      interest expense attributable to the movement of the mark-to-market valuation of obligations under derivative instruments,

(iii)      costs associated with incurring or terminating Swap Contracts and cash costs associated with breakage in respect of Swap Contracts,

(iv)      commissions, discounts, yield, make-whole premium and other fees and charges (including any interest expense) incurred in connection with any Securitization Financing;

(v)      "additional interest" owing pursuant to a registration rights agreement with respect to any securities,

(vi)      any payments with respect to make-whole premiums or other breakage costs of any Indebtedness,

(vii)      penalties and interest relating to Taxes,

(viii)      accretion or accrual of discounted liabilities not constituting Indebtedness,

(ix)      interest expense attributable to Holdings or any parent thereof resulting from push-down accounting,

(x)      any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization or purchase accounting,

(xi)      any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto in connection with any acquisition or Investment permitted by this Agreement, and

(xii)      annual agency fees paid to any trustees, administrative agents and collateral agents with respect to any secured or unsecured loans, debt facilities, debentures, bonds, commercial paper facilities or other forms of Indebtedness (including any security or collateral trust arrangements related thereto).

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding cash and Cash Equivalents, amounts related to current or deferred taxes based on income or profits, assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees and derivative financial instruments, and excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to any consummated acquisition.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding (A) the current portion of any Funded Debt, (B) the current portion of interest, (C) accruals for current or deferred taxes based on income or profits, (D) accruals of any costs or expenses related to restructuring reserves, (E) revolving loans, swingline loans and letter of credit obligations under the ABL Facilities or any other revolving credit facility, (F) the current portion of any Capitalized Lease Obligation, (G) deferred revenue arising from cash receipts that are earmarked for specific projects, (H) liabilities in respect of unpaid earn-outs and (I) the current portion of any other long-term liabilities, and, furthermore, excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation any consummated acquisition.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person, including the amortization of deferred financing fees or costs for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated EBITDA**" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period:

(a)        increased by (without duplication):

(i)        (A) provision for taxes based on income or profits or capital, plus state, provincial, franchise, property or similar taxes and foreign withholding taxes and foreign unreimbursed value added taxes, of such Person for such period (including, in each case, penalties and interest related to such taxes or arising from tax examinations) deducted in computing Consolidated Net Income and (B) amounts paid to Holdings or any direct or indirect parent of Holdings in respect of taxes in accordance with Section 7.06(g), in each case under clauses (A) and (B) solely to the extent such amounts were deducted in computing Consolidated Net Income, plus

(ii)       (A) total interest expense (including (A) imputed interest on Capitalized Lease Obligations and Attributable Indebtedness (which, in each case, will be deemed to accrue at the interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligations or Attributable Indebtedness), (B) commissions, discounts and other fees, charges and expenses owed with respect to letters of credit, bankers' acceptance financing, surety and performance bonds and receivables financings, (C) amortization and write-offs of deferred financing fees, debt issuance costs, debt discounts, commissions, fees, premium and other expenses, as well as expensing of bridge, commitment or financing fees, (D) payments made in respect of hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, (E) cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than such Person or a wholly-owned Restricted Subsidiary) in connection with Indebtedness incurred by such plan or trust, (F) all interest paid or payable with respect to discontinued operations, (G) the interest portion of any deferred payment obligations) and (H) all interest on any Indebtedness that is (x) Indebtedness of others secured by any Lien on property owned or acquired by such Person or its Restricted Subsidiaries, whether or not the obligations secured thereby have been assumed, but limited to the fair market value of such property, (y) contingent obligations in respect of Indebtedness; provided that such interest expense shall be calculated after giving effect to hedging agreements related to interest rates (including associated

costs), but excluding unrealized gains and losses with respect to such hedging agreements or (z) fee and expenses paid to the Administrative Agent (in its capacity as such and for its own account) pursuant to the Loan Documents and fees and expenses paid to the administrative agent, the collateral agent, trustee or other similar Persons for any other Indebtedness permitted by Section 7.03) of such Person for such period and (B) bank fees and costs of surety bonds, in each case under this clause (B), in connection with financing activities and, in each case under clauses (A) and (B), to the extent such amounts were deducted in computing Consolidated Net Income, <u>plus</u>

(iii)    Consolidated Depreciation and Amortization Expense of such Person for such period to the extent such depreciation and amortization were deducted in computing Consolidated Net Income, <u>plus</u>

(iv)    any fees, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or the incurrence or repayment of Indebtedness permitted to be incurred hereunder including a refinancing thereof (whether or not successful) and any amendment, restatement or modification to the terms of any such transactions, deducted in computing Consolidated Net Income, <u>plus</u>

(v)    (1) the amount of any charge, cost, loss, expense  or reserve deducted in such period in computing Consolidated Net Income related to: (A) restructuring (including restructuring charges or reserves, whether or not classified as such under GAAP), severance, relocation, consolidation, integration or other similar items, (B) strategic and/or business initiatives, business optimization (including costs and expenses relating to business optimization programs, which, for the avoidance of doubt, shall include, without limitation, implementation of operational and reporting systems and technology initiatives; strategic initiatives; retention; severance; systems establishment costs; systems conversion and integration costs; contract termination costs; recruiting and relocation costs and expenses; costs, expenses and charges incurred in connection with curtailments or modifications to pension and post-retirement employee benefits plans; costs to start-up, pre-opening, opening, closure, transition and/or consolidation of distribution centers, operations, officers and facilities) including in connection with any Investment permitted hereunder, and new systems design and implementation, as well as consulting fees and any one-time expense relating to enhanced accounting function, (C) business or facilities (including greenfield facilities) start-up, opening, transition, consolidation, shut-down and closing, (D) signing, retention and completion bonuses, (E) severance, relocation or recruiting, (F) [reserved], (G) charges and expenses incurred in connection with litigation (including threatened litigation), any investigation or proceeding (or any threatened investigation or proceeding) by a regulatory, governmental or law enforcement body (including any attorney general), and (H) expenses incurred in connection with casualty events or asset sales outside the ordinary course of business and (2) any one-time costs, expenses or charges incurred in connection with (A) Permitted Acquisitions or other Investments permitted hereunder after the Closing Date or (B) the closing of any Stores or distribution centers after the Closing Date, provided that (1) amounts added back under this clause (v) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) and (2) the aggregate amount added back pursuant to this clause (v), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clauses (vi) and (x) below shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (v) and clauses (vi) and (x) below), <u>plus</u>

(vi)    the amount of costs relating to pre-opening and opening costs for Stores, signing, retention and completion bonuses, costs incurred in connection with any strategic initiatives, transition costs, consolidation and closing costs for Stores and costs incurred in connection with non-recurring (without, in any such case, limitation on the calculation hereof by Item 10(e) of Regulation S-K promulgated by the SEC) product and intellectual property development after the Closing Date, other business optimization expenses (including costs and expenses relating to business optimization programs), and new systems design and implementation costs and project start-up costs, provided that (1) amounts added back under this clause (vi) shall be reasonable and

documented in detail reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) and (2) the aggregate amount added back pursuant to this clause (vi), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clauses (v) above and (x) below shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (vi) and clauses (v) above and (x) below);  plus

(vii)    any other non-cash charges including any write offs or write downs, to the extent reducing such Consolidated Net Income for such period (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (1) the Borrower may determine not to add back such non-cash charge in the current period and (2) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period), including the following: (A) non-cash expenses in connection with, or resulting from, stock option plans, employee benefit plans or agreements or post-employment benefit plans or agreements, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other similar rights, (B) non-cash currency translation losses related to changes in currency exchange rates (including re-measurements of Indebtedness (including intercompany Indebtedness) and any net non-cash loss resulting from hedge agreements for currency exchange risk), (C) non-cash losses, expenses, charges or negative adjustments attributable to the movement in the mark-to-market valuation of hedge agreements or other derivative instruments, including the effect of FASB Accounting Standards Codification 815 and International Accounting Standard No. 9 and their respective related pronouncements and interpretations, (D) non-cash charges for deferred tax asset valuation allowances, (E) any non-cash impairment charge or asset write-off or write-down related to intangible assets (including goodwill), long-lived assets, and Investments in debt and equity securities, (F) any non-cash charges or losses resulting from any purchase accounting adjustment or any step-ups with respect to re-valuing assets and liabilities in connection with any Investments permitted hereunder, (G) all non-cash losses from Investments permitted hereunder recorded using the equity method and (H) the excess of GAAP rent expense over actual cash rent paid during such period due to the use of straight line rent for GAAP purposes; plus

(viii)    the amount of any minority interest expense deducted in calculating Consolidated Net Income, plus

(ix)    any net after-tax extraordinary, non-recurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses, and fees and expenses in connection with relocation costs, integration costs, facility consolidation and closing costs, severance costs and expenses and non-recurring compensation charges (without, in any such case, limitation on the calculation hereof by Item 10(e) of Regulation S-K promulgated by the SEC); provided that (1) amounts added back under this clause (ix) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent and (2) the aggregate amount added back pursuant to this clause (ix), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clauses (v) and (vi) above, shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (ix) and clauses (v) and (vi) above), plus

(x)    [reserved], plus

(xi)    the amount of loss on sale of receivables, Securitization Assets and related assets to any Securitization Subsidiary in connection with a Qualified Securitization Financing, plus

(xii)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back, plus

(xiii)    any costs or expenses incurred by the Borrower or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or stockholders agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of issuance of Equity Interests of the Borrower (other than Disqualified Equity Interests), in each case, solely to the extent that such cash proceeds are excluded from the calculation of the Available Amount; plus

(xiv)    [reserved], plus

(xv)    proceeds of business interruption insurance actually received (to the extent not counted in any prior period in anticipation of such receipt) or, to the extent not counted in any prior period, reasonably expected to be received, and

(b)    decreased by (without duplication):

(i)    any non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any gains that represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period (other than such cash charges that have been added back to Consolidated Net Income in calculating Consolidated EBITDA in accordance with this definition), plus

(ii)    any non-cash gains with respect to cash actually received in a prior period unless such cash did not increase Consolidated EBITDA in such prior period.

"**Consolidated First Lien Net Debt**" means, as of any date of determination, Consolidated Net Debt that is secured by a Lien on any asset or property of any Loan Party or any Restricted Subsidiary (other than any such amount of Consolidated Net Debt that is secured solely by Liens on the Collateral that are expressly subordinated to the Liens securing the Obligations).

"**Consolidated Net Debt**" means, as of any date of determination, (a) Consolidated Total Debt, minus (b) the amount of cash and Cash Equivalents on a consolidated balance sheet of the Borrower that are not "Restricted" for purposes of GAAP on such balance sheet.

"**Consolidated Net Income**" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP; *provided*, *however*, that, without duplication,

(a)    [reserved],

(b)    the Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period, whether effected through a cumulative effect adjustment or a retroactive application in each case in accordance with GAAP,

(c)    effects of adjustments (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries) in such Person's consolidated financial statements pursuant to GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded,

(d)    any net after-tax income (loss) from disposed or discontinued operations and any net after-tax gains or losses on disposal of disposed or discontinued operations shall be excluded,

(e)    any net after-tax gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or the sale or other disposition of any Equity Interests of any Person other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(f)    the Net Income for such period of any Person that is not a Subsidiary, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of the Borrower shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof in respect of such period,

(g)    (i) any net unrealized gain or loss (after any offset) resulting in such period from obligations in respect of Swap Contracts and the application of Financial Accounting Standards Board Accounting Standards Codification 815 (Derivatives and Hedging), (ii) any net gain or loss resulting in such period from currency translation gains or losses related to currency remeasurements of Indebtedness (including the net loss or gain (A) resulting from Swap Contracts for currency exchange risk and (B) resulting from intercompany Indebtedness) and all other foreign currency translation gains or losses to the extent such gain or losses are non-cash items, and (iii) any net after-tax income (loss) for such period attributable to the early extinguishment or conversion of (A) Indebtedness, (B) obligations under any Swap Contracts or (C) other derivative instruments, shall be excluded,

(h)    any impairment charge or asset write-off, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(i)    any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days), shall be excluded,

(j)    to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded, and

(k)    any non-cash (for such period and all other periods) compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by, or to, management of the Borrower or any of its Restricted Subsidiaries, shall be excluded.

"**Consolidated Total Debt**" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and the Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with any Permitted Acquisition or any other Investment permitted hereunder), consisting of Indebtedness for borrowed money, unreimbursed obligations in respect of drawn letters of credit, obligations in respect of Capitalized Leases and debt obligations evidenced by promissory notes or similar instruments; *provided* that Consolidated Total Debt shall not include Indebtedness in respect of (i) any Qualified Securitization Financing, (ii) any letter of credit, except to the extent of unreimbursed obligations in respect of drawn letters of credit (*provided* that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Debt until three (3) Business Days after such amount is drawn (it being understood

that any borrowing, whether automatic or otherwise, to fund such reimbursement shall be counted)) and (iii) obligations under Swap Contracts.

"**Consolidated Total Secured Net Debt**" means, as of any date of determination, Consolidated Net Debt that is secured by a Lien on any asset or property of any Loan Party or any Restricted Subsidiary.

"**Consolidated Working Capital**" means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities.

"**Contract Consideration**" has the meaning specified in the definition of "Excess Cash Flow."

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning specified in the definition of "Affiliate."

"**Credit Agreement Refinancing Indebtedness**" means any (a) Permitted Pari Passu Secured Debt that is designated in writing to the Administrative Agent by a Responsible Officer of the Borrower as "Credit Agreement Refinancing Indebtedness" on or prior to the date of incurrence, (b) Permitted Junior Secured Refinancing Debt, (c) Permitted Unsecured Refinancing Debt or (d) Other Loans, in each case, issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) in exchange for, or to extend, renew, replace or refinance, in whole or part, existing Loans ("**Refinanced Term Debt**"); *provided* that such exchanging, extending, renewing, replacing or refinancing Indebtedness is in an original aggregate principal amount not greater than the aggregate principal amount of the Refinanced Term Debt except by an amount equal to unpaid accrued interest and premium (including tender premium) thereon plus reasonable upfront fees and OID on such exchanging, extending, renewing, replacing or refinancing Indebtedness, plus other reasonable and customary fees and expenses in connection with such exchange, modification, refinancing, refunding, renewal, replacement or extension.

"**Current Asset Collateral**" means all the "ABL Priority Collateral" as defined in the ABL Intercreditor Agreement.

"**Daily Simple SOFR**" with respect to any applicable determination date means the SOFR published on such date on the Federal Reserve Bank of New York's website (or any successor source).

"**Debtors**" has the meaning assigned to such term in the recitals to this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.0% per annum; *provided* that with respect to the outstanding principal amount of any Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan (giving effect to Section 2.02(c)) plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Designated Assets**" means the assets set forth on Schedule 1.01B.

-17-

"**Designated Jurisdiction**" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"**DIP Credit Agreement**" has the meaning assigned to such term in the recitals to this Agreement.

"**DIP Lenders**" has the meaning assigned to such term in the recitals to this Agreement.

"**Direction of the Required Lenders**" means a written direction or instruction from Lenders constituting the Required Lenders which may be in the form of an email or other form of written communication, it being understood and agreed that the Administrative Agent may conclusively rely on any such written direction or instruction from such Specified Lender Advisor or designated Lender Advisor at the direction of the Required Lenders.  For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory," "acceptable," "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Required Lenders, such determination may be communicated by a Direction of the Required Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Required Lenders, such consent, approval or determination may be communicated by a Direction of the Required Lenders as contemplated above.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests in a Restricted Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date of the Loans at the time of issuance; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings, the Borrower or the Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by Holdings, the Borrower or the Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"**Disqualified Institution**" means:

(1)      such Persons as separately identified in writing by the Borrower and the Required Lenders to the Administrative Agent prior to the Closing Date;

(2)      any Person that is a competitor of the Borrower and identified by the Borrower in good faith in writing to the Administrative Agent from time to time after the Closing Date;

(3)      those banks, financial institutions, other institutional lenders and investors and other entities that were identified by the Borrower as such in writing to the Administrative Agent on or prior to the Closing Date; and

(4)      any Affiliates of Persons described in the foregoing clauses (1) and (2) that are readily identifiable as such solely on the basis of their names (other than any such Affiliate that is a bank, financial institution or fund (other than a Person described in clause (2) above) that regularly invest in commercial

loans or similar extensions of credit in the ordinary course of business and for which no personnel involved with the relevant competitor or Person referred to in clause (2) above make investment decisions);

*provided* that in no event shall any update to the list of Disqualified Institutions (A) be effective prior to two Business Days after receipt thereof by the Administrative Agent or (B) apply retroactively to disqualify any Persons that have previously acquired an assignment or participation interest under this Agreement or that is party to a pending trade.

Notwithstanding anything in the Loan Documents to the contrary, the Administrative Agent shall not be responsible (or have any liability) for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions thereof relating to Disqualified Institutions. Without limiting the generality of the foregoing, the Administrative Agent shall not (1) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (2) have any liability with respect to or arising out of any assignment or participation of Loans or commitments, or disclosure of confidential information, to any Disqualified Institution. The list of Disqualified Institutions may be made available by the Administrative Agent on the Platform and to prospective assignees and Participants (including Public Lenders).

"**Division**" has the meaning assigned to such term in Section 1.11.

"**Division Successor**" has the meaning assigned to such term in Section 1.11.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**ECF Percentage**" has the meaning specified in Section 2.03(b)(i).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.07(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 10.07(b)(iii)).

"**Employee Benefit Plan**" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations (other than internal reports prepared by any Loan Party or any of its Subsidiaries (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings with respect to any Environmental Liability (hereinafter "**Claims**"), including (i) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages

-19-

pursuant to any Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to the protection of the environment or, to the extent relating to exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Loan Party or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to an Employee Benefit Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from an Employee Benefit Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of their respective ERISA Affiliates concerning the imposition of withdrawal liability or written notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA; (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate an Employee Benefit Plan, the treatment of an Employee Benefit Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate an Employee Benefit Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Employee Benefit Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates, (f) a failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code) with respect to an Employee Benefit Plan, whether or not waived, (g) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to an Employee Benefit Plan, (h) the imposition of a lien under Section 303(k) of ERISA with respect to any Employee Benefit Plan or (i) a determination that any Employee Benefit Plan is in "at risk" status (within the meaning of Section 303 of ERISA).

"**Erroneous Payment**" has the meaning assigned to it in Section 9.16(a).

"**Erroneous Payment Return Deficiency**" has the meaning assigned to it in Section 9.16(d).

"**Erroneous Payment Subrogation Rights**" has the meaning assigned to it in Section 9.16(d).

US-DOCS\149885390.12

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excess Cash Flow**" means, for any period, an amount equal to the excess of:

(a)        the sum, without duplication, of:

(i)        Consolidated Net Income of the Borrower for such period,

(ii)        an amount equal to the amount of all non-cash charges (including depreciation and amortization) to the extent deducted in arriving at such Consolidated Net Income, but excluding any such non-cash charges representing an accrual or reserve for potential cash items in any future period and excluding amortization of a prepaid cash item that was paid in a prior period,

(iii)        decreases in Consolidated Working Capital for such period (other than any such decreases arising from acquisitions or Dispositions by the Borrower and the Restricted Subsidiaries completed during such period or the application of purchase accounting),

(iv)        an amount equal to the aggregate net non-cash loss on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income,

(v)        the amount deducted as tax expense in determining Consolidated Net Income to the extent in excess of cash taxes paid in such period, and

(vi)        cash receipts in respect of Swap Contracts during such period to the extent not otherwise included in such Consolidated Net Income; <u>over</u>

(b)        the sum, without duplication, of:

(i)        an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income (but excluding any non-cash credit to the extent representing the reversal of an accrual or reserve described in clause (a)(ii) above) and cash charges excluded by virtue of clauses (a) through (k) of the definition of "Consolidated Net Income,"

(ii)        without duplication of amounts deducted pursuant to clause (xi) below in prior periods, the amount of Capital Expenditures or acquisitions of intellectual property accrued or made in cash during such period to the extent financed with (A) internally generated funds or (B) the proceeds of extensions of credit under the ABL Facilities or any other revolving credit facility, in each case, of the Borrower or the Restricted Subsidiaries,

(iii)        the aggregate amount of all principal payments of Indebtedness of the Borrower and the Restricted Subsidiaries (including (A) the principal component of payments in respect of Capitalized Leases and (B) the amount of any mandatory prepayment of Loans pursuant to Section 2.03(b)(ii) to the extent required due to a Disposition that resulted in an increase to such Consolidated Net Income and not in excess of the amount of such increase, but excluding (X) all other prepayments of Loans, (Y) all prepayments in respect of the ABL Facilities and except to the extent there is an equivalent permanent reduction in commitments thereunder, all other prepayments of any other revolving credit facility and (Z) payments of any subordinated indebtedness except to the extent permitted to be paid pursuant to Section 7.12(a)) made during such period, in each case except to the extent financed with the proceeds of other long term Indebtedness (other than the proceeds of any revolving Indebtedness) of the Borrower or the Restricted Subsidiaries,

(iv)      an amount equal to the aggregate net non-cash gain on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income and the net cash loss on Dispositions to the extent otherwise added to arrive at Consolidated Net Income,

(v)      increases in Consolidated Working Capital for such period (other than any such increases arising from acquisitions or Dispositions by the Borrower and the Restricted Subsidiaries completed during such period or the application of purchase accounting),

(vi)      cash payments by the Borrower and the Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and the Restricted Subsidiaries (other than Indebtedness) to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income,

(vii)      without duplication of amounts deducted pursuant to clauses (viii) and (xi) below in prior periods, the amount of Investments made pursuant to Sections 7.02(b)(iii), (m) (but excluding such loans and advances in respect of Sections 7.06(g)(i), (g)(iv) (to the extent the amount of such Investment would not have been deducted pursuant to this clause if made by the Borrower or a Restricted Subsidiary) and (k)) and (n) and acquisitions made during such period to the extent that such Investments and acquisitions were financed with internally generated cash flow of the Borrower and the Restricted Subsidiaries and not made in reliance on any basket calculated by reference to the Available Amount,

(viii)      the amount of Restricted Payments paid during such period pursuant to Sections 7.06(g), (h) and (o), in each case to the extent such Restricted Payments were financed with internally generated cash flow of the Borrower and the Restricted Subsidiaries,

(ix)      the aggregate amount of expenditures actually made by the Borrower and the Restricted Subsidiaries from internally generated cash flow of the Borrower and the Restricted Subsidiaries during such period (including expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such period or are not deducted in calculating Consolidated Net Income,

(x)      the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by Holdings, the Borrower and the Restricted Subsidiaries during such period that are made in connection with any prepayment of Indebtedness to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income and such payments reduced Excess Cash Flow pursuant to clause (b)(iii) above or reduced the mandatory prepayment required by Section 2.03(b)(i),

(xi)      without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate consideration required to be paid in cash by the Borrower or any of the Restricted Subsidiaries pursuant to binding contracts (the "**Contract Consideration**") entered into prior to or during such period relating to Permitted Acquisitions, Capital Expenditures or acquisitions of intellectual property to be consummated or made during the period of four consecutive fiscal quarters of the Borrower following the end of such period; *provided* that, to the extent the aggregate amount of internally generated cash flow actually utilized to finance such Permitted Acquisitions, Capital Expenditures or acquisitions of intellectual property during such period of four consecutive fiscal quarters is less than the Contract Consideration, the amount of such shortfall shall be added to the calculation of Excess Cash Flow at the end of such period of four consecutive fiscal quarters,

(xii)      the amount of cash taxes paid or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, and

-22-

(xiii)    cash expenditures in respect of Swap Contracts during such period to the extent not deducted in arriving at such Consolidated Net Income.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Exchange Term Loans**" has the meaning assigned to such term in the recitals to this Agreement.

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a wholly owned Subsidiary of the Borrower or a Guarantor, (b) any Foreign Subsidiary, (c) any Domestic Subsidiary substantially all of the assets of which consist of Equity Interests in, or Equity Interests in and indebtedness of, one or more Foreign Subsidiaries or Domestic Subsidiaries described in this clause (c), (d) any Domestic Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary, (e) any Subsidiary that is prohibited or restricted by applicable Law from providing a Guaranty or if such Guaranty would require governmental (including regulatory) consent, approval, license or authorization, (f) any special purpose securitization vehicle (or similar entity), including any Securitization Subsidiary, (g) any Subsidiary that is a not-for-profit organization, (h) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), the cost or other consequences (including any adverse tax consequences) of providing the Guaranty shall be excessive in view of the benefits to be obtained by the Lenders therefrom and (i) each Unrestricted Subsidiary.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to any "keepwell, support or other agreement" for the benefit of such Guarantor and any and all guarantees of such Guarantor's Swap Obligations by other Loan Parties) at the time the Guaranty of such Guarantor, or a grant by such Guarantor of a security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes excluded in accordance with the first sentence of this definition.

"**Excluded Taxes**" means, with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) any Tax imposed on or measured by such recipient's net income or any franchise Tax (in each case, however denominated), in each case (i) imposed by a jurisdiction as a result of such recipient being organized or having its principal office or applicable Lending Office located in such jurisdiction (including, for the avoidance of doubt, any backup withholding in respect of such a tax under Section 3406 of the Code) or (ii) that are Other Connection Taxes, (b) any branch profits Tax under Section 884(a) of the Code imposed by any jurisdiction described in (a), (c) with respect to any Lender (other than any Lender becoming a party hereto pursuant to the Borrower's request under Section 3.07), any U.S. federal withholding Tax that is imposed on amounts payable to such Lender pursuant to a Law in effect at the time such Lender becomes a party hereto or designates a new Lending Office or experiences a change in circumstances (other than a Change in Law), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment or change in circumstances), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding tax pursuant to Section 3.01, (d) any withholding Tax attributable to such recipient's failure to comply with Section 3.01(c) or (h), and (e) any U.S. federal withholding Tax imposed under FATCA.

"**Existing Term Loan Agreement**" has the meaning specified in the recitals.

"**Extended Loans**" has the meaning specified in Section 2.14(a).

"**Extending Lender**" has the meaning specified in Section 2.14(a).

"**Extension**" has the meaning specified in Section 2.14(a).

-23-

"**Extension Offer**" has the meaning specified in Section 2.14(a).

"**Facility**" means the Exchange Term Loans, the Incremental Exit Loans, the Term Loans, any Extended Loans, any Incremental Loans or any Other Loans, as the context may require.

"**FATCA**" means Sections 1471 through 1474 of the Code as in effect on the Closing Date (including, for the avoidance of doubt, any agreements between governmental authorities implementing such provisions, any law implementing such agreements and any agreements entered into pursuant to Section 1471(b)(1) of the Code) and any amended or successor provisions that are substantively comparable and not materially more onerous to comply with (and, in each case, any regulations promulgated thereunder or official interpretations thereof).

"**Federal Funds Rate**" means, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; *provided* that if the Federal Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Fee Letter**" means that certain fee letter, dated as of April [  ], 2024 by and between the Administrative Agent and the Borrower.

"**First Lien Intercreditor Agreement**" means a first lien intercreditor agreement among the Collateral Agent and one or more Senior Representatives for holders of Permitted Pari Passu Secured Debt (or Permitted Refinancing thereof) substantially in the form of Exhibit H-1, with such changes thereto, taken as a whole, as the Administrative Agent reasonably determines are not materially adverse to the Lenders.

"**Flood Insurance Laws**" shall mean, collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"**Foreign Casualty Event**" has the meaning specified in Section 2.03(b)(v).

"**Foreign Disposition**" has the meaning specified in Section 2.03(b)(v).

"**Foreign Plan**" means any material employee benefit plan, program or agreement maintained or contributed to by, or entered into with, Holdings or any Subsidiary of Holdings with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"**Foreign Subsidiary**" means any direct or indirect Subsidiary that is not a Domestic Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**Funded Debt**" means all Indebtedness of the Borrower and the Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time; *provided*, *however*, that (i) accounting for leases shall be determined in accordance with generally

accepted accounting principles in the United States as in effect on the Closing Date and (ii) if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof (including through the adoption of IFRS) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through the adoption of IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(g).

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or monetary other obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness for borrowed money). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantors**" has the meaning specified in the definition of "Collateral and Guarantee Requirement." For avoidance of doubt, the Borrower may cause any Restricted Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Restricted Subsidiary to execute a joinder to the Guaranty in form and substance reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders), and any such Restricted Subsidiary shall be a Guarantor hereunder for all purposes.

"**Guaranty**" means (a) the guaranty made by Holdings and the other Guarantors in favor of the Administrative Agent on behalf of the Secured Parties pursuant to clause (b) of the definition of "Collateral and Guarantee Requirement," on the Closing Date and (b) each other guaranty and guaranty supplement delivered pursuant to Section 6.11.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, all substances, wastes, contaminants or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, and radon gas, regulated pursuant to any Environmental Law.

"**Hedge Bank**" means any Person that is an Agent, a Lender or an Affiliate of any of the foregoing on the Closing Date or at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto, whether or not such Person subsequently ceases to be an Agent, a Lender or an Affiliate of any of the foregoing.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**IFRS**" means international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements.

"**Incremental Amendment**" has the meaning specified in Section 2.12(a).

"**Incremental Exit Loans**" has the meaning assigned to such term in the recitals to this Agreement.

"**Incremental Facility Closing Date**" has the meaning specified in Section 2.12(a).

"**Incremental Loans**" has the meaning specified in Section 2.12(a).

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all obligations of such Person in respect of Disqualified Equity Interests; and

(h)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include (A) the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt and (B) in the case of Restricted Subsidiaries that are not Loan Parties, exclude loans and advances made by Loan Parties having a term not exceeding 364 days (inclusive of any roll over or extensions of terms) and made in the ordinary course of business solely to the extent that such intercompany loans and advances

-26-

are evidenced by one or more notes in form and substance reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) and pledged as Collateral. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"**Information**" has the meaning specified in Section 10.08.

"**Initial Loans**" means all loans outstanding under this Agreement immediately prior to the Closing Date.

"**Intellectual Property**" has the meaning specified in the Security Agreement.

"**Intellectual Property Security Agreements**" has the meaning specified in the Security Agreement.

"**Intercompany Subordination Agreement**" means an agreement executed by each Restricted Subsidiary of the Borrower, in substantially the form of Exhibit J.

"**Interest Coverage Ratio**" means, as of any date of determination, the ratio of (a) Consolidated EBITDA of the Borrower to (b) Consolidated Cash Interest Expense of the Borrower, in each case, for the most recent Test Period, calculated on a Pro Forma Basis.

"**Interest Payment Date**" means, (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the applicable Maturity Date; *provided* that if any Interest Period for a Term SOFR Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the applicable Maturity Date and (c) with respect to the Initial Loans, the Closing Date. Notwithstanding the foregoing, the first Interest Payment Date on the Term Loans shall be deferred until September 30, 2024.

"**Interest Period**" means as to each Term SOFR Loan, the period commencing on the date such Term SOFR Loan is disbursed or converted to or continued as a Term SOFR Loan and ending on the date one, three or six months thereafter, as selected by the Borrower in its Committed Loan Notice; provided that:

(i)      any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(iii)      no Interest Period shall extend beyond the applicable Maturity Date.

-27-

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Restricted Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on the Borrower's good faith estimate of the fair market value of such asset or property at the time such Investment is made)), without adjustment for subsequent changes in the value of such Investment, net of any return representing a return of capital with respect to such Investment.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other nationally recognized statistical rating agency selected by the Borrower.

"**IP Rights**" has the meaning specified in Section 5.15.

"**IRS**" means Internal Revenue Service of the United States.

"**Jo-Ann Stores**" has the meaning assigned to such term in the recitals to this Agreement.

"**Joint Venture**" means (a) any Person which would constitute an "equity method investee" of the Borrower or any of the Restricted Subsidiaries and (b) any Person in whom the Borrower or any of the Restricted Subsidiaries beneficially owns any Equity Interest that is not a Restricted Subsidiary (other than an Unrestricted Subsidiary).

"**Junior Financing**" means any Indebtedness in an aggregate principal amount of not less than the Threshold Amount at such time that is contractually subordinated in right of payment to the Obligations expressly by its terms.

"**Junior Financing Documentation**" means any documentation governing any Junior Financing.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Incremental Loan, any Other Loan or any Extended Loan, in each case as extended in accordance with this Agreement from time to time.

"**Laws**" means, collectively, all applicable international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."  For avoidance of doubt, each Additional Lender is a Lender to the extent any such Person has executed and delivered a Refinancing Amendment or an Incremental Amendment, as the case may be, and to the extent such Refinancing Amendment or Incremental Amendment shall have become effective in accordance with the terms hereof and thereof, and each Extending Lender shall continue to be a Lender.

"**Lender Advisors**" means (x) the Specified Lender Advisors, and (y) any other financial advisor, auditor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Required Lenders and agreed by the Borrower in its reasonable discretion.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); *provided* that in no event shall an operating lease in and of itself be deemed a Lien.

"**Limited Condition Acquisition**" means any Investment or acquisition (whether by way of merger, amalgamation, consolidation or other business combination or the acquisition of Equity Interests or otherwise) by the Borrower or one or more of its Restricted Subsidiaries permitted by this Agreement whose consummation is not conditioned on the availability of, or on obtaining, third party acquisition financing and which is designated as a Limited Condition Acquisition by the Borrower or such Restricted Subsidiary in writing to the Administrative Agent.

"**Loan**" means an extension of credit by a Lender to the Borrower under Article II.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) any Refinancing Amendment, Incremental Amendment or Extension Offer, (d) the Guaranty, (e) the Fee Letter, (f) the Collateral Documents and (g) each joinder agreement, and any other document or instrument designated by the Borrower and the Administrative Agent (acting at the Direction of the Required Lenders) as a "Loan Document.".

"**Loan Parties**" means, collectively, (a) Holdings, (b) the Borrower and (c) each other Guarantor.

"**Make-Whole Premium**" means an amount equal to (a) the present value of all required payments of interest (calculated at the rate of interest in effect on the applicable prepayment date) on the principal amount of the Loans being prepaid or repaid from the applicable prepayment date through the first anniversary of the Closing Date (excluding accrued and unpaid interest to the applicable prepayment date), which present value shall be calculated using a discount rate equal to the Treasury Rate plus 50 basis points plus (b) 2.0% of the principal amount of the Loans being repaid or prepaid; provided that, in no case shall the Make-Whole Premium be less than zero.

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" has the meaning specified in the definition of "Swap Contract."

"**Material Adverse Effect**" means any event, circumstance or condition that has had a materially adverse effect on (a) the business, operations, assets, liabilities (actual or contingent) or financial condition of Holdings and its Subsidiaries, taken as a whole, (b) the ability of the Loan Parties (taken as a whole) to perform their respective material payment obligations under any Loan Document to which any of the Loan Parties is a party or (c) the rights and remedies of the Lenders, the Collateral Agent or the Administrative Agent (taken as a whole) under any Loan Document.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater

than 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for the period of four consecutive fiscal quarters ending as of the last day of such fiscal quarter, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement (or such longer period as the Administrative Agent may agree in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP.

"**Material Intellectual Property**" shall mean any Intellectual Property owned by any Loan Party that is material to the operation of the business of Holdings and its Subsidiaries, taken as a whole (as reasonably determined by the Borrower in good faith).

"**Material Real Property**" means any real property owned by any Loan Party with a fair market value in excess of $5,000,000.

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means (i) with respect to the Term Loans that have not been extended pursuant to Section 2.14, the earliest of (a) the date that is four years after the Closing Date (the "**Original Maturity Date**"), (ii) with respect to any tranche of Extended Loans, the final maturity date as specified in the applicable Extension Offer accepted by the respective Lender or Lenders, (iii) with respect to any Other Loans, the final maturity date as specified in the applicable Refinancing Amendment and (iv) with respect to any Incremental Loans, the final maturity date as specified in the applicable Incremental Amendment; *provided*, in each case, that if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately preceding such day.

"**Maximum Incremental Amount**" means $35,000,000  (which shall for the avoidance of doubt, exclude the aggregate principal amount of the Incremental Exit Loans)  .

"**Maximum Rate**" has the meaning specified in Section 10.10.

"**Minimum Extension Condition**" has the meaning specified in Section 2.14(b).

"**Minority Investment**" means any Person other than a Subsidiary in which the Borrower or any Restricted Subsidiary owns any Equity Interests.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage Policies**" has the meaning specified in Section 6.13(b)(ii).

"**Mortgaged Properties**" has the meaning specified in paragraph (e) of the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the deeds of trust, trust deeds, deeds to secure debt, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Collateral Agent on behalf of the Lenders in form and substance reasonably satisfactory to the Collateral Agent, and any other mortgages executed and delivered pursuant to Section 6.11.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means:

(a)      with respect to the Disposition of any asset by the Borrower or any of the Restricted Subsidiaries or any Casualty Event, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash and Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any of the Restricted Subsidiaries) over (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition or Casualty Event and required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents, the ABL Facilities Documentation, Credit Agreement Refinancing Indebtedness and other Indebtedness secured on a *pari passu* basis with (or junior priority basis to) the Obligations), (B) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred by the Borrower or such Restricted Subsidiary in connection with such Disposition or Casualty Event, (C) taxes or distributions made pursuant to Section 7.06(g)(i) or (g)(iii) paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Net Cash Proceeds), (D) in the case of any Disposition or Casualty Event by a non-wholly owned Restricted Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (D)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Restricted Subsidiary as a result thereof, and (E) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (E); *provided* that no net cash proceeds calculated in accordance with the foregoing realized in any transaction or series of related transactions shall constitute Net Cash Proceeds unless such amount exceeds $10,000,000; *provided further* that no net cash proceeds calculated in accordance with the foregoing realized in any fiscal year shall constitute Net Cash Proceeds under this clause (a) in such fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $20,000,000 (and, in each case, thereafter only net cash proceeds in excess of such amount shall constitute Net Cash Proceeds under this <u>clause (a)</u>); and

(b)      (i) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary or any Permitted Equity Issuance by the Borrower, the excess, if any, of (A) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (B) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance and (ii) with respect to any Permitted Equity Issuance by any direct or indirect parent of the Borrower, the amount of cash from such Permitted Equity Issuance contributed to the capital of the Borrower.

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"**Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA of the Borrower for such Test Period.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07.

"**Non-Excluded Taxes**" means all Taxes other than Excluded Taxes and Other Taxes.

"**Non-Loan Party**" means any Subsidiary of the Borrower that is not a Loan Party.

"**Non-US Lender**" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Note**" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender.

"**Obligations**" means all (a) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, including without limitation the Applicable Prepayment Amount, (b) obligations of any Loan Party arising under any Secured Hedge Agreement, (c) Cash Management Obligations and (d) Erroneous Payment Subrogation Rights. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and any of their Subsidiaries to the extent they have obligations under the Loan Documents) include the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document; *provided* that the Obligations shall exclude any Excluded Swap Obligations.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**OID**" means original issue discount.

"**Organization Documents**" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Original Maturity Date**" has the meaning specified in the definition of "Maturity Date.".

"**Other Applicable Indebtedness**" has the meaning specified in Section 2.03(b)(ii)(A).

"**Other Connection Taxes**" means, with respect to any Lender, any Agent or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, Taxes imposed as a result of a present or former connection between such Lender, recipient or any Agent and the jurisdiction imposing such Tax (other than connections arising from such Lender, recipient or any Agent

US-DOCS\149885390.12

having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Loans**" means one or more Classes of Loans that result from a Refinancing Amendment.

"**Other Taxes**" means any and all present or future stamp, court or documentary intangible, recording, filing or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document excluding, in each case, Other Connection Taxes that result from an Assignment and Assumption or other assignment (other than an assignment made pursuant to Section 3.07).

"**Other Term Commitments**" means one or more Classes of Loan commitments hereunder that result from a Refinancing Amendment.

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Parent**" has the meaning assigned to such term in the recitals to this Agreement.

"**Participant**" has the meaning specified in Section 10.07(d).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**Payment Recipient**" has the meaning assigned to it in Section 9.16(a).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Permitted Acquisition**" has the meaning specified in Section 7.02(i).

"**Permitted Equity Issuance**" means any sale or issuance of any Qualified Equity Interests of the Borrower or any direct or indirect parent of the Borrower, in each case to the extent permitted hereunder.

"**Permitted Holder**" means any of (a) any beneficial owner in the common equity of Parent as of the Closing Date, (b) any of the Controlled Affiliates (excluding any portfolio companies or of any of their Controlled Affiliates) of any of the Persons specified in clause (a) above and (c) any "group" within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act (or any successor provision) of which any of the foregoing are members; provided that in the case of such "group" and without giving effect to the existence of such "group" or any other "group", such Persons specified in clauses (a) and (b) above, individually or collectively, have beneficial ownership, directly or indirectly, of more than 50% of the total voting power of the voting stock of Parent or any of its direct or indirect parent entities held by such "group".

"**Permitted Junior Secured Refinancing Debt**" means any secured Indebtedness incurred by the Borrower and/or any Subsidiary Guarantor in the form of one or more series of second-lien secured notes or second-lien secured loans; provided that (i) such Indebtedness is secured by the Collateral on a second-priority basis with the Obligations and is not secured by any property or assets of the Borrower or any Subsidiary other than the Collateral, (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, (iii) such Indebtedness does not mature or have scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (other than customary offers to repurchase upon a change of control, asset sale or casualty event and customary acceleration rights after an event of default) prior to the Latest Maturity Date at the time such Indebtedness is incurred, (iv) the security agreements relating to such Indebtedness are substantially the same as the Collateral Documents (with such differences as are reasonably satisfactory to the Collateral Agent), (v) such Indebtedness is not guaranteed by any Subsidiaries other than the Subsidiary Guarantors and (vi) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to or

otherwise subject to the provisions of (A) the ABL Intercreditor Agreement and (B) a Second Lien Intercreditor Agreement; *provided* that if such Indebtedness is the initial Permitted Junior Secured Refinancing Debt incurred by the Borrower, then Holdings, the Borrower, the Subsidiary Guarantors, the Collateral Agent and the Senior Representative for such Indebtedness shall have executed and delivered a Second Lien Intercreditor Agreement. Permitted Junior Secured Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"**Permitted Pari Passu Secured Debt**" means any secured Indebtedness incurred by the Borrower and/or any Subsidiary Guarantor in the form of one or more series of senior secured notes or loans; *provided* that (i) such Indebtedness is secured by the Collateral on a *pari passu* basis (but without regard to the control of remedies) with the Obligations and is not secured by any property or assets of Holdings or any Subsidiary other than the Collateral, (ii) either (x) the aggregate principal amount of Permitted Pari Passu Secured Debt previously issued under this clause (x), when aggregated with the aggregate principal amount of Incremental Loans previously borrowed (and the aggregate principal amount of Permitted Ratio Debt incurred), does not exceed the Maximum Incremental Amount; *provided* that any Indebtedness incurred in reliance on this clause (x) shall be subject to the provisions of Section 2.12(a)(e) to the same extent as if such Indebtedness was in the form of Incremental Loans or (y) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, (iii) such Indebtedness does not mature or have scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (other than (w) customary offers to repurchase upon a change of control, asset sale or casualty event, (x) customary acceleration rights after an event of default, (y) customary rollover (or equivalent repayment) provisions in any bridge facility or (z) with the proceeds of any Permitted Refinancing thereof) prior to the Latest Maturity Date at the time such Indebtedness is incurred, (iv) the security agreements relating to such Indebtedness are substantially the same as the Collateral Documents (with such differences as are reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders)), (v) such Indebtedness is not guaranteed by any Subsidiaries other than the Subsidiary Guarantors and (vi) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to or otherwise subject to the provisions of (A) the ABL Intercreditor Agreement and (B) a First Lien Intercreditor Agreement; *provided* that if such Indebtedness is the initial Permitted Pari Passu Secured Debt incurred by the Loan Parties, then the Loan Parties, the Collateral Agent and the Senior Representative for such Indebtedness shall have executed and delivered a First Lien Intercreditor Agreement. Permitted Pari Passu Secured Debt will include any Registered Equivalent Notes issued in exchange therefor.

"**Permitted Ratio Debt**" means Indebtedness of the Borrower and/or any Subsidiary Guarantor *provided* that:

(a)    such Indebtedness does not mature prior to the date that is one hundred and eighty one (181) days after the Latest Maturity Date at the time such Indebtedness is incurred (except that Indebtedness may have an initial maturity that is earlier than the Latest Maturity Date so long as such Indebtedness automatically converts to Indebtedness maturing after the Latest Maturity Date subject only to the condition that no payment event of default or bankruptcy (with respect to the Borrower and its Subsidiaries) event of default exists on the initial maturity date);

(b)    such Indebtedness has no scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (other than (w) customary offers to repurchase upon a change of control, asset sale or casualty event, (x) customary acceleration rights after an event of default, (y) customary rollover (or equivalent repayment) provisions in any bridge facility or (z) from the proceeds of a Permitted Refinancing thereof) prior to the date that is one hundred and eighty one (181) days after the Latest Maturity Date at the time such Indebtedness is incurred;

(c)    immediately after giving effect thereto and to the use of the proceeds thereof (but excluding any cash proceeds thereof), no Event of Default shall exist or result therefrom (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 8.01(a) or 8.01(f) as of the Transaction Agreement Date); and

(d)    immediately after giving effect to the issuance, incurrence, or assumption of such Indebtedness:

(x)        in the case of Pari Passu Secured Debt, the Senior Secured Net Leverage Ratio after giving Pro Forma Effect to the incurrence of such Indebtedness is less than or equal to (I) 2.50:1.00 or (II) if any such Indebtedness is incurred to finance a Permitted Acquisition or other permitted Investment, the Total Secured Net Leverage Ratio immediately prior to the incurrence of such Indebtedness;

(y)        in the case of Indebtedness secured solely by Liens on the Collateral ranking junior to the Liens securing the Obligations pursuant to a Second Lien Intercreditor Agreement, the Total Secured Net Leverage Ratio after giving Pro Forma Effect to the incurrence of such Indebtedness is less than or equal to (I) 3.50:1.00 or (II) if any such Indebtedness is incurred to finance a Permitted Acquisition or other permitted Investment, the Total Secured Net Leverage Ratio immediately prior to the incurrence of such Indebtedness; and

(z)        in the case of Indebtedness that is unsecured or secured by assets that do not constitute Collateral, either (A) the Net Leverage Ratio after giving Pro Forma Effect to the incurrence of such Indebtedness and the application of proceeds therefrom is less than or equal to (I) 4.00:1.00 [or (II) if any such Indebtedness is incurred to finance a Permitted Acquisition or other permitted Investment, the Net Leverage Ratio immediately prior to the incurrence of such Indebtedness or (III) the Interest Coverage Ratio after giving Pro Forma Effect to the incurrence of such Indebtedness and the application of proceeds thereof is at least (1) 2.00:1.00 or (2) if any such Indebtedness is incurred to finance a Permitted Acquisition or other permitted Investment, the Interest Coverage Ratio immediately prior to the incurrence of such Indebtedness.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium (including tender premiums) thereon, plus reasonable OID and upfront fees plus other fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(b) or Section 7.03(e), such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), at the time thereof, no Event of Default shall have occurred and be continuing, (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is Junior Financing, (i) such modification, refinancing, refunding, renewal, replacement or extension shall constitute Junior Financing on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (ii) the terms and conditions (excluding as to subordination, pricing, premiums and optional prepayment or redemption provisions) of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, are not materially less favorable to the Loan Parties or the Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended; *provided* that a certificate of a Responsible Officer of the Borrower delivered to the Administrative Agent at least five (5) Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees) and (iii) such modification, refinancing, refunding, renewal or extension is incurred by the Person who is the obligor of the Indebtedness being modified, refinanced, refunded, renewed or extended and no additional obligors become liable for such Indebtedness, and (e) in the case of any Permitted Refinancing in respect of the ABL Facilities, such Permitted Refinancing is secured only by assets pursuant to one or more security agreements permitted by and subject to the ABL Intercreditor Agreement.

"**Permitted Unsecured Refinancing Debt**" means any unsecured Indebtedness incurred by the Borrower and/or any Subsidiary Guarantor in the form of one or more series of unsecured notes or loans; *provided* that (i) such Indebtedness is not secured by any property or assets of the Borrower or any Restricted Subsidiary, (ii)

such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, (iii) such Indebtedness does not mature or have scheduled amortization prior to the Latest Maturity Date at the time such Indebtedness is incurred (other than customary offers to repurchase upon a change of control or asset sale and customary acceleration rights after an event of default), and (iv) such Indebtedness is not guaranteed by any Subsidiaries other than the Subsidiary Guarantors.  Permitted Unsecured Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Platform**" has the meaning specified in Section 6.02.

"**Pledged Debt**" has the meaning specified in the Security Agreement.

"**Pledged Equity**" has the meaning specified in the Security Agreement.

"**Prepetition Credit Agreement**" has the meaning assigned to such term in the recitals to this Agreement.

"**Prepetition Lenders**" has the meaning assigned to such term in the recitals to this Agreement.

"**Prepetition Loans**" has the meaning assigned to such term in the recitals to this Agreement.

"**Pro Forma Basis**" and "**Pro Forma Effect**" mean, with respect to compliance with any test or covenant or calculation hereunder, or the calculation of Consolidated EBITDA hereunder, the determination or calculation of such test, covenant, ratio or Consolidated EBITDA (including in connection with Specified Transactions) in accordance with Section 1.08.

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments and, if applicable and without duplication, Loans of such Lender under the applicable Facility or Facilities at such time and the denominator of which is the amount of the Aggregate Commitments and, if applicable and without duplication, Loans under the applicable Facility or Facilities at such time.

"**Public Lender**" has the meaning specified in Section 6.02.

"**QFC Credit Support**" has the meaning specified in Section 10.24.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualified Securitization Financing**" means any Securitization Financing of a Securitization Subsidiary that meets the following conditions:  (a) such Qualified Securitization Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the Securitization Subsidiary, (b) all sales and/or contributions of Securitization Assets and related assets to the Securitization Subsidiary are made at fair market value and (c) the financing terms, covenants, termination events and other provisions thereof, including any Standard Securitization Undertakings, shall be market terms.  The grant of a security interest in any Securitization Assets of the Borrower or any of the Restricted Subsidiaries (other than a Securitization Subsidiary) to secure Indebtedness under this Agreement prior to engaging in any Securitization Financing shall not be deemed a Qualified Securitization Financing.

"**Quarterly Financial Statements**" means the unaudited condensed consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the most recent fiscal quarters after the date of the Annual Financial Statements and ended at least forty-five (45) days before the Closing Date.

"**Reference Date**" has the meaning specified in the definition of "Available Amount."

"**Refinanced Loans**" has the meaning specified in Section 10.01.

"**Refinancing Amendment**" means an amendment to this Agreement in form and substance reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower executed by each of (a) the Borrower, (b) the Administrative Agent (whose consent shall not be unreasonably withheld) and (c) each Additional Lender and Lender that agrees to provide any portion of the Other Loans being incurred pursuant thereto, in accordance with Section 2.13.

"**Refinanced Term Debt**" has the meaning specified in the definition of "Credit Agreement Refinancing Indebtedness."

"**Register**" has the meaning specified in Section 10.07(c).

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"**Related Adjustment**" means, in determining any Successor Rate, the first relevant available alternative set forth in the order below that can be determined by the Administrative Agent applicable to such Successor Rate:

> (A)    the spread adjustment, or method for calculating or determining such spread adjustment, that has been selected or recommended by the Relevant Governmental Body for the relevant Pre-Adjustment Successor Rate (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto); or

> (B)    the spread adjustment that would apply (or has previously been applied) to the fallback rate for a derivative transaction referencing the ISDA Definitions (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto).

"**Related Indemnified Person**" of an Indemnitee means (a) any controlling person or controlled affiliate of such Indemnitee, (b) the respective directors, officers, or employees of such Indemnitee or any of its controlling persons or controlled affiliates and (c) the respective agents of such Indemnitee or any of its controlling persons or controlled affiliates, in the case of this clause (c), acting at the instructions of such Indemnitee, controlling person or such controlled affiliate; *provided* that each reference to a controlled affiliate or controlling person in this definition shall pertain to a controlled affiliate or controlling person involved in the negotiation or syndication of the Facility or the ABL Facilities.

"**Relevant Governmental Body**" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"**Replacement Loans**" has the meaning specified in Section 10.01.

"**Reportable Event**" means, with respect to any Employee Benefit Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Repricing Transaction**" means the prepayment, refinancing, substitution or replacement of all or a portion of the Term Loans with the incurrence by the Borrower or any Subsidiary of any debt financing the primary purpose of which is to reduce the effective interest cost or weighted average yield (with the comparative determinations to be made by the Administrative Agent consistent with generally accepted financial practices, after

-37-

giving effect to, among other factors, margin, interest rate floors, upfront or similar fees or original issue discount shared with all providers of such financing, but excluding the effect of any arrangement, structuring, syndication or other fees payable in connection therewith that are not shared with all providers of such financing, and without taking into account any fluctuations in the Term SOFR) of the Term Loans, including without limitation, as may be effected through any amendment to this Agreement relating to the interest rate for, or weighted average yield of, such Term Loans or the incurrence of any Replacement Loans; provided, that in each case, the term "Repricing Transaction" shall exclude any prepayment, refinancing, substitution or replacement of all or a portion of the Term Loans in connection with any transaction that would, if consummated, constitute a Transformative Acquisition.

"**Required Facility Lenders**" means, with respect to any Facility on any date of determination, Lenders having more than 50% of the sum of (i) the outstanding Loans under such Facility and (ii) the aggregate unused Commitments under such Facility.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the sum of the (a) outstanding Loans and (b) aggregate unused Commitments.

"**Rescindable Amount**" has the meaning assigned to such term in Section 2.10(a)(ii).

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, treasurer or controller of a Loan Party, solely for purposes of the delivery of incumbency certificates, the secretary or any assistant secretary of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of Holdings, the Borrower or any of its Restricted Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or Holdings' stockholders, partners or members (or the equivalent Persons thereof) other than (i) the payment of compensation in the ordinary course of business to holders of any such Equity Interests who are employees or service providers of Holdings (or any direct or indirect parent thereof) or any Subsidiary solely in their capacity as employees or service providers and (ii) other than payments of intercompany indebtedness permitted under this Agreement, unless such payments are made in the form of dividends or other distributions that would otherwise be classified as Restricted Payments hereunder.

"**Restricted Subsidiary**" means any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means disbursements and payments in immediately available funds.

"**Sanctions**" means any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, His Majesty's Treasury ("**HMT**") or other relevant sanctions authority.

"**Scheduled Unavailability Date**" has the meaning specified in Section 3.03(b)(ii).

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Lien Intercreditor Agreement**" means a junior lien intercreditor agreement among the Collateral Agent, the ABL Administrative Agent and one or more Senior Representatives, including one or more Senior Representatives for the holders of Permitted Junior Secured Refinancing Debt or Permitted Ratio Debt substantially in the form of Exhibit H-2, with such changes thereto, taken as a whole, as are reasonably determined by the Administrative Agent (acting at the Direction of the Required Lenders) to be not materially adverse to the Lenders.

"**Secured Hedge Agreement**" means any Swap Contract permitted under Section 7.03(f) that is entered into by and between any Loan Party or any Restricted Subsidiary and any Hedge Bank; and designated in writing by the Hedge Bank and the Borrower to the Administrative Agent as a "Secured Hedge Agreement."

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, each Hedge Bank, each Cash Management Bank, the Supplemental Administrative Agent and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.01(b).

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Securitization Assets**" means the accounts receivable, royalty and other similar rights to payment subject to a Qualified Securitization Financing and the proceeds thereof.

"**Securitization Fees**" means distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees paid to a Person that is not a Securitization Subsidiary in connection with any Qualified Securitization Financing.

"**Securitization Financing**" means any transaction or series of transactions that may be entered into by the Borrower or any of its Subsidiaries pursuant to which the Borrower or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Securitization Subsidiary (in the case of a transfer by the Borrower or any of its Subsidiaries) or (b) any other Person (in the case of a transfer by a Securitization Subsidiary), or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries, and any assets related thereto, including all collateral securing such Securitization Assets, all contracts and all guarantees or other obligations in respect of such Securitization Assets, proceeds of such Securitization Assets and other assets that are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving Securitization Assets.

"**Securitization Repurchase Obligation**" means any obligation of a seller of Securitization Assets in a Qualified Securitization Financing to repurchase Securitization Assets arising as a result of a breach of a Standard Securitization Undertaking, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"**Securitization Subsidiary**" means a wholly owned Subsidiary of the Borrower (or another Person formed for the purposes of engaging in a Qualified Securitization Financing in which the Borrower or any Subsidiary of the Borrower makes an Investment and to which the Borrower or any Subsidiary of the Borrower transfers Securitization Assets and related assets) that engages in no activities other than in connection with the financing of Securitization Assets of the Borrower or its Subsidiaries, all proceeds thereof and all rights (contingent and other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the board of directors of the Borrower or such other Person (as provided below) as a Securitization Subsidiary and (a) no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by Holdings, the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary (excluding guarantees of obligations (other than the principal of, and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates Holdings, the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, in any way other than pursuant to Standard

-39-

Securitization Undertakings or (iii) subjects any property or asset of Holdings, the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings, (b) with which none of Holdings, the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, has any material contract, agreement, arrangement or understanding other than on terms which the Borrower reasonably believes to be no less favorable to Holdings, the Borrower or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Borrower and (c) to which none of Holdings, the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.  Any such designation by the board of directors of the Borrower or such other Person shall be evidenced to the Administrative Agent by delivery to the Administrative Agent of a certified copy of the resolution of the board of directors of the Borrower or such other Person giving effect to such designation and a certificate executed by a Responsible Officer of the Borrower certifying that such designation complied with the foregoing conditions.

"**Security Agreement**" means, collectively, the Security Agreement executed by the Loan Parties on the Closing Date, together with each other Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"**Security Agreement Supplement**" has the meaning specified in the Security Agreement.

"**Senior Representative**" means, with respect to any series of Permitted Pari Passu Secured Debt, Permitted Junior Secured Refinancing Debt, Permitted Ratio Debt or any Permitted Refinancing thereof, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Senior Secured Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA of the Borrower for such Test Period.

"**SOFR**" means the Secured Overnight Financing Rate as administered by the Federal Reserve Bank of New York (or a successor administrator).

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the assets of such Person exceeds its debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person is greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person is able to pay its debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured and (d) such Person is not engaged in, and is not about to engage in, business for which it has unreasonably small capital.  The amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

"**SPC**" has the meaning specified in Section 10.07(g).

"**Specified Lender Advisors**" means (i) Gibson, Dunn & Crutcher LLP, as legal counsel to the Lenders and (ii) Lazard Ltd., as financial advisor to the Lenders.

"**Specified Representations**" means those representations and warranties made by the Borrower in Sections 5.01(a) (with respect to organizational existence only), 5.01(b)(ii), 5.02(a), 5.02(b)(i), 5.02(b)(iii), 5.04, 5.13, 5.16, 5.18 and 5.19.

"**Specified Transaction**" means any Investment that results in a Person becoming a Restricted Subsidiary, any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary, any Permitted Acquisition, any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower, any

Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or a Store or any Disposition of a business unit, line of business or division or a Store of the Borrower or a Restricted Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise, or any incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes), Restricted Payment or Incremental Loan that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"**Standard Securitization Undertakings**" means representations, warranties, covenants and indemnities entered into by the Borrower or any Subsidiary of the Borrower that are customary in a Securitization Financing.

"**Store**" means any retail store (which includes any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by the Borrower or any Restricted Subsidiary.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, charitable foundations) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than Holdings.

"**Successor Borrower**" has the meaning specified in Section 7.04(d).

"**Successor Holdings**" has the meaning specified in Section 7.04(e).

"**Successor Rate**" has the meaning specified in Section 3.03(b).

"**Supplemental Administrative Agent**" and "**Supplemental Administrative Agents**" have the meanings specified in Section 9.12(a).

"**Supported QFC**" has the meaning specified in Section 10.24.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligations**" means with respect to any Guarantor any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance

therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

"**Tax Indemnitee**" has the meaning given to such term in Section 3.01(e).

"**Term Priority Collateral**" has the meaning assigned to such term in the ABL Intercreditor Agreement.

"**Test Period**" in effect at any time means the most recent period of four consecutive fiscal quarters of the Borrower ended on or prior to such time (taken as one accounting period) in respect of which financial statements for each quarter or fiscal year in such period have been or are required to be delivered pursuant to Section 4.01(g) or Section 6.01(a) or (b), as applicable; *provided* that, prior to the first date that financial statements have been or are required to be delivered pursuant to Section 6.01(a) or (b), the Test Period in effect shall be the period of four consecutive fiscal quarters of the Borrower ended February 3, 2024. A Test Period may be designated by reference to the last day thereof (i.e., the "February 3, 2024 Test Period" refers to the period of four consecutive fiscal quarters of the Borrower ended February 3, 2024), and a Test Period shall be deemed to end on the last day thereof.

"**Term Commitment**" means, with respect to each Term Lender, its commitment to make a Term Loan on the Closing Date in an aggregate principal amount equal to $[  ].

"**Term Lender**" means a Lender with a Term Commitment and/or Term Loans.

"**Term Loan**" has the meaning assigned to such term in the recitals of this Agreement.

"**Term SOFR**" means:

(a)        for any Interest Period with respect to a Term SOFR Loan, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the commencement of such Interest Period with a term equivalent to such Interest Period; provided that if the rate is not published prior to 11:00 a.m. on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto; and

(b)        for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to such date with a term of one month commencing that day; provided that if the rate is not published prior to 11:00 a.m. on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto;

*provided* that if Term SOFR determined in accordance with either of the foregoing provisions (a) or (b) of this definition would otherwise be less than 0.75%, Term SOFR shall be deemed to be 0.75% for purposes of this Agreement.

"**Term SOFR Loan**" means a Loan that bears interest at a rate based on clause (a) of the definition of Term SOFR.

"**Term SOFR Replacement Date**" has the meaning specified in Section 3.03(b).

"**Term SOFR Screen Rate**" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Administrative Agent (acting at the Direction of the Required

Lenders)) and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"**Threshold Amount**" means $45,000,000.

"**Total Assets**" means the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 6.01(a) or (b) or, for the period prior to the time any such statements are so delivered pursuant to Section 6.01(a) or (b), the Quarterly Financial Statements.

"**Total Secured Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Secured Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA of the Borrower for such Test Period.

"**Transaction Agreement Date**" has the meaning assigned to such term in Section 1.10

"**Transformative Acquisition**" shall mean any acquisition by Holdings or any of its Restricted Subsidiaries that either (a) is not permitted by the terms of this Agreement (other than any such acquisition that would be prohibited solely by Section 7.13) immediately prior to the consummation of such acquisition or (b) if permitted by the terms of this Agreement immediately prior to the consummation of such acquisition, would not provide Holdings and its Restricted Subsidiaries with adequate flexibility under this Agreement for the continuation and/or expansion of their combined operations following such consummation, as determined by the Borrower acting in good faith.

"**TSA**" means the Transaction Support Agreement, dated as of March 15, 2024 among the Loan Parties, the Lenders and other parties thereto.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Term SOFR Loan.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Uniform Commercial Code**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning given to such term in Section 3.01(c).

"**Unrestricted Subsidiary**" means (i) each Securitization Subsidiary and (ii) any Subsidiary of the Borrower designated by the board of directors of the Borrower as an Unrestricted Subsidiary pursuant to Section 6.14 subsequent to the Closing Date, in each case, until such Person ceases to be an Unrestricted Subsidiary of the Borrower in accordance with Section 6.14 or ceases to be a Subsidiary of the Borrower.

"**U.S. Government Securities Business Day**" means any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the

Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"**U.S. Lender**" means any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (b) the then outstanding principal amount of such Indebtedness; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Refinanced Term Debt or any Indebtedness that is being modified, refinanced, refunded, renewed, replaced or extended (the "**Applicable Indebtedness**"), the effects of any prepayments or amortization made on such Applicable Indebtedness prior to the date of the applicable modification, refinancing, refunding, renewal, replacement or extension shall be disregarded.

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) nominal shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    (i)  The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(d)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

SECTION 1.03    Accounting Terms.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  For purposes of calculating any consolidated amounts necessary to determine compliance by any Person and, if applicable, its Restricted Subsidiaries with any ratio or other financial covenant in this Agreement, Unrestricted Subsidiaries shall be excluded.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Requisite Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided* that, until so amended, (A) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (B) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding the foregoing or the definition of "Capitalized Leases", only those leases (assuming for purposes hereof that such leases were in existence on the Closing Date) that would constitute Capitalized Leases (including leases that are classified as "Financing Leases" for purposes of GAAP) in conformity with GAAP as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)" shall be considered Capitalized Leases hereunder or under any other Loan Document, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or prepared, as applicable, in accordance therewith; provided that all financial statements required to be provided hereunder may, at the option of the Borrower, be prepared in accordance with GAAP without giving effect to the foregoing treatment of Capitalized Leases.

SECTION 1.04    Rounding.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05    References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 1.06    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

SECTION 1.07    Available Amount Transactions.  If more than one action occurs on any given date the permissibility of the taking of which is determined hereunder by reference to the amount of the Available Amount immediately prior to the taking of such action, the permissibility of the taking of each such action shall be determined independently and in no event may any two or more such actions be treated as occurring simultaneously, i.e. each transaction must be permitted under the Available Amount as so calculated.

SECTION 1.08    Pro Forma Calculations.

(a)    Notwithstanding anything to the contrary herein, Consolidated EBITDA and any financial ratio or test, including the Senior Secured Net Leverage Ratio, the Total Secured Net Leverage Ratio, the Net Leverage Ratio and the Interest Coverage Ratio shall be calculated in the manner prescribed by this Section 1.08; *provided* that, notwithstanding anything to the contrary in clause (b), (c) or (d) of this Section 1.08, when calculating the Senior Secured Net Leverage Ratio for purposes of Section 2.03(b)(i), the events described in this Section 1.08 that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect.

(b)    For purposes of calculating Consolidated EBITDA or Consolidated Cash Interest Expense and any financial ratios or tests, including the Senior Secured Net Leverage Ratio, the Total Secured Net Leverage Ratio, the Net Leverage Ratio and the Interest Coverage Ratio, Specified Transactions (and the incurrence or repayment of any Indebtedness in connection therewith) that have been made (i) during the applicable Test Period or (ii) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (any increase or decrease in Consolidated EBITDA and Consolidated Cash Interest Expense and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period.  If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.08, then the Senior Secured Net Leverage Ratio, the Total Secured Net Leverage Ratio, the Net Leverage Ratio, the Interest Coverage Ratio and Consolidated EBITDA shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.08.

(c)    [Reserved].

(d)    In the event that the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of the Senior Secured Net Leverage Ratio and the Net Leverage Ratio, as the case may be (in each case, other than Indebtedness incurred or repaid under the ABL Facility or any other revolving credit facility in the ordinary course of business for working capital purposes), (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then the Senior Secured Net Leverage Ratio, Total Secured Net Leverage Ratio, the Net Leverage Ratio and the Interest Coverage Ratio shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(e)    For purposes of making any computation of the Interest Coverage Ratio on a Pro Forma Basis:

(1)    if any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date for which a determination under this definition is made had been the applicable rate for the entire period (taking into account any Swap Contracts applicable to such Indebtedness if such Swap Contract has a remaining term in excess of 12 months);

(2)    interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP;

(3)    interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Borrower may designate.

SECTION 1.09    Currency Equivalents Generally.

(a)      For purposes of determining compliance with Sections 7.01, 7.02 and 7.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

(b)      For purposes of determining the Senior Secured Net Leverage Ratio and the Net Leverage Ratio amounts denominated in a currency other than Dollars will be converted to Dollars at the currency exchange rates used in preparing the Borrower's financial statements corresponding to the Test Period with respect to the applicable date of determination and will, in the case of Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of Swap Contracts permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

SECTION 1.10      Limited Condition Acquisitions.  In connection with any action being taken in connection with a Limited Condition Acquisition for purposes of determining

(a)      whether any Indebtedness that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in compliance with Section 7.03 or Section 2.12;

(b)      whether any Lien being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in accordance with Section 7.01 or Section 2.12;

(c)      whether any other transaction undertaken or proposed to be undertaken in connection with such Limited Condition Acquisition complies with the covenants or agreements contained in this Agreement; and

(d)      any calculation of the ratios or baskets, including the Net Leverage Ratio, Senior Secured Net Leverage Ratio, Consolidated Net Income, Consolidated EBITDA and/or pro forma cost savings and baskets determined by reference to Consolidated EBITDA or Total Assets and whether a Default or Event of Default exists in connection with the foregoing:

at the option of the Borrower, the date that the definitive agreement for such Limited Condition Acquisition is entered into (the "**Transaction Agreement Date**") may be used as the applicable date of determination, as the case may be, in each case with such pro forma adjustments as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Pro Forma Basis" or "Consolidated EBITDA."  For the avoidance of doubt, if the Borrower elects to use the Transaction Agreement Date as the applicable date of determination in accordance with the foregoing, (a) any fluctuation or change in the Net Leverage Ratio, Senior Secured Net Leverage Ratio, Consolidated Net Income, Consolidated EBITDA and/or Total Assets of the Borrower from the Transaction Agreement Date to the date of consummation of such Limited Condition Acquisition will not be taken into account for purposes of determining whether any Indebtedness or Lien that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred, or whether any other transaction undertaken in connection with such Limited Condition Acquisition by the Borrower or any of the Restricted Subsidiaries complies with the Loan Documents and (b) after the Transaction Agreement Date and until such Limited Condition Acquisition is consummated or the definitive agreements in respect thereof are terminated or expire, such Limited Condition Acquisition and all transactions proposed to be undertaken in connection therewith (including without limitation the incurrence of Indebtedness and Liens) will be given Pro Forma Effect when determining compliance of other transactions (including without limitation the incurrence of Indebtedness and Liens unrelated to such Limited Condition Acquisition) that are consummated after the Transaction Agreement Date and on or prior to the date of consummation of such Limited Condition Acquisition and any such transactions (including without limitation any incurrence of Indebtedness and the use of proceeds thereof) will be deemed to have occurred on the Transaction Agreement Date and be outstanding thereafter for purposes of calculating any baskets or ratios under the Loan Documents after the Transaction Agreement Date and before the date of consummation of such Limited Condition Acquisition (or the date the definitive agreements in respect thereof are terminated or expire); *provided* that solely with respect to Restricted Payments only (and only until such time as the applicable Limited Condition Acquisition has been consummated or the definitive documentation for such Limited Condition Acquisition is terminated), such calculation shall

-47-

also be made on a standalone basis without giving effect to such Limited Condition Acquisition and the other transactions in connection therewith.

SECTION 1.11    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws) (each, a "**Division**"): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person (such different Person, a "**Division Successor**"), then it shall be deemed to have been transferred from the original Person to the Division Successor, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

# ARTICLE II

## The Commitments and Borrowings

SECTION 2.01    The Loans.

(a)    Each Lender (under and as defined in the DIP Credit Agreement) holding Initial DIP Loans (as defined in the DIP Credit Agreement) hereby, severally and not jointly, exchanges, converts or otherwise deems satisfied all of the Obligations (as defined in the DIP Credit Agreement) owing to such Lender under the DIP Credit Agreement in respect of the Initial DIP Loans (including all of the outstanding principal amount thereof all accrued and unpaid interest, fees, premiums and other obligations, including any fees or other amounts payable in kind pursuant to the DIP Credit Agreement or the DIP Order, in each case, on account thereof) (such amount, such Lender's "Exchange Amount") on the Closing Date for Exchange Term Loans deemed made by such Lender to the Borrower on the Closing Date in a principal amount equal to such Lender's Exchange Amount. On and as of the Closing Date, $[153,400,000.00] of Exchange Term Loans were deemed funded pursuant to this Section 2.01(a) and each Lender's Exchange Amount is set forth on Schedule I. Immediately after giving effect to the exchange in this Section 2.01(a) and without any further action from any other party, (i) all Exchange Term Loans shall constitute, and be treated for all purposes (including tax purposes), as a single fungible Class and Facility of Term Loans hereunder and (ii) all Obligations (as defined in the DIP Credit Agreement) under the DIP Credit Agreement in respect of the Initial DIP Loans shall be fully satisfied and discharged.

(b)    Each Lender having a Commitment to make Incremental Loans agrees, subject to the terms and conditions set forth in the applicable Incremental Amendment, to make Incremental Loans to the Borrower, in an aggregate principal amount not to exceed its Commitment.

(c)    Amounts of Term Loans borrowed (or deemed borrowed) under Section 2.01 that are repaid or prepaid may not be reborrowed.

SECTION 2.02    Borrowings, Conversions and Continuations of Loans.

(a)    Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Term SOFR Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by (A) telephone or (B) a Committed Loan Notice; provided that any telephonic notice must be confirmed immediately by delivery to the Administrative Agent of a Committed Loan Notice. Each such Committed Loan Notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three (3) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Term SOFR Loans or of any conversion of Term SOFR Loans to Base Rate Loans, and (ii) one (1) Business Day before the requested date of any Borrowing of Base Rate Loans.  Not later than 11:00 a.m., three Business Days before the requested date of such Borrowing, conversion or continuation, the Administrative Agent shall notify the Borrower (which notice may be by telephone) whether or not the requested Interest Period has been consented to by all the Lenders and the Administrative Agent.  Each Borrowing of, conversion to or continuation of Term SOFR Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof.  Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof.  Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Term SOFR Loans, (ii) the requested date of the Borrowing, conversion

-48-

or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Term SOFR Loans.  If the Borrower requests a Borrowing of, conversion to, or continuation of Term SOFR Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)        Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation of Loans described in Section 2.02(a).  In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.02 (and if such Borrowing is on the Closing Date, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)        Except as otherwise provided herein, a Term SOFR Loan may be continued or converted only on the last day of an Interest Period for such Term SOFR Loan.  Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent or the Required Lenders may require by notice to the Borrower that, no Loans may be requested as, converted to or continued as Term SOFR Loans.

(d)        The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Term SOFR Loans upon determination of such interest rate. The determination of Term SOFR by the Administrative Agent shall be conclusive in the absence of manifest error, unless otherwise objected to by the Required Lenders by a Direction of the Required Lenders. At any time when Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the Administrative Agent's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)        After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than ten Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent; *provided* that after the establishment of any new Class of Loans pursuant to a Refinancing Amendment or Extension, the number of Interest Periods otherwise permitted by this Section 2.02(e) shall increase by three (3) Interest Periods for each applicable Class so established.

(f)        The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(g)        Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (b) above, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount

together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Overnight Rate plus any administrative, processing, or similar fees customarily charged by the Administrative Agent in accordance with the foregoing. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(g) shall be conclusive in the absence of manifest error. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.03    Prepayments.

(a)    Optional.

(i)    The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty, except the Applicable Prepayment Amount, if applicable; *provided* that (1) such notice must be received by the Administrative Agent not later than 11:00 a.m. (New York City time) (A) three (3) Business Days prior to any date of prepayment of Term SOFR Loans and (B) on the date of prepayment of Base Rate Loans; (2) any partial prepayment of Term SOFR Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof or, if less, the entire principal amount thereof then outstanding; and (3) any prepayment of Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid and the payment amount specified in such notice shall be due and payable on the date specified therein. The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment. Any prepayment of a Term SOFR Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05. Each prepayment of the Loans pursuant to this Section 2.03(a) shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares; *provided*, that at the request of the Borrower, in lieu of such application on a pro rata basis among all Classes of Loans, such prepayment may be applied to any Class of Loans so long as the Maturity Date of such Class of Loans (or such Classes of Loans) precedes the Maturity Date of each other Class of Loans then outstanding or, in the event more than one Class of Loans shall have an identical Maturity Date, to such Classes on a pro rata basis.

(ii)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.03(a)(i) if such prepayment would have resulted from a refinancing of all of the applicable Facility, which refinancing shall not be consummated or shall otherwise be delayed.

(iii)    Voluntary prepayments of any Class of Loans permitted hereunder shall be applied to the remaining scheduled installments of principal thereof pursuant to Section 2.05 in a manner determined at the discretion of the Borrower and specified in the notice of prepayment (and absent such direction, in direct order of maturity).

(b)    Mandatory.

(i)    To the extent such payment is permitted under the ABL Credit Agreement as in effect on the Closing Date or is otherwise consented to pursuant to the terms of the ABL Credit Agreement, within five (5) Business Days after financial statements have been delivered pursuant to Section 6.01(a) and the related Compliance Certificate has been delivered pursuant to Section 6.02(a), the Borrower shall, subject to clause (b)(v) of this Section 2.03, prepay an aggregate principal amount of Loans equal to (A) 50% (such percentage as it may be reduced as described below, the "**ECF Percentage**") of Excess Cash Flow, if any, for the fiscal year covered by such financial statements (commencing with the fiscal year ended January 28, 2025) minus (B) the sum of (at the Borrower's option) (i) all voluntary prepayments of Loans (including any Incremental Loans), pursuant to Section 2.03(a)(i) during

-50-

such fiscal year (or after the end of such fiscal year and prior to the time such mandatory prepayment is due, without duplication in any other Excess Cash Flow period) and (ii) all voluntary prepayments of loans under the ABL Facilities during such fiscal year (or after the end of such fiscal year and prior to the time such mandatory prepayment is due, without duplication in any other Excess Cash Flow period) to the extent accompanied by a corresponding permanent reduction in the commitments under the ABL Facilities, in the case of each of the immediately preceding clauses (i) and (ii), to the extent such prepayments are not funded with the proceeds of long term Indebtedness (other than revolving borrowings); *provided* that (x) the ECF Percentage shall be 25% if the Senior Secured Net Leverage Ratio for the fiscal year covered by such financial statements was less than or equal to 2.50 to 1.0 and greater than 2.00 to 1.0, (y) the ECF Percentage shall be 0% if the Senior Secured Net Leverage Ratio for the fiscal year covered by such financial statements was less than or equal to 2.00 to 1.0; *provided further* that no such payment shall be required if such amount is equal to or less than the greater of (I) $36,000,000 and (II) 10% of Consolidated EBITDA on a Pro Forma Basis as of the last day of the most recent Test Period (and only the amount of such required prepayment that is in excess of such amount shall be required) and (z) if the amount of any required mandatory prepayment (without giving effect to the foregoing clause (y) of this proviso) is less than $0, the negative amount of such mandatory prepayment will be reduce the amount of any required prepayment pursuant to this clause (b)(i) in the immediately following fiscal year. For the avoidance of doubt, the Applicable Prepayment Amount shall not be due with respect to any payment made under this Section 2.03(b)(i).

(ii)    (A)  If (x) the Borrower or any of its Restricted Subsidiaries Disposes of any property or assets pursuant to Section 7.05(j) following the Closing Date (other than, so long as the ABL Credit Agreement is in effect, any Disposition of Current Asset Collateral) or (y) any Casualty Event occurs (other than with respect to Current Asset Collateral so long as the ABL Facility or any Permitted Refinancing thereof is in effect), which results in the realization or receipt by the Borrower or such Restricted Subsidiary of Net Cash Proceeds, the Borrower shall prepay on or prior to the date which is ten (10) Business Days after the date of the realization or receipt of such Net Cash Proceeds, subject to clause (b)(v) of this Section 2.03, an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds realized or received; *provided*, that if at the time that any such prepayment would be required, the Borrower is required to offer to repurchase Permitted Pari Passu Secured Debt (or any Permitted Refinancing thereof that is secured on a *pari passu* basis with the Obligations) pursuant to the terms of the documentation governing such Indebtedness with the net proceeds of such Disposition or Casualty Event (such Permitted Pari Passu Secured Debt (or Permitted Refinancing thereof) required to be offered to be so repurchased, "**Other Applicable Indebtedness**"), then the Borrower may apply such Net Cash Proceeds on a pro rata basis (determined on the basis of the aggregate outstanding principal amount of the Loans and Other Applicable Indebtedness at such time; *provided* that the portion of such net proceeds allocated to the Other Applicable Indebtedness shall not exceed the amount of such net proceeds required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such net proceeds shall be allocated to the Loans in accordance with the terms hereof) to the prepayment of the Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Loans that would have otherwise been required pursuant to this Section 2.03(b)(ii)(A) shall be reduced accordingly; *provided*, *further*, that to the extent the holders of Other Applicable Indebtedness decline to have such indebtedness repurchased or prepaid, the declined amount shall promptly (and in any event within ten (10) Business Days after the date of such rejection) be applied to prepay the Loans in accordance with the terms hereof; *provided*, *further*, that, no prepayment shall be required pursuant to this Section 2.03(b)(ii)(A) with respect to such portion of such Net Cash Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest in accordance with Section 2.03(b)(ii)(B).  The Applicable Prepayment Amount shall be due with respect to any payment made under this Section 2.03(b)(ii).

(B)  With respect to any Net Cash Proceeds realized or received with respect to any Disposition (other than any Disposition specifically excluded from the application of Section 2.03(b)(ii)(A)) or any Casualty Event, at the option of the Borrower, the Borrower may reinvest all or any portion of such Net Cash Proceeds in assets useful for its business within (x) eighteen (18) months following receipt of such Net Cash Proceeds or (y) if the Borrower enters into a legally binding commitment to reinvest such Net Cash Proceeds within eighteen (18) months following receipt thereof, within the later of (1) eighteen (18) months following receipt thereof and (2) one hundred and eighty (180) days of the date of such legally binding commitment; *provided* that if any Net Cash Proceeds are no longer intended to be or cannot be so reinvested at any time after delivery of a notice of reinvestment election, and subject to clauses (iv) and (v) of this Section 2.03(b), an amount equal to any such Net Cash Proceeds shall be

-51-

applied within five (5) Business Days after the Borrower reasonably determines that such Net Cash Proceeds are no longer intended to be or cannot be so reinvested to the prepayment of the Loans as set forth in this Section 2.03.

(iii)    If the Borrower or any Restricted Subsidiary incurs or issues any Indebtedness (A) not expressly permitted to be incurred or issued pursuant to Section 7.03 or (B) that constitutes Credit Agreement Refinancing Indebtedness, the Borrower shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom on or prior to the date which is five (5) Business Days after the receipt of such Net Cash Proceeds. The Applicable Prepayment Amount shall be due with respect to any payment made under this Section 2.03(b)(iii).

(iv)    (A) Except as may otherwise be set forth in any Refinancing Amendment, Extension Offer or any Incremental Amendment, each prepayment of Loans pursuant to this Section 2.03(b) shall be applied ratably to each Class of Loans then outstanding (*provided*, that any prepayment of Loans with the Net Cash Proceeds of Credit Agreement Refinancing Indebtedness shall be applied solely to each applicable Class of Loans selected by the Borrower), (B) with respect to each Class of Loans, each prepayment pursuant to clauses (i) through (iii) of this Section 2.03(b) shall be applied to the next eight (8) scheduled installments of principal thereof following the date of prepayment pursuant to Section 2.05 in direct order of maturity and to the remaining installments pro rata; and (C) each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment; provided that the Borrower may apply the Net Cash Proceeds of any mandatory prepayment from asset sales or casualty events ratably to the payment of Loans under the Facility and any other indebtedness that is secured on a *pari passu* basis with the Loans under the Facility to the extent required by the terms of such other indebtedness.

(v)    Notwithstanding any other provisions of this Section 2.03(b), (A) to the extent that any or all of the Net Cash Proceeds of any Disposition by a Foreign Subsidiary (or a Domestic Subsidiary of a Foreign Subsidiary) giving rise to a prepayment event pursuant to Section 2.03(b)(ii) (a "**Foreign Disposition**"), the Net Cash Proceeds of any Casualty Event from a Foreign Subsidiary (or a Domestic Subsidiary of a Foreign Subsidiary) (a "**Foreign Casualty Event**"), or Excess Cash Flow from a Foreign Subsidiary (or a Domestic Subsidiary of a Foreign Subsidiary) are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Loans at the times provided in this Section 2.03(b) but may be retained by the applicable Foreign Subsidiary (or the applicable Domestic Subsidiary of a Foreign Subsidiary) so long as the applicable local law will not permit repatriation to the Borrower in the United States (the Borrower hereby agreeing to cause the applicable Subsidiary to use its commercially reasonable efforts to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and the Borrower shall not be required to monitor any such prohibition or delay and/or reserve cash for future repatriation after the Borrower has notified the Administrative Agent of the existence of such prohibition or delay and (B) to the extent that the Borrower has determined in good faith that repatriation to the Borrower in the United States of any of or all the Net Cash Proceeds of any Foreign Disposition, any Foreign Casualty Event or any or all of the Excess Cash Flow of a Foreign Subsidiary would have material adverse tax consequences (relative to the relevant Foreign Disposition, Foreign Casualty Event or Excess Cash Flow and taking into account any foreign tax credit or benefit actually realized in connection with such repatriation) with respect to such Net Cash Proceeds or Excess Cash Flow, the portion of such Net Cash Proceeds or Excess Cash Flow so affected (the "Holdback Amount") will not be required to be applied to repay Loans at the times provided herein and instead may be retained by the applicable Foreign Subsidiary (or the applicable Domestic Subsidiary of a Foreign Subsidiary), *provided* that, to the extent that within 12 months of the applicable prepayment event, the Borrower obtains actual knowledge that the repatriation of any Net Cash Proceeds or Excess Cash Flow from such Foreign Subsidiary would no longer have material adverse tax consequences (relative to the relevant Foreign Disposition, Foreign Casualty Event or Excess Cash Flow), such Foreign Subsidiary shall promptly repatriate an aggregate amount equal to the Holdback Amount to (i) the Administrative Agent, which amount shall be applied to the pro rata prepayment of the Loans pursuant to Section 2.03(b)(iv) or (ii) permanently repayment Other Applicable Indebtedness, in each case in accordance with Section 2.03(b).

(vi)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to clause (i) or (ii) of this Section 2.03(b) at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify

each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment. Each Lender may reject all or a portion of its share of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Loans required to be made pursuant to clause (i) or (ii) of this Section 2.03(b) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m. (New York City time) one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment. Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory prepayment of Loans to be rejected by such Lender. If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory repayment of Loans. Subject to any requirements of any other Indebtedness, any Declined Proceeds remaining after offering such Declined Proceeds to Lenders in accordance with the terms hereof may be retained by the Borrower.

(c)        Interest, Funding Losses, Etc. All prepayments under this Section 2.03 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Term SOFR Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Term SOFR Loan pursuant to Section 3.05.

Notwithstanding any of the other provisions of this Section 2.03, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Term SOFR Loans is required to be made under this Section 2.03 prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.03 in respect of any such Term SOFR Loan prior to the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit an amount sufficient to make any such prepayment otherwise required to be made thereunder together with accrued interest to the last day of such Interest Period into a Cash Collateral Account until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.03. Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with the relevant provisions of this Section 2.03.

SECTION 2.04        Termination or Reduction of Commitments.

(a)        Optional. The Borrower may, upon written notice to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class, in each case without premium or penalty; *provided* that (i) any such notice shall be received by the Administrative Agent one (1) Business Day prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof or, if less, the entire amount thereof. Notwithstanding the foregoing, the Borrower may rescind or postpone any notice of termination of the Commitments if such termination would have resulted from a refinancing of all of the applicable Facility, which refinancing shall not be consummated or otherwise shall be delayed.

(b)        Mandatory. The Term Commitment of each Term Lender shall be automatically and permanently reduced to $0 upon the making of such Lender's Term Loan pursuant to Section 2.01.

SECTION 2.05        Repayment of Loans. The Borrower shall repay to the Administrative Agent (a) for the ratable account of each Lender holding Term Loans at such time, on the last Business Day of each March, June, September and December, commencing with the first full fiscal quarter ending on or after the Closing Date, an aggregate principal amount equal to 0.25% of the aggregate principal amount of all Term Loans outstanding on the Closing Date; (b) for the ratable account of the Appropriate Lenders, on the Maturity Date for the Term Loans, the aggregate principal amount of all Term Loans outstanding on such date and (c) on the Closing Date, for the ratable account of the Lenders holding Initial Loans, the outstanding balance of such Initial Loans.

SECTION 2.06    Interest.

(a)    Subject to the provisions of Section 2.06(b), (i) each Term SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Term SOFR for such Interest Period plus the Applicable Rate and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)    The Borrower shall pay interest on past due amounts hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.  The first Interest Payment Date on the Term Loans shall be September 30, 2024.

SECTION 2.07    Fees.  The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

SECTION 2.08    Computation of Interest and Fees.  All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error, unless otherwise objected to by the Required Lenders by a Direction of the Required Lenders.

SECTION 2.09    Evidence of Indebtedness.

(a)    The Borrowings made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Borrowings made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.09(a), and by each Lender in its account or accounts pursuant to Section 2.09(a), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; provided that the failure of the Administrative Agent or such

Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

SECTION 2.10    Payments Generally; Administrative Agent's Clawback.

(a)    General. All payments to be made by the Borrower shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share in respect of the relevant Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(i)    Funding by Lenders; Presumption by Administrative Agent. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Term SOFR Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    Payments by Borrower; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. With respect to any payment that the Administrative Agent makes for the account of the Lenders hereunder as to which the Administrative Agent determines (which determination shall be conclusive absent manifest error) that any of the following applies (such payment referred to as the "**Rescindable Amount**") : (1) the Borrower has not in fact made such payment; (2) the Administrative Agent has made a payment in excess of the amount so paid by the Borrower (whether or not then owed); or (3) the Administrative agent has for any reason otherwise erroneously made such payment; then each of the Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent,

US-DOCS\149885390.12

at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (a) shall be conclusive, absent manifest error.

(b)      Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(c)      Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to purchase its participation.

(d)      Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(e)      Insufficient Funds. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

SECTION 2.11      Sharing of Payments.  If, other than as expressly provided elsewhere herein, any Lender shall obtain payment in respect of any principal of or interest on account of the Loans made by it (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment of principal of or interest on such Loans, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  For avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.11 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 2.11 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

US-DOCS\149885390.12

SECTION 2.12    Incremental Borrowings.

(a)    The Borrower may at any time or from time to time after the Closing Date, upon at least 5 Business Days' notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders) and with the consent of the Required Lenders, request one or more additional tranches of Loans under this clause (a) of this Section 2.12 (the "**Incremental Loans**"); *provided* that, subject to the Limited Condition Acquisition provisions, at the time when any such Incremental Loan is made (and after giving effect thereto), no Default or Event of Default (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 8.01(a) or 8.01(f) as of the Transaction Agreement Date) shall exist.  Each tranche of Incremental Loans shall be in an aggregate principal amount that is not less than $5,000,000 (*provided* that such amount may be less than $5,000,000 if such amount represents all remaining availability under the limit set forth in the next sentence).  Notwithstanding anything to the contrary herein, the aggregate amount of the Incremental Loans, when aggregated with (A) the aggregate amount of Permitted Pari Passu Secured Debt (that is not designated as Credit Agreement Refinancing Indebtedness) and (B) the aggregate principal amount of Permitted Ratio Debt shall not exceed the Maximum Incremental Amount.  (I) The Incremental Loans shall rank *pari passu* in right of security and *pari passu* or, with the consent of the Required Lenders, superpriority in right of payment with the Loans, (II) the Incremental Loans shall not mature earlier than the Maturity Date; provided that customary bridge facilities so long as the long-term debt into which any such customary bridge facility is to be converted satisfies the foregoing, (III) the Weighted Average Life to Maturity of any Incremental Loans shall be no shorter than that of the then-existing Loans, (IV) subject to clauses (II) and (III) above, the amortization schedule applicable to any Incremental Loans shall be determined by the Borrower and the lenders thereunder, (V) the interest rate margin applicable to any Incremental Loans will be determined by the Borrower and the lenders providing such Incremental Loans, *provided* that, in the event that the All-In Yield applicable to any Incremental Loans that is a Comparable Financing made on or prior to the date which is 18 months after the Closing Date exceeds the All-In Yield of any Class of Loans existing at such time by more than 50 basis points, then the interest rate margins for each such Class of Loans shall be increased to the extent necessary so that the All-In Yield of such Loans is equal to the All-In Yield of such Incremental Loans minus 50 basis points, (VI) the Specified Representations shall be accurate in all material respects before and after the effectiveness of any Incremental Amendment referred to below and (VII) except as otherwise required or permitted in clauses (I) through (VI) above, all other terms of such Incremental Loans, if not consistent with the terms of the existing Loans, shall either be reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) or not more favorable, taken as a whole, to the lenders providing such Incremental Loans than the terms of the existing Loans (other than with respect to any terms and conditions applicable after the maturity date of the Loans); provided that no such Incremental Loans shall have financial covenants and more restrictive covenants than those contained in this Agreement unless (A) such more restrictive terms are not applicable until after the then Latest Maturity Date or (B) this Agreement is amended in a manner reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower to incorporate such more restrictive provisions for the benefit of the Lenders.  Any Incremental Loans may participate on a pro rata basis or on a less than pro rata basis (but not on a greater than pro rata basis) in any voluntary or mandatory prepayments hereunder, as specified in the applicable Incremental Amendment.  Each notice from the Borrower pursuant to this Section shall set forth the requested amount and proposed terms of the relevant Incremental Loans.  Incremental Loans may be made by any existing Lender (it being understood that no existing Lender will have an obligation to make a portion of any Incremental Loan) or by any Additional Lender on terms permitted in this Section 2.12 and otherwise on terms reasonably acceptable to the Administrative Agent (acting at the Direction of the Required Lenders).  Commitments in respect of Incremental Loans shall become Commitments under this Agreement pursuant to an amendment (an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Loan Documents, executed by Holdings, the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and the Administrative Agent.  The Incremental Amendment may effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower, to effect the provisions of this Section 2.12 (including, without limitation, to implement superpriority payment priority of the Incremental Loans, if applicable).  The effectiveness of (and, in the case of any Incremental Amendment for an Incremental Loan, the Borrowing under) any Incremental Amendment shall be subject to the satisfaction on the date thereof (each, an "**Incremental Facility Closing Date**") of each of the conditions described in this Section 2.12(a) (including, without limitation, consent of the Required Lenders) and such other conditions as the parties thereto shall agree.  The Borrower shall use the proceeds of the Incremental Loans for any purpose not prohibited by this Agreement.

US-DOCS\149885390.12

(b)    The Borrower may at any time or from time to time after the Closing Date, upon at least 5 Business Days' notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders) and with the consent of the Required Lenders, request a Borrowing of Incremental Exit Loans under this clause (b) of this Section 2.12 to be provided by the then-existing Lenders, or by any other financing source approved by the Required Lenders (it being acknowledged that the Required Lenders hereby consent to such Incremental Exit Loans to be provided by the proposed financing source (and/or any of its Affiliates) previously disclosed to the Required Lenders on terms and conditions no less favorable to the Borrower (as determined by the Borrower in its reasonable discretion) than previously disclosed to the Required Lenders); provided, further, that, at the time when any such Incremental Exit Loan is made (and after giving effect thereto), no Default or Event of Default shall exist.  Notwithstanding anything to the contrary herein, the aggregate amount of the Incremental Exit Loans shall not exceed $10,500,000 (which, shall for the avoidance of doubt not be duplicative of any amounts under the Maximum Incremental Amount).  (I) The Incremental Exit Loans shall rank pari passu in right of payment and of security with the Term Loans, (II) the Incremental Exit Loans shall not mature earlier than the Maturity Date, (III) the Weighted Average Life to Maturity of any Incremental Exit Loans shall be no shorter than that of the Initial Exit Loans, (IV) the interest rate margin applicable to the Incremental Exit Loans shall be the same as the interest rate margin applicable to the Term Loans, (V) the representations and warranties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects before and after the effectiveness of any Incremental Amendment and (VI) all other terms of such Incremental Exit Loans shall have terms consistent with the terms of the Term Loans.  Each notice from the Borrower pursuant to this Section 2.12(b) shall set forth the requested amount of the Incremental Exit Loans.  Commitments in respect of Incremental Exit Loans shall become Commitments under this Agreement pursuant to an Incremental Amendment to this Agreement and, as appropriate, the other Loan Documents, executed by Holdings, the Borrower, each Lender agreeing to provide such Commitment, and the Administrative Agent.  The Incremental Amendment may, without the consent of any other Lenders, effect such technical amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.12(b).  The effectiveness of (and, in the case of any Incremental Amendment for the Incremental Exit Loan, the Borrowing under) any Incremental Amendment shall be subject to the satisfaction on such Incremental Facility Closing Date of each of the conditions described in this Section 2.12(b) (including, without limitation, consent of the Required Lenders) and such other conditions as the parties thereto shall agree.  The Borrower shall use the proceeds of the Incremental Exit Loans for any purpose not prohibited by this Agreement.

(c)    This Section 2.12 shall supersede any provisions in Section 2.11 or 10.01 to the contrary.

SECTION 2.13    Refinancing Amendments.  At any time after the Closing Date, the Borrower may obtain, from any Lender or any Additional Lender, Other Loans to refinance all or any portion of the Loans then outstanding under this Agreement which will be made pursuant to Other Term Commitments in each case pursuant to a Refinancing Amendment; provided that such Other Loans (i) will rank pari passu in right of payment and of security with the other Loans and Commitments hereunder, (ii) will have such pricing, premiums and optional prepayment or redemption terms as may be agreed by the Borrower and the Lenders thereof, (iii) will have a final maturity date no earlier than, and will have a Weighted Average Life to Maturity equal to or greater than, the Loans being refinanced, and (iv) will have terms and conditions that are substantially identical to, or (taken as a whole) are no more favorable to the lenders or holders providing such Other Term Commitments and Other Loans than those applicable to the Loans being refinanced unless (A) such more restrictive terms are not applicable until after the then Latest Maturity Date or (B) this Agreement is amended in a manner reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower to incorporate such more restrictive provisions for the benefit of the Lenders.  Any Other Loans may participate on a pro rata basis or on a less than pro rata basis (but not on a greater than pro rata basis) in any voluntary or mandatory prepayments hereunder, as specified in the applicable Refinancing Amendment.  The effectiveness of any Refinancing Amendment shall be subject to the satisfaction on the date thereof of each of the conditions set forth in Section 4.02 and, to the extent reasonably requested by the Administrative Agent (acting at the Direction of the Required Lenders), receipt by the Administrative Agent of legal opinions, board resolutions, officers' certificates and/or reaffirmation agreements consistent with those delivered on the Closing Date under Section 4.01 (other than changes to such legal opinions resulting from a change in law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders)).  Each Class of Other Term Commitments and Other Loans incurred under this Section 2.13 shall be in an aggregate principal amount that is not less than $100,000,000.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Refinancing Amendment.

US-DOCS\149885390.12

Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Other Term Commitments and Other Loans incurred pursuant thereto (including any amendments necessary to treat the Other Loans and/or Other Term Commitments as Loans and Commitments). Any Refinancing Amendment may effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower, to effect the provisions of this Section 2.13. This Section 2.13 shall supersede any provisions in Section 2.11 or 10.01 to the contrary. No Lender shall be under any obligation to provide any Other Term Commitment unless such Lender executes a Refinancing Amendment.

SECTION 2.14    Extensions of Loans.

(a)    Notwithstanding anything to the contrary in this Agreement, pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders of Loans with a like Maturity Date on a pro rata basis (based on the aggregate outstanding principal amount of the respective Loans with the same Maturity Date) and on the same terms to each such Lender, the Borrower may from time to time with the consent of any Lender that shall have accepted such offer to extend the maturity date of any Loans and otherwise modify the terms of such Loans of such Lender pursuant to the terms of the relevant Extension Offer (including, without limitation, by increasing the interest rate or fees payable in respect of such Loans and/or modifying the amortization schedule in respect of such Loans) (each, an "**Extension**," and each group of Loans as so extended, as well as the original Loans not so extended, being a "**tranche**"; any Extended Loans shall constitute a separate tranche of Loans from the tranche of Loans from which they were converted), so long as the following terms are satisfied: (i) no Default shall exist at the time the notice in respect of an Extension Offer is delivered to the Lenders, and no Default shall exist immediately prior to or after giving effect to the effectiveness of any Extended Loans, (ii) except as to interest rates, fees, amortization, final maturity date, premium, required prepayment dates and participation in prepayments (which shall, subject to immediately succeeding clauses (iii), (iv) and (v), be determined by the Borrower and set forth in the relevant Extension Offer), the Loans of any Lender (an "**Extending Lender**") extended pursuant to any Extension ("**Extended Loans**") shall have the same terms as the tranche of Loans subject to such Extension Offer unless, with respect to any covenants and defaults that are, taken as a whole, more restrictive than the terms of this Agreement (A) such more restrictive terms are not applicable until after the then Latest Maturity Date or (B) this Agreement is amended in a manner reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower to incorporate such more restrictive provisions for the benefit of the Lenders, (iii) the final maturity date of any Extended Loans shall be no earlier than the then Latest Maturity Date at the time of extension and the amortization schedule applicable to Loans pursuant to Section 2.05 for periods prior to the Maturity Date may not be increased, (iv) the Weighted Average Life to Maturity of any Extended Loans shall be no shorter than the remaining Weighted Average Life to Maturity of the Loans extended thereby, (v) any Extended Loans may participate on a pro rata basis or on a less than pro rata basis (but not on a greater than pro rata basis) in any voluntary or mandatory prepayments hereunder, as specified in the applicable Extension Offer, (vi) if the aggregate principal amount of Loans (calculated on the face amount thereof) in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Loans offered to be extended by the Borrower pursuant to such Extension Offer, then the Loans of such Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer, (vii) all documentation in respect of such Extension shall be consistent with the foregoing, (viii) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower and (ix) the interest rate margin applicable to any Extended Loans will be determined by the Borrower and the lenders providing such Extended Loans.

(b)    With respect to all Extensions consummated by the Borrower pursuant to this Section 2.14, (i) such Extensions shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 2.03 and (ii) any Extension Offer is required to be in any minimum amount of $25,000,000, *provided* that the Borrower may at its election specify as a condition (a "**Minimum Extension Condition**") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Offer in the Borrower's sole discretion and may be waived by the Borrower) of Loans of any or all applicable tranches are tendered.

(c)    The Lenders hereby irrevocably authorize the Administrative Agent and the Collateral Agent, in each case acting at the written direction of the Required Lenders, to enter into amendments to this

Agreement and the other Loan Documents with the Borrower as may be necessary in order to establish new tranches or sub-tranches in respect of Loans so extended and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new tranches or sub-tranches, in each case on terms consistent with this Section 2.14.

(d)     In connection with any Extension, the Borrower shall provide the Administrative Agent at least five (5) Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and shall agree to such procedures, if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably, to accomplish the purposes of this Section 2.14.

(e)     This Section 2.14 shall supersede any provisions in Section 2.11 or 10.01 to the contrary.

## ARTICLE III
## Taxes, Increased Costs Protection and Illegality

SECTION 3.01     Taxes.

(a)     All sums payable by or on account of any obligation of any Loan Party hereunder or under any other Loan Document to any Lender or Agent shall (except to the extent required by applicable Law) be paid free and clear of, and without any deduction or withholding on account of, any Taxes.

(b)     If any Loan Party or any Agent is required by Law (as determined in the good faith discretion of such Loan Party or any Agent) to make any deduction or withholding on account of any Non-Excluded Tax or Other Taxes from any sum paid or payable by any Loan Party to any Lender or Agent under any of the Loan Documents: (i) the applicable Loan Party (if it is required to make the deduction or withholding) shall notify the applicable Agent of any such requirement or any change in any such requirement as soon as reasonably practicable after such Loan Party becomes aware of it; (ii) the applicable Loan Party or Agent, as applicable, shall make such deduction or withholding and pay to the relevant Governmental Authority, in accordance with applicable law, any such Non-Excluded Tax or Other Tax before the date on which penalties attach thereto; (iii) the sum payable to such Lender or Agent (as applicable) shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding (including any deductions or withholdings attributable to any payments required to be made under this Section 3.01), the Lender or the Agent (as applicable), receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and (iv) within thirty days after paying any sum from which it is required by Law to make any deduction or withholding (or, if later, within thirty days after the due date of payment of any Tax which it is required by clause (ii) above to pay), the Loan Party making such payments (if it is required to make the deduction or withholding) shall deliver to the applicable Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority.

(c)     Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Laws or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under any Loan Document. Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(c)) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent of its inability to do so.

Without limiting the foregoing:

(1)     Each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

-60-

(2)        Each Non-US Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)        in the case of a Non-US Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, two properly completed and duly signed original copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(B)        two properly completed and duly signed original copies of IRS Form W-8ECI or W-8EXP (or any successor forms),

(C)        in the case of a Non-US Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates substantially in the form of Exhibit I (any such certificate, a "**United States Tax Compliance Certificate**") to the effect that such Non-US Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to any Loan Party described in Section 881(c)(3)(C) of the Code, and that no payment under any Loan Document is effectively connected with such Non-US Lender's U.S. trade or business, and (y) two properly completed and duly signed original copies of IRS Form W-8BEN or W-8BEN-E, as applicable, (or any successor forms),

(D)        to the extent a Non-US Lender is not the beneficial owner (for example, where the Non-US Lender is a partnership or a participating Lender), two properly completed duly signed original copies of IRS Form W-8IMY (or any successor forms) of the Non-US Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, as applicable, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information (or any successor forms) from each beneficial owner that would be required under this Section 3.01(c) if such beneficial owner were a Lender, as applicable (provided that, if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Non-US Lender on behalf of such beneficial owner), or

(E)        two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax Laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding tax on any payments to such Lender under the Loan Documents.

(3)        If a payment made to a Lender under any Loan Document may be subject to U.S. federal withholding tax imposed by Sections 1471 through 1474 of the Code (including any successor provisions), such Lender shall deliver to Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under Sections 1471 through 1474 of the Code and to determine whether such Lender has or has not complied under such Lender's obligations under such Sections and, if necessary, to determine the amount to deduct and withhold from such payment.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(d)        In addition to the payments by a Loan Party required by Section 3.01(b), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(e)        The Borrower shall indemnify each Lender and Agent (each a "**Tax Indemnitee**"), within 20 days after written demand therefor, for the full amount of any Non-Excluded Taxes paid or payable by such Tax Indemnitee that is imposed on or in respect of any payment under or with respect to any Loan Document, and any Other Taxes payable by such Tax Indemnitee (including Non-Excluded Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01), in each case, including any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Tax Indemnitee or by the Agent on its own behalf or on behalf of another Tax Indemnitee, shall be conclusive absent manifest error.

(f)        If and to the extent that a Tax Indemnitee, in its sole discretion (exercised in good faith), determines that it has received a refund of any Non-Excluded Taxes or Other Taxes in respect of which it has received additional payments under this Section 3.01, then such Tax Indemnitee shall pay to the relevant Loan Party an amount equal to of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses of the Tax Indemnitee (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Party, upon the request of the Tax Indemnitee, agrees to repay the amount paid over by the Tax Indemnitee (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee if the Tax Indemnitee is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the Tax Indemnitee be required to pay any amount to a Loan Party pursuant to this paragraph (f) the payment of which would place the Tax Indemnitee in a less favorable net after-Tax position than the Tax Indemnitee would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(g)        In the event that a Loan Party makes an indemnification payment to a Tax Indemnitee with respect to Non-Excluded Taxes or Other Taxes pursuant to subsection (e) of this Section 3.01 or a Loan Party is required to repay to a Tax Indemnitee an amount in respect of a refund of any Non-Excluded Taxes or Other Taxes previously paid over to such Loan Party pursuant to subsection (f) of this Section 3.01, such Tax Indemnitee shall reasonably cooperate with all reasonable requests of such Loan Party, at the sole expense of such Loan Party, if (i) in the reasonable judgment of the Tax Indemnitee such cooperation shall not subject such Tax Indemnitee, as the case may be, to any unreimbursed third party cost or expense or otherwise be materially disadvantageous to such Tax Indemnitee and (ii) there is a reasonable basis for such Loan Party to contest with the applicable Governmental Authority the imposition of such Non-Excluded Taxes or Other Taxes or the repayment of such refund.  Any resulting refund shall be governed by Section 3.01(f).  This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)        On or before the date any Agent becomes a party to this Agreement, such Agent shall provide to the Borrower two duly properly completed and duly signed copies of the documentation prescribed in clause (i) or (ii) below, as applicable (together with all required attachments thereto): (i) IRS Form W-9 or any successor thereto, or (ii) (A) with respect to payments received for its own account, IRS Form W-8ECI or any successor thereto, and (B) with respect to payments received on account of any Lender, a U.S. branch withholding certificate on IRS Form W-8IMY or any successor thereto evidencing its agreement with the Borrower to be treated as a U.S. Person for U.S. federal withholding purposes.  At any time thereafter, any Agent shall provide updated documentation previously provided (or a successor form thereto) when any documentation previously delivered has expired or become obsolete or invalid or otherwise upon the reasonable request of the Borrower or promptly notify the Borrower of its legal ineligibility to do so.  The Administrative Agent hereby represents and warrants to the Loan Parties that it is a "U.S. person" and a "financial institution" and that it will comply with its "obligation to withhold," each within the meaning of Treasury Regulations Section 1.1441-1(b)(2)(ii).

(i)        Each party's obligations under this Section shall survive the resignation or replacement of the any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 3.02        Illegality.  If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to SOFR or Term SOFR, or to determine or charge interest rates based upon SOFR or Term SOFR, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of such Lender to make or continue Term SOFR Loans or to convert Base Rate Loans to Term SOFR Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Term SOFR Loans and shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loan to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loan and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Term SOFR component of the Base Rate with respect to any Base Rate Loans, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 3.05.

SECTION 3.03        Inability to Determine Rates.

(a)        If in connection with any request for a Term SOFR Loan or a conversion to or a continuation thereof, (i) the Administrative Agent determines  that (A) Dollar deposits are not being offered to banks in the relevant interbank market for the applicable amount and Interest Period for such Term SOFR Loans, or (B) (x) adequate and reasonable means do not exist for determining Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan or in connection with an existing or proposed Base Rate Loan and (y) the circumstances described in Section 3.03(c) do not apply (in each case with respect to this clause (i), "Impacted Loans"), or (ii) the Administrative Agent or the Required Lenders determine that for any reason that Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Term SOFR Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.

Thereafter, (x) the obligation of the Lenders to make or maintain Term SOFR Loans shall be suspended (to the extent of the affected Term SOFR Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Term SOFR component of the Base Rate, the utilization of the Term SOFR component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (or, in the case of a determination by the Required Lenders described in clause (ii) of this Section 3.03(a), until the Administrative Agent upon instruction of the Required Lenders) revokes such notice.

Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, or conversion to, or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

(b)        Notwithstanding the foregoing, if the Administrative Agent has made the determination described in Section 3.03(a)(i), the Administrative Agent, in consultation with the Borrower, may establish an

alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (i) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under the first sentence of Section 3.03(a)(i), (ii) the Administrative Agent or the Required Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (iii) any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof.

(c)    <u>Replacement of Term SOFR or Successor Rate</u>.  Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Required Lenders notify the Administrative Agent (with a copy to the Borrower) (after which the Administrative Agent will promptly notify each Lender) that the Required Lenders have determined, that:

(i)    adequate and reasonable means do not exist for ascertaining one month, three month and six month interest periods of Term SOFR, including, without limitation, because the Term SOFR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)    CME or any successor administrator of the Term SOFR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent or such administrator with respect to its publication of Term SOFR, in each case acting in such capacity, has made a public statement identifying a specific date after which one month, three month and six month interest periods of Term SOFR or the Term SOFR Screen Rate shall or will no longer be made available, or permitted to be used for determining the interest rate of U.S. dollar denominated syndicated loans, or shall or will otherwise cease, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders), that will continue to provide such interest periods of Term SOFR after such specific date (the latest date on which one month, three month and six month interest periods of Term SOFR or the Term SOFR Screen Rate are no longer available permanently or indefinitely, the "<u>Scheduled Unavailability Date</u>"); or

(iii)    the administrator of the Term SOFR Screen Rate or a Governmental Authority having jurisdiction over such administrator has made a public statement announcing that all Interest Periods and other tenors of Term SOFR are no longer representative; or

(iv)    syndicated loans currently being executed, or that include language similar to that contained in this Section 3.03, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace Term SOFR,

then, in the case of clauses (i)-(iii) above, on a date and time determined by the Administrative Agent in consultation with the Borrower (any such date, the "<u>Term SOFR Replacement Date</u>"), which date shall be at the end of an Interest Period or on the relevant interest payment date, as applicable, for interest calculated and shall occur reasonably promptly upon the occurrence of any day of the events or circumstances under clauses (i), (ii) or (iii) above and, solely with respect to clause (ii) above, no later than the Scheduled Unavailability Date, Term SOFR will be replaced hereunder and under any Loan Document with Daily Simple SOFR *plus* the Related Adjustment for any payment period for interest calculated that can be determined by the Administrative Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document (the "<u>Successor Rate</u>"; and any such rate before giving effect to the Related Adjustment, the "<u>Pre-Adjustment Successor Rate</u>"); and in the case of clause (iv) above, the Borrower and Administrative Agent may amend this Agreement solely for the purpose of replacing Term SOFR under this Agreement and under any other Loan Document in accordance with the definition of "Successor Rate" and such amendment will become effective at 5:00 p.m., on the fifth Business Day after the Administrative Agent shall have notified all Lenders and the Borrower of the occurrence of the circumstances described in clause (iv) above unless, prior to such time, Lenders comprising the Required Lenders

have delivered to the Administrative Agent written notice that such Required Lenders object to the implementation of a Successor Rate pursuant to such clause.

The Administrative Agent will promptly (in one or more notices) notify the Borrower and each Lender of (x) any occurrence of any of the events, periods or circumstances under clauses (i) through (iii) above, (y) a Term SOFR Replacement Date and (z) the Successor Rate.

Any Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Administrative Agent, such Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent (acting at the Direction of the Required Lenders).

Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than 0.75%, the Successor Rate will be deemed to be 0.75% for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a Successor Rate, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

If the events or circumstances of the type described in 3.03(c)(i)-(iii) have occurred with respect to the Successor Rate then in effect, then the successor rate thereto shall be determined in accordance with the definition of "Successor Rate".

(d)     Notwithstanding anything to the contrary herein, (i) after any such determination by the Administrative Agent or receipt by the Administrative Agent of any such notice described under Section 3.03(c)(i)-(iii), as applicable, if the Administrative Agent (acting at the Direction of the Required Lenders) determines that Daily Simple SOFR is not available on or prior to the Term SOFR Replacement Date, (ii) if the events or circumstances described in Section 3.03(c)(iv) have occurred but Daily Simple SOFR is not available, or (iii) if the events or circumstances of the type described in Section 3.03(c)(i)-(iii) have occurred with respect to the Successor Rate then in effect and the Administrative Agent (acting at the Direction of the Required Lenders) determines that Daily Simple SOFR is not available, then in each case, the Administrative Agent and the Borrower may amend this Agreement solely for the purpose of replacing Term SOFR or any then current Successor Rate in accordance with this Section 3.03 at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, as applicable, with another alternative benchmark rate giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks and, in each case, including any Related Adjustments and any other mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated. For the avoidance of doubt, any such proposed rate and adjustments, shall constitute a "Successor Rate". Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to such amendment.

(e)     If, at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, no Successor Rate has been determined in accordance with clauses (c) or (d) of this Section 3.03 and the circumstances under clauses (c)(i) or (c)(iii) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Term SOFR Loans shall be suspended, (to the extent of the affected Term SOFR Loans, Interest Periods, interest payment dates or payment periods), and (y) the Term SOFR component shall no longer be utilized in determining the Base Rate, until the Successor Rate has been determined in accordance

-65-

with clauses (c) or (d). Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans, Interest Periods, interest payment dates or payment periods) or, failing that, will be deemed to have converted such request into a request for a Committed Borrowing of Base Rate Loans (subject to the foregoing clause (y)) in the amount specified therein.

SECTION 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Term SOFR Loans.

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Term SOFR Loan made by it (except for (x) any Taxes described in clauses (c) through (e) of the definition of Excluded Tax, (y) any Non-Excluded Taxes or Other Taxes indemnifiable or otherwise paid under Section 3.01, or (z) Connection Income Taxes); or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Term SOFR Loans made by such Lender that is not otherwise accounted for in this clause (a);

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan the interest on which is determined by reference to the Term SOFR (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements. If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by it to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent),the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation, *provided* that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise

-66-

to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 3.05    Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day prior to the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)    any assignment of a Term SOFR Loan on a day prior to the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 3.07;

including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

SECTION 3.06    Matters Applicable to All Requests for Compensation.

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect.

(b)    Suspension of Lender Obligations.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Term SOFR Loans from one Interest Period to another Interest Period, or to convert Base Rate Loans into Term SOFR Loans, until the event or condition giving rise to such request ceases to be in effect(in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)    Conversion of Term SOFR Loans.  If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Term SOFR Loans no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Term SOFR Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Term SOFR Loans, to the extent necessary so that, after giving effect thereto, all Loans of a given Class held by the Lenders of such Class holding Term SOFR Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

SECTION 3.07    Replacement of Lenders under Certain Circumstances.  If (i) any Lender requests compensation under Section 3.04 or ceases to make Term SOFR Loans as a result of any condition described

-67-

in Section 3.02 or Section 3.04, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (iii) any Lender is a Non-Consenting Lender or (iv) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07), all of its interests, rights and obligations under this Agreement and the related Loan Documents to one or more Eligible Assignees, *provided* that:

> (a)    the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.07(b)(iv);

> (b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

> (c)    such Lender being replaced pursuant to this Section 3.07 shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Notes shall be deemed to be canceled upon such failure;

> (d)    the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender;

> (e)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

> (f)    such assignment does not conflict with applicable Laws.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans and (iii) the Required Lenders or Required Facility Lenders, as applicable, have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

> A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

> SECTION 3.08    Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

# ARTICLE IV

## Conditions Precedent to Borrowing

SECTION 4.01    Conditions to the Closing Date. The effectiveness of this Agreement and the obligation of each Lender to make its Term Commitment and Term Loans on the Closing Date is subject solely to the satisfaction of the following conditions precedent (or waiver of such conditions precedent in accordance with Section 10.01):

(a)    The Administrative Agent's receipt of the following, each of which shall be original, .pdf or facsimile copies or delivered by other electronic method unless otherwise specified, each properly executed (if applicable) by a Responsible Officer of each signing Loan Party, each in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders:

(i)    a Committed Loan Notice in accordance with the requirements hereof;

(ii)    executed counterparts of this Agreement and the Guaranty; and

(iii)    a Note executed by the Borrower in favor of each Lender that has requested a Note at least two Business Days in advance of the Closing Date;

(iv)    each Collateral Document set forth on Schedule 1.01A required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with certificates, if any, representing the Pledged Equity referred to therein accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt endorsed in blank;

(v)    (i) A certificate of each Loan Party, each dated the Closing Date and executed by a secretary, assistant secretary or other Responsible Officer thereof, which shall (A) certify that (1) attached thereto is a true and complete copy of the certificate or articles of incorporation, formation or organization (or equivalent) of such Loan Party certified by the relevant authority of its jurisdiction of organization (to the extent reasonably avail-able in the applicable jurisdiction), (2) the certificate or articles of incorporation, formation or organization (or equivalent) of such Loan Party attached thereto have not been amended (except as attached thereto) since the date reflected thereon, (3) attached thereto is a true and correct copy of the by-laws or operating, management, partner-ship or similar agreement of such Loan Party (if applicable), together with all amendments thereto as of the Closing Date, and such by-laws or operating, management, partnership or similar agreement are in full force and effect as of the Closing Date and (4) attached thereto is a true and complete copy of the resolutions or written consent, as applicable, of its board of directors, board of managers, sole member or other applicable governing body authorizing the execution and delivery of the Loan Documents, which resolutions or consent have not been modified, rescinded or amended (other than as attached thereto) and are in full force and effect, and (B) identify by name and title and bear the signatures of the officers, managers, directors or authorized signatories of such Loan Party authorized to sign the Loan Documents to which such Loan Party is a party on the Closing Date and (ii) a good standing (or equivalent) certificate as of a recent date for each Loan Party from the relevant authority of its jurisdiction of organization (to the extent applicable in such jurisdiction).

(vi)    an opinion from (i) Latham & Watkins LLP, New York counsel to the Loan parties and (ii) Jones Day LLP, Ohio counsel to the Loan Parties, each in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders;

(vii)    a solvency certificate from the chief financial officer of the Borrower substantially in the form attached hereto as Exhibit K;

(viii)    evidence that all insurance (other than title insurance) required to be maintained pursuant to the Loan Documents as of the Closing Date has been obtained and is in effect;

(ix)      a certificate, dated the Closing Date and executed by a Responsible Officer of the Borrower, certifying as to the satisfaction of the conditions set forth in Sections 4.01(g) and (h); and

(x)      copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Administrative Agent with respect to the Loan Parties.

(b)      The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Required Lenders and the Debtors, which Confirmation Order shall be in full force and effect and shall not have been vacated, reversed, modified, stayed or amended.

(c)      Since the date of the Confirmation Order, there has been no occurrence, development, change, event or loss affecting the Borrower that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)      The Plan Effective Date (under and as defined in the TSA) shall have occurred in accordance with the terms thereof, and the documents required to be executed and delivered pursuant to Section 3 of the TSA shall have been so executed and delivered.

(e)      All fees and expenses required to be paid hereunder and invoiced at least two (2) Business Days before the Closing Date shall have been paid in full in cash.

(f)      The Administrative Agent shall have received at least two (2) Business Days prior to the Closing Date all documentation and other information about the Borrower and the Guarantors as shall have been reasonably requested in writing by the Administrative Agent at least four (4) Business Days prior to the Closing Date and as determined by the Administrative Agent to be required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

(g)      The representations and warranties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (or in all respects, if qualified by materiality or "Material Adverse Effect"), in each case, on and as of the Closing Date (unless such representations and warranties relate to an earlier date, in which case, such representations and warranties shall have been true and correct in all material respects as of such earlier date (or in all respects, if qualified by materiality or "Material Adverse Effect")).

(h)      At the time of and immediately after giving effect to the making of such Loan, no Event of Default has occurred and is continuing.

For purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

SECTION 4.02    Conditions to All Borrowings After the Closing Date. Subject to Section 1.10, the obligation of each Lender to honor a Committed Loan Notice (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Term SOFR Loans) after the Closing Date is subject to the following conditions precedent:

(a)      The Specified Representations shall be true and correct in all material respects on and as of the date of such Borrowing.

(b)      The Administrative Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

Each Committed Loan Notice (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Term SOFR Loans) submitted by the Borrower shall be deemed to

be a representation and warranty that the condition specified in Section 4.02(a) has been satisfied on and as of the date of the applicable Borrowing.

**ARTICLE V**

**Representations and Warranties**

The Borrower represents and warrants to the Administrative Agent and the Lenders that:

SECTION 5.01    Existence, Qualification and Power; Compliance with Laws.  Each Loan Party and each of its Restricted Subsidiaries that is a Material Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), (b) has all corporate or other organizational power and authority to (i) own its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all applicable Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.02    Authorization; No Contravention.  (a)  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.  (b) Neither the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party will (i) contravene the terms of any of such Person's Organization Documents, (ii) result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted by Section 7.01) under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any applicable Law; except with respect to any breach, contravention or violation (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.03    Governmental Authorization.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.04    Binding Effect.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

SECTION 5.05    Financial Statements; No Material Adverse Effect.

(a)    The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(b)    Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(c)    The forecasts of consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries, copies of which have been furnished to the Administrative Agent prior to the Closing Date  have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts and actual results may vary materially from such forecasts.

SECTION 5.06    Litigation.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.07    Labor Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any of the Borrower or its Subsidiaries pending or, to the knowledge of the Borrower, threatened and (b) since the Petition Date, hours worked by and payment made based on hours worked to employees of each of the Borrower or its Subsidiaries have not been in material violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

SECTION 5.08    Ownership of Property; Liens.  Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.09    Environmental Matters.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Loan Party and each of its Subsidiaries and their respective operations is in compliance with all applicable Environmental Laws (including having obtained all Environmental Permits) and (ii) none of the Loan Parties or any of their respective Subsidiaries has become subject to any pending, or to the knowledge of the Borrower, threatened Environmental Claim or any other Environmental Liability.

(b)    None of the Loan Parties or any of their respective Subsidiaries has released, treated, stored, transported, arranged for transport or disposed of Hazardous Materials at or from any currently or formerly owned or operated real estate or facility in a manner that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.10    Taxes.  Holdings, the Borrower and its Restricted Subsidiaries have filed all federal, state, local, foreign and other Tax returns and reports required to be filed, and have paid all federal, state, local, foreign and other Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets or otherwise due and payable (including in its capacity as a withholding agent), except those (a) which are being contested in good faith by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP or (b) with respect to which the failure to make such filing or payment could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect.  There is no proposed Tax assessment, Tax deficiency or other Tax claim against Holdings, Borrower or any of its Restricted Subsidiaries except (i) those being actively contested by Holdings, Borrower or such Restricted Subsidiary in good faith and by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP or (ii) those that would not reason-ably be expected to, individually or in the aggregate, have a Material Adverse Effect.

-72-

SECTION 5.11    ERISA Compliance.

(a)    Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(b)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Employee Benefit Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Employee Benefit Plan; (iii) none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan; (iv) none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and (v) neither any Loan Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is insolvent (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA) and no such Multiemployer Plan is expected to be insolvent or endangered or critical status, except, with respect to each of the foregoing clauses of this Section 5.11(b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)    Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, each Foreign Plan has been maintained in compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders, and neither Holdings nor any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

SECTION 5.12    Subsidiaries. As of the Closing Date, neither Holdings nor any other Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests in Holdings, the Borrower and the Subsidiaries have been validly issued and are fully paid and (if applicable) nonassessable, and all Equity Interests owned by Holdings or any other Loan Party are owned free and clear of all security interests of any person except (i) those created under the Collateral Documents or under the ABL Facilities Documentation (which Liens shall be subject to the ABL Intercreditor Agreement) and (ii) any nonconsensual Lien that is permitted under Section 7.01. As of the Closing Date, Schedule 5.12 (a) sets forth the name and jurisdiction of each Subsidiary, (b) sets forth the ownership interest of Holdings, the Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

SECTION 5.13    Margin Regulations; Investment Company Act.

(a)    As of the Closing Date, none of the Collateral is Margin Stock. No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)    Neither the Borrower nor any Guarantor is an "investment company" under the Investment Company Act of 1940.

SECTION 5.14    Disclosure. None of the information and data heretofore or contemporaneously furnished in writing by or on behalf of any Loan Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make such information and data (taken as a whole), in the light of the circumstances under which it was delivered, not materially misleading; it being understood that for purposes of this Section 5.14, such information and data shall not include projections and pro forma financial information or information of a general economic or general industry nature.

-73-

SECTION 5.15    Intellectual Property; Licenses, Etc.  The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all material patents, trademarks, service marks, trade names, copyrights, technology, software, know-how, licenses and other intellectual property rights (collectively, "**IP Rights**") that are necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any of its Subsidiaries as currently conducted does not infringe upon, misuse, misappropriate or violate any IP Rights held by any Person except for such infringements, misuses, misappropriations or violations individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened against any Loan Party or Subsidiary, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 5.16    Solvency.  On the Closing Date the Borrower and its Restricted Subsidiaries, on a consolidated basis, are Solvent.

SECTION 5.17    OFAC.  Neither the Borrower, nor any of its Subsidiaries, nor, to the knowledge of the Borrower and its Subsidiaries, any director, officer, employee, agent, Affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority  or (iii) located, organized or resident in a Designated Jurisdiction.

SECTION 5.18    USA PATRIOT Act.  To the extent applicable, each of Holdings and its Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the USA PATRIOT Act and (iii) the Beneficial Ownership Regulation.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 or other similar anti-corruption legislation in any jurisdiction.

SECTION 5.19    Collateral Documents.  Except as otherwise contemplated hereby or under any other Loan Documents, the provisions of the Collateral Documents, together with such filings and other actions required to be taken hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Debt and any Pledged Equity required to be delivered pursuant to the applicable Collateral Documents), are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable first priority Lien (subject to Liens permitted by Section 7.01 and subject to the ABL Intercreditor Agreement) on all right, title and interest of the respective Loan Parties in the Collateral described therein.

SECTION 5.20    Anti-Corruption Laws.  The Borrower and its Subsidiaries have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

SECTION 5.21    Affected Financial Institution.  No Loan Party is an Affected Financial Institution.

## ARTICLE VI

## **Affirmative Covenants**

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations) shall remain unpaid or unsatisfied,

each of Holdings and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Restricted Subsidiaries to:

SECTION 6.01    <u>Financial Statements</u>.  Deliver to the Administrative Agent for prompt further distribution to each Lender each of the following and shall take the following actions:

(a)    as soon as available, but in any event within ninety-five (95) days after the end of each fiscal year of the Borrower commencing with the fiscal year ending February 3, 2024, a consolidated balance sheet of the Borrower  and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year together with related notes thereto (and, so long as provided to the holders of Borrower's or any of its direct or indirect parent companies' debt securities, management's discussion and analysis describing results of operations), setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of Ernst & Young LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (other than a "going concern" qualification that is due to the impending maturity of any of the Facility, the ABL Facilities, Permitted Pari Passu Secured Debt, Credit Agreement Refinancing Indebtedness or any Permitted Refinancing of any of the foregoing Indebtedness);

(b)    as soon as available, but in any event (1) within one hundred forty (140) days after the end of the first fiscal quarter of the Borrower ending after the Closing Date, (2) within ninety (90) days after the end of the second fiscal quarter of the Borrower ending after the Closing Date, (3) within seventy-five (75) days after the end of the third fiscal quarter of the Borrower ending after the Closing Date, and (4) within forty-fifty (50) days after the end of each fiscal quarter of each fiscal year of the Borrower thereafter, a condensed consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (i) condensed consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) condensed consolidated statements of cash flows for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes (together with and, so long as provided to the holders of the Borrower's or any of its direct or indirect parent companies' debt securities' management's discussion and analysis describing results of operations);

(c)    [reserved];

(d)    simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 6.01(a) and 6.01(b) above, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; and

(e)    quarterly, at a time mutually agreed with the Administrative Agent that is promptly after the delivery of the information required pursuant to clause (a) above and the information delivered pursuant to clause (b) above for each fiscal quarter, participate in a conference call for Lenders to discuss the financial condition and results of operations of Holdings and its Subsidiaries for the most recently-ended period for which financial statements have been delivered, which requirement may be satisfied by including the Lenders and the Administrative Agent on quarterly conference calls with the lenders under the ABL Facilities or any other debt or equity securities of Holdings or any of its direct or indirect parent companies.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 6.01 may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable financial statements of any direct or indirect parent of the Borrower that, directly or indirectly, holds all of the

Equity Interests of the Borrower or (B) the Borrower's or such entity's Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to each of clauses (A) and (B), (i) to the extent such information relates to a parent of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to the Borrower (or such parent), on the one hand, and the information relating to the Borrower and the Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of Ernst & Young LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit other than as permitted by Section 6.01(a).

SECTION 6.02    Certificates; Other Information.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    no later than five (5) days after the delivery of the financial statements referred to in Sections 6.01(a) and (b), a duly completed Compliance Certificate signed by the chief financial officer of Holdings;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which Holdings or the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(c)    promptly after the furnishing thereof, copies of any material statements or material reports furnished to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the terms of the ABL Credit Agreement, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02;

(d)    together with the delivery of the financial statements pursuant to Section 6.01(a) and each Compliance Certificate pursuant to Section 6.02(a), (i) a report setting forth the information required by Section 3.03(c) of the Security Agreement (or confirming that there has been no change in such information since the Closing Date or the date of the last such report), (ii) a description of each event, condition or circumstance during the last fiscal quarter covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.03(b) and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such Compliance Certificate or a confirmation that there is no change in such information since the later of the Closing Date and the date of the last such list; and

(e)    promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(c) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to

the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Subsidiaries, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States Federal and state securities Laws (*provided, however,* that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

SECTION 6.03    Notices. Promptly after a Responsible Officer of the Borrower obtains actual knowledge thereof, notify the Administrative Agent:

(a)    of the occurrence of any Default; and

(b)    of (i) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (ii) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights, the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (iii) the occurrence of any ERISA Event that, in any such case referred to in clauses (i), (ii) or (iii), has resulted or could reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to Section 6.03(a) or (b) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

SECTION 6.04    Payment of Taxes. Timely pay, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon; *provided*, no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim.

SECTION 6.05    Preservation of Existence, Etc. (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of clause (a) or (b) to the extent (other than with respect to the preservation of the existence of Holdings and the Borrower) that

failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article VII.

SECTION 6.06    Maintenance of Properties.  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

SECTION 6.07    Maintenance of Insurance.  (a)  Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Administrative Agent (acting at the Direction of the Required Lenders), information presented in reasonable detail as to the insurance so carried.  Each such policy of insurance shall as appropriate, (i) name the Collateral Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Collateral Agent, on behalf of the Lenders as the loss payee thereunder and (b) with respect to each Mortgaged Property, obtain flood insurance in such total amounts as the Collateral Agent may from time to time reasonably require, if at any time the area in which any improvements located on any Mortgaged Property is designated as a "flood hazard area" in any Flood Insurance Rate Map established by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the Flood Insurance Laws.

SECTION 6.08    Compliance with Laws.  Comply in all material respects with its Organization Documents and the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

SECTION 6.09    Books and Records.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or such Restricted Subsidiary, as the case may be.

SECTION 6.10    Inspection Rights.  Permit representatives and independent contractors of the Administrative Agent and the Required Lenders to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; *provided, further*, that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 6.10, none of the Borrower or any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

SECTION 6.11    Covenant to Guarantee Obligations and Give Security. At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent or the Collateral Agent (acting at the Direction of the Required Lenders) to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)    (x) upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Unrestricted Subsidiary or an Excluded Subsidiary) by any Loan Party, the designation in accordance with Section 6.14, of any existing direct or indirect wholly owned Material Domestic Subsidiary as a Restricted Subsidiary or any Subsidiary becoming a wholly owned Material Domestic Subsidiary, (y) upon the acquisition of any material assets by the Borrower or any other Loan Party or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any material assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

(i)    within forty-five (45) days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the Administrative Agent may agree in its reasonable discretion:

(A)    cause each such Material Domestic Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement to furnish to the Collateral Agent a description of the Material Real Properties owned by such Material Domestic Subsidiary in detail reasonably satisfactory to the Collateral Agent;

(B)    within forty-five (45) days (or within ninety (90) days in the case of documents listed in Section 6.13(b)) after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent Mortgages with respect to any Material Real Property, Security Agreement Supplements, Intellectual Property Security Agreements and other security agreements and documents (including, with respect to Mortgages, the documents listed in Section 6.13(b)), as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent (consistent with the Mortgages, Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(C)    cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank (or any other documents customary under local law) and instruments evidencing the intercompany Indebtedness held by such Material Domestic Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Collateral Agent;

(D)    within forty-five (45) days (or within ninety (90) days in the case of documents listed in Section 6.13(b)) after such formation, acquisition or designation, take and cause the applicable Material Domestic Subsidiary and each direct or indirect parent of such applicable Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) may be necessary in the reasonable opinion of the Administrative Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid Liens

required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law);

(ii)    within forty-five (45) days (or within ninety (90) days in the case of documents listed in Section 6.13(b)) after the request therefor by the Administrative Agent (or such longer period as the Administrative Agent may agree in its reasonable discretion), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent (acting at the Direction of the Required Lenders) as to such matters set forth in this Section 6.11(a) as the Administrative Agent may reasonably request; and

(iii)    as promptly as practicable after the reasonable request therefor by the Administrative Agent or Collateral Agent (acting at the Direction of the Required Lenders), deliver to the Collateral Agent with respect to each Material Real Property, title reports, surveys and environmental assessment reports *provided* that the Collateral Agent may in its reasonable discretion accept any such existing report or survey to the extent prepared as of a date reasonably satisfactory to the Collateral Agent; *provided*, *however*, that there shall be no obligation to deliver to the Collateral Agent any environmental assessment report whose disclosure to the Collateral Agent would require the consent of a Person other than the Borrower or one of its Subsidiaries, where, despite the commercially reasonable efforts of the Borrower to obtain such consent, such consent cannot be obtained; and

(b)    (i) the Borrower shall obtain the security interests and Guarantees set forth on Schedule 1.01A on or prior to the dates corresponding to such security interests and Guarantees set forth on Schedule 1.01A; and

(ii)    after the Closing Date, promptly after the acquisition of any Material Real Property by any Loan Party other than Holdings, and such Material Real Property shall not already be subject to a perfected Lien pursuant to the Collateral and Guarantee Requirement, the Borrower shall give notice thereof to the Collateral Agent and will take, or cause the relevant Loan Party to take, the actions referred to in Section 6.13(b).

SECTION 6.12    Compliance with Environmental Laws.  Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent required by applicable Environmental Laws, conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all applicable Environmental Laws.

SECTION 6.13    Further Assurances and Post-Closing Conditions.  Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Loan Parties:

(a)    Promptly upon reasonable request by the Administrative Agent or the Collateral Agent (acting at the Direction of the Required Lenders) or as may be required by applicable law (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or Collateral Agent (acting at the Direction of the Required Lenders) may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents.

-80-

(b)        In the case of any Material Real Property, provide the Collateral Agent with Mortgages with respect to such owned real property within ninety (90) days (or such longer period as the Collateral Agent may agree in its sole discretion) of the acquisition of such real property in each case together with:

(i)        evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices that the Collateral Agent (acting at the Direction of the Required Lenders) may deem reasonably necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Collateral Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Collateral Agent (acting at the Direction of the Required Lenders);

(ii)        fully paid American Land Title Association Lender's Extended Coverage title insurance policies or the equivalent or other form available in each applicable jurisdiction (the "**Mortgage Policies**") in form and substance, with endorsements available in the applicable jurisdiction and in amount, reasonably acceptable to the Collateral Agent (not to exceed the fair market value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Collateral Agent, insuring the Mortgages to be valid subsisting Liens on the property described therein, subject only to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Collateral Agent may reasonably request and is available in the applicable jurisdiction;

(iii)        opinions of local counsel for the Loan Parties in states in which the real properties are located, with respect to the enforceability and perfection of the Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders);

(iv)        (A) a completed "life of the loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property duly executed and acknowledged by the appropriate Loan Parties and (B) with respect to any Mortgaged Property which is designated as a "flood hazard area" in any Flood Insurance Rate Map established by the Federal Emergency Management Agency (or any successor agency) and evidence of flood insurance as required by Section 6.07 hereof; and

(v)        such other evidence that all other actions that the Administrative Agent or Collateral Agent (acting at the Direction of the Required Lenders) may reasonably deem necessary or desirable in order to create valid and subsisting Liens on the property described in the Mortgages has been taken, including the delivery of those documents necessary to satisfy the Collateral and Guarantee Requirement.

(c)        Within sixty (60) days (or such longer period as the Collateral Agent may agree in its sole discretion (acting at the Direction of the Required Lenders)) of the Closing Date, and without duplication of Section 4.01(a)(iv), provide evidence that all other actions, recordings and filings that the Administrative Agent and the Collateral Agent (acting at the Direction of the Required Lenders) may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement at such time shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders).

SECTION 6.14    <u>Designation of Subsidiaries</u>.  The board of directors of the Borrower may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that (i) immediately before and after such designation, no Default shall have occurred and be continuing, (ii) other than for purposes of designating a Restricted Subsidiary as an Unrestricted Subsidiary that is a Securitization Subsidiary in connection with the establishment of a Qualified Securitization Financing, immediately after giving effect to such designation, the Net Leverage Ratio for the Test Period immediately preceding

such designation for which financial statements have been delivered pursuant to Section 6.01 is less than or equal to 4.25 to 1.0 (calculated on a Pro Forma Basis) (and, as a condition precedent to the effectiveness of any such designation, the Borrower shall deliver to the Administrative Agent a certificate setting forth in reasonable detail the calculations demonstrating satisfaction of such test) and (iii) no Subsidiary may be designated as an Unrestricted Subsidiary if, after such designation, it would be a "Restricted Subsidiary" for the purpose of the ABL Facilities or any Junior Financing or any other Indebtedness for borrowed money of any Loan Party in a principal amount in excess of the Threshold Amount.  The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the fair market value as determined by the Borrower in good faith of the Borrower's or its Subsidiary's (as applicable) Investment therein.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time and a return on any Investment by the Borrower in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the fair market value as determined by the Borrower in good faith at the date of such designation of the Borrower's or its Subsidiary's (as applicable) Investment in such Subsidiary.

Notwithstanding the foregoing, any Unrestricted Subsidiary that has been re-designated a Restricted Subsidiary may not be subsequently re-designated as an Unrestricted Subsidiary.

Neither the Borrower nor any Restricted Subsidiary shall permit transfer any Material Intellectual Property to any Unrestricted Subsidiary or be permitted to designate any Restricted Subsidiary that owns any such Material Intellectual Property as an Unrestricted Subsidiary.

SECTION 6.15    <u>Maintenance of Ratings</u>.  Use commercially reasonable efforts to obtain and maintain (i) public corporate credit ratings and a public corporate family ratings from Moody's and S&P in respect of the Borrower, and (ii) a public ratings from Moody's and S&P for the Term Loans, in each case within thirty (30) days of the Closing Date.

SECTION 6.16    <u>Cash Flow Forecast</u>.  From and after the Closing Date through September 30, 2024, the Borrower shall deliver an updated Cash Flow Forecast on a rolling 13-week basis on Wednesday of each week, together with a variance report, in form and substance reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders), comparing the Borrower's and its Restricted Subsidiaries' actual cash receipts and disbursements on a line item basis for the immediately preceding applicable period in the Cash Flow Forecast as compared to projected cash receipts and disbursements for such applicable period, as set forth in the Cash Flow Forecast.

## ARTICLE VII

### <u>Negative Covenants</u>

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations) shall remain unpaid or unsatisfied, each of Holdings and the Borrower shall not (and, with respect to Section 7.13, only Holdings shall not), nor shall Holdings or the Borrower permit any Restricted Subsidiary to:

SECTION 7.01    <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens created pursuant to any Loan Document;

(b)    Liens existing on the Closing Date and set forth on <u>Schedule 7.01(b)</u>;

(c)    Liens for taxes, assessments or governmental charges that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP;

(d)        statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materi-almen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in re-spect of Indebtedness) in favor of landlords, so long as, in each case, such Liens arise in the ordinary course of business that secure amounts not overdue for a period of more than thirty (30) days or, if more than thirty (30) days overdue, are unfiled and no other action has been taken to enforce such Lien or that are be-ing contested in good faith and by appropriate actions, if adequate reserves with respect thereto are main-tained on the books of the applicable Person in accordance with GAAP;

(e)        (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, the Borrower or any Restricted Subsidiary;

(f)        deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and ap-peal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)        easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole, or the use of the property for its intended purpose, and any other exceptions to title on the Mortgage Policies accepted by the Collateral Agent in accordance with the Loan Documents;

(h)        Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 8.01(g);

(i)        (i) Liens securing obligations in respect of Indebtedness permitted under Section 7.03(e); *provided* that (A) such Liens attach concurrently with or within two hundred and seventy (270) days after completion of the acquisition, construction, repair, replacement or improvement (as applicable) of the prop-erty subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits and (C) such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to, or acquired, constructed, repaired, replaced or improved with the proceeds of such Indebtedness; *provided* that individual financings of equip-ment provided by one lender may be cross collateralized to other financings of equipment provided by such lender and (ii) Liens on assets of Restricted Subsidiaries that are Non-Loan Parties securing Indebtedness of such Restricted Subsidiaries permitted pursuant to Section 7.03(n);

(j)        leases, licenses, subleases or sublicenses granted to others in the ordinary course of busi-ness which do not (i) interfere in any material respect with the business of the Borrower and its Subsidiar-ies, taken as a whole, or (ii) secure any Indebtedness;

(k)        Liens (i) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business and (ii) on specific items of inventory or other goods and proceeds thereof of any Person securing such Per-son's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or such other goods in the or-dinary course of business;

(l)        Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other com-modities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits

-83-

or other funds maintained with a financial institution (including the right of set off) and that are within the general parameters customary in the banking industry;

(m)    Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02(i) or Section 7.02(n) to be applied against the purchase price for such Investment or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(n)    Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary incurred pursuant to Section 7.03(b), (g), (n) or (t);

(o)    Liens in favor of the Borrower or a Restricted Subsidiary securing Indebtedness permitted under Section 7.03(d);

(p)    Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary (other than by designation as a Restricted Subsidiary pursuant to Section 6.14), in each case after the Closing Date (other than Liens on the Equity Interests of any Person that becomes a Restricted Subsidiary); *provided* that (i) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Restricted Subsidiary), and (ii) the Indebtedness secured thereby is permitted under Section 7.03(e) or (g);

(q)    any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases (other than Capitalized Leases) or licenses entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(r)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(s)    Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02 and reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts maintained in the ordinary course of business and not for speculative purposes;

(t)    Liens that are customary contractual rights of setoff (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions in the ordinary course and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Holdings, the Borrower or any of the Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings, the Borrower or any of the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(u)    Liens solely on any cash earnest money deposits made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement not prohibited hereunder;

(v)    ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(w)    purported Liens evidenced by the filing of precautionary Uniform Commercial Code financing statements or similar public filings;

(x)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(y)      Liens securing obligations in respect of Indebtedness permitted under Section 7.03(r)(i) and obligations in respect of any Secured Hedge Agreement and any Secured Cash Management Agreement (in each case, as defined in the ABL Credit Agreement) permitted under Section 7.03(r)(ii) (or, in each case, any Permitted Refinancing in respect thereof) that are subject to the ABL Intercreditor Agreement;

(z)      Liens on the Securitization Assets arising in connection with a Qualified Securitization Financing;

(aa)      any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(bb)      the modification, replacement, renewal or extension of any Lien permitted by clauses (b), (i) and (p) of this Section 7.01; *provided* that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03(e), and (B) proceeds and products thereof, and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03;

(cc)      Liens on the Collateral securing obligations in respect of Permitted Pari Passu Secured Debt, Permitted Junior Secured Refinancing Debt, Permitted Ratio Debt and any Permitted Refinancing of any of the foregoing; *provided* that (x) any such Liens securing any Permitted Refinancing in respect of Permitted Pari Passu Secured Debt are subject to the ABL Intercreditor Agreement and a First Lien Intercreditor Agreement and (y) any such Liens securing Permitted Ratio Debt or any Permitted Refinancing in respect of Permitted Junior Secured Refinancing Debt or Permitted Ratio Debt are subject to a Second Lien Intercreditor Agreement;

(dd)      Liens or rights of setoff against credit balances of the Borrower or any of its Subsidiaries with credit card issuers or credit card processors on amounts owing by such credit card issuers or credit card processors to the Borrower or any of its Subsidiaries in the ordinary course of business, but not Liens on or rights of setoff against any other property or assets of any Borrower or any of its Subsidiaries pursuant to the credit card agreements in effect on the Closing Date or as subsequently amended in any manner not materially adverse to the Lenders, to secure the obligations of the Borrower or any of its Subsidiaries to the credit card issuers or credit card processors as a result of fees and chargebacks;

(ee)      Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)      deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business of the Borrower and such Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises; and

(gg)      Liens securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not to exceed the greater of $150,000,000 and 6.50% of Total Assets, in each case determined as of the date of incurrence; provided, that any Liens on the Collateral incurred under this clause (gg) securing Indebtedness shall rank junior to the Liens securing the Obligations pursuant to a Second Lien Intercreditor Agreement.

SECTION 7.02    <u>Investments</u>.  Make or hold any Investments, except:

(a)    Investments by Holdings, the Borrower or any of the Restricted Subsidiaries in assets that are Cash Equivalents;

(b)    loans or advances to officers, directors and employees of Holdings (or any direct or indirect parent thereof), the Borrower or any of the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings (or any direct or indirect parent thereof; *provided* that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to Holdings in cash) and (iii) for any other purpose, in an aggregate principal amount outstanding under clauses (i) through (iii) not to exceed $22,000,000;

(c)    Investments (i) by (A) Holdings in any Loan Party and (B) the Borrower or any Restricted Subsidiary that is a Loan Party in the Borrower or any Restricted Subsidiary that is a Loan Party, (ii) by any Non-Loan Party in any other Non-Loan Party that is a Restricted Subsidiary, (iii) by any Non-Loan Party in the Borrower or any Restricted Subsidiary that is a Loan Party and (iv) by any Loan Party in any Non-Loan Party that is a Restricted Subsidiary; *provided* that (A) any such Investments made pursuant to this clause (iv) in the form of intercompany loans shall be evidenced by notes that have been pledged (individually or pursuant to a global note) to the Collateral Agent for the benefit of the Lenders (it being understood and agreed that any Investments permitted under this clause (iv) that are not so evidenced as of the Closing Date are not required to be so evidenced and pledged until the date that is sixty (60) days after the Closing Date (or such later date as may be acceptable to the Administrative Agent)) and (B) the aggregate amount of Investments made pursuant to this clause (iv) shall not exceed at any time outstanding the $20,000.000.

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)    Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under Section 7.01, 7.03 (other than Section 7.03(c)(ii) or (d)), 7.04 (other than Section 7.04(c)(ii) or (f)), 7.05 (other than Section 7.05(d)(ii) or (e)) and 7.06 (other than Section 7.06(d) or (g)(iv)), respectively;

(f)    Investments existing on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date, in each case, set forth on <u>Schedule 7.02(f)</u> and any modification, replacement, renewal, reinvestment or extension of any of the foregoing; *provided* that the amount of any Investment permitted pursuant to this Section 7.02(f) is not increased from the amount of such Investment on the Closing Date except pursuant to the terms of such Investment as of the Closing Date or as otherwise permitted by another clause of this Section 7.02;

(g)    Investments in Swap Contracts permitted under Section 7.03;

(h)    promissory notes and other non-cash consideration that is permitted to be received in connection with Dispositions permitted by Section 7.05;

(i)    the purchase or other acquisition of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, a Store or Equity Interests in a Person that, upon the consummation thereof, will be a wholly owned Restricted Subsidiary of the Borrower (including as a result of a merger or consolidation); *provided* that with respect to each purchase or other acquisition made pursuant to this Section 7.02(i) (each, a "**Permitted Acquisition**"):

(A)      the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and each applicable Loan Party and any such newly created or acquired Subsidiary (and, to the extent required under the Collateral and Guarantee Requirement, the Subsidiaries of such created or acquired Subsidiary) shall be Guarantors and shall have complied with the requirements of Section 6.11, within the times specified therein (for the avoidance of doubt, this clause (A) shall not override any provisions of the Collateral and Guarantee Requirement, subject to the limit in clause (B) below); *provided* that the formation of any Subsidiary that is a Division Successor shall be deemed to constitute the acquisition of a Restricted Subsidiary for all purposes of this definition;

(B)      the aggregate amount of Investments made in Persons that do not become Loan Parties shall not exceed at any time outstanding the greater of $55,000,000 and 2.50% of Total Assets in the aggregate following the Closing Date;

(C)      the acquired property, assets, business or Person is in a business permitted under Section 7.07; and

(D)      immediately before and immediately after giving Pro Forma Effect to any such purchase or other acquisition, no Event of Default shall have occurred and be continuing (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 8.01(a) or 8.01(f) shall have occurred and be continuing on the Transaction Agreement Date);

(j)      [reserved];

(k)      Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(l)      Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment;

(m)      loans and advances to Holdings (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings (or such direct or indirect parent) in accordance with Section 7.06(g);

(n)      Investments that do not exceed in the aggregate at any time outstanding the sum of (i) $40,000,000, determined as of the date of such Investment, and (ii) the Available Amount at such time;

(o)      advances of payroll payments to employees in the ordinary course of business;

(p)      Investments to the extent that payment for such Investments is made solely with Qualified Equity Interests of Holdings (or any direct or indirect parent thereof);

(q)      Investments held by a Restricted Subsidiary acquired after the Closing Date or of a Person merged into the Borrower or merged or consolidated with a Restricted Subsidiary in accordance with Section 7.04 after the Closing Date (other than existing Investments in subsidiaries of such Subsidiary or Person, which must comply with the requirements of Section 7.02(i) or (n)) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

-87-

(r)        Guarantees by the Borrower or any of the Restricted Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(s)        (i) Investments in a Securitization Subsidiary or any Investment by a Securitization Subsidiary in any other Person in connection with a Qualified Securitization Financing; *provided*, *however*, that any such Investment in a Securitization Subsidiary is in the form of a contribution of additional Securitization Assets or as equity, and (ii) distributions or payments of Securitization Fees and purchases of Securitization Assets pursuant to a Securitization Repurchase Obligation in connection with a Qualified Securitization Financing;

(t)        Investments made by any Restricted Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Restricted Subsidiary from an Investment in such Restricted Subsidiary made pursuant to Section 7.02(c)(iv), (i)(B) or (n); and

(u)        Investments so long as (i) before and after giving effect thereto, no Event of Default under clause (a) or (f) of Section 8.01 has occurred and is continuing and (ii) the Net Leverage Ratio on a Pro Forma Basis does not exceed 2.50 to 1.00.

Notwithstanding anything to the contrary set forth in this Section 7.02, no Loan Party shall make any Investment in any Subsidiary (other than another Loan Party) if the consideration paid by such Loan Party to such Subsidiary (other than a Loan Party) in respect of such Investment constitutes Material Intellectual Property; provided that nothing in this sentence shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary in the ordinary course of business.

SECTION 7.03      Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest, other than:

(a)        Indebtedness under the Loan Documents;

(b)        (i) Indebtedness existing on the Closing Date set forth on Schedule 7.03(b) and any Permitted Refinancing thereof and (ii) intercompany Indebtedness outstanding on the Closing Date; *provided* that all such Indebtedness of any Loan Party owed to any Non-Loan Party shall be subject to the Intercompany Subordination Agreement;

(c)        (i) Guarantees by Holdings, the Borrower and the Restricted Subsidiaries in respect of Indebtedness of the Borrower or any of the Restricted Subsidiaries otherwise permitted hereunder (except that a Restricted Subsidiary that is not a Loan Party may not, by virtue of this Section 7.03(c), Guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 7.03); *provided* that (A) no Guarantee by any Restricted Subsidiary of any Junior Financing shall be permitted unless such Restricted Subsidiary is a Loan Party and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guaranty on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (ii) any Guaranty by a Loan Party of Indebtedness of a Restricted Subsidiary that would have been permitted as an Investment by such Loan Party in such Restricted Subsidiary under Section 7.02(c);

(d)        Indebtedness of the Borrower or any of the Restricted Subsidiaries owing to the Borrower or any other Restricted Subsidiary to the extent constituting an Investment permitted by Section 7.02; *provided* that all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subject to the Intercompany Subordination Agreement;

(e)        (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) of the Borrower and the Restricted Subsidiaries financing the acquisition, construction, repair, replacement or

-88-

improvement of fixed or capital assets; *provided* that such Indebtedness is incurred concurrently with or within two hundred and seventy (270) days after the applicable acquisition, construction, repair, replacement or improvement and any Permitted Refinancing thereof in an aggregate principal amount pursuant to this subclause (i) not to exceed the greater of (x) \$110,000,000 and (y) 4.75% of Total Assets, in each case determined at the date of incurrence, (ii) Attributable Indebtedness arising out of sale-leaseback transactions (other than sale-leaseback transactions with respect to any Designated Assets) with respect to properties acquired after the Closing Date and any Permitted Refinancing thereof in an aggregate amount outstanding pursuant to this sub-clause (ii) at any time not to exceed the greater of (x) \$110,000,000 and (y) 4.75% of Total Assets, in each case, determined at the date of incurrence and (iii) Attributable Indebtedness arising out of sale-leaseback transactions with respect to any Designated Assets, and any Permitted Refinancing thereof;

(f)     Indebtedness in respect of Swap Contracts designed to hedge against Holdings', the Borrower's or any Restricted Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)     Indebtedness (i) of any Person that becomes a Restricted Subsidiary after the Closing Date, which Indebtedness is existing at the time such Person becomes a Restricted Subsidiary and is not incurred in contemplation of such Person becoming a Restricted Subsidiary that is non-recourse to the Borrower, Holdings or any other Restricted Subsidiary (other than any Subsidiary of such Person that is a Subsidiary on the date such Person becomes a Restricted Subsidiary after the Closing Date) and is either (A) unsecured or (B) secured only by the assets of such Restricted Subsidiary by Liens permitted under Section 7.01(p) and, in each case, any Permitted Refinancing thereof, and (ii) of the Borrower or any Restricted Subsidiary incurred or assumed in connection with any Permitted Acquisition that is secured only by Liens permitted under Section 7.01(p) (and any Permitted Refinancing of the foregoing) and so long as the aggregate principal amount of such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof at any time outstanding pursuant to this clause (g)(ii) does not exceed the greater of (x) \$110,000,000 and (y) 4.75% of Total Assets;

(h)     Permitted Pari Passu Secured Debt, Credit Agreement Refinancing Indebtedness and any Permitted Refinancing of any of the foregoing Indebtedness;

(i)     Indebtedness representing deferred compensation to employees of the Borrower and its Subsidiaries incurred in the ordinary course of business;

(j)     Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of Holdings (or any direct or indirect parent thereof) permitted by Section 7.06;

(k)     Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in a Permitted Acquisition, any other Investment expressly permitted hereunder or any Disposition, in each case to the extent constituting indemnification obligations or obligations in respect of purchase price (including earnouts) or other similar adjustments;

(l)     Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements with employees incurred by such Person in connection with any Permitted Acquisitions or any other Investment expressly permitted hereunder;

(m)     Cash Management Obligations and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof;

(n)     (i) Indebtedness of the Borrower and the Restricted Subsidiaries in an aggregate principal amount at any time outstanding not to exceed the greater of \$150,000,000 and 6.50% of Total Assets, in

each case determined at the time of incurrence and (ii) Indebtedness incurred by Non-Loan Parties, in each case determined at the time of incurrence in an aggregate principal amount not to exceed the greater of $58,000,000 and 2.50% of Total Assets;

(o)       Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(p)       Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business consistent with past practice in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(q)       obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(r)       (i) Indebtedness in an aggregate principal amount not to exceed the greater of (A) $600,000,000 plus incremental amounts permitted under the ABL Credit Agreement as in effect on the Closing Date and (B) the then applicable Borrowing Base at any time outstanding under the ABL Facilities and (ii) the amount of obligations in respect of any Secured Hedge Agreement and any Secured Cash Management Agreement (in each case, as defined in the ABL Credit Agreement) at any time outstanding and not incurred in violation of Section 7.03(f) and, in respect of clauses (i) and (ii), any Permitted Refinancing thereof;

(s)       [reserved];

(t)       Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness incurred pursuant to this clause (t) and then outstanding, does not exceed the greater of $58,000,000 and 2.50% of Total Assets;

(u)       Permitted Ratio Debt and any Permitted Refinancing thereof;

(v)       Indebtedness incurred by a Securitization Subsidiary in a Qualified Securitization Financing that is not recourse (except for Standard Securitization Undertakings) to the Borrower or any of the Restricted Subsidiaries;

(w)       Indebtedness in respect of letters of credit issued for the account of any of the Subsidiaries of Holdings to finance the purchase of inventory so long as (x) such Indebtedness is unsecured and (y) the aggregate principal amount of such Indebtedness does not exceed the greater of $81,000,000 and 3.50% of Total Assets at any time;

(x)       [reserved]; and

(y)       all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (x) above.

Notwithstanding the foregoing, no Restricted Subsidiary that is a Non-Loan Party will guarantee any Indebtedness for borrowed money of a Loan Party unless such Restricted Subsidiary becomes a Guarantor.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was

-90-

incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, plus the aggregate amount of fees, underwriting discounts, premiums and other costs and expenses incurred in connection with such refinancing.

The accrual of interest, the accretion of original issue discount and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

Notwithstanding anything to the contrary contained in this Agreement, Indebtedness incurred pursuant to the ABL Facilities (and any Permitted Refinancing thereof) may only be incurred pursuant to Section 7.03(r).

SECTION 7.04    Fundamental Changes.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(a)    Holdings or any Restricted Subsidiary may merge or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that (x) the Borrower shall be the continuing or surviving Person, (y) such merger or consolidation does not result in the Borrower ceasing to be organized under the Laws of the United States, any state thereof or the District of Columbia and (z) in the case of a merger or consolidation of Holdings with and into the Borrower, Holdings shall not be an obligor in respect of any other Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement, shall have no direct Subsidiaries at the time of such merger or consolidation other than the Borrower and, after giving effect to such merger or consolidation, the direct parent of the Borrower shall expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders);

(b)    (i) any Restricted Subsidiary that is not a Loan Party may merge or consolidate with or into any other Restricted Subsidiary of the Borrower that is not a Loan Party, (ii) any Restricted Subsidiary may merge or consolidate with or into any other Restricted Subsidiary of the Borrower that is a Loan Party, (iii) any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States shall be permitted and (iv) any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Restricted Subsidiaries and is not materially disadvantageous to the Lenders, *provided*, in the case of clauses (ii) through (iv), that (A) no Event of Default shall result therefrom, (B) no Change of Control shall result therefrom and (C) the surviving Person (or, with respect to clause (iv), the Person who receives the assets of such dissolving or liquidated Restricted Subsidiary that is a Guarantor) shall be a Loan Party;

(c)    any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (i) the transferee must be a Loan Party or (ii) such Investment must be a permitted Investment in a Restricted Subsidiary which is not a Loan Party in accordance with Sections 7.02 (other than Section 7.02(e));

(d)    so long as no Default exists or would result therefrom, the Borrower may merge or consolidate with any other Person; *provided* that (i) the Borrower shall be the continuing or surviving

-91-

corporation or (ii) if the Person formed by or surviving any such merger or consolidation is not the Borrower (any such Person, the "**Successor Borrower**"), (A) the Successor Borrower shall be an entity organized or existing under the Laws of the United States, any state thereof or the District of Columbia, (B) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (C) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guaranty confirmed that its Guarantee of the Obligations shall apply to the Successor Borrower's obligations under this Agreement, (D) each Loan Party, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement confirmed that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement, (E) each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to the Collateral Agent) confirmed that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement, and (F) the Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Collateral Document comply with this Agreement; *provided*, *further*, that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(e)　　so long as no Default exists or would result therefrom, Holdings may merge or consolidate with any other Person; *provided* that (A) Holdings shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, amalgamation or consolidation is not Holdings or is a Person into which Holdings has been liquidated (any such Person, the "**Successor Holdings**") (A) the Successor Holdings shall be an entity organized or existing under the Laws of the United States, any state thereof or the District of Columbia, (B) the Successor Holdings shall expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and (C) the Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Collateral Document comply with this Agreement; *provided*, *further*, that if the foregoing are satisfied, the Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement;

(f)　　so long as no Default exists or would result therefrom, any Restricted Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to Section 7.02 (other than Section 7.02(e)); *provided* that the continuing or surviving Person shall be the Borrower or a Restricted Subsidiary, which together with each of its Restricted Subsidiaries, shall have complied with the applicable requirements of Section 6.11;

(g)　　[reserved]; and

(h)　　so long as no Default exists or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 (other than Section 7.05(e)).

SECTION 7.05　　Dispositions.  Make any Disposition, except:

(a)　　Dispositions of obsolete, worn-out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and the Restricted Subsidiaries;

(b)　　Dispositions of inventory and goods held for sale in the ordinary course of business;

(c)　　Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property; *provided* that to the extent the

property being transferred constitutes Term Priority Collateral, such replacement property shall constitute Term Priority Collateral;

(d)        Dispositions of property to the Borrower or a Restricted Subsidiary; *provided* that if the transferor of such property is a Loan Party (i) the transferee thereof must be a Loan Party or (ii) such Investment must be a permitted Investment in a Restricted Subsidiary that is not a Loan Party in accordance with Section 7.02 (other than Section 7.02(e));

(e)        Dispositions permitted by Sections 7.02 (other than Section 7.02(e)), 7.04 (other than Section 7.04(h)) and 7.06 (other than Section 7.06(d)) and Liens permitted by Section 7.01 (other than Section 7.01(m)(ii));

(f)        Dispositions of property pursuant to sale-leaseback transactions; *provided* that the Net Cash Proceeds thereof are applied in accordance with Section 2.03(b)(ii);

(g)        Dispositions of Cash Equivalents;

(h)        leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(i)        transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event;

(j)        Dispositions of property not otherwise permitted under this Section 7.05; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Event of Default exists), no Event of Default shall exist or would result from such Disposition; and (ii) with respect to any Disposition pursuant to this clause (j) for a purchase price in excess of $20,000,000, the Borrower or any of the Restricted Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than nonconsensual Liens permitted by Section 7.01 and Liens permitted by Sections 7.01(a), (l), (m), (s), (t)(i), (t)(ii), (u), (y) and (cc)); *provided, however,* that for the purposes of this clause (ii), (A) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by such Restricted Subsidiary from such transferee that are converted by such Restricted Subsidiary into cash (to the extent of the cash received) within one hundred and eighty (180) days following the closing of the applicable Disposition and (C) any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value as determined by the Borrower in good faith, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (C) that is at that time outstanding, not in excess of the greater of $58,000,000 and 2.50% of Total Assets at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash;

(k)        Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(l)        Dispositions of accounts receivable in connection with the collection or compromise thereof;

-93-

(m)     any issuance or sale of Equity Interests in, or sale of Indebtedness or other securities of, an Unrestricted Subsidiary;

(n)     to the extent allowable under Section 1031 of the Code (or comparable or successor provision), any exchange of like property (excluding any boot thereon permitted by such provision) for use in any business conducted by the Borrower or any of its Restricted Subsidiaries that is not in contravention of Section 7.07; *provided* that to the extent the property being transferred constitutes Term Priority Collateral, such replacement property shall constitute Term Priority Collateral;

(o)     [reserved];

(p)     the unwinding of any Swap Contract;

(q)     sales or other dispositions by the Borrower or any Restricted Subsidiary of assets in connection with the closing or sale of a Store (including a factory Store) in the ordinary course of business of the Borrower and its Subsidiaries, which consist of leasehold interests in the premises of such Store, the equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such Store; *provided* that as to each and all such sales and closings, (A) no Event of Default shall result therefrom and (B) such sale shall be on commercially reasonable prices and terms in a bona fide arm's-length transaction;

(r)     bulk sales or other Dispositions of the inventory of a Loan Party not in the ordinary course of business in connection with Store closings, at arm's length;

(s)     any Disposition of Securitization Assets to a Securitization Subsidiary; and

(t)     the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any IP Rights;

*provided* that (i) no Loan Party shall make any Disposition of Material Intellectual Property to any Subsidiary (other than another Loan Party); provided that nothing in this clause (i) shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary in the ordinary course of business, and (ii) any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(e), (i), (k), (p) and (t) and except for Dispositions from the Borrower or a Restricted Subsidiary that is a Loan Party to the Borrower or a Restricted Subsidiary that is a Loan Party), shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith.  To the extent any Collateral is Disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent (acting at the Direction of the Required Lenders), upon the certification by the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent (acting at the Direction of the Required Lenders) shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 7.06    Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, except:

(a)     each Restricted Subsidiary may make Restricted Payments to the Borrower and to its other Restricted Subsidiaries (and, in the case of a Restricted Payment by a non-wholly owned Restricted Subsidiary, to the Borrower and any of its other Restricted Subsidiaries and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)     [reserved];

(c)     [reserved];

(d)      to the extent constituting Restricted Payments, Holdings, the Borrower and the Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.02 (other than Section 7.02(e)), 7.04 (other than a merger or consolidation of Holdings and the Borrower) or 7.08 (other than Section 7.08(a), (j) or (r));

(e)      repurchases of Equity Interests in Holdings, the Borrower or any of the Restricted Subsidiaries deemed to occur upon exercise of stock options or warrants or similar rights if such Equity Interests represent a portion of the exercise price of such options or warrants or similar rights;

(f)      [reserved];

(g)      the Borrower may make Restricted Payments to Holdings or to any direct or indirect parent of Holdings (and Holdings may make Restricted Payments to any direct or indirect parent of Holdings):

(i)      the proceeds of which will be used to pay (in amounts required for Holdings or such other parent company) consolidated or combined federal, state and/or local income Taxes imposed on such entity to the extent such income Taxes are attributable to the income of the Borrower and its Subsidiaries; *provided, however*, that (x) the amount of such payments in respect of any Tax year does not, in the aggregate, exceed the amount that the Borrower and its Subsidiaries whose activities are included in such consolidated or combined group would have been required to pay in respect of the relevant federal, state and/or local income Taxes (as the case may be) in respect of such year if the Borrower and such Subsidiaries paid such income Taxes directly as a stand-alone consolidated or combined income Tax group (reduced by any such taxes paid directly by the Borrower or any Subsidiary) and (y) the permitted payment pursuant to this clause (g)(i) and clause (g)(iii) with respect to any Taxes attributable to income of any Unrestricted Subsidiary for any taxable period shall be limited to the amount actually paid with respect to such period by such Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary for the purposes of paying such consolidated, combined or similar Taxes;

(ii)      the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, attributable to the ownership or operations of the Borrower and its Subsidiaries;

(iii)      the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof which does not own other Subsidiaries besides Holdings, its Subsidiaries and the direct or indirect parents of Holdings to pay) franchise taxes and other fees, taxes and expenses required to maintain its (or any of such direct or indirect parents') corporate existence;

(iv)      to finance any Investment permitted to be made pursuant to Section 7.02; *provided* that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment and (B) Holdings and the Borrower shall, immediately following the closing thereof, cause (1) all property acquired (whether assets or Equity Interests) to be contributed to the Borrower or a Restricted Subsidiary or (2) the merger (to the extent permitted in Section 7.04) of the Person formed or acquired into the Borrower or a Restricted Subsidiary in order to consummate such Permitted Acquisition, in each case, in accordance with the requirements of Section 6.11 and 7.02;

(v)      the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) costs, fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering permitted by this Agreement; and

(vi)     the proceeds of which (A) shall be used to pay customary salary, bonus and other benefits payable to officers and employees of Holdings or any direct or indirect parent company of Holdings to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries or (B) shall be used to make payments permitted under Sections 7.08(h) and (q) (but only to the extent such payments have not been and are not expected to be made by the Borrower or a Restricted Subsidiary);

(h)     Holdings, the Borrower or any of the Restricted Subsidiaries may pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any Permitted Acquisition;

(i)     [reserved];

(j)     repurchases of Equity Interests (i) deemed to occur on the exercise of options by the delivery of Equity Interests in satisfaction of the exercise price of such options or (ii) in consideration of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing), including deemed repurchases in connection with the exercise of stock options;

(k)     [reserved];

(l)     [reserved];

(m)     [reserved];

(n)     [reserved]; and

(o)     the Borrower may make Restricted Payments (the proceeds of which may be utilized by Holdings to make additional Restricted Payments) so long as (i) no Event of Default under clause (a) or (f) of Section 8.01 has occurred and is continuing and (ii) the Net Leverage Ratio on a Pro Forma Basis is no greater than 2.50 to 1.0.

Notwithstanding anything to the contrary set forth in this Section 7.06, no Loan Party shall make any Restricted Payment to any Subsidiary (other than another Loan Party) in the form of Material Intellectual Property; provided that nothing in this sentence shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary in the ordinary course of business.

SECTION 7.07    Change in Nature of Business.  Engage in any material line of business substantially different from those lines of business conducted by Holdings, the Borrower and the Restricted Subsidiaries on the Closing Date or any business reasonably related or ancillary thereto.

SECTION 7.08    Transactions with Affiliates.  Enter into any transaction of any kind with any Affiliate of Holdings or the Borrower, whether or not in the ordinary course of business, in excess of $10,000,000 other than:

(a)     transactions between or among the Borrower or any of the Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction,

(b)     transactions on terms substantially as favorable to Holdings, the Borrower or such Restricted Subsidiary as would be obtainable by Holdings, the Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate,

(c)     transactions under this Agreement or any other Loan Document,

-96-

(d)        [reserved],

(e)        [reserved],

(f)        employment and severance arrangements between Holdings, the Borrower and the Restricted Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements,

(g)        the non-exclusive licensing of trademarks, copyrights or other IP Rights in the ordinary course of business to permit the commercial exploitation of IP Rights between or among Affiliates and Subsidiaries of Holdings or the Borrower,

(h)        the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers and employees of Holdings and the Restricted Subsidiaries or any direct or indirect parent of Holdings in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries,

(i)        any agreement, instrument or arrangement as in effect as of the Closing Date and set forth on Schedule 7.08, or any amendment thereto (so long as any such amendment is not adverse to the Lenders in any material respect as compared to the applicable agreement as in effect on the Closing Date),

(j)        Restricted Payments permitted under Section 7.06,

(k)        [reserved],

(l)        transactions in which the Borrower or any of the Restricted Subsidiaries, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (b) of this Section 9.8,

(m)        the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof to the extent otherwise permitted by this Agreement and to the extent such issuance or transfer would not give rise to a Change of Control,

(n)        the Closing Date Transactions and the payment of all fees and expenses related to the Closing Date Transactions and permitted pursuant to the Confirmation Order,

(o)        payments to or from, and transactions with, Joint Ventures (to the extent any such Joint Venture is only an Affiliate as a result of Investments by Holdings and the Restricted Subsidiaries in such Joint Venture) in the ordinary course of business to the extent otherwise permitted under Section 7.02,

(p)        any Disposition of Securitization Assets or related assets in connection with any Qualified Securitization Financing,

(q)        the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to shareholders of Holdings or any direct or indirect parent thereof pursuant to the stockholders agreement or the registration and participation rights agreement entered into on the Closing Date in connection therewith,

(r)        the entering into of any tax sharing agreement or arrangement to the extent that the payments pursuant thereto are permitted by Section 7.06(g)(i), and

(s)      payments to an Affiliate in respect of the Indebtedness or Equity Interests of Holdings, the Borrower or any of the Restricted Subsidiaries that are payable to Affiliates that may from time to time own such Indebtedness or Equity Interests.

SECTION 7.09    <u>Burdensome Agreements</u>.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that prohibits, restricts, imposes any condition on or limits the ability of (a) any Restricted Subsidiary that is not a Loan Party to make Restricted Payments to (directly or indirectly) or to make or repay loans or advances to any Loan Party or to Guarantee the Obligations of any Loan Party under the Loan Documents or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Facility and the Obligations under the Loan Documents; *provided* that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations that:

(i)      (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on <u>Schedule 7.09</u> hereto and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing does not expand the scope of such Contractual Obligation,

(ii)      are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary,

(iii)      represent Indebtedness of a Restricted Subsidiary that is not a Loan Party that is permitted by Section 7.03,

(iv)      are customary restrictions that arise in connection with (x) any Lien permitted by Sections 7.01(a), (l), (m), (s), (t)(i), (t)(ii), (u), (y) and (cc) and relate to the property subject to such Lien or (y) any Disposition permitted by Section 7.05 applicable pending such Disposition solely to the assets subject to such Disposition,

(v)      are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture entered into in the ordinary course of business,

(vi)      are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness (and excluding in any event any Indebtedness constituting any Junior Financing) and the proceeds and products thereof and, in the case of the ABL Facilities, Permitted Pari Passu Secured Debt, Permitted Ratio Debt, Credit Agreement Refinancing Indebtedness and any Permitted Refinancing of any of the foregoing, permit the Liens securing the Obligations without restriction (subject to the ABL Intercreditor Agreement),

(vii)      are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto,

(viii)      comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 7.03(e), (g), (h), (o)(i), (r) or (t) to the extent that such restrictions apply only to the property or assets securing such Indebtedness or to the Restricted Subsidiary party to such Indebtedness,

(ix)      are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary,

(x)      are customary provisions restricting assignment of any agreement entered into in the ordinary course of business,

(xi)　　　are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business,

(xii)　　　are restrictions contained in the ABL Credit Agreement, the ABL Facilities Documentation and any documentation governing a Permitted Refinancing of any of the foregoing,

(xiii)　　　arise in connection with cash or other deposits permitted under Section 7.01, or

(xiv)　　　comprise restrictions imposed by any agreement governing Indebtedness entered into after the Closing Date and permitted under Section 7.03 that are, taken as a whole, in the good faith judgment of the Borrower, no more restrictive with respect to the Borrower or any Restricted Subsidiary than customary market terms for Indebtedness of such type, so long as the Borrower shall have determined in good faith that such restrictions will not affect its obligation or ability to make any payments required hereunder.

SECTION 7.10　　　Use of Proceeds.  Use the proceeds of any Borrowing, whether directly or indirectly, in a manner prohibited by this Agreement.

SECTION 7.11　　　Accounting Changes.  Make any change in fiscal year; *provided, however,* that Holdings and the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent (acting at the Direction of the Required Lenders), in which case, Holdings, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

SECTION 7.12　　　Prepayments, Etc. of Indebtedness.

(a)　　　Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal, interest and mandatory prepayments shall be permitted) Junior Financing, except (A) the refinancing thereof with the Net Cash Proceeds of, or in exchange for, any Permitted Refinancing, to the extent not required to prepay any Loans pursuant to Section 2.03(b), (B) the conversion of any Junior Financing to Equity Interests (other than Disqualified Equity Interests) of Holdings or any of its direct or indirect parents, (C) the prepayment, redemption, purchase, defeasance or other satisfaction of Indebtedness of the Borrower or any Restricted Subsidiary owed to Holdings, the Borrower or a Restricted Subsidiary or the prepayment, redemption, purchase, defeasance or other satisfaction of any other Junior Financing with the proceeds of any other Junior Financing otherwise permitted by Section 7.03, (D) prepayments, redemptions, purchases, defeasances and payments in respect of Junior Financings prior to their scheduled maturity in an aggregate amount not to exceed the sum of (1) 25,000,000 and (2) so long as no Event of Default has occurred and is continuing, the Available Amount at such time (solely in the case of clause (a)(ii) of the definition of "Available Amount," so long as on a Pro Forma Basis, the Net Leverage Ratio is not greater than 4.25 to 1.0) and (E) prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings prior to their scheduled maturity so long as no Event of Default has occurred and is continuing under clause (a) or (f) of Section 8.01 and the Net Leverage Ratio on a Pro Forma Basis is not greater than 2.75 to 1.0.

(b)　　　Amend, modify or change in any manner materially adverse to the interests of the Lenders any term or condition of any Junior Financing Documentation, other than as a result of a Permitted Refinancing thereof, without the consent of the Administrative Agent.

SECTION 7.13　　　Holdings.  In the case of Holdings, conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto): (i) its ownership of the Equity Interests of the Borrower, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the ABL Facilities, any Permitted Ratio Debt, any Credit Agreement Refinancing Indebtedness, any Permitted Pari Passu Secured Debt and any other Indebtedness permitted to be incurred by Holdings pursuant to Section 7.03, (iv) any public offering of its common stock or any other issuance of its Equity Interests or any transaction permitted under Section 7.04, (v) financing activities, including the issuance of securities, incurrence of debt, payment of Restricted Payments, making contributions to the capital of its Subsidiaries and guaranteeing the obligations of its

Subsidiaries in each case solely to the extent permitted hereunder, (vi) participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings (or any direct or indirect parent entity of Holdings) and the Borrower, (vii) holding any cash or property received in connection with Restricted Payments made by the Borrower in accordance with Section 7.06 pending application thereof by Holdings, (viii) providing indemnification to officers and directors and (ix) activities incidental to the businesses or activities described in clauses (i) to (viii) of this Section 7.13.

## ARTICLE VIII

## Events of Default and Remedies

SECTION 8.01    Events of Default.  Each of the events referred to in clauses (a) through (l) of this Section 8.01 shall constitute an "**Event of Default**":

(a)    Non-Payment.  The Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)    Specific Covenants.  The Borrower, any Restricted Subsidiary or, in the case of Section 7.13, Holdings, fails to perform or observe any term, covenant or agreement contained in any of Sections 6.03(a) or 6.05(a) (solely with respect to the Borrower) or Article VII; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(d)    Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(e)    Cross-Default.  Any Loan Party or any Restricted Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (e)(B) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided*, *further*, that such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02; *provided* that no such event under the ABL Facilities (other than the failure of any Loan Party or any Restricted Subsidiary to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of the ABL Facilities) shall constitute an Event of Default under this Section 8.01(e) until the earliest to occur of (x) the acceleration of the Indebtedness under the ABL Facilities and (y) the exercise of any remedies by the ABL Administrative Agent in respect of any Collateral; or

(f)    <u>Insolvency Proceedings, Etc</u>. Holdings, the Borrower or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)    <u>Judgments</u>. There is entered against any Loan Party or any Restricted Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(h)    <u>ERISA</u>. (i) An ERISA Event occurs with respect to an Employee Benefit Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party or their respective ERISA Affiliates under Title IV of ERISA in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, (ii) any Loan Party or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, or (iii) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable law or plan terms that would reasonably be expected to result in a Material Adverse Effect; or

(i)    <u>Invalidity of Loan Documents</u>. Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document; or

(j)    <u>Collateral Documents</u>. (i) Any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.11 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create, or any Lien purported to be created by any Collateral Document shall be asserted in writing by any Loan Party not to be, a valid and perfected lien, with the priority required by the Collateral Documents (or other security purported to be created on the applicable Collateral) on any security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, except to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file Uniform Commercial Code continuation statements and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage, or (ii) any of the Equity Interests of the Borrower ceasing to be pledged pursuant to the Security Agreement free of Liens other than Liens permitted by the ABL Intercreditor Agreement, First Lien Intercreditor Agreement (if any) and the Second Lien Intercreditor Agreement (if any) or any nonconsensual Liens arising solely by operation of Law; or

(k)    <u>Junior Financing Documentation</u>. (i) Any of the Obligations of the Loan Parties under the Loan Documents for any reason shall cease to be "Senior Indebtedness" (or any comparable term) or "Senior Secured Financing" (or any comparable term) under, and as defined in any Junior Financing

Documentation with an aggregate principal amount of not less than the Threshold Amount or (ii) the subordination provisions set forth in any Junior Financing Documentation with an aggregate principal amount of not less than the Threshold Amount shall, in whole or in part, cease to be effective or cease to be legally valid, binding and enforceable against the holders of any such Junior Financing, if applicable; or

(l)     Change of Control.  There occurs any Change of Control.

SECTION 8.02     Remedies upon Event of Default.  If any Event of Default occurs and is continuing, the Administrative Agent may with the consent of, and shall at the request of, the Required Lenders, take any or all of the following actions:

(a)     declare Commitments of each Lender to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder, including any Applicable Prepayment Amount, or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(c)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States or any Debtor Relief Laws, the Commitments of each Lender shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

The parties hereto acknowledge and agree that (A) the Applicable Prepayment Amount (i) is additional consideration for providing the Loans, (ii) is a material inducement to the Lenders to provide the Commitments and make the Loans, (iii) is reasonable and is the product of an arm's length transaction between sophisticated parties ably represented by counsel, (iv) constitutes reasonable liquidated damages calculated in good faith to compensate the Lenders for, and is a proportionate quantification of, the actual loss of the anticipated stream of interest payments upon an acceleration of the Term Loans (such damages being otherwise impossible to ascertain or even estimate for various reasons, including, without limitation, because such damages would depend on, among other things, (x) when the Loans might otherwise be repaid and (y) future changes in interest rates which are not readily ascertainable on the Closing Date), (v) shall be payable notwithstanding any then-prevailing market rates at the time payment is made, and (vi) is not a penalty to punish the Borrower for its early prepayment of the Loans or for the occurrence of any Event of Default or acceleration; (B) there has been a course of conduct between the Lenders and the Credit Parties giving specific consideration in this transaction for the agreement to pay the Applicable Prepayment Amount; and (C) the Loan Parties shall be estopped from claiming differently from as agreed to in this Section 8.02.

SECTION 8.03     Application of Funds.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under

Section 10.04 and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, the Obligations under Secured Hedge Agreements and Cash Management Obligations, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

## ARTICLE IX

### Administrative Agent and Other Agents

SECTION 9.01    <u>Appointment and Authorization of the Administrative Agent</u>.

(a)    Each Lender hereby irrevocably appoints Wilmington Savings Fund Society, FSB. to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this <u>Article IX</u> (other than Sections 9.09 and 9.11) are solely for the benefit of the Administrative Agent and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any such provision.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities as a Lender and a potential Hedge Bank and/or Cash Management Bank) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this <u>Article IX</u> (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto (including the ABL Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

(c)    Each Lender hereby irrevocably authorizes the Administrative Agent, based upon the Direction of the Required Lenders (but subject in all respects to the TSA), to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by the Administrative Agent or the Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC (or any equivalent provision of the UCC), at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any other sale or foreclosure

US-DOCS\149885390.12

conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable Laws. In no event shall the Administrative Agent be obligated to take title to or possession of Collateral in its own name, or otherwise in a form or manner that may, in its reasonable judgment, expose it to liability; *provided that* if the Administrative Agent declines to take title to or possession of Collateral because it exposes it to liability, it will promptly notify the Required Lenders thereof.

(d)       Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable Laws a security interest can be perfected by possession or control. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly following the Administrative Agent's request therefor, shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

SECTION 9.02       Rights as a Lender. Any Person serving as an Agent (including as Administrative Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as an Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders. The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

SECTION 9.03       Exculpatory Provisions. Neither the Administrative Agent nor any other Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, an Agent (including the Administrative Agent):

(a)       shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties;

(b)       shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)       shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any Person serving as an Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein; provided, that, any action or inaction taken at the direction of the Required Lenders (or such other number or

-104-

percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary) shall not be deemed gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower or a Lender.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.  The Administrative Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on (including any flood insurance policies or for determining whether any flood insurance policies are or should be obtained in respect of the Collateral, which each Lender shall be solely responsible for), or the payment of taxes with respect to, any of the Collateral.  The Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as the Administrative Agent.

The Administrative Agent shall not be liable for any action omitted to be taken by it by reason of the lack of direction or instruction for such action (including, without limitation, for refusing to exercise discretion or for withholding its consent in the absence of receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instructions to exercise such direction or grant such consent from any such Lender, as applicable). The Administrative Agent shall have no liability for any failure, inability, unwillingness on the part of any Lender or Loan Party to provide accurate and complete information on a timely basis to the Administrative Agent, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall not have any liability for any inaccuracy or error in the performance or observance on the Administrative Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely in-formation received by it, or other failure on the part of any such other party to comply with the terms hereof.

The Administrative Agent shall not be liable for interest on any money received by it. Money held by the Administrative Agent hereunder need not be segregated from other funds except to the extent required by law. The Administrative Agent shall not have any liability for interest on any money received by it hereunder except as otherwise agreed in writing.

For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to either Agent hereunder (including without limitation this Article IX), phrases such as "satisfactory to the Administrative Agent/Collateral Agent," "approved by the Administrative Agent/Collateral Agent," "acceptable to the Administrative Agent/Collateral Agent," "as determined by the Administrative Agent/Collateral Agent," "in the Administrative Agent/Collateral Agent's discretion," "selected by the Administrative Agent/Collateral Agent," "elected by the Administrative Agent/Collateral Agent," "requested by the Administrative Agent/Collateral Agent," and phrases of similar import that authorize and permit the Administrative Agent/Collateral Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Administrative Agent/Collateral Agent receiving written Direction from the Required Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

SECTION 9.04    Reliance by the Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the

proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law.

SECTION 9.05    Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Agent-Related Persons of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

SECTION 9.06    Non-Reliance on Administrative Agent and Other Lenders; Disclosure of Information by Agents.  Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

SECTION 9.07    Indemnification of Agents.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Administrative Agent and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless the Administrative Agent and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) from against any and all Indemnified Liabilities incurred by it; *provided* that no Lender shall be

liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction; *provided* that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided, further*, that the failure of any Lender to indemnify or reimburse the Administrative Agent shall not relieve any other Lender of its obligation in respect thereof.  The undertaking in this Section 9.07 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

SECTION 9.08    No Other Duties; Other Agents, Etc.  Anything herein to the contrary notwithstanding, none of the other Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder and such Persons shall have the benefit of this Article IX.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any agency or fiduciary or trust relationship with any Lender, Holdings, the Borrower or any of their respective Subsidiaries.  Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

SECTION 9.09    Resignation of Administrative Agent.  The Administrative Agent or Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed), to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such Lender or bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent or Collateral Agent, as applicable, may on behalf of the Lenders, appoint a successor Administrative Agent or Collateral Agent, as applicable, meeting the qualifications set forth above; *provided* that if the Administrative Agent or Collateral Agent, as applicable, shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent or Collateral Agent, as applicable, on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor of such Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent, as applicable, hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent or Collateral Agent, as applicable, and the retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor

Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Sections 10.04 and 10.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Administrative Agent or Collateral Agent, as applicable.

SECTION 9.10    Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.07 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.07 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The holders of the Obligations hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the holders thereof shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided* that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 10.01 of this Agreement), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata

-108-

by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Lender or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Lender or any acquisition vehicle to take any further action.

SECTION 9.11    Collateral and Guaranty Matters.  Each of the Lenders (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank) irrevocably authorizes the Administrative Agent and the Collateral Agent, solely to the extent that each of the Administrative Agent and the Collateral Agent has received a Direction of the Required Lenders, and each of the Administrative Agent and the Collateral Agent agrees that it will:

(a)    release any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (x) obligations and liabilities under Secured Hedge Agreements as to which arrangements satisfactory to the applicable Hedge Bank shall have been made, (y) Cash Management Obligations as to which arrangements satisfactory to the applicable Cash Management Bank shall have been made and (z) contingent indemnification obligations not yet accrued and payable), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than Holdings, the Borrower or any of its Domestic Subsidiaries that are Guarantors, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below or (iv) such property becoming an Excluded Asset;

(b)    release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i);

(c)    release any Guarantor from its obligations under the Guaranty (and release (or acknowledge the release of) any Liens granted by such Guarantor) if in the case of any Subsidiary, such Person ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary (other than as a result of such Guarantor ceasing to be a wholly owned Subsidiary unless Equity Interests of such Subsidiary have been transferred to a Person that is not an Affiliate of the Borrower for a bona fide business purpose that is not in connection with a financing) as a result of a transaction or designation permitted hereunder; *provided* that no such release shall occur if such Guarantor continues to be a guarantor in respect of the ABL Facilities, any Permitted Pari Passu Secured Debt, any Credit Agreement Refinancing Indebtedness or any Junior Financing; and

(d)    if any Guarantor shall cease to be a Material Domestic Subsidiary (as certified in writing by a Responsible Officer of the Borrower), and the Borrower notifies the Administrative Agent in writing that it wishes such Guarantor to be released from its obligations under the Guaranty and provides the Administrative Agent and the Collateral Agent such certifications or documents as either such Agent shall reasonably request, (i) release such Subsidiary from its obligations under the Guaranty and (ii) release any Liens granted by such Subsidiary or Liens on the Equity Interests of such Subsidiary; *provided* that no such release shall occur if such Subsidiary continues to be a guarantor in respect of the ABL Facilities, any Permitted Pari Passu Secured Debt, any Credit Agreement Refinancing Indebtedness or any Junior Financing.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.11.  In each case as specified in this Section 9.11, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to),

at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.11.

Anything contained in any of the Loan Documents to the contrary notwithstanding, each Agent, each Lender and each Secured Party hereby agree that:

(i)    no provision of any Loan Documents shall require the creation, perfection or maintenance of pledges of or security interests in, or the obtaining of title insurance or abstracts with respect to, any Excluded Assets and any other particular assets, if and for so long as, in the reasonable judgment of the Collateral Agent (acting at the Direction of the Required Lenders), the cost of creating, perfecting or maintaining such pledges or security interests in such other particular assets or obtaining title insurance or abstracts in respect of such other particular assets is excessive in view of the fair market value of such assets or the practical benefit to the Lenders afforded thereby; and

(ii)    the Collateral Agent (acting at the Direction of the Required Lenders) may grant extensions of time for the creation or perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the Closing Date for the creation or perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that creation or perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

SECTION 9.12    Appointment of Supplemental Administrative Agents.

(a)    It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Administrative Agent**" and collectively as "**Supplemental Administrative Agents**").

(b)    In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)    Should any instrument in writing from any Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower or Holdings, as applicable, shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  In case any Supplemental Administrative Agent, or a successor thereto, shall die, become

-110-

incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

SECTION 9.13    Intercreditor Agreements. The Administrative Agent and the Collateral Agent are authorized to enter into the ABL Intercreditor Agreement, any First Lien Intercreditor Agreement and any Second Lien Intercreditor Agreement and the parties hereto acknowledge that the ABL Intercreditor Agreement and any such First Lien Intercreditor Agreement or Second Lien Intercreditor Agreement is binding upon them. Each Lender (a) hereby consents to the subordination of the Liens on the Current Asset Collateral securing the Obligations on the terms set forth in the ABL Intercreditor Agreement and to the provisions of the First Lien Intercreditor Agreement with respect to the parity nature of the Liens on the Collateral, (b) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the ABL Intercreditor Agreement and any such First Lien Intercreditor Agreement or Second Lien Intercreditor Agreement and (c) hereby authorizes and instructs the Administrative Agent and Collateral Agent to enter into the ABL Intercreditor Agreement and, if applicable, any such First Lien Intercreditor Agreement or Second Lien Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.

SECTION 9.14    Secured Cash Management Agreements and Secured Hedge Agreements. Except as otherwise expressly set forth herein or in any Guaranty or any Collateral Document, no Cash Management Bank or Hedge Bank that obtains the benefits of Section 8.03, any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article IX to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

SECTION 9.15    Withholding Taxes. To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 3.01, each Lender shall indemnify and hold harmless the Administrative Agent (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Borrower to do so) against, and shall make payable in respect thereof within 20 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and reasonable expenses (including reasonable fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including, without limitation, because the appropriate form was not delivered or properly executed, or be-cause such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.15. The agreements in this Section 9.15 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

SECTION 9.16    Erroneous Payments.

(a)    Without limitation of any other provision in this Agreement, if at any time the Administrative Agent makes a payment hereunder in error to any Lender, whether or not in respect of an Obligation due and owing by the Borrower at such time, where such payment is a Rescindable Amount, then in any such event, each Lender receiving a Rescindable Amount severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount received by such Lender in immediately available funds in the currency so received, with

interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. Each Lender irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another) or similar defense to its obligation to return any Rescindable Amount.  The Administrative Agent shall inform each Lender promptly upon determining that any payment made to such Lender comprised, in whole or in part, a Rescindable Amount.

(b)        If the Administrative Agent notifies a Lender or other Secured Party, or any other Person who has received funds on behalf of a Lender or other Secured Party (any such Lender, Secured Party or other recipient, a "**Payment Recipient**") that the Administrative Agent has determined in its sole reasonable discretion that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Payment Recipient shall promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent, in same day funds (in the currency so received), the amount of any such Erroneous Payment (or portion thereof), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent (acting at the Direction of the Required Lenders) in accordance with prevailing banking industry rules on interbank compensation from time to time in effect. To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Payment Recipient under this <u>clause (b)</u> shall be conclusive, absent manifest error.

(c)        Without limiting immediately preceding <u>clause (b)</u>, each Payment Recipient hereby further agrees that if it receives an Erroneous Payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Erroneous Payment (the "**Payment Notice**"), or (y) that was not preceded or accompanied by a Payment Notice sent by the Administrative Agent (or any of its Affiliates), then, said Payment Recipient shall be on notice, in each case, that an error has been made with respect to such Erroneous Payment.  Each Payment Recipient agrees that, in each such case, or if it otherwise becomes aware an Erroneous Payment (or portion thereof) may have been sent in error, such Payment Recipient shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent (acting at the Direction of the Required Lenders) in accordance with prevailing banking industry rules on interbank compensation from time to time in effect.

(d)        Each Payment Recipient hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Payment Recipient under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Payment Recipient from any source, against any amount due to the Administrative Agent under any of the immediately preceding <u>clauses (b)</u> or <u>(c)</u> or under the indemnification provisions of this Agreement.

(e)        In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent (such unrecovered amount, an "**Erroneous Payment Return Deficiency**"), the Borrower and each other Loan Party hereby agrees that (x) the

Administrative Agent shall be subrogated to all the rights of such Payment Recipient with respect to such amount (including, without limitation, the right to sell and assign the Loans (or any portion thereof), which were subject to the Erroneous Payment Return Deficiency) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.  For the avoidance of doubt, no assignment of an Erroneous Payment Return Deficiency will reduce the Commitments of any Payment Recipient and such Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to the assignment of an Erroneous Payment Return Deficiency, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Payment Recipient under the Loan Documents with respect to each Erroneous Payment Return Deficiency (for the avoidance of doubt, without increasing the Obligations owed by the Borrower or any other Loan Party with respect to the Erroneous Payment Return Deficiency).

(f)      To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)      The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by any Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from or on behalf of any Borrower or any other Loan Party (including from the proceeds of any Collateral) for the purpose of making such Erroneous Payment.

(h)      Each party's obligations, agreements and waivers under this <u>Section 9.16</u> shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Secured Obligations (or any portion thereof) under any Loan Document.

## ARTICLE X

### Miscellaneous

SECTION 10.01    <u>Amendments, Etc</u>.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)      extend or increase the Commitment of any Lender without the written consent of each Lender directly affected thereby (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)      postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.05 or 2.06 without the written consent of each Lender directly affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c)      reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (i) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any

other Loan Document without the written consent of each Lender directly affected thereby; *provided* that (i) only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate and (ii) the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(d)      change any provision of this Section 10.01 or the definition of "Required Lenders," "Required Facility Lenders" or "Pro Rata Share" or any other provision specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender affected thereby;

(e)      except pursuant to the ABL Intercreditor Agreement or as contemplated by Section 9.11(i) (i) subordinate the Obligations in right of payment to any other obligations or (ii) subordinate the Liens on all or substantially all of the Collateral, in each case, without the written consent of each Lender directly and adversely affected thereby;

(f)      other than with respect to Indebtedness that is expressly permitted by Section 2.12(a)(I), change (i) Section 8.03 or (ii) the order of application of any reduction in the Commitments or any prepayment of Loans from the application thereof set forth in the applicable provisions of Section 2.03(b) or 2.04(b), respectively, in any manner that materially and adversely affects any Lender without the written consent of such Lender;

(g)      other than in a transaction permitted under Section 7.04 or Section 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(h)      other than in a transaction permitted under Section 7.04 or Section 7.05, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(i)      to the extent not otherwise permitted by this Agreement as in effect on the Closing Date, authorize additional Indebtedness that would be issued under the Loan Documents for the purpose of influencing voting thresholds, without the written consent of each Lender directly and adversely affected thereby;

(j)      amend or modify the definition of "Material Intellectual Property" or the last paragraph of Section 7.02, the last paragraph of Section 7.05 and the last paragraph of Section 7.06, in each case without the written consent of each Lender;

(k)      other than in connection with a  debtor-in-possession financing or any proceeding under any Debtor Relief Law or with respect to Indebtedness that is expressly permitted by Section 2.12(a)(I) or Section 7.03(e) or (r) (solely with respect to the Current Asset Collateral) and/or Liens that are expressly permitted by Section 7.01(i) or (y) (solely with respect to the Current Asset Collateral) of this Agreement as in effect as of the Closing Date to be senior to the Obligations and/or be secured by a Lien that is senior to the Lien securing the Secured Obligations, subordinate (x) the Liens securing any of the Facilities on all or substantially all of the Collateral ("**Existing Liens**") to the Liens securing any other Indebtedness or other obligations or (y) any of the Facilities in contractual right of payment to any other Indebtedness (any such Indebtedness, "**Senior Indebtedness**"), without the consent of each directly and adversely affected Lender, in either the case of subclause (x) or (y), unless each such adversely affected Lender (other than a Defaulting Lender) has been offered a bona fide opportunity to provide on a pro rata basis any new loans or other Indebtedness (on the same terms as each other lender providing such loans or Indebtedness, including as to any fees (other than any customary "backstop" fee) payable in connection therewith); provided, however, that if any such adversely affected Lender does not accept an offer to provide its pro rata share of such Senior Indebtedness within ten (10) Business Days of such offer being made, such adversely affected Lender shall be deemed to have declined such offer); or

(l)      amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent;

and *provided*, *further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (ii) Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification and (iii) the consent of Required Facility Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of Lenders under such Facility in respect of payments hereunder in a manner different than such amendment affects other Facilities.

Notwithstanding the foregoing,

(a)    No Lender consent is required to effect any amendment or supplement to the ABL Intercreditor Agreement, any First Lien Intercreditor Agreement or any Second Lien Intercreditor Agreement (i) that is for the purpose of adding the holders of Permitted Pari Passu Secured Debt or Permitted Junior Secured Refinancing Debt (or a Senior Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of the ABL Intercreditor Agreement, such First Lien Intercreditor Agreement or such Second Lien Intercreditor Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and *provided* that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by the ABL Intercreditor Agreement (or the comparable provisions, if any, of any First Lien Intercreditor Agreement or any Second Lien Intercreditor Agreement); *provided*, *further*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable; and

(b)    This Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the Replacement Loans (as defined below) to permit the refinancing of all outstanding Loans of any Class ("**Refinanced Loans**") with replacement term loans ("**Replacement Loans**") hereunder; *provided* that (a) the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of such Refinanced Loans, (b) the All-In Yield with respect to such Replacement Loans (or similar interest rate spread applicable to such Replacement Loans) shall not be higher than the All-In Yield for such Refinanced Loans (or similar interest rate spread applicable to such Refinanced Loans) immediately prior to such refinancing, (c) the Weighted Average Life to Maturity of such Replacement Loans shall not be shorter than the Weighted Average Life to Maturity of such Refinanced Loans at the time of such refinancing (except by virtue of amortization or prepayment of the Refinanced Loans prior to the time of such incurrence) and (d) all other terms applicable to such Replacement Loans shall be substantially identical to, or less favorable to the Lenders providing such Replacement Loans than, those applicable to such Refinanced Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the Latest Maturity Date of the Loans in effect immediately prior to such refinancing.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, collateral security documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

SECTION 10.02    Notices and Other Communications; Facsimile Copies.

(a)    General.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to Holdings, the Borrower or the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)    Electronic Communication.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

(c)    Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(d)    The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE," THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Agent-Related Persons or any Arranger (collectively, the "**Agent Parties**") have any liability to Holdings, the Borrower, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender or any

-116-

other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

        (e)    <u>Change of Address</u>.  Each of Holdings, the Borrower and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities Laws.

        (f)    <u>Reliance by the Administrative Agent</u>.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

        SECTION 10.03    <u>No Waiver; Cumulative Remedies</u>.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

        SECTION 10.04    <u>Attorney Costs and Expenses</u>.  The Borrower agrees (a) if the Closing Date occurs, to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all fees, charges and disbursements of the Lender Advisors and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole, and (b) to pay or reimburse the Administrative Agent and the Lenders for all documented out-of-pocket costs and expenses, including any and all recording and filing fees, cost and expenses incurred pursuant to any Collateral Document, the reasonable fees, charges and disbursements of ArentFox Schiff LLP, as lead counsel to the Administrative Agent, incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of one counsel to the Administrative Agent and one counsel to the Lenders (and, if reasonably necessary, one local counsel in any relevant material jurisdiction and, in the event of any conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole)).  The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations.  All amounts due under this Section 10.04 shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail and such backup material as the Borrower may reasonably request.  If any Loan Party fails to pay when due any costs, expenses or other amounts

-117-

payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion. The Borrower and each other Loan Party hereby acknowledge that the Administrative Agent and/or any Lender may receive a benefit, including without limitation, a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with the Administrative Agent and/or such Lender, including, without limitation, fees paid pursuant to this Agreement or any other Loan Document.

SECTION 10.05    Indemnification by the Borrower.  The Borrower shall indemnify and hold harmless the Agents, each Lender and their respective Affiliates, directors, officers, employees, agents, partners, trustees or advisors and other representatives (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interest of the Lenders, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment, Loan or the use or proposed use of the proceeds therefrom, or (c) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liability arising out of the activities or operations of the Borrower, any Subsidiary or any other Loan Party, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee or agent of such Indemnitee, (y) a material breach of any obligations under any Loan Document by such Indemnitee or of any Related Indemnified Person as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under the Facility and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates. To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party).  In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated.  All amounts due under this Section 10.05 shall be paid within twenty (20) Business Days after written demand therefor.  The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.  This Section 10.05 shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, etc., arising from a non-Tax claim.

SECTION 10.06    Marshaling; Payments Set Aside.  None of the Administrative Agent or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

SECTION 10.07    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may, except as permitted by Section 7.04, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section, or (iv) to an SPC in accordance with the provisions of subsection (g) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Agent-Related Persons of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment or, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless each of the Administrative Agent and, so long as no Event of Default under Section 8.01(a) or, solely with respect to the Borrower or any Guarantor, Section 8.01(f) has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

US-DOCS\149885390.12

(iii)    <u>Required Consents</u>.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (1) an Event of Default under Section 8.01(a) or, solely with respect to the Borrower, Section 8.01(f), has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that if the Borrower does not respond to a request for an assignment within ten (10) Business Days after receiving written notice of a request for such consent, the Borrower shall be deemed to have consented to such assignment; and

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)    <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.  All assignments shall be by novation.

(v)    <u>No Assignments to Certain Persons</u>.  No such assignment shall be made (A) to Holdings, the Borrower or any of the Borrower's Subsidiaries, (B) subject to subsection (h) below, any of the Borrower's Affiliates, (C) to a natural person or an investment vehicle of a natural person or (D) any Disqualified Institution to the extent that the list of Disqualified Institutions has been provided to all Public Lenders on the Platform.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)    The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, owing to each Lender pursuant to the terms hereof from time to time (the **"Register"**).  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  This Section 10.07(c) and Section 2.09 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations), and including Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations and, in each case, any amended or successor versions.

(d)        Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, an investment vehicle of a natural person or, to the extent that the list of Disqualified Institutions has been provided to all Public Lenders on the Platform, any Disqualified Institution or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that directly affects such Participant. Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled (through the applicable Lender) to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections (including the limitation in the definition of "Excluded Taxes"), and Sections 3.06(a) and 3.07, as if the Participant were a Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section.  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.11 as though it were a Lender.

(e)        <u>Limitations upon Participant Rights</u>.  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld, conditioned or delayed).  Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**").  A Lender shall not be obligated to disclose the Participant Register to any Person except to the extent such disclosure is necessary to establish that any Loan or other obligation is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury regulations (or any amended or successor version). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)        Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)        Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that an SPC shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections (including the limitation in the definition of "Excluded Taxes"), and Sections 3.06(a) and 3.07, as if the SPC were a Lender); <u>provided</u>, that neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Sections 3.01, 3.04 or 3.05) unless such increase or change results from a Change in Law after the grant was made.  Each party hereto further agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and (ii) the Granting Lender shall for all purposes,

US-DOCS\149885390.12

including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the Laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

    SECTION 10.08    Confidentiality. Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable prior to any such disclosure by such Person unless such notification is prohibited by law, rule or regulation or except in connection with any request as part of a regulatory examination, (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such unless such notification is prohibited by law, rule or regulation or except in connection with any request as part of a regulatory examination, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee invited to be an Additional Lender (other than to a Disqualified Institution; *provided* that the list of Disqualified Institutions may be provided) or (ii) any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower, (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from the Administrative Agent or such Lender) or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent or Lender to be subject to a confidentiality restriction in respect thereof in favor of the Borrower or any Affiliate of the Borrower.

    For purposes of this Section, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof; it being understood that all information received from Holdings, the Borrower or any Subsidiary after the Closing Date shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

    Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such

US-DOCS\149885390.12

material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

SECTION 10.09    Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent,  to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 10.10    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 10.11    Counterparts; Integration; Effectiveness.  This Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement (each a "**Communication**"), including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures.  Each of the Loan Parties agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on each of the Loan Parties to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of each of the Loan Parties enforceable against such in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered.  Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Administrative Agent and each of the Lenders of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Administrative Agent and each of the Lenders may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("**Electronic Copy**"), which shall be deemed created in the ordinary course of the such Person's business, and destroy the original paper document.  All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record.  Notwithstanding anything contained herein to the contrary, the Administrative Agent is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Administrative Agent has agreed to accept such Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification and (b) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by such manually executed counterpart.  For purposes hereof, "**Electronic Record**" and "**Electronic Signature**" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

-123-

SECTION 10.12    Electronic Execution of Assignments and Certain Other Documents.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

SECTION 10.13    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

SECTION 10.14    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 10.15    GOVERNING LAW.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH  IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b)

OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

SECTION 10.16   <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 10.17   <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by the Borrower, Holdings and the Administrative Agent and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

SECTION 10.18   <u>Lender Action</u>.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent (which shall not be withheld in contravention of Section 9.04).  The provision of this Section 10.18 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 10.19   <u>Use of Name, Logo, etc</u>.  Each Loan Party consents to the publication in the ordinary course by Administrative Agent of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark.  Such consent shall remain effective until revoked by such Loan Party in writing to the Administrative Agent.

SECTION 10.20   <u>USA PATRIOT Act</u>.  Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulation.

SECTION 10.21   <u>Service of Process</u>.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

SECTION 10.22   <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings  acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents are arm's-length commercial transactions between the Borrower, Holdings and their

respective Affiliates, on the one hand, and the Agents, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Agents and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents nor any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Lender and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings their respective Affiliates, and none of the Agents nor any Lender has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Agents nor any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 10.23    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

SECTION 10.24    Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "QFC Credit Support", and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be

effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 10.23, the following terms have the following meanings:

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Covered Entity**" means any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

JOANN HOLDINGS 2, LLC

By: _____
     Name:
     Title:

NEEDLE HOLDINGS LLC

By: _____
     Name:
     Title:

WILMINGTON SAVINGS FUND SOCIETY, FSB,

as Administrative Agent and Collateral Agent

By: _____
    Name:
    Title:

[    ], as a Lender

By: _____
      Name:
      Title:

[Signature Page to Credit Agreement]

# **EXHIBIT B-2**

**Blackline (Revised Exit Facilities Documents)**

**THIS DRAFT OF THE CREDIT AGREEMENT REMAINS SUBJECT TO CONTINUING NEGOTIATIONS WITH ALL PARTIES IN INTEREST AND THE FINAL VERSION MAY CONTAIN MATERIAL DIFFERENCES. FOR THE AVOIDANCE OF DOUBT, NO PARTY HAS CONSENTED TO THIS VERSION AS THE FINAL FORM, AND ALL PARTIES RESERVE THEIR RESPECTIVE RIGHTS WITH RESPECT TO THIS DOCUMENT AND ANY RELATED DOCUMENTS**

$600,000,000

SECOND AMENDED AND RESTATED CREDIT AGREEMENT

Dated as of [~~          ~~]**April 30**, 2024

among

JO-ANN STORES, LLC,
as the Borrower,

[~~NEWCO~~]**JOANN HOLDINGS 2**, LLC,
as Parent,

NEEDLE HOLDINGS LLC,
as Holdings,

BANK OF AMERICA, N.A.,
as Administrative Agent, Collateral Agent and Issuer,

1903P LOAN AGENT, LLC,
as FILO Documentation Agent,

and

THE OTHER LENDERS AND ISSUERS PARTY HERETO

_____

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Syndication Agent,

BMO HARRIS BANK, N.A.,
PNC BANK, NATIONAL ASSOCIATION,
TD BANK, N.A. and
U.S. BANK NATIONAL ASSOCIATION,
as Co-Documentation Agents,

BANK OF AMERICA, N.A., and
WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Joint Lead Arrangers and Joint Bookrunners

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS ...................................1

SECTION 1.1     Defined Terms ...............................................................................1
SECTION 1.2     Other Interpretive Provisions .....................................................66
SECTION 1.3     Accounting Terms ........................................................................67
SECTION 1.4     Rounding .......................................................................................68
SECTION 1.5     Letter of Credit Amounts .............................................................68
SECTION 1.6     References to Agreements, Laws, Etc ..........................................68
SECTION 1.7     Times of Day .................................................................................68
SECTION 1.8     Pro Forma Calculations; Reclassification; IP Matters ...............68
SECTION 1.9     Limited Condition Acquisitions ...................................................70
SECTION 1.10    Interest Rates .................................................................................71
SECTION 1.11    FILO Documentation Agent .........................................................71

ARTICLE II THE FACILITIES ..............................................................................................72

SECTION 2.1     The Commitments .........................................................................72
SECTION 2.2     Borrowing Procedures for Revolving Loans; Conforming Changes ...73
SECTION 2.3     Swing Loans .................................................................................74
SECTION 2.4     Letters of Credit ...........................................................................76
SECTION 2.5     Reduction and Termination of the Commitments .......................81
SECTION 2.6     Repayment of Loans .....................................................................82
SECTION 2.7     Evidence of Indebtedness .............................................................82
SECTION 2.8     Optional Prepayments ..................................................................83
SECTION 2.9     Mandatory Prepayments ...............................................................83
SECTION 2.10    Interest ...........................................................................................84
SECTION 2.11    Conversion/Continuation Option ..................................................85
SECTION 2.12    Fees ...............................................................................................85
SECTION 2.13    Payments and Computations ........................................................86
SECTION 2.14    [Reserved] ......................................................................................88
SECTION 2.15    Revolving Commitment Increase ..................................................88
SECTION 2.16    Defaulting Lenders .......................................................................90
SECTION 2.17    Extensions of Loans ......................................................................91
SECTION 2.18    Sustainability Adjustments ...........................................................94
SECTION 2.19    FILO Deficiency Reserve; Certain Availability Reserves ...........95

ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY .................97

SECTION 3.1     Taxes .............................................................................................97
SECTION 3.2     Illegality .......................................................................................99
SECTION 3.3     Inability to Determine Rates .......................................................100
SECTION 3.4     Increased Cost and Reduced Return; Capital Adequacy; Reserves on Term SOFR Loans ...103
SECTION 3.5     Funding Losses ...........................................................................104
SECTION 3.6     Matters Applicable to all Requests for Compensation ..............104
SECTION 3.7     Replacement of Lenders under Certain Circumstances ..............105
SECTION 3.8     Survival ........................................................................................106

i

**TABLE OF CONTENTS**
**(CONTINUED)**

ARTICLE IV CONDITIONS PRECEDENT ........................................................................... 106

    SECTION 4.1    Conditions Precedent to Effectiveness of this Agreement ................... 106
    SECTION 4.2    Conditions Precedent to Each Loan and Letter of Credit .................... 109

ARTICLE V REPRESENTATIONS AND WARRANTIES ............................................. 110

    SECTION 5.1    Existence, Qualification and Power; Compliance with Laws ............. 110
    SECTION 5.2    Authorization; No Contravention ........................................................ 111
    SECTION 5.3    Governmental Authorization ............................................................... 111
    SECTION 5.4    Binding Effect .................................................................................... 111
    SECTION 5.5    Financial Statements; No Material Adverse Effect ........................... 111
    SECTION 5.6    Litigation ........................................................................................... 112
    SECTION 5.7    Labor Matters .................................................................................... 112
    SECTION 5.8    Ownership of Property; Liens ........................................................... 112
    SECTION 5.9    Environmental Matters ...................................................................... 112
    SECTION 5.10    Taxes ................................................................................................ 112
    SECTION 5.11    ERISA Compliance ........................................................................... 113
    SECTION 5.12    Subsidiaries ...................................................................................... 114
    SECTION 5.13    Margin Regulations; Investment Company Act ............................... 114
    SECTION 5.14    Disclosure ........................................................................................ 115
    SECTION 5.15    Intellectual Property; Licenses, Etc. ................................................ 115
    SECTION 5.16    Solvency ........................................................................................... 115
    SECTION 5.17    OFAC; Sanctions ............................................................................. 115
    SECTION 5.18    USA PATRIOT Act .......................................................................... 115
    SECTION 5.19    Collateral Documents ....................................................................... 116
    SECTION 5.20    Anti-Corruption Laws. ...................................................................... 116
    SECTION 5.21    Affected Financial Institution. ......................................................... 116

ARTICLE VI FINANCIAL COVENANT ......................................................................... 116

    SECTION 6.1    Minimum Excess Availability. ......................................................... 116
    SECTION 6.2    Minimum Consolidated Fixed Charge Coverage Ratio .................... 116

ARTICLE VII REPORTING COVENANTS ..................................................................... 117

    SECTION 7.1    Financial Statements, Etc. ................................................................. 117
    SECTION 7.2    Certificates; Other Information ......................................................... 119
    SECTION 7.3    Notices .............................................................................................. 121
    SECTION 7.4    Borrowing Base Certificates; Appraisals; Field Examinations ........ 122

ARTICLE VIII AFFIRMATIVE COVENANTS ............................................................... 123

    SECTION 8.1    Preservation of Existence, Etc. ......................................................... 124
    SECTION 8.2    Compliance with Laws, Etc. ............................................................. 124
    SECTION 8.3    Designation of Subsidiaries .............................................................. 124
    SECTION 8.4    Payment of Taxes, Etc. ..................................................................... 125
    SECTION 8.5    Maintenance of Insurance ................................................................. 125
    SECTION 8.6    Inspection Rights .............................................................................. 125
    SECTION 8.7    Books and Records ........................................................................... 126
    SECTION 8.8    Maintenance of Properties. ............................................................... 126
    SECTION 8.9    Use of Proceeds ................................................................................ 126
    SECTION 8.10    Compliance with Environmental Laws ............................................ 126

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

TABLE OF CONTENTS
(CONTINUED)

| | | |
|---|---|---|
| SECTION 8.11 | Covenant to Guarantee Obligations and Give Security | 126 |
| SECTION 8.12 | Cash Receipts | 127 |
| SECTION 8.13 | Further Assurances | 129 |

**ARTICLE IX NEGATIVE COVENANTS** ........................................................... 129

| | | |
|---|---|---|
| SECTION 9.1 | Liens | 130 |
| SECTION 9.2 | Investments | 133 |
| SECTION 9.3 | Indebtedness | 135 |
| SECTION 9.4 | Fundamental Changes | 139 |
| SECTION 9.5 | Dispositions | 140 |
| SECTION 9.6 | Restricted Payments | 142 |
| SECTION 9.7 | Change in Nature of Business | 144 |
| SECTION 9.8 | Transactions with Affiliates | 145 |
| SECTION 9.9 | Burdensome Agreements | 146 |
| SECTION 9.10 | Accounting Changes; Fiscal Year. | 147 |
| SECTION 9.11 | Prepayment, Etc. of Indebtedness. | 148 |
| SECTION 9.12 | Modification of Debt Agreements | 148 |
| SECTION 9.13 | Holdings and Parent | 148 |

**ARTICLE X EVENTS OF DEFAULT AND REMEDIES** .................................... 149

| | | |
|---|---|---|
| SECTION 10.1 | Events of Default | 149 |
| SECTION 10.2 | Remedies upon Event of Default | 151 |
| SECTION 10.3 | Application of Funds | 153 |
| SECTION 10.4 | [Reserved]. | 155 |
| SECTION 10.5 | Actions in Respect of Letters of Credit; Cash Collateral | 155 |
| SECTION 10.6 | Post-Petition Financings; Insolvency Proceedings | 156 |
| SECTION 10.7 | Separate Classification | 158 |
| SECTION 10.8 | Avoidance and Reinstatement | 158 |
| SECTION 10.9 | Payments Over | 158 |
| SECTION 10.10 | Subrogation | 158 |
| SECTION 10.11 | Credit Bidding | 159 |
| SECTION 10.12 | FILO Purchase Option | 160 |

**ARTICLE XI THE ADMINISTRATIVE AGENT** .............................................. 161

| | | |
|---|---|---|
| SECTION 11.1 | Appointment and Authorization | 161 |
| SECTION 11.2 | Rights as a Lender. | 162 |
| SECTION 11.3 | Exculpatory Provisions | 162 |
| SECTION 11.4 | Reliance by the Administrative Agent | 163 |
| SECTION 11.5 | Delegation of Duties | 164 |
| SECTION 11.6 | Resignation of Administrative Agent | 164 |
| SECTION 11.7 | Non-Reliance on Administrative Agent and Other Lenders; Disclosure of Information by Agents | 165 |
| SECTION 11.8 | No Other Duties; Other Agents, Arrangers, Managers, Etc. | 166 |
| SECTION 11.9 | Intercreditor Agreement | 166 |
| SECTION 11.10 | Administrative Agent May File Proofs of Claim | 166 |
| SECTION 11.11 | Collateral and Guaranty Matters | 167 |
| SECTION 11.12 | Secured Cash Management Agreements, Secured Bank Product Agreements and Secured Hedge Agreements | 168 |
| SECTION 11.13 | Indemnification of Agents | 169 |

TABLE OF CONTENTS
(CONTINUED)

SECTION 11.14    Certain ERISA Matters ....................................................... 169
SECTION 11.15    Recovery of Erroneous Payments. ..................................... 171

ARTICLE XII MISCELLANEOUS .................................................................. 171

SECTION 12.1     Amendments, Etc. ............................................................... 171
SECTION 12.2     Successors and Assigns ...................................................... 176
SECTION 12.3     Costs and Expenses ............................................................ 181
SECTION 12.4     Indemnities .......................................................................... 181
SECTION 12.5     Limitation of Liability ........................................................ 183
SECTION 12.6     Right of Set-off ................................................................... 183
SECTION 12.7     Sharing of Payments. .......................................................... 183
SECTION 12.8     Notices and Other Communications; Facsimile Copies ..... 184
SECTION 12.9     No Waiver; Cumulative Remedies ...................................... 186
SECTION 12.10    [Reserved]. .......................................................................... 186
SECTION 12.11    Binding Effect ..................................................................... 186
SECTION 12.12    Governing Law; Submission to Jurisdiction; Service of Process ... 186
SECTION 12.13    Waiver of Jury Trial ............................................................ 187
SECTION 12.14    Marshaling; Payments Set Aside ........................................ 187
SECTION 12.15    Execution in Counterparts ................................................. 188
SECTION 12.16    Electronic Execution of Assignments and Certain Other Documents ... 188
SECTION 12.17    Confidentiality .................................................................... 189
SECTION 12.18    Use of Name, Logo, etc. ..................................................... 190
SECTION 12.19    USA PATRIOT Act Notice ................................................. 190
SECTION 12.20    No Advisory or Fiduciary Responsibility ............................ 191
SECTION 12.21    Severability .......................................................................... 191
SECTION 12.22    Survival of Representations and Warranties ........................ 191
SECTION 12.23    Lender Action ...................................................................... 192
SECTION 12.24    Interest Rate Limitation ....................................................... 192
SECTION 12.25    Time of the Essence. ........................................................... 192
SECTION 12.26    No Strict Construction. ........................................................ 192
SECTION 12.27    Intercreditor Agreement. ..................................................... 192
SECTION 12.28    Keepwell. ............................................................................. 193
SECTION 12.29    Acknowledgment and Consent to Bail-In of Affected Financial Institutions. ... 193
SECTION 12.30    Acknowledgement Regarding Any Supported QFCs. ......... 193
SECTION 12.31    Limited Waiver; Amendment and Restatement. .................. 194

iv

**SCHEDULES**

| | | |
|---|---|---|
| Schedule I | - | Commitments |
| Schedule II | - | Guarantors |
| Schedule 1.1D | - | Designated Assets |
| Schedule 1.1E | - | Credit Card Agreements |
| Schedule 5.12 | - | Subsidiaries and Other Equity Investments |
| Schedule 8.12 | - | Material Bank Accounts; Credit Card Processors |
| Schedule 9.1(b) | - | Existing Liens |
| Schedule 9.2(f) | - | Existing Investments |
| Schedule 9.3(b) | - | Existing Indebtedness |
| Schedule 9.8 | - | Transactions with Affiliates |
| Schedule 9.9 | - | Burdensome Agreements |
| Schedule 12.8 | - | Administrative Agent's Office, Certain Addresses for Notices |

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Form of Assignment and Assumption |
| Exhibit B | - | Form of Revolving Credit Note |
| Exhibit C | - | Form of Notice of Borrowing |
| Exhibit D | - | Form of Swing Loan Request |
| Exhibit E | - | Form of Letter of Credit Request |
| Exhibit F | - | Form of Notice of Conversion or Continuation |
| Exhibit G | - | Form of Cash Flow Forecast |
| Exhibit H | - | Form of Guaranty |
| Exhibit I | - | Form of Security Agreement |
| Exhibit J | - | Form of Borrowing Base Certificate |
| Exhibit K | - | Form of Intercreditor Agreement |
| Exhibit L | - | Form of Intercompany Subordination Agreement |
| Exhibit M | - | Form of United States Tax Compliance Certificate |
| Exhibit N | - | Form of Compliance Certificate |
| Exhibit O | - | Form of Solvency Certificate |
| Exhibit P | - | Form of FILO Note |

i

This SECOND AMENDED AND RESTATED CREDIT AGREEMENT (as further defined herein, this "*Agreement*") is entered into as of [_____]**April 30**, 2024, among JO-ANN STORES, LLC, an Ohio limited liability company (the "*Borrower*"), **[NewCo]JOANN HOLDINGS 2**, LLC, a Delaware ~~corporation ("~~**limited liability company ("***Parent*"), NEEDLE HOLDINGS LLC, a Delaware limited liability company ("*Holdings*"), BANK OF AMERICA, N.A., as administrative agent (in such capacity, including any successor thereto, the "*Administrative Agent*") and as collateral agent (in such capacity, including any successor thereto, the "*Collateral Agent*") under the Loan Documents, 1903P LOAN AGENT, LLC, as documentation agent for the FILO Facility (in such capacity, including any successor thereto, the "*FILO Documentation Agent*"), and each lender from time to time party hereto (collectively, as further defined herein, the "*Lenders*" and individually, a "*Lender*").

PRELIMINARY STATEMENTS

Holdings and the Borrower have entered into that certain Amended and Restated Credit Agreement, dated as of October 21, 2016 (as amended and in effect, the "*Existing Credit Agreement*"), among Holdings, the Borrower, the "Lenders" as defined therein, Bank of America, N.A., as Administrative Agent and Collateral Agent thereunder, and 1903P Loan Agent, LLC, as FILO Documentation Agent thereunder.

On March 18, 2024 (the "*Petition Date*"), (i) JoAnn, Inc., Holdings and certain of Holdings' Subsidiaries (collectively, the "*Debtors*" and each individually, a "*Debtor*") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code and their cases are being jointly administered under Case No. [_____]**24-10418 (CTG)** (the "*Chapter 11 Cases*") with the United States Bankruptcy Court for the District of Delaware (the "*Court*").

On [_____], 2024, the Court entered the Confirmation Order (as hereinafter defined) approving the Debtors' [Joint Chapter 11 Plan of Reorganization of [Joann Inc.] and its Affiliated Debtors] (the "*Approved Plan*").

The Borrower has requested that the Lenders enter into this Agreement to provide exit financing to the Debtors in connection with their emergence from the Chapter 11 Cases on the Second Restatement Date, pursuant to the Approved Plan and on the terms and conditions set forth herein.

The applicable Lenders have indicated their willingness to lend, and the Issuers have indicated their willingness to issue Letters of Credit, in each case, on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree that the Existing Credit Agreement shall be amended and restated in its entirety to read as follows:

**ARTICLE I**

**DEFINITIONS, INTERPRETATION AND ACCOUNTING TERMS**

SECTION 1.1        Defined Terms.

As used in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Account*" has the meaning given to such term in Article 9 of the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of or (b) for services rendered or to be rendered.

"*Account Debtor*" has the meaning given to such term in Article 9 of the UCC.

"*ACH*" means automated clearing house transfers.

"*Additional Lender*" has the meaning specified in *Section 2.15(a)*.

"*Adjustment Date*" means the first day of each Fiscal Quarter beginning with [August 5], 2024.

"*Administrative Agent*" has the meaning specified in the preamble to this Agreement.

"*Administrative Agent's Office*" means the Administrative Agent's address and, as appropriate, account as set forth on *Schedule 12.8*, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Affected Financial Institution*" any EEA Financial Institution or UK Financial Institution.

"*Affiliate*" means, with respect to any Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  For the avoidance of doubt, none of the Arrangers, the Agents or their respective lending affiliates or any entity acting as an Issuer hereunder shall be deemed to be an Affiliate of Parent, Holdings, the Borrower or any of their respective Subsidiaries.

"*Agent Parties*" has the meaning specified in *Section 12.8(d)*.

"*Agent-Related Persons*" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Persons and of such Persons' Affiliates.

"*Agents*" means, collectively, the Administrative Agent, the Collateral Agent, each of the Co-Syndication Agents, each of the Co-Documentation Agent, the FILO Documentation Agent, each co-agent or sub-agent (if any) appointed by the Administrative Agent from time to time pursuant to *Section 11.5* and the Arrangers.

"*Aggregate Commitments*" means the Revolving Credit Commitments of all the Lenders. As of the Second Restatement Date, the Aggregate Commitments are $500,000,000.

"*Agreement*" means this Credit Agreement, as amended, restated, modified, replaced, extended, renewed or supplemented from time to time in accordance with the terms hereof.

"*Annual Financial Statements*" means the audited consolidated balance sheets of the Borrower and its Subsidiaries as of January 28, 2023 and the related consolidated statements of

2

operations, changes in stockholders' equity and cash flows for the Borrower for the Fiscal Years then ended.

"*Applicable Indebtedness*" has the meaning specified in the definition of "Weighted Average Life to Maturity".

"*Applicable Margin*" means a percentage per annum equal to (a) from and after the Second Restatement Date until the first Adjustment Date, the percentages set forth in Level III of the pricing grid below; and (b) thereafter, the following percentages per annum, based upon Average Historical Excess Availability as of the most recent Adjustment Date:

| Level | Average Historical Excess Availability | Term SOFR Loans and Term SOFR Margin for Letter of Credit Fees (Standby Letters of Credit) | Base Rate | Letter of Credit Fees (Documentary Letters of Credit) |
|-------|----------------------------------------|-------------------------------------------------------------------------------------------|-----------|--------------------------------------------------------|
| I | Greater than or equal to 66 2/3% of the Maximum Credit | 2.50% | 1.50% | 1.75% |
| II | Less than 66 2/3% of the Maximum Credit, but greater than or equal to 33 1/3% of the Maximum Credit | 2.75% | 1.75% | 1.875% |
| III | Less than 33 1/3% of the Maximum Credit | 3.00% | 2.00% | 2.00% |

The Applicable Margin shall be adjusted quarterly in accordance with the table above on each Adjustment Date for the period beginning on such Adjustment Date based upon the Average Historical Excess Availability as the Administrative Agent shall determine in good faith within ten (10) Business Days after such Adjustment Date. Any increase or decrease in the Applicable Margin resulting from a change in the Average Historical Excess Availability shall become effective as of the first Business Day immediately following the Adjustment Date. If any Borrowing Base Certificates are at any time restated or otherwise revised or if the information set forth in any Borrowing Base Certificates otherwise proves to be false or incorrect such that the Applicable Margin would have been higher than was otherwise in effect during any period, without constituting a waiver of any Default or Event of Default arising as a result thereof, interest due under this Agreement shall be immediately recalculated at such higher rate for any applicable periods and shall be due and payable on demand.

"*Applicable Percentage*" means with respect to any Revolving Credit Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Revolving Credit Commitment at such time, subject to adjustment as provided in *Section 2.16(a)(iv)*. If the commitment of each Revolving Credit Lender to make Revolving Loans and the obligation of the Issuers to make L/C Credit Extensions have been terminated pursuant to *Section 10.2(a)(i)*, or if the Aggregate Commitments have expired, then the Applicable Percentage of each Revolving Credit Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of

each Revolving Credit Lender is set forth opposite the name of such Lender on *Schedule I* or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"*Applicable Unused Commitment Fee Rate*" means, for any day, a percentage per annum equal to 0.25% per annum.

"*Approved Account Bank*" means a financial institution at which the Borrower or a Guarantor maintains an Approved Deposit Account.

"*Approved Deposit Account*" means each Deposit Account in respect of which a Loan Party shall have entered into a Deposit Account Control Agreement.

"*Approved Fund*" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"*Approved Plan*" has the meaning specified in the preliminary statements of this Agreement.

"*Approved Securities Account*" means each Securities Account in respect of which the Borrower or any Subsidiary Guarantor shall have entered into a Securities Account Control Agreement.

"*Approved Securities Intermediary*" means a securities intermediary at which the Borrower or a Subsidiary Guarantor maintains an Approved Securities Account.

"*Arrangers*" means BofA Securities, Inc. (or any of its designated affiliates), Wells Fargo Bank, National Association, U.S. Bank National Association, and BMO Harris Bank, N.A., each in its capacity as a joint lead arranger and joint bookrunner under this Agreement.

"*Assignee Group*" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"*Assignment and Assumption*" means an assignment and assumption entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in substantially the form of *Exhibit A* or any other form approved by the Administrative Agent.

"*Attorney Costs*" means all reasonable and documented fees, expenses and disbursements of counsel to the Administrative Agent, the FILO Documentation Agent, the Issuers and the Lenders to the extent payable by a Loan Party pursuant to *Sections 12.3* and *12.4*.

"*Attributable Indebtedness*" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"*Availability Reserves*" means, without duplication of any other reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as the Administrative Agent (solely with respect to the Borrowing Base) or the FILO Documentation Agent (solely with respect to the FILO Borrowing Base) from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Collateral Agent's ability to realize upon the Current Asset Collateral, (b) to reflect claims and liabilities that the Administrative Agent or the FILO Documentation Agent determines will need to be satisfied in connection with the realization upon the Current Asset Collateral,

4

or (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base or the FILO Borrowing Base, the Current Asset Collateral or the validity or enforceability of this Agreement or the other Loan Documents or any material remedies of the Secured Parties hereunder or thereunder.  Without limiting the generality of the foregoing, Availability Reserves may include (but are not limited to) reserves based on: (i) rent; *provided* that, as long as no Event of Default is continuing, such Availability Reserves shall be limited to an amount not to exceed the sum of (x) past due rent for all of the Borrower and the Subsidiary Guarantors' leased locations plus (y) one (1) month's rent for all of the Borrower and the Subsidiary Guarantors' leased locations (A) located in the states of Washington, Virginia, Pennsylvania and all other Landlord Lien States or (B) that are distribution centers or warehouses, other than, in each case, such locations, distribution centers or warehouses with respect to which the Administrative Agent has received a Collateral Access Agreement; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, *ad valorem*, real estate, personal property, sales, and other Taxes which would have priority over the interests of the Collateral Agent in the Current Asset Collateral; (iv) during the continuance of a Cash Dominion Period, salaries, wages and benefits due to employees of the Borrower; (v) Customer Credit Liabilities and customer deposits; (vi) warehousemen's or bailee's charges and other Liens permitted under *Section 9.1* which would have priority over the interests of the Collateral Agent in the Current Asset Collateral; and (vii) (A) the Cash Management Reserve, (B) the Bank Product Reserve and (C) the Swap Obligations Reserve; *provided*, in each case, that any such Availability Reserve under this clause (vii) shall not be established unless Excess Availability is less than $75,000,000 or an Event of Default has occurred and is continuing.  The amount of any Availability Reserve established or increased by the Administrative Agent or the FILO Documentation Agent shall (i) have a reasonable relationship to the event, condition or other matter that is the basis for the Availability Reserve and (ii) be limited to such Availability Reserves and changes as (1) the Administrative Agent determines, in its Permitted Discretion, are appropriate based on the analysis of facts or events first occurring or first discovered by the Administrative Agent after the Second Restatement Date or that differ from facts or events occurring and known to the Administrative Agent on the Second Restatement Date or (2) the FILO Documentation Agent determines, in its Permitted Discretion, are appropriate based on the analysis of facts or events first occurring or first discovered by the FILO Documentation Agent after the Second Restatement Date or that differ from facts or events occurring and known to the FILO Documentation Agent on the Second Restatement Date; *provided*, this clause (2) shall not prohibit the Administrative Agent or the FILO Documentation Agent from implementing Cash Management Reserves, Bank Product Reserves and/or Swap Obligations Reserves in accordance with clause (vii) above.  Notwithstanding anything herein to the contrary, Availability Reserves shall not duplicate eligibility criteria contained in the definition of Eligible Credit Card Receivables, Eligible Trade Receivables, Eligible In-Transit Inventory, Eligible Inventory or Eligible Letter of Credit Inventory.  For the avoidance of doubt, the FILO Deficiency Reserve shall not be deemed to be an Availability Reserve.

"*Average Historical Excess Availability*" means, at any Adjustment Date, the average daily Excess Availability for the Fiscal Quarter immediately preceding such Adjustment Date.

 "*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"*Bail-In Legislation*" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms

or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"*Bank of America*" means Bank of America, N.A., a national banking association, acting in its individual capacity, and its successors and assigns.

"*Bank Product Agreement*" means any agreement or arrangement to provide Bank Products.

"*Bank Product Bank*" means, as of any date of determination, any Person that is an Agent, a Revolving Credit Lender or an Affiliate of a Revolving Credit Lender on such date.

"*Bank Product Obligations*" means obligations owed by any Loan Party to any Bank Product Bank in respect of or in connection with any Bank Products and either (i) in existence on the Second Restatement Date or (ii) after the Second Restatement Date, designated by the Bank Product Bank and the Borrower in writing to the Administrative Agent as "Bank Product Obligations".

"*Bank Product Reserve*" shall mean the aggregate amount of reserves established (based upon the obligations and liabilities of any Loan Party in respect of the Bank Product Obligations) by the Administrative Agent or the FILO Documentation Agent from time to time in its Permitted Discretion in respect of Bank Product Obligations then outstanding.

"*Bank Product / Swap Obligations Cap*" shall mean, in respect of amounts applied to payment of Bank Product Obligations and obligations of any Loan Party arising under any Secured Hedge Agreement pursuant to *Section 10.3*, an aggregate amount equal to $5,000,000.

"*Bank Products*" shall mean any of the following products, services or facilities extended to the Borrower or any Restricted Subsidiary from time to time by any Revolving Credit Lender or any of its Affiliates: (i) supply chain financing services and (ii) credit or debit cards, including purchase cards. Notwithstanding the foregoing, and for the avoidance of doubt, Bank Products shall not include any Cash Management Services or Swap Contracts.

"*Banker's Acceptance*" means a time draft or bill of exchange or other deferred payment obligation relating to a Documentary Letter of Credit which has been accepted by the Issuer.

"*Bankruptcy Code*" means Title 11 of the United States Code or any similar federal or state law for the relief of debtors, as now and hereafter in effect, or any successor statute.

"*Base Rate*" means for any day a fluctuating rate of interest per annum equal to the highest of (a) the Federal Funds Rate *plus* 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate," (c) Term SOFR *plus* 1.00%, and (d) the applicable Floor *plus* 1.00%. The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such prime rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change. If the Base Rate is being used as an alternate rate of interest pursuant to *Section 3.3*, then the Base Rate shall be the highest of *clauses (a)*, *(b)* and *(d)* above and shall be determined without reference to *clause (c)* above. The Floor shall be determined separately for the Revolving Obligations and the FILO Obligations, as set forth in the definition of "Floor".

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

"*Base Rate Loan*" means a Loan that bears interest based on the Base Rate.

"*Beneficial Ownership Certification*" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" means 31 C.F.R. § 1010.230.

"*Benefit Plan*" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"*BHC Act Affiliate*" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"*Borrower*" has the meaning specified in the preamble to this Agreement.

"*Borrower Materials*" has the meaning specified in *Section 7.2*.

"*Borrowing*" means a borrowing consisting of Loans of the same Class and Type made, converted or continued on the same date and, in the case of Term SOFR Loans, having the same Interest Period.

"*Borrowing Base*" means, at any time of calculation, an amount equal to:

(a)    the face amount of Eligible Credit Card Receivables multiplied by the Credit Card Advance Rate; <u>plus</u>

(b)    the face amount of Eligible Trade Receivables multiplied by the Trade Receivables Advance Rate, net of Receivables Reserves applicable thereto; *provided* that unless and until the Administrative Agent receives (A) a Field Examination of all Accounts arising from the sale of the Borrower's or any Subsidiary Guarantor's Inventory from a field examiner reasonably satisfactory to the Administrative Agent in its Permitted Discretion and establishes Receivables Reserves (if applicable) therefor in accordance with this Agreement, and (B) such other due diligence as the Administrative Agent may reasonably require, no Accounts shall be included in the Borrowing Base pursuant to this *clause (b)*; <u>plus</u>

(c)    the Net Recovery Percentage of Eligible Inventory (other than, for the avoidance of doubt, Eligible Letter of Credit Inventory and Eligible In-Transit Inventory), multiplied by the Inventory Advance Rate multiplied by the Cost of Eligible Inventory (other than, for the avoidance of doubt, Eligible Letter of Credit Inventory and Eligible In-Transit Inventory), net of Inventory Reserves attributable to Eligible Inventory; <u>plus</u>

(d)    the Net Recovery Percentage of Eligible Letter of Credit Inventory multiplied by the Letter of Credit Advance Rate, multiplied by the Cost of Eligible Letter of Credit Inventory, net of Inventory Reserves attributable to Eligible Letter of Credit Inventory; <u>plus</u>

(e)    the Net Recovery Percentage of Eligible In-Transit Inventory multiplied by the In-Transit Advance Rate, multiplied by the Cost of Eligible In-Transit Inventory, net of Inventory Reserves attributable to Eligible In-Transit Inventory; <u>minus</u>

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

(f)      the then amount of any FILO Deficiency Reserve; <u>minus</u>

(g)      the then amount of all Availability Reserves.

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent and the FILO Documentation Agent pursuant to *Section 4.1(a)* or *Section 7.4*, as applicable, as adjusted to give effect to Availability Reserves and any FILO Deficiency Reserve following such delivery*; provided*, that such Availability Reserves shall not be established or changed except upon not less than three (3) Business Days' notice to the Borrower (during which period the Administrative Agent shall be available to discuss any such proposed Availability Reserve with the Borrower and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such Availability Reserve no longer exists, in a manner and to the extent reasonably satisfactory to the Administrative Agent); *provided further* that, during such three (3) Business Day period, Credit Extensions hereunder shall be subject to the Borrowing Base as if such new or modified Availability Reserves were given effect; *provided further* that no such prior notice shall be required for changes to any Availability Reserves resulting solely by virtue of mathematical calculations of the amount of the Availability Reserve in accordance with the methodology of calculation previously utilized (such as, but not limited to, rent and Customer Credit Liabilities) or if an Event of Default is continuing.

"*Borrowing Base Certificate*" means a certificate of the Borrower substantially in the form of *Exhibit J*.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located.

"*Capital Expenditures*" means, for any period, the aggregate of (a) all amounts that would be reflected as additions to property, plant or equipment on a Consolidated statement of cash flows of the Borrower and its Restricted Subsidiaries in accordance with GAAP and (b) the value of all assets under Capitalized Leases incurred by the Borrower and its Restricted Subsidiaries during such period; provided that the term "Capital Expenditures" shall not include (i) expenditures made in connection with the replacement, substitution, restoration or repair of assets to the extent financed with (x) insurance proceeds paid on account of the loss of or damage to the assets being replaced, substituted, restored or repaired or (y) awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (ii) the purchase of plant, property or equipment or software to the extent financed with the Net Cash Proceeds of Dispositions that are not required to be applied to prepay the Loans or the Term Facility, (iii) expenditures that are accounted for as capital expenditures by the Borrower or any Restricted Subsidiary and that actually are paid for, or reimbursed to the Borrower or any Restricted Subsidiary in cash or Cash Equivalents, by a Person other than the Borrower or any Restricted Subsidiary and for which neither the Borrower nor any Restricted Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation (other than rent) in respect of such expenditures to such Person or any other Person (whether before, during or after such period), including, without limitation, expenditures which are contractually required to be, and are, reimbursed to the Borrower or a Subsidiary Guarantor in cash by its landlords as tenant allowances during such period, (iv) expenditures to the extent constituting any portion of a Permitted Acquisition, (v) the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (A) used or surplus equipment traded in at the time of such purchase, and (B) the Net Cash Proceeds of a concurrent sale of used or surplus equipment, in each case, in the ordinary course of business, *provided* that such portion of the purchase price in excess of the credit granted by the seller of such equipment for the equipment being traded in at such time or such Net Cash Proceeds, as

applicable, shall not be excluded as "Capital Expenditures" hereunder, (vi) expenditures relating to the construction, acquisition, replacement, reconstruction, development, refurbishment, renovation or improvement of any property which has been transferred to a Person other than a Loan Party or any of its Restricted Subsidiaries during the same Fiscal Year in which such expenditures were made pursuant to a sale-leaseback transaction, to the extent of the Net Cash Proceeds received by a Loan Party or such Restricted Subsidiary pursuant to such sale-leaseback transaction, *provided* that such portion of the expenditures which exceed the Net Cash Proceeds received by a Loan Party or such Restricted Subsidiary pursuant to such sale-leaseback transaction shall not be excluded as "Capital Expenditures" hereunder, or (vii) expenditures financed with the proceeds of an issuance of Equity Interests of the Borrower or a capital contribution to the Borrower or Indebtedness permitted to be incurred hereunder, to the extent such expenditures are made within 365 days after the receipt of such proceeds.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP.

"*Capitalized Leases*" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the Capitalized Lease Obligation with respect thereto.

"*Carve Out*" means, in connection with any Insolvency Proceeding relating to any Loan Party, any carve out amount granted with respect to professional fees and expenses, court costs, filing fees, and fees and costs of the Office of the United States Trustee as granted by the court or as agreed to by the Administrative Agent in its reasonable discretion.

"*Cash Collateral*" shall have a meaning correlative to "Cash Collateralize" and shall include the proceeds of such cash collateral and other credit support.

"*Cash Collateralize*" means to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Administrative Agent, an Issuer or the Swing Loan Lender (as applicable) and the Revolving Credit Lenders, as collateral for Letter of Credit Obligations, Obligations in respect of Swing Loans, or obligations of Revolving Credit Lenders to fund participations in respect of either thereof (as the context may require), cash or deposit account balances or, if the applicable Issuer or Swing Loan Lender benefitting from such collateral shall agree in its sole discretion, other credit support, in each case pursuant to documentation in form and substance reasonably satisfactory to (a) the Administrative Agent and (b) the applicable Issuer or the Swing Loan Lender (as applicable).

"*Cash Dominion Period*" means (a) each period beginning on the date that Excess Availability shall have been less than the greater of (x) 10% of the Modified Maximum Credit and (y) (i) from the Second Restatement Date through September 30, 2024, $35,000,000, and (ii) thereafter, $45,000,000, and ending on the date Excess Availability shall have been equal to or greater than the greater of (x) 10% of the Modified Maximum Credit and (y) (i) from the Second Restatement Date through September 30, 2024, $35,000,000, and (ii) thereafter, $45,000,000, in each case, for twenty (20) consecutive calendar days or (b) upon the occurrence of a Specified Event of Default, the period during which such Specified Event of Default shall be continuing; *provided that* a Cash Dominion Period shall be deemed continuing (even if Excess Availability exceeds the required amounts for twenty (20) consecutive calendar day) if a Cash Dominion Period has occurred and been discontinued on five (5) occasions in any twelve month period. The termination of a Cash Dominion Period as provided herein shall in no way limit, waive or delay the occurrence of a subsequent Cash Dominion Period in the event that the conditions set forth in this definition again arise.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

"*Cash Equivalents*" means any of the following types of Investments, to the extent owned by the Borrower or any Restricted Subsidiary:

(a)     Dollars;

(b)     in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business and not for speculation;

(c)     readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(d)     certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500,000,000;

(e)     repurchase obligations for underlying securities of the types described in *clauses (c)* and *(d)* above or *clause (g)* below entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)     commercial paper rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and in each case maturing within 12 months after the date of creation thereof;

(g)     marketable short-term money market and similar highly liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(h)     readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) with maturities of 12 months or less from the date of acquisition;

(i)     Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); and

(j)     investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (i) above.

In the case of Investments by any Foreign Subsidiary that is a Restricted Subsidiary or Investments made in a country outside the United States, Cash Equivalents shall also include (i) investments of the type and maturity described in clauses (a) through (j) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or

10

equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries that are Restricted Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (a) through (j) and in this paragraph.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, provided that such amounts are converted into Dollars as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"*Cash Flow Forecast*" means a cash flow forecast substantially in the form of *Exhibit G*, reflecting the Borrower's and its Restricted Subsidiaries' (i) good faith projections of all weekly cash receipts and disbursements on a line item basis in connection with the operation of their businesses for the following 13-week period, and (ii) calculations of the Borrowing Base, the FILO Borrowing Base and Excess Availability for each week of such 13-week period.

"*Cash Management Agreement*" means any agreement or arrangement to provide Cash Management Services.

"*Cash Management Bank*" means, as of any date of determination, any Person that is an Agent, a Revolving Credit Lender or an Affiliate of a Revolving Credit Lender on such date.

"*Cash Management Obligations*" means obligations owed by any Loan Party to any Cash Management Bank in respect of or in connection with any Cash Management Services and either (i) in existence on the Second Restatement Date or (ii) after the Second Restatement Date, designated by the Cash Management Bank and the Borrower in writing to the Administrative Agent as "Cash Management Obligations".

"*Cash Management Reserve*" shall mean the aggregate amount of reserves established (based upon the obligations and liabilities of any Loan Party in respect of the Cash Management Obligations) by the Administrative Agent or the FILO Documentation Agent from time to time in its Permitted Discretion in respect of Cash Management Obligations then outstanding.

"*Cash Management Services*" means any agreement or arrangement to provide cash management services, including automated clearinghouse transfers, controlled disbursement accounts, treasury, depository, overdraft, credit card processing, electronic funds transfer and other cash management arrangements.  Notwithstanding the foregoing, and for the avoidance of doubt, Cash Management Services shall not include any Bank Products or Swap Contracts.

"*Cash Receipts*" shall have the meaning specified in *Section 8.12(c)*.

"*Cash Taxes*" means, with respect to any Test Period, all taxes paid or payable in cash by the Borrower and its Restricted Subsidiaries during such period.

"*Change in Law*" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty (excluding the taking effect after the date of this Agreement of a law, rule, regulation or treaty adopted prior to the date of this Agreement), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and

Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"*Change of Control*" means the earliest to occur of:

(a)      (1) any Person (other than a Permitted Holder) or (2) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person and its Subsidiaries, and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Exchange Act), directly or indirectly, of Equity Interests representing more than fifty percent (50%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Parent and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of Parent beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders unless, in any case, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of Parent or Holdings; or

(b)      any "Change of Control" (or any comparable term) in any document pertaining to the Term Facility; or

(c)      Holdings (or any successor under *Section 9.4(a)*) ceasing to be a direct wholly owned Subsidiary of Parent; or

(d)      the Borrower ceasing to be a direct wholly owned Subsidiary of Holdings (or any successor under *Section 9.4(a)*).

"*Chapter 11 Cases*" has the meaning specified in the preliminary statements of this Agreement.

"*Class*" (a) when used with respect to commitments, refers to whether such commitment is a Revolving Credit Commitment, an Extended Revolving Credit Commitment of a given Extension Series or a New Revolving Credit Commitment, (b) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Revolving Loans, Loans under Extended Revolving Credit Commitments of a given Extension Series, Loans under New Revolving Credit Commitments or FILO Loans, and (c) when used with respect to Lenders, refers to whether such Lenders have a Loan or commitment with respect to a particular Class of Loans or commitments.

"*CME*" means CME Group Benchmark Administration Limited.

"*Co-Documentation Agents*" means BMO Harris Bank, N.A., PNC Bank, National Association, TD Bank, N.A. and U.S. Bank National Association, each as a Co-Documentation Agent under this Agreement.

"*Co-Syndication Agents*" means Wells Fargo Bank, National Association, U.S. Bank National Association, and BMO Harris Bank, N.A., each as a Co-Syndication Agent under this Agreement.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations thereunder.

"*Collateral*" means all the "*Collateral*" (or equivalent term) as defined in any Collateral Document.

"*Collateral Agent*" has the meaning specified in the preamble to this Agreement.

"*Collateral Access Agreement*" means an agreement reasonably satisfactory in form and substance to the Administrative Agent executed by, as the case may be, (a) a bailee or other Person in possession of Collateral, and (b) any landlord of any premises leased by any Loan Party, pursuant to which, except as the Administrative Agent otherwise may agree, such Person (i) acknowledges the Collateral Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such premises, (iii) agrees to provide the Collateral Agent with access to the Collateral held by such bailee or other Person or located in or on such premises for the purpose of conducting field exams, appraisals or a Liquidation, and (iv) makes such other agreements with the Collateral Agent as the Administrative Agent may reasonably require.

"*Collateral and Guarantee Requirement*" means, at any time, the requirement that:

(a)     the Administrative Agent shall have received (i) each Collateral Document required to be delivered on the Second Restatement Date pursuant to *Section 4.1(a)(iv)*, pursuant to *Section 8.11*, *Section 8.12* or *Section 8.13* at such time, duly executed by each Loan Party thereto, or (ii) a ratification of each Collateral Document delivered on or prior to the Second Restatement Date (to the extent such Collateral Document shall remain in effect as of the Second Restatement Date);

(b)     all Obligations shall have been unconditionally guaranteed by Holdings, Parent, each Restricted Subsidiary of the Borrower that is a Wholly-Owned Subsidiary that is a Material Domestic Subsidiary and not an Excluded Subsidiary, including those Subsidiaries that are listed on *Schedule II* hereto (each such guarantor, a "*Guarantor*") and any Restricted Subsidiary of the Borrower that Guarantees any Indebtedness pursuant to the Term Facility, any Junior Financing (or, in each case, any Permitted Refinancing thereof) shall be a Guarantor hereunder;

(c)     the Obligations and the Guaranty shall have been secured by a first-priority perfected security interest in substantially all Current Asset Collateral of the Loan Parties, in each case, with the priority required by the Collateral Documents and *Section 8.12* shall have been complied with;

(d)     the Obligations and the Guaranty shall have been secured by a perfected security interest (subject in priority only to the Lien of the Term Facility Administrative Agent to secure the obligations under the Term Facility, any Permitted Pari Passu Secured Debt (as defined in the Term Facility Credit Agreement as in effect on the Second Restatement Date or, subject to prior consent of the Administrative Agent, as in effect after the Second Restatement Date) or, in each case, any Permitted Refinancing thereof, and to any non-consensual Liens permitted by *Section 9.1*) in (i) all Equity Interests of the Borrower, (ii) all Equity Interests of each direct Wholly-Owned Subsidiary that is a Domestic Subsidiary (other than a Domestic Subsidiary described in the following *clause (iii)(A)*) of the Borrower or any Subsidiary Guarantor, and (iii) 65% of the issued and outstanding Equity Interests of (A) each Wholly-Owned Subsidiary that is a Domestic Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor and substantially all of the assets of which consist of Equity Interests in, or Equity Interests in and indebtedness of, one or more Foreign Subsidiaries or Domestic Subsidiaries described in this clause (iii)(A), and (B) each Wholly-Owned Subsidiary that is a Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor;

13

(e)        the Obligations and the Guaranty shall have been secured by a perfected security interest (subject in priority only to the Lien of the Term Facility Administrative Agent to secure the obligations under the Term Facility, any Permitted Pari Passu Secured Debt (as defined in the Term Facility Credit Agreement as in effect on the Second Restatement Date or, subject to prior consent of the Administrative Agent, as in effect after the Second Restatement Date) or, in each case, any Permitted Refinancing thereof, and to any non-consensual Liens permitted by *Section 9.1*) (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the UCC or making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office) in substantially all other tangible and intangible personal property of the Borrower and each Guarantor other than the Current Asset Collateral, in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, surveys, abstracts or appraisals with respect to, (i) any real property or (ii) any other particular assets if and for so long as, in the case of this clause (ii) in the reasonable judgment of the Administrative Agent and the Borrower, the cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance, surveys, abstracts or appraisals in respect of such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

The Administrative Agent may grant extensions of time for the perfection of security interests in particular assets where it reasonably determines, in consultation with the Borrower, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

"*Collateral Documents*" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Security Agreement Supplements, security agreements or other similar agreements delivered to the Administrative Agent or the Collateral Agent and the Lenders pursuant to *Section 4.1(a)(iv)*, *Section 8.11*, *Section 8.12* or *Section 8.13*, the Guaranty, each Lien Acknowledgment Agreement, the Intercreditor Agreement, the Securities Account Control Agreements (if any), the Deposit Account Control Agreements, and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Administrative Agent or the Collateral Agent for the benefit of the Secured Parties.

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"*Communication*" has the meaning specified in *Section 12.6*.

"*Compliance Certificate*" means a certificate substantially in the form of *Exhibit N* and which certificate shall in any event be a certificate of the chief financial officer (a) certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (b) setting forth a reasonably detailed calculation of Consolidated EBITDA and the Consolidated Fixed Charge Coverage Ratio for the most recently completed Test Period.

"*Concentration Account*" has the meaning specified in *Section 8.12(c)*.

"*Confirmation Order*" means the order of the Court confirming the Approved Plan.

"*Conforming Changes*" means, with respect to the use, administration of or any conventions associated with SOFR or any proposed Successor Rate or Term SOFR, as applicable, any conforming changes to the definitions of "Base Rate", "SOFR", "Term SOFR" and "Interest Period", the

addition of the concept of an "interest period", timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definitions of "Business Day" and "U.S. Government Securities Business Day", timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the discretion of the Administrative Agent determined in consultation with the Borrower (and, to the extent pertaining to the FILO Obligations, the FILO Documentation Agent), to reflect the adoption and implementation of such applicable rate(s) and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such rate exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"*Conforming Post-Petition Financing*" has the meaning specified in *Section 10.6(a)*.

"*Consolidated*" means, with respect to any Person, the consolidation of accounts of such Person and any other Person in accordance with GAAP.

"*Consolidated Depreciation and Amortization Expense*" means, with respect to the Borrower and its Restricted Subsidiaries for any period, the total amount of depreciation and amortization expense of the Borrower and its Restricted Subsidiaries, including the amortization of deferred financing fees or costs for such period on a Consolidated basis and otherwise determined in accordance with GAAP.

"*Consolidated EBITDA*" means, with respect to the Borrower and its Restricted Subsidiaries for any Test Period, the Consolidated Net Income of the Borrower and its Restricted Subsidiaries for such Test Period:

(a)        increased by (without duplication):

(i)        (A) provision for taxes based on income or profits or capital, plus state, provincial, franchise, property or similar taxes and foreign withholding taxes and foreign unreimbursed value added taxes, of such Person for such period (including, in each case, penalties and interest related to such taxes or arising from tax examinations) deducted in computing Consolidated Net Income and (B) amounts paid to Holdings or any direct or indirect parent of Holdings in respect of taxes in accordance with *Section 9.6(g)*, in each case under clauses (A) and (B), solely to the extent such amounts were deducted in computing Consolidated Net Income, <u>plus</u>

(ii)        (A) total interest expense (including (A) imputed interest on Capitalized Lease Obligations and Attributable Indebtedness (which, in each case, will be deemed to accrue at the interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligations or Attributable Indebtedness), (B) commissions, discounts and other fees, charges and expenses owed with respect to letters of credit, bankers' acceptance financing, surety and performance bonds and receivables financings, (C) amortization and write-offs of deferred financing fees, debt issuance costs, debt discounts, commissions, fees, premium and other expenses, as well as expensing of bridge, commitment or financing fees, (D) payments made in respect of hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, (E) cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than such Person or a

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

wholly-owned Restricted Subsidiary) in connection with Indebtedness incurred by such plan or trust, (F) all interest paid or payable with respect to discontinued operations, (G) the interest portion of any deferred payment obligations and (H) all interest on any Indebtedness that is (x) Indebtedness of others secured by any Lien on property owned or acquired by such Person or its Restricted Subsidiaries, whether or not the obligations secured thereby have been assumed, but limited to the fair market value of such property, (y) contingent obligations in respect of Indebtedness; *provided* that such interest expense shall be calculated after giving effect to Hedge Agreements related to interest rates (including associated costs), but excluding unrealized gains and losses with respect to such Hedge Agreements or (z) fee and expenses paid to the Administrative Agent or the FILO Documentation Agent (in each case, in its capacity as such and for its own account) pursuant to the Loan Documents and fees and expenses paid to the administrative agent, the collateral agent, trustee or other similar Persons for any other Indebtedness permitted by *Section 9.3*) of such Person for such period and (B) bank fees and costs of surety bonds, in each case under this clause (B), in connection with financing activities and, in each case under clauses (A) and (B), to the extent such amounts were deducted in computing Consolidated Net Income, <u>plus</u>

(iii)    Consolidated Depreciation and Amortization Expense of such Person for such period to the extent such depreciation and amortization were deducted in computing Consolidated Net Income, <u>plus</u>

(iv)    any fees, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or the incurrence or repayment of Indebtedness permitted to be incurred hereunder including a refinancing thereof (whether or not successful) and any amendment, restatement or modification to the terms of any such transactions, including such fees, expenses or charges incurred in connection with any amendment to this Agreement and any amendment or refinancing of the Term Facility, in each case, deducted in computing Consolidated Net Income, <u>plus</u>

(v)    (1) the amount of any charge, cost, loss, expense or reserve deducted in such period in computing Consolidated Net Income related to: (A) restructuring (including restructuring charges or reserves, whether or not classified as such under GAAP), severance, relocation, consolidation, integration or other similar items, (B) strategic and/or business initiatives, business optimization (including costs and expenses relating to business optimization programs, which, for the avoidance of doubt, shall include, without limitation, implementation of operational and reporting systems and technology initiatives; strategic initiatives; retention; severance; systems establishment costs; systems conversion and integration costs; contract termination costs; recruiting and relocation costs and expenses; costs, expenses and charges incurred in connection with curtailments or modifications to pension and post-retirement employee benefits plans; costs to start-up, pre-opening, opening, closure, transition and/or consolidation of distribution centers, operations, officers and facilities) including in connection with any Investment permitted hereunder, and new systems design and implementation, as well as consulting fees and any one-time expense relating to enhanced accounting function, (C) business or facilities (including greenfield facilities) start-up, opening, transition, consolidation, shut-down and closing, (D) signing, retention and completion bonuses, (E) severance, relocation or recruiting, (F) charges and expenses incurred in connection with litigation (including threatened litigation), any investigation or proceeding (or any threatened investigation or proceeding) by a regulatory, governmental or law enforcement body (including any attorney general), and (G) expenses incurred in

DB1/ ~~145587008.8~~ 145587008.11

US-DOCS\149610879.14

connection with casualty events or asset sales outside the ordinary course of business and (2) any one-time costs, expenses or charges incurred in connection with (A) Permitted Acquisitions or other Investments permitted hereunder after the Second Restatement Date or (B) the closing of any Stores or distribution centers after the Second Restatement Date; provided that (1) amounts added back under this clause (v) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent and (2) the aggregate amount added back pursuant to this clause (v), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clauses (vi) and (ix) below, shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (v) and clauses (vi) and (ix) below), plus

(vi)    the amount of costs relating to pre-opening and opening costs for Stores, signing, retention and completion bonuses, costs incurred in connection with any strategic initiatives, transition costs, consolidation and closing costs for Stores and costs incurred in connection with non-recurring (without, in any such case, limitation on the calculation hereof by Item 10(e) of Regulation S-K promulgated by the SEC) product and intellectual property development after the Second Restatement Date, other business optimization expenses (including costs and expenses relating to business optimization programs), and new systems design and implementation costs and project start-up costs; provided that (1) amounts added back under this clause (vi) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent and (2) the aggregate amount added back pursuant to this clause (vi), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clause (v) above and clause (ix) below, shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (vi), clause (v) above and clause (ix) below), plus

(vii)    any other non-cash charges including any write offs or write downs, to the extent reducing such Consolidated Net Income for such period (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (1) the Borrower may determine not to add back such non-cash charge in the current period and (2) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period), including the following: (A) non-cash expenses in connection with, or resulting from, stock option plans, employee benefit plans or agreements or post-employment benefit plans or agreements, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other similar rights, (B) non-cash currency translation losses related to changes in currency exchange rates (including re-measurements of Indebtedness (including intercompany Indebtedness) and any net non-cash loss resulting from hedge agreements for currency exchange risk), (C) non-cash losses, expenses, charges or negative adjustments attributable to the movement in the mark-to-market valuation of hedge agreements or other derivative instruments, including the effect of FASB Accounting Standards Codification 815 and International Accounting Standard No. 9 and their respective related pronouncements and interpretations, (D) non-cash charges for deferred tax asset valuation allowances, (E) any non-cash impairment charge or asset write-off or write-down related to intangible assets (including goodwill), long-lived assets, and Investments in debt and equity securities, (F) any non-cash charges or losses resulting

from any purchase accounting adjustment or any step-ups with respect to re-valuing assets and liabilities in connection with any Investments permitted hereunder, (G) all non-cash losses from Investments permitted hereunder recorded using the equity method and (H) the excess of GAAP rent expense over actual cash rent paid during such period due to the use of straight line rent for GAAP purposes, <u>plus</u>

(viii)    the amount of any minority interest expense deducted in calculating Consolidated Net Income, <u>plus</u>

(ix)    any net after-tax extraordinary, non-recurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses, and fees and expenses in connection with relocation costs, integration costs, facility consolidation and closing costs, severance costs and expenses and non-recurring compensation charges (without, in any such case, limitation on the calculation hereof by Item 10(e) of Regulation S-K promulgated by the SEC); provided that (1) amounts added back under this clause (ix) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent and (2) the aggregate amount added back pursuant to this clause (ix), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clauses (v) and (vi) above, shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (ix) and clauses (v) and (vi) above), <u>plus</u>

(x)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back, <u>plus</u>

(xi)    any costs or expenses incurred by the Borrower or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or stockholders agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of issuance of Equity Interests of the Borrower (other than Disqualified Equity Interests), <u>plus</u>

(xii)    proceeds of business interruption insurance actually received (to the extent not counted in any prior period in anticipation of such receipt) or, to the extent not counted in any prior period, reasonably expected to be received, and

(b)    decreased by (without duplication):

(i)    any non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any gains that represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period (other than such cash charges that have been added back to Consolidated Net Income in calculating Consolidated EBITDA in accordance with this definition), <u>plus</u>

(ii)    any non-cash gains with respect to cash actually received in a prior period unless such cash did not increase Consolidated EBITDA in such prior period.

"*Consolidated Fixed Charge Coverage Ratio*" means, for any Test Period, the ratio of (a) (i) Consolidated EBITDA for such period, minus (ii) Capital Expenditures made during such period and not financed with the proceeds of Indebtedness, minus (iii) Cash Taxes during such period to (b) Debt Service Charges of or by the Borrower and its Restricted Subsidiaries on a Consolidated basis for the most recently completed Test Period in accordance with GAAP.

"*Consolidated Interest Charges*" means, for any Test Period, the sum of (a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, and (b) the portion of rent expense with respect to such period under Capitalized Lease Obligations that is treated as interest in accordance with GAAP, minus (c) cash interest income during such period, in each case of or by the Borrower and its Restricted Subsidiaries on a consolidated basis for the most recently completed Test Period in accordance with GAAP. For purposes of the foregoing, interest expense shall exclude one-time financing fees (including arrangement, amendment and contract fees), debt issuance costs, commissions, expenses and, in each case, the amortization thereof.

"*Consolidated Net Debt*" means, as of any date of determination, (a) Consolidated Total Debt, minus (b) the amount of cash and Cash Equivalents on a consolidated balance sheet of the Borrower that are not "Restricted" for purposes of GAAP on such balance sheet.

"*Consolidated Net Income*" means, with respect to the Borrower and its Restricted Subsidiaries for any Test Period, the aggregate of the Net Income of the Borrower and its Restricted Subsidiaries for such Test Period on a Consolidated basis and otherwise determined in accordance with GAAP; *provided*, *however*, that, without duplication,

(a)    [reserved],

(b)    the Net Income for such Test Period shall not include the cumulative effect of a change in accounting principles during such Test Period, whether effected through a cumulative effect adjustment or a retroactive application in each case in accordance with GAAP,

(c)    effects of adjustments (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries) in such Person's Consolidated financial statements pursuant to GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to any consummated Permitted Acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded,

(d)    any net after-tax income (loss) from disposed or discontinued operations and any net after-tax gains or losses on disposal of disposed or discontinued operations shall be excluded,

(e)    any net after-tax gains or losses (less all fees and expenses relating thereto) attributable to asset Dispositions or the other Disposition of any Equity Interests of any Person other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(f)    the Net Income for such Test Period of any Person that is not a Subsidiary, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of the Borrower and its Restricted Subsidiaries shall include the amount of dividends or distributions or other payments that are actually paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof in respect of such Test Period,

19

(g)      (i) any net unrealized gain or loss (after any offset) resulting in such Test Period from obligations in respect of Swap Contracts and the application of Financial Accounting Standards Board Accounting Standards Codification 815 (Derivatives and Hedging), (ii) any net gain or loss resulting in such period from currency translation gains or losses related to currency remeasurements of Indebtedness (including the net loss or gain (A) resulting from Swap Contracts for currency exchange risk and (B) resulting from intercompany Indebtedness) and all other foreign currency translation gains or losses to the extent such gain or losses are non-cash items, and (iii) any net after-tax income (loss) for such Test Period attributable to the early extinguishment or conversion of (A) Indebtedness, (B) obligations under any Swap Contracts or (C) other derivative instruments, shall be excluded,

(h)      any impairment charge or asset write-off, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(i)      any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other Disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days), shall be excluded,

(j)      to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded, and

(k)      any non-cash (for such period and all other periods) compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by, or to, management of the Borrower or any of its Restricted Subsidiaries, shall be excluded.

"*Consolidated Total Debt*" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and the Restricted Subsidiaries outstanding on such date, determined on a Consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with any Permitted Acquisition or any other Investment permitted hereunder), consisting of Indebtedness for borrowed money, unreimbursed obligations in respect of drawn letters of credit, obligations in respect of Capitalized Leases and debt obligations evidenced by promissory notes or similar instruments; *provided* that Consolidated Total Debt shall not include Indebtedness in respect of (i) any letter of credit, except to the extent of unreimbursed obligations in respect of drawn letters of credit (*provided* that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Debt until three (3) Business Days after such amount is drawn (it being understood that any borrowing, whether automatic or otherwise, to fund such reimbursement shall be counted)) and (ii) obligations under Swap Contracts.

"*Constituent Documents*" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"*Contractual Obligation*" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such is a party or by which it or any of its property is bound.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Cost*" means the cost of purchases of Inventory determined according to the accounting policies used in the preparation of the Borrower's financial statements.

"*Court*" has the meaning specified in the preliminary statements of this Agreement.

"*Covenant Trigger Event*" means that Excess Availability on any day is less than the greater of (i) $45,000,000 and (ii) 10% of the Modified Maximum Credit.  For purposes hereof, the occurrence of a Covenant Trigger Event shall be deemed to be continuing until Excess Availability is equal to or greater than the greater of (i) $45,000,000 and (ii) 10% of the Modified Maximum Credit, in each case, for thirty (30) consecutive calendar days, in which case a Covenant Trigger Event shall no longer be deemed to be continuing for purposes of this Agreement.  The termination of a Covenant Trigger Event as provided herein shall in no way limit, waive or delay the occurrence of a subsequent Covenant Trigger Event in the event that the conditions set forth in this definition again arise.

"*Covered Entity*" means any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"*Covered Party*" has the meaning specified in *Section 12.30.*

"*Credit Card Advance Rate*" means 90%.

"*Credit Card Agreements*" means all agreements or arrangements now or hereafter entered into by the Borrower or any Guarantor for the benefit of the Borrower or a Subsidiary Guarantor, in each case with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, including, but not limited to, the agreements or arrangements set forth on *Schedule 1.1E* hereto.

"*Credit Card Issuer*" means any Person (other than the Borrower or a Guarantor) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc.

"*Credit Card Notification*" means, collectively, the notices to Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements in substantially the form delivered under the Existing Credit Agreement, which Credit Card Notifications shall require the ACH or wire transfer no less frequently than each Business Day (and whether or not there are then any outstanding Obligations) to an Approved Deposit Account of all payments due from Credit Card Processors.

"*Credit Card Processor*" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to the Borrower's or any Guarantor's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"*Credit Card Receivables*" means, collectively, (a) all present and future rights of the Borrower or any Guarantor to payment from any Credit Card Issuer, Credit Card Processor or other third party arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of the Borrower or any Guarantor to payment from any Credit Card Issuer, Credit Card Processor or other third party in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the Credit Card Agreements or otherwise, in each case above calculated net of prevailing interchange charges.

"*Credit Extension*" means each of the following: (a) a Borrowing and (b) a L/C Credit Extension.

"*Current Asset Collateral*" means all the "*ABL Priority Collateral*" as defined in the Intercreditor Agreement.

"*Customer Credit Liabilities*" means, at any time, the aggregate remaining balance at such time of (a) outstanding gift certificates and gift cards of the Borrower and each Subsidiary Guarantor entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory and (b) outstanding merchandise credits of the Borrower or such Subsidiary Guarantor, in each case, net of any dormancy reserves maintained by the Borrower on its books and records in the ordinary course of business consistent with past practices.

"*Customs Broker/Carrier Agreement*" means an agreement in form and substance reasonably satisfactory to the Administrative Agent among a Loan Party, a customs broker, freight forwarder, consolidator, or other carrier, and the Collateral Agent, in which the customs broker, freight forwarder, consolidator, or carrier acknowledges that it has control over and holds the documents evidencing ownership of, or other shipping documents relating to, the subject Inventory or other property for the benefit of the Collateral Agent and agrees, upon notice from the Collateral Agent (which notice shall be delivered only upon the occurrence and during the continuance of an Event of Default), to hold and dispose of the subject Inventory and other property solely as directed by the Collateral Agent.

"*Daily Simple SOFR*" with respect to any applicable determination date means the SOFR published on such date on the Federal Reserve Bank of New York's website (or any successor source).

"*Debt Service Charges*" means for any Test Period, the sum of (a) Consolidated Interest Charges paid, or required to be paid, in cash for such Test Period, plus (b) scheduled principal payments made or required to be made on account of Indebtedness of the types set forth in clauses (a), (b), (c) and (f) of the definition of "Indebtedness" (excluding the Obligations but including, without limitation, Capitalized Lease Obligations) for such Test Period, plus (c) mandatory and voluntary prepayments of the Term Facility made during such Test Period, in each case determined on a consolidated basis in accordance with GAAP.

"*Debtor Relief Laws*" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, arrangement, adjustment, composition, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Debtors*" has the meaning specified in the preliminary statements of this Agreement.

"*Default*" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would constitute an Event of Default.

"*Default Rate*" means (a) when used with respect to Revolving Obligations, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin applicable to Base Rate Loans plus (iii) 2.0% per annum; *provided* that with respect to the outstanding principal amount of any Loan constituting a Revolving Obligation, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such Loan (giving effect to *Section 2.10*) plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws, and (b) when used with respect to FILO Obligations, an interest rate equal to (i) the Base Rate plus (ii) the FILO Applicable Margin applicable to Base Rate Loans plus (iii) 2.0% per annum; *provided* that with respect to the outstanding principal amount of any Loan constituting a FILO Obligation, the Default Rate shall be an interest rate equal to the interest rate (including any FILO Applicable Margin) otherwise applicable to such Loan (giving effect to *Section 2.10*) plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"*Default Right*" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"*Defaulting Lender*" means, subject to *Section 2.16(b)*, any Revolving Credit Lender that, as reasonably determined by the Administrative Agent, (a) has failed to perform any of its funding obligations hereunder, including in respect of its Revolving Loans or participations in respect of Letters of Credit or Swing Loans, within three (3) Business Days of the date required to be funded by it hereunder, (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit generally, (c) has failed, within three Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations (*provided* that any Lender that has failed to give such timely confirmation shall cease to be a Defaulting Lender under this *clause (c)* upon receipt of such confirmation by the Administrative Agent), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) become subject to a Bail-In Action or had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; provided that a Lender shall not be a

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority.

"*Deposit Account*" means any checking or other demand deposit account maintained by the Loan Parties, including any "deposit accounts" within the meaning given to such term in Article 9 of the UCC.  All funds in such Deposit Accounts shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the Deposit Accounts, subject to the Security Agreement and the Intercreditor Agreement.

"*Deposit Account Control Agreement*" has the meaning specified in *Section 8.12(a)*.

"*Designated Assets*" means the assets set forth on *Schedule 1.1D*.

"*Designated Jurisdiction*" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"*Designated Non-Cash Consideration*" means the fair market value of non-cash consideration received by the Borrower or a Restricted Subsidiary in connection with a Disposition pursuant to *Section 9.5(j)* that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Borrower, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within one-hundred eighty (180) days following the consummation of the applicable Disposition).

"*Dilution Reserve*" means, for any period, that percentage reasonably determined by the Administrative Agent (or, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) based upon the immediately prior 12 months (or such shorter period as determined by the Administrative Agent (or, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) in its Permitted Discretion) by dividing (A) the amount of charge-offs of Eligible Trade Receivables and returns of goods purchased from the Borrower and the Subsidiary Guarantors during such period which had, at the time of sale, resulted in the creation of an Eligible Trade Receivable, by (B) the amount of sales (exclusive of sales and other similar taxes) of the Borrower and the Subsidiary Guarantors during such period and thereafter ("Dilution") but only to the extent to which Dilution is in excess of 5%.

"*DIP Order*" means, collectively, the order of the Court entered in the Chapter 11 Cases after an interim or final hearing, as applicable (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent and the FILO Documentation Agent, which, among other matters but not by way of limitation, authorizes, on an interim or final basis, as applicable, the use of cash collateral constituting ABL Priority Collateral during the pendency of the Chapter 11 Cases.

"*Disposition*" or "*Dispose*" means the sale, transfer, license, lease or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of any property by any Person (including any sale and leaseback transaction and any sale or issuance of Equity Interests in a Restricted Subsidiary), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Disqualified Equity Interests*" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Revolving Credit Commitments and all outstanding Letters of Credit (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the applicable Issuer)), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after Latest Maturity Date at the time of issuance; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Parent, Holdings, the Borrower or the Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by Parent, Holdings, the Borrower or the Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"*Disqualified Institution*" means:

(1)  any Person that is a competitor of the Borrower and identified by the Borrower in good faith in writing to the Administrative Agent from time to time after the Second Restatement Date;

(2)  those banks, financial institutions, other institutional lenders and investors and other entities that were identified by the Borrower as such in writing to the Administrative Agent on or prior to the Second Restatement Date; and

(3)  any Affiliates of Persons described in the foregoing clauses (1) and (2) that are readily identifiable as such solely on the basis of their names (other than any such Affiliate that is a bank, financial institution or fund (other than a Person described in clause (2) above) that regularly invest in commercial loans or similar extensions of credit in the ordinary course of business and for which no personnel involved with the relevant competitor or Person referred to in clause (2) above make investment decisions);

*provided* that in no event shall any update to the list of Disqualified Institutions (A) be effective prior to two (2) Business Days after receipt thereof by the Administrative Agent or (B) apply retroactively to disqualify any Persons that have previously acquired an assignment or participation interest under this Agreement or that is party to a pending trade.

Notwithstanding anything in the Loan Documents to the contrary, the Administrative Agent shall not be responsible (or have any liability) for, or have any duty to ascertain, inquire into, monitor, or enforce, compliance with the provisions thereof relating to Disqualified Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (1) be obligated to ascertain, monitor, or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (2) have any liability with respect to or arising out of any assignment or participation of Revolving Credit Exposure, Revolving Credit Commitments or FILO Loans, or disclosure of confidential information, to any Disqualified Institution.  The list of Disqualified Institutions may be made available

by the Administrative Agent on the Platform and to prospective assignees and Participants (including Public Lenders).

"*Dividing Person*" has the meaning assigned to it in the definition of "Division."

"*Division*" means the division of the assets, liabilities and/or obligations of a Person (the "*Dividing Person*") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"*Division Successor*" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division.  A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"*Document*" has the meaning set forth in Article 9 of the UCC.

"*Documentary Letter of Credit*" means any Letter of Credit that is drawable upon presentation of documents evidencing the sale or shipment of goods purchased by the Borrower or a Guarantor in the ordinary course of its business.

"*Dollar Equivalent*" of any amount means, at the time of determination thereof, (a) if such amount is expressed in Dollars, such amount or (b) if such amount is denominated in any other currency, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it reasonably deems appropriate.

"*Dollars*" and "*$*" mean lawful money of the United States.

"*Domestic Subsidiary*" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the Laws of Puerto Rico or any other territory).

"*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Effective Date*" means the effective date of the Existing Credit Agreement, which date was October 21, 2016.

"*Electronic Copy*" has the meaning specified in *Section 12.6*.

"*Electronic Record*" has the meaning specified in *Section 12.6*.

"*Electronic Signature*" has the meaning specified in *Section 12.6*.

"*Eligible Assignee*" means (a) a Lender or any of its Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Lender assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Lender's rights in and to a material portion of such Lender's portfolio of asset based credit facilities, and (e) any other Person that meets the requirements to be an assignee under *Section 12.2(b)(iv)* and *(v)* (subject to such consents, if any, as may be required under *Section 12.2(b)(iii)*); *provided* that, with respect to the Revolving Facility (other than in connection with any exercise of the purchase option under *Section 10.12*), no FILO Lender, Affiliate of any FILO Lender or Approved Fund with respect to any FILO Lender may be an Eligible Assignee without the written approval of Administrative Agent (which may be granted or withheld at the Administrative Agent's sole discretion).

"*Eligible Credit Card Receivables*" means Credit Card Receivables due to the Borrower or any Subsidiary Guarantor engaged in the business on a non-recourse basis from Visa, Mastercard, American Express Co., Discover and other major credit card processors reasonably acceptable to the Administrative Agent and the FILO Documentation Agent as arise in the ordinary course of business, which have been earned by performance and are deemed by the Administrative Agent and the FILO Documentation Agent, each in its Permitted Discretion, to be eligible for inclusion in the calculation of the Borrowing Base and the FILO Borrowing Base. Without limiting the foregoing, unless otherwise approved in writing by the Administrative Agent and the FILO Documentation Agent, none of the following shall be deemed to be Eligible Credit Card Receivables:

(a)    Any Credit Card Receivable that has been outstanding for more than five (5) Business Days from the date of sale of the Inventory giving rise to such Credit Card Receivable;

(b)    Credit Card Receivables with respect to which the Borrower or a Subsidiary Guarantor does not have good, valid and marketable title thereto, free and clear of any Lien (other than (i) Liens granted to the Collateral Agent, for its benefit and the ratable benefit of the Secured Parties, pursuant to the Collateral Documents and (ii) (A) Liens permitted under *Section 9.1* having priority by operation of applicable Laws over the Liens of the Collateral Agent, and (B) Liens under *Section 9.1(w)* securing obligations under the Term Facility and any Permitted Refinancings thereof);

(c)    Credit Card Receivables that are not subject to a first priority security interest in favor of the Collateral Agent, for the benefit of itself and the Secured Parties (it being the intent that chargebacks in the ordinary course by the credit card processors shall not be deemed violative of this clause); or

(d)    Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback).

Any Credit Card Receivables which are not Eligible Credit Card Receivables shall nevertheless be part of the Collateral.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

"*Eligible In-Transit Inventory*" means, as of the date of determination thereof, without duplication of other Eligible Inventory, Inventory (a) located outside of the United States or in transit within or outside of the United States to the Borrower or any Subsidiary Guarantor from vendors and suppliers for receipt by the Borrower or a Subsidiary Guarantor within sixty (60) days of the date of determination that has not yet been received into a distribution center or store of such Person, (b) for which the purchase order for such Inventory is in the name of the Borrower or a Subsidiary Guarantor and title has passed to the Borrower or a Subsidiary Guarantor, (c) which has been consigned to the Borrower or a Subsidiary Guarantor (along with delivery to the Borrower or a Subsidiary Guarantor of the documents of title with respect thereto), (d) as to which a Customs Broker/Carrier Agreement, reasonably satisfactory to the Administrative Agent, is in effect or with respect to which Inventory Reserves have been established by the Administrative Agent or the FILO Documentation Agent, and (e) which otherwise would constitute Eligible Inventory; *provided* that the Administrative Agent or the FILO Documentation Agent may, in its Permitted Discretion, and upon notice to the Borrower, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event that the Administrative Agent or the FILO Documentation Agent determines in its Permitted Discretion and upon notice to the Borrower that such Inventory is subject to any Person's right or claim which is (or is capable of being) senior to, or pari passu with, the Lien of the Collateral Agent (such as, without limitation, a right of reclamation or stoppage in transit), as applicable, and would be reasonably likely to adversely impact the ability of the Collateral Agent to realize upon such Inventory.

"*Eligible Inventory*" means, as of the date of determination thereof, (a) Eligible In-Transit Inventory, (b) Eligible Letter of Credit Inventory but only if and to the extent that the Administrative Agent and the FILO Documentation Agent, each in its Permitted Discretion, determines to include such as Eligible Inventory, and (c) items of Inventory of the Borrower or a Subsidiary Guarantor that are finished goods, merchantable and readily saleable to the public in the ordinary course deemed by the Administrative Agent and the FILO Documentation Agent, each in its Permitted Discretion, to be eligible for inclusion in the calculation of the Borrowing Base and the FILO Borrowing Base. Without limiting the foregoing, unless otherwise approved in writing by the Administrative Agent and the FILO Documentation Agent, none of the following shall be deemed to be Eligible Inventory:

(a)     Inventory that is not owned solely by the Borrower or a Subsidiary Guarantor, or is leased or on consignment or the Borrower or a Subsidiary Guarantor does not have good and valid title thereto;

(b)     Inventory (including any portion thereof in transit from vendors, other than Eligible In-Transit Inventory) that is not located at a warehouse facility used by the Borrower or a Subsidiary Guarantor in the ordinary course or at a property that is owned or leased by the Borrower or a Subsidiary Guarantor;

(c)     Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, work-in-process, raw materials, or that constitute spare parts, promotional, marketing, packaging and shipping materials or supplies used or consumed in the Borrower's or a Subsidiary Guarantor's business, (iv) are not in compliance in all material respects with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (v) are bill and hold goods;

(d)     Inventory that is not located in the United States of America (excluding territories and possessions thereof) other than Eligible In-Transit Inventory;

(e)     Inventory that is not subject to a perfected first-priority security interest in favor of the Collateral Agent for the benefit of the Secured Parties (subject only to Liens permitted under *Section 9.1* having priority by operation of applicable Law over the Liens of the Collateral Agent);

(f)     Inventory which consists of samples, labels, bags, packaging, and other similar non-merchandise categories;

(g)     Inventory as to which insurance in compliance with the provisions of *Section 8.5* hereof is not in effect;

(h)     Inventory which has been sold but not yet delivered or as to which the Borrower or any Subsidiary Guarantor has accepted a deposit;

(i)     Inventory which is being Disposed of in a Store closing, "going-out-of-business" or similar sale; and

(j)     Inventory acquired in a Permitted Acquisition, unless and until the Collateral Agent has completed or received (A) an appraisal of such Inventory from appraisers satisfactory to the Administrative Agent and the FILO Documentation Agent, and the Administrative Agent or the FILO Documentation Agent has established Inventory Reserves (if applicable) therefor, and (B) such other due diligence as the Administrative Agent or the FILO Documentation Agent may require, all of the results of the foregoing to be reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent, each in its Permitted Discretion.

Any Inventory which is not Eligible Inventory shall nevertheless be part of the Collateral.

"*Eligible Letter of Credit Inventory*" means, as of the date of determination thereof, without duplication of other Eligible Inventory, Inventory (a) which does not constitute Eligible In-Transit Inventory and for which no documents of title have then been issued, (b) the purchase of which is supported by a Documentary Letter of Credit or Banker's Acceptance having an expiry within sixty (60) days of such date of determination, which Documentary Letter of Credit or Banker's Acceptance provides that it may be drawn only after the Inventory is completed and after documents of title have been issued for such Inventory reflecting the Borrower, a Subsidiary Guarantor or the Collateral Agent as consignee of such Inventory, and (c) which otherwise would constitute Eligible Inventory. For the avoidance of doubt, Eligible Letter of Credit Inventory is without duplication of Eligible In-Transit Inventory.

"*Eligible Trade Receivables*" means Accounts arising from the sale of the Borrower's or any Subsidiary Guarantor's Inventory (but excluding, for the avoidance of doubt, Credit Card Receivables) that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Account (i) has been earned by performance and represents the bona fide amounts due to the Borrower or any Subsidiary Guarantor from an account debtor, and in each case is originated in the ordinary course of business of the Borrower or such Subsidiary Guarantor, and (ii) in each case is acceptable to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent), in its Permitted Discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (r) below. Without limiting the foregoing, to qualify as an Eligible Trade Receivable, an Account shall indicate no Person other than the Borrower or a Subsidiary Guarantor as payee or remittance party.  In determining the amount to be so included, and without duplication of eligibility criteria or Availability Reserves, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such

face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower or a Subsidiary Guarantor may be obligated to rebate to a customer pursuant to the terms of any written agreement) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrower or Subsidiary Guarantors to reduce the amount of such Eligible Trade Receivable. Except as otherwise agreed by the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent), any Account included within any of the following categories shall not constitute an Eligible Trade Receivable:

(a) Accounts that are not evidenced by an invoice;

(b) Accounts that have been outstanding for more than ninety (90) days from the date of sale or more than sixty (60) days past the due date;

(c) Accounts due from any account debtor for which more than fifty percent (50%) of the accounts of such account debtor are accounts described in clause (b), above;

(d) All Accounts owed by an account debtor and/or its Affiliates together exceed fifteen percent (15%) (or such higher percentage as the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) may establish from time to time in its Permitted Discretion) of the amount of all Accounts at any one time (but the portion of the Accounts not in excess of the applicable percentage may be deemed Eligible Trade Receivables, in the Administrative Agent's (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent's) discretion);

(e) Accounts (i) that are not subject to a perfected first-priority security interest in favor of the Collateral Agent, for its benefit and the ratable benefit of the Secured Parties, or (ii) with respect to which the Borrower or a Subsidiary Guarantor does not have good and valid title thereto, free and clear of any Lien (other than (i) Liens granted to the Collateral Agent, for its benefit and the ratable benefit of the Secured Parties, pursuant to the Collateral Documents and (ii) (A) Liens permitted under *Section 9.1* having priority by operation of applicable Laws over the Liens of the Collateral Agent, and (B) Liens under *Section 9.1(w)* securing obligations under the Term Facility and any Permitted Refinancings thereof);

(f) Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback; provided that no Account that otherwise constitutes an Eligible Trade Receivable shall be rendered ineligible by virtue of this clause (f) to the extent, but only to the extent, that the account debtor's right of setoff is limited by an enforceable agreement that is reasonably satisfactory to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent);

(g) Accounts which arise out of any sale (i) not made in the ordinary course of business, or (ii) are not payable in Dollars;

(h) [reserved];

(i) Accounts which are owed by any Affiliate or any employee of a Loan Party;

(j)        Accounts for which all consents, approvals or authorizations of, or registrations or declarations with any Governmental Authority required to be obtained, effected or given in connection with the performance of such Account by the account debtor or in connection with the enforcement of such Account by the Administrative Agent have not been duly obtained, effected or given and are not in full force and effect;

(k)        Accounts due from an account debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(l)        Accounts due from any Governmental Authority except to the extent that the subject account debtor is the federal government of the United States of America and the Borrower or Subsidiary Guarantors have complied with the Federal Assignment of Claims Act of 1940;

(m)        Accounts (i) owing from any Person that is also a supplier to or creditor of the Borrower or any Subsidiary Guarantor or (ii) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling the Borrower or any Subsidiary Guarantor to discounts on future purchase therefrom;

(n)        Accounts arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval or consignment basis or subject to any right of return;

(o)        Accounts arising out of sales to account debtors outside the United States unless either (i) such Accounts are fully backed by an irrevocable letter of credit on terms, and issued by a financial institution, acceptable to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) and such irrevocable letter of credit is in the possession of the Collateral Agent or (ii) covered by credit insurance reasonably acceptable to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent);

(p)        Accounts evidenced by a promissory note or other instrument;

(q)        Accounts consisting of amounts due from vendors as rebates or allowances; and

(r)        Accounts acquired in a Permitted Acquisition, unless and until the Collateral Agent has completed or received (A) a Field Exam in respect of such Accounts, which Field Exam shows results reasonably satisfactory to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent), and the Administrative Agent (or, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) has established Receivables Reserves (if applicable) therefor, and (B) such other due diligence as the Administrative Agent (or, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) may require, all of the results of the foregoing to be reasonably satisfactory to the Administrative Agent (and, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) in its Permitted Discretion.

"*Entitlement Holder*" has the meaning given to such term in Article 8 of the UCC.

"*Entitlement Order*" has the meaning given to such term in Article 8 of the UCC.

"*Environmental Claim*" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations (other than internal reports prepared by any Loan Party or any of its Subsidiaries (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings with respect to any Environmental Liability (hereinafter "*Claims*"), including (i) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"*Environmental Laws*" means any and all Laws relating to the protection of the environment or, to the extent relating to exposure to Hazardous Materials, human health.

"*Environmental Liability*" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Loan Party or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"*Equity Interests*" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"*ERISA Event*" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of their respective ERISA Affiliates concerning the imposition of Withdrawal Liability or written notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA; (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (f) the failure to satisfy the minimum funding standard (within the meaning of Section

302 of ERISA or Section 412 of the Code) with respect to a Pension Plan, whether or not waived, (g) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to a Pension Plan; (h) the imposition of a lien under Section 303(k) of ERISA with respect to any Pension Plan; or (i) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA).

"*ESG*" has the meaning specified in *Section 2.18*.

"*ESG Amendment*" has the meaning specified in *Section 2.18*.

"*ESG Pricing Provisions*" has the meaning specified in *Section 2.18*.

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Event of Default*" has the meaning specified in *Section 10.1*.

"*Excess Availability*" means, at any time, (a) the Maximum Credit at such time *minus* (b) the aggregate Revolving Credit Outstandings at such time.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Accounts*" means deposit or securities accounts (a) established (or otherwise maintained) (including deposit accounts that are that are zero balance accounts) by the Loan Parties that do not have cash balances at any time exceeding $5,000,000 in the aggregate for all such accounts, (b) solely containing cash allocated as proceeds of the sale of Term Priority Collateral (as such term is defined in the Intercreditor Agreement), (c) payroll, trust and tax withholding accounts, (d) used by the Loan Parties exclusively for disbursements and payments in the ordinary course of business, or (e) that are located outside of the United States.

"*Excluded Subsidiary*" means (a) any Subsidiary that is not a wholly owned Subsidiary of the Borrower or a Guarantor, (b) any Foreign Subsidiary, (c) any Domestic Subsidiary substantially all of the assets of which consist of Equity Interests in, or Equity Interests in and indebtedness of, one or more Foreign Subsidiaries or Domestic Subsidiaries described in this clause (c), (d) any Domestic Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary, (e) any Subsidiary that is prohibited or restricted by applicable Law from providing a Guaranty or if such Guaranty would require governmental (including regulatory) consent, approval, license or authorization, (f) any special purpose securitization vehicle (or similar entity), (g) any Subsidiary that is a not-for-profit organization, (h) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), the cost or other consequences (including any adverse tax consequences) of providing the Guaranty shall be excessive in view of the benefits to be obtained by the Lenders therefrom and (i) each Unrestricted Subsidiary.

"*Excluded Swap Obligation*" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party under the Guaranty of, or the grant under a Loan Document by such Loan Party of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act (or the application or official interpretation thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to *Section 12.28* hereof and any and all guarantees of such Loan Party's Swap Obligations by other Loan Parties) at the time the guaranty of such Loan Party, or grant by such Loan Party of a security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a Master Agreement governing more than one Swap Contract, such exclusion shall apply only to

the portion of such Swap Obligation that is attributable to Swap Contracts for which such guaranty or security interest becomes illegal.

"*Excluded Taxes*" means, with respect to any Agent, any Lender, any Issuer or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) any tax on such recipient's net income or profits (or franchise tax or minimum tax imposed in lieu of such tax on net income or profits) imposed by a jurisdiction as a result of such recipient being organized or having its principal office or applicable Lending Office located in such jurisdiction (including, for the avoidance of doubt, any backup withholding in respect of such a tax under Section 3406 of the Code) or as a result of any other present or former connection between such recipient and the jurisdiction (including as a result of such recipient carrying on a trade or business, having a permanent establishment or being a resident for tax purposes in such jurisdiction), other than a connection arising solely from such recipient having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction specifically contemplated by, or sold or assigned an interest in, any Loan or Loan Documents, (b) any branch profits tax under Section 884(a) of the Code, or any similar tax, imposed by any jurisdiction described in (a), (c) with respect to any Lender (other than any Lender becoming a party hereto pursuant to the Borrower's request under *Section 3.7*), any U.S. federal withholding tax that is imposed on amounts payable to such Lender pursuant to a Law in effect at the time such Lender becomes a party hereto (or where the Lender is a partnership for U.S. federal income tax purposes, pursuant to a Law in effect on the later of the date on which such Lender becomes a party hereto or the date on which the affected partner becomes a partner of such Lender) or designates a new Lending Office or experiences a change in circumstances (other than a Change in Law), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment or change in circumstances), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding tax pursuant to *Section 3.1*, (d) any withholding tax attributable to such recipient's failure to comply with *Section 3.1(c)* or *(h)*, (e) any tax imposed under FATCA and (f) any interest, additions to taxes and penalties with respect to any taxes described in clauses (a) through (e) of this definition.

"*Existing Credit Agreement*" has the meaning specified in the preliminary statements of this Agreement.

"*Existing Obligations*" has the meaning specified in *Section 12.31(b)*.

"*Existing Revolver Tranche*" has the meaning specified in *Section 2.17(a)*.

"*Extended Revolving Credit Commitments*" has the meaning specified in *Section 2.17(a)*.

"*Extending Revolving Credit Lender*" has the meaning specified in *Section 2.17(b)*.

"*Extension*" means any establishment of Extended Revolving Credit Commitments pursuant to *Section 2.17* and the applicable Extension Amendment.

"*Extension Amendment*" has the meaning specified in Section 2.17(d).

"*Extension Election*" has the meaning specified in Section 2.17(b).

"*Extension Request*" has the meaning specified in Section 2.17(a).

"*Extension Series*" has the meaning specified in Section 2.17(a).

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"*Federal Funds Rate*" means, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; provided that if the Federal Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"*Federal Reserve Board*" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Fee Letter*" means, collectively, (i) the Fee Letter dated September 20, 2016, among the Borrower, Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Bank of America; (ii) the Fee Letter dated as November 25, 2020, among the Borrower and Bank of America; (iii) the Fee Letter dated December 22, 2021, among the Borrower and Bank of America, as may be amended and in effect from time to time; (iv) the Fee Letter dated March 10, 2023, among the Borrower and Bank of America, as may be amended and in effect from time to time; (v) the Fee Letters dated March 15, 2024, among the Borrower and Bank of America, as may be amended and in effect from time to time.

"*Field Examination*" has the meaning specified in *Section 7.4(d)*.

"*FILO Adjustment Date*" has the meaning specified in the definition of "FILO Applicable Margin".

"*FILO Applicable Margin*" means a percentage per annum equal to (a) from and after the Second Restatement Date until the first FILO Adjustment Date thereafter, the applicable percentage set forth in Level II of the pricing grid below, and (b) thereafter, the applicable percentage in the applicable Level of pricing grid below, based upon Consolidated EBITDA for the then most-recently ended Test Period as of the most recent FILO Adjustment Date:

| Level | Consolidated EBITDA | Term SOFR Loans | Base Rate Loans |
|-------|---------------------|-----------------|-----------------|
| I | Greater than the FILO Applicable Margin EBITDA Threshold for the applicable Test Period | 8.75% | 7.75% |
| II | Less than or equal to the FILO Applicable Margin EBITDA Threshold for the applicable Test Period | 9.75% | 8.75% |

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

The calculation of Consolidated EBITDA shall be based upon the Compliance Certificate and accompanying financial statements delivered by the Borrower to the Administrative Agent and the FILO Documentation Agent by the date required under this Agreement.  The movement between Levels in the pricing grid shall occur on the first calendar day of the month following the month in which the respective Compliance Certificate and accompanying financial statements (commencing with the Compliance Certificate and accompanying financial statements for the Fiscal Quarter ending [June 30, 2025][1]) have been delivered to the Administrative Agent and the FILO Documentation Agent (a "*FILO Adjustment Date*").  For example, if the Borrower delivers the Compliance Certificate and accompanying financial statements for the Fiscal Quarter ending [June 30, 2025] during the month of [August 2025], then any applicable Level change would be implemented on the first calendar day in [September 2025].

Notwithstanding the foregoing, (x) if the Borrower fails to deliver the financial statements and the related Compliance Certificate necessary to determine the relevant Level under the pricing grid by the date required under this Agreement with respect to any Test Period, then at the FILO Documentation Agent's election, the FILO Applicable Margin shall be a percentage per annum equal to the applicable percentage set forth in Level II of the pricing grid above until such financial statements and Compliance Certificate are delivered (in which event any applicable Level change would be implemented on the first calendar day of the month following such delivery), and (y) no reduction to the FILO Applicable Margin shall become effective at any time when an Event of Default has occurred and is continuing.

If, as a result of any restatement of or other adjustment to the financial statements of the Borrower, the FILO Documentation Agent determines that (i) Consolidated EBITDA as calculated by the Borrower as of any applicable date was inaccurate and (ii) a proper calculation of Consolidated EBITDA would have resulted in different pricing for any period, then (1) if the proper calculation of Consolidated EBITDA would have resulted in higher pricing for such period, the Borrower shall automatically and retroactively be obligated to pay an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period unless waived by the FILO Documentation Agent, and (2) if the proper calculation of Consolidated EBITDA would have resulted in lower pricing for such period, neither the FILO Documentation Agent nor the FILO Lenders shall have any obligation to repay any interest or fees to the Borrower; *provided* that if, as a result of any restatement or other event a proper calculation of Consolidated EBITDA would have resulted in higher pricing for one or more periods and lower pricing for one or more other periods (due to the shifting of income or expenses from one period to another period or any similar reason), then the amount payable by the Borrower pursuant to the foregoing clause (1) shall be based upon the excess, if any, of the amount of interest and fees that should have been paid for all applicable periods over the amount of interest and fees paid for all such periods.

"*FILO Applicable Margin EBITDA Threshold*" means, for the applicable Test Period in the table below, the amount of Consolidated EBITDA corresponding to such Test Period in such table:

| Test Period Ending On or About | Consolidated EBITDA |
|---|---|
| May 3, 2025 | $155,600,000 |
| August 2, 2025 | $164,700,000 |
| November 1, 2025 | $163,700,000 |
| January 31, 2026 | $199,100,000 |

---

[1] NB: To be the date that is the end of the fourth full FQ following the Second Restatement Date

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

| May 2, 2026 | $205,100,000 |
| August 1, 2026 | $210,900,000 |
| October 31, 2026 | $218,100,000 |
| January 30, 2027 and thereafter | $226,900,000 |

"*FILO Borrowing Base*" means, at any time of calculation, an amount equal to:

(a)    the face amount of Eligible Credit Card Receivables multiplied by the FILO Credit Card Advance Rate; plus

(b)    the face amount of Eligible Trade Receivables multiplied by the FILO Trade Receivables Advance Rate, net of Receivables Reserves applicable thereto; *provided* that unless and until the FILO Documentation Agent (A) receives a Field Examination of all Accounts arising from the sale of the Borrower's or any Subsidiary Guarantor's Inventory from a field examiner reasonably satisfactory to the FILO Documentation Agent in its sole discretion and establishes Receivables Reserves (if applicable) therefor in accordance with this Agreement, (B) receives such other due diligence as the FILO Agent may require in its sole discretion, and (C) determines in its sole discretion to include Eligible Trade Receivables in the FILO Borrowing Base, no Accounts shall be included in the FILO Borrowing Base pursuant to this *clause (b)*; plus

(c)    the Net Recovery Percentage of Eligible Inventory (other than, for the avoidance of doubt, Eligible Letter of Credit Inventory and Eligible In-Transit Inventory), multiplied by the FILO Inventory Advance Rate multiplied by the Cost of Eligible Inventory (other than, for the avoidance of doubt, Eligible Letter of Credit Inventory and Eligible In-Transit Inventory), net of Inventory Reserves attributable to Eligible Inventory (without duplication of Inventory Reserves in effect under the Borrowing Base); plus

(d)    the Net Recovery Percentage of Eligible Letter of Credit Inventory multiplied by the FILO Letter of Credit Advance Rate, multiplied by the Cost of Eligible Letter of Credit Inventory, net of Inventory Reserves attributable to Eligible Letter of Credit Inventory (without duplication of Inventory Reserves in effect under the Borrowing Base); plus

(e)    the Net Recovery Percentage of Eligible In-Transit Inventory multiplied by the FILO In-Transit Advance Rate, multiplied by the Cost of Eligible In-Transit Inventory, net of Inventory Reserves attributable to Eligible In-Transit Inventory (without duplication of Inventory Reserves in effect under the Borrowing Base); minus

(f)    the then amount of all Availability Reserves (without duplication of Availability Reserves in effect under the Borrowing Base).

The FILO Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent and the FILO Documentation Agent pursuant to *Section 4.1(a)* or *7.4*, as applicable, as adjusted to give effect to Availability Reserves following such delivery (without duplication of Availability Reserves in effect under the Borrowing Base)*; provided*, that such Availability Reserves shall not be established or changed except upon not less than three (3) Business Days' notice to the Borrower (during which period the FILO Documentation Agent shall be available to discuss any such proposed Availability Reserve with the Borrower and the Borrower may take such action as may be required so that the event, condition or matter that is the basis for such Availability Reserve no longer exists, in a manner and to the extent reasonably satisfactory to the

37

FILO Documentation Agent); *provided further* that, during such three (3) Business Day period, Credit Extensions hereunder shall be subject to the Borrowing Base (including after giving effect to any new or increased FILO Deficiency Reserve) as if such new or modified Availability Reserves were given effect; *provided further* that no such prior notice shall be required for changes to any Availability Reserves resulting solely by virtue of mathematical calculations of the amount of the Availability Reserve in accordance with the methodology of calculation previously utilized (such as, but not limited to, rent and Customer Credit Liabilities) or if an Event of Default is continuing.

"*FILO Credit Card Advance Rate*" means 10%; *provided*, that such advance rate shall be reduced by 2.5% (i.e., from 10% to 7.5%) at all times when Excess Availability (calculated without giving effect to such reduction or any corresponding reduction under any other component of the FILO Borrowing Base) is less than 20% of the Global Borrowing Base.

"*FILO Deficiency Reserve*" means, at any time, a reserve maintained against the Borrowing Base established by the Administrative Agent (subject to *Section 2.19(a)*) in the amount, if any, by which the then outstanding principal amount of the FILO Loans (excluding, for this purpose, any portion of the FILO Prepayment Premium capitalized to such principal) exceeds the FILO Borrowing Base at such time.

"*FILO Deficiency Reserve Correction Notice*" has the meaning specified in *Section 2.19(a)*.

"*FILO Documentation Agent*" has the meaning specified in the preamble to this Agreement.

"*FILO Facility*" means the term loan facility under this Agreement comprised of FILO Loans.

"*FILO Fee Letter*" means the Amended and Restated FILO Fee Letter dated as of the Second Restatement Date, between the Borrower and the FILO Documentation Agent, as amended and in effect from time to time.

"*FILO In-Transit Advance Rate*" means (a) during the period from September 1, 2024 through and including November 30, 2024, 12.5% and (b) at all other times, 15%; *provided*, in each case, that such applicable advance rate shall be reduced by 2.5% (i.e., from 12.5% to 10%, or from 15% to 12.5%, as applicable) at all times when Excess Availability (calculated without giving effect to such reduction or any corresponding reduction under any other component of the FILO Borrowing Base) is less than 20% of the Global Borrowing Base.

"*FILO Inventory Advance Rate*" means (a) during the period from September 1, 2024 through and including November 30, 2024, 17.5% and (b) at all other times, 20%; *provided*, in each case, that such applicable advance rate shall be reduced by 2.5% (i.e., from 17.5% to 15%, or from 20% to 17.5%, as applicable) at all times when Excess Availability (calculated without giving effect to such reduction or any corresponding reduction under any other component of the FILO Borrowing Base) is less than 20% of the Global Borrowing Base.

"*FILO Lender*" means each Lender that holds a FILO Loan.

"*FILO Letter of Credit Advance Rate*" means 15%; *provided*, that such advance rate shall be reduced by 2.5% (i.e., from 15% to 12.5%) at all times when Excess Availability (calculated without

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

giving effect to such reduction or any corresponding reduction under any other component of the FILO Borrowing Base) is less than 20% of the Global Borrowing Base.

"*FILO Loan*" has the meaning specified in *Section 2.1(d)*.

"*FILO Maturity Date*" means the earliest of (a) the Scheduled Termination Date, (b) the Revolving Credit Termination Date and (c) the date on which the Obligations become due and payable pursuant to *Section 10.2*.

"*FILO Note*" means a promissory note of the Borrower payable to the order of any FILO Lender evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the FILO Loan owing to such Lender.

"*FILO Obligations*" means all Obligations with respect to any FILO Loan (including the FILO Prepayment Premium, if applicable) or otherwise payable to any FILO Secured Party or otherwise in respect of the FILO Facility.

"*FILO Prepayment Premium*" has the meaning specified in the FILO Fee Letter.

"*FILO Secured Parties*" means, collectively, the FILO Documentation Agent and the FILO Lenders.

"*FILO Specified Event of Default*" means (a) an Event of Default under *Section 10.1(a)* with respect to the FILO Loans or any other FILO Obligations, (b) an Event of Default under *Section 10.1(a)* with respect to the Revolving Obligations as a result of failure of the Borrower to pay all such Obligations then due and owing on the Revolving Credit Termination Date, (c) an Event of Default under *Section 10.1(b)(i)*, but only to the extent such Event of Default arises from the Loan Parties' failure to comply with the provisions of *Section 6.1* or *Section 6.2*, as applicable, (d) an Event of Default under *Section 10.1(b)(iii)* or *10.1(b)(iv)*, but only to the extent such Event of Default arises from the Loan Parties' failure to comply with the provisions of *Section 7.4(a)* or *7.4(b)*, and (e) an Event of Default under *Section 10.1(b)(ii)*.  Each determination of whether a FILO Specified Event of Default has occurred and is continuing shall be made without giving effect to any waiver or modification of any such provision effected pursuant to the terms hereof without the consent of the FILO Documentation Agent.

"*FILO Standstill Period*" means the period commencing on the date of the Administrative Agent's and the Borrower's receipt of written notice from the FILO Documentation Agent that a FILO Specified Event of Default has occurred and is continuing and that the FILO Documentation Agent is requesting the Administrative Agent to accelerate the FILO Obligations or otherwise commence the enforcement of remedies, and ending on the date that is (a) thirty (30) days after receipt of such notice with respect to a FILO Specified Event of Default arising under *Section 10.1(a)* and (b) forty-five (45) days after such receipt of such notice with respect to any other FILO Specified Event of Default.

"*FILO Trade Receivables Advance Rate*" means the lesser of (a) 10% and (b) such other advance rate to be determined by the FILO Documentation Agent in its sole discretion; provided, that such advance rate shall be reduced by 2.5% (i.e., from 10% (or such lower advance rate) to 7.5% (or such lower advance rate minus 2.5 percentage points)) at all times when Excess Availability (calculated without giving effect to such reduction or any corresponding reduction under any other component of the FILO Borrowing Base) is less than 20% of the Global Borrowing Base.

"*Financial Asset*" has the meaning given to such term in Article 8 of the UCC.

"*Financial Statements*" means the financial statements of the Borrower and its Subsidiaries delivered in accordance with *Sections 7.1(a)* and *7.1(b)*.

"*Fiscal Quarter*" means a fiscal quarter of any Fiscal Year.

"*Fiscal Year*" means the fiscal year of the Borrower and its Subsidiaries ending on the Saturday closest to January 31 in the following calendar year.

"*Floor*" means a rate per annum equal to (a) with respect to the Revolving Obligations, 0.00%, and (b) with respect to the FILO Obligations, 1.50%.

"*Foreign Lender*" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"*Foreign Plan*" means any material employee benefit plan, program or agreement maintained or contributed to by, or entered into with, Parent, Holdings or any Subsidiary of Holdings with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"*Foreign Subsidiary*" means any direct or indirect Subsidiary that is not a Domestic Subsidiary.

"*Fronting Exposure*" means, at any time there is a Defaulting Lender, (a) with respect to an Issuer, such Defaulting Lender's Applicable Percentage of the outstanding Letter of Credit Obligations to the extent that such Defaulting Lender's Applicable Percentage of such outstanding Letter of Credit Obligations has not been reallocated pursuant to *Section 2.16(a)(iv)* or Cash Collateralized pursuant to *Section 2.16(c)*, and (b) with respect to the Swing Loan Lender, such Defaulting Lender's Applicable Percentage of Swing Loans to the extent that such Defaulting Lender's Applicable Percentage of Swing Loans has not been reallocated pursuant to *Section 2.16(a)(iv)* or Cash Collateralized pursuant to *Section 2.16(c)*.

"*Fund*" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"*GAAP*" means generally accepted accounting principles in the United States, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Second Restatement Date in GAAP or in the application thereof (including through the adoption of IFRS) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Requisite Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through the adoption of IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"*GB Consulting Agreements*" has the meaning specified in *Section 4.1(i)*.

"*Global Borrowing Base*" means, at any time of calculation, an amount equal to the sum of the Modified Borrowing Base plus the FILO Borrowing Base.

"*Governmental Authority*" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"*Granting Lender*" has the meaning specified in *Section 12.2(g)*.

"*Guarantee*" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or monetary other obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Second Restatement Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness for borrowed money).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"*Guarantors*" has the meaning specified in the definition of "Collateral and Guarantee Requirement".  For avoidance of doubt, the Borrower may cause any Restricted Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Restricted Subsidiary to execute a joinder to the Guaranty in form and substance reasonably satisfactory to the Administrative Agent, and any such Restricted Subsidiary shall be a Guarantor hereunder for all purposes.

"*Guaranty*" means (a) the guaranty made by Holdings, Parent and the other Guarantors in favor of the Administrative Agent on behalf of the Secured Parties pursuant to *clause (b)* of the definition of "*Collateral and Guarantee Requirement*," substantially in the form of *Exhibit H*, and (b) each other guaranty and guaranty supplement delivered pursuant to *Section 8.11*.

"*Hazardous Materials*" means all explosive or radioactive substances or wastes, all substances, wastes, contaminants or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, and radon gas, regulated pursuant to any Environmental Law.

"*Hedge Bank*" means, as of any date of determination, (a) any Person that is a Revolving Credit Lender or an Affiliate of a Revolving Credit Lender on such date or (b) any Person who (i) was a

Revolving Credit Lender or an Affiliate of a Revolving Credit Lender at the time the applicable Swap Contract was entered into and who is no longer a Revolving Credit Lender or an Affiliate of a Revolving Credit Lender, (ii) is, and at all times remains, in compliance with the provisions of Section 11.12(b)(i), and (iii) agrees in writing that the Agents and the other Secured Parties shall have no duty to such Person (other than the payment of any amounts to which such Person may be entitled under *Section 10.3* hereof and acknowledges that the Agents and the other Secured Parties may deal with the Loan Parties and the Collateral as they deem appropriate (including the release of any Loan Party or all or any portion of the Collateral) without notice or consent from such Person, whether or not such action impairs the ability of such Person to be repaid the Secured Obligations under the Secured Hedge Agreements) and agrees to be bound by *Sections 11.12,* in each case such Person being a party to a Secured Hedge Agreement.

"*Holdings*" has the meaning specified in the preamble to this Agreement.

"*In-Transit Advance Rate*" means (a) during the period from September 1, 2024 through and including November 30, 2024, 92.5%, and (b) at all other times, 90%.

"*Incremental Amendment*" has the meaning specified in *Section 2.15(a)*.

"*Incremental Availability*" has the meaning specified in *Section 2.15(a)*.

"*Incremental Facility Effective Date*" has the meaning specified in *Section 2.15(a)*.

"*Indebtedness*" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business), to the extent that the same would be required to be shown as a long-term liability on the balance sheet for such Person prepared in accordance with GAAP;

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse, *provided* that if such Indebtedness has not been assumed by such Person, the amount of Indebtedness under this *clause (e)* shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby;

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

(f)  all Attributable Indebtedness;

(g)  all obligations of such Person in respect of Disqualified Equity Interests; and

(h)  all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, (x) the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt, (y) the amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date, and (z) loans and advances made by Loan Parties to Restricted Subsidiaries that are not Loan Parties which have a term not exceeding 364 days (inclusive of any roll over or extensions of terms) and which are made in the ordinary course of business shall not be deemed "Indebtedness" hereunder (except for purposes of Sections 9.2(c)(iv) and 9.3(d)). Notwithstanding the foregoing, Indebtedness will not include (1) contingent obligations incurred in the ordinary course of business unless and until such obligations are non-contingent, (2) earn-outs, purchase price holdbacks or similar obligations in connection with any Permitted Acquisition, (3) intercompany liabilities in the ordinary course of business, (4) Indebtedness of any direct or indirect parent company appearing on the balance sheet of such Person solely by reason of push down accounting under GAAP and (5) lease obligations other than in respect of a Capitalized Lease.

"*Indemnified Liabilities*" has the meaning specified in *Section 12.4*.

"*Indemnitees*" has the meaning specified in *Section 12.4*.

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"*Information*" has the meaning specified in *Section 12.17*.

"*Insolvency Increase Amount*" means, during any Insolvency Proceeding by or against a Loan Party, an amount equal to the result of (a) 5% of the Modified Borrowing Base, <u>minus</u> (b) any then outstanding Protective Advances made pursuant to *clause (b)* of the definition of Maximum Revolving Insolvency Amount (subject to the limitations set forth therein), whether such Protective Advance is made prior to or during such Insolvency Proceeding; *provided* that such result shall not be less than zero.

"*Insolvency Proceeding*" means any case or proceeding commenced by or against a Person under any state, federal, provincial, territorial or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code or any other Debtor Relief Law, (b) the appointment of a receiver, interim receiver, monitor, trustee, liquidator, administrator, conservator, custodian or other similar Person for such Person or any part of its property, including, in the case of any Lender, the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity, or (c) an assignment for the benefit of creditors, but excluding, for the avoidance of doubt, the Chapter 11 Cases.

"*Intellectual Property*" has the meaning specified in the Security Agreement.

"*Intellectual Property Security Agreements*" has the meaning specified in the Security Agreement.

"*Intercompany Subordination Agreement*" means an agreement executed by each Restricted Subsidiary of the Borrower, in substantially the form of *Exhibit L*.

"*Intercreditor Agreement*" means the intercreditor agreement dated as of the Second Restatement Date, among Holdings, Parent, the Borrower, the Subsidiary Guarantors, the Administrative Agent, the Collateral Agent and the Term Facility Administrative Agent, substantially in the form attached as *Exhibit K*, as amended, restated, supplemented or otherwise modified from time to time in accordance therewith and herewith.

"*Interest Period*" means, as to each Term SOFR Loan that is a Revolving Loan, the period commencing on the date such Term SOFR Loan is disbursed or converted to or continued as a Term SOFR Loan and ending on the date one, three or six months thereafter, as selected by the Borrower in its Notice of Borrowing; <u>provided</u> that:

(i) any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(iii) no Interest Period shall extend beyond the Revolving Credit Termination Date.

Notwithstanding anything to the contrary herein, in no event shall a FILO Loan be assigned an Interest Period.

"*Inventory*" has the meaning given to such term in Article 9 of the UCC.

"*Inventory Advance Rate*" means (a) during the period from September 1, 2024 through and including November 30, 2024, 92.5%, and (b) at all other times, 90%.

"*Inventory Appraisal*" has the meaning specified in *Section 7.4(c)*.

"*Inventory Reserves*" means (a) such reserves as may be established from time to time by the Administrative Agent or the FILO Documentation Agent, in its Permitted Discretion, with respect to changes in the determination of the saleability, at retail, of the Eligible Inventory or which reflect such other factors as negatively affect the market value of the Eligible Inventory, (b) Shrink Reserves, and (c) contra Inventory load.

"*Investment*" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Restricted Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the

44

purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on the Borrower's good faith estimate of the fair market value of such asset or property at the time such Investment is made)), without adjustment for subsequent changes in the value of such Investment, net of any return representing a return of capital with respect to such Investment.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other nationally recognized statistical rating agency selected by the Borrower.

"*IP Rights*" has the meaning specified in *Section 5.15*.

"*IRS*" means the Internal Revenue Service of the United States.

"*ISDA Definitions*" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"*ISP*" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"*Issue*" means, with respect to any Letter of Credit, to issue, extend the expiry of, amend, renew or increase the maximum face amount (including by deleting or reducing any scheduled decrease in such maximum face amount) of, such Letter of Credit.  The terms "*Issued*", "*Issuing*" and "*Issuance*" shall have a corresponding meaning.

"*Issuer*" means Bank of America and each other Revolving Credit Lender or Affiliate of a Revolving Credit Lender that (a) is listed on the signature pages hereof as an "Issuer" or (b) hereafter becomes an Issuer with the approval of the Administrative Agent and the Borrower by agreeing pursuant to an agreement with and in form and substance satisfactory to the Administrative Agent and the Borrower to be bound by the terms hereof applicable to Issuers (and in the case of any resignation, subject to and in accordance with *Section 12.2(h)*).

"*Issuer Documents*" means, with respect to any Letter of Credit, the Letter of Credit Request, and any other document, agreement and instrument entered into by an Issuer and the Borrower (or any of its Subsidiaries) or in favor of such Issuer and relating to such Letter of Credit.

"*Junior Financing*" means any Indebtedness that is unsecured or subordinated to the Obligations expressly by its terms (other than Indebtedness among Holdings, Parent, the Borrower and its Restricted Subsidiaries).

"*Junior Financing Documentation*" means any documentation governing any Junior Financing.

"*KPI's*" has the meaning specified in *Section 2.18*.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

"*L/C Credit Extension*" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"*Landlord Lien State*" means any state in which, at any time, a landlord's claim for rent has priority (notwithstanding any contractual provision to the contrary) by operation of applicable Law over the lien of the Collateral Agent in any of the Collateral.

"*Latest Maturity Date*" means, at any date of determination, the latest Scheduled Termination Date applicable to any Loan or Revolving Credit Commitment hereunder at such time, including the latest termination date of any Extended Revolving Credit Commitment or New Revolving Credit Commitment, as applicable, as extended in accordance with this Agreement from time to time.

"*Laws*" means, collectively, all applicable international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"*Leases*" means, with respect to any Person, all of those leasehold estates in real property of such Person, as lessee, as such may be amended, supplemented or otherwise modified from time to time.

"*Lender*" means the Swing Loan Lender, each Revolving Credit Lender, each FILO Lender and each other financial institution or other entity that (a) is listed on the signature pages hereof as a "*Lender*" or (b) from time to time becomes a party hereto by execution of an Assignment and Assumption or, in connection with a Revolving Commitment Increase, an Incremental Amendment or, in connection with an Extended Revolving Credit Commitment or a New Revolving Credit Commitment, an Extension Amendment.

"*Lending Office*" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"*Letter of Credit*" means any Banker's Acceptance or any letter of credit Issued (or deemed Issued) pursuant to *Section 2.4*. A Letter of Credit may be a Documentary Letter of Credit or a Standby Letter of Credit.

"*Letter of Credit Advance Rate*" means 90%.

"*Letter of Credit Borrowing*" means an extension of credit resulting from a drawing under any Letter of Credit that has not been reimbursed on the applicable Reimbursement Date or refinanced as a Revolving Loan.

"*Letter of Credit Fee*" has the meaning specified in *Section 2.12(b)*.

"*Letter of Credit Obligations*" means, at any time, the aggregate of all liabilities at such time of any Loan Party to all Issuers with respect to Letters of Credit, whether or not any such liability is contingent, including, without duplication, the sum of (a) the Reimbursement Obligations at such time and (b) the Letter of Credit Undrawn Amounts at such time.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

"*Letter of Credit Reimbursement Agreement*" has the meaning specified in *clause (vi)* of the proviso to *clause (a)* of *Section 2.4*.

"*Letter of Credit Request*" has the meaning specified in *Section 2.4(c)*.

"*Letter of Credit Sublimit*" means $125,000,000, as such amount may be increased or reduced in accordance with the provisions of this Agreement.  The Letter of Credit Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"*Letter of Credit Undrawn Amounts*" means, at any time, the aggregate undrawn face amount of all Letters of Credit outstanding at such time.

"*Lien*" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); *provided*, that in no event shall an operating lease in and of itself be deemed a Lien.

"*Lien Acknowledgment Agreement*" means each Collateral Access Agreement and Customs Broker/Carrier Agreement.

"*Limited Condition Acquisition*" means any Investment or acquisition (whether by way of merger, amalgamation, consolidation or other business combination or the acquisition of Equity Interests or otherwise) by the Borrower or one or more of its Restricted Subsidiaries permitted by this Agreement whose consummation is not conditioned on the availability of, or on obtaining, third party acquisition financing and which is designated as a Limited Condition Acquisition by the Borrower or such Restricted Subsidiary in writing to the Administrative Agent on or before the Transaction Agreement Date.

"*Liquidation*" means the exercise by the Collateral Agent or the Administrative Agent of those rights and remedies accorded to the Collateral Agent or the Administrative Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Collateral Agent or the Administrative Agent, of any public, private or "going out of business" sale or other disposition of the Collateral for the purpose of liquidating the Collateral.  Derivations of the word "*Liquidation*" (such as "*Liquidate*") are used with like meaning in this Agreement.

"*Liquidity*" means, at any time of calculation, the amount of Excess Availability plus unrestricted cash of the Loan Parties; *provided that* Excess Availability (together with cash held in the Segregated Cash Collateral Account (as such term is defined in the DIP Order) shall comprise not less than $40,000,000 of such calculation; and provided further that the amount of any cash held in the Segregated Cash Collateral Account (as such term is defined in the DIP Order) shall not be duplicative of unrestricted cash used in such calculation.

"*Loan*" means any loan made by any Lender pursuant to this Agreement, including, without limitation, Revolving Loans, FILO Loans, Swing Loans and any Loans made in respect of any Revolving Commitment Increase.

"*Loan Documents*" means, collectively, this Agreement, the Revolving Credit Notes, the FILO Notes, any Incremental Amendment and any Extension Amendment, the Guaranty, the Fee Letter, the FILO Fee Letter, each Letter of Credit Reimbursement Agreement, the Collateral Documents, the Issuer Documents, the Ratification Agreement and each certificate, agreement or document executed by a Loan Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

"*Loan Parties*" means, collectively, (a) Holdings, (b) Parent, (c) the Borrower and (d) each other Guarantor.

"*Margin Stock*" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Master Agreement*" has the meaning specified in the definition of "*Swap Contract*."

"*Material Adverse Effect*" means any event, circumstance or condition that has had a materially adverse effect on (a) the business, operations, assets, liabilities (actual or contingent) or financial condition of Parent and its Subsidiaries, taken as a whole, other than, in each case, customary events or circumstances which resulted from the commencement of the Chapter 11 Cases, (b) the ability of the Loan Parties (taken as a whole) to perform their respective material payment obligations under any Loan Document to which any of the Loan Parties is a party or (c) the rights and remedies of the Lenders, the Collateral Agent, the Administrative Agent and the FILO Documentation Agent (taken as a whole, collectively, for the Lenders and all such Agents) under the Loan Documents (taken as a whole).

"*Material Bank Accounts*" has the meaning specified in *Section 8.12*.

"*Material Domestic Subsidiary*" means, at any date of determination, each of the Borrower's Domestic Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the Consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Second Restatement Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in *clauses (a)* or *(b)* comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended Fiscal Quarter of the Borrower or more than 5.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for the period of four consecutive Fiscal Quarters ending as of the last day of such Fiscal Quarter, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement (or such longer period as may be agreed by the Administrative Agent in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of *Sections 8.11*, *8.12* and *8.13* applicable to such Subsidiary. Notwithstanding anything to the contrary herein contained, the Borrower may, at any time, designate (by written notice to the Administrative Agent) a Subsidiary which would not otherwise constitute a "Material Domestic Subsidiary" as such a Material Domestic Subsidiary and shall thereupon comply with the provisions of *Sections 8.11*, *8.12* and *8.13* applicable to such Subsidiary.

"*Material Foreign Subsidiary*" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test

48

Period were equal to or greater than 2.5% of the Consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP.

"*Material Indebtedness*" means Indebtedness having an aggregate outstanding principal amount of $45,000,000 or more.

"*Material Subsidiary*" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"*Maximum Credit*" means, at any time, the lesser of (i) the Revolving Credit Commitments in effect at such time and (ii) the Borrowing Base at such time.

"*Maximum Rate*" has the meaning specified in *Section 12.24*.

"*Maximum Revolving Insolvency Amount*" means an amount equal to the sum of (a) the Borrowing Base, plus (b) Protective Advances (subject to the aggregate cap thereon in the definition of "Protective Advances"), plus (c) in addition to the Protective Advances described in the foregoing *clause (b)*, Protective Advances (without regard to the aggregate cap thereon in the definition of "Protective Advances") in an aggregate amount equal to the sum of (i) the aggregate amount required to fund payroll of the Loan Parties and their Subsidiaries for a two-week period and (ii) rent and charges at the Loan Parties' distribution centers and warehouses for a one-month period, plus (d) all then outstanding Unintentional Overadvances, plus (e) the Insolvency Increase Amount, plus (f) the amount of Revolving Loans (including loans made pursuant to a Post-Petition Financing that is a Conforming Post-Petition Financing) to fund the Carve Out.

"*Modified Borrowing Base*" means the Borrowing Base (calculated without giving effect to any FILO Deficiency Reserves).

"*Modified Maximum Credit*" means, at any time, the lesser of (i) the Revolving Credit Commitments in effect at such time and (ii) the Modified Borrowing Base at such time.

"*Monthly Borrowing Base Certificate*" shall have the meaning specified in *Section 7.4(a)*.

"*Moody's*" means Moody's Investors Service, Inc. and any successor thereto.

"*Multiemployer Plan*" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years has made or been obligated to make contributions.

"*Net Cash Proceeds*" means:

(a)    with respect to the Disposition of any asset by the Borrower or any of the Restricted Subsidiaries, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition (including any cash and Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition and that is required to be repaid in connection with such Disposition (other than Indebtedness under the Loan Documents or the Term Facility Documentation or any Permitted Refinancing of the Indebtedness under the Term Facility Documentation), (B) the out-of-pocket fees and expenses (including attorneys' fees, investment

banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred by the Borrower or such Restricted Subsidiary in connection with such Disposition, (C) in the case of any Disposition by a non-wholly owned Restricted Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (C)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Restricted Subsidiary as a result thereof, (D) taxes or distributions made pursuant to *Section 9.6(g)(i)* or *(g)(iii)* paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Net Cash Proceeds), *provided* that to the extent that the actual taxes are less than such estimate, the excess shall constitute Net Cash Proceeds, and (E) any funded reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (E); *provided* that, so long as no Cash Dominion Period has occurred and is continuing hereunder, no net cash proceeds calculated in accordance with the foregoing realized in any fiscal year shall constitute Net Cash Proceeds under this *clause (a)* in such fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $10,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Cash Proceeds under this *clause (a)*); and

(b)    (i) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary or any Permitted Equity Issuance by the Borrower, the excess, if any, of (A) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (B) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance and (ii) with respect to any Permitted Equity Issuance by any direct or indirect parent of the Borrower, the amount of cash from such Permitted Equity Issuance contributed to the capital of the Borrower.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"*Net Leverage Ratio*" means, with respect to any Test Period, the ratio of (a) Consolidated Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA of the Borrower for such Test Period.

 "*Net Recovery Percentage*" means the fraction, expressed as a percentage, (a) the numerator of which is the amount equal to the recovery on the aggregate amount of the Inventory at such time on a "going out of business sale" basis as set forth in the most recent appraisal of Inventory received by the Administrative Agent and the FILO Documentation Agent in accordance with *Section 7.4*, net of operating expenses, liquidation expenses and commissions, and (b) the denominator of which is the applicable original cost of the aggregate amount of the Inventory subject to appraisal.  The Net Recovery Percentage for any category of Inventory used in determining the Borrowing Base and the FILO Borrowing Base shall be based on the applicable percentage in the most recent appraisal conducted as set forth in *Section 7.4*.

"*New Revolving Commitment Lenders*" has the meaning specified in *Section 2.17(c)*.

"*New Revolving Credit Commitments*" has the meaning specified in *Section 2.17(c)*.

"*Non-Consenting Lender*" has the meaning specified in *Section 3.7*.

"*Non-Excluded Taxes*" means all Taxes other than Excluded Taxes and Other Taxes.

"*Non-Loan Party*" means any Subsidiary of the Borrower that is not a Loan Party.

"*Notice of Borrowing*" has the meaning specified in *Section 2.2*.

"*Notice of Conversion or Continuation*" has the meaning specified in *Section 2.11(a)*.

"*Obligations*" means all (a) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, (b) obligations of any Loan Party arising under any Secured Hedge Agreement, (c) Cash Management Obligations, and (d) Bank Product Obligations.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and any of their Subsidiaries to the extent they have obligations under the Loan Documents) include the obligation (including guarantee obligations) to pay principal, interest, Letter of Credit, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document; *provided* that Obligations of a Loan Party shall exclude any Excluded Swap Obligations with respect to such Loan Party.

"*OFAC*" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"*OID*" means original issue discount.

"*Other Taxes*" means any and all present or future stamp or documentary Taxes or any other excise or property Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document excluding, in each case, any such tax that result from an Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document (an "Assignment Tax"), but only if (1) such Assignment Tax is imposed as a result of a present or former connection of the assignor or assignee and the jurisdiction imposing such Assignment Tax (other than a connection arising solely from such recipient having executed, delivered, enforced, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction specifically contemplated by, or enforced, any Loan Documents) and (2) the assignment, participation, etc., giving rise to such Assignment Tax did not take place at the request of the Borrower.

"*Outstanding Amount*" means (a) with respect to the Revolving Loans and Swing Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Loans (including any refinancing of Letter of Credit Obligations as a Revolving Loan) and Swing Loans, as the case may be, occurring on such date; and (b) with respect to any Letter of Credit Obligations on any date, the amount of such Letter of Credit Obligations on such date after giving effect to any related extension of any Letter of Credit occurring on

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding Letter of Credit Obligations (including any refinancing of outstanding Letter of Credit Obligations under related Letters of Credit or related extensions of any Letters of Credit as a Revolving Loan) or any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"*Overadvance*" means a Credit Extension to the extent that, immediately after its having been made, Excess Availability is less than zero.

"*Overnight Rate*" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent, an Issuer, or the Swing Loan Lender, as applicable, in accordance with banking industry rules on interbank compensation.

"*Parent*" has the meaning specified in the preamble to this Agreement.

"*Parent Entity*" has the meaning specified in Section 7.1.

"*Participant*" has the meaning specified in *Section 12.2(d)*.

"*Participant Register*" has the meaning specified in *Section 12.2(e)*.

"*Payment Conditions*" means, at any time of determination, (a) with respect to any Permitted Acquisition or Specified Payment under clause (i) of the definition thereof, that (x) no Event of Default exists or would arise as a result of the making of the subject Specified Payment or Permitted Acquisition, as the case may be, and (y) after giving Pro Forma Effect to such Specified Payment or Permitted Acquisition, as the case may be, and for the six-month period immediately preceding such Specified Payment or Permitted Acquisition, as the case may be and on a projected basis for the six-month period immediately following such Specified Payment or Permitted Acquisition, as the case may be, Excess Availability shall be greater than the greater of (A) 15% of the Modified Maximum Credit and (B) $75,000,000 and (b) with respect to any Specified Payment under clause (ii) of the definition thereof, that (x) no Event of Default exists or would arise as a result of the making of the subject Specified Payment and (y) after giving Pro Forma Effect to such Specified Payment, and for the six-month period immediately preceding such Specified Payment and on a projected basis for the six-month period immediately following such Specified Payment, Excess Availability shall be greater than the greater of (A) 25% of the Modified Maximum Credit and (B) $112,000,000.  In each case with respect to the above conditions, the Borrower shall have delivered in accordance with *Section 7.2(f)* hereof, to the Administrative Agent evidence reasonably satisfactory to the Administrative Agent that the conditions in the foregoing clauses *(a)* and *(b)*, as applicable, have been satisfied.

"*PBGC*" means the Pension Benefit Guaranty Corporation or any successor thereto.

"*Pension Plan*" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions in the preceding five plan years.

"*Permitted Acquisition*" means the purchase or other acquisition by Holdings or any of its Restricted Subsidiaries of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, a Store or Equity Interests in a Person that,

upon the consummation thereof, will be a wholly owned Restricted Subsidiary of the Borrower (including as a result of a merger or consolidation); *provided* that, with respect to each such purchase or other acquisition:

(i)      the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and each applicable Loan Party and any newly created or acquired Subsidiary (and, to the extent required under the Collateral and Guarantee Requirement, the Subsidiaries of such created or acquired Subsidiary) shall be Guarantors, except for any (A) Foreign Subsidiary or (B) Domestic Subsidiaries up to an acquisition amount not to exceed the greater of (i) $55,000,000 and (ii) 2.50% of Total Assets in the aggregate for all such Domestic Subsidiaries, and shall have complied with the requirements of *Section 8.11, 8.12* and *8.13*, within the times specified therein (for the avoidance of doubt, this *clause (i)* shall not override any provisions of the Collateral and Guarantee Requirement); *provided* that the formation of any Subsidiary that is a Division Successor shall be deemed to constitute the acquisition of a Restricted Subsidiary for all purposes of this definition;

(ii)      the Borrower shall have delivered to the Administrative Agent, on behalf of the Lenders, no later than five (5) Business Days before the date on which any such purchase or other acquisition is consummated, a certificate of a Responsible Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying that all of the requirements set forth in this definition have been satisfied or will be satisfied on or prior to the consummation of such purchase or other acquisition; and

(iii)      the Borrower is in compliance, on a pro forma basis after giving effect to such transaction, with the Payment Conditions.

"*Permitted Discretion*" means a determination made by the Administrative Agent, the FILO Documentation Agent or the Collateral Agent (as applicable) in good faith in the exercise of its reasonable (from the perspective of an asset-based lender) business judgment.

"*Permitted Equity Issuance*" means any sale or issuance of any Qualified Equity Interests of the Borrower or any direct or indirect parent of the Borrower, in each case to the extent permitted hereunder.

"*Permitted Holder*" means any of (a) each beneficial owner in the common equity of Parent as of the Second Restatement Date as set forth on a schedule delivered to the Administrative Agent and the FILO Documentation Agent on or prior to the Second Restatement Date, (b) any of the Controlled Affiliates (excluding any portfolio companies or of any of their Controlled Affiliates) of any of the Persons specified in *clause (a)* above and (c) any "group" within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act (or any successor provision) of which any of the foregoing are members; *provided* that in the case of such "group" and without giving effect to the existence of such "group" or any other "group", such Persons specified in *clauses (a)* and *(b)* above, individually or collectively, have beneficial ownership, directly or indirectly, of more than 50% of the total voting power of the voting stock of Parent or any of its direct or indirect parent entities held by such "group".

"*Permitted Refinancing*" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium (including tender premiums) thereon plus fees and expenses (including upfront fees and OID) reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

Indebtedness permitted pursuant to *Sections 9.3(b)* and *(e),* such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) [reserved], (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment to the Obligations, (i) such modification, refinancing, refunding, renewal, replacement or extension shall be subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (ii) the terms and conditions (excluding as to subordination, pricing, premiums and optional prepayment or redemption provisions) of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, are not materially less favorable to the Loan Parties or the Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended; *provided* that a certificate of a Responsible Officer of the Borrower delivered to the Administrative Agent at least five (5) Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees) and (iii) such modification, refinancing, refunding, renewal or extension is incurred by the Person who is the obligor of the Indebtedness being modified, refinanced, refunded, renewed or extended and no additional obligors become liable for such Indebtedness, and (e) in the case of any Permitted Refinancing in respect of the Term Facility, such Permitted Refinancing is secured only by assets pursuant to one or more security agreements permitted by and subject to the Intercreditor Agreement (or another intercreditor agreement containing terms that are at least as favorable to the Secured Parties as those contained in the Intercreditor Agreement).

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"*Petition Date*" has the meaning specified in the preliminary statements of this Agreement.

"*Plan*" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"*Platform*" has the meaning specified in *Section 7.2.*

"*Pledged Debt*" has the meaning specified in the Security Agreement.

"*Pledged Equity*" has the meaning specified in the Security Agreement.

"*Post-Petition Financing*" means, in connection with any Insolvency Proceeding with respect to a Loan Party, the consensual use of cash collateral by, or the provision of financing or financial accommodations to, such Loan Party (including, in either event, all of the terms and conditions established and/or approved in connection with the consensual use of cash collateral, financing or financial accommodations).

"*Pro Forma Basis*" and "*Pro Forma Effect*" mean, with respect to compliance with any test or covenant or calculation hereunder, or the calculation of Consolidated EBITDA hereunder, the

determination or calculation of such test, covenant, ratio or Consolidated EBITDA (including in connection with Specified Transactions) in accordance with *Section 1.8*.

"*Proceeds*" has the meaning given to such term in Article 9 of the UCC.

"*Projections*" shall have the meaning specified in *Section 7.1(d)*.

"*Protective Advances*" means an Overadvance made or deemed to exist by the Administrative Agent, in its discretion, which:

(a)    is made to maintain, protect or preserve the Collateral and/or the Loan Parties' rights under the Loan Documents or which is otherwise for the benefit of the Loan Parties; or

(b)    is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation; or

(c)    is made to pay any other amount chargeable to any Loan Party hereunder; and

(d)    together with all other Protective Advances then outstanding, shall not (i) exceed the greater of five percent (5%) of the Modified Borrowing Base and $20,000,000 at any time or (ii) unless a Liquidation is taking place, remain outstanding for more than forty-five (45) consecutive Business Days, unless in each case, the Requisite Revolving Credit Lenders and the FILO Documentation Agent otherwise agree;

*provided however*, that the foregoing shall not (i) modify or abrogate any of the provisions regarding the Revolving Credit Lenders' obligations with respect to Letters of Credit or with respect to Swing Loans, or (ii) result in any claim or liability against the Administrative Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances, and such Unintentional Overadvances shall not reduce the amount of Protective Advances allowed hereunder.

"*PTE*" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"*Public Lender*" has the meaning specified in *Section 7.2*.

"*Purchase Date*" has the meaning specified in *Section 10.12(a)*.

"*Purchase Notice*" has the meaning specified in *Section 10.12(a)*.

"*Purchase Option Event*" means the occurrence of any of the following: (a) the Administrative Agent shall notify the FILO Documentation Agent of its intention to (by itself or at the direction of the Requisite Lenders) sell, lease or otherwise dispose of all or substantially all of the Collateral whether by private or public sale or to release any Loan Party from its Obligations under this Agreement, in each case in accordance with the last paragraph of *Section 12.1*, (b) the Administrative Agent shall consent to any Liquidation of all or substantially all of the Current Asset Collateral (or if any such Liquidation is otherwise commenced or is the subject of a binding agreement among any Loan Party and a liquidator), (c) any FILO Specified Event of Default shall occur, (d) any Event of Default under *Section 10.1(f)* shall occur, (e) any Event of Default under *Section 10.1(b)(i)* shall occur, but only to the extent (x) such Event of Default arises from the Loan Parties' failure to comply with the provisions of *Section 9.1*, *Section 9.3*, *Section 9.4* or *Section 9.5* (in each case, as in effect on the Second Restatement

Date) and (y) such Event of Default has not been waived or cured within thirty (30) days, (f) any Event of Default under *Section 10.1(b)(v)* shall occur, but only to the extent (x) such Event of Default arises from the Loan Parties' failure to comply with the provisions of *Section 7.4(c)* or *(d)* and (y) such Event of Default has not been waived or cured within thirty (30) days, or (g) any assignment by the Revolving Credit Lenders, after giving effect to which more than twenty-five percent (25%) of the aggregate Revolving Credit Exposure will be held by one or more Persons (together with each such Person's Affiliates and Approved Funds with respect to such Person) that is not a financial institution regulated by the Federal Reserve Board.  The Administrative Agent shall endeavor to notify the FILO Documentation Agent of any Purchase Option Event arising under the foregoing *clause (b)* or *clause (g)*.

"*Purchasing Creditors*" has the meaning specified in *Section 10.12(a)*.

"*QFC*" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"*QFC Credit Support*" has the meaning specified in *Section 12.30*.

"*Qualified ECP Guarantor*" means, at any time, each Loan Party with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"*Qualified Equity Interests*" means any Equity Interests that are not Disqualified Equity Interests.

"*Qualified Holding Company Debt*" means unsecured Indebtedness of Parent or Holdings (A) that is not subject to any Guarantee by any Subsidiary of Holdings, (B) that will not mature prior to the date that is six (6) months after the Latest Maturity Date in effect on the date of issuance or incurrence thereof, (C) that has no scheduled amortization of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (E) below), (D) that does not require any payments in cash of interest or other amounts in respect of the principal thereof prior to the earlier to occur of (1) the date that is four (4) years from the date of the issuance or incurrence thereof and (2) the date that is ninety-one (91) days after the Latest Maturity Date in effect on the date of such issuance or incurrence, and (E) that has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior discount notes of an issuer that is the parent of a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy provisions, no more restrictive (taken as a whole) than those set forth in this Agreement (other than provisions customary for senior discount notes of a holding company); *provided* that the Borrower shall have delivered a certificate of a Responsible Officer to the Administrative Agent at least five (5) Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement (and such certificate shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five (5) Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees)); *provided further* that any such Indebtedness shall constitute Qualified Holding Company Debt only if immediately after giving effect to the issuance or incurrence thereof and the use of proceeds thereof, no Event of Default shall have occurred and be continuing.

"*Quarterly Financial Statements*" means the unaudited Consolidated balance sheets and related statements of income, and cash flows of the Borrower and its Subsidiaries for the most recent Fiscal Quarter ended October 28, 2023.

"*Ratable Portion*", "*Pro Rata Share*", "*ratable share*" or (other than in the expression "equally and ratably") "*ratably*" means (a) with respect to any Revolving Credit Lender, the percentage obtained by dividing (i) the Revolving Credit Commitment of such Class of such Lender by (ii) the aggregate Revolving Credit Commitments of all Lenders of such Class (or, at any time after the Revolving Credit Termination Date, the percentage obtained by dividing the aggregate outstanding principal balance of the Revolving Credit Outstandings of such Class owing to such Lender by the aggregate outstanding principal balance of the Revolving Credit Outstandings owing to all Lenders of such Class) and (b) with respect to any FILO Lender, the percentage obtained by dividing (i) the aggregate outstanding principal balance of the FILO Loans owing to such Lender by (ii) the aggregate outstanding principal balance of the FILO Loans owing to all FILO Lenders.

"*Ratification Agreement*" means the Confirmation and Ratification Agreement dated as of the Second Restatement Date by and among the Loan Parties and the Administrative Agent.

"*Receivables Reserves*" means such Reserves as may be established from time to time by the Administrative Agent (or, if Eligible Trade Receivables are included in the FILO Borrowing Base, the FILO Documentation Agent) in its Permitted Discretion with respect to the determination of the collectability in the ordinary course of Eligible Trade Receivables, including, without limitation, Dilution Reserves.

"*Recovery*" has the meaning specified in *Section 10.8*.

"*Register*" has the meaning specified in *Section 12.2(c)*.

"*Reimbursement Date*" has the meaning specified in *Section 2.4(h)*.

"*Reimbursement Obligations*" means, as and when matured, the obligation of any Loan Party to pay, on the date payment is made or scheduled to be made to the beneficiary under each such Letter of Credit (or at such other date as may be specified in the applicable Letter of Credit Reimbursement Agreement) and in the currency drawn (or in such other currency as may be specified in the applicable Letter of Credit Reimbursement Agreement), all amounts of each drafts and other requests for payments drawn under Letters of Credit, and all other matured reimbursement or repayment obligations of any Loan Party to any Issuer with respect to amounts drawn under Letters of Credit.

"*Related Indemnified Person*" of an Indemnitee means (a) any controlling person or controlled affiliate of such Indemnitee, (b) the respective directors, officers, or employees of such Indemnitee or any of its controlling persons or controlled affiliates and (c) the respective agents of such Indemnitee or any of its controlling persons or controlled affiliates, in the case of this *clause (c)*, acting at the instructions of such Indemnitee, controlling person or such controlled affiliate; *provided* that each reference to a controlled affiliate or controlling person in this definition shall pertain to a controlled affiliate or controlling person involved in the negotiation or syndication of any Revolving Facility, the FILO Facility, the Term Facility or any Junior Financing.

"*Related Parties*" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"*Reportable Event*" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"*Requisite Lenders*" means, collectively, Lenders having more than fifty percent (50%) of the sum of (a) the aggregate outstanding amount of the Revolving Credit Commitments (or, after the Revolving Credit Termination Date, the aggregate Revolving Credit Outstandings) plus (b) the aggregate outstanding principal amount of the FILO Loans; *provided* that the unused Revolving Credit Commitment of, and the portion of the Revolving Loans and outstanding Letters of Credit held or deemed held by, any Defaulting Lender or Disqualified Institution shall be excluded for purposes of making a determination of Requisite Lenders; *provided further* that for purposes of determining any consent, request, direction or other action of Requisite Lenders, such consent, request, direction or other action of the FILO Documentation Agent shall be binding upon and deemed to be a consent, request, direction or other action of each FILO Lender.

"*Requisite Revolving Credit Lenders*" means, collectively, Revolving Credit Lenders having more than fifty percent (50%) of the aggregate outstanding amount of the Revolving Credit Commitments (or, after the Revolving Credit Termination Date, the aggregate Revolving Credit Outstandings); *provided* that the unused Revolving Credit Commitment of, and the portion of the Revolving Loans and outstanding Letters of Credit held or deemed held by, any Defaulting Lender or Disqualified Institution shall be excluded for purposes of making a determination of Requisite Revolving Credit Lenders.

"*Rescindable Amount*" has the meaning specified in *Section 2.13(e)*.

"*Resolution Authority*" an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" means the chief executive officer, president, chief financial officer, treasurer or controller of a Loan Party, solely for purposes of the delivery of incumbency certificates, the secretary or any assistant secretary of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"*Restricted Payment*" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any of its Restricted Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or Holdings' stockholders, partners or members (or the equivalent Persons thereof) other than (i) the payment of compensation in the ordinary course of business to holders of any such Equity Interests who are employees or service providers of Holdings (or any direct or indirect parent thereof) or any Subsidiary solely in their capacity as employees or service providers and (ii) other than payments of intercompany indebtedness permitted under this Agreement, unless such payments are made in the form of dividends or other distributions that would otherwise be classified as Restricted Payments hereunder.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

"*Restricted Subsidiary*" means any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"*Revolving Commitment Increase*" has the meaning specified in *Section 2.15(a)*.

"*Revolving Commitment Increase Lender*" has the meaning specified in *Section 2.15(a)*.

"*Revolving Credit Commitment*" means, with respect to each Revolving Credit Lender, the commitment of such Lender to make Revolving Loans and acquire interests in other Revolving Credit Outstandings expressed as an amount representing the maximum principal amount of the Revolving Loans to be made by such Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to this Agreement and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Lender pursuant to an Assignment and Assumption, (ii) a Revolving Commitment Increase, (iii) a New Revolving Credit Commitment or (iv) an Extension.  The initial amount of each Revolving Credit Lender's Revolving Credit Commitment is set forth on *Schedule I* under the caption "*Revolving Credit Commitment*," as amended to reflect each Assignment and Assumption, Incremental Amendment or Extension Amendment, in each case executed by such Lender.  The aggregate amount of the Revolving Credit Commitments as of the Second Restatement Date is $500,000,000.

"*Revolving Credit Exposure*" means, as to each Revolving Credit Lender, the sum of the Outstanding Amount of such Lender's Revolving Loans (including any Protective Advances), its Pro Rata Share of the Letter of Credit Obligations and its Pro Rata Share of the Swing Loan Obligations at such time.

"*Revolving Credit Lender*" means each Lender that (a) has a Revolving Credit Commitment, (b) holds a Revolving Loan or (c) participates in any Letter of Credit.

"*Revolving Credit Note*" means a promissory note of the Borrower payable to the order of any Revolving Credit Lender in a principal amount equal to the amount of such Lender's Revolving Credit Commitment evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Revolving Loans of a given Class owing to such Lender.

"*Revolving Credit Outstandings*" means, at any particular time, the sum of (a) the principal amount of the Loans (other than FILO Loans) outstanding at such time, (b) the Letter of Credit Obligations outstanding at such time and (c) the principal amount of the Swing Loans outstanding at such time.

"*Revolving Credit Termination Date*" means the earliest of (a) the Scheduled Termination Date, (b) the date of termination of all of the Revolving Credit Commitments pursuant to *Section 2.5* and (c) the date on which the Obligations become due and payable pursuant to *Section 10.2*.

"*Revolving Facility*" means the Revolving Credit Commitments and the provisions herein related to the Revolving Loans, Swing Loans and Letters of Credit, Loans under Extended Revolving Credit Commitments and Loans under New Revolving Credit Commitments.

"*Revolving Loan*" has the meaning specified in *Section 2.1(a)*.

"*Revolving Obligations*" means all Obligations other than FILO Obligations.

"*Revolving Secured Parties*" means all Secured Parties other than the FILO Secured Parties.

"*S&P*" means Standard & Poor's Rating Services and any successor thereto.

"*Sale Event*" has the meaning specified in *Section 10.2(c)*.

"*Same Day Funds*" means disbursements and payments in immediately available funds.

"*Sanctioned Person*" has the meaning specified in *Section 5.17*.

"*Sanctions*" means any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, His Majesty's Treasury ("*HMT*") or other relevant sanctions authority.

"*Scheduled Termination Date*" means June 22, 2027, as such date may be extended (solely with respect to the extending Class) pursuant to *Section 12.1(b)* or *Section 2.17*, *provided* that, in each case, if such day is not a Business Day, the Scheduled Termination Date shall be the Business Day immediately preceding such day.

"*Scheduled Unavailability Date*" has the meaning specified in *Section 3.3(b)*.

"*SEC*" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"*Second Restatement Date*" means [    ]**April 30**, 2024, being the first date all the conditions precedent in *Section 4.1* were satisfied or waived in accordance with *Section 12.1*.

"*Second Restatement Transactions*" means, collectively, the entry of the Confirmation Order, the transactions contemplated by the Approved Plan, the funding (or deemed funding) of the Loans and issuance (or deemed issuance) of the Letters of Credit under this Agreement on the Second Restatement Date, the funding (or deemed funding) of the loans under the Term Facility on the Second Restatement Date, the consummation of the other transactions contemplated by this Agreement, the Term Facility Documentation, the Approved Plan or the Confirmation Order, the consummation of any other transactions in connection with the foregoing and the payment of the fees and expenses incurred in connection with any of the foregoing.

"*Secured Bank Product Agreement*" means any Bank Product Agreement that is entered into by and between any Loan Party and any Bank Product Bank.

"*Secured Cash Management Agreement*" means any Cash Management Agreement that is entered into by and between any Loan Party and any Cash Management Bank.

"*Secured Hedge Agreement*" means any Swap Contract permitted under *Section 9.3(f)* that is entered into by and between any Loan Party and any Hedge Bank and designated in writing by the Hedge Bank and the Borrower to the Administrative Agent as a "*Secured Hedge Agreement*."

"*Secured Obligations*" means, in the case of the Borrower, the Obligations and, in the case of any other Loan Party, the obligations of such Loan Party under the Guaranty and the other Loan Documents to which it is a party.

"*Secured Parties*" means, collectively, the Lenders, the Issuers, the Administrative Agent, the Collateral Agent, the FILO Documentation Agent, each Hedge Bank, each Cash Management Bank, each Bank Product Bank and each co-agent or sub-agent (if any) appointed by the Administrative Agent from time to time pursuant to *Section 11.5*.

"*Securities Account*" means all securities accounts of any Loan Party, including "securities accounts" within the meaning given to such term in Article 8 of the UCC.

"*Securities Account Control Agreement*" means an effective securities account control agreement with an Approved Securities Intermediary, in each case in form and substance reasonably satisfactory to the Administrative Agent.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Security*" means any Equity Interest, voting trust certificate, bond, debenture, note or other evidence of Indebtedness, whether secured, unsecured, convertible or subordinated, or any certificate of interest, share or participation in, any temporary or interim certificate for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, but shall not include any evidence of the Obligations.

"*Security Agreement*" means, collectively, the Amended and Restated Security Agreement executed by the Loan Parties, substantially in the form of *Exhibit I*, together with each Security Agreement Supplement executed and delivered pursuant to *Section 8.11*.

"*Security Agreement Supplement*" has the meaning specified in the Security Agreement.

"*Shrink Reserve*" means an amount reasonably estimated by the Administrative Agent or the FILO Documentation Agent to be equal to that amount which is required in order that the shrink reflected in current books and records of the Borrower and its Restricted Subsidiaries would be reasonably equivalent to the shrink calculated as part of the Borrower's and its Restricted Subsidiaries most recent physical Inventory (it being understood and agreed that no Shrink Reserve established by the Administrative Agent or the FILO Documentation Agent shall be duplicative of any shrink as so reflected in the current books and records of the Borrower and its Restricted Subsidiaries or estimated by the Borrower for purposes of computing the Borrowing Base and the FILO Borrowing Base).

"*SOFR*" means the Secured Overnight Financing Rate as administered by the Federal Reserve Bank of New York (or a successor administrator).

"*SOFR Adjustment*" with respect to Daily Simple SOFR and Term SOFR means (a) with respect to the Revolving Obligations, 0.10% (10.00 basis points) per annum, and (b) with respect to the FILO Obligations, zero.

"*Solvent*" and "*Solvency*" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the assets of such Person exceeds its debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person is greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person is able to pay its debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured and (d) such Person is not engaged in, and is not about to engage in, business for which it has unreasonably small capital.  The amount of any contingent liability at any

time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

"*SPC*" has the meaning specified in *Section 12.2(g)*.

"*Specified Event of Default*" means any Event of Default (a) of the type described in *Section 10.1(a)*, *10.1(b)(i)(A)*, *10.1(b)(ii)*, *10.1(b)(iii)*, *10.1(d)* (with respect to any Borrowing Base Certificate) or *10.1(f)*.

"*Specified Loan Party*" means any Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to *Section 12.28*).

"*Specified Payment*" means (i) any Investment, incurrence of Indebtedness, incurrence of Liens, or Disposition, or (ii) any Restricted Payment or payments made pursuant to *Section 9.11* that, in each case, is subject to the satisfaction of the Payment Conditions.

"*Specified Representations*" shall mean those representations and warranties made by the Borrower in *Sections 5.1(a)* (with respect to organizational existence only), *5.1(b)(ii)*, *5.2(a)*, *5.2(b)(i)*, *5.2(b)(iii)*, *5.4*, *5.13*, *5.16*, *5.18* and *5.19*.

"*Specified Transaction*" means any Investment that results in a Person becoming a Restricted Subsidiary, any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary, any Permitted Acquisition, any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or a Store or any Disposition of a business unit, line of business or division or a Store of the Borrower or a Restricted Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise, incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes), and any Restricted Payment or Revolving Commitment Increase that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"*Standby Letter of Credit*" means any Letter of Credit that is not a Documentary Letter of Credit.

"*Stated Amount*" means at any time the maximum amount for which a Letter of Credit may be honored.

"*Store*" means any retail store (which includes any real property, fixtures, equipment, Inventory and other property related thereto) operated, or to be operated, by the Borrower or any Restricted Subsidiary.

"*Store Accounts*" means Deposit Accounts established for the purpose of receiving receipts from a Store location of a Loan Party.

"*Subsidiary*" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, charitable foundations) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.

Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"*Subsidiary Guarantor*" means any Guarantor (other than Holdings and Parent).

"*Successor Borrower*" has the meaning specified in *Section 9.4(d)*.

"*Successor Rate*" has the meaning specified in *Section 3.3(b)*.

"*Supermajority Revolving Credit Lenders*" means, collectively, Revolving Credit Lenders having more than 66.67% of the aggregate outstanding amount of the Revolving Credit Commitments or, after the Revolving Credit Termination Date, more than 66.67% of the aggregate Revolving Credit Outstandings; *provided* that the unused Revolving Credit Commitment of, and the portion of the Loans and outstanding Letters of Credit held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Supermajority Revolving Credit Lenders.

"*Supported QFC*" has the meaning specified in *Section 12.30*.

"*Sustainability Coordinator*" has the meaning specified in *Section 2.18*.

"*Sustainability Linked Loan Principles*" means the Sustainability Linked Loan Principles as most recently published by the Loan Market Association and Loan Syndications & Trading Association.

"*Swap Contract*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "*Master Agreement*"), including any such obligations or liabilities under any Master Agreement.

"*Swap Obligations*" means with respect to any Loan Party any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"*Swap Obligations Reserve*" shall mean the aggregate amount of reserves established by the Administrative Agent or the FILO Documentation Agent from time to time in its Permitted Discretion in respect of Secured Hedge Agreements.

"*Swap Termination Value*" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in *clause (a)*, the amount(s) determined as the mark-to-market value(s) for such Swap

Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"*Swing Loan*" has the meaning specified in *Section 2.3(a)*.

"*Swing Loan Lender*" means Bank of America in its capacity as the Swing Loan Lender hereunder.

"*Swing Loan Obligations*" means, as at any date of determination, the aggregate Outstanding Amount of all Swing Loans.

"*Swing Loan Request*" has the meaning specified in *Section 2.3*(*b*).

"*Swing Loan Sublimit*" means the lesser of (a) $30,000,000 and (b) the aggregate principal amount of the Revolving Credit Commitments.  The Swing Loan Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"*Taxes*" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

"*Tax Indemnitee*" has the meaning specified in *Section 3.1(e)*.

"*Term Facility*" means the credit facility under the Term Facility Credit Agreement.

"*Term Facility Administrative Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and collateral agent under the Term Facility Credit Agreement, or any successor administrative agent and collateral agent under the Term Facility Credit Agreement.

"*Term Facility Credit Agreement*" means that certain credit agreement dated as of the Second Restatement Date among Needle Holdings LLC, as borrower, [NewCo]**JOANN Holdings 2**, LLC, as holdings, the lenders party thereto and the Term Facility Administrative Agent, as administrative agent and collateral agent, as the same may be amended, restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time in one or more agreements (in each case with the same or new lenders, institutional investors or agents), including any agreement extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case as and to the extent permitted by this Agreement and the Intercreditor Agreement.

"*Term Facility Documentation*" means the Term Facility Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"*Term Facility Lenders*" means the lenders from time to time party to the Term Facility Credit Agreement.

"*Term SOFR*" means:

(a)     for any Interest Period with respect to a Term SOFR Loan that is a Revolving Loan, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days

prior to the commencement of such Interest Period with a term equivalent to such Interest Period; *provided* that if the rate is not published prior to 11:00 a.m. (New York City time) on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto, in each case, *plus* the SOFR Adjustment for such Interest Period;

(b)      for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the Term SOFR Screen Rate with a term of one month commencing that day; and

(c)      for any interest calculation with respect to a Term SOFR Loan that is a FILO Loan, for any day in any calendar month, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the first day of such calendar month with a term of one month; *provided* that if the rate is not published prior to 11:00 a.m. (New York City time) on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto with a term of one month.

*provided* that if Term SOFR determined in accordance with any of the foregoing *clauses (a)*, *(b)* or *(c)* of this definition would otherwise be less than the applicable Floor, Term SOFR shall be deemed to be the applicable Floor for purposes of this Agreement.  The Floor shall be determined separately for the Revolving Obligations and the FILO Obligations, as set forth in the definition of "Floor".

"*Term SOFR Loan*" means a Loan that bears interest at a rate based on *clause (a)* or *(c)* of the definition of Term SOFR.

"*Term SOFR Replacement Date*" has the meaning specified in *Section 3.3(b)*.

"*Term SOFR Screen Rate*" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Administrative Agent) and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"*Test Period*" in effect at any time means the most recent period of four consecutive Fiscal Quarters of the Borrower ended on or prior to such time (taken as one accounting period) for which financial statements are available after the use of commercially reasonable efforts by the Borrower to provide same.  A Test Period may be designated by reference to the last day thereof (i.e., the "January 29, 2021 Test Period" refers to the period of four consecutive Fiscal Quarters of the Borrower ended January 29, 2021), and a Test Period shall be deemed to end on the last day thereof.

"*Threshold Amount*" means $45,000,000.

"*Total Assets*" means the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered pursuant *to Sections 7.1(a)* or *7.1(b)*.

"*Trade Receivables Advance Rate*" means 85%.

"*Transaction Agreement Date*" has the meaning specified in *Section 1.9*.

"*Type*" means, with respect to a Loan, its character as a Base Rate Loan or a Term SOFR Loan.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

"*UCC*" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"*UK Financial Institutions*" any BRRD Undertaking (as defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Unintentional Overadvance*" means an Overadvance which, to the Administrative Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Administrative Agent, the Issuers and the Lenders, including, without limitation, the imposition of (or increase in) the FILO Deficiency Reserve, a reduction in the Net Recovery Percentage of property or assets included in the Borrowing Base or the FILO Borrowing Base or misrepresentation by the Loan Parties.

"*United States*" and "*U.S.*" mean the United States of America.

"*United States Tax Compliance Certificate*" has the meaning given to such term in *Section 3.1(c)*.

"*Unrestricted Subsidiary*" means any Subsidiary of the Borrower designated by the board of directors of the Borrower as an Unrestricted Subsidiary pursuant to *Section 8.3* subsequent to the Second Restatement Date, in each case, until such Person ceases to be an Unrestricted Subsidiary of the Borrower in accordance with Section 8.3 or ceases to be a Subsidiary of the Borrower; *provided that* no Subsidiary may be designated as an Unrestricted Subsidiary unless none of its assets are included in the calculation of Borrowing Base and the FILO Borrowing Base immediately prior to such Subsidiary's being designated as an Unrestricted Subsidiary.

"*Unused Commitment Fee*" has the meaning specified in *Section 2.12(a)*.

"*U.S. Government Securities Business Day*" means any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"*U.S. Lender*" means any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"*U.S. Special Resolution Regimes*" has the meaning specified in *Section 12.30.*

"*USA PATRIOT Act*" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"*Weekly Monitoring Event*" means (a) a Specified Event of Default has occurred and is continuing or (b) the Borrower fails to maintain Excess Availability of the greater of (i) $45,000,000 and (ii) 12.5% of the Modified Maximum Credit; *provided* that a Weekly Monitoring Event shall be deemed continuing until the date on which, as applicable, in the case of the foregoing *clause (a)*, such Specified Event of Default is waived in accordance with *Section 12.1*, or, in the case of the foregoing *clause (b)*, Excess Availability has been greater than or equal to the greater of (i) $45,000,000 and (ii) 12.5% of the Modified Maximum Credit, in each case under *clauses (i)* and *(ii)*, for at least twenty (20) consecutive calendar days.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (b) the then outstanding principal amount of such Indebtedness; *provided*, that for purposes of determining the Weighted Average Life to Maturity of any Indebtedness that is being modified, refinanced, refunded, renewed, replaced or extended (the "*Applicable Indebtedness*"), the effects of any prepayments or amortization made on such Applicable Indebtedness prior to the date of the applicable modification, refinancing, refunding, renewal, replacement or extension shall be disregarded.

"*Wholly-Owned Subsidiary*" of a Person means a Subsidiary of such Person, all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) nominal shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more Wholly-Owned Subsidiaries of such Person.

"*Withdrawal Liability*" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"*Write-Down and Conversion Powers*" (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule; or (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.2    Other Interpretive Provisions.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    (i)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation, except when used in the computation of time periods.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(v)    Unless otherwise expressly indicated herein, the words "above" and "below," when following a reference to a clause or a sub-clause of any Loan Document, refer to a clause or sub-clause within, respectively, the same Section or clause.

(c)    The terms "Lender," "Swing Loan Lender", "Issuer", "Administrative Agent", "Collateral Agent" and "FILO Documentation Agent" include, without limitation, their respective successors.

(d)    In the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including", the words "*to*" and "*until*" each mean "to but excluding" and the word "*through*" means "to and including."

(e)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(f)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Cash Collateralization) of all of the Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Swap Contracts) other than (i) unasserted contingent indemnification Obligations, and any Obligations relating to Swap Contracts that, at such time, are allowed by the applicable Hedge Bank to remain outstanding without being required to be repaid.

(g)    Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

SECTION 1.3    Accounting Terms.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  For purposes of calculating any consolidated amounts necessary to determine compliance by any Person and, if applicable, its Restricted Subsidiaries with any ratio or other financial covenant in this Agreement, Unrestricted Subsidiaries shall be excluded.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Requisite Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Requisite Lenders); *provided* that, until so amended, (A) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (B) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding the foregoing or the definition of "Capitalized Leases", only those leases (assuming for purposes hereof that such leases were in existence on the Second Restatement Date) that would constitute Capitalized Leases (including leases that are classified as "Financing Leases" for purposes of GAAP) in conformity with GAAP as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)" shall be considered Capitalized Leases hereunder or under any other Loan Document, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or prepared, as applicable, in accordance therewith; provided that all financial statements required to be provided hereunder may, at the option of the Borrower, be prepared in accordance with GAAP without giving effect to the foregoing treatment of Capitalized Leases.

SECTION 1.4    Rounding.

Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.5    Letter of Credit Amounts.

Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

SECTION 1.6    References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to Constituent Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all appendices, exhibits and schedules thereto and all subsequent amendments, restatements, extensions, supplements and other modifications thereto (but only to the extent that such amendments, restatements, extensions, supplements and other

modifications are permitted by any Loan Document); and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 1.7    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

SECTION 1.8    Pro Forma Calculations; Reclassification; IP Matters.

(a)    Notwithstanding anything to the contrary herein, Consolidated EBITDA and any financial ratio or test, including the Net Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio shall be calculated in the manner prescribed by this *Section 1.8*; *provided* that, notwithstanding anything to the contrary in this *Section 1.8*, when calculating the Consolidated Fixed Charge Coverage Ratio for purposes of determining actual compliance (and not compliance on a Pro Forma Basis) with *Section 6.2*, the events described in this *Section 1.8* that occurred subsequent to the end of the applicable Test Period shall not be given Pro Forma Effect.

(b)    For purposes of calculating Consolidated EBITDA and any financial ratio or tests, including the Net Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio, Specified Transactions (and the incurrence or repayment of any Indebtedness in connection therewith) that have been made (i) during the applicable Test Period or (ii) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a pro forma basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period.  If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this *Section 1.8*, then the Net Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio and Consolidated EBITDA shall be calculated to give pro forma effect thereto in accordance with this *Section 1.8*.

(c)    In the event that the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of the Net Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio, as the case may be (in each case, other than Indebtedness incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes), (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then the Net Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio shall be calculated giving pro forma effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(d)    [Reserved].

(e)    If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation of the Consolidated Fixed Charge Coverage Ratio is made had been the applicable rate for the entire period (taking into account any hedging obligations applicable to such Indebtedness).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Borrower to be the rate of

DB1/ 145587008.8145587008.11

US-DOCS\149610879.14

interest implicit in such Capitalized Lease Obligation in accordance with GAAP.  Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower may designate.

(f)       The Borrower (i) shall in its sole discretion, exercised in good faith, determine under which category such Lien (other than Liens securing the Obligations or the Term Facility) or Specified Payment (other than Indebtedness incurred under the Loan Documents or the Term Facility Documentation) is permitted and (ii) shall be permitted, in its sole discretion, to make any redetermination and/or to divide, classify or reclassify under which category or categories such Lien or Specified Payment is permitted from time to time as it may determine and without notice to the Administrative Agent or any Lender, so long as at the time of such redesignation the Loan Parties would be permitted to incur such Lien or Specified Payment under such category or categories, as applicable; *provided*, that, if Payment Conditions were not satisfied at the time of such Lien or Specified Payment, the Borrower may not make any redetermination and/or divide, classify or reclassify such Lien or Specified Payment as being made under a category that is or categories that are subject to the satisfaction of Payment Conditions.

(g)       In the event of any Investment pursuant to *Section 9.2*, Disposition pursuant to *Section 9.5* or Restricted Payment pursuant to *Section 9.6* that results in the transfer by a Loan Party to an Unrestricted Subsidiary, non-Loan Party or third party of IP Rights necessary in connection with the Current Asset Collateral, the purchaser, assignee or other transferee thereof agrees in writing to be bound by a non-exclusive royalty-free worldwide license of such IP Rights in favor of such Loan Party, which license shall be in a form that enables the Administrative Agent to exercise rights and remedies on behalf of the Secured Parties; *provided* that, in the case of any such Investment, Disposition or Restricted Payment that includes, immediately prior to such Investment, Disposition or Restricted Payment, intellectual property licensed to the Borrower or any of its Restricted Subsidiaries by a third party, such purchaser, assignee or other transferee shall be required to provide such a license only to the extent to which the applicable license gives it a right to do so.

SECTION 1.9      Limited Condition Acquisitions.

In connection with any action being taken in connection with a Limited Condition Acquisition (other than a Permitted Acquisition or a Limited Condition Acquisition made in reliance on *Section 9.2(u)*) for purposes of determining:

(a)       whether any Indebtedness that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in compliance with *Section 9.3* (other than Indebtedness that is being incurred in reliance on *Section 9.3(s)*) or *Section 2.15*;

(b)       whether any Lien being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in accordance with *Section 9.1*;

(c)       whether any other transaction undertaken or proposed to be undertaken in connection with such Limited Condition Acquisition (other than any such transaction that is being undertaken or proposed to be undertaken in reliance on a basket or exception that requires compliance with Payment Conditions with respect thereto) complies with the covenants or agreements contained in this Agreement; and

(d)        any calculation of the ratios or baskets, including the Net Leverage Ratio, Consolidated Fixed Charge Coverage Ratio, Consolidated Net Income, Consolidated EBITDA and/or pro forma cost savings and baskets determined by reference to Consolidated EBITDA or Total Assets and whether a Default or Event of Default exists in connection with the foregoing;

at the option of the Borrower, the date that the definitive agreement for such Limited Condition Acquisition is entered into (the "*Transaction Agreement Date*") may be used as the applicable date of determination, as the case may be, in each case with such pro forma adjustments as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Pro Forma Basis" or "Consolidated EBITDA."  For the avoidance of doubt, if the Borrower elects to use the Transaction Agreement Date as the applicable date of determination in accordance with the foregoing, (a) any fluctuation or change in the Net Leverage Ratio, Consolidated Fixed Charge Coverage Ratio, Consolidated Net Income, Consolidated EBITDA and/or Total Assets of the Borrower from the Transaction Agreement Date to the date of consummation of such Limited Condition Acquisition will not be taken into account for purposes of determining whether any Indebtedness or Lien that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred, or whether any other transaction undertaken in connection with such Limited Condition Acquisition by the Borrower or any of the Restricted Subsidiaries complies with the Loan Documents and (b) after the Transaction Agreement Date and until such Limited Condition Acquisition is consummated or the definitive agreements in respect thereof are terminated or expire, such Limited Condition Acquisition and all transactions proposed to be undertaken in connection therewith (including without limitation the incurrence of Indebtedness and Liens) will be given Pro Forma Effect when determining compliance of other transactions (including without limitation the incurrence of Indebtedness and Liens unrelated to such Limited Condition Acquisition) that are consummated after the Transaction Agreement Date and on or prior to the date of consummation of such Limited Condition Acquisition and any such transactions (including without limitation any incurrence of Indebtedness and the use of proceeds thereof) will be deemed to have occurred on the Transaction Agreement Date and be outstanding thereafter for purposes of calculating any baskets or ratios under the Loan Documents after the Transaction Agreement Date and before the date of consummation of such Limited Condition Acquisition (or the date the definitive agreements in respect thereof are terminated or expire); *provided* that solely with respect to Restricted Payments only (and only until such time as the applicable Limited Condition Acquisition has been consummated or the definitive documentation for such Limited Condition Acquisition is terminated), such calculation shall also be made on a standalone basis without giving effect to such Limited Condition Acquisition and the other transactions in connection therewith.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

SECTION 1.10    Interest Rates.  The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "Term SOFR" or with respect to any rate that is an alternative or replacement for or successor to any of such rate (including, without limitation, any Successor Rate) or the effect of any of the foregoing, or of any Successor Rate Conforming Changes.

SECTION 1.11    FILO Documentation Agent.  For the purposes of the definition of "Availability Reserves", "Bank Product Reserve", "Cash Management Reserve", "Dilution Reserve", "Eligible Credit Card Receivables", "Eligible In-Transit Inventory", "Eligible Inventory", "Eligible Trade Receivables", "Inventory Reserves", "Receivables Reserves", "Shrink Reserve" or "Swap Obligations Reserve", or any other provision of this Agreement (other than the provisions of *Section 12.1*) or any other Loan Document where the FILO Documentation Agent has a consent right on a matter for which the Administrative Agent also has a consent right, the FILO Documentation Agent shall consult with the Administrative Agent prior to imposing Reserves, withholding consent rights or otherwise taking action that would be less favorable to the Loan Parties than corresponding action taken by the Administrative Agent.

## ARTICLE II

## THE FACILITIES

SECTION 2.1    The Commitments.

(a)    Revolving Loans.  On the terms and subject to the conditions contained in this Agreement, each Revolving Credit Lender severally agrees to make loans in Dollars (each, a "*Revolving Loan*") to the Borrower from time to time on any Business Day during the period from the Effective Date until the Revolving Credit Termination Date in an aggregate principal amount at any time outstanding for all such loans by such Lender not to exceed such Lender's Revolving Credit Commitment; *provided*, *however*, that at no time shall any Revolving Credit Lender be obligated to make a Revolving Loan in excess of such Lender's Ratable Portion of the Maximum Credit.  For the avoidance of doubt, all "Revolving Loans" made pursuant to the Existing Credit Agreement and outstanding on the Second Restatement Date shall be deemed Revolving Loans pursuant to, and shall be subject to the terms and conditions of, this Agreement.  Within the limits of the Revolving Credit Commitment of each Revolving Credit Lender, amounts of Loans repaid may be reborrowed under this *Section 2.1*.

(b)    Protective Advances.  Subject to the limitations set forth below (and notwithstanding anything to the contrary in *Section 4.2*), the Administrative Agent is authorized by the Borrower and the Lenders, from time to time in the Administrative Agent's sole discretion (but shall have absolutely no obligation), to make Revolving Loans (which may be a Swing Loan) to the Borrower, on behalf of all Revolving Credit Lenders at any time that any condition precedent set forth in *Section 4.2* has not been satisfied or waived, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable for the purposes specified in the definition of "Protective Advances".  Any Protective Advance may be made in a principal amount that would cause the aggregate Revolving Credit Exposure to exceed the Borrowing Base; *provided* that the aggregate amount of outstanding Protective Advances plus the aggregate of all other Revolving Credit Exposure shall not exceed the Aggregate Commitments; *provided* further that the foregoing shall not result in any claim or liability against the Administrative Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances, and such Unintentional Overadvances shall not reduce the amount of Protective Advances allowed hereunder.  Protective Advances may be made even if the conditions precedent set forth in *Section 4.2* have not been satisfied or waived.  Each Protective Advance shall be secured by the Liens in favor of the

73

Collateral Agent in and to the Collateral and shall constitute Obligations hereunder. The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Requisite Revolving Credit Lenders. Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof. The making of a Protective Advance on any one occasion shall not obligate the Administrative Agent to make any Protective Advance on any other occasion. At any time that the conditions precedent set forth in *Section 4.2* have been satisfied or waived, the Administrative Agent may request the Revolving Credit Lenders to make a Revolving Loan to repay a Protective Advance. At any other time, the Administrative Agent may require the Revolving Credit Lenders to fund their risk participations described in *Section 2.1(c)*.

(c)    Risk Participations in Protective Advances. Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of a Default), each Revolving Credit Lender shall be deemed, without further action by any party hereto, unconditionally and irrevocably to have purchased from the Administrative Agent without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Applicable Percentage. From and after the date, if any, on which any Revolving Credit Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender, such Lender's Applicable Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

(d)    FILO Loans. The FILO Lenders made term loans in Dollars (each, a "FILO Loan") to the Borrower under the Existing Credit Agreement in an aggregate original principal amount equal to $100,000,000, the full balance of which remains outstanding on the Second Restatement Date. For the avoidance of doubt, such "FILO Loans" made pursuant to the Existing Credit Agreement shall remain outstanding and be deemed FILO Loans under, and shall be subject to the terms and conditions of, this Agreement. FILO Loans that are repaid or prepaid may not be reborrowed.

SECTION 2.2    Borrowing Procedures for Revolving Loans; Conforming Changes.

(a)    Each Borrowing consisting of Revolving Loans shall be made on notice given by the Borrower to the Administrative Agent not later than (i) 11:00 a.m. on the same Business Day, in the case of a Borrowing of Base Rate Loans, and (ii) 12:00 noon three (3) Business Days, in the case of a Borrowing of Term SOFR Loans, prior to the date of the proposed Borrowing. Each such notice shall be in substantially the form of *Exhibit C* (a "*Notice of Borrowing*"), specifying (A) the date of such proposed Borrowing, which shall be a Business Day, (B) the aggregate amount of such proposed Borrowing, (C) whether any portion of the proposed Borrowing will be of Base Rate Loans or Term SOFR Loans, (D) the initial Interest Period or Interest Periods for any such Term SOFR Loans, (E) the Class of the proposed Borrowing, and (F) with respect to any Borrowing the proceeds of which will be used to fund a Restricted Payment subject to the satisfaction of the Payment Conditions, an additional solvency representation and warranty of the Borrower and its Subsidiaries (taken as a whole) after giving effect to such Borrowing and the use of proceeds thereof. The Revolving Loans shall be made as Base Rate Loans unless, subject to *Section 2.14*, the Notice of Borrowing specifies that all or a portion thereof shall be Term SOFR Loans. Each Borrowing consisting of Revolving Loans that are Base Rate Loans shall be in an aggregate amount of not less than $500,000 or an integral multiple of $100,000 in excess thereof and the aggregate amount of each Borrowing consisting of Revolving Loans that are Term SOFR Loans for each Interest Period must be in the amount of at least $1,000,000 or an integral multiple of $500,000 in excess thereof.

(b)    The Administrative Agent shall give to each Revolving Credit Lender prompt notice of the Administrative Agent's receipt of a Notice of Borrowing and, if Term SOFR Loans are properly requested in such Notice of Borrowing, the applicable interest rate determined pursuant to

74

*Section 2.14(a)*.  Each Revolving Credit Lender shall, before 1:00 p.m. on the date of the proposed Borrowing, make available to the Administrative Agent at its address referred to in *Section 12.8*, in Same Day Funds, such Lender's Ratable Portion of such proposed Borrowing.  Upon fulfillment (or due waiver in accordance with *Section 12.1*) (i) on the Second Restatement Date, of the applicable conditions set forth in *Section 4.1* and (ii) at any time (including the Second Restatement Date), of the applicable conditions set forth in *Section 4.2*, and, subject to *clause (c)* below, after the Administrative Agent's receipt of such funds, the Administrative Agent shall make such funds available to the Borrower as promptly as reasonably practicable.

(c)     Unless the Administrative Agent shall have received notice from a Revolving Credit Lender prior to the date of any proposed Borrowing that such Lender will not make available to the Administrative Agent such Lender's Ratable Portion of such Borrowing (or any portion thereof), the Administrative Agent may assume that such Lender has made such Ratable Portion available to the Administrative Agent on the date of such Borrowing in accordance with this *Section 2.2* and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If and to the extent that such Lender shall not have so made such Ratable Portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Rate for the first Business Day and thereafter at the interest rate applicable at the time to the Loans comprising such Borrowing.  If such Lender shall repay to the Administrative Agent such corresponding amount, such corresponding amount so repaid shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.  If the Borrower shall repay to the Administrative Agent such corresponding amount, such payment shall not relieve such Lender of any obligation it may have hereunder to the Borrower.

(d)     The failure of any Defaulting Lender to make on the date specified any Loan or any payment required by it, including any payment in respect of its participation in Swing Loans and Letter of Credit Obligations, shall not relieve any other Lender of its obligations to make such Loan or payment on such date but, except to the extent otherwise provided herein, no such other Lender shall be responsible for the failure of any Defaulting Lender to make a Loan or payment required under this Agreement.

(e)     After giving effect to all Borrowings, all conversions of Revolving Loans from one Type to the other, and all continuations of Revolving Loans as the same Type, there shall not be more than ten (10) Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent; *provided* that after the establishment of any new Class of Revolving Loans pursuant to an Extension Amendment, the number of Interest Periods otherwise permitted by this *Section 2.2(e)* shall increase by three (3) Interest Periods for each applicable Class so established.

(f)     With respect to SOFR or Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document; <u>provided</u> that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

SECTION 2.3    Swing Loans.

(a)    On the terms and subject to the conditions contained in this Agreement, the Swing Loan Lender shall make, in Dollars, loans (each, a "*Swing Loan*") otherwise available to the Borrower under the Revolving Facility from time to time on any Business Day during the period from the Effective Date until the Revolving Credit Termination Date in an aggregate principal amount at any time outstanding (together with the aggregate outstanding principal amount of any other Loan made by the Swing Loan Lender hereunder in its capacity as the Swing Loan Lender) not to exceed the Swing Loan Sublimit; *provided*, *however*, that at no time shall the Swing Loan Lender make any Swing Loan to the extent that, after giving effect to such Swing Loan, the aggregate Revolving Credit Outstandings would exceed the Maximum Credit; *provided further* that in the event that the Swing Loan Lender and the Administrative Agent are not the same Person, then the Swing Loan Lender shall only make a Swing Loan after having given prior notice thereof to the Administrative Agent; *provided further* that the Swing Loan Lender shall not be required to make any Swing Loan to the extent that such Swing Loan Lender reasonably believes that any Lender is a Defaulting Lender unless, after giving effect to the requested Swing Loan, there would exist no Fronting Exposure (in the good faith determination of the Swing Loan Lender and the Administrative Agent).  For the avoidance of doubt, all "Swing Loans" made pursuant to the Existing Credit Agreement and outstanding on the Second Restatement Date shall be deemed Swing Loans pursuant to, and shall be subject to the terms and conditions of, this Agreement. Each Swing Loan shall be a Base Rate Loan and must be repaid in full in Dollars within seven (7) days after its making or, if sooner, upon any Borrowing hereunder and shall in any event mature no later than the Revolving Credit Termination Date (without giving effect to any extensions of the type referred to in *Section 12.1(b)* hereof).  Within the limits set forth in the first sentence of this *clause (a)*, amounts of Swing Loans repaid may be reborrowed under this *clause (a)*.

(b)    In order to request a Swing Loan, the Borrower shall telecopy (or forward by electronic mail or similar means) to the Administrative Agent a duly completed request in substantially the form of *Exhibit D*, setting forth the requested amount and date of such Swing Loan (a "*Swing Loan Request*"), to be received by the Administrative Agent not later than 1:00 p.m. on the day of the proposed borrowing.  The Administrative Agent shall promptly notify the Swing Loan Lender of the details of the requested Swing Loan.  Subject to the terms of this Agreement, the Swing Loan Lender shall make a Swing Loan available to the Administrative Agent and, in turn, the Administrative Agent shall make such amounts available to the Borrower as promptly as reasonably practicable on the date set forth in the relevant Swing Loan Request.  The Swing Loan Lender shall not make any Swing Loan (other than a Protective Advance) in the period commencing on the first Business Day after it receives written notice from the Administrative Agent or any Lender that one or more of the conditions precedent contained in *Section 4.2* shall not on such date be satisfied, and ending when such conditions are satisfied.  The Swing Loan Lender shall not otherwise be required to determine that, or take notice whether, the conditions precedent set forth in *Section 4.2* have been satisfied in connection with the making of any Swing Loan.

(c)    The Swing Loan Lender may demand at any time (and shall demand, not less frequently than weekly unless such Swing Loan is repaid in accordance with *Section 2.3(a)* hereof), that each Revolving Credit Lender pay to the Administrative Agent, for the account of the Swing Loan Lender, in the manner provided in *clause (d)* below, such Lender's Ratable Portion of all or a portion of the outstanding Swing Loans, which demand shall be made through the Administrative Agent, shall be in writing and shall specify the outstanding principal amount of Swing Loans demanded to be paid.

(d)    The Administrative Agent shall forward each demand referred to in *clause (c)* above to each Revolving Credit Lender on the day such notice or such demand is received by the Administrative Agent (except that any such notice or demand received by the Administrative Agent after 2:00 p.m. on any Business Day or any such notice or demand received on a day that is not a Business Day

shall not be required to be forwarded to the Revolving Credit Lenders by the Administrative Agent until the next succeeding Business Day), together with a statement prepared by the Administrative Agent specifying the amount of each Revolving Credit Lender's Ratable Portion of the aggregate principal amount of the Swing Loans stated to be outstanding in such notice or demanded to be paid pursuant to such demand, and, notwithstanding whether or not the conditions precedent set forth in *Sections 4.2* and *2.1* shall have been satisfied (which conditions precedent the Lenders hereby irrevocably waive), each Lender shall, before 11:00 a.m. on the Business Day next succeeding the date of such Lender's receipt of such notice or demand, make available to the Administrative Agent, in Same Day Funds in Dollars, for the account of the Swing Loan Lender, the amount specified in such statement. Upon such payment by a Revolving Credit Lender, such Lender shall, except as provided in *clause (e)* below, be deemed to have made a Revolving Loan to the Borrower in the amount of such payment. The Administrative Agent shall use such funds to repay the Swing Loans to the Swing Loan Lender.

(e)    Upon the occurrence of a Default under *Section 10.1(f)*, each Revolving Credit Lender shall acquire, without recourse or warranty, an undivided participation in each Swing Loan otherwise required to be repaid by such Lender pursuant to *clause (d)* above, which participation shall be in a principal amount equal to such Lender's Ratable Portion of such Swing Loan, by paying to the Swing Loan Lender on the date on which such Lender would otherwise have been required to make a payment in respect of such Swing Loan pursuant to *clause (d)* above, in Same Day Funds, an amount equal to such Lender's Ratable Portion of such Swing Loan. If all or part of such amount is not in fact made available by such Lender to the Swing Loan Lender on such date, the Swing Loan Lender shall be entitled to recover any such unpaid amount on demand from such Lender together with interest accrued from such date at the Federal Funds Rate for the first Business Day after such payment was due and thereafter at the rate of interest then applicable to Base Rate Loans.

(f)    From and after the date on which any Revolving Credit Lender (i) is deemed to have made a Revolving Loan pursuant to *clause (d)* above with respect to any Swing Loan or (ii) purchases an undivided participation interest in a Swing Loan pursuant to *clause (e)* above, the Swing Loan Lender shall promptly distribute to such Lender such Lender's Ratable Portion of all payments of principal and interest received by the Swing Loan Lender on account of such Swing Loan other than those received from a Lender pursuant to *clause (d)* or *(e)* above.

SECTION 2.4    Letters of Credit.

(a)    Subject to the terms and subject to the conditions contained in this Agreement, each Issuer agrees to Issue at the request of the Borrower, for the account of the Borrower or a Restricted Subsidiary (*provided* that any Letter of Credit issued for the benefit of any Restricted Subsidiary that is not the Borrower shall be issued naming the Borrower as the account party on any such Letter of Credit but such Letter of Credit may contain a statement that it is being issued for the benefit of such Restricted Subsidiary), one or more Letters of Credit from time to time on any Business Day during the period commencing on the Effective Date and ending on the earlier of the Revolving Credit Termination Date and five (5) Business Days prior to the Scheduled Termination Date (without giving effect to any extension of the type referred to in *Section 12.1(b)* hereof) (or, if such day is not a Business Day, the next preceding Business Day), or such later date as agreed to by the Administrative Agent in its sole discretion; *provided*, *however*, that no Issuer shall be under any obligation to Issue (and, upon the occurrence of any of the events described in *clauses (ii)*, *(iii)*, *(iv)* and *(v)(A)* below, shall not Issue) any Letter of Credit upon the occurrence of any of the following:

(i)    any order, judgment or decree of any Governmental Authority or arbitrator having binding powers shall purport by its terms to enjoin or restrain such Issuer from Issuing such Letter of Credit or any Law applicable to such Issuer or any request or directive

DB1/ 145587008.8145587008.11

US-DOCS\149610879.14

(whether or not having the force of law) from any Governmental Authority with jurisdiction over such Issuer shall prohibit, or request that such Issuer refrain from, the Issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuer with respect to such Letter of Credit any restriction or reserve or capital requirement (for which such Issuer is not otherwise compensated) not in effect on the Effective Date or result in any unreimbursed loss, cost or expense that was not applicable, in effect or known to such Issuer as of the Effective Date and that such Issuer in good faith deems material to it (for which such Issuer is not otherwise compensated);

(ii)      the issuance of such Letter of Credit would violate one or more policies of the Issuer applicable to letters of credit generally;

(iii)      such Issuer shall have received any written notice of the type described in *clause (d)* below;

(iv)      after giving effect to the Issuance of such Letter of Credit, (A) the aggregate Revolving Credit Outstandings would exceed the Maximum Credit at such time, (B) the Letter of Credit Obligations would exceed the Letter of Credit Sublimit or (C)  the Revolving Credit Outstandings of any Revolving Credit Lender would exceed such Lender's Revolving Credit Commitment;

(v)      such Letter of Credit is requested to be denominated in any currency other than Dollars, except as may be approved by the Administrative Agent and such Issuer, each in their reasonable discretion;

(vi)      (A) any fees due in connection with a requested Issuance have not been paid, (B) such Letter of Credit is requested to be Issued in a form that is not acceptable to such Issuer or (C) the Issuer for such Letter of Credit shall not have received, in form and substance reasonably acceptable to it and, if applicable, duly executed by the Borrower, applications, agreements and other documentation (collectively, a "*Letter of Credit Reimbursement Agreement*") such Issuer generally employs in the ordinary course of its business for the Issuance of letters of credit of the type of such Letter of Credit;

(vii)      any Revolving Credit Lender is at that time a Defaulting Lender, unless (i) after giving effect to the requested Issuance, there would exist no Fronting Exposure (in the good faith determination of the applicable Issuer) or (ii) the applicable Issuer has entered into arrangements, including the delivery of Cash Collateral, satisfactory to the applicable Issuer (in its reasonable discretion) with the Borrower or such Lender to eliminate such Issuer's actual or potential Fronting Exposure (after giving effect to Section *2.16(a)(iv)*) with respect to the Defaulting Lender arising from either the Letter of Credit then proposed to be issued or any other Letter of Credit Obligations as to which such Issuer has actual or potential Fronting Exposure, as it may elect in its sole discretion.

None of the Lenders (other than the Issuers in their capacity as such) shall have any obligation to Issue any Letter of Credit.  Any Letter of Credit which has been or deemed Issued hereunder may be amended at any time to reduce the amount outstanding thereunder.  For the avoidance of doubt, all "Letters of Credit" issued pursuant to the Existing Credit Agreement and outstanding on the Second Restatement Date shall be deemed Letters of Credit pursuant to, and shall be subject to the terms and conditions of, this Agreement.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

(b)     In no event shall (i) the expiration date of (A) any Documentary Letter of Credit be more than 210 days after the date of issuance thereof, or (B) any Standby Letter of Credit be more than one (1) year after the date of issuance thereof; *provided*, *however*, that any Standby Letter of Credit with a term less than or equal to one (1) year may provide for the renewal thereof for additional periods less than or equal to one (1) year, as long as, on or before the expiration of each such term and each such period, the Borrower and the Issuer of such Standby Letter of Credit shall have the option to prevent such renewal or (ii) the expiration date of any Letter of Credit be later than the date that is five (5) Business Days before the Scheduled Termination Date; *provided further*, that, for any Letter of Credit having an expiration date after the Scheduled Termination Date, the Borrower agrees to deliver to the Administrative Agent on or prior to the Scheduled Termination Date a letter of credit or letters of credit in form and substance reasonably acceptable to the Administrative Agent issued by a bank acceptable to the Administrative Agent, in each case in its sole discretion, and/or cash collateral in an amount equal to 103% of the maximum drawable amount of any such Letter of Credit.

(c)     In connection with the Issuance of each Letter of Credit, the Borrower shall give the relevant Issuer and the Administrative Agent at least two (2) Business Days' prior written notice, in substantially the form of *Exhibit E* (or in such other written or electronic form as is acceptable to such Issuer), of the requested Issuance of such Letter of Credit (a "*Letter of Credit Request*"). Such notice shall specify the Issuer of such Letter of Credit, the face amount of the Letter of Credit requested, the date on which such Letter of Credit is to expire (which date shall be a Business Day) and, in the case of an issuance, the Person for whose benefit the requested Letter of Credit is to be issued. Such notice, to be effective, must be received by the relevant Issuer and the Administrative Agent not later than 11:00 a.m. on the last Business Day on which such notice can be given under the first sentence of this *clause (c)*; *provided* that the relevant Issuer and the Administrative Agent may agree in a particular instance in their sole discretion to a later time and date.

(d)     Subject to the satisfaction of the conditions set forth in this *Section 2.4*, the relevant Issuer shall, on the requested date, Issue a Letter of Credit on behalf of the Borrower in accordance with such Issuer's usual and customary business practices. No Issuer shall Issue any Letter of Credit in the period commencing on the first Business Day after it receives written notice from any Lender that one or more of the conditions precedent contained in *Section 4.2* or *clause (a)* above are not on such date satisfied or duly waived and ending when such conditions are satisfied or duly waived. No Issuer shall otherwise be required to determine that, or take notice whether, the conditions precedent set forth in *Section 4.2* have been satisfied in connection with the Issuance of any Letter of Credit. Each Letter of Credit shall be Issued in Dollars.

(e)     The Borrower agrees that, if requested by the Issuer of any Letter of Credit prior to the issuance of a Letter of Credit, it shall execute a Letter of Credit Reimbursement Agreement in respect to any Letter of Credit Issued hereunder. In the event of any conflict between the terms of any Letter of Credit Reimbursement Agreement and this Agreement, the terms of this Agreement shall govern.

(f)     Each Issuer shall comply with the following:

(i)     give the Administrative Agent written notice (or telephonic notice confirmed promptly thereafter in writing), which writing may be a telecopy or electronic mail, of the Issuance of any Letter of Credit Issued by it, all drawings under any Letter of Credit Issued by it and of the payment (or the failure to pay when due) by the Borrower of any Reimbursement Obligation when due (which notice the Administrative Agent shall promptly transmit by telecopy, electronic mail or similar transmission to each Revolving Credit Lender);

79

(ii)     upon the request of any Revolving Credit Lender, furnish to such Lender copies of any Letter of Credit Reimbursement Agreement to which such Issuer is a party and such other documentation as may reasonably be requested by such Lender; and

(iii)     on the first Business Day of each calendar week, provide to the Administrative Agent (and the Administrative Agent shall provide a copy to each Revolving Credit Lender requesting the same) and the Borrower separate schedules for Documentary Letters of Credit and Standby Letters of Credit issued by it, in form and substance reasonably satisfactory to the Administrative Agent, setting forth the aggregate Letter of Credit Obligations, in each case outstanding at the end of each month, and any information requested by the Borrower or the Administrative Agent relating thereto.

(g)     Immediately upon the issuance by an Issuer of a Letter of Credit in accordance with the terms and conditions of this Agreement, such Issuer shall be deemed to have sold and transferred to each Revolving Credit Lender, and each Revolving Credit Lender shall be deemed irrevocably and unconditionally to have purchased and received from such Issuer, without recourse or warranty, an undivided interest and participation, to the extent of such Lender's Ratable Portion, in such Letter of Credit and the obligations of the Borrower with respect thereto (including all Letter of Credit Obligations with respect thereto) and any security therefor and guaranty pertaining thereto.

(h)     The Borrower agrees to pay to the Issuer of any Letter of Credit the amount of all Reimbursement Obligations owing to such Issuer under any Letter of Credit issued for its account no later than (x) the Business Day following the date that the Borrower receives written notice from such Issuer that payment has been made under such Letter of Credit in accordance with its terms if such notice is received by the Borrower by 11:00 a.m. and (y) on the second Business Day after which the Borrower receives written notice from such Issuer that payment has been made under such Letter of Credit in accordance with its terms if such notice is received by the Borrower after 11:00 a.m. (such date described in *clause (x)* or *(y)* above, the "*Reimbursement Date*"), irrespective of any claim, set-off, defense or other right that the Borrower may have at any time against such Issuer or any other Person.  In the event that any Issuer makes any payment under any Letter of Credit in accordance with its terms and the Borrower shall not have repaid such amount to such Issuer pursuant to this *clause (h)* (directly or by application of the deemed Loans described below in this *clause (h)* or by virtue of the penultimate sentence of this *clause (h)*) or any such payment by the Borrower is rescinded or set aside for any reason, such Reimbursement Obligation shall be payable on demand with interest thereon computed (i) from the date on which such Reimbursement Obligation arose to the Reimbursement Date, at the rate of interest applicable during such period to Loans that are Base Rate Loans and (ii) from the Reimbursement Date until the date of repayment in full, at the rate of interest applicable during such period to past due Loans that are Base Rate Loans, and such Issuer shall promptly notify the Administrative Agent, which shall promptly notify each Revolving Credit Lender of such failure, and each Revolving Credit Lender shall promptly and unconditionally pay to the Administrative Agent for the account of such Issuer the amount of such Lender's Ratable Portion of such payment in Same Day Funds in Dollars.  If the Administrative Agent so notifies such Lender prior to 11:00 a.m. on any Business Day, such Lender shall make available to the Administrative Agent for the account of such Issuer its Ratable Portion of the amount of such payment on such Business Day in Same Day Funds.  Upon such payment by a Revolving Credit Lender, such Lender shall, except during the continuance of a Default or Event of Default under *Section 10.1(f)* and notwithstanding whether or not the conditions precedent set forth in *Section 4.2* shall have been satisfied (which conditions precedent the Revolving Credit Lenders hereby irrevocably waive), be deemed to have made a Revolving Loan to the Borrower in the principal amount of such payment. Whenever any Issuer receives from the Borrower a payment of a Reimbursement Obligation as to which the Administrative Agent has received for the account of such Issuer any payment from a Revolving Credit Lender pursuant to this *clause (h)*, such Issuer shall pay over to the Administrative Agent any

80

amount received in excess of such Reimbursement Obligation and, upon receipt of such amount, the Administrative Agent shall promptly pay over to each Revolving Credit Lender, in Same Day Funds, an amount equal to such Lender's Ratable Portion of the amount of such payment adjusted, if necessary, to reflect the respective amounts the Revolving Credit Lenders have paid in respect of such Reimbursement Obligation.  (A) In the absence of written notice to the contrary from the Borrower, and subject to the other provisions of this Agreement (but without regard to the conditions to borrowing set forth in *Section 4.2*), Reimbursement Obligations shall be financed when due with a Base Rate Loan or Swing Loan to the Borrower in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting Base Rate Loan or Swing Loan, and (B) in the event that the Borrower has notified the Administrative Agent that it will not so finance any such payments, the Borrower will make payment directly to the applicable Issuer when due. The Administrative Agent shall promptly remit the proceeds from any Loans made pursuant to *clause (A)* above in reimbursement of a draw under a Letter of Credit to the applicable Issuer.

(i)        Each Defaulting Lender agrees to pay to the Administrative Agent for the account of such Issuer forthwith on demand any such unpaid amount together with interest thereon, for the first Business Day after payment was first due at the Federal Funds Rate and, thereafter, until such amount is repaid to the Administrative Agent for the account of such Issuer, at a rate per annum equal to the rate applicable to Base Rate Loans under the Revolving Facility.

(j)        The Borrower's obligations to pay each Reimbursement Obligation and the obligations of the Revolving Credit Lenders to make payments to the Administrative Agent for the account of the Issuers with respect to Letters of Credit shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement, under any and all circumstances whatsoever, including the occurrence of any Default or Event of Default, and irrespective of any of the following:

(i)        any lack of validity or enforceability of any Letter of Credit or any Loan Document, or any term or provision therein;

(ii)        any amendment or waiver of or any consent to departure from all or any of the provisions of any Letter of Credit or any Loan Document;

(iii)        the existence of any claim, set-off, defense or other right that the Borrower, any other party guaranteeing, or otherwise obligated with, the Borrower, any Subsidiary or other Affiliate thereof or any other Person may at any time have against the beneficiary under any Letter of Credit, any Issuer, the Administrative Agent or any Lender or any other Person, whether in connection with this Agreement, any other Loan Document or any other related or unrelated agreement or transaction;

(iv)        any draft or other document presented under a Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect, or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(v)        payment by the Issuer under a Letter of Credit against presentation of a draft or other document that does not strictly comply, but that does substantially comply, with the terms of such Letter of Credit; or any payment made by an Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(vi) any other act or omission to act or delay of any kind of any Issuer, the Lenders, the Administrative Agent or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this *Section 2.4*, constitute a legal or equitable discharge of the Borrower's obligations hereunder; or

(vii) the fact that any Default or Event of Default shall have occurred and be continuing.

Any action taken or omitted to be taken by the relevant Issuer under or in connection with any Letter of Credit, if taken or omitted in the absence of gross negligence or willful misconduct, shall not result in any liability of such Issuer to the Borrower or any Revolving Credit Lender.  In determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof, the Issuers may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary and, in making any payment under any Letter of Credit, the Issuers may rely exclusively on the documents presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary thereunder equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other document presented pursuant to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever, and any noncompliance in any immaterial respect of the documents presented under such Letter of Credit with the terms thereof shall, in each case, be deemed not to constitute willful misconduct or gross negligence of the applicable Issuer.

Each Issuer shall act on behalf of the Revolving Credit Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in *Article XI* with respect to any acts taken or omissions suffered by such Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in *Article XI* included such Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to such Issuer.

(k) *Applicability of ISP and UCP*.  Unless otherwise expressly agreed by the relevant Issuer and the Borrower when a Letter of Credit is issued, (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each Documentary Letter of Credit.

SECTION 2.5    Reduction and Termination of the Commitments.

The Borrower may, upon at least three (3) Business Days' prior notice to the Administrative Agent, terminate in whole or reduce in part ratably the unused portions of any Class of Revolving Credit Commitments of the Revolving Credit Lenders without premium or penalty other than any amount required to be paid by the Borrower pursuant to *Section 3.5*; *provided*, *however*, that each partial reduction shall be in an aggregate amount of not less than $1,000,000 or an integral multiple of $500,000 in excess thereof *provided*, *further*, that no reduction or termination of the Revolving Credit

Commitments having a later maturity shall be permitted on a greater than pro rata basis with commitments having an earlier maturity.  Except as set forth in the following sentence, each such notice of reduction or termination shall be irrevocable when given.  Notwithstanding the foregoing, the Borrower may rescind or postpone any notice of termination of the Revolving Credit Commitments if such termination would have resulted from a refinancing of all of the applicable Revolving Facility, which refinancing shall not be consummated or otherwise shall be delayed.

SECTION 2.6     Repayment of Loans.

The Borrower promises to repay to the Administrative Agent for the ratable account of (a) the Revolving Credit Lenders the aggregate unpaid principal amount of the Loans (including any Letter of Credit Borrowings, but excluding the FILO Loans) and the Swing Loans on the Revolving Credit Termination Date or earlier, if otherwise required by the terms hereof, and (b) the FILO Lenders the aggregate unpaid principal amount of the FILO Loans on the FILO Maturity Date or earlier, if otherwise required by the terms hereof.

SECTION 2.7     Evidence of Indebtedness.

(a)     The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and maintained by the Administrative Agent, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. After the end of each month, the Administrative Agent shall send to the Borrower a statement accounting for the charges, loans, advances and other transactions occurring among and between the Administrative Agent, the Lenders and the Borrower during that month. The monthly statements shall, absent manifest error, be an account stated, which is final, conclusive and binding on the Borrower.

(b)     [Reserved].

(c)     The entries made in the Register and in the accounts therein maintained pursuant to *clauses (a)* and *(b)* above and *Section 12.2* hereof shall, to the extent permitted by applicable law, be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided*, *however*, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans or perform any of its obligations hereunder or under any other Loan Documents in accordance with their terms.  In addition, the Loan Parties, the Administrative Agent, the FILO Documentation Agent, the Lenders and the Issuers shall treat each Person whose name is recorded in the Register as a Lender or as an Issuer, as applicable, for all purposes of this Agreement.  Information contained in the Register with respect to any Lender or Issuer shall be available for inspection by the Borrower, the Administrative Agent, the FILO Documentation Agent, such Lender or such Issuer at any reasonable time and from time to time upon reasonable prior notice.

(d)     Notwithstanding any other provision of the Agreement, in the event that any Lender requests that the Borrower execute and deliver a promissory note or notes payable to such Lender in order to evidence the Indebtedness owing to such Lender by the Borrower hereunder, the Borrower

shall promptly execute and deliver a Revolving Credit Note or Revolving Credit Notes, or a FILO Note or FILO Notes, as applicable, to such Lender evidencing the Loans of such Lender, substantially in the form of *Exhibit B* or *Exhibit P*, as applicable. Each Lender may attach schedules to its Revolving Credit Note or FILO Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto; *provided* that the failure to do so shall in no way affect the obligations of the Borrower or any other Loan Party under any Loan Document.

SECTION 2.8    Optional Prepayments.

The Borrower may prepay the outstanding principal amount of the Revolving Loans and Swing Loans in whole or in part at any time; *provided*, *however*, that if any prepayment of any Term SOFR Loan is made by the Borrower other than on the last day of an Interest Period for such Loan, the Borrower shall also pay any amount owing pursuant to *Section 3.5*. No prepayment of the FILO Loans (other than, for the avoidance of doubt, a Permitted Refinancing of the full remaining amount of the FILO Loans or a repayment in full of the FILO Loans on the FILO Maturity Date) shall be made prior to the Revolving Credit Termination Date without the written consent of each Revolving Credit Lender. Without limiting the foregoing, concurrently with any prepayment of the FILO Loans made with the consent of each Revolving Credit Lender, the Borrower shall pay any FILO Prepayment Premium due and payable with respect thereto, if applicable.

SECTION 2.9    Mandatory Prepayments.

(a)    If at any time, the aggregate principal amount of Revolving Credit Outstandings exceeds the aggregate Maximum Credit at such time, the Borrower shall forthwith, upon notification by the Administrative Agent, prepay the Swing Loans *first* and then the other Loans (other than FILO Loans) then outstanding in an amount equal to such excess. If any such excess remains after repayment in full of the aggregate outstanding Swing Loans and the other Loans (other than FILO Loans), the Borrower shall Cash Collateralize the Letter of Credit Obligations in the manner set forth in *Section 10.5* in an amount equal to 103% of such excess.

(b)    [Reserved].

(c)    [Reserved].

(d)    Subject to *Section 3.5* hereof, all such payments in respect of the Revolving Loans pursuant to this *Section 2.9* shall be without premium or penalty. All interest accrued on the principal amount of the Revolving Loans paid pursuant to this *Section 2.9* shall be paid, or may be charged by the Administrative Agent to any loan account(s) of the Borrower, at the Administrative Agent's option, on the date of such payment. Interest shall accrue and be due, until the next Business Day, if the amount so paid by the Borrower to the bank account designated by the Administrative Agent for such purpose is received in such bank account after 3:00 p.m.

(e)    At all times after the occurrence and during the continuance of a Cash Dominion Period and notification thereof by the Administrative Agent to the Borrower (subject to the provisions of *Section 10.3* and to the terms of the Security Agreement), on each Business Day, at or before 1:00 p.m., the Administrative Agent shall apply all Same Day Funds credited to the Concentration Account, *first* to pay any fees or expense reimbursements then due to the Administrative Agent, the FILO Documentation Agent, the Issuers and the Lenders (other than in connection with Cash Management Obligations, Obligations in respect of Secured Hedge Agreements or any Revolving Commitment Increases), *pro rata*, *second* to pay interest due and payable in respect of any Loans (including Swing Loans, but excluding FILO Loans) and any Protective Advances that may be outstanding, *pro rata*, *third* to prepay the principal

of any Protective Advances that may be outstanding, *pro rata*, and *fourth* to prepay the principal of the Loans (including Swing Loans, but excluding FILO Loans) and to Cash Collateralize outstanding Letter of Credit Obligations, *pro rata*.

SECTION 2.10        Interest.

(a)        Rate of Interest.  Subject to the provisions of *Section 3.3*, all Loans and the outstanding amount of all other Obligations owing under the Loan Documents shall bear interest, in the case of any Class of Loans, on the unpaid principal amount thereof from the date such Loans are made and, in the case of such other Obligations, from the date such other Obligations are due and payable until, in all cases, paid in full, except as otherwise provided in *clause (c)* below, as follows:

(i)        when used with respect to Revolving Obligations, if a Base Rate Loan or such other Revolving Obligation (other than a Term SOFR Loan), at a rate per annum equal to the sum of (A) the Base Rate as in effect from time to time and (B) the Applicable Margin for Base Rate Loans;

(ii)        when used with respect to Revolving Obligations, if a Term SOFR Loan, at a rate per annum equal to the sum of (A) Term SOFR determined for the applicable Interest Period and (B) the Applicable Margin for Term SOFR Loans in effect from time to time during such Interest Period;

(iii)        when used with respect to FILO Obligations, if a Base Rate Loan or such other FILO Obligation (other than a Term SOFR Loan), at a rate per annum equal to the sum of (A) the Base Rate as in effect from time to time and (B) the FILO Applicable Margin for Base Rate Loans; and

(iv)        when used with respect to FILO Obligations, if a Term SOFR Loan, at a rate per annum equal to the sum of (A) Term SOFR and (B) the FILO Applicable Margin for Term SOFR Loans.

Notwithstanding the foregoing, all FILO Loans shall be made and maintained as Term SOFR Loans (and may not be made as or converted to Base Rate Loans), except as otherwise provided in *Sections 3.2*, *3.3* and *3.6*.

(b)        Interest Payments.  (i) Interest accrued on each Base Rate Loan (other than Swing Loans) shall be payable in arrears (A) in the case of FILO Loans, on the first Business Day of each calendar month, commencing on the first such day following the making of such Base Rate Loan, (B) in the case of Revolving Loans, on the first Business Day of each January, April, July and October, commencing on the first such day following the making of such Base Rate Loan and (C) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Base Rate Loan, (ii) interest accrued on Swing Loans shall be payable in arrears on the first Business Day of each January, April, July and October, (iii) interest accrued on each Term SOFR Loan shall be payable in arrears (A) in the case of FILO Loans, on the first Business Day of each calendar month, commencing on the first such day following the making of such Term SOFR Loan, (B) in the case of Revolving Loans, on the last day of each Interest Period applicable to such Loan and, if such Interest Period has a duration of more than three (3) months, on each date during such Interest Period occurring every three (3) months from the first day of such Interest Period, (C) upon the payment or prepayment thereof in full or in part and (D) if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Term SOFR Loan and

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

(iv) interest accrued on the amount of all other Obligations shall be payable on demand from and after the time such Obligation becomes due and payable (whether by acceleration or otherwise).

(c)    Default Interest.  The Borrower shall pay interest on past due amounts hereunder constituting Revolving Obligations at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  During the continuance of any Event of Default, the Borrower shall, (i) effective upon notice from the FILO Documentation Agent (which notice may elect to apply such Default Rate retroactively as of the first day of such Event of Default, or such later date as the FILO Documentation Agent may agree) or (ii) automatically when any Event of Default under *Section 10.1(f)* exists, pay interest on all outstanding FILO Obligations at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

SECTION 2.11    Conversion/Continuation Option.

(a)    The Borrower may elect (i) at any time on any Business Day, to convert Base Rate Loans (other than Swing Loans) consisting of Revolving Loans or any portion thereof to Term SOFR Loans and (ii) at the end of any applicable Interest Period, to convert Term SOFR Loans consisting of Revolving Loans or any portion thereof into Base Rate Loans or to continue such Term SOFR Loans or any portion thereof for an additional Interest Period; *provided*, *however*, that the aggregate amount of Term SOFR Loans for each Interest Period must be in the amount of at least $1,000,000 or an integral multiple of $500,000 in excess thereof.  Each conversion or continuation shall be allocated among the Revolving Loans of each Revolving Credit Lender in accordance with such Lender's Ratable Portion. Each such election shall be in substantially the form of *Exhibit F* (a "*Notice of Conversion or Continuation*") and shall be made by giving the Administrative Agent at least two (2) Business Days' prior written notice specifying (A) the amount and Type of Revolving Loan being converted or continued, (B) in the case of a conversion to or a continuation of Term SOFR Loans, the applicable Interest Period and (C) in the case of a conversion, the date of such conversion.

(b)    The Administrative Agent shall promptly notify each Revolving Credit Lender of its receipt of a Notice of Conversion or Continuation and of the options selected therein.  Notwithstanding the foregoing, the Administrative Agent or the Requisite Revolving Credit Lenders may require, by notice to the Borrower, that no conversion in whole or in part of Base Rate Loans consisting of Revolving Loans to Term SOFR Loans and no continuation in whole or in part of Term SOFR Loans consisting of Revolving Loans upon the expiration of any applicable Interest Period shall be permitted at any time at which (A) an Event of Default shall have occurred and be continuing, or (B) the continuation of, or conversion into, a Term SOFR Loan would violate any provision of *Section 2.14*.  If, within the time period required under the terms of this *Section 2.11*, the Administrative Agent does not receive a Notice of Conversion or Continuation from the Borrower containing a permitted election to continue any Term SOFR Loans consisting of Revolving Loans for an additional Interest Period or to convert any such Loans, then, upon the expiration of the applicable Interest Period, such Loans shall be automatically converted to Base Rate Loans.  Each Notice of Conversion or Continuation shall be irrevocable.

SECTION 2.12    Fees.

(a)    Unused Commitment Fee.  The Borrower agrees to pay in Same Day Funds in Dollars to the Administrative Agent for the account of each Revolving Credit Lender a commitment fee (the "*Unused Commitment Fee*") on the average daily amount by which the Revolving Credit Commitment of such Lender exceeds such Lender's Ratable Portion of the sum of (i) the aggregate outstanding principal amount of Revolving Loans for the applicable Class, and (ii) the outstanding

amount of the aggregate Letter of Credit Undrawn Amounts from the Effective Date through the Revolving Credit Termination Date at the Applicable Unused Commitment Fee Rate, payable in arrears (x) on the first Business Day of each January, April, July and October, commencing on the first such Business Day following the Effective Date and (y) on the Revolving Credit Termination Date.  For the avoidance of doubt, any Swing Loans outstanding shall reduce the Revolving Credit Commitment of the Swing Loan Lender in its capacity as a Lender.

(b)      Letter of Credit Fees.  The Borrower agrees to pay the following amounts with respect to Letters of Credit issued by any Issuer:

(i)      to the Administrative Agent for the account of each Issuer of a Letter of Credit, with respect to each Letter of Credit issued by such Issuer, an issuance fee equal to 0.125% per annum of the average daily maximum undrawn face amount of such Letter of Credit for the immediately preceding calendar quarter (or portion thereof), payable in arrears (A) on the first Business Day of each January, April, July and October, commencing on the first such Business Day following the issuance of such Letter of Credit and (B) on the Revolving Credit Termination Date;

(ii)      to the Administrative Agent for the ratable benefit of the Revolving Credit Lenders, with respect to each Letter of Credit, a fee accruing in Dollars at a rate per annum equal to (x) in the case of each Standby Letter of Credit, the Applicable Margin for Term SOFR Loans and (y) in the case of each Documentary Letter of Credit, 50% of the Applicable Margin for Term SOFR Loans (each such fee, a "*Letter of Credit Fee*"), in each case multiplied by the daily Stated Amount of such Letter of Credit for the immediately preceding calendar quarter (or portion thereof), payable in arrears (A) on the first Business Day of each January, April, July and October, commencing on the first such Business Day following the issuance of such Letter of Credit and (B) on the Revolving Credit Termination Date; *provided, however,* that any Letter of Credit Fees otherwise payable for the account of a Defaulting Lender with respect to any Letter of Credit as to which such Defaulting Lender has not provided Cash Collateral satisfactory to the applicable Issuer pursuant to *Section 2.4* shall be payable, to the maximum extent permitted by applicable Law, to the other Revolving Credit Lenders in accordance with the upward adjustments in their respective Applicable Percentages allocable to such Letter of Credit pursuant to *Section 2.16(a)(iv)*, with the balance of such fee, if any, payable to the applicable Issuer for its own account; and

(iii)      to the Issuer of any Letter of Credit, with respect to the issuance, amendment or transfer of each Letter of Credit and each drawing made thereunder, customary documentary and processing charges in accordance with such Issuer's standard schedule for such charges in effect at the time of issuance, amendment, transfer or drawing, as the case may be.

(c)      Additional Fees.  The Borrower has agreed to pay to (i) the Administrative Agent and the Arrangers additional fees, the amount and dates of payment of which are embodied in the Fee Letter, and (ii) the FILO Documentation Agent additional fees, the amount and dates of payment of which are embodied in the FILO Fee Letter.

SECTION 2.13      Payments and Computations.

(a)      All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  The Borrower shall make each payment and prepayment hereunder (including fees and expenses) not later than 2:00 p.m. on the day when due, in Dollars to the Administrative Agent, for the account of the respective Lenders to which such payment is

owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds without condition or deduction for any defense, recoupment, set-off or counterclaim.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office; *provided*, *however*, that all payments of principal and interest in respect of the FILO Loans shall be distributed to the FILO Documentation Agent for further distribution by the FILO Documentation Agent to the FILO Lenders as separately agreed by the FILO Lenders.  All payments received by the Administrative Agent after 2:00 p.m. shall, in each case, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)     All computations of interest for Base Rate Loans when the Base Rate is determined by Bank of America's "prime rate" shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(c)     Each payment by the Borrower of any Loan and Reimbursement Obligation (including interest and fees in respect thereof) and each reimbursement of costs, expenses and other Obligations owing under any Loan Document shall be made in Dollars.

(d)     Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, the due date for such payment shall be extended to the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be; *provided*, *however*, that if such extension would cause payment of interest on or principal of any Term SOFR Loan to be made in the next calendar month, such payment shall be made on the immediately preceding Business Day.  All repayments of any Revolving Loans shall be applied as follows:  *first*, to repay any such Loans outstanding as Base Rate Loans and *then*, to repay any such Loans outstanding as Term SOFR Loans, with those Term SOFR Loans having earlier expiring Interest Periods being repaid prior to those having later expiring Interest Periods.

(e)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the applicable Issuer hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable Issuer, as the case may be, the amount due. With respect to any payment that the Administrative Agent makes for the account of the Lenders or any Issuer hereunder as to which the Administrative Agent determines (which determination shall be conclusive absent manifest error) that any of the following applies (such payment referred to as the "*Rescindable Amount*"): (1) the Borrower has not in fact made such payment; (2) the Administrative Agent has made a payment in excess of the amount so paid by the Borrower (whether or not then owed); or (3) the Administrative Agent has for any reason otherwise erroneously made such payment; then each of the Lenders or the applicable Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount so distributed to such Lender or such Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. A notice of the Administrative Agent to any

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

Lender or the Borrower with respect to any amount owing under this clause (e) shall be conclusive, absent manifest error.

(f)     Except for payments and other amounts received by the Administrative Agent and applied in accordance with the provisions of *Section 10.2(c)* (or required to be applied in accordance with *Section 2.9*), all payments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied as follows: *first*, to pay principal of, and interest on, any portion of the Loans the Administrative Agent may have advanced pursuant to the express provisions of this Agreement on behalf of any Lender, for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, *second*, to pay all other Obligations then due and payable and *third*, as the Borrower so designates. Payments in respect of Swing Loans received by the Administrative Agent shall be distributed to the Swing Loan Lender; payments in respect of Loans received by the Administrative Agent shall be distributed to each Lender in accordance with such Lender's Ratable Portion; and all payments of fees and all other payments in respect of any other Obligation shall be allocated among such of the Lenders and Issuers as are entitled thereto and, for such payments allocated to the Lenders, in proportion to their respective Ratable Portions.

(g)     At the option of the Administrative Agent, principal on the Swing Loans, Reimbursement Obligations, interest, fees, expenses and other sums due and payable in respect of the Loans and Protective Advances may be paid from the proceeds of Swing Loans or the Revolving Loans unless the Borrower makes such payments on the next succeeding Business Day after the Borrower receives written notice from the Administrative Agent requesting such payments. The Borrower hereby authorizes the Swing Loan Lender to make such Swing Loans pursuant to *Section 2.3(a)* and the Lenders to make such Loans pursuant to *Section 2.2(a)* from time to time in the amounts of any and all principal payable with respect to the Swing Loans, Reimbursement Obligations, interest, fees, expenses and other sums payable in respect of the Loans and Protective Advances, and further authorizes the Administrative Agent to give the Lenders notice of any Borrowing with respect to such Swing Loans and the Revolving Loans and to distribute the proceeds of such Swing Loans and the Revolving Loans to pay such amounts. The Borrower agrees that all such Swing Loans and the Revolving Loans so made shall be deemed to have been requested by it (irrespective of the satisfaction of the conditions in *Section 4.2*, which conditions the Lenders irrevocably waive) and directs that all proceeds thereof shall be used to pay such amounts.

SECTION 2.14     [Reserved].

SECTION 2.15     Revolving Commitment Increase.

(a)     The Borrower may at any time or from time to time after the Second Restatement Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request one or more increases in the amount of any Class of Revolving Credit Commitments (each such increase, a "*Revolving Commitment Increase*"); *provided* that subject to the Limited Condition Acquisition provisions, at the time of any such Revolving Commitment Increase (and after giving effect thereto), no Default or Event of Default (or, in the case of any Revolving Commitment Increase to be used to fund a Limited Condition Acquisition, no Event of Default under *Section 10.1(a)* or *Section 10.1(f)* as of the Transaction Agreement Date) shall exist. Each Revolving Commitment Increase shall be in an aggregate principal amount that is not less than $20,000,000 (*provided* that such amount may be less than $20,000,000 if such amount represents all remaining availability under the limit set forth in the next sentence). Notwithstanding anything to the contrary herein, the aggregate amount of the Revolving Commitment Increases shall not exceed $150,000,000 (the "*Incremental Availability*"), and the Borrower may make a maximum of five (5) such requests. Each notice from the Borrower pursuant to this *Section 2.15* shall set forth the requested amount and proposed

terms of the relevant Revolving Commitment Increases.  Revolving Commitment Increases may be provided by any existing Revolving Credit Lender (it being understood that no existing Revolving Credit Lender will have an obligation to provide a portion of any Revolving Commitment Increase), in each case on terms permitted in this *Section 2.15* and otherwise on terms reasonably acceptable to the Administrative Agent or by any other Person constituting an Eligible Assignee (any such other Person being called an "*Additional Lender*"), *provided* that the Administrative Agent shall have consented (such consent not to be unreasonably withheld or delayed) to such Lender's or Additional Lender's providing such Revolving Commitment Increases if such consent would be required under *Section 12.2(b)* for an assignment of Loans or Revolving Credit Commitments to such Lender or Additional Lender.  Revolving Credit Commitments in respect of Revolving Commitment Increases shall become Revolving Credit Commitments (or in the case of a Revolving Commitment Increase to be provided by an existing Revolving Credit Lender, an increase in such Lender's applicable Revolving Credit Commitment) under this Agreement pursuant to an amendment (an "*Incremental Amendment*") to this Agreement and, as appropriate, the other Loan Documents, executed by Parent, Holdings, the Borrower, each Revolving Credit Lender agreeing to provide such Revolving Credit Commitment, if any, each Additional Lender, if any, and the Administrative Agent.  The Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section.  The effectiveness of any Incremental Amendment shall be subject to the satisfaction on the date thereof (each, an "*Incremental Facility Effective Date*") of each of the conditions set forth in *Section 4.2* (it being understood that all references to "the date of such Loan or Issuance" or similar language in such *Section 4.2* shall be deemed to refer to the effective date of such Incremental Amendment) and such other conditions as the parties thereto shall agree.  The representations and warranties contained in the Loan Documents (or, in the case of any Revolving Commitment Increase used to fund a Permitted Acquisition or similar permitted Investment (including any Limited Condition Acquisition), the Specified Representations) shall be accurate in all material respects (or, if qualified by "materiality", "Material Adverse Effect" or similar language, in all respects (after giving effect to such qualification)) before and after the effectiveness of any Incremental Amendment referred to below and any Revolving Commitment Increase shall be documented as an increase to the Revolving Facility and shall be on terms identical to those applicable to the Revolving Facility, except with respect to any commitment, arrangement, upfront or similar fees that may be agreed to among the Borrower and the lenders agreeing to participate in such Revolving Commitment Increase.  The Borrower shall use Revolving Commitment Increases only as permitted pursuant to *Section 8.9* hereof.  Upon each increase in the Revolving Credit Commitments pursuant to this *Section 2.15*, (x) each Revolving Credit Lender of the applicable Class immediately prior to such increase will automatically and without further act be deemed to have assigned to each Revolving Credit Lender providing a portion of the Revolving Commitment Increase of the applicable Class (each a "*Revolving Commitment Increase Lender*") in respect of such increase, and each such Revolving Commitment Increase Lender will automatically and without further act be deemed to have assumed, a portion of such Lender's participations hereunder in outstanding Letters of Credit and Swing Loans such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding (i) participations hereunder in Letters of Credit, (ii) participations hereunder in Swing Loans held by each Revolving Credit Lender of the applicable Class and (iii) participations in Protective Advances held by each Revolving Credit Lender of the applicable Class (including each such Revolving Commitment Increase Lender) will equal the percentage of the aggregate Revolving Credit Commitments of all Revolving Credit Lenders of such Class represented by such Lender's Revolving Credit Commitment and (y) if, on the date of such increase, there are any Revolving Loans of such Class outstanding, such Revolving Loans shall on or prior to the effectiveness of such Revolving Commitment Increase be prepaid from the proceeds of additional Revolving Loans of such Class made hereunder (reflecting such increase in Revolving Credit Commitments of such Class), which prepayment shall be accompanied by accrued interest on the Revolving Loans of such Class being prepaid and any costs incurred by any

Revolving Credit Lender in accordance with *Section 3.5*. The Administrative Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(b)    This *Section 2.15* shall supersede any provisions in *Section 12.1* or *Section 12.7* to the contrary.

SECTION 2.16    Defaulting Lenders.

(a)    *Adjustments*. Notwithstanding anything to the contrary contained in this Agreement, if any Revolving Credit Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    *Waivers and Amendments*. That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in *Section 12.1*.

(ii)    *Reallocation of Payments*. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to *Article X* or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to *Section 12.6*), shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to any Issuer or the Swing Loan Lender hereunder; *third*, if so determined by the Administrative Agent or requested by any Issuer or the Swing Loan Lender, to be held as cash collateral for future funding obligations of that Defaulting Lender of any participation in any Swing Loan or Letter of Credit; *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; *sixth*, to the payment of any amounts owing to the Lenders, any Issuer or the Swing Loan Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, any Issuer or the Swing Loan Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans or Letter of Credit Borrowings in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans or Letter of Credit Borrowings were made at a time when the conditions set forth in *Section 4.2* were satisfied or waived, such payment shall be applied solely to pay the Loans of, and Letter of Credit Borrowings owed to, all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or Letter of Credit Borrowings owed to, that Defaulting Lender. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash

collateral pursuant to this *Section 2.16(a)(ii)* shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    *Certain Fees*.  That Defaulting Lender (x) shall not be entitled to receive any commitment fee pursuant to *Section 2.12(a)* for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender for such period) and (y) shall be limited in its right to receive Letter of Credit Fees as provided in *Section 2.12(b)*.

(iv)    *Reallocation of Applicable Percentages to Reduce Fronting Exposure*. During any period in which there is a Defaulting Lender, for purposes of computing the amount of the obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Swing Loans or Letters of Credit pursuant to *Sections 2.3* and *2.4*, the "Applicable Percentage" of each non-Defaulting Lender shall be computed without giving effect to the Revolving Credit Commitment of that Defaulting Lender; *provided* that (i) each such reallocation shall be given effect only if, at the date the applicable Lender becomes a Defaulting Lender, no Default or Event of Default exists; and (ii) the aggregate obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit and Swing Loans shall not exceed the positive difference, if any, of (1) the Revolving Credit Commitment of that non-Defaulting Lender minus (2) the aggregate Outstanding Amount of the Revolving Loans (including Protective Advances) of that Lender.

(b)    *Defaulting Lender Cure*.  If the Borrower, the Administrative Agent, Swing Loan Lender and the Issuers agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Revolving Loans and funded and unfunded participations in Letters of Credit and Swing Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to *Section 2.16(a)(iv)*), whereupon that Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower for the period that such Lender was a Defaulting Lender; and *provided further* that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)    *Cash Collateral*.  At any time that there shall exist a Defaulting Lender, immediately upon the request of the Administrative Agent, the applicable Issuer or the Swing Loan Lender, the Borrower shall deliver to the Administrative Agent Cash Collateral in an amount sufficient to cover all Fronting Exposure (after giving effect to *Section 2.16(a)(iv)* and any Cash Collateral provided by the Defaulting Lender).

SECTION 2.17    Extensions of Loans.

(a)    *Extension of Revolving Credit Commitments*.  The Borrower may at any time and from time to time request that all or a portion of the Revolving Credit Commitments of a given Class (each, an "*Existing Revolver Tranche*") be amended to extend the Scheduled Termination Date with respect to all or a portion of any principal amount of such Revolving Credit Commitments (any such

Revolving Credit Commitments which have been so amended, "*Extended Revolving Credit Commitments*") and to provide for other terms consistent with this *Section 2.17*; *provided* that there shall be no more than two (2) Classes of Revolving Loans and Revolving Credit Commitments outstanding at any time.  In order to establish any Extended Revolving Credit Commitments, the Borrower shall provide a notice to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders under the applicable Existing Revolver Tranche) (each, a "*Extension Request*") setting forth the proposed terms (which shall be determined in consultation with the Administrative Agent) of the Extended Revolving Credit Commitments to be established, which shall (x) be identical as offered to each Lender under such Existing Revolver Tranche (including as to the proposed interest rates and fees payable) and offered pro rata to each Lender under such Existing Revolver Tranche and (y) be identical to the Revolving Credit Commitments under the Existing Revolver Tranche from which such Extended Revolving Credit Commitments are to be amended, except that: (i) the Scheduled Termination Date of the Extended Revolving Credit Commitments shall be later than the Scheduled Termination Date of the Revolving Credit Commitments of such Existing Revolver Tranche, (ii) the Extension Amendment may provide for other covenants and terms that (I) apply solely to any period after the Latest Maturity Date that is in effect on the effective date of the Extension Amendment (immediately prior to the establishment of such Extended Revolving Credit Commitments) or (II) are reasonably satisfactory to the Administrative Agent and the Borrower to incorporate such more restrictive provisions for the benefit of the Lenders (which amendment shall, notwithstanding any provision herein to the contrary, not require the consent of any Lender); and (iii) all borrowings under the Revolving Credit Commitments and repayments thereunder shall be made on a pro rata basis (except for (I) payments of interest and fees at different rates on Extended Revolving Credit Commitments (and related outstandings) and (II) repayments required upon the Revolving Credit Termination Date of the non-extending Revolving Credit Commitments); *provided*, *further*, that (A) the conditions precedent to a Borrowing set forth in *Section 4.2* shall be satisfied as of the date of such Extension Amendment and at the time when any Loans are made in respect of any Extended Revolving Credit Commitment, (B) in no event shall the final maturity date of any Extended Revolving Credit Commitments of a given Extension Series at the time of establishment thereof be earlier than the then Latest Maturity Date of any other Revolving Credit Commitments hereunder, (C) any such Extended Revolving Credit Commitments (and the Liens securing the same) shall be permitted by the terms of the Intercreditor Agreements (to the extent any Intercreditor Agreement is then in effect) and (D) all documentation in respect of the such Extension Amendment shall be consistent with the foregoing.  Any Extended Revolving Credit Commitments amended pursuant to any Extension Request shall be designated a series (each, a "*Extension Series*") of Extended Revolving Credit Commitments for all purposes of this Agreement; provided that any Extended Revolving Credit Commitments amended from an Existing Revolver Tranche may, to the extent provided in the applicable Extension Amendment, be designated as an increase in any previously established Extension Series with respect to such Existing Revolver Tranche.  Each Extension Series of Extended Revolving Credit Commitments incurred under this *Section 2.17* shall be in an aggregate principal amount equal to not less than 50% of the aggregate Revolving Credit Commitments outstanding at the time such Extended Revolving Credit Commitments become effective.

(b)     *Extension Request*.  The Borrower shall provide the applicable Extension Request at least ten (10) Business Days (or such shorter period as may be agreed by the Administrative Agent) prior to the date on which Lenders under the Existing Revolver Tranche are requested to respond, and shall agree to such procedures, if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably, to accomplish the purposes of this *Section 2.17*.  No Lender shall have any obligation to agree to provide any Extended Revolving Credit Commitment pursuant to any Extension Request.  Any Revolving Credit Lender (each, an "*Extending Revolving Credit Lender*") wishing to have all or a portion of its Revolving Credit Commitments under the Existing Revolver Tranche subject to such Extension Request amended into Extended Revolving Credit Commitments shall notify the Administrative Agent (each, an "*Extension Election*") on or prior to the date specified in such

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

Extension Request of the amount of its Revolving Credit Commitments under the Existing Revolver Tranche which it has elected to request be amended into Extended Revolving Credit Commitments (subject to any minimum denomination requirements imposed by the Administrative Agent). In the event that the aggregate principal amount of Revolving Credit Commitments under the Existing Revolver Tranche in respect of which applicable Revolving Credit Lenders shall have accepted the relevant Extension Request exceeds the amount of Extended Revolving Credit Commitments requested to be extended pursuant to the Extension Request, Revolving Credit Commitments subject to Extension Elections shall be amended to reflect allocations of the Extended Revolving Credit Commitments, which Extended Revolving Credit Commitments shall be allocated as agreed by Administrative Agent and the Borrower.

(c)     *New Revolving Commitment Lenders*.  Following any Extension Request made by the Borrower in accordance with this *Section 2.17*, if the Revolving Credit Lenders shall have declined to agree during the period specified in *Section 2.17(b)* above to provide Extended Revolving Credit Commitments in an aggregate principal amount equal to the amount requested by the Borrower in such Extension Request, the Borrower may request that banks, financial institutions or other institutional lenders or investors other than the Revolving Credit Lenders or Extending Revolving Credit Lenders (the "*New Revolving Commitment Lenders*"), which New Revolving Commitment Lenders may elect to provide an Extended Revolving Credit Commitment hereunder (the "*New Revolving Credit Commitment*"); *provided* that such Extended Revolving Credit Commitments of such New Revolving Commitment Lenders (i) shall be in an aggregate principal amount for all such New Revolving Commitment Lenders not to exceed the aggregate principal amount of Extended Revolving Credit Commitments so declined to be provided by the existing Revolving Credit Lenders and (ii) shall be on identical terms to the terms applicable to the terms specified in the applicable Extension Request (and any Extended Revolving Credit Commitments provided by existing Revolving Credit Lenders in respect thereof); *provided further* that, as a condition to the effectiveness of any Extended Revolving Credit Commitment of any New Revolving Commitment Lender, the Administrative Agent, each Issuer and the Swing Loan Lender shall have consented (such consent not to be unreasonably withheld or delayed) to each New Revolving Commitment Lender if such consent would be required under *Section 12.2(b)(iii)* for an assignment of Revolving Credit Commitments to such Person.  Notwithstanding anything herein to the contrary, any Extended Revolving Credit Commitment provided by New Revolving Commitment Lenders shall be pro rata to each New Revolving Commitment Lender.  Upon effectiveness of the Extension Amendment to which each such New Revolving Commitment Lender is a party, (a) the Revolving Credit Commitments of all existing Revolving Credit Lenders of each Class specified in the Extension Amendment in accordance with this *Section 2.17* will be permanently reduced pro rata by an aggregate amount equal to the aggregate principal amount of the Extended Revolving Credit Commitments of such New Revolving Commitment Lenders and (b) the Revolving Credit Commitment of each such New Revolving Commitment Lender will become effective.  The Extended Revolving Credit Commitments of New Revolving Commitment Lenders will be incorporated as Revolving Credit Commitments hereunder in the same manner in which Extended Revolving Credit Commitments of existing Revolving Credit Lenders are incorporated hereunder pursuant to this *Section 2.17*, and for the avoidance of doubt, all Borrowings and repayments of Revolving Loans from and after the effectiveness of such Extension Amendment shall be made pro rata across all Classes of Revolving Credit Commitments including such New Revolving Commitment Lenders (based on the outstanding principal amounts of the respective Classes of Revolving Credit Commitments) except for (x) payments of interest and fees at different rates for each Class of Revolving Credit Commitments (and related Outstanding Amounts) and (y) repayments required on the Revolving Credit Termination Date for any particular Class of Revolving Credit Commitments.  Upon the effectiveness of each New Revolving Credit Commitment pursuant to this *Section 2.17(c)*, (a) each Revolving Credit Lender of all applicable existing Classes of Revolving Credit Commitments immediately prior to such effectiveness will automatically and without further act be deemed to have assigned to each New Revolving Commitment Lender, and each such New

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

Revolving Commitment Lender will automatically and without further act be deemed to have assumed, a portion of such Revolving Credit Lender's participations hereunder in outstanding Letters of Credit and Swing Loans such that, after giving effect to each such deemed assignment and assumption of participations, subject to *Section 2.16*, the percentage of the outstanding (i) participations hereunder in Letters of Credit and (ii) participations hereunder in Swing Loans held by each Revolving Credit Lender of each Class of Revolving Credit Commitments (including each such New Revolving Commitment Lender) will equal the percentage of the aggregate Revolving Credit Commitments of all Classes of Revolving Credit Lenders represented by such Revolving Credit Lender's Revolving Credit Commitment and (b) if, on the date of such effectiveness, there are any Revolving Loans outstanding, such Revolving Loans shall on or prior to the effectiveness of such New Revolving Credit Commitment be prepaid from the proceeds of Revolving Loans made hereunder under the New Revolving Credit Commitments, which prepayment shall be accompanied by accrued interest on the Revolving Loans being prepaid and any costs incurred by any Revolving Credit Lender in accordance with *Section 3.5*. The Administrative Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(d)     *Extension Amendment*. Extended Revolving Credit Commitments and New Revolving Credit Commitments shall be established pursuant to an amendment (each, an "*Extension Amendment*") to this Agreement among the Borrower, the Administrative Agent and each Extending Revolving Credit Lender and each New Revolving Commitment Lender, if any, providing an Extended Revolving Credit Commitment or a New Revolving Credit Commitment, as applicable, thereunder, which shall be consistent with the provisions set forth in *Sections 2.17(a, (b))* and *(c)* above (but which shall not require the consent of any other Lender). The effectiveness of any Extension Amendment shall be subject to the satisfaction on the date thereof of each of the conditions set forth in *Sections 4.2(a)* and *(b)* and, to the extent reasonably requested by the Administrative Agent, receipt by the Administrative Agent of (i) legal opinions, board resolutions and officers' certificates consistent with those delivered on the Second Restatement Date other than changes to such legal opinion resulting from a Change in Law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent and (ii) reaffirmation agreements and/or such amendments to the Collateral Documents as may be reasonably requested by the Collateral Agent in order to ensure that the Extended Revolving Credit Commitments or the New Revolving Credit Commitments, as the case may be, are provided with the benefit of the applicable Loan Documents. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Extension Amendment. Each of the parties hereto hereby agrees that this Agreement and the other Loan Documents may be amended pursuant to an Extension Amendment, without the consent of any other Lenders, to the extent (but only to the extent) necessary to (i) reflect the existence and terms of the Extended Revolving Credit Commitments or the New Revolving Credit Commitments, as the case may be, incurred pursuant thereto, (ii) make such other changes to this Agreement and the other Loan Documents (without the consent of the Requisite Lenders) and (iii) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section, and the Requisite Lenders hereby expressly authorize the Administrative Agent to enter into any such Extension Amendment.

(e)     No conversion of Revolving Loans pursuant to any Extension in accordance with this *Section 2.17* shall constitute a voluntary or mandatory payment or prepayment for purposes of this Agreement.

SECTION 2.18    Sustainability Adjustments.  After the Second Restatement Date, the Borrower, in consultation with the Administrative Agent (in such capacity, the "*Sustainability Coordinator*"), shall be entitled to establish specified Key Performance Indicators ("*KPI's*") with respect to certain Environmental, Social and Governance ("*ESG*") targets of Holdings and its Subsidiaries. The Sustainability Coordinator, the Requisite Revolving Credit Lenders and the Borrower may amend this Agreement (such amendment, the "*ESG Amendment*") solely for the purpose of incorporating the KPI's and other related provisions (the "*ESG Pricing Provisions*") into this Agreement. Upon effectiveness of any such ESG Amendment, based on Holdings' and its Subsidiaries' performance against the KPI's, certain adjustments (increase, decrease or no adjustment) to the otherwise applicable Applicable Unused Commitment Fee Rate, Applicable Margin for Base Rate Loans consisting of Revolving Loans, and Applicable Margin for Term SOFR Loans consisting of Revolving Loans will be made; *provided that* the amount of such adjustments shall not exceed (i) a 0.05% increase and/or a 0.05% decrease in the otherwise applicable Applicable Margin for Term SOFR Loans consisting of Revolving Loans, in each case, determined based upon the applicable rating on the effective date of the ESG Amendment, and the adjustments to the Applicable Margin for Base Rate Loans consisting of Revolving Loans shall be the same amount, in basis points, as the adjustments to the Applicable Margin for Term SOFR Loans consisting of Revolving Loans or (ii) a 0.01% increase and/or a 0.01% decrease in the otherwise Applicable Unused Commitment Fee Rate. The pricing adjustments pursuant to the KPI's will require, among other things, reporting and validation of the measurement of the KPI's in a manner that is aligned with the Sustainability Linked Loan Principles and is to be agreed between the Borrower and the Sustainability Coordinator (each acting reasonably). Following the effectiveness of the ESG Amendment, any modification to the ESG Pricing Provisions which does not have the effect of reducing the Applicable Unused Commitment Fee Rate, Applicable Margin for Base Rate Loans consisting of Revolving Loans or Applicable Margin for Term SOFR Loans consisting of Revolving Loans to a level not otherwise permitted by this paragraph shall be subject only to the consent of the Requisite Revolving Credit Lenders.  The Sustainability Coordinator will (i) assist the Borrower in determining the ESG Pricing Provisions in connection with the ESG Amendment and (ii) assist the Borrowers in preparing informational materials focused on ESG to be used in connection with the ESG Amendment.  The provisions of this Section shall supersede any provisions in Section 12.1 to the contrary.

SECTION 2.19    FILO Deficiency Reserve; Certain Availability Reserves.

(a)    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, as long as any portion of the FILO Loans are outstanding, the Administrative Agent shall implement and maintain the FILO Deficiency Reserve, if applicable.  For the purposes of determining any FILO Deficiency Reserve, the Administrative Agent shall be entitled to rely solely on the calculation thereof made by the Borrower as reflected in the most recent Borrowing Base Certificate delivered by the Borrower to the Administrative Agent, unless the Administrative Agent is notified in writing by the FILO Documentation Agent that such calculation is inaccurate and providing the Administrative Agent and the Borrower with the correct calculation, prepared in good faith, of the FILO Deficiency Reserve (any such notice, a "*FILO Deficiency Reserve Correction Notice*"), and, in such event, the Administrative Agent shall be entitled to rely solely on the calculation of the FILO Deficiency Reserve made by the FILO Documentation Agent as reflected in the FILO Deficiency Reserve Correction Notice.  Upon receipt by the Administrative Agent of a Borrowing Base Certificate or a FILO Deficiency Reserve Correction Notice, as applicable, the Administrative Agent shall have a two (2) Business Day period of time to implement any FILO Deficiency Reserve or any adjustments to the FILO Deficiency Reserve then in effect as set forth in such Borrowing Base Certificate or such FILO Deficiency Reserve Correction Notice, as the case may be, and shall thereafter maintain such FILO Deficiency Reserve until further adjustment, if any, pursuant to receipt of a subsequent Borrowing Base Certificate or FILO Deficiency Reserve Correction Notice.  The Administrative Agent shall not have any liability for relying on the calculation of any FILO Deficiency Reserve as set forth in a Borrowing Base Certificate delivered by the

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

Borrower or in any FILO Deficiency Reserve Correction Notice delivered by the FILO Documentation Agent, as the case may be.  In the event of any discrepancy or dispute between the FILO Documentation Agent and the Borrower as to the amount of any FILO Deficiency Reserve, the Administrative Agent shall rely (and shall be entitled to rely) solely on the calculation of the FILO Deficiency Reserve as determined by the FILO Documentation Agent and shall have no liability to any Person for doing so.

(b)        At any time that Excess Availability is less than $75,000,000 or an Event of Default is continuing, upon the written request of the FILO Documentation Agent (with any such written request to be delivered to the Borrower concurrent with delivery to the Administrative Agent), the Administrative Agent shall establish a Cash Management Reserve, a Bank Product Reserve and a Swap Obligations Reserve.  The amount of such Cash Management Reserve, Bank Product Reserve and Swap Obligations Reserve shall be determined by the Administrative Agent in its Permitted Discretion, in consultation with the FILO Documentation Agent, and shall be reviewed and adjusted by the Administrative Agent periodically (but no less frequently than with the delivery of each Borrowing Base Certificate) to reflect any material changes in the credit exposure with respect to such Obligations.  The Administrative Agent shall release any such Cash Management Reserve, Bank Product Reserve and Swap Obligations Reserve established pursuant to this *Section 2.19(b)* on the date on which (x) if the occurrence of an Event of Default was the basis for establishing such reserve, no Event of Default is continuing or (y) if Excess Availability being less than $75,000,000 was the basis for establishing such reserve, Excess Availability is at least equal to $75,000,000.  The foregoing provisions are intended solely to establish circumstances in which the Administrative Agent must establish, at the direction of the FILO Documentation Agent, any such Cash Management Reserve, Bank Product Reserve and Swap Obligations Reserve.  This *Section 2.19(b)* shall not limit the right of the Administrative Agent to establish Availability Reserves at such time and in such amounts as the Administrative Agent determines in its Permitted Discretion and in accordance with the terms of this Agreement.

(c)        Notwithstanding anything to the contrary contained in this Agreement, as long as any FILO Loans remain outstanding, (i) the Administrative Agent shall maintain Availability Reserves against the Borrowing Base of the type established on the Second Restatement Date, which Availability Reserves shall be calculated by the same methodology as established on the Second Restatement Date; *provided* that (A) subject to the following *clause (ii)*, the Administrative Agent may eliminate (or reduce below the level of such Availability Reserve as of the Second Restatement Date) any such Availability Reserve concurrently with or after elimination or reduction of the risk, event or circumstance that gave rise to the establishment of such Availability Reserve (other than any Cash Management Reserve, Bank Product Reserve or Swap Obligations Reserve described in *Section 2.19(b)*, which shall be implemented and may be released in accordance with the terms of *Section 2.19(b)*), (B) the Administrative Agent may, in accordance with the terms of this Agreement, change the methodology used to calculate any such Availability Reserve if the effect of such change is to increase the amount of such Availability Reserve and (C) subject to the following *clause (ii)*, the Administrative Agent may reduce, eliminate or modify any Availability Reserve against the Borrowing Base to the extent imposed or established after the Second Restatement Date; *provided*, *further*, that, in connection with a Conforming Post-Petition Financing and that is consented to by the Administrative Agent, the Person providing such Post-Petition Financing may release or eliminate any Availability Reserves against the Borrowing Base implemented and maintained by the Administrative Agent that relate to claims or rights that are not senior in priority to such Post-Petition Financing, and (ii) at any time that Excess Availability is less than $75,000,000 or an Event of Default is continuing, the Administrative Agent shall establish Availability Reserves against the Borrowing Base as recommended by the field examiner in connection with any Field Examination (other than any such recommended Availability Reserves that the Administrative Agent and the FILO Documentation Agent mutually agreed to remove or not to implement in connection with or following a prior Field Examination) and shall maintain such Availability Reserves until the field examiner recommends their removal in connection with a subsequent Field Examination, unless otherwise mutually

97

agreed by the Administrative Agent and the FILO Documentation Agent, each in its Permitted Discretion. For clarity, the foregoing shall not limit the right of the Administrative Agent, (x) to modify the amount of any of any Availability Reserves against the Borrowing Base based upon mathematical calculations (*e.g.*, based on an increase or reduction in deposits at the time of calculation) or (y) without regard to the foregoing *clause (x)*, but subject to the foregoing *clause (ii)*, to increase any Availability Reserve against the Borrowing Base from the level established as of the Second Restatement Date and thereafter to reduce the amount of such Availability Reserve to an amount not less than (unless otherwise permitted pursuant to this *Section 2.19(c)*) the amount thereof established on the Second Restatement Date, in the case of each of *clauses (x)* and *(y)*, in a manner otherwise permitted by this Agreement.

## ARTICLE III

### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

SECTION 3.1      Taxes.  For purposes of this Section 3.1, the term "*applicable Law*" or "*Law*" includes FATCA.

(a)      All sums payable by any Loan Party hereunder or under any other Loan Document to any Agent, Issuer or any Lender shall (except to the extent required by Law) be paid free and clear of, and without any deduction or withholding on account of, any Taxes.

(b)      If any Loan Party or any Agent, Issuer or Lender is required by Law to make any deduction or withholding on account of any Non-Excluded Tax or Other Taxes from any sum paid or payable by any Loan Party to any Lender, Issuer or Agent under any of the Loan Documents: (i) the applicable Loan Party (if it is required to make the deduction or withholding) shall notify the applicable Agent of any such requirement or any change in any such requirement as soon as reasonably practicable after such Loan Party becomes aware of it; (ii) the applicable Loan Party or Agent, Issuer or Lender, as applicable, shall make such deduction or withholding and pay to the relevant Governmental Authority, in accordance with applicable Law, any such Non-Excluded Tax or Other Tax before the date on which penalties attach thereto; (iii) the sum payable to such Lender, Issuer or Agent (as applicable) shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding (including any deductions or withholdings attributable to any payments required to be made under this *Section 3.1*), such Lender, Issuer or Agent (as applicable), receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and (iv) within thirty days after paying any sum from which it is required by Law to make any deduction or withholding (or, if later, within thirty days after the due date of payment of any Tax which it is required by clause (ii) above to pay), the Loan Party making such payments (if it is required to make the deduction or withholding) shall deliver to the Administrative Agent evidence reasonably satisfactory to the Administrative Agent of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority.

(c)      Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under any Loan Document.  Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this *Section 3.1(c)*) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the

Administrative Agent) or promptly notify the Borrower and the Administrative Agent of its inability to do so.

Without limiting the foregoing:

(1)　　Each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(2)　　Each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)　　in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, two properly completed and duly signed original copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(B)　　two properly completed and duly signed original copies of IRS Form W-8ECI or W-8EXP (or any successor forms),

(C)　　in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates substantially in the form of Exhibit M (any such certificate, a "United States Tax Compliance Certificate") to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to any Loan Party described in Section 881(c)(3)(C) of the Code, and that no payment under any Loan Document is effectively connected with such Foreign Lender's U.S. trade or business, and (y) two properly completed and duly signed original copies of IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor forms),

(D)　　to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), two properly completed duly signed original copies of IRS Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, as applicable United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information (or any successor forms) from each beneficial owner that would be required under this *Section 3.1(c)* if such beneficial owner were a Lender, as applicable (provided that, if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Foreign Lender on behalf of such beneficial owner), or

(E)　　two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax Laws (including the Treasury

Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding tax on any payments to such Lender under the Loan Documents.

(3)    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (3), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(d)    In addition to the payments by a Loan Party required by *Section 3.1(b)*, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(e)    The Borrower shall indemnify each Lender, each Issuer and each Agent (each a *"Tax Indemnitee"*), within 20 days after written demand therefor, for the full amount of any Non-Excluded Taxes paid or payable by such Tax Indemnitee that is imposed on or in respect of any payment under or with respect to any Loan Document, and any Other Taxes payable by such Tax Indemnitee (including Non-Excluded Taxes or Other Taxes imposed on or attributable to amounts payable under this *Section 3.1*), whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority.  A certificate setting forth in reasonable detail the basis for such claim and the calculation of the amount of such payment or liability prepared in good faith and delivered by the Tax Indemnitee or by the Administrative Agent on its own behalf or on behalf of another Tax Indemnitee, shall be conclusive absent manifest error.

(f)    If and to the extent that a Tax Indemnitee, in its sole discretion (exercised in good faith), determines that it has received a refund of any Non-Excluded Taxes or Other Taxes in respect of which it has received additional payments under this *Section 3.1*, then such Tax Indemnitee shall pay to the relevant Loan Party the amount of such refund, net of all reasonable out-of-pocket expenses of the Tax Indemnitee (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Party, upon the request of the Tax Indemnitee, agrees to repay the amount paid over by the Tax Indemnitee (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee if the Tax Indemnitee is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(g)    In the event that a Loan Party makes an indemnification payment to a Tax Indemnitee with respect to Non-Excluded Taxes or Other Taxes pursuant to subsection (e) of this *Section 3.1* or a Loan Party is required to repay to a Tax Indemnitee an amount in respect of a refund of any

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

Non-Excluded Taxes or Other Taxes previously paid over to such Loan Party pursuant to subsection (f) of this *Section 3.1*, such Tax Indemnitee shall reasonably cooperate with all reasonable requests of such Loan Party, at the sole expense of such Loan Party, if (i) in the reasonable judgment of the Tax Indemnitee such cooperation shall not subject such Tax Indemnitee, as the case may be, to any unreimbursed third party cost or expense or otherwise be materially disadvantageous to such Tax Indemnitee and (ii) there is a reasonable basis for such Loan Party to contest with the applicable Governmental Authority the imposition of such Non-Excluded Taxes or Other Taxes or the repayment of such refund. Any resulting refund shall be governed by *Section 3.1(f)*. This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)     Each of the Administrative Agent and the FILO Documentation Agent (and any successor thereto or sub-agent or supplemental agent thereof) shall deliver to the Borrower on or prior to the date on which it becomes an Agent hereunder or under any other Loan Document (and from time to time thereafter upon the reasonable request of the Borrower) two properly completed and duly signed original copies of IRS Form W-9 (or any successor form). The FILO Documentation Agent hereby represents and warrants to the Loan Parties that it is a "U.S. person" and a "financial institution" and that it will comply with its "obligation to withhold," each within the meaning of Treasury Regulations Section 1.1441-1(b)(2)(ii).

SECTION 3.2     Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to SOFR or Term SOFR, or to determine or charge interest rates based upon SOFR or Term SOFR, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of such Lender to make or continue Term SOFR Loans or to convert Base Rate Loans to Term SOFR Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor (or, in the case of any impacted FILO Loan, the last day of the current calendar month), if such Lender may lawfully continue to maintain such Term SOFR Loan to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loan and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon SOFR, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to *Section 3.5*.

SECTION 3.3     Inability to Determine Rates.

(a)     If in connection with any request for a Term SOFR Loan or a conversion of Base Rate Loans to Term SOFR Loans or a continuation or maintenance of

any of such Loans, as applicable, (i) the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (A) no Successor Rate has been determined in accordance with *Section 3.3(b)*, and the circumstances under *clause (i)* of *Section 3.3(b)* or the Scheduled Unavailability Date has occurred, or (B) adequate and reasonable means do not otherwise exist for determining Term SOFR for any requested Interest Period (or, in the case of the FILO Loans, for any calendar month) with respect to an existing or proposed Term SOFR Loan or in connection with an existing or proposed Base Rate Loan, or (ii) the Administrative Agent or the Requisite Revolving Credit Lenders (with respect to the Revolving Obligations) or the FILO Documentation Agent (with respect to the FILO Obligations) determine that for any reason that Term SOFR for any requested Interest Period (or, in the case of the FILO Loans, for any calendar month) with respect to an existing or proposed Loan does not adequately and fairly reflect the cost to the applicable Lenders of funding or maintaining such Loan, the Administrative Agent will promptly so notify the Borrower and each applicable Lender.

Thereafter, (x) the obligation of the applicable Lenders to make or maintain Term SOFR Loans, or to convert Base Rate Loans to Term SOFR Loans, shall be suspended (to the extent of the affected Term SOFR Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Term SOFR component of the Base Rate, the utilization of the Term SOFR component in determining the Base Rate for such Loans shall be suspended, in each case until the Administrative Agent (or, in the case of a determination by the Requisite Revolving Credit Lenders or the FILO Documentation Agent described in *clause (ii)* of this *Section 3.3(a)*, until the Administrative Agent upon instruction of the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable) revokes such notice.

Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, or conversion to, or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Committed Borrowing of Base Rate Loans in the amount specified therein and (ii) any outstanding Term SOFR Loans shall be deemed to have been converted to Base Rate Loans immediately at the end of their respective applicable Interest Period (or, in the case of any impacted FILO Loan, at the end of the current calendar month).

(b)      Replacement of Term SOFR or Successor Rate. Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or Requisite Revolving Credit Lenders (with respect to the Revolving Obligations) or FILO Documentation Agent (with respect to the FILO Obligations) notify the Administrative Agent (with, in the case of the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable, a copy to the Borrower) that the Borrower or Requisite Revolving Credit Lenders or FILO Documentation Agent (as applicable) have determined, that:

(i)      adequate and reasonable means do not exist for ascertaining one month, three month and six month interest periods of Term SOFR (or, in the case of the FILO Loans, the one month period of Term SOFR), including, without limitation, because the Term SOFR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)    CME or any successor administrator of the Term SOFR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent or such administrator with respect to its publication of Term SOFR, in each case acting in such capacity, has made a public statement identifying a specific date after which one month, three month and six month interest periods of Term SOFR (or, in the case of the FILO Loans, the one month period of Term SOFR) or the Term SOFR Screen Rate shall or will no longer be made available, or permitted to be used for determining the interest rate of U.S. dollar denominated syndicated loans, or shall or will otherwise cease, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent, that will continue to provide such interest periods of Term SOFR after such specific date (the latest date on which one month, three month and six month interest periods of Term SOFR (or, in the case of the FILO Loans, the one month period of Term SOFR) or the Term SOFR Screen Rate are no longer available permanently or indefinitely, the "*Scheduled Unavailability Date*");

then, on a date and time determined by the Administrative Agent (any such date, the "*Term SOFR Replacement Date*"), which date shall be at the end of an Interest Period (or, in the case of the FILO Loans, at the end of the current calendar month) or on the relevant interest payment date, as applicable, for interest calculated and, solely with respect to *clause (ii)* above, no later than the Scheduled Unavailability Date, Term SOFR will be replaced hereunder and under any Loan Document with (x) with respect to the Revolving Obligations, Daily Simple SOFR *plus* the SOFR Adjustment for any payment period for interest calculated that can be determined by the Administrative Agent, or (y) with respect to the FILO Obligations, an alternate benchmark rate that has been selected by the Administrative Agent, the FILO Documentation Agent and the Borrower giving due consideration to any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current rate applicable to FILO Obligations hereunder for similar credit facilities at such time, in each case of the foregoing *clauses (x)* and *(y)*, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document (the "*Successor Rate*").

(c)    Solely with respect to the Revolving Obligations, if the Successor Rate is Daily Simple SOFR plus the SOFR Adjustment, all interest payments will be payable on a quarterly basis (it being understood that all interest payments with respect to the FILO Loans will always be payable on a monthly basis).

(d)    Notwithstanding anything to the contrary herein, (i) solely with respect to the Revolving Obligations, if the Administrative Agent determines that Daily Simple SOFR is not available on or prior to the Term SOFR Replacement Date, or (ii) if the events or circumstances of the type described in *Section 3.3(b)(i)* or *(ii)* have occurred with respect to Term SOFR or the Successor Rate then in effect, then in each case, the Administrative Agent and the Borrower may amend this Agreement solely for the purpose of replacing Term SOFR or any then current Successor Rate in accordance with this *Section 3.3* at the end of any Interest Period (or, in the case of the FILO Loans, at the end of the current calendar month), relevant interest payment date or payment period for interest calculated, as applicable, with (x) with respect to the Revolving Obligations, an alternative benchmark rate giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated credit facilities syndicated and agented in the United States for such alternative benchmark, and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated credit facilities syndicated and agented in the United States for such benchmark, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated, or (y) with respect to the FILO Obligations, an alternate benchmark rate described in *clause (y)* of the definition of "Successor Rate" above.  For the avoidance of doubt, any such proposed rate and adjustments shall constitute a "*Successor*

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

*Rate*".  Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all applicable Lenders and the Borrower unless, prior to such time, Lenders comprising the Requisite Revolving Credit Lenders (with respect to the Revolving Obligations) or the FILO Documentation Agent (with respect to the FILO Obligations) have delivered to the Administrative Agent written notice that such Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable, object to such amendment.

(e)    The Administrative Agent will promptly (in one or more notices) notify the Borrower and each applicable Lender of the implementation of any Successor Rate.

(f)    Any Successor Rate shall be applied in a manner consistent with market practice; *provided* that to the extent such market practice is not administratively feasible for the Administrative Agent, such Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

(g)    Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than the applicable Floor, the Successor Rate will be deemed to be the applicable Floor for the purposes of this Agreement and the other Loan Documents.  The Floor shall be determined separately for the Revolving Obligations and the FILO Obligations, as set forth in the definition of "Floor".

(h)    In connection with the implementation of a Successor Rate, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement; *provided* that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

SECTION 3.4    <u>Increased Cost and Reduced Return; Capital Adequacy; Reserves on Term SOFR Loans</u>.

(a)    *Increased Costs Generally*.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or any Issuer;

(ii)    subject any Lender or any Issuer to any Tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any Term SOFR Loan made by it, or change the basis of taxation of payments to such Lender or the Issuer in respect thereof (except for any Excluded Taxes or any Non-Excluded Taxes or Other Taxes indemnifiable or otherwise paid under *Section 3.1*); or

(iii)    impose on any Lender or any Issuer any other condition, cost or expense (other than Taxes) affecting this Agreement or Term SOFR Loans made by such Lender or any Letter of Credit or participation therein, in each case that is not otherwise accounted for in this *clause (a)*;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan the interest on which is determined by reference to Term SOFR (or of maintaining

its obligation to make any such Loan), or to increase the cost to such Lender or such Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or Issuer hereunder (whether of principal, interest or any other amount) then, from time to time within ten (10) days after demand by such Lender or Issuer setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender or Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)     *Capital Requirements*.  If any Lender or any Issuer reasonably determines that any Change in Law affecting such Lender or such Issuer or any Lending Office of such Lender or such Lender's or such Issuer's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or such Issuer's capital or on the capital of such Lender's or such Issuer's holding company, if any, as a consequence of this Agreement, the Revolving Credit Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuer, to a level below that which such Lender or such Issuer or such Lender's or such Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuer's policies and the policies of such Lender's or such Issuer's holding company with respect to capital adequacy), then from time to time upon demand of such Lender or such Issuer setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender or such Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuer or such Lender's or such Issuer's holding company for any such reduction suffered.

(c)     *Certificates for Reimbursement*.  A certificate of a Lender or an Issuer setting forth the amount or amounts necessary to compensate such Lender or such Issuer or its holding company, as the case may be, as specified in *subsection (a)* or *(b)* of this *Section 3.4* and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender or such Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     *Delay in Requests*.  Failure or delay on the part of any Lender or any Issuer to demand compensation pursuant to the foregoing provisions of this *Section 3.4* shall not constitute a waiver of such Lender's or such Issuer's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender or an Issuer pursuant to the foregoing provisions of this *Section 3.4* for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender or such Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180 day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 3.5     Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

(b)        any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)        any assignment of a Term SOFR Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to *Section 3.7*;

including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

SECTION 3.6        <u>Matters Applicable to all Requests for Compensation.</u>

(a)        *Designation of a Different Lending Office*.  If any Lender requests compensation under *Section 3.4*, or the Borrower is required to pay any additional amount to any Lender, any Issuer, or any Governmental Authority for the account of any Lender or any Issuer pursuant to *Section 3.1*, or if any Lender gives a notice pursuant to *Section 3.2*, then such Lender or such Issuer shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or such Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to *Section 3.1* or *3.4*, as the case may be, in the future, or eliminate the need for the notice pursuant to *Section 3.2*, as applicable, and (ii) in each case, would not subject such Lender or such Issuer, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or such Issuer, as the case may be in any material economic, legal or regulatory respect.

(b)        *Suspension of Lender Obligations*.  If any Lender requests compensation by the Borrower under *Section 3.4*, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make, continue Term SOFR Loans from one Interest Period to another Interest Period or maintain Term SOFR Loans, or to convert Base Rate Loans into Term SOFR Loans, until the event or condition giving rise to such request ceases to be in effect; *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

SECTION 3.7        <u>Replacement of Lenders under Certain Circumstances</u>.

If (i) any Lender requests compensation under *Section 3.4* or ceases to make Term SOFR Loans as a result of any condition described in *Section 3.2* or *Section 3.4*, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to *Section 3.1*, (iii) any Lender is a Non-Consenting Lender or (iv) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, *Section 12.2*), all of its interests, rights and obligations under this Agreement and the related Loan Documents to one or more Eligible Assignees that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment), *provided* that:

(a)        the Borrower shall have paid to the Administrative Agent the assignment fee specified in *Section 12.2(b)(iv)*;

(b)        such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.5 and, in the case of any FILO Loan, any applicable FILO Prepayment Premium due and payable with respect thereto, determined as if such Loan were voluntarily prepaid as of such date) from the assignee (to the extent of such outstanding principal and accrued interest and fees, other than the applicable FILO Prepayment Premium) or the Borrower (in the case of all other amounts, including the applicable FILO Prepayment Premium);

(c)        such Lender being replaced pursuant to this *Section 3.7* shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans, and (ii) deliver any Revolving Credit Notes or FILO Notes evidencing such Loans to the Borrower or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Revolving Credit Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Revolving Credit Notes or FILO Notes, as applicable, shall be deemed to be canceled upon such failure;

(d)        pursuant to such Assignment and Assumption, (i) the Eligible Assignee shall acquire all or a portion, as the case may be, of the assigning Lender's Revolving Credit Commitment and outstanding Loans, (ii) the Eligible Assignee shall purchase, at par, all Loans, accrued interest, accrued fees and other amounts owing to the assigning Lender as of the date of replacement and (iii) upon such payment (regardless of whether such replaced Lender has executed an Assignment and Assumption or delivered its Revolving Credit Notes or FILO Notes, as applicable, to the Borrower or the Administrative Agent), the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Revolving Credit Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender;

(e)        in the case of any such assignment resulting from a claim for compensation under *Section 3.4* or payments required to be made pursuant to *Section 3.1*, such assignment will result in a reduction in such compensation or payments thereafter; and

(f)        such assignment does not conflict with applicable Laws.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans and (iii) the Requisite Lenders or the requisite Lenders of the applicable Class or Classes of the Loans (or, with respect to the FILO Loans, the FILO Documentation Agent), have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "*Non-Consenting Lender.*"

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 3.8        Survival.  All of the Borrower's obligations under this *Article III* shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent, the Collateral Agent, the Swing Loan Lender or any Issuer.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

## ARTICLE IV

## CONDITIONS PRECEDENT

SECTION 4.1        <u>Conditions Precedent to Effectiveness of this Agreement</u>.

        The effectiveness of this Agreement on the Second Restatement Date is subject to the satisfaction or due waiver in accordance with *Section 12.1* of each of the following conditions precedent (the date on which such conditions are satisfied or waived being herein in accordance with *Section 12.1* shall be the "*Second Restatement Date*"):

        (a)        The Administrative Agent's receipt (or, in the case of the FILO Fee Letter, the FILO Documentation Agent's receipt) of the following, each of which shall be originals or facsimiles or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (in each case followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party each in form and substance reasonably satisfactory to the Administrative Agent (or, in the case of the FILO Fee Letter, the FILO Documentation Agent) and its legal counsel:

                (i)        executed counterparts of this Agreement, the Collateral Documents, the Ratification Agreement and the FILO Fee Letter;

                (ii)        a Revolving Credit Note executed by the Borrower in favor of each Lender that has requested a Revolving Credit Note at least one (1) Business Day in advance of the Second Restatement Date;

                (iii)        evidence that all UCC financing statements required by Law to be filed, registered or recorded to create or perfect the Lien of the Collateral Agent on the Collateral have been so filed, registered or recorded;

                (iv)        such certificates of good standing from the applicable secretary of state of the state of organization of each Loan Party, copies of each Loan Party's Constituent Documents, certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party and the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Second Restatement Date;

                (v)        an opinion from Latham & Watkins LLP, New York counsel to the Loan Parties, and an opinion from Jones Day, Ohio counsel to the Loan Parties;

                (vi)        a certificate from a Responsible Officer of the Borrower reasonably satisfactory in form and substance to the Administrative Agent and the FILO Documentation Agent, certifying that as of the Second Restatement Date and after giving effect to the Second Restatement Transactions (i) ~~Parent~~the Borrower and its Subsidiaries, on a consolidated basis, are Solvent, and (ii) since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect (other than customary

events or circumstances which resulted from the commencement of the Chapter 11 Cases);

(vii)    evidence that all insurance required to be maintained pursuant to the Loan Documents as of the Second Restatement Date, has been obtained and is in effect and that the Collateral Agent has been named as lender loss payee and/or additional insured, as applicable, under each insurance policy with respect to such insurance as to which the Collateral Agent shall have requested to be so named;

(viii)    copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Administrative Agent with respect to the Loan Parties;

(ix)    a Borrowing Base Certificate, certified as complete and correct in all material respects, which calculates the Borrowing Base as of the last Business Day of the most recent week ended prior to the Second Restatement Date; and

(x)    to the extent not previously delivered in connection with the Existing Credit Agreement, copies of Credit Card Notifications which have been executed on behalf of such Loan Party to be delivered to such Loan Party's Credit Card Processors listed on *Schedule 8.12*.

(b)    All fees due to the Administrative Agent, the FILO Documentation Agent and the Lenders shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, the FILO Documentation Agent and the Lenders that have been invoiced at least one (1) Business Day prior to the Second Restatement Date shall have been paid (or shall have been caused to be paid).

(c)    The DIP Order shall be in full force and effect (without any adverse modification as to the treatment of the Existing Obligations and Liens under the Existing Credit Agreement and without any other material modification except as approved in writing by all of the Lenders), and no Cash Collateral Termination Event shall have occurred thereunder.

(d)    The Confirmation Order, authorizing the Loan Parties to execute, deliver, and perform their obligations under this Agreement and the other Loan Documents (including the payment of all fees with respect hereto and thereto), shall have been entered on or before the date that is fifty (50) days following the Petition Date, shall be in full force and effect and shall not have been (i) stayed, reversed, vacated, amended, supplemented or otherwise modified in any manner that could be reasonably expected to adversely affect the interests of the Administrative Agent, the FILO Documentation Agent or the Lenders or (ii) the subject of an appeal.

(e)    The Intercreditor Agreement and the Term Facility Documentation required to be delivered under the Term Facility Credit Agreement on the Second Restatement Date shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(f)    The Second Restatement Transactions, including the Approved Plan and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Approved Plan, shall have been (or concurrently with the occurrence of the Second Restatement Date, shall be) substantially consummated in accordance with applicable Law, the Court, and the Bankruptcy Code.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

(g)    The Administrative Agent, the FILO Documentation Agent and the Lenders shall have received an updated business plan reasonably satisfactory to the Lenders and in a form reasonably consistent with the business plan received prior to the filing of the Chapter 11 Cases.

(h)    The FILO Lenders shall have entered into an agreement among lenders substantially in the form of the agreement among lenders with respect to the Existing Credit Agreement.

(i)    The existing executory contracts between the Borrower and Gordon Brothers Retail Partners, LLC (as amended and supplemented in a manner reasonably acceptable to the Borrower, the FILO Lenders, the Administrative Agent, and the Required DIP Lenders (as defined in the DIP Order), and which amendments and supplements shall include a commercially reasonable agency agreement (reasonably acceptable in form and substance to the Borrower, the FILO Lenders, the Administrative Agent and the Required DIP Lenders) to be effective solely upon a Sale Event) and Gordon Brothers Realty Services, LLC (collectively, the "*GB Consulting Agreements*") shall be assumed on the effective date of the Approved Plan.

(j)    Liquidity as of the Second Restatement Date shall be no less than $65,000,000, after giving effect to all amounts advanced (or deemed advanced) under this Agreement on the Second Restatement Date and all payments authorized to be made pursuant to the Approved Plan on or about the Second Restatement Date.

(k)    The Lenders shall have received at least three (3) Business Days prior to the Second Restatement Date all documentation and other information reasonably requested in writing by them at least ten (10) Business Days prior to the Second Restatement Date in order to allow the Lenders to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(l)    The representations and warranties of the Borrower and each other Loan Party contained in <u>Article V</u> or any other Loan Document shall be true and correct in all material respects on and as of the Second Restatement Date; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(m)    No Default or Event of Default shall exist or would result from the Second Restatement Transactions.

Without limiting the generality of the provisions of the last paragraph of *Section 9.3*, for purposes of determining compliance with the conditions specified in this *Section 4.1*, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Second Restatement Date specifying its objection thereto.

SECTION 4.2    <u>Conditions Precedent to Each Loan and Letter of Credit</u>.

The obligation of each Lender on any date to make any Loan and of each Issuer on any date to Issue any Letter of Credit (including, without limitation, all Loans deemed made and Letters of

Credit deemed issued on the Second Restatement Date) is subject to the satisfaction of each of the following conditions precedent:

(a)    <u>Request for Borrowing or Issuance of Letter of Credit</u>.  With respect to any Revolving Loan, the Administrative Agent shall have received a duly executed Notice of Borrowing (or, in the case of Swing Loans, a duly executed Swing Loan Request), and, with respect to any Letter of Credit, the Administrative Agent and the applicable Issuer shall have received a duly executed Letter of Credit Request.

(b)    <u>Representations and Warranties; No Defaults</u>.  The following statements shall be true on the date of such Loan or Issuance, both immediately before and immediately after giving effect thereto and, in the case of any Loan, giving effect to the application of the proceeds thereof:

(i)    The representations and warranties of the Borrower and each other Loan Party contained in <u>Article V</u> or any other Loan Document (or, if the applicable Loan is being incurred in connection with a Revolving Commitment Increase the proceeds of which are to fund a Permitted Acquisition or similar permitted Investment, the Specified Representations) shall be true and correct in all material respects on and as of the date of such Borrowing; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates; and

(ii)    (x) no Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom, and (y) no Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(c)    <u>Borrowing Base</u>.  After giving effect to the Loans or Letters of Credit requested to be made or Issued on any such date and the use of proceeds thereof, the Revolving Credit Outstandings shall not exceed the Maximum Credit at such time.

Each submission by the Borrower to the Administrative Agent of a Notice of Borrowing or a Swing Loan Request and the acceptance by the Borrower of the proceeds of each Loan requested therein, and each submission by the Borrower to an Issuer of a Letter of Credit Request, and the Issuance of each Letter of Credit requested therein, shall be deemed to constitute a representation and warranty by the Borrower that the conditions specified in *clause (b)* above have been satisfied on and as of the date of the making of such Loan or the Issuance of such Letter of Credit.

The conditions set forth in this *Section 4.2* are for the sole benefit of the Secured Parties but until the Requisite Revolving Credit Lenders otherwise direct the Administrative Agent to cease making Loans, the Lenders will fund their Applicable Percentage of all Loans and Letter of Credit Borrowings and participate in all Swing Loans and Letters of Credit whenever made or issued, which are requested by the Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this *Section 4.2*, are agreed to by the Administrative Agent, *provided*, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Secured

Party of the provisions of this *Section 4.2* on any future occasion or a waiver of any rights or the Secured Parties against the Loan Parties as a result of any such failure to comply.

Notwithstanding the foregoing, other than in connection with Protective Advances made in accordance with *Section 2.1(b)* or referred to in *clause (c)* of the definition of "Maximum Revolving Insolvency Amount", neither the Administrative Agent nor any Lender will waive any condition in this *Section 4.2* if the Loan Parties are not, on a Pro Forma Basis, in compliance with *Section 6.1* or *Section 6.2*, as applicable, immediately before and after giving effect to the applicable Credit Extension.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

To induce the Lenders, the Issuers, the Administrative Agent and the FILO Documentation Agent to enter into this Agreement, each of Parent, Holdings and the Borrower represents and warrants each of the following to the Lenders, the Issuers, the Administrative Agent and the FILO Documentation Agent, on and as of the Second Restatement Date and after giving effect to the making (or deemed making) of the Loans and the other financial accommodations on the Second Restatement Date and on and as of each date as required by *Section 4.2(b)(i)*:

SECTION 5.1    Existence, Qualification and Power; Compliance with Laws.  Each Loan Party and each of its Restricted Subsidiaries that is a Material Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), (b) has all corporate or other organizational power and authority to (i) own its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all applicable Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.2    Authorization; No Contravention.  (a) The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.  (b) Neither the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party nor the consummation of the Second Restatement Transactions will (i) contravene the terms of any of such Person's Constituent Documents, (ii) result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted under *Section 9.1*) under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any applicable Law; except with respect to any breach, contravention or violation (but not creation of Liens) referred to in *clauses (ii)* and *(iii)*, to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.3    Governmental Authorization.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

against, any Loan Party of this Agreement or any other Loan Document, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.4    <u>Binding Effect</u>.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

SECTION 5.5    <u>Financial Statements; No Material Adverse Effect</u>.

(a)    The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from, normal year-end adjustments and the absence of footnotes.

(b)    Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(c)    The forecasts of consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries, copies of which have been furnished to the Administrative Agent and the FILO Documentation Agent prior to the Second Restatement Date, and all Projections delivered pursuant to *Section 7.1(d)* have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts and actual results may vary materially from such forecasts.

SECTION 5.6    <u>Litigation</u>.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Parent, Holdings, the Borrower, or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.7    <u>Labor Matters</u>.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any of the Borrower or its Subsidiaries pending or, to the knowledge of the Borrower, threatened and (b) since the Petition Date, hours worked by and payment made based on hours worked to employees of each of the Borrower or its Subsidiaries have not been in material violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

SECTION 5.8    <u>Ownership of Property; Liens</u>.  Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by *Section 9.1* and except where the failure

113

to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.9    Environmental Matters.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Loan Party and each of its Subsidiaries and their respective operations is in compliance with all applicable Environmental Laws (including having obtained all Environmental Permits) and (ii) none of the Loan Parties or any of their respective Subsidiaries has become subject to any pending, or to the knowledge of the Borrower, threatened Environmental Claim or any other Environmental Liability.

(b)    None of the Loan Parties or any of their respective Subsidiaries has released, treated, stored, transported, arranged for transport or disposed of Hazardous Materials at or from any currently or formerly owned or operated real estate or facility in a manner that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.10    Taxes.  Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, Parent, Holdings, the Borrower and its Restricted Subsidiaries (i) have timely filed all federal and state and other Tax returns and reports required to be filed, and (ii) have timely paid all federal and state and other Taxes, assessments, fees and other governmental charges (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets or otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.

SECTION 5.11    ERISA Compliance.

(a)    Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(b)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan; (iii) none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan; (iv) none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and (v) neither any Loan Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is insolvent (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA) and no such Multiemployer Plan is expected to be insolvent or endangered or critical status, except, with respect to each of the foregoing clauses of this *Section 5.11(b)*, as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)    Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, each Foreign Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules,

regulations and orders, and neither Parent, Holdings nor any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

(d)    Borrower represents and warrants, as of the Second Restatement Date and throughout the term of this Agreement, at least one of the following is and will be true with respect to the Borrower:

(i)    the Borrower is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to the Borrower's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Credit Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the Borrower's entering into and performance of this Agreement, the other Loan Documents, the Loans, the Letters of Credit or the Revolving Credit Commitments and each action or obligation hereunder and thereunder,

(iii)    (A) the Borrower is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Borrower to enter into and perform this Agreement, the other Loan Documents, the Loans, the Letters of Credit or the Revolving Credit Commitments and each action or obligation hereunder and thereunder, (C) the entering into and performance of this Agreement, the other Loan Documents, the Loans, the Letters of Credit or the Revolving Credit Commitments and each action or obligation hereunder and thereunder, each satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of the Borrower, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to the Borrower's entering into and performance of this Agreement, the other Loan Documents, the Loans, the Letters of Credit or the Revolving Credit Commitments and each action or obligation hereunder and thereunder, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and the Borrower.

(e)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (d) is true with respect to the Borrower or (2) the Borrower has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (d), the Borrower further represents and warrants, as of the date hereof and throughout the term of this Agreement, that the Administrative Agent is not a fiduciary with respect to the assets of the Borrower involved in the Borrower's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Revolving Credit Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

SECTION 5.12    Subsidiaries.  As of the Second Restatement Date, neither Parent, Holdings nor any other Loan Party has any Subsidiaries other than those specifically disclosed in

*Schedule 5.12*, and all of the outstanding Equity Interests in Holdings, the Borrower and the Subsidiaries have been validly issued and are fully paid and (if applicable) nonassessable, and all Equity Interests owned by Parent, Holdings or any other Loan Party are owned free and clear of all security interests of any person except (i) those created under the Collateral Documents or under the Term Facility Documentation and secured Permitted Refinancing Indebtedness in respect of the Indebtedness under the Term Facility Documentation (which Liens shall be subject to the Intercreditor Agreement) and (ii) any nonconsensual Lien that is permitted under *Section 9.1*.  As of the Second Restatement Date, *Schedule 5.12* (a) sets forth the name and jurisdiction of each Subsidiary, (b) sets forth the ownership interest of Parent, Holdings, the Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary the Equity Interests of which are required to be pledged on the Second Restatement Date pursuant to the Collateral and Guarantee Requirement.

SECTION 5.13    Margin Regulations; Investment Company Act.

(a)    As of the Second Restatement Date, none of the Collateral is comprised of any Margin Stock.  No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Federal Reserve Board), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)    Neither the Borrower nor any Guarantor is an "investment company" under the Investment Company Act of 1940.

SECTION 5.14    Disclosure.  None of the information and data heretofore or contemporaneously furnished in writing by or on behalf of any Loan Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make such information and data (taken as a whole), in the light of the circumstances under which it was delivered, not materially misleading; it being understood that for purposes of this *Section 5.14*, such information and data shall not include projections and pro forma financial information or information of a general economic or general industry nature.  As of the Second Restatement Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

SECTION 5.15    Intellectual Property; Licenses, Etc.  The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, trademarks, service marks, trade names, copyrights, technology, software, know-how, licenses and other intellectual property rights (collectively, "*IP Rights*") that are necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any of its Subsidiaries as currently conducted does not infringe upon, misuse, misappropriate or violate any IP Rights held by any Person except for such infringements, misuses, misappropriations or violations individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect.  No written claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened against any Loan Party or Subsidiary, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

SECTION 5.16        Solvency.  After giving effect to the Second Restatement Transactions, the Borrower and its Restricted Subsidiaries, on a Consolidated basis, are Solvent.

SECTION 5.17        OFAC; Sanctions.  Neither the Borrower, nor any of its Subsidiaries, nor, to the knowledge of the Borrower and its Subsidiaries, any director, officer, employee, agent, Affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction (a "*Sanctioned Person*").  No proceeds of any Loan made or Letter of Credit issued hereunder will be used directly, or to the Borrower's knowledge, indirectly, to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person, or otherwise used in any manner that would result in a violation of any applicable Sanctions by any Person (including any Secured Party or other individual or entity participating in any transaction).

SECTION 5.18        USA PATRIOT Act.  To the extent applicable, each of Parent, Holdings and its Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA PATRIOT Act.  No part of the proceeds of the Loans or any Letters of Credit will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 or other similar anti-corruption legislation in any jurisdiction.

SECTION 5.19        Collateral Documents.  The provisions of the Collateral Documents, together with such filings and other actions required to be, and when, taken hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Debt and any Pledged Equity required to be delivered pursuant to the applicable Collateral Documents), are, and will be, effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable first priority Lien (subject to Liens permitted by *Section 9.1* and subject to the Intercreditor Agreement) on all right, title and interest of the respective Loan Parties in the Collateral described therein.

SECTION 5.20        Anti-Corruption Laws.

The Borrower and its Subsidiaries have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws in all material respects.

SECTION 5.21        Affected Financial Institution.

No Loan Party is an Affected Financial Institution.

**ARTICLE VI**

**FINANCIAL COVENANT**

So long as any Lender shall have any Revolving Credit Commitment hereunder, any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements, Cash Management Obligations and Bank Product Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent and each applicable Issuer), the Borrower agrees with the Lenders, the Issuers, the Administrative Agent and the FILO Documentation Agent to the following:

SECTION 6.1    <u>Minimum Excess Availability</u>.

From the Second Restatement Date until [~~July 1~~**May 4**, 2025][2], the Loan Parties will not permit Excess Availability at any time to be less than (x) from the Second Restatement Date through September 30, 2024, $25,000,000, and (y) from October 1, 2024 through [~~July 1~~**May 4**, 2025][3], $45,000,000.

SECTION 6.2    <u>Minimum Consolidated Fixed Charge Coverage Ratio</u>.

From and after [~~July 1~~**May 4**, 2025][4], at any time that a Covenant Trigger Event shall be in effect, the Consolidated Fixed Charge Coverage Ratio of the Borrower and its Restricted Subsidiaries for the Test Period ending on the last day of the most recent Fiscal Quarter for which financial statements of the Borrower and its Restricted Subsidiaries were required to have been delivered pursuant to *Section 7.1(a)* or *(b)*, as applicable, and each subsequent Test Period during the continuance of such Covenant Trigger Event, shall be not less than 1.0 to 1.0 and the Borrower shall immediately deliver to the Administrative Agent a certificate of the chief financial officer setting forth reasonably detailed calculations of the Consolidated Fixed Charge Coverage Ratio.

**ARTICLE VII**

**REPORTING COVENANTS**

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements, Cash Management Obligations and Bank Product Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent), the Borrower shall, and shall (except in the case of the covenants set forth in *Sections 7.1, 7.2 and 7.3*) cause each of the Restricted Subsidiaries to:

---

[2] NB: To be the date that is immediately following the completion of four full FQs of the Company post-exit.

[3] See f.n. above

[4] See f.n.s above

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

SECTION 7.1          Financial Statements, Etc.

Deliver to the Administrative Agent for prompt further distribution to each Lender each of the following and shall take the following actions:

(a)          as soon as available, but in any event within ninety-five (95) days (or such longer period as the Administrative Agent and the FILO Documentation Agent may agree) after the end of each Fiscal Year of the Borrower (commencing with the Fiscal Year of the Borrower ending on February 3, 2024), a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year, and the related Consolidated statements of income or operations, stockholders' equity and cash flows for such Fiscal Year together with related notes thereto and, so long as provided to the holders of the Borrower's or any of its direct or indirect parent companies' debt securities, management's discussion and analysis describing results of operations, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of Ernst & Young LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any explanatory statement (other than an "emphasis of matter" paragraph) or any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (other than a "going concern" qualification or exception resulting from or relating to (i) an actual or anticipated breach of the financial covenant set forth in *Section 6.1* or *Section 6.2*, as applicable, (ii) an upcoming maturity date or (iii) any Unrestricted Subsidiary);

(b)          as soon as available, but in any event (1) within one hundred forty (140) days after the end of the first Fiscal Quarter of the Borrower ending after the Second Restatement Date, **(i.e. the Fiscal Quarter ending May 4, 2024),** (2) within ninety (90) days after the end of the second Fiscal Quarter of the Borrower ending after the Second Restatement Date, (3) within seventy-five (75) days after the end of the third Fiscal Quarter of the Borrower ending after the Second Restatement Date, and (4) within fifty (50) days after the end of each Fiscal Quarter of the Borrower thereafter (or, in each case, such longer period as the Administrative Agent and the FILO Documentation Agent may agree), a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Quarter, and the related (i) Consolidated statements of income or operations for such Fiscal Quarter and for the portion of the Fiscal Year then ended and (ii) Consolidated statements of cash flows for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes (together with and, so long as provided to the holders of the Borrower's or any of its direct or indirect parent companies' debt securities' management's discussion and analysis describing results of operations);

(c)          as soon as available, but in any event (1) within thirty (30) days (or such longer period as the Administrative Agent and the FILO Documentation Agent may agree) after the end of each fiscal month **(commencing with the fiscal month ending May 4, 2024)** of the Borrower ending on or prior to February 1, 2025 **(it being agreed and acknowledged that the last fiscal month for which any such monthly financials will be delivered pursuant to this clause (c)(1) shall be the fiscal month ending on or about February 1, 2025),** (x) a Consolidated statement of income of the Borrower and its Subsidiaries for such fiscal month, in reasonable detail and

119

certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the results of operations of the Borrower and its Subsidiaries for such fiscal month, but which, for the avoidance of doubt, is not required to be prepared in accordance with GAAP and (y) [a detailed summary](i) a statement of the fiscal month-end balance of the Borrower and its Subsidiaries' Cash Equivalents, Credit Card Receivables, Accounts payable, including aging report, Inventory by category, and accrued expenses, and(ii) an Accounts payable aging report for such fiscal month, and (iii) a statement of the aggregate amount of Capital Expenditures][5] expended for such fiscal month, and (2) within thirty (30) days (or such longer period as the Administrative Agent and the FILO Documentation Agent may agree) after the end of each fiscal month of the Borrower ending after February 1, 2025 (it being agreed and acknowledged that the first fiscal month for which any such monthly financials will be delivered shall be the fiscal month ending on or about February 28, 2025), a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month, and the related (i) Consolidated statements of income or operations for such fiscal month and for the portion of the Fiscal Year then ended and (ii) Consolidated statements of cash flows for such fiscal month and for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal month of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, in each case, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject to normal **quarterly and** year-end adjustments and the absence of footnotes;

(d)    within ninety (90) days (or such longer period as the Administrative Agent and the FILO Documentation Agent may agree) after the end of each Fiscal Year, a reasonably detailed Consolidated budget for the following Fiscal Year as customarily prepared by management of the Borrower for its internal use (including a projected Consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following Fiscal Year, the related Consolidated statements of projected operations, projected cash flow, projected income, projected Excess Availability and any projected FILO Deficiency Reserves and setting forth the material underlying assumptions applicable thereto) in each case on a monthly basis (collectively, the "*Projections*"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer of the Borrower stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such Projections, it being understood that actual results may vary from such Projections and that such variations may be material;

(e)    simultaneously with the delivery of each set of Consolidated financial statements referred to in *Sections 7.1(a)*, *7.1(b)* and *7.1(c)* above, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such Consolidated financial statements; and

(f)    quarterly, at a time mutually agreed with the Administrative Agent and the FILO Documentation Agent that is promptly after the delivery of the information required pursuant to clause (a) above and the information delivered pursuant to clause (b) above for each Fiscal Quarter, participate in a conference call for Lenders to discuss the financial condition and results of operations of the Borrower and its Subsidiaries for the most recently-ended period for which financial statements have been delivered, which requirement may be satisfied by including the Lenders, the Administrative Agent and the FILO Documentation Agent on quarterly conference

---

[5] NTD: Under company consideration.

calls with the Term Facility Lenders or the noteholders in respect of any other debt securities of Parent, Holdings or the Borrower.

Notwithstanding the foregoing, the obligations in paragraphs (a) ~~and~~, (b)**, and (c)** of this *Section 7.1* may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable financial statements of any direct or indirect parent of the Borrower that holds all of the Equity Interests of the Borrower (a "*Parent Entity*") or (B) the Borrower's or such entity's Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to each of clauses (A) and (B), (i) to the extent such information relates to a parent of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to the Borrower (or such parent), on the one hand, and the information relating to the Borrower and the Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under *Section 7.1(a)*, such materials are accompanied by a report and opinion of Ernst & Young LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit other than as permitted by *Section 7.1(a)*.

SECTION 7.2    <u>Certificates; Other Information</u>. Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    concurrently with the delivery of the financial statements referred to in *Section 7.1(a)* and *Section 7.1(b)*, a duly completed Compliance Certificate signed by the chief financial officer of the Borrower;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which Parent, Holdings or the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this *Section 7.2*;

(c)    promptly after the furnishing thereof, copies of any material statements or material reports furnished to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the terms of the Term Facility Credit Agreement, in each case, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this *Section 7.2*;

(d)    together with the delivery of the financial statements pursuant to *Sections 7.1(a)* and *7.1(b)* and each Compliance Certificate delivered pursuant to *Section 7.2(a)*, (i) **solely with respect to the delivery of annual financial statements pursuant to Section 7.1(a),** a report setting forth the information required by *Section ~~3.3~~3.03(c)* of the Security Agreement (or confirming that there has been no change in such information since the Second Restatement Date or the date of the last such report), (ii) a description of each event, condition or circumstance during the last Fiscal Quarter covered by such Compliance Certificate requiring a mandatory

prepayment under *Section 2.9* and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such Compliance Certificate or a confirmation that there is no change in such information since the later of the Second Restatement Date and the date of the last such list;

(e)    on the date on which the delivery of financial statements is required to be made pursuant to *Section 7.1(a)*, the Borrower shall furnish to the Administrative Agent a description, in detail reasonably satisfactory to the Administrative Agent, of all material insurance coverage maintained by the Loan Parties, together with evidence thereof;

(f)    prior to the making of any Specified Payment, a reasonably detailed calculation of the Consolidated Fixed Charge Coverage Ratio and applicable Excess Availability as required pursuant to *clause (b)* of the definition of "Payment Conditions" together with a certification that no Event of Default exists or would arise as a result of the making of the subject Specified Payment, and in the case of a Permitted Acquisition, that the requirements of the definition of "Permitted Acquisition" have been satisfied;

(g)    (i) prompt written notice of any change (A) in any Loan Party's corporate name, (B) in any Loan Party's identity or corporate structure or jurisdiction of formation or (C) in any Loan Party's Federal Taxpayer Identification Number; and (ii) with the delivery of each Compliance Certificate, written notice of any change from the most recently delivered Compliance Certificate, (A) in the location of any Loan Party's chief executive office, its principal place of business, or (B) in the location of any office in which any Loan Party maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility);

(h)    concurrently with the delivery of the financial statements referred to in *Section 7.1(a), Section 7.1(b) and Section 7.1(c)* (if applicable), notice of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof since the date of the most recent financial statements delivered to the Administrative Agent (other than changes made in accordance with GAAP);

(i)    concurrently with the delivery of each Borrowing Base Certificate pursuant to *Section 7.4*, notice of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof since the date of the most recent Borrowing Base Certificate delivered to the Administrative Agent but only to the extent that such changes materially affect the calculation of the Borrowing Base and the FILO Borrowing Base (other than changes made in accordance with GAAP);

(j)    promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or the FILO Documentation Agent may from time to time on its own behalf or on behalf of any Lender reasonably request; and

(k)    promptly following any request therefor, provide information and documentation reasonably requested by the Administrative Agent, the FILO Documentation Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the USA PATRIOT Act and the Beneficial Ownership Regulation.

Documents required to be delivered pursuant to *Section 7.1(a)*, *(b)* or *(c)* or *Section 7.2(c)* may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on *Schedule 12.8*; or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender, the Administrative Agent and the FILO Documentation Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that:  (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arrangers will make available to the Lenders and the Issuers materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "*Borrower Materials*") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "*Platform*") and (b) certain of the Lenders (each, a "*Public Lender*") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Subsidiaries, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arrangers, the Issuers and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in *Section 12.17*); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Arrangers shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

SECTION 7.3     Notices.

Promptly after a Responsible Officer of the Borrower obtains actual knowledge thereof, notify the Administrative Agent who shall promptly thereafter notify each Lender:

(a)     of the occurrence of any Default or Event of Default;

(b)     of (i) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (ii) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights, the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (iii) the occurrence of any ERISA

Event that, in any such case referred to in clauses (i), (ii) or (iii), has resulted or would reasonably be expected to result in a Material Adverse Effect; and

(c)    any termination, withdrawal or resignation of Parent's, Holdings' or Borrower's Registered Public Accounting Firm.

Each notice pursuant to this *Section 7.3* shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to *Section 7.3(a)*, *(b)* or *(c)* (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

SECTION 7.4    Borrowing Base Certificates; Appraisals; Field Examinations.

(a)    Subject to *Section 7.4(b)* hereof, Borrower shall provide the Administrative Agent and the FILO Documentation Agent with the following documents in a form and detail to be generally consistent with the form and detail of such documents provided in past practices as soon as possible after the end of each calendar month (but in any event within fifteen (15) Business Days after the end thereof) for prompt further distribution to each Lender: a Borrowing Base Certificate setting forth the calculation of the Borrowing Base, the FILO Borrowing Base and Excess Availability as of the last Business Day of the immediately preceding calendar month, duly completed and executed by a Responsible Officer of the Borrower, together with all schedules required pursuant to the terms of the Borrowing Base Certificate duly completed (such certification, a "*Monthly Borrowing Base Certificate*"); *provided* that the Borrower may elect, at its option, to deliver more frequent Borrowing Base Certificates, in which case such Borrowing Base Certificates shall be computed in accordance with the requirements in respect of Borrowing Base Certificates required to be delivered during the continuance of a Weekly Monitoring Event and the Borrower shall continue to deliver Borrowing Base Certificates on a weekly basis until January 15th of the next succeeding calendar year.

(b)    (i) ~~From~~**Subject to Section 4.1(a)(ix), from** the Second Restatement Date through September 30, 2024, and (ii) thereafter, at any time during the occurrence and continuation of a Weekly Monitoring Event, the Borrower shall furnish a Borrowing Base Certificate calculated as of the close of business on the last day of the immediately preceding calendar week, on Wednesday of each week (or, if Wednesday is not a Business Day, on the next succeeding Business Day).

(c)    The Borrower shall also cooperate with (and cause its Subsidiaries to cooperate with) the Administrative Agent in connection with appraisals of Inventory that shall be in form and detail and from third-party appraisers reasonably acceptable to (1) the Administrative Agent and (2) if such appraiser is not Hilco, the FILO Documentation Agent (each, an "*Inventory Appraisal*") for the purpose of determining the amount of the Borrowing Base and the FILO Borrowing Base attributable to Inventory; *provided*, *however*, that (x) the Administrative Agent may (and upon the written request of the FILO Documentation Agent shall) carry out, at the Borrower's expense, (i) two (2) Inventory Appraisals during any twelve month period and (ii) at any time during the continuation of a Specified Event of Default, Inventory Appraisals as frequently as determined by the Administrative Agent or the FILO Documentation Agent, each in its reasonable discretion, and (y) in addition to the foregoing *clause (x)*, the Administrative Agent may carry out, at the Lenders' expense, one (1) additional Inventory Appraisal in any twelve month period.  The Borrower shall furnish to the Administrative Agent and the FILO Documentation Agent any information that the Administrative Agent or the FILO Documentation Agent may reasonably request regarding the determination and calculation of the Borrowing Base and the FILO Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of Accounts referred to therein.  It is understood and agreed that (i) the Inventory Appraisals referred to in this *Section 7.4(c)*

shall be for the benefit of all Lenders (including the FILO Lenders), and the FILO Documentation Agent shall not have a right to separate or independent Inventory Appraisals and (ii) the methodology of each Inventory Appraisal shall be consistent with the appraisal methodology utilized in the most recent Inventory Appraisal completed [prior to the Second Restatement Date] (or the methodology most recently approved by the FILO Documentation Agent), unless any changes in such methodology are approved by the FILO Documentation Agent in its Permitted Discretion.  In the event the FILO Documentation Agent disagrees with the results of any Inventory Appraisal solely due to a change in methodology not otherwise approved by the FILO Documentation Agent and such Inventory Appraisal results in a higher Net Recovery Percentage (other than any higher Net Recovery Percentage due to seasonal fluctuations) than the prior Inventory Appraisal, the prior Inventory Appraisal shall continue to be the Inventory Appraisal utilized for all purposes under this Agreement.

(d)      The Administrative Agent may (and upon the written request of the FILO Documentation Agent shall) carry out investigations and reviews of each Loan Party's property at the reasonable expense of the Borrower (including field audits conducted by the Administrative Agent) ("*Field Examination*"); *provided*, *however*, that (x) the Administrative Agent may (and upon the written request of the FILO Documentation Agent shall) carry out, at the Borrower's expense, (i) one (1) Field Examination in any twelve month period, (ii) a second Field Examination during any such twelve month period (I) if requested by the FILO Documentation Agent in writing or (II) at any time on or after the date on which Excess Availability has been less than the greater of (A) $48,125,000 and (B) 17.5% of the Modified Maximum Credit, in each case, for five (5) consecutive Business Days, and (iii) at any time during the continuation of a Specified Event of Default, Field Examinations as frequently as determined by the Administrative Agent or the FILO Documentation Agent, each in its reasonable discretion, and (y) in addition to the foregoing *clause (x)*, the Administrative Agent may carry out, at the Lenders' expense, one (1) additional Field Examination in any twelve month period.  The Borrower shall furnish to the Administrative Agent and the FILO Documentation Agent any information that the Administrative Agent or the FILO Documentation Agent may reasonably request regarding the determination and calculation of the Borrowing Base and the FILO Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of Accounts referred to therein.  It is understood and agreed that the Field Examinations referred to in this *Section 7.4(d)* shall be for the benefit of all Lenders (including the FILO Lenders), and the FILO Lenders and the FILO Documentation Agent shall not have a right to separate or independent Field Examinations.

(e)      From and after the Second Restatement Date through September 30, 2024, Borrower shall deliver an updated Cash Flow Forecast on a rolling 13-week basis on Wednesday of each week, together with a variance report, in form and substance reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent, comparing the Borrower's and the Guarantors' actual cash receipts and disbursements on a line item basis for the immediately preceding applicable period in the Cash Flow Forecast as compared to projected cash receipts and disbursements for such applicable period, as set forth in the Cash Flow Forecast.

# ARTICLE VIII

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Revolving Credit Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements, Cash Management Obligations and Bank Product Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent), the Borrower shall, and shall cause each of the Restricted Subsidiaries to:

SECTION 8.1        Preservation of Existence, Etc.

(a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to obtain, preserve, renew and keep in full force and effect the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of *clause (a)* or *(b)* to the extent (other than with respect to the preservation of the existence of Holdings and the Borrower) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or is pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by *Article IX*.

SECTION 8.2        Compliance with Laws, Etc.

Comply in all material respects with its Constituent Documents and the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

SECTION 8.3        Designation of Subsidiaries.

The board of directors of the Borrower may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that (i) immediately before and after such designation, no Default shall have occurred and be continuing, (ii) immediately after giving effect to such designation, the Net Leverage Ratio for the Test Period immediately preceding such designation for which financial statements have been delivered pursuant to *Section 7.1* is less than or equal to 5.25 to 1.0 (calculated on a Pro Forma Basis) (and, as a condition precedent to the effectiveness of any such designation, the Borrower shall deliver to the Administrative Agent a certificate setting forth in reasonable detail the calculations demonstrating satisfaction of such test) and (iii) no Subsidiary may be designated as an Unrestricted Subsidiary if, after such designation, it would be a "Restricted Subsidiary" for the purpose of the Term Facility or any Junior Financing or any other Indebtedness for borrowed money of any Loan Party in a principal amount in excess of $45,000,000.  The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the fair market value as determined by the Borrower in good faith of the Borrower's or its Subsidiary's (as applicable) Investment therein.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time and a return on any Investment by the Borrower in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the fair market value as determined by the

126

Borrower in good faith at the date of such designation of the Borrower's or its Subsidiary's (as applicable) Investment in such Subsidiary.

Notwithstanding the foregoing, any Unrestricted Subsidiary that has been re-designated a Restricted Subsidiary after the Second Restatement Date may not be subsequently re-designated as an Unrestricted Subsidiary.

SECTION 8.4    Payment of Taxes, Etc.

Timely pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities in respect of taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (i) any such tax, assessment, charge or levy is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP or (ii) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

SECTION 8.5    Maintenance of Insurance.

Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried. Each such policy of insurance shall, as appropriate, (i) name the Collateral Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a lenders loss payable clause or endorsement reasonably acceptable to the Collateral Agent that names the Collateral Agent, on behalf of the Lenders as the lenders loss payee thereunder (it being agreed and acknowledged that the lenders loss payable clause or endorsement in effect as of the Second Restatement Date is reasonably acceptable to the Collateral Agent).

SECTION 8.6    Inspection Rights.

In addition to the requirements pursuant to *Section 7.4,* permit representatives and independent contractors of the Administrative Agent and the Requisite Lenders to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Requisite Lenders may exercise rights of the Administrative Agent and the Requisite Lenders under this *Section 8.6* and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; *provided further* that when an Event of Default exists, the Administrative Agent or the Requisite Lenders (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at

any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this *Section 8.6*, none of the Borrower or any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any bona fide arm's length third party contract, or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

SECTION 8.7    Books and Records.

Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or such Restricted Subsidiary, as the case may be.

SECTION 8.8    Maintenance of Properties.

Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

SECTION 8.9    Use of Proceeds.

Use the proceeds of the Loans and Letters of Credit only in compliance with (and not in contravention of) applicable Laws, with each Loan Document and with the representations set forth in Sections 5.17 and 5.18 regarding use of proceeds of the Loans and Letters of Credit.

SECTION 8.10    Compliance with Environmental Laws.

Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent required by applicable Environmental Laws, conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all applicable Environmental Laws.

SECTION 8.11    Covenant to Guarantee Obligations and Give Security.

At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent or the Collateral Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including, upon (x) the formation or acquisition of any new direct or indirect Wholly-Owned Subsidiary that is a Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party, the designation in accordance with *Section 8.3* of any existing direct or indirect Wholly-Owned Subsidiary that is a Material Domestic Subsidiary as a

Restricted Subsidiary or any Subsidiary becoming a Wholly-Owned Subsidiary that is a Material Domestic Subsidiary or (y) the acquisition of any material assets by the Borrower or any other Loan Party or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any material assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

(a)  within forty-five (45) days after such formation, acquisition or designation or, in each case, such longer period as the Administrative Agent may agree in its reasonable discretion:

(i)  cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent Security Agreement Supplements, Intellectual Property Security Agreements and other security agreements and documents, as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent (consistent with the Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Second Restatement Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(ii)  cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank (or any other documents customary under local law) and instruments evidencing the intercompany Indebtedness held by such Material Domestic Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Collateral Agent;

(iii)  (1) take and cause any applicable Material Domestic Subsidiary and each direct or indirect parent of such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action (including the filing of UCC financing statements and delivery of stock and membership interest certificates to the extent certificated) may be necessary in the reasonable opinion of the Administrative Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law) and (2) comply with the requirements of *Section 8.12* with respect to all Deposit Accounts; and

(b)  within forty-five (45) days after the request therefor by the Administrative Agent (or such longer period as the Administrative Agent may agree in its reasonable discretion), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this *Section 8.11* as the Administrative Agent may reasonably request.

SECTION 8.12    Cash Receipts.

(a)  Use commercially reasonable efforts to enter on or prior to the Second Restatement Date (or such longer period following such date as the Administrative Agent may agree in its reasonable discretion), into an effective account control agreement (a "*Deposit Account Control*

*Agreement*") with each Approved Account Bank, in each case in form reasonably satisfactory to the Administrative Agent, with respect to each Deposit Account existing as of the Second Restatement Date and listed on *Schedule 8.12* attached hereto, but excluding any Excluded Account (collectively, all Deposit Accounts required to become subject to a Deposit Account Control Agreement being referred to as the "*Material Bank Accounts*").

(b)    Each Loan Party shall (i) instruct each Account Debtor or other Person obligated to make a payment to any of them under any Account to make payment, or to continue to make payment, to an Approved Deposit Account, (ii) deposit in (A) a Store Account all Cash Receipts received in the Stores, and (B) an Approved Deposit Account promptly upon receipt all other Cash Receipts (as defined below) received by any Loan Party from any other Person, (iii) deliver to the Administrative Agent, prior to the Second Restatement Date, Credit Card Notifications (it being agreed and acknowledged that as of the Second Restatement Date the Administrative Agent has received such Credit Card Notifications) and (iv) instruct each depository institution for a Deposit Account (including, without limitation, Store Accounts) to cause all amounts on deposit and available at the close of each Business Day in such Deposit Account to be swept to one of the Loan Parties' Approved Deposit Accounts no less frequently than on a daily basis, such instructions to be irrevocable unless otherwise agreed to by the Administrative Agent; *provided* that the Loan Parties shall not be required to sweep, and may maintain, an amount not to exceed $2,000,000 in the aggregate in all of the Store Accounts. So long as no Cash Dominion Period is continuing, the Loan Parties may direct, and shall have sole control over, the manner of disposition of funds in the Approved Deposit Accounts, in each case subject to the other provisions of this Agreement and the other Loan Documents.

(c)    Each Credit Card Notification and Deposit Account Control Agreement shall require (without further consent of the Loan Parties), and the Loan Parties shall cause, after the occurrence and during the continuance of a Cash Dominion Period and subject to the Intercreditor Agreement, the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account maintained at Bank of America (or at another financial institution acceptable to the Administrative Agent in its sole discretion) by and in the name of the Borrower (the "*Concentration Account*"), of all cash receipts and collections, including, without limitation, the following (collectively, the "*Cash Receipts*"):

(i)    all available cash receipts from the sale of Inventory and other Collateral or casualty insurance proceeds arising from any of the foregoing;

(ii)    all proceeds of collections of Accounts (including, without limitation, Credit Card Receivables);

(iii)    the then contents of each Deposit Account (including, without limitation, any Approved Deposit Account subject to a Deposit Account Control Agreement and any Store Account) (net of any minimum balance as may be required to be kept in the subject Deposit Account by the institution at which such Deposit Account is maintained);

(iv)    the cash proceeds of all credit card charges; and

(v)    all cash proceeds of any other Collateral.

(d)    The Concentration Account shall at all times be under the sole dominion and control of the Collateral Agent.  The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations, and (iii) the funds

DB1/ 145587008.8145587008.11

US-DOCS\149610879.14

on deposit in the Concentration Account shall be applied as provided in this Agreement and in the Intercreditor Agreement.  In the event that, notwithstanding the provisions of this *Section 8.12*, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections during a Cash Dominion Period, such proceeds and collections shall be held in trust by such Loan Party for the Collateral Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Administrative Agent.  Any amounts received in the Concentration Account at any time when all of the Obligations have been indefeasibly paid in full shall be remitted to the operating account of the Loan Parties maintained with the Administrative Agent.

(e)    From and after the Second Restatement Date, except as otherwise expressly provided in the Loan Documents, each Loan Party shall maintain all Material Bank Accounts with the Administrative Agent or another financial institution reasonably acceptable to the Administrative Agent that has executed and delivered such Deposit Account Control Agreements in respect of each such Material Bank Account.

(f)    The Administrative Agent shall promptly (but in any event shall use its commercially reasonable efforts within one (1) Business Day to) furnish written notice to each Approved Account Bank at which any Approved Deposit Account which is subject to a Deposit Account Control Agreement is maintained of any termination of a Cash Dominion Period.

SECTION 8.13    Further Assurances.

Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Loan Parties:

(a)    Promptly upon reasonable request by the Administrative Agent or the Collateral Agent or as may be required by applicable law (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents.

**ARTICLE IX**

**NEGATIVE COVENANTS**

So long as any Lender shall have any Revolving Credit Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements, Cash Management Obligations and Bank Product Obligations) shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit Obligations related thereto has been Cash Collateralized or back-stopped by a letter of credit in form and substance reasonably satisfactory to the Administrative Agent), the Borrower shall not (and, with respect to *Section 9.13*, only Parent and Holdings shall not), nor shall the Borrower permit any Restricted Subsidiary to:

SECTION 9.1     <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)     Liens created pursuant to any Loan Document;

(b)     Liens existing on the Second Restatement Date and set forth on *Schedule 9.1(b)*;

(c)     Liens for taxes, assessments or governmental charges that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP;

(d)     statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens or other customary Liens (other than in respect of Indebtedness) in favor of landlords, so long as, in each case, such Liens arise in the ordinary course of business that secure amounts not overdue for a period of more than thirty (30) days or, if more than thirty (30) days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)     (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, the Borrower or any Restricted Subsidiaries;

(f)     deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)     easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole, or the use of the property for its intended purpose;

(h)     Liens arising from judgments or orders for the payment of money not constituting an Event of Default under *Section 10.1(g)*;

(i)     (i) Liens securing obligations in respect of Indebtedness permitted under *Section 9.3(e)*; *provided* that (A) such Liens attach concurrently with or within two hundred and seventy (270) days after completion of the acquisition, construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits, (C) such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets, replacements and products thereof and

customary security deposits) other than the assets subject to, or acquired, constructed, repaired, replaced or improved with the proceeds of such Indebtedness; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender, and (D) if requested by the Administrative Agent, the Loan Parties shall use commercially reasonable efforts to cause the holder of such Lien to enter into a Collateral Access Agreement, and (ii) Liens on assets of Restricted Subsidiaries that are Non-Loan Parties securing Indebtedness of such Restricted Subsidiaries permitted pursuant to *Section 9.3(l)*;

(j)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (ii) secure any Indebtedness;

(k)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)    Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to *Section 9.2(i)* or *Section 9.2(m)* to be applied against the purchase price for such Investment or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under *Section 9.5*, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(m)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(n)    Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary incurred pursuant to *Sections 9.3(b), (l), (r) or (v)*;

(o)    Liens in favor of the Borrower or a Restricted Subsidiary securing Indebtedness permitted under *Section 9.3(d)*;

(p)    Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary (other than by designation as a Restricted Subsidiary pursuant to *Section 8.3*), in each case after the Second Restatement Date; *provided* that (i) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Restricted Subsidiary), and (ii) the Indebtedness secured thereby is permitted under *Section 9.3(e) or (v)*;

(q)    any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases (other than Capitalized Leases) or licenses entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(r)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(s)    Liens deemed to exist in connection with Investments in repurchase agreements under *Section 9.2* and reasonable customary initial deposits and margin deposits and similar Liens

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

attaching to commodity trading accounts or other brokerage accounts maintained in the ordinary course of business and not for speculative purposes;

(t)     Liens solely on any cash earnest money deposits made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement not prohibited hereunder;

(u)     ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(v)     purported Liens evidenced by the filing of precautionary UCC financing statements or similar public filings;

(w)     Liens securing obligations in respect of Indebtedness permitted under *Section 9.3(p)* and other obligations in respect of any Secured Hedge Agreement and any Cash Management Obligation (in each case, as defined in each of the Term Facility Credit Agreement) permitted under *Section 9.3(p),* which Liens shall be subject to the terms of the Intercreditor Agreement (or, in the case of any Permitted Refinancing in respect thereof, another intercreditor agreement containing terms that are at least as favorable to the Secured Parties as those contained in the Intercreditor Agreement);

(x)     Liens (i) of a collection bank arising under Section 4-208 of the UCC on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set off) and that are within the general parameters customary in the banking industry;

(y)     any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(z)     the modification, replacement, renewal or extension of any Lien permitted by clauses (b), (i) and (o) of this *Section 9.1; provided* that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under *Section 9.3(e)*, and (B) proceeds and products thereof, and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by *Section 9.3;*

(aa)     rights of set-off against credit balances of the Borrower or any of its Subsidiaries with Credit Card Issuers or Credit Card Processors or amounts owing by such Credit Card Issuers or Credit Card Processors to the Borrower or any of its Subsidiaries in the ordinary course of business, but not rights of set-off against any other property or assets of the Borrower or any of its Subsidiaries pursuant to the agreements with such Credit Card Issuers or Credit Card Processors (as in effect on the Second Restatement Date) to secure the obligations of the Borrower or any of its Subsidiaries to the Credit Card Issuers or Credit Card Processors as a result of fees and chargebacks;

(bb)     without duplication of, or aggregation with, any other Lien permitted under any other clause of this *Section 9.1*, other Liens (not covering Current Asset Collateral unless the Liens thereon are subordinated to the Lien of the Collateral Agent in a manner consistent with the

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

terms of the Intercreditor Agreement) securing Indebtedness permitted under (i) *Section 9.3(s)* (subject to the requirements set forth therein) or (ii) any other clause contained in *Section 9.3* outstanding in an aggregate principal amount not to exceed the greater of $150,000,000 and 6.50% of Total Assets at any time outstanding;

(cc)    deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business of the Borrower and such Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises; and

(dd)    Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the issuance of Indebtedness or (ii) relating to pooled deposit or sweep accounts of Holdings, the Borrower or any of the Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings, the Borrower and the Restricted Subsidiaries.

For the avoidance of doubt, all Liens on Current Asset Collateral that secure Indebtedness for borrowed money shall be subordinated to the Liens of the Collateral Agent in a manner consistent with the terms of the Intercreditor Agreement.

SECTION 9.2    Investments.

Make or hold any Investments, except:

(a)    Investments by the Borrower or any of the Restricted Subsidiaries in assets that are cash and Cash Equivalents;

(b)    loans or advances to officers, directors and employees of Holdings (or any direct or indirect parent thereof), the Borrower or any of the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings (or any direct or indirect parent thereof; *provided* that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to Holdings in cash) and (iii) for any other purpose, in an aggregate principal amount outstanding under this clause (b) not to exceed $22,000,000;

(c)    Investments (i) by the Borrower or any Restricted Subsidiary that is a Loan Party in the Borrower or any Restricted Subsidiary that is a Loan Party, (ii) by any Non-Loan Party in any other Non-Loan Party that is a Restricted Subsidiary, (iii) by any Non-Loan Party in the Borrower or any Restricted Subsidiary that is a Loan Party and (iv) without duplication of any other clauses of this *Section 9.2*, by any Loan Party in any Non-Loan Party that is a Restricted Subsidiary; *provided* that (A) any such Investments made pursuant to this *clause (iv)* in the form of intercompany loans shall be evidenced by notes that have been pledged (individually or pursuant to a global note) to the Collateral Agent for the benefit of the Lenders and (B) the aggregate amount of Investments made pursuant to this *clause (iv)* shall not exceed $20,000,000 at any time outstanding unless the Payment Conditions have been met at the time of, and after giving effect to, each such Investment (in which event the limit of $20,000,000 shall not apply to such Investment);

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)    Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under *Sections 9.1*, *9.3* (other than *9.3(c)(ii)* or *(d)*), *9.4* (other than *9.4(c)(ii),* or *(e)*), *9.5* (other than *9.5(d)* or *(e)*) and *9.6* (other than *9.6(d)* or *(g)(iv)*), respectively;

(f)    Investments existing on the Second Restatement Date or made pursuant to legally binding written contracts in existence on the Second Restatement Date, in each case, set forth on *Schedule 9.2(f)* and any modification, replacement, renewal, reinvestment or extension of any of the foregoing; *provided* that the amount of any Investment permitted pursuant to this *Section 9.2(f)* is not increased from the amount of such Investment on the Second Restatement Date except pursuant to the terms of such Investment as of the Second Restatement Date or as otherwise permitted by another clause of this *Section 9.2*;

(g)    Investments in Swap Contracts permitted under *Section 9.3*;

(h)    promissory notes and other non-cash consideration that is permitted to be received in connection with Dispositions permitted by *Section 9.5*;

(i)    Permitted Acquisitions;

(j)    [Reserved];

(k)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment;

(l)    loans and advances to Holdings (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings (or such direct or indirect parent) in accordance with *Section 9.6(g)*;

(m)    without duplication of any other clauses of this *Section 9.2*, other Investments that do not exceed $40,000,000 in the aggregate at any time outstanding, determined as of the date of such Investment;

(n)    advances of payroll payments to employees in the ordinary course of business;

(o)    Investments to the extent that payment for such Investments is made solely with Qualified Equity Interests of Holdings (or any direct or indirect parent thereof);

(p)    Investments held by a Restricted Subsidiary acquired after the Second Restatement Date or of a Person merged into the Borrower or merged or consolidated with a Restricted Subsidiary in accordance with *Section 9.4* after the Second Restatement Date (other than existing Investments in subsidiaries of such Subsidiary or Person, which must comply with the requirements of *Section 9.2(i) or (m)*) to the extent that such Investments were not made in

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(q)      Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(r)      Investments made by any Restricted Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Restricted Subsidiary from an Investment made pursuant to *clauses (c)(iv), (i) or (m)* of this *Section 9.2;*

(s)      Guarantees by the Borrower or any of the Restricted Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(t)      Investments received in connection with a Disposition permitted by *Section 9.5(m)*; and

(u)      without duplication of, or aggregation with, any Investment made under any other clause of this *Section 9.2*, the Borrower and its Restricted Subsidiaries may make other Investments as long as the Payment Conditions are satisfied after giving effect thereto.

SECTION 9.3      Indebtedness.

Create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest, other than:

(a)      Indebtedness under the Loan Documents;

(b)      (i) Indebtedness existing on the Second Restatement Date set forth on *Schedule 9.3(b)* and any Permitted Refinancing thereof and (ii) intercompany Indebtedness outstanding on the Second Restatement Date; *provided* that all such Indebtedness of any Loan Party owed to any Non-Loan Party shall be subject to the Intercompany Subordination Agreement;

(c)      (i) Guarantees by the Borrower and the Restricted Subsidiaries in respect of Indebtedness of the Borrower or any of the Restricted Subsidiaries otherwise permitted hereunder (except that a Restricted Subsidiary that is not a Loan Party may not, by virtue of this *Section 9.3(c)*, Guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this *Section 9.3*); *provided* that (A) no Guarantee by any Restricted Subsidiary of any Junior Financing shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Obligations substantially on the terms set forth in the Guaranty, and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guaranty on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness, and (ii) any Guaranty by a Loan Party of Indebtedness of a Restricted Subsidiary that would have been permitted as an Investment by such Loan Party in such Restricted Subsidiary under *Section 9.2(c)*;

(d)      Indebtedness of the Borrower or any of the Restricted Subsidiaries owing to the Borrower or any other Restricted Subsidiary to the extent constituting an Investment permitted by *Section 9.2*; *provided* that (i) all such Indebtedness of any Loan Party owed to any Person that is

137

not a Loan Party shall be subject to the Intercompany Subordination Agreement and (ii) in the event of any such Indebtedness in respect of the sale, transfer or assignment of Current Asset Collateral, such Indebtedness shall be duly noted on the books and records of the Loan Parties as being owing in respect of Current Asset Collateral;

(e)    (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) of the Borrower and the Restricted Subsidiaries financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; *provided* that such Indebtedness is incurred concurrently with or within two hundred and seventy (270) days after the applicable acquisition, construction, repair, replacement or improvement and any Permitted Refinancing thereof in an aggregate principal amount pursuant to this sub-clause (i) not to exceed the greater of $110,000,000 and 4.75% of Total Assets, in each case determined at the date of incurrence, (ii) Attributable Indebtedness arising out of sale-leaseback transactions (other than sale-leaseback transactions with respect to any Designated Assets) with respect to properties acquired after the Second Restatement Date and any Permitted Refinancing thereof in an aggregate amount outstanding pursuant to this sub-clause (ii) at any time not to exceed the greater of (x) $110,000,000 and (y) 4.75% of Total Assets, in each case determined at the date of incurrence, and (iii) Attributable Indebtedness arising out of sale-leaseback transactions with respect to any Designated Assets, and any Permitted Refinancing thereof;

(f)    Indebtedness in respect of Swap Contracts designed to hedge against Holdings, the Borrower's or any Restricted Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)    Indebtedness representing deferred compensation to employees of the Borrower and its Subsidiaries incurred in the ordinary course of business;

(h)    Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of Holdings (or any direct or indirect parent thereof) permitted by *Section 9.6*;

(i)    Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in a Permitted Acquisition, any other Investment expressly permitted hereunder or any Disposition, in each case to the extent constituting indemnification obligations or obligations in respect of purchase price (including earn-outs) or other similar adjustments;

(j)    Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements with employees incurred by such Person in connection with the Permitted Acquisitions or any other Investment expressly permitted hereunder;

(k)    Indebtedness in respect of Cash Management Services, Bank Products and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof;

(l)    Indebtedness of the Borrower and the Restricted Subsidiaries in an aggregate principal amount at any time outstanding not to exceed the greater of $150,000,000 and 6.50% of Total Assets (determined at the time of incurrence); *provided* that a maximum of the greater of

$58,000,000 and 2.50% of Total Assets (determined at the time of incurrence) in aggregate principal amount of such Indebtedness may be incurred by Non-Loan Parties;

(m)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(n)     Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business consistent with past practice in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(o)     obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(a)     Indebtedness in an aggregate principal amount not to exceed (i) $[   ]⁶⁵ plus (ii) the amount of (A) ~~clauses (y) and (z) of~~ the Maximum Incremental Amount (as defined in the Term Facility Credit Agreement as in effect on the Second Restatement Date or, subject to prior consent of the Administrative Agent and the FILO Documentation Agent, as in effect after the Second Restatement Date), (B) Permitted Pari Passu Secured Debt, [(C) Secured Obligations under Secured Hedge Agreements and not incurred in violation of *Section 9.3(f)*, (D) Obligations under Secured Cash Management Agreements]⁷~~and~~ ⁶, (E) Credit Agreement Refinancing Indebtedness**, and (F) Incremental Exit Loans in an aggregate principal amount not to exceed $10,500,000** (in the case of each of the foregoing *clauses (A), (B), (C), (D)* ~~and~~**,** *(E)**, and (F)***, as capitalized terms not defined herein are defined in the Term Facility Credit Agreement), in each case, at any time outstanding and in respect of clauses (i) and (ii), any Permitted Refinancing thereof;

(b)     Indebtedness (i) of any Person that becomes a Restricted Subsidiary after the Second Restatement Date, which Indebtedness is existing at the time such Person becomes a Restricted Subsidiary and is not incurred in contemplation of such Person becoming a Restricted Subsidiary that is non-recourse to the Borrower, Holdings or any other Restricted Subsidiary, other than any Subsidiary of such Person that is a Subsidiary on the date such Person becomes a Restricted Subsidiary after the Second Restatement Date and is either (A) unsecured or (B) secured only by the assets of such Restricted Subsidiary by Liens permitted under *Section 9.1(p)* and, in each case, any Permitted Refinancing thereof, and (ii) of the Borrower or any Restricted Subsidiary incurred or assumed in connection with any Permitted Acquisition that is secured only by Liens permitted under *Section 9.1(p)* (and any Permitted Refinancing of the foregoing) and so long as the aggregate principal amount of such Indebtedness and all Indebtedness

---

⁶⁵ NTD: To be the outstanding principal amount of exit term loan at emergence.

⁷ ~~NTD: To be confirmed.~~

⁶ NTD: To be confirmed.

resulting from any Permitted Refinancing thereof at any time outstanding pursuant to this clause (g)(ii) does not exceed (x) $110,000,000 and (y) 4.75% of Total Assets at any time outstanding;

(c)      Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness of all such Foreign Subsidiaries incurred pursuant to this *clause (r)* and then outstanding, does not exceed the greater of $58,000,000 and 2.50% of Total Assets (determined at the time of incurrence);

(d)      other secured, unsecured or subordinated Indebtedness of the Borrower or any Restricted Subsidiary (and any Permitted Refinancing thereof), so long as (A) the Payment Conditions shall have been satisfied after giving effect thereto, (B) the maturity date and Weighted Average Life to Maturity of such Indebtedness is at least six (6) months after the Latest Maturity Date at the time of incurrence of such Indebtedness, and (C) if such Indebtedness is secured, (i) any such Liens with respect to any Current Asset Collateral shall be junior to the Liens securing the Obligations and (ii) such Indebtedness is subject to an intercreditor agreement containing terms that are at least as favorable to the Secured Parties as those contained in the Intercreditor Agreement;

(e)      [Reserved];

(f)      Indebtedness in respect of letters of credit issued for the account of any of the Subsidiaries of Holdings to finance the purchase of Inventory so long as (x) such Indebtedness is unsecured, and (y) the aggregate principal amount of such Indebtedness does not exceed the greater of $81,000,000 and 3.50% of Total Assets at any time;

(g)      Indebtedness (i) of any Person that becomes a Restricted Subsidiary after the Second Restatement Date, which Indebtedness is existing at the time such Person becomes a Restricted Subsidiary and is not incurred in contemplation of such Person becoming a Restricted Subsidiary that is non-recourse to the Borrower, Holdings or any other Restricted Subsidiary (other than any Subsidiary of such Person that is a Subsidiary on the date such Person becomes a Restricted Subsidiary after the Second Restatement Date) and is either (A) unsecured or (B) secured only by the assets of such Restricted Subsidiary by Liens permitted under *Section 9.1(p)* and, in each case, any Permitted Refinancing thereof, and (ii) of the Borrower or any Restricted Subsidiary incurred or assumed in connection with any Permitted Acquisition that is secured only by Liens permitted under *Section 9.1(p)* (and any Permitted Refinancing of the foregoing) and so long as the aggregate principal amount of such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof at any time outstanding pursuant to *clause (v)(ii)* does not exceed $70,000,000; and

(h)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in *clauses (a)* through *(v)* above.

Notwithstanding the foregoing, no Restricted Subsidiary that is a Non-Loan Party will guarantee any Indebtedness for borrowed money of a Loan Party unless such Restricted Subsidiary becomes a Guarantor.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving

140

credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased.

The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

Notwithstanding anything to the contrary contained in this Agreement, Indebtedness incurred pursuant to the Term Facility (and any Permitted Refinancing thereof) may only be incurred pursuant to *Section 9.3(p)*.

SECTION 9.4    <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (including, in each case, pursuant to a Division; *provided* that the formation of any Subsidiary that is a Division Successor shall be deemed to constitute the acquisition of a Restricted Subsidiary for all purposes of this *Section 9.4*), except that:

(a)    Holdings or any Restricted Subsidiary may merge or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that (x) the Borrower shall be the continuing or surviving Person, (y) such merger or consolidation does not result in the Borrower ceasing to be organized under the Laws of the United States, any state thereof or the District of Columbia and (z) in the case of a merger or consolidation of Holdings with and into the Borrower, Holdings shall not be an obligor in respect of any Qualified Holding Company Debt or other Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement, shall not be an obligor in respect of any Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement, shall have no direct Subsidiaries at the time of such merger or consolidation other than the Borrower and, after giving effect to such merger or consolidation, the direct parent of the Borrower shall expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent;

(b)    (i) any Restricted Subsidiary that is not a Loan Party may merge or consolidate with or into any other Restricted Subsidiary of the Borrower that is not a Loan Party, (ii) any Restricted Subsidiary may merge or consolidate with or into any other Restricted Subsidiary of the Borrower that is a Loan Party, (iii) any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States shall be permitted and (iv) any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Restricted Subsidiaries and is not materially disadvantageous to the Lenders; *provided*, in the case of *clauses (ii)* through *(iv)* of this *paragraph (b)*, that (A) no Event of Default shall result therefrom, (B) no Change of Control shall result therefrom and (C) the surviving Person (or, with respect to

*clause (iv)*, the Person who receives the assets of such dissolving or liquidated Restricted Subsidiary that is a Guarantor) shall be a Loan Party;

(c)      any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (i) the transferee must be a Loan Party or (ii) such Investment must be a permitted Investment in a Restricted Subsidiary which is not a Loan Party in accordance with *Section 9.2* (other than *clause (e)* thereof) and must be a permitted Disposition in accordance with *Section 9.5*;

(d)      so long as no Default or Event of Default is continuing or would result therefrom, the Borrower may merge or consolidate with any other Person; *provided* that (i) the Borrower shall be the continuing or surviving corporation or (ii) if the Person formed by or surviving any such merger or consolidation is not the Borrower (any such Person, the "*Successor Borrower*"), (A) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (B) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (C) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guaranty confirmed that its Guarantee of the Obligations shall apply to the Successor Borrower's obligations under this Agreement, (D) each Loan Party, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement confirmed that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement, and (E) the Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Collateral Document comply with this Agreement; *provided*, *further*, that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(e)      so long as no Default or Event of Default is continuing or would result therefrom, any Restricted Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to *Section 9.2* (other than *Section 9.2(e)*); *provided* that the continuing or surviving Person shall be the Borrower or a Restricted Subsidiary, which together with each of its Restricted Subsidiaries, shall have complied with the applicable requirements of *Sections 8.11*, *8.12* and *8.13*; and

(f)      so long as no Default or Event of Default is continuing or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to *Section 9.5* (other than *Section 9.5(e)*).

SECTION 9.5      <u>Dispositions</u>.  Make any Disposition except:

(a)      Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and the Restricted Subsidiaries;

(b)      Dispositions of inventory and goods held for sale in the ordinary course of business;

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

(c)     Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property; *provided* that to the extent the property being transferred constitutes Current Asset Collateral, such replacement property shall constitute Current Asset Collateral.

(d)     Dispositions of property to the Borrower or a Restricted Subsidiary; *provided* that if the transferor of such property is a Loan Party (i) the transferee thereof must be a Loan Party or (ii) such Investment must be a permitted Investment in a Restricted Subsidiary that is not a Loan Party in accordance with *Section 9.2* (other than *Section 9.2(e)*) or (iii) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Loan Party, such Disposition is for fair value and any promissory note or other non-cash consideration received in respect thereof is a permitted investment in a Restricted Subsidiary that is not a Loan Party in accordance with *Section 9.2* (other than *Section 9.2(e)*); *provided* that if the property being disposed of constitutes Current Asset Collateral and is being transferred to a Subsidiary which is not a Subsidiary Guarantor, such disposition shall be made only if the Payment Conditions are satisfied after giving effect thereto;

(e)     Dispositions permitted by *Sections 9.2* (other than *Section 9.2(e)*), *9.4* (other than *Section 9.4(g)*) and *9.6* (other than *Section 9.6(d)*) and Liens permitted by *Section 9.1*(other than *Section 9.1(l)(ii)*);

(f)     Dispositions of property pursuant to sale-leaseback transactions;

(g)     any issuance or sale of Equity Interests in, or sale of Indebtedness or other securities of, an Unrestricted Subsidiary;

(h)     leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(i)     Dispositions of property subject to Casualty Events (as such term is defined in the Term Facility Credit Agreements);

(j)     Dispositions of property not otherwise permitted under this *Section 9.5*; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default exists), no Default shall exist or would result from such Disposition; (ii) with respect to any Disposition pursuant to this *clause (j)* for a purchase price in excess of $20,000,000, the Borrower or any of the Restricted Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than nonconsensual Liens permitted by *Section 9.1* and Liens permitted by *Sections 9.1(a)*, *(m)*, *(s)*, *(t)*, *(x)*, *(w)*, *(dd)(i)* and *(dd)(ii)*); and (iii) if the property continues to be used by the Loan Parties in the conduct of their business and holds any Current Asset Collateral on the premises thereof, and if requested by the Administrative Agent, the Loan Parties shall use commercially reasonable efforts to cause the transferee of such property to enter into a Collateral Access Agreement; provided, however, that for the purposes of *clause (ii)*, (A) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the

143

applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by such Restricted Subsidiary from such transferee that are converted by such Restricted Subsidiary into cash (to the extent of the cash received) within 180 days following the closing of the applicable Disposition and (C) any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value (as determined by the Borrower in good faith), taken together with all other Designated Non-Cash Consideration received pursuant to this *clause (C)* that is at that time outstanding, not in excess of the greater of $58,000,000 and 2.50% of Total Assets at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash; and (iv) proceeds of such Dispositions are applied in accordance with the Term Facility Credit Agreements;

(k)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(l)      bulk sales or other dispositions of the Inventory of a Borrower not in the ordinary course of business in connection with Store closings, at arm's length, *provided, that* such Store closures and related Inventory dispositions shall not exceed (i) in any Fiscal Year, twenty-five percent (25%) of the number of the Borrower's Stores as of the beginning of such Fiscal Year (net of new Store openings) and (ii) in the aggregate from and after the Second Restatement Date, fifty percent (50%) of the number of the Borrower's Stores in existence as of the Second Restatement Date (net of new Store openings), *provided further* that all sales of Inventory in connection with store closings shall be in accordance with liquidation agreements and with professional liquidators reasonably acceptable to the Administrative Agent and the FILO Documentation Agent, *provided further* that all Net Cash Proceeds received in connection therewith are applied to the Obligations if then required in accordance with *Section 2.9* hereof;

(m)      the unwinding of any Swap Contract;

(n)      the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any IP Rights;

(o)      to the extent allowable under Section 1031 of the Code (or comparable or successor provision), any exchange of like property (excluding any boot thereon permitted by such provision) for use in any business conducted by the Borrower or any of its Restricted Subsidiaries that is not in contravention of *Section 9.7*;

(p)      Dispositions of accounts receivable in connection with the collection or compromise thereof, *provided* that no disposition of Eligible Credit Card Receivables or Eligible Trade Receivables shall be permitted pursuant to this *clause (p)* unless the Borrower shall have (i) delivered to the Administrative Agent and the FILO Documentation Agent written notice of such disposition in reasonable detail and (ii) if requested by the Administrative Agent or the FILO Documentation Agent, delivered to the Administrative Agent and the FILO Documentation Agent an updated Borrowing Base Certificate;

(q)      sales or other dispositions by the Borrower or any Restricted Subsidiary of assets in connection with the closing or sale of a Store (including a factory Store) in the ordinary course of the business of the Borrower or such Restricted Subsidiary which consist of leasehold interests

in the premises of such Store, the equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such Store (but excluding any Current Asset Collateral); *provided* that as to each and all such sales and closings, (A) no Event of Default shall result therefrom and (B) such sale shall be on commercially reasonable prices and terms in a *bona fide* arm's length transaction;

(r)    Dispositions of Cash Equivalents; *provided* that, if any such Disposition occurs during a Cash Dominion Period, the Loan Parties shall be in compliance with *Section 11.12*; and

(s)    Dispositions of Excluded Property by non-Loan Parties and Dispositions of Excluded Property by Loan Parties for fair market value.

*provided* that (i) any Disposition of any property pursuant to this *Section 9.5* (except pursuant to *Sections 9.5(a), (e), (i), (k), (m)* and *(o)* and except for Dispositions from the Borrower or a Restricted Subsidiary that is a Loan Party to the Borrower or a Restricted Subsidiary that is a Loan Party), shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith, (ii) in the case of any such Disposition of any Current Asset Collateral the value of which exceeds five (5%) percent of the Borrowing Base, the Borrower shall deliver to Administrative Agent and the FILO Documentation Agent an updated Borrowing Base Certificate prior to the consummation of such Disposition, calculated as of the date thereof and giving effect thereto, and (iii) to the extent any Collateral is Disposed of as expressly permitted by this *Section 9.5* to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent, upon the certification by the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 9.6    Restricted Payments.

Declare or make, directly or indirectly, any Restricted Payment, except:

(a)    each Restricted Subsidiary may make Restricted Payments to the Borrower and to its other Restricted Subsidiaries (and, in the case of a Restricted Payment by a non-wholly owned Restricted Subsidiary, to the Borrower and any of its other Restricted Subsidiaries and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)    the Borrower and each of its Restricted Subsidiaries may declare and make dividend payments or other distributions payable solely in the Equity Interests (other than Disqualified Equity Interests not otherwise permitted by *Section 9.3*) of such Person;

(c)    [reserved];

(d)    to the extent constituting Restricted Payments, Holdings, the Borrower and the Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of *Section 9.2* (other than *Section 9.2(e)*), *9.4* (other than a merger or consolidation of Holdings and the Borrower) or *9.8* (other than *Section 9.8(a)* or *(j)*);

(e)    repurchases of Equity Interests in Holdings, the Borrower or any of the Restricted Subsidiaries deemed to occur upon exercise of stock options or warrants or similar

rights if such Equity Interests represent a portion of the exercise price of such options or warrants or similar rights;

(f)        [reserved];

(g)        the Borrower may make Restricted Payments to Holdings (or to Parent and any other direct or indirect parent of Holdings):

(i)        the proceeds of which will be used to pay (or to make Restricted Payments to allow Parent and any other direct or indirect parent of Holdings to pay) the tax liability to each foreign, federal, state or local jurisdiction in respect of which a consolidated, combined, unitary or affiliated return is filed by Holdings (or Parent or any other direct or indirect parent of Holdings) that includes the activities of the Borrower and/or any of its Subsidiaries, to the extent such tax liability does not exceed the lesser of (A) the taxes that would have been payable by the Borrower and/or its Subsidiaries as a stand-alone group with the Borrower the regarded corporate parent of the group and (B) the actual tax liability of Holdings', Parent's or such other direct or indirect parent's consolidated, combined, unitary or affiliated group, reduced by any such taxes paid or to be paid directly by the Borrower or its Subsidiaries;

(ii)        the proceeds of which shall be used to pay (or to make Restricted Payments to allow Parent or any direct parent of Parent to pay) the operating costs and expenses of Holdings (or Parent or any other direct or indirect parent of Holdings) incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, attributable to the ownership or operations of the Borrower and its Subsidiaries;

(iii)        the proceeds of which shall be used to pay franchise taxes and other fees, taxes and expenses required to maintain Holdings' (or Parent's or any direct or indirect parent of Holdings) corporate existence;

(iv)        to finance any Investment permitted to be made pursuant to *Section 9.2*; *provided* that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment and (B) Parent, Holdings and the Borrower shall, immediately following the closing thereof, cause (1) all property acquired (whether assets or Equity Interests) to be contributed to the Borrower or a Restricted Subsidiary or (2) the merger (to the extent permitted in *Section 9.4*) of the Person formed or acquired into the Borrower or a Restricted Subsidiary in order to consummate such Permitted Acquisition, in each case, in accordance with the requirements of *Sections 8.11, 8.12* and *9.2*;

(v)        the proceeds of which shall be used to pay (or to make Restricted Payments to allow Parent to pay) costs, fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering permitted by this Agreement;

(vi)        the proceeds of which (A) shall be used to pay customary salary, bonus and other benefits payable to officers and employees of Holdings (or Parent) to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries or (B) shall be used to make payments permitted under *Sections 9.8(p)* (but, in the case of this clause (B), only to the extent such

payments have not been and are not expected to be made by the Borrower or a Restricted Subsidiary), or (C) shall be used to make payments permitted under *Section 9.8(h)*; and

(vii)    the proceeds of which shall be used to pay withholding or other similar taxes payable upon repurchase, retirement or other acquisition or retirement of Equity Interests of Holdings, a Parent Entity or its Subsidiaries or otherwise pursuant to any employee or director equity plan, employee or director stock option or profits interest plan or any other employee or director benefit plan or any agreement;

(h)    Holdings, the Borrower or any of the Restricted Subsidiaries may pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any Permitted Acquisition;

(i)    [reserved];

(j)    repurchases of Equity Interests (i) deemed to occur on the exercise of options by the delivery of Equity Interests in satisfaction of the exercise price of such options and (ii) in consideration of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing), including deemed repurchases in connection with the exercise of stock options;

(k)    [reserved];

(l)    [reserved];

(m)    the Borrower may (or may make Restricted Payments to permit any Parent Entity to) (i) redeem, repurchase, retire or otherwise acquire in whole or in part any Equity Interests of the Borrower or any Restricted Subsidiary or any Equity Interests of any Parent Entity ("*Treasury Equity Interests*"), in exchange for, or with the proceeds (to the extent contributed to Holdings or the Borrower substantially concurrently) of the sale or issuance (other than to the Borrower or any Restricted Subsidiary) of, other Equity Interests or rights to acquire its Equity Interests ("Refunding Equity Interests") and (ii) declare and pay dividends on any Treasury Equity Interests out of any such proceeds; and

(n)    redemptions in whole or in part of any of its Equity Interests for another class of its Equity Interests (other than Disqualified Equity Interests, except to the extent issued by the Borrower to a Restricted Subsidiary) or with proceeds from substantially concurrent equity contributions or issuances of new Equity Interests (other than Disqualified Equity Interests, except to the extent issued by the Borrower to a Restricted Subsidiary).

SECTION 9.7    Change in Nature of Business.

Engage in any material line of business substantially different from those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Second Restatement Date or any business reasonably related or ancillary thereto.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

SECTION 9.8        Transactions with Affiliates.

Enter into any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, in excess of $12,500,000, other than:

(a)        transactions between or among (i) the Borrower or any of the Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction, and (ii) the Loan Parties,

(b)        transactions on terms substantially as favorable to such Loan Party or such Restricted Subsidiary as would be obtainable by such Loan Party or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate,

(c)        transactions under the Term Facility Documentation,

(d)        [reserved],

(e)        [reserved],

(f)        employment and severance arrangements between Holdings, the Borrower and the Restricted Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements,

(g)        the non-exclusive licensing of trademarks, copyrights or other IP Rights in the ordinary course of business to permit the commercial exploitation of IP Rights between or among Affiliates and Subsidiaries of Holdings or the Borrower,

(h)        the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers and employees of Holdings and the Restricted Subsidiaries or any direct or indirect parent of Holdings in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries,

(i)        any agreement, instrument or arrangement as in effect as of the Second Restatement Date and set forth on *Schedule 9.8*, or any amendment thereto (so long as any such amendment is not adverse to the Lenders in any material respect as compared to the applicable agreement as in effect on the Second Restatement Date),

(j)        Restricted Payments permitted under *Section 9.6*,

(k)        [reserved],

(l)        transactions in which the Borrower or any of the Restricted Subsidiaries, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of *clause (b)* of this *Section 9.8*,

(m)        the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors,

DB1/ 145587008.8145587008.11

US-DOCS\149610879.14

administrators, heirs, legatees or distributees of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent thereof to the extent otherwise permitted by this Agreement and to the extent such issuance or transfer would not give rise to a Change of Control,

(n)    [reserved],

(o)    payments to or from, and transactions with, joint ventures (to the extent any such joint venture is only an Affiliate as a result of Investments by the Borrower and the Restricted Subsidiary in such joint venture) in the ordinary course of business to the extent otherwise permitted under *Section 9.2,*

(p)    the Second Restatement Transactions and the payment of all fees and expenses related to the Second Restatement Transactions and permitted pursuant to the Confirmation Order,

(q)    the entering into of any tax sharing agreement or arrangement and any payments pursuant thereto, to the extent permitted by *Section 9.6(g)(i)*, and

(r)    to the extent not otherwise prohibited under this Agreement, payments by Holdings, the Borrower or any of its Restricted Subsidiaries in respect of any of their respective Indebtedness or Equity Interests that are payable to holders of such Indebtedness or Equity Interests generally (including Affiliates that may from time to time own such Indebtedness or Equity Interests).

SECTION 9.9    Burdensome Agreements.

Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that prohibits, restricts, imposes any condition on or limits the ability of (a) any Restricted Subsidiary that is not a Loan Party to make Restricted Payments to (directly or indirectly) or to make or repay loans or advances to any Loan Party or to Guarantee the Obligations of any Loan Party under the Loan Documents or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Revolving Facility, the FILO Facility and the Obligations under the Loan Documents; *provided* that the foregoing *clauses (a)* and *(b)* shall not apply to Contractual Obligations that:

(i)    (x) exist on the Second Restatement Date and (to the extent not otherwise permitted by this *Section 9.9*) are listed on *Schedule 9.9* hereto and (y) to the extent Contractual Obligations permitted by *clause (x)* are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing does not expand the scope of such Contractual Obligation,

(ii)    are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary,

(iii)    represent Indebtedness of a Restricted Subsidiary that is not a Loan Party that is permitted by *Section 9.3*,

(iv)    (A) are customary restrictions that arise in connection with any (x) any Lien permitted by *Sections 9.1(a), (l), (s), (t), (w), (x)* and *(dd)* and relate to the property subject

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

to such Lien or (y) Disposition permitted by *Section 9.5* applicable pending such Disposition solely to the assets subject to such Disposition,

(v)      are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under *Section 9.2* and applicable solely to such joint venture entered into in the ordinary course of business,

(vi)      are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under *Section 9.3* but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness and the proceeds and products thereof and, in the case of the Term Facility and any Permitted Refinancing thereof, permit the Liens securing the Obligations without restriction (subject to the Intercreditor Agreement),

(vii)      are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto,

(viii)      comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to *Sections 9.3(e), (m)(i), (p), (r)* or *(u)* to the extent that such restrictions apply only to the property or assets securing such Indebtedness or to the Restricted Subsidiary party to such Indebtedness,

(ix)      are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary,

(x)      are customary provisions restricting assignment of any agreement entered into in the ordinary course of business,

(xi)      are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business,

(xii)      are restrictions contained in the Term Facility Credit Agreement and the Term Facility Documentation, and any documentation governing a Permitted Refinancing of any of the foregoing, or

(xiii)      arise in connection with cash or other deposits permitted under *Section 9.1*, or

(xiv)      comprise restrictions imposed by any agreement governing Indebtedness entered into after the Second Restatement Date and permitted under *Section 9.3* that are, taken as a whole, in the good faith judgment of the Borrower, no more restrictive with respect to the Borrower or any Restricted Subsidiary than customary market terms for Indebtedness of such type, so long as the Borrower shall have determined in good faith that such restrictions will not affect its obligation or ability to make any payments required hereunder.

SECTION 9.10      <u>Accounting Changes; Fiscal Year.</u>

Make any change in Fiscal Year; *provided*, *however*, that Holdings and the Borrower may, upon written notice to the Administrative Agent, change its Fiscal Year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, Holdings, the Borrower and the

Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

SECTION 9.11    Prepayment, Etc. of Indebtedness.

Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal and interest and mandatory prepayments of principal and interest shall be permitted) any Indebtedness constituting Junior Financing (including the FILO Loans, but excluding, for the avoidance of doubt, the Term Facilities and any Permitted Refinancing thereof), except (i) [reserved]; (ii) so long as the Payment Conditions are satisfied after giving effect thereto, any prepayment, redemption, defeasance or other satisfaction of any Indebtedness (other than the FILO Loans) that do not exceed ~~the greater of~~ $~~100,000,000 and 4.30% of Total Assets~~25,000,000 (determined at the time of such prepayment, redemption, defeasance or other satisfaction of such Indebtedness) in the aggregate at any time outstanding; (iii) the refinancing of any Indebtedness with the Net Cash Proceeds of, or in exchange for, any Permitted Refinancing, to the extent not required to be applied to prepayments pursuant to the Term Facility to the extent permitted by *Section 9.14* below; (iv) the conversion (or exchange) of any Indebtedness to Equity Interests (other than Disqualified Equity Interests) or Indebtedness of Holdings or any of its direct or indirect parents; (v) the prepayment, redemption, purchase, defeasance or other satisfaction of Indebtedness of the Borrower or any Restricted Subsidiary owed to Holdings, the Borrower or a Restricted Subsidiary or the prepayment, redemption, purchase, defeasance or other satisfaction of any Indebtedness with the proceeds of any other Indebtedness otherwise permitted by Section 9.3; (vi) any Permitted Refinancing of any Indebtedness; (vii) any prepayment, redemption, purchase, defeasance or other satisfaction with the Net Cash Proceeds of any Permitted Equity Issuance; and (viii) the prepayment of Indebtedness incurred pursuant to clauses (e), (f), (g), (h), (k)  and (v) of Section 9.3.

SECTION 9.12    Modification of Debt Agreements.

Amend, modify or change in any manner (i) materially adverse to the interest of the Lenders any term or condition of any Material Indebtedness (other than as a result of a Permitted Refinancing thereof and in any event excluding the Term Facility and any Permitted Refinancing thereof and any Indebtedness hereunder) without the consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed) or (ii) with respect to the Term Facility Documentation or any amendment to any Permitted Refinancing thereof to the extent that such amendment, modification or change would (A) shorten the maturity date of the Term Facility or such refinancing Indebtedness to a date which is prior to ninety-one (91) days after the Latest Maturity Date, (B) [reserved], or (C) violate the Intercreditor Agreement.

SECTION 9.13    Holdings and Parent.

In the case of Holdings and Parent, conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto): (i) with respect to Parent, its ownership of the Equity Interests of Holdings, and with respect to Holdings, its ownership of the Equity Interests of the Borrower, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the Term Facility or, with respect to Parent or Holdings, any Qualified Holding Company Debt, (iv) with respect to Parent or Holdings, the incurrence of Qualified Holding Company Debt, the issuance of securities, and the incurrence of Qualified Equity Interests, (v) making contributions to the capital of its Subsidiaries, (vi) guaranteeing the obligations of its Subsidiaries in each case solely to the extent such obligations of the Borrower and its Subsidiaries are permitted hereunder, (vii) participating in tax, accounting and other administrative matters as a member of the consolidated group of

Parent, Holdings and the Borrower, (viii) holding any cash or property received in connection with Restricted Payments made by the Borrower in accordance with *Section 9.6* pending application thereof by Holdings or Parent, (ix) providing indemnification to officers and directors, (x) making investments in Cash Equivalents in the ordinary course of business, (xi) any issuance of its Equity Interests or making payments or restricted payments with any amounts received in any transaction permitted under *Section 9.6*, and (xii) activities incidental to the businesses or activities described in *clauses (i)* to *(xi)* of this *Section 9.13*.

SECTION 9.14    Repayment of Term Loan.

Make any repayment or prepayment of the outstanding principal amount under the Term Facility Credit Agreement, other than (i) amortization payments thereunder as in effect on the Second Restatement Date, (ii) mandatory prepayments thereunder made from the proceeds of Term Loan Priority Collateral and (iii) any Permitted Refinancing thereof to the extent permitted pursuant to Section 9.3.

SECTION 9.15    GB Consulting Agreements.

So long as any FILO Obligations shall remain outstanding, take any action (or fail to take any required action) that directly results in the termination of a GB Consulting Agreement, except if at the time of such action (or at the deadline for such required action), a party to such GB Consulting Agreement that is not a Loan Party or a Subsidiary of a Loan Party has breached or terminated any such GB Consulting Agreement.

## ARTICLE X

## EVENTS OF DEFAULT AND REMEDIES

SECTION 10.1    Events of Default.

Each of the events referred to in *clauses (a)* through *(m)* of this *Section 10.1* shall constitute an "*Event of Default*":

(a)    Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within three (3) Business Days after the same becomes due, any interest on any Loan, or (iii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or with respect to any other Loan Document; or

(b)    Specific Covenants.

(i)    The Borrower, any Restricted Subsidiary or, in the case of *Section 9.13*, Holdings or Parent, fails to perform or observe any term, covenant or agreement contained in (A) *Article VI*, (B) *Section 7.1(a), Section 7.1(b), Section 7.1(c), Section 7.1(d), Section 7.2(a), Section 7.3(a), Section 8.1(a), Section 8.5*, or *Section 8.9*, or (C) *Article IX*;

(ii)    during the continuance of any Cash Dominion Period, the Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in *Section 8.12*; or

(iii)    the Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in *Section 7.4(a)* and such failure continues for five (5) Business Days; or

(iv)    the Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in *Section 7.4(b) or (e)*, and such failure continues for two (2) Business Days; or

(v)    the Borrower or any other Loan Party fails to perform or observe (or to cause to be performed or observed) any covenant or agreement contained in *Section 7.4(c)* or *Section 7.4(d)*, as applicable, and, in either case, such failure continues for five (5) Business Days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in *Section 10.1(a)* or *(b)* above), and, for the purposes of clarity, including any failure to perform or observe any covenant or agreement contained in *Section 8.12* other than during the continuance of a Cash Dominion Period, contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent or the FILO Documentation Agent; or

(d)    Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(e)    Cross-Default.  Any Loan Party or any Restricted Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party) the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this *clause (e)(B)* shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness or (ii) the conversion of, or the satisfaction of any condition to the conversion of, any Indebtedness that is convertible or exchangeable for Equity Interests; *provided further* that **such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Aggregate Commitments or acceleration of the Loans pursuant to *Section 10.2*; *provided further* that** no such event under the Term Facility (other than a payment default or any other event of default thereunder which constitutes an independent Event of Default under this Agreement without regard to the provisions of the Term Facility Documentation) shall constitute

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

an Event of Default under this Section 10.1(e) until the earliest to occur of (x) the date that is thirty (30) days after such event or circumstance (but only if such event or circumstance has not been waived or cured), (y) the acceleration of the Indebtedness under the Term Facility and (z) the exercise of any remedies by any Term Facility Administrative Agent or collateral agent or any lenders under such Term Facility in respect of any Collateral; or

(f)      _Insolvency Proceedings, Etc_. Any Loan Party or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)      _Judgments_.  There is entered against any Loan Party or any Material Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive calendar days; or

(h)      _ERISA_.  (i)  An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party or their respective ERISA Affiliates under Title IV of ERISA in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, (ii) any Loan Party or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, or (iii) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable law or plan terms that would reasonably be expected to result in a Material Adverse Effect; or

(i)      _Invalidity of Loan Documents_.  Any material provision of any Loan Document at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under _Section 9.4_ or _9.5_) or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document; or

(j)      _Collateral Documents_.  Any Collateral Document after delivery thereof pursuant to _Section 4.1_ or _8.11_ shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under _Section 9.4_ or _9.5_) cease to create, or any Lien purported to be created by any Collateral Document shall be asserted in writing by any Loan Party not to be, a valid and perfected lien, with the priority required by the Collateral Documents

154

(or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under *Section 9.1*, except to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file UCC continuation statements and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(k)     Junior Financing Documentation.  (i) Any of the Obligations of the Loan Parties under the Loan Documents for any reason shall cease to be "Senior Indebtedness" (or any comparable term) or "Senior Secured Financing" (or any comparable term) under, and as defined in any Junior Financing Documentation governing Junior Financing subordinated in right of payment to the Obligations under the Loan Documents with an aggregate principal amount of not less than the Threshold Amount or (ii) the subordination provisions set forth in any Junior Financing Documentation governing Junior Financing subordinated in right of payment to the Obligations under the Loan Documents with an aggregate principal amount of not less than the Threshold Amount shall, in whole or in part, cease to be effective or cease to be legally valid, binding and enforceable against the holders of any such Junior Financing, if applicable; or

(l)     Change of Control.  There occurs any Change of Control.

SECTION 10.2     Remedies upon Event of Default.

(a)     If any Event of Default occurs and is continuing, the Administrative Agent may, and, at the request of the Requisite Lenders shall, take any or all of the following actions:

(i)     declare Revolving Credit Commitments of each Lender and any obligation of the Issuers to make L/C Credit Extensions to be terminated, whereupon such Revolving Credit Commitments and obligation shall be terminated;

(ii)     declare the unpaid principal amount of all outstanding Loans (including any FILO Prepayment Premium that shall have been capitalized and added to the principal amount of the FILO Loans pursuant to the FILO Fee Letter), all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(iii)     require that the Borrower Cash Collateralize the Letter of Credit Obligations (in an amount equal to the then Outstanding Amount thereof); and

(iv)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code, the Revolving Credit Commitments of each Lender and any obligation of the Issuers to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans (including any FILO Prepayment Premium that shall have been capitalized and added to the principal amount of the FILO Loans pursuant to the FILO Fee Letter) and all interest and other amounts as aforesaid shall automatically become due

and payable, and the obligation of the Borrower to Cash Collateralize the Letter of Credit Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

(b)    If any FILO Specified Event of Default occurs and is continuing and the FILO Standstill Period has expired, the Administrative Agent, at the written request of the FILO Documentation Agent, shall, within a reasonable time after receipt of such request (but in any event within two (2) Business Days with respect to *clause (i)* below, it being agreed that if the Administrative Agent fails to take such requested action described in *clause (i)* below within such two (2) Business Day period, the FILO Documentation Agent may take such action directly) take any or all of the following actions:

(i)    declare the unpaid principal amount of all outstanding FILO Loans (including any FILO Prepayment Premium that shall have been capitalized and added to the principal amount of the FILO Loans pursuant to the FILO Fee Letter), all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document in respect of the FILO Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(ii)    exercise on behalf of itself and the FILO Lenders all rights and remedies available to it and the FILO Lenders under the Loan Documents or applicable Law, including commencing and prosecuting any suits, actions or proceedings at law or in equity in any court of competent jurisdiction and collecting the Collateral or any portion thereof and enforcing any other right in respect of any Collateral, all in such manner as the Administrative Agent may determine in its reasonable discretion; *provided*, *however*, that none of the FILO Lenders or the FILO Documentation Agent will request or direct the Administrative Agent to commence or continue the exercise of any secured creditor remedies or direct or request the Administrative Agent to seek or continue any rights and remedies under this Agreement, any of the other Loan Documents or applicable Law on behalf of the FILO Lenders so long as the Administrative Agent is diligently pursuing in good faith the exercise of its rights and remedies against all or a material portion of the Collateral, including through actions taken by the Loan Parties with the consent of the Administrative Agent.

(c)    Without limiting *clauses (a) and (b)* of this *Section 10.2*, if any Event of Default pursuant to *Section 10.1(a)* or *(f)* has occurred and is continuing, either of the Administrative Agent or the FILO Documentation Agent shall have the right to direct the Loan Parties to commence a commercially reasonable process for the sale of the Loan Parties' assets on terms reasonably satisfactory to the Administrative Agent and the FILO Documentation Agent (a "*Sale Event*").

(d)    The Borrower hereby irrevocably waives the right to direct the application of any and all payments in respect of the Obligations and any proceeds of Collateral after the occurrence and during the continuance of an Event of Default and agrees that during the continuance of a Specified Event of Default, the Administrative Agent may in its sole discretion, or upon the written direction of the Requisite Lenders, deliver a notice to each Approved Account Bank instructing them to cease complying with any instructions from any Loan Party and to transfer all funds therein to the Administrative Agent and the Administrative Agent shall apply all payments

in respect of any Obligations and all funds on deposit in the Concentration Account and all other proceeds of Collateral in the order specified in *Section 10.3* hereof.

SECTION 10.3    <u>Application of Funds</u>.  After the exercise of remedies provided for in *Section 10.2* (or after the Loans have automatically become immediately due and payable and the Letter of Credit Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to *Section 10.2*), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, ratably, pay any fees, indemnities, or expense reimbursements then due to the Administrative Agent, the FILO Documentation Agent or any Issuer from the Borrower (other than in connection with Cash Management Obligations, Bank Product Obligations or Obligations in respect of Secured Hedge Agreements);

*Second*, ratably, to pay any fees or expense reimbursements then due to the Revolving Credit Lenders from the Borrower (other than in connection with Cash Management Obligations, Bank Product Obligations or Obligations in respect of Secured Hedge Agreements);

*Third*, ratably, to pay interest due and payable in respect of any Revolving Loans (including any Swing Loans) and any Protective Advances;

*Fourth*, ratably, to pay the principal of the Protective Advances and the Swing Loans;

*Fifth*, ratably, to pay principal on the Revolving Loans (other than the Protective Advances and Swing Loans) and unreimbursed Letter of Credit Borrowings;

*Sixth*, to pay an amount to the Administrative Agent equal to 103% of the Letter of Credit Obligations on such date, to be held in the Concentration Account as cash collateral for such Obligations;

*Seventh*, to pay Cash Management Obligations, ratably among the Cash Management Banks in proportion to the respective amounts described in this clause *Seventh* held by them;

*Eighth*, ratably, to pay (i) Bank Product Obligations in an amount equal to the sum of (A) without duplication of clause (ii)(A) below, the Bank Product / Swap Obligations Cap, plus (B) such other amounts in respect of Bank Product Obligations for which the Administrative Agent has implemented a Bank Product Reserve (so long as such Bank Product Reserve was established prior to the occurrence of, and not in contemplation of, an Event of Default) and (ii) obligations of any Loan Party arising under any Secured Hedge Agreement then due to the Hedge Banks in an amount equal to the sum of (A) without duplication of clause (i)(A) above, the Bank Product / Swap Obligations Cap, plus (B) such other amounts in respect of obligations of any Loan Party arising under any Secured Hedge Agreement for which the Administrative Agent has implemented a Swap Obligations Reserve (so long as such Swap Obligations Reserve was established prior to the occurrence of, and not in contemplation of, an Event of Default), in each case of *clause (i)* and *clause (ii)*, ratably among the Bank Product Providers and Hedge Banks in proportion to the respective amounts described in this clause *Eighth* held by them;

*Ninth*, ratably, to pay any fees or expense reimbursements then due to the FILO Lenders from the Borrower;

*Tenth*, to pay interest due and payable in respect of any FILO Loans;

*Eleventh,* to pay principal on the FILO Loans (including any FILO Prepayment Premium that shall have been capitalized and added to the principal amount of the FILO Loans pursuant to the FILO Fee Letter);

*Twelfth*, to payment of all other Revolving Obligations (including Bank Product Obligations and obligations of any Loan Party arising under any Secured Hedge Agreement not otherwise paid pursuant to clause *Eighth* above), ratably among the Persons to whom such other Revolving Obligations are owed in proportion to the respective amounts described in this clause *Twelfth* held by them;

*Thirteenth,* to the payment of any other Obligation due to the Administrative Agent, the FILO Documentation Agent or any Lender by the Borrower, ratably among the Persons to whom such other Obligations are owed in proportion to the respective amounts described in this clause *Thirteenth* held by them;

*Fourteenth*, as provided for under the Intercreditor Agreement; and

*Fifteenth*, after all of the Obligations have been paid in full, to the Borrower or as the Borrower shall direct or as otherwise required by Law.

Subject to *Sections 2.4, 2.16, 8.12 and 10.5,* amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause *Sixth* above shall be applied to satisfy drawings under such Letters of Credit as they occur.  If any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above and, if no Obligations remain outstanding, to the Borrower.

Notwithstanding the foregoing, if sufficient funds are not available to fund all payments to be made in respect of any Secured Obligation described in any of *clauses First* through *Thirteenth* above, the available funds being applied with respect to any such Secured Obligation (unless otherwise specified in such clause) shall be allocated to the payment of such Secured Obligation ratably, based on the proportion of the Administrative Agent's, the FILO Documentation Agent's and each Lender's or Issuer's interest in the aggregate outstanding Secured Obligations described in such clauses; *provided*, *however*, that payments that would otherwise be allocated to the Lenders shall be allocated *first* to repay Protective Advances and Swing Loans *pro rata* until such Protective Advances and Swing Loans are paid in full and *then* to repay the Loans.  The order of priority set forth in *clauses First* through *Thirteenth* above may at any time and from time to time be changed by the agreement of all directly affected Lenders without necessity of notice to or consent of or approval by the Borrower, any Secured Party that is not a Lender or Issuer or by any other Person that is not a Lender or Issuer.  The order of priority set forth in *clauses First* through *Thirteenth* above may be changed only with the prior written consent of the Administrative Agent in addition to that of all directly affected Lenders.  Excluded Swap Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to the Obligations otherwise set forth above in this Section.

SECTION 10.4     [Reserved].

SECTION 10.5     Actions in Respect of Letters of Credit; Cash Collateral.

(a)     At any time (i) upon the Revolving Credit Termination Date, (ii) after the Revolving Credit Termination Date when the aggregate funds on deposit in the Concentration Account to

158

Cash Collateralize Letter of Credit Obligations shall be less than 103% of the Letter of Credit Obligations and (iii) as may be required by *Section 2.9* or *Section 2.16*, the Borrower shall pay to the Administrative Agent in Same Day Funds at the Administrative Agent's office referred to in *Section 12.8*, for deposit in the Concentration Account, (x) in the case of *clauses (i)* and *(ii)* above, the amount required to that, after such payment, the aggregate funds on deposit in the Concentration Account counts equals or exceeds 103% of the sum of all outstanding Letter of Credit Obligations and (y) in the case of *clause (iii)* above, the amount required by *Section 2.9*.  The Administrative Agent may, from time to time after funds are deposited in the Concentration Account, apply funds then held in the Concentration Account to the payment of any amounts, in accordance with *Section 2.9* and *Section 10.2(c)*, as shall have become or shall become due and payable by the Borrower to the Issuers or Lenders in respect of the Letter of Credit Obligations.  The Administrative Agent shall promptly give written notice of any such application; *provided*, *however*, that the failure to give such written notice shall not invalidate any such application.  If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent as herein provided, or that the total amount of such Cash Collateral is less than the applicable Fronting Exposure and other obligations secured thereby, the Borrower or the relevant Defaulting Lender will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency.

(b)　　*Application*.  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under any of this *Section 10.5* or *Sections 2.4, 2.9, 2.13* or *10.2* in respect of Letters of Credit or Swing Loans shall be held and applied to the satisfaction of the specific Letter of Credit Obligations, Swing Loans, obligations to fund participations therein (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may be provided for herein.

(c)　　*Release*.  Cash Collateral (or the appropriate portion thereof) provided to reduce Fronting Exposure or other obligations shall be released promptly following (i) the elimination of the applicable Fronting Exposure or other obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Lender or, as appropriate, its assignee following compliance with *Section 12.2(b)(vi)*) or (ii) the Administrative Agent's good faith determination that there exists excess Cash Collateral; provided, however, (x) that Cash Collateral furnished by or on behalf of a Loan Party shall not be released during the continuance of a Default or Event of Default (and following application as provided in this *Section 10.5* may be otherwise applied in accordance with *Section 10.3*), and (y) the Person providing Cash Collateral and the applicable Issuer or Swing Loan Lender, as applicable, may agree that Cash Collateral shall not be released but instead held to support future anticipated Fronting Exposure or other obligations.

SECTION 10.6　　Post-Petition Financings; Insolvency Proceedings.  Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, if any Loan Party shall be subject to any Insolvency Proceeding:

(a)　　*Conforming Post-Petition Financings*. If the Administrative Agent or any Revolving Credit Lender shall seek to provide any Loan Party with, or consent to a third party providing, any Post-Petition Financing, with such Post-Petition Financing to be secured by all or any portion of the Collateral (including assets that, but for the application of Section 552 of the Bankruptcy Code or other applicable Law, would be Collateral), each of the FILO Secured Parties agrees and confirms that it shall be deemed to have consented to such Post-Petition Financing and to the Liens securing the same (or securing any claim for diminution in value in connection therewith) and that it shall not object to any such Post-Petition Financing or to the Liens securing the same (or securing any claim for diminution in value

in connection therewith) (nor support any other Person objecting to such Post-Petition Financing or to the Liens securing the same (or securing any claim for diminution in value in connection therewith) or request the Administrative Agent make any such objection), on any grounds whatsoever so long as (i) the Administrative Agent retains its Lien on the Collateral to secure the FILO Obligations, subordinate to the Liens securing such Post-Petition Financing which satisfies the terms and conditions of this *Section 10.6* (and any Lien securing any claim for diminution in value in connection therewith), but otherwise with the same relative priority vis-a-vis other liens in the Collateral as existed immediately prior to the commencement of such Insolvency Proceeding; *provided* that, if in connection with any Post-Petition Financing provided, or consented to, by the Administrative Agent or any Revolving Credit Lender, any Liens on the Collateral held by the Administrative Agent, or any Liens securing such Post-Petition Financing, are subject to a surcharge or are subject to a Carve Out, court ordered charge, fee or other similar interest or right, and so long as the amount of such surcharge, Carve Out, court ordered charge, fee or other similar interest or right is reasonable under the circumstances, then the Liens of the Administrative Agent on the Collateral securing the FILO Obligations shall also be subordinated to such surcharge, claim, Carve Out, court ordered charge, fee or other similar interest or right to the same extent as the Revolving Obligations and/or Post-Petition Financing, as applicable, (ii) the aggregate principal amount of the unfunded commitments and loans and letter of credit accommodations outstanding under any such Post-Petition Financing, together with the aggregate Revolving Credit Outstandings (giving effect to any repayments), does not exceed the Maximum Revolving Insolvency Amount, (iii) the agent under such Post-Petition Financing shall implement, and maintain, at all times, a reserve against all borrowing bases under such Post-Petition Financing in the amount of the Carve Out, (iv) the agent under such Post-Petition Financing shall implement, and maintain, at all times, a reserve against all borrowing bases under such Post-Petition Financing in the amount of the FILO Deficiency Reserve, consistent with the terms of this Agreement, (v) such Post-Petition Financing shall not compel any Loan Party to seek confirmation of a specific plan of reorganization, unless the FILO Obligations shall be indefeasibly paid in full in cash on the effective date thereof, and (vi) such Post-Petition Financing shall be subject to the same rights of the FILO Documentation Agent and the FILO Lenders with respect to amendments, waivers and modifications as set forth in *Section 12.1* with respect to this Agreement and the other Loan Documents (a Post-Petition Financing complying with the provisions of this paragraph referred to herein as a "*Conforming Post-Petition Financing*").

       (b)    *Other Post-Petition Financing Offers*. The FILO Secured Parties hereby agree that they shall not, and shall not permit any Affiliate controlled by any of them to, (i) provide or offer to provide any Post-Petition Financing to the Loan Parties or (ii) except in the case of a Conforming Post-Petition Financing provided in accordance with *Section 10.6(a)*, endorse, or support any other Person in, the provision of any Post-Petition Financing to the Loan Parties in any Insolvency Proceeding with respect to a Loan Party.

       (c)    *Roll-up Post-Petition Financings*. The Administrative Agent and the Revolving Credit Lenders hereby agree that, to the extent any Post-Petition Financing offered by the Administrative Agent or any Revolving Credit Lender includes a "roll up" or refinancing of any portion of the Revolving Loans, (i) the FILO Lenders may offer and/or request a "roll up" or refinancing of the FILO Loans on a ratable basis with the Revolving Loans that will be subject to the "roll up" or refinancing in connection with such Post-Petition Financing and (ii) neither the Administrative Agent nor any Revolving Credit Lender shall object (or support any other Person in objecting) to such request by any FILO Lender; *provided* that, to the extent such FILO Loans are "rolled up" or refinanced in connection with such Post-Petition Financing, the Maximum Revolving Insolvency Amount shall be deemed increased by the amount of such FILO Loans that are "rolled up" or refinanced by such Post-Petition Financing.

       (d)    *Adequate Protection*. All adequate protection granted to the Administrative Agent in any Insolvency Proceeding with respect to a Loan Party, including all Liens granted to the

Administrative Agent in any such Insolvency Proceeding as adequate protection, are intended to be for the benefit of all Secured Parties and shall be subject to *Section 10.3*, subject to any court order affecting the rights and interests of the parties hereto not in conflict with the terms hereof.  Without limiting the foregoing, the FILO Documentation Agent, on behalf of the FILO Secured Parties, shall have the right to seek adequate protection for the FILO Loans solely in the form of payment of interest at the then applicable interest rate (including the FILO Applicable Margin) for the FILO Loans and reimbursement of reasonable expenses of the FILO Documentation Agent; *provided*, *however*, that the Administrative Agent, on behalf of the Revolving Secured Parties, may contest (or support any other Person contesting) any request by any FILO Secured Parties for such adequate protection from proceeds of Collateral unless each of the following conditions is satisfied: (i) such payments are approved by a final order of the applicable U.S. Bankruptcy Court (or other court of competent jurisdiction) approving a Post-Petition Financing consented to by the Administrative Agent, (ii) the Administrative Agent and the other Secured Parties (other than the FILO Secured Parties) are also receiving adequate protection payments covering their interest, fees and expenses, (iii) the amount of all such payments is added to the Maximum Revolving Insolvency Amount, and (iv) the FILO Secured Parties agree to pay over an amount not to exceed the payments so received if the Revolving Obligations and all obligations under such Post-Petition Financing are not paid in full in such Insolvency Proceeding.

(e)     *Relief from Stay*. Each of the FILO Secured Parties agrees not to (i) seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency Proceeding with respect to a Loan Party, without the prior written consent of the Administrative Agent, or (ii) oppose any request by the Administrative Agent, any other Secured Party (other than any FILO Secured Party), or, in the case of any Conforming Post-Petition Financing, any Person providing such Post-Petition Financing, for relief from the automatic stay or any other stay in any such Insolvency Proceeding.

(f)     *Judgment Liens*. Each of the FILO Secured Parties agrees that, in the event FILO Secured Party becomes a judgment lien creditor in respect of any Collateral securing the Obligations, such judgment lien shall be subordinated to any Lien on such Collateral securing the Revolving Obligations on the same basis and to the same extent as the Liens on the Collateral of the Administrative Agent securing the FILO Obligations are subordinated (including with respect to the proceeds thereof being subject to *Section 10.3*) to those Liens securing the Revolving Obligations.

(g)     *Intercreditor Agreement Controls*. For the avoidance of doubt in the event of any inconsistency between this Section 10.6 and the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall govern and control.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

SECTION 10.7    Separate Classification.  Whether or not it is held that the Revolving Obligations and the FILO Obligations together constitute only one secured claim (rather than separate classes of secured claims), the FILO Secured Parties hereby agree that in any Insolvency Proceeding with respect to a Loan Party, all payments and distributions shall be applied as if the Revolving Obligations and the FILO Obligations were separate classes of secured claims against the Loan Parties in respect of the Collateral with the effect that the Revolving Secured Parties and the FILO Secured Parties shall be entitled to receive payment of all amounts owing to them as set forth pursuant to the priorities in *Section 10.3* (whether or not allowed in such Insolvency Proceeding, and including in respect of post-petition interest and expenses) that would be owing to them as if the Revolving Obligations and the FILO Obligations were so classified as a separate claim and secured by a separate Lien, and any payments or proceeds of Collateral otherwise received or receivable shall be turned over to the appropriate Secured Party to the extent necessary to effectuate the intent of this *Section 10.7*.

SECTION 10.8    Avoidance and Reinstatement.  If a Revolving Secured Party or a FILO Secured Party receives payment or property on account of any Revolving Obligations or FILO Obligations, respectively, and the payment is subsequently invalidated, avoided, declared to be fraudulent or preferential, set aside or otherwise required to be transferred to a trustee, receiver or the estate of any Loan Party (in each instance, to the extent required by applicable law, a "*Recovery*"), then, to the extent of the Recovery, the applicable Obligations intended to have been satisfied by the payment will be reinstated as Revolving Obligations or FILO Obligations, as applicable, as of the date of such payment, and no payment with respect to, or discharge of the Revolving Obligations or FILO Obligations, as applicable, will be deemed to have occurred for all purposes hereunder.  If this Agreement is terminated prior to a Recovery, this Agreement will be reinstated in full force and effect, and such prior termination will not diminish, release, discharge, impair, or otherwise affect the obligations of the Loan Parties from the date of reinstatement.  Upon such reinstatement of any Obligations, each applicable Secured Party will disgorge and deliver to the Administrative Agent any Collateral or proceeds thereof received in payment of, or to discharge, such Obligations to effect the reinstatement required pursuant to the terms hereof.  No Secured Party may benefit from a Recovery, and any distribution made to a Secured Party as a result of a Recovery will be paid over to the Administrative Agent for application to the Obligations in accordance with *Section 10.3* (after application to any Post-Petition Financing that is a Conforming Post-Petition Financing or is otherwise consented to by the FILO Documentation Agent).

SECTION 10.9    Payments Over.  In the event that, notwithstanding the provisions of this *Article X*, payments or proceeds of Collateral shall be received by any Secured Party in violation of the priorities set forth herein, such payments or proceeds of Collateral shall be held in trust for the benefit of and shall be paid over to or delivered to the Administrative Agent upon the Administrative Agent's or the Requisite Lenders' written demand.

SECTION 10.10    Subrogation.  Until the Revolving Obligations are paid in full, the FILO Secured Parties shall have no right of subrogation to the rights of the Revolving Secured Parties to receive payments or distributions of cash or property applicable to the Revolving Obligations.  For purposes of such subrogation, no payments or distributions to the Revolving Secured Parties of any cash or property to which the FILO Secured Parties would be entitled except for the provisions of this Agreement, and no payment over to the Revolving Secured Parties pursuant to this Agreement by the FILO Secured Parties, as between any Loan Party, its creditors (other than the Revolving Secured Parties), and the FILO Secured Parties, shall be deemed to be a payment by the Loan Parties to or on account of the FILO Obligations.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

SECTION 10.11    Credit Bidding.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Requisite Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 and/or 1129 of the Bankruptcy Code, or any other applicable Laws, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Laws; *provided* that the consent of the FILO Documentation Agent shall be required to credit bid all or any portion of the FILO Obligations.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the equity interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid, (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof shall be governed, directly or indirectly, by the vote of the Requisite Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Requisite Lenders contained in *Section 12.1*), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any equity interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the equity interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

Notwithstanding anything to the contrary set forth in the foregoing paragraph, each of the Secured Parties hereby agrees that the Administrative Agent may, on behalf of itself and the other Revolving Secured Parties, credit bid the Revolving Obligations in accordance with Section 363(k) of the Bankruptcy Code (or any similar provision of other applicable Law, including the Uniform Commercial Code), and each FILO Secured Party agrees not to object to (and shall be deemed to consent to) such credit bid, so long as such credit bid does not exceed the amount of the Revolving Obligations.  Each of the Secured Parties hereby agrees that the FILO Documentation Agent may direct the Administrative Agent to, on behalf of the FILO Secured Parties, credit bid the FILO Obligations in accordance with Section 363(k) of the Bankruptcy Code (or any similar provision of other applicable Law, including the Uniform Commercial Code), and the Administrative Agent agrees to take such direction from the FILO Documentation Agent and to not object thereto (and shall be deemed to consent thereto), in each case, so long as such credit bid does not exceed the amount of the FILO Obligations and all Revolving Obligations shall be paid in full in cash upon the effectiveness of any such sale under Section 363 of the Bankruptcy Code (or any similar provision of other applicable Law) (and any such credit bid of the FILO Obligations shall provide for the same). The Secured Parties hereby agree that, in the event the

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

Administrative Agent takes any action to credit bid the FILO Obligations upon the direction of the FILO Documentation Agent on behalf of the FILO Secured Parties, the Administrative Agent shall be entitled to all of the benefits of *Article XI* in connection with such action.

SECTION 10.12      FILO Purchase Option.

(a)      If any Purchase Option Event shall occur, the FILO Lenders shall have the right, but not the obligation, to purchase all, but not less than all, of the Revolving Obligations; *provided* that such option shall expire if the FILO Documentation Agent on behalf of the electing FILO Lenders fails to deliver a written notice (a "*Purchase Notice*") to the Administrative Agent within ten (10) Business Days following the date the FILO Documentation Agent obtains knowledge of the occurrence of a Purchase Option Event (or, in the case of a Purchase Option Event arising under *clause (g)* of such defined term, five (5) Business Days), which Purchase Notice shall (i) identify the applicable FILO Lenders committing to such purchase (the "*Purchasing Creditors*") and indicate the percentage of the Revolving Obligations to be purchased by each Purchasing Creditor (which aggregate commitments must add up to one hundred percent (100%) of the Revolving Obligations) and (ii) confirm that the offer contained therein is irrevocable.  Upon receipt of such Purchase Notice by the Administrative Agent, the Purchasing Creditors shall have from the date of delivery thereof to and including the date that is ten (10) Business Days after the Purchase Notice was received by the Administrative Agent (or such later date as may be agreed by the Administrative Agent in its sole discretion) to purchase all (but not less than all) of the Revolving Obligations (the date of such purchase, the "*Purchase Date*").

(b)      On the Purchase Date, the Administrative Agent and the Revolving Secured Parties shall, subject to any required approval of any Governmental Authority, if any, sell to the Purchasing Creditors all (but not less than all) of the Revolving Obligations.  On such Purchase Date, the Purchasing Creditors shall (i) pay to the Administrative Agent, for the benefit of the Revolving Secured Parties, as directed by the Administrative Agent, in immediately available funds the full amount of all Revolving Obligations, together with all accrued and unpaid interest and fees, all in the amounts specified by the Administrative Agent and determined in good faith in accordance with the Loan Documents or other applicable documents, (ii) furnish such amount of cash collateral in immediately available funds as the Administrative Agent determines is reasonably necessary to secure the Revolving Credit Parties on terms reasonably satisfactory to the Administrative Agent in connection with any (x) asserted indemnification claims, and (y) all Revolving Obligations in respect of or relating to Letters of Credit but not in any event in an amount greater than 103% thereof, and (iii) agree to reimburse the Revolving Secured Parties for any loss, cost, damage or expense resulting from the granting of provisional credit for any checks, wire or ACH transfers that are reversed or not final or other payments provisionally credited to the Revolving Obligations and as to which the Administrative Agent and the other Revolving Secured Parties have not yet received final payment as of the Purchase Date.  Such purchase price shall be remitted by wire transfer in immediately available funds to such bank account of the Administrative Agent (for the benefit of the applicable Secured Parties) as the Administrative Agent shall have specified in writing to the FILO Documentation Agent.  Interest and fees shall be calculated to but excluding the Purchase Date if the amounts so paid by the applicable Purchasing Creditors to the bank account designated by the Administrative Agent are received in such bank account prior to 2:00 p.m., and interest shall be calculated to and including such Purchase Date if the amounts so paid by the Purchasing Creditors to the bank account designated by the Administrative Agent are received in such bank account after 2:00 p.m.  Notwithstanding anything to the contrary contained in the Loan Documents, the Loan Parties hereby consent to and approve the assignment of the Revolving Obligations contemplated by this Section.

(c)      Any purchase pursuant to the purchase option described in this Section shall, except as provided below, be expressly made without representation or warranty of any kind by the

Administrative Agent or the other Revolving Secured Parties as to the Obligations, the Collateral or otherwise, and without recourse to the Administrative Agent and the other Revolving Secured Parties as to the Obligations, the Collateral or otherwise, except that the Administrative Agent and each of the other Revolving Secured Parties, as to itself only, shall represent and warrant only as to (i) the principal amount of the Obligations being sold by it, (ii) that such Person has not created any Lien on, or sold any participation in, any Obligations being sold by it, and (iii) that such Person has the right to assign the Obligations being assigned by it.

(d)    In connection with any purchase of Revolving Obligations pursuant to this Section, each Revolving Secured Party agrees to enter into and deliver to the Purchasing Creditors on the Purchase Date, as a condition to closing, an assignment agreement substantially in the form of *Exhibit A* to this Agreement or any other form approved by the Administrative Agent and, at the expense of the Loan Parties, each of the Revolving Secured Parties shall deliver all possessory Collateral (if any), together with any necessary endorsements and other documents (including any applicable stock powers or note powers), then in such Secured Party's possession or in the possession of its agent or bailee, or turn over control as to any pledged Collateral, deposit accounts or securities accounts of which such Secured Party or its agent or bailee then has control, as the case may be, to the FILO Documentation Agent to act as the successor Administrative Agent and Collateral Agent and otherwise take such actions as may be reasonably appropriate to effect an orderly transition to the FILO Documentation Agent to act as the successor Administrative Agent and Collateral Agent.  Upon the consummation of the purchase of the Revolving Obligations pursuant to this Section, the Administrative Agent shall be deemed to have resigned as an "agent" or "administrative agent" or "collateral agent" (or any similar role) for the Secured Parties, under the Loan Documents; *provided* the Administrative Agent (and all other agents under this Agreement) shall be entitled to all of the rights and benefits of a former "agent" or "administrative agent" or "collateral agent" under this Agreement.

(e)    Notwithstanding the foregoing purchase of the Revolving Obligations by the Purchasing Creditors, the Revolving Secured Parties shall continue to have recourse to the Loan Parties for those contingent indemnification obligations and other obligations under the Loan Documents which by their terms would survive any repayment of the Obligations.

# ARTICLE XI

# THE ADMINISTRATIVE AGENT

SECTION 11.1    Appointment and Authorization.

(a)    Each of the Lenders and the Issuers hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each of the FILO Lenders hereby irrevocably appoints 1903P Loan Agent, LLC (and its successors and permitted assigns in such capacity) to act on its behalf as the FILO Documentation Agent hereunder and under the other Loan Documents and authorizes the FILO Documentation Agent to take such actions on its behalf and to exercise such powers as are delegated to the FILO Documentation Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this *Article XI* (other than *Sections 11.6* and *11.11*) are solely for the benefit of the Administrative Agent, the FILO Documentation Agent, the Lenders and the Issuers, and the Borrower shall not have rights as a third party beneficiary of any such provision.

DB1/ 145587008.8145587008.11

US-DOCS\149610879.14

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities as a potential Hedge Bank, Cash Management Bank and/or Bank Product Bank) and the Issuers hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender and such Issuer for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to *Section 11.5* for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this *Article XI* and *Article XII* (including, without limitation, *Sections 11.3, 11.13, 12.3, 12.4* and *12.5*, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto (including the Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

SECTION 11.2    Rights as a Lender.

Any Person serving as an Agent (including as Administrative Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as an Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.  The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

SECTION 11.3    Exculpatory Provisions.  Neither the Administrative Agent nor any other Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, an Agent (including the Administrative Agent and the FILO Documentation Agent):

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Requisite

Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any Person serving as an Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Requisite Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in *Sections 12.1* and *12.2*) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein.

The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a Lender or an Issuer.  Upon the occurrence of a Default or an Event of Default, the Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Requisite Lenders, the Requisite Revolving Credit Lenders and the FILO Documentation Agent, as applicable in accordance with the terms of this Agreement.  Unless and until the Administrative Agent shall have received such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Secured Parties.  In no event shall the Administrative Agent be required to comply with any such directions to the extent that the Administrative Agent believes that its compliance with such directions would be unlawful.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in *Article IV* or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or (vii) to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

SECTION 11.4      Reliance by the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone

and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the applicable Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or such Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or such Issuer prior to the making of such Loan or the issuance of such Letter of Credit.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Requisite Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable, as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders or the FILO Lenders, as applicable, against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Requisite Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable (or such greater number of Lenders as may be expressly required hereby in any instance), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law.

SECTION 11.5      Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Agent-Related Persons of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

SECTION 11.6      Resignation of Administrative Agent and Collateral Agent.

(a)      The Administrative Agent or the Collateral Agent may at any time give notice of its resignation to the Lenders, the Issuers and the Borrower.  Upon receipt of any such notice of resignation, the Requisite Lenders shall have the right, with the consent of the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed), to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such Lender or bank with an office in the United States.  If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent or Collateral Agent, as applicable, gives notice of its resignation, then the retiring Administrative Agent or Collateral Agent, as applicable, may on behalf of the Lenders and the Issuers, appoint a successor Administrative Agent or Collateral Agent, as applicable, meeting the qualifications set forth above; *provided* that if the Administrative Agent or the Collateral Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent or Collateral Agent, as applicable,

shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent or the Collateral Agent on behalf of the Lenders or the Issuers under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor of such Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and each Issuer directly, until such time as the Requisite Lenders appoint a successor Administrative Agent as provided for above in this *Section 11.6*.  Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent, as applicable, hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Requisite Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent or Collateral Agent, as applicable, and the retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this *Section 11.6*).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and *Sections 12.3, 12.4* and *12.5* shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Administrative Agent or Collateral Agent, as applicable.

(b)      Any resignation by Bank of America as Administrative Agent pursuant to this Section shall also constitute its resignation as an Issuer and Swing Loan Lender.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuer and Swing Loan Lender, (ii) the retiring Issuer and Swing Loan Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (iii) the successor Issuer shall issue letters of credit in substitution for the Letters of Credit issued by Bank of America, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuer to effectively assume the obligations of the retiring Issuer with respect to such Letters of Credit.

SECTION 11.7      Non-Reliance on Administrative Agent and Other Lenders; Disclosure of Information by Agents.

Each Lender and each Issuer acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender and each Issuer also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Agent-Related Persons and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit

analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

SECTION 11.8      No Other Duties; Other Agents, Arrangers, Managers, Etc.

Anything herein to the contrary notwithstanding, none of the Arrangers, Co-Syndication Agents or the Co-Documentation Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, the Collateral Agent or a Lender hereunder and such Persons shall have the benefit of this *Article XI*.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any agency or fiduciary or trust relationship with any Lender, Parent, Holdings, the Borrower or any of their respective Subsidiaries.  Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

SECTION 11.9      Intercreditor Agreement.  The Administrative Agent and the Collateral Agent are authorized to enter into the Intercreditor Agreement, and the parties hereto acknowledge that the Intercreditor Agreement is binding upon them.  Each Lender (a) hereby consents to the subordination of the Liens on the Collateral other than the Current Asset Collateral securing the Obligations on the terms set forth in the Intercreditor Agreement, (b) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (c) hereby authorizes and instructs the Administrative Agent and the Collateral Agent to enter into the Intercreditor Agreement or other intercreditor agreement contemplated hereunder or under any Loan Document with the collateral agent or other representative of the holders of Indebtedness that is secured by a Lien on Collateral that is not prohibited (including with respect to priority) under this Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.  The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrower and such Secured Parties are intended third-party beneficiaries of such provisions and the provisions of the Intercreditor Agreement.

SECTION 11.10     Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or Letter of Credit Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, Letter of Credit Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuers and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuers and the Administrative

Agent and their respective agents and counsel and all other amounts due the Lenders, the Issuers and the Administrative Agent under Sections 2.*12*, *12.3* and *12.4*) allowed in such judicial proceeding; and

(b)        to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and each Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuers, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under *Sections 2.12*, *12.3* and *12.4*.

Nothing contained herein shall be deemed to authorize the Administrative Agent to credit bid any of the Obligations without the consent of the Requisite Lenders (which credit bid shall be made in accordance with *Section 10.11*) or authorize or consent to or accept or adopt on behalf of any Lender or any Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or any Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender or any Issuer in any such proceeding.

SECTION 11.11    Collateral and Guaranty Matters.

Each of the Lenders (including in its capacities as a potential Cash Management Bank, Bank Product Bank and/or Hedge Bank) and the Issuers irrevocably authorizes the Administrative Agent (including in its capacity as Collateral Agent) to, and the Administrative Agent agrees that it will:

(a)        release any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (x) obligations and liabilities under Secured Hedge Agreements, Cash Management Obligations and Bank Product Obligations as to which arrangements satisfactory to the applicable Hedge Bank, Cash Management Bank or Bank Product Bank, respectively, shall have been made and (y) contingent indemnification obligations not yet accrued and payable) and the expiration or termination of all Letters of Credit (other than Letters of Credit as to which other arrangements reasonably satisfactory to the Administrative Agent and each applicable Issuer shall have been made), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than Parent, Holdings, the Borrower or any of its Domestic Subsidiaries that are Guarantors, (iii) subject to *Section 12.1*, if the release of such Lien is approved, authorized or ratified in writing by the Requisite Lenders, or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below;

(b)        release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by *Section 9.1(i)*;

(c)        release any Guarantor from its obligations under the Guaranty if (i) in the case of any Subsidiary, such Person ceases to be a Restricted Subsidiary as a result of a transaction or designation permitted hereunder or (ii) in the case of Holdings, as a result of a transaction permitted hereunder;

171

*provided* that no such release shall occur if such Guarantor continues to be a guarantor in respect of the Term Facility or any Junior Financing; and

(d)      if any Guarantor shall cease to be a Material Domestic Subsidiary (as certified in writing by a Responsible Officer of the Borrower), and the Borrower notifies the Administrative Agent in writing that it wishes such Guarantor to be released from its obligations under the Guaranty and provides the Administrative Agent and the Collateral Agent such certifications or documents as either such Agent shall reasonably request, (i) release such Subsidiary from its obligations under the Guaranty and (ii) release any Liens granted by such Subsidiary or Liens on the Equity Interests of such Subsidiary; *provided* that no such release shall occur if such Subsidiary continues to be a guarantor in respect of the Term Facility or any Junior Financing.

Upon request by the Administrative Agent at any time, the Requisite Lenders will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this *Section 11.11*. In each case as specified in this *Section 11.11*, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this *Section 11.11*.

SECTION 11.12      Secured Cash Management Agreements, Secured Bank Product Agreements and Secured Hedge Agreements.

(a)      Except as otherwise expressly set forth herein or in any Guaranty or any Collateral Document, no Cash Management Bank, Bank Product Bank or Hedge Bank that obtains the benefits of *Section 10.3*, any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this *Article XI* to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements, Secured Bank Product Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank, Bank Product Bank or Hedge Bank, as the case may be.

(b)      Each Secured Party hereby agrees (i) that, after the occurrence and during the continuance of a Cash Dominion Period (and thereafter at such frequency as the Administrative Agent may reasonably request in writing),    it will provide to the Administrative Agent, promptly upon the written request of the Administrative Agent, a summary of all Obligations owing to it under this Agreement and (ii) that the benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not an Agent, a Lender or an Issuer party hereto as long as, by accepting such benefits, such Secured Party agrees, as among Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by Agent, shall confirm such agreement in a writing in form and substance reasonably acceptable to Agent) this *Article XI* and *Sections 3.1*, *Sections 12.4, 12.6, 12.19, 12.23* and *12.26* and the Intercreditor Agreement, and the decisions and actions of any Agent and the Requisite Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties

hereto as required herein) to the same extent a Lender is bound; *provided, however*, that, notwithstanding the foregoing *clause (ii)*, (x) such Secured Party shall be bound by the provisions set forth above only to the extent of liabilities, reimbursement obligations, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements with respect to or otherwise relating to the Liens and Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (y) each of the Agents, the Lenders and the Issuers party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (z) such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

SECTION 11.13   Indemnification of Agents.

Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Administrative Agent and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless the Administrative Agent and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) from and against any and all Indemnified Liabilities incurred by it; provided that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Requisite Lenders, the Requisite Revolving Credit Lenders or the FILO Documentation Agent, as applicable (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this *Section 11.13*. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this *Section 11.13* applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided further* that the failure of any Lender to indemnify or reimburse the Administrative Agent shall not relieve any other Lender of its obligation in respect thereof. The undertaking in this Section *11.13* shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent, the Swing Loan Lender or any Issuer.

SECTION 11.14   Certain ERISA Matters.

(a)   Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the

DB1/ 145587008.8145587008.11

US-DOCS\149610879.14

Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)        such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)        the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)        (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Aggregate Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Aggregate Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Aggregate Commitments and this Agreement, or

(iv)        such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)        In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Aggregate Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

SECTION 11.15    Recovery of Erroneous Payments.  Without limitation of any other provision in this Agreement, if at any time the Administrative Agent makes a payment hereunder in error to any Lender or any other Secured Party, whether or not in respect of an Obligation due and owing by the Borrower at such time, where such payment is a Rescindable Amount, then in any such event, each Secured Party receiving a Rescindable Amount severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount received by such Secured Party in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. Each Secured Party irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another) or similar defense to its obligation to return any Rescindable Amount.  The Administrative Agent shall inform each Secured Party promptly upon determining that any payment made to such Secured Party comprised, in whole or in part, a Rescindable Amount.

# ARTICLE XII

## MISCELLANEOUS

SECTION 12.1    Amendments, Etc.  Subject to *Section 3.3* and except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Requisite Lenders and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)    extend or increase the Revolving Credit Commitment of any Lender, or other commitment of any Lender to extend credit, without the written consent of each Lender directly affected thereby (it being understood that (i) a waiver of any condition precedent set forth in *Section 4.2* and (ii) the waiver of any Default, mandatory prepayment or mandatory reduction of the Revolving Credit Commitments shall not constitute an extension or increase of any Revolving Credit Commitment of any Lender);

(b)    postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under *Section 2.6* or *2.10* (or change the format of any such interest payment, including any change that would result in interest that is payable in cash being payable in-kind or for other non-cash consideration) without the written consent of each Lender directly affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans or any condition precedent set forth in *Section 4.2* shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c)    reduce the principal of, or the rate of interest specified herein on, any Loan or Letter of Credit Borrowing, or (subject to *clause (iii)* of the third proviso to this *Section 12.1*) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby (it being understood that any change to any component of "Excess Availability" shall not constitute a reduction in the rate of interest); *provided* that only the consent of (i) the Requisite Revolving Credit Lenders (and not the Requisite Lenders) shall be necessary to amend the definition of "Default Rate", or to waive any obligation of the Borrower to pay interest at the Default Rate, as it relates to the Revolving

Obligations (except that any increase in such Default Rate in excess of 2.00% shall also require the consent of the FILO Documentation Agent), and (ii) the FILO Documentation Agent (and not the Requisite Lenders) shall be necessary to amend the definition of "Default Rate", or to waive any obligation of the Borrower to pay interest at the Default Rate, as it relates to the FILO Obligations (except that any increase in such Default Rate in excess of 2.00% shall also require the consent of the Requisite Revolving Credit Lenders);

(d)        change (i) any provision of this *Section 12.1*, without the written consent of each Lender affected thereby, (ii) the definition of "Requisite Lenders", without the written consent of each Lender, (iii) the definition of "Requisite Revolving Credit Lenders" or "Supermajority Revolving Credit Lenders", without the written consent of each Revolving Credit Lender (and not the Requisite Lenders), or (iv) any other provision specifying the number of Lenders or portion of the Loans or Revolving Credit Commitments required to take any action under the Loan Documents, without the written consent of each Lender affected thereby (and not the Requisite Lenders);

(e)        other than in a transaction permitted under *Section 9.4* or *9.5*, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(f)        other than in a transaction permitted under *Section 9.4* or *9.5*, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(g)        change the definition of the term "Borrowing Base" or any component definition thereof, but excluding the definition of "Credit Card Advance Rate", "Trade Receivables Advance Rate", "Letter of Credit Advance Rate", "Inventory Advance Rate" or "In-Transit Advance Rate", in each case the amendment or modifications of which shall be subject to *clause (h)* below, if as a result thereof the amounts available to be borrowed by the Borrower would be increased, without the written consent of the Supermajority Revolving Credit Lenders (and not the Requisite Lenders), *provided* that the foregoing shall not limit the discretion of the Administrative Agent or the FILO Documentation Agent to change, establish or eliminate any Availability Reserves, Inventory Reserves, Receivables Reserves or Shrink Reserves without the consent of any Lenders;

(h)        increase the numerical percentage contained in Credit Card Advance Rate, Trade Receivables Advance Rate, Letter of Credit Advance Rate, Inventory Advance Rate or In-Transit Advance Rate without the written consent of each Lender; *provided* that the foregoing shall not limit the discretion of the Administrative Agent or the FILO Documentation Agent to change, establish or eliminate any Availability Reserves, Inventory Reserves, Receivables Reserves or Shrink Reserves without the consent of any Lenders;

(i)        except as provided by operation of applicable Law or in the Intercreditor Agreement, without the prior written consent of all Lenders directly affected thereby, (i) subordinate the Obligations hereunder to any other Indebtedness, or (ii) subordinate the Liens granted hereunder or under the other Loan Documents to any other Lien;

(j)        change the order of the application of funds specified in *Section 10.3* without the written consent of each directly affected Lender;

176

(k)      amend or waive any provision of *Section 2.8* or *Section 9.11* to permit any voluntary prepayment of the FILO Loans, or any provision of *Section 2.18*, in each case without the written consent of each Revolving Credit Lender (and not the Requisite Lenders);

(l)      amend or waive any provision of *Section 9.6* to permit the making of any Restricted Payment in cash or *Section 9.11* to permit any additional prepayment of the Term Facility, in each case as such Sections are in effect as of the Second Restatement Date, without the written consent of each Lender; or

(m)      amend or waive any provision of *Section 4.1* without the written consent of each Lender;

*provided further* that, in addition to the written consent of the Requisite Lenders, the written consent of the FILO Documentation Agent shall be required for any waiver, amendment or consent that:

(1)      except in connection with, and solely with respect to, a Conforming Post-Petition Financing, (i) except as contemplated by *Section 2.15* as of the Second Restatement Date, increases the Aggregate Commitments or (ii) adds new tranches of Indebtedness under any Loan Document that, in the case of this *clause (ii)*, are senior in right of repayment to, or *pari passu* in right of repayment with, the FILO Loans;

(2)      other than in connection with the provision of a Conforming Post-Petition Financing to implement the Insolvency Increase Amount, (i) changes the definition of "Borrowing Base" (or any component definition thereof), or increases the advance rates applied to eligible assets in the Borrowing Base, if as a result thereof the amounts available to be borrowed by the Borrower would be increased, (ii) changes the definitions of "Excess Availability", "Global Borrowing Base", "Maximum Credit", "Modified Borrowing Base" or "Modified Maximum Credit", or (iii) changes the definition of "FILO Borrowing Base" (or any component definition thereof); *provided* that the foregoing shall not limit the discretion of the Administrative Agent or the FILO Documentation Agent to change, establish or eliminate any Availability Reserves, Inventory Reserves, Receivables Reserves or Shrink Reserves without the consent of any Lenders;

(3)      (i) changes the definition of "FILO Deficiency Reserve" or ceases to deduct from the Borrowing Base (or fails to establish or maintain) the FILO Deficiency Reserve or (ii) amends, modifies or waives any of the provisions of *Section 2.19*;

(4)      amends, modifies or waives (i) any of the provisions of *Section 6.1*, *Section 6.2* or the definition of "Covenant Trigger Event" or (ii) the last paragraph of *Section 4.2*;

(5)      changes the definitions of "Protective Advances" or "Unintentional Overadvance";

(6)      (i) changes the definitions of "Carve Out", "Conforming Post-Petition Financing", "Post-Petition Financing", "Insolvency Increase Amount" or "Maximum Revolving Insolvency Amount" or (ii) changes, modifies or waives any of the provisions of *Sections 10.6* through *10.12*;

(7)      changes, modifies or waives (i) any of the provisions of *Section 7.4* or the definition of "Weekly Monitoring Event", in each case, in a manner which is more favorable to

the Loan Parties, or (ii) any of the provisions of *Section 8.12* or the definition of "Cash Dominion Period", in each case, in a manner which is more favorable to the Loan Parties;

(8)    (i) changes the definitions of "FILO Specified Event of Default" or "FILO Standstill Period" or (ii) changes, modifies or waives any of the provisions of (x) *Section 10.1* in any manner which would also constitute a waiver of any FILO Specified Event of Default or (y) *Section 10.2(b)* or *(c)*;

(9)    changes the definitions of (i) "Cash Management Agreement", "Cash Management Bank", "Cash Management Obligations", "Cash Management Reserve", "Cash Management Services" or "Secured Cash Management Agreement", (ii) "Hedge Bank", "Secured Hedge Agreement", "Swap Contract" or "Swap Obligations Reserve", (iii) "Bank Product Agreement", "Bank Product Bank", "Bank Product Reserve", "Bank Product Obligations", "Bank Products" or "Secured Bank Product Agreement", (iv) "Obligations", "Revolving Obligations", "FILO Obligations" or "Secured Obligations" or (v) "Availability Reserves", "Dilution Reserve", "Inventory Reserves", "Receivables Reserves" or "Shrink Reserves";

(10)    changes the definition of "Eligible Assignee" (or any component definition thereof), or changes, modifies or waives any of the provisions of *Section 12.2*, in a manner which would directly make assignments of the FILO Loans more restrictive or would permit the Loan Parties or their Affiliates to be Eligible Assignees;

(11)    changes, modifies or waives any of the provisions of (i) *Section 2.1(d)* or *Section 2.10* in any manner that relates to the FILO Obligations or (ii) *Section 9.11* in any manner that would further restrict prepayment of the FILO Loans; or

(12)    changes, modifies or waives any of the provisions of the Intercreditor Agreement in a manner that is adverse to the FILO Lenders as a Class (but not, for the avoidance of doubt, any amendment that treats the FILO Lenders in the same manner as the Revolving Credit Lenders); *provided*, the Borrower shall provide at least two (2) Business Days' (or such shorter time as agreed by the FILO Documentation Agent) advance notice to the FILO Documentation Agent of proposed changes, modifications and waivers of any of the provisions of the Intercreditor Agreement;

and *provided further* that (i) no amendment, waiver or consent shall, unless in writing and signed by each Issuer in addition to the Lenders required above, affect the rights or duties of an Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Swing Loan Lender in addition to the Lenders required above, affect the rights or duties of the Swing Loan Lender under this Agreement; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (iv) *Section 12.2(g)* may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (v) the consent of Requisite Revolving Credit Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of the Lenders under such Revolving Facility in respect of payments hereunder in a manner different than such amendment affects other Revolving Loan; (vi) no amendment, waiver or consent shall, unless in writing and signed by the FILO Documentation Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the FILO Documentation Agent under this Agreement or any other Loan Document; and (vii) the Fee Letter and the FILO Fee Letter, respectively, may be amended, or rights or privileges

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

thereunder waived, in a writing executed by only the respective parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Revolving Credit Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding anything to the contrary contained in *Section 12.1*, guarantees, collateral security documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement or any other Loan Document, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Requisite Lenders, the Borrower may replace such non-consenting Lender in accordance with *Section 3.7*; *provided* that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

No Lender or Issuer consent is required to effect any amendment or supplement to any Intercreditor Agreement or any other intercreditor agreement that is for the purpose of adding the holders of Permitted Pari Passu Secured Debt (as defined in any of the Term Facility Documentation) (or a debt representative with respect to any Indebtedness with respect to which it is a representative or agent) as parties thereto, as expressly contemplated by the terms of such intercreditor agreement (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing).

Notwithstanding this *Section 12.1* or anything else to the contrary in this Agreement or any other Loan Document, each FILO Secured Party agrees that it will not raise any objection to, or oppose, and shall be deemed to have consented to, the release of any Loan Party from its obligations under any Loan Document or to any private or public sale or other disposition of all or any portion of the Collateral (and any post-petition or post-filing assets subject to adequate protection Liens or comparable Liens under any applicable Law in favor of the Administrative Agent) free and clear of any Liens and other claims (a) at any time after the occurrence and during the continuance of an Event of Default under this Agreement if the Administrative Agent has consented to such release or such sale or other disposition; *provided*, *however*, that after the occurrence and during the continuance of an Event of Default under this Agreement and prior to the commencement of any Insolvency Proceeding with respect to any Loan Party, any such release and/or any such sale or other disposition by the Administrative Agent shall be made in accordance with applicable Law and the Administrative Agent shall provide not less than five (5) Business Days' prior written notice to the FILO Documentation Agent of any proposed release and/or sale or other disposition, or (b) under Section 363 of the Bankruptcy Code (or other similar provision of any applicable Law), in each case under the foregoing *clauses (a)* and *(b)*, if the Administrative Agent has consented to such release any/or such sale or other disposition, and in

connection with each of the foregoing *clauses (a)* and *(b)*, each FILO Secured Party shall be deemed to have consented to such release any/or such sale or other disposition and hereby irrevocably authorizes the Administrative Agent to release any Lien on any of the Collateral in connection therewith; *provided* that any Lien of the Administrative Agent on such Collateral attaches to the net proceeds of such release and/or such sale or other disposition of the Collateral received by the Administrative Agent and that all proceeds of the Collateral received by the Administrative Agent from such release and/or such sale or other disposition are, after application to any Conforming Post-Petition Financing, applied in accordance with *Section 10.3*.

SECTION 12.2    Successors and Assigns.

(a)    *Successors and Assigns Generally*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Parent, Holdings nor the Borrower may, except as permitted by *Section 9.4*, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of *subsection (b)* of this Section, (ii) by way of participation in accordance with the provisions of *subsection (d)* of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of *subsection (f)* of this Section, or (iv) to an SPC in accordance with the provisions of *subsection (g)* of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in *subsection (d)* of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuers and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    *Assignments by Lenders*.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Credit Commitment and the Loans (including for purposes of this subsection (b), participations in Letter of Credit Obligations and in Swing Loans) at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    *Minimum Amounts*.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Credit Commitment and the Loans of any Class at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in *subsection (b)(i)(A)* of this Section, the aggregate amount of the Revolving Credit Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Revolving Credit Commitment is not then in effect (or with respect to FILO Loans), the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless each of the Administrative Agent and, so long as no Event of Default under *Section 10.1(a)* or *(f)*, solely with respect to the Borrower, has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided*, *however*, that

concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)     *Proportionate Amounts*.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Revolving Credit Commitment assigned, except that this *clause (ii)* shall not apply to rights in respect of the Swing Loan Lender's rights and obligations in respect of Swing Loans;

(iii)     *Required Consents*.  No consent shall be required for any assignment except to the extent required by *subsection (b)(i)(B)* of this Section and, in addition:

(A)     the consent of the Borrower (such consent not to be unreasonably withheld) shall be required unless (1) an Event of Default under *Section 10.1(a)* or, solely with respect to the Borrower, *Section 10.1(f)*, has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund;

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender;

(C)     the consent of the Issuers (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding); and

(D)     the consent of the Swing Loan Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment;

(iv)     *Assignment and Assumption*.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided*, *however*, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The Eligible Assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.  All assignments shall be by novation.

(v)     *No Assignment to Certain Persons*.  No such assignment shall be made (A) to Parent, Holdings, the Borrower or any of the Borrower's Affiliates or Subsidiaries (including any Permitted Holder), or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this *clause (B)*, (C) to a natural person or an investment vehicle of a natural person, or (D) any Disqualified Institution to the extent that the list of Disqualified Institutions has been provided to all Public Lenders on the Platform.

(vi)     *Certain Additional Payments*.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swing Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to *clause (c)* of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of *Sections 3.1*, *3.4*, *3.5*, *12.3*, *12.4* and *12.5* with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Revolving Credit Note or FILO Note, as applicable, the Borrower (at its expense) shall execute and deliver a Revolving Credit Note or FILO Note, as applicable, to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with *subsection (d)* of this Section.

(c)     *Register*.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Credit Commitments of, and principal amounts (and related interest amounts) of the Loans and Letter of Credit Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  This *Section 12.2(c)* and *Section 2.7* shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code

or of such Treasury regulations, and including Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations and, in each case, any amended or successor versions).

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or an investment vehicle of a natural person), any Disqualified Institution to the extent that the list of Disqualified Institutions has been provided to all Public Lenders on the Platform, a Defaulting Lender or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "*Participant*") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Credit Commitment and/or the Loans (including such Lender's participations in Letter of Credit Obligations and/or Swing Loans) owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents, the other Lenders and the Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to *Section 12.1* (other than *clause (d)* thereof) that directly affects such Participant. Subject to *subsection (e)* of this Section, the Borrower agrees that each Participant shall be entitled (through the applicable Lender) to the benefits of *Sections 3.1, 3.4 and 3.5* (subject to the requirements and limitations of such Sections (including the limitation in the definition of "Excluded Taxes"), and *Sections 3.6(a) and 3.7*, as if the Participant were a Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to *subsection (b)* of this Section. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of *Section 12.6* as though it were a Lender, *provided* such Participant agrees to be subject to *Section 12.7* as though it were a Lender.

(e)     *Limitations upon Participant Rights*. A Participant shall not be entitled to receive any greater payment under *Section 3.1*, *3.4* or *3.5* than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant shall not be entitled to the benefits of *Section 3.1* unless the Borrower is notified of the participation sold to such Participant, the applicable Lender (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintains a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder relating to the exemption from withholding for portfolio interest on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "*Participant Register*") and such Participant agrees, for the benefit of the Borrower, to comply and does in fact comply with *Section 3.1* as though it were a Lender. No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury regulations (or, in each case, any amended or successor versions). Unless otherwise required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS. The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant

Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)     Any Lender may, at any time, pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Revolving Credit Note or FILO Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "*Granting Lender*") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "*SPC*") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Administrative Agent as is required under *Section 2.13(e)*.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under *Sections 3.1, 3.4* and *3.5*, but such obligations under *Section 3.1* as to an SPC will only exist if the SPC satisfies the requirements of *Section 3.1* as if it were a Lender), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Revolving Credit Loan by an SPC hereunder shall utilize the Revolving Credit Commitment of the Granting Lender to the same extent, and as if, such Revolving Credit Loan were made by such Granting Lender.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(h)     *Resignation as Issuer or Swing Loan Lender after Assignment*.  Notwithstanding anything to the contrary contained herein, if at any time Bank of America or any other Issuer assigns all of its Revolving Credit Commitment and Revolving Loans pursuant to *subsection (b)* above, Bank of America or the applicable Issuer may, (i) upon thirty (30) days' notice to the Borrower and the Lenders, resign as Issuer and/or (ii) if applicable, upon thirty (30) days' notice to the Borrower, resign as Swing Loan Lender.  In the event of any such resignation as Issuer or Swing Loan Lender, the Borrower shall be entitled to appoint from among the Lenders a successor Issuer or Swing Loan Lender hereunder; *provided*, *however*, that no failure by the Borrower to appoint any such successor shall affect the resignation of Bank of America or the applicable Issuer as Issuer or (as applicable) Swing Loan Lender, as the case may be.  If Bank of America or the applicable Issuer resigns as Issuer, it shall retain all the rights, powers, privileges and duties of an Issuer hereunder with respect to all Letters of Credit

184

outstanding as of the effective date of its resignation as Issuer and all Letter of Credit Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in unreimbursed amounts under Letters of Credit pursuant to *Section 2.4*).  If Bank of America resigns as Swing Loan Lender, it shall retain all the rights of the Swing Loan Lender provided for hereunder with respect to Swing Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Loans pursuant to *Section 2.3*.  Upon the appointment of a successor Issuer and/or Swing Loan Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuer or Swing Loan Lender, as the case may be, and (b) the successor Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America or the applicable Issuer to effectively assume the obligations of Bank of America or the applicable Issuer with respect to such Letters of Credit.

(i)     Notwithstanding the foregoing, no Disqualified Institution that purports to become a Lender hereunder (notwithstanding the provisions of this Agreement that prohibit Disqualified Institutions from becoming Lenders) shall be entitled to any of the rights or privileges enjoyed by the other Lenders with respect to voting, information, and lender meetings. In addition, if any assignment or participation is made to any Disqualified Institution without the Borrower's express prior written consent (which consent shall state expressly that the Borrower acknowledges that the assignee Lender is a Disqualified Institution) in violation of clause (v) of *Section 12.2(b)*, the Borrower may, in addition to any other rights and remedies that it may have against such Disqualified Institution, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) in the case of outstanding Loans held by Disqualified Institutions, purchase or prepay such Loan by paying the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such Loans, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and/or (B) require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in *Section 12.2*), all of its interest, rights and obligations under this Agreement to one or more Eligible Assignees at the lesser of (x) the principal amount thereof and (y) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder.

Notwithstanding anything herein to the contrary, the provisions of this *Section 12.2* shall not apply retroactively to disqualify any person that has previously acquired an assignment or interest in any of the Loans with respect to amounts previously acquired to the extent such party was not a Disqualified Institution at the time of the applicable assignment but for only so long as such person continues to hold such Loans.

SECTION 12.3     Costs and Expenses.

The Borrower agrees (a) to pay or reimburse the Administrative Agent, the FILO Documentation Agent and the Arrangers for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, and in the case of legal fees and expenses, limited to (i) all Attorney Costs of Morgan, Lewis & Bockius LLP (as counsel to the Administrative Agent), (ii) all Attorney Costs of Choate, Hall & Stewart LLP (as counsel to the FILO Documentation Agent), (iii) the Attorney Costs of Proskauer Rose LLP (as counsel to Centerbridge Credit CS, L.P.) in connection with the preparation, negotiation and execution of

185

this Agreement, and, (iv) if reasonably necessary, all Attorney Costs of one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole, and (b) to pay or reimburse the Administrative Agent, the Issuers and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and in the case of legal fees and expenses, limited to all Attorney Costs of one counsel to the Administrative Agent, the Issuers and the Lenders taken as a whole and all Attorney Costs of one counsel to the FILO Secured Parties taken as a whole selected by the FILO Documentation Agent (and if reasonably necessary (x) one local counsel in any relevant material jurisdiction and (y) in the event of any conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole of the affected parties (including, during the continuance of an Event of Default and after working in good faith to use one counsel, if reasonably necessary in the event of any conflict of interest between the FILO Documentation Agent and any FILO Secured Parties, one additional counsel in each relevant jurisdiction to each group of affected FILO Secured Parties similarly situated taken as a whole of such affected parties; *provided* that no amounts received on account of the Obligations shall be applied, pursuant to *Section 10.3* or otherwise, to pay such additional legal fees and expenses of counsel to such affected FILO Secured Parties under this *clause (y)* until all other FILO Obligations have been paid in full))).  The agreements in this *Section 12.3* shall survive the termination of the Aggregate Commitments and repayment of all other Obligations.  All amounts due under this *Section 12.3* shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail and such supporting material as the Borrower may reasonably request.  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

SECTION 12.4    Indemnities.

The Borrower shall indemnify and hold harmless the Agents, each Lender, each Issuer, the Arrangers and their respective Affiliates, directors, officers, employees, agents, partners, trustees or advisors and other representatives (collectively the "*Indemnitees*") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interest of the Lenders, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Revolving Credit Commitment, Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by an Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), or (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liabilities arising out of the activities or operations of the Borrower, any Subsidiary or any other Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or

threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "*Indemnified Liabilities*"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee or agent of such Indemnitee, (y) a material breach of any obligations under any Loan Document by such Indemnitee or of any Related Indemnified Person, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under the Revolving Facility or the FILO Facility and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates.  To the extent that the undertakings to indemnify and hold harmless set forth in this *Section 12.4* may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Effective Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party).  In the case of an investigation, litigation or other proceeding to which the indemnity in this *Section 12.4* applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated.  All amounts due under this *Section 12.4* shall be paid within twenty (20) Business Days after written demand therefor.  The agreements in this *Section 12.4* shall survive the resignation of the Administrative Agent, the Collateral Agent, the Swing Loan Lender or any Issuer, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.  This *Section 12.4* and *Section 12.3* shall not apply to Taxes, which shall be governed by *Section 3.1* and *Section 3.4*.

SECTION 12.5    Limitation of Liability.

The Loan Parties agree that no Indemnitee shall have any liability (whether in contract, tort or otherwise) to any Loan Party or any of their respective Subsidiaries or any of their respective equity holders or creditors for or in connection with the transactions contemplated hereby and in the other Loan Documents, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnitee's gross negligence or willful misconduct or bad faith or breach by such Indemnitee of its material obligations under this Agreement.  In no event, shall any party hereto or any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings).  Each party hereto hereby waives, releases and agrees (each for itself and on behalf of its Subsidiaries) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

SECTION 12.6    Right of Set-off.

If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent

of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such other Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of *Section 2.16* and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 12.7    Sharing of Payments.

If, other than as expressly provided elsewhere herein, any Lender shall obtain payment in respect of any principal of or interest on account of the Loans made by it, or the participations in Letter of Credit Obligations and Swing Loans held by it (in each case, whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them and/or such subparticipations in the participations in Letter of Credit Obligations or Swing Loans held by them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment of principal of or interest on such Loans or such participations, as the case may be, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in *Section 12.14* (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  The provisions of this Section shall not be construed to apply to the application of Cash Collateral provided for in *Sections 10.3* and *10.5*.  For avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of set-off, but subject to *Section 12.6*) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this *Section 12.7* and will in each case notify the Lenders following any such purchases or repayments.  Each

Lender that purchases a participation pursuant to this *Section 12.7* shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

SECTION 12.8    Notices and Other Communications; Facsimile Copies.

(a)    *General*.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in *subsection (b)* below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to Parent, Holdings, the Borrower, the Administrative Agent, the FILO Documentation Agent, an Issuer or the Swing Loan Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on *Schedule 12.8*; and

(ii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in *subsection (b)* below shall be effective as provided in such *subsection (b)*.

(b)    *Electronic Communications*.  Notices and other communications to the Lenders and the Issuers hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender or Issuer pursuant to *Article II* if such Lender or Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(c)    *Receipt*.  Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing *clause (i)* of notification that such notice or communication is available and identifying the website address therefor.

(d)    *The Platform*.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Agent-Related Persons or any Arranger (collectively, the "*Agent Parties*") have any liability to Parent, Holdings, the Borrower, any Lender, any Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to Parent, Holdings, the Borrower, any Lender, any Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)    *Change of Address*.  Each of Parent, Holdings, the Borrower, the Administrative Agent, the FILO Documentation Agent, each Issuer and the Swing Loan Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent, each Issuer and the Swing Loan Lender.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(f)    *Reliance by Administrative Agent, FILO Documentation Agent, Issuers and Lenders*.  The Administrative Agent, the FILO Documentation Agent, the Issuers and the Lenders shall be entitled to rely and act upon any notices (including telephonic Notices of Borrowing or Swing Loan Requests) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, the FILO Documentation Agent, each Issuer, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

SECTION 12.9      No Waiver; Cumulative Remedies.

No failure by any Lender, the Administrative Agent or the FILO Documentation Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

SECTION 12.10      [Reserved].

SECTION 12.11      Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower, Parent, Holdings and the Administrative Agent and the Administrative Agent shall have been notified by each Lender, Swing Loan Lender and each Issuer that each such Lender, Swing Loan Lender and Issuer has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, Parent, Holdings, each Agent and each Lender and their respective successors and assigns.

SECTION 12.12      Governing Law; Submission to Jurisdiction; Service of Process.

(a)      THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)      THE BORROWER, PARENT, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO AGREES THAT THE ADMINISTRATIVE AGENT AND THE LENDERS (BUT NOT THE BORROWER, PARENT OR HOLDINGS) RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST THE BORROWER, PARENT OR HOLDINGS IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY LOAN DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)      THE BORROWER, PARENT, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT

IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN *SECTION 12.8*.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

SECTION 12.13    Waiver of Jury Trial.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 12.14    Marshaling; Payments Set Aside.

None of the Administrative Agent, the FILO Documentation Agent, any Lender or any Issuer shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

SECTION 12.15    Execution in Counterparts.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in *Sections 4.1* and *4.3*, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that,

when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 12.16    <u>Electronic Execution of Assignments and Certain Other Documents</u>.

The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other modifications, Notice of Borrowing, Swing Loan Request, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided* that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

This Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement (each a "*Communication*"), including Communications required to be in writing, may, if agreed by the Administrative Agent, be in the form of an Electronic Record and may be executed using Electronic Signatures, including, without limitation, facsimile and/or .pdf.  The Loan Parties agree that any Electronic Signature (including, without limitation, facsimile or .pdf) on or associated with any Communication shall be valid and binding on the Loan Parties to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of the Loan Parties enforceable against the Loan Parties in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered to the Administrative Agent.  Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Administrative Agent of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention.  The Administrative Agent and each Lender may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("*Electronic Copy*"), which shall be deemed created in the ordinary course of the Administrative Agent's business, and destroy the original paper document.  All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record.  Notwithstanding anything contained herein to the contrary, the Administrative Agent is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it; *provided*, further, without limiting the foregoing, (a) to the extent the Administrative Agent has agreed to accept such Electronic Signature, each Secured Party shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification and (b) upon the request of the Administrative Agent any Electronic Signature shall be promptly followed by a manually executed,

193

original counterpart.  For purposes hereof, "Electronic Record" and "Electronic Signature" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

SECTION 12.17    Confidentiality.

Each of the Administrative Agent, the FILO Documentation Agent, the Lenders and the Issuers agrees to maintain the confidentiality of the Information in accordance with its customary procedures (set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); *provided* that the Administrative Agent, the FILO Documentation Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable prior to any such disclosure by such Person unless such notification is prohibited by applicable Laws, or except in connection with any request as part of a regulatory examination, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, *provided* that the Administrative Agent, the FILO Documentation Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of such disclosure unless such notification is prohibited by law, rule or regulation or except in connection with any request as part of a regulatory examination, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this *Section 12.17*, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee invited to be an Additional Lender (other than to a Disqualified Institution; *provided* that the list of Disqualified Institutions may be provided) or (ii) any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower; (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from the Administrative Agent, the FILO Documentation Agent or such Lender); or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, the FILO Documentation Agent, any Issuer, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than Parent, Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent or Lender to be subject to a confidentiality restriction in respect thereof in favor of the Borrower or any Affiliate of the Borrower.

For purposes of this Section, "*Information*" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent, the FILO Documentation Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof, it being understood that all information received from Parent, Holdings, the Borrower or any Subsidiary after the Second Restatement Date, shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

DB1/ 145587008.8145587008.11

US-DOCS\149610879.14

Each of the Administrative Agent, the FILO Documentation Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

SECTION 12.18    Use of Name, Logo, etc.

Each Loan Party consents to the publication in the ordinary course by Administrative Agent, the FILO Documentation Agent or the Arrangers of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark.  Such consent shall remain effective until revoked by such Loan Party in writing to the Administrative Agent, the FILO Documentation Agent and the Arrangers. The Administrative Agent, the FILO Documentation Agent and the Arrangers reserve the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

SECTION 12.19    USA PATRIOT Act Notice; Foreign Asset Control Regulations.

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

Neither the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "*Foreign Assets Control Regulations*") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "*Executive Order*")) or the USA PATRIOT Act.  Furthermore, none of the Loan Parties or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

SECTION 12.20    No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower, Parent and Holdings acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents and the Arrangers are arm's-length commercial transactions between the Borrower, Parent, Holdings and their respective Affiliates, on the one hand, and the Agents and the Arrangers, on the other

hand, (B) each of the Borrower, Parent and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower, Parent and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Agents, the Arrangers and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Parent, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents, the Arrangers nor any Lender has any obligation to the Borrower, Parent, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Arrangers, the Lender and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Parent, Holdings their respective Affiliates, and none of the Agents, the Arrangers nor any Lender has any obligation to disclose any of such interests to the Borrower, Parent, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrower, Parent and Holdings hereby waives and releases any claims that it may have against the Agents, the Arrangers nor any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 12.21    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this *Section 12.21*, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, the applicable Issuer or the Swing Loan Lender, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

SECTION 12.22    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent, the FILO Documentation Agent, each Issuer and each Lender, regardless of any investigation made by the Administrative Agent, the FILO Documentation Agent, any Issuer or any Lender or on their behalf and notwithstanding that the Administrative Agent, the FILO Documentation Agent, any Issuer or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

SECTION 12.23    Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of set-off, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent (which shall not be withheld in contravention of *Section 11.4*).  The provision of this *Section 12.23* are for

the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 12.24    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "*Maximum Rate*").  If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 12.25    Time of the Essence.

Time is of the essence in the Loan Documents.

SECTION 12.26    No Strict Construction.

The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

SECTION 12.27    Intercreditor Agreement.

Each of Parent, Holdings, the Borrower, the Agents, the Issuers and the Lenders acknowledge that the exercise of certain of the Administrative Agents' rights and remedies hereunder may be subject to, and restricted by, the provisions of the Intercreditor Agreement.  Except as specified herein, nothing contained in the Intercreditor Agreement shall be deemed to modify any of the provisions of this Agreement and the other Loan Documents, which, as among the Loan Parties, the Agents, the Issuers and the Lenders shall remain in full force and effect. In the event of any inconsistency between the provisions of this Agreement or any other Loan Document and the Intercreditor Agreement, the provisions of the Intercreditor Agreement shall govern and control.

SECTION 12.28    Keepwell.

Each Loan Party that is a Qualified ECP Guarantor at the time the Guaranty or the grant of a security interest under the Loan Documents, in each case, by any Specified Loan Party becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under the Guaranty voidable under applicable Laws relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this *Section 12.28* shall remain in full force and

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

effect until the Obligations have been indefeasibly paid and performed in full. Each Loan Party intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

SECTION 12.29    Acknowledgment and Consent to Bail-In of Affected Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties, each party hereto (including each Secured Party) acknowledges that, with respect to any Secured Party that is an Affected Financial Institution, any liability of such Secured Party arising under a Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority, and each party hereto agrees and consents to, and acknowledges and agrees to be bound by,

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liability which may be payable to it by such Secured Party; and

(b)    the effects of any Bail-in Action on any such liability, including (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under any Loan Document; or (iii) the variation of the terms of such liability in connection with the exercise of any Write-Down and Conversion Powers.

SECTION 12.30    Acknowledgement Regarding Any Supported QFCs.

To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "*QFC Credit Support*", and each such QFC, a "*Supported QFC*"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "*U.S. Special Resolution Regimes*") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "*Covered Party*") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

DB1/ ~~145587008.8~~145587008.11

US-DOCS\149610879.14

Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

SECTION 12.31     Limited Waiver; Amendment and Restatement.

(a)     The filing of the Chapter 11 Cases on the Petition Date constitutes an Event of Default pursuant to *Section 10.1(f)* of the Existing Credit Agreement (the "*Specified Insolvency Event of Default*").  Subject to the terms and conditions herein contained and in reliance upon the representations and warranties of the Loan Parties herein contained, effective upon the Second Restatement Date, the Administrative Agent, the FILO Documentation Agent and the Lenders hereby waive for any and all purposes of the Existing Credit Agreement and the other Loan Documents, the Specified Insolvency Event of Default. Other than the limited waiver set forth in the preceding sentence, nothing contained in this Agreement shall be construed as a waiver by the Administrative Agent, the FILO Documentation Agent or any Lender of any covenant or provision of the Existing Credit Agreement, the other Loan Documents, this Agreement, or of any other contract or instrument between Loan Parties and Administrative Agent, the FILO Documentation Agent or any Lender, and the failure of the Administrative Agent, the FILO Documentation Agent or any Lender at any time or times hereafter to require strict performance by the Loan Parties of any provision thereof shall not waive, affect or diminish any right of the Administrative Agent, the FILO Documentation Agent or the Lenders to thereafter demand strict compliance therewith.  Other than with respect to the limited waiver set forth above, the Administrative Agent, the FILO Documentation Agent and each Lender hereby reserves all rights granted under the Existing Credit Agreement, the other Loan Documents, this Agreement and any other contract or instrument between any of them. The foregoing limited waiver shall be effective only in this specific instance and for the specific purpose for which it is given, and shall not entitle the Loan Parties to any other or further waiver in any similar or other circumstances.

(b)     This Agreement is an amendment and restatement of the Existing Credit Agreement, it being acknowledged and agreed that as of the Second Restatement Date all obligations outstanding under or in connection with the Existing Credit Agreement and any of the other Loan Documents (such obligations, collectively, the "*Existing Obligations*") constitute obligations under this Agreement.  This Agreement is in no way intended to constitute a novation of the Existing Credit Agreement or the Existing Obligations.  With respect to (i) any date or time period occurring and ending prior to the Second Restatement Date, the Existing Credit Agreement and the other Loan Documents shall govern the respective rights and obligations of any party or parties hereto also party thereto and shall for such purposes remain in full force and effect; and (ii) any date or time period occurring or ending on or after the Second Restatement Date, the rights and obligations of the parties hereto shall be governed by this Agreement (including, without limitation, the exhibits and schedules hereto) and the other Loan Documents.  From and after the Second Restatement Date, any reference to the Existing Credit Agreement in any of the other Loan Documents executed or issued by and/or delivered to any one or more parties hereto pursuant to or in connection therewith shall be deemed to be a reference to this Agreement, and the provisions of this Agreement shall prevail in the event of any conflict or inconsistency between such provisions and those of the Existing Credit Agreement.


**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

199

**THIS DRAFT OF THE CREDIT AGREEMENT REMAINS SUBJECT TO CONTINUING NEGOTIATIONS WITH ALL PARTIES IN INTEREST AND THE FINAL VERSION MAY CONTAIN MATERIAL DIFFERENCES. FOR THE AVOIDANCE OF DOUBT, NO PARTY HAS CONSENTED TO THIS VERSION AS THE FINAL FORM, AND ALL PARTIES RESERVE THEIR RESPECTIVE RIGHTS WITH RESPECT TO THIS DOCUMENT AND ANY RELATED DOCUMENTS**

**GD Draft 4/19/24**

CREDIT AGREEMENT

Dated as of April [  ], 2024
among

NEEDLE HOLDINGS LLC,
as the Borrower,

[NEWCO]JOANN HOLDINGS 2, LLC,
as Holdings,

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent,

and

THE OTHER LENDERS PARTY HERETO
_____

Table of Contents

Page

ARTICLE I

Definitions and Accounting Terms

SECTION 1.01    Defined Terms ................................................................. 1
SECTION 1.02    Other Interpretive Provisions ........................................ 4544
SECTION 1.03    Accounting Terms ........................................................... 45
SECTION 1.04    Rounding ......................................................................... 45
SECTION 1.05    References to Agreements, Laws, Etc. .......................... 45
SECTION 1.06    Times of Day ................................................................... 4645
SECTION 1.07    Available Amount Transactions ..................................... 4645
SECTION 1.08    Pro Forma Calculations ................................................. 4645
SECTION 1.09    Currency Equivalents Generally .................................... 4746
SECTION 1.10    Limited Condition Acquisitions ..................................... 47
SECTION 1.11    Divisions ......................................................................... 4847

ARTICLE II

The Commitments and Borrowings

SECTION 2.01    The Loans ....................................................................... 48
SECTION 2.02    Borrowings, Conversions and Continuations of Loans ... 48
SECTION 2.03    Prepayments ................................................................... 50
SECTION 2.04    Termination or Reduction of Commitments .................. 53
SECTION 2.05    Repayment of Loans ...................................................... 53
SECTION 2.06    Interest ........................................................................... 5453
SECTION 2.07    Fees ................................................................................. 54
SECTION 2.08    Computation of Interest and Fees ................................. 54
SECTION 2.09    Evidence of Indebtedness ............................................. 54
SECTION 2.10    Payments Generally; Administrative Agent's Clawback ... 5554
SECTION 2.11    Sharing of Payments ...................................................... 56
SECTION 2.12    Incremental Borrowings ................................................ 5756
SECTION 2.13    Refinancing Amendments .............................................. 58
SECTION 2.14    Extensions of Loans ....................................................... 59
SECTION 2.15    [Loan Repricing Amendment ........................................ 60

ARTICLE III

Taxes, Increased Costs Protection and Illegality

SECTION 3.01    Taxes ............................................................................... 60
SECTION 3.02    Illegality .......................................................................... 63
SECTION 3.03    Inability to Determine Rates .......................................... 63
SECTION 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Term
                SOFR Loans ..................................................................... 66
SECTION 3.05    Funding Losses ............................................................... 67
SECTION 3.06    Matters Applicable to All Requests for Compensation ... 67
SECTION 3.07    Replacement of Lenders under Certain Circumstances ... 6867
SECTION 3.08    Survival ........................................................................... 68

US-DOCS\150029138.4149885390.12

Page

ARTICLE IV

Conditions Precedent to Borrowing

SECTION 4.01    Conditions to the Closing Date .......................................................... 6968
SECTION 4.02    Conditions to All Borrowings After the Closing Date ....................... 70

ARTICLE V

Representations and Warranties

SECTION 5.01    Existence, Qualification and Power; Compliance with Laws .............. 71
SECTION 5.02    Authorization; No Contravention ...................................................... 71
SECTION 5.03    Governmental Authorization ............................................................ 71
SECTION 5.04    Binding Effect .................................................................................. 71
SECTION 5.05    Financial Statements; No Material Adverse Effect ........................... 7271
SECTION 5.06    Litigation ......................................................................................... 72
SECTION 5.07    Labor Matters .................................................................................. 72
SECTION 5.08    Ownership of Property; Liens ........................................................... 72
SECTION 5.09    Environmental Matters ..................................................................... 72
SECTION 5.10    Taxes ................................................................................................ 72
SECTION 5.11    ERISA Compliance ........................................................................... 73
SECTION 5.12    Subsidiaries ...................................................................................... 73
SECTION 5.13    Margin Regulations; Investment Company Act ................................. 73
SECTION 5.14    Disclosure ........................................................................................ 7473
SECTION 5.15    Intellectual Property; Licenses, Etc. ................................................. 74
SECTION 5.16    Solvency ........................................................................................... 74
SECTION 5.17    OFAC ............................................................................................... 74
SECTION 5.18    USA PATRIOT Act .......................................................................... 74
SECTION 5.19    Collateral Documents ....................................................................... 74
SECTION 5.20    Anti-Corruption Laws ...................................................................... 74
SECTION 5.21    Affected Financial Institution .......................................................... 7574

ARTICLE VI

Affirmative Covenants

SECTION 6.01    Financial Statements ........................................................................ 75
SECTION 6.02    Certificates; Other Information ......................................................... 76
SECTION 6.03    Notices ............................................................................................. 77
SECTION 6.04    Payment of Taxes ............................................................................ 77
SECTION 6.05    Preservation of Existence, Etc. ......................................................... 78
SECTION 6.06    Maintenance of Properties ............................................................... 78
SECTION 6.07    Maintenance of Insurance ................................................................ 78
SECTION 6.08    Compliance with Laws ..................................................................... 78
SECTION 6.09    Books and Records ........................................................................... 78
SECTION 6.10    Inspection Rights ............................................................................. 78
SECTION 6.11    Covenant to Guarantee Obligations and Give Security ..................... 79
SECTION 6.12    Compliance with Environmental Laws .............................................. 80
SECTION 6.13    Further Assurances and Post-Closing Conditions ............................. 8180
SECTION 6.14    Designation of Subsidiaries .............................................................. 82
SECTION 6.15    Maintenance of Ratings .................................................................... 82
SECTION 6.16    Cash Flow Forecast .......................................................................... 82

Page

ARTICLE VII

Negative Covenants

SECTION 7.01      Liens .................................................................................................... ~~83~~82
SECTION 7.02      Investments ........................................................................................... 86
SECTION 7.03      Indebtedness .......................................................................................... 88
SECTION 7.04      Fundamental Changes ........................................................................... 91
SECTION 7.05      Dispositions ........................................................................................... 92
SECTION 7.06      Restricted Payments .............................................................................. 94
SECTION 7.07      Change in Nature of Business ................................................................ 96
SECTION 7.08      Transactions with Affiliates ................................................................... 96
SECTION 7.09      Burdensome Agreements ....................................................................... 98
SECTION 7.10      Use of Proceeds ..................................................................................... 99
SECTION 7.11      Accounting Changes .............................................................................. 99
SECTION 7.12      Prepayments, Etc. of Indebtedness ........................................................ 99
SECTION 7.13      Holdings ................................................................................................ ~~99~~100

ARTICLE VIII

Events of Default and Remedies

SECTION 8.01      Events of Default ................................................................................... 100
SECTION 8.02      Remedies upon Event of Default ........................................................... 102
SECTION 8.03      Application of Funds .............................................................................. ~~102~~103

ARTICLE IX

Administrative Agent and Other Agents

SECTION 9.01      Appointment and Authorization of the Administrative Agent .............. 103
SECTION 9.02      Rights as a Lender .................................................................................. 104
SECTION 9.03      Exculpatory Provisions .......................................................................... 104
SECTION 9.04      Reliance by the Administrative Agent .................................................... ~~105~~106
SECTION 9.05      Delegation of Duties ............................................................................... 106
SECTION 9.06      Non-Reliance on Administrative Agent and Other Lenders; Disclosure of
                        Information by Agents ............................................................................ 106
SECTION 9.07      Indemnification of Agents ...................................................................... ~~106~~107
SECTION 9.08      No Other Duties; Other Agents, Etc. ..................................................... 107
SECTION 9.09      Resignation of Administrative Agent ..................................................... 107
SECTION 9.10      Administrative Agent May File Proofs of Claim .................................... 108
SECTION 9.11      Collateral and Guaranty Matters ........................................................... 109
SECTION 9.12      Appointment of Supplemental Administrative Agents ........................... 110
SECTION 9.13      Intercreditor Agreements ....................................................................... 111
SECTION 9.14      Secured Cash Management Agreements and Secured Hedge Agreements ... 111
SECTION 9.15      Withholding Taxes ................................................................................. 111
SECTION 9.16      Erroneous Payments. .............................................................................. ~~111~~112

ARTICLE X

Miscellaneous

SECTION 10.01     Amendments, Etc. ................................................................................. 113
SECTION 10.02     Notices and Other Communications; Facsimile Copies .......................... ~~115~~116

-iii-

Page

SECTION 10.03  No Waiver; Cumulative Remedies ........................................................ 117
SECTION 10.04  Attorney Costs and Expenses ............................................................. 117
SECTION 10.05  Indemnification by the Borrower ........................................................ 117118
SECTION 10.06  Marshaling; Payments Set Aside ....................................................... 118119
SECTION 10.07  Successors and Assigns .................................................................... 118119
SECTION 10.08  Confidentiality ................................................................................ 121122
SECTION 10.09  Setoff ............................................................................................ 122123
SECTION 10.10  Interest Rate Limitation .................................................................... 122123
SECTION 10.11  Counterparts; Integration; Effectiveness ............................................ 123
SECTION 10.12  Electronic Execution of Assignments and Certain Other Documents ...... 123124
SECTION 10.13  Survival of Representations and Warranties ......................................... 123124
SECTION 10.14  Severability ...................................................................................... 123124
SECTION 10.15  GOVERNING LAW ............................................................................. 124
SECTION 10.16  WAIVER OF RIGHT TO TRIAL BY JURY ............................................. 124125
SECTION 10.17  Binding Effect .................................................................................. 124125
SECTION 10.18  Lender Action .................................................................................. 125
SECTION 10.19  Use of Name, Logo, etc. .................................................................. 125
SECTION 10.20  USA PATRIOT Act ............................................................................ 125
SECTION 10.21  Service of Process ............................................................................ 125126
SECTION 10.22  No Advisory or Fiduciary Responsibility ............................................. 125126
SECTION 10.23  Acknowledgement and Consent to Bail-In of Affected Financial Institutions ...... 125126
SECTION 10.24  Acknowledgement Regarding Any Supported QFCs .............................. 126127

SCHEDULES

I              Commitments
II             Guarantors
1.01A          Certain Security Interests and Guarantees
1.01B          Designated Assets
1.01F          Mortgaged Properties
5.12           Subsidiaries and Other Equity Investments
7.01(b)        Existing Liens
7.02(f)        Existing Investments
7.03(b)        Existing Indebtedness
7.08           Transactions with Affiliates
7.09           Existing Restrictions
10.02          Administrative Agent's Office, Certain Addresses for Notices

EXHIBITS

*Form of*

A              Committed Loan Notice
B              Note
C              Compliance Certificate
D              Assignment and Assumption
E              [Reserved]
F              [Reserved]
G              [Reserved]
H-1            First Lien Intercreditor Agreement
H-2            Second Lien Intercreditor Agreement
I              United States Tax Compliance Certificate
J              Intercompany Subordination Agreement
K              Solvency Certificate

# CREDIT AGREEMENT

This CREDIT AGREEMENT ("**Agreement**") is entered into as of April [ ], 2024, by and among NEEDLE HOLDINGS LLC, a Delaware limited liability company (the "**Borrower**"), [**NEWCO**]**JOANN HOLDINGS 2**, LLC, a [Delaware limited liability company] ("**Holdings**") and WILMINGTON SAVINGS FUND SOCIETY, FSB ("**WSFS**"), as administrative agent (in such capacity, including any successor thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any successor thereto, the "**Collateral Agent**") under the Loan Documents, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**").

## PRELIMINARY STATEMENTS

WHEREAS, on October 16, 2016, Jo-Ann Stores, LLC, an Ohio limited liability company ("**Jo-Ann Stores**"), entered into that certain Credit Agreement, by and among Needle Holdings LLC, as holdings, Jo-Ann Stores, as borrower, the lenders party thereto ("**Prepetition Lenders**") and WSFS, as the successor administrative agent and collateral agent thereunder (as amended, amended and restated, supplemented or otherwise modified, the "**Prepetition Credit Agreement**") under which it incurred "Loans" (the "**Prepetition Loans**");

WHEREAS, on March 19, 2024, JoAnn Inc., a Delaware corporation (the "**Parent**"), the Borrower and certain Subsidiaries of the Borrower (collectively, the "**Debtors**") commenced Chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") under Case No. 24-10418 (CTG) (the "**Chapter 11 Cases**");

WHEREAS, on March 19, 2024, the Debtors entered into that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to the DIP Order (as defined therein), the "**DIP Credit Agreement**"), by and among the Parent, as holdings, the Borrower, as borrower, WSFS, as DIP Agent (as defined in the DIP Order), and the lenders party thereto (the "**DIP Lenders**"), pursuant to which the DIP Lenders made available to the Borrower "Initial DIP Loans" (as defined in the DIP Credit Agreement);

WHEREAS, on April [ ], 2024, the Bankruptcy Court ended the Confirmation Order (as defined in the DIP Order) approving the Plan (as defined in the DIP Credit Agreement).

WHEREAS, upon the terms and conditions set forth in this Agreement and the Plan, the Lenders shall (i) convert (x) the aggregate principal amount of all "Initial DIP Loans" (as defined in the DIP Credit Agreement) outstanding under the DIP Credit Agreement on the Plan Effective Date and (y) all accrued and unpaid interest, fees, premiums, and all other obligations on account of such "Initial DIP Loans" (as defined in the DIP Credit Agreement) into Term Loans hereunder (the "**Exchange Term Loans**") and (ii) make available to the Borrower an uncommitted additional tranche of Term Loans hereunder in an aggregate principal amount not to exceed $10,500,000 (the "**Incremental Exit Loans**", and together with the Exchange Term Loans, the "**Term Loans**");

WHEREAS, upon the terms and conditions set forth in this Agreement and the Plan, the Lenders have agreed to make the Term Loans hereunder;

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

## ARTICLE I

### Definitions and Accounting Terms

SECTION 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Administrative Agent**" means Bank of America, N.A., in its capacity as administrative agent and collateral agent under the ABL Facilities Documentation, or any successor administrative agent and collateral agent under the ABL Facilities Documentation.

"**ABL Credit Agreement**" means that Second Amended and Restated Credit Agreement, dated as of the Closing Date among the Borrower, Holdings, the guarantors party thereto, the lenders party thereto, the ABL Administrative Agent and the FILO Documentation Agent, as the same may be amended, restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time in one or more agreements (in each case with the same or new lenders, institutional investors or agents), including any agreement extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case as and to the extent permitted by this Agreement and the ABL Intercreditor Agreement.

"**ABL Facilities**" means the asset-based revolving credit facilities under the ABL Credit Agreement.

"**ABL Facilities Documentation**" means the ABL Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"**ABL Intercreditor Agreement**" means the amended and restated intercreditor agreement dated as of April [  ], 2024 among the Administrative Agent, the Collateral Agent, the ABL Administrative Agent and the Loan Parties or any other intercreditor agreement among the ABL Administrative Agent, one or more Senior Representatives of Permitted Pari Passu Secured Debt or Permitted Junior Secured Refinancing Debt, the Administrative Agent and the Collateral Agent on terms, taken as a whole, reasonably determined by the Administrative Agent **(acting at the Direction of the Required Lenders)** to be not materially adverse to the Lenders compared to those contained in the intercreditor agreement described above, as the same may be supplemented or amended from time to time.

"**Additional Lender**" means, at any time, any bank, other financial institution, institutional investor that, in any case, is not an existing Lender and that agrees to provide any portion of any (a) Incremental Loan in accordance with Section 2.12 or (b) Other Loans pursuant to a Refinancing Amendment in accordance with Section 2.13; *provided* that each Additional Lender (other than any Person that is an Affiliate of a Lender, an Approved Fund of a Lender at such time) shall be subject to the approval of the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed), in each case to the extent any such consent would be required from the Administrative Agent under Section 10.07(b)(iii)(B) for an assignment of Loans to such Additional Lender.

"**Administrative Agent**" has the meaning specified in the introductory paragraph to this Agreement.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.  For the avoidance of doubt, none of the Agents or their respective lending affiliates shall be deemed to be an Affiliate of Holdings, the Borrower or any of their respective Subsidiaries.

"**Agent Parties**" has the meaning specified in Section 10.02(d).

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Persons and of such Persons' Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent and the Supplemental Administrative Agents (if any).

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Credit Agreement, as amended, restated, modified, replaced, extended, renewed or supplemented from time to time in accordance with the terms hereof.

"**All-In Yield**" means, as to any Indebtedness, the yield thereof, whether in the form of interest rate, margin, OID, upfront fees, a Term SOFR or Base Rate floor greater than [0.75]% or [1.75]%, respectively (with such increased amount being equated to interest margins for purposes of determining any increase to the Applicable Rate), or otherwise; *provided* that (i) OID and upfront fees on floating rate Indebtedness shall be equated to an interest rate assuming a 4-year life to maturity (or, if less, the stated life to maturity at the time of the incurrence of the applicable Indebtedness) and (ii) "All-In Yield" with respect to any fixed rate indebtedness shall be determined in accordance with bond market convention  (as reasonably determined by the Administrative Agent) and adjusted to a floating rate yield (based on mid-rate swaps having a term equivalent to such fixed rate Indebtedness at the time of issuance thereof as reasonably determined by the Administrative Agent); *provided*, *further*, that "All-In Yield" shall not include arrangement fees, structuring fees or underwriting or similar fees paid to arrangers for such Indebtedness.

"**Annual Financial Statements**" means the audited consolidated balance sheets of ~~Holdings~~Jo-Ann Stores and its Subsidiaries as of ~~the Saturday closest to [  ]~~January 28, 2023, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for ~~Holdings~~Jo-Ann Stores for the fiscal year then ended.

"**Applicable ECF Builder Percentage**" means (100% minus the ECF Percentage for the fiscal year in which such fiscal quarter occurs (*provided*, that prior to the date of determination of the ECF Percentage for any fiscal year, such ECF Percentage shall be deemed to be 50%).

"**Applicable Indebtedness**" has the meaning specified in the definition of "Weighted Average Life to Maturity."

"**Applicable Prepayment Amount**" means, in the case of any repayment or prepayment of Loans hereunder (other than pursuant to Section 2.05), (a) on or prior to the first anniversary of the Closing Date, the Make-Whole Premium, (b) after the first anniversary of the Closing Date, but on or prior to the second anniversary of the Closing Date, 2.00%, and (c) thereafter, 0%.

"**Applicable Rate**" means, with respect to Term Loans, a percentage per annum equal to (i) for Term SOFR Loans, 9.50% and (ii) for Base Rate Loans, 8.50%.

"**Appropriate Lender**" means, at any time, with respect to Loans of any Class, the Lenders of such Class.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit D or any other form approved by the Administrative Agent.

"**Attorney Costs**" means all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Available Amount**" means, at any time (the "**Reference Date**"), the sum of:

(a)        (i) $0 plus (ii) an amount equal to the Available Excess Cash Flow Amount; plus

(b)        the amount of any capital contributions or Net Cash Proceeds from Permitted Equity Issuances (or issuances of debt securities that have been converted into or exchanged for Qualified Equity Interests) received or made by the Borrower (or any direct or indirect parent thereof and contributed by such parent to the Borrower) during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date; plus

(c)        to the extent not (A) included in clause (a) above or (B) already reflected as a return of capital with respect to such Investment for purposes of determining the amount of such Investment, the aggregate amount of all dividends, distributions, returns of principal, interest, profits on sale and similar amounts received in cash or Cash Equivalents by the Borrower or any Restricted Subsidiary from any Minority Investments, Unrestricted Subsidiaries or Investments made pursuant to Section 7.02(n) during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date; plus

(d)        to the extent not (A) included in clause (a) above or (B) already reflected as a return of capital with respect to such Investment for purposes of determining the amount of such Investment, the aggregate amount of all repayments of principal, interest or similar amounts received in cash or Cash Equivalents by the Borrower or any Restricted Subsidiary from any Minority Investments or Unrestricted Subsidiaries and the fair market value of any Unrestricted Subsidiary that is redesignated as a Restricted Subsidiary (to the extent the Investment in such Unrestricted Subsidiary was made in reliance on the Available Amount) during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date in respect of loans or advances made by the Borrower or any Restricted Subsidiary to such Minority Investments or Unrestricted Subsidiaries; plus

(e)        to the extent not (A) included in clause (a) above, (B) already reflected as a return of capital with respect to such Investment for purposes of determining the amount of such Investment or (C) required to be applied to prepay Loans in accordance with Section 2.03(b)(ii), the aggregate amount of all Net Cash Proceeds received by the Borrower or any Restricted Subsidiary in connection with the sale,

transfer or other disposition of its ownership interest in any Minority Investment or Unrestricted Subsidiary during the period from and including the Business Day immediately following the Closing Date through and including the Reference Date; plus

(f)      the aggregate amount of mandatory prepayments declined pursuant to Section 2.03(b)(vi); minus

(g)      the aggregate amount of any Investments made pursuant to Section 7.02(c)(iv)(B), 7.02(i)(B) and Section 7.02(n)(ii) or any payment made pursuant to Section 7.12(a)(D)(2) during the period commencing on the Closing Date and ending on the Reference Date (and, for purposes of this clause (g), without taking account of the intended usage of the Available Amount on such Reference Date in the contemplated transaction).

"**Available Excess Cash Flow Amount**" means, on any Reference Date (i) the Applicable ECF Builder Percentage multiplied by the Excess Cash Flow for each fiscal year of the Borrower after the Closing Date for which financial statements have been delivered pursuant to Section 6.01(a) on or prior to the applicable Reference Date; *provided* that in no event shall the amount determined pursuant to clause definition at any time be less than zero.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Court**" has the meaning assigned to such term in the recitals to this Agreement.

"**Base Rate**" means for any day a fluctuating rate of interest per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1% (b) the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its "prime rate", (c) Term SOFR *plus* 1.00% and (d) 1.75%. The "prime rate" is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by the Administrative Agent shall take effect at the opening of business on the day specified in the public announcement of such change. If the Base Rate is being used as an alternate rate of interest pursuant to Section 3.03 hereof, then Base Rate shall be the highest of clauses (a), (b) and (d) above and shall be determined without reference to clause (c) above.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Borrower**" has the meaning specified in the introductory paragraph to this Agreement.

"**Borrower Materials**" has the meaning specified in Section 6.02.

"**Borrowing**" means a borrowing consisting of Loans of the same Class and Type made, converted or continued on the same date and, in the case of Term SOFR Loans, having the same Interest Period.

"**Borrowing Base**" means, on any date, the sum of (x) 90% of 10% of the net sales of the Borrower and its Restricted Subsidiaries, on a consolidated basis in accordance with GAAP, for the most recent fiscal month for which internal financial statements are available at such time plus (y) 80% of the book value of inventory of the Borrower and its Restricted Subsidiaries, on a consolidated basis in accordance with GAAP, as of

the last day of the most recent fiscal month of the Borrower for which internal financial statements are available at such time.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capitalized Leases) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are or are required to be included as capital expenditures on the consolidated statement of cash flows of the Borrower and the Restricted Subsidiaries.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the Capitalized Lease Obligation with respect thereto.

"**Cash Collateral Account**" means an account held at, and subject to the sole dominion and control of, the Collateral Agent.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Restricted Subsidiary:

(a)     Dollars;

(b)     in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business and not for speculation;

(c)     readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(d)     certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500,000,000;

(e)     repurchase obligations for underlying securities of the types described in clauses (c) and (d) above or clause (g) below entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)     commercial paper rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and in each case maturing within 12 months after the date of creation thereof;

(g)     marketable short-term money market and similar highly liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P

-6-

shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

        (h)      readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) with maturities of 12 months or less from the date of acquisition;

        (i)      Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); and

        (j)      investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (i) above.

        In the case of Investments by any Foreign Subsidiary that is a Restricted Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents shall also include (i) investments of the type and maturity described in clauses (a) through (j) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries that are Restricted Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (a) through (j) and in this paragraph.

        Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, provided that such amounts are converted into Dollars as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

        "**Cash Flow Forecast**" means a cash flow forecast in a customary form to be agreed among the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower, reflecting the Borrower's and its Restricted Subsidiaries' good faith projections of all weekly cash receipts and disbursements on a line item basis in connection with the operation of their businesses for the following 13-week period.

        "**Cash Management Bank**" means any Person that is a Lender or an Affiliate of a Lender on the Closing Date or at the time it provides any Cash Management Services, whether or not such Person subsequently ceases to be a Lender or an Affiliate of a Lender.

        "**Cash Management Obligations**" means obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank in respect of or in connection with any Cash Management Services and designated by the Cash Management Bank and the Borrower in writing to the Administrative Agent as "Cash Management Obligations."

        "**Cash Management Services**" means any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit card processing, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements.

        "**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair, or as compensation for the taking of, such equipment, fixed assets or real property.

        "**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty (excluding the taking effect after the date of this Agreement of a law, rule, regulation or treaty adopted prior to the date of this Agreement), (b) any change in any

-7-

law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" means the earliest to occur of:

(a)    (1) any Person (other than a Permitted Holder) or (2) Persons (other than one or more Permitted Holders) constituting a "group" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person and its Subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), becomes the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of Equity Interests representing more than fifty percent (50%) of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings and the percentage of aggregate ordinary voting power so held is greater than the percentage of the aggregate ordinary voting power represented by the Equity Interests of Holdings beneficially owned, directly or indirectly, in the aggregate by the Permitted Holders unless, in any case, the Permitted Holders have, at such time, the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of Holdings or the Borrower; or

(b)    any "Change of Control" (or any comparable term) in any document pertaining to the ABL Facilities;

(c)    the Borrower ceases to be a direct wholly owned Subsidiary of Holdings (or any Successor Holdings or other successor under 7.04(a)); or

(d)    Jo-Ann Stores ceases to be a direct wholly owned Subsidiary of the Borrower (or any Successor Borrower or other successor under 7.04(d)).

"**Chapter 11 Cases**" has the meaning assigned to such term in the recitals to this Agreement.

"**Class**" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Exchange Term Loans, Incremental Exit Loans, Term Loans, Incremental Loans, Other Loans or Extended Loans, (b) any Commitment, refers to whether such Commitment is a Commitment in respect of Exchange Term Loans, Term Loans, Other Term Commitment (and, in the case of an Other Term Commitment, the Class of Loans to which such commitment relates), or a Commitment in respect of a Class of Loans to be made pursuant to an Incremental Amendment or an Extension Offer and (c) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments.  Other Term Commitments, Other Loans, Incremental Loans and Extended Loans that have different terms and conditions shall be construed to be in different Classes.

"**Closing Date**" means April [ ], 2024.

"**Closing Date Transactions**" means, collectively, the entry of the Confirmation Order, the transactions contemplated by the Approved Plan, the funding (or deemed funding) of the Loans under this Agreement on the Closing date, the funding (or deemed funding) of the loans under the ABL Facilities on the Second Restatement Date (as defined in the ABL Credit Agreement), the consummation of the other transactions contemplated by this Agreement, the ABL Facilities Documentation, the Approved Plan or the Confirmation Order, the consummation of any other transactions in connection with the foregoing and the payment of the fees and expenses incurred in connection with any of the foregoing.

"**CME**" means CME Group Benchmark Administration Limited.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the "Collateral" (or equivalent term) as defined in any Collateral Document and shall include the Mortgaged Properties.

"**Collateral Agent**" has the meaning specified in the introductory paragraph to this Agreement.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)     the Collateral Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Section 4.01(a)(iv) or pursuant to Section 6.11 or Section 6.13 at such time, duly executed by each Loan Party thereto;

(b)     all Obligations shall have been unconditionally guaranteed by Holdings, each Restricted Subsidiary of the Borrower that is a wholly owned Material Domestic Subsidiary and not an Excluded Subsidiary including those that are listed on Schedule II hereto (each, a "**Guarantor**"), and any Restricted Subsidiary of the Borrower that Guarantees any Indebtedness incurred by the Borrower pursuant to the ABL Facilities (or is a co-borrower with the Borrower thereunder), any Junior Financing or any Credit Agreement Refinancing Indebtedness or Permitted Pari Passu Secured Debt (or, in each case, any Permitted Refinancing thereof) shall be a Guarantor hereunder;

(c)     the Obligations and the Guaranty shall have been secured by a first-priority security interest (subject to non-consensual Liens permitted by Section 7.01) in (i) all the Equity Interests of the Borrower, (ii) all Equity Interests of each direct, wholly owned Domestic Subsidiary (other than a Domestic Subsidiary described in the following clause (iii)(A)) that is directly owned by the Borrower or any Subsidiary Guarantor and (iii) 65% of the issued and outstanding Equity Interests of (A) each wholly owned Domestic Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor and substantially all of the assets of which consist of Equity Interests in, or Equity Interests in and Indebtedness of, one or more Foreign Subsidiaries or Domestic Subsidiaries described in this clause (iii)(A), and (B) each wholly owned Foreign Subsidiary that is directly owned by the Borrower or by any Subsidiary Guarantor;

(d)     except to the extent otherwise provided hereunder, including subject to Liens permitted by Section 7.01, or under any Collateral Document, the Obligations and the Guaranty shall have been secured by a perfected security interest (to the extent such security interest may be perfected by delivering certificated securities, filing financing statements under the Uniform Commercial Code or making any necessary filings with the United States Patent and Trademark Office or United States Copyright Office) in substantially all tangible and intangible personal property of the Borrower and each Guarantor (including accounts (other than deposit accounts, other bank or securities accounts or any Securitization Assets), inventory, equipment, investment property, contract rights, applications and registrations of intellectual property filed in the United States, other general intangibles, and proceeds of the foregoing), in each case, with the priority required by the Collateral Documents, in each case subject to exceptions and limitations otherwise set forth in this Agreement and the Collateral Documents; *provided* that any such security interests in Current Asset Collateral shall be subject to the terms of the ABL Intercreditor Agreement; and

(e)     the Collateral Agent shall have received, each in form and substance reasonably acceptable to the Collateral Agent, (i) counterparts of a Mortgage with respect to each Material Real Property listed on Schedule 1.01F or required to be delivered pursuant to Section 6.11 and 6.13(b) (the "**Mortgaged Properties**") duly executed and delivered by the record owner of such property, (ii) fully paid Mortgage Policies in form and substance, with endorsements available in the applicable jurisdiction and in amount, reasonably acceptable to the Collateral Agent (not to exceed the fair market value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Collateral Agent, insuring the Mortgages to be valid subsisting Liens on the property described therein,

subject only to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Collateral Agent may reasonably request and is available in the applicable jurisdiction, (iii) such surveys, abstracts and appraisals and such customary opinions of local counsel and other documents as the Collateral Agent may reasonably request with respect to any such Mortgaged Property, including evidence of payment by any applicable Loan Party of all title policy premiums, and related charges, mortgage recording taxes, fees and expenses required in connection with recording the Mortgages and issuing the Mortgage Policies, copies of all leases in which any Loan Party holds the lessor's interest, if any, and (iv) (A) a completed "life of the loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property duly executed and acknowledged by the appropriate Loan Parties and (B) with respect to any Mortgaged Property which is designated as a "flood hazard area" in any Flood Insurance Rate Map established by the Federal Emergency Management Agency (or any successor agency), evidence of flood insurance as required by Section 6.07 hereof.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, surveys, abstracts or appraisals with respect to, particular assets if and for so long as, in the reasonable judgment of the Collateral Agent and the Borrower, the cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance, surveys abstracts or appraisals in respect of such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

The Collateral Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Mortgages, Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Agents and the Lenders pursuant to Sections 4.01(a)(iv), 6.11 or 6.13, the Guaranty, the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement (if any), the Second Lien Intercreditor Agreement (if any) and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Commitment**" means, as to each Lender, its obligation to make a Loan to the Borrower hereunder (including the Term Commitment), expressed as an amount representing the maximum principal amount of the Loan to be made by such Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to Section 2.04 and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Lender pursuant to an Assignment and Assumption, (ii) an Incremental Amendment, (iii) a Refinancing Amendment or (iv) an Extension.  The initial amount of each Lender's Commitment as of the Closing Date is set forth on Schedule I hereto under the caption "Term Commitment" or, otherwise, in the Assignment and Assumption, Incremental Amendment or Refinancing Amendment pursuant to which such Lender shall have assumed its Commitment, as the case may be.

"**Committed Loan Notice**" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Term SOFR Loans, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A or such other form as may be approved by the Administrative Agent (**acting at the Direction of the Required Lenders) (**including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time, and any successor statute.

"**Company Parties**" means the collective reference to Holdings and its Subsidiaries, including the Borrower, and "**Company Party**" means any one of them.

"**Comparable Financing**" means any Indebtedness that is (a) in the form of a syndicated "term loan B" facility, (b) denominated in Dollars and (c) secured by Liens on Collateral that rank pari passu in priority with the Liens that secure the Term Loans.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C and which certificate shall in any event be a certificate of the chief financial officer (a) certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (b) setting forth reasonably detailed calculations, in the case of financial statements delivered under Section 6.01(a), beginning with the financial statements for the fiscal year of the Borrower ending [February 3, 2024, of Excess Cash Flow for such fiscal year, (c) commencing with the certificate delivered pursuant to Section 6.02(a) for the first fiscal quarter ending after the Closing Date, setting forth a calculation of the Senior Secured Net Leverage Ratio as of the end of the most recent Test Period and (d) in the case of financial statements delivered under Section 6.01(a), setting forth a reasonably detailed calculation of the Net Cash Proceeds received during the applicable period by or on behalf of, Holdings or any of its Restricted Subsidiaries in respect of any Disposition subject to prepayment pursuant to Section 2.03(b)(ii)(A) and the portion of such Net Cash Proceeds that has been invested or are intended to be reinvested in accordance with Section 2.03(b)(ii)(B).

"**Conforming Changes**" means, with respect to the use, administration of or any conventions associated with SOFR or any proposed Successor Rate or Term SOFR, as applicable, any conforming changes to the definitions of "Base Rate", "SOFR", "Term SOFR" and "Interest Period", timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters (including, for the avoidance of doubt, the definitions of "Business Day" and "U.S. Government Securities Business Day", timing of borrowing requests or prepayment, conversion or continuation notices and length of lookback periods) as may be appropriate, in the discretion of the Administrative Agent determined in consultation with the Borrower, to reflect the adoption and implementation of such applicable rate(s) and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such rate exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and any other Loan Document).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Cash Interest Expense**" means, with respect to any Person for any period, without duplication, the cash interest expense (including that attributable to any Capitalized Lease Obligation), net of cash interest income, with respect to Indebtedness (including Disqualified Equity Interest) of such Person and its Restricted Subsidiaries (calculated on a consolidated basis in accordance with GAAP) for such period, other than non-recourse Indebtedness, including commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net cash costs under hedging agreements (other than in connection with the early termination thereof), excluding, in each case:

    (i)   amortization of deferred financing costs, debt issuance costs, commissions, fees and expenses and any other amounts of non-cash interest (including as a result of the effects of acquisition method accounting or pushdown accounting),

    (ii)   interest expense attributable to the movement of the mark-to-market valuation of obligations under derivative instruments,

    (iii)   costs associated with incurring or terminating Swap Contracts and cash costs associated with breakage in respect of Swap Contracts,

-11-

(iv)  commissions, discounts, yield, make-whole premium and other fees and charges (including any interest expense) incurred in connection with any Securitization Financing;

(v)  "additional interest" owing pursuant to a registration rights agreement with respect to any securities,

(vi)  any payments with respect to make-whole premiums or other breakage costs of any Indebtedness,

(vii)  penalties and interest relating to Taxes,

(viii)  accretion or accrual of discounted liabilities not constituting Indebtedness,

(ix)  interest expense attributable to Holdings or any parent thereof resulting from push-down accounting,

(x)  any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization or purchase accounting,

(xi)  any interest expense attributable to the exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto in connection with any acquisition or Investment permitted by this Agreement, and

(xii)  annual agency fees paid to any trustees, administrative agents and collateral agents with respect to any secured or unsecured loans, debt facilities, debentures, bonds, commercial paper facilities or other forms of Indebtedness (including any security or collateral trust arrangements related thereto).

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding cash and Cash Equivalents, amounts related to current or deferred taxes based on income or profits, assets held for sale, loans (permitted) to third parties, pension assets, deferred bank fees and derivative financial instruments, and excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to any consummated acquisition.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of the Borrower and the Restricted Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding (A) the current portion of any Funded Debt, (B) the current portion of interest, (C) accruals for current or deferred taxes based on income or profits, (D) accruals of any costs or expenses related to restructuring reserves, (E) revolving loans, swingline loans and letter of credit obligations under the ABL Facilities or any other revolving credit facility, (F) the current portion of any Capitalized Lease Obligation, (G) deferred revenue arising from cash receipts that are earmarked for specific projects, (H) liabilities in respect of unpaid earn-outs and (I) the current portion of any other long-term liabilities, and, furthermore, excluding the effects of adjustments pursuant to GAAP resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation any consummated acquisition.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person, including the amortization of deferred financing fees or costs for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated EBITDA**" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period:

(a)        increased by (without duplication):

(i)      (A) provision for taxes based on income or profits or capital, plus state, provincial, franchise, property or similar taxes and foreign withholding taxes and foreign unreimbursed value added taxes, of such Person for such period (including, in each case, penalties and interest related to such taxes or arising from tax examinations) deducted in computing Consolidated Net Income and (B) amounts paid to Holdings or any direct or indirect parent of Holdings in respect of taxes in accordance with Section 7.06(g), in each case under clauses (A) and (B) solely to the extent such amounts were deducted in computing Consolidated Net Income, plus

(ii)     (A) total interest expense (including (A) imputed interest on Capitalized Lease Obligations and Attributable Indebtedness (which, in each case, will be deemed to accrue at the interest rate reasonably determined by a Responsible Officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligations or Attributable Indebtedness), (B) commissions, discounts and other fees, charges and expenses owed with respect to letters of credit, bankers' acceptance financing, surety and performance bonds and receivables financings, (C) amortization and write-offs of deferred financing fees, debt issuance costs, debt discounts, commissions, fees, premium and other expenses, as well as expensing of bridge, commitment or financing fees, (D) payments made in respect of hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, (E) cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than such Person or a wholly-owned Restricted Subsidiary) in connection with Indebtedness incurred by such plan or trust, (F) all interest paid or payable with respect to discontinued operations, (G) the interest portion of any deferred payment obligations) and (H) all interest on any Indebtedness that is (x) Indebtedness of others secured by any Lien on property owned or acquired by such Person or its Restricted Subsidiaries, whether or not the obligations secured thereby have been assumed, but limited to the fair market value of such property, (y) contingent obligations in respect of Indebtedness; provided that such interest expense shall be calculated after giving effect to hedging agreements related to interest rates (including associated costs), but excluding unrealized gains and losses with respect to such hedging agreements or (z) fee and expenses paid to the Administrative Agent (in its capacity as such and for its own account) pursuant to the Loan Documents and fees and expenses paid to the administrative agent, the collateral agent, trustee or other similar Persons for any other Indebtedness permitted by Section 7.03) of such Person for such period and (B) bank fees and costs of surety bonds, in each case under this clause (B), in connection with financing activities and, in each case under clauses (A) and (B), to the extent such amounts were deducted in computing Consolidated Net Income, plus

(iii)    Consolidated Depreciation and Amortization Expense of such Person for such period to the extent such depreciation and amortization were deducted in computing Consolidated Net Income, plus

(iv)    any fees, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or the incurrence or repayment of Indebtedness permitted to be incurred hereunder including a refinancing thereof (whether or not successful) and any amendment, restatement or modification to the terms of any such transactions, deducted in computing Consolidated Net Income, plus

(v)     (1) the amount of any charge, cost, loss, expense  or reserve deducted in such period in computing Consolidated Net Income related to: (A) restructuring (including restructuring charges or reserves, whether or not classified as such under GAAP), severance, relocation, consolidation, integration or other similar items, (B) strategic and/or business initiatives, business optimization (including costs and expenses relating to business optimization programs, which, for the avoidance of doubt, shall include, without limitation, implementation of operational and reporting systems and technology initiatives; strategic initiatives; retention; severance; systems

establishment costs; systems conversion and integration costs; contract termination costs; recruiting and relocation costs and expenses; costs, expenses and charges incurred in connection with curtailments or modifications to pension and post-retirement employee benefits plans; costs to start-up, pre-opening, opening, closure, transition and/or consolidation of distribution centers, operations, officers and facilities) including in connection with any Investment permitted hereunder, and new systems design and implementation, as well as consulting fees and any one-time expense relating to enhanced accounting function, (C) business or facilities (including greenfield facilities) start-up, opening, transition, consolidation, shut-down and closing, (D) signing, retention and completion bonuses, (E) severance, relocation or recruiting, (F) [reserved], (G) charges and expenses incurred in connection with litigation (including threatened litigation), any investigation or proceeding (or any threatened investigation or proceeding) by a regulatory, governmental or law enforcement body (including any attorney general), and (H) expenses incurred in connection with casualty events or asset sales outside the ordinary course of business and (2) any one-time costs, expenses or charges incurred in connection with (A) Permitted Acquisitions or other Investments permitted hereunder after the Closing Date or (B) the closing of any Stores or distribution centers after the Closing Date, provided that (1) amounts added back under this clause (v) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) and (2) the aggregate amount added back pursuant to this clause (v), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clauses (vi) and (x) below shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (v) and clauses (vi) and (x) below), <u>plus</u>

(vi)    the amount of costs relating to pre-opening and opening costs for Stores, signing, retention and completion bonuses, costs incurred in connection with any strategic initiatives, transition costs, consolidation and closing costs for Stores and costs incurred in connection with non-recurring (without, in any such case, limitation on the calculation hereof by Item 10(e) of Regulation S-K promulgated by the SEC) product and intellectual property development after the Closing Date, other business optimization expenses (including costs and expenses relating to business optimization programs), and new systems design and implementation costs and project start-up costs, provided that (1) amounts added back under this clause (vi) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) and (2) the aggregate amount added back pursuant to this clause (vi), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clauses (v) above and (x) below shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (vi) and clauses (v) above and (x) below);  <u>plus</u>

(vii)    any other non-cash charges including any write offs or write downs, to the extent reducing such Consolidated Net Income for such period (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (1) the Borrower may determine not to add back such non-cash charge in the current period and (2) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period), including the following: (A) non-cash expenses in connection with, or resulting from, stock option plans, employee benefit plans or agreements or post-employment benefit plans or agreements, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other similar rights, (B) non-cash currency translation losses related to changes in currency exchange rates (including re-measurements of Indebtedness (including intercompany Indebtedness) and any net non-cash loss resulting from hedge agreements for currency exchange risk), (C) non-cash losses, expenses, charges or negative adjustments attributable to the movement in the mark-to-market valuation of hedge agreements or other derivative instruments, including the effect of FASB Accounting Standards Codification 815 and International Accounting Standard No. 9 and their respective related pronouncements and interpretations, (D) non-cash charges for deferred tax asset valuation allowances, (E) any non-cash impairment charge or asset write-off or

write-down related to intangible assets (including goodwill), long-lived assets, and Investments in debt and equity securities, (F) any non-cash charges or losses resulting from any purchase accounting adjustment or any step-ups with respect to re-valuing assets and liabilities in connection with any Investments permitted hereunder, (G) all non-cash losses from Investments permitted hereunder recorded using the equity method and (H) the excess of GAAP rent expense over actual cash rent paid during such period due to the use of straight line rent for GAAP purposes; <u>plus</u>

(viii)    the amount of any minority interest expense deducted in calculating Consolidated Net Income, <u>plus</u>

(ix)    any net after-tax extraordinary, non-recurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses, and fees and expenses in connection with relocation costs, integration costs, facility consolidation and closing costs, severance costs and expenses and non-recurring compensation charges (without, in any such case, limitation on the calculation hereof by Item 10(e) of Regulation S-K promulgated by the SEC); provided that (1) amounts added back under this clause (ix) shall be reasonable and documented in detail reasonably satisfactory to the Administrative Agent and (2) the aggregate amount added back pursuant to this clause (ix), when taken together with the aggregate amount added back to Consolidated EBITDA pursuant to clauses (v) and (vi) above, shall not exceed 10% of Consolidated EBITDA for such Test Period (calculated after giving effect to any increase to Consolidated EBITDA pursuant to this clause (ix) and clauses (v) and (vi) above), <u>plus</u>

(x)    [reserved], <u>plus</u>

(xi)    the amount of loss on sale of receivables, Securitization Assets and related assets to any Securitization Subsidiary in connection with a Qualified Securitization Financing, <u>plus</u>

(xii)    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back, <u>plus</u>

(xiii)    any costs or expenses incurred by the Borrower or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or stockholders agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of issuance of Equity Interests of the Borrower (other than Disqualified Equity Interests), in each case, solely to the extent that such cash proceeds are excluded from the calculation of the Available Amount; <u>plus</u>

(xiv)    [reserved], <u>plus</u>

(xv)    proceeds of business interruption insurance actually received (to the extent not counted in any prior period in anticipation of such receipt) or, to the extent not counted in any prior period, reasonably expected to be received, and

(b)    decreased by (without duplication):

(i)    any non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any gains that represent the reversal of any accrual of, or cash reserve for, anticipated cash charges in any prior period (other than such cash charges that have been added

-15-

back to Consolidated Net Income in calculating Consolidated EBITDA in accordance with this definition), plus

(ii)     any non-cash gains with respect to cash actually received in a prior period unless such cash did not increase Consolidated EBITDA in such prior period.

"**Consolidated First Lien Net Debt**" means, as of any date of determination, Consolidated Net Debt that is secured by a Lien on any asset or property of any Loan Party or any Restricted Subsidiary (other than any such amount of Consolidated Net Debt that is secured solely by Liens on the Collateral that are expressly subordinated to the Liens securing the Obligations).

"**Consolidated Net Debt**" means, as of any date of determination, (a) Consolidated Total Debt, minus (b) the amount of cash and Cash Equivalents on a consolidated balance sheet of the Borrower that are not "Restricted" for purposes of GAAP on such balance sheet.

"**Consolidated Net Income**" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP; *provided*, *however*, that, without duplication,

(a)     [reserved],

(b)     the Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period, whether effected through a cumulative effect adjustment or a retroactive application in each case in accordance with GAAP,

(c)     effects of adjustments (including the effects of such adjustments pushed down to the Borrower and the Restricted Subsidiaries) in such Person's consolidated financial statements pursuant to GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded,

(d)     any net after-tax income (loss) from disposed or discontinued operations and any net after-tax gains or losses on disposal of disposed or discontinued operations shall be excluded,

(e)     any net after-tax gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions or the sale or other disposition of any Equity Interests of any Person other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(f)     the Net Income for such period of any Person that is not a Subsidiary, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of the Borrower shall be increased by the amount of dividends or distributions or other payments that are actually paid in cash (or to the extent converted into cash) to the referent Person or a Restricted Subsidiary thereof in respect of such period,

(g)     (i) any net unrealized gain or loss (after any offset) resulting in such period from obligations in respect of Swap Contracts and the application of Financial Accounting Standards Board Accounting Standards Codification 815 (Derivatives and Hedging), (ii) any net gain or loss resulting in such period from currency translation gains or losses related to currency remeasurements of Indebtedness (including the net loss or gain (A) resulting from Swap Contracts for currency exchange risk and (B) resulting from intercompany Indebtedness) and all other foreign currency translation gains or losses to the extent such gain or losses are non-cash items, and (iii) any net after-tax income (loss) for such period

attributable to the early extinguishment or conversion of (A) Indebtedness, (B) obligations under any Swap Contracts or (C) other derivative instruments, shall be excluded,

(h)    any impairment charge or asset write-off, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(i)    any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment, Permitted Acquisition or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days), shall be excluded,

(j)    to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed within 365 days of the date of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded, and

(k)    any non-cash (for such period and all other periods) compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by, or to, management of the Borrower or any of its Restricted Subsidiaries, shall be excluded.

"**Consolidated Total Debt**" means, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and the Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with any Permitted Acquisition or any other Investment permitted hereunder), consisting of Indebtedness for borrowed money, unreimbursed obligations in respect of drawn letters of credit, obligations in respect of Capitalized Leases and debt obligations evidenced by promissory notes or similar instruments; *provided* that Consolidated Total Debt shall not include Indebtedness in respect of (i) any Qualified Securitization Financing, (ii) any letter of credit, except to the extent of unreimbursed obligations in respect of drawn letters of credit (*provided* that any unreimbursed amount under commercial letters of credit shall not be counted as Consolidated Total Debt until three (3) Business Days after such amount is drawn (it being understood that any borrowing, whether automatic or otherwise, to fund such reimbursement shall be counted)) and (iii) obligations under Swap Contracts.

"**Consolidated Total Secured Net Debt**" means, as of any date of determination, Consolidated Net Debt that is secured by a Lien on any asset or property of any Loan Party or any Restricted Subsidiary.

"**Consolidated Working Capital**" means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities.

"**Contract Consideration**" has the meaning specified in the definition of "Excess Cash Flow."

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

-17-

"**Control**" has the meaning specified in the definition of "Affiliate."

"**Credit Agreement Refinancing Indebtedness**" means any (a) Permitted Pari Passu Secured Debt that is designated in writing to the Administrative Agent by a Responsible Officer of the Borrower as "Credit Agreement Refinancing Indebtedness" on or prior to the date of incurrence, (b) Permitted Junior Secured Refinancing Debt, (c) Permitted Unsecured Refinancing Debt or (d) Other Loans, in each case, issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) in exchange for, or to extend, renew, replace or refinance, in whole or part, existing Loans ("**Refinanced Term Debt**"); *provided* that such exchanging, extending, renewing, replacing or refinancing Indebtedness is in an original aggregate principal amount not greater than the aggregate principal amount of the Refinanced Term Debt except by an amount equal to unpaid accrued interest and premium (including tender premium) thereon plus reasonable upfront fees and OID on such exchanging, extending, renewing, replacing or refinancing Indebtedness, plus other reasonable and customary fees and expenses in connection with such exchange, modification, refinancing, refunding, renewal, replacement or extension.

"**Current Asset Collateral**" means all the "ABL Priority Collateral" as defined in the ABL Intercreditor Agreement.

"**Daily Simple SOFR**" with respect to any applicable determination date means the SOFR published on such date on the Federal Reserve Bank of New York's website (or any successor source).

"**Debtors**" has the meaning assigned to such term in the recitals to this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.0% per annum; *provided* that with respect to the outstanding principal amount of any Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan (giving effect to Section 2.02(c)) plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Designated Assets**" means the assets set forth on Schedule 1.01B.

"**Designated Jurisdiction**" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"**DIP Credit Agreement**" has the meaning assigned to such term in the recitals to this Agreement.

"**DIP Lenders**" has the meaning assigned to such term in the recitals to this Agreement.

"**Direction of the Required Lenders**" means a written direction or instruction from Lenders constituting the Required Lenders which may be in the form of an email or other form of written communication, it being understood and agreed that the Administrative Agent may conclusively rely on any such written direction or instruction from such Specified Lender Advisor or designated Lender Advisor at the direction of the Required Lenders.  For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory," "acceptable," "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Required Lenders, such determination may be communicated by a Direction of the Required Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the

Required Lenders, such consent, approval or determination may be communicated by a Direction of the Required Lenders as contemplated above.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests in a Restricted Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Latest Maturity Date of the Loans at the time of issuance; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Holdings, the Borrower or the Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because it may be required to be repurchased by Holdings, the Borrower or the Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations.

"**Disqualified Institution**" means:

(1)    such Persons as separately identified in writing by the Borrower and the Required Lenders to the Administrative Agent prior to the Closing Date;

(2)    any Person that is a competitor of the Borrower and identified by the Borrower in good faith in writing to the Administrative Agent from time to time after the Closing Date;

(3)    those banks, financial institutions, other institutional lenders and investors and other entities that were identified by the Borrower as such in writing to the Administrative Agent on or prior to the Closing Date; and

(4)    any Affiliates of Persons described in the foregoing clauses (1) and (2) that are readily identifiable as such solely on the basis of their names (other than any such Affiliate that is a bank, financial institution or fund (other than a Person described in clause (2) above) that regularly invest in commercial loans or similar extensions of credit in the ordinary course of business and for which no personnel involved with the relevant competitor or Person referred to in clause (2) above make investment decisions);

*provided* that in no event shall any update to the list of Disqualified Institutions (A) be effective prior to two Business Days after receipt thereof by the Administrative Agent or (B) apply retroactively to disqualify any Persons that have previously acquired an assignment or participation interest under this Agreement or that is party to a pending trade.

Notwithstanding anything in the Loan Documents to the contrary, the Administrative Agent shall not be responsible (or have any liability) for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions thereof relating to Disqualified Institutions. Without limiting the generality of the foregoing, the Administrative Agent shall not (1) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (2) have any liability with respect to or arising out of any assignment or participation of Loans or commitments, or disclosure of confidential

information, to any Disqualified Institution.  The list of Disqualified Institutions may be made available by the Administrative Agent on the Platform and to prospective assignees and Participants (including Public Lenders).

"**Division**" has the meaning assigned to such term in Section 1.11.

"**Division Successor**" has the meaning assigned to such term in Section 1.11.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**ECF Percentage**" has the meaning specified in Section 2.03(b)(i).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 10.07(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 10.07(b)(iii)).

"**Employee Benefit Plan**" means any material "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations (other than internal reports prepared by any Loan Party or any of its Subsidiaries (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings with respect to any Environmental Liability (hereinafter "**Claims**"), including (i) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to the protection of the environment or, to the extent relating to exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Loan Party or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to an Employee Benefit Plan; (b) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from an Employee Benefit Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan, written notification of any Loan Party or any of their respective ERISA Affiliates concerning the imposition of withdrawal liability or written notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA; (d) the filing under Section 4041(c) of ERISA of a notice of intent to terminate an Employee Benefit Plan, the treatment of an Employee Benefit Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate an Employee Benefit Plan or Multiemployer Plan; (e) the imposition of any liability under Title IV of ERISA with respect to the termination of any Employee Benefit Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates, (f) a failure to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code) with respect to an Employee Benefit Plan, whether or not waived, (g) the application for a minimum funding waiver under Section 302(c) of ERISA with respect to an Employee Benefit Plan, (h) the imposition of a lien under Section 303(k) of ERISA with respect to any Employee Benefit Plan or (i) a determination that any Employee Benefit Plan is in "at risk" status (within the meaning of Section 303 of ERISA).

"**Erroneous Payment**" has the meaning assigned to it in Section 9.16(a).

"**Erroneous Payment Return Deficiency**" has the meaning assigned to it in Section 9.16(d).

"**Erroneous Payment Subrogation Rights**" has the meaning assigned to it in Section 9.16(d).

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excess Cash Flow**" means, for any period, an amount equal to the excess of:

(a)        the sum, without duplication, of:

(i)        Consolidated Net Income of the Borrower for such period,

(ii)        an amount equal to the amount of all non-cash charges (including depreciation and amortization) to the extent deducted in arriving at such Consolidated Net Income, but excluding any such non-cash charges representing an accrual or reserve for potential cash items in

any future period and excluding amortization of a prepaid cash item that was paid in a prior period,

(iii)    decreases in Consolidated Working Capital for such period (other than any such decreases arising from acquisitions or Dispositions by the Borrower and the Restricted Subsidiaries completed during such period or the application of purchase accounting),

(iv)    an amount equal to the aggregate net non-cash loss on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income,

(v)    the amount deducted as tax expense in determining Consolidated Net Income to the extent in excess of cash taxes paid in such period, and

(vi)    cash receipts in respect of Swap Contracts during such period to the extent not otherwise included in such Consolidated Net Income; <u>over</u>

(b)    the sum, without duplication, of:

(i)    an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income (but excluding any non-cash credit to the extent representing the reversal of an accrual or reserve described in clause (a)(ii) above) and cash charges excluded by virtue of clauses (a) through (k) of the definition of "Consolidated Net Income,"

(ii)    without duplication of amounts deducted pursuant to clause (xi) below in prior periods, the amount of Capital Expenditures or acquisitions of intellectual property accrued or made in cash during such period to the extent financed with (A) internally generated funds or (B) the proceeds of extensions of credit under the ABL Facilities or any other revolving credit facility, in each case, of the Borrower or the Restricted Subsidiaries,

(iii)    the aggregate amount of all principal payments of Indebtedness of the Borrower and the Restricted Subsidiaries (including (A) the principal component of payments in respect of Capitalized Leases and (B) the amount of any mandatory prepayment of Loans pursuant to Section 2.03(b)(ii) to the extent required due to a Disposition that resulted in an increase to such Consolidated Net Income and not in excess of the amount of such increase, but excluding (X) all other prepayments of Loans, (Y) all prepayments in respect of the ABL Facilities and except to the extent there is an equivalent permanent reduction in commitments thereunder, all other prepayments of any other revolving credit facility and (Z) payments of any subordinated indebtedness except to the extent permitted to be paid pursuant to Section 7.12(a)) made during such period, in each case except to the extent financed with the proceeds of other long term Indebtedness (other than the proceeds of any revolving Indebtedness) of the Borrower or the Restricted Subsidiaries,

(iv)    an amount equal to the aggregate net non-cash gain on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income and the net cash loss on Dispositions to the extent otherwise added to arrive at Consolidated Net Income,

(v)    increases in Consolidated Working Capital for such period (other than any such increases arising from acquisitions or Dispositions by the Borrower and the Restricted Subsidiaries completed during such period or the application of purchase accounting),

(vi)    cash payments by the Borrower and the Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and the Restricted Subsidiaries (other

-22-

than Indebtedness) to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income,

(vii)    without duplication of amounts deducted pursuant to clauses (viii) and (xi) below in prior periods, the amount of Investments made pursuant to Sections 7.02(b)(iii), (m) (but excluding such loans and advances in respect of Sections 7.06(g)(i), (g)(iv) (to the extent the amount of such Investment would not have been deducted pursuant to this clause if made by the Borrower or a Restricted Subsidiary) and (k)) and (n) and acquisitions made during such period to the extent that such Investments and acquisitions were financed with internally generated cash flow of the Borrower and the Restricted Subsidiaries and not made in reliance on any basket calculated by reference to the Available Amount,

(viii)    the amount of Restricted Payments paid during such period pursuant to Sections 7.06(g), (h) and (o), in each case to the extent such Restricted Payments were financed with internally generated cash flow of the Borrower and the Restricted Subsidiaries,

(ix)    the aggregate amount of expenditures actually made by the Borrower and the Restricted Subsidiaries from internally generated cash flow of the Borrower and the Restricted Subsidiaries during such period (including expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such period or are not deducted in calculating Consolidated Net Income,

(x)    the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by Holdings, the Borrower and the Restricted Subsidiaries during such period that are made in connection with any prepayment of Indebtedness to the extent such payments are not expensed during such period or are not deducted in calculating Consolidated Net Income and such payments reduced Excess Cash Flow pursuant to clause (b)(iii) above or reduced the mandatory prepayment required by Section 2.03(b)(i),

(xi)    without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate consideration required to be paid in cash by the Borrower or any of the Restricted Subsidiaries pursuant to binding contracts (the "**Contract Consideration**") entered into prior to or during such period relating to Permitted Acquisitions, Capital Expenditures or acquisitions of intellectual property to be consummated or made during the period of four consecutive fiscal quarters of the Borrower following the end of such period; *provided* that, to the extent the aggregate amount of internally generated cash flow actually utilized to finance such Permitted Acquisitions, Capital Expenditures or acquisitions of intellectual property during such period of four consecutive fiscal quarters is less than the Contract Consideration, the amount of such shortfall shall be added to the calculation of Excess Cash Flow at the end of such period of four consecutive fiscal quarters,

(xii)    the amount of cash taxes paid or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, and

(xiii)    cash expenditures in respect of Swap Contracts during such period to the extent not deducted in arriving at such Consolidated Net Income.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Exchange Term Loans**" has the meaning assigned to such term in the recitals to this Agreement.

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a wholly owned Subsidiary of the Borrower or a Guarantor, (b) any Foreign Subsidiary, (c) any Domestic Subsidiary substantially all of the assets of which consist of Equity Interests in, or Equity Interests in and indebtedness of, one or more Foreign Subsidiaries or

Domestic Subsidiaries described in this clause (c), (d) any Domestic Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary, (e) any Subsidiary that is prohibited or restricted by applicable Law from providing a Guaranty or if such Guaranty would require governmental (including regulatory) consent, approval, license or authorization, (f) any special purpose securitization vehicle (or similar entity), including any Securitization Subsidiary, (g) any Subsidiary that is a not-for-profit organization, (h) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), the cost or other consequences (including any adverse tax consequences) of providing the Guaranty shall be excessive in view of the benefits to be obtained by the Lenders therefrom and (i) each Unrestricted Subsidiary.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to any "keepwell, support or other agreement" for the benefit of such Guarantor and any and all guarantees of such Guarantor's Swap Obligations by other Loan Parties) at the time the Guaranty of such Guarantor, or a grant by such Guarantor of a security interest, becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes excluded in accordance with the first sentence of this definition.

"**Excluded Taxes**" means, with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) any Tax imposed on or measured by such recipient's net income or any franchise Tax (in each case, however denominated), in each case (i) imposed by a jurisdiction as a result of such recipient being organized or having its principal office or applicable Lending Office located in such jurisdiction **(including, for the avoidance of doubt, any backup withholding in respect of such a tax under Section 3406 of the Code )** or (ii) that are Other Connection Taxes, (b) any branch profits Tax under Section 884(a) of the Code imposed by any jurisdiction described in (a), (c) with respect to any Lender (other than any Lender becoming a party hereto pursuant to the Borrower's request under Section 3.07), any U.S. federal withholding Tax that is imposed on amounts payable to such Lender pursuant to a Law in effect at the time such Lender becomes a party hereto or designates a new Lending Office or experiences a change in circumstances (other than a Change in Law), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment or change in circumstances), to receive additional amounts from a Loan Party with respect to such U.S. federal withholding tax pursuant to Section 3.01, (d) any withholding Tax attributable to such recipient's failure to comply with Section 3.01(c) or (h), and (e) any U.S. federal withholding Tax imposed under FATCA.

"**Existing Term Loan Agreement**" has the meaning specified in the recitals.

"**Extended Loans**" has the meaning specified in Section 2.14(a).

"**Extending Lender**" has the meaning specified in Section 2.14(a).

"**Extension**" has the meaning specified in Section 2.14(a).

"**Extension Offer**" has the meaning specified in Section 2.14(a).

"**Facility**" means the Exchange Term Loans, the Incremental Exit Loans, the Term Loans, any Extended Loans, any Incremental Loans or any Other Loans, as the context may require.

"**FATCA**" means Sections 1471 through 1474 of the Code as in effect on the Closing Date (including, for the avoidance of doubt, any agreements between governmental authorities implementing such provisions, any law implementing such agreements and any agreements entered into pursuant to Section 1471(b)(1) of the Code) and any amended or successor provisions that are substantively comparable and not materially more

onerous to comply with (and, in each case, any regulations promulgated thereunder or official interpretations thereof).

"**Federal Funds Rate**" means, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the federal funds effective rate; *provided* that if the Federal Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Fee Letter**" means that certain fee letter, dated as of April [ ], 2024 by and between the Administrative Agent and the Borrower.

"**First Lien Intercreditor Agreement**" means a first lien intercreditor agreement among the Collateral Agent and one or more Senior Representatives for holders of Permitted Pari Passu Secured Debt (or Permitted Refinancing thereof) substantially in the form of Exhibit H-1, with such changes thereto, taken as a whole, as the Administrative Agent reasonably determines are not materially adverse to the Lenders.

"**Flood Insurance Laws**" shall mean, collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"**Foreign Casualty Event**" has the meaning specified in Section 2.03(b)(v).

"**Foreign Disposition**" has the meaning specified in Section 2.03(b)(v).

"**Foreign Plan**" means any material employee benefit plan, program or agreement maintained or contributed to by, or entered into with, Holdings or any Subsidiary of Holdings with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"**Foreign Subsidiary**" means any direct or indirect Subsidiary that is not a Domestic Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**Funded Debt**" means all Indebtedness of the Borrower and the Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time; *provided*, *however*, that (i) accounting for leases shall be determined in accordance with generally accepted accounting principles in the United States as in effect on the Closing Date and (ii) if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof (including through the adoption of IFRS) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof (including through the adoption of IFRS), then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such

change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(g).

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or monetary other obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness for borrowed money).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantors**" has the meaning specified in the definition of "Collateral and Guarantee Requirement."  For avoidance of doubt, the Borrower may cause any Restricted Subsidiary that is not a Guarantor to Guarantee the Obligations by causing such Restricted Subsidiary to execute a joinder to the Guaranty in form and substance reasonably satisfactory to the Administrative Agent **(acting at the Direction of the Required Lenders)**, and any such Restricted Subsidiary shall be a Guarantor hereunder for all purposes.

"**Guaranty**" means (a) the guaranty made by Holdings and the other Guarantors in favor of the Administrative Agent on behalf of the Secured Parties pursuant to clause (b) of the definition of "Collateral and Guarantee Requirement," on the Closing Date and (b) each other guaranty and guaranty supplement delivered pursuant to Section 6.11.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, all substances, wastes, contaminants or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, and radon gas, regulated pursuant to any Environmental Law.

"**Hedge Bank**" means any Person that is an Agent, a Lender or an Affiliate of any of the foregoing on the Closing Date or at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto, whether or not such Person subsequently ceases to be an Agent, a Lender or an Affiliate of any of the foregoing.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

-26-

"**IFRS**" means international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements.

"**Incremental Amendment**" has the meaning specified in Section 2.12(a).

"**Incremental Exit Loans**" has the meaning assigned to such term in the recitals to this Agreement.

"**Incremental Facility Closing Date**" has the meaning specified in Section 2.12(a).

"**Incremental Loans**" has the meaning specified in Section 2.12(a).

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness;

(g)     all obligations of such Person in respect of Disqualified Equity Interests; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include (A) the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt and (B) in the case of Restricted Subsidiaries that are not Loan Parties, exclude loans and advances made by Loan Parties having a term not exceeding 364 days (inclusive of any roll over or extensions of terms) and made in the ordinary course of business solely to the extent that such intercompany loans and advances are evidenced by one or more notes in form and substance reasonably satisfactory to the Administrative Agent **(acting at the Direction of the Required Lenders)** and pledged as Collateral.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i)

-27-

the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"**Information**" has the meaning specified in Section 10.08.

"**Initial Loans**" means all loans outstanding under this Agreement immediately prior to the Closing Date.

"**Intellectual Property**" has the meaning specified in the Security Agreement.

"**Intellectual Property Security Agreements**" has the meaning specified in the Security Agreement.

"**Intercompany Subordination Agreement**" means an agreement executed by each Restricted Subsidiary of the Borrower, in substantially the form of Exhibit J.

"**Interest Coverage Ratio**" means, as of any date of determination, the ratio of (a) Consolidated EBITDA of the Borrower to (b) Consolidated Cash Interest Expense of the Borrower, in each case, for the most recent Test Period, calculated on a Pro Forma Basis.

"**Interest Payment Date**" means, (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the applicable Maturity Date; *provided* that if any Interest Period for a Term SOFR Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the applicable Maturity Date and (c) with respect to the Initial Loans, the Closing Date. Notwithstanding the foregoing, the first Interest Payment Date on the Term Loans shall be deferred until September 30, 2024.

"**Interest Period**" means as to each Term SOFR Loan, the period commencing on the date such Term SOFR Loan is disbursed or converted to or continued as a Term SOFR Loan and ending on the date one, three or six months thereafter, as selected by the Borrower in its Committed Loan Notice; provided that:

(i)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii)   any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(iii)  no Interest Period shall extend beyond the applicable Maturity Date.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other

Person (excluding, in the case of the Borrower and its Restricted Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business) or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made (which, in the case of any Investment constituting the contribution of an asset or property, shall be based on the Borrower's good faith estimate of the fair market value of such asset or property at the time such Investment is made)), without adjustment for subsequent changes in the value of such Investment, net of any return representing a return of capital with respect to such Investment.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other nationally recognized statistical rating agency selected by the Borrower.

"**IP Rights**" has the meaning specified in Section 5.15.

"**IRS**" means Internal Revenue Service of the United States.

"**Jo-Ann Stores**" has the meaning assigned to such term in the recitals to this Agreement.

"**Joint Venture**" means (a) any Person which would constitute an "equity method investee" of the Borrower or any of the Restricted Subsidiaries and (b) any Person in whom the Borrower or any of the Restricted Subsidiaries beneficially owns any Equity Interest that is not a Restricted Subsidiary (other than an Unrestricted Subsidiary).

"**Junior Financing**" means any Indebtedness in an aggregate principal amount of not less than the Threshold Amount at such time that is contractually subordinated in right of payment to the Obligations expressly by its terms.

"**Junior Financing Documentation**" means any documentation governing any Junior Financing.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, including the latest maturity or expiration date of any Incremental Loan, any Other Loan or any Extended Loan, in each case as extended in accordance with this Agreement from time to time.

"**Laws**" means, collectively, all applicable international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."  For avoidance of doubt, each Additional Lender is a Lender to the extent any such Person has executed and delivered a Refinancing Amendment or an Incremental Amendment, as the case may be, and to the extent such Refinancing Amendment or Incremental Amendment shall have become effective in accordance with the terms hereof and thereof, and each Extending Lender shall continue to be a Lender.

"**Lender Advisors**" means (x) the Specified Lender Advisors, and (y) any other financial advisor, auditor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Required Lenders and agreed by the Borrower in its reasonable discretion.

-29-

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); *provided* that in no event shall an operating lease in and of itself be deemed a Lien.

"**Limited Condition Acquisition**" means any Investment or acquisition (whether by way of merger, amalgamation, consolidation or other business combination or the acquisition of Equity Interests or otherwise) by the Borrower or one or more of its Restricted Subsidiaries permitted by this Agreement whose consummation is not conditioned on the availability of, or on obtaining, third party acquisition financing and which is designated as a Limited Condition Acquisition by the Borrower or such Restricted Subsidiary in writing to the Administrative Agent.

"**Loan**" means an extension of credit by a Lender to the Borrower under Article II.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) any Refinancing Amendment, Incremental Amendment or Extension Offer, (d) the Guaranty, (e) the Fee Letter, (f) the Collateral Documents and (g) each joinder agreement, and any other document or instrument designated by the Borrower and the Administrative Agent (acting at the Direction of the Required Lenders) as a "Loan Document.".

"**Loan Parties**" means, collectively, (a) Holdings, (b) the Borrower and (c) each other Guarantor.

"**Make-Whole Premium**" means an amount equal to (a) the present value of all required payments of interest (calculated at the rate of interest in effect on the applicable prepayment date) on the principal amount of the Loans being prepaid or repaid from the applicable prepayment date through the first anniversary of the Closing Date (excluding accrued and unpaid interest to the applicable prepayment date), which present value shall be calculated using a discount rate equal to the Treasury Rate plus 50 basis points plus (b) 2.0% of the principal amount of the Loans being repaid or prepaid; provided that, in no case shall the Make-Whole Premium be less than zero.

"**Margin Stock**" has the meaning set forth in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Master Agreement**" has the meaning specified in the definition of "Swap Contract."

"**Material Adverse Effect**" means any event, circumstance or condition that has had a materially adverse effect on (a) the business, operations, assets, liabilities (actual or contingent) or financial condition of Holdings and its Subsidiaries, taken as a whole, (b) the ability of the Loan Parties (taken as a whole) to perform their respective material payment obligations under any Loan Document to which any of the Loan Parties is a party or (c) the rights and remedies of the Lenders, the Collateral Agent or the Administrative Agent (taken as a whole) under any Loan Document.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more

-30-

Case 24-10418-CTG    Doc 290    Filed 04/23/24    Page 658 of 774

than 5.0% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for the period of four consecutive fiscal quarters ending as of the last day of such fiscal quarter, then the Borrower shall, not later than forty-five (45) days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement (or such longer period as the Administrative Agent may agree in its reasonable discretion), (i) designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and (ii) comply with the provisions of Section 6.11 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP.

"**Material Intellectual Property**" shall mean any Intellectual Property owned by any Loan Party that is material to the operation of the business of Holdings and its Subsidiaries, taken as a whole (as reasonably determined by the Borrower in good faith).

"**Material Real Property**" means any real property owned by any Loan Party with a fair market value in excess of $5,000,000.

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means (i) with respect to the Term Loans that have not been extended pursuant to Section 2.14, the earliest of (a) the date that is four years after the Closing Date (the "**Original Maturity Date**"), (ii) with respect to any tranche of Extended Loans, the final maturity date as specified in the applicable Extension Offer accepted by the respective Lender or Lenders, (iii) with respect to any Other Loans, the final maturity date as specified in the applicable Refinancing Amendment and (iv) with respect to any Incremental Loans, the final maturity date as specified in the applicable Incremental Amendment; *provided*, in each case, that if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately preceding such day.

"**Maximum Incremental Amount**" means $35,000,000 **(which shall for the avoidance of doubt, exclude the aggregate principal amount of the Incremental Exit Loans)**.

"**Maximum Rate**" has the meaning specified in Section 10.10.

"**Minimum Extension Condition**" has the meaning specified in Section 2.14(b).

"**Minority Investment**" means any Person other than a Subsidiary in which the Borrower or any Restricted Subsidiary owns any Equity Interests.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage Policies**" has the meaning specified in Section 6.13(b)(ii).

"**Mortgaged Properties**" has the meaning specified in paragraph (e) of the definition of "Collateral and Guarantee Requirement."

"**Mortgages**" means collectively, the deeds of trust, trust deeds, deeds to secure debt, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Collateral Agent on behalf of the Lenders in form and substance reasonably satisfactory to the Collateral Agent, and any other mortgages executed and delivered pursuant to Section 6.11.

-31-

US-DOCS\150029138.4149885390.12

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means:

(a)    with respect to the Disposition of any asset by the Borrower or any of the Restricted Subsidiaries or any Casualty Event, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash and Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any of the Restricted Subsidiaries) over (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition or Casualty Event and required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents, the ABL Facilities Documentation, Credit Agreement Refinancing Indebtedness and other Indebtedness secured on a *pari passu* basis with (or junior priority basis to) the Obligations), (B) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred by the Borrower or such Restricted Subsidiary in connection with such Disposition or Casualty Event, (C) taxes or distributions made pursuant to Section 7.06(g)(i) or (g)(iii) paid or reasonably estimated to be payable in connection therewith (including taxes imposed on the distribution or repatriation of any such Net Cash Proceeds), (D) in the case of any Disposition or Casualty Event by a non-wholly owned Restricted Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (D)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Restricted Subsidiary as a result thereof, and (E) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include the amount of any reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (E); *provided* that no net cash proceeds calculated in accordance with the foregoing realized in any transaction or series of related transactions shall constitute Net Cash Proceeds unless such amount exceeds $10,000,000; *provided further* that no net cash proceeds calculated in accordance with the foregoing realized in any fiscal year shall constitute Net Cash Proceeds under this clause (a) in such fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $20,000,000 (and, in each case, thereafter only net cash proceeds in excess of such amount shall constitute Net Cash Proceeds under this clause (a)); and

(b)    (i) with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary or any Permitted Equity Issuance by the Borrower, the excess, if any, of (A) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (B) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance and (ii) with respect to any Permitted Equity Issuance by any direct or indirect parent of the Borrower, the amount of cash from such Permitted Equity Issuance contributed to the capital of the Borrower.

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends.

"**Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA of the Borrower for such Test Period.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07.

"**Non-Excluded Taxes**" means all Taxes other than Excluded Taxes and Other Taxes.

"**Non-Loan Party**" means any Subsidiary of the Borrower that is not a Loan Party.

"**Non-US Lender**" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Note**" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender.

"**Obligations**" means all (a) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, including without limitation the Applicable Prepayment Amount, (b) obligations of any Loan Party arising under any Secured Hedge Agreement, (c) Cash Management Obligations and (d) Erroneous Payment Subrogation Rights.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and any of their Subsidiaries to the extent they have obligations under the Loan Documents) include the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document; *provided* that the Obligations shall exclude any Excluded Swap Obligations.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**OID**" means original issue discount.

"**Organization Documents**" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Original Maturity Date**" has the meaning specified in the definition of "Maturity Date.".

"**Other Applicable Indebtedness**" has the meaning specified in Section 2.03(b)(ii)(A).

"**Other Connection Taxes**" means, with respect to any Lender, any Agent or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, Taxes imposed as a result of a present or former connection between such Lender, recipient or any Agent and the jurisdiction imposing such Tax (other than connections arising from such Lender, recipient or any Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received

-33-

or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Loans**" means one or more Classes of Loans that result from a Refinancing Amendment.

"**Other Taxes**" means any and all present or future stamp, court or documentary intangible, recording, filing or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document excluding, in each case, Other Connection Taxes that result from an Assignment and Assumption or other assignment (other than an assignment made pursuant to Section 3.07).

"**Other Term Commitments**" means one or more Classes of Loan commitments hereunder that result from a Refinancing Amendment.

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Parent**" has the meaning assigned to such term in the recitals to this Agreement.

"**Participant**" has the meaning specified in Section 10.07(d).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**Payment Recipient**" has the meaning assigned to it in Section 9.16(a).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Permitted Acquisition**" has the meaning specified in Section 7.02(i).

"**Permitted Equity Issuance**" means any sale or issuance of any Qualified Equity Interests of the Borrower or any direct or indirect parent of the Borrower, in each case to the extent permitted hereunder.

"**Permitted Holder**" means any of (a) any beneficial owner in the common equity of Parent as of the Closing Date, (b) any of the Controlled Affiliates (excluding any portfolio companies or of any of their Controlled Affiliates) of any of the Persons specified in clause (a) above and (c) any "group" within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act (or any successor provision) of which any of the foregoing are members; provided that in the case of such "group" and without giving effect to the existence of such "group" or any other "group", such Persons specified in clauses (a) and (b) above, individually or collectively, have beneficial ownership, directly or indirectly, of more than 50% of the total voting power of the voting stock of Parent or any of its direct or indirect parent entities held by such "group".

"**Permitted Junior Secured Refinancing Debt**" means any secured Indebtedness incurred by the Borrower and/or any Subsidiary Guarantor in the form of one or more series of second-lien secured notes or second-lien secured loans; *provided* that (i) such Indebtedness is secured by the Collateral on a second-priority basis with the Obligations and is not secured by any property or assets of the Borrower or any Subsidiary other than the Collateral, (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, (iii) such Indebtedness does not mature or have scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (other than customary offers to repurchase upon a change of control, asset sale or casualty event and customary acceleration rights after an event of default) prior to the Latest Maturity Date at the time such Indebtedness is incurred, (iv) the security agreements relating to such Indebtedness are substantially the same as the Collateral Documents (with such differences as are reasonably satisfactory to the Collateral Agent), (v) such Indebtedness is not guaranteed by any Subsidiaries other than the Subsidiary Guarantors and (vi) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to or otherwise subject to the provisions of (A) the ABL Intercreditor Agreement and (B) a

Second Lien Intercreditor Agreement; *provided* that if such Indebtedness is the initial Permitted Junior Secured Refinancing Debt incurred by the Borrower, then Holdings, the Borrower, the Subsidiary Guarantors, the Collateral Agent and the Senior Representative for such Indebtedness shall have executed and delivered a Second Lien Intercreditor Agreement.  Permitted Junior Secured Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"**Permitted Pari Passu Secured Debt**" means any secured Indebtedness incurred by the Borrower and/or any Subsidiary Guarantor in the form of one or more series of senior secured notes or loans; *provided* that (i) such Indebtedness is secured by the Collateral on a *pari passu* basis (but without regard to the control of remedies) with the Obligations and is not secured by any property or assets of Holdings or any Subsidiary other than the Collateral, (ii) either (x) the aggregate principal amount of Permitted Pari Passu Secured Debt previously issued under this clause (x), when aggregated with the aggregate principal amount of Incremental Loans previously borrowed (and the aggregate principal amount of Permitted Ratio Debt incurred), does not exceed the Maximum Incremental Amount; *provided* that any Indebtedness incurred in reliance on this clause (x) shall be subject to the provisions of Section 2.12(a)(e) to the same extent as if such Indebtedness was in the form of Incremental Loans or (y) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, (iii) such Indebtedness does not mature or have scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (other than (w) customary offers to repurchase upon a change of control, asset sale or casualty event, (x) customary acceleration rights after an event of default, (y) customary rollover (or equivalent repayment) provisions in any bridge facility or (z) with the proceeds of any Permitted Refinancing thereof) prior to the Latest Maturity Date at the time such Indebtedness is incurred, (iv) the security agreements relating to such Indebtedness are substantially the same as the Collateral Documents (with such differences as are reasonably satisfactory to the Administrative Agent **(acting at the Direction of the Required Lenders)**), (v) such Indebtedness is not guaranteed by any Subsidiaries other than the Subsidiary Guarantors and (vi) a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to or otherwise subject to the provisions of (A) the ABL Intercreditor Agreement and (B) a First Lien Intercreditor Agreement; *provided* that if such Indebtedness is the initial Permitted Pari Passu Secured Debt incurred by the Loan Parties, then the Loan Parties, the Collateral Agent and the Senior Representative for such Indebtedness shall have executed and delivered a First Lien Intercreditor Agreement.  Permitted Pari Passu Secured Debt will include any Registered Equivalent Notes issued in exchange therefor.

"**Permitted Ratio Debt**" means Indebtedness of the Borrower and/or any Subsidiary Guarantor *provided* that:

(a)        such Indebtedness does not mature prior to the date that is one hundred and eighty one (181) days after the Latest Maturity Date at the time such Indebtedness is incurred (except that Indebtedness may have an initial maturity that is earlier than the Latest Maturity Date so long as such Indebtedness automatically converts to Indebtedness maturing after the Latest Maturity Date subject only to the condition that no payment event of default or bankruptcy (with respect to the Borrower and its Subsidiaries) event of default exists on the initial maturity date);

(b)        such Indebtedness has no scheduled amortization or scheduled payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (other than (w) customary offers to repurchase upon a change of control, asset sale or casualty event, (x) customary acceleration rights after an event of default, (y) customary rollover (or equivalent repayment) provisions in any bridge facility or (z) from the proceeds of a Permitted Refinancing thereof) prior to the date that is one hundred and eighty one (181) days after the Latest Maturity Date at the time such Indebtedness is incurred;

(c)        immediately after giving effect thereto and to the use of the proceeds thereof (but excluding any cash proceeds thereof), no Event of Default shall exist or result therefrom (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 8.01(a) or 8.01(f) as of the Transaction Agreement Date); and

(d)        immediately after giving effect to the issuance, incurrence, or assumption of such Indebtedness:

(x)        in the case of Pari Passu Secured Debt, the Senior Secured Net Leverage Ratio after giving Pro Forma Effect to the incurrence of such Indebtedness is less than or equal to (I) [2.50]:1.00 [or (II) if any such Indebtedness is incurred to finance a Permitted Acquisition or other permitted Investment, the Total Secured Net Leverage Ratio immediately prior to the incurrence of such Indebtedness];

(y)        in the case of Indebtedness secured solely by Liens on the Collateral ranking junior to the Liens securing the Obligations pursuant to a Second Lien Intercreditor Agreement, the Total Secured Net Leverage Ratio after giving Pro Forma Effect to the incurrence of such Indebtedness is less than or equal to (I) [3.50]:1.00 [or (II) if any such Indebtedness is incurred to finance a Permitted Acquisition or other permitted Investment, the Total Secured Net Leverage Ratio immediately prior to the incurrence of such Indebtedness]; and

(z)        in the case of Indebtedness that is unsecured or secured by assets that do not constitute Collateral, either (A) the Net Leverage Ratio after giving Pro Forma Effect to the incurrence of such Indebtedness and the application of proceeds therefrom is less than or equal to (I) [4.00:1.00 [or (II) if any such Indebtedness is incurred to finance a Permitted Acquisition or other permitted Investment, the Net Leverage Ratio immediately prior to the incurrence of such Indebtedness] or (III) the Interest Coverage Ratio after giving Pro Forma Effect to the incurrence of such Indebtedness and the application of proceeds thereof is at least (1) 2.00:1.00 [or (2) if any such Indebtedness is incurred to finance a Permitted Acquisition or other permitted Investment, the Interest Coverage Ratio immediately prior to the incurrence of such Indebtedness].

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium (including tender premiums) thereon, plus reasonable OID and upfront fees plus other fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(b) or Section 7.03(e), such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), at the time thereof, no Event of Default shall have occurred and be continuing, (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is Junior Financing, (i) such modification, refinancing, refunding, renewal, replacement or extension shall constitute Junior Financing on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (ii) the terms and conditions (excluding as to subordination, pricing, premiums and optional prepayment or redemption provisions) of any such modified, refinanced, refunded, renewed or extended Indebtedness, taken as a whole, are not materially less favorable to the Loan Parties or the Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended; *provided* that a certificate of a Responsible Officer of the Borrower delivered to the Administrative Agent at least five (5) Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a description of the basis upon which it disagrees) and (iii) such modification, refinancing, refunding, renewal or extension is incurred by the Person who is the obligor of the Indebtedness being modified, refinanced, refunded, renewed or extended and no additional obligors become liable for such Indebtedness, and (e) in the case of any Permitted Refinancing in respect of the ABL Facilities, such Permitted Refinancing is secured only by assets pursuant to one or more security agreements permitted by and subject to the ABL Intercreditor Agreement.

"**Permitted Unsecured Refinancing Debt**" means any unsecured Indebtedness incurred by the Borrower and/or any Subsidiary Guarantor in the form of one or more series of unsecured notes or loans; *provided* that (i) such Indebtedness is not secured by any property or assets of the Borrower or any Restricted Subsidiary, (ii) such Indebtedness constitutes Credit Agreement Refinancing Indebtedness, (iii) such Indebtedness does not mature or have scheduled amortization prior to the Latest Maturity Date at the time such Indebtedness is incurred (other than customary offers to repurchase upon a change of control or asset sale and customary acceleration rights after an event of default), and (iv) such Indebtedness is not guaranteed by any Subsidiaries other than the Subsidiary Guarantors.  Permitted Unsecured Refinancing Debt will include any Registered Equivalent Notes issued in exchange therefor.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Platform**" has the meaning specified in Section 6.02.

"**Pledged Debt**" has the meaning specified in the Security Agreement.

"**Pledged Equity**" has the meaning specified in the Security Agreement.

"**Prepetition Credit Agreement**" has the meaning assigned to such term in the recitals to this Agreement.

"**Prepetition Lenders**" has the meaning assigned to such term in the recitals to this Agreement.

"**Prepetition Loans**" has the meaning assigned to such term in the recitals to this Agreement.

"**Pro Forma Basis**" and "**Pro Forma Effect**" mean, with respect to compliance with any test or covenant or calculation hereunder, or the calculation of Consolidated EBITDA hereunder, the determination or calculation of such test, covenant, ratio or Consolidated EBITDA (including in connection with Specified Transactions) in accordance with Section 1.08.

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments and, if applicable and without duplication, Loans of such Lender under the applicable Facility or Facilities at such time and the denominator of which is the amount of the Aggregate Commitments and, if applicable and without duplication, Loans under the applicable Facility or Facilities at such time.

"**Public Lender**" has the meaning specified in Section 6.02.

"**QFC Credit Support**" has the meaning specified in Section 10.24.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualified Securitization Financing**" means any Securitization Financing of a Securitization Subsidiary that meets the following conditions:  (a) such Qualified Securitization Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and the Securitization Subsidiary, (b) all sales and/or contributions of Securitization Assets and related assets to the Securitization Subsidiary are made at fair market value and (c) the financing terms, covenants, termination events and other provisions thereof, including any Standard Securitization Undertakings, shall be market terms.  The grant of a security interest in any Securitization Assets of the Borrower or any of the Restricted Subsidiaries (other than a Securitization Subsidiary) to secure Indebtedness under this Agreement prior to engaging in any Securitization Financing shall not be deemed a Qualified Securitization Financing.

-37-

"**Quarterly Financial Statements**" means the unaudited condensed consolidated balance sheets and related statements of income and cash flows of the Borrower and its Subsidiaries for the most recent fiscal quarters after the date of the Annual Financial Statements and ended at least forty-five (45) days before the Closing Date.

"**Reference Date**" has the meaning specified in the definition of "Available Amount."

"**Refinanced Loans**" has the meaning specified in Section 10.01.

"**Refinancing Amendment**" means an amendment to this Agreement in form and substance reasonably satisfactory to the Administrative Agent **(acting at the Direction of the Required Lenders)** and the Borrower executed by each of (a) the Borrower, (b) the Administrative Agent (whose consent shall not be unreasonably withheld) and (c) each Additional Lender and Lender that agrees to provide any portion of the Other Loans being incurred pursuant thereto, in accordance with Section 2.13.

"**Refinanced Term Debt**" has the meaning specified in the definition of "Credit Agreement Refinancing Indebtedness."

"**Register**" has the meaning specified in Section 10.07(c).

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"**Related Adjustment**" means, in determining any Successor Rate, the first relevant available alternative set forth in the order below that can be determined by the Administrative Agent applicable to such Successor Rate:

(A)    the spread adjustment, or method for calculating or determining such spread adjustment, that has been selected or recommended by the Relevant Governmental Body for the relevant Pre-Adjustment Successor Rate (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto); or

(B)    the spread adjustment that would apply (or has previously been applied) to the fallback rate for a derivative transaction referencing the ISDA Definitions (taking into account the interest period, interest payment date or payment period for interest calculated and/or tenor thereto).

"**Related Indemnified Person**" of an Indemnitee means (a) any controlling person or controlled affiliate of such Indemnitee, (b) the respective directors, officers, or employees of such Indemnitee or any of its controlling persons or controlled affiliates and (c) the respective agents of such Indemnitee or any of its controlling persons or controlled affiliates, in the case of this clause (c), acting at the instructions of such Indemnitee, controlling person or such controlled affiliate; *provided* that each reference to a controlled affiliate or controlling person in this definition shall pertain to a controlled affiliate or controlling person involved in the negotiation or syndication of the Facility or the ABL Facilities.

"**Relevant Governmental Body**" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"**Replacement Loans**" has the meaning specified in Section 10.01.

-38-

"**Reportable Event**" means, with respect to any Employee Benefit Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Repricing Transaction**" means the prepayment, refinancing, substitution or replacement of all or a portion of the Term Loans with the incurrence by the Borrower or any Subsidiary of any debt financing the primary purpose of which is to reduce the effective interest cost or weighted average yield (with the comparative determinations to be made by the Administrative Agent consistent with generally accepted financial practices, after giving effect to, among other factors, margin, interest rate floors, upfront or similar fees or original issue discount shared with all providers of such financing, but excluding the effect of any arrangement, structuring, syndication or other fees payable in connection therewith that are not shared with all providers of such financing, and without taking into account any fluctuations in the Term SOFR) of the Term Loans, including without limitation, as may be effected through any amendment to this Agreement relating to the interest rate for, or weighted average yield of, such Term Loans or the incurrence of any Replacement Loans; provided, that in each case, the term "Repricing Transaction" shall exclude any prepayment, refinancing, substitution or replacement of all or a portion of the Term Loans in connection with any transaction that would, if consummated, constitute a Transformative Acquisition.

"**Required Facility Lenders**" means, with respect to any Facility on any date of determination, Lenders having more than 50% of the sum of (i) the outstanding Loans under such Facility and (ii) the aggregate unused Commitments under such Facility.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the sum of the (a) outstanding Loans and (b) aggregate unused Commitments.

"**Rescindable Amount**" has the meaning assigned to such term in Section 2.10(a)(ii).

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, treasurer or controller of a Loan Party, solely for purposes of the delivery of incumbency certificates, the secretary or any assistant secretary of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of Holdings, the Borrower or any of its Restricted Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or Holdings' stockholders, partners or members (or the equivalent Persons thereof) other than (i) the payment of compensation in the ordinary course of business to holders of any such Equity Interests who are employees or service providers of Holdings (or any direct or indirect parent thereof) or any Subsidiary solely in their capacity as employees or service providers and (ii) other than payments of intercompany indebtedness permitted under this Agreement, unless such payments are made in the form of dividends or other distributions that would otherwise be classified as Restricted Payments hereunder.

"**Restricted Subsidiary**" means any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means disbursements and payments in immediately available funds.

"**Sanctions**" means any sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, His Majesty's Treasury ("**HMT**") or other relevant sanctions authority.

"**Scheduled Unavailability Date**" has the meaning specified in Section 3.03(b)(ii).

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Lien Intercreditor Agreement**" means a junior lien intercreditor agreement among the Collateral Agent, the ABL Administrative Agent and one or more Senior Representatives, including one or more Senior Representatives for the holders of Permitted Junior Secured Refinancing Debt or Permitted Ratio Debt substantially in the form of Exhibit H-2, with such changes thereto, taken as a whole, as are reasonably determined by the Administrative Agent **(acting at the Direction of the Required Lenders)** to be not materially adverse to the Lenders.

"**Secured Hedge Agreement**" means any Swap Contract permitted under Section 7.03(f) that is entered into by and between any Loan Party or any Restricted Subsidiary and any Hedge Bank; and designated in writing by the Hedge Bank and the Borrower to the Administrative Agent as a "Secured Hedge Agreement."

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, each Hedge Bank, each Cash Management Bank, the Supplemental Administrative Agent and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.01(b).

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Securitization Assets**" means the accounts receivable, royalty and other similar rights to payment subject to a Qualified Securitization Financing and the proceeds thereof.

"**Securitization Fees**" means distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees paid to a Person that is not a Securitization Subsidiary in connection with any Qualified Securitization Financing.

"**Securitization Financing**" means any transaction or series of transactions that may be entered into by the Borrower or any of its Subsidiaries pursuant to which the Borrower or any of its Subsidiaries may sell, convey or otherwise transfer to (a) a Securitization Subsidiary (in the case of a transfer by the Borrower or any of its Subsidiaries) or (b) any other Person (in the case of a transfer by a Securitization Subsidiary), or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries, and any assets related thereto, including all collateral securing such Securitization Assets, all contracts and all guarantees or other obligations in respect of such Securitization Assets, proceeds of such Securitization Assets and other assets that are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving Securitization Assets.

"**Securitization Repurchase Obligation**" means any obligation of a seller of Securitization Assets in a Qualified Securitization Financing to repurchase Securitization Assets arising as a result of a breach of a Standard Securitization Undertaking, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

-40-

"**Securitization Subsidiary**" means a wholly owned Subsidiary of the Borrower (or another Person formed for the purposes of engaging in a Qualified Securitization Financing in which the Borrower or any Subsidiary of the Borrower makes an Investment and to which the Borrower or any Subsidiary of the Borrower transfers Securitization Assets and related assets) that engages in no activities other than in connection with the financing of Securitization Assets of the Borrower or its Subsidiaries, all proceeds thereof and all rights (contingent and other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the board of directors of the Borrower or such other Person (as provided below) as a Securitization Subsidiary and (a) no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by Holdings, the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary (excluding guarantees of obligations (other than the principal of, and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates Holdings, the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, in any way other than pursuant to Standard Securitization Undertakings or (iii) subjects any property or asset of Holdings, the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings, (b) with which none of Holdings, the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, has any material contract, agreement, arrangement or understanding other than on terms which the Borrower reasonably believes to be no less favorable to Holdings, the Borrower or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Borrower and (c) to which none of Holdings, the Borrower or any other Subsidiary of the Borrower, other than another Securitization Subsidiary, has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.  Any such designation by the board of directors of the Borrower or such other Person shall be evidenced to the Administrative Agent by delivery to the Administrative Agent of a certified copy of the resolution of the board of directors of the Borrower or such other Person giving effect to such designation and a certificate executed by a Responsible Officer of the Borrower certifying that such designation complied with the foregoing conditions.

"**Security Agreement**" means, collectively, the Security Agreement executed by the Loan Parties on the Closing Date, together with each other Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"**Security Agreement Supplement**" has the meaning specified in the Security Agreement.

"**Senior Representative**" means, with respect to any series of Permitted Pari Passu Secured Debt, Permitted Junior Secured Refinancing Debt, Permitted Ratio Debt or any Permitted Refinancing thereof, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Senior Secured Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated First Lien Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA of the Borrower for such Test Period.

"**SOFR**" means the Secured Overnight Financing Rate as administered by the Federal Reserve Bank of New York (or a successor administrator).

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the assets of such Person exceeds its debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person is greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person is able to pay its debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured and (d) such Person is not engaged in, and is not about to engage in, business for which it has unreasonably small capital.  The amount of any

contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

"**SPC**" has the meaning specified in Section 10.07(g).

"**Specified Lender Advisors**" means (i) Gibson, Dunn & Crutcher LLP, as legal counsel to the Lenders and (ii) Lazard Ltd., as financial advisor to the Lenders.

"**Specified Representations**" means those representations and warranties made by the Borrower in Sections 5.01(a) (with respect to organizational existence only), 5.01(b)(ii), 5.02(a), 5.02(b)(i), 5.02(b)(iii), 5.04, 5.13, 5.16, 5.18 and 5.19.

"**Specified Transaction**" means any Investment that results in a Person becoming a Restricted Subsidiary, any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary, any Permitted Acquisition, any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or a Store or any Disposition of a business unit, line of business or division or a Store of the Borrower or a Restricted Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise, or any incurrence or repayment of Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes), Restricted Payment or Incremental Loan that by the terms of this Agreement requires such test to be calculated on a "Pro Forma Basis" or after giving "Pro Forma Effect."

"**Standard Securitization Undertakings**" means representations, warranties, covenants and indemnities entered into by the Borrower or any Subsidiary of the Borrower that are customary in a Securitization Financing.

"**Store**" means any retail store (which includes any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by the Borrower or any Restricted Subsidiary.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, charitable foundations) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Guarantor other than Holdings.

"**Successor Borrower**" has the meaning specified in Section 7.04(d).

"**Successor Holdings**" has the meaning specified in Section 7.04(e).

"**Successor Rate**" has the meaning specified in Section 3.03(b).

"**Supplemental Administrative Agent**" and "**Supplemental Administrative Agents**" have the meanings specified in Section 9.12(a).

"**Supported QFC**" has the meaning specified in Section 10.24.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap

transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligations**" means with respect to any Guarantor any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, imposed by any Governmental Authority, including any interest, additions to tax and penalties applicable thereto.

"**Tax Indemnitee**" has the meaning given to such term in Section 3.01(e).

"**Term Priority Collateral**" has the meaning assigned to such term in the ABL Intercreditor Agreement.

"**Test Period**" in effect at any time means the most recent period of four consecutive fiscal quarters of the Borrower ended on or prior to such time (taken as one accounting period) in respect of which financial statements for each quarter or fiscal year in such period have been or are required to be delivered pursuant to Section 4.01(g) or Section 6.01(a) or (b), as applicable; *provided* that, prior to the first date that financial statements have been or are required to be delivered pursuant to Section 6.01(a) or (b), the Test Period in effect shall be the period of four consecutive fiscal quarters of the Borrower ended [——]**February 3, 2024**.  A Test Period may be designated by reference to the last day thereof (i.e., the "[——]**February 3, 2024** Test Period" refers to the period of four consecutive fiscal quarters of the Borrower ended [——]**February 3, 2024**), and a Test Period shall be deemed to end on the last day thereof.

"**Term Commitment**" means, with respect to each Term Lender, its commitment to make a Term Loan on the Closing Date in an aggregate principal amount equal to $[  ].

"**Term Lender**" means a Lender with a Term Commitment and/or Term Loans.

"**Term Loan**" has the meaning assigned to such term in the recitals of this Agreement.

"**Term SOFR**" means:

(a)    for any Interest Period with respect to a Term SOFR Loan, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to the commencement of such Interest Period with a term equivalent to such Interest Period; provided that if the rate is not published prior to 11:00 a.m. on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto; and

-43-

(b)    for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to the Term SOFR Screen Rate two U.S. Government Securities Business Days prior to such date with a term of one month commencing that day; provided that if the rate is not published prior to 11:00 a.m. on such determination date then Term SOFR means the Term SOFR Screen Rate on the first U.S. Government Securities Business Day immediately prior thereto[;

*provided* that if Term SOFR determined in accordance with either of the foregoing provisions (a) or (b) of this definition would otherwise be less than [0.75]%, Term SOFR shall be deemed to be [0.75]% for purposes of this Agreement].

"**Term SOFR Loan**" means a Loan that bears interest at a rate based on clause (a) of the definition of Term SOFR.

"**Term SOFR Replacement Date**" has the meaning specified in Section 3.03(b).

"**Term SOFR Screen Rate**" means the forward-looking SOFR term rate administered by CME (or any successor administrator satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders)) and published on the applicable Reuters screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time).

"**Threshold Amount**" means $45,000,000.

"**Total Assets**" means the total assets of the Borrower and the Restricted Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 6.01(a) or (b) or, for the period prior to the time any such statements are so delivered pursuant to Section 6.01(a) or (b), the Quarterly Financial Statements.

"**Total Secured Net Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Secured Net Debt as of the last day of such Test Period to (b) Consolidated EBITDA of the Borrower for such Test Period.

"**Transaction Agreement Date**" has the meaning assigned to such term in Section 1.10

"**Transformative Acquisition**" shall mean any acquisition by Holdings or any of its Restricted Subsidiaries that either (a) is not permitted by the terms of this Agreement (other than any such acquisition that would be prohibited solely by Section 7.13) immediately prior to the consummation of such acquisition or (b) if permitted by the terms of this Agreement immediately prior to the consummation of such acquisition, would not provide Holdings and its Restricted Subsidiaries with adequate flexibility under this Agreement for the continuation and/or expansion of their combined operations following such consummation, as determined by the Borrower acting in good faith.

"**TSA**" means the Transaction Support Agreement, dated as of March 15, 2024 among the Loan Parties, the Lenders and other parties thereto.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Term SOFR Loan.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

-44-

"**Uniform Commercial Code**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" has the meaning given to such term in Section 3.01(c).

"**Unrestricted Subsidiary**" means (i) each Securitization Subsidiary and (ii) any Subsidiary of the Borrower designated by the board of directors of the Borrower as an Unrestricted Subsidiary pursuant to Section 6.14 subsequent to the Closing Date, in each case, until such Person ceases to be an Unrestricted Subsidiary of the Borrower in accordance with Section 6.14 or ceases to be a Subsidiary of the Borrower.

"**U.S. Government Securities Business Day**" means any Business Day, except any Business Day on which any of the Securities Industry and Financial Markets Association, the New York Stock Exchange or the Federal Reserve Bank of New York is not open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"**U.S. Lender**" means any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (b) the then outstanding principal amount of such Indebtedness; *provided* that for purposes of determining the Weighted Average Life to Maturity of any Refinanced Term Debt or any Indebtedness that is being modified, refinanced, refunded, renewed, replaced or extended (the "**Applicable Indebtedness**"), the effects of any prepayments or amortization made on such Applicable Indebtedness prior to the date of the applicable modification, refinancing, refunding, renewal, replacement or extension shall be disregarded.

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) nominal shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)        The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)        (i)  The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)        References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(iii)        The term "including" is by way of example and not limitation.

(iv)        The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)        In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(d)        Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

SECTION 1.03        Accounting Terms**.**

(a)        **Generally**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  **For purposes of calculating any consolidated amounts necessary to determine compliance by any Person and, if applicable, its Restricted Subsidiaries with any ratio or other financial covenant in this Agreement, Unrestricted Subsidiaries shall be excluded.**

**(b)        Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Requisite Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided* that, until so amended, (A) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (B) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding the foregoing or the definition of "Capitalized Leases", only those leases (assuming for purposes hereof that such leases were in existence on the Closing Date) that would constitute Capitalized Leases (including leases that are classified as "Financing Leases" for purposes of GAAP) in conformity with GAAP as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)" shall be considered Capitalized Leases hereunder or under any other Loan Document, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or prepared, as applicable, in accordance therewith; provided that all financial statements required to be provided hereunder may, at the option of the Borrower, be prepared in accordance with GAAP without giving effect to the foregoing treatment of Capitalized Leases.**

SECTION 1.04        Rounding.  Any financial ratios required to be satisfied in order for a specific action to be permitted under this Agreement shall be calculated by dividing the appropriate component by the other

component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05     References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 1.06     Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

SECTION 1.07     Available Amount Transactions.  If more than one action occurs on any given date the permissibility of the taking of which is determined hereunder by reference to the amount of the Available Amount immediately prior to the taking of such action, the permissibility of the taking of each such action shall be determined independently and in no event may any two or more such actions be treated as occurring simultaneously, i.e. each transaction must be permitted under the Available Amount as so calculated.

SECTION 1.08     Pro Forma Calculations.

(a)     Notwithstanding anything to the contrary herein, Consolidated EBITDA and any financial ratio or test, including the Senior Secured Net Leverage Ratio, the Total Secured Net Leverage Ratio, the Net Leverage Ratio and the Interest Coverage Ratio shall be calculated in the manner prescribed by this Section 1.08; *provided* that, notwithstanding anything to the contrary in clause (b), (c) or (d) of this Section 1.08, when calculating the Senior Secured Net Leverage Ratio for purposes of Section 2.03(b)(i), the events described in this Section 1.08 that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect.

(b)     For purposes of calculating Consolidated EBITDA or Consolidated Cash Interest Expense and any financial ratios or tests, including the Senior Secured Net Leverage Ratio, the Total Secured Net Leverage Ratio, the Net Leverage Ratio and the Interest Coverage Ratio, Specified Transactions (and the incurrence or repayment of any Indebtedness in connection therewith) that have been made (i) during the applicable Test Period or (ii) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and Consolidated Cash Interest Expense and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period.  If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.08, then the Senior Secured Net Leverage Ratio, the Total Secured Net Leverage Ratio, the Net Leverage Ratio, the Interest Coverage Ratio and Consolidated EBITDA shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.08.

(c)     [Reserved].

(d)     In the event that the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of the Senior Secured Net Leverage Ratio and the Net Leverage Ratio, as the case may be (in each case, other than Indebtedness incurred or repaid under the ABL Facility or any other revolving credit facility in the ordinary course of business for working capital purposes), (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then the Senior Secured Net Leverage Ratio, Total Secured Net Leverage Ratio, the Net Leverage Ratio and the Interest Coverage Ratio shall be calculated giving *pro forma* effect

-47-

to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(e)      For purposes of making any computation of the Interest Coverage Ratio on a Pro Forma Basis:

(1)  if any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date for which a determination under this definition is made had been the applicable rate for the entire period (taking into account any Swap Contracts applicable to such Indebtedness if such Swap Contract has a remaining term in excess of 12 months);

(2)  interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP;

(3)  interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Borrower may designate.

SECTION 1.09      Currency Equivalents Generally.

(a)      For purposes of determining compliance with Sections 7.01, 7.02 and 7.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder).

(b)      For purposes of determining the Senior Secured Net Leverage Ratio and the Net Leverage Ratio amounts denominated in a currency other than Dollars will be converted to Dollars at the currency exchange rates used in preparing the Borrower's financial statements corresponding to the Test Period with respect to the applicable date of determination and will, in the case of Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of Swap Contracts permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

SECTION 1.10      Limited Condition Acquisitions.  In connection with any action being taken in connection with a Limited Condition Acquisition for purposes of determining

(a)      whether any Indebtedness that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in compliance with Section 7.03 or Section 2.12;

(b)      whether any Lien being incurred in connection with such Limited Condition Acquisition is permitted to be incurred in accordance with Section 7.01 or Section 2.12;

(c)      whether any other transaction undertaken or proposed to be undertaken in connection with such Limited Condition Acquisition complies with the covenants or agreements contained in this Agreement; and

(d)      any calculation of the ratios or baskets, including the Net Leverage Ratio, Senior Secured Net Leverage Ratio, Consolidated Net Income, Consolidated EBITDA and/or pro forma cost savings and baskets determined by reference to Consolidated EBITDA or Total Assets and whether a Default or Event of Default exists in connection with the foregoing:

at the option of the Borrower, the date that the definitive agreement for such Limited Condition Acquisition is entered into (the "**Transaction Agreement Date**") may be used as the applicable date of determination, as the case may be, in each case with such pro forma adjustments as are appropriate and consistent with the pro forma adjustment provisions set forth in the definition of "Pro Forma Basis" or "Consolidated EBITDA."  For the avoidance of doubt, if the Borrower elects to use the Transaction Agreement Date as the applicable date of determination in accordance with the foregoing, (a) any fluctuation or change in the Net Leverage Ratio, Senior Secured Net Leverage Ratio, Consolidated Net Income, Consolidated EBITDA and/or Total Assets of the Borrower from the Transaction Agreement Date to the date of consummation of such Limited Condition Acquisition will not be taken into account for purposes of determining whether any Indebtedness or Lien that is being incurred in connection with such Limited Condition Acquisition is permitted to be incurred, or whether any other transaction undertaken in connection with such Limited Condition Acquisition by the Borrower or any of the Restricted Subsidiaries complies with the Loan Documents and (b) after the Transaction Agreement Date and until such Limited Condition Acquisition is consummated or the definitive agreements in respect thereof are terminated or expire, such Limited Condition Acquisition and all transactions proposed to be undertaken in connection therewith (including without limitation the incurrence of Indebtedness and Liens) will be given Pro Forma Effect when determining compliance of other transactions (including without limitation the incurrence of Indebtedness and Liens unrelated to such Limited Condition Acquisition) that are consummated after the Transaction Agreement Date and on or prior to the date of consummation of such Limited Condition Acquisition and any such transactions (including without limitation any incurrence of Indebtedness and the use of proceeds thereof) will be deemed to have occurred on the Transaction Agreement Date and be outstanding thereafter for purposes of calculating any baskets or ratios under the Loan Documents after the Transaction Agreement Date and before the date of consummation of such Limited Condition Acquisition (or the date the definitive agreements in respect thereof are terminated or expire); *provided* that solely with respect to Restricted Payments only (and only until such time as the applicable Limited Condition Acquisition has been consummated or the definitive documentation for such Limited Condition Acquisition is terminated), such calculation shall also be made on a standalone basis without giving effect to such Limited Condition Acquisition and the other transactions in connection therewith.

SECTION 1.11    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws) (each, a "**Division**"): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person (such different Person, a "**Division Successor**"), then it shall be deemed to have been transferred from the original Person to the Division Successor, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

# ARTICLE II

## The Commitments and Borrowings

SECTION 2.01    The Loans.

(a)    Each Lender (under and as defined in the DIP Credit Agreement) holding Initial DIP Loans (as defined in the DIP Credit Agreement) hereby, severally and not jointly, exchanges, converts or otherwise deems satisfied all of the Obligations (as defined in the DIP Credit Agreement) owing to such Lender under the DIP Credit Agreement in respect of the Initial DIP Loans (including all of the outstanding principal amount thereof all accrued and unpaid interest, fees, premiums and other obligations, including any fees or other amounts payable in kind pursuant to the DIP Credit Agreement or the DIP Order, in each case, on account thereof) (such amount, such Lender's "Exchange Amount") on the Closing Date for Exchange Term Loans deemed made by such Lender to the Borrower on the Closing Date in a principal amount equal to such Lender's Exchange Amount. On and as of the Closing Date, $[153,400,000.00] of Exchange Term Loans were deemed funded pursuant to this Section 2.01(a) and each Lender's Exchange Amount is set forth on Schedule I. Immediately after giving effect to the exchange in this Section 2.01(a) and without any further action from any other party, (i) all Exchange Term Loans shall constitute, and be treated for all purposes (including tax purposes), as a single fungible Class and Facility of Term Loans hereunder and (ii) all Obligations (as defined in the DIP Credit Agreement) under the DIP Credit Agreement in respect of the Initial DIP Loans shall be fully satisfied and discharged.

-49-

(b)     Each Lender having a Commitment to make Incremental Loans agrees, subject to the terms and conditions set forth in the applicable Incremental Amendment, to make Incremental Loans to the Borrower, in an aggregate principal amount not to exceed its Commitment.

(c)     Amounts of Term Loans borrowed (or deemed borrowed) under Section 2.01 that are repaid or prepaid may not be reborrowed.

SECTION 2.02     Borrowings, Conversions and Continuations of Loans.

(a)     Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Term SOFR Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by (A) telephone or (B) a Committed Loan Notice; provided that any telephonic notice must be confirmed immediately by delivery to the Administrative Agent of a Committed Loan Notice. Each such Committed Loan Notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three (3) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Term SOFR Loans or of any conversion of Term SOFR Loans to Base Rate Loans, and (ii) one (1) Business Day before the requested date of any Borrowing of Base Rate Loans. Not later than 11:00 a.m., three Business Days before the requested date of such Borrowing, conversion or continuation, the Administrative Agent shall notify the Borrower (which notice may be by telephone) whether or not the requested Interest Period has been consented to by all the Lenders and the Administrative Agent. Each Borrowing of, conversion to or continuation of Term SOFR Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof. Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof. Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Term SOFR Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Term SOFR Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Term SOFR Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.

(b)     Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation of Loans described in Section 2.02(a). In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and if such Borrowing is on the Closing Date, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)     Except as otherwise provided herein, a Term SOFR Loan may be continued or converted only on the last day of an Interest Period for such Term SOFR Loan. Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent or the Required Lenders may require by notice to the Borrower that, no Loans may be requested as, converted to or continued as Term SOFR Loans.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Term SOFR Loans upon determination of such interest rate. The determination of Term SOFR by the Administrative Agent shall be conclusive in the absence of manifest error, unless otherwise objected to by the Required Lenders by a Direction of the Required Lenders. At any time when

Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the Administrative Agent's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)     After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than ten Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent; *provided* that after the establishment of any new Class of Loans pursuant to a Refinancing Amendment or Extension, the number of Interest Periods otherwise permitted by this Section 2.02(e) shall increase by three (3) Interest Periods for each applicable Class so established.

(f)     The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(g)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (b) above, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Overnight Rate plus any administrative, processing, or similar fees customarily charged by the Administrative Agent in accordance with the foregoing. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(g) shall be conclusive in the absence of manifest error. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.03     Prepayments.

(a)     Optional.

(i)     The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty, except the Applicable Prepayment Amount, if applicable; *provided* that (1) such notice must be received by the Administrative Agent not later than 11:00 a.m. (New York City time) (A) three (3) Business Days prior to any date of prepayment of Term SOFR Loans and (B) on the date of prepayment of Base Rate Loans; (2) any partial prepayment of Term SOFR Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof or, if less, the entire principal amount thereof then outstanding; and (3) any prepayment of Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid and the payment amount specified in such notice shall be due and payable on the date specified therein. The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment. Any prepayment of a Term SOFR Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05. Each prepayment of the Loans pursuant to this Section 2.03(a) shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares; *provided*, that at the request of the

Borrower, in lieu of such application on a pro rata basis among all Classes of Loans, such prepayment may be applied to any Class of Loans so long as the Maturity Date of such Class of Loans (or such Classes of Loans) precedes the Maturity Date of each other Class of Loans then outstanding or, in the event more than one Class of Loans shall have an identical Maturity Date, to such Classes on a pro rata basis.

(ii)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.03(a)(i) if such prepayment would have resulted from a refinancing of all of the applicable Facility, which refinancing shall not be consummated or shall otherwise be delayed.

(iii)    Voluntary prepayments of any Class of Loans permitted hereunder shall be applied to the remaining scheduled installments of principal thereof pursuant to Section 2.05 in a manner determined at the discretion of the Borrower and specified in the notice of prepayment (and absent such direction, in direct order of maturity).

(b)    <u>Mandatory</u>.

(i)    To the extent such payment is permitted under the ABL Credit Agreement as in effect on the Closing Date or is otherwise consented to pursuant to the terms of the ABL Credit Agreement, within five (5) Business Days after financial statements have been delivered pursuant to Section 6.01(a) and the related Compliance Certificate has been delivered pursuant to Section 6.02(a), the Borrower shall, subject to clause (b)(v) of this Section 2.03, prepay an aggregate principal amount of Loans equal to (A) 50% (such percentage as it may be reduced as described below, the "**ECF Percentage**") of Excess Cash Flow, if any, for the fiscal year covered by such financial statements (commencing with the fiscal year ended [January 28, 2025]) minus (B) the sum of (at the Borrower's option) (i) all voluntary prepayments of Loans (including any Incremental Loans), pursuant to Section 2.03(a)(i) during such fiscal year (or after the end of such fiscal year and prior to the time such mandatory prepayment is due, without duplication in any other Excess Cash Flow period) and (ii) all voluntary prepayments of loans under the ABL Facilities during such fiscal year (or after the end of such fiscal year and prior to the time such mandatory prepayment is due, without duplication in any other Excess Cash Flow period) to the extent accompanied by a corresponding permanent reduction in the commitments under the ABL Facilities, in the case of each of the immediately preceding clauses (i) and (ii), to the extent such prepayments are not funded with the proceeds of long term Indebtedness (other than revolving borrowings); *provided* that (x) the ECF Percentage shall be 25% if the Senior Secured Net Leverage Ratio for the fiscal year covered by such financial statements was less than or equal to [2.50] to 1.0 and greater than [2.00] to 1.0, (y) the ECF Percentage shall be 0% if the Senior Secured Net Leverage Ratio for the fiscal year covered by such financial statements was less than or equal to [2.00] to 1.0; *provided further* that no such payment shall be required if such amount is equal to or less than the greater of (I) $[36,000,000] and (II) [10]% of Consolidated EBITDA on a Pro Forma Basis as of the last day of the most recent Test Period (and only the amount of such required prepayment that is in excess of such amount shall be required) and (z) if the amount of any required mandatory prepayment (without giving effect to the foregoing clause (y) of this proviso) is less than $0, the negative amount of such mandatory prepayment will be reduce the amount of any required prepayment pursuant to this clause (b)(i) in the immediately following fiscal year. For the avoidance of doubt, the Applicable Prepayment Amount shall not be due with respect to any payment made under this Section 2.03(b)(i).

(ii)    (A) If (x) the Borrower or any of its Restricted Subsidiaries Disposes of any property or assets pursuant to Section 7.05(j) following the Closing Date (other than, so long as the ABL Credit Agreement is in effect, any Disposition of Current Asset Collateral) or (y) any Casualty Event occurs (other than with respect to Current Asset Collateral so long as the ABL Facility or any Permitted Refinancing thereof is in effect), which results in the realization or receipt by the Borrower or such Restricted Subsidiary of Net Cash Proceeds, the Borrower shall prepay on or prior to the date which is ten (10) Business Days after the date of the realization or receipt of such Net Cash Proceeds, subject to clause (b)(v) of this Section 2.03, an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds realized or received; *provided*, that if at the time that any such prepayment would be required, the Borrower is required to offer to repurchase Permitted Pari Passu Secured Debt (or any Permitted Refinancing thereof that is secured on a *pari passu* basis with the Obligations) pursuant to the terms of the documentation governing such Indebtedness with the net proceeds of such Disposition or Casualty Event (such Permitted Pari Passu Secured Debt (or Permitted Refinancing thereof) required to be offered to be so repurchased, "**Other Applicable Indebtedness**"), then the Borrower may apply such Net Cash Proceeds on a pro rata basis

-52-

(determined on the basis of the aggregate outstanding principal amount of the Loans and Other Applicable Indebtedness at such time; *provided* that the portion of such net proceeds allocated to the Other Applicable Indebtedness shall not exceed the amount of such net proceeds required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such net proceeds shall be allocated to the Loans in accordance with the terms hereof) to the prepayment of the Loans and to the repurchase or prepayment of Other Applicable Indebtedness, and the amount of prepayment of the Loans that would have otherwise been required pursuant to this Section 2.03(b)(ii)(A) shall be reduced accordingly; *provided*, *further*, that to the extent the holders of Other Applicable Indebtedness decline to have such indebtedness repurchased or prepaid, the declined amount shall promptly (and in any event within ten (10) Business Days after the date of such rejection) be applied to prepay the Loans in accordance with the terms hereof; *provided*, *further*, that, no prepayment shall be required pursuant to this Section 2.03(b)(ii)(A) with respect to such portion of such Net Cash Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest in accordance with Section 2.03(b)(ii)(B).  The Applicable Prepayment Amount shall be due with respect to any payment made under this Section 2.03(b)(ii).

(B)  With respect to any Net Cash Proceeds realized or received with respect to any Disposition (other than any Disposition specifically excluded from the application of Section 2.03(b)(ii)(A)) or any Casualty Event, at the option of the Borrower, the Borrower may reinvest all or any portion of such Net Cash Proceeds in assets useful for its business within (x) eighteen (18) months following receipt of such Net Cash Proceeds or (y) if the Borrower enters into a legally binding commitment to reinvest such Net Cash Proceeds within eighteen (18) months following receipt thereof, within the later of (1) eighteen (18) months following receipt thereof and (2) one hundred and eighty (180) days of the date of such legally binding commitment; *provided* that if any Net Cash Proceeds are no longer intended to be or cannot be so reinvested at any time after delivery of a notice of reinvestment election, and subject to clauses (iv) and (v) of this Section 2.03(b), an amount equal to any such Net Cash Proceeds shall be applied within five (5) Business Days after the Borrower reasonably determines that such Net Cash Proceeds are no longer intended to be or cannot be so reinvested to the prepayment of the Loans as set forth in this Section 2.03.

(iii)     If the Borrower or any Restricted Subsidiary incurs or issues any Indebtedness (A) not expressly permitted to be incurred or issued pursuant to Section 7.03 or (B) that constitutes Credit Agreement Refinancing Indebtedness, the Borrower shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom on or prior to the date which is five (5) Business Days after the receipt of such Net Cash Proceeds.  The Applicable Prepayment Amount shall be due with respect to any payment made under this Section 2.03(b)(iii).

(iv)     (A) Except as may otherwise be set forth in any Refinancing Amendment, Extension Offer or any Incremental Amendment, each prepayment of Loans pursuant to this Section 2.03(b) shall be applied ratably to each Class of Loans then outstanding (*provided*, that any prepayment of Loans with the Net Cash Proceeds of Credit Agreement Refinancing Indebtedness shall be applied solely to each applicable Class of Loans selected by the Borrower), (B) with respect to each Class of Loans, each prepayment pursuant to clauses (i) through (iii) of this Section 2.03(b) shall be applied to the next eight (8) scheduled installments of principal thereof following the date of prepayment pursuant to Section 2.05 in direct order of maturity and to the remaining installments pro rata; and (C) each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares of such prepayment; provided that the Borrower may apply the Net Cash Proceeds of any mandatory prepayment from asset sales or casualty events ratably to the payment of Loans under the Facility and any other indebtedness that is secured on a *pari passu* basis with the Loans under the Facility to the extent required by the terms of such other indebtedness.

(v)     Notwithstanding any other provisions of this Section 2.03(b), (A) to the extent that any or all of the Net Cash Proceeds of any Disposition by a Foreign Subsidiary (or a Domestic Subsidiary of a Foreign Subsidiary) giving rise to a prepayment event pursuant to Section 2.03(b)(ii) (a "**Foreign Disposition**"), the Net Cash Proceeds of any Casualty Event from a Foreign Subsidiary (or a Domestic Subsidiary of a Foreign Subsidiary) (a "**Foreign Casualty Event**"), or Excess Cash Flow from a Foreign Subsidiary (or a Domestic Subsidiary of a Foreign Subsidiary) are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Loans at the times provided in this Section 2.03(b) but may be retained by the applicable Foreign Subsidiary (or the

applicable Domestic Subsidiary of a Foreign Subsidiary) so long as the applicable local law will not permit repatriation to the Borrower in the United States (the Borrower hereby agreeing to cause the applicable Subsidiary to use its commercially reasonable efforts to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and the Borrower shall not be required to monitor any such prohibition or delay and/or reserve cash for future repatriation after the Borrower has notified the Administrative Agent of the existence of such prohibition or delay and (B) to the extent that the Borrower has determined in good faith that repatriation to the Borrower in the United States of any of or all the Net Cash Proceeds of any Foreign Disposition, any Foreign Casualty Event or any or all of the Excess Cash Flow of a Foreign Subsidiary would have material adverse tax consequences (relative to the relevant Foreign Disposition, Foreign Casualty Event or Excess Cash Flow and taking into account any foreign tax credit or benefit actually realized in connection with such repatriation) with respect to such Net Cash Proceeds or Excess Cash Flow, the portion of such Net Cash Proceeds or Excess Cash Flow so affected (the "Holdback Amount") will not be required to be applied to repay Loans at the times provided herein and instead may be retained by the applicable Foreign Subsidiary (or the applicable Domestic Subsidiary of a Foreign Subsidiary), *provided* that, to the extent that within 12 months of the applicable prepayment event, the Borrower obtains actual knowledge that the repatriation of any Net Cash Proceeds or Excess Cash Flow from such Foreign Subsidiary would no longer have material adverse tax consequences (relative to the relevant Foreign Disposition, Foreign Casualty Event or Excess Cash Flow), such Foreign Subsidiary shall promptly repatriate an aggregate amount equal to the Holdback Amount to (i) the Administrative Agent, which amount shall be applied to the pro rata prepayment of the Loans pursuant to Section 2.03(b)(iv) or (ii) permanently repayment Other Applicable Indebtedness, in each case in accordance with Section 2.03(b).

(vi)    The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Loans required to be made pursuant to clause (i) or (ii) of this Section 2.03(b) at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment. Each Lender may reject all or a portion of its share of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Loans required to be made pursuant to clause (i) or (ii) of this Section 2.03(b) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m. (New York City time) one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment. Each Rejection Notice from a given Lender shall specify the principal amount of the mandatory prepayment of Loans to be rejected by such Lender. If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above or such Rejection Notice fails to specify the principal amount of the Loans to be rejected, any such failure will be deemed an acceptance of the total amount of such mandatory repayment of Loans. Subject to any requirements of any other Indebtedness, any Declined Proceeds remaining after offering such Declined Proceeds to Lenders in accordance with the terms hereof may be retained by the Borrower.

(c)    Interest, Funding Losses, Etc. All prepayments under this Section 2.03 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment into a Term SOFR Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Term SOFR Loan pursuant to Section 3.05.

Notwithstanding any of the other provisions of this Section 2.03, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Term SOFR Loans is required to be made under this Section 2.03 prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.03 in respect of any such Term SOFR Loan prior to the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit an amount sufficient to make any such prepayment otherwise required to be made thereunder together with accrued interest to the last day of such Interest Period into a Cash Collateral Account until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.03. Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with the relevant provisions of this Section 2.03.

SECTION 2.04    Termination or Reduction of Commitments.

(a)    Optional.  The Borrower may, upon written notice to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class, in each case without premium or penalty; *provided* that (i) any such notice shall be received by the Administrative Agent one (1) Business Day prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof or, if less, the entire amount thereof.  Notwithstanding the foregoing, the Borrower may rescind or postpone any notice of termination of the Commitments if such termination would have resulted from a refinancing of all of the applicable Facility, which refinancing shall not be consummated or otherwise shall be delayed.

(b)    Mandatory.  The Term Commitment of each Term Lender shall be automatically and permanently reduced to $0 upon the making of such Lender's Term Loan pursuant to Section 2.01.

SECTION 2.05    Repayment of Loans.  The Borrower shall repay to the Administrative Agent (a) for the ratable account of each Lender holding Term Loans at such time, on the last Business Day of each March, June, September and December, commencing with the first full fiscal quarter ending on or after the Closing Date, an aggregate principal amount equal to 0.25% of the aggregate principal amount of all Term Loans outstanding on the Closing Date; (b) for the ratable account of the Appropriate Lenders, on the Maturity Date for the Term Loans, the aggregate principal amount of all Term Loans outstanding on such date and (c) on the Closing Date, for the ratable account of the Lenders holding Initial Loans, the outstanding balance of such Initial Loans.

SECTION 2.06    Interest.

(a)    Subject to the provisions of Section 2.06(b), (i) each Term SOFR Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to Term SOFR for such Interest Period plus the Applicable Rate and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)    The Borrower shall pay interest on past due amounts hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.  The first Interest Payment Date on the Term Loans shall be September 30, 2024.

SECTION 2.07    Fees.  The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

SECTION 2.08    Computation of Interest and Fees.  All computations of interest for Base Rate Loans shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error, unless otherwise objected to by the Required Lenders by a Direction of the Required Lenders.

SECTION 2.09    Evidence of Indebtedness.

(a)    The Borrowings made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Borrowings made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.09(a), and by each Lender in its account or accounts pursuant to Section 2.09(a), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

SECTION 2.10    Payments Generally; Administrative Agent's Clawback.

(a)    General. All payments to be made by the Borrower shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share in respect of the relevant Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(i)    Funding by Lenders; Presumption by Administrative Agent. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Term SOFR Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a

payment to be made by the Borrower, the interest rate applicable to Base Rate Loans. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    Payments by Borrower; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. With respect to any payment that the Administrative Agent makes for the account of the Lenders hereunder as to which the Administrative Agent determines (which determination shall be conclusive absent manifest error) that any of the following applies (such payment referred to as the "**Rescindable Amount**") : (1) the Borrower has not in fact made such payment; (2) the Administrative Agent has made a payment in excess of the amount so paid by the Borrower (whether or not then owed); or (3) the Administrative agent has for any reason otherwise erroneously made such payment; then each of the Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (a) shall be conclusive, absent manifest error.

(b)    Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(c)    Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to purchase its participation.

(d)    Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(e)    Insufficient Funds. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

SECTION 2.11    Sharing of Payments.  If, other than as expressly provided elsewhere herein, any Lender shall obtain payment in respect of any principal of or interest on account of the Loans made by it (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative

-57-

Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment of principal of or interest on such Loans, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  For avoidance of doubt, the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement as in effect from time to time or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.11 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 2.11 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

SECTION 2.12    Incremental Borrowings.

(a)    The Borrower may at any time or from time to time after the Closing Date, upon at least 5 Business Days' notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders) and with the consent of the Required Lenders, request one or more additional tranches of Loans **under this clause (a) of this Section 2.12** (the "**Incremental Loans**"); *provided* that, subject to the Limited Condition Acquisition provisions, at the time when any such Incremental Loan is made (and after giving effect thereto), no Default or Event of Default (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 8.01(a) or 8.01(f) as of the Transaction Agreement Date) shall exist.  Each tranche of Incremental Loans shall be in an aggregate principal amount that is not less than $[5,000,000] (*provided* that such amount may be less than $[5,000,000] if such amount represents all remaining availability under the limit set forth in the next sentence).  Notwithstanding anything to the contrary herein, the aggregate amount of the Incremental Loans, when aggregated with (A) the aggregate amount of Permitted Pari Passu Secured Debt (that is not designated as Credit Agreement Refinancing Indebtedness) and (B) the aggregate principal amount of Permitted Ratio Debt shall not exceed the Maximum Incremental Amount.  (**aI**) The Incremental Loans shall rank *pari passu* in right of ~~payment~~**security** and *pari passu* or, with the consent of the Required Lenders, superpriority in right of ~~security~~**payment** with the Loans, (**bII**) the Incremental Loans shall not mature earlier than the Maturity Date; provided that customary bridge facilities so long as the long-term debt into which any such customary bridge facility is to be converted satisfies the foregoing, (**cIII**) the Weighted Average Life to Maturity of any Incremental Loans shall be no shorter than that of the then-existing Loans, (**dIV**) subject to clauses (**bII**) and (**cIII**) above, the amortization schedule applicable to any Incremental Loans shall be determined by the Borrower and the lenders thereunder, (**eV**) the interest rate margin applicable to any Incremental Loans will be determined by the Borrower and the lenders providing such Incremental Loans, *provided* that, in the event that the All-In Yield applicable to any Incremental Loans that is a Comparable Financing made on or prior to the date which is 18 months after the Closing Date exceeds the All-In Yield of any Class of Loans existing at such time by more than 50 basis points, then the interest rate margins for each such Class of Loans shall be increased to the extent necessary so that the All-In Yield of such Loans is equal to the All-In Yield of such Incremental Loans <u>minus</u> 50 basis points, (**fVI**) the Specified Representations shall be accurate in all material respects before and after the effectiveness of any Incremental Amendment referred to below and (**gVII**) except as otherwise required or permitted in clauses (**aI**) through (**fVI**) above, all other terms of such Incremental Loans, if not consistent with the terms of the existing Loans, shall either be reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) or not more favorable, taken as a whole, to the lenders providing such Incremental Loans than the terms of the existing Loans (other than with respect to any terms and conditions applicable after the maturity date of the Loans); provided that

-58-

no such Incremental Loans shall have financial covenants and more restrictive covenants than those contained in this Agreement unless (A) such more restrictive terms are not applicable until after the then Latest Maturity Date or (B) this Agreement is amended in a manner reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower to incorporate such more restrictive provisions for the benefit of the Lenders (which amendment shall not require the consent of any Lender). Any Incremental Loans may participate on a pro rata basis or on a less than pro rata basis (but not on a greater than pro rata basis) in any voluntary or mandatory prepayments hereunder, as specified in the applicable Incremental Amendment. Each notice from the Borrower pursuant to this Section shall set forth the requested amount and proposed terms of the relevant Incremental Loans. Incremental Loans may be made by any existing Lender (it being understood that no existing Lender will have an obligation to make a portion of any Incremental Loan) or by any Additional Lender on terms permitted in this Section 2.12 and otherwise on terms reasonably acceptable to the Administrative Agent (acting at the Direction of the Required Lenders). Commitments in respect of Incremental Loans shall become Commitments under this Agreement pursuant to an amendment (an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Loan Documents, executed by Holdings, the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and the Administrative Agent. The Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent (acting at the Direction of the Required Lenders) and the Borrower, to effect the provisions of this Section 2.12. (including, without limitation, to implement superpriority payment priority of the Incremental Loans, if applicable). The effectiveness of (and, in the case of any Incremental Amendment for an Incremental Loan, the Borrowing under) any Incremental Amendment shall be subject to the satisfaction on the date thereof (each, an "**Incremental Facility Closing Date**") of each of the conditions described in this Section 2.12(a) (including, without limitation, consent of the Required Lenders) and such other conditions as the parties thereto shall agree. The Borrower shall use the proceeds of the Incremental Loans for any purpose not prohibited by this Agreement.

(b)  The Borrower may at any time or from time to time after the Closing Date, upon at least 5 Business Days' notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders) and with the consent of the Required Lenders, request a Borrowing of Incremental Exit Loans under this clause (b) of this Section 2.12 to be provided by the then-existing Lenders, or by a any other financing source previously disclosed to approved by the Required Lenders (and it being acknowledged that the Required Lenders hereby consent to such Incremental Exit Loans to be provided by a the proposed financing source (and/or any of its Affiliates) previously disclosed to the Required Lenders, on terms and conditions no less favorable to the Borrower (as determined by the Borrower in its reasonable discretion) than previously disclosed to the Required Lenders); *provided, further,* that, at the time when any such Incremental Exit Loan is made (and after giving effect thereto), no Default or Event of Default shall exist. Notwithstanding anything to the contrary herein, the aggregate amount of the Incremental Exit Loans shall not exceed $10,500,000 (which, shall for the avoidance of doubt not be duplicative of any amounts under the Maximum Incremental Amount). (aI) The Incremental Exit Loans shall rank *pari passu* in right of payment and of security with the Term Loans, (bII) the Incremental Exit Loans shall not mature earlier than the Maturity Date, (cIII) the Weighted Average Life to Maturity of any Incremental Exit Loans shall be no shorter than that of the Initial Exit Loans, (dIV) the interest rate margin applicable to the Incremental Exit Loans shall be the same as the interest rate margin applicable to the Term Loans, (eV) the representations and warranties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects before and after the effectiveness of any Incremental Amendment and (fVI) all other terms of such Incremental Exit Loans shall have terms consistent with the terms of the Term Loans. Each notice from the Borrower pursuant to this Section 2.12(b) shall set forth the requested amount of the Incremental Exit Loans. Commitments in respect of Incremental Exit Loans shall become Commitments under this Agreement pursuant to an Incremental Amendment to this Agreement and, as appropriate, the other Loan Documents, executed by Holdings, the Borrower, each Lender agreeing to provide such Commitment, and the Administrative Agent. The Incremental Amendment may, without the consent of any other Lenders, effect such technical amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.12(b). The effectiveness of (and, in the case of any Incremental Amendment for the Incremental Exit Loan, the Borrowing under) any Incremental Amendment shall be subject to the satisfaction on such Incremental Facility Closing Date of each of the conditions described in this Section 2.12(b) (including, without limitation, consent of the Required Lenders) and such other

conditions as the parties thereto shall agree.  The Borrower shall use the proceeds of the Incremental Exit Loans for any purpose not prohibited by this Agreement.

(c)        This Section 2.12 shall supersede any provisions in Section 2.11 or 10.01 to the contrary.

SECTION 2.13        Refinancing Amendments.  At any time after the Closing Date, the Borrower may obtain, from any Lender or any Additional Lender, Other Loans to refinance all or any portion of the Loans then outstanding under this Agreement which will be made pursuant to Other Term Commitments in each case pursuant to a Refinancing Amendment; *provided* that such Other Loans (i) will rank *pari passu* in right of payment and of security with the other Loans and Commitments hereunder, (ii) will have such pricing, premiums and optional prepayment or redemption terms as may be agreed by the Borrower and the Lenders thereof, (iii) will have a final maturity date no earlier than, and will have a Weighted Average Life to Maturity equal to or greater than, the Loans being refinanced, and (iv) will have terms and conditions that are substantially identical to, or (taken as a whole) are no more favorable to the lenders or holders providing such Other Term Commitments and Other Loans than those applicable to the Loans being refinanced unless (A) such more restrictive terms are not applicable until after the then Latest Maturity Date or (B) this Agreement is amended in a manner reasonably satisfactory to the Administrative Agent **(acting at the Direction of the Required Lenders)** and the Borrower to incorporate such more restrictive provisions for the benefit of the Lenders ~~(which amendment shall not require the consent of any Lender)~~.  Any Other Loans may participate on a pro rata basis or on a less than pro rata basis (but not on a greater than pro rata basis) in any voluntary or mandatory prepayments hereunder, as specified in the applicable Refinancing Amendment.  The effectiveness of any Refinancing Amendment shall be subject to the satisfaction on the date thereof of each of the conditions set forth in Section 4.02 and, to the extent reasonably requested by the Administrative Agent **(acting at the Direction of the Required Lenders)**, receipt by the Administrative Agent of legal opinions, board resolutions, officers' certificates and/or reaffirmation agreements consistent with those delivered on the Closing Date under Section 4.01 (other than changes to such legal opinions resulting from a change in law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent **(acting at the Direction of the Required Lenders)**).  Each Class of Other Term Commitments and Other Loans incurred under this Section 2.13 shall be in an aggregate principal amount that is not less than $~~[~~100,000,000~~]~~.  The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Refinancing Amendment.  Each of the parties hereto hereby agrees that, upon the effectiveness of any Refinancing Amendment, this Agreement shall be deemed amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Other Term Commitments and Other Loans incurred pursuant thereto (including any amendments necessary to treat the Other Loans and/or Other Term Commitments as Loans and Commitments).  Any Refinancing Amendment may**~~, without the consent of any other Lenders,~~** effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent **(acting at the Direction of the Required Lenders)** and the Borrower, to effect the provisions of this Section 2.13.  This Section 2.13 shall supersede any provisions in Section 2.11 or 10.01 to the contrary.  No Lender shall be under any obligation to provide any Other Term Commitment unless such Lender executes a Refinancing Amendment.

SECTION 2.14        Extensions of Loans.

(a)        Notwithstanding anything to the contrary in this Agreement, pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders of Loans with a like Maturity Date on a pro rata basis (based on the aggregate outstanding principal amount of the respective Loans with the same Maturity Date) and on the same terms to each such Lender, the Borrower may from time to time with the consent of any Lender that shall have accepted such offer to extend the maturity date of any Loans and otherwise modify the terms of such Loans of such Lender pursuant to the terms of the relevant Extension Offer (including, without limitation, by increasing the interest rate or fees payable in respect of such Loans and/or modifying the amortization schedule in respect of such Loans) (each, an "**Extension**," and each group of Loans as so extended, as well as the original Loans not so extended, being a "**tranche**"; any Extended Loans shall constitute a separate tranche of Loans from the tranche of Loans from which they were converted), so long as the following terms are satisfied:  (i) no Default shall exist at the time the notice in respect of an Extension Offer is delivered to the Lenders, and no Default shall exist immediately prior to or after giving effect to the effectiveness of any Extended Loans, (ii) except as to interest rates, fees, amortization, final maturity date, premium, required prepayment dates and participation in prepayments (which shall, subject to immediately succeeding clauses (iii), (iv) and (v), be determined by the Borrower and set forth in the relevant Extension Offer), the Loans of any Lender (an "**Extending**

**Lender**") extended pursuant to any Extension ("**Extended Loans**") shall have the same terms as the tranche of Loans subject to such Extension Offer unless, with respect to any covenants and defaults that are, taken as a whole, more restrictive than the terms of this Agreement (A) such more restrictive terms are not applicable until after the then Latest Maturity Date or (B) this Agreement is amended in a manner reasonably satisfactory to the Administrative Agent **(acting at the Direction of the Required Lenders)** and the Borrower to incorporate such more restrictive provisions for the benefit of the Lenders **(which amendment shall, notwithstanding any provision herein to the contrary, not require the consent of any Lender)**, (iii) the final maturity date of any Extended Loans shall be no earlier than the then Latest Maturity Date at the time of extension and the amortization schedule applicable to Loans pursuant to Section 2.05 for periods prior to the Maturity Date may not be increased, (iv) the Weighted Average Life to Maturity of any Extended Loans shall be no shorter than the remaining Weighted Average Life to Maturity of the Loans extended thereby, (v) any Extended Loans may participate on a pro rata basis or on a less than pro rata basis (but not on a greater than pro rata basis) in any voluntary or mandatory prepayments hereunder, as specified in the applicable Extension Offer, (vi) if the aggregate principal amount of Loans (calculated on the face amount thereof) in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Loans offered to be extended by the Borrower pursuant to such Extension Offer, then the Loans of such Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer, (vii) all documentation in respect of such Extension shall be consistent with the foregoing, (viii) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower and (ix) the interest rate margin applicable to any Extended Loans will be determined by the Borrower and the lenders providing such Extended Loans.

(b)        With respect to all Extensions consummated by the Borrower pursuant to this Section 2.14, (i) such Extensions shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 2.03 and (ii) any Extension Offer is required to be in any minimum amount of $[25,000,000], *provided* that the Borrower may at its election specify as a condition (a "**Minimum Extension Condition**") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Offer in the Borrower's sole discretion and may be waived by the Borrower) of Loans of any or all applicable tranches be tendered.

(c)        The Lenders hereby irrevocably authorize the Administrative Agent and the Collateral Agent**, in each case acting at the written direction of the Required Lenders,** to enter into amendments to this Agreement and the other Loan Documents with the Borrower as may be necessary in order to establish new tranches or sub-tranches in respect of Loans so extended and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new tranches or sub-tranches, in each case on terms consistent with this Section 2.14.

(d)        In connection with any Extension, the Borrower shall provide the Administrative Agent at least five (5) Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and shall agree to such procedures, if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably, to accomplish the purposes of this Section 2.14.

(e)        This Section 2.14 shall supersede any provisions in Section 2.11 or 10.01 to the contrary.

**SECTION 2.15    [Reserved]**

**Taxes, Increased Costs Protection and Illegality**

SECTION 3.01        Taxes.

(a)        All sums payable by or on account of any obligation of any Loan Party hereunder or under any other Loan Document to any Lender or Agent shall (except to the extent required by applicable Law) be paid free and clear of, and without any deduction or withholding on account of, any Taxes.

(b)      If any Loan Party or any Agent is required by Law (as determined in the good faith discretion of such Loan Party or any Agent) to make any deduction or withholding on account of any Non-Excluded Tax or Other Taxes from any sum paid or payable by any Loan Party to any Lender or Agent under any of the Loan Documents: (i) the applicable Loan Party (if it is required to make the deduction or withholding) shall notify the applicable Agent of any such requirement or any change in any such requirement as soon as reasonably practicable after such Loan Party becomes aware of it; (ii) the applicable Loan Party or Agent, as applicable, shall make such deduction or withholding and pay to the relevant Governmental Authority, in accordance with applicable law, any such Non-Excluded Tax or Other Tax before the date on which penalties attach thereto; (iii) the sum payable to such Lender or Agent (as applicable) shall be increased by such Loan Party to the extent necessary to ensure that, after the making of any required deduction or withholding (including any deductions or withholdings attributable to any payments required to be made under this Section 3.01), the Lender or the Agent (as applicable), receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and (iv) within thirty days after paying any sum from which it is required by Law to make any deduction or withholding (or, if later, within thirty days after the due date of payment of any Tax which it is required by clause (ii) above to pay), the Loan Party making such payments (if it is required to make the deduction or withholding) shall deliver to the applicable Agent evidence reasonably satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant Governmental Authority.

(c)      Each Lender shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Laws or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under any Loan Document.  Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documentation required below in this Section 3.01(c)) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent of its inability to do so.

Without limiting the foregoing:

(1)      Each U.S. Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding.

(2)      Each Non-US Lender shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)      in the case of a Non-US Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, two properly completed and duly signed original copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty,

(B)      two properly completed and duly signed original copies of IRS Form W-8ECI or W-8EXP (or any successor forms),

(C)      in the case of a Non-US Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates substantially in the form of Exhibit I (any such certificate, a "**United**

**States Tax Compliance Certificate**") to the effect that such Non-US Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to any Loan Party described in Section 881(c)(3)(C) of the Code, and that no payment under any Loan Document is effectively connected with such Non-US Lender's U.S. trade or business, and (y) two properly completed and duly signed original copies of IRS Form W-8BEN or W-8BEN-E, as applicable, (or any successor forms),

(D)    to the extent a Non-US Lender is not the beneficial owner (for example, where the Non-US Lender is a partnership or a participating Lender), two properly completed duly signed original copies of IRS Form W-8IMY (or any successor forms) of the Non-US Lender, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E, as applicable, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information (or any successor forms) from each beneficial owner that would be required under this Section 3.01(c) if such beneficial owner were a Lender, as applicable (provided that, if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Non-US Lender on behalf of such beneficial owner), or

(E)    two properly completed and duly signed original copies of any other form prescribed by applicable U.S. federal income tax Laws (including the Treasury Regulations) as a basis for claiming a complete exemption from, or a reduction in, United States federal withholding tax on any payments to such Lender under the Loan Documents.

(3)    If a payment made to a Lender under any Loan Document may be subject to U.S. federal withholding tax imposed by Sections 1471 through 1474 of the Code (including any successor provisions), such Lender shall deliver to Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under Sections 1471 through 1474 of the Code and to determine whether such Lender has or has not complied with such Lender's obligations under such Sections and, if necessary, to determine the amount to deduct and withhold from such payment.

Notwithstanding any other provision of this clause (c), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(d)    In addition to the payments by a Loan Party required by Section 3.01(b), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(e)    The Borrower shall indemnify each Lender and Agent (each a "**Tax Indemnitee**"), within 20 days after written demand therefor, for the full amount of any Non-Excluded Taxes paid or payable by such Tax Indemnitee that is imposed on or in respect of any payment under or with respect to any Loan Document, and any Other Taxes payable by such Tax Indemnitee (including Non-Excluded Taxes or Other Taxes imposed on or attributable to amounts payable under this Section 3.01), in each case, including any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the Governmental Authority.  A certificate as to the amount of such payment or liability prepared in good faith and delivered by the Tax Indemnitee or by the Agent on its own behalf or on behalf of another Tax Indemnitee, shall be conclusive absent manifest error.

(f)    If and to the extent that a Tax Indemnitee, in its sole discretion (exercised in good faith), determines that it has received a refund of any Non-Excluded Taxes or Other Taxes in respect of which it has received additional payments under this Section 3.01, then such Tax Indemnitee shall pay to the relevant Loan Party an amount equal to of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses of the Tax Indemnitee

(including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Loan Party, upon the request of the Tax Indemnitee, agrees to repay the amount paid over by the Tax Indemnitee (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Tax Indemnitee if the Tax Indemnitee is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the Tax Indemnitee be required to pay any amount to a Loan Party pursuant to this paragraph (f) the payment of which would place the Tax Indemnitee in a less favorable net after-Tax position than the Tax Indemnitee would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(g)      In the event that a Loan Party makes an indemnification payment to a Tax Indemnitee with respect to Non-Excluded Taxes or Other Taxes pursuant to subsection (e) of this Section 3.01 or a Loan Party is required to repay to a Tax Indemnitee an amount in respect of a refund of any Non-Excluded Taxes or Other Taxes previously paid over to such Loan Party pursuant to subsection (f) of this Section 3.01, such Tax Indemnitee shall reasonably cooperate with all reasonable requests of such Loan Party, at the sole expense of such Loan Party, if (i) in the reasonable judgment of the Tax Indemnitee such cooperation shall not subject such Tax Indemnitee, as the case may be, to any unreimbursed third party cost or expense or otherwise be materially disadvantageous to such Tax Indemnitee and (ii) there is a reasonable basis for such Loan Party to contest with the applicable Governmental Authority the imposition of such Non-Excluded Taxes or Other Taxes or the repayment of such refund.  Any resulting refund shall be governed by Section 3.01(f).  This subsection shall not be construed to require a Tax Indemnitee to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)      On or before the date any Agent becomes a party to this Agreement, such Agent shall provide to the Borrower two duly properly completed and duly signed copies of the documentation prescribed in clause (i) or (ii) below, as applicable (together with all required attachments thereto): (i) IRS Form W-9 or any successor thereto, or (ii) (A) with respect to payments received for its own account, IRS Form W-8ECI or any successor thereto, and (B) with respect to payments received on account of any Lender, a U.S. branch withholding certificate on IRS Form W-8IMY or any successor thereto evidencing its agreement with the Borrower to be treated as a U.S. Person for U.S. federal withholding purposes.  At any time thereafter, any Agent shall provide updated documentation previously provided (or a successor form thereto) when any documentation previously delivered has expired or become obsolete or invalid or otherwise upon the reasonable request of the Borrower or promptly notify the Borrower of its legal ineligibility to do so.  The Administrative Agent hereby represents and warrants to the Loan Parties that it is a "U.S. person" and a "financial institution" and that it will comply with its "obligation to withhold," each within the meaning of Treasury Regulations Section 1.1441-1(b)(2)(ii).

(i)      Each party's obligations under this Section shall survive the resignation or replacement of the any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 3.02      Illegality.  If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to SOFR or Term SOFR, or to determine or charge interest rates based upon SOFR or Term SOFR, then, upon notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of such Lender to make or continue Term SOFR Loans or to convert Base Rate Loans to Term SOFR Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Term SOFR component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Term SOFR Loans and shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable,

convert all Term SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loan to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loan and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Term SOFR component of the Base Rate with respect to any Base Rate Loans, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 3.05.

SECTION 3.03    Inability to Determine Rates.

(a)    If in connection with any request for a Term SOFR Loan or a conversion to or a continuation thereof, (i) the Administrative Agent determines  that (A) Dollar deposits are not being offered to banks in the relevant interbank market for the applicable amount and Interest Period for such Term SOFR Loans, or (B) (x) adequate and reasonable means do not exist for determining Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan or in connection with an existing or proposed Base Rate Loan and (y) the circumstances described in Section 3.03(c) do not apply (in each case with respect to this clause (i), "Impacted Loans"), or (ii) the Administrative Agent or the Required Lenders determine that for any reason that Term SOFR for any requested Interest Period with respect to a proposed Term SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such Term SOFR Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.

Thereafter, (x) the obligation of the Lenders to make or maintain Term SOFR Loans shall be suspended (to the extent of the affected Term SOFR Loans or Interest Periods), and (y) in the event of a determination described in the preceding sentence with respect to the Term SOFR component of the Base Rate, the utilization of the Term SOFR component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (or, in the case of a determination by the Required Lenders described in clause (ii) of this Section 3.03(a), until the Administrative Agent upon instruction of the Required Lenders) revokes such notice.

Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, or conversion to, or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

(b)    Notwithstanding the foregoing, if the Administrative Agent has made the determination described in Section 3.03(a)(i), the Administrative Agent, in consultation with the Borrower, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (i) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under the first sentence of Section 3.03(a)(i), (ii) the Administrative Agent or the Required Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (iii) any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof.

(c)    Replacement of Term SOFR or Successor Rate.  Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Required Lenders notify the Administrative Agent (with a copy to the Borrower) (after which the Administrative Agent will promptly notify each Lender) that the Required Lenders have determined, that:

US-DOCS\150029138.4149885390.12

(i)    adequate and reasonable means do not exist for ascertaining one month, three month and six month interest periods of Term SOFR, including, without limitation, because the Term SOFR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)    CME or any successor administrator of the Term SOFR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent or such administrator with respect to its publication of Term SOFR, in each case acting in such capacity, has made a public statement identifying a specific date after which one month, three month and six month interest periods of Term SOFR or the Term SOFR Screen Rate shall or will no longer be made available, or permitted to be used for determining the interest rate of U.S. dollar denominated syndicated loans, or shall or will otherwise cease, provided that, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders), that will continue to provide such interest periods of Term SOFR after such specific date (the latest date on which one month, three month and six month interest periods of Term SOFR or the Term SOFR Screen Rate are no longer available permanently or indefinitely, the "Scheduled Unavailability Date"); or

(iii)    the administrator of the Term SOFR Screen Rate or a Governmental Authority having jurisdiction over such administrator has made a public statement announcing that all Interest Periods and other tenors of Term SOFR are no longer representative; or

(iv)    syndicated loans currently being executed, or that include language similar to that contained in this Section 3.03, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace Term SOFR,

then, in the case of clauses (i)-(iii) above, on a date and time determined by the Administrative Agent in consultation with the Borrower (any such date, the "Term SOFR Replacement Date"), which date shall be at the end of an Interest Period or on the relevant interest payment date, as applicable, for interest calculated and shall occur reasonably promptly upon the occurrence of any day of the events or circumstances under clauses (i), (ii) or (iii) above and, solely with respect to clause (ii) above, no later than the Scheduled Unavailability Date, Term SOFR will be replaced hereunder and under any Loan Document with Daily Simple SOFR *plus* the Related Adjustment for any payment period for interest calculated that can be determined by the Administrative Agent, in each case, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document (the "Successor Rate"; and any such rate before giving effect to the Related Adjustment, the "Pre-Adjustment Successor Rate"); and in the case of clause (iv) above, the Borrower and Administrative Agent may amend this Agreement solely for the purpose of replacing Term SOFR under this Agreement and under any other Loan Document in accordance with the definition of " Successor Rate" and such amendment will become effective at 5:00 p.m., on the fifth Business Day after the Administrative Agent shall have notified all Lenders and the Borrower of the occurrence of the circumstances described in clause (iv) above unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to the implementation of a Successor Rate pursuant to such clause.

The Administrative Agent will promptly (in one or more notices) notify the Borrower and each Lender of (x) any occurrence of any of the events, periods or circumstances under clauses (i) through (iii) above, (y) a Term SOFR Replacement Date and (z) the Successor Rate.

Any Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Administrative Agent, such Successor Rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent (acting at the Direction of the Required Lenders).

Notwithstanding anything else herein, if at any time any Successor Rate as so determined would otherwise be less than 0.75%, the Successor Rate will be deemed to be 0.75% for the purposes of this Agreement and the other Loan Documents.

In connection with the implementation of a Successor Rate, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Conforming Changes to the Borrower and the Lenders reasonably promptly after such amendment becomes effective.

If the events or circumstances of the type described in 3.03(c)(i)-(iii) have occurred with respect to the Successor Rate then in effect, then the successor rate thereto shall be determined in accordance with the definition of "Successor Rate".

(d)    Notwithstanding anything to the contrary herein, (i) after any such determination by the Administrative Agent or receipt by the Administrative Agent of any notice described under Section 3.03(c)(i)-(iii), as applicable, if the Administrative Agent (acting at the Direction of the Required Lenders) determines that Daily Simple SOFR is not available on or prior to the Term SOFR Replacement Date, (ii) if the events or circumstances described in Section 3.03(c)(iv) have occurred but Daily Simple SOFR is not available, or (iii) if the events or circumstances of the type described in Section 3.03(c)(i)-(iii) have occurred with respect to the Successor Rate then in effect and the Administrative Agent (acting at the Direction of the Required Lenders) determines that Daily Simple SOFR is not available, then in each case, the Administrative Agent and the Borrower may amend this Agreement solely for the purpose of replacing Term SOFR or any then current Successor Rate in accordance with this Section 3.03 at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, as applicable, with another alternative benchmark rate giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks and, in each case, including any Related Adjustments and any other mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such benchmarks, which adjustment or method for calculating such adjustment shall be published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated. For the avoidance of doubt, any such proposed rate and adjustments, shall constitute a "Successor Rate". Any such amendment shall become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders object to such amendment.

(e)    If, at the end of any Interest Period, relevant interest payment date or payment period for interest calculated, no Successor Rate has been determined in accordance with clauses (c) or (d) of this Section 3.03 and the circumstances under clauses (c)(i) or (c)(iii) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Term SOFR Loans shall be suspended, (to the extent of the affected Term SOFR Loans, Interest Periods, interest payment dates or payment periods), and (y) the Term SOFR component shall no longer be utilized in determining the Base Rate, until the Successor Rate has been determined in accordance with clauses (c) or (d). Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Term SOFR Loans (to the extent of the affected Term SOFR Loans, Interest Periods, interest payment dates or payment periods) or, failing that, will be deemed to have converted such request into a request for a Committed Borrowing of Base Rate Loans (subject to the foregoing clause (y)) in the amount specified therein.

SECTION 3.04    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Term SOFR Loans.

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

-67-

(ii)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Term SOFR Loan made by it (except for (x) any Taxes described in clauses (c) through (e) of the definition of Excluded Tax, (y) any Non-Excluded Taxes or Other Taxes indemnifiable or otherwise paid under Section 3.01, or (z) Connection Income Taxes); or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Term SOFR Loans made by such Lender that is not otherwise accounted for in this clause (a);

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan the interest on which is determined by reference to the Term SOFR (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by it to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent),the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation, *provided* that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 3.05    Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day prior to the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)        any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)        any assignment of a Term SOFR Loan on a day prior to the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 3.07;

including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

SECTION 3.06        Matters Applicable to All Requests for Compensation.

(a)        Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect.

(b)        Suspension of Lender Obligations.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue Term SOFR Loans from one Interest Period to another Interest Period, or to convert Base Rate Loans into Term SOFR Loans, until the event or condition giving rise to such request ceases to be in effect(in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)        Conversion of Term SOFR Loans.  If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Term SOFR Loans no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Term SOFR Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Term SOFR Loans, to the extent necessary so that, after giving effect thereto, all Loans of a given Class held by the Lenders of such Class holding Term SOFR Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

SECTION 3.07        Replacement of Lenders under Certain Circumstances.  If (i) any Lender requests compensation under Section 3.04 or ceases to make Term SOFR Loans as a result of any condition described in Section 3.02 or Section 3.04, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (iii) any Lender is a Non-Consenting Lender or (iv) any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.07), all of its interests, rights and obligations under this Agreement and the related Loan Documents to one or more Eligible Assignees, *provided* that:

(a)        the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.07(b)(iv);

-69-

(b)        such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)        such Lender being replaced pursuant to this Section 3.07 shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof); *provided* that the failure of any such Lender to execute an Assignment and Assumption or deliver such Notes shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register and the Notes shall be deemed to be canceled upon such failure;

(d)        the Eligible Assignee shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender;

(e)        in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(f)        such assignment does not conflict with applicable Laws.

In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, all affected Lenders or all the Lenders or all affected Lenders with respect to a certain Class or Classes of the Loans and (iii) the Required Lenders or Required Facility Lenders, as applicable, have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 3.08        <u>Survival</u>.  All of the Borrower's obligations under this <u>Article III</u> shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

## ARTICLE IV

## Conditions Precedent to Borrowing

SECTION 4.01        <u>Conditions to the Closing Date</u>.  The effectiveness of this Agreement and the obligation of each Lender to make its Term Commitment and Term Loans on the Closing Date is subject solely to the satisfaction of the following conditions precedent (or waiver of such conditions precedent in accordance with Section 10.01):

(a)        The Administrative Agent's receipt of the following, each of which shall be original, .pdf or facsimile copies or delivered by other electronic method unless otherwise specified, each properly executed (if applicable) by a Responsible Officer of each signing Loan Party, each in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders:

(i)        a Committed Loan Notice in accordance with the requirements hereof;

(ii)    executed counterparts of this Agreement and the Guaranty; and

(iii)   a Note executed by the Borrower in favor of each Lender that has requested a Note at least two Business Days in advance of the Closing Date;

(iv)   each Collateral Document set forth on Schedule 1.01A required to be executed on the Closing Date as indicated on such schedule, duly executed by each Loan Party thereto, together with certificates, if any, representing the Pledged Equity referred to therein accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt endorsed in blank;

(v)    (i) A certificate of each Loan Party, each dated the Closing Date and executed by a secretary, assistant secretary or other Responsible Officer thereof, which shall (A) certify that (1) attached thereto is a true and complete copy of the certificate or articles of incorporation, formation or organization (or equivalent) of such Loan Party certified by the relevant authority of its jurisdiction of organization (to the extent reasonably avail-able in the applicable jurisdiction), (2) the certificate or articles of incorporation, formation or organization (or equivalent) of such Loan Party attached thereto have not been amended (except as attached thereto) since the date reflected thereon, (3) attached thereto is a true and correct copy of the by-laws or operating, management, partner-ship or similar agreement of such Loan Party (if applicable), together with all amendments thereto as of the Closing Date, and such by-laws or operating, management, partnership or similar agreement are in full force and effect as of the Closing Date and (4) attached thereto is a true and complete copy of the resolutions or written consent, as applicable, of its board of directors, board of managers, sole member or other applicable governing body authorizing the execution and delivery of the Loan Documents, which resolutions or consent have not been modified, rescinded or amended (other than as attached thereto) and are in full force and effect, and (B) identify by name and title and bear the signatures of the officers, managers, directors or authorized signatories of such Loan Party authorized to sign the Loan Documents to which such Loan Party is a party on the Closing Date and (ii) a good standing (or equivalent) certificate as of a recent date for each Loan Party from the relevant authority of its jurisdiction of organization (to the extent applicable in such jurisdiction).

(vi)   an opinion from (i) Latham & Watkins LLP, New York counsel to the Loan parties and (ii) Jones Day LLP, Ohio counsel to the Loan Parties, each in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders;

(vii)  a solvency certificate from the chief financial officer of the Borrower substantially in the form attached hereto as Exhibit K;

(viii) evidence that all insurance (other than title insurance) required to be maintained pursuant to the Loan Documents as of the Closing Date has been obtained and is in effect;

(ix)   a certificate, dated the Closing Date and executed by a Responsible Officer of the Borrower, certifying as to the satisfaction of the conditions set forth in Sections 4.01(g) and (h); and

(x)    copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the Administrative Agent with respect to the Loan Parties.

(b)    The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Required Lenders and the Debtors, which Confirmation Order shall be in full force and effect and shall not have been vacated, reversed, modified, stayed or amended.

(c)    Since the date of the Confirmation Order, there has been no occurrence, development, change, event or loss affecting the Borrower that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)      The Plan Effective Date (under and as defined in the TSA) shall have occurred in accordance with the terms thereof, and the documents required to be executed and delivered pursuant to Section 3 of the TSA shall have been so executed and delivered.

(e)      All fees and expenses required to be paid hereunder and invoiced at least two (2) Business Days before the Closing Date shall have been paid in full in cash.

(f)      The Administrative Agent shall have received at least two (2) Business Days prior to the Closing Date all documentation and other information about the Borrower and the Guarantors as shall have been reasonably requested in writing by the Administrative Agent at least four (4) Business Days prior to the Closing Date and as determined by the Administrative Agent to be required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

(g)      The representations and warranties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (or in all respects, if qualified by materiality or "Material Adverse Effect"), in each case, on and as of the Closing Date (unless such representations and warranties relate to an earlier date, in which case, such representations and warranties shall have been true and correct in all material respects as of such earlier date (or in all respects, if qualified by materiality or "Material Adverse Effect")).

(h)      At the time of and immediately after giving effect to the making of such Loan, no Event of Default has occurred and is continuing.

For purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

SECTION 4.02      Conditions to All Borrowings After the Closing Date.  Subject to Section 1.10, the obligation of each Lender to honor a Committed Loan Notice (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Term SOFR Loans) after the Closing Date is subject to the following conditions precedent:

(a)      The Specified Representations shall be true and correct in all material respects on and as of the date of such Borrowing.

(b)      The Administrative Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

Each Committed Loan Notice (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Term SOFR Loans) submitted by the Borrower shall be deemed to be a representation and warranty that the condition specified in Section 4.02(a) has been satisfied on and as of the date of the applicable Borrowing.

**ARTICLE V**

**Representations and Warranties**

The Borrower represents and warrants to the Administrative Agent and the Lenders that:

SECTION 5.01      Existence, Qualification and Power; Compliance with Laws.  Each Loan Party and each of its Restricted Subsidiaries that is a Material Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), (b) has all corporate or other organizational power and authority to (i) own its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to

which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all applicable Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.02    Authorization; No Contravention. (a)  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.  (b) Neither the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party will (i) contravene the terms of any of such Person's Organization Documents, (ii) result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Restricted Subsidiaries (other than as permitted by Section 7.01) under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any applicable Law; except with respect to any breach, contravention or violation (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.03    Governmental Authorization.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.04    Binding Effect.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity and principles of good faith and fair dealing.

SECTION 5.05    Financial Statements; No Material Adverse Effect.

(a)    The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except as otherwise expressly noted therein and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year-end adjustments and the absence of footnotes.

(b)    Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(c)    The forecasts of consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries, copies of which have been furnished to the Administrative Agent prior to the Closing Date  have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts and actual results may vary materially from such forecasts.

SECTION 5.06    Litigation.  There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any

Governmental Authority, by or against Holdings, the Borrower or any of the Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.07    Labor Matters.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any of the Borrower or its Subsidiaries pending or, to the knowledge of the Borrower, threatened and (b) since the Petition Date, hours worked by and payment made based on hours worked to employees of each of the Borrower or its Subsidiaries have not been in material violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

SECTION 5.08    Ownership of Property; Liens.  Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.09    Environmental Matters.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Loan Party and each of its Subsidiaries and their respective operations is in compliance with all applicable Environmental Laws (including having obtained all Environmental Permits) and (ii) none of the Loan Parties or any of their respective Subsidiaries has become subject to any pending, or to the knowledge of the Borrower, threatened Environmental Claim or any other Environmental Liability.

(b)    None of the Loan Parties or any of their respective Subsidiaries has released, treated, stored, transported, arranged for transport or disposed of Hazardous Materials at or from any currently or formerly owned or operated real estate or facility in a manner that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.10    Taxes.  Holdings, the Borrower and its Restricted Subsidiaries have filed all federal, state, local, foreign and other Tax returns and reports required to be filed, and have paid all federal, state, local, foreign and other Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets or otherwise due and payable (including in its capacity as a withholding agent), except those (a) which are being contested in good faith by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP or (b) with respect to which the failure to make such filing or payment could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect.  There is no proposed Tax assessment, Tax deficiency or other Tax claim against Holdings, Borrower or any of its Restricted Subsidiaries except (i) those being actively contested by Holdings, Borrower or such Restricted Subsidiary in good faith and by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP or (ii) those that would not reason-ably be expected to, individually or in the aggregate, have a Material Adverse Effect.

SECTION 5.11    ERISA Compliance.

(a)    Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(b)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Employee Benefit Plan has failed to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Employee Benefit Plan; (iii) none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan; (iv) none of the Loan Parties or any of their respective

ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA; and (v) neither any Loan Party nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is insolvent (within the meaning of Section 4245 of ERISA) or has been determined to be in "endangered" or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA) and no such Multiemployer Plan is expected to be insolvent or endangered or critical status, except, with respect to each of the foregoing clauses of this Section 5.11(b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)    Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, each Foreign Plan has been maintained in compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders, and neither Holdings nor any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

SECTION 5.12    Subsidiaries.  As of the Closing Date, neither Holdings nor any other Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests in Holdings, the Borrower and the Subsidiaries have been validly issued and are fully paid and (if applicable) nonassessable, and all Equity Interests owned by Holdings or any other Loan Party are owned free and clear of all security interests of any person except (i) those created under the Collateral Documents or under the ABL Facilities Documentation (which Liens shall be subject to the ABL Intercreditor Agreement) and (ii) any nonconsensual Lien that is permitted under Section 7.01.  As of the Closing Date, Schedule 5.12 (a) sets forth the name and jurisdiction of each Subsidiary, (b) sets forth the ownership interest of Holdings, the Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

SECTION 5.13    Margin Regulations; Investment Company Act.

(a)    As of the Closing Date, none of the Collateral is Margin Stock.  No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

(b)    Neither the Borrower nor any Guarantor is an "investment company" under the Investment Company Act of 1940.

SECTION 5.14    Disclosure.  None of the information and data heretofore or contemporaneously furnished in writing by or on behalf of any Loan Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make such information and data (taken as a whole), in the light of the circumstances under which it was delivered, not materially misleading; it being understood that for purposes of this Section 5.14, such information and data shall not include projections and pro forma financial information or information of a general economic or general industry nature.

SECTION 5.15    Intellectual Property; Licenses, Etc.  The Borrower and the Restricted Subsidiaries have good and marketable title to, or a valid license or right to use, all material patents, trademarks, service marks, trade names, copyrights, technology, software, know-how, licenses and other intellectual property rights (collectively, "**IP Rights**") that are necessary for the operation of their respective businesses as currently conducted, except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Borrower, the operation of the respective businesses of the Borrower or any of its Subsidiaries as currently conducted does not infringe upon, misuse, misappropriate or violate any IP Rights held by any Person except for such infringements, misuses, misappropriations or violations individually or in the aggregate, that would not reasonably be expected to have a

-75-

Material Adverse Effect.  No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened against any Loan Party or Subsidiary, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 5.16    Solvency.  On the Closing Date the Borrower and its Restricted Subsidiaries, on a consolidated basis, are Solvent.

SECTION 5.17    OFAC.  Neither the Borrower, nor any of its Subsidiaries, nor, to the knowledge of the Borrower and its Subsidiaries, any director, officer, employee, agent, Affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority  or (iii) located, organized or resident in a Designated Jurisdiction.

SECTION 5.18    USA PATRIOT Act.  To the extent applicable, each of Holdings and its Subsidiaries is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the USA PATRIOT Act and (iii) the Beneficial Ownership Regulation.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 or other similar anti-corruption legislation in any jurisdiction.

SECTION 5.19    Collateral Documents.  Except as otherwise contemplated hereby or under any other Loan Documents, the provisions of the Collateral Documents, together with such filings and other actions required to be taken hereby or by the applicable Collateral Documents (including the delivery to Collateral Agent of any Pledged Debt and any Pledged Equity required to be delivered pursuant to the applicable Collateral Documents), are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable first priority Lien (subject to Liens permitted by Section 7.01 and subject to the ABL Intercreditor Agreement) on all right, title and interest of the respective Loan Parties in the Collateral described therein.

SECTION 5.20    Anti-Corruption Laws.  The Borrower and its Subsidiaries have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

SECTION 5.21    Affected Financial Institution.  No Loan Party is an Affected Financial Institution.

**ARTICLE VI**

**Affirmative Covenants**

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations) shall remain unpaid or unsatisfied, each of Holdings and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Restricted Subsidiaries to:

SECTION 6.01    Financial Statements.  Deliver to the Administrative Agent for prompt further distribution to each Lender each of the following and shall take the following actions:

(a)    as soon as available, but in any event within ~~ninety~~**ninety-five** (95) days after the end of each fiscal year of ~~Holdings~~**the Borrower** commencing with the fiscal year ending [February ~~[   ]~~**3**, 2024],

-76-

a consolidated balance sheet of ~~Holdings~~the Borrower  and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year together with related notes thereto (and, so long as provided to the holders of ~~Holdings'~~Borrower's or any of its direct or indirect parent companies' debt securities, management's discussion and analysis describing results of operations), setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of ~~[Deloitte Touche Tohmatsu Limited]~~Ernst & Young LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (other than a "going concern" qualification that is due to the impending maturity of any of the Facility, the ABL Facilities, Permitted Pari Passu Secured Debt, Credit Agreement Refinancing Indebtedness or any Permitted Refinancing of any of the foregoing Indebtedness);

(b)     as soon as available, but in any event (1) within one hundred forty (140) days after the end of the first fiscal quarter of ~~Holdings~~the Borrower ending after the Closing Date, (2) within ninety (90) days after the end of the second fiscal quarter of ~~Holdings~~the Borrower ending after the Closing Date, (3) within seventy-five (75) days after the end of the third fiscal quarter of ~~Holdings~~the Borrower ending after the Closing Date, and (4) within ~~forty-five~~forty-fifty (~~45~~50) days after the end of each fiscal quarter of each fiscal year of ~~Holdings~~the Borrower thereafter, a condensed consolidated balance sheet of ~~Holdings~~the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (i) condensed consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) condensed consolidated statements of cash flows for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of ~~Holdings~~the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of ~~Holdings~~the Borrower and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes (together with and, so long as provided to the holders of ~~Holdings'~~the Borrower's or any of its direct or indirect parent companies' debt securities' management's discussion and analysis describing results of operations);

(c)     [reserved];

(d)     simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 6.01(a) and 6.01(b) above, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements; and

(e)     quarterly, at a time mutually agreed with the Administrative Agent that is promptly after the delivery of the information required pursuant to clause (a) above and the information delivered pursuant to clause (b) above for each fiscal quarter, participate in a conference call for Lenders to discuss the financial condition and results of operations of Holdings and its Subsidiaries for the most recently-ended period for which financial statements have been delivered, which requirement may be satisfied by including the Lenders and the Administrative Agent on quarterly conference calls with the lenders under the ABL Facilities or any other debt or equity securities of Holdings or any of its direct or indirect parent companies.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 6.01 may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing (A) the applicable financial statements of any direct or indirect parent of the Borrower that, directly or indirectly, holds all of the Equity Interests of the Borrower or (B) the Borrower's or such entity's Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to each of clauses (A) and (B), (i) to the extent such information relates to a parent of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to the Borrower (or such parent), on the one hand, and the information relating to the Borrower and the Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such

materials are accompanied by a report and opinion of Ernst & Young LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit other than as permitted by Section 6.01(a).

SECTION 6.02    Certificates; Other Information.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    no later than five (5) days after the delivery of the financial statements referred to in Sections 6.01(a) and (b), a duly completed Compliance Certificate signed by the chief financial officer of Holdings;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which Holdings or the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(c)    promptly after the furnishing thereof, copies of any material statements or material reports furnished to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the terms of the ABL Credit Agreement, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02;

(d)    together with the delivery of the financial statements pursuant to Section 6.01(a) and each Compliance Certificate pursuant to Section 6.02(a), (i) a report setting forth the information required by Section 3.03(c) of the Security Agreement (or confirming that there has been no change in such information since the Closing Date or the date of the last such report), (ii) a description of each event, condition or circumstance during the last fiscal quarter covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.03(b) and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary as of the date of delivery of such Compliance Certificate or a confirmation that there is no change in such information since the later of the Closing Date and the date of the last such list; and

(e)    promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time on its own behalf or on behalf of any Lender reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(c) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely

-78-

responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Subsidiaries, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States Federal and state securities Laws (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

SECTION 6.03    Notices.  Promptly after a Responsible Officer of the Borrower obtains actual knowledge thereof, notify the Administrative Agent:

(a)    of the occurrence of any Default; and

(b)    of (i) any dispute, litigation, investigation or proceeding between any Loan Party and any arbitrator or Governmental Authority, (ii) the filing or commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights, the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (iii) the occurrence of any ERISA Event that, in any such case referred to in clauses (i), (ii) or (iii), has resulted or would reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to Section 6.03(a) or (b) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

SECTION 6.04    Payment of Taxes.  Timely pay, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon; *provided*, no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim.

SECTION 6.05    Preservation of Existence, Etc.  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of clause (a) or (b) to the extent (other than with respect to the preservation of the existence of Holdings and the Borrower) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article VII.

SECTION 6.06    Maintenance of Properties.  Except if the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment used in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

SECTION 6.07    Maintenance of Insurance.  (a)  Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the Administrative Agent (acting at the Direction of the Required Lenders), information presented in reasonable detail as to the insurance so carried.  Each such policy of insurance shall as appropriate, (i) name the Collateral Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Collateral Agent, on behalf of the Lenders as the loss payee thereunder and (b) with respect to each Mortgaged Property, obtain flood insurance in such total amounts as the Collateral Agent may from time to time reasonably require, if at any time the area in which any improvements located on any Mortgaged Property is designated as a "flood hazard area" in any Flood Insurance Rate Map established by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the Flood Insurance Laws.

SECTION 6.08    Compliance with Laws.  Comply in all material respects with its Organization Documents and the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected individually or in the aggregate to have a Material Adverse Effect.

SECTION 6.09    Books and Records.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or such Restricted Subsidiary, as the case may be.

SECTION 6.10    Inspection Rights.  Permit representatives and independent contractors of the Administrative Agent and the Required Lenders to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; *provided, further,* that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 6.10, none of the Borrower or any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

SECTION 6.11    Covenant to Guarantee Obligations and Give Security.  At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent or the Collateral

Agent **(acting at the Direction of the Required Lenders)** to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

      (a)      (x) upon the formation or acquisition of any new direct or indirect wholly owned Material Domestic Subsidiary (in each case, other than an Unrestricted Subsidiary or an Excluded Subsidiary) by any Loan Party, the designation in accordance with Section 6.14, of any existing direct or indirect wholly owned Material Domestic Subsidiary as a Restricted Subsidiary or any Subsidiary becoming a wholly owned Material Domestic Subsidiary, (y) upon the acquisition of any material assets by the Borrower or any other Loan Party or (z) with respect to any Subsidiary at the time it becomes a Loan Party, for any material assets held by such Subsidiary (in each case, other than assets constituting Collateral under a Collateral Document that becomes subject to the Lien created by such Collateral Document upon acquisition thereof (without limitation of the obligations to perfect such Lien)):

      (i)      within forty-five (45) days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the Administrative Agent may agree in its reasonable discretion:

      (A)      cause each such Material Domestic Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement to furnish to the Collateral Agent a description of the Material Real Properties owned by such Material Domestic Subsidiary in detail reasonably satisfactory to the Collateral Agent;

      (B)      within forty-five (45) days (or within ninety (90) days in the case of documents listed in Section 6.13(b)) after such formation, acquisition or designation, cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Collateral Agent Mortgages with respect to any Material Real Property, Security Agreement Supplements, Intellectual Property Security Agreements and other security agreements and documents (including, with respect to Mortgages, the documents listed in Section 6.13(b)), as reasonably requested by and in form and substance reasonably satisfactory to the Collateral Agent (consistent with the Mortgages, Security Agreement, Intellectual Property Security Agreements and other Collateral Documents in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

      (C)      cause each such Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank (or any other documents customary under local law) and instruments evidencing the intercompany Indebtedness held by such Material Domestic Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Collateral Agent;

      (D)      within forty-five (45) days (or within ninety (90) days in the case of documents listed in Section 6.13(b)) after such formation, acquisition or designation, take and cause the applicable Material Domestic Subsidiary and each direct or indirect parent of such applicable Material Domestic Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) may be necessary in the reasonable opinion of the Administrative Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by

Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law);

(ii)    within forty-five (45) days (or within ninety (90) days in the case of documents listed in Section 6.13(b)) after the request therefor by the Administrative Agent (or such longer period as the Administrative Agent may agree in its reasonable discretion), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent **(acting at the Direction of the Required Lenders)** as to such matters set forth in this Section 6.11(a) as the Administrative Agent may reasonably request; and

(iii)    as promptly as practicable after the reasonable request therefor by the Administrative Agent or Collateral Agent **(acting at the Direction of the Required Lenders)**, deliver to the Collateral Agent with respect to each Material Real Property, title reports, surveys and environmental assessment reports *provided* that the Collateral Agent may in its reasonable discretion accept any such existing report or survey to the extent prepared as of a date reasonably satisfactory to the Collateral Agent; *provided*, *however*, that there shall be no obligation to deliver to the Collateral Agent any environmental assessment report whose disclosure to the Collateral Agent would require the consent of a Person other than the Borrower or one of its Subsidiaries, where, despite the commercially reasonable efforts of the Borrower to obtain such consent, such consent cannot be obtained; and

(b)    (i)  the Borrower shall obtain the security interests and Guarantees set forth on <u>Schedule 1.01A</u> on or prior to the dates corresponding to such security interests and Guarantees set forth on <u>Schedule 1.01A</u>; and

(ii)    after the Closing Date, promptly after the acquisition of any Material Real Property by any Loan Party other than Holdings, and such Material Real Property shall not already be subject to a perfected Lien pursuant to the Collateral and Guarantee Requirement, the Borrower shall give notice thereof to the Collateral Agent and will take, or cause the relevant Loan Party to take, the actions referred to in Section 6.13(b).

SECTION 6.12    <u>Compliance with Environmental Laws</u>.  Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent required by applicable Environmental Laws, conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all applicable Environmental Laws.

SECTION 6.13    <u>Further Assurances and Post-Closing Conditions</u>.  Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document and in each case at the expense of the Loan Parties:

(a)    Promptly upon reasonable request by the Administrative Agent or the Collateral Agent (acting at the Direction of the Required Lenders) or as may be required by applicable law (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or Collateral Agent **(acting at the Direction of the Required Lenders)** may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents.

-82-

(b)        In the case of any Material Real Property, provide the Collateral Agent with Mortgages with respect to such owned real property within ninety (90) days (or such longer period as the Collateral Agent may agree in its sole discretion) of the acquisition of such real property in each case together with:

(i)        evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices that the Collateral Agent **(acting at the Direction of the Required Lenders)** may deem reasonably necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Collateral Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Collateral Agent **(acting at the Direction of the Required Lenders)**;

(ii)        fully paid American Land Title Association Lender's Extended Coverage title insurance policies or the equivalent or other form available in each applicable jurisdiction (the "**Mortgage Policies**") in form and substance, with endorsements available in the applicable jurisdiction and in amount, reasonably acceptable to the Collateral Agent (not to exceed the fair market value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Collateral Agent, insuring the Mortgages to be valid subsisting Liens on the property described therein, subject only to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Collateral Agent may reasonably request and is available in the applicable jurisdiction;

(iii)        opinions of local counsel for the Loan Parties in states in which the real properties are located, with respect to the enforceability and perfection of the Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent **(acting at the Direction of the Required Lenders)**;

(iv)        (A) a completed "life of the loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property duly executed and acknowledged by the appropriate Loan Parties and (B) with respect to any Mortgaged Property which is designated as a "flood hazard area" in any Flood Insurance Rate Map established by the Federal Emergency Management Agency (or any successor agency) and evidence of flood insurance as required by Section 6.07 hereof; and

(v)        such other evidence that all other actions that the Administrative Agent or Collateral Agent **(acting at the Direction of the Required Lenders)** may reasonably deem necessary or desirable in order to create valid and subsisting Liens on the property described in the Mortgages has been taken, including the delivery of those documents necessary to satisfy the Collateral and Guarantee Requirement.

(c)        Within sixty (60) days (or such longer period as the Collateral Agent may agree in its sole discretion (acting at the Direction of the Required Lenders)) of the Closing Date, and without duplication of Section 4.01(a)(iv), provide evidence that all other actions, recordings and filings that the Administrative Agent and the Collateral Agent **(acting at the Direction of the Required Lenders)** may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement at such time shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent **(acting at the Direction of the Required Lenders)**.

SECTION 6.14        Designation of Subsidiaries.  The board of directors of the Borrower may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that (i) immediately before and after such designation, no Default shall have occurred and be continuing, (ii) other than for purposes of designating a Restricted Subsidiary as an Unrestricted Subsidiary that is a Securitization Subsidiary in connection with the establishment of a Qualified Securitization

Financing, immediately after giving effect to such designation, the Net Leverage Ratio for the Test Period immediately preceding such designation for which financial statements have been delivered pursuant to Section 6.01 is less than or equal to 4.25 to 1.0 (calculated on a Pro Forma Basis) (and, as a condition precedent to the effectiveness of any such designation, the Borrower shall deliver to the Administrative Agent a certificate setting forth in reasonable detail the calculations demonstrating satisfaction of such test) and (iii) no Subsidiary may be designated as an Unrestricted Subsidiary if, after such designation, it would be a "Restricted Subsidiary" for the purpose of the ABL Facilities or any Junior Financing or any other Indebtedness for borrowed money of any Loan Party in a principal amount in excess of the Threshold Amount.  The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the fair market value as determined by the Borrower in good faith of the Borrower's or its Subsidiary's (as applicable) Investment therein.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time and a return on any Investment by the Borrower in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the fair market value as determined by the Borrower in good faith at the date of such designation of the Borrower's or its Subsidiary's (as applicable) Investment in such Subsidiary.

Notwithstanding the foregoing, any Unrestricted Subsidiary that has been re-designated a Restricted Subsidiary may not be subsequently re-designated as an Unrestricted Subsidiary.

Neither the Borrower nor any Restricted Subsidiary shall permit transfer any Material Intellectual Property to any Unrestricted Subsidiary or be permitted to designate any Restricted Subsidiary that owns any such Material Intellectual Property as an Unrestricted Subsidiary.

SECTION 6.15    Maintenance of Ratings.  Use commercially reasonable efforts to obtain and maintain (i) public corporate credit ratings and a public corporate family ratings from Moody's and S&P in respect of the Borrower, and (ii) a public ratings from Moody's and S&P for the Term Loans, in each case within thirty (30) days of the Closing Date.

SECTION 6.16    Cash Flow Forecast.  From and after the Closing Date through September 30, 2024, the Borrower shall deliver an updated Cash Flow Forecast on a rolling 13-week basis on Wednesday of each week, together with a variance report, in form and substance reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders), comparing the Borrower's and its Restricted Subsidiaries' actual cash receipts and disbursements on a line item basis for the immediately preceding applicable period in the Cash Flow Forecast as compared to projected cash receipts and disbursements for such applicable period, as set forth in the Cash Flow Forecast.

## ARTICLE VII

### Negative Covenants

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Cash Management Obligations) shall remain unpaid or unsatisfied, each of Holdings and the Borrower shall not (and, with respect to Section 7.13, only Holdings shall not), nor shall Holdings or the Borrower permit any Restricted Subsidiary to:

SECTION 7.01    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens created pursuant to any Loan Document;

(b)    Liens existing on the Closing Date and set forth on Schedule 7.01(b);

(c)        Liens for taxes, assessments or governmental charges that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP;

(d)        statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in respect of Indebtedness) in favor of landlords, so long as, in each case, such Liens arise in the ordinary course of business that secure amounts not overdue for a period of more than thirty (30) days or, if more than thirty (30) days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)        (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, the Borrower or any Restricted Subsidiary;

(f)        deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)        easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries taken as a whole, or the use of the property for its intended purpose, and any other exceptions to title on the Mortgage Policies accepted by the Collateral Agent in accordance with the Loan Documents;

(h)        Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 8.01(g);

(i)        (i) Liens securing obligations in respect of Indebtedness permitted under Section 7.03(e); *provided* that (A) such Liens attach concurrently with or within two hundred and seventy (270) days after completion of the acquisition, construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits and (C) such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to, or acquired, constructed, repaired, replaced or improved with the proceeds of such Indebtedness; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender and (ii) Liens on assets of Restricted Subsidiaries that are Non-Loan Parties securing Indebtedness of such Restricted Subsidiaries permitted pursuant to Section 7.03(n);

(j)        leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (ii) secure any Indebtedness;

(k)        Liens (i) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business and (ii) on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account

-85-

of such person to facilitate the purchase, shipment or storage of such inventory or such other goods in the ordinary course of business;

(l)     Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set off) and that are within the general parameters customary in the banking industry;

(m)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02(i) or Section 7.02(n) to be applied against the purchase price for such Investment or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(n)     Liens on property of any Foreign Subsidiary securing Indebtedness of such Foreign Subsidiary incurred pursuant to Section 7.03(b), (g), (n) or (t);

(o)     Liens in favor of the Borrower or a Restricted Subsidiary securing Indebtedness permitted under Section 7.03(d);

(p)     Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary (other than by designation as a Restricted Subsidiary pursuant to Section 6.14), in each case after the Closing Date (other than Liens on the Equity Interests of any Person that becomes a Restricted Subsidiary); *provided* that (i) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property of such acquired Restricted Subsidiary), and (ii) the Indebtedness secured thereby is permitted under Section 7.03(e) or (g);

(q)     any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases (other than Capitalized Leases) or licenses entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(r)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(s)     Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02 and reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts maintained in the ordinary course of business and not for speculative purposes;

(t)     Liens that are customary contractual rights of setoff (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions in the ordinary course and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of Holdings, the Borrower or any of the Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings, the Borrower or any of the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(u)     Liens solely on any cash earnest money deposits made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement not prohibited hereunder;

(v)     ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(w)     purported Liens evidenced by the filing of precautionary Uniform Commercial Code financing statements or similar public filings;

(x)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(y)     Liens securing obligations in respect of Indebtedness permitted under Section 7.03(r)(i) and obligations in respect of any Secured Hedge Agreement and any Secured Cash Management Agreement (in each case, as defined in the ABL Credit Agreement) permitted under Section 7.03(r)(ii) (or, in each case, any Permitted Refinancing in respect thereof) that are subject to the ABL Intercreditor Agreement;

(z)     Liens on the Securitization Assets arising in connection with a Qualified Securitization Financing;

(aa)     any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(bb)     the modification, replacement, renewal or extension of any Lien permitted by clauses (b), (i) and (p) of this Section 7.01; *provided* that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03(e), and (B) proceeds and products thereof, and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03;

(cc)     Liens on the Collateral securing obligations in respect of Permitted Pari Passu Secured Debt, Permitted Junior Secured Refinancing Debt, Permitted Ratio Debt and any Permitted Refinancing of any of the foregoing; *provided* that (x) any such Liens securing any Permitted Refinancing in respect of Permitted Pari Passu Secured Debt are subject to the ABL Intercreditor Agreement and a First Lien Intercreditor Agreement and (y) any such Liens securing Permitted Ratio Debt or any Permitted Refinancing in respect of Permitted Junior Secured Refinancing Debt or Permitted Ratio Debt are subject to a Second Lien Intercreditor Agreement;

(dd)     Liens or rights of setoff against credit balances of the Borrower or any of its Subsidiaries with credit card issuers or credit card processors on amounts owing by such credit card issuers or credit card processors to the Borrower or any of its Subsidiaries in the ordinary course of business, but not Liens on or rights of setoff against any other property or assets of any Borrower or any of its Subsidiaries pursuant to the credit card agreements in effect on the Closing Date or as subsequently amended in any manner not materially adverse to the Lenders, to secure the obligations of the Borrower or any of its Subsidiaries to the credit card issuers or credit card processors as a result of fees and chargebacks;

(ee)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(ff)     deposits of cash with the owner or lessor of premises leased and operated by the Borrower or any of its Subsidiaries in the ordinary course of business of the Borrower and such Subsidiary to secure the performance of the Borrower's or such Subsidiary's obligations under the terms of the lease for such premises; and

(gg)    Liens securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not to exceed the greater of $150,000,000 and 6.50% of Total Assets, in each case determined as of the date of incurrence; provided, that any Liens on the Collateral incurred under this clause (gg) **securing Indebtedness** shall rank junior to the Liens securing the Obligations pursuant to a Second Lien Intercreditor Agreement.

SECTION 7.02    <u>Investments</u>.  Make or hold any Investments, except:

(a)    Investments by Holdings, the Borrower or any of the Restricted Subsidiaries in assets that are Cash Equivalents;

(b)    loans or advances to officers, directors and employees of Holdings (or any direct or indirect parent thereof), the Borrower or any of the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of Holdings (or any direct or indirect parent thereof; *provided* that, to the extent such loans or advances are made in cash, the amount of such loans and advances used to acquire such Equity Interests shall be contributed to Holdings in cash) and (iii) for any other purpose, in an aggregate principal amount outstanding under clauses (i) through (iii) not to exceed $[ ]**22,000,000**;

(c)    Investments (i) by (A) Holdings in any Loan Party and (B) the Borrower or any Restricted Subsidiary that is a Loan Party in the Borrower or any Restricted Subsidiary that is a Loan Party, (ii) by any Non-Loan Party in any other Non-Loan Party that is a Restricted Subsidiary, (iii) by any Non-Loan Party in the Borrower or any Restricted Subsidiary that is a Loan Party and (iv) by any Loan Party in any Non-Loan Party that is a Restricted Subsidiary; *provided* that (A) any such Investments made pursuant to this clause (iv) in the form of intercompany loans shall be evidenced by notes that have been pledged (individually or pursuant to a global note) to the Collateral Agent for the benefit of the Lenders (it being understood and agreed that any Investments permitted under this clause (iv) that are not so evidenced as of the Closing Date are not required to be so evidenced and pledged until the date that is sixty (60) days after the Closing Date (or such later date as may be acceptable to the Administrative Agent)) and (B) the aggregate amount of Investments made pursuant to this clause (iv) shall not exceed at any time outstanding the $20,000.000.

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)    Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under Section 7.01, 7.03 (other than Section 7.03(c)(ii) or (d)), 7.04 (other than Section 7.04(c)(ii) or (f)), 7.05 (other than Section 7.05(d)(ii) or (e)) and 7.06 (other than Section 7.06(d) or (g)(iv)), respectively;

(f)    Investments existing on the Closing Date or made pursuant to legally binding written contracts in existence on the Closing Date, in each case, set forth on <u>Schedule 7.02(f)</u> and any modification, replacement, renewal, reinvestment or extension of any of the foregoing; *provided* that the amount of any Investment permitted pursuant to this Section 7.02(f) is not increased from the amount of such Investment on the Closing Date except pursuant to the terms of such Investment as of the Closing Date or as otherwise permitted by another clause of this Section 7.02;

(g)    Investments in Swap Contracts permitted under Section 7.03;

(h)    promissory notes and other non-cash consideration that is permitted to be received in connection with Dispositions permitted by Section 7.05;

-88-

(i)        the purchase or other acquisition of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, a Store or Equity Interests in a Person that, upon the consummation thereof, will be a wholly owned Restricted Subsidiary of the Borrower (including as a result of a merger or consolidation); *provided* that with respect to each purchase or other acquisition made pursuant to this Section 7.02(i) (each, a "**Permitted Acquisition**"):

(A)        the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and each applicable Loan Party and any such newly created or acquired Subsidiary (and, to the extent required under the Collateral and Guarantee Requirement, the Subsidiaries of such created or acquired Subsidiary) shall be Guarantors and shall have complied with the requirements of Section 6.11, within the times specified therein (for the avoidance of doubt, this clause (A) shall not override any provisions of the Collateral and Guarantee Requirement, subject to the limit in clause (B) below); *provided* that the formation of any Subsidiary that is a Division Successor shall be deemed to constitute the acquisition of a Restricted Subsidiary for all purposes of this definition;

(B)        the aggregate amount of Investments made in Persons that do not become Loan Parties shall not exceed at any time outstanding the greater of $55,000,000 and 2.50% of Total Assets in the aggregate following the Closing Date;

(C)        the acquired property, assets, business or Person is in a business permitted under Section 7.07; and

(D)        immediately before and immediately after giving Pro Forma Effect to any such purchase or other acquisition, no Event of Default shall have occurred and be continuing (or, in the case of any Limited Condition Acquisition, no Event of Default under Section 8.01(a) or 8.01(f) shall have occurred and be continuing on the Transaction Agreement Date);

(j)        [reserved];

(k)        Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(l)        Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment;

(m)        loans and advances to Holdings (or any direct or indirect parent thereof) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to Holdings (or such direct or indirect parent) in accordance with Section 7.06(g);

(n)        Investments that do not exceed in the aggregate at any time outstanding the sum of (i) $40,000,000, determined as of the date of such Investment, and (ii) the Available Amount at such time;

(o)        advances of payroll payments to employees in the ordinary course of business;

(p)        Investments to the extent that payment for such Investments is made solely with Qualified Equity Interests of Holdings (or any direct or indirect parent thereof);

(q)        Investments held by a Restricted Subsidiary acquired after the Closing Date or of a Person merged into the Borrower or merged or consolidated with a Restricted Subsidiary in accordance with Section 7.04 after the Closing Date (other than existing Investments in subsidiaries of such Subsidiary

-89-

or Person, which must comply with the requirements of Section 7.02(i) or (n)) to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(r)        Guarantees by the Borrower or any of the Restricted Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(s)        (i) Investments in a Securitization Subsidiary or any Investment by a Securitization Subsidiary in any other Person in connection with a Qualified Securitization Financing; *provided*, *however*, that any such Investment in a Securitization Subsidiary is in the form of a contribution of additional Securitization Assets or as equity, and (ii) distributions or payments of Securitization Fees and purchases of Securitization Assets pursuant to a Securitization Repurchase Obligation in connection with a Qualified Securitization Financing;

(t)        Investments made by any Restricted Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Restricted Subsidiary from an Investment in such Restricted Subsidiary made pursuant to Section 7.02(c)(iv), (i)(B) or (n); and

(u)        Investments so long as (i) before and after giving effect thereto, no Event of Default under clause (a) or (f) of Section 8.01 has occurred and is continuing and (ii) the Net Leverage Ratio on a Pro Forma Basis does not exceed [2.50] to 1.00.

Notwithstanding anything to the contrary set forth in this Section 7.02, no Loan Party shall make any Investment in any Subsidiary (other than another Loan Party) if the consideration paid by such Loan Party to such Subsidiary (other than a Loan Party) in respect of such Investment constitutes Material Intellectual Property; provided that nothing in this sentence shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary in the ordinary course of business.

SECTION 7.03        Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness or issue any Disqualified Equity Interest, other than:

(a)        Indebtedness under the Loan Documents;

(b)        (i) Indebtedness existing on the Closing Date set forth on Schedule 7.03(b) and any Permitted Refinancing thereof and (ii) intercompany Indebtedness outstanding on the Closing Date; *provided* that all such Indebtedness of any Loan Party owed to any Non-Loan Party shall be subject to the Intercompany Subordination Agreement;

(c)        (i) Guarantees by Holdings, the Borrower and the Restricted Subsidiaries in respect of Indebtedness of the Borrower or any of the Restricted Subsidiaries otherwise permitted hereunder (except that a Restricted Subsidiary that is not a Loan Party may not, by virtue of this Section 7.03(c), Guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 7.03); *provided* that (A) no Guarantee by any Restricted Subsidiary of any Junior Financing shall be permitted unless such Restricted Subsidiary is a Loan Party and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guaranty on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (ii) any Guaranty by a Loan Party of Indebtedness of a Restricted Subsidiary that would have been permitted as an Investment by such Loan Party in such Restricted Subsidiary under Section 7.02(c);

(d)        Indebtedness of the Borrower or any of the Restricted Subsidiaries owing to the Borrower or any other Restricted Subsidiary to the extent constituting an Investment permitted by Section 7.02;

*provided* that all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subject to the Intercompany Subordination Agreement;

(e)    (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) of the Borrower and the Restricted Subsidiaries financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; *provided* that such Indebtedness is incurred concurrently with or within two hundred and seventy (270) days after the applicable acquisition, construction, repair, replacement or improvement and any Permitted Refinancing thereof in an aggregate principal amount pursuant to this subclause (i) not to exceed the greater of (x) $110,000,000 and (y) 4.75% of Total Assets, in each case determined at the date of incurrence, (ii) Attributable Indebtedness arising out of sale-leaseback transactions (other than sale-leaseback transactions with respect to any Designated Assets) with respect to properties acquired after the Closing Date and any Permitted Refinancing thereof in an aggregate amount outstanding pursuant to this sub-clause (ii) at any time not to exceed the greater of (x) $110,000,000 and (y) 4.75% of Total Assets, in each case, determined at the date of incurrence and (iii) Attributable Indebtedness arising out of sale-leaseback transactions with respect to any Designated Assets, and any Permitted Refinancing thereof;

(f)    Indebtedness in respect of Swap Contracts designed to hedge against Holdings', the Borrower's or any Restricted Subsidiary's exposure to interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)    Indebtedness (i) of any Person that becomes a Restricted Subsidiary after the Closing Date, which Indebtedness is existing at the time such Person becomes a Restricted Subsidiary and is not incurred in contemplation of such Person becoming a Restricted Subsidiary that is non-recourse to the Borrower, Holdings or any other Restricted Subsidiary (other than any Subsidiary of such Person that is a Subsidiary on the date such Person becomes a Restricted Subsidiary after the Closing Date) and is either (A) unsecured or (B) secured only by the assets of such Restricted Subsidiary by Liens permitted under Section 7.01(p) and, in each case, any Permitted Refinancing thereof, and (ii) of the Borrower or any Restricted Subsidiary incurred or assumed in connection with any Permitted Acquisition that is secured only by Liens permitted under Section 7.01(p) (and any Permitted Refinancing of the foregoing) and so long as the aggregate principal amount of such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof at any time outstanding pursuant to this clause (g)(ii) does not exceed the greater of (x) $110,000,000 and (y) 4.75% of Total Assets;

(h)    Permitted Pari Passu Secured Debt, Credit Agreement Refinancing Indebtedness and any Permitted Refinancing of any of the foregoing Indebtedness;

(i)    Indebtedness representing deferred compensation to employees of the Borrower and its Subsidiaries incurred in the ordinary course of business;

(j)    Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of Holdings (or any direct or indirect parent thereof) permitted by Section 7.06;

(k)    Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in a Permitted Acquisition, any other Investment expressly permitted hereunder or any Disposition, in each case to the extent constituting indemnification obligations or obligations in respect of purchase price (including earn-outs) or other similar adjustments;

(l)    Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements with employees incurred by such Person in connection with any Permitted Acquisitions or any other Investment expressly permitted hereunder;

(m)     Cash Management Obligations and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof;

(n)     (i) Indebtedness of the Borrower and the Restricted Subsidiaries in an aggregate principal amount at any time outstanding not to exceed the greater of $150,000,000 and 6.50% of Total Assets, in each case determined at the time of incurrence and (ii) Indebtedness incurred by Non-Loan Parties, in each case determined at the time of incurrence in an aggregate principal amount not to exceed the greater of $58,000,000 and 2.50% of Total Assets;

(o)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(p)     Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business consistent with past practice in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(q)     obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(r)     (i) Indebtedness in an aggregate principal amount not to exceed the greater of (A) $600,000,000 plus incremental amounts permitted under the ABL Credit Agreement as in effect on the Closing Date and (B) the then applicable Borrowing Base at any time outstanding under the ABL Facilities and (ii) the amount of obligations in respect of any Secured Hedge Agreement and any Secured Cash Management Agreement (in each case, as defined in the ABL Credit Agreement) at any time outstanding and not incurred in violation of Section 7.03(f) and, in respect of clauses (i) and (ii), any Permitted Refinancing thereof;

(s)     [reserved];

(t)     Indebtedness incurred by a Foreign Subsidiary which, when aggregated with the principal amount of all other Indebtedness incurred pursuant to this clause (t) and then outstanding, does not exceed the greater of $58,000,000 and 2.50% of Total Assets;

(u)     Permitted Ratio Debt and any Permitted Refinancing thereof;

(v)     Indebtedness incurred by a Securitization Subsidiary in a Qualified Securitization Financing that is not recourse (except for Standard Securitization Undertakings) to the Borrower or any of the Restricted Subsidiaries;

(w)     Indebtedness in respect of letters of credit issued for the account of any of the Subsidiaries of Holdings to finance the purchase of inventory so long as (x) such Indebtedness is unsecured and (y) the aggregate principal amount of such Indebtedness does not exceed the greater of $81,000,000 and 3.50% of Total Assets at any time;

(x)     [reserved]; and

(y)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (x) above.

Notwithstanding the foregoing, no Restricted Subsidiary that is a Non-Loan Party will guarantee any Indebtedness for borrowed money of a Loan Party unless such Restricted Subsidiary becomes a Guarantor.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased, plus the aggregate amount of fees, underwriting discounts, premiums and other costs and expenses incurred in connection with such refinancing.

The accrual of interest, the accretion of original issue discount and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03.  The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

Notwithstanding anything to the contrary contained in this Agreement, Indebtedness incurred pursuant to the ABL Facilities (and any Permitted Refinancing thereof) may only be incurred pursuant to Section 7.03(r).

SECTION 7.04    Fundamental Changes.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(a)    Holdings or any Restricted Subsidiary may merge or consolidate with the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that (x) the Borrower shall be the continuing or surviving Person, (y) such merger or consolidation does not result in the Borrower ceasing to be organized under the Laws of the United States, any state thereof or the District of Columbia and (z) in the case of a merger or consolidation of Holdings with and into the Borrower, Holdings shall not be an obligor in respect of any other Indebtedness that is not permitted to be Indebtedness of the Borrower under this Agreement, shall have no direct Subsidiaries at the time of such merger or consolidation other than the Borrower and, after giving effect to such merger or consolidation, the direct parent of the Borrower shall expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent (acting at the Direction of the Required Lenders);

(b)    (i) any Restricted Subsidiary that is not a Loan Party may merge or consolidate with or into any other Restricted Subsidiary of the Borrower that is not a Loan Party, (ii) any Restricted Subsidiary may merge or consolidate with or into any other Restricted Subsidiary of the Borrower that is a Loan Party, (iii) any merger the sole purpose of which is to reincorporate or reorganize a Loan Party in another jurisdiction in the United States shall be permitted and (iv) any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Restricted Subsidiaries and is not materially disadvantageous to the Lenders, *provided*, in the case of clauses (ii) through (iv), that (A) no Event of Default shall result therefrom, (B) no Change of Control shall result therefrom and (C) the surviving Person (or, with respect to clause (iv), the Person who receives the assets of such dissolving or liquidated Restricted Subsidiary that is a Guarantor) shall be a Loan Party;

(c)        any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (i) the transferee must be a Loan Party or (ii) such Investment must be a permitted Investment in a Restricted Subsidiary which is not a Loan Party in accordance with Sections 7.02 (other than Section 7.02(e));

(d)        so long as no Default exists or would result therefrom, the Borrower may merge or consolidate with any other Person; *provided* that (i) the Borrower shall be the continuing or surviving corporation or (ii) if the Person formed by or surviving any such merger or consolidation is not the Borrower (any such Person, the "**Successor Borrower**"), (A) the Successor Borrower shall be an entity organized or existing under the Laws of the United States, any state thereof or the District of Columbia, (B) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (C) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guaranty confirmed that its Guarantee of the Obligations shall apply to the Successor Borrower's obligations under this Agreement, (D) each Loan Party, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement confirmed that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement, (E) each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to the Collateral Agent) confirmed that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement, and (F) the Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Collateral Document comply with this Agreement; *provided*, *further*, that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(e)        so long as no Default exists or would result therefrom, Holdings may merge or consolidate with any other Person; *provided* that (A) Holdings shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, amalgamation or consolidation is not Holdings or is a Person into which Holdings has been liquidated (any such Person, the "**Successor Holdings**") (A) the Successor Holdings shall be an entity organized or existing under the Laws of the United States, any state thereof or the District of Columbia, (B) the Successor Holdings shall expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and (C) the Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Collateral Document comply with this Agreement; *provided*, *further*, that if the foregoing are satisfied, the Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement;

(f)        so long as no Default exists or would result therefrom, any Restricted Subsidiary may merge or consolidate with any other Person in order to effect an Investment permitted pursuant to Section 7.02 (other than Section 7.02(e)); *provided* that the continuing or surviving Person shall be the Borrower or a Restricted Subsidiary, which together with each of its Restricted Subsidiaries, shall have complied with the applicable requirements of Section 6.11;

(g)        [reserved]; and

(h)        so long as no Default exists or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05 (other than Section 7.05(e)).

SECTION 7.05        Dispositions.  Make any Disposition, except:

(a)        Dispositions of obsolete, worn-out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and the Restricted Subsidiaries;

(b)        Dispositions of inventory and goods held for sale in the ordinary course of business;

(c)        Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property; *provided* that to the extent the property being transferred constitutes Term Priority Collateral, such replacement property shall constitute Term Priority Collateral;

(d)        Dispositions of property to the Borrower or a Restricted Subsidiary; *provided* that if the transferor of such property is a Loan Party (i) the transferee thereof must be a Loan Party or (ii) such Investment must be a permitted Investment in a Restricted Subsidiary that is not a Loan Party in accordance with Section 7.02 (other than Section 7.02(e));

(e)        Dispositions permitted by Sections 7.02 (other than Section 7.02(e)), 7.04 (other than Section 7.04(h)) and 7.06 (other than Section 7.06(d)) and Liens permitted by Section 7.01 (other than Section 7.01(m)(ii));

(f)        Dispositions of property pursuant to sale-leaseback transactions; *provided* that the Net Cash Proceeds thereof are applied in accordance with Section 2.03(b)(ii);

(g)        Dispositions of Cash Equivalents;

(h)        leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(i)        transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event;

(j)        Dispositions of property not otherwise permitted under this Section 7.05; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Event of Default exists), no Event of Default shall exist or would result from such Disposition; and (ii) with respect to any Disposition pursuant to this clause (j) for a purchase price in excess of $20,000,000, the Borrower or any of the Restricted Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than nonconsensual Liens permitted by Section 7.01 and Liens permitted by Sections 7.01(a), (l), (m), (s), (t)(i), (t)(ii), (u), (y) and (cc)); *provided, however,* that for the purposes of this clause (ii), (A) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by such Restricted Subsidiary from such transferee that are converted by such Restricted Subsidiary into cash (to the extent of the cash received) within one hundred and eighty (180) days following the closing of the applicable Disposition and (C) any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value as determined by the Borrower in good faith, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (C) that is at that time outstanding, not in excess of the greater of $58,000,000 and 2.50% of Total Assets at the time of the receipt of such Designated Non-Cash Consideration, with the fair

-95-

market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash;

(k)       Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(l)       Dispositions of accounts receivable in connection with the collection or compromise thereof;

(m)       any issuance or sale of Equity Interests in, or sale of Indebtedness or other securities of, an Unrestricted Subsidiary;

(n)       to the extent allowable under Section 1031 of the Code (or comparable or successor provision), any exchange of like property (excluding any boot thereon permitted by such provision) for use in any business conducted by the Borrower or any of its Restricted Subsidiaries that is not in contravention of Section 7.07; *provided* that to the extent the property being transferred constitutes Term Priority Collateral, such replacement property shall constitute Term Priority Collateral;

(o)       [reserved];

(p)       the unwinding of any Swap Contract;

(q)       sales or other dispositions by the Borrower or any Restricted Subsidiary of assets in connection with the closing or sale of a Store (including a factory Store) in the ordinary course of business of the Borrower and its Subsidiaries, which consist of leasehold interests in the premises of such Store, the equipment and fixtures located at such premises and the books and records relating exclusively and directly to the operations of such Store; *provided* that as to each and all such sales and closings, (A) no Event of Default shall result therefrom and (B) such sale shall be on commercially reasonable prices and terms in a bona fide arm's-length transaction;

(r)       bulk sales or other Dispositions of the inventory of a Loan Party not in the ordinary course of business in connection with Store closings, at arm's length;

(s)       any Disposition of Securitization Assets to a Securitization Subsidiary; and

(t)       the lapse or abandonment in the ordinary course of business of any registrations or applications for registration of any IP Rights;

*provided* that (i) no Loan Party shall make any Disposition of Material Intellectual Property to any Subsidiary (other than another Loan Party); provided that nothing in this clause (i) shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary in the ordinary course of business, and (ii) any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(e), (i), (k), (p) and (t) and except for Dispositions from the Borrower or a Restricted Subsidiary that is a Loan Party to the Borrower or a Restricted Subsidiary that is a Loan Party), shall be for no less than the fair market value of such property at the time of such Disposition as determined by the Borrower in good faith.  To the extent any Collateral is Disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and, if requested by the Administrative Agent (acting at the Direction of the Required Lenders), upon the certification by the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent (acting at the Direction of the Required Lenders) shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 7.06     Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, except:

(a)     each Restricted Subsidiary may make Restricted Payments to the Borrower and to its other Restricted Subsidiaries (and, in the case of a Restricted Payment by a non-wholly owned Restricted Subsidiary, to the Borrower and any of its other Restricted Subsidiaries and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(b)     [reserved];

(c)     [reserved];

(d)     to the extent constituting Restricted Payments, Holdings, the Borrower and the Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.02 (other than Section 7.02(e)), 7.04 (other than a merger or consolidation of Holdings and the Borrower) or 7.08 (other than Section 7.08(a), (j) or (r));

(e)     repurchases of Equity Interests in Holdings, the Borrower or any of the Restricted Subsidiaries deemed to occur upon exercise of stock options or warrants or similar rights if such Equity Interests represent a portion of the exercise price of such options or warrants or similar rights;

(f)     [reserved];

(g)     the Borrower may make Restricted Payments to Holdings or to any direct or indirect parent of Holdings (and Holdings may make Restricted Payments to any direct or indirect parent of Holdings):

(i)     the proceeds of which will be used to pay (in amounts required for Holdings or such other parent company) consolidated or combined federal, state and/or local income Taxes imposed on such entity to the extent such income Taxes are attributable to the income of the Borrower and its Subsidiaries; *provided*, *however*, that (x) the amount of such payments in respect of any Tax year does not, in the aggregate, exceed the amount that the Borrower and its Subsidiaries whose activities are included in such consolidated or combined group would have been required to pay in respect of the relevant federal, state and/or local income Taxes (as the case may be) in respect of such year if the Borrower and such Subsidiaries paid such income Taxes directly as a stand-alone consolidated or combined income Tax group (reduced by any such taxes paid directly by the Borrower or any Subsidiary) and (y) the permitted payment pursuant to this clause (g)(i) and clause (g)(iii) with respect to any Taxes attributable to income of any Unrestricted Subsidiary for any taxable period shall be limited to the amount actually paid with respect to such period by such Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary for the purposes of paying such consolidated, combined or similar Taxes;

(ii)     the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, attributable to the ownership or operations of the Borrower and its Subsidiaries;

(iii)     the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof which does not own other Subsidiaries besides Holdings, its Subsidiaries and the direct or indirect parents of Holdings to pay) franchise taxes and

other fees, taxes and expenses required to maintain its (or any of such direct or indirect parents') corporate existence;

(iv)    to finance any Investment permitted to be made pursuant to Section 7.02; *provided* that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment and (B) Holdings and the Borrower shall, immediately following the closing thereof, cause (1) all property acquired (whether assets or Equity Interests) to be contributed to the Borrower or a Restricted Subsidiary or (2) the merger (to the extent permitted in Section 7.04) of the Person formed or acquired into the Borrower or a Restricted Subsidiary in order to consummate such Permitted Acquisition, in each case, in accordance with the requirements of Section 6.11 and 7.02;

(v)    the proceeds of which shall be used to pay (or make Restricted Payments to allow any direct or indirect parent thereof to pay) costs, fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering permitted by this Agreement; and

(vi)    the proceeds of which (A) shall be used to pay customary salary, bonus and other benefits payable to officers and employees of Holdings or any direct or indirect parent company of Holdings to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries or (B) shall be used to make payments permitted under Sections 7.08(h) and (q) (but only to the extent such payments have not been and are not expected to be made by the Borrower or a Restricted Subsidiary);

(h)    Holdings, the Borrower or any of the Restricted Subsidiaries may pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof or any Permitted Acquisition;

(i)    [reserved];

(j)    repurchases of Equity Interests (i) deemed to occur on the exercise of options by the delivery of Equity Interests in satisfaction of the exercise price of such options or (ii) in consideration of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing), including deemed repurchases in connection with the exercise of stock options;

(k)    [reserved];

(l)    [reserved];

(m)    [reserved];

(n)    [reserved]; and

(o)    [the Borrower may make Restricted Payments (the proceeds of which may be utilized by Holdings to make additional Restricted Payments) so long as (i) no Event of Default under clause (a) or (f) of Section 8.01 has occurred and is continuing and (ii) the Net Leverage Ratio on a Pro Forma Basis is no greater than [2.50]- to 1.0].

Notwithstanding anything to the contrary set forth in this Section 7.06, no Loan Party shall make any Restricted Payment to any Subsidiary (other than another Loan Party) in the form of Material Intellectual Property; provided that nothing in this sentence shall prohibit any non-exclusive (other than exclusive distribution or other similar within a specified jurisdiction) license or sublicense of Material

-98-

Intellectual Property to, or use of Material Intellectual Property by, any Subsidiary in the ordinary course of business.

SECTION 7.07    Change in Nature of Business. Engage in any material line of business substantially different from those lines of business conducted by Holdings, the Borrower and the Restricted Subsidiaries on the Closing Date or any business reasonably related or ancillary thereto.

SECTION 7.08    Transactions with Affiliates. Enter into any transaction of any kind with any Affiliate of Holdings or the Borrower, whether or not in the ordinary course of business, in excess of $10,000,000 other than:

(a)    transactions between or among the Borrower or any of the Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction,

(b)    transactions on terms substantially as favorable to Holdings, the Borrower or such Restricted Subsidiary as would be obtainable by Holdings, the Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate,

(c)    [reserved]transactions under this Agreement or any other Loan Document,

(d)    [reserved],

(e)    [reserved],

(f)    employment and severance arrangements between Holdings, the Borrower and the Restricted Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements,

(g)    the non-exclusive licensing of trademarks, copyrights or other IP Rights in the ordinary course of business to permit the commercial exploitation of IP Rights between or among Affiliates and Subsidiaries of Holdings or the Borrower,

(h)    the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers and employees of Holdings and the Restricted Subsidiaries or any direct or indirect parent of Holdings in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries,

(i)    any agreement, instrument or arrangement as in effect as of the Closing Date and set forth on Schedule 7.08, or any amendment thereto (so long as any such amendment is not adverse to the Lenders in any material respect as compared to the applicable agreement as in effect on the Closing Date),

(j)    Restricted Payments permitted under Section 7.06,

(k)    [reserved],

(l)    transactions in which the Borrower or any of the Restricted Subsidiaries, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (b) of this Section 9.8,

(m)    the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of Holdings to any Permitted Holder or to any former, current or future director, manager, officer, employee or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing) of the Borrower, any of its Subsidiaries or any direct or indirect parent

-99-

thereof to the extent otherwise permitted by this Agreement and to the extent such issuance or transfer would not give rise to a Change of Control,

(n)     the Closing Date Transactions and the payment of all fees and expenses related to the Closing Date Transactions and permitted pursuant to the Confirmation Order,

(o)     payments to or from, and transactions with, Joint Ventures (to the extent any such Joint Venture is only an Affiliate as a result of Investments by Holdings and the Restricted Subsidiaries in such Joint Venture) in the ordinary course of business to the extent otherwise permitted under Section 7.02,

(p)     any Disposition of Securitization Assets or related assets in connection with any Qualified Securitization Financing,

(q)     the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to shareholders of Holdings or any direct or indirect parent thereof pursuant to the stockholders agreement or the registration and participation rights agreement entered into on the Closing Date in connection therewith,

(r)     the entering into of any tax sharing agreement or arrangement to the extent that the payments pursuant thereto are permitted by Section 7.06(g)(i), and

(s)     payments to an Affiliate in respect of the Indebtedness or Equity Interests of Holdings, the Borrower or any of the Restricted Subsidiaries that are payable to Affiliates that may from time to time own such Indebtedness or Equity Interests.

SECTION 7.09     Burdensome Agreements.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that prohibits, restricts, imposes any condition on or limits the ability of (a) any Restricted Subsidiary that is not a Loan Party to make Restricted Payments to (directly or indirectly) or to make or repay loans or advances to any Loan Party or to Guarantee the Obligations of any Loan Party under the Loan Documents or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Facility and the Obligations under the Loan Documents; *provided* that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations that:

(i)     (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09 hereto and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing does not expand the scope of such Contractual Obligation,

(ii)     are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary,

(iii)     represent Indebtedness of a Restricted Subsidiary that is not a Loan Party that is permitted by Section 7.03,

(iv)     are customary restrictions that arise in connection with (x) any Lien permitted by Sections 7.01(a), (l), (m), (s), (t)(i), (t)(ii), (u), (y) and (cc) and relate to the property subject to such Lien or (y) any Disposition permitted by Section 7.05 applicable pending such Disposition solely to the assets subject to such Disposition,

(v)    are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture entered into in the ordinary course of business,

(vi)    are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness (and excluding in any event any Indebtedness constituting any Junior Financing) and the proceeds and products thereof and, in the case of the ABL Facilities, Permitted Pari Passu Secured Debt, Permitted Ratio Debt, Credit Agreement Refinancing Indebtedness and any Permitted Refinancing of any of the foregoing, permit the Liens securing the Obligations without restriction (subject to the ABL Intercreditor Agreement),

(vii)    are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto,

(viii)    comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Sections 7.03(e), (g), (h), (o)(i), (r) or (t) to the extent that such restrictions apply only to the property or assets securing such Indebtedness or to the Restricted Subsidiary party to such Indebtedness,

(ix)    are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary,

(x)    are customary provisions restricting assignment of any agreement entered into in the ordinary course of business,

(xi)    are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business,

(xii)    are restrictions contained in the ABL Credit Agreement, the ABL Facilities Documentation and any documentation governing a Permitted Refinancing of any of the foregoing,

(xiii)    arise in connection with cash or other deposits permitted under Section 7.01, or

(xiv)    comprise restrictions imposed by any agreement governing Indebtedness entered into after the Closing Date and permitted under Section 7.03 that are, taken as a whole, in the good faith judgment of the Borrower, no more restrictive with respect to the Borrower or any Restricted Subsidiary than customary market terms for Indebtedness of such type, so long as the Borrower shall have determined in good faith that such restrictions will not affect its obligation or ability to make any payments required hereunder.

SECTION 7.10    Use of Proceeds.  Use the proceeds of any Borrowing, whether directly or indirectly, in a manner prohibited by this Agreement.

SECTION 7.11    Accounting Changes.  Make any change in fiscal year; *provided*, *however,* that Holdings and the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent (acting at the Direction of the Required Lenders), in which case, Holdings, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

SECTION 7.12    Prepayments, Etc. of Indebtedness.

(a)    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled principal, interest and mandatory prepayments shall be permitted) Junior Financing, except (A) the refinancing thereof with the Net Cash Proceeds of,

-101-

or in exchange for, any Permitted Refinancing, to the extent not required to prepay any Loans pursuant to Section 2.03(b), (B) the conversion of any Junior Financing to Equity Interests (other than Disqualified Equity Interests) of Holdings or any of its direct or indirect parents, (C) the prepayment, redemption, purchase, defeasance or other satisfaction of Indebtedness of the Borrower or any Restricted Subsidiary owed to Holdings, the Borrower or a Restricted Subsidiary or the prepayment, redemption, purchase, defeasance or other satisfaction of any other Junior Financing with the proceeds of any other Junior Financing otherwise permitted by Section 7.03, (D) prepayments, redemptions, purchases, defeasances and payments in respect of Junior Financings prior to their scheduled maturity in an aggregate amount not to exceed the sum of (1) 25,000,000 and (2) so long as no Event of Default has occurred and is continuing, the Available Amount at such time (solely in the case of clause (a)(ii) of the definition of "Available Amount," so long as on a Pro Forma Basis, the Net Leverage Ratio is not greater than [4.25] to 1.0) and (E) prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings prior to their scheduled maturity so long as no Event of Default has occurred and is continuing under clause (a) or (f) of Section 8.01 and the Net Leverage Ratio on a Pro Forma Basis is not greater than [2.75] to 1.0.

(b)    Amend, modify or change in any manner materially adverse to the interests of the Lenders any term or condition of any Junior Financing Documentation, other than as a result of a Permitted Refinancing thereof, without the consent of the Administrative Agent.

SECTION 7.13    Holdings.  In the case of Holdings, conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto):  (i) its ownership of the Equity Interests of the Borrower, (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iii) the performance of its obligations with respect to the Loan Documents, the ABL Facilities, any Permitted Ratio Debt, any Credit Agreement Refinancing Indebtedness, any Permitted Pari Passu Secured Debt and any other Indebtedness permitted to be incurred by Holdings pursuant to Section 7.03, (iv) any public offering of its common stock or any other issuance of its Equity Interests or any transaction permitted under Section 7.04, (v) financing activities, including the issuance of securities, incurrence of debt, payment of Restricted Payments, making contributions to the capital of its Subsidiaries and guaranteeing the obligations of its Subsidiaries in each case solely to the extent permitted hereunder, (vi) participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings (or any direct or indirect parent entity of Holdings)  and the Borrower, (vii) holding any cash or property received in connection with Restricted Payments made by the Borrower in accordance with Section 7.06 pending application thereof by Holdings, (viii) providing indemnification to officers and directors and (ix) activities incidental to the businesses or activities described in clauses (i) to (viii) of this Section 7.13.

## ARTICLE VIII

## Events of Default and Remedies

SECTION 8.01    Events of Default.  Each of the events referred to in clauses (a) through (l) of this Section 8.01 shall constitute an "**Event of Default**":

(a)    Non-Payment.  The Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)    Specific Covenants.  The Borrower, any Restricted Subsidiary or, in the case of Section 7.13, Holdings, fails to perform or observe any term, covenant or agreement contained in any of Sections 6.03(a) or 6.05(a) (solely with respect to the Borrower) or Article VII; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

-102-

(d)    <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(e)    <u>Cross-Default</u>.  Any Loan Party or any Restricted Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (e)(B) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided, further*, that such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02; *provided* that no such event under the ABL Facilities (other than the failure of any Loan Party or any Restricted Subsidiary to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of the ABL Facilities) shall constitute an Event of Default under this Section 8.01(e) until the earliest to occur of (x) the acceleration of the Indebtedness under the ABL Facilities and (y) the exercise of any remedies by the ABL Administrative Agent in respect of any Collateral; or

(f)    <u>Insolvency Proceedings, Etc</u>.  Holdings, the Borrower or any Material Subsidiary institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and remains undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)    <u>Judgments</u>.  There is entered against any Loan Party or any Restricted Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage thereof) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(h)    <u>ERISA</u>.  (i)  An ERISA Event occurs with respect to an Employee Benefit Plan or Multiemployer Plan which has resulted or would reasonably be expected to result in liability of any Loan Party or their respective ERISA Affiliates under Title IV of ERISA in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, (ii) any Loan Party or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect, or (iii)

-103-

with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable law or plan terms that would reasonably be expected to result in a Material Adverse Effect; or

(i)     Invalidity of Loan Documents.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document; or

(j)     Collateral Documents.  (i) Any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.11 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create, or any Lien purported to be created by any Collateral Document shall be asserted in writing by any Loan Party not to be, a valid and perfected lien, with the priority required by the Collateral Documents (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, except to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent or the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file Uniform Commercial Code continuation statements and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage, or (ii) any of the Equity Interests of the Borrower ceasing to be pledged pursuant to the Security Agreement free of Liens other than Liens permitted by the ABL Intercreditor Agreement, First Lien Intercreditor Agreement (if any) and the Second Lien Intercreditor Agreement (if any) or any nonconsensual Liens arising solely by operation of Law; or

(k)     Junior Financing Documentation.  (i) Any of the Obligations of the Loan Parties under the Loan Documents for any reason shall cease to be "Senior Indebtedness" (or any comparable term) or "Senior Secured Financing" (or any comparable term) under, and as defined in any Junior Financing Documentation with an aggregate principal amount of not less than the Threshold Amount or (ii) the subordination provisions set forth in any Junior Financing Documentation with an aggregate principal amount of not less than the Threshold Amount shall, in whole or in part, cease to be effective or cease to be legally valid, binding and enforceable against the holders of any such Junior Financing, if applicable; or

(l)     Change of Control.  There occurs any Change of Control.

SECTION 8.02     Remedies upon Event of Default.  If any Event of Default occurs and is continuing, the Administrative Agent may with the consent of, and shall at the request of, the Required Lenders, take any or all of the following actions:

(a)     declare Commitments of each Lender to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder, including any Applicable Prepayment Amount, or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(c)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States or any Debtor Relief Laws, the Commitments of each Lender shall

automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

The parties hereto acknowledge and agree that (A) the Applicable Prepayment Amount (i) is additional consideration for providing the Loans, (ii) is a material inducement to the Lenders to provide the Commitments and make the Loans, (iii) is reasonable and is the product of an arm's length transaction between sophisticated parties ably represented by counsel, (iv) constitutes reasonable liquidated damages calculated in good faith to compensate the Lenders for, and is a proportionate quantification of, the actual loss of the anticipated stream of interest payments upon an acceleration of the Term Loans (such damages being otherwise impossible to ascertain or even estimate for various reasons, including, without limitation, because such damages would depend on, among other things, (x) when the Loans might otherwise be repaid and (y) future changes in interest rates which are not readily ascertainable on the Closing Date), (v) shall be payable notwithstanding any then-prevailing market rates at the time payment is made, and (vi) is not a penalty to punish the Borrower for its early prepayment of the Loans or for the occurrence of any Event of Default or acceleration; (B) there has been a course of conduct between the Lenders and the Credit Parties giving specific consideration in this transaction for the agreement to pay the Applicable Prepayment Amount; and (C) the Loan Parties shall be estopped from claiming differently from as agreed to in this Section 8.02.

SECTION 8.03    Application of Funds.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, the Obligations under Secured Hedge Agreements and Cash Management Obligations, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

*Fifth*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

## ARTICLE IX

### Administrative Agent and Other Agents

SECTION 9.01    Appointment and Authorization of the Administrative Agent.

(a)        Each Lender hereby irrevocably appoints Wilmington Savings Fund Society, FSB. to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article IX (other than Sections 9.09 and 9.11) are solely for the benefit of the Administrative Agent and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any such provision.

(b)        The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities as a Lender and a potential Hedge Bank and/or Cash Management Bank) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.  Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto (including the ABL Intercreditor Agreement), as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

(c)        Each Lender hereby irrevocably authorizes the Administrative Agent, based upon the Direction of the Required Lenders (but subject in all respects to the TSA), to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by the Administrative Agent or the Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC (or any equivalent provision of the UCC), at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any other sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable Laws.  In no event shall the Administrative Agent be obligated to take title to or possession of Collateral in its own name, or otherwise in a form or manner that may, in its reasonable judgment, expose it to liability; *provided that* if the Administrative Agent declines to take title to or possession of Collateral because it exposes it to liability, it will promptly notify the Required Lenders thereof.

(d)        Each Lender irrevocably appoints each other Lender as its agent and bailee for the purpose of perfecting Liens (whether pursuant to Section 8-301(a)(2) of the UCC or otherwise), for the benefit of the Secured Parties, in assets in which, in accordance with the UCC or any other applicable Laws a security interest can be perfected by possession or control.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly following the Administrative Agent's request therefor, shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

SECTION 9.02        Rights as a Lender.  Any Person serving as an Agent (including as Administrative Agent) hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as an Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.  The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may

be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

SECTION 9.03    Exculpatory Provisions.  Neither the Administrative Agent nor any other Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, an Agent (including the Administrative Agent):

(a)        shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties;

(b)        shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided* that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)        shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any Person serving as an Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein**; provided, that, any action or inaction taken at the direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary) shall not be deemed gross negligence or willful misconduct**.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower or a Lender.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.  The Administrative Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on (including any flood insurance policies or for determining whether any flood insurance policies are or should be obtained in respect of the Collateral, which each Lender shall be solely responsible for), or the payment of taxes with respect to, any of

-107-

the Collateral.  The Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as the Administrative Agent.

The Administrative Agent shall not be liable for any action omitted to be taken by it by reason of the lack of direction or instruction for such action (including, without limitation, for refusing to exercise discretion or for withholding its consent in the absence of receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instructions to exercise such direction or grant such consent from any such Lender, as applicable). The Administrative Agent shall have no liability for any failure, inability, unwillingness on the part of any Lender or Loan Party to provide accurate and complete information on a timely basis to the Administrative Agent, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall not have any liability for any inaccuracy or error in the performance or observance on the Administrative Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely in-formation received by it, or other failure on the part of any such other party to comply with the terms hereof.

The Administrative Agent shall not be liable for interest on any money received by it. Money held by the Administrative Agent hereunder need not be segregated from other funds except to the extent required by law. The Administrative Agent shall not have any liability for interest on any money received by it hereunder except as otherwise agreed in writing.

For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to either Agent hereunder (including without limitation this Article ~~VIII~~IX), phrases such as "satisfactory to the Administrative Agent**/Collateral Agent**," "approved by the Administrative Agent**/Collateral Agent**," "acceptable to the Administrative Agent**/Collateral Agent**," "as determined by the Administrative Agent**/Collateral Agent**," "in the Administrative **Agent/Collateral** Agent's discretion," "selected by the Administrative Agent**/Collateral Agent**," "elected by the Administrative Agent**/Collateral Agent**," "requested by the Administrative Agent**/Collateral Agent**," and phrases of similar import that authorize and permit the Administrative Agent**/Collateral Agent** to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Administrative Agent**/Collateral Agent** receiving written ~~direction~~**Direction** from the Required Lenders (or such other number or percentage of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

SECTION 9.04    Reliance by the Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law.

SECTION 9.05    <u>Delegation of Duties</u>.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Agent-Related Persons of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

SECTION 9.06    <u>Non-Reliance on Administrative Agent and Other Lenders; Disclosure of Information by Agents</u>.  Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

SECTION 9.07    <u>Indemnification of Agents</u>.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Administrative Agent and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless the Administrative Agent and each other Agent-Related Person (solely to the extent any such Agent-Related Person was performing services on behalf of the Administrative Agent) from and against any and all Indemnified Liabilities incurred by it; *provided* that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction; *provided* that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto, *provided*, *further*, that the failure of any Lender to indemnify or reimburse the Administrative Agent shall not relieve any other Lender of its obligation in respect thereof.  The undertaking in this Section 9.07 shall survive

termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

SECTION 9.08    No Other Duties; Other Agents, Etc.  Anything herein to the contrary notwithstanding, none of the other Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder and such Persons shall have the benefit of this Article IX.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any agency or fiduciary or trust relationship with any Lender, Holdings, the Borrower or any of their respective Subsidiaries.  Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

SECTION 9.09    Resignation of Administrative Agent.  The Administrative Agent or Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Borrower at all times other than during the existence of an Event of Default (which consent of the Borrower shall not be unreasonably withheld or delayed), to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such Lender or bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent or Collateral Agent, as applicable, may on behalf of the Lenders, appoint a successor Administrative Agent or Collateral Agent, as applicable, meeting the qualifications set forth above; *provided* that if the Administrative Agent or Collateral Agent, as applicable, shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent or Collateral Agent, as applicable, on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor of such Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent, as applicable, hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent or Collateral Agent, as applicable, and the retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Sections 10.04 and 10.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Administrative Agent or Collateral Agent, as applicable.

SECTION 9.10    Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the

US-DOCS\150029138.4149885390.12

Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.07 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.07 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The holders of the Obligations hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the holders thereof shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided* that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 10.01 of this Agreement), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Lender or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Lender or any acquisition vehicle to take any further action.

SECTION 9.11    Collateral and Guaranty Matters. Each of the Lenders (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank) irrevocably authorizes the Administrative Agent and the Collateral Agent, solely to the extent that each of the Administrative Agent and the

-111-

Collateral Agent has received a Direction of the Required Lenders, and each of the Administrative Agent and the Collateral Agent agrees that it will:

(a)    release any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (x) obligations and liabilities under Secured Hedge Agreements as to which arrangements satisfactory to the applicable Hedge Bank shall have been made, (y) Cash Management Obligations as to which arrangements satisfactory to the applicable Cash Management Bank shall have been made and (z) contingent indemnification obligations not yet accrued and payable), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than Holdings, the Borrower or any of its Domestic Subsidiaries that are Guarantors, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below or (iv) such property becoming an Excluded Asset;

(b)    release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i);

(c)    release any Guarantor from its obligations under the Guaranty (and release (or acknowledge the release of) any Liens granted by such Guarantor) if in the case of any Subsidiary, such Person ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary (other than as a result of such Guarantor ceasing to be a wholly owned Subsidiary unless Equity Interests of such Subsidiary have been transferred to a Person that is not an Affiliate of the Borrower for a bona fide business purpose that is not in connection with a financing) as a result of a transaction or designation permitted hereunder; *provided* that no such release shall occur if such Guarantor continues to be a guarantor in respect of the ABL Facilities, any Permitted Pari Passu Secured Debt, any Credit Agreement Refinancing Indebtedness or any Junior Financing; and

(d)    if any Guarantor shall cease to be a Material Domestic Subsidiary (as certified in writing by a Responsible Officer of the Borrower), and the Borrower notifies the Administrative Agent in writing that it wishes such Guarantor to be released from its obligations under the Guaranty and provides the Administrative Agent and the Collateral Agent such certifications or documents as either such Agent shall reasonably request, (i) release such Subsidiary from its obligations under the Guaranty and (ii) release any Liens granted by such Subsidiary or Liens on the Equity Interests of such Subsidiary; *provided* that no such release shall occur if such Subsidiary continues to be a guarantor in respect of the ABL Facilities, any Permitted Pari Passu Secured Debt, any Credit Agreement Refinancing Indebtedness or any Junior Financing.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.11.  In each case as specified in this Section 9.11, the applicable Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.11.

Anything contained in any of the Loan Documents to the contrary notwithstanding, each Agent, each Lender and each Secured Party hereby agree that:

US-DOCS\150029138.4149885390.12

(i)    no provision of any Loan Documents shall require the creation, perfection or maintenance of pledges of or security interests in, or the obtaining of title insurance or abstracts with respect to, any Excluded Assets and any other particular assets, if and for so long as, in the reasonable judgment of the Collateral Agent (acting at the Direction of the Required Lenders), the cost of creating, perfecting or maintaining such pledges or security interests in such other particular assets or obtaining title insurance or abstracts in respect of such other particular assets is excessive in view of the fair market value of such assets or the practical benefit to the Lenders afforded thereby; and

(ii)    the Collateral Agent (acting at the Direction of the Required Lenders) may grant extensions of time for the creation or perfection of security interests in or the obtaining of title insurance and surveys with respect to particular assets (including extensions beyond the Closing Date for the creation or perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that creation or perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

SECTION 9.12    Appointment of Supplemental Administrative Agents.

(a)    It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Administrative Agent**" and collectively as "**Supplemental Administrative Agents**").

(b)    In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)    Should any instrument in writing from any Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower or Holdings, as applicable, shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

SECTION 9.13    Intercreditor Agreements.  The Administrative Agent and the Collateral Agent are authorized to enter into the ABL Intercreditor Agreement, any First Lien Intercreditor Agreement and any Second Lien Intercreditor Agreement and the parties hereto acknowledge that the ABL Intercreditor Agreement and

any such First Lien Intercreditor Agreement or Second Lien Intercreditor Agreement is binding upon them.  Each Lender (a) hereby consents to the subordination of the Liens on the Current Asset Collateral securing the Obligations on the terms set forth in the ABL Intercreditor Agreement and to the provisions of the First Lien Intercreditor Agreement with respect to the parity nature of the Liens on the Collateral, (b) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the ABL Intercreditor Agreement and any such First Lien Intercreditor Agreement or Second Lien Intercreditor Agreement and (c) hereby authorizes and instructs the Administrative Agent and Collateral Agent to enter into the ABL Intercreditor Agreement and, if applicable, any such First Lien Intercreditor Agreement or Second Lien Intercreditor Agreement and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.

SECTION 9.14    Secured Cash Management Agreements and Secured Hedge Agreements.  Except as otherwise expressly set forth herein or in any Guaranty or any Collateral Document, no Cash Management Bank or Hedge Bank that obtains the benefits of Section 8.03, any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this Article IX to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

SECTION 9.15    Withholding Taxes.  To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of Section 3.01, each Lender shall indemnify and hold harmless the Administrative Agent (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Borrower to do so) against, and shall make payable in respect thereof within 20 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and reasonable expenses (including ~~rea-sonable~~reasonable fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including, without limitation, because the appropriate form was not delivered or properly executed, or be-cause such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.15.  The agreements in this Section 9.15 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

SECTION 9.16    Erroneous Payments.

(a)    Without limitation of any other provision in this Agreement, if at any time the Administrative Agent makes a payment hereunder in error to any Lender, whether or not in respect of an Obligation due and owing by the Borrower at such time, where such payment is a Rescindable Amount, then in any such event, each Lender receiving a Rescindable Amount severally agrees to repay to the Administrative Agent forthwith on demand the Rescindable Amount received by such Lender in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. Each Lender irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another) or similar defense to its obligation to return any Rescindable Amount.  The Administrative Agent shall inform each

-114-

Lender promptly upon determining that any payment made to such Lender comprised, in whole or in part, a Rescindable Amount.

(b)        If the Administrative Agent notifies a Lender or other Secured Party, or any other Person who has received funds on behalf of a Lender or other Secured Party (any such Lender, Secured Party or other recipient, a "**Payment Recipient**") that the Administrative Agent has determined in its sole reasonable discretion that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Payment Recipient shall promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent, in same day funds (in the currency so received), the amount of any such Erroneous Payment (or portion thereof), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent (acting at the Direction of the Required Lenders) in accordance with prevailing banking industry rules on interbank compensation from time to time in effect. To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Payment Recipient under this <u>clause (b)</u> shall be conclusive, absent manifest error.

(c)        Without limiting immediately preceding <u>clause (b)</u>, each Payment Recipient hereby further agrees that if it receives an Erroneous Payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Erroneous Payment (the "**Payment Notice**"), or (y) that was not preceded or accompanied by a Payment Notice sent by the Administrative Agent (or any of its Affiliates), then, said Payment Recipient shall be on notice, in each case, that an error has been made with respect to such Erroneous Payment.  Each Payment Recipient agrees that, in each such case, or if it otherwise becomes aware an Erroneous Payment (or portion thereof) may have been sent in error, such Payment Recipient shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one (1) Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent (acting at the Direction of the Required Lenders) in accordance with prevailing banking industry rules on interbank compensation from time to time in effect.

(d)        Each Payment Recipient hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Payment Recipient under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Payment Recipient from any source, against any amount due to the Administrative Agent under any of the immediately preceding <u>clauses (b)</u> or <u>(c)</u> or under the indemnification provisions of this Agreement.

(e)        In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent (such unrecovered amount, an "**Erroneous Payment Return Deficiency**"), the Borrower and each other Loan Party hereby agrees that (x) the Administrative Agent shall be subrogated to all the rights of such Payment Recipient with respect to such amount (including, without limitation, the right to sell and assign the Loans (or any portion thereof), which were subject to the Erroneous Payment Return Deficiency) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making

such Erroneous Payment.  For the avoidance of doubt, no assignment of an Erroneous Payment Return Deficiency will reduce the Commitments of any Payment Recipient and such Commitments shall remain available in accordance with the terms of this Agreement.  In addition, each party hereto agrees that, except to the extent that the Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to the assignment of an Erroneous Payment Return Deficiency, and irrespective of whether the Administrative Agent may be equitably subrogated, the Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Payment Recipient under the Loan Documents with respect to each Erroneous Payment Return Deficiency (for the avoidance of doubt, without increasing the Obligations owed by the Borrower or any other Loan Party with respect to the Erroneous Payment Return Deficiency).

(f)        To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

**(g)        The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by any Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from or on behalf of any Borrower or any other Loan Party (including from the proceeds of any Collateral) for the purpose of making such Erroneous Payment.**

**(h)**        ~~(g)~~ Each party's obligations, agreements and waivers under this <u>Section 9.16</u> shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Secured Obligations (or any portion thereof) under any Loan Document.

**ARTICLE X**

**Miscellaneous**

SECTION 10.01        <u>Amendments, Etc</u>.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)        extend or increase the Commitment of any Lender without the written consent of each Lender directly affected thereby (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)        postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.05 or 2.06 without the written consent of each Lender directly affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c)        reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (i) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; *provided* that (i) only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate and (ii) the waiver of (or amendment to the terms of)

any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(d)     change any provision of this Section 10.01 or the definition of "Required Lenders," "Required Facility Lenders" or "Pro Rata Share" or any other provision specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender affected thereby;

(e)     except pursuant to the ABL Intercreditor Agreement or as contemplated by Section 9.11(i) (i) subordinate the Obligations in right of payment to any other obligations or (ii) subordinate the Liens on all or substantially all of the Collateral, in each case, without the written consent of each Lender directly and adversely affected thereby;

(f)     **other than with respect to Indebtedness that is expressly permitted by Section 2.12(a)(I),** change (i) Section 8.03 or (ii) the order of application of any reduction in the Commitments or any prepayment of Loans from the application thereof set forth in the applicable provisions of Section 2.03(b) or 2.04(b), respectively, in any manner that materially and adversely affects any Lender without the written consent of such Lender;

(g)     other than in a transaction permitted under Section 7.04 or Section 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(h)     other than in a transaction permitted under Section 7.04 or Section 7.05, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(i)     to the extent not otherwise permitted by this Agreement as in effect on the Closing Date, authorize additional Indebtedness that would be issued under the Loan Documents for the purpose of influencing voting thresholds, without the written consent of each Lender directly and adversely affected thereby;

(j)     amend or modify the definition of "Material Intellectual Property" or the last paragraph of Section 7.02, the last paragraph of Section 7.05 and the last paragraph of Section 7.06, in each case without the written consent of each Lender;

(k)     other than in connection with a debtor-in-possession financing or any proceeding under any Debtor Relief Law or with respect to Indebtedness that is expressly permitted by Section **2.12(a)(I) or Section** 7.03(e) or (r) (solely with respect to the Current Asset Collateral) and/or Liens that are expressly permitted by Section 7.01(i) or (y) (solely with respect to the Current Asset Collateral) of this Agreement as in effect as of the Closing Date to be senior to the Obligations and/or be secured by a Lien that is senior to the Lien securing the Secured Obligations, subordinate (x) the Liens securing any of the Facilities on all or substantially all of the Collateral ("**Existing Liens**") to the Liens securing any other Indebtedness or other obligations or (y) any of the Facilities in contractual right of payment to any other Indebtedness (any such Indebtedness, "**Senior Indebtedness**"), without the consent of each directly and adversely affected Lender, in either the case of subclause (x) or (y), unless each such adversely affected Lender (other than a Defaulting Lender) has been offered a bona fide opportunity to provide on a pro rata basis any new loans or other Indebtedness (on the same terms as each other lender providing such loans or Indebtedness, including as to any fees (other than any customary "backstop" fee) payable in connection therewith); provided, however, that if any such adversely affected Lender does not accept an offer to provide its pro rata share of such Senior Indebtedness within ten (10) Business Days of such offer being made, such adversely affected Lender shall be deemed to have declined such offer); or

(l)     amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent;

and *provided, further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other

amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (ii) Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification and (iii) the consent of Required Facility Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of Lenders under such Facility in respect of payments hereunder in a manner different than such amendment affects other Facilities.

Notwithstanding the foregoing,

(a)    No Lender consent is required to effect any amendment or supplement to the ABL Intercreditor Agreement, any First Lien Intercreditor Agreement or any Second Lien Intercreditor Agreement (i) that is for the purpose of adding the holders of Permitted Pari Passu Secured Debt or Permitted Junior Secured Refinancing Debt (or a Senior Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of the ABL Intercreditor Agreement, such First Lien Intercreditor Agreement or such Second Lien Intercreditor Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and *provided* that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by the ABL Intercreditor Agreement (or the comparable provisions, if any, of any First Lien Intercreditor Agreement or any Second Lien Intercreditor Agreement); *provided, further*, that no such amendment shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable; and

(b)    This Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the Replacement Loans (as defined below) to permit the refinancing of all outstanding Loans of any Class ("**Refinanced Loans**") with replacement term loans ("**Replacement Loans**") hereunder; *provided* that (a) the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of such Refinanced Loans, (b) the All-In Yield with respect to such Replacement Loans (or similar interest rate spread applicable to such Replacement Loans) shall not be higher than the All-In Yield for such Refinanced Loans (or similar interest rate spread applicable to such Refinanced Loans) immediately prior to such refinancing, (c) the Weighted Average Life to Maturity of such Replacement Loans shall not be shorter than the Weighted Average Life to Maturity of such Refinanced Loans at the time of such refinancing (except by virtue of amortization or prepayment of the Refinanced Loans prior to the time of such incurrence) and (d) all other terms applicable to such Replacement Loans shall be substantially identical to, or less favorable to the Lenders providing such Replacement Loans than, those applicable to such Refinanced Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the Latest Maturity Date of the Loans in effect immediately prior to such refinancing.

Notwithstanding anything to the contrary contained in this Section 10.01, guarantees, collateral security documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

SECTION 10.02     Notices and Other Communications; Facsimile Copies.

(a)     General.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to Holdings, the Borrower or the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)     if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)     Electronic Communication.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

(c)     Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(d)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE," THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Agent-Related Persons or any Arranger (collectively, the "**Agent Parties**") have any liability to Holdings, the Borrower, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender

or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)    Change of Address.  Each of Holdings, the Borrower and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities Laws.

(f)    Reliance by the Administrative Agent.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

SECTION 10.03    No Waiver; Cumulative Remedies.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

SECTION 10.04    Attorney Costs and Expenses.  The Borrower agrees (a) if the Closing Date occurs, to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all fees, charges and disbursements of the Lender Advisors and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of the Lenders taken as a whole, and (b) to pay or reimburse the Administrative Agent and the Lenders for all documented out-of-pocket costs and expenses, including any and all recording and filing fees, cost and expenses incurred pursuant to any Collateral Document, the reasonable fees, charges and disbursements of ArentFox Schiff LLP, as lead counsel to the Administrative Agent, incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of one counsel to the Administrative Agent and one counsel to the Lenders (and, if reasonably necessary, one local counsel in any relevant material jurisdiction and, in the event of any conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole)).  The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations.  All amounts due under this Section 10.04 shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail and such backup material as the Borrower may reasonably request.  If any Loan Party fails to pay when due

any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion. The Borrower and each other Loan Party hereby acknowledge that the Administrative Agent and/or any Lender may receive a benefit, including without limitation, a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with the Administrative Agent and/or such Lender, including, without limitation, fees paid pursuant to this Agreement or any other Loan Document.

SECTION 10.05    Indemnification by the Borrower.  The Borrower shall indemnify and hold harmless the Agents, each Lender and their respective Affiliates, directors, officers, employees, agents, partners, trustees or advisors and other representatives (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, a single local counsel for all Indemnitees taken as a whole in each relevant jurisdiction that is material to the interest of the Lenders, and solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole) (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment, Loan or the use or proposed use of the proceeds therefrom, or (c) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liability arising out of the activities or operations of the Borrower, any Subsidiary or any other Loan Party, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee or agent of such Indemnitee, (y) a material breach of any obligations under any Loan Document by such Indemnitee or of any Related Indemnified Person as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under the Facility and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates.  To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee to a third party).  In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated.  All amounts due under this Section 10.05 shall be paid within twenty (20) Business Days after written demand therefor.  The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations. This Section 10.05 shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, etc., arising from a non-Tax claim.

SECTION 10.06    Marshaling; Payments Set Aside.  None of the Administrative Agent or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

SECTION 10.07    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may, except as permitted by Section 7.04, assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section, or (iv) to an SPC in accordance with the provisions of subsection (g) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Agent-Related Persons of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment or, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless each of the Administrative Agent and, so long as no Event of Default under Section 8.01(a) or, solely with respect to the Borrower or any Guarantor, Section 8.01(f) has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

-122-

(iii)    <u>Required Consents</u>.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (1) an Event of Default under Section 8.01(a) or, solely with respect to the Borrower, Section 8.01(f), has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; *provided* that if the Borrower does not respond to a request for an assignment within ten (10) Business Days after receiving written notice of a request for such consent, the Borrower shall be deemed to have consented to such assignment; and

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)    <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.  All assignments shall be by novation.

(v)    <u>No Assignments to Certain Persons</u>.  No such assignment shall be made (A) to Holdings, the Borrower or any of the Borrower's Subsidiaries, (B) subject to subsection (h) below, any of the Borrower's Affiliates, (C) to a natural person or an investment vehicle of a natural person or (D) any Disqualified Institution to the extent that the list of Disqualified Institutions has been provided to all Public Lenders on the Platform.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)    The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, owing to each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  This Section 10.07(c) and Section 2.09 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations), and including Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations and, in each case, any amended or successor versions.

(d)       Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, an investment vehicle of a natural person or, to the extent that the list of Disqualified Institutions has been provided to all Public Lenders on the Platform, any Disqualified Institution or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that directly affects such Participant. Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled (through the applicable Lender) to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections (including the limitation in the definition of "Excluded Taxes"), and Sections 3.06(a) and 3.07, as if the Participant were a Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.11 as though it were a Lender.

(e)       <u>Limitations upon Participant Rights</u>. A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld, conditioned or delayed). Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrower) maintain a register on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"). A Lender shall not be obligated to disclose the Participant Register to any Person except to the extent such disclosure is necessary to establish that any Loan or other obligation is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury regulations (or ay amended or successor version). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)       Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)       Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that an SPC shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of such Sections (including the limitation in the definition of "Excluded Taxes"), and Sections 3.06(a) and 3.07, as if the SPC were a Lender); *provided*, that neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Sections 3.01, 3.04 or 3.05) unless such increase or change results from a Change in Law after the grant was made. Each party hereto further agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable and (ii) the Granting Lender shall for

-124-

all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the Laws of the United States or any State thereof.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the Administrative Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

SECTION 10.08    Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information in accordance with its customary procedures (as set forth below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable prior to any such disclosure by such Person unless such notification is prohibited by law, rule or regulation or except in connection with any request as part of a regulatory examination, (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, *provided* that the Administrative Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such unless such notification is prohibited by law, rule or regulation or except in connection with any request as part of a regulatory examination, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or any Eligible Assignee invited to be an Additional Lender (other than to a Disqualified Institution; *provided* that the list of Disqualified Institutions may be provided) or (ii) any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower, (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from the Administrative Agent or such Lender) or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings, the Borrower or any Subsidiary thereof, and which source is not known by such Agent or Lender to be subject to a confidentiality restriction in respect thereof in favor of the Borrower or any Affiliate of the Borrower.

For purposes of this Section, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof; it being understood that all information received from Holdings, the Borrower or any Subsidiary after the Closing Date shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has

developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

SECTION 10.09    Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent,  to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 10.10    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 10.11    Counterparts; Integration; Effectiveness.  This Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or authorization related to this Agreement (each a "**Communication**"), including Communications required to be in writing, may be in the form of an Electronic Record and may be executed using Electronic Signatures.  Each of the Loan Parties agrees that any Electronic Signature on or associated with any Communication shall be valid and binding on each of the Loan Parties to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid and binding obligation of each of the Loan Parties enforceable against such in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered.  Any Communication may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Communication.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Administrative Agent and each of the Lenders of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention. The Administrative Agent and each of the Lenders may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record ("**Electronic Copy**"), which shall be deemed created in the ordinary course of the such Person's business, and destroy the original paper document.  All Communications in the form of an Electronic Record, including an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity and enforceability as a paper record.  Notwithstanding anything contained herein to the contrary, the Administrative Agent is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it; provided, further, without limiting the foregoing, (a) to the extent the Administrative Agent has agreed to accept such Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification and (b) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by such manually executed counterpart.  For purposes hereof, "**Electronic**

Record" and "**Electronic Signature**" shall have the meanings assigned to them, respectively, by 15 USC §7006, as it may be amended from time to time.

SECTION 10.12    Electronic Execution of Assignments and Certain Other Documents.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

SECTION 10.13    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

SECTION 10.14    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 10.15    GOVERNING LAW.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH  IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)    THE BORROWER, HOLDINGS, THE ADMINISTRATIVE AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT

PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

SECTION 10.16  WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 10.17  Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower, Holdings and the Administrative Agent and the Administrative Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

SECTION 10.18  Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent (which shall not be withheld in contravention of Section 9.04).  The provision of this Section 10.18 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 10.19  Use of Name, Logo, etc.  Each Loan Party consents to the publication in the ordinary course by Administrative Agent of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark.  Such consent shall remain effective until revoked by such Loan Party in writing to the Administrative Agent.

SECTION 10.20  USA PATRIOT Act.  Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulation.

SECTION 10.21  Service of Process.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

SECTION 10.22     No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings  acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Agents, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Agents and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Agents nor any Lender has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents, the Lender and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings their respective Affiliates, and none of the Agents nor any Lender has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Agents nor any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 10.23     Acknowledgement and Consent to Bail-In of Affected Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

SECTION 10.24     Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "QFC Credit Support", and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)        In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)        As used in this Section 10.23, the following terms have the following meanings:

"**BHC Act Affiliate**" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Covered Entity**" means any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

[NEWCO]JOANN HOLDINGS 2, LLC

By: _____
    Name:
    Title:


NEEDLE HOLDINGS LLC

By: _____
    Name:
    Title:

WILMINGTON SAVINGS FUND SOCIETY, FSB,

as Administrative Agent and Collateral Agent

By: _____
     Name:
     Title:

[    ], as a Lender

By: _____

     Name:

     Title:

107248619.6107248619.11

**<u>EXHIBIT C</u>**

**Revised Governance Term Sheet**

NON-BINDING AND SUBJECT TO DEFINITIVE DOCUMENTATION

## Reorganized JOANN Parent – Corporate Governance Term Sheet[1]

## Capital Structure; New Certificate of Incorporation and Bylaws; Shareholders Agreement of Reorganized JOANN Parent

| Topic | Provision |
|---|---|
| **Capital Stock** | |
| Number of authorized shares | 201,000,000 shares of stock consisting of (i) 200,000,000 shares of common stock ("New Common Stock") and (ii) 1,000,000 shares of "blank check" preferred stock ("Preferred Stock"). |
| Number of shares received on the Effective Date | The number of shares of New Common Stock to be received by: (i) the holders of DIP Claims, (ii) the holders of Term Loan Claims, (iii) ███████████, (iv) Project Swift LLC ("Green Square") and (v) ███████████ shall be determined in connection with, and in accordance with the terms and subject to the conditions of, the transactions contemplated by the Plan and the Transaction Support Agreement. |
| New Common Stock | One class with one vote per share. |
| Preferred Stock | The Board of Directors of Reorganized JOANN Parent (the "Board") shall have the power to issue and define the terms of any series of Preferred Stock following the Effective Date. |
| Management Incentive Plan | Within 120 days following the Effective Date, the Board shall in good faith determine the structure of and otherwise establish the Management Incentive Plan, pursuant to which up to 10% of the aggregate number of outstanding shares of New Common Stock on the Effective Date (calculated on a fully-diluted basis) shall be reserved for issuance to management, key employees, and/or directors of Reorganized JOANN Parent and its Subsidiaries (such shares of New Common Stock issued or issuable pursuant to the Management |

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in that certain Transaction Support Agreement, made and entered into as of March 15, 2024 (the "Transaction Support Agreement"), by and among JOANN, Inc., the Consenting Term Lenders and the Consenting Stockholder Parties.

| Topic | Provision |
|---|---|
| | Incentive Plan, "MIP Shares"), in each case, in accordance with the terms and conditions of such Management Incentive Plan. |
| **Directors** | |
| Board size | The Board will initially consist of five directors, which shall include (i) the Chief Executive Officer of Reorganized JOANN Parent (the "CEO Director"), (ii) one director designated by Green Square (the "Green Square Director"), and (iii) three directors (the "Selection Committee Directors") designated by a board selection committee (the "Selection Committee") composed of the four largest holders on a pro forma basis of shares of New Common Stock among the DIP Backstop Parties (collectively, the "Initial Directors").<br><br>The Board may elect one of the directors to serve as the Executive Chair of the Board, with such duties as the Board shall determine.<br><br>So long as ▓▓▓▓ holds at least 8.15% of the fully diluted shares of New Common Stock (the "▓▓▓▓ Threshold"), ▓▓▓▓ shall have the right to appoint one non-voting observer to the Board (the "Observer"). The Observer shall be entitled to receive all board materials of Reorganized JOANN Parent or any of its subsidiaries or any committees thereof, subject to any redactions reasonably necessary to, as determined by the Board: (i) preserve attorney-client privilege or (ii) avoid a conflict of interest between the interests of Reorganized JOANN Parent and those of ▓▓▓▓.<br><br>The Observer (including any successor) shall be required to enter into customary non-disclosure and confidentiality agreements regarding any information obtained in connection with such person's role as an Observer.<br><br>The Initial Directors and the Observer will be specifically identified in the New Organizational Documents prior to confirmation of the Plan. |
| Selection Committee | The Selection Committee shall act with the consent of members of the Selection Committee holding a majority of the equity interests held on a pro forma basis by the members of the Selection Committee in the aggregate. |
| Term | Directors are elected each year at Reorganized JOANN Parent's annual meeting |

| Topic | Provision |
|---|---|
| | of stockholders to serve one-year terms, unless earlier removed pursuant to the terms of the governing documents of Reorganized JOANN Parent. |
| Nomination of Directors | For so long as Green Square (together with 3551300 Canada Inc. and Universe Group, Inc. for so long as Green Square holds a full proxy to freely vote their shares of New Common Stock) collectively have not transferred shares of Common Stock (other than to a Permitted Transferee) resulting in them owning less than 5.00% of the fully-diluted outstanding shares of the New Common Stock (the "<u>Green Square Threshold</u>"), Green Square shall be entitled to nominate the director to serve as the Green Square Director as well as the right to appoint any successor resulting from the removal or resignation of the named Green Square Director.<br><br>The Nominating Committee shall nominate (i) the Chief Executive Officer of Reorganized JOANN Parent to serve as the CEO Director and (ii) the other directors to serve as director other than the Green Square Director, if any, and the CEO Director (the "<u>At-Large Directors</u>"). |
| Voting for directors | Other than the Green Square Director, all directors are elected by a plurality of votes.  No cumulative voting. |
| Removal of directors | Until the first annual meeting of Reorganized JOANN Parent following the Effective Date, any Selection Committee Director or their successors may be removed from office by the Selection Committee.<br><br>The Green Square Director or his/her successor may be removed from office by Green Square.<br><br>The Observer or his/her successor may be removed from such role by ▮▮▮▮▮.<br><br>From and after the first annual meeting of Reorganized JOANN Parent following the Effective Date, each At-Large Director may be removed from office by an affirmative vote of stockholders owning a majority of the outstanding shares of New Common Stock. |

| Topic | Provision |
|---|---|
| Vacancies | Vacancies of seats held by any director, other than an At-Large Director removed by an affirmative vote of stockholders owning a majority of the outstanding shares of New Common Stock or, for so long as Green Square meets the Green Square Threshold, the Green Square Director, shall be filled by an affirmative vote of the majority of the remaining directors until the next election.<br><br>In the event an At-Large Director was removed by an affirmative vote of stockholders owning a majority of the outstanding shares of New Common Stock, then the Board shall provide written notice to the stockholders (a "Director Replacement Notice"), and stockholders owning a majority of the outstanding shares of New Common Stock shall be entitled to elect a replacement director to serve in the seat held by such removed At-Large Director until the next election; provided, that if stockholders owning a majority of the outstanding shares of New Common Stock shall not have elected a successor director within 30 days following the date of the Director Replacement Notice, then the vacancy shall be filled by an affirmative vote of the majority of the remaining directors until the next election.<br><br>For so long as ▮▮▮▮ meets the ▮▮▮▮ Threshold, the Observer or his/her successor shall be determined by ▮▮▮; provided, that the identity of the replacement Observer shall be subject to the consent of stockholders owning a majority of the outstanding shares of New Common Stock (which shall not be unreasonably withheld). |
| Quorum; voting | The presence of 80% or more of the directors of the Board shall constitute a quorum (following at least 48 hours' advance notice to each director). A majority of the directors present will be required to take action. |
| Board action by consent | Consent in writing is permitted. |
| Board committees | Standing Board committees will consist of:<br><br>• an audit committee;<br>• a nominating and corporate governance committee (the "Nominating Committee"), which shall be comprised of either (i) until the first annual |

| Topic | Provision |
|---|---|
| | meeting of Reorganized JOANN Parent following the Effective Date, the Selection Committee Directors, or (ii) from and after the first annual meeting of Reorganized JOANN Parent following the Effective Date, the At-Large Directors; and<br><br>• a compensation committee.<br><br>Additional Board committees may be created by the Board.  Committees are permitted to act in any manner only to the extent authorized by the Board and permitted by applicable law. |
| Compensation | The compensation of Directors, other than the CEO Director, may be composed of reasonable annual cash payments; provided that the annual cash compensation of the Initial Directors shall be determined in the first instance by the Required DIP Backstop Parties. |
| **Stockholders** | |
| Annual meetings | An annual meeting must be held within 120 days after the close of the immediately preceding fiscal year. |
| Stockholder proposals | At any meeting of stockholders, only the business brought forward by the directors or the stockholders shall be decided.  To submit business for an annual meeting, a stockholder must provide notice not less than 60 days nor more than 90 days prior to the first anniversary of the preceding year's annual meeting.  In each case, stockholders must provide a description of business to be discussed along with information about their holdings and interests in Reorganized JOANN Parent in the notice.  There is no limit with respect to the number of matters that can be brought at a meeting. |
| Quorum | Stockholders holding a majority of the outstanding shares of New Common Stock shall constitute a quorum.  Unless otherwise required by law, approval of a majority of the outstanding shares of New Common Stock present in person or voting by proxy shall be sufficient to take corporate action. |
| Stockholder action by consent | Stockholders may take any action without a meeting if the required vote for such action is achieved in writing (including by electronic submission). |

| Topic | Provision |
|---|---|
| **Other** | |
| Jurisdiction of incorporation | Delaware. |
| Dividends | Subject to applicable law, the Board may declare and pay dividends upon the shares of Reorganized JOANN Parent stock. |
| Corporate opportunities | No executive director or officer of Reorganized JOANN Parent and/or its subsidiaries shall be permitted to take a corporate opportunity that could reasonably benefit Reorganized JOANN Parent and/or its subsidiaries based on the then-current business plan without first presenting, or offering the opportunity to participate in, such corporate opportunity to Reorganized JOANN Parent or such subsidiary, as applicable. Each non-executive director of Reorganized JOANN Parent shall be able to take a corporate opportunity that could reasonably benefit Reorganized JOANN Parent and/or its subsidiaries based on the then current business plan, in each case, except to the extent such corporate opportunity was presented to or acquired, created or developed by, or otherwise came into the possession of, such non-executive director expressly, solely and directly in such person's official capacity as a non-executive director. Subject to the foregoing and the "Reserved Matters" below, no stockholder of Reorganized JOANN Parent shall be restricted from pursuing any corporate opportunities. |
| Amendments to the Bylaws | Subject to applicable law and the terms of the Certificate of Incorporation of Reorganized JOANN Parent (including the "Reserved Matters" below), the Bylaws of Reorganized JOANN Parent may be amended or repealed, or new Bylaws adopted, by stockholders holding a majority of outstanding shares of New Common Stock. |
| Amendments to the Certificate of Incorporation | Any amendment to the Certificate of Incorporation of Reorganized JOANN Parent shall be made in accordance with applicable law. |
| Reserved Matters | Notwithstanding the foregoing, the Certificate of Incorporation of Reorganized JOANN Parent shall include that the approval of stockholders of not less than a majority of the outstanding shares of New Common Stock shall be required for Reorganized JOANN Parent or any of its subsidiaries to take any of the following actions: |

| Topic | Provision |
|-------|-----------|
| | <ul><li>other than in connection with a drag-along sale, in one transaction or a series of related transactions, the entering into of any agreement with respect to or consummation of (i) any merger or similar combination between Reorganized JOANN Parent or any of its subsidiaries, on the one hand, and a third party, on the other hand, or (ii) any acquisition, investment, transfer or disposition of assets (including the equity securities of another person), in each case that results in a change of control of Reorganized JOANN Parent; and</li><li>the completion of an initial public offering by Reorganized JOANN Parent or the listing of any securities of Reorganized JOANN Parent with a national exchange requiring registration under Section 12(b) of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>") (each, a "<u>Go Public Transaction</u>").</li></ul> |
| Affiliated Transactions | Other than commercial transactions in the ordinary course of business consistent with past practice on arms'-length terms and the issuance of securities pursuant to the preemptive rights described below, neither Reorganized JOANN Parent nor any of its subsidiaries shall enter into any agreement or transaction (or amendment or modification thereto) with (i) any director or officer of Reorganized JOANN Parent or its subsidiaries, (ii) any entity, together with its affiliates, which owns, directly or indirectly, 5% or more of the outstanding equity securities of Reorganized JOANN Parent, (iii) any entity in which one or more directors or officers of Reorganized JOANN Parent owns, directly or indirectly, individually or in the aggregate, 5% or more of the outstanding equity securities of such entity or (iv) any "affiliate", "associate" or member of the "immediate family" (as such terms are respectively defined in rules and regulations under the Exchange Act) of any person described in the foregoing clauses (i), (ii) or (iii) (each of the persons described in the foregoing clauses (i), (ii), (iii) and (iv), a "<u>Related Party</u>") without, in each case, the affirmative vote of a majority of the directors of the Company (excluding any director who is, or is a Related Party of, the person with whom the Company or any of its subsidiaries is proposing to enter into the relevant agreement or transaction (or amendment or modification thereto)). |
| Indemnification Provisions | The New Organizational Documents shall contain indemnification provisions that |

| Topic | Provision |
|---|---|
| | are consistent with the Transaction Support Agreement and the Plan. |

## Shareholder Agreement

| Topic | Provision |
|---|---|
| **Registration Rights** | |
| Demand registration rights after Reorganized JOANN Parent is public | Following a Go-Public Transaction by Reorganized JOANN Parent, upon receipt of a demand by one or more holders together holding at least 20% of the outstanding (i) shares of New Common Stock, (ii) securities issued or issuable with respect to, or on account of or in exchange for such New Common Stock and (iii) options, warrants or other rights to acquire, and any securities received as a dividend or distribution in respect of, any of the securities described in the foregoing clauses (i) and (ii) (collectively, "Registrable Securities"), subject to mutually agreed restrictions regarding the aggregate number of demand rights and customary time limitations, Reorganized JOANN Parent shall provide a notice to all holders of Registrable Securities to allow participation in a registration as selling holders. Amounts sold by selling holders will be *pro rata* based on their ownership of Registrable Securities, in all cases subject to normal blackout provisions. |
| Piggy-back registration rights after Reorganized JOANN Parent is public | If Reorganized JOANN Parent plans to file a registration statement (other than (i) for a Go Public Transaction that does not register any Registrable Securities and (ii) on Forms S-4 or S-8), Reorganized JOANN Parent shall provide a notice to all holders of Registrable Securities to offer participation in the registration as selling holders. Reorganized JOANN Parent shall have the right to sell as many shares as Reorganized JOANN Parent wants and participating selling holders will participate on a *pro rata* basis based on their ownership of Registrable Securities, in all cases subject to normal blackout provisions. |
| Lock-up | Any reasonable lock-up requested by underwriters shall apply only to selling holders and, in connection with a Go Public Transaction only, all other holders of outstanding Registrable Securities that are required by the managing underwriter to be subject to a lock-up. |

| Topic | Provision |
|---|---|
| **Transfer Restrictions** | |
| Restrictions on transfer | There shall be no transfer restrictions other than as follows: (i) no holder may transfer unless such transfer is in compliance with federal and state securities laws, (ii) no holder may transfer New Common Stock to an unaffiliated, third-party purchaser of New Common Stock that is a competitor without the prior written consent of Reorganized JOANN Parent (subject to customary exceptions for passive interests and existing interests for institutional investor equity holders) and (iii) any transferee of New Common Stock shall execute a joinder to the Shareholder Agreement, effective upon the consummation of such transfer.<br><br>In addition, holders of New Common Stock shall not, prior to a Go Public Transaction, transfer any such New Common Stock if, in Reorganized JOANN Parent's reasonable, good faith judgment, such transfer could, or may reasonably be expected to, result in an increase in the number of holders of record of such class of equity securities which would cause Reorganized JOANN Parent to become required to register such securities under Section 12(g) of the Exchange Act. |
| **Other** | |
| Drag and tag rights | The Shareholder Agreement shall provide: (i) drag-along rights to the applicable selling stockholder(s) in the event that a stockholder or any group of stockholders collectively owning 50% or more of the outstanding shares of New Common Stock held by stockholders party to the Shareholder Agreement (other than MIP Shares) receives a bona fide offer from an unaffiliated third-party purchaser to consummate a sale of Reorganized JOANN Parent and its subsidiaries or all or substantially all of the assets of Reorganized JOANN Parent and its subsidiaries (a "<u>Company Sale</u>"); and (ii) tag-along rights to the applicable non-selling stockholders in the event that a stockholder or any group of stockholders wishes to sell New Common Stock representing at least 50% of the outstanding shares of New Common Stock held by stockholders party to the Shareholder Agreement (calculated on a fully-diluted basis but excluding MIP Shares), in each case, to an unaffiliated third party in a bona fide transaction.  Drag- and tag-along rights shall be subject to customary limits on representations, warranties, restrictive covenants and indemnities and the consideration to be received by stockholders participating in transactions subject to such drag- and tag-along rights shall be in the same form and amount per share, with customary exceptions. |

| Topic | Provision |
|-------|-----------|
| | |
| Preemptive rights | Subject to customary exceptions, (x) Green Square (for so long as it meets the Green Square Threshold), (y) ████████ (for so long as it meets the Spinrite Threshold), and (z) each holder of 10% or more of then-outstanding shares of New Common Stock (other than MIP Shares) shall have the right to purchase such stockholder's *pro rata* share of newly issued Reorganized JOANN Parent capital stock; *provided*, any such stockholder may assign such right to one or more of its controlled affiliates that qualifies as an "accredited investor." |
| Information rights | Reorganized JOANN Parent shall provide each stockholder (via an electronic data room) with (i) monthly flash reports within a customary time period following each month's end, (ii) quarterly unaudited financial statements within a customary time period following each quarter's end and (iii) annual audited financial statements within a customary time period following each fiscal year's end (the foregoing financial statements provided to all stockholders, the "<u>Financial Statements</u>"). |
| | Reorganized JOANN Parent shall provide each holder the right to access any information that is made generally available to "public side" lenders of Reorganized JOANN Parent or its subsidiaries. |
| | Information to be subject to customary confidentiality requirements and, subject to compliance with such confidentiality requirements, may be shared by holders of New Common Stock with actual and prospective purchasers. Recipients of materials through an electronic data room must certify through the click-through confidentiality prompt (prior to receipt of such materials) that they are not a competitor of Reorganized JOANN Parent. |
| Amendments | Amendments to provisions of the governing documents of Reorganized JOANN Parent shall require the prior consent of stockholders owning more than 50% of the shares of New Common Stock held by the stockholders party thereto; *provided*, that (i) no amendment may adversely affect a stockholder relative to other stockholders without such stockholder's specific written consent; (ii) no amendment may be made to the affiliate transactions, demand registration rights, |

| Topic | Provision |
|---|---|
| | piggy-back registration rights, information rights or amendments sections of the Shareholder Agreement that is materially adverse to a stockholder without such materially affected stockholder's specific written consent, (iii) any amendment to the provisions of the Shareholder Agreement regarding the Selection Committee's right to nominate directors shall require the written consent of each of the holders comprising the Selection Committee; (iv) any amendment to the provisions of the Shareholder Agreement regarding Green Square's right to nominate the Green Square Director shall require the written consent of Green Square; (v) any amendment to the provisions of the Shareholder Agreement regarding ██████ right to nominate the Observer shall require the written consent of ██████; and (vi) no provision in the Shareholder Agreement, Certificate of Incorporation or the By-Laws which requires the consent of holders owning a higher percentage of outstanding shares of capital stock than is otherwise set forth herein in order to take the action described in such provision may be amended without the consent of holders holding such higher percentage of outstanding shares of capital stock.  Upon a Go-Public Transaction, the Shareholder Agreement (other than provisions relating to registration rights) shall terminate. |

**<u>EXHIBIT D</u>**

**Revised Members of the Reorganized Board**

## Directors and Officers of the Reorganized Debtors[1]

Pursuant to the Plan, the Reorganized Board shall initially have five (5) board seats, comprising the Chief Executive Officer of the Reorganized Debtors,[2] three (3) directors to be selected by the DIP Backstop Parties, and one (1) director to be selected by Project Swift LLC.

The identity and affiliations of Persons presently proposed to serve on the Reorganized Board are as follows:

1.    Darrell Horn – Project Swift LLC

2.    Bill Wall – Fidelity Management & Research Company, LLC

3.    James Kim – Nuveen Asset Management, LLC

In addition, an additional director may be appointed following the Effective Date in accordance with the New Organizational Documents.

The Debtors shall disclose the identity and affiliations of any other Person proposed to serve on the Reorganized Board as soon as such Persons are known and determined.

Each director of the Reorganized Board shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and may be designated, replaced, or removed in accordance with such New Organizational Documents.

The existing directors serving on the boards of the subsidiary Debtors shall remain in their current positions from and after the Effective Date, subject to all rights with respect to the resignation, removal, and replacement of such directors.

Except to the extent that a member of the board of directors of the Reorganized Parent is designated in this exhibit to serve as a director of the Reorganized Board on the Effective Date, the members of the board of directors of the Reorganized Parent prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date, and each such director shall be deemed to have resigned or shall otherwise cease to be a director of the Reorganized Parent on the Effective Date.

The existing officers of the Debtors as of the Effective Date shall remain in their current capacities as officers of the Reorganized Debtors, subject to their right to resign and the ordinary rights and powers of the Reorganized Board to remove or replace them in accordance with the New Organizational Documents and any applicable employment agreements that are assumed pursuant to the Plan.

---

[1]    The selection process for the Reorganized Board is still ongoing and the contents of this exhibit may be supplemented or revised in an amended Plan Supplement.

[2]    Prior to and following emergence, the Company will continue to be managed by the Office of the Chief Executive Officer, which will report to the Reorganized Board following emergence.  Once a Chief Executive Officer is appointed, such individual will be appointed to the Reorganized Board to fill this board seat in accordance with the New Organizational Documents.