IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------ x
                                                       :
In re:                                                 :   Chapter 11
                                                       :
JOANN INC., et al.,                                    :   Case No. 24-10418 (CTG)
                                                       :
            Debtors.¹                                  :   (Jointly Administered)
                                                       :
                                                       :
------------------------------------------------------ x
```

**DECLARATION OF JONATHAN GOULDING IN SUPPORT
OF CONFIRMATION OF THE FIRST AMENDED PREPACKAGED
JOINT PLAN OF REORGANIZATION OF JOANN INC. AND
ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Jonathan Goulding, hereby declare as follows:

1.  I am a Managing Director with Alvarez & Marsal North America, LLC ("***A&M***"). Since A&M's initial engagement on February 8, 2023, A&M has been providing services to the above-captioned debtors and debtors in possession (collectively, the "***Debtors***"), and was engaged in February 2024 to advise on matters pertaining to the Chapter 11 Cases.

2.  I submit this declaration (the "***Declaration***") in support of confirmation of the *First Amended Prepackaged Joint Plan of Reorganization of JOANN Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* filed on April 23, 2024 [Docket No. 288] (as may be amended, supplemented, or otherwise modified, the "***Plan***") and the Debtors' *Memorandum of Law in Support of (I) Approval of Debtors' Disclosure Statement and (II) Confirmation of First*

---

[1] The Debtors in these cases, together with the last four digits of each Debtor's taxpayer identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, OH 44236.

*Amended Prepackaged Joint Plan of Reorganization of JOANN Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* filed contemporaneously herewith.[2]

3. I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I can and will testify competently as to the facts set forth herein. Except as otherwise indicated, the statements in this Declaration are based on: (a) my personal knowledge of the Debtors' operations; (b) my review of relevant documents; (c) information provided to me by, or through discussions with, employees of A&M working under my supervision; (d) information provided to me by, or through discussions with, members of the Debtors' management team, the Debtors' other employees, or the Debtors' other advisors; and/or (e) my general experience and knowledge. I am not being compensated specifically for this testimony other than through A&M, a retained professional in the Chapter 11 Cases.[3]

## Background and Qualifications

4. I have more than 20 years of experience in management consulting and financial restructuring, specializing in liquidity management, financial and strategic planning, and implementing financial strategies for corporate turnarounds and restructurings. I am a Certified Insolvency and Restructuring Advisor and a CFA charterholder with experience in a wide variety of industries, including retail, energy, agriculture, transportation and logistics, manufacturing, telecommunications, and financial services.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Disclosure Statement (as defined below), as applicable.

[3] The Debtors filed the *Debtors' Application to Employ and Retain Alvarez & Marsal North America LLC as Financial Advisors to the Debtors and Debtors in Possession Pursuant to Sections 327(a) and 328 of the Bankruptcy Code* [Docket No. 157] on March 27, 2024, which was approved on April 15, 2024 [Docket No. 247].

**A&M's Qualifications and Role for the Debtors**

5. A&M's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts, business plans and related assessments of a business's strategic position; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages. Since its inception in 1983, A&M has become a global leader in providing turnaround and other advisory services to companies in distress or those in need of performance improvements in specific financial and operations areas. More specifically, A&M has been retained as financial advisor in the following recent chapter 11 cases: *In re Rite Aid Corp.*, No. 23-18993 (Bankr. D.N.J. Dec. 20, 2023); *In re WeWork, Inc.*, No. 23-19865 (D.N.J. Dec. 6, 2023); *In re PGX Holdings, Inc.*, No. 23-10718 (Bankr. D. Del. Sept. 16, 2023); *In re Orbital Infrastructure Grp., Inc.*, No. 23-90763 (Bankr. S.D. Tex. Aug. 23, 2023); *In re Yellow Corp.*, No. 23-11069 (Bankr. D. Del. Aug. 6, 2023); *In re Genesis Care Pty Ltd.*, No. 23-90614 (Bankr. S.D. Tex. June 1, 2023); *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (Bankr S.D. Tex. June 1, 2023); In re MLCJR LLC, No. 23-90324 (Bankr. S.D. Tex. May 14, 2023); and *In re Vyera Pharmaceuticals, LLC*, Case No. 23-10605 (Bankr. D. Del. May 9, 2023).

6. A&M was engaged on a prepetition basis to assist the Debtors in various activities including, but not limited to, cash forecasting and managing liquidity. Additionally, A&M's prepetition efforts included, among others, (a) assistance in evaluation of the Company's (as defined below) business plan and preparation of a revised operating plan and cash flow forecast; (b) assistance in evaluation of restructuring alternatives; (c) assistance in development and management of a 13-week cash flow forecast; (d) assistance in financing issues including preparation of reports and liaison with creditors; (e) assistance in preparation of the Plan and the

*Disclosure Statement for Prepackaged Joint Chapter 11 Plan of Reorganization of JOANN Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 16] (as may be amended, supplemented, or otherwise modified, the "***Disclosure Statement***"); and (f) assistance in planning for a prepackaged chapter 11 filing and related contingency planning.

7. Postpetition, among other responsibilities, A&M has assisted with: (a) the Company's transition into chapter 11; (b) the Debtors' short-term cash forecasting and overall cash management; (c) providing evidence for the first day hearing; (d) fulfilling various bankruptcy reporting requirements; (e) preparing for the confirmation hearing; (f) satisfying various reporting requirements under the DIP Facility; and (g) other support to assist with the efficient progression and completion of the Chapter 11 Cases.

8. I, and others from A&M working at my direction, (a) assisted with formulating and reviewed the Debtors' financial projections attached as Exhibit C to the Disclosure Statement (the "***Projections***") and (b) assisted the Debtors in the preparation of the hypothetical liquidation analysis (the "***Liquidation Analysis***") attached to the Disclosure Statement as Exhibit D.

## The Projections

9. As set forth in greater detail in the *Declaration of Scott Sekella, Chief Financial Officer and Executive Vice President, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 2], the Debtors are a national retailer of sewing, arts and crafts, and select home décor products. The Debtors are the United States' category leader in sewing products and reach their customers across the country through 815 brick-and-mortar stores – 96% of which are "four-wall positive" (*i.e.*, have positive cash flow at a store level) on a trailing twelve-month basis – and a comprehensive e-commerce platform.

10. The Projections reflect the consolidated projections of JOANN Inc. and all of its direct and indirect Debtor and non-Debtor subsidiaries (collectively, the "***Company***"), consistent

with the Company's regular financial reporting practices, and cover the fiscal years ending January 2025 through January 2029 (the "***Projection Period***"). The Projections reflect management's view of the business going forward taking into consideration the following factors: (a) current and projected market conditions in which the Debtors operate; (b) no contemplated store closures or any other material changes to existing operations as a result of the Chapter 11 plan; (c) capital expenditures related to normal course maintenance and renovation capital expenditures related to retail stores and digital platforms; (d) a de-levered capital structure; (e) working capital levels based on net sales projections, historical trends, and product enhancements; (f) no anticipated material acquisitions or divestitures; (g) inclusion of all Debtor and non-Debtor entities; and (h) the Debtors' emergence from chapter 11 on or around April 24, 2024 (the "***Projected Emergence Date***").[4] The Projections do not consider any potential impact of the application of "fresh start" accounting under Accounting Standards Codification 852, "Reorganizations" that may potentially apply upon the Effective Date. The Projections do not account for any tax obligations as a result of consummating the Plan. These amounts could vary significantly pending final tax analysis of the transaction. The Projections also assume that all debt facilities existing at the Effective Date remain in place through the Projection Period, at the same rate.

11. The Projections were prepared by the Debtors' management, with support from A&M, and consist of the following unaudited projected financial information: (a) consolidated statements of operations for each fiscal year of the Projection Period; (b) projected consolidated balance sheets for each fiscal year of the Projection Period; and (c) projected consolidated statement of cash flows for each fiscal year of the Projection Period.

---

[4] While April 24, 2024 was used as the Projected Emergence Date at the time of preparation of the Projections, I understand that the current projected Effective Date is on or around April 30, 2024.

12. The Projections are subject to a variety of risks and uncertainties and are predicated upon a set of assumptions developed by the Debtors that may be affected by a series of internal and external factors as more fully described in Article IX of the Disclosure Statement.

13. The Projections reflect modest revenue growth in the business. Specifically, consolidated revenue is projected to be approximately $2,134.8 million for the fiscal year ending January 2025, with year-over-year growth of 2.6%, 2.6%, 1.8%, and 1.6% for the fiscal years ending January 2026, 2027, 2028 and 2029, respectively.[5] Earnings before interest, taxes, depreciation and amortization adjusted for stock-based compensation expenses ("*Adjusted EBITDA*") is projected to grow from $152 million for the fiscal year ending January 2025, to $223 million for the fiscal year ending January 2029, reflecting a compounded annual growth rate of approximately 10% over the same period.

14. Based upon A&M's analysis of the Projections, and my own examination of the assumptions underlying the Debtors' related business strategies, I believe that the business strategies and assumptions embodied in the Projections are reasonable and appropriate to provide a foundation for the Plan. The Projections demonstrate that the Debtors will be able to generate sufficient liquidity to service their debt and other obligations throughout the Projection Period.

---

[5] Fiscal Year 2029 is a 53-week year. On a normalized basis, revenue is flat YoY for Fiscal Year 2029.

## The Plan Is Feasible and Satisfies Section 1129(a)(11) of the Bankruptcy Code

15. I understand that section 1129(a)(11) of the Bankruptcy Code requires a court to determine that a chapter 11 plan is feasible, and that the confirmation of such plan is not likely to be followed by the liquidation or further financial reorganization of the debtor. I am familiar with the material provisions of the Plan and the transactions embodied therein. In conjunction with preparing the Projections, A&M assisted the Debtors with formulating a multi-year business plan covering the period from the Projected Emergence Date through fiscal year 2027.

16. The Debtors sought chapter 11 protection to restructure their balance sheet and eliminate unsustainable indebtedness. Indeed, under the Plan, total funded debt would be reduced by approximately $504.7 million, from approximately $1.06 billion to approximately $555.5 million. The de-leveraging of the balance sheet is projected to result in significantly improved credit metrics. For example, the pre-Restructuring Transactions net leverage ratio was 15.9 based on fiscal year 2024 estimated Adjusted EBITDA. After taking into account the impact of the Restructuring Transactions contemplated under the Plan, the net leverage ratio is projected to decrease to 3.0 based on fiscal year 2025 forecasted Adjusted EBITDA.

17. On the Projected Emergence Date, the Debtors are projected to have substantial cash and cash equivalents to make required distributions and payments due pursuant to the Plan on the Effective Date—including payment of certain Claims and expenses, such as (*inter alia*) Other Secured Claims, General Unsecured Claims, interest on account of ABL Claims and FILO Claims, Professional Fee Claims, United States Trustee statutory fees, and Restructuring Fees and Expenses—and, together with availability under the Exit Facilities, to provide go-forward liquidity for working capital and general corporate purposes. Further, following the Projected Emergence Date, the Reorganized Debtors are expected to generate positive cash flow each year during the

Projection Period for a cumulative increase in cash of $127 million in the aggregate over such Projection Period.

18. As a result of the foregoing deleveraging, improved capital structure, and expected cash flow generation as reflected in the Projections, the Reorganized Debtors are anticipated to have sufficient liquidity to pay interest and scheduled amortization on their outstanding indebtedness and to fund capital expenditures relating to ongoing business operations as contemplated through the Projection Period. Moreover, I believe that, after taking into account the Restructuring Transactions contemplated by the Plan, including the Exit Facilities, the Reorganized Debtors, on a consolidated basis, (a) will not be left with unreasonably small capital to operate their businesses as a result of the Plan or any transactions contemplated by the Plan and (b) will be able to generate sufficient cash flow and possess sufficient liquidity to meet the necessary distributions required under the Plan and to sustain their operations going forward throughout the Projection Period.

19. Based upon the foregoing and my other work with the Debtors before and during the Chapter 11 Cases, and based on the facts and circumstances known to me at this time, I believe that the Plan is feasible (as I understand that term's meaning in the context of Bankruptcy Code section 1129(a)(11)) and will maximize value for those stakeholders receiving distributions under the Plan. In my opinion, the Plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors during the Projection Period. In forming my opinions, I considered, among other factors, the capital structure of the Reorganized Debtors, the earning power of the business, macroeconomic conditions, the anticipation of competent management and adherence to the business plan underlying the Projections, and the reasonableness of the assumptions in the Projections.

### The Plan Is in the Best Interests of All Creditors and Interest Holders as Required by Section 1129(A)(7) of the Bankruptcy Code

20. I am advised that to satisfy the "best interests" test under section 1129(a)(7) of the Bankruptcy Code, a debtor must demonstrate that each holder of a claim or interest in such impaired class either (a) has accepted or is deemed to have accepted the plan or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of such plan, that is not less than the amount such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, I believe that the Plan satisfies the "best interests" test under section 1129(a)(7) of the Bankruptcy Code.

21. To demonstrate the Plan's compliance with section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of A&M and other professionals, prepared the Liquidation Analysis, which is attached to the Disclosure Statement as Exhibit D. The Liquidation Analysis contains various estimates, assumptions, and qualifications, all of which are incorporated herein by reference. I believe that the information used by the Debtors in the Liquidation Analysis is information that debtors typically rely upon in conducting analyses of this type.

22. In formulating the Liquidation Analysis, it was assumed that, upon conversion of the Chapter 11 Cases to cases under chapter 7 on or around April 24, 2024 (the "***Conversion Date***"), a trustee (the "***Chapter 7 Trustee***") would be appointed to manage the Debtors' affairs and conduct the liquidation of all of their assets and conversion of those assets to cash.

23. The Liquidation Analysis assumes the Chapter 7 Trustee would manage the Debtors' estates to maximize recovery to creditors as expeditiously as possible and would appoint professionals to assist in the liquidation and wind down of the Debtors' estates. The Chapter 7 Trustee would oversee inventory liquidation (assumed to be approximately $525.5 million as of

the Conversion Date that would be sold through orderly going-out-of business sales covering all existing stores) and the collection of outstanding accounts receivables in addition to attempting to sell or otherwise monetize other assets owned by the Debtors to one or more buyers. Specifically, during the first three (3) month period, the Debtors would complete going-out-of-business sales for all remaining store inventory, furniture, fixtures, and equipment. At the end of this period, the Debtors would reject all operating leases immediately and return the spaces to landlords in broom-swept condition. During the remaining nine (9) months (in the Low Case) or three (3) months (in the High Case) (each as such terms used in the Liquidation Analysis),[6] the Debtors would primarily focus on monetizing other assets such as intellectual property and other remaining personal property and equipment, as well as various administrative activities. The Liquidation Analysis assumes the chapter 7 case is to be funded by cash on hand and liquidation of assets.

24.     To estimate what members of each Class of Claims and Interests under the Plan would receive if the Debtors were to liquidate under chapter 7, A&M assisted the Debtors in determining the net proceeds from the monetization of the Debtors' assets. The net proceeds available for distribution in a hypothetical liquidation scenario reflects proceeds available to creditors after reductions for liquidation expenses likely to be incurred in a chapter 7 case, including wind-down costs, compensation of the Chapter 7 Trustee, and fees for professionals retained by the Chapter 7 Trustee.

25.     The Liquidation Analysis presents "Low," "Mid" and "High" estimates of Liquidation Proceeds, thus representing a range of the Debtors' assumptions relating to the assets in the estates and recoverable by the Debtors. Recoveries to creditors are presented on an

---

[6] The liquidation of the Debtors' assets is assumed to be completed over a period of twelve (12) months in the Low Case, and six (6) months in the High Case, each pursuant to a chapter 7 case managed by the Chapter 7 Trustee.

10

undiscounted basis, and the Debtors have estimated an amount of Allowed Claims for each Class of claimants.

26. Proceeds generated by the Chapter 7 Trustee with respect to assets encumbered by prepetition liens would first go to pay the costs of disposing of such assets, including wind-down costs, with the balance of the proceeds used to satisfy the Secured Claims of the applicable lienholders as well as carve-out expenses as outlined in the DIP Orders. Assets not encumbered by prepetition liens are made available to satisfy Administrative Claims, other priority Claims, and General Unsecured Claims in strict order of priority pursuant to section 726 of the Bankruptcy Code. Based on my experience, it is my belief that the methodology used to prepare the Liquidation Analysis and the assumptions and conclusions set forth therein are fair and reasonable under the circumstances and represent a reasonable exercise of the Debtors' business judgment with respect to such matters.

27. Each Debtors' estimated creditor recoveries under the Plan are based upon the methodology reflected in the Liquidation Analysis. The Debtors' estimated creditor recoveries under the Plan are based upon the total enterprise value of the Reorganized Debtors as estimated by the Debtors' investment banker, Houlihan Lokey, Inc. (and as reflected in the Disclosure Statement). The Debtors estimated recovery values by Class and the classification and treatment of claims are set forth in the "Summary of the Expected Recoveries" section beginning on page 6 of the Disclosure Statement.

28. Based on the foregoing, I believe that no Holder of a Claim or Interest would receive or retain an amount under the Plan on account of its Claim or Interest, as of the Effective Date, that is *less than* the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Indeed, on an aggregate basis, Class 3 (FILO

Claims) recoveries under the Liquidation Analysis would be reduced and range from 29% to 89% as compared to the expected recovery of 100% under the Plan.[7]  Recoveries of Class 4 (Term Loan Claims) and Class 5 (General Unsecured Claims) are also lower in a chapter 7 liquidation, in each case, with zero recovery as compared to the Plan's proposed 1.1% and 100% recoveries, respectively.  Additionally, each of Class 7 (Intercompany Claims), Class 8 (Intercompany Interests), and Class 9 (Existing Equity Interests) receive zero recovery in both a chapter 7 liquidation and under the Plan if the Class 7 and 8 Claims and Interests are Impaired.[8] Accordingly, with respect to individual recoveries at every Debtor, each class of Claim and Interest Holders will not receive less under the Plan than what they would receive in a liquidation. Therefore, I believe that the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

29.  In summary, the Liquidation Analysis indicates that, if these Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, the value of distributions would be significantly lower overall than what creditors would receive under the Plan.  Further, based on my involvement in the preparation of the Liquidation Analysis and my experience and expertise, I believe that the methodology used to prepare the Liquidation Analysis is appropriate and represents the best judgment of A&M and the Debtors' management with respect to the results of a hypothetical chapter 7 liquidation, and that the assumptions and conclusions set forth therein are fair and reasonable under the circumstances.

[*Remainder of page intentionally left blank*]

---

[7]  Class 2 (ABL Claims) receives 100% projected recovery under the Plan and in a chapter 7 liquidation scenario.

[8]  For the avoidance of doubt, even in the event that Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) are reinstated and "Unimpaired" under the Plan, there will be no distributions on account of such Intercompany Claims and Intercompany Interests under the Plan.

Pursuant to 28 U.S.C. § 1746, to the best of my knowledge, information and belief, and after reasonable inquiry, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 23, 2024
       Los Angeles, California

*/s/ Jonathan Goulding*
Jonathan Goulding
Managing Director
Alvarez & Marsal North America, LLC