RECEIVED

2024 JUL 10 PM 3: 43

CLERK
U.S. BANKRUPTCY COURT
DIST. OF DELAWARE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>JOANN INC., et al.<br>Debtors. | Chapter 11<br>Case 24-10418-CTG<br>Jointly Administered |

### THE AD HOC COMMITTEE OF SHAREHOLDERS' OMNIBUS OBJECTION TO APPROVAL OF (I) DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF JOANN INC. AND ITS DEBTOR-AFFILIATES

The ad hoc group of shareholders (the "Ad Hoc Committee of Shareholders")[2] of JOANN INC (together with its chapter 11 debtor-affiliates, the "Debtors"), hereby submits this omnibus objection (the "Objection") to approval of the (i) *Disclosure Statement for First Amended Joint Chapter 11 Plan of Reorganization of JOANN INC and its Debtor Affiliates* [Dkt. No. 290] (the "Disclosure Statement"); and expense reimbursement requested under the Transaction Support Agreement. Apologies to the court for the delay. It was the intention of the *Ad-Hoc Committee of Shareholders* to trust the process and see the reorganization as-is, but it appears that the plan as it is proceeding does not represent the best interests of its recovery. *In support of this Objection, the Ad Hoc Committee of Shareholders respectfully represents as follows:*

**PRELIMINARY STATEMENT**[3]

The Debtors filed Chapter 11 voluntarily, due to the conclusions of the board and the analysis of Houlihan Lokey who has been serving as a financial advisor to the company since 2020. Per the JOANN INC. press release at the beginning of the initiation of the "Voluntary Chapter 11" stated that the intention of the voluntary, prepacked Chapter 11 per interim CEO and CFO Scott Skella:

  3. "This agreement is a significant step forward in addressing JOANN's capital structure needs, and it will provide us with the financial resources and flexibility necessary to continue to deliver best-in-class product assortments and enhance the customer experience wherever they are shopping with us. This includes our more

our suppliers, partners, Team Members and *other stakeholders*, and are focused on ensuring we continue to operate as usual so we can continue to best serve our millions of customers nationwide."

The Debtors filed for Chapter 11 in a "prepacked, voluntary" bankruptcy entering into a "Transaction Support Agreement ("TSA" or "Agreement") with a majority of its financial stakeholders and additional industry financing parties to strengthen the Company's financial position" and "..in connection with the TSA, the Company has received commitments for approximately $132 million in new financing and related financial accommodations and expects to reduce funded debt on its balance sheet by approximately $505 million. *The Debtors' own financial projections* cited in the *Disclosure Statement*[1] indicate a project recovery by FY26 to 24,000,000 in net income, which will prove Chapter 11 successful with the reduction in long-term debt due to the TSA financing. The question that this Ad-Hoc Debtor group is asking is why did the board act now.

The First Amended plan and disclosure statement accounts for the granting of equity in the Reorganized Parent for the *New Equity Interests,* but not for Class 9 common stock shareholders. Given the nature of this Chapter 11 being voluntary and 95% of the JOANN inc retail locations being cash flow positive, it does not appear that the former JOANN Inc. board and Interim CEO (and CFO) Scott Skella considered the best outcome for "other stakeholders" which includes common stock shareholders (Class 9).

For this Ad-Hoc Shareholder group, there is a fundamental issue around the nature of this case. Leonard Green (LGP) owned approximately 68% of JOANN common stock, around 28 million shares out of 40.7. Per correspondence with LGP's attorney Michael J Merchant of Richards, Layton & Finger (see Exhibit B), and the 2021 *Amended and Restated Stockholders Agreement* confirmed that Leonard Green is the same class of shareholder, with no differentiation. Per *SECTION IV. CORPORATE GOVERNANCE (b) LGP Stockholders' Representation* of the *Amended and Restated Stockholders Agreement,* 50% or greater ownership guarantees 5 Director spots out of 7 of LGP, and therefore a majority. Additionally, LGP by

"*Consenting Stockholder Parties*" support the Transaction Agreement. In 2021 completed an IPO of JOANN Inc and retained 27 Million shares, converted at $11.14/share. LGP held those shares to April 2024 lows of $.07 per share. This means that LGP, an insider, that had owned the company privately for a decade and 3 years publicly as a majority owner intentionally took an approximate $300,000,000 loss post-2021 IPO that could have been avoided. It is also unlikely that LGP has yet to recoup its original $1.6 billion investment. *The Ad Hoc Committee of Shareholders* estimates 2011-2021 net income of $1.52 billion based on 2010 and 2021 net income averaged. Considering the IPO sale of 27,827,357 shares at par value of $12/share, totaling $333,928,284 in profit for LGP. Adding the income to the estimated 2011-2021 net income totals $1,833,928,284 (and a 14.6% return, $233,928,284). If LGP were to invest the initial $1.6 billion into a broad S&P 500 index, by comparison, it would have been 333.61% or $7,033,819,084. As a top-ranked private equity firm, they would be completely negligent in their fiduciary duty to LGP shareholders. With their insider knowledge of a path toward Chapter 11, they could have divested the majority of their position and mitigated the risk of loss significantly, but they did not. They could have IPO'd much earlier given the S&P performance was far exceeding JOANN Inc. performance over that same decade. To the *Ad-Hoc Committee of Shareholders*, this is an anomaly and leaves them suspecting that LGP might have been compensated outside of Chapter 11 to meet their fiduciary duty and given a priority that they legally don't have with their class of shares.

Additionally, a simple calculation of Net Operating Loss Carryforwards for 2022 and 2023 totals $315 million which could be utilized as a tax asset in a Sec. 382 carryforward, which allows for the NOLs to be used in a reorganization.[2] 50% of shareholders need to be brought along to preserve the tax benefit. Not doing so is a significant detriment to *the Debtors* to the tune of approximately 300 million and also benefits Class 9 with preservation. Unfortunately, Deloitte Financial Advisory Services LLP only spent .9 hours considering the value of this carryforward[3], which is a mistake of resource allocation if the goal of the bankruptcy is to

*Committee of Shareholders* understands that redacted parties listed in *New Equity Holders* may include LGP, which could also grant recovery for other common stock shareholders, but other holders have no benefit of knowing due to the redactions. Until the Debtors have exhausted all meaningful options for a plan that includes all Class 9 recovery (not just LGP), no final decree should be awarded. It is worth reexamining the speed of this Chapter 11, when initiation was arguably not required at this specific time given 95% positive cash flow in its retail locations and recent net incomes of $212 million in 2021 and $57 million in 2022. 2023 appears to be an anomaly. Additionally, *by the Debtors' own calculations* in the *Disclosure Statement*[4] indicate a $825,000,000 enterprise value that can have a profitable future to benefit all, yet the company has been handed over to new financiers instead of shareholders that have been loyal to the company.

<u>**Under these circumstances, the Court should not approve the Disclosure Statement.**</u>

## **RELEVANT BACKGROUND**

1. The Debtors' positive revenue trajectory suffered an abrupt reversal in 2023. *By the Debtors own statement*[5]

    > "Since the last quarter of 2022, the Company has taken steps both strategically and financially to alleviate liquidity-related pressures Since 2022, the Company has closed underperforming stores and reduced annual costs through its "Focus, Simplify, and Grow" initiative…With respect to supply chain streamlining, the Company has reduced its ocean freight costs by an estimated **$102 million** annually through a combination of capitalizing on positive market forces and new contract negotiation. …has also reduced its domestic freight costs by an estimated **$8 million** through similar efforts. With respect to product costs, the Company has sought out new suppliers and renegotiated with incumbent vendors, generating estimated annual cost savings of **$60 million** without materially increasing its vendor concentration or long-term supply commitments. Finally, the Company has reduced corporate overhead and other selling, general, and administrative costs by an estimated **$88 million** annually… As a result of these efforts, the Company has <u>**reduced estimated annualized costs by approximately $258 million since 2022.**</u>

taken to cut expenses and reach net neutral income without Chapter 11.

2. As of the Petition Date, JOANN Inc. parent was a publicly traded company, listed on the New York Stock Exchange under the symbol JOANQ, with approximately 40,700,000 shares of common stock issued and outstanding.

3. The Debtors spent the year before the Petition Date attempting to stabilize their business. The Debtors only started to engage with Gordon Brothers Holdings II LLC (an affiliate of one of the Debtors' Prepetition FILO Lenders) to assist in renegotiating the Company's hundreds of store leases. and potential equity sponsors with the hiring of restructuring expert Pamela Corrie to the board to evaluate the viability of reorganization and also to help build a plan of reorganization. *The Debtors,* however, only pursued this for approximately a year when there were $2,180,800,000 in assets compared to $1,020,600,000 in 2010 that could be evaluated for liquidation. The company also boasted a 1.14 asset-to-liability ratio prior to entering Chapter 11 on March 18th, 2024.

4. By typical business metrics, this did not indicate a severe emergency to save the business. Nor did the Debtors explore whether any of their shareholders would be interested in investing new capital in the Debtors on more favorable terms than those proposed by other parties.

5. On March 18, 2024, the Debtors filed a proposed Chapter 11 plan and Disclosure Statement reflecting their initial selection of the DIP Agent Wilmington Savings Fund Society, FSB providing $107 million and $117 million in "new money" loans along with Exit FILO Facility of 1903P Loan Agent, LLC, 1903 Loan Partners, LLC and Centerbridge Credit CS, L.P providing $100 million. Additionally, the Exit Term Loans secured between $153.4 million and $165.4 million of funding. This funding was to ensure the target of a reduction of long-term debt to the tune of $505 million

Debtor Affiliates. [Dkt. No. 15,16] (the "Plan") and (ii) Disclosure Statement. Under the Plan, Existing JOANN Inc. Equity Interests would be canceled and released without any distribution on account of such interests [Dkt 16, pg. 14]. Furthermore, the Disclosure Statement[6] indicates *New Equity Holders* are the following:

a. Holders of Term Loan Claims receive: 2.5% New Equity Interests

b. DIP Lenders Entitled to DIP Participation Fee: 85% New Equity Interests

c. Certain Additional Financing Parties: 12.5% New Equity Interests

**OBJECTION TO APPROVAL OF DISCLOSURE STATEMENT**

**I. THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE**

8. It is well-settled that a court must not approve a disclosure statement where the plan to which it relates is not confirmable on its face. See In re Am. Capital Equip., LLC, 688 F.3d 145, 154 (3d Cir. 2012) ("[A] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that . . . the plan described by the disclosure statement is patently unconfirmable . . . ."); see also In re Phx. Petroleum Corp., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."); In re Quigley Co., 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."). Just as important as concerns for judicial economy and the efficient use of estate assets is a court's duty not to grant legitimacy to a plan that violates essential confirmation principles. Courts have recognized that "approval of a disclosure statement for a plan which will

Statement to avoid not only the wasteful use of judicial and estate resources but also any suggestion that the Court approves of the Debtors' rank misuse of the bankruptcy process.10

9. As described below, the Plan is patently unconfirmable because: (i) it wipes out existing equity interests while the *New Equity Interests* and the % of ownership given appears arbitrary, and *DIP Lenders* are receiving 85% of new equity while only contributing $155.3 million.

### A. The Plan Is Not "Fair and Equitable"

10. Where an impaired class, such as Class 9 (Existing JOANN Inc. Equity Interests), is deemed to reject the Plan, "the plan proponent must . . . show that the plan meets the additional requirements of §1129(b), including the requirements that the plan does not unfairly discriminate against dissenting classes and the treatment of the dissenting classes is fair and equitable." In re Exide Techs., 303 B.R. 48, 58 (Bankr. D. Del. 2003); see also In re Genesis Health Ventures, Inc., 266 B.R. 591, 599 (Bankr. D. Del. 2001) ("Where, as here, at least one impaired class of claims has not consented to the proposed plan, the "cram down" provisions of 11 U.S.C. § 1129(b)(1) come into play").

11. Any plan that denies holders of Existing JOANN Inc. Parent Equity Interests any recovery is not "fair and equitable." In a non-consensual case such as these Chapter 11 Cases, Section 1129(b)(1) of the Bankruptcy Code provides that, if all confirmation requirements of Section 1129(a) other than Section 1129(a)(8) are met, the court "shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable" with respect to each non-accepting, impaired class of claims or interests. See 11 U.S.C. § 1129(b)(1). Section 1129(b)(2), in turn, describes how a plan may be "fair and equitable" to a class of impaired, non-accepting claims or interests. See 11 U.S.C. §1129(b)(2).

12. Thus, with respect to a class of interests, such as Class 9 here, the plan must provide "that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed

1007 (8th Cir. 2001) (emphasis added); see also In re Machne Menachem, Inc., 371 B.R. 63, 72 (Bankr. M.D. Pa. 2006) ("11 U.S.C. § 1129(b)(2)(C)(i) requires that a plan provide that every class of interest, including stockholders, receive the 'value of such interest.' . . . . [T]he beneficiaries of this corporation . . . deserve to share the benefits of the net value of the corporate assets[.]")

13. The "fair and equitable" standard further incorporates the "absolute priority rule," which requires (among other things) "that no creditor be paid more than it is owed." 7 COLLIER ON BANKRUPTCY ¶ 1129.03[4][a]; see In re Exide Techs, 303 B.R. at 61 ("Courts have decided that a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.")

14. The requirement that no creditor may be paid more than it is owed means that "[o]nce the participant receives or retains property equal to its claim, it may receive no more." 7COLLIER ON BANKRUPTCY ¶ 1129.03[4][a][ii]. Put differently, no claim or interest holder may be paid a "premium" in excess of the allowed amount of its claim. A plan that proposes to pay unsecured creditors value in excess of their allowed claim amounts is therefore not "fair and equitable" under Section 1129(b)(2)(B) of the Bankruptcy Code, and may not be confirmed. See In re Genco Shipping & Trading Ltd., 513 B.R. 233, 242 (Bankr. S.D.N.Y. 2014) ("It's undisputed that the 'fair and equitable' requirement encompasses a rule that a senior class cannot receive more than full compensation for its claims.") (quoting In re Chemtura Corp., 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010)); In re AbitibiBowater, Inc., Case No. 09-11296, 2010 WL 4823839, *12 (Bankr. D. Del. Nov. 22, 2010) ("[S]enior classes cannot receive more than a 100% recovery on their claims."); In re Granite Broad. Corp., 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to the junior classes of debt or equity, as the case may be."); In re Exide Techs., 303 B.R. 48 (denying confirmation of plan that afforded secured lenders value in excess of the amount of their claims); In re Genesis Health

Debtors' assets are larger than the Debtors' liabilities. The Plan – which wipes out existing equityinterests without providing them with any recovery – is therefore not fair and equitable. See In re Exide Techs., 303 B.R. at 60-61 ("A determination of [a] Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. §1129(b)."); In re Johns-Manville Corp., 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) ("A valuation of the debtor's business is, by virtue of the statutory language, almost a prerequisite to a determination that a plan satisfies the fair and equitable test of §1129(b).").

**i. The Plan Is Not Fair and Equitable Because The Board Did Not Explore Alternative Measures For Paying Off Long-Term Debt, Such As At The Money Offering Of Substance.**

16. In addition to the efforts previously mentioned, there were also possibilities Post-2021 IPO to pursue an At-the-money offering of substance which would dilute but at the very least preserve the existence of *Existing Equity Claims*.



17. In light of the foregoing, it cannot reasonably be disputed that the Debtors are solvent. Moreover, while the Ad Hoc Committee of Shareholders is still in the initial stages of its valuation analysis and even without the benefit of discovery from *the Debtors*, it has identified additional strong indications that the Debtors are solvent:

valuation purposes. Applying Michaels's 2021 sale to Apollo Management for $5 Billion.[7] There is significantly more value to be unlocked.

- <u>Balance Sheet Capacity.</u> The capital structure contemplated by the Plan consists of (i) approximately $22 million in U.S. cash upon emergence from Chapter 11; (ii) $674 million in new funded term loan debt, (iii) a $500 million revolving credit facility with a letter of credit sub-limit that is undrawn at exit. This capital structure is overly conservative for a retailer with 95% positive cash flow and only recent net income loss.

18. The Plan – which purports to wipe out the Debtors' equity despite their demonstrable solvency – is therefore patently unconfirmable. The Court should not approve the Disclosure Statement for this reason alone.

## II. THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE IT FAILS TO PROVIDE ADEQUATE INFORMATION

19. Section 1125(b) of the Bankruptcy Code requires that a plan proponent furnish stakeholders with "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" in order to solicit acceptances or rejections of a proposed chapter 11 plan. See 11 U.S.C. § 1125(b). "Adequate information" is defined in the Bankruptcy Code as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

20. Critical to the reorganization process is meaningful disclosure sufficient to enable stakeholders to make an informed decision about whether to accept or reject a proposed plan of

21. The provision of adequate information is at the very heart of the reorganization process. See In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("Given the necessity for adequate information in the Disclosure Statement and the paramount position section 1125 occupies in the Chapter 11 process, there is little, if any, room for harmless error."). A court should examine each disclosure individually to discern whether the Bankruptcy Code's "adequate information" requirement is satisfied. See In re Worldcom, Inc., Case No. M--47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003) ("[T]he approval of a disclosure statement . . . involves a fact-specific inquiry into the particular plan to determine whether it possesses 'adequate information' under § 1125.") (quoting In re Ionosphere Clubs, Inc., 179 B.R. 24, 28 (S.D.N.Y. 1995).

22. Here, the Disclosure Statement fails to provide adequate information as it fails to explain why the Debtors chose the current Plan Sponsors.

23. For a disclosure statement to provide "adequate information," it must list "the assets of the bankruptcy estate and their value." In re Phoenix Petroleum Corp., 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001). "[T]he normal topics for inclusion in a disclosure statement" include, among other things, "a description of the available assets and their value." Id. at 393 n.6; see also In re Dakota Rail, Inc., 104 B.R. 138, 147 (Bankr. D. Minn. 1989) ("Because the knowledge of a debtor's financial condition is essential before any informed decision concerning the merits of a chapter 11 plan can be made, it is vital, if not a prerequisite, that a description of available assets, their value, and certainly their ownership be disclosed under § 1125.").

24. This omission is all the more egregious given that the only purported justification for providing no recoveries to shareholders here is the Debtors' position that they need to restructure long-term debt at this time through voluntary Chapter 11 instead of finding other methods. Indeed, the Debtors themselves put the valuation at issue by proposing a cram-down plan that wipes out existing equity for no consideration.

**RESERVATION OF RIGHTS**

## **CONCLUSION**

Wherefore, the Ad Hoc Committee of Shareholders respectfully requests that this Court (i) deny approval of the Disclosure Statement and First Amended Plan; (ii) deny approval of Expense Reimbursement; and (iii) grant the Ad Hoc Committee of Shareholders such other relief as is just and proper.

Dated: Jul 3rd, 2024

Nashville, TN

_____

James Stark

1207 Delaware Ave #1618

Wilmington, DE 19806

Telephone: (615)-669-1070
949-939-4721
Email: stardj4@protonmail.com

*Pro-Se Self-Represented, Member of Ad-Hoc Committee of Shareholders and Registered Shareholder (see Exhibit A for proof of holding)*

## **CERTIFICATE OF SERVICE**

I, James Stark, certify that I am not less than 18 years of age and that service of the foregoing The Ad Hoc Committee of Shareholders' Omnibus Objection to Approval of (I) Disclosure Statement for First Amended Chapter 11 Plan of Reorganization of the JOANN INC and Its Debtor Affiliates was caused to be made on July 3rd, 2024, via CM/ECF upon those parties registered to receive such electronic notifications and served additionally, as indicated, upon the parties identified below.

**VIA ELECTRONIC MAIL**
**NAME**
Joseph McMahon
Timothy J. Fox Jr
Malcolm M. Bates
OFFICE OF THE UNITED STATES TRUSTEE
U.S. Department of Justice
844 King Street, Suite 2207
Wilmington, DE 19801
Jospeh.McMahon@usdoj.gov

Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Merchant@RLF.com

George A. Davis (pro hac vice pending)
Alexandra M. Zablocki (pro hac vice pending)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
george.davis@lw.com
alexandra.zablocki@lw.com

Ted A. Dillman (pro hac vice pending)
Nicholas J. Messana (pro hac vice pending)
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
ted.dillman@lw.com
nicholas.messana@lw.com

Ebba Gebisa (pro hac vice pending)
LATHAM & WATKINS LLP

mnestor@ycst.com
kcoyle@ycst.com
sreil@ycst.com
 rlamb@ycst.com

**EXHIBIT A**

# JOANN

**Computershare**

Computershare Trust Company, N.A.
PO Box 43006
Providence RI 02940-3006
Within USA, US territories & Canada 1-800-736-3001
Outside USA, US territories & Canada 1-781-575-3100
www.computershare.com/investor

JOANN Inc. is incorporated under the laws of the State of DE.

003641

JAMES STARK
1618 FORREST AVE
NASHVILLE TN 37206-1935

**Holder Account Number**
C0000000647



Company ID
SSN/TIN Certified

JOAN
Yes

## JOANN Inc. - Direct Registration (DRS) Advice

### Transaction(s)

| Date | Transaction Description | Total Shares/Units | CUSIP | Class Description |
|---|---|---|---|---|
| 23 Apr 2024 | Dic Stock Withdrawals (Drs) | 4,000.000000 | 47758J101 | Common Stock |

### Account Information: Date: 23 Apr 2024 (Excludes transactions pending settlement)

| Direct Registration Balance | Total Shares/Units | CUSIP | Class Description |
|---|---|---|---|
| 4,000.000000 | 4,000.000000 | 47758J101 | Common Stock |

**IMPORTANT INFORMATION — RETAIN FOR YOUR RECORDS**

40UDR         JOAN         

Please see important PRIVACY NOTICE on reverse side of statement

# EXHIBIT B

---------- Forwarded message ---------
From: **Merchant, Michael J.** <Merchant@rlf.com>
Date: Mon, Apr 22, 2024 at 8:42 AM
Subject: RE: [EXTERNAL] JOANN Question
To: JD Stark <jdstark4@gmail.com>

JD, thank you for your email. The LGP related shares are common and no different than the shares held by the public shareholders. LGP is being treated no differently than any other shareholder and is not receiving any distribution under the proposed chapter 11 plan.

Best regards,



**Michael J. Merchant**
**Richards, Layton & Finger, P.A.**
Merchant@RLF.com

920 N. King Street | Wilmington, DE 19801
**O:** 302-651-7854 | **M:** 302-545-7339 | **F:** 302-498-7701
vCard, bio, www.rlf.com,